UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DONNA J. GARRETT, et al.,            )
                                     )
            Plaintiffs,              )
                                     )
     vs.                             )          Case No. 4:09CV01252 ERW
                                     )
J. DOUGLAS CASSITY, et al.,          )
                                     )
            Defendants.              )

## MEMORANDUM AND ORDER

     This matter comes before the Court on the following Motions: Defendant Anne Chrun's

Motion to Dismiss [doc. #120], Defendants David Wulf and Wulf, Bates and Murphy, Inc.'s

Motion to Make More Definite Plaintiffs' Claim for Relief and Motion to Dismiss Plaintiffs'

Eleventh Claim for Relief [doc. #124], Defendants Brentwood Heritage Properties, LLC, Forever

Enterprises, Inc., Forever Illinois, Inc., Forever Network, Inc., Legacy International Imports, Inc.,

Lincoln Memorial Services, Inc., National Heritage Enterprises, Inc., National Prearranged

Services Agency, Inc., and Texas Forever Inc.'s Motion to Dismiss, or in the Alternative, Motion

for More Definite Statement [doc. #235], Defendants Tyler Cassity and Hollywood Forever,

Inc.'s Motion to Dismiss Complaint, or, in the Alternative, for More Definite Statement [doc.

#246], Defendants Howard Wittner and Wittner, Spewak & Maylack P.C.'s Motion to Dismiss

Plaintiffs' Complaint [doc. #251], Defendant Brent D. Cassity's Motion to Dismiss and Motion

for a More Definite Statement [doc. #254], Defendant James M. Crawford's Motion to Make

More Definite and Certain and Motion to Join Co-Defendants' Motions and Memoranda [doc.

#273], Defendant Roxanne J. Schnieders n/k/a Roxanne J. Sargent's Motion to Dismiss, or in the

Alternative, Motion for More Definite Statement [doc. #281], Defendant J. Douglas Cassity's

Motion to Dismiss, Motion to Make More Definite and Certain, and Motion to Join Co-Defendants' Motions and Memoranda [doc. #287], Defendant Rhonda Cassity and Rhonda L. Cassity, Inc. a/k/a Wellstream, Inc.'s Motion to Dismiss, or in the Alternative, Motion for More Definite Statement and Motion to Join Co-Defendants' Motions and Memoranda [doc. #289], Defendant Nekol Province's Motion to Dismiss Complaint, or, in the Alternative, for More Definite Statement [doc. #296], Defendant Randall K. Sutton's Motion to Dismiss Plaintiffs' Complaint [doc. #299], Defendant Larry Keith Hale's Motion to Dismiss, or in the Alternative, Motion for More Definite Statement [doc. #365], and Defendant Marianne Jones' Motion for More Definite Statement [doc. #382].

## I.     FACTUAL BACKGROUND[1]

This litigation arises out of an alleged scheme by the owners, directors, officers, and employees[2] of three entities – National Prearranged Services, Inc. ("NPS"), Lincoln Memorial Life Insurance Company ("Lincoln"), and Memorial Service Life Insurance Company ("Memorial") – to defraud funeral homes and consumers in the sale of pre-need funeral service contracts, and to re-direct the funds received from the sale of those products to other related entities and certain individual parties, with the ultimate result of causing the Texas Department of Insurance to declare these entities insolvent and place them in receivership.  Plaintiffs in this litigation are Donna J. Garrett, acting on behalf of NPS, Lincoln, and Memorial as Special Deputy Receiver ("Plaintiff SDR") in connection with the receivership proceedings instituted in Travis County, Texas, The National Organization of Life and Health Guaranty Associations

---

[1] The Court's recitation of the facts is taken from allegations in Plaintiffs' Amended Complaint [doc. #486], taken as true for purposes of these Motions to Dismiss.

[2] This is a bit of a generalization; several outside attorneys, consultants, and otherwise tangentially-involved parties are also alleged to have taken part in the fraud.

("NOLHGA"),[3] and the individual state life and health insurance guaranty associations of Arkansas, Illinois, Kansas, Kentucky, Missouri, Oklahoma, and Texas. These individual guaranty associations, as well as those represented by NOLHGA (collectively, "SGA Plaintiffs"), are statutory entities created by state legislatures to provide protection for resident policyholders in the event that a member insurance company becomes insolvent. Plaintiffs represent that the SGA Plaintiffs have been assigned or are subrogated to the claims of funeral homes and consumers arising out of dealings with NPS through (1) each state guaranty association's enabling act; (2) the NPS / Lincoln / Memorial Liquidation Plan approved by the Texas Receivership Court on September 22, 2008; and (3) express assignments received from recipients of death benefits paid by a state guaranty association.

NPS, Lincoln, and Memorial are all owned by the RBT Trust II ("the RBT Trust"), a family trust of which Defendants J. Douglas Cassity ("Doug Cassity"), Rhonda Cassity, Brent Cassity, and Tyler Cassity (the latter three representing the "R," "B," and "T," respectively) (collectively, "the Cassitys") are the sole beneficiaries, and of which Doug Cassity was the settlor. The RBT Trust owns a number of other entities involved in this litigation, including the corporate Defendants with Motions currently before the Court: Defendants Brentwood Heritage Properties, LLC ("BHP"), Forever Enterprises, Inc. ("Forever Enterprises"), Forever Illinois, Inc. ("Forever Illinois"), Forever Network, Inc.("Forever Network"), Legacy International Imports, Inc. ("Legacy International"), Lincoln Memorial Services, Inc. ("LMS"), National Heritage Enterprises, Inc. ("NHE"), National Prearranged Services Agency, Inc. ("NPS Agency"), Texas

---

[3] NOLHGA represents the interests of the state life and health insurance guaranty associations of Arizona, California, Colorado, the District of Columbia, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Washington, West Virginia, Wisconsin, and Wyoming.

Forever Inc. ("Texas Forever"), and Hollywood Forever, Inc. ("Hollywood Forever").[4]

Defendant Howard Wittner ("Wittner") is the trustee of the RBT Trust, and his law firm, Wittner, Spewak & Maylack, P.C. ("Wittner Spewak") served as general counsel to various entities owned by the RBT Trust. Wittner also served as an officer or director to various corporate Defendants at different relevant points in time. Defendants Randall Sutton ("Sutton"), Roxanne Sargent, née Schnieders ("Sargent"), Anne Chrun ("Chrun"), Larry Keith Hale ("Hale), Marianne Jones ("Jones"), James Crawford ("Crawford"), and Nekol Province ("Province") were all officers or directors of NPS, Lincoln, Memorial, or other entities owned by the RBT Trust.

Prior to the institution of the Texas proceedings, NPS was in the business of selling pre-need funeral service contracts, sold to consumers through funeral homes, and Lincoln and Memorial were issuers of life insurance policies. NPS marketed its pre-need contracts by assuring consumers that funds paid to NPS would be secured in pre-need trusts and backed by whole life insurance policies issued by Lincoln or Memorial. Depending on the applicable state law, the purchaser applied for the insurance policy at the time of purchasing the contract, or the trust holding the contract funds purchased the policy after obtaining the customer's funds, so ostensibly in both cases, the necessary funds would be available when the pre-need beneficiary died and the claim became due.

## A. Manipulation of Life Insurance Policies

The first component of Defendants' alleged scheme is based on NPS's fraudulent use of Lincoln and Memorial life insurance policies to accumulate funds from consumers. In those states in which the contract purchaser simultaneously applied for the life insurance policy, the

---

[4] Plaintiffs refer to the entities owned by the RBT Trust as "Cassity-controlled" or as parts of the "Cassity Consortium," but the Court finds it more accurate to simply state that they were commonly owned by the RBT Trust.

purchaser was required to pay the amount of the contract in full at the time of purchase, and an application for the corresponding insurance policy was then marked as a single-premium policy that had likewise been paid in full, through the price of the contract. When an employee at NPS, Lincoln, or Memorial received that life insurance policy application, however, the employee was instructed to white out the policy, or otherwise alter it, so that it appeared that it was an installment policy for which only the first installment payment had been received. In states in which the pre-need trust was permitted or obligated to purchase the life insurance policy, the trust would simply purchase an installment policy with monthly payments instead of a policy in the full amount of the contract price. In both cases, this allowed NPS to retain the majority of the price of the pre-need contract, instead of placing funds in trust or using them to insure the entire amount of the contract.

Plaintiffs assert that Defendants Doug Cassity, Brent Cassity, Sutton, Sargent, Hale, Nekol Province, and Scannell "directed, knew about, and/or helped conceal" from NPS's sales force, its funeral home customers, and pre-need consumers that NPS was altering policies in this manner. An NPS sales agent inquired of Brent Cassity, who in addition to being a beneficial owner of NPS was also a director, whether NPS was engaging in this policy "mismatching." He responded with an email to Sargent, President-Corporate Development Division at NPS, and to Scannell, general counsel to NPS, Lincoln, and Memorial, advising them: "Just tell her that [it] is not being done."

Plaintiffs further allege that NPS accumulated cash by taking out loans on the insurance policies issued by Lincoln and Memorial, as directed by Sutton, who was President of NPS and also served as a director to the corporation. In order to take out these loans, however, NPS had to be the named owner or beneficiary of the policy, and so NPS employees were also directed to

alter those policies on which the purchaser of the contract was the named beneficiary to make NPS the owner or beneficiary. In other instances, the application form had an assignment provision, where the purchaser was required to irrevocably assign her interest in the policy to NPS. According to Plaintiffs, these practices were contrary to certain state laws prohibiting pre-need funeral contract sellers from being the beneficiaries of the funding insurance policy, and prohibiting irrevocable assignments by the purchaser to the seller.

Sutton, who served in various positions with Lincoln and Memorial in addition to being President of NPS and one of its directors, gave instructions to Defendant Tony Lumpkin ("Lumpkin") concerning loans NPS took against the policies issued by Lincoln and Memorial. From August 1995 through June 2007, NPS took out over 400,000 policy loans, totaling more than $130 million. Plaintiffs allege, however, that NPS never actually undertook to repay these loans, and that instead repayment was reflected only through book entries unsupported by real financial transactions, by crediting the value of other policies that NPS surrendered in exchange for cash, or by reducing available death benefit proceeds.

Plaintiffs assert that Doug Cassity, Brent Cassity, Tyler Cassity, Sutton, Wittner, Scannell, Wulf, Wulf Bates, Hale, Sargent, and Nekol Province all "directed, knew about, and intentionally concealed" from NPS's sales force, its funeral home customers, and its consumers that NPS was taking out loans on policies issued to it by Lincoln and Memorial. As an example, in May 2007, in order to camouflage the identities of the parties responsible for the decisions concerning policy loans, Doug Cassity, Scannell, Wittner, and Lumpkin drafted a letter, purporting to be from Wulf to Sutton, advising Sutton that Wulf was recommending that NPS take out policy loans on the Lincoln and Memorial policies. Wulf signed the letter, and Plaintiffs believe it was then provided to the Texas Department of Insurance.

Additionally, in Fall 2007, Ohio regulators began questioning funeral homes in the state about NPS's practices concerning policy loans, and in response, some funeral homes contacted NPS sales agents about whether it had, in fact, taken out any policy loans. In a September 2007 email to Scannell, Brent Cassity, and others, Nekol Province stated that she had told various funeral homes that NPS did not "do" policy loans. Nekol Province suggested in a subsequent email to Sargent, Brent Cassity, and Scannell that if funeral homes were to ask if NPS has taken out policy loans in the past, the standard response should be "not that I am aware of"; Brent Cassity responded with "Agreed." Also in that month, Nekol Province sent a letter to a funeral home in Ohio, stating that NPS was not assuming ownership of any insurance policies, that NPS and Lincoln were separate entities although they shared "distant but common ownership," and that NPS was unaware that Lincoln had been changing the beneficiary designation on policies to NPS, where the form application, as mailed, had stated that both the funeral home and NPS were beneficiaries.

In addition to taking out loans on the policies, Plaintiffs allege that Doug Cassity, Brent Cassity, Sutton, Wulf, Wittner, and others manipulated the policies in order to extract further funds from Lincoln and to keep NPS from needing to pay premiums on the policies. One tactic was to simply stop paying premiums on the policies, allowing NPS to retain funds paid by the consumer. Another was to surrender whole life policies to Lincoln in exchange for the cash value, and replace them with a whole life policy with a longer period for making payments, or with a term policy, which has no significantly lower premiums and no cash value. In some cases, the policies were simply surrendered and not replaced at all. Ultimately, surrendering these policies allowed NPS to significantly decrease its obligations to Lincoln, and therefore to retain more of the money it had received from purchasers of its pre-need contracts.

As a representative transaction, Plaintiffs assert that on January 15, 2008, Lumpkin directed a Lincoln employee to surrender all of the whole life insurance policies in Illinois of which NPS was the owner, and to replace them with term policies. The decision to surrender these policies involved Doug Cassity, Brent Cassity, Sutton, Wulf, and several others, and Sutton relayed the instructions to Lumpkin. This transaction involved more than 11,000 policies with a cash surrender value of approximately $15.7 million. Of that amount, Lincoln credited around $5 million to paying off previous policy loans to NPS, $3 million toward the first twelve months of premiums on replacement term policies, and the remainder, approximately $7.3 million, was paid to NPS.

### B. Manipulation of Pre-Need Trust Assets

As noted above, NPS created pre-need trusts in a variety of states, ostensibly to safeguard funds from the purchase price of pre-need contracts, but Plaintiffs claim that the funds in those trusts were "systematically" looted through withdrawals in exchange for promissory notes, some which were unsecured, and in exchange for debentures. Payments on these instruments were only made in the form of unsupported book entries or through temporary shifts of money between entities owned by the RBT Trust; Plaintiffs allege on information and belief that cash was never actually repaid to the pre-need trusts. As an example, Plaintiffs point to the N2A Trust, a section of a pre-need trust for Missouri pre-need contracts. An email from Scannell in April 2008 indicates that as of that month, the trust had no assets other than four certificates of debenture from NPS, with total face values of approximately $3.7 million. Each of those instruments was signed by Sutton and Crawford, as President and Secretary of NPS, respectively.

The promissory notes issued to the pre-need trusts were further manipulated through novations, in which the face value of the notes was changed – either increased to support an

additional payout of funds without receiving any additional security, or reduced without the issuer having received any payment in exchange – and through assignments, with the trusts assigning their rights to payment under the notes to other RBT Trust-controlled entities.

Plaintiffs offer a number of examples of such transactions:

> (1) On June 22, 2001, LMS received $1.6 million from Allegiant Bank, acting as trustee for the NPS Pre-Need Trust IV, and Nekol Province signed the promissory note in exchange as Vice President of LMS. In September 2003, Sutton and Wulf authorized a novation of the note from $1.6 million to approximately $2 million, with the additional $400,000 again paid to LMS, and the note was again signed by Nekol Province on behalf of LMS.

> (2) On October 21, 2002, Forever Network received approximately $560,000, also from Allegiant Bank as trustee for Pre-Need Trust IV, and Brent Cassity signed a note in exchange as its President.[5]

> (3) On November 1, 2002, LMS issued a promissory note to Allegiant Bank for $4.1 million from Pre-Need Trust IV, and Sutton, as LMS's president, authorized a novation of that note on October 1, 2003, increasing its amount to $4.5 million. On October 30, 2007, LMS and Allegiant Bank agreed to a novation of the note from $4.5 million to approximately $700,000. The trust then assigned the note in January of 2008 to another affiliated entity, the Professional Liability Corporation of America; Nekol Province authorized the assignment as NPS's President.

Plaintiffs set forth an additional series of promissory notes that were issued among NPS, Lincoln, Memorial, and other corporate Defendants "to access the cash paid by the NPS pre-need trusts to purchase the Lincoln and Memorial life insurance policies."[6]

> (1) On November 9, 1999, Forever Enterprises issued a note to Lincoln for $4 million, signed by Brent Cassity as its President.

> (2) On January 1, 2001, NPS issued a note to Memorial for $2.8 million, signed by Sutton as its President.

> (3) On June 1, 2004, LMS issued a note to Forever Enterprises for $6.3 million,

---

[5] Plaintiffs do not allege that this note was assigned or novated; its intended significance is unclear.

[6] This is Plaintiffs' characterization, but it seems to the Court that if the purpose was to access cash paid for life insurance policies, these transactions would all involve notes issued to Lincoln and Memorial in exchange for cash, which they do not.

signed by LMS's then-President. That same day, the RBT Trust issued a note to LMS for $6.3 million, signed by Wittner as trustee.

(4) On July 18, 2006, Forever Enterprises issued a note to NPS for $1.7 million, signed by Brent Cassity as CEO of Forever Enterprises and Sutton as President of NPS.

Hale, who acted as Financial Reporting Director for Forever Enterprises and NHE from 2000 to 2004, and as Chief Financial Officer of Lincoln and Memorial from 2004 to 2007, and Defendant Michael Butler ("Butler"), Forever Enterprises's Chief Financial Officer, approved these intercompany transactions, drafted the promissory notes, and performed accounting duties for entities under the RBT Trust umbrella. According to Plaintiffs, they therefore knew that the involved entities were not making payments on these notes, and that funds properly belonging to the NPS pre-need trusts, NPS, Lincoln, and Memorial were being diverted to other RBT Trust entities. As evidence of that, Plaintiffs offer an excerpt of an email from Hale to Butler concerning the purchase of "All Faiths," presumably some type of business or property, in which Hale states: "When we purchased All Faiths, NPS funded that purchase for us. Are we going to have a note with them, or are we treating this as just another intercompany advance?"

### C. Roll-Over Transactions

A "roll-over," also known as a "trust conversion" or "trust transfer," occurred in situations in which a funeral home agreed to transfer – that is, "roll over" – its existing pre-need funeral service contracts to NPS, obligating it to transfer to NPS the funds it was holding in trust from those contracts. Funeral homes were told that proceeds from the roll-overs would likewise be placed in trust, and then used to purchase life insurance policies within thirty days, giving the contract a "double layer of protection using trusted insurance." Plaintiffs allege that NPS engaged in the same practices with respect to these funds as those described above – failing to

make payments on the policies, surrendering and replacing the policies with whole life policies of a longer installment duration or term life policies with no cash value, withdrawing the pre-need funds from trust in exchange for promissory notes, and otherwise as set forth above.

### D. Role of the Investment Advisor Defendants

NPS established five trust accounts, NPS Pre-Need Trusts I-V ("Trust I," etc.) to hold funds generated from the sale of pre-need contracts, primarily for those sold in Missouri, and a corresponding NPS Iowa Trust for Iowa contracts. Subsidiaries of Forever Network also established two additional trust accounts, the Mt. Washington Forever Pre-Need Trust ("the Mt. Washington Trust"), for funds from contracts sold at the Mt. Washington Forever Funeral Home in Independence, Missouri, and the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust ("the Mason Securities Trust"), intended to hold funds from contracts sold by the Mason Securities Association. Plaintiffs allege on information and belief that there are "many" other trusts associated with Defendants, some of which are pre-need trusts. Under the terms of various trust agreements, the NPS trusts were required to hold funds received from NPS for purposes of satisfying future claims.

In 1988, Sutton, as President of NPS, hired Wulf and his firm, Wulf Bates, to act as independent investment advisors to the NPS pre-need trusts. In 1994, however, Wulf and Wulf Bates turned around and appointed Sutton to act as investment agent on their behalf with respect to the pre-need trusts. At the time, Sutton was President of both NPS and Lincoln. Because he was vested with Wulf and Wulf Bates's authority, Sutton was permitted to perform "administrative functions"[7] concerning trust assets, actions that would have otherwise required

---

[7] This phrase appears in quotation marks in the Amended Complaint, and the Court has therefore presented it in the same manner here.

Sutton to seek Wulf and Wulf Bates's approval. Between 2005 and 2008, Wulf and Wulf Bates received over $600,000 in fees from Lincoln and other RBT Trust entities, and compensation from NPS of at least $15,000 per year. A single entity was responsible for providing health benefits for all employees of RBT Trust entities, and Wulf received health benefits from this entity as well. As mentioned above, Plaintiffs also assert that Doug Cassity, Scannell, Lumpkin, and Wittner drafted letters for Wulf's signature, which he then signed, concerning actions to be taken with respect to trust assets, so that it would appear that those directives were coming from an independent investment advisor, and also in order to give the impression that NPS was no longer taking out loans against insurance policies issued to it by Lincoln and Memorial.

Plaintiffs offer the text of a letter dated May 29, 2007 purportedly from Wulf to Sutton, but allegedly prepared by Scannell and Doug Cassity:

> Dear Mr. Sutton:
> As the independent investment advisor for National Prearranged Services, Inc. Preneed Funeral Trust I have historically recommended that the Trust purchases [sic] life insurance policies to fund the prearranged funeral contracts and exercise its right to request policy loans on those life insurance policies. This confirms that I will no longer advise that NPS or the Trust exercise their [sic] right to apply for and receive policy loans.

Based on the preceding, Plaintiffs contend that Wulf and Wulf Bates directly participated in the previously-discussed activities concerning policy loans, policy surrenders, and promissory notes, and also that they were aware that the pre-need trusts had insufficient assets and cash flows to ensure payment of premiums on insurance policies and payment of funeral benefits under NPS's contracts. Plaintiffs also allege the following in further support of their allegation that Wulf and Wulf Bates, as independent investment advisors, failed to act independently and in the interests of pre-need trust beneficiaries:

(1) Wulf and Wulf Bates directed the pre-need trusts to invest "millions of dollars" in Wulf's personal investment partnerships;

(2) Wulf and Wulf Bates directed the pre-need trusts to invest pre-need trust funds in purchasing over 275,000 shares of stock in Forever Enterprises;

(3) Wulf and Wulf Bates "relied on NPS computer programs to make their decisions on purchasing life insurance policies from Lincoln"[8];

(4) Wulf and Wulf Bates failed to consider that NPS received a commission from Lincoln for every insurance policy purchased with NPS pre-need trust assets;

(5) Wulf Bates's offices were located in the same building in St. Louis, Missouri as NPS, Forever Enterprises, NHE, LMS, Forever Network, Texas Forever, NPS Agency, Legacy International, and BHP.

**E.  Attorney Involvement**

 In addition to acting as trustee of the RBT Trust, Wittner served as general counsel to various entities owned by the trust at various times from 1996 onward, including to NPS, Lincoln, Memorial, Forever Enterprises, and NHE.  He also acted as outside counsel during certain time periods in which he was not general counsel.  Wittner Spewak, his law firm, was outside counsel to NPS, Lincoln, and Memorial at all times relevant to Plaintiffs' claims.

Plaintiffs allege that Wittner and Wittner Spewak engaged in legal malpractice and breached fiduciary duties owed to NPS, Lincoln, and Memorial through their involvement in the foregoing.  As alleged above, Wittner knew about the letters that certain other Defendants drafted for Wulf to sign as independent investment advisor.  In general, Plaintiffs contend that Wittner failed to advise, or at least failed to properly advise, NPS, Lincoln, and Memorial about the ramifications of their actions with respect to pre-need funds and the corresponding life insurance policies, and that Wittner improperly relied on the legal advice and analysis of Doug Cassity,

---

[8] This sentence is reproduced verbatim from Plaintiffs' Amended Complaint because the Court declines to attempt to paraphrase a statement that it does not fully understand.

who was formerly a licensed attorney in Missouri but no longer held a license to practice law at the time of the actions described in Plaintiffs' Amended Complaint.

## F. Fraudulent Transfers

In their Amended Complaint, Plaintiffs set forth numerous examples of specific transfers of cash from the receivership entities, other entities controlled by the RBT Trust, and various pre-need trusts to both individual and corporate Defendants – transfers which Plaintiffs contend were fraudulent because they were carried out in exchange for nominal or no consideration.  In certain cases, these transfers were in exchange for promissory notes on which payment was never made.  Although a complete listing of these alleged transfers is unnecessary for purposes of these Motions, the following are illustrative: (1) transfers of $1 million to Brent Cassity and $1 million to Tyler Cassity from NHE on February 26, 1996; (2) a transfer of $4.6 million to LMS from Bremen Bank, acting as trustee for Pre-Need Trust IV, on February 1, 2004; and (3) a transfer of $250,000 from Forever Enterprises to Lumpkin on January 24, 2006.  Plaintiffs also offer examples of transfers from NPS to members of the Cassity family and to other directors and officers of RBT Trust-owned entities to pay personal expenses such as credit card payments, vehicle payments, and the costs of country club memberships.  For example, in the time period between January 2003 and when NPS was placed in receivership in May 2008, Plaintiffs assert that NPS made total credit card payments for Doug Cassity totaling approximately $3 million, for Sutton in the neighborhood of $2.7 million, and for Tyler Cassity around $1 million.

## G. Creation of Corporate Fictions

According to Plaintiffs, the Cassitys furthered the above-described schemes by creating numerous alter ego entities, which existed only in order to facilitate seemingly-legitimate transfers of funds out of NPS, Lincoln, and Memorial and to the Cassitys as well as to certain

other Defendants. NPS, Lincoln, Memorial, NHE, Forever Enterprises, and LMS all shared common ownership, officers, directors, general counsel, and employees, including Sutton, Wittner, Scannell, Brent Cassity, Tyler Cassity, Crawford, and Nekol Province. These entities did not observe corporate formalities, shared office space and computer systems, and NHE provided payroll and benefit services to the employees of all of these entities. Audit reports prepared by Defendant Brown Smith Wallace, L.L.C, ("Brown Smith Wallace"), independent auditor of Forever Enterprises from 2001 through 2007, and independent auditor for Lincoln and Memorial from 2004 through 2006, did not distinguish between these entities, and audit reports consolidated the corporate dealings of NPS, Lincoln, and Memorial. As an example, Plaintiffs assert that Forever Enterprises purchased an entity that would later become a subsidiary called Forever Marin with funds from the RBT Trust, NPS, and LMS. In support of their claim that these entities were all alter egos of one another and of the Cassitys, Plaintiffs also note that Doug Cassity, Rhonda Cassity, Brent Cassity, and Tyler Cassity all used corporate funds for personal expenses, as discusssed above.

**H.    Plaintiffs' Claims**

As set forth below, Plaintiffs assert their claims against discrete groups of Defendants, characterized in terms of their participation in the alleged fraud. The Court lists only those claims against parties with motions currently before the Court.

The RICO Defendants group consists of, among others, Defendants Doug Cassity, Brent Cassity, Tyler Cassity, Sutton, Wittner (individually and as trustee of the RBT Trust), Wulf, Wulf Bates, Sargent, Crawford, Hale, Nekol Province, Forever Enterprises, NHE, and LMS. Plaintiffs assert the following claims against the RICO Defendants: violation of the RICO Act, 18 U.S.C. § 1962(c), conspiracy to violate the RICO Act, 18 U.S.C. § 1962(d), violation of the

Lanham Act, 15 U.S.C. § 1125(a), fraudulent omission or nondisclusure, fraudulent misrepresentation, conspiracy to commit fraud, aiding and abetting fraud, negligent misrepresentation and omission, violations of the Consumer Protection Acts of the states represented by SGA Plaintiffs, violations of the Texas Insurer Receivership Act, violations of the Texas Insurance Code,[9] aiding and abetting breach of fiduciary duty by investment advisors Wulf and Wulf Bates,[10] aiding and abetting breach of fiduciary duty by the Trustee Defendants, interference with business relationships a/k/a tortious interference with contract, and conversion. Plaintiffs also assert claims against Brent Cassity, Tyler Cassity, and Forever Enterprises for violations of § 1962(a) of the RICO Act.

The next grouping of claims is against the so-called Fraudulent Transfer Defendants, consisting of, among others, Doug Cassity, Rhonda Cassity, Brent Cassity, Tyler Cassity, Sutton, Wittner, Wulf, Wulf Bates, Sargent, Crawford, Nekol Province, Forever Enterprises, NHE, LMS, Rhonda L. Cassity, Inc., Forever Network, Forever Illinois, Hollywood Forever, Texas Forever, NPS Agency, Legacy International, and BHP. Plaintiffs assert claims against these Defendants for violation of the Texas Receivership Act, violation of the Fraudulent Transfer Acts of the states represented by SGA Plaintiffs, unjust enrichment, and money had and received.

The Promissory Note Defendants group is made up of Wittner, Forever Enterprises, Hollywood, Texas Forever, NPS Agency, Legacy, Wise Mitchell, and BHP. Plaintiffs bring claims against the Promissory Note Defendants for breach of promissory notes.

The Director and Officer Defendants ("D&O Defendants") are Sutton, Crawford, Brent Cassity, Tyler Cassity, Nekol Province, Sargent, Wittner (only as an individual), Hale, Jones, and

---

[9] Plaintiffs also assert this claim against Rhonda Cassity.

[10] This claim is asserted against all RICO Defendants except for Wulf and Wulf Bates.

Chrun. Plaintiffs assert claims against the D&O Defendants for breach of fiduciary duty, gross negligence, and aiding and abetting breach of fiduciary duty by the Trustee Defendants.

The Investment Advisor Defendants are Wulf and Wulf Bates, against whom Plaintiffs assert claims for breach of fiduciary duty and gross negligence.

In addition to Scannell, who does not have a pending Motion to Dismiss, the Attorney Defendants group consists of Wittner and Wittner Spewak. Plaintiffs bring claims against the Attorney Defendants for legal malpractice and breach of fiduciary duty.

Apart from the aforementioned grouped claims, Plaintiffs assert claims against Doug Cassity, Rhonda Cassity, Brent Cassity, Tyler Cassity, Sutton, Wittner, Scannell, Wulf, Wulf Bates, Forever Enterprises, NHE, LMS, Rhonda L. Cassity, Inc., Forever Network, Forever Illinois, Hollywood, Texas Forever, NPS Agency, and Legacy International for a constructive trust.

## III. DISCUSSION

In the many Motions currently before the Court, Defendants present an array of arguments in favor of dismissal of the claims against them. The Court first addresses the argument that Plaintiffs lack standing to bring RICO Act and Lanham Act claims, as that argument impacts many of the Motions currently at issue. The Court then considers the sufficiency of the Amended Complaint as to individual Defendants.

### A. RICO Standing

Brent Cassity argues that Plaintiffs lack prudential standing to bring their RICO claims because the alleged injuries they suffered are not directly connected with the alleged unlawful conduct on the part of Defendants. Although not all moving parties have raised this issue, the Court considers it with respect to all RICO Defendants because "[a] federal court bears the

burden of examining standing at all stages of litigation, even if the parties do not raise the issue themselves." *See Harmon v. City of Kansas City, Mo.*, 197 F.3d 321, 327 (8th Cir. 1999) (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982)).

The RICO Act provides for a private cause of action for "[a]ny person injured in his business or property *by reason of a violation*" of the Act's criminal prohibitions. 18 U.S.C. § 1964(c) (emphasis added). This "by reason of" language means that "to state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 989 (2010) (plurality)[11] (internal quotations and citation omitted). Although proximate causation, as it is understood in the common-law sense, generally includes consideration of the foreseeability that the plaintiff's injury will result from the defendant's actions, the plurality rejected that analysis, finding instead that "the directness of the relationship between the conduct and the harm" is the focus under RICO. *Id.* at 991; *see also id.* at 989 ("[P]roximate cause [under RICO] . . . requires some direct relation between the injury asserted and the injurious conduct alleged."). Thus, "[a] link that is 'too remote,' 'purely contingent,' or 'indirect' is insufficient." *Id.* at 989 (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 271, 274 (1992)).

In *Holmes*, cited approvingly in *Hemi*, the Supreme Court considered a RICO claim brought by the Securities Investor Protection Corporation ("SIPC") against defendants who were alleged to have manipulated stock prices. 503 U.S. at 262-63. When the manipulation was

---

[11] *Hemi* was decided by a panel of eight Justices, with four Justices joining the plurality opinion, Justice Ginsberg concurring in part and concurring in the judgment, and three Justices dissenting.

discovered, it caused stock prices to collapse, and the SIPC was then obligated to reimburse the customers of certain registered broker-dealers who were unable to meet their financial obligations as a result. *Id.* The Court found that this injury was insufficient to support a RICO claim, even if the SIPC was entitled to bring claims on behalf of the broker-dealers' customers, because the harm to the customers was "purely contingent on the harm suffered by the broker-dealers." *Id.* at 271. The Court stated the underlying principle, reiterated again in *Hemi*, 130 S. Ct. at 989, that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Holmes*, 503 U.S. at 271-72 (internal quotations and citations omitted). Thus, because only the "intervening insolvency" of the broker-dealers "connect[ed] the conspirators' acts to the losses suffered" by their customers, the link was "too remote" to support a RICO claim. *Id.* at 271.

In *Hemi*, the City of New York brought a RICO action against an out-of-state company, Hemi, which was in the business of selling cigarettes over the internet. 130 S. Ct. at 987. The City, as authorized by the State of New York, imposed its own taxes on cigarettes, and the City was responsible for collecting those taxes from out-of-state sellers, who were not subject to the requirement for in-state retailers that the seller collect and remit the cigarette tax to the City. *Id.* New York law required out-of-state cigarette retailers to file a report with state tax authorities containing information on sales to New York residents, which the State would then pass along to the City to assist it in its out-of-state collection efforts. *Id.* Hemi, however, failed to file those reports with the State as required, and the City responded by bringing the RICO suit, alleging that Hemi's failure to file the reports cost the City in excess of $10 million per year in cigarette excise taxes. *Id.*

The plurality concluded that the City's injury was too remote to support a RICO claim against Hemi, noting that it was "far more attenuated" than the theory rejected in *Holmes*:

> Here, the City's theory of liability rests not just on separate *actions*, but separate actions carried out by separate *parties*.
>
> The City's theory thus requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City). Indeed, the fourth-party taxpayers here only caused harm to the City in the first place if they decided not to pay taxes they were legally obligated to pay. Put simply, Hemi's obligation was to file the . . . reports with the State, not the City, and the City's harm was directly caused by the customers, not Hemi. We have never stretched the causal chain of a RICO violation so far, and we decline to do so today.

*Id.* at 989-90 (internal citations omitted). In so finding, the plurality rejected the argument that the lynchpin of the RICO proximate cause analysis should be the foreseeability of the plaintiff's injury, a long-recognized component of proximate causation at common law, noting that the Court's prior cases on RICO causation had not even mentioned the term. *See id.* at 991.

Justice Ginsburg, however, who supplied the vote necessary to support the plurality's decision to affirm the dismissal of the City's claims below, expressly declined to "subscrib[e] to the broader range of the Court's proximate cause analysis." *Id.* at 994-95 (concurring in part and concurring in the judgment). Although the precise import of this statement is unclear, given that Justice Ginsburg declined to endorse either the plurality's anti-foreseeability position or the dissent's argument that foreseeability should be the focus, it is nevertheless apparent that her position represents the narrowest grounds of agreement between those Justices concurring in the judgment, and therefore is the controlling position in the case. *See Marks v. United States*, 430 U.S. 188, 193 (1977). As such, the Court does not believe that *Hemi* necessarily did away with a foreseeability analysis for RICO causation, in that the outright rejection of that analysis only had the support of three Justices.

It is noteworthy in this regard that Justice Sotomayor did not participate in the case due to her involvement in the Second Circuit's decision below, in which she joined the majority's opinion considering foreseeability of injury in the RICO context and concluding that the City had met the applicable standard. *See City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 440-42 (2d Cir. 2008). Given that the three dissenting Justices in *Hemi* took the same position with respect to foreseeability, 130 S. Ct. at 998, and that Justice Ginsburg declined to join the three Justices who sought to foreclose a foreseeability standard, it would appear likely that the foreseeability of the plaintiff's injury, to the extent it was ever a proper component of proximate causation under RICO, continues to occupy that same position. In sum, the preceding is all by way of stating that the Court believes that the foreseeability of Plaintiffs' injury remains relevant to RICO proximate causation, and that *Hemi* should not necessarily be read as a departure from prior precedent on the issue. *See, e.g.*, *RWB Servs., LLC v. Hartford Computer Group, Inc.*, 539 F.3d 681, 688 (7th Cir. 2008) (injury is directly caused by RICO violations if the victim was reasonably foreseeable); *Smokes-Spirits.com*, 541 F.3d at 442-43 (proximate causation satisfied if defendant's conduct was "substantial factor" in causing the loss).

### a. Plaintiff SDR's Standing

No Defendant currently contests the standing of Plaintiff SDR, the Special Deputy Receiver in the Texas receivership proceedings, to bring claims on behalf of the receivership entities NPS, Lincoln, and Memorial, but Brent Cassity argues that she lacks standing to assert the claims of funeral homes and consumers who purchased NPS's pre-need funeral contracts.

There are two parts to this inquiry: first, whether Plaintiff SDR is entitled to bring claims on behalf of funeral homes and consumers; and second, if so, whether the injuries those funeral homes and consumers suffered were proximately caused by the RICO Defendants' allegedly

unlawful actions.  With respect to the first inquiry, Plaintiffs allege that Plaintiff SDR can bring these claims on behalf of funeral homes and consumers pursuant to a provision of the Texas Receivership Act, Tex. Ins. Code § 443.154(m), which states that the receiver may prosecute claims on behalf of "the creditors, members, policyholders, shareholders of the insurer, or the public against any person, except to the extent that a claim is personal to" those parties.  The parties have not addressed in any depth the import of this provision, and the Court is therefore not inclined to find it inapplicable in these circumstances without the benefit of briefing on the issue.

As for the second question, the Court is satisfied that the RICO Defendants' alleged actions did directly lead to injuries to funeral homes and consumers, at least based on the facts as alleged in Plaintiffs' Amended Complaint.  *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (recognizing that a plaintiff's burden to demonstrate constitutional standing is less onerous at the motion to dismiss stage, as opposed to the summary judgment stage, because the court may "presume that general allegations [in the plaintiff's complaint] embrace those specific facts that are necessary to support the claim").  With respect to NPS, Plaintiffs allege that certain RICO Defendants made it unable to satisfy its pre-need funeral contract obligations by facilitating the withdrawal of pre-need funds that NPS was obligated to safeguard in the various pre-need trusts, and by converting whole life insurance policies to term life policies, thereby reducing their value and decreasing the amount of security backing NPS's pre-need funeral contracts.  As for Lincoln and Memorial, Plaintiffs allege that the RICO Defendants caused NPS to take out improvident loans on life insurance policies these entities issued to NPS, and that the RICO Defendants likewise failed to ensure that Lincoln and Memorial were collecting premiums owed on those policies.

These alleged actions had a two-fold effect, in that they simultaneously caused harm to both the receivership entities and their funeral home and individual customers directly; the receivership entities were harmed to the extent they were unable to satisfy their obligations because they no longer possessed funds that were misappropriated by the RICO Defendants, and funeral homes and consumers were harmed to the extent they were no longer able to obtain the funeral service funds they had contracted to receive from NPS. It does not break the direct causal link that funeral homes and individual customers would be seeking these funds from Plaintiff SDR because NPS, Lincoln, and Memorial were in receivership, as the receivership proceedings merely substituted Plaintiff SDR for these entities for purposes of administering creditor claims – that is, funeral homes and customers are still effectively seeking funds from NPS when they approach Plaintiff SDR as creditors.

As such, the Court concludes that Plaintiff SDR has standing to assert these claims because the injuries it is asserting – to funeral homes and customers of NPS – were proximately caused by the RICO Defendants' alleged fraudulent scheme. The Court acknowledges, however, that this issue may be raised in the future, as the Court has not considered Plaintiff SDR's statutory authority under the Texas Receivership Act to assert these claims, and because this conclusion is based only on the facts as alleged, and not as they may be found to exist following some opportunity for discovery.

### b. SGA Plaintiffs' Standing

SGA Plaintiffs, consisting of Plaintiff NOLHGA[12] and the individual state guaranty

associations Plaintiffs, assert their RICO claims only as assignees or subrogees of funeral homes

and consumers, to the extent of coverage they have provided. SGA Plaintiffs claim that in the

period since Lincoln and Memorial were declared insolvent, SGA Plaintiffs have been forced to

satisfy Lincoln and Memorial's obligations under life insurance policies issued by those entities.

Brent Cassity argues that Plaintiff NOLHGA and the individual state guaranty associations lack

standing to bring RICO claims because their allegations are insufficient to demonstrate that they

have been validly assigned, or are properly subrogated to, the claims of funeral homes and

consumers they seek to bring in this litigation.

It is undisputed, both in general and as between the parties in this litigation, that RICO

claims are assignable. *See, e.g.*, *Nat'l Asbestos Workers Med. Fund. v. Philip Morris, Inc.*, 74 F.

Supp. 2d 213, 217 (E.D.N.Y. 1999) (collecting cases). As stated above in Section I, SGA

Plaintiffs assert that they have been assigned or are subrogated to these claims through three

mechanisms. First, SGA Plaintiffs contend that each state guaranty association has been

assigned these claims through its state's state guaranty association enabling act. *See, e.g.*, Tex.

Ins. Code § 463.261(a) ("A person receiving a benefit under this chapter, including a payment of

or on account of a contractual obligation . . . is considered to have assigned to the association the

rights under, and any cause of action relating to, the covered policy to the extent of the benefit

received."). Second, SGA Plaintiffs claim that Section 9.1 of the NPS / Lincoln / Memorial

---

[12]As set forth above in Section I, NOLHGA, The National Organization of Life and
Health Guaranty Associations, is an organization representing the interests of the state guaranty
associations of numerous states, while certain other state guaranty associations in this litigation
are asserting their claims individually.

Liquidation Plan accomplished this result, as it contains substantially similar language with respect to the rights of the state guaranty associations. Third, SGA Plaintiffs allege that they have received express assignments from every recipient of a death benefit claim they have paid, in which the recipient assigns "any and all past, present and future claims . . . [the assignor] may have against the Insurer . . . related in any way to the Policy and/or any losses arising under, resulting from, or otherwise relating to the Policy" up to the amount of death benefit paid.[13]

At the motion to dismiss stage, these allegations are sufficient to establish valid assignments and to confer standing on SGA Plaintiffs to assert these claims. Neither Brent Cassity nor any other RICO Defendant makes a specific challenge to the effect of these agreements, and the Court is not aware of any reason why they should not be given effect, recognizing that RICO claims are, in fact, assignable.

### B. Standing under the Lanham Act

Brent Cassity argues that Plaintiffs lack standing to assert claims under the Lanham Act, 15 U.S.C. §§ 1051–1141n, because they have not, and cannot, allege that they have suffered a competitive injury. Plaintiffs contend that Lanham Act standing is not only available to plaintiffs in direct competition with the defendant, but even if it is, that they have satisfied that requirement because the funeral homes on behalf of whom they are asserting claims competed with NPS in the market for pre-need funeral contracts.

15 U.S.C. § 1125(a), the Lanham Act provision under which Plaintiffs assert their claims, states as follows:

---

[13] In response to Brent Cassity's Motion, Plaintiffs attached some of the preceding as exhibits to their responsive brief. The Court may consider matters outside the pleadings in the context of a factual challenge to subject matter jurisdiction, as this is a factual challenge to SGA Plaintiffs' standing. *See, e.g.*, *Harris v. P.A.M. Transp., Inc.*, 339 F.3d 635, 638 n.4 (8th Cir. 2003).

> (1) Any person who, on or in connection with any good or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which–
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

While declining to adopt a position on the issue, the Eighth Circuit has explained that such Lanham Act claims have a prudential standing component, the approach to which differs among the circuits:

> Applying prudential standing considerations, a number of circuits have held, categorically, that false advertising claims not involving misuse of a trademark are actionable only "when brought by competitors of the wrongdoer." *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1109 (9th Cir. 1992); *accord Telecom Int'l America, Ltd. v. AT & T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001); *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 873 (10th Cir. 1995), *cert. denied*, 516 U.S. 920 (1995); *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir. 1993).  Other circuits have adopted a less categorical multi-factor test, based on the Supreme Court's test for antitrust standing, that focuses on judicial enforcement of the Lanham Act on the protection of commercial interests and the prevention of competitive harm.  *See Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 233-35 (3d Cir. 1998); *followed in Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 562-64 (5th Cir. 2001), *cert. denied*, 534 U.S. 945 (2001).

*American Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1103-04 (8th Cir. 2006).  Under this latter, multi-factor approach, courts consider the following factors: (1) whether the injury was of the type Congress sought to redress in providing for a cause of action under the Lanham Act; (2) the directness of the asserted injury; (3) the proximity of the party to the alleged injurious conduct; (4) the speculativeness of the damages claim; and (5) the risk of duplicative damages awards and the complexity in apportioning damages.  *Conte Bros*, 165 F.3d at 233-235.

The Court finds Plaintiffs' allegations sufficient to satisfy even the more restrictive "categorical" test, again recognizing that in assessing prudential standing at the motion to dismiss stage, the Court's analysis is limited to the allegations in the complaint. *See Alloco Recycling, Ltd. v. Doherty*, 378 F. Supp. 2d 348, 357 (S.D.N.Y. 2005) (internal citation omitted). As discussed above, Plaintiffs are asserting claims in this litigation on behalf of funeral homes who sold and marketed NPS's pre-need funeral contracts, and Plaintiffs expressly allege in their Lanham Act claims that these funeral homes were competitors of the RICO Defendants, as the parties controlling NPS, "in the market for the sales of pre-need contracts, including the financing and servicing of such contracts." While Brent Cassity characterizes this allegation as wildly inconsistent with the other allegations in Plaintiffs' Complaint, the Court agrees with Plaintiffs that their allegation is at least plausible when read in light of their allegation that funeral homes would have provided pre-need contract services themselves had they not chose to market NPS's contracts. Thus, because the funeral homes chose to contract with NPS instead of compete with it, based on allegedly false representations from NPS that NPS would safeguard the pre-need funds, the funeral homes suffered competitive injuries when NPS proved unable to satisfy its obligations under those contracts. As a factual matter, these allegations may not be accurate, but given that the Court is only considering the adequacy of Plaintiffs' Amended Complaint, the Court finds them sufficient to demonstrate that at least some Plaintiffs have standing in this respect.

As such, Brent Cassity's Motion will be denied on this point. Plaintiffs' Amended Complaint contains allegations supporting the inference that Plaintiffs have suffered competitive injuries due to the RICO Defendants' allegedly false representations, and accordingly Plaintiffs have prudential standing to bring claims under the Lanham Act.

## C.    Sufficiency of Plaintiffs' Pleadings

Defendants bringing the Motions currently before the Court all argue that Plaintiffs' claims must be dismissed because Plaintiffs' allegations are insufficiently specific to survive a motion to dismiss.  It bears mentioning at this point, however, that many Defendants have made purely general arguments that Plaintiffs' claims against them are insufficiently pled, without addressing to which of Plaintiffs' claims Rule 9(b) applies, what claims are asserted against them, the elements of those claims, or how Plaintiffs' allegations relate to those claims.  The repeated refrain is that Defendants are unable to respond to Plaintiffs' allegations because many of Plaintiffs' allegations are against groups of Defendants, and Defendants therefore cannot ascertain whether a given allegation is directed at them on an individual basis.  The Court interprets the allegations against these Defendants individually and individual Defendants must answer accordingly.

### 1. Legal Standard

The notice pleading standard of Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to give "a short and plain statement showing that the pleader is entitled to relief."  In order to meet this standard and to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotations and citation omitted).  This requirement of facial plausibility means that the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 861 (8th Cir. 2010) (quoting *Iqbal*, 129 S. Ct. at 1949).  Furthermore, courts must assess the plausibility of a given claim with reference to the plaintiff's allegations as a whole, not in terms of the plausibility of each individual allegation.

*Zoltek Corp. v. Structural Polymer Group*, 592 F.3d 893, 896 n.4 (8th Cir. 2010) (internal

citation omitted). This inquiry is "a context-specific task that requires the reviewing court to

draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950.

    "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal

alterations and citations omitted); *see also Iqbal*, 129 S. Ct. at 1950 ("[W]here the well-pleaded

facts do not permit the court to infer more than the mere possibility of misconduct, the complaint

has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'") (quoting Fed. R.

Civ. P. 8(a)(2). Nevertheless, although the "plausibility standard requires a plaintiff to show at

the pleading stage that success on the merits is more than a sheer possibility," it is not a

"probability requirement." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)

(citing *Iqbal*, 129 S. Ct. at 1949). As such, "a well-pleaded complaint may proceed even if it

strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is

very remote and unlikely," *id.* (quoting *Twombly*, 550 U.S. at 556) (internal quotations omitted),

provided that the complaint contains sufficient facts to "give the defendant fair notice of what

the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93

(2007) (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

    Thus, in sum, these considerations suggest a two-step analysis under which the court may

first (1) identify whether the complaint contains pleadings that are "more than conclusions," and

that the court can therefore treat as factual allegations entitled to "the assumption of truth," and if

it does, (2) "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950.

In cases in which a party alleges fraud or mistake, Federal Rule of Civil Procedure 9(b) requires that the party plead "with particularity the circumstances" of the fraud or mistake. The Eighth Circuit has recognized that this rule is to be interpreted "in harmony with the principles of notice pleading, and to satisfy it, the complaint must allege such matters as the time, place, and contents of false representations, as well as the identity of the person making the representation and what was obtained or given up thereby." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009). "In other words, the complaint must plead the who, what, where, when, and how of the alleged fraud." *Id.*

That said, "[t]he special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001). Furthermore, the overarching principles of notice pleading dictate that a plaintiff does not need to plead fraud "with complete insight before discovery is complete." *Gunderson v. ADM Investor Servs., Inc.*, 230 F.3d 1363, at *3 (8th Cir. 2000) (table) (quoting *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir. 1998)). As a result, Rule 9(b) does not require a plaintiff to set out specific facts concerning matters that are likely solely known by the defendant. *See, e.g.*, *Abels*, 259 F.3d at 921. Likewise, the Eighth Circuit has recognized that in cases alleging a systematic scheme to defraud, the plaintiff can satisfy Rule 9(b) by providing "some representative examples of [the defendants'] alleged fraudulent conduct, specifying the time, place, and content of their acts and the identity of the actors," *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557

(8th Cir. 2006), and in cases involving multiple defendants participating in such a scheme, by "inform[ing] each defendant of the nature of his alleged participation in the fraud." *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 778 (7th Cir. 1994) (internal quotations and citations omitted).

## 2. Brent Cassity

Brent Cassity argues that Plaintiffs' fraud-based claims must be dismissed because Plaintiffs' group allegations fail to satisfy Rule 9(b)'s heightened pleading requirements, and that Plaintiffs should be required to provide more definite statements as to their state-law claims.

With respect to the fraud-based claims – those for violations of the RICO Act, fraudulent omissions / nondisclosure, fraudulent misrepresentation, conspiracy to commit fraud, aiding and abetting fraud, and violations of various Consumer Protection Acts and Fraudulent Transfer Acts – Brent Cassity's arguments suffer from the same lack of specificity that he attributes to Plaintiffs' pleadings. At no point does he address the elements of these claims and how Plaintiffs' allegations fail to satisfy those elements; instead, his argument focuses solely on Plaintiffs' use of group allegations, contending that such pleading fails to plead fraud with particularity because it omits the "who" of the alleged fraud. *See Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009). Although Plaintiffs' Amended Complaint does contain a substantial number of allegations directed at defined groups such as the RICO Defendants, the Fraudulent Transfer Defendants, and so on, it also contains numerous allegations specifically highlighting Brent Cassity's involvement in the scheme to defraud, *inter alia*:

> (1) that he served as an officer and director of multiple Defendant entities owned by the RBT Trust, including Forever Enterprises, NHE, LMS, Forever Network, BHP, as well as of the receivership entities NPS, Lincoln, and Memorial;

> (2) that he "directed, knew about, and/or helped conceal" NPS's practices of altering

life insurance policy applications and engaging in policy "mismatching," including a specific allegation that he sent an email to Sargent and Scannell directing that NPS sales agents be told that NPS was not mismatching policies;

(3) that he "directed, knew about, and/or helped conceal" that NPS was taking out loans on policies issued by Lincoln and Memorial, and that he authored an email agreeing with Nekol Province's suggestion that the standard response to inquiries from funeral homes about whether NPS had taken out such loans should be "not that I am aware of";

(4) that he participated in NPS's decisions to surrender whole life policies in exchange for cash or replace them with term policies, including the specific decision in January 2008 to surrender all Illinois whole life insurance policies and replace them with term policies;

(5) that he personally signed, on behalf of some of the above-mentioned entities of which he was a director or officer, promissory notes that were used to siphon funds out of NPS, Lincoln, Memorial, and pre-need trusts;

(6) that he is a beneficiary of the RBT Trust, which Plaintiffs allege to be the alter ego of the various entities it owns, as well as an alter ego of its beneficiaries; and

(7) that he pledged personal assets to cover the liabilities of the receivership entities, indicating the alter ego status of those entities.

When read as a whole, the Amended Complaint presents a sufficiently detailed picture of Brent Cassity's participation in the allegedly unlawful activities underlying Plaintiffs' fraud-based claims, and absent any argument with respect to the sufficiency of any specific claims, Brent Cassity is not entitled to the dismissal of these claims solely because Plaintiffs have, in some instances, directed their allegations at certain defined groups of Defendants. In short, this is not a case in which Plaintiffs have simply directed all of their factual allegations at Defendants as a whole; Plaintiffs' group allegations are, at least with respect to Brent Cassity, accompanied by specific allegations directed at him, and the Court therefore concludes that he is not entitled to dismissal of the fraud-based claims on this basis.

Brent Cassity next argues that Plaintiffs should be required to provide more definite

statements as to certain of their state-law claims against him. Specifically, he contends that Plaintiffs should be required to supplement their Count XI, for violations of various state Consumer Protection Acts, and their Count XIV, for violations of various state Fraudulent Transfer Acts, because these Counts fail to specify under what specific provision Plaintiffs are asserting their claims and fail to illustrate what actions are alleged to violate those provisions.

In support of his argument, Brent Cassity relies heavily on the Southern District of Iowa's opinion in *Young v. Wells Fargo & Company*, 671 F. Supp. 2d 1006 (S.D. Iowa 2009). In *Young*, the court considered claims asserting in conclusory fashion that the defendant's "actions, as complained of [in the complaint], constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes," and then went on to list the consumer protection statutes of thirty-nine states. *Id.* at 1015-16. Contrasting these claims with the plaintiffs' claims under the California and South Dakota consumer protection statutes, which "specif[ied] how those statutes protect against the activities set forth in [the plaintiffs'] allegations, and highlight which provisions of the statutes are specifically applicable to [those allegations]," the court concluded that the claims unnecessarily obscured the plaintiffs' "material allegations" and thereby prevented the defendant from being able to form "a reasonable response." *Id.* at 1016. The court also noted that this "'shotgun pleading' is especially problematic when pleading numerous causes of action under a variety of state consumer protection statutes, because the type and degree of protection offered by the various state laws varies extensively." *Id.* (citing Michael Isaac Miller, *The Class Action (Un)fairness Act of 2005: Could It Spell the End of the Multi-state Consumer Class Action?*, 36 Pepperdine L. Rev. 879, 890-95 (2009); Donald M. Zupanec, *Practices Forbidden by State Deceptive Trade Practice and Consumer Protection Acts*, 89 A.L.R.3d 449 (2009)).

While it is true that Plaintiffs' Counts XI and XIV are pled simultaneously under the Consumer Protection Acts and Fraudulent Transfer Acts of numerous states, the Court concludes that Plaintiffs' claims are distinguishable from those in *Young*. First, Plaintiffs' claims contain significantly more detail than the one- or two-line claims at issue in *Young*; it is readily apparent that the alleged Consumer Protection Act violations are premised on NPS officers, directors, and employees deceiving customers about the nature of the pre-need funeral service contracts NPS was selling, and that the Fraudulent Transfer Act claims concern the transfers of funds out of the receivership entities and the pre-need trusts, likewise to the detriment of those individuals who had purchased pre-need contracts from NPS. Thus, to the extent Brent Cassity might believe that his actions in those regards were not proscribed by any of the listed state statutes, he is in possession of sufficient information to make those arguments. The Court agrees that it would be much simpler for him to do so had Plaintiffs set forth the specific sub-sections under which they are bringing their claims, but the Court is not aware of any authority for requiring that degree of specificity as a matter of Rule 8 or Rule 9(b).

Lastly, Brent Cassity argues that Plaintiffs should be required to provide more definite statements concerning their remaining state-law claims – those for fraudulent omissions / nondisclosure, fraudulent misrepresentation, conspiracy to commit fraud, aiding and abetting fraud, negligent misrepresentations and omissions, breach of fiduciary duty by officers and directors, gross negligence by officers and directors, aiding and abetting breach of fiduciary duty by investment advisors, aiding and abetting breach of fiduciary duty by trustee banks, interference with business relationships, conversion, unjust enrichment, money had and received, and their claims for a constructive trust – similarly on grounds that Plaintiffs have failed to set forth the applicable state law. The problem with Brent Cassity's argument is apparent from his

statement that he "and this Court should not be forced to undertake a complex conflicts analysis for each of Plaintiffs' fourteen state common law claims to hypothetically guess which state common law will apply for each claim, and answer the Complaint based upon these conjectures." In fact, that is *precisely* what Plaintiffs and Defendants must do: undertake the conflicts analysis to ascertain what state's law applies to these claims, and then make specific arguments as to how Plaintiffs have or have not pled valid claims. This result necessarily follows from the recognition that even if Plaintiffs had pled the governing law for their state-law claims, such pleadings would have not been binding on Defendants, who would have remained free to argue that conflicts principles require the application of some other state's law to a given claim.

In sum, the Court concludes that Brent Cassity's Motion will be denied. Plaintiffs have pled sufficient facts to enable him to respond to the Amended Complaint. Likewise, the Court will not require Plaintiffs to provide more definite statements with respect to their state-law claims because the pleading requirements in Rule 8 and Rule 9(b) do not require, as a general matter, that plaintiffs plead the specific statutory provisions or state laws under which they are asserting their claims.

### 3. Tyler Cassity

Tyler Cassity argues that Plaintiffs' claims against him must be dismissed because Plaintiffs' group allegations fail to give sufficient notice of the claims' factual basis. Plaintiffs respond that the Amended Complaint contains adequate factual allegations to state claims for relief against him.

Although the factual allegations against Tyler Cassity are somewhat thinner, factually speaking, than those against Brent Cassity, the Court nevertheless finds that these allegations are sufficient to support the inference that he participated in the allegedly fraudulent scheme to

defraud NPS, Lincoln, and Memorial, as well as their funeral home customers and the purchasers of NPS's pre-need funeral service contracts. In the time period during which hundreds of millions of were allegedly fraudulently extracted from the receivership entities, Plaintiffs allege that Tyler Cassity

> (1) served as an officer and director of several corporations owned by the RBT Trust, including Lincoln, Memorial, Forever Enterprises, and Forever Network, and owed corresponding fiduciary duties to these entities;

> (2) personally participated in NPS taking out policy loans and concealing that from its customers, including the specific allegation that he was part of an email exchange about how to respond to regulatory requests concerning policy loans taken by NPS;

> (3) had NPS pay over $1 million in credit card payments for his personal expenses;

> (4) used the proceeds of the fraud to operate Forever Enterprises and its subsidiary Hollywood Forever;

> (5) received $1 million from NHE in exchange for a fraudulent promissory note; and

> (6) pledged his personal assets to cover the liabilities of NPS, Lincoln, and Memorial, once it was determined that these entities were in financial trouble.

In short, the Amended Complaint adequately sets forth Plaintiffs' position that Tyler Cassity had knowledge of, and personal involvement in, the specific artifices of the alleged fraud, such as the "mismatching" of policies with pre-need contracts, altering insurance policies, taking improper policy loans, and surrendering insurance policies. It may well be that Plaintiffs have failed to allege one or more necessary elements of their numerous claims against Tyler Cassity, but he makes no such argument in support of his Motion, and it is not the Court's responsibility to conduct such a rigorous analysis of the pleadings *sua sponte*. Furthermore, although there is no controlling authority from within the Eighth Circuit on this issue, the Court finds persuasive the

reasoning of those courts that have concluded that Rule 9(b)'s heightened requirements should be applied permissively with respect to corporate insiders. *See, e.g., Allen v. New World Coffee, Inc.*, 2001 WL 293683, at *4 (S.D.N.Y. 2001) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). If such a relaxed standard with respect to fraud pleadings is ever warranted, it would be in a case such as this, where the corporate insiders, including Tyler Cassity, are alleged to have established a network of shell corporations in order to carry out the fraud, thereby obscuring each individual's personal involvement in the scheme.

As such, the Court concludes that Tyler Cassity's Motion to Dismiss will be denied, as Plaintiffs have set forth with sufficient particularity his role in the alleged scheme to defraud. As a result, the Court also finds that more definite statements of these claims are not warranted.

### 4. Hollywood Forever

Plaintiffs' claims against Hollywood Forever are for breach of promissory notes, violations of the Texas Receivership Act, violations of various Fraudulent Transfer Acts, unjust enrichment, money had and received, and for imposition of a constructive trust, and Hollywood Forever vaguely asserts that the pleadings are insufficient without noting any specific deficiencies with respect to any of the pleaded claims.

At the outset, it is clear that Hollywood Forever is not entitled to dismissal of Plaintiffs' claims for breach of promissory notes. Plaintiffs set forth numerous notes of which Hollywood is the maker, along with the date of the note, the amount, the holder, the signatory, and any known subsequent information, such as novations, and allege that Hollywood Forever is in default on these notes. These allegations are more than sufficient to state a claim for breach of a promissory note.

With respect to the remaining claims, Hollywood Forever offers no specific rationale in

favor of dismissal, and the Court declines to formulate one on its behalf. Hollywood Forever's alleged involvment in the fraud is limited to the specifically identified promissory notes, and Defendant Bremen Bank is the holder of all of these notes, either on behalf of the NPS Custody Account or as trustee for Pre-Need Trust IV. Plaintiffs allege, generally speaking, that Hollywood Forever issued these notes as part of an over-arching plan to siphon funds out of NPS, through other entities controlled by the RBT Trust – including, of course, Hollywood Forever – and ultimately to certain individual Defendants. As such, one could hardly argue that their allegations fail to give Hollywood Forever sufficient notice of the factual basis of the claims against them, and the Court therefore concludes that Hollywood Forever's Motion will be denied.

### 5. David Wulf and Wulf Bates

Wulf and his firm Wulf Bates, investment advisors for the NPS pre-need trusts, contend that Plaintiffs' claims against them must be dismissed, or in the alternative, that Plaintiffs should be required to provide more definite statements, because the allegations in the Amended Complaint are overly vague and ambiguous.

First, Wulf and Wulf Bates note that Plaintiffs allege that the RICO Defendants, a group of numerous Defendants including Wulf and Wulf Bates, "hired Defendants Wulf and Wulf Bates . . . to act as purported 'independent' investment advisors for the various NPS trusts holding the proceeds of the pre-need funeral contracts," suggesting that Wulf and Wulf Bates themselves were involved in their own hiring, while the Amended Complaint later alleges that "NPS, through Defendant Sutton, engaged Defendants Wulf and Wulf Bates to act as purportedly 'independent' investment advisors for the NPS pre-need trusts." While the Court agrees with Wulf and Wulf Bates that these statements are inconsistent, it fails to see how this inconsistency requires dismissal or calls for a more definite statement. Wulf and Wulf Bates concede that they

know who hired them, and as such, there is no reason why they cannot either admit or deny both of these statements.  Furthermore, Plaintiffs provide numerous factual allegations directed specifically at Wulf and Wulf Bates concerning their involvement in the mismanagement of pre-need trust assets, such that the Court is not inclined to credit any argument that Plaintiffs' claims are, as a whole, so vague and ambiguous that they must be dismissed.

Second, Wulf and Wulf Bates assert that Plaintiffs' Count Eleven, for state consumer protection act violations, must be dismissed because the facts alleged do not state viable claims under the Missouri Merchandising Practices Act ("MMPA").  Plaintiffs, apparently conceding that they are bringing these claims under the MMPA and not under one of the myriad of other state Consumer Protection Acts cited in that Count, argue that they have pleaded all of the necessary elements.

The Court agrees with Wulf and Wulf Bates that these claims must be dismissed.  Mo. Rev. Stat. § 407.020.1, proscribes, among other things, "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact *in connection with the sale or advertisement of any merchandise in trade or commerce*." (emphasis added).  Although Plaintiffs' Count XI contains conclusory assertions directed at the RICO Defendants that essentially mirror the language of § 407.020.1, there are no specific factual allegations in the Amended Complaint supporting the inference that Wulf or Wulf Bates were responsible for any fraud or deception "in connection with the sale or advertisement of any merchandise in trade or commerce."  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.")

(internal citations omitted). Plaintiffs allege that Wulf and Wulf Bates were hired in order to give the impression that an independent third party was responsible for overseeing the investment of the assets of the pre-need trusts, and that they then participated in mismanaging and manipulating these assets; the Court was unable to locate a single substantive allegation, however, suggesting that they were in any way involved with the marketing or sale of the pre-need contracts themselves. As such, the Court concludes that Plaintiffs' Count Eleven will be dismissed as to Wulf and Wulf Bates.

Next, Wulf and Wulf Bates contend that the Amended Complaint is overly vague in that it fails to identify the individuals or entities on behalf of whom the Plaintiff SDR is asserting her claims, which according to Wulf and Wulf Bates is essential to assessing her authority to bring these claims. *See* Tex. Ins. Code § 443.154(m) ("The liquidator may prosecute any action that may exist on behalf of the creditors, members, policyholders, shareholders of the insurer, or the public against any person, except to the extent that a claim is personal to a specific creditor, member, policyholder, or shareholder and recovery on such claim would not inure to the benefit of the estate.").[14] Wulf and Wulf Bates also argue that this information is necessary in order to assess the implications of *Speaks Family Legacy Chapels, Inc. v. Nat'l Heritage Enters., Inc.*, Case No. 2:08CV004148 NKL – a matter currently pending in the Western District of Missouri, in which the funeral home plaintiffs seek class action treatment of claims alleged to be identical to at least some of the claims asserted here.

---

[14] Wulf and Wulf Bates also point to Tex. Ins. Code 443.011(a), which provides that "[a]n allegation by the receiver of improper or fraudulent conduct against any person may not be the basis of a defense to the enforcement of a contractual obligation owed to the insurer by a third party, unless the conduct is found to have been materially and substantially related to the contractual obligation for which enforcement is sought." Given that this litigation does not involve third-party claims against the receivership entities, the Court fails to see the relevance of this statute.

The Court finds this argument to be persuasive, at least to the extent Wulf and Wulf Bates seek a more definite statement of these claims, and not outright dismissal. In order for Defendants to be able to ascertain whether Plaintiff SDR has stated claims that plausibly give rise to an entitlement to relief, they must know the real parties in interest to Plaintiff SDR's claims. Contrary to Plaintiffs' assertions, requiring Plaintiffs to provide such information would not, in effect, require them to plead additional facts that are more properly found in discovery; the identity of the parties on whose behalf the SDR is asserting claims goes to the clarity of the pleaded claims and not their factual sufficiency. Furthermore, the Court fails to see why discovery would be necessary in order for Plaintiff SDR to determine on whose behalf she is asserting her claims, and Plaintiffs do not point to any specific information necessary for them to accomplish that task. Most of all, however, the Court finds that in the circumstances of this highly complex case, involving numerous Plaintiffs and Defendants and a wide array of factually distinct claims, requiring Plaintiffs to identify the parties in interest behind Plaintiff SDR's claims is an appropriate means of streamlining this litigation in order to more efficiently resolve Plaintiffs' claims, which is surely in the interest of both parties.

Thus, in sum, the Court finds that Plaintiffs' Count Eleven, for violations of the MMPA, will be dismissed as to these Defendants, and Plaintiffs will also be required to provide more definite statements concerning on whose behalf Plaintiff SDR is asserting her claims against Defendants. Wulf and Wulf Bates's Motion will otherwise be denied.

## 6. Randall Sutton

Sutton, former president and director of NPS, argues that Plaintiffs' Complaint should be dismissed pursuant to Rule 8 because it fails to demonstrate a plausible entitlement to relief, in that its claims are based on conclusory assertions of illegality with respect to Defendants' actions. Sutton further claims that specifically with respect to him, Plaintiffs' claims must be dismissed because their group allegations give him insufficient notice of the claims against him, and because their fraud-related allegations lack the particularity required by Rule 9(b). Lastly, Sutton contends that Plaintiffs have failed to state cognizable RICO claims and RICO conspiracy claims, and that the same is true for Plaintiffs' Lanham Act claims against him.[15]

Sutton persuasively points out several problems with Plaintiffs' theory of the case and with their allegations against him,[16] but given the numerous factual allegations setting forth the specifics of the alleged fraud, and describing Sutton's role in some detail, the Court is not inclined to dismiss any of Plaintiffs' claims in the absence of an argument specifically addressing the deficiencies in individual claims. Sutton may well be correct that many of Plaintiffs' claims are premised on conclusory assertions that Defendants' underlying actions were unlawful, but that argument, standing alone, is insufficient to lead the Court to dismiss some twenty-one

---

[15] The Court will grant Sutton's request that Plaintiffs specify which Plaintiffs are asserting which claims, as set forth in the preceding Section, but it rejects his argument that Plaintiffs' claims are deficient in that they fail to set forth the applicable state law, as discussed above with respect to Brent Cassity's Motion to Dismiss. Sections III.A and III.B explain why the Court rejects Sutton's claims that Plaintiffs lack standing to bring RICO and Lanham Act claims, respectively.

[16] For example, Sutton notes that Plaintiffs' claims appear to be based on the assumptions that NPS was not permitted to take out any policy loans, that NPS was required to deposit all proceeds from the sales of its pre-need contracts in trust or use them to purchase backing life insurance policies, and that any payments of personal expenses by the receivership entities are indicative of wrongdoing on the part of those individuals whose expenses were paid – all of which are not necessarily true.

pleaded claims, where Sutton has not discussed in any detail the elements of those claims or how the pleadings fail to satisfy them. In short, Sutton's arguments concerning the general deficiencies in Plaintiffs' Amended Complaint suffer from the same two problems he attributes to Plaintiffs' factual allegations: a lack of detail, and an abundance of conclusory assertions. As such, the Court declines to dismiss any of these claims pursuant to Rule 8.

Turning to Sutton's contention that Plaintiffs' fraud-based claims against him – for violation of the RICO Act, conspiracy to violate the RICO Act, violation of the Lanham Act, fraudulent omissions/nondisclosure, fraudulent misrepresentations, conspiracy to commit fraud, aiding and abetting fraud, and violations of state Consumer Protection Acts and Fraudulent Transfer Acts – must be dismissed because Plaintiffs have failed to plead fraud with particularity, the Court finds that Plaintiffs have satisfied Rule 9(b)'s requirements. "[W]here a plaintiff's complaint accuses multiple defendants of participating in the scheme to defraud, the plaintiffs must take care to identify which of them was responsible for the individual acts of fraud." *Remmes v. Int'l Flavors & Fragrances, Inc.*, 389 F. Supp. 2d 1080, 1088 (N.D. Iowa 2005) (internal quotations and citations omitted); *see also Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) ("[I]n a case involving multiple defendants . . . , the complaint should inform each defendant of the nature of his alleged participation in the fraud.") (internal quotations and citations omitted). In *Vicom*, the Seventh Circuit noted that dismissal is therefore warranted where the complaint is "bereft of any detail concerning who was involved in each allegedly fraudulent activity" and where it instead "lump[s] all of the defendants together and [does] not specify who was involved in what activity." *Id.* (internal quotations and citations omitted). That is plainly not the situation presented here; although numerous allegations are directed at certain groups of Defendants, there are also sufficient allegations targeted specifically

at Sutton to allow him to ascertain his role in the alleged fraud. Among other things, Plaintiffs contend that Sutton, in addition to being President and a director of NPS at all relevant times:

(1) held a variety of officer and director positions with other entities controlled by the RBT Trust;

(2) was directly involved in carrying out and concealing NPS's practices of altering life insurance policies and "mismatching" policies with pre-need contracts;

(3) directed NPS's actions in taking out loans on those life insurance policies;

(4) concealed those policy loans from NPS's sales force and its funeral home and contract customers;

(5) participated in the decisions to surrender whole life policies in exchange for cash;

(6) reviewed a letter drafted by Nicki Province to a funeral home customer which false stated that NPS did not claim an ownership interest in any life insurance policies, and that NPS had not altered any life insurance policies to show NPS as the beneficiary and was not aware of Lincoln doing so;

(7) was the signatory or decision-maker with respect to numerous, specifically-identified promissory notes and debentures used to extract funds from pre-need trusts;

(8) hired Wulf and Wulf Bates to act as independent investment advisors for the pre-need trusts, and was then in turn appointed by Wulf and Wulf Bates to serve in that capacity, while he was President of both NPS and Lincoln; and

(9) had NPS pay over $2.7 million in personal credit card expenses between 2003 and 2008.

It is true, as Sutton contends, that Plaintiffs have not proven that any of those actions were illegal or fraudulent, but they need not do so at this juncture in this litigation. It is sufficient that Sutton be put on notice of what actions are *alleged* to be unlawful, and Plaintiffs have carried their pleading burden in that respect. Accordingly, the Court concludes that Sutton is not entitled to dismissal of these claims under Rule 9(b).

Sutton next argues that Plaintiffs' RICO claims must be dismissed because they have failed to allege that he committed the necessary underlying predicate acts. The RICO Act, 18 U.S.C. § 1962(c), makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."[17] A claim under § 1962(c) thus requires proof of four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009). "[R]acketeering activity" is defined in 18 U.S.C. § 1961(1) with a lengthy list of so-called "predicate acts," principally made up of various state-law and federal crimes, including mail fraud and wire fraud, which are proscribed in 18 U.S.C. § 1341 and 18 U.S.C. § 1343, respectively. A "pattern" of committing such offenses requires only that the defendant committed at least two predicate acts within the applicable statute of limitations. § 1961(5).

A plaintiff may succeed on a claim for mail or wire fraud, even without proving any actual misrepresentation of fact, if the plaintiff proves the following four elements: "(1) a scheme to defraud; (2) intent to defraud; (3) reasonable foreseeability that the mails (or wires) would be used; and (4) use of the mails (or wires) in furtherance of the scheme." *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1069 n.6 (8th Cir. 1995) (internal citations omitted); *see also Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 918 (8th Cir. 2001) ("The crime of mail fraud is broad in scope and its fraudulent aspect is measured by a non-technical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental

---

[17] § 1962(d) provides for a cause of action for conspiracy to violate § 1962(c), as Plaintiffs allege in their Count Two.

honesty, and fair play.") (internal quotations and citations omitted). These predicate offenses do not require that the defendant personally used the mail or wires in the fraud; the mail and wire fraud statutes only require that the defendant "causes" the use of those means of communication. *See* 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); *see also Jerome M. Sobel & Co. v. Fleck*, 2003 WL 22839799, at *6 (S.D.N.Y. 2003).

Plaintiffs have met these requirements with respect to Sutton. They expressly allege that Sutton was part of an intentional scheme to defraud NPS's funeral home and pre-need contract customers, that it was reasonably foreseeability that the mails and wires would be used in furtherance of that scheme, and they provide specific examples of how the mails and wires were in fact used – for example, by communicating instructions concerning fraudulent sales practices between Defendants' offices and to NPS's sales force, by transmitting funds between NPS, Lincoln, and Memorial, and by sending fraudulent "paid in full" certificates to funeral homes and consumers. As such, the Court finds that Plaintiffs have stated viable RICO claims against Sutton.

In sum, then, the Court concludes that Sutton's Motion will be denied. Plaintiffs have alleged sufficient facts to satisfy Rule 8 and Rule 9(b), and they have alleged all of the elements of a claim under the RICO Act.

### 7. Howard Wittner and Wittner Spewak

Wittner, attorney to various entities controlled by the RBT Trust, and Wittner Spewak, his law firm, identify the following deficiencies in Plaintiffs' Amended Complaint: (1) Plaintiffs have failed to plead their RICO claims with particularity and failed to allege that Wittner or Wittner Spewak conducted an enterprise; (2) with respect to their Lanham Act claims, Plaintiffs have failed to allege with particularity who made the alleged misrepresentation(s); (3) Plaintiffs'

fraud-based claims, in general, are not pled with particularity; (4) Plaintiffs' fraudulent transfer claim is deficient in that it fails to allege that Wittner made or received any fraudulent transfers; (5) Plaintiffs' allegations do not support claims for negligent misrepresentation and omission or tortious interference with business relationships; (6) Plaintiffs have pled insufficient facts to state claims for legal malpractice; (7) Plaintiffs have pled insufficient facts to state claims for breach of fiduciary duty; (8) with respect to their claims for breach of promissory notes, Plaintiffs have failed to identify a promissory note on which Wittner was the borrower; and (9) Plaintiffs' claims for Texas Receivership Act violations, violations of the Texas Insurance Code, conversion, unjust enrichment, money had and received, and for a constructive trust lack sufficient underlying factual allegations.[18]

### i. RICO Claims

As noted above, a claim under the RICO Act, 18 U.S.C. § 1962(c), requires proof that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009). The "conduct" requirement means that the statute only permits recovery "against individuals who participate in the operation or management of the enterprise itself." *Id.* (internal citations omitted). "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management," as well as by other individuals who are "'associated with' the enterprise" and "exert control over it." *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993). Thus, "it is not necessary that a RICO defendant . . . wielded control over the enterprise, but the plaintiff "must prove some part in the *direction* . . . of the enterprise's

---

[18] The sufficiency of Plaintiffs' claims for gross negligence and breach of fiduciary duty against the D&O Defendants, of which Wittner is one, is discussed below in Section III.C.15.

affairs." *Handeen*, 112 F.3d at 1348 (quoting *United States v. Darden*, 70 F.3d 1507, 1543 (8th Cir. 1995)). "[A]n attorney or other professional does not conduct an enterprise's affairs through run-of-the-mill provision of professional services," *id.*, but "[t]his result . . . is not compelled by the fact that the person happens to be a lawyer, but for the reason that these actions do not entail the operation or management of an enterprise." *Id.* at 1349.

Plaintiffs' RICO allegations against Wittner are sufficient to satisfy these standards and the requirements of Rule 9(b). Plaintiffs allege that Wittner participated in the alleged fraud in multiple roles: as the sole trustee of the RBT Trust, as general counsel and outside counsel to numerous entities owned by the trust, and as an officer or director to many of those same entities. Plaintiffs claim that instead of merely providing legal services, Wittner was actively involved in NPS's decisions to take out policy loans and to surrender life insurance policies in exchange for cash, in order to ultimately funnel the proceeds to the Cassitys as beneficiaries of the RBT Trust, and that he also participated in the concealment of those activities from NPS's sale force and its customers. As examples of this involvement, Plaintiffs assert that Wittner:

> (1) helped draft a letter, purportedly from Wulf as the investment advisor to the pre-need trusts, indicating that Wulf, and not Wittner or any other Defendants, was responsible for the decisions to take out policy loans;

> (2) participated in specific email and telephone exchanges with Scannell, Doug Cassity, Brent Cassity, Sutton, and others, concerning allegedly fraudulent promissory notes and how to respond to regulatory inquiries concerning policy loans; and

> (3) signed a promissory note for $6.3 million from LMS on behalf of the RBT Trust, on the same day that LMS received $6.3 million from Forever Enterprises in exchange for a promissory note.

The Amended Complaint, read as a whole, presents Plaintiffs' position that Defendants operated the entities under the RBT Trust as a single enterprise, and the foregoing allegations sufficiently

indicate that Wittner was involved in the direction of that enterprise through multiple fraudulent acts – that is, through a pattern of racketeering activity. As the Court has noted with respect to multiple other Defendants in this action, Wittner may ultimately be able to demonstrate that these underlying actions were lawful or that Plaintiffs' allegations are not supported by the evidence, but those are not the inquiries before the Court at this time.

As such, the Court concludes that Plaintiffs have pled their RICO claims against Wittner with sufficient particularity, including his role in the management of the allegedly fraudulent enterprise. Wittner further contends that Plaintiffs' RICO conspiracy claim should be dismissed, but because that contention is premised on his claim that the underlying § 1962(c) claim is insufficiently pled, that argument will likewise be rejected.

ii.      *Lanham Act Claims*

15 U.S.C. § 1125(a) provides for civil liability for "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." Thus, a plaintiff bringing such a claim must prove the following elements: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir.

1998) (internal citations omitted). "The false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; and (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id.* (internal citations omitted).

To the extent Wittner claims the Amended Complaint is deficient in that it fails to identify the precise nature of the misrepresentations at issue, the Court disagrees.[19] Plaintiffs allege, among other things, that NPS repeatedly misrepresented to its funeral home and pre-need contract customers that it was not taking out loans on the insurance policies purchased with pre-need funds, and that Wittner was one of several Defendants involved in the decision to make these misrepresentations. Although it is true, as Wittner notes, that Plaintiffs do not allege that Wittner *personally* made any of the misrepresentations at issue, he offers no authority for the proposition that § 1125(a) liability contains such a requirement. Indeed, it would appear somewhat absurd for false advertising liability to attach only to the actual maker of the misrepresentation; if that were the case, the actor in a television advertisement containing a false statement would be liable, while the corporate executives who commissioned the advertisement and approved its content would not. As such, the Court finds that Plaintiffs' allegations – that certain false statements to consumers were made, and that Wittner was personally involved in the decision to make those statements – are sufficient to state claims under § 1125(a), and accordingly Wittner's Motion will be denied on this point.

---

[19] As the parties recognized in the briefing of this matter, it is not clear whether Rule 9(b) applies to false advertising claims under the Lanham Act. *See Axcan Scandipharm Inc. v. Ethex Corp.*, 585 F. Supp. 2d 1067, 1084 (D. Minn. 2007) (noting that no appellate court has addressed the issue and that district courts are split). Because the Court finds that Plaintiffs' pleadings satisfy the more rigorous Rule 9(b) standard, it finds it unnecessary to weigh in on this dispute.

*iii.*     *Fraud-Based Claims*

Based on the allegations discussed in the preceding sub-sections, the Court rejects Wittner's argument that Plaintiffs' fraud-based claims against him must be dismissed under Rule 9(b).  Plaintiffs allege that Wittner was directly involved in the decisions to make numerous misrepresentations to NPS's funeral home customers and pre-need contract consumers, and they have presented statements as examples of those misrepresentations.  As such, Wittner can hardly claim that he has not been put on notice of the nature of his alleged participation in the fraud, and to the extent he claims that he did not, in fact, have any such involvement, he is more than able to present that position by denying the relevant factual allegations.

*iv.*     *Fraudulent Transfer Claim*

Wittner contends that Plaintiffs' Fraudulent Transfer Act claims must be dismissed because the Amended Complaint fails to set forth the specifics of any alleged fraudulent transfer.  To the contrary, Plaintiffs specifically allege that Wittner signed a fraudulent promissory note for $6.3 million on June 1, 2004 to LMS, on behalf of the RBT Trust, in order to facilitate the scheme to defraud by transferring funds from the corporate Defendants to the RBT Trust, ultimately for the benefit of the Cassity trust beneficiaries.  In the absence of any further argument as to why this claim should be dismissed, the Court finds these allegations sufficient to support the pleaded claim.

*v.*    *Negligent Misrepresentation and Omission and Tortious Interference with*

   *Business Relationships*

Wittner argues that these claims, against all twenty-two of the RICO Defendants, must be dismissed because they improperly lump together the actions of all of these Defendants without specifying their individual actions.

As with Plaintiffs' fraud-based claims in general, it is apparent from the Amended Complaint that Plaintiffs' contention is that the RICO Defendants acted in concert in making numerous misrepresentations to NPS's funeral home and pre-need contract customers about the nature of NPS's products, such as the manner in which pre-need funds would be invested, and NPS's connection with Lincoln and Memorial as the companies responsible for the life insurance policies issued in conjunction with the sale of pre-need contracts.  As noted multiple times above, Plaintiffs allege that Wittner was personally involved in the decision-making concerning how NPS presented that information to these third parties, and as such, the Court finds that Plaintiffs have given Wittner sufficient notice of the factual basis of these claims.  Accordingly, his Motion will be denied with respect to these claims.

*vi.*    *Legal Malpractice*

Wittner and Wittner Spewak argue that these legal malpractice claims must be dismissed because there are no facts alleged supporting the inference that either he or his firm acted negligently.[20]

---

[20] Wittner and Wittner Spewak also claim that Plaintiffs should be required to specify which Plaintiffs are asserting these claims and on whose behalf.  Plaintiffs allege in connection with these claims that Plaintiff SDR suffered damages as a result, making it readily apparent that Plaintiff SDR is bringing these claims on behalf of NPS, Lincoln, and Memorial.

The Court finds that Plaintiffs have adequately alleged legal malpractice claims against Wittner and Wittner Spewak. Notwithstanding Plaintiffs' occasional citations to Texas law, the parties appear to be in agreement that this legal malpractice claim is governed by Missouri law, under which the claim consists of the following elements: "(1) an attorney-client relationship; (2) negligence or breach of contract by the defendant; (3) proximate causation of [the] plaintiff's damages; and (4) damages to the plaintiff." *Klemme v. Best*, 941 S.W.2d 493, 496 (Mo. 1997). Here, Plaintiffs claim that Wittner and Wittner Spewak acted negligently in providing legal services, in that they:

> (1) provided substandard advice concerning the decisions to take out policy loans and to surrender and let lapse insurance policies;

> (2) failed to properly advise NPS, Lincoln, and Memorial as to the consequences of the allegedly illegal conduct set forth in the Amended Complaint;

> (3) failed to advise those entities of preferable courses of action; and

> (4) relied upon the advice of Doug Cassity, who is not a licensed attorney, in giving legal advice to these entities.

These allegations are sufficient to apprise these Defendants of the basis for Plaintiffs' allegation that they performed negligently in providing legal services, and the Court therefore declines to dismiss these claims.

    *vii.*      *Breach of Fiduciary Duty as Attorneys*

Wittner and Wittner Spewak argue that these claims must be dismissed because Plaintiffs fail to allege a breach of fiduciary duty, and because Plaintiffs' contentions with respect to their legal services are subsumed by their malpractice allegations.

"[A]n attorney has the basic fiduciary obligations of undivided loyalty and confidentiality." *Klemme v. Best*, 941 S.W.2d 493, 495 (Mo. 1997). As against an attorney, a

breach of fiduciary duty claim is distinct from one for legal malpractice, and requires proof of: "(1) an attorney-client relationship; (2) breach of a fiduciary obligation by the attorney; (3) proximate causation; (4) damages to the client; and (5) no other recognized tort encompasses the facts alleged." *Id.* at 496. As the fifth element indicates, "[i]f the alleged breach can be characterized as both a breach of the standard of care (legal malpractice based on negligence) and a breach of a fiduciary obligation (constructive fraud), then the sole claim is legal malpractice." *Id.*

The Court agrees with Plaintiffs that their allegations with respect to these claims are distinct from those related to their legal malpractice claims. Plaintiffs allege that Wittner and Wittner Spewak breached their fiduciary obligations by failing to disclose conflicts of interest to NPS, Lincoln, and Memorial. Specifically, Plaintiffs contend that in providing legal advice to NPS, Lincoln, and Memorial with respect to policy loans, surrenders, and management of assets within the pre-need trusts, Wittner and Wittner Spewak were actually acting in the interests of the beneficiaries of the RBT Trust, other entities owned by the trust, including NHE and Forever Enterprises, and themselves. Plaintiffs further allege that Wittner and Wittner Spewak should have obtained waivers from NPS, Lincoln, and Memorial based on their dual representation of NHE and Forever Enterprises. These allegations are distinct from the negligence alleged in the legal malpractice claims, and the Court therefore concludes that Wittner and Wittner Spewak are not entitled to dismissal on this basis.

viii. *Breach of Promissory Notes*

The Court agrees with Wittner that Plaintiffs' breach of promissory note claim against him must be dismissed. In connection with this claim, Plaintiffs set forth numerous promissory notes which they have alleged have been breached, but Wittner is not the borrower on any of

those notes. Plaintiffs claim that the list of relevant notes is not exhaustive, but in response to Wittner's Motion, they nevertheless failed to identify a specific note that he breached. Recognizing that Plaintiffs may ultimately discover such a note, however, the Court will dismiss this claim against Wittner without prejudice.

ix. *Texas Receivership Act Violations, Texas Insurance Code Violations, Conversion, Unjust Enrichment, Money Had and Received, and Constructive Trust*

Wittner contends that all of these claims are ultimately premised on allegations that he improperly obtained funds or property from NPS, Lincoln, and Memorial, and that these claims must be dismissed because the Amended Complaint does no more than state in conclusory fashion that he was involved with such transfers.

The Court agrees with Wittner that certain of these claims must be dismissed for failure to state a claim. As the Supreme Court has emphasized, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim under Rule 8. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *see also id.* at 1950 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). Plaintiffs' claim for violation of the Texas Receivership Act simply states that the Act gives a special deputy receiver the right to recover on transfers to affiliates within two years of the petition for receivership, that the Fraudulent Transfer Defendants, including Wittner, are such affiliates, and that NPS, Lincoln, or Memorial made such transfers to them within the applicable timeframe. These allegations ultimately just regurgitate the elements of the claim and are unsupported by any underlying facts in the Amended Complaint as to Wittner, and as such, this claim will be dismissed.

The same is true of Plaintiffs' claim for violation of the Texas Insurance Code. That claim alleges that the applicable statute, Tex. Ins. Code § 463.302, "authorizes the SDR to recover distributions to affiliates of the insolvent insurer, other than a stock dividend the insurer paid on the insurer's capital stock, made during the five years preceding the date of the petition for liquidation or rehabilitation." Plaintiffs then allege that "each of the RICO Defendants received distributions directly, or indirectly, from NPS, Lincoln, or Memorial, other than stock dividends, in the five years before the receivership." As with the preceding claim, there are no factual allegations in the Amended Complaint that support this conclusory allegation as to Wittner, and this claim will therefore likewise be dismissed.

As for the remaining claims, the Court finds that they do satisfy Rule 8, as each of them is supported by factual allegations – allegations that may or may not ultimately be supported by the evidence, but allegations nonetheless – that rise above a mere recitation of the claim's elements. The conversion claim alleges that Wittner and the RICO Defendants, "diverted and misappropriated the pre-need contract funds for the other and different purposes of using the funds for their own personal use and different business interests that were in conflict with and unrelated to the purpose of funding pre-need contracts." The unjust enrichment claim contains even more detail, alleging, among other things, that the Fraudulent Transfer Defendants, of which Wittner is one, appropriated pre-need trust funds and funds obtained from policy loans and from roll-over transactions with funeral homes "in various ways, including through direct payments, indirect payments of credit card bills and other expenses, and loans with below-market interest rates or an indefinitely extended repayment schedule ," and that these funds were used for personal expenses "and to purchase assets including residences and funeral homes." The claim for money had and received, a cause of action premised on the defendant's receipt of funds

from the plaintiff in inequitable circumstances, *see, e.g.*, *Pitman v. City of Columbia*, 309 S.W.3d 395, 402 (Mo. Ct. App. 2010), likewise alleges that Wittner and others appropriated pre-need trust funds for their own use "through direct payments, direct loans with below-market interest rates which were not paid back, and policy loans on life insurance policies." Lastly, in support of their claim for imposition of a constructive trust, Plaintiffs allege that Wittner wrongfully diverted funds from NPS, Lincoln, and Memorial for the personal use of Defendants, and this is at least nominally supported by their underlying allegation that he signed a $6.3 million promissory note as trustee of the RBT Trust that was part of an over-arching plan to channel funds away from NPS, Lincoln, and Memorial and to the trust beneficiaries. For the Court to conclude that these allegations are insufficient would effectively amount to a requirement that Plaintiffs plead these claims with particularity, but that is not what Rule 8 requires; as such, the Court finds that Plaintiffs' allegations on these Counts are adequate to state claims for relief against Wittner.

Thus, in sum, the Court concludes that Plaintiffs' claims for violations of the Texas Receivership Act and the Texas Insurance Code must be dismissed as to Wittner, but that they have stated valid claims against him for conversion, unjust enrichment, money had and received, and for imposition of a constructive trust.

> x. *Summary*

As set forth above, the Court finds that Wittner and Wittner Spewak's Motion will be granted as to Plaintiffs' claims against Wittner for breach of promissory notes and for violations of the Texas Receivership Act and the Texas Insurance Code, and will otherwise be denied.

### 8. Doug Cassity

In addition to the standing arguments that the Court rejected above, Doug Cassity makes two principal arguments in favor of dismissal of the claims against him: (1) that Plaintiffs have failed to plead their fraud-based with particularity; and (2) that Plaintiff SDR lacks standing to assert claims on behalf of NPS because the Texas court in the underlying receivership proceeding lacked subject matter jurisdiction.

Doug Cassity's claim that Plaintiffs' allegations fail to satisfy Rule 9(b) is entirely conclusory in nature, and could simply be rejected on that basis, but in any event the Amended Complaint contains numerous factual allegations setting forth his role in the alleged fraud. For example, Plaintiffs allege that Doug Cassity:

(1) was the settlor of the RBT Trust;

(2) directed or participated in the altering of life insurance policies and applications, "mismatching" those policies with pre-need contracts, taking out loans on those policies, surrendering whole life policies and replacing them with term policies, and concealing those activities from NPS's funeral home and pre-need contract customers;

(3) instructed the computer programmer for NPS, Lincoln, and Memorial concerning when to issue new insurance policies, which premiums to process, and which policies to surrender or let lapse;

(4) drafted letters purporting to be from NPS's independent investment advisor concerning the management of pre-need funds held in trust, in order to conceal who was making the decisions about policy loans;

(5) participated in the January 2008 decision to surrender all Illinois whole life policies and replace them with term policies;

(6) participated in specifically-identified email exchanges with other Defendants concerning promissory notes between entities owned by the RBT Trust and how to respond to inquiries from funeral homes and regulators about policy loans and NPS business practices generally;

(7) created various undercapitalized alter ego entities to facilitate transfers of funds

from NPS, Lincoln, Memorial, and the pre-need trusts for the benefit of himself and other Defendants;

(8) directed the investment decisions of the pre-need trusts;

(9) used corporate funds of RBT Trust-controlled entities, including NPS, Lincoln, and Memorial, for personal expenses; and

(10) provided legal advice to Wittner and Scannell without a valid license to practice law.

Given that Doug Cassity does not make any arguments addressing how these allegations fail to support the elements of any individual claim against, the Court concludes that they are sufficiently factual to allow him to intelligently respond to the Amended Complaint, and that he is therefore not entitled to dismissal of any of the claims against him on this basis.

As for the Texas court's supposed lack of subject matter jurisdiction over NPS, the Court agrees with Plaintiffs that Doug Cassity's argument is refuted by his acknowledgment that NPS entered into an agreement with the Texas Department of Insurance, under which it consented to the jurisdiction of the Texas court by agreeing to be placed in receivership. The Texas Insurer Receivership Act, Tex. Ins. Code § 443.001-443.402, applies to insurers doing business in Texas under a variety of different circumstances, *see* § 443.003 (listing entities subject to the Act); § 443.004(14) (defining "insurer"); § 443.004(5) (defining "the business of insurance"), and the thrust of Doug Cassity's position is that NPS, as a seller of pre-need funeral contracts, fails to qualify as an "insurer" under any of the relevant statutes. While the Court will leave open the possibility of a subsequent challenge to Plaintiff SDR's standing on this basis, Doug Cassity offers no authority suggesting that the Texas Department of Insurance's power to place an entity into receivership is an issue of nonwaivable subject matter jurisdiction. As Plaintiffs note, it appears that NPS stipulated to facts in that underlying proceeding that qualified it as an "insurer,"

and as such, the Court fails to see any colorable argument that the court's assumption of jurisdiction over NPS was improper.

As such, the Court concludes that Doug Cassity's Motion will be denied. Plaintiffs have alleged numerous facts setting forth his role in the alleged fraud, and moreoever, he has failed to demonstrate that Plaintiff SDR lacks standing to bring claims against him on behalf of NPS.

### 9. Rhonda Cassity and Rhonda L. Cassity, Inc.

Rhonda Cassity and Rhonda L. Cassity, Inc. argue that Plaintiffs' claims for Fraudulent Transfer Act violations, unjust enrichment, money had and received, and for a constructive trust must be dismissed due to inadequate and impermissibly vague factual allegations. Rhonda Cassity also moves to dismiss Plaintiffs' claim for violation of Tex. Ins. Code § 463.032 on the same grounds. Plaintiffs also assert claims against Rhonda Cassity and Rhonda L. Cassity, Inc. for violations of the Texas Receivership Act, but their joint Motion to Dismiss does not address those claims.

Plaintiffs set forth a limited number of factual allegations directed at Rhonda Cassity and Rhonda L. Cassity, Inc. Ultimately, these allegations amount to a general claim that Rhonda Cassity, as a beneficiary of the RBT Trust, and the corporation she controls, Rhonda L. Cassity, Inc., received fraudulent transfers from the various entities under the RBT Trust umbrella – all of which are alleged to be alter egos of the trust beneficiaries themselves. As a specific example of such a transfer, Plaintiffs assert that NPS at some point transferred $862,083 to Rhonda L. Cassity, Inc., and that NPS recorded a note receivable but did not obtain a promissory note in return.

While the Court is inclined to agree that these are fairly insubstantial allegations, these Defendants do not make any specific arguments as to how these allegations fail to state the

elements of the pleaded claims, and as the Court has stated numerous times above, it declines to supply a rationale for dismissal for Defendants when they cannot be troubled to do so. Rhonda Cassity and Rhonda L. Cassity, Inc. state nothing more than that the pleaded claims fail to give sufficient notice of the nature of the claims and their factual basis, but if anything, the problem with these allegations is with respect to whether they support the pleaded claims, not whether they are sufficiently clear to enable these Defendants to respond. Furthermore, Plaintiffs' allegation that the entities controlled by the RBT Trust are the alter egos of the trust beneficiaries, including Rhonda Cassity, in combination with the specifically-identified allegedly fraudulent transfer to Rhonda L. Cassity, Inc., gives rise to at least a minimal inference of fraudulent conduct. The Court sees no reason why Rhonda Cassity and Rhonda L. Cassity, Inc. cannot respond to these allegations, and the Court therefore finds that their Motion will be denied.

### 10. Roxanne Sargent

Sargent, former President of NPS's Corporate Development Division, asserts that Plaintiffs' numerous claims against her[21] must be dismissed because their factual allegations are vague and conclusory, particularly with respect to Plaintiffs' use of group allegations.

Given that Sargent makes essentially the same argument in favor of dismissal with respect to all of these claims – that Plaintiffs' Amended Complaint contains insufficient detail

---

[21] Here, the Court discusses those counts against Sargent for violation of the RICO Act, conspiracy to violate the RICO Act, violation of the Lanham Act, fraudulent omissions / nondisclosure, fraudulent misrepresentation, conspiracy to commit fraud, aiding and abetting fraud, negligent misrepresentations and omissions, Consumer Protection Act violations, Texas Receivership Act violations, Texas Insurance Code violations, Fraudulent Transfer Act violations, tortious interference with business relationships, conversion, unjust enrichment, and money had and received. The Court addresses the claims against Sargent for breach of fiduciary duty by officers and directors, gross negligence by officers and directors, and aiding and abetting breach of fiduciary duty by the trustee banks below in Section III.C.15.

about the nature of her allegedly unlawful actions – the Court declines to address her claims on an individual basis, finding that Plaintiffs' factual allegations against Sargent are, as a whole, sufficient to enable her to formulate a response. Sargent's role in the alleged fraud is based on allegations that she, as an NPS officer:

> (1) "directed, knew about, and/or helped conceal" NPS's practices with respect to altering life insurance policy applications and engaging in policy "mismatching," based at least in part on a specifically-identified email she sent to Brent Cassity, Scannell, and Nicki Province on September 18, 2007 stating "I almost think us whiting/blacking stuff out on the contracts that we copied for [funeral homes] has made a bigger hoopla then [sic] the state letter that went out";
>
> (2) "directed, knew about, and/or helped conceal" from NPS's sales force and its funeral home and pre-need contract customers that it was taking out policy loans;
>
> (3) in response to inquiries from Ohio funeral homes, directed NPS sales agents to inform them that NPS was not taking out policy loans in Ohio or any other state;
>
> (4) reviewed a letter sent to an Ohio funeral home that allegedly misrepresented NPS's relationship with Lincoln, its ownership interest in the life insurance policies corresponding to the pre-need contracts, and whether NPS was altering policy applications;
>
> (5) sent an email to Erin Province, Nekol Province, Sutton, and Brent Cassity on March 25, 2005 discussing limiting information given to NPS's sales force and funeral homes about NPS's business operations; and
>
> (6) sent an email to NPS sales agents on September 14, 2007 instructing them to tell funeral homes that NPS was not taking out policy loans.

Based on these allegations, the Court sees little merit to Sargent's argument that she cannot intelligently respond to the Amended Complaint. Sargent's position within NPS and her role in the alleged fraud in set out in significant detail, particularly given the allegations related to specific email exchanges, and the Court therefore concludes that her Motion will be denied.

### 11. Crawford

Crawford, a former officer and director with NPS as well as with several other entities under the RBT Trust umbrella, asserts in his Motion to Dismiss that the claims against him should be dismissed based on the arguments offered by the other Defendants with motions to dismiss currently before the Court. It is entirely unclear which arguments he purports to adopt and offer in support of dismissal, and the Court could simply deny his Motion on that basis. In the interest of thoroughness, however, the Court finds that Plaintiffs have adequately pled Crawford's role in the alleged fraud, through their allegations that he, among other things:

(1) was an officer and director of NPS at all relevant times, serving at various times as Chief Executive Officer, President, Vice President, and Secretary;

(2) was an officer, director, and the sole shareholder of NPS Agency, which is alleged to be a pass-through entity to facilitate fraudulent transfers, based at least in part on a wire transfer from Lincoln to NPS Agency on June 29, 2006 of approximately $4 million in proceeds from policy loans Lincoln gave to NPS;

(3) signed debentures totaling approximately $3.7 million to NPS Pre-Need Trust I on behalf of NPS in order to channel those funds out of the trust, ultimately for the benefit of certain Defendants; and

(4) had NPS pay over $500,000 of his personal credit card expenses and over $280,000 for personal vehicle expenses, without giving any consideration in return.

As with numerous other Defendants, these allegations are sufficient to allow Crawford to formulate a response to the Amended Complaint, and the Court therefore concludes that his Motion will be denied.

### 12. Larry Keith Hale

Hale's Motion to Dismiss will be denied because he has already filed an Answer in this matter [doc. #69]. In his Motion, and in his Answer, Hale seeks dismissal under Rule 12(b)(6), or in the alternative, a more definite statement under Rule 12(e), but both of those Rules are clear

that such motions must be made before filing a responsive pleading.  *See* Rule 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed."); Rule 12(e) ("The motion must be made before filing a responsive pleading . . . .").

### 13.  Nekol Province

Like many of the Defendants discussed above, Nekol Province argues that the claims against her must be dismissed because Plaintiffs' allegations against her are too vague and indefinite.  The Court disagrees, in that Plaintiffs allege that Nekol Province:

(1) held a variety of officer and director positions with NPS, Lincoln, Memorial, NHE, LMS, and other related entities;

(2) participated in the altering of life insurance policies and policy applications, as evidenced by several emails quoted in the Amended Complaint in which she discussed those activities;

(3) participated in the concealment of NPS's policy loans from its customers, and confirmed in a September 10, 2007 email to Scannell, Brent Cassity, Erin Province, and Tate that she had advised funeral homes that NPS did not "do" policy loans;

(4) instructed NPS's sales force to provide that standard response to funeral home inquiries about policy loans, and suggested that general response as a company policy in a September 13, 2007 email to Sargent, Brent Cassity, and Scannell;

(5) drafted and sent a letter in September 2007 to an Ohio funeral home, allegedly misrepresenting the connection between NPS and Lincoln, NPS's status as a beneficiary of life insurance policies, and NPS's policies with respect to altering beneficiary designations on those policies;

(6) signed a series of allegedly fraudulent debentures as Vice-President of LMS in June 2001 and September 2003 in order to siphon funds out of a pre-need trust; and

(7) authorized the novation of a promissory note on January 19, 2008 as President of NPS, transferring the right to payment to a related RBT Trust entity and thereby eliminating the need for LMS to repay approximately $2 million to a pre-need trust.

These allegations are sufficiently definite and factual to be entitled to the assumption of truth, and given that Nekol Province does not make any other argument concerning the sufficiency of Plaintiffs' claims, the Court concludes that her Motion will be denied.

### 14. Corporate Defendants

In a joint Motion, Defendants Forever Enterprises, NHE, LMS, Forever Illinois, Texas Forever, BHP, NPS Agency, Legacy International, and Forever Network (collectively, "Corporate Defendants") move to dismiss Plaintiffs' claims for violation of the RICO Act, conspiracy to violate the RICO Act, violation of the Lanham Act, fraudulent omissions/nondisclosure, fraudulent misrepresentations, conspiracy to commit fraud, aiding and abetting fraud, negligent misrepresentation, breach of promissory notes, Consumer Protection Act violations, Fraudulent Transfer Act violations, aiding and abetting breach of fiduciary duty by Investment Advisor Defendants, and aiding and abetting breach of fiduciary duty by Trustee Banks. Plaintiffs assert the majority of these claims only against Forever Enterprises, NHE, and LMS as RICO Defendants; the other six Corporate Defendants are only subjects of those claims for breach of promissory notes and for Fraudulent Transfer Act violations.

The Court concludes that this Motion will be denied, as Corporate Defendants offer the same general arguments concerning the deficiency of the Amended Complaint that the Court has already considered and rejected numerous times above. With respect to Forever Enterprises, NHE, and LMS, Plaintiffs allege that these entities were parties to numerous fraudulent transfers of funds from the receivership entities and Pre-Need Trust IV, that LMS was the principal entity through which pre-need funds were channeled, that Butler and Hale, as officers and directors of Forever Enterprises and NHE, were responsible for coordinating fraudulent transfers between entities controlled by the RBT Trust, and that these entities are the alter egos of the Cassitys and

of the other corporations under the RBT Trust umbrella. These allegations, among others, clearly present Plaintiffs' view of these entities' role in the alleged fraud, and are sufficiently factual to enable them to form an intelligent response. As for the remaining Corporate Defendants, the Amended Complaint sets forth numerous promissory notes and allegedly fraudulent transfers to which they were parties, and there is therefore no basis for finding that they are unable to respond to Plaintiffs' claims for breach of promissory notes and Fraudulent Transfer Act violations.

In sum, then, the Court concludes that Corporate Defendants are not entitled to dismissal of any of these claims, as Plaintiffs' allegations are adequate to show that they are plausibly entitled to relief.

### 15. Claims against D&O Defendants

D&O Defendants Chrun, Jones, Crawford, Brent Cassity, Tyler Cassity, Sargent, Wittner, and Hale[22] – all faced with claims for breach of fiduciary duty, gross negligence, aiding and abetting breach of fiduciary duty by the Investment Advisor Defendants, and aiding and abetting breach of fiduciary by the Trustee Defendants – argue that Plaintiffs' claims against them should be dismissed, or in the alternative, that Plaintiffs should be required to provide more definite statements, because Plaintiffs have failed to allege sufficient facts to establish their liability. Plaintiffs assert that their allegations are more than sufficient to satisfy *Twombly*'s plausibility standard for notice pleading.

Plaintiffs' breach of fiduciary duty and gross negligence claims against these Defendants are premised on their allegations that they held various officer and director positions with the receivership entities, and that they therefore had knowledge of, but failed to address, the

---

[22] Defendant Nekol Province, whose Motion to Dismiss is addressed in this Memorandum and Order, is also a D&O Defendant, but she did not move for dismissal of any of these claims in her Motion.

fraudulent activities otherwise alleged in the Amended Complaint. Plaintiffs' breach of fiduciary duty and gross negligence claims also allege, among other things, that the D&O Defendants as a group are liable as a result of:

(1) actively participating in the misconduct described in the Complaint;

(2) failing to ensure that Defendants Wulf and Wulf Bates were acting as independent advisors to the pre-need trusts, as required by statute;

(3) withdrawing and allowing the withdrawal of funds from the NPS pre-need trusts without appropriate documentation, without commitments to re-pay, without ensuring reasonable interest rates in return for the withdrawals, and without actually repaying or ensuring the actual repayments of those loans;

(4) taking or allowing the taking of unreasonable and imprudent policy loans and the life insurance policies purchased with pre-need trust funds;

(5) allowing the whole life policies issued by Lincoln to be replaced with term life policies of a significantly lower value;

(6) failing to pay and failing to ensure the payment of premiums on the life insurance policies issued by Lincoln and Memorial;

(7) engaging in self-dealing; and

(8) allowing the fraudulent activities otherwise described in the Complaint to continue, thereby depleting the assets of Lincoln and Memorial.

Fact pleading is, of course, not the standard in federal court, and the Court is satisfied that the above allegations – primarily those that concern specific activities carried out by NPS, Lincoln, and Memorial's directors and officers – are sufficiently factual to be "entitled to the assumption of truth." *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). As the Court has explained above and in its Memorandum and Order denying the Trustee Defendants' Motions to Dismiss [doc. #449], it is not necessarily fatal to Plaintiffs' pleadings that they make allegations against certain Defendants as a group, to the extent that Plaintiffs allege that each Defendant is liable for committing essentially the same actions. As with the claims against the Trustee Banks,

it may strike the Court as highly unlikely that each of these Defendants is liable to Plaintiffs for breach of fiduciary duty or gross negligence on precisely the same grounds, but such a conclusion does not supply a basis for dismissing Plaintiffs' claims. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

In the Amended Complaint, Plaintiffs describe in detail an alleged scheme to defraud consumers and extract money from the receivership entities NPS, Lincoln, and Memorial, and they allege that the D&O Defendants are liable for breach of fiduciary and gross negligence due to either their participation in, or knowledge and inaction in the face of, that scheme. As such, Plaintiffs' failure to make allegations specifically directed at these Defendants is not fatal to their claims; this is not a case in which the plaintiffs assert a wide variety of group allegations, and the defendants cannot ascertain what they are alleged to have done. Plaintiffs' allegations are more than sufficient to put these Defendants on notice of the claims against them; the D&O Defendants cannot plausibly suggest that they are unable to respond to Plaintiffs' allegations with either an "admit" or "deny," especially given that they themselves possess information about whether they did or did not have knowledge of, or participate in, the corporate activities that Plaintiffs claim were unlawful.

Furthermore, the Court agrees with Plaintiffs that it is a fairly well-established principle of corporate law that a corporation's directors and officers may be held liable for breach of fiduciary duty based on both negligence and actual affirmative acts that lead to the wrongful dissipation of corporate assets. *See, e.g., Boulicault v. Oriel Glass Co.*, 223 S.W. 423, 426 (Mo. 1920) (corporate directors' duty "to exercise ordinary care" to prevent the loss or dissipation of corporate assets "extends to all directors . . . and renders them liable for losses resulting from

negligence as well as from actual misfeasance")[23]; *Landon v. S & H Mktg. Group, Inc.*, 82 S.W.3d 666, 676 (Tex. Ct. App. 2002) (corporate officer and directors have a "minimal duty and responsibility to protect the corporation against acts adverse to the interest of the corporation, whether perpetrated by fellow directors or by strangers").[24] Thus, Plaintiffs' allegations that certain officers or directors served in their positions during relevant time periods and failed to address the specific acts of mismanagement of other officers or directors constitute claims that "plausibly give rise to an entitlement to relief." *See Iqbal*, 129 S. Ct. at 1950.

Although these Defendants generally do not contest the legal sufficiency of Plaintiffs' allegations against them – their arguments focus almost entirely on the first prong of the *Twombly* / *Iqbal* analysis – the Court does have some concerns in that regard. In what is a recurring issue in Plaintiffs' Amended Complaint, and therefore also in this Memorandum and Order, Plaintiffs fail to specify in their claims against the D&O Defendant which Plaintiffs are asserting these claims. Given the possibility of arguments concerning Plaintiffs' standing, the Court concludes that Plaintiffs will be required to provide more definite statements in this regard.

In sum, then, the Court concludes that Plaintiffs' factual allegations are sufficiently clear and definite to enable the D&O Defendants to formulate a response, and accordingly these Defendants are not entitled to dismissal of these claims. The Court will, however, require Plaintiffs to clarify which of them are asserting these claims and on whose behalf.

---

[23] Although admittedly not a recent case, it appears that Missouri courts have not had the occasion to re-examine the scope of a corporate director's duty of care, and that *Boulicault* therefore remains good law.

[24] As noted above, Plaintiffs have failed to specify what state's law governs these claims, but it would appear that it is either Missouri's or Texas's.

## IV.    CONCLUSION

Defendants' Motions will be ruled as set forth below.  With respect to the Amended Complaint as a whole, the Court finds that Defendants' requests for more definite statements will be granted, to the extent they request clarification from Plaintiffs as to which Plaintiffs are purporting to bring each asserted claim, and in cases in which Plaintiff SDR is asserting the claim, on whose behalf she is doing so.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Anne Chrun's Motion to Dismiss [doc. #120] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants David Wulf and Wulf, Bates and Murphy's Motion to Make More Definite Plaintiffs' Claims for Relief and Motion to Dismiss Plaintiffs' Eleventh Claim for Relief [doc. #124] is **GRANTED, in part** and **DENIED, in part**. Plaintiffs' Count Eleven against these Defendants will be dismissed, and the Motion is otherwise denied.

**IT IS FURTHER ORDERED** that Defendants Brentwood Heritage Properties, LLC, Forever Enterprises, Inc., Forever Illinois, Inc., Forever Network, Inc., Legacy International Imports, Inc., Lincoln Memorial Services, Inc., National Heritage Enterprises, Inc., National Prearranged Services Agency, Inc., and Texas Forever, Inc.'s Motion to Dismiss, or in the Alternative, Motion for More Definite Statement [doc. #235] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants Tyler Cassity and Hollywood Forever, Inc.'s Motion to Dismiss Complaint, or, in the Alternative, for More Definite Statement [doc. #246] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants Howard Wittner and Wittner, Spewak & Maylack P.C.'s Motion to Dismiss and Motion for a More Definite Statement [doc. #254] is **GRANTED, in part** and **DENIED, in part**. Defendants' Motion is granted with respect to Plaintiffs' Count Ten against Wittner for breach of promissory notes, Plaintiffs' Count Twelve against Wittner for violation of the Texas Receivership Act, and Plaintiffs' Count Thirteen against Wittner for violation of the Texas Insurance Code, and is otherwise denied.

**IT IS FURTHER ORDERED** that Defendant Brent D. Cassity's Motion to Dismiss and Motion for a More Definite Statement [doc. #254] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant James M. Crawford's Motion to Make More Definite and Certain and Motion to Join Co-Defendants' Motions and Memoranda [doc. #273] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Roxanne J. Schnieders n/k/a Roxanne J. Sargent's Motion to Dismiss, or in the Alternative, Motion for More Definite Statement [doc. #281] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant J. Douglas Cassity's Motion to Dismiss, Motion to Make More Definite and Certain, and Motion to Join Co-Defendants' Motions and Memoranda [doc. #287] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants Rhonda Cassity and Rhonda L. Cassity, Inc. a/k/a Wellstream, Inc.'s Motion to Dismiss, or in the Alternative, Motion for More Definite Statement and Motion to Join Co-Defendants' Motions and Memoranda [doc. #289] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Nekol Province's Motion to Dismiss Complaint, or, in the Alternative, for More Definite Statement [doc. #296] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Randall K. Sutton's Motion to Dismiss Plaintiffs' Complaint [doc. #299] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Larry Keith Hale's Motion to Dismiss, or in the Alternative, Motion for More Definite Statement [doc. #365] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Marianne Jones's Motion for More Definite Statement [doc. #382] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs shall file a Second Amended Complaint no later than January 28th, 2011, clarifying which Plaintiffs are asserting which pleaded claims, and with respect to those claims brought by Plaintiff Donna J. Garrett as Special Deputy Receiver, on whose behalf she is asserting those claims.

Dated this 21st Day of December, 2010.

E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE