**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DONNA J. GARRETT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV01252 ERW |
| | ) | |
| J. DOUGLAS CASSITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction Freezing Assets of Specified Defendants [doc. #405].[1]

## I. FACTUAL BACKGROUND

This litigation arises out of proceedings instituted by the Texas Department of Insurance in Travis County, Texas, in which National Prearranged Services, Inc. ("NPS"), Lincoln Memorial Life Insurance Company ("Lincoln"), and Memorial Service Life Insurance Company ("Memorial") were placed in receivership and are currently in the process of being liquidated. Plaintiffs in this litigation are Donna J. Garrett, acting on behalf of NPS, Lincoln, and Memorial as Special Deputy Receiver ("SDR") in connection with the Texas receivership proceedings, The National Organization of Life and Health Guaranty Associations ("NOLHGA"),[2] and the

---

[1] The Court also addresses below numerous extraneous Motions brought by Defendants that are to some extent dependent on the Court's ruling on Plaintiffs' Motion.

[2] NOLHGA represents the interests of the state life and health insurance guaranty associations of Arizona, California, Colorado, the District of Columbia, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Washington, West Virginia, Wisconsin, and Wyoming.

individual state life and health insurance guaranty associations of Arkansas, Illinois, Kansas, Kentucky, Missouri, Oklahoma, and Texas. These individual guaranty associations, as well as those represented by NOLHGA, are statutory entities created by state legislatures to provide protection for resident policyholders in the event that a member insurance company becomes insolvent. Plaintiffs represent that these state guaranty associations have been assigned or subrogated to the claims of funeral homes and consumers arising out of dealings with NPS through (1) each state guaranty association's enabling act; (2) the NPS / Lincoln / Memorial Liquidation Plan approved by the Texas Receivership Court on September 22, 2008; or (3) express assignments received from recipients of death benefits paid by a state guaranty association.

Prior to the institution of the Texas proceedings, NPS was in the business of selling pre-need funeral service contracts, sold to consumers through funeral homes, and Lincoln and Memorial were issuers of life insurance policies. NPS marketed its pre-need contracts by assuring consumers that funds paid to NPS would be secured in pre-need trusts and backed by whole life insurance policies issued by Lincoln or Memorial for the full amount of the contract, so that the necessary funds would be available when the pre-need beneficiary died and the funeral home's claim became due. In accordance with state law, this was accomplished in certain states by requiring the purchaser to simultaneously apply for a life insurance policy issued by Lincoln or Memorial in an amount corresponding to the amount of the pre-need contract, and in other states, the pre-need trust itself purchased the life insurance policies.

There are over forty defendants named in Plaintiffs' Complaint, with varying degrees of alleged involvement in what Plaintiffs characterize as a scheme to defraud individual consumers

and funeral homes in the sale of NPS's pre-need funeral contracts, with the ultimate goal of siphoning funds away from NPS, Lincoln, and Memorial for the personal use of certain defendants, and with the effect of leaving more than $600 million in liabilities to be satisfied by the SDR and the state life and health guaranty association Plaintiffs. The principal focus of Plaintiffs' claims is a group of defendants consisting of (1) Doug Cassity, Tyler Cassity, Rhonda Cassity, and Brent Cassity ("the Cassity Defendants"), the beneficial owners of NPS, Lincoln, Memorial, and a number of affiliated entities through the RBT Trust II – a family trust of which Doug Cassity is the settlor and the Cassity Defendants are the sole beneficiaries; (2) certain officers and employees of the Cassity-controlled entities; (3) a number of attorneys and law firms engaged by those entities; and (4) several of those entities themselves. Plaintiffs allege that the RICO Defendants defrauded and conspired to defraud NPS's individual and funeral home consumers by, among other things:

(1) not revealing to NPS employees, funeral homes, or consumers that Lincoln and Memorial, as issuers of the life insurance policies intended to fund the pre-need contracts upon the death of the purchaser, were not independent of NPS, and that Lincoln, Memorial, NPS, and the Cassity Defendants were not independent of each other;

(2) in states in which the purchaser of the pre-need contract applied for the life insurance policy directly, altering policy applications to indicate that the policy was to be paid for in installments, when in fact the purchaser had paid the full amount of the policy in full, so that NPS would only be required to deposit the first installment into a pre-need trust, with the remainder of the amount then ultimately diverted to the RICO or Cassity Defendants through various Cassity-controlled entities, including NPS, Lincoln, and Memorial;

(3) in states in which the pre-need trusts purchased the life insurance policies, purchasing installment policies with monthly payments when the consumer paid for the pre-need contract with a single payment in full, likewise in order to avoid depositing the entire policy amount into a pre-

need trust and to siphon the remaining funds to the RICO or Cassity Defendants;

(4) altering life insurance policy applications to indicate that NPS was the owner or beneficiary of the policy, in order to allow NPS to take out loans on the policies from Lincoln or Memorial, and then denying that NPS had taken out any such loans in response to inquiries from funeral homes;

(5) directing NPS to stop paying premiums to Lincoln on whole life policies and surrendering whole life policies for their cash value, with the effect of reducing NPS's obligations to Lincoln and allowing NPS to retain a greater percentage of funds received from consumers in exchange for the pre-need funeral contracts;

(6) removing funds from the NPS pre-need trusts in exchange for the issuance of promissory notes or debentures, with repayment only occurring through book entries unsupported by actual transactions or through the temporary shifting of funds between various entities controlled by the RICO Defendants; and

(7) engaging in "roll-over" transactions with funeral homes, whereby a funeral home would agree to transfer its existing pre-need contracts to NPS and remit to NPS the balance of its trust funds from those contracts, with NPS then using the above-described tactics with whole life insurance policies issued by Lincoln to avoid placing as much as possible of the "roll-over" funds into a pre-need trust, and diverting the remainder to the RICO or Cassity Defendants.

Based on these allegedly wrongful actions, Plaintiffs assert a wide variety of claims against the RICO Defendants, including but not limited to claims for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968, violations of the Lanham Act, 15 U.S.C. §§ 1051-1141n, state law claims concerning intentional and negligent fraudulent misrepresentations, and violations of the Texas Receivership Act, Tex. Ins. Code §§ 443.202-443.205. Plaintiffs assert additional claims related to allegedly fraudulent transfers between Cassity-controlled entities against another set of Defendants (collectively, "the Fraudulent Transfer Defendants"), consisting of some of the RICO Defendants as well as certain additional

Defendants. Plaintiffs also bring another set of claims arising out of the removal of funds from the pre-need trusts through the issuance of promissory notes and debentures against yet another defined group of defendants ("the Promissory Note Defendants"), some of which are likewise RICO or Fraudulent Transfer Defendants.

In the Motion currently before the Court, Plaintiffs seek a preliminary injunction against Defendants Douglas Cassity, Rhonda Cassity, Brent Cassity, Tyler Cassity, Howard Wittner ("Wittner") in his capacity as trustee of RBT Trust II, Rhonda Cassity, Inc. a/k/a Wellstream, Inc., National Heritage Enterprises, Inc. ("NHE"), Lincoln Memorial Services, Inc. ("LMS"), Forever Enterprises, Inc.("Forever Enterprises"), Forever Network, Inc. ("Forever Network"), Legacy International Imports, Inc. d/b/a Triad ("Legacy International"), Hollywood Forever, Inc. ("Hollywood Forever"), Texas Forever, Inc. ("Texas Forever"), Brentwood Heritage Properties, LLC ("BHP"), Forever Illinois, Inc. ("Forever Illinois"), and National Prearranged Services Agency, Inc. ("NPS Agency") (collectively, for purposes of this Memorandum and Order, "Defendants"), enjoining Defendants from, among other things, selling, encumbering, or otherwise transferring any asset in which they have an ownership interest without Court approval. In addition to the claims mentioned above, Plaintiffs also assert equitable claims against these Defendants for unjust enrichment, money had and received, and for imposition of a constructive trust. Plaintiffs assert that Defendants have been unjustly enriched at the expense of Plaintiffs, and those parties whose interests Plaintiffs represent, and that injunctive relief is necessary to prevent Defendants from dissipating and attempting to dissipate assets acquired with funds misappropriated from NPS pre-need trusts.

## II. EVIDENCE PRESENTED AT THE PRELIMINARY INJUNCTION HEARING

Plaintiffs focus on five topics – five categories of allegedly improper transactions involving Defendants – to convince the Court that Defendants have unjustly enriched themselves and that preliminary injunctive relief is warranted: (A) transfers of funds out of pre-need trusts for the benefit of Defendants, culminating in the RBT Trust II's[3] purchase of the Professional Liability Insurance Company of America ("PLICA"); (B) purchases of real estate in Nantucket, Massachusetts; ( C) NPS's payments of certain Defendants' credit card bills; (D) acquisition and funding of Hollywood Forever; and (E) NPS's related party receivables – i.e. sums owed to NPS by certain Defendants as of the time the receivership action was instituted, as evidence of how Defendants extracted money from the pre-need trusts and the receivership entities.

### A. Purchase of PLICA

The purchase of PLICA originated, according to Plaintiffs, with NPS wrongfully obtaining ownership of funds paid by consumers for NPS's pre-need funeral service contracts – funds that Defendants were required to safeguard in pre-need trusts. When purchasing pre-need contracts, NPS required consumers to pay the cost of the contract in full, and Plaintiffs offered evidence showing that entries on corresponding insurance policy applications were whited-out and re-written, so that the applications indicated that the policy was to be paid for in installments, thereby allowing NPS to retain the remainder of the proceeds. As an example, Plaintiffs showed a policy application on which it was recorded that $8,900.00 in cash had been received, and the policy therefore marked as "paid in full." An NPS or Lincoln employee then covered these items

[3] As noted above, Doug Cassity is the settlor of the RBT Trust II, and Rhonda, Brent, and Tyler Cassity are its beneficiaries. The RBT Trust II owned or owns the receivership entities and many of the corporate entities involved in this litigation.

with white-out tape and substituted $353.47, representing the first installment of a monthly premium obligation. This allegedly enabled NPS to retain roughly $8,500.00 that it would have otherwise been required to place in trust or use to purchase the corresponding insurance policy.

Plaintiff also offered evidence showing that NPS whited-out the names of certain policy beneficiaries – the purchaser or the servicing funeral home – and substituted itself, and Plaintiffs assert that various state laws prohibited NPS, as the seller of pre-need funeral contracts, from obtaining beneficial ownership of corresponding insurance policies. Furthermore, these alterations enabled NPS, as the owner/beneficiary of the policies, to then obtain loans against the policies from Lincoln and Memorial. Plaintiffs assert that Nebraska investigators concluded that NPS had taken out over $60 million in policy loans as of 2007. As examples of such transactions, Plaintiffs offered evidence of a June 28, 2006 wire transfer of $4.5 million from Lincoln's general account to NPS for policy loans, and another on June 29, 2006 in the amount of $4.395 million from Lincoln to NPS Agency, an entity affiliated with NPS and the Cassity Defendants.

Plaintiffs contend that NPS further enriched itself by manipulating the whole life insurance policies over which it had wrongfully obtained ownership. A whole life insurance policy has a cash surrender value related to the amount in premiums that has been paid on the policy, and in certain instances, NPS simply surrendered these policies in exchange for cash. In other cases, NPS retained additional funds by converting whole life policies into term life policies, which carry lower premium obligations and have no cash value, and then sometimes completely failed to make any premium payments to Lincoln or Memorial. Defendants noted, however, that Plaintiffs failed to produce any evidence that NPS had failed to make payments on

term policies.[4]

Plaintiffs connect these activities with the purchase of PLICA by attempting to show that the RBT Trust II purchased PLICA with NPS funds that should have been safeguarded in trusts and invested in life insurance policies. To that end, Plaintiffs primarily rely on four pieces of evidence: (1) an affidavit from Brent Cassity, stating that the purchase of PLICA was at least partially funded by a loan from Pre-Need Trust IV – a specific trust for pre-need funds – with a scheduled maturity date in 2011, (2) ledger sheets evidencing a May 27, 2004 wire transfer from NPS to LMS in the amount of $4.5 million (with the note "PLICA purchase"), and then an immediate corresponding $4.5 million transfer to the RBT Trust II "for PLICA"; (3) a promissory note dated February 1, 2004 under which the RBT Trust II received $4.6 million from LMS, and (4) another promissory note dated February 1, 2004, this one issued to Bremen Bank as the trustee for Pre-Need Trust IV by LMS, likewise in the amount of $4.6 million. Plaintiffs assert without documentation that no payments have been made on these notes. In sum, then, the Court concludes from this evidence that PLICA's total purchase price of $10.5 million was, in fact, partially funded through $4.6 million from Pre-Need Trust IV, but it reaches no conclusions as to the current status of these notes.

Plaintiffs go on to contend that Defendants are siphoning "tremendous sums" out of PLICA, as shown by a number of transactions. First, PLICA paid approximately $8.3 million in "management fees" to Bayside Capital, an entity owned by Brent and Doug Cassity. Plaintiffs

---

[4] With respect to the issue of whether these payments were made, Plaintiff SDR seized records of NPS, Lincoln Memorial and Memorial Services, and those documents remain in the custody of Plaintiffs. Plaintiffs' counsel represented that they have initiated review of these documents but were "nowhere near" completion as of the hearing on this Motion.

appear to take the position that this money was not properly earned, based on an absence of any evidence to the contrary. Additionally, PLICA loaned another alleged Cassity-controlled entity, LMSLIC, $1.4 million. Plaintiffs did not offer any evidence concerning the purpose of this loan or whether it was secured. Third, Howard Wittner, trustee of the RBT Trust II, is also general counsel for PLICA, and Plaintiffs demonstrated through tax filings that in 2008 and 2009, PLICA paid over $10 million in non-employee compensation to an LLC owned by Wittner, as well as $360,000 annually to Wittner or his LLC – the documentation was unclear – "for executive management of claims and claims administration operations." Lastly, Plaintiffs showed that on April 30, 2010, the New York Department of Insurance placed PLICA in Rehabilitation. Plaintiffs were unable to explain the precise effect of this development on PLICA's operations, but they assert that the order resulted at least in part from the above-described transactions.

**B. Nantucket Properties**

In their effort to demonstrate that Defendants have been unjustly enriched, Plaintiffs presented evidence concerning the benefits Rhonda and Doug Cassity derived from transactions connected to two properties in Nantucket, Massachusetts. Rhonda and Doug Cassity had originally acquired the properties in 1997, and evidence showed that NPS paid approximately $750,000 in 2001 to pay off mortgages they had granted in purchasing them. Specifically, NPS transferred approximately $348,000 to Allegiant Bank on April 19, 2001, and approximately $397,000 to Option One Mortgage on April 23, 2001, to satisfy the mortgages in full. After the mortgages had been paid, Rhonda and Doug Cassity then sold the two properties to LMS for $1.45 million. LMS then issued a promissory note for $1.6 million to Allegiant Bank as trustee for Pre-Need Trust IV, secured by a first-priority deed of trust to the two Nantucket properties.

Plaintiffs assert that they have found no evidence that the deed was ever recorded. At the direction of Defendant Wulf, investment advisor to Pre-Need Trust IV, Allegiant Bank then wired $900,000 to Central Bank and $700,000 to Truman Bank. Plaintiffs assert that this $1.6 million was then disbursed to Rhonda and Doug Cassity – the reason why it was $1.6 and not $1.45 million is unclear – and as a result, the total amount realized from these transactions was over $2.3 million, accounting for the payment of the mortgages and the subsequent sale of the properties to LMS.

Two additional noteworthy transactions concerning that promissory note followed. On September 17, 2003, the $1.6 million note was novated, with LMS taking an additional $600,000 from Pre-Need Trust IV. No additional security was pledged. Trust records indicate that approximately $1.3 million is still owed on the note, and that no payments have been made on it since May 2008. Plaintiffs also discovered a subsequent mortgage granted by LMS on the Nantucket properties in favor of certain third parties, attorneys based in Nantucket, acting as trustees for a previously-unknown trust titled NPS Trust IV Nominee Trust. Then, on February 24, 2004, LMS apparently sold the Nantucket properties, and these trustees executed a partial release, releasing LMS from its obligations under that mortgage, with the ultimate result of leaving Pre-Need Trust IV without any security on the note it obtained from LMS.

**C. Payment of Credit Card Expenses**

With respect to this category of transactions, it suffices to say that Plaintiffs presented uncontroverted evidence demonstrating that NPS paid at least several hundred thousand dollars in credit card expenses incurred by Rhonda, Doug, Brent, and Tyler Cassity, for purchases such as yacht rentals, clothing, and flights and hotel expenses associated with trips to Mexico, the

Caribbean, and elsewhere. The records of these transactions indicate that NPS made these payments out of its general corporate account.

### D. Acquisition and Funding of Hollywood Forever

Plaintiffs next claim that Defendants improperly used pre-need funds to benefit Hollywood Forever – a cemetery located in California – and its owner, Tyler Cassity. Plaintiffs' evidence of wrongdoing focuses largely on the fact that Brent Cassity personally authorized a number of loans from Pre-Need Trust IV that benefitted Hollywood Forever, and that Brent Cassity stated in an affidavit that he had no knowledge of the process by which loans from Trust IV were made.

Evidence showed that Tyler Cassity originally owned Hollywood Forever together with certain Chilean investors. Then, on June 5, 2001, Pre-need Trust IV loaned approximately $1,654,000, without security and in exchange for an IOU, to Forever Enterprises, and Plaintiffs assert that these funds were then used to buy out the other investors. A memo with the subject "Hollywood Note Refinancing," circulated among Brent Cassity, Tyler Cassity, and Defendants Keith Hale and Randall Sutton, indicates that the terms of the loan to Forever Enterprises – 10 years at 7.5% interest – were significantly more favorable than the five-year, 8.5% interest loan arrangement Tyler Cassity previously had with the Chilean investors.[5]

Then, on November 29, 2001, Hollywood Forever issued a note to Pre-Need Trust IV for $1.7, for purposes of constructing a mausoleum. The note purports to be secured by a first-priority deed of trust to the property and the improvements, but Plaintiffs assert that the local

---

[5] According to the memo, after "refinancing" the monthly payment decreased from around $48,000 to approximately $20,000.

clerk has been unable to locate the recording of such a deed. Plaintiffs produced wire transfers evidencing a series of transactions to finance the construction, which ultimately went over budget and totaled $1,872,000.

Through a long and convoluted series of consolidations, novations, and assignments – too long and convoluted to go into great detail here – Hollywood Forever was ultimately relieved of any obligations to make payments on these notes, with Forever Network and LMS assuming liability. Plaintiffs assert that there is no evidence that Hollywood Forever ever made payments on these notes, but there was evidence that the final consolidated note, with a face value of approximately $4.5 million, was paid down to approximately $220,000. Plaintiffs assert that in any event, it was imprudent for Brent Cassity, on behalf of Pre-Need Trust IV, to substitute Forever Network and LMS for these obligations because these entities, unlike Hollywood Forever, lacked tangible assets to secure the debt.

### E. Related Party Receivables

Plaintiffs' last category of evidence of unjust enrichment concerns NPS's records of notes receivable, as of December 2007, from certain Defendants. Plaintiffs lack records concerning the origin of these receivables, but the amounts are as follows: $64 million from NHE, $14 million from LMS, $3.3 million from Forever Enterprises, and $4.2 million from the RBT Trust II shareholders – that is, Brent, Tyler, and Rhonda Cassity.

## III. DISCUSSION

Although the parties devoted significant efforts to briefing and arguing the issue of whether the Court possesses jurisdiction to enter the requested preliminary injunction, in light of the Supreme Court's decision in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund,*

*Inc.*, 527 U.S. 308 (1999), the Court first considers whether Plaintiffs have sufficiently demonstrated that they are entitled to injunctive relief because it finds that issue to be dispositive.

The factors for determining whether a preliminary injunction should issue are: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "The party seeking injunctive relief bears the burden of proving these factors." *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

The four-factor test set forth in *Dataphase* notwithstanding, the Eighth Circuit has affirmed that "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 n.5 (8th Cir. 2008) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)). "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996) (citing *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986)).

Plaintiffs allege that an award of damages may prove an inadequate remedy because the award might not be collectible due to Defendants' lack of resources, but the case law makes clear that this mere possibility is insufficient to establish a threat of irreparable harm. Although the Eighth Circuit stated in *Iowa Utilities Board* that "[t]he threat of unrecoverable economic loss . . . does qualify as irreparable harm," that case, and the other cases Plaintiffs have cited for that

proposition, can readily be distinguished because all involved a truly unrecoverable loss, not a money judgment that might prove uncollectible depending on a subsequent disposition of assets. *See id.* at 426 (where local phone carriers would not be able to bring a lawsuit to recover losses if an FCC pricing rule were to be overturned); *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472-73 (8th Cir. 1994) (where party from whom loss would be recoverable is entitled to Eleventh Amendment sovereign immunity in suits for money damages); *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1226-27 (8th Cir. 1987) (approving preliminary injunction preventing defendants from transferring airline tickets, where it appeared that recovering those tickets would be the plaintiffs' only means of recovery given the defendants' lack of financial resources).[6] Indeed, the Eighth Circuit has clearly stated that there is no threat of irreparable harm where a party can be fully compensated for its injuries through an award of damages. *Gen. Motors. Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

Here, Plaintiffs *can* be compensated for their alleged injury – as defined by the extent to which Defendants have appropriated pre-need trust funds – through an award of damages, and in fact, Plaintiffs seek precisely such an award in their non-equitable claims for, among other things, violations of the RICO Act and various types of fraud. Put simply, Plaintiffs seek to recover money from Defendants, and the possibility that Defendants might not have any money when this case is concluded does not necessarily mean that Plaintiffs face a threat of irreparable harm.

---

[6] It also bears mentioning that *Barry* involved claims for violations of the RICO Act, fraud, and conversion. It is therefore questionable whether *Barry* is still good law, in light of the Supreme Court's subsequent conclusion that federal courts have no jurisdiction to enter preliminary injunctive relief in cases in which the plaintiff seeks purely legal relief. *See Grupo Mexico de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 310 (1999).

Furthermore, although Plaintiffs assert that the threat of irreparable harm exists in that Defendants may dissipate and conceal their assets during the course of this litigation, Plaintiffs have failed to meet their burden of demonstrating that this harm "is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utilities Board*, 109 F.3d at 425. Plaintiffs have presented evidence suggesting that Defendants have attempted, and are attempting, to transfer assets – such as by selling PLICA, and through PLICA's payment of allegedly exorbitant management fees to Doug and Brent Cassity – but at most, it appears that Defendants are liquidating assets and transferring funds among themselves. As Brent Cassity has persuasively argued, the transfer or liquidation of assets only amounts to a threat of irreparable harm where there is evidence, or at least credible allegations, that the defendants are transferring assets out of the Court's jurisdiction, allegations which are not present here. *See, e.g.*, *United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 493 (4th Cir. 1999); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988). For purposes of Defendants' ability to satisfy a money judgment, it makes little difference whether, for example, the RBT Trust II owns PLICA, or instead possesses the cash obtained from selling the company. Apart from that, the risk that a defendant will be unable to satisfy a money judgment because he has squandered his resources in the interim is a risk present in every case, and therefore cannot alone warrant granting preliminary injunctive relief.

The Court could conclude its analysis with its finding that Plaintiffs have made an insufficient showing of threat of irreparable harm, *see Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 n.5 (8th Cir. 2008) ("[I]n some cases, lack of irreparable injury is the factor that should begin and end the *Dataphase* analysis."), but some additional discussion of

Plaintiffs' likelihood of success on the merits is warranted. With respect to this factor, the party seeking injunctive relief does not need to prove a mathematical probability of success – that is, a probability greater than fifty percent – but instead must only show that she has "a fair chance of prevailing." *Id.* at 732 ("[D]istrict courts should . . . apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes."); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing . . . ."). The likelihood of success on the merits test ultimately recognizes two situations in which this factor favors granting injunctive relief: (1) where "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined"; and (2) "where the balance of other factors tips decidedly toward [the movant]," and the movant "has raised questions so serious and difficult as to call for more deliberate investigation." *Dataphase Sys. Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

Plaintiffs presented evidence of numerous transactions between the Cassity Defendants, Lincoln, NPS, and Memorial – including purchases and payments of personal expenses by corporate entities controlled by the RBT Trust II for the benefit of the Cassity Defendants, the issuance of promissory notes by and among these entities with little or no documented security, and the blatant altering of life insurance policy applications to allow NPS to take out loans against those policies – that appear, at the very least, to be of questionable propriety, if not flatly fraudulent. This evidence, however, does not necessarily inform the Court's inquiry into whether

Plaintiffs are likely to succeed *on their equitable claims*.

Plaintiffs' equitable claims are premised on Defendants unjustly enriching themselves by misappropriating pre-need trust funds, but Plaintiffs have failed to establish to what extent Defendants were required to keep pre-need funds in trust – that is, to what extent, if any, funds were actually misappropriated. It is hardly necessary to state that Defendants were not required to deposit *all* funds received from selling pre-need funeral contracts in trust; if that were the case, it would be impossible to extract any profit from the business. According to Defendants, with respect to Pre-Need Trust IV for Missouri pre-need contracts, a 1994 consent judgment required them to place 80% of the face value of a contract in trust, and Brent Cassity asserts that any loans made from that trust were only made with funds in excess of that amount. It also appears that at least some of the actions taken with respect to Trust IV were approved by a court-appointed monitor pursuant to the consent judgment, and the implications of that, if any, have not been fully addressed. In short, while there have been some indications that Defendants have left their pre-need trusts with insufficient assets, the Court cannot infer that Defendants improperly enriched themselves without some evidence demonstrating a discrepancy between what assets are currently in those trusts and what assets *should* be in those trusts.

There are several additional problems with Plaintiffs' claims that Defendants unjustly enriched themselves with pre-need funds. Defendants claim that Trust IV contained some amount of so-called "trapped funds" – premiums from lapsed policies – which Defendants were free to extract and use to fund other business activities. Plaintiffs seem to acknowledge that Defendants would be permitted to use these trapped funds for their own ends, but they assert without evidence that the amounts of such funds were negligible. Furthermore, Defendants

assert that all loans from Trust IV were being serviced until the Texas Department of Insurance instituted receivership proceedings and seized control of NPS, Lincoln, and Memorial, and Plaintiffs did not actively refute this assertion, other than to state that they do not know if payments were made. Likewise, Plaintiffs failed to demonstrate that it would necessarily be improper for Defendants to convert whole life insurance policies to term policies, and they did not refute Defendants' assertion that Defendants never failed to make premium payments on whole life policies that were converted to term policies. As such, without any evidence as to (1) whether Defendants violated the consent judgment in removing funds from Pre-Need Trust IV, (2) whether Defendants failed to service loans that were properly taken from the trust, (3) whether Defendants were prohibited from converting whole life policies to term policies, and (4) whether Defendants ever actually failed to make premium payments on such term policies, the Court cannot reach a reasoned conclusion that Plaintiffs are likely to succeed on the merits on their equitable claims.

In sum, then, the Court concludes that Plaintiffs' request for preliminary injunctive relief will be denied. Plaintiffs failed to make the necessary showing of a threat of irreparable harm, in that their only threatened harm is the possibility that Defendants might be unable to satisfy a future money judgment. The Court is also not persuaded that Plaintiffs have a "fair chance" of succeeding on the merits on their equitable claims, as they failed to present sufficient evidence to support their allegations that Defendants' extraction of funds from Pre-Need Trust IV was improper. As such, the Court finds it unnecessary to consider the remaining *Dataphase* factors.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction Freezing

Assets of Specified Defendants [doc. #405] is **DENIED**.

**IT IS FURTHER ORDERED** that Brent Cassity's Motion to Strike Unauthenticated Exhibits [doc. #457], Tyler Cassity and Hollywood Forever's Motion to Provide Supplemental Briefing to the Court [doc. #502], BHP, Forever Enterprises, Forever Illinois, Forever Network, Legacy International, LMS, NHE, NPS Agency, and Texas Forever's Motion to Join [doc. #504], Brent Cassity's Motion for Leave to Provide Supplemental Briefing [doc. #506], Doug Cassity's Motion to Join [doc. #515], Doug Cassity's Motion to Join [doc. #519], and Rhonda Cassity's Motion to Join [doc. #550] are **DENIED, as moot**.

Dated this 23rd Day of March, 2011.

E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE