**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| JO ANN HOWARD AND ASSOCIATES, P.C., | ) | |
| SPECIAL DEPUTY RECEIVER OF LINCOLN | ) | |
| MEMORIAL LIFE INSURANCE COMPANY, | ) | |
| MEMORIAL SERVICE LIFE INSURANCE | ) | |
| COMPANY, AND NATIONAL | ) | |
| PREARRANGED SERVICES, INC.; THE | ) | |
| NATIONAL ORGANIZATION OF LIFE AND | ) | |
| HEALTH INSURANCE GUARANTY | ) | |
| ASSOCIATIONS; THE MISSOURI LIFE & | ) | |
| HEALTH INSURANCE GUARANTY | ) | |
| ASSOCIATION; THE TEXAS LIFE & | ) | |
| HEALTH INSURANCE GUARANTY | ) | |
| ASSOCIATION; THE ILLINOIS LIFE & | ) | |
| HEALTH INSURANCE GUARANTY | ) | |
| ASSOCIATION; THE KANSAS LIFE & | ) | |
| HEALTH INSURANCE GUARANTY | ) | |
| ASSOCIATION; THE OKLAHOMA LIFE & | ) | |
| HEALTH INSURANCE GUARANTY | ) | |
| ASSOCIATION; THE KENTUCKY LIFE & | ) | Case No. 09-CV-1252-ERW |
| HEALTH INSURANCE GUARANTY | ) | |
| ASSOCIATION; and THE ARKANSAS LIFE & | ) | Jury Trial Demanded |
| HEALTH INSURANCE GUARANTY | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| J. DOUGLAS CASSITY; RANDALL K. | ) | |
| SUTTON; BRENT D. CASSITY; J. TYLER | ) | |
| CASSITY; RHONDA L. CASSITY; | ) | |
| KATHERINE P. SCANNELL; RANDALL J. | ) | |
| SINGER; HOWARD A. WITTNER, individually | ) | |
| and as Trustee of the RBT TRUST II; WITTNER, | ) | |
| SPEWAK & MAYLACK, P.C. f/k/a WITTNER, | ) | |
| POGER, SPEWAK, MAYLACK & SPOONER, | ) | |
| P.C.; DAVID R. WULF; WULF, BATES & | ) | |
| MURPHY, INC.; MICHAEL R. BUTLER; | ) | |
| LENNIE J. CAPPLEMAN; JAMES M. | ) | |

598252

CRAWFORD; TONY B. LUMPKIN, III;           )
NEKOL PROVINCE; ROXANNE J.                )
SCHNIEDERS; GEORGE WISE, III;             )
MARIANNE JONES, ANNE CHRUN;               )
NATIONAL HERITAGE ENTERPRISES, INC.;      )
FOREVER ENTERPRISES, INC. f/k/a           )
LINCOLN HERITAGE CORPORATION;             )
LINCOLN MEMORIAL SERVICES, INC.;          )
RHONDA L. CASSITY, INC. a/k/a             )
WELLSTREAM, INC., f/k/a R.L. CASSITY,     )
INC. and TRANS-AMERICAN FACILITIES,       )
INC.; FOREVER NETWORK, INC. f/k/a         )
FOREVER ENTERPRISES, INC., CASSITY        )
ENTERPRISES, INC., and CASSITY            )
HERITAGE FUNERAL HOMES, INC.;             )
FOREVER ILLINOIS, INC.; HOLLYWOOD         )
FOREVER, INC.; TEXAS FOREVER, INC.        )
d/b/a FOREVER ALL FAITHS; NATIONAL        )
PREARRANGED SERVICES AGENCY, INC.;        )
LEGACY INTERNATIONAL IMPORTS, INC.        )
d/b/a TRIAD; WISE, MITCHELL &             )
ASSOCIATES, LTD.; BRENTWOOD               )
HERITAGE PROPERTIES, LLC; BREMEN          )
BANK AND TRUST COMPANY; NATIONAL          )
CITY BANK; MARSHALL & ILSLEY TRUST        )
COMPANY, N.A.; SOUTHWEST BANK an          )
M&I BANK; U.S. BANK, N.A.; BANK OF        )
AMERICA, N.A.; AMERICAN STOCK             )
TRANSFER AND TRUST COMPANY;               )
COMERICA BANK AND TRUST, N.A.;            )
BROWN SMITH WALLACE, L.L.C.; PNC          )
BANK, N.A.; BMO HARRIS BANK, N.A.;        )
RICHARD MARKOW; HERBERT MORISSE;          )
and JOHN DOES 1-25,                       )
                                          )
          Defendants.                     )
                                          )
                                          )
                                          )
                                          )

## THIRD AMENDED COMPLAINT

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  SUMMARY OF THE FRAUDULENT SCHEME ........................................... 1

III.  JURISDICTION AND VENUE ....................................................................... 9

IV.  PARTIES ........................................................................................................ 10

    A.  Plaintiffs ................................................................................................ 10

    B.  Which Plaintiffs Assert Which Claims ................................................ 12

    C.  Plaintiffs' Right to Bring Claims ......................................................... 19

    D.  Defendants and Associated Non-Parties .............................................. 20

V.  FACTUAL ALLEGATIONS ........................................................................... 40

    A.  The RICO Defendants Accumulated Millions of Dollars Generated from the Sales of Pre-Need Funeral Contracts ................................................... 40

    B.  The RICO Defendants "Whited-Out" and Altered Key Information on Insurance Policy Applications ............................................................... 43

    C.  The RICO Defendants Cashed Out Whole Life Insurance Policies Through Improper Policy Loans ........................................................................... 48

    D.  The RICO Defendants Siphoned Money by Surrendering Whole Life Policies and Replacing Them with Ill-Suited Term Policies ............................... 54

    E.  The RICO Defendants and Promissory Note Defendants Looted the NPS Pre-Need Trusts and Issued Promissory Notes and Debentures in Exchange ............ 57

    F.  To Further Fund Their Scheme to Defraud, the RICO Defendants Siphoned Additional Funds from "Roll-Overs" ................................................... 62

    G.  The Investment Advisor Defendants Played a Critical Role in the Scheme to Defraud ................................................................................................ 63

    H.  The Trustee Defendants of the NPS Pre-Need Trusts Breached Their Fiduciary Duties ................................................................................... 68

    I.  The SDR, NOLHGA, and the State Guaranty Association Claims Against the Trustee Defendants ............................................................................. 70

i

J.  The Defendant Attorneys Were Materially Involved in the Schemes to Defraud ....... 76

K.  The Defendant Auditor Failed to Disclose the Looting of Lincoln and
    Memorial .................................................................................................... 78

L.  The RICO Defendants' Schemes to Loot NPS, Lincoln, and Memorial
    Involved Extensive Mail and Wire Fraud in Violation of RICO ......................... 80

M.  The Fraudulent Transfer Defendants Initiated and Accepted Millions of
    Dollars in Fraudulent Transfers ...................................................................... 84

N.  The Cassity Consortium Entities Are Alter Egos of the Defendants ......................... 86

O. The Trustee Defendants Further Breached Their Duties and Aided and Abetted
    the Unlawful Conduct of Other Defendants ......................................................... 88

    1.      State and Federal Regulators Identified Breaches of Duties and
           Statutory Violations ................................................................................ 89

    2.      The Missouri Trustee Banks Failed to Control Trust Assets ................... 92

    3.      The Iowa Trustee Banks Failed to Hold Pre-Need Funds and NPS
           Iowa Pre-Need Trust Assets .................................................................. 95

    4.      The Trustee Defendants Failed to Ensure Prudent Trust
           Investments .......................................................................................... 95

           a.      The Trustee Defendants Breached Their Duties By
                Allowing Wulf, Wulf Bates, and NPS Employees to Direct
                Trust Investments ...................................................................... 96

           b.      The Missouri Trustee Banks Breached Their Duties By
                Allowing Improper Transfers to and Investments in NPS
                Affiliates ................................................................................... 98

           c.      The Iowa Trustee Banks Breached Their Duties by
                Improperly Allowing Pre-Need Trust Funds to be Used to
                Purchase Insurance Policies ....................................................... 102

           d.      The Iowa Trustee Banks Breached Their Duties by
                Allowing Improper Investments in an NPS-Affiliated
                Insurance Company .................................................................... 103

           e.      Allegiant Bank Breached Its Duties by Using Funds From
                NPS Pre-Need Trusts to Purchase Assets From Forever
                Enterprises at Inflated Prices ..................................................... 104

ii

f.     The Missouri Trustee Banks Failed to Safeguard the Insurance Policies that Were Assets of the Trusts ..................... 111

5.     The Trustee Defendants Failed to Maintain Adequate Trust Records ........................................................................... 114

6.     The Missouri Trustee Banks Improperly Distributed Funds to NPS ...... 117

7.     The Missouri Trustee Banks Breached Their Duties With Respect to Roll-Overs ...................................................................... 118

8.     Allegiant Bank's, Marshall & Ilsley's, and Southwest Bank's Other Banking Relationships Created Conflicts of Interest ................... 119

9.     The Iowa Trustee Banks Violated Iowa Statute ..................................... 121

10.    The Trustee Defendants Failed to Warn of Their Concerns and of Problems With the Trusts....................................................... 121

11.    National City Bank Improperly Cancelled a Mortgage After Receivership........................................................................ 124

P.  Defendants Markow and Morisse Were Negligent and Participated in Various Fiduciary Breaches by Allegiant Bank and Bremen Bank ................. 125

FIRST CLAIM FOR RELIEF ........................................................................ 134

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) ............................................................................ 134

SECOND CLAIM FOR RELIEF ................................................................... 138

Conspiracy to Violate RICO under 18 U.S.C. § 1962(d) ............................ 138

THIRD CLAIM FOR RELIEF ....................................................................... 139

Violation of RICO 18 U.S.C. § 1962(a) ...................................................... 139

FOURTH CLAIM FOR RELIEF .................................................................... 141

Lanham Act (Violation of 15 U.S.C. § 1125(a)) ......................................... 141

FIFTH CLAIM FOR RELIEF ........................................................................ 142

Fraudulent Omissions/Nondisclosure .......................................................... 142

iii

SIXTH CLAIM FOR RELIEF.................................................................................... 147

    Fraudulent Misrepresentations............................................................................ 147

SEVENTH CLAIM FOR RELIEF ............................................................................. 150

    Conspiracy to Commit Fraud .............................................................................. 150

EIGHTH CLAIM FOR RELIEF ................................................................................. 151

    Aiding and Abetting Fraud .................................................................................. 151

NINTH CLAIM FOR RELIEF.................................................................................... 152

    Negligent Misrepresentations and Omissions................................................... 152

TENTH CLAIM FOR RELIEF ................................................................................... 154

    Breach of Promissory Notes ............................................................................... 154

ELEVENTH CLAIM FOR RELIEF ........................................................................... 157

    Consumer Protection Act Violations .................................................................. 157

TWELFTH CLAIM FOR RELIEF.............................................................................. 158

    Texas Receivership Act Violations (Tex. Ins. Code §§ 443.202 to 205) ...................... 158

THIRTEENTH CLAIM FOR RELIEF ....................................................................... 161

    Violation of Texas Insurance Code § 463.302 ("Distributions to Shareholders
    and Affiliates")................................................................................................... 161

FOURTEENTH CLAIM FOR RELIEF ...................................................................... 162

    Fraudulent Transfer Act Violations ................................................................... 162

FIFTEENTH CLAIM FOR RELIEF ........................................................................... 165

    Breach of Fiduciary Duty by Officers and Directors......................................... 165

SIXTEENTH CLAIM FOR RELIEF .......................................................................... 167

    Gross Negligence by Officers and Directors ..................................................... 167

598252

SEVENTEENTH CLAIM FOR RELIEF .................................................................... 169

    Breach of Fiduciary Duty by Investment Advisors ...................................... 169

EIGHTEENTH CLAIM FOR RELIEF ...................................................................... 172

    Gross Negligence by Investment Advisors.................................................. 172

NINETEENTH CLAIM FOR RELIEF ...................................................................... 173

    Breach of Fiduciary Duty by Trustee Banks............................................... 173

TWENTIETH CLAIM FOR RELIEF ........................................................................ 176

    Negligence and Gross Negligence by Trustee Banks ................................. 176

TWENTY-FIRST CLAIM FOR RELIEF ................................................................. 178

    Aiding and Abetting Breach of Fiduciary Duty by Investment Advisors ..................... 178

TWENTY-SECOND CLAIM FOR RELIEF .............................................................. 180

    Aiding and Abetting Breach of Fiduciary Duty by Trustee Banks................................ 180

TWENTY-THIRD CLAIM FOR RELIEF ................................................................. 181

    Legal Malpractice ....................................................................................... 181

TWENTY-FOURTH CLAIM FOR RELIEF .............................................................. 183

    Breach of Fiduciary Duty by Attorneys...................................................... 183

TWENTY-FIFTH CLAIM FOR RELIEF .................................................................. 184

    Professional Negligence Against Auditors ................................................. 184

TWENTY-SIXTH CLAIM FOR RELIEF .................................................................. 186

    Interference with Business Relationships (Tortious Interference with Contract)........... 186

TWENTY-SEVENTH CLAIM FOR RELIEF ............................................................ 188

    Conversion .................................................................................................. 188

TWENTY-EIGHTH CLAIM FOR RELIEF ............................................................... 189

    Unjust Enrichment ...................................................................................... 189

598252

TWENTY-NINTH CLAIM FOR RELIEF ................................................................. 191

    Money Had and Received ................................................................. 191

THIRTIETH CLAIM FOR RELIEF ................................................................. 193

    Constructive Trust ................................................................. 193

THIRTY-FIRST CLAIM FOR RELIEF ................................................................. 194

    Aiding and Abetting Fraud ................................................................. 194

THIRTY-SECOND CLAIM FOR RELIEF ................................................................. 197

    Aiding and Abetting Breach of Fiduciary Duty by Investment Advisors ..................... 197

THIRTY-THIRD CLAIM FOR RELIEF ................................................................. 200

    Aiding and Abetting Breach of Fiduciary Duty by Bremen Bank ................................. 200

THIRTY-FOURTH CLAIM FOR RELIEF ................................................................. 202

    Aiding and Abetting Breach of Fiduciary Duty by Bremen Bank ................................. 202

THIRTY-FIFTH CLAIM FOR RELIEF ................................................................. 203

    Negligence ................................................................. 203

THIRTY-SIXTH CLAIM FOR RELIEF ................................................................. 205

    Breach of Fiduciary Duty ................................................................. 205

THIRTY-SEVENTH CLAIM FOR RELIEF ................................................................. 205

    Participation in Breach of Trust Duties and Aiding and Abetting Breach of
        Fiduciary Duties ................................................................. 205

THIRTY-EIGHTH CLAIM FOR RELIEF ................................................................. 207

    Aiding and Abetting Fraud ................................................................. 207

THIRTY-NINTH CLAIM FOR RELIEF ................................................................. 208

    Negligence ................................................................. 208

FORTIETH CLAIM FOR RELIEF ............................................................... 209

    Breach of Fiduciary Duty ............................................................... 209

FORTY-FIRST CLAIM FOR RELIEF ......................................................... 210

    Participation in a Breach of Trust Duties and Aiding and Abetting Breach of
        Fiduciary Duties ............................................................... 210

FORTY-SECOND CLAIM FOR RELIEF ....................................................... 211

    Aiding and Abetting Fraud ............................................................... 211

RELIEF REQUESTED ............................................................................... 213

598252

Plaintiffs, as set forth in the caption and detailed below, through their attorneys, Reilly Pozner LLP, state and allege as follows.

## I. INTRODUCTION

1.      The Cassity family of St. Louis preyed on consumers and funeral homes to perpetrate a multi-million dollar, nationwide scheme arising from the sale of "pre-need" funeral services and merchandise.  The Cassity family took in massive amounts of money paid by funeral home customers for their future funeral needs.  Rather than safeguarding that money, the Cassity family and other Defendants systematically looted the cash for their personal enrichment. Plaintiffs are nationwide life and health insurance guaranty associations and a Texas receiver who have been left to pay more than $600 million of liabilities left behind by the Cassity family and the other Defendants.

## II. SUMMARY OF THE FRAUDULENT SCHEME

2.      Plaintiffs are bringing this lawsuit to recover losses in excess of $600 million caused by the RICO Defendants' (as defined later in this Complaint) scheme to defraud hundreds of funeral homes and consumers across the nation into selling and purchasing pre-need funeral contracts marketed by St. Louis-based National Prearranged Services, Inc. ("NPS"), and purportedly backed by life insurance policies issued by two affiliated entities:  Texas-based companies Lincoln Memorial Life Insurance Company ("Lincoln") and Memorial Service Life Insurance Company ("Memorial").

3.      NPS, Lincoln, and Memorial are part of a larger consortium of related entities that are all ultimately owned by a family trust of the St. Louis-based Cassity family, whose members are Defendants Doug, Rhonda, Brent, and Tyler Cassity.  The majority of entities within this

1

consortium are involved in some aspect of the funeral industry.  This group of Cassity-controlled and related entities is collectively referred to in this Complaint as the "Cassity Consortium."

4.      Each of the Defendants was employed or retained by, associated with, or consists of one or more of the entities within the Cassity Consortium, and each Defendant operated, managed, assisted in, negligently failed to detect, and/or personally participated in the scheme to defraud the funeral homes and consumers that is detailed in this Complaint.

5.      The Cassity family operated and ultimately owned NPS (which was formed in 1979), created Memorial in 1986, and acquired Lincoln as part of the Cassity Consortium in 1998.  The acquisition of Lincoln and creation of Memorial was critical to perpetrating the scheme to defraud the funeral homes because the vast majority of pre-need funeral contracts sold by NPS were claimed to be backed by whole life insurance policies issued by Lincoln or Memorial.  The NPS/Lincoln/Memorial enterprise provided the RICO Defendants a seemingly legitimate cover under which they could siphon off the pre-need funds entrusted to NPS by funeral homes and their customers all over the country.

6.      Defendant Doug Cassity is a disbarred Missouri lawyer who in 1982 was sentenced to two years in federal prison as a result of a felony fraud conviction.  Defendant Doug Cassity used fraudulent letters of credit in order to obtain loans or lines of credit to acquire property and assets, and falsified an income tax return.  As a result of his conviction, Doug Cassity was and is permanently banned from having any involvement in the insurance industry.  Despite and contrary to this bar, Doug Cassity actively engaged in the management of all entities within the Cassity Consortium, including but not limited to NPS, Lincoln, and Memorial.

7.     The RICO Defendants intentionally misled funeral homes and consumers around the country into believing pre-need funds entrusted to NPS would be safeguarded in a trust and/or backed by whole life insurance policies so that the funds would be readily available when a pre-need beneficiary died and the funeral home's death claim came due.  Rather than safeguarding the pre-need funds they accumulated, the RICO Defendants systematically: (1) siphoned money away from NPS, Lincoln, and Memorial; (2) looted NPS' pre-need trusts; (3) used the funds from the pre-need funeral contract sales to enrich other entities within the Cassity Consortium as well as individual Defendants; and (4) depleted the cash value of whole life insurance policies by repeatedly taking policy loans, converting the policies to "reduced paid up" ("RPU") status, and mass surrendering the whole life policies and frequently replacing the whole life polices with term life insurance policies with no cash value and which may be cancelled unless premiums are paid.

8.     The RICO Defendants knowingly failed to disclose and concealed these practices from the funeral homes and consumers, despite the RICO Defendants' knowledge that these practices would have been material to the funeral homes' decisions of whether to sell NPS pre-need contracts and consumers' decisions to purchase NPS pre-need contracts.

9.     To further their schemes, the RICO Defendants hired Defendants Wulf and Wulf Bates (the "Investment Advisor Defendants") to act as purported "independent" investment advisors for the various NPS trusts holding the proceeds of the pre-need funeral contracts. Defendants Wulf and Wulf Bates subsequently appointed and authorized the President of both NPS and Lincoln (Defendant Sutton) to act as an "investment agent" for the pre-need trust funds, thus allowing the RICO Defendants to directly manipulate the trust assets.

3

10.     Defendants Wulf and Wulf Bates not only actively participated in the RICO Defendants' various schemes to loot NPS, Lincoln, and Memorial, but directed the investment of millions of dollars of NPS pre-need trust funds into Defendant Wulf's personal investment partnerships and Cassity family entities in which Wulf held a personal ownership interest.

11.     Defendant banks Bremen Bank, National City Bank (as the ultimate successor in interest to Allegiant Bank), PNC Bank (as the ultimate successor in interest to Allegiant Bank and National City Bank), Marshall & Ilsley, Southwest Bank, BMO Harris Bank (as the ultimate successor in interest to Marshall & Ilsley and Southwest Bank), U.S. Bank (as the ultimate successor in interest to Mark Twain Bank and Mercantile Trust Company), Bank of America, American Stock Transfer, and Comerica Bank and Trust (collectively, the "Trustee Defendants") served as trustees of the various NPS pre-need trusts and failed to properly supervise the NPS pre-need trusts' assets.  The Trustee Defendants allowed the NPS pre-need trust assets to be pillaged through the purchase and mass surrender of life insurance policies from Lincoln, the transfer of cash to Cassity Consortium entities in exchange for promissory notes from those entities that the Cassity Consortium entities never intended to enforce, and numerous other acts detailed below.

12.     Defendants Scannell, Wittner, and Wittner's law firm, Wittner, Spewak & Maylack, P.C. (collectively, the "Attorney Defendants"), served as general counsel to the entities within the Cassity Consortium and were directly involved in and profited from the RICO Defendants' illegal schemes.  Scannell and Wittner also committed legal malpractice by providing legal advice authorizing and assisting in the development and implementation of the techniques used to siphon money as described in this Complaint.

4

13.     The RICO Defendants siphoned away the pre-need funds through a variety of mechanisms, including:

    a) Directing NPS, as the improper "owner" of the whole life insurance policies issued by Lincoln, to take over $130 million of policy loans against the policies;

    b) Directing NPS, as the improper assignee/beneficiary on the Lincoln whole life insurance policies, to surrender thousands of policies so the RICO Defendants could confiscate millions of dollars of the cash surrender values;

    c) Replacing the whole life policies with term policies that required NPS to pay far less monthly premiums to Lincoln, thus allowing the RICO Defendants to keep for themselves more of the funds received from the funeral home consumers;

    d) Allowing NPS to stop paying premiums on the whole life and/or term insurance policies issued by Lincoln and Memorial, thus allowing the RICO Defendants to keep for themselves more of the funds received from the funeral home consumers;

    e) Altering life insurance policy applications to allow the RICO Defendants to keep for themselves the bulk of the funds received from the funeral home consumers;

    f) Taking tens of millions of dollars in cash out of the pre-need funeral trusts and replacing those funds with promissory notes, debentures,[1] and general ledger entries which were never intended to be repaid;

    g) Funneling the pre-need contract funds to other entities the RICO Defendants owned and controlled within the Cassity Consortium;

---

[1] A "debenture (also called a note) is a certificate issued by a company acknowledging that it has borrowed money on which interest is being paid.  It is an unsecured corporate bond or a corporate bond that does not have a certain

h) Paying commissions to themselves through NPS for insurance policies purchased from their own affiliated companies Lincoln and Memorial; and

i) Reducing by millions of dollars reinsurance recoveries due to Lincoln and Memorial by wrongfully surrendering whole life policies and issuing term policies in their place.

14. The RICO Defendants used the ill-gotten funds for a variety of improper purposes, including to personally enrich themselves. For example, within the five years prior to the date of receivership , NPS paid the following personal credit card and other expenses of some of the RICO Defendants:

a) $3,003,649 for Defendant Doug Cassity's credit card bills;

b) $2,707,833 for Defendant Randall Sutton's credit card bills;

c) $1,010,375 for Defendant Tyler Cassity's credit card bills;

d) $542,437 for Defendant Brent Cassity's and his wife's credit card bills;

e) $502,419 for Defendant Jim Crawford's credit card bills;

f) $463,472 in direct, non-salary payments to Defendant Randy Singer; and

g) $146,521 for Defendant Tony Lumpkin's credit card bills.

15. The RICO Defendants looted NPS, Lincoln, and Memorial by engaging in sham transactions. For example, the RICO Defendants caused NPS to make the following sham transactions:

---

line of income or piece of property or equipment to guarantee repayment of principal upon the bond's maturity." http://en.wikipedia.org/wiki/Debenture

a) $25,463,492 paid to Defendant National Heritage Enterprises, Inc. ("NHE"), with NPS recording a note receivable but without a promissory note in return;

b) $17,542,578 paid to Defendant Forever Enterprises, with NPS recording a note receivable but without a promissory note in return;

c) $16,132,907 paid via check to Defendant Forever Enterprises, without a recorded note receivable or promissory note in return; and

d) $862,083 paid to Defendant Rhonda L. Cassity, Inc., with NPS recording a note receivable but without a promissory note in return.

16.    In the summer and fall of 2007, insurance regulators from various states began confidentially investigating the operations of NPS, Lincoln, and Memorial and began uncovering the RICO Defendants' scheme to defraud.  On October 24, 2007, Lincoln and Memorial were placed under an Order of Confidential Supervision by the Texas Department of Insurance. During the time Lincoln and Memorial were under the Supervision Order (the remainder of 2007 through mid-May 2008), the RICO Defendants, in violation of the Supervision Order and the instructions of the Supervisor, took improper actions without the knowledge and/or consent of the Texas Department of Insurance.   The RICO Defendants intentionally and fraudulently concealed these actions from the Supervisor and other regulators.

17.    By early 2008, additional state regulators had also begun investigations.  NPS, Lincoln, and Memorial were placed into receivership in Texas as the house of cards collapsed. By the time of and subsequent to the receivership, numerous states had revoked or suspended Lincoln's and NPS' right to do business in their states, and the FBI had begun an investigation into the illegal and fraudulent practices detailed in this Complaint.

7

18.     As a result of the RICO Defendants' schemes to defraud, the Special Deputy Receiver ("SDR") for NPS, Lincoln, and Memorial is now responsible for tens of millions of dollars in creditor claims against the estates of NPS, Lincoln, and Memorial, including millions in inflation (or "growth") payments NPS promised to the funeral homes as part of NPS' marketing program.  Because the RICO Defendants so systematically drained the assets of NPS, Lincoln, and Memorial, the SDR has not had sufficient liquid assets to satisfy these creditor claims.

19.     Following the receivership of Lincoln and Memorial, the state life and health insurance guaranty associations of forty-seven states developed a plan to provide coverage for the insurance policies issued by Lincoln and Memorial notwithstanding the RICO Defendants' scheme to defraud.  These guaranty associations are obligated and stand ready to pay approximately $600 million in face value of life insurance policy benefits under the Lincoln and Memorial life insurance policies.

20.     In perpetrating, assisting in, or negligently failing to detect the scheme to defraud the funeral homes and their customers, Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, violated the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, committed fraud, breached their fiduciary duties, violated numerous state consumer protection acts, committed fraudulent transfers, breached obligations to repay funds and/or were unjustly enriched to the tune of more than half a billion dollars.

21.     None of the Defendants are entitled to any offset, setoff, credit or other adjustment to their liability pursuant to the provisions of the TEX. INS. CODE § 443.009.  The RICO Defendants, Trustee Defendants, Investment Advisor Defendants, D&O Defendants (as

defined later in this Complaint) were fiduciaries or the affiliates of fiduciaries, which had legal obligations to disclose the conduct described in this Complaint, but failed to do so.  The RICO Defendants sought to and did fraudulently conceal their conduct.

22.     All individual property and all community property of the individual Defendants are subject to the liability of this lawsuit and subject to recapture, to the extent of any distribution in preference to the community debt arising from this suit.

### III.  JURISDICTION AND VENUE

23.     This Court has original jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States.  Specifically, this action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* and the Lanham Act, 15 U.S.C. §§ 1050 *et seq.*

24.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367, because all other claims are so related to those claims over which the Court has original jurisdiction as to form part of the same case or controversy under Article III of the United States Constitution.

25.     This Court has jurisdiction over the causes of action asserted by the SDR pursuant to, *inter alia*, TEX. INS. CODE § 443.005(c), which provides that the Texas Receivership Court has original but not exclusive jurisdiction to civil matters related to the delinquency proceedings of NPS, Lincoln, and Memorial.

26.     Personal jurisdiction comports with due process under the United States Constitution and the long-arm statutes of Missouri.  Many of the Defendants, as detailed in the Parties section of this Complaint, are residents of the state of Missouri.  Those Defendants that are not residents of Missouri, either directly or through agents, had the requisite minimum

contacts with Missouri such that, under the circumstances, it is fair and reasonable to require Defendants to come to this Court to defend this action.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events that give rise to the claims occurred in this District.

## IV. PARTIES

### A. *Plaintiffs*

28.     Plaintiff SDR, located in Austin, Texas, is the duly appointed and designated Special Deputy Receiver for NPS, Lincoln, and Memorial, and is authorized to deal with the property, business, and claims for or against NPS, Lincoln, and Memorial pursuant to the provisions of the *Insurer Receivership Act,* Texas Insurance Code Chapter 443, including but not limited to the authority granted under TEX. INS. CODE § 443.154.  The SDR, though this action, exercises the full extent of her authority under TEX. INS. CODE § 443.154 to bring claims on behalf of NPS, Lincoln, Memorial, their creditors, members, policyholders, and shareholders, and/or the public.  Under TEX. INS. CODE § 443.011, the SDR has the right to bring such claims notwithstanding that NPS, Lincoln, and Memorial were part of the Cassity Consortium.

29.     Plaintiff the National Organization of Life and Health Insurance Guaranty Associations ("NOLHGA") is a Virginia nonstock corporation.  It is a voluntary association of its members, which are all of the life and health insurance guaranty associations of the states of the United States of America, and the District of Columbia and Puerto Rico.  NOLHGA is a plaintiff in this action as the assignee of claims for collection purposes from the following state life and health insurance guaranty associations:   Arizona, California, Colorado, District of Columbia, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota,

Mississippi, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Washington, West Virginia, Wisconsin, and Wyoming. Each state life and health insurance guaranty association is a statutory entity created by their respective state legislatures to provide protection to their respective state's resident policyholders in the event of an insolvency of a member insurance company.

30.     NOLHGA also brings claims under the doctrine of associational standing as an association on behalf of certain of its members:  the state life and health insurance guaranty associations for the states of Arizona, California, Colorado, District of Columbia, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Washington, West Virginia, Wisconsin, and Wyoming.  NOLHGA's members are suffering immediate and continued injury as a result of Defendants' actions as set forth in this Complaint.

31.     Plaintiffs Missouri Life and Health Insurance Guaranty Association, Texas Life and Health Insurance Guaranty Association, Illinois Life and Health Insurance Guaranty Association, Kansas Life and Health Insurance Guaranty Association, Oklahoma Life and Health Insurance Guaranty Association, Kentucky Life and Health Insurance Guaranty Association, and Arkansas Life and Health Insurance Guaranty Association are statutory entities created by their respective state legislatures to provide protection to their respective states' resident policyholders in the event of an insolvency of a member insurance company.

32.     The various state life and health insurance guaranty associations (including those named as Plaintiffs and those bringing claims through NOLHGA) have been assigned and/or

subrogated to the causes of action the funeral homes, consumers and their estates, policyholders, beneficiaries, and other payees have against those responsible for the losses in this case through: (1) each state guaranty association's enabling act; (2) the NPS/Lincoln/Memorial Liquidation Plan approved on September 22, 2008, by the Texas Receivership Court in Travis County, Texas; and/or (3) express assignments received from every recipient of a death benefit paid by a state guaranty association.

## B.  Which Plaintiffs Assert Which Claims

32.1.   Plaintiffs' claim for violation of RICO, 18 U.S.C. § 1962(c), (first claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers.

32.2.   Plaintiffs' claim for conspiracy to violate RICO, 18 U.S.C. § 1962(d), (second claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers.

32.3.   Plaintiffs' claim for violation of RICO, 18 U.S.C. § 1962(a), (third claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers.

32.4.   Plaintiffs' claim for violation of the Lanham Act, 15 U.S.C. § 1125(a), (fourth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from

Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of funeral homes.

32.5.   Plaintiffs' claim for fraudulent omissions/nondisclosure (fifth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of funeral homes and consumers.

32.6.   Plaintiffs' claim for fraudulent misrepresentations (sixth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of funeral homes and consumers.

32.7.   Plaintiffs' claim for conspiracy to commit fraud (seventh claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of funeral homes and consumers.

32.8.   Plaintiffs' claim for aiding and abetting fraud (eighth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of funeral homes and consumers.

32.9.   Plaintiffs' claim for negligent misrepresentations and omissions (ninth claim for relief) is brought by:   (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of funeral homes and consumers.

32.10.  Plaintiffs' claim for breach of promissory notes (tenth claim for relief) is brought by the SDR on behalf of NPS, Lincoln, and Memorial.

32.11.  Plaintiffs' claim for consumer protection act violations (eleventh claim for relief) is brought by:   (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of funeral homes and consumers.

32.12.  Plaintiffs' claim for Texas Receivership Act violations (twelfth claim for relief) is brought by the SDR on behalf of NPS, Lincoln, and Memorial.

32.13.  Plaintiffs' claim for violation of the Texas Insurance Code § 463.302 (thirteenth claim for relief) is brought by the SDR on behalf of NPS, Lincoln, and Memorial.

32.14.  Plaintiffs' claim for fraudulent transfer act violations (fourteenth claim for relief) is brought by:   (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, consumers, and all other general creditors of the estates of NPS, Lincoln, and Memorial.

32.15.  Plaintiffs' claim for breach of fiduciary duty by officers and directors (fifteenth claim for relief) is brought by the SDR on behalf of NPS, Lincoln, and Memorial.

32.16.  Plaintiffs' claim for gross negligence by officers and directors (sixteenth claim for relief) is brought by the SDR on behalf of NPS, Lincoln, and Memorial.

32.17.  Plaintiffs' claim for breach of fiduciary duty by investment advisors (seventeenth claim for relief) is brought by:   (1) NOLHGA; (2) the individual state guaranty associations from

Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.18.  Plaintiffs' claim for gross negligence by investment advisors (eighteenth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.19.  Plaintiffs' claim for breach of fiduciary duty by trustee banks (nineteenth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.20.  Plaintiffs' claim for negligence and gross negligence by trustee banks (twentieth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.21.  Plaintiffs' claim for aiding and abetting breach of fiduciary duty by investment advisors (twenty-first claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.22.  Plaintiffs' claim for aiding and abetting breach of fiduciary duty by trustee banks (twenty-second claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.23.  Plaintiffs' claim for legal malpractice (twenty-third claim for relief) is brought by the SDR on behalf of NPS, Lincoln, and Memorial.

32.24.  Plaintiffs' claim for breach of fiduciary duty by attorneys (twenty-fourth claim for relief) is brought by the SDR on behalf of NPS, Lincoln, and Memorial.

32.25.  Plaintiffs' claim for professional negligence against auditors (twenty-fifth claim for relief) is brought by the SDR on behalf of Lincoln and Memorial.

32.26.  Plaintiffs' claim for interference with business relationships/tortious interference with contract (twenty-sixth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.27.  Plaintiffs' claim for conversion (twenty-seventh claim for relief) is brought by the SDR on behalf of NPS, Lincoln, and Memorial.

32.28.  Plaintiffs' claim for unjust enrichment (twenty-eighth claim for relief) against the Fraudulent Transfer Defendants is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers.  With regard to the Trustee Defendants, only the SDR on behalf of NPS is bringing the unjust enrichment claim, as detailed in paragraph 197.2.

32.29. Plaintiffs' claim for money had and received (twenty-ninth claim for relief) against the Fraudulent Transfer Defendants is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers.

With regard to the Trustee Defendants, only the SDR on behalf of NPS is bringing the money had and received claim, as detailed in paragraph 197.2.

32.30.  Plaintiffs' claim for constructive trust (thirtieth claim for relief) is brought by: (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers.

32.31.  Plaintiffs' claim for aiding and abetting fraud (thirty-first claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of funeral homes and consumers.

32.32.  Plaintiffs' claim for aiding and abetting breach of fiduciary duty by investment advisors (thirty-second claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.33.  Plaintiffs' claim for aiding and abetting breach of fiduciary duty by Bremen Bank (thirty-third claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.34.  Plaintiffs' claim for aiding and abetting breach of fiduciary duty by Bremen Bank (thirty-fourth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.35.  Plaintiffs' claim for negligence by Defendant Richard Markow (thirty-fifth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.36.  Plaintiffs' claim for breach of fiduciary duty by Defendant Richard Markow (thirty-sixth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.37.  Plaintiffs' claim for participation in a breach of trust duties and aiding and abetting breach of fiduciary duties by Defendant Richard Markow (thirty-seventh claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.38.  Plaintiffs' claim for aiding and abetting fraud by Defendant Richard Markow (thirty-eighth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of funeral homes and consumers.

32.39.  Plaintiffs' claim for negligence by Defendant Herbert Morisse (thirty-ninth claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.40. Plaintiffs' claim for breach of fiduciary duty by Defendant Herbert Morisse (fortieth claim for relief) is brought by:   (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.41. Plaintiffs' claim for participation in a breach of trust duties and aiding and abetting breach of fiduciary duties by Defendant Herbert Morisse (forty-first claim for relief) is brought by:  (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of NPS, funeral homes, and consumers.

32.42. Plaintiffs' claim for aiding and abetting fraud by Defendant Herbert Morisse (forty-second claim for relief) is brought by:   (1) NOLHGA; (2) the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and (3) the SDR on behalf of funeral homes and consumers.

### C.  Plaintiffs' Right to Bring Claims

32.43.  NOLHGA and the seven individual state guaranty associations bring their claims by virtue of their obligations to pay approximately $600 million in face value of Lincoln and Memorial life insurance policies.

32.44.  The division of payment obligations among the state guaranty associations is set forth in the Liquidation Plan developed in cooperation with NOLHGA, the state guaranty associations, and the SDR, and entered by the Texas Receivership Court on September 22, 2008. The Liquidation Plan is attached as Exhibit 2 and the court order (the "Liquidation Order") approving the Liquidation Plan is attached as Exhibit 3.

19

32.45.  The Liquidation Plan classifies life insurance policies as either "Disputed Policies" or "Standard Policies."  "Disputed Policies" include generally, but are not limited to, those policies for which:  (a) NPS and/or an NPS pre-need trust is identified as the owner, beneficiary, payee, or assignee of the policy; (b) NPS took out or arranged for policy loans; or (c) NPS converted or arranged for the conversion from whole life policies to term policies.  (Ex. 2 ¶ 5.1).  "Standard Policies" include generally, but are not limited to, those policies for which: (a) neither NPS nor a Trustee is identified as the owner, beneficiary, or assignee of the policy; and (b) no policy loan was authorized, requested and/or made by/to NPS and/or a Trustee.  (*Id.* ¶ 4.1).

32.46.  The residency as of September 22, 2008, of the *insured* (for a "Disputed Policy") or the *policy owner* (for a "Standard Policy") determines which state guaranty association is responsible for providing coverage.  (Ex. 2 ¶ 6.1).  If the insured on a Disputed Policy was originally a resident of State A but moved to and became a resident of State B prior to September 22, 2008, the guaranty association for State B is responsible for paying the face value of that policy when a death claim is submitted.

32.47.  The SDR brings her claims pursuant to the Texas Insurer Receivership Act, including but not limited to section 443.154; the Liquidation Plan; and the Liquidation Order approving the Liquidation Plan.

### D.  Defendants and Associated Non-Parties

33.  Defendant J. Douglas ("Doug") Cassity, an individual, resides at one or more of the following locations:  Naples, Florida; Nantucket, Massachusetts; and/or New York, New York.  For all relevant times to this action, Defendant Doug Cassity maintained a business office

in the State of Missouri from which he conducted business related to the wrongful acts alleged in this Complaint.  Defendant Doug Cassity is and was at all times relevant to the allegations of this Complaint an Officer and Director of Rhonda L. Cassity, Inc. a/k/a Wellstream, Inc., a Missouri corporation and entity within the Cassity Consortium.  Defendant Doug Cassity appears to have held no other official positions within the Cassity Consortium but was ostensibly a "consultant" to NPS at all times relevant to the allegations in this Complaint.  Defendant Doug Cassity directed the scheme to defraud the funeral homes and consumers through the RICO Enterprises described in this Complaint.  Defendant Doug Cassity was also settlor of the RBT Trust II.

34.     Defendant Randall K. Sutton, an individual, resides at one or more of the following locations:  Chesterfield, Missouri, and/or Naples, Florida.  Defendant Sutton was President and Director of St. Louis-based NPS during all times relevant to this Complaint. Defendant Sutton also held numerous positions with Lincoln and Memorial at times relevant to the allegations in this Complaint, including serving as President, Director, and Chief Executive Officer.  Defendant Sutton acted as agent and administrator for the NPS pre-need trusts' investment advisors, Defendants Wulf and Wulf Bates, thus enabling Defendant Sutton to loot the NPS pre-need trusts.  Defendant Sutton also has served in various Officer and/or Director positions with Defendants Forever Enterprises and Lincoln Memorial Services, Inc. ("LMS") at times relevant to the allegations in this Complaint.  Upon information and belief, Defendant Sutton was also an Officer and/or Director of other entities within the Cassity Consortium.

35.     Defendant Brent D. Cassity, an individual, resides in St. Louis, Missouri. Defendant Brent Cassity was a Director and CEO of Defendant Forever Enterprises, President and a Director of Defendant NHE, a Director of NPS, a Director of Defendant LMS, President

and a Director of Defendant Forever Network, and a Director of Lincoln and Memorial at times relevant to the allegations in this Complaint.  Defendant Brent Cassity was also a beneficiary of the RBT Trust II.  Upon information and belief, Defendant Brent Cassity was an Officer and/or Director of other entities within the Cassity Consortium.

36.     Defendant J. Tyler Cassity, an individual, is a resident of California.  Tyler Cassity served as President and a Director of Defendant Forever Enterprises, Vice President and a Director of Defendant NHE, Vice President and a Director of Defendant Forever Network, and a Director of Lincoln and Memorial at times relevant to the allegations in this Complaint. Defendant Tyler Cassity was also a beneficiary of the RBT Trust II.  Upon information and belief, Tyler Cassity also was an Officer and/or Director of other entities within the Cassity Consortium.  Tyler Cassity conducted business in Missouri related to the wrongful acts alleged in this Complaint during relevant times by communicating via email, U.S. mail, and telephone with Cassity Consortium employees in Missouri, participating in Board of Directors meetings and/or teleconferences with other Cassity Consortium Directors located in Missouri, traveling to NPS' St. Louis office for business meetings, and wiring money to and receiving money from Cassity Consortium bank accounts in Missouri.

37.     Defendant Rhonda L. Cassity, an individual, resides at one or more of the following locations:  Naples, Florida; Nantucket, Massachusetts; and/or New York, New York. Upon information and belief, for all relevant times to this action, Defendant Rhonda Cassity maintained a business office in the State of Missouri from which Rhonda Cassity conducted business related to the wrongful acts alleged in this Complaint.  Rhonda Cassity was a beneficiary of the RBT Trust II and, upon information and belief, an Officer and Director of

22

Defendant Rhonda L. Cassity, Inc. a/k/a Wellstream Inc., a Missouri corporation and entity within the Cassity Consortium.

38.     Defendant Katherine P. Scannell, an individual, resides in St. Louis, Missouri. Defendant Scannell served as in-house or general counsel to all entities within the Cassity Consortium, including but not limited to Defendant NHE, Defendant Forever Enterprises, NPS, Lincoln, and Memorial at times relevant to the allegations in this Complaint.

39.     Defendant Randall J. Singer, an individual, resides in Sappington, Missouri. Defendant Singer served as President of Lincoln from at least 2005 until 2007, and as President of Memorial in 2007.  In addition, for a period of time unknown, Defendant Singer served as NPS' Regional President for Missouri.

40.     Defendant Howard A. Wittner, an individual, resides in Chesterfield, Missouri. Defendant Wittner served as trustee to the RBT Trust II and as an Officer and/or Director of Defendant NHE, Defendant Forever Enterprises, Defendant Forever Illinois, Defendant Texas Forever, NPS, Lincoln, and Memorial for times relevant to the allegations in this Complaint. Defendant Wittner also served as an Officer and/or Director of other entities within the Cassity Consortium.  Additionally, beginning in at least 1996, Defendant Wittner served as general counsel to entities within the Cassity Consortium, including NPS, Lincoln, Memorial, Defendant Forever Enterprises, and Defendant NHE.  At relevant times when he was no longer general counsel, Defendant Wittner also served as outside counsel to NPS, Lincoln, Memorial, and other entities within the Cassity Consortium.

41.     Defendant David R. Wulf, an individual, resides in Chesterfield, Missouri. Defendant Wulf, along with Defendant Wulf, Bates & Murphy, Inc. ("Wulf Bates") served as the

investment advisor to the various NPS pre-need trusts.  Defendant Wulf is the Chief Executive Officer, Secretary, and Director of Defendant Wulf Bates and, upon information and belief, is also a shareholder.  Defendant Wulf was intimately involved in the RICO Enterprises and the scheme to defraud the funeral homes and consumers detailed in this Complaint.

42.     Defendant Wulf Bates is a Missouri corporation with its principal place of business in Ellisville, Missouri.  Wulf Bates, along with Defendant Wulf, served as the investment advisor to the various NPS pre-need trusts.

43.     Defendant Lennie "Joe" Cappleman, an individual, resides in Austin, Texas. Defendant Cappleman held various positions within Lincoln and Memorial from at least 2003 until 2005, including Chief Accountant, Vice President, Secretary-Treasurer, and Director.  After 2005 Cappleman continued with Lincoln and Memorial as Reinsurance Supervisor until at least 2007.  Upon information and belief, Cappleman conducted business in Missouri related to the wrongful acts alleged in this Complaint during relevant times by communicating via email, U.S. mail, and telephone with Cassity Consortium employees in Missouri, participating in Board of Directors meetings and/or teleconferences with Lincoln and Memorial Directors located in Missouri, traveling to NPS' St. Louis office for business meetings, wiring money to and receiving money from Cassity Consortium bank accounts in Missouri, and providing accounting statements, consumer lists, and other insurance documents to Cassity Consortium employees in Missouri.

44.     Defendant James M. Crawford, an individual, resides in Chesterfield, Missouri. Defendant Crawford was hired to work for NPS in 1979 by Defendant Doug Cassity and worked there until shortly before NPS entered receivership.  Defendant Crawford was an Officer and

Director of NPS at all times relevant to the allegations in this Complaint and served at various times as Chief Executive Officer, President, Vice President, and Secretary.  Beginning in 2000, Defendant Crawford was also employed as Chief Business Development Officer for Defendant Forever Enterprises.  Defendant Crawford was also a licensed insurance agent for Lincoln in numerous states at times relevant to the allegations in this Complaint.

45.     Defendant Tony B. Lumpkin, III, an individual, is a resident of Texas.  Defendant Lumpkin resided in Missouri from approximately 2001 until at least November 2006.  From 1998 to 2006, Defendant Lumpkin worked for Memorial in various capacities:  as Manager of Information Systems from 1998 until 2001, as Chief Information Officer from 2001 until 2003, and as Chief Operations Officer from 2003 until 2006.  He also served as a Director of both Lincoln and Memorial from at least 2001 until 2005.  After he ended his formal employment with Memorial, Defendant Lumpkin continued to serve as a "consultant" to both Lincoln and Memorial until at least 2007.  During the entire period of his employment by Memorial, Defendant Lumpkin regularly conducted business related to the wrongful acts alleged in this Complaint at the St. Louis, Missouri office of NPS and Defendant Forever Enterprises.

46.     Defendant Nekol ("Nicki") Province, an individual, resides in Ballwin, Missouri.  Defendant Nicki Province served in various Officer positions within the Cassity Consortium, including serving as Secretary for NPS from at least 2001 to 2003, President of NPS in 2008, Vice President of Lincoln and Memorial from at least 2003 to 2007, Secretary of Defendant NHE from 1999 to 2003 and in 2007, and as the Vice President and/or Secretary of Defendant LMS.  Defendant Nicki Province directed and oversaw the movement of the pre-need funds among the entities within the Cassity Consortium and to the individual Defendants.

47.     Defendant Erin Province a/k/a Erin Engle, an individual, resides in Ballwin, Missouri.  Defendant Erin Province was the Customer Service/Claims Manager for NPS at times relevant to the allegations in this Complaint.[2]

48.     Defendant Roxanne J. Schnieders, an individual, resides in Jefferson City, Missouri.  Defendant Schnieders was the President—Corporate Development Division of NPS at times relevant to the allegations in this Complaint.

49.     Defendant Kelly Tate, an individual, resides in High Ridge, Missouri.  Defendant Tate served as an assistant to Defendant Scannell at times relevant to the allegations in this Complaint.[3]

50.     Defendant George Wise, III, an individual, is a resident of the State of Texas. Defendant Wise both served as an actuarial consultant to Lincoln and Memorial and held Officer positions with Lincoln and Memorial at times relevant to the allegations in this Complaint, including serving as Vice President of both entities in 2007.  He was also an Officer of Wise & Associates, a Missouri actuarial company that was incorporated as a subsidiary of Defendant Forever Enterprises in 1998, during times relevant to the allegations in this Complaint.  Upon information and belief, Wise conducted business in Missouri related to the wrongful acts alleged in this Complaint during relevant times by communicating via email, U.S. mail, and telephone with Cassity Consortium employees in Missouri, participating in Board of Directors meetings and/or teleconferences with Lincoln and Memorial Directors located in Missouri, traveling to NPS' St. Louis office for business meetings, wiring money to and receiving money from Cassity

---

[2] On November 23, 2010, Defendant Erin Province a/k/a Erin Engle was dismissed as a Defendant.

[3] On September 14, 2011, Defendant Kelly Tate was dismissed as a Defendant.

Consortium bank accounts in Missouri, and providing accounting statements, consumer lists, and other insurance documents to Cassity Consortium employees in Missouri.

51.     Defendant Larry "Keith" Hale, an individual, resides in Austin, Texas.  Defendant Hale worked in St. Louis, Missouri as the Financial Reporting Director for Defendants Forever Enterprises and NHE from at least 2000 through 2004.  Defendant Hale then moved to Austin, Texas where he served as Chief Financial Officer of Lincoln and Memorial from 2004 to 2007 and worked for related non-party Professional Liability Insurance Company of America ("PLICA") as Controller and Assistant Vice President.  After moving to Austin, Defendant Hale continued to conduct business in Missouri related to the wrongful acts alleged in this Complaint by having daily contact with Defendants located in St. Louis and, upon information and belief, by frequently traveling to St. Louis on business.[4]

52.     Defendant Michael R. Butler, an individual, resides in Chesterfield, Missouri. Defendant Butler began working for Defendant Forever Enterprises in 1998, and served as Chief Financial Officer of Defendant Forever Enterprises at times relevant to the allegations in this Complaint.

53.     Defendant Marianne Jones, an individual, resides in Cedar Park, Texas. Defendant Jones was employed by Lincoln and/or Memorial from 1995 through 2006, and served as the Secretary of both entities in 2006.  Upon information and belief, Jones had knowledge of the defendants' fraudulent activity of siphoning money out of the insurance policies, including through policy loans and surrenders.  Through her employment with Lincoln, Jones conducted business in Missouri related to the wrongful acts alleged in this Complaint by

---

[4] On November 16, 2011, Defendant Larry Keith Hale was dismissed as a Defendant.

27

having regular contact with Missouri regulatory agencies and with Defendants located in St. Louis.

54.     Defendant Anne Chrun, an individual, resides in Ballwin, Missouri.  Defendant Chrun held various positions as an officer and director for Lincoln and Memorial from at least 2007 through 2008, including Treasurer of both entities.  Upon information and belief, Chrun had knowledge of the fraudulent activity being perpetrated by other Defendants, including the taking of improper policy loans and altering policies to make NPS the owner and/or beneficiary.

55.     Non-party RBT Trust II was established by Defendant Doug Cassity, and Defendants Rhonda Cassity, Brent Cassity, and Tyler Cassity were the sole beneficiaries.  At all times relevant to the allegations in this Complaint, Defendant Doug Cassity exercised control over the Cassity Consortium, including the RBT Trust II, which ultimately owned Lincoln; Memorial; NPS; Defendant NHE; Defendant Forever Enterprises; Forever Pre-Need Insurance Agency, Inc.; Defendant LMS; Heritage Research, Inc.; National Cemetery Management Company; National Cemetery Merchandise, Inc.; Forever Georgia, Inc.; Defendant Forever Illinois, Inc.; Defendant Forever Network, Inc.; Forever Memorial, Inc.; and Wise & Associates, Inc.  The organization chart attached as Ex. 1 sets forth the ownership structure in detail.

56.     Defendant NHE is a currently dissolved Missouri corporation with its last known principal place of business at 10 S. Brentwood, St. Louis, Missouri, which was its principal place of business at all times relevant to this Complaint.  Upon information and belief, Defendant NHE nonetheless continues to operate and conduct business in St. Louis, Missouri.  Defendant NHE is a holding company that owns Defendant Forever Enterprises and other entities in the business of insurance, cemetery, funeral homes, and investments.  NHE, during relevant times, was owned

and controlled by the RBT Trust II.  Upon information and belief, Defendant NHE currently is owned and controlled by a newly created entity formed by the Cassity family.

57.     Defendant Forever Enterprises, Inc. f/k/a Lincoln Heritage Corporation is a Texas corporation with its current principal place of business in St. Louis, Missouri and is authorized to transact business in Missouri.  During all times relevant to this Complaint, Defendant Forever Enterprises had offices in West Lake Hills, Texas, and at 10 S. Brentwood, St. Louis, Missouri. Defendant Forever Enterprises owns Memorial, indirectly owns Lincoln, and is a sister company to NPS.  Defendant Forever Enterprises is a subsidiary of Defendant NHE.

58.     Defendant LMS is an Illinois corporation with its last known principal place of business at 10 S. Brentwood, St. Louis, Missouri.  Defendant LMS operated at this Missouri address during all times relevant to the allegations in this Complaint.  LMS is a subsidiary of Defendant NHE and is the purported investment arm for the Cassity Consortium.  The RICO Defendants utilized Defendant LMS as an entity through which much of the looted money was funneled in furtherance of their scheme to defraud.

59.     Defendant Rhonda L. Cassity, Inc. a/k/a Wellstream, Inc. f/k/a R.L. Cassity, Inc. and Trans-American Facilities, Inc. ("Rhonda L. Cassity, Inc.") is a Missouri corporation with its last known principal place of business in St. Louis, Missouri.  Defendant Rhonda L. Cassity, Inc. is a real estate company that materially benefited from the scheme to defraud the funeral homes and consumers by receiving fraudulent transfers.

60.     Defendant Forever Network, Inc. f/k/a Forever Enterprises, Inc., Cassity Enterprises, Inc., and Cassity Heritage Funeral Homes, Inc. is a Missouri corporation with its last known principal place of business in St. Louis, Missouri.  Its principal place of business at all

times relevant to the allegations in this Complaint was 10 S. Brentwood, St. Louis, Missouri. Defendant Forever Network is a subsidiary of Defendant Forever Enterprises, and is the parent corporation of numerous cemetery and funeral home entities, including Defendants Hollywood Forever and Texas Forever.  Defendant Forever Network accepted fraudulent transfers from the RICO Defendants and NPS.

61.     Defendant Forever Illinois, Inc. is an Illinois corporation with its last known principal place of business at 10 S. Brentwood, St. Louis, Missouri, which was its principal place of business at all times relevant to the allegations in this Complaint.  Defendant Forever Illinois is a subsidiary of Defendant Forever Enterprises.  Defendant Forever Illinois accepted fraudulent transfers from the RICO Defendants and NPS.

62.     Defendant Hollywood Forever is a California corporation with its principal place of business in Los Angeles, California.  Defendant Hollywood Forever is a subsidiary of Defendant Forever Network, and operates funeral home and cemetery services.  Defendant Hollywood Forever conducted business in Missouri related to the wrongful acts alleged in this Complaint by accepting fraudulent transfers from non-party NPS, a Missouri corporation, and the NPS pre-need trusts, located in Missouri.

63.     Defendant Texas Forever, Inc. d/b/a Forever All Faiths is a Texas corporation with its last known principal place of business at 10 S. Brentwood, St. Louis, Missouri, which was its principal place of business at all times relevant to the allegations in this Complaint. Defendant Texas Forever is a subsidiary of Defendant Forever Network.  Defendant Texas Forever accepted fraudulent transfers from the RICO Defendants and NPS.

64.     Defendant National Prearranged Services Agency, Inc. ("NPS Agency") is a Texas corporation with its last known principal place of business at 1250 S. Capital of Texas Hwy, Bldg. 1, Suite 470, West Lake Hills, Texas; it also conducted business at 10 S. Brentwood, St. Louis, Missouri, at all times relevant to the allegations in this Complaint.  Upon information and belief, Defendant NPS Agency was a pass-through entity for NPS.  Defendant NPS Agency was formed to be the licensed insurance agent for NPS in various states in which NPS sold pre-need contracts, including but not limited to Texas and California.  In addition, NPS Agency paid commissions to funeral directors and NPS account executives.  Upon information and belief, NPS Agency operated in offices in Missouri and transacted business in Missouri related to the wrongful acts alleged in this Complaint.  Defendant Crawford was the sole shareholder of Defendant NPS Agency and was an Officer and Director of NPS Agency.  On June 29, 2006, NPS Agency received a wire transfer from Lincoln for $4,439,607.64 from proceeds of policy loans.

65.     Defendant Legacy International Imports, Inc. d/b/a Triad is a closed Delaware corporation authorized to transact business in Missouri.  Its last known principal place of business, which was its principal place of business at all times relevant to the allegations in this Complaint, was 10 S. Brentwood, St. Louis, Missouri.  Defendant Legacy International was owned and operated by some of the Defendants at all times relevant to this Complaint, is a subsidiary of Defendant Forever Network, and accepted fraudulent transfers from the RICO Defendants and NPS.

66.     Defendant Wise, Mitchell & Associates, Ltd. ("Wise Mitchell") is a cancelled Texas limited partnership with its last known principal place of business in West Lake Hills,

Texas, which was its principal place of business at all times relevant to this Complaint. Defendant George Wise was a general partner of Defendant Wise Mitchell at all times relevant to the allegations in this Complaint.  Defendant Wise Mitchell accepted fraudulent transfers from the RICO Defendants and Memorial.

67.     Defendant Brentwood Heritage Properties, LLC ("Brentwood Heritage") is a Missouri limited liability company with its last known principal place of business at 10 S. Brentwood, St. Louis, Missouri.  Defendant Brentwood Heritage's President is Defendant Brent Cassity.  Brentwood Heritage accepted fraudulent transfers from the RICO Defendants and NPS, and is the maker of a promissory note held by NPS.

68.     Defendant Wittner, Spewak & Maylack, P.C. is a law firm and Missouri professional corporation with its principal place of business in St. Louis, Missouri.  At all times relevant to this Complaint, Defendant Wittner, Spewak & Maylack had its principal place of business in Missouri.  Defendant Wittner is a shareholder in Wittner, Spewak & Maylack. Wittner, Spewak & Maylack served as outside counsel to NPS, Lincoln, Memorial, and other Cassity Consortium entities at all times relevant to this Complaint.  Wittner, Spewak & Maylack was formerly known as Wittner, Poger, Spewak, Maylack & Spooner, P.C. and Wittner, Spewak, Maylack & Spooner, P.C.

69.     Defendant Bremen Bank and Trust Company ("Bremen Bank") is a Missouri corporation with its principal place of business in St. Louis, Missouri.  Defendant Bremen Bank acted as trustee for NPS Pre-Need Trusts I through V from May 2004 to December 2005.  In approximately May 2006, Defendant Bremen Bank again became the trustee for NPS Pre-Need Trusts I through V and remained trustee through May 14, 2008, the date of receivership.

Additionally, Bremen acted as trustee of the NPS Iowa Trust from approximately June 2006 to the date of receivership, of the Mt. Washington Forever Pre-Need Trust from May 2004 to May 2005, and of the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust from May 2004 to May 2005.

70.     Non-party Allegiant Bank d/b/a Allegiant Trust Company ("Allegiant Bank") was a Missouri corporation with its principal place of business in St. Louis, Missouri.  Allegiant Bank acted as trustee of the NPS Pre-Need Trusts I through V from approximately July 1998 to May 2004, of the Mt. Washington Forever Pre-Need Trust from April 2000 to May 2004, and of the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust from February 1998 to May 2004.  On July 30, 2004, Allegiant Bank merged with and into National City Bank of the Midwest.

71.     Non-party National City Bank of the Midwest was a nationally chartered bank with its principal place of business in Bannockburn, Illinois.  On July 30, 2004, National City Bank of the Midwest acquired Allegiant Bank through a merger.  As the surviving entity, National City Bank of the Midwest assumed all liabilities of Allegiant Bank.  On July 22, 2006, National City Bank of the Midwest merged with and into Defendant National City Bank.

72.     Defendant National City Bank is a nationally chartered bank with its principal place of business in Cleveland, Ohio.  On July 22, 2006, Defendant National City Bank acquired National City Bank of the Midwest as a result of a merger.  As the surviving entity, Defendant National City Bank assumed all liabilities of National City Bank of the Midwest and of the predecessors of National City Bank of the Midwest, including Allegiant Bank.

73.     Defendant Marshall & Ilsley Trust Company N.A. ("Marshall & Ilsley") is a nationally chartered bank with its principal place of business in Milwaukee, Wisconsin. Defendant Marshall & Ilsley acted as trustee for NPS Pre-Need Trusts I through V from December 2005 until May 2006, at which time the trusts were transferred back to Defendant Bremen Bank.  Additionally, Marshall & Ilsley acted as trustee of the NPS Iowa Trust from December 2005 to approximately June 2006, of the Mt. Washington Forever Pre-Need Trust from May 2005 to the date of receivership, and of the Mason Securities Association d/b/a Funeral Cremation Society of America Pre-Need Trust from May 2005 to the date of receivership.

74.     Defendant Southwest Bank, an M&I Bank ("Southwest Bank"), is a Missouri corporation with its principal place of business in St. Louis, Missouri.  Defendant Southwest Bank acted as trustee for NPS Pre-Need Trusts I through V and the NPS Iowa Trust from December 2005 until approximately June 2006.  Defendant Southwest Bank also acted as trustee for the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust and the Mt. Washington Forever Pre-Need Trust from May 2005 to the date of receivership.

75.     Non-party Mark Twain Bank was a Missouri corporation with its principal place of business in Ladue, Missouri.  Mark Twain Bank acted as trustee of NPS Pre-Need Trusts I through V and the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust from at least January 1995 until approximately June 1997.  On June 21, 1997, Mark Twain Bank was acquired by Mercantile Bank, and the trusts were then transferred to a related entity, Mercantile Trust Company.

76.     Non-party Mercantile Bank, N.A. ("Mercantile Bank") was a nationally chartered bank with its principal place of business in St. Louis, Missouri.  On June 21, 1997, Mercantile Bank acquired Mark Twain Bank as a result of a merger.  As the surviving entity, Mercantile Bank assumed all liabilities of Mark Twain Bank.  In 2000, Mercantile Bank merged with and into Firstar Bank, N.A.

77.     Non-party Mercantile Trust Company, N.A. ("Mercantile Trust Company") was a nationally chartered bank with its principal place of business in St. Louis, Missouri.  After Mark Twain Bank merged into Mercantile Bank, Mercantile Trust Company acted as trustee of NPS Pre-Need Trusts I through V and the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust from July 1997 until approximately July 1998.  In 2000, Mercantile Trust Company merged with and into Firstar Bank, N.A.

78.     Non-party Firstar Bank, N.A. ("Firstar Bank") was a nationally chartered bank with its principal place of business in Cincinnati, Ohio.  In 2000, Firstar Bank acquired Mercantile Bank and Mercantile Trust Company as a result of a merger.  As the surviving entity, Firstar Bank assumed all liabilities of Mercantile Bank and Mercantile Trust Company, and their predecessors, including Mark Twain Bank.  On August 10, 2001, Firstar Bank merged with and into Defendant U.S. Bank.

79.     Defendant U.S. Bank, N.A. ("U.S. Bank") is a nationally chartered bank with its principal place of business in Cincinnati, Ohio.  In 2001, Defendant U.S. Bank acquired Firstar Bank as a result of a merger.  As the surviving entity, Defendant U.S. Bank assumed all liabilities of Firstar Bank and the predecessors of Firstar Bank, including Mercantile Trust Company, Mercantile Bank, and Mark Twain Bank.

80.     Defendant Bank of America, N.A. ("Bank of America") is a nationally chartered bank that is registered to transact business in Missouri and that operates branch locations throughout the state of Missouri.  Its principal place of business is in Charlotte, North Carolina. Defendant Bank of America acted as trustee for the NPS Iowa Trust from September 2002 to May 2003.

81.     Defendant American Stock Transfer and Trust Company, L.L.C. f/k/a American Stock Transfer and Trust Company ("American Stock Transfer") is, upon information and belief, a New York limited liability company with its principal place of business in New York, New York.  Defendant American Stock Transfer acted as trustee of the NPS Iowa Trust from January 2004 to June 2004.  As trustee, American Stock Transfer, through its employees and agents, transacted business in Missouri related to the wrongful acts alleged in this Complaint by sending emails, correspondence, and trust documents to Cassity Consortium employees or agents in Missouri.  Upon information and belief, Defendant American Stock Transfer also solicited and received payments, accounting documents, emails, and other correspondence from Cassity Consortium employees or agents in Missouri relating to the NPS Iowa Trust.

82.     Defendant Comerica Bank & Trust, N.A. ("Comerica Bank") is a nationally chartered bank with its principal place of business in Dallas, Texas.  Defendant Comerica Bank acted as trustee of the NPS Iowa Trust from June 2004 to approximately January 2006.  As trustee, Comerica Bank, through its employees and agents, transacted business in Missouri related to the wrongful acts alleged in this Complaint by sending emails, correspondence, and trust documents to Cassity Consortium employees or agents in Missouri.  Upon information and belief, Defendant Comerica Bank also solicited and received payments, accounting documents,

emails, and other correspondence from Cassity Consortium employees or agents in Missouri relating to the NPS Iowa Trust.

83.     Non-party Security Trust Company, N.A. is a dissolved banking association that acted as trustee of the NPS Iowa Trust from May 2003 to January 2004.

84.     Defendant Brown Smith Wallace, L.L.C. is a Missouri limited liability company with its principal place of business in St. Louis, Missouri.  Defendant Brown Smith Wallace served as the independent auditor of Defendant Forever Enterprises and its subsidiaries from September 2001 through May 2007, and as the independent auditor of Lincoln and Memorial from at least 2001 through 2007.

84.1.   Defendant Richard Markow, an individual, resides in Des Peres, Missouri. Markow was the President of Allegiant Trust Company from 1997 to 2001.  From 2003 to 2008, he was the head of Defendant Bremen Bank's trust department and a Senior Vice President/Trust Officer for Bremen Bank.

84.2.   Defendant Herbert Morisse, an individual, resides in St. Louis, Missouri.  Morisse was the Vice President and Trust Officer for Allegiant Trust Company from 1997 through 2004, during which time he was responsible for the administration of Allegiant Bank's trust accounts including the NPS pre-need trusts.

84.3.   Defendant PNC Bank, N.A. ("PNC Bank") is a nationally chartered bank with its principal place of business in Pittsburgh, Pennsylvania.  Defendant National City Bank merged into PNC Bank in November 2009.  As the surviving entity, Defendant PNC Bank assumed all liabilities of Defendant National City Bank and of the predecessors of Defendant National City Bank, including Allegiant Bank.

84.4.   Non-party Marshall and Ilsley Bank was a nationally chartered bank with its principal place of business in Milwaukee, Wisconsin.  On July 1, 2010, Marshall and Ilsley Bank acquired Southwest Bank through a merger.  As the surviving entity, Marshall and Ilsley Bank assumed all liabilities of Southwest Bank.

84.5.   Defendant BMO Harris Bank, N.A. ("BMO Harris Bank") is a nationally chartered bank with its principal place of business in Chicago, Illinois.  On July 5, 2011, Defendant BMO Harris Bank acquired Marshall and Ilsley Bank and Marshall and Ilsley Trust Company through a merger.  As the surviving entity, Defendant BMO Harris Bank assumed all liabilities of Marshall and Ilsley Trust Company and Marshall and Ilsley Bank and its predecessors, including Southwest Bank.

85.   Defendants John Does 1 through 25 are additional individuals and/or entities who, upon information and belief, operated, managed, assisted in, benefitted from, and/or personally participated in the scheme to defraud the funeral homes and consumers that is detailed in this Complaint, and/or who engaged in other wrongdoing that directly and proximately caused Plaintiffs harm.  As discovery reveals the identity of John Does 1 through 25, Plaintiffs reserve the right to add them as named Defendants.

86.   As used in this Complaint, the term "RICO Defendants" collectively refers to the following group of Defendants:  Doug Cassity, Brent Cassity, Tyler Cassity, Randall Sutton, Howard Wittner individually and as Trustee of RBT Trust II, David Wulf, Wulf, Bates & Murphy, Inc., Tony Lumpkin, Katherine Scannell, Kelly Tate, George Wise, Randy Singer, Joe Cappleman, Roxanne Schnieders, James Crawford, Keith Hale, Mike Butler, Nicki Province,

Erin Province, Forever Enterprises, Inc., National Heritage Enterprises, Inc., and Lincoln Memorial Services, Inc.

87.     As used in this Complaint, the term "Fraudulent Transfer Defendants" collectively refers to the following group of Defendants:  Doug Cassity, Rhonda Cassity, Brent Cassity, Tyler Cassity, Randall Sutton, Howard Wittner individually and as Trustee of RBT Trust II, David R. Wulf, Wulf, Bates & Murphy, Inc., Tony Lumpkin, Katherine Scannell, Kelly Tate, George Wise, Randy Singer, Joe Cappleman, Roxanne Schnieders, James Crawford, Nicki Province, Erin Province, Michael Butler, Forever Enterprises, Inc., National Heritage Enterprises, Inc., Lincoln Memorial Services, Inc., Rhonda L. Cassity, Inc., a/k/a Wellstream, Inc., Forever Network, Inc., Forever Illinois, Inc., Hollywood Forever, Inc., Texas Forever, Inc., National Prearranged Services Agency, Inc., Legacy International Imports, Inc., Wise, Mitchell & Associates, Inc., and Brentwood Heritage Properties, LLC.

88.     As used in this Complaint, the term "Promissory Note Defendants" collectively refers to the following group of Defendants:  Defendants Howard Wittner as Trustee of RBT Trust II, Forever Enterprises, Inc., Forever Network, Inc., Lincoln Memorial Services, Inc., Hollywood Forever, Inc., Texas Forever, Inc., National Prearranged Services Agency, Inc., Legacy International Imports, Inc., Wise, Mitchell & Associates, Ltd., and Brentwood Heritage Properties, LLC.

89.     As used in this Complaint, the term "Trustee Defendants" collectively refers to the following group of Defendants:  Bremen Bank, National City Bank (as the ultimate successor in interest to Allegiant Bank), PNC Bank (as the ultimate successor in interest to Allegiant Bank and National City Bank), Marshall & Ilsley, Southwest Bank, BMO Harris Bank (as the ultimate

successor in interest to Marshall & Ilsley and Southwest Bank), U.S. Bank (as the ultimate successor in interest to Mark Twain Bank and Mercantile Trust Company), Bank of America, American Stock Transfer, and Comerica Bank and Trust.

90.     As used in this Complaint, the term "D&O Defendants" collectively refers to the following group of Defendants:  Randall Sutton, James Crawford, Brent Cassity, Tyler Cassity, Nicki Province, Roxanne Schnieders, Howard Wittner (individually), Tony Lumpkin, Joe Cappleman, George Wise, Randy Singer, Keith Hale, Marianne Jones, and Anne Chrun.

## V.  FACTUAL ALLEGATIONS

### A.  *The RICO Defendants Accumulated Millions of Dollars Generated from the Sales of Pre-Need Funeral Contracts*

91.     The Cassity family created their consortium of affiliated companies to engage in a multi-state scheme to accumulate massive amounts of cash through the receipt of proceeds from the sale of pre-need funeral contracts and the transfer of cash from existing funeral homes' trust funds generated by the funeral homes' previous sales of pre-need contracts.  The RICO Defendants also accumulated millions of dollars by taking cash from Lincoln and Memorial through illegal policy loans and surrenders.

92.     The Cassity Consortium included a selling company (NPS), two life insurance companies (Lincoln and Memorial) whose primary business was to issue life insurance policies and commissions to NPS, and multiple related companies all with common ownership, directors, and employees.  NPS was used to market the scheme to funeral homes and consumers, and Lincoln and Memorial were used to give the scheme the semblance of corporate and regulatory credibility and to provide a vehicle to siphon cash from the insurance policies that NPS represented as providing guaranteed funds for future funeral costs.

93.     The additional affiliated entities in the Cassity Consortium were used by the RICO Defendants to transfer funds among themselves when it was necessary to give the appearance to outsiders of being legitimate businesses.  Because these entities were all jointly owned and controlled by the Cassity family and because fraudulent and illegal conduct was at the heart of these supposed businesses, none of them were legitimate companies but instead were part of the scheme to accumulate cash and cover-up the RICO Defendants' schemes to loot the money for their personal enrichment.

94.     The RICO Defendants preyed on funeral homes and consumers to sell more than $600 million—and potentially as much as a billion dollars worth—of pre-need funeral contracts through a nationwide, uniform marketing effort implemented by NPS.  NPS hired and trained a national sales force to target funeral homes and consumers for the sale of pre-need contracts and the transfer of funeral homes' existing pre-need funds.  The NPS sales force used uniform marketing materials, pre-written scripts, standardized contracts, and standardized insurance applications in pitching the NPS/Lincoln/Memorial products and services to funeral homes and consumers throughout the country.

95.     The NPS sales agents provided funeral homes and consumers with NPS marketing brochures and other materials that were developed and distributed by the RICO Defendants.  The NPS sales agents would work from a sales script developed by the RICO Defendants, including scripts written by Defendant Brent Cassity.  The NPS "Advantage" marketing materials falsely represented that consumers who paid in full were "100% protected" and non-Missouri pre-need contracts falsely stated that "National Prearranged Services, Inc. shall

41

deposit all payments required to be placed in trust to secure the performance of the Prearranged Funeral Agreement with [bank name]".

96.     The RICO Defendants withheld from their sales force, and thus the funeral homes and consumers, that:  (1)  Lincoln and Memorial were not independent of NPS; (2) NPS, Lincoln, and Memorial were not independent of many of the Defendants; (3) the pre-need funeral funds would not be prudently managed to ensure future payment of funeral services; and (4) the RICO Defendants engaged in the numerous schemes discussed in detail in this Complaint to loot NPS, Lincoln, and Memorial.

97.     If at any time a funeral home raised questions about the solvency of NPS, Lincoln, and/or Memorial, the RICO Defendants' practice was to not only falsely assure the funeral home that the companies were financially sound, but also to promise to the funeral home that should anything ever happen to the companies, the state life and health insurance guaranty associations would pay the funeral home's death claims.

98.     The RICO Defendants also intentionally withheld from the NPS sales force and thus the funeral homes and consumers that a convicted felon, Defendant Doug Cassity, was actively involved in concocting the scheme, that he would be directing and controlling NPS' operations through his family and advisors, and that he would be actively participating in management, personnel, and investment decisions for the RICO Enterprises.

99.     The RICO Defendants' scheme to defraud used new dollars received through NPS pre-need contract sales to pay claims on prior contracts sold by NPS and to pay life insurance premiums.  It was thus necessary to constantly drive the sales force to generate such sales.  To

generate additional cash to pay prior obligations and to enrich themselves, the RICO Defendants also engaged in numerous other fraudulent schemes as discussed below.

**B. The RICO Defendants "Whited-Out" and Altered**
**Key Information on Insurance Policy Applications**

100.    As part of the RICO Defendants' scheme to defraud, the RICO Defendants regularly engaged in a ploy to deliberately "white-out" and alter key information on insurance policy applications in order to pocket the money that was being entrusted to them so that the funeral expenses could be paid in the future.  The "white-out" schemes worked as follows.

101.    The funeral home consumer paid the funeral home for the pre-need contract in full at the time the contract was entered.  The funeral home then paid NPS the entire amount due on the pre-need funeral contract.  At the time of full payment, an insurance policy application was correspondingly marked as a single premium policy that was *paid-in-full*.  For example, where a consumer paid in full $5,000 for a pre-need funeral contract, the consumer simultaneously applied for a corresponding, single-premium, paid-in-full life insurance policy with a face amount of $5,000.

102.    After the consumer submitted the life insurance application, an employee within NPS, Lincoln, or Memorial would "white-out" or otherwise alter those portions of the insurance application showing a single-premium policy *paid-in-full*, and change the application to show that the policy was to be paid for in *installments* over a period of time, such as 60 months.

103.    The RICO Defendants used a related technique in states where an NPS pre-need trust, and not the consumer, purchased the life insurance policy by directing the purchase of policies that did not "match" how the consumer paid for the pre-need contract.  Under this "policy mismatching" scheme, if a consumer paid for the pre-need contract with a single, up-

43

front payment of, for example, $5,000, the RICO Defendants would direct the NPS pre-need trust to purchase a corresponding life insurance policy from Lincoln that was a 60-month installment policy with monthly premium payments.

104.    By altering the insurance policy applications to falsely state that payments had not been made in full, and by engaging in the "policy mismatching," the RICO Defendants were able to pocket the vast majority of the up-front payments rather than putting the money from the paid-in-full pre-need funeral contracts into trusts or purchasing a paid-in-full life insurance policy to fund the future funeral expenses.

105.    The RICO Defendants' "white-out" scheme also included illegally changing the named owner or named beneficiary on the insurance application from the funeral home to NPS. Altering the insurance applications to make NPS the named owner and/or beneficiary was vital to the overall scheme to defraud, because only a policy owner can take out policy loans or surrender whole life policies to receive the cash surrender value.  As explained later in this Complaint, after illegally altering the insurance applications to make NPS the owner and/or beneficiary of the whole life policies, the RICO Defendants caused NPS to request hundreds of millions of dollars worth of policy loans and surrenders of whole life policies from Lincoln.  The policy alterations were therefore instrumental to the RICO Defendants' siphoning of cash out of the Lincoln insurance policies.

106.    NPS, as a pre-need funeral contract seller, was prohibited by law in many states from altering and being named as the owner or beneficiary of the insurance policies used to fund the NPS pre-need contracts.  The valid owner of an insurance policy was also prohibited by

many states' laws from irrevocably assigning the insurance policy to NPS.  As set forth in the following paragraphs, the RICO Defendants violated both of these prohibitions.

107.    Two sections of the life insurance application addressed beneficiary and ownership status.  In many instances, the "Beneficiary" section of the application was pre-completed with "National Prearranged Services, Inc." as the named beneficiary.  If "National Prearranged Services, Inc." was not pre-completed as the named beneficiary on the insurance application, the consumer was required to name a beneficiary.

108.    If anyone, including the consumer, did not name NPS as the policy beneficiary, an employee within NPS, Lincoln, or Memorial would either strike out any named beneficiary that was not NPS and write in NPS or a related entity as the beneficiary, or would stamp "National Prearranged Services, Inc." over the beneficiary that the consumer had chosen.

109.    Similarly, the insurance policy application form had an "Assignment" section. The Assignment section stated:

> I hereby irrevocably assign and transfer all the policy benefits and proceeds of this policy to: _____ as their interest may appear.  I understand fully the effects of this assignment and transfer.  It is my intention as owner to continue to pay premiums and *retain ownership*.  (emphasis added)

In addition to containing the line to write-in the name of the assignee, the Assignment section contained a check box for "Yes" or "No," and a place for the consumer to initial.

110.    If anyone, including the consumer, wrote in the "Assignment" section a name other than NPS (typically the funeral home) as the assignee, an employee within NPS, Lincoln, or Memorial would either strike out the named assignee and write in NPS or a related entity as

45

the assignee, or would stamp "National Prearranged Services, Inc." over the assignee that the consumer had chosen.

111.   The RICO Defendants used the altered life insurance applications as the basis for manipulating the life insurance policies through policy mismatching/white-outs, and policy loans and policy surrenders (described in detail below), despite the fact that neither the funeral homes nor the consumers knew that the alterations had occurred, and despite the fact that the "Assignment" section explicitly stated that the consumer retained ownership of the policy.

112.   The RICO Defendants knew the funeral homes and consumers were not aware either that the life insurance policy applications were altered or that the policies actually written did not match how the consumer paid for the pre-need funeral contract.  The RICO Defendants purposely kept the funeral homes and consumers in the dark on these practices.  For example, the RICO Defendants would not send copies of the policies to the funeral homes or consumers because they were not issued the same as the pre-need funeral contract.

113.   Under the policy mismatching scheme, the insurance companies would issue an installment policy such as a fully insured benefit ("FIB") or monthly increasing benefit ("MIB"), regardless of how the consumer paid for the pre-need funeral contract.

114.   Both the RICO Defendants' knowledge of these schemes and their intentional attempts to fraudulently conceal these material facts from the funeral homes and consumers are evidenced by the RICO Defendants' internal discussions, as reflected in the following e-mails.

115.   On September 18, 2007, in response to funeral home concerns over rumors that NPS altered the life insurance policy applications, Defendant Schnieders wrote to Defendants Brent Cassity, Scannell, and Nicki Province:

46

> "*I almost think us whiting/blacking stuff out on the contracts that we copied for fh's [funeral homes] has made a bigger hoopla then [sic] the state letter that went out.*"  (emphasis added)

116.    On February 11, 2008, in response to an e-mail from an NPS sales agent asking whether NPS engaged in policy mismatching, Defendant Brent Cassity wrote to Defendants Schnieders and Scannell:  "*Just tell her that [it] is not being done*…."  (emphasis added)

117.    On February 26, 2008, in discussing how to fill out an annual report, Defendant Kelly Tate wrote to Defendant Kati Scannell:

> "The premiums received column may show an amount less than the amount the consumer actually paid to NPS…which we know and the IOC knows, *but the funeral home does not know that (i.e. we issued term policies) so when the FH [funeral home] gets their report and they see a PIF [paid-in-full] contract for $5,000.00 and the premium received column says something other than that, they might notice that and have questions*…."  (emphasis added)

118.    On March 13, 2008, following a request to funeral homes from the State of Illinois for all Lincoln life insurance policy applications on file with each Illinois funeral home, NPS employees suggested the company provide copies of the applications to the funeral homes to ease the funeral homes' burden in responding to the regulatory request.   In response, Defendant Kelly Tate wrote to Defendant Brent Cassity, with Defendants Nicki Province and Scannell copied:

> "Brent – I can have someone get started on making copies for this home.  *I wanted to let you know though that the life applications will become an issue with the funeral homes.*  In the past when a preneed contract submitted a paid in full contract in IL, the life application was changed when received in the office from a Single Pay to a 10 year FIB for example.  The *altered applications* were the only applications kept on file. . . .  *I am concerned about how the funeral homes will react if we send them an application that has been altered or the MRT [monthly renewable term] (we probably don't want to do that anyway)*. (emphasis added)

119.    On April 1, 2008, non-party Jim Shawn, an employee of the insurance companies, sent an e-mail to Defendant Erin Province, with Defendants Singer, Scannell, Wise, Tate, and Nicki Province copied, regarding the white-out scheme:

> "Erin, I have attached another document that [the regulator] just gave me.  He said ***it 'appears' that someone whited out the person/entity designated as beneficiary and assignee and then substituted NPS.***  He also says the initial box in the assignment section has not been signed.  In his words this is another example of 'problems' that he is uncovering." (emphasis added).

120.    The practices of altering life insurance policy applications, "whiting-out" applications, and engaging in policy mismatching dates back at least until 2003 as part of the RICO Defendants' scheme to defraud.  Defendants Doug Cassity, Brent Cassity, Sutton, Lumpkin, Schnieders, Butler, Hale, Erin Province, Nicki Province, Tate, and Scannell directed, knew about, and/or helped to conceal these practices from NPS' sales force, funeral homes, and the pre-need consumers.

### C.  The RICO Defendants Cashed Out Whole Life Insurance Policies Through Improper Policy Loans

121.    As part of their scheme to defraud, the RICO Defendants relied on NPS' illegally obtained and/or improper "ownership" of the life insurance policies and directed Lincoln to make policy loans totaling at least $130,000,000 against the value of the whole life insurance policies needed to fund future funeral expenses.  Policy loans deplete the cash value of whole life insurance policies thus eradicating the ability to pay funeral home expenses as those expenses came due.  As directed, Lincoln executed the policy loans and siphoned the money to NPS and the money was then available for the RICO Defendants' use.

122.    Defendant Sutton directed Defendant Lumpkin regarding when and in what amount to take out the policy loans.  Defendant Lumpkin in turn instructed the Lincoln

employees who carried out the directive.  A "Policy Service Request" was sometimes filled out requesting the policy loan.  To the extent such forms were created, the forms were electronically signed by either Defendant Sutton or Defendant Singer.

123.    The practice of extracting cash through policy loans to further the RICO Defendants' fraudulent scheme lasted for over a decade.  From August 31, 1995, until June 29, 2007, NPS took 443,348 policy loans totaling at least $130,690,595.43.

124.    Policy loans were often taken out by NPS, through Lincoln, in large batches on a single day.   For example, on June 28, 2006, 5,087 policy loans were taken totaling $10,704,275.98.  A year later, on June 29, 2007, 20,579 policy loans were taken out totaling $9,803,889.66.

125.    The following chart provides a representative sample (it is not an exhaustive list of all loans taken from the policies) of the large batches of Lincoln policy loans for the period of August 31, 1995, through June 29, 2007:

| Date | Number of Policy Loans from Lincoln | Original Policy Loan Amt. (in $) |
|---|---|---|
| 8/31/1995 | 271 | 285,373.48 |
| 6/24/1997 | 2,074 | 1,099,571.45 |
| 6/27/1997 | 2,467 | 1,100,358.21 |
| 12/23/1997 | 5,025 | 5,096,156.01 |
| 1/28/1998 | 2,692 | 1,029,639.74 |
| 3/27/1998 | 1,035 | 1,365,497.12 |
| 11/19/1998 | 4,705 | 3,903,572.34 |
| 1/27/1999 | 299 | 1,027,463.22 |
| 9/28/1999 | 3,517 | 3,019,804.82 |
| 4/3/2000 | 255 | 1,069,263.00 |
| 8/31/2000 | 6,793 | 1,161,820.53 |
| 9/29/2000 | 285 | 1,051,236.00 |
| 12/10/2002 | 12,567 | 5,172,605.45 |

| | | |
|---|---|---|
| 3/25/2003 | 22,529 | 2,843,758.32 |
| 6/30/2003 | 6,160 | 1,302,017.70 |
| 11/17/2003 | 17,989 | 3,364,258.60 |
| 1/2/2004 | 3,157 | 2,086,978.84 |
| 4/1/2004 | 33,535 | 3,094,216.35 |
| 6/30/2004 | 46,318 | 9,156,207.80 |
| 10/27/2004 | 36,544 | 3,828,358.45 |
| 1/4/2005 | 37,431 | 5,270,734.37 |
| 7/3/2005 | 879 | 4,377,244.41 |
| 10/18/2005 | 3,395 | 3,557,501.46 |
| 12/30/2005 | 31,494 | 5,507,395.10 |
| 6/28/2006 | 5,087 | 10,704,275.98 |
| 9/29/2006 | 28,952 | 5,991,648.58 |
| 12/1/2006 | 26,269 | 5,233,120.21 |
| 1/23/2007 | 1,042 | 2,335,759.22 |
| 2/20/2007 | 1,533 | 2,847,001.34 |
| 5/9/2007 | 26,089 | 6,146,027.55 |
| 5/30/2007 | 28,221 | 2,370,779.84 |
| 6/29/2007 | 20,579 | 9,803,889.66 |
| **TOTALS** | **419,188** | **116,203,535.15** |

126.   To the extent that there was ever an attempt to "repay" policy loans, such "repayment" occurred merely through book entries unsupported by real financial transactions through crediting some of the cash surrender value created by policy surrenders or through a reduction in death benefit proceeds for the "repayment" of policy loans, thus merely temporarily shifting money out of another Cassity-affiliated entity to Lincoln, and through other illegitimate means.

127.   The RICO Defendants used wires to transfer information about the policy loans from the NPS office in St. Louis, Missouri to Lincoln's office in Austin, Texas.  The RICO Defendants, including Defendant Doug Cassity, would instruct a programmer for NPS', Lincoln's, and Memorial's "InsWare" computer system on when to issue new policies, which premiums to process, and which policies to surrender and/or lapse on behalf of the NPS pre-need

trusts.  This information would then be transferred to Lincoln's office in Austin via the InsWare program.

128.    The RICO Defendants transferred the cash from the policy loans by sending checks through the United States mail or through wire transfer from Lincoln to NPS and/or an NPS pre-need trust, and used the loan money for a variety of improper purposes.  These improper purposes include paying life insurance premiums made necessary by the RICO Defendants' "white-out" and policy mismatching schemes, making fraudulent intercompany money transfers, and personally enriching the RICO Defendants, Fraudulent Transfer Defendants and Promissory Note Defendants.

129.    The following chart summarizes several examples of the wire transfers:

| Date | From Lincoln To | Amount of Transfer (in $) |
|---|---|---|
| 6/28/2006 | NPS | 4,500,000.00 |
| 6/29/2006 | NPS Agency, Inc. | 4,439,607.64 |
| 10/5/2006 | NPS Pre-Need Trust IV | 2,138,516.77 |
| 10/6/2006 | NPS | 2,000,000.00 |
| 10/6/2006 | NPS | 1,531,668.01 |
| 1/23/2007 | NPS | 1,500,000.00 |
| 1/23/2007 | NPS Pre-Need Trust III | 283,191.55 |
| 1/23/2007 | NPS Pre-Need Trust IV | 1,602,951.21 |
| 1/23/2007 | Mount Washington Pre-Need Trust | 92,664.86 |
| 1/24/2007 | NPS | 500,000.00 |
| 1/24/2007 | NPS | 470,934.93 |
| 1/24/2007 | NPS | 11,694.73 |
| 5/14/2007 | NPS | 1,803,057.41 |
| 5/15/2007 | NPS | 1,415,623.24 |
| 6/07/2007 | NPS Pre-Need | 284,510.20 |

|  | Trust IV |  |
|---|---|---|
| 6/07/2007 | NPS | 1,000,000.00 |
| 6/08/2007 | NPS | 926,160.92 |
|  | **TOTAL:** | **24,500,581.47** |

130.    Defendants Doug Cassity, Brent Cassity, Tyler Cassity, Sutton, Wittner, Scannell, Wulf, Wulf Bates, Lumpkin, Singer, Hale, Cappleman, Tate, Schnieders, Nicki Province, and Erin Province directed, knew about, and intentionally concealed the practice of taking out policy loans from NPS' sales force, NPS' funeral home customers, and the pre-need consumers.

131.    On or around May 25-29, 2007, Defendants Scannell, Wittner, Lumpkin and Doug Cassity collectively drafted a letter purporting to be from Defendant Wulf to Defendant Sutton, supposedly advising Sutton that it was Wulf who historically recommended NPS take out policy loans on the life insurance policies.  These Defendants drafted this letter to have in their "back pocket" as camouflage for the true facts about who was directing and controlling the policy loans portion of the RICO Defendants' scheme.  Defendant Wulf signed this letter.  Upon information and belief, it was provided to the Texas Department of Insurance.

132.    In the fall of 2007, Ohio funeral homes learned of the policy loan activity after Ohio regulators sent them questionnaires about NPS and three of the questions regarded policy loans.  In response, the worried funeral homes began asking NPS sales agents whether policy loans were occurring or had occurred in the past.  Defendants Brent Cassity, Schnieders, Scannell, and Nicki Province actively and intentionally concealed the truth about policy loans from the NPS sales agents and falsely instructed the NPS sales agents to inform the funeral homes that NPS did not take out policy loans in Ohio or any other state.

133.    Defendant Nicki Province intentionally misrepresented to funeral homes that called NPS offices that NPS did not take out policy loans.  In an email to Defendants Scannell,

Brent Cassity, Erin Province, and Tate on September 10, 2007, Defendant Nicki Province confirmed her intentional misrepresentations:

> "All three [funeral homes] asked about the last three questions in the questionnaire (policy loans), *told them we don't know where that is coming from, we don't do policy loans."* (emphasis added)

134.    September 13, 2007, following questions by NPS sales agents and funeral homes in Ohio regarding policy loans, Defendant Nicki Province wrote to Defendants Schnieders, Brent Cassity, and Scannell setting forth false and misleading information to tell the sales agents:

> "*The answer should simply be, we do not do policy loans in any state . . . . If the ae [account executive, or sales agent] is asked if we ever have the answer should be 'not that I am aware of.'"* (emphasis added)

135.    On September 13, 2007, in response to the above email, Defendant Brent Cassity wrote to Defendants Nicki Province, Schnieders, and Scannell:  "*Agreed*."  (emphasis added)

136.    On September 14, 2007, Defendant Erin Province intentionally misrepresented to an Ohio funeral home that NPS did not allow policy loans to be taken out against the insurance policies.   In an email to Defendants Schnieders, Nicki Province, Tate, and Scannell on September 14, 2007, Defendant Erin Province confirmed her intentional misrepresentations:

> "He said rumor is that NPS is the owner of the policy and is taking out policy loans on these accounts and then taking out policy loans on other accts [sic] to pay off these accts [sic] when the accounts become deceased.  *I told him the purchaser is the policy owner and although the policy language for a whole life policy, which is used to fund preneeds, may state policy loans are available we do not allow the purchasers to take out a policy loan."* (emphasis added)

137.    On September 18, 2007, Defendant Nicki Province sent a letter reviewed by Defendants Doug Cassity, Brent Cassity, Sutton, Scannell, Schnieders, Tate, and Erin Province to Reed Funeral Home of Canton, Ohio falsely stating:

(1) "NPS has no ownership in the [insurance] policy.  The purchaser is, at all times, the owner of the policy."; and

(2) "NPS and Lincoln, while they share distant but common ownership, are separate entities. . . .  NPS was not aware that (a) applications were being sent in showing NPS/Reed Funeral Home as beneficiary, and (b) that Lincoln was changing the beneficiary designation to show only NPS as is appropriate."

### D.  The RICO Defendants Siphoned Money by Surrendering Whole Life Policies and Replacing Them with Ill-Suited Term Policies

138.    The RICO Defendants manipulated the whole life insurance policies in a variety of ways to either extract cash from Lincoln or to prevent NPS from paying Lincoln premiums to obtain additional cash.  At times, the RICO Defendants would direct NPS to stop paying Lincoln premiums on the whole life policies, thus causing Lincoln to convert the policies to "reduced paid up" ("RPU") status.  By converting the policies to RPU status, the RICO Defendants ceased paying Lincoln premiums on the policies and instead kept the cash paid by the consumer.

139.    In addition to converting policies to RPU status, the RICO Defendants caused Lincoln to surrender hundreds of thousands of whole life policies and to siphon the cash value of those policies to NPS.  Once a whole life insurance policy is surrendered it is no longer "in force" and at the time of death there are no funds available from surrendered policies to pay the funeral benefits.

140.    After the RICO Defendants surrendered a whole life policy and received the cash value, the RICO Defendants would cause the insurance companies to issue another whole life policy with a longer duration for premium payments, would fail to issue a replacement policy altogether, or would replace the whole life policy with a much cheaper and ill-suited term policy.

Term policies have significantly lower premium payments than whole life policies and have no cash value.

141.    By replacing the surrendered whole life policies with term policies, the RICO Defendants decreased significantly the monthly premium that NPS owed Lincoln, thus slowing the flow of funds to Lincoln and allowing NPS, and thus the RICO Defendants, to retain more of the money received from the consumer.

142.    Defendants Doug Cassity, Brent Cassity, Sutton, Lumpkin, Singer, Wise, Wulf, Wittner, and Scannell directed, knew about, and/or assisted in the fraudulent scheme of surrendering the whole life policies to obtain their cash value and replacing them with ill-suited term policies.

143.    As with the policy loans, the RICO Defendants often surrendered massive numbers of whole life policies in a single batch on a single day in order to extract large sums of money from Lincoln.  The following chart summarizes some of the largest batches of surrenders between 1995 and 2008.  As with the policy loans, this chart is not exhaustive of all policies ever surrendered:

| Surrender Date | Policy Count | Cash Surrender Value (in $) |
|---|---|---|
| 2/8/1995 | 379 | Unknown |
| 5/22/1995 | 1,678 | Unknown |
| 7/3/1995 | 424 | Unknown |
| 9/30/1995 | 1,131 | Unknown |
| 12/20/1996 | 3,678 | Unknown |
| 12/29/1998 | 1,839 | 1,992,598.56 |
| 6/29/1999 | 888 | 489,313.01 |
| 6/28/2000 | 1,245 | 1,124,947.52 |
| 7/2/2002 | 186 | 318,877.17 |
| 12/31/2004 | 8,111 | 7,482,969.75 |
| 1/31/2005 | 19,774 | 4,008,956.19 |

| | | |
|---|---|---|
| 11/11/2005 | 521 | Unknown |
| 12/21/2006 | 17,737 | 15,343,658.14 |
| 9/26/2007 | 56,514 | 31,660,106.04 |
| 1/15/2008 | 11,557 | 15,734,865.73 |
| **TOTALS** | **125,662** | **62,738,629.91** |

144.    As reflected in the above chart, on January 15, 2008, Defendant Lumpkin directed a Lincoln employee to surrender in a single batch all of the remaining whole life insurance policies in Illinois that were improperly "owned" by NPS and to replace the whole life policies with term policies.  Defendant Lumpkin acted on the direction of Defendant Sutton, who was relaying the decision reached by Defendants Doug Cassity, Brent Cassity, Sutton, Wulf, Wise, Singer, and Scannell.

145.    The 2008 surrendered Illinois policies had a cash surrender value of $15,743,865.73.   Of this amount, Lincoln credited $5,076,142.49 to paying off previous fraudulent policy loans, and credited $3,314,832.60 to pay the first twelve months premium on the improper replacement term policies.  The remaining $7,352,890.64 was paid from Lincoln to NPS.

146.    By converting whole life insurance policies to term policies, the RICO Defendants were able to decrease substantially the amount of monthly premium that NPS owed to Lincoln to keep the policies active.  The money kept by NPS was used for a variety of improper purposes, including but not limited to fraudulent intercompany money transfers among the Cassity Consortium entities, the purchase of additional assets to expand the Cassity Consortium, and otherwise personally enriching the RICO Defendants, the Fraudulent Transfer Defendants, and the Promissory Note Defendants.

56

147.    Although the term policies required far less premium than the whole life policies, the RICO Defendants would periodically fail to pay Lincoln the premiums owed on the term policies.  When the RICO Defendants failed to pay the premiums owed, the term policies were at risk of lapsing, which would have left no insurance in existence to secure the NPS pre-need funeral contracts.

*E.  The RICO Defendants and Promissory Note Defendants*
*Looted the NPS Pre-Need Trusts and Issued*
*Promissory Notes and Debentures in Exchange*

148.    To further their scheme and enrich themselves, the RICO Defendants and/or Promissory Note Defendants systematically looted cash from the NPS pre-need trusts and issued promissory notes and debentures to the trusts in exchange.  The RICO Defendants and/or Promissory Note Defendants generally used the cash from these purported "loans" to purchase additional assets within the Cassity Consortium in order to further enrich themselves.

149.    Any "repayments" of the promissory notes occurred only through book entries unsupported by an actual financial transaction or through the Promissory Note Defendants and/or RICO Defendants directing that money be temporarily shifted from one Cassity Consortium entity to another.  Upon information and belief, the cash was never actually repaid to the NPS pre-need trusts, leaving inadequate assets for payment by NPS to the funeral homes when the funeral services they committed to provide were needed.

150.    The RICO Defendants and/or Promissory Note Defendants completely looted at least one NPS pre-need trust of all assets other than debentures.  The "N2A Trust" (a section of the NPS Pre-Need Trust I that was supposed to hold funds in trust for over two thousand Missouri pre-need contracts) had no assets other than certificates of debenture from NPS as of

57

April 2008.  Defendant Scannell confirmed this in an April 17, 2008 email.  The face values of the debentures for the N2A Trust were $1,805,572.51; $1,395,836.93; and $535,029.86, respectively; for a total of $3,736,439.30.  Each debenture bore the signatures of Defendant Sutton, as President of NPS, and Defendant Crawford, as Secretary of NPS.

151.    Not only were the NPS pre-need trusts' funds depleted through the multiple promissory notes executed by the RICO Defendants and/or Promissory Note Defendants to loot the trusts, but the RICO Defendants and/or Promissory Note Defendants also decreased the face amounts of the promissory notes through "novations" and assigned the trusts' rights to receive the money to other Cassity Consortium entities.  This scheme allowed the RICO Defendants and/or Promissory Note Defendants to pillage the trust assets without any repayment to the trusts.

152.    Examples of the promissory notes and the RICO Defendants and/or Promissory Note Defendants' fraudulent methods of repayment, including the issuance of new, or "novated," notes to replace and improperly "repay" previous promissory notes, are set forth in the allegations below.  These are not exhaustive of all promissory notes issued by the RICO Defendants and/or Promissory Note Defendants.  At least some of these promissory notes were unsecured.

153.    On or about June 22, 2001, Defendant LMS took $1,600,000 from Allegiant Bank as trustee for the NPS Pre-Need Trust IV.  The $1,600,000 promissory note was signed by Defendant Nicki Province as the Vice President of Defendant LMS.

154.    Two years later, on or about September 17, 2003, Defendants Wulf and Sutton authorized a novation of the June 22, 2001, promissory note from $1,600,000 to $2,061,551.43

(taking an additional $461,551.40 in trust funds), ostensibly to be repaid by Defendant LMS. Allegiant Bank booked the new promissory note to the NPS pre-need trust account. Defendant Nicki Province signed the new promissory note as the Vice-President of Defendant LMS.

155.    On or about October 21, 2002, Defendant Forever Network took $559,912.79 from Allegiant Bank as trustee for the NPS Pre-Need Trust IV. Defendant Brent Cassity, as President of Defendant Forever Network, signed this promissory note.

156.    On or about November 1, 2002, Defendant LMS took $4,108,754.85 from the NPS Pre-Need Trust IV. Defendant Sutton, as President of Defendant LMS, later authorized a novation on or about October 1, 2003, to the November 1, 2002, promissory note to $4,508,754.85 (taking an additional $400,000 of trust funds) from Allegiant Bank. On or about October 30, 2007, Defendant LMS (through Defendant Sutton as President) and Allegiant Bank as trustee for the NPS Pre-Need Trust IV agreed to a novation of the October 1, 2003 promissory note from $4,508,754.85 to $704,409.93. The result of this novation is that the $3,804,344.90 was no longer even ostensibly required to be repaid to the NPS pre-need trust.

157.    On or about January 19, 2008, the NPS Pre-Need Trust IV then assigned the novated promissory note to another affiliate within the Cassity Consortium, the Professional Liability Corporation of America, as authorized by Defendant Nicki Province as President of NPS. The result of this assignment is that the NPS pre-need trust is no longer entitled to any repayment; rather, a Cassity Consortium entity is purportedly owed the money.

158.    As part of the scheme to defraud, the RICO Defendants and/or Promissory Note Defendants also issued promissory notes to NPS, Lincoln, Memorial, and other Cassity

Consortium entities, to access the cash paid by the NPS pre-need trusts to purchase the Lincoln and Memorial life insurance policies.  For example:

a)  On or about November 9, 1999, Defendant Forever Enterprises took $4,000,000 from Lincoln.  The promissory note was signed by Defendant Brent Cassity as President of Defendant Forever Enterprises.  The loan was effectuated by a same-day transfer of funds.

b)  On or about January 1, 2001, NPS took $2,754,327 from Memorial.  The promissory note was signed by Defendant Sutton as President of NPS.

c)  On or about June 1, 2004, Defendant LMS took $6,300,000 from Defendant Forever Enterprises.  The promissory note was signed by the President of Defendant LMS.

d)  That same day, on or about June 1, 2004, the RBT Trust II took $6,300,000 from Defendant LMS.  The promissory note was signed by Defendant Wittner in his capacity as trustee for the RBT Trust II.

e)  On or about July 18, 2006, Defendant Forever Enterprises took $1,700,000 from NPS.  The promissory note was signed by both Defendant Brent Cassity as CEO of Defendant Forever Enterprises and Defendant Sutton as President of NPS.

159.    In their respective positions as CFO of Defendant Forever Enterprises, Financial Reporting Director of Defendants Forever Enterprises and NHE, and Chief Financial Officer of Lincoln and Memorial, Defendants Butler and Hale were actively involved in the Cassity Consortium's promissory note and intercompany transfer activity.

160.    Defendants Butler and/or Hale approved the intercompany transactions, drafted the promissory notes, and performed the accounting for the entities within the Cassity Consortium.  Defendants Butler and Hale knew that the Cassity Consortium entities failed to pay back the promissory notes, and that money belonging to NPS, Lincoln, Memorial, and the pre-need trusts was used to purchase assets by other Cassity Consortium entities, such as Defendant Forever Enterprises.  Defendants Butler and Hale therefore knew that millions of dollars were being siphoned away from NPS, Lincoln, Memorial, and the pre-need trusts.  Rather than stopping the siphoning, Defendants Butler and Hale acted to further the scheme to defraud.

161.    The following e-mail evidences the involvement of Defendants Butler and Hale in perpetrating the scheme to defraud through promissory notes and intercompany transfers, such as those detailed above, and also evidences the improper use of funds from NPS to purchase assets and entities within the Cassity Consortium.   On March 5, 2003, Defendant Hale wrote to Defendant Butler:

> "When we purchased All Faiths, ***NPS funded that purchase for us.  Are we going to have a note with them, or are we treating this as just another intercompany advance?***" (emphasis added)

162.    The Promissory Note Defendants systematically failed to repay either the principal or interest on the notes held by the NPS pre-need trusts, Lincoln, or Memorial thus gutting the pre-need trusts and Lincoln and Memorial of assets needed to pay funeral expenses when due.

*F.  To Further Fund Their Scheme to Defraud,
the RICO Defendants Siphoned Additional Funds from "Roll-Overs"*

163.    The RICO Defendants also obtained additional funds for the RICO enterprise through "roll-overs", which provided a large influx of cash to further fund their scheme to defraud.

164.    A roll-over (also called a "trust conversion" or "trust transfer" by NPS) occurred when a funeral home agreed to transfer its existing pre-need contracts to NPS.  A funeral home that agreed to a "roll-over" would also remit to NPS the balance of the funeral home's trust funds from those pre-need contract sales.

165.    Once NPS got possession of the "roll-over" money into the NPS pre-need trust accounts, the RICO Defendants generally would direct the purchase of Lincoln whole life insurance policies for most of the roll-overs.  Some roll-overs were never funded by insurance, despite the RICO Defendants' misrepresentation to funeral homes that "Proceeds [from the roll-overs] will go to trust, ***and subsequently be placed in life insurance within thirty (30) days***." (emphasis added)

166.    The RICO Defendants misrepresented to funeral homes seeking to complete a roll-over with NPS that "There is a double-layer of protection using ***trusted*** insurance[.]" (emphasis added)

167.    For those roll-overs where insurance policies were purchased, the RICO Defendants and/or Promissory Note Defendants would engage in the same schemes described in this Complaint to take the "roll-over" money.  Additionally, for all roll-overs, the RICO Defendants and/or the Promissory Note Defendants would take the money from the NPS pre-

need trusts and issue promissory notes and/or debentures as set forth previously in this Complaint.

### G.  The Investment Advisor Defendants Played a Critical Role in the Scheme to Defraud

168.    The NPS pre-need trusts consisted of a variety of trust accounts established by NPS to supposedly hold the funds collected from the pre-need contract sales as required by state law to be placed in a trust account.

169.    Five of these trust accounts, called NPS Pre-Need Trust I through NPS Pre-Need Trust V, were established to purportedly hold funds generated from the sale of pre-need contracts mainly in Missouri.

170.    Another account, called the NPS Iowa Trust, was established to hold funds generated primarily from the sale of pre-need contracts in Iowa.

171.    Two other trust accounts, called the "Mt. Washington Forever Pre-Need Trust" and the "Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust" (aka the "Forever dba Mason Securities Pre-Need Trust"), were established by subsidiaries of Defendant Forever Network to hold funds generated from the sale of pre-need contracts at the Mount Washington Forever Funeral Home in Independence, Missouri and by Mason Securities Association, respectively.  A large portion of the assets of those trusts were Lincoln life insurance policies, and, upon information and belief, Defendants perpetrated the same fraudulent schemes with respect to those policies as with policies held by the other NPS pre-need trusts.

171.1. Another trust account was the Pfitzinger Funeral Home Pre-Need Trust, which was established to hold funds generated from the sale of pre-need contracts at the Pfitzinger

Funeral Home in Kirkwood, Missouri.  Allegiant Bank acted as trustee of the Pfitzinger Funeral Home Pre-Need Trust from approximately May 2002 to May 2004.  Defendant Bremen Bank acted as trustee of the Pfitzinger Funeral Home Pre-Need Trust from approximately May 2004 to May 2005.  Defendants Marshall & Ilsley and Southwest Bank acted as trustee of the Pfitzinger Funeral Home Pre-Need Trust from approximately May 2005 until the date of receivership.

172.    Upon information and belief, there were many other trusts associated with Defendants, some of which are additional pre-need trusts.  The RICO Defendants may have perpetrated the same fraudulent schemes as to one or more of those additional trusts, thereby further damaging Plaintiffs.

173.    The NPS pre-need trusts were legally required to hold funds received from NPS for future funeral services under a Trust Agreement.

174.    In 1988, NPS, through Defendant Sutton, engaged Defendants Wulf and Wulf Bates to act as purportedly "independent" investment advisors for the NPS pre-need trusts. Defendants Wulf and Wulf Bates served as investment advisors for all the NPS pre-need trusts and continued to act as investment advisors until NPS was placed in receivership.

175.    Defendants Wulf and Wulf Bates were not "independent" investment advisors and they materially participated in and furthered the RICO Defendants' scheme to defraud.

176.    In 1994, Defendants Wulf and Wulf Bates appointed and authorized Defendant Sutton to act as an "investment agent" on behalf of Wulf and Wulf Bates for the pre-need trust funds.  At that time, Defendant Sutton was the President of both NPS and Lincoln.

177.    As an "investment agent" for Defendants Wulf and Wulf Bates, Defendant Sutton performed, with full authority on behalf of Defendants Wulf and Wulf Bates, daily

"administrative functions" relating to the NPS pre-need trust assets that would and should otherwise have required the oversight and approval of Defendants Wulf and Wulf Bates. Defendant Sutton was therefore able to directly manipulate the trust assets for the RICO Defendants, the Fraudulent Transfer Defendants, and the Promissory Note Defendants.

178.   Defendants Wulf and Wulf Bates received more than $600,000 in fees from Lincoln and other Cassity Consortium entities between 2005 and 2008 and received additional compensation from NPS of at least $15,000 per year.  Defendant Wulf and Trip Bates were paid health benefits directly by the same entity within the Cassity Consortium that paid all other Cassity Consortium employees' health benefits, as if Defendant Wulf and Trip Bates were employees.

179.   As purportedly "independent" investment advisors, Defendants Wulf and Wulf Bates owed fiduciary duties to NPS as the entity that settled and funded the NPS pre-need trust accounts, and to the funeral homes and consumers as the beneficiaries of the pre-need trusts. Those fiduciary duties include, without limitation, loyalty, care, good faith, candor, sound business judgment, forthrightness, and fairness, through their direction and control over the trust funds.

180.   Defendants Wulf and Wulf Bates authorized improper policy loans, depleted the pre-need trusts' cash in exchange for promissory notes, failed to ensure payment of principal and interest from the notes, disregarded the types of policies being purchased and the value of policies being surrendered, authorized the lapsing of some policies, and ignored the withdrawals made from the NPS pre-need trusts, all in violation of their fiduciary obligations.

181.    Defendants Wulf and Wulf Bates knew for at least several years prior to the demise of NPS, Lincoln, and Memorial that the NPS pre-need trusts had insufficient assets and cash inflow from the sale of pre-need contracts to pay the premiums due on the insurance policies, and to pay the funeral benefits.  Defendants Wulf and Wulf Bates engaged in various schemes described in this Complaint in order to generate cash necessary to pay such present obligations without regard to the obvious and negative impact these payments would have on the trust assets and the ability of the trusts to pay future obligations to the beneficiaries.

182.    Defendants Doug Cassity, Scannell, Lumpkin, and Wittner drafted letters for Defendant Wulf Bates' signature that were purportedly to come from Defendant Wulf Bates as the "independent investment" advisor to the NPS pre-need trusts directing the trusts' actions as to the trusts' assets.  These letters were generated to make it look like Defendant Wulf had alone been directing the activities of the trusts when in fact this was not true.  The letters were also generated to give the false impression that the RICO Defendants were no longer engaged in the practice of taking policy loans.  Defendant Wulf signed some or all of these letters drafted for his signature.

183.    An example of a letter drafted by Defendants Doug Cassity, Scannell, Lumpkin, and Wittner for Wulf's signature follows (this example letter was drafted by Defendants Scannell and Doug Cassity):

Dated: May 29, 2007

Mr. Randall K. Sutton
National Prearranged Services, Inc.
10 South Brentwood Blvd.
St. Louis, MO 63105

RE:  National Prearranged Services, Inc. Pre-need Funeral Trust

Dear Mr. Sutton:

As the independent investment advisor for National Prearranged Services, Inc. Preneed Funeral Trust I have historically recommended that the Trust purchases life insurance policies to fund the prearranged funeral contracts and exercise its right to request policy loans on those life insurance policies.  This confirms that I will no longer advise that NPS or the Trust exercise their right to apply for and receive policy loans.

Sincerely,

[signature]

David R. Wulf

184.    As evidenced by the following additional facts, Defendants Wulf and Wulf Bates failed to disclose that they were not independent from NPS and Lincoln, but rather were actually acting in their own interest and in the interest of the other RICO Defendants, rather than in the interests of the pre-need trust beneficiaries:

a)   Defendants Wulf and Wulf Bates directed the investment of millions of dollars of NPS pre-need trust funds into Defendant Wulf's personal investment partnerships.

b)   Defendants Wulf and Wulf Bates directed the investment of NPS pre-need trust funds in over 275,000 shares of stock in Defendant Forever Enterprises.

c)   Defendant Wulf personally owned over 18,000 shares of stock in Defendant Forever Enterprises, one of the entities in the Cassity Consortium that ultimately owned Lincoln.

d)   Defendants Wulf and Wulf Bates relied on NPS computer programs to make their decisions on purchasing life insurance policies from Lincoln.

e) Defendants Wulf and Wulf Bates did not consider that NPS received a commission from Lincoln for every insurance policy purchased with NPS pre-need trust assets.

f) Defendants Wulf and Wulf Bates' offices were on the fourth floor of the same St. Louis building that housed NPS, Defendant Forever Enterprises, and Defendant NHE, Defendant LMS, Defendant Forever Network, Defendant Texas Forever, Defendant NPS Agency, Defendant Legacy International, and Defendant Brentwood Heritage.

### H.  The Trustee Defendants of the NPS Pre-Need Trusts Breached Their Fiduciary Duties

185.   The Trustee Defendants or their respective predecessors in interest, at various relevant periods, served as trustees of the NPS pre-need trusts in Missouri and Iowa, and received substantial fees in exchange for providing trust services.

186.   During the time each Trustee Defendant (or its respective predecessor in interest) served as trustee of one or more of the NPS pre-need trusts, each had a fiduciary duty to both NPS, as the entity that settled and funded the NPS pre-need trust accounts, and to the funeral homes and consumers, as beneficiaries of the NPS pre-need trusts.

187.   The Trustee Defendants were responsible for prudently administering the NPS pre-need trusts in good faith in order to protect and grow the trust assets, so there would be sufficient funds for NPS to pay the funeral home to provide consumers the agreed-upon funeral services when needed, as set forth in the NPS pre-need funeral contract.

188.   The Trustee Defendants breached their fiduciary duties by failing to properly manage the NPS pre-need trust assets, and by failing to ensure that those assets were prudently

handled.  As a result, the assets of the NPS pre-need trusts were manipulated and drained to the detriment of the funeral homes and their customers and to the benefit and furtherance of the RICO Defendants, the Promissory Note Defendants, and the Fraudulent Transfer Defendants.

189.     The Defendant Trustees, including specifically National City Bank as successor in interest to Allegiant Bank, approved and authorized promissory notes by companies affiliated with NPS and within the Cassity Consortium that were used to loot the trust assets of millions of dollars.  Upon information and belief, these promissory notes were also approved and authorized by the other Trustee Defendants at various relevant times.   As to any promissory notes not approved by the Trustee Defendants, the Trustee Defendants failed to discover and/or prevent the millions of dollars being pillaged from the trusts and replaced with promissory notes.

190.     The Trustee Defendants failed to ensure that the promissory notes were adequately secured by assets, that security interests were properly recorded, and failed to ensure payment of interest due under the promissory notes.

191.     The Trustee Defendants allowed Defendants Wulf and Wulf Bates to act as the purportedly "independent" investment advisors, while the Trustee Defendants knew or should have known of Defendants Wulf's and Wulf Bates' lack of independence.

192.     The Trustee Defendants worked directly with and took direction from Defendant Sutton in approving withdrawals from the NPS pre-need trusts to the detriment of the trust beneficiaries.

193.     The Trustee Defendants allowed the NPS pre-need trust assets to be pillaged through the purchase of life insurance policies from Lincoln, an affiliated company of NPS, and

allowing such policies to be manipulated by the RICO Defendants in various ways, including policy loans and mass surrenders, both of which depleted the cash value of the policies.

194.    The Trustee Defendants permitted NPS pre-need trust funds to be invested in illiquid assets including partnerships owned by Defendant Wulf and stock in entities affiliated with NPS and owned by the RICO Defendants.

195.    The Trustee Defendants permitted and authorized substantial cash transfers from the NPS pre-need trusts for the personal benefit of the RICO Defendants, the Promissory Note Defendants, and the Fraudulent Transfer Defendants, and to the detriment of the trust beneficiaries.

196.    The Trustee Defendants failed to ensure the payment of premiums on life insurance policies held by the NPS pre-need trusts, thus allowing those policies to be surrendered or lapsed.

197.    The Trustee Defendants failed to properly supervise the NPS pre-need trusts' assets, and enabled the RICO Defendants, the Promissory Note Defendants, and the Fraudulent Transfer Defendants to pillage the trust assets to the detriment of the Plaintiffs.

*I. The SDR, NOLHGA, and the State Guaranty Association Claims*
*Against the Trustee Defendants*

197.1.    Plaintiffs' claims for breach of fiduciary duty (nineteenth claim for relief) and negligence and gross negligence (twentieth claim for relief) against the Trustee Defendants are brought by:  (1) the SDR; (2) NOLHGA[5]; and (3) individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas.  For those claims, the

---

[5] NOLHGA brings claims as assignee of the state life and health insurance guaranty associations of Arizona, California, Colorado, District of Columbia, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Michigan,

SDR, NOLHGA, and the seven individual state guaranty associations seek all damages flowing from the Trustee Defendants' failure to properly discharge their duties to safeguard the pre-need funds.

197.2.     Plaintiffs' claims for aiding and abetting fraud (thirty-first claim for relief), aiding and abetting breach of fiduciary duty by investment advisors (thirty-second claim for relief), and aiding and abetting breach of fiduciary duty by Bremen Bank (thirty-third and thirty-fourth claims for relief) against certain Trustee Defendants are also brought by:  (1) the SDR; (2) NOLHGA;  and  (3) individual  state  guaranty  associations  from  Missouri,  Texas,  Illinois, Kansas, Oklahoma, Kentucky, and Arkansas.

197.3.     For the claims asserting unjust enrichment (twenty-eighth claim for relief) and money had and received (twenty-ninth claim for relief) against the Trustee Defendants, Plaintiff SDR is the only plaintiff bringing such claims.  The SDR's unjust enrichment and money had and received claims seek restitution of all fees charged to NPS by the Trustee Defendants, or other benefits received by the Trustee Defendants at NPS' expense.  The SDR brings such claims against the Trustee Defendants on behalf of NPS based on her capacity as the Special Duty Receiver for NPS.

197.4.     NOLHGA and the seven individual state guaranty associations bring their breach of fiduciary duty claim, their negligence and gross negligence claim, and their aiding and abetting claims against the Trustee Defendants by virtue of their obligations to pay the face value of the Lincoln life insurance policies.  Absent the coverage provided by the state guaranty associations, the life insurance policies would have little or no value.  The division of payment

---

Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Rhode Island,

obligations among the state guaranty associations is set forth in the Liquidation Plan developed in cooperation with NOLHGA, the state guaranty associations, and the SDR, and entered by the Texas Receivership Court on September 22, 2008.  The Liquidation Plan is attached as Exhibit 2 and the court order approving the Liquidation Plan is attached as Exhibit 3.

197.5.    Under the Liquidation Plan, the state guaranty associations are obligated to pay approximately $600 million in face value of Lincoln and Memorial life insurance policies. The Trustee Defendants held approximately $250 million in face value of these policies in pre-need trusts.

197.6.    The residency as of September 22, 2008, of the *policy owner* (for a "Standard Policy") or the *insured* (for a "Disputed Policy"), determines which state guaranty association is responsible for providing coverage.  The life insurance policies classified under Paragraph 5.1 of the Liquidation Plan as "Disputed Policies" include generally, but are not limited to, those policies for which:  (a) NPS and/or an NPS pre-need trust is identified as the owner, beneficiary, payee, or assignee of the policy; (b) NPS took out or arranged for policy loans; or (c) NPS converted or arranged for the conversion from whole life policies to term policies.  "Standard Policies" under Paragraph 4.1 of the Liquidation Plan include generally, but are not limited to, those policies for which:  (a) neither NPS nor a Trustee is identified as the owner, beneficiary, or assignee of the policy; and (b) no policy loan was authorized, requested and/or made by/to NPS and/or a Trustee.

197.7.    Based on the terms of the Liquidation Plan and their attendant payment obligations, NOLHGA (on behalf of all 28 state guaranty associations) and all seven individual

---

South Dakota, Tennessee, Utah, Washington, West Virginia, Wisconsin, and Wyoming.

state guaranty associations (Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas) assert claims for breach of fiduciary duty, negligence and gross negligence, and aiding and abetting against the Trustee Defendants who were trustees, or whose predecessors were trustees, of NPS Pre-Need Trusts I through V, the NPS Iowa Pre-Need Trust, and the NPS Illinois Pre-Need Trust.

197.8.    Based on the terms of the Liquidation Plan and its attendant payment obligations, the Missouri Life and Health Insurance Guaranty Association asserts claims for breach of fiduciary duty, negligence and gross negligence, and aiding and abetting against the Trustee Defendants who were trustees, or whose predecessors were trustees, of the Mt. Washington Forever Pre-Need Trust, and the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust.

197.9.    The SDR, on behalf of NPS, funeral homes, and consumers, asserts breach of fiduciary duty, negligence and gross negligence, and aiding and abetting claims against the Trustee Defendants who were trustees, or whose predecessors were trustees, of one or more of the following trusts:  the NPS Pre-Need Trusts I through V, the NPS Iowa Pre-Need Trust, the Mt. Washington Forever Pre-Need Trust, the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust, and the NPS Illinois Pre-Need Trust.

197.10.    All claims against the Trustee Defendants have a significant relationship to Missouri and Texas because they arise from conduct undertaken in those states by the RICO Defendants, and permitted by the Trustee Defendants.  Those activities are detailed above in Section H and include, in part:  (a) NPS (a Missouri company) purchasing and placing life insurance policies from Lincoln (a Texas company affiliated with NPS) into the pre-need trusts;

and (b) the RICO Defendants converting pre-need trust funds by taking substantial policy loans, causing mass surrenders of whole life policies issued by Lincoln and replacing them with term policies, and removing pre-need trust funds in exchange for promissory notes from Cassity Consortium entities.

197.11.    The majority of the Trustee Defendants' conduct in failing to properly administer and safeguard the NPS pre-need trust assets, as detailed above in Section H and below in Sections O and P, occurred in the states in which the Trustee Defendants or their predecessors were doing business.  The domicile, state of incorporation, or principal place of business of each Trustee Defendant, the SDR, NOLHGA, RICO Defendants, and other parties and non-parties relevant to the claims against the Trustee Defendants is set forth in the "Parties" section of this Complaint.

197.12.    NPS was the settlor of NPS Pre-Need Trusts I through V, the NPS Iowa Pre-Need Trust, and the NPS Illinois Pre-Need Trust.

197.13.    Most of the entities that acted as trustees for NPS Pre-Need Trusts I through V, the Mt. Washington Forever Pre-Need Trust, the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust, and the NPS Illinois Pre-Need Trust were domiciled or had their principal place of business in Missouri.

197.14.    The trust agreements for NPS Pre-Need Trusts I through V, the Mt. Washington Forever Pre-Need Trust, and the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust designate Missouri law as governing those pre-need trusts, with each stating:  "This agreement is made and intended to be performed within the State of Missouri and shall be governed by Missouri law applicable to Prearranged Funeral

Agreements.  Any provisions hereof in conflict with any statute of Missouri now or hereafter applicable to this trust shall be considered a nullity, and this Declaration of Trust shall be construed as fully as possible in conformity with the laws of the State of Missouri."

197.15.    Missouri funeral homes and Missouri consumers provided the vast majority of the pre-need funds that were attributed to NPS Pre-Need Trusts I through V, the Mt. Washington Forever Pre-Need Trust, and the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust.  Iowa funeral homes and Iowa consumers provided the vast majority of the pre-need funds that were attributed to the NPS Iowa Pre-Need Trust.

197.16.    Under the Liquidation Plan, the Missouri Life and Health Insurance Guaranty Association is responsible for payment of:   (a) approximately $150,000,000 of approximately $154,000,000 in face value of the life insurance policies held in NPS Pre-Need Trust IV as of September 22, 2008; (b) the majority of the approximately $10,000,000 in total face value of such policies in NPS Pre-Need Trust III as of September 22, 2008; and (c) 100% of the approximately $14,000,000 in face value of such policies in the Mt. Washington Forever Pre-Need Trust, and the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust as of September 22, 2008.

197.17.    The trust agreement for the NPS Iowa Pre-Need Trust contains an identical choice of law provision as that set forth above, except that Iowa law is designated as governing: "This Agreement is made and intended to be performed within the State of Iowa and shall be governed by Iowa law applicable to Prearranged Funeral Agreements.  Any provisions hereof in conflict with any statute of Iowa now or hereafter applicable to this Trust shall be considered a

nullity, and this Declaration of Trust shall be construed as fully as possible in conformity with the laws of the State of Iowa."

197.18.    Under the Liquidation Plan, the Iowa Life and Health Insurance Guaranty Association is responsible for payment of approximately $8,000,000 of approximately $10,000,000 in face value of the life insurance policies held in the NPS Iowa Pre-Need Trust as of September 22, 2008.

197.19.    In January 2008, Illinois regulators required NPS to segregate funds related to pre-need contracts of Illinois residents into a separate account, called the NPS Illinois Pre-Need Trust.   The trust agreement for the NPS Illinois Pre-Need Trust contains a choice of law provision stating:   "This Agreement shall be governed by the laws of the State of Illinois." Defendant Bremen Bank was the sole trustee of the NPS Illinois Pre-Need Trust and acted as trustee from that trust's formation in January 2008 to the date of receivership.

197.20.    Under the Liquidation Plan, the Illinois Life and Health Insurance Guaranty Association is responsible for almost all of the approximately $60,000,000 in total face value of life insurance policies held in the NPS Illinois Pre-Need Trust as of September 22, 2008.

*J.  The Defendant Attorneys Were Materially Involved in the Schemes to Defraud*

198.    Defendants Scannell and Wittner served as general counsel, at various relevant times, to entities within the Cassity Consortium, including NPS, Lincoln, Memorial, Defendant Forever Enterprises, and Defendant NHE.  Defendant Wittner began serving as general counsel to entities within the Cassity Consortium at least by 1996, and Defendant Scannell began serving as general counsel in approximately October 2002.

199.    Defendant Wittner also served as outside counsel to NPS, Lincoln, and Memorial, and upon information and belief other entities within the Cassity Consortium after Defendant Wittner's time as general counsel ended.

200.    Defendant Wittner, Spewak & Maylack served as outside counsel to NPS, Lincoln, and Memorial at all times relevant to this Complaint.  In addition to Defendant Wittner, other attorneys within the firm regularly provided professional legal services to NPS, Lincoln, and Memorial, including but not limited to Jean Maylack, David Spewak, and Jack Spooner.

201.    As attorneys to NPS, Lincoln, and Memorial, each of the Attorney Defendants (Defendants Scannell, Wittner, and Wittner, Spewak & Maylack) had an attorney-client relationship with NPS, Lincoln, and Memorial, and owed professional duties to exercise reasonable care consistent with the applicable standards and care.  The Attorney Defendants were also fiduciaries who owed duties to NPS, Lincoln, and Memorial, including the duties of loyalty and scrupulous fidelity to their clients' best interests.

202.    The Attorney Defendants failed to exercise reasonable care under the circumstances and breached the applicable standards of care.  The Attorney Defendants at times consented to, encouraged, participated in, and/or authorized the policy loans, policy surrenders, and promissory notes that pillaged the NPS pre-need trusts, Lincoln, and Memorial, and enriched the RICO Defendants, the Promissory Note Defendants, and the Fraudulent Transfer Defendants and other entities within the Cassity Consortium to the detriment of NPS, Lincoln, and Memorial.

203.    The Attorney Defendants at times consented to, encouraged, participated in, and/or authorized the misrepresentations to the funeral homes and consumers.

204.     Defendant Scannell drafted letters supposedly from Defendant Wulf in his role as investment advisor describing and justifying investment decisions, in an attempt to hide the fact that Defendants Wulf and Wulf Bates were not "independent" and that the RICO Defendants were directing the investment of pre-need trust funds.  Defendant Wittner knew about, and upon information and belief, participated in the drafting of these letters.

205.     The Attorney Defendants at times acted for their own personal and financial gain.

206.     The Attorney Defendants at times failed to advise NPS, Lincoln, and Memorial as to the ramifications of the fraudulent, illegal, and improper actions planned and carried out as described in this Complaint.

207.     The Attorney Defendants at times failed to properly research and evaluate the ramifications of those actions, and gave faulty legal advice related to the actions described in this Complaint, and failed to inform NPS, Lincoln, and Memorial of better alternative courses of action.

208.     The Attorney Defendants relied upon the legal advice and analysis of Defendant Doug Cassity, a disbarred Missouri attorney, in rendering legal advice to NPS, Lincoln, and Memorial, in violation of their duties as both fiduciaries and attorneys to NPS, Lincoln, and Memorial.

### K.  The Defendant Auditor Failed to Disclose the Looting of Lincoln and Memorial

209.     Defendant Brown Smith Wallace served as the independent auditor of Lincoln and Memorial from at least 2001 through 2007, and as the independent auditor of Defendant Forever Enterprises, Inc. and its subsidiaries, including Lincoln and Memorial, from September 2001 through May 2007.  Brown Smith Wallace conducted audits of the statutory financial

statements of Lincoln and Memorial for 2001 through 2007, and audited the consolidated balance sheets of Defendant Forever Enterprises and its subsidiaries for 2001 through 2007. Defendant Brown Smith Wallace also audited PLICA for 2004 through 2008.

210.    Lincoln and Memorial were obligated to provide their audit reports to state regulators, including state insurance departments where the companies were licensed.  Brown Smith Wallace knew that the insurance commissioners of the states where Lincoln and Memorial were licensed would rely on the information contained in the audit reports in monitoring the financial conditions of the companies.

211.    Brown Smith Wallace never identified that the assets of Lincoln and Memorial were being diminished so as to cause those companies' insolvencies.  Rather, each audit report issued by Brown Smith Wallace concluded that Lincoln's and Memorial's respective financial position was acceptable and that their financial statements showing substantial assets fairly presented the financial positions and operations of the companies, including their assets, liabilities, and capital and surplus.  Despite the wholesale looting of Lincoln and Memorial, and the manipulation of insurance policies issued by those companies, in no audit report did Brown Smith Wallace identify any material weaknesses or reportable conditions arising from internal controls or operational matters.

212.    In each audit report, Brown Smith Wallace included a section on Related Party Transactions, where it described the relationship between NPS and the other Cassity Consortium entities, and identified certain transactions between the companies.  Brown Smith Wallace never disclosed that intercompany transactions created any risk to Lincoln or Memorial.  On the

contrary, for example, in Lincoln's 2005 audit, Brown Smith Wallace reported that policy loans taken by NPS did not subject Lincoln to "significant credit risks".

213.    Brown Smith Wallace failed to comply with auditing standards by:  (1) failing to report or identify the massive numbers of transactions that depleted the cash value of the policies, including mass surrenders of whole life policies, numerous policy loans taken on the same dates, and multiple conversions of policies to RPU status; (2) failing to communicate with the insured parties to confirm their knowledge of the existence of policy loans taken on their insurance policies, term policies that replaced whole life policies, and alterations made to policy applications; and (3) failing to review the financial condition of NPS as the premium payor of the majority of the policies to ensure that NPS had sufficient funds to meet its obligations.

### L. The RICO Defendants' Schemes to Loot NPS, Lincoln, and Memorial Involved Extensive Mail and Wire Fraud in Violation of RICO

214.    In order to loot NPS, Lincoln, Memorial, and the NPS pre-need trusts, the RICO Defendants engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961 *et seq*.

215.    Specifically, the RICO Defendants routinely engaged in mail and wire fraud to further their scheme to defraud the funeral homes and consumers while the RICO Defendants siphoned away the pre-need funds.  The RICO Defendants used the mails and wires daily to further and execute their scheme to defraud, by sending mails and wires that include but are not limited to:

   a)  Transmitting instructions for the fraudulent practices between the RICO Defendants' St. Louis, Missouri office and their Austin, Texas office containing, among other things, instructions related to policy loans and surrenders;

b)  Transmitting funds from Lincoln and/or Memorial to NPS;

c)  Transmitting funds from any of the entities within the Cassity Consortium to any other entity within the Cassity Consortium, or to any Defendant;

d)  Transmitting false information to NPS sales agents for purposes of passing the information along to funeral homes and consumers;

e)  Transmitting fraudulent misrepresentations and omissions directly to funeral homes and consumers;

f)  Sending fraudulent "paid in full" certificates to funeral homes and/or consumers;

g)  Transmitting from NPS to funeral homes payment of death claims under the NPS pre-need funeral contracts;

h)  Transmitting from NPS to funeral homes monthly statements of the funeral home's accounts with NPS;

i)  Responding to various state regulators' inquiries about the fraudulent schemes;

j)  Transmitting files, forms, instructions, life insurance applications, pre-need contracts, and other documents between the RICO Defendants' St. Louis, Missouri office and their Austin, Texas office; and

k)  Communications between and among each of the RICO Defendants discussing the Defendants' fraudulent activities and the schemes to defraud.

216.    The RICO Defendants used the wires and/or mails on a daily basis for the above stated purposes to further and execute the scheme to defraud the funeral homes and consumers. For example, every time NPS mailed or wired a paid-in-full certificate to a funeral home or consumer, or paid a funeral home on a death claim, the RICO Defendants furthered the false

impression that NPS was a viable company that had prudently managed the pre-need funds.  The "Paid in Full" Certificates were materially false and misleading because the RICO Defendants' fraudulent schemes to white-out/alter policy applications, take out policy loans, cause mass policy surrenders, loot the NPS pre-need trusts, and engage in other schemes to siphon the pre-need contract money rendered the consumer's payments under the pre-need funeral contracts worthless.

217.    In addition to those quoted throughout this Complaint, the following are specific examples of e-mails the RICO Defendants used to further and execute the scheme to defraud. This list is not exhaustive of all e-mails or other wires used in furtherance of the scheme, but rather provides a representative sample of the RICO Defendants' daily use of the wires:

| Date (on/about) | From | To | Description |
|---|---|---|---|
| 1/12/2004 | Darci Greco | Kati Scannell; Nicki Province; Tony Lumpkin | Discussion of policy mismatching/white-outs and cover-up |
| 7/21/2004 | Nicki Province | Steven Bott; Mike Butler; Kati Scannell; Keith Hale; Randy Sutton | Discussion of inter-company money transfers |
| 1/9/2005 | Tony Lumpkin | Darci Greco; Randy Sutton | Instructions for wiring money |
| 3/7/2005 | Kati Scannell | Doug Cassity; Randy Sutton | Discussion of promissory notes |
| 3/14/2005 | Howard Wittner | Kati Scannell | Discussion of promissory notes |
| 3/25/2005 | Roxanne Schnieders | Erin Province; Nicki Province; Randy Sutton; Brent Cassity; Cindy Boydston | Discussion of limiting the information given to sales agents and funeral homes |
| 1/3/2006 | Tony Lumpkin | Darci Greco | Instructions for money transfers |
| 5/18/2006 | Keith Hale | Mike Butler | Discussion of 2005 policy loans |
| 12/4/2006 | Kati Scannell | Brent Cassity; Randy | Discussion of response to |

| | | Sutton; Doug Cassity | funeral home inquiring about NPS practices |
|---|---|---|---|
| 9/14/2007 | Roxanne Schnieders | NPS Sales Agents | Instruction to sales agents to tell funeral homes NPS does not make policy loans |
| 9/21/2007 | Tony Lumpkin | Randy Singer; George Wise | Discussion of policy surrenders |
| 10/5/2007 | Randy Singer | Kati Scannell | Discussion of lapsed policies |
| 10/15/2007 | Mike Butler | Kati Scannell; Brent Cassity | Discussion of wire transfers |
| 10/29/2007 | Kati Scannell | Doug Cassity; Brent Cassity; Tyler Cassity; Howard Wittner; Randy Sutton | Discussion of how to respond to regulatory inquiries regarding policy loans |
| 1/15/2008 | Doug Cassity | Kati Scannell | Instruction for policy surrenders |
| 1/15/2008 | Tony Lumpkin | Jim Fischer; Randy Sutton; Randy Singer; George Wise; Kati Scannell | Instruction for policy surrenders |
| 4/3/2008 | Doug Cassity | Kati Scannell | Instructions on promissory notes |

218.    Specific examples of telephone calls used to further and execute the scheme to defraud include:

| Date (on/about) | From | To | Description |
|---|---|---|---|
| 3/14/2005 | Howard Wittner | Kati Scannell | Discussion of promissory notes |
| 9/10/2007 | Nicki Province | Ohio Funeral Homes | Misrepresentations regarding policy loans |
| 9/14/2007 | Erin Province | Ohio Funeral Home | Misrepresentations regarding policy loans |
| 9/14/2007 | Roxanne Schnieders | NPS Sales Agents | Instruction to sales agents to tell funeral homes NPS does not make policy loans |

| 9/21/2007 | Kati Scannell | Randy Singer | Discussion of policy surrenders |

219.   Specific examples of mailings used to further and execute the scheme to defraud include:

| Date (on/about) | From | To | Description |
|---|---|---|---|
| 8/6/2004 | St. Louis Office | Austin Office | Materials for Texas Department of Banking inquiry |
| 9/9/2004 | Austin Office | Kati Scannell, St. Louis Office | Life insurance applications |
| 1/3/2006 | St. Louis Office | Austin Office | Overnight delivery of checks |
| 9/18/2007 | Nicki Province, St. Louis Office | Scott Reed, Reed Funeral Home, Canton, Ohio | Letter to funeral home containing fraudulent misrepresentations |

220.   Each of the mail and wire transfers detailed in this Complaint constituted a predicate act of mail and wire fraud in furtherance of the scheme to defraud the funeral homes and consumers.

*M.  The Fraudulent Transfer Defendants Initiated and
Accepted Millions of Dollars in Fraudulent Transfers*

221.   The following chart lists several examples of Defendant entities and individuals who accepted fraudulent transfers from NPS, Lincoln, Memorial, NPS pre-need trusts, and Defendants NHE and Forever Enterprises while giving no or inadequate consideration in return:

| Date | Amount Received (in $) | Borrower / Transferee | Lender / Transferor | Type of Fraudulent Transfer |
|---|---|---|---|---|
| 1/1/1993 | 1,500,000.00 | NPS Agency | NPS | Promissory Note |
| 2/26/1996 | 1,000,000.00 | Brent D. Cassity | NHE | Promissory Note |
| 2/26/1996 | 1,000,000.00 | J. Tyler Cassity | NHE | Promissory Note |

84

| 12/18/2000 | 228,176.90 | Wise, Mitchell & Associates | Memorial | Promissory Note |
|---|---|---|---|---|
| 1/1/2001 | 8,508,360.51 | Forever Enterprises | Memorial | Promissory Note |
| 1/1/2001 | 2,754,327.00 | NPS | Memorial | Promissory Note |
| 1/1/2001 | 8,652,419.81 | Forever Enterprises | Memorial | Promissory Note |
| 10/21/2002 | 559,912.79 | Forever Network | Allegiant Bank, Trustee for NPS Pre-Need Trust IV | Promissory Note |
| 11/26/2002 | 150,000.00 | Texas Forever | NPS Pre-Need Trust IV | Promissory Note |
| 2/1/2004 | 4,600,000.00 | LMS | Bremen Bank, Trustee for NPS Pre-Need Trust IV | Promissory Note |
| 11/22/2004 | 100,000.00 | Hollywood Forever | NPS Custody Account (Bremen Bank) | Promissory Note |
| 1/24/2006 | 250,000.00 | Tony Lumpkin | Forever Enterprises | Promissory Note |
| 7/18/2006 | 1,700,000.00 | Forever Enterprises | NPS | Promissory Note |
| 1/31/2007 | 193,109.22 | Legacy International | NPS | Promissory Note |
| 4/23/2007 | 50,000.00 | Brentwood Heritage | NPS | Promissory Note |
| 3/13/2008 | 5,659,237.99 | NPS | Lincoln | Promissory Note |
| 1/1/2003 – 5/14/2008 | 3,003,649.00 | Doug Cassity | NPS | Credit Card payments |
| 1/1/2003 – 5/14/2008 | 2,707,833.00 | Randall Sutton | NPS | Credit Card payments |
| 1/1/2003 – 5/14/2008 | 1,010,375.00 | Tyler Cassity | NPS | Credit Card payments |
| 1/1/2003 – 5/14/2008 | 542,437.00 | Brent Cassity and Julie Ann Cassity | NPS | Credit Card payments |
| 1/1/2003 – 5/14/2008 | 502,419.00 | James Crawford | NPS | Credit Card payments |
| 1/1/2003 – 5/14/2008 | 146,521.00 | Tony Lumpkin | NPS | Credit Card payments |

| 1/1/2003 – 5/14/2008 | 23,928.00 | Lennie Cappleman | NPS | Credit Card payments |
|---|---|---|---|---|
| 1/1/2003 – 5/14/2008 | 9,351.00 | George Wise | NPS | Credit Card payments |
| 1/1/2003 – 5/14/2008 | 287,558.00 | James Crawford | NPS | Vehicle payments |
| 1/1/2003 – 5/14/2008 | 107,618.00 | Doug Cassity | NPS | Vehicle payments |
| 1/1/2003 – 5/14/2008 | 39,978.00 | Randall Singer | NPS | Vehicle payments |
| 1/1/2003 – 5/14/2008 | 60,453.00 | Michael Butler | NPS | Country club payments |

222.    Upon information and belief, the following entities also accepted fraudulent transfers via promissory notes:  Defendant Forever Illinois ($455,780.00), Hollywood Forever ($1,700,000.00), Forever Enterprises ($1,653,988.00 for Odessa), Forever Enterprises ($250,000.00 for Family Tree Memorials), and Forever Network ($577,864.10 for Oak Hill).

*N. The Cassity Consortium Entities Are Alter Egos of the Defendants*

223.    Defendant Doug Cassity created numerous alter ego entities within the Cassity Consortium which were undercapitalized, funded only by the siphoning of the pre-need contract funds from the NPS pre-need trusts, Lincoln, and Memorial, and were stripped of their assets for the personal benefit of the RICO Defendants, the Fraudulent Transfer Defendants, and the Promissory Note Defendants, including Defendant Doug Cassity, Rhonda Cassity, Brent Cassity, and Tyler Cassity.  The RICO Defendants used the alter ego entities for the purpose of defrauding the funeral homes and their customers.

224.    The corporate structure established by Defendants Doug Cassity, Rhonda Cassity, Brent Cassity, and Tyler Cassity was used to perpetrate the scheme to defraud the funeral homes and consumers detailed in this Complaint.  Only by treating the entities as alter egos of each other were the RICO Defendants able to siphon funds from NPS, Lincoln, and Memorial through

86

the other entities and for their own personal benefit, as evidenced by the numerous fraudulent transfers between the entities.

225.   The alter ego status of the Cassity Consortium is evidenced by Defendants NHE, Forever Enterprises, LMS, NPS, Lincoln and Memorial sharing common ownership, officers, directors, general counsel, and employees, which included Defendants Sutton, Wittner, Scannell, Brent Cassity, Tyler Cassity, Crawford, and Nicki Province.   Corporate formalities were not observed by the Cassity Consortium entities.   The Cassity Consortium entities shared office space and the same computer system; payroll and health benefits were provided to all employees of all entities by Defendant NHE.   The audit reports prepared by Brown Smith Wallace failed to distinguish between entities and consolidated the corporate dealings of NPS, Lincoln, and Memorial.   The Cassity Consortium entities did not deal with one another at arms length and they co-mingled funds and assets.   For example, funds were used from the RBT Trust II, NPS, and LMS in order to purchase Forever Marin, an asset and subsidiary of Defendant Forever Enterprises.   Defendants Wittner (as trustee for the RBT Trust II), Doug Cassity, Rhonda Cassity, Brent Cassity, and Tyler Cassity used corporate funds for personal purposes and expenses.

226.   On April 8, 2008, NPS, Lincoln, and Memorial consented to a Chapter 404 Order in the State of Texas that formally recognized that these three companies "are inextricably intertwined" and designated them as being in "hazardous financial condition."   This Order stated that NPS, Lincoln, and Memorial "are all owned and managed by the same core group of executives and staff, including Brent Cassity, Tyler Cassity, Rhonda Cassity, Doug Cassity, Randall Sutton, Howard Wittner, James B. Crawford, and Katherine Scannell."

227.    The Order further states "Brent Cassity, Tyler Cassity, Rhonda Cassity, [and] Doug Cassity have represented that they will pledge personal assets to [NPS, Lincoln, and Memorial] to ensure that 'everyone receives the benefit they purchased'" and that "they will continue to make up any shortfall in funds necessary to pay claims under insurance policies and pre-need contracts."

228.    To now recognize or treat the Cassity Consortium entities, including but not limited to, Defendants Howard Wittner as trustee for the RBT Trust II, NHE, Forever Enterprises, LMS, Doug Cassity, Rhonda Cassity, Brent Cassity, Tyler Cassity, as well as non-parties NPS, Lincoln, and Memorial as having a real and separate corporate or individual existence would unjustly sanction the RICO scheme and the fraud upon the Plaintiffs.

### O. The Trustee Defendants Further Breached Their Duties and Aided and Abetted the Unlawful Conduct of Other Defendants

228.1.    While serving as trustees of the NPS pre-need trusts, the Trustee Defendants knew of the requirements of the relevant laws governing pre-need contracts, including Missouri and Iowa statutes requiring and governing the establishment of pre-need trusts.

228.2.    While serving as trustees of the NPS pre-need trusts, the Trustee Defendants knew that the NPS pre-need trusts were intended to preserve and protect the funds paid by thousands of consumers and funeral homes under pre-need funeral contracts so that there would be sufficient funds to pay for the contracted-for funeral goods and services when needed.

228.3.    The Trustee Defendants admitted in the trust agreements, in tax filings, and in other documents that they were performing fiduciary obligations with respect to the NPS pre-need trusts.  For example, in December 2000, Allegiant Bank sent a letter to Defendant

88

Sutton proposing a revised fee for Allegiant Bank's "fiduciary services" with respect to the pre-need trusts.  Similarly, in July 2006, Bremen Bank sent Sutton a letter regarding invoices for its "fiduciary services" with respect to the pre-need trusts.

228.4.    As described below, the Trustee Defendants breached their duties and aided and abetted the unlawful conduct of other Defendants.  They are therefore jointly and severally liable for the damages caused to Plaintiffs.

1.  *State and Federal Regulators Identified Breaches of Duties and Statutory Violations*

228.5.    On or about January 4, 1999, Missouri state examiners cited Allegiant Bank for "apparent violations" of Missouri statutes with respect to the NPS pre-need trust accounts.

228.6.    The violations cited by the Missouri state examiners in 1999 included:

a.  failing to keep control of the trust assets by allowing NPS to hold life insurance policies that were trust assets;

b.  allowing reimbursements of trust principal to NPS without verifying that funeral services were paid for by NPS;

c.  allowing income distributions to NPS without assuring that those distributions complied with statutory limitations; and

d.  allowing trust assets to be invested in speculative and sub-investment quality securities.

228.7.    Allegiant Bank sent a letter to the Missouri state examiners promising to resolve the issues identified in the 1999 examination.

228.8.      Allegiant Bank did not resolve the violations cited in the 1999 examination.

228.9.      Allegiant Bank did not notify the beneficiaries of the NPS pre-need trusts about the violations cited in the 1999 examination by Missouri state examiners.

228.10.     Subsequent examinations by the Missouri state examiners and the Federal Deposit Insurance Corporation ("FDIC") concluded that Allegiant Bank did not resolve these issues in response to the original examination.

228.11.     Bremen Bank knew of the violations cited in the 1999 examination by Missouri state examiners.

228.12.     Bremen Bank did not resolve the violations cited in the 1999 examination by Missouri state examiners when it was trustee of the NPS pre-need trusts.

228.13.     In 2008, the FDIC conducted an examination of Bremen Bank's trust department and issued a Report of Examination (the "2008 FDIC Report").

228.14.     With respect to the NPS pre-need trust accounts, the 2008 FDIC Report contained the following conclusions:

- "Weaknesses in the trust department's administration of these accounts are widespread and include the areas of asset custody, asset valuation, and trust recordkeeping." (2008 FDIC Report at 15).

- "Our review of these accounts found that Bremen Bank and Trust Company, as trustee, has not adhered to many of the statutory requirements associated with pre-need trusts. These accounts demonstrate lax account acceptance procedures, significant operational weaknesses, lack of understanding of the regulations and the trust agreement, and poor management oversight. . . . As a result of these weaknesses, the bank is exposed to a significant contingent liability." (*Id.* at 13).

- "The trust department's account recordkeeping for these accounts is virtually non-existent." (*Id.* at 15).

- "It appears the department processed cash payments and transfers at the direction of NPS or the independent investment advisor without regard to determining whether a payment of principal or income was authorized under law or the trust agreement." (*Id.*)

- "Term life insurance [is] issued primarily by affiliated insurance company, Lincoln Memorial Life Insurance, which historically has been poorly rated." (*Id.* at 14).

- "Bremen Bank and Trust Company has not met its fiduciary and legal responsibilities as trustee of the NPS accounts.  It did not appropriately gain control of account assets, provide a recordkeeping system that properly monitored principal and income cash flows and calculate the sum account deposits, and report the accurate market values of account assets.  These weaknesses have resulted in numerous apparent violations of law." (*Id.* at 16).

228.15.        The 2008 FDIC Report also concluded that Bremen had contingent liabilities of approximately $294 million relating to the NPS pre-need trusts.  (*Id.* at 13).

228.16.        Prior trustee Allegiant Bank administered the NPS pre-need trusts for which it served as trustee in the same manner as Bremen Bank.

228.17.        Upon information and belief, Mark Twain Bank, Mercantile Trust Company, Marshall & Ilsley, and Southwest Bank administered the NPS pre-need trusts for which they served as trustee in the same manner as Bremen Bank.

228.18.        Although Allegiant Bank and Bremen Bank were warned by regulators of violations, they did not correct the violations or warn the beneficiaries of the NPS pre-need trusts.

### 2. *The Missouri Trustee Banks Failed to Control Trust Assets*

228.19.     Even though they knew they were fiduciaries, Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank (the "Missouri Trustee Banks") treated the NPS pre-need trusts as custody accounts rather than trusts.

228.20.     The Missouri Trustee Banks allowed pre-need contract funds that were supposed to be deposited into NPS pre-need trusts to be offset by death benefits owed on other pre-need contracts.   This netting or offsetting violated Missouri law and the relevant trust agreements.

228.21.     The Missouri Trustee Banks did not require former trustees or others to deliver trust property to them, including the life insurance policies that made up the vast majority of the NPS pre-need trust assets.

228.22.     The Missouri Trustee Banks did not take custody of the life insurance policies that made up the vast majority of the NPS pre-need trust assets.

228.23.     The Missouri Trustee Banks did not take and retain ownership of the trust assets, including the life insurance policies that made up the vast majority of the NPS pre-need trust assets.

228.24.     On or about November 1, 1999, Allegiant Bank signed a Custody Agreement with NPS and Wulf Bates (the "NPS Custody Agreement").

228.25.     In the NPS Custody Agreement, Allegiant Bank agreed to give custody to NPS of the life insurance policies that formed the majority of the assets of NPS Pre-Need Trusts I through V.

228.26.     The NPS Custody Agreement memorialized Mark Twain Bank's, Mercantile Trust Company's, and Allegiant Bank's practice of not taking custody of trust assets.

228.27.     The NPS Custody Agreement violated Missouri law governing pre-need contracts, including by avoiding the requirement that pre-need trust assets must be held by the trustee and by permitting NPS, a pre-need seller, to take possession of trust assets.

228.28.     On or about November 1, 1999, Allegiant Bank signed a separate Custody Agreement with Forever Enterprises and Wulf Bates (the "Forever Custody Agreement").

228.29.     In the Forever Custody Agreement, Allegiant Bank agreed to give custody of the life insurance policies that formed the majority of the assets of the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust to Forever Enterprises.

228.30.     The Forever Custody Agreement memorialized Mark Twain Bank's, Mercantile Trust Company's, and Allegiant Bank's practice of not taking custody of trust assets.

228.31.     The Forever Custody Agreement violated Missouri law governing pre-need contracts by avoiding the requirement that pre-need trust assets must be held by the trustee and by permitting Forever Enterprises to take possession of trust assets.

228.32.     On or about May 28, 2002, Allegiant Bank signed a separate Custody Agreement with Forever Network and Wulf Bates (the "Pfitzinger Custody Agreement").

228.33.     In the Pfitzinger Custody Agreement, Allegiant Bank agreed to give custody of the life insurance policies that formed the majority of the assets of the Pftizinger Funeral Home Pre-Need Trust to Forever Network.

228.34.	The Pfitzinger Custody Agreement violated Missouri law governing pre-need contracts by avoiding the requirement that pre-need trust assets must be held by the trustee and by permitting Forever Network to take possession of trust assets.

228.35.	While serving as successor trustee of the NPS pre-need trusts, Bremen Bank knew of the Custody Agreements signed by Allegiant Bank.

228.36.	As successor trustee, Bremen Bank adopted the Custody Agreements signed by Allegiant Bank.

228.37.	Upon information and belief, while they served as successor trustees, Marshall & Ilsley and Southwest Bank knew of the Custody Agreements signed by Allegiant Bank.

228.38.	Upon information and belief, while they served as successor trustees, Marshall & Ilsley and Southwest Bank adopted the Custody Agreements signed by Allegiant Bank.

228.39.	Marshall & Ilsley and Southwest Bank's failure to control and retain custody of the trust assets of any NPS pre-need trust is demonstrated by the fact that when they took over as trustee of the Pfitzinger Funeral Home Pre-Need Trust in May 2005, they began issuing trust statements falsely stating that the trust contained Lincoln life insurance policies related to Mt. Washington cemetery, even though the trust did not contain any Lincoln policies and had no connection with Mt. Washington cemetery.  Marshall & Ilsley and Southwest Bank issued such statements with false information from approximately May 2005 until at least the date of receivership, even though during that period they received monthly reports showing that the account did not contain Lincoln policies.

### 3. The Iowa Trustee Banks Failed to Hold Pre-Need Funds and NPS Iowa Pre-Need Trust Assets

228.40.          Even though they knew they were fiduciaries, Bank of America, American Stock Transfer, Comerica Bank, Marshall & Ilsley, Southwest Bank, and Bremen Bank (the "Iowa Trustee Banks") treated the NPS Iowa Pre-Need Trust as a custody account rather than a trust.

228.41.          The Iowa Trustee Banks failed to hold NPS Iowa Pre-Need Trust funds for the beneficiary of the pre-need contract until release as required by Iowa law.  Instead, they allowed the majority of the funds to be used to purchase life insurance policies held outside the trust.

228.42.          The Iowa Trustee Banks did not take custody of the life insurance policies that made up the majority of the NPS Iowa Pre-Need Trust assets.

228.43.          The Iowa Trustee Banks did not take and retain ownership of the life insurance policies that made up the majority of the NPS Iowa Pre-Need Trust assets.

228.44.          The Iowa Trustee Banks did not require former trustees or others to deliver the life insurance policies that made up the vast majority of the NPS Iowa Pre-Need Trust assets.

### 4. The Trustee Defendants Failed to Ensure Prudent Trust Investments

228.45.          The Trustee Defendants did not review the assets in the NPS pre-need trusts to determine whether they were invested in reasonably prudent investments.

228.46.          The Trustee Defendants did not ensure that assets in the NPS pre-need trusts were invested in reasonably prudent investments.

228.47.     The Trustee Defendants did not ensure that NPS pre-need trust investments were properly diversified.

228.48.     The Trustee Defendants did not retain sufficient liquidity in the trusts.

### a. The Trustee Defendants Breached Their Duties By Allowing Wulf, Wulf Bates, and NPS Employees to Direct Trust Investments

228.49.     The Trustee Defendants knew or should have known of the requirements of Missouri and Iowa law and the trust agreements that any trust investment advisor designated by NPS must be "independent."

228.50.     The Trustee Defendants knew or should have known that Wulf and Wulf Bates, the NPS-designated investment advisors for the NPS pre-need trusts, were not independent.

228.51.     The Trustee Defendants did not review Wulf and Wulf Bates' qualifications.

228.52.     The Trustee Defendants did not establish the scope of Wulf and Wulf Bates' authority.

228.53.     The Trustee Defendants did not monitor Wulf and Wulf Bates' actions or performance.

228.54.     The Trustee Defendants took direction from NPS employees regarding investment decisions and disposition of NPS pre-need trust assets, in violation of their duties.

228.55.     In approximately October 1999, Allegiant Bank participated in drafting a letter signed by David Wulf on behalf of Wulf Bates and dated November 5, 1999, authorizing and instructing Allegiant Bank to take direction from any "principal, officer, employee, agent or

representative of . . . National Prearranged Services, Inc." regarding depositing assets, distributing assets, or settling trades in NPS Pre-Need Trusts I through V.

228.56.　　The November 5, 1999 Wulf letter memorialized Mark Twain Bank's, Mercantile Trust Company's, and Allegiant Bank's practice of taking direction from NPS employees regarding investment decisions and disposition of trust assets.

228.57.　　The November 5, 1999 Wulf letter violated Missouri law and the trust agreements, including because it allowed NPS, a pre-need seller, to dictate the investment and disposition of trust assets.

228.58.　　In approximately April 2000, Allegiant Bank participated in drafting a letter signed by David Wulf on behalf of Wulf Bates and dated April 13, 2000, authorizing and instructing Allegiant Bank to take direction from any "principal, officer, employee, agent or representative of . . . Mount Washington Forever, L.L.C." regarding depositing assets or settling trades in the Mt. Washington Pre-Need Trust and from any "principal, officer, employee, agent or representative of . . . National Prearranged Services, Inc." regarding distributing assets from that trust.

228.59.　　The April 13, 2000 Wulf letter memorialized Mark Twain Bank's, Mercantile Trust Company's, and Allegiant Bank's practice of taking direction from employees of NPS and other Cassity-related entities regarding investment and/or disposition of trust assets.

228.60.　　Bremen Bank knew of the November 5, 1999 and April 13, 2000 Wulf letters during the time it served as successor trustee of the NPS pre-need trusts.

228.61.　　Bremen Bank adopted the November 5, 1999 and April 13, 2000 Wulf letters during the time it served as successor trustee of the NPS pre-need trusts.

228.62.     Upon information and belief, while serving as successor trustees of the NPS pre-need trusts Marshall & Ilsley and Southwest Bank also knew of and adopted the November 5, 1999 and April 13, 2000 Wulf letters.

228.63.     While serving as trustees of NPS pre-need trusts, Bremen Bank, Marshall & Ilsley, and Southwest Bank continued the practice of taking direction from employees of NPS or other Cassity-related entities regarding investment and/or disposition of NPS pre-need trust assets.

228.64.     On November 21, 2005, Bladen McClelland of Comerica Bank sent Defendant Sutton a list of NPS individuals who "have the authority to direct Comerica Bank regarding financial transactions" in the NPS Iowa Pre-Need Trust.

228.65.     The November 21, 2005 letter memorialized Bank of America's, American Stock Transfer's, and Comerica Bank's practice of taking direction from NPS employees regarding investment and/or disposition of trust assets in the NPS Iowa Pre-Need Trust.

228.66.     While serving as trustees of the NPS Iowa Pre-Need Trust, Marshall & Ilsley, Southwest Bank, and Bremen Bank continued the practice of taking direction from employees of NPS regarding investment and/or disposition of trust assets.

### b.  The Missouri Trustee Banks Breached Their Duties By Allowing Improper Transfers to and Investments in NPS Affiliates

228.67.     While serving as trustees of the NPS pre-need trusts, the Missouri Trustee Banks knew that Lincoln, Memorial, and NPS shared common ownership and control.

228.68.      The Missouri Trustee Banks knew that Defendant Sutton was President and CEO of both NPS and Lincoln.

228.69.      Upon information and belief, the Missouri Trustee Banks knew that Lincoln and Memorial were poorly rated insurance companies.

228.70.      Upon information and belief, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank knew that NPS and Defendant Forever Enterprises had signed an Exclusivity Agreement dated April 1, 1998, under which NPS bound itself to purchase insurance policies exclusively from Lincoln and Memorial to fund its pre-need contracts.  The Exclusivity Agreement was disclosed in publicly available documents filed by Defendant Forever Enterprises with the Securities and Exchange Commission ("SEC") beginning in 1998.

228.71.      Allegiant Bank knew that substantially all of the insurance policies sold by Lincoln and Memorial were issued to fund NPS pre-need contracts.

228.72.      Upon information and belief, Bremen Bank, Marshall & Ilsley, and Southwest Bank knew that substantially all of the insurance policies sold by Lincoln and Memorial were issued to fund NPS pre-need contracts.  This information was disclosed in Defendant Forever Enterprises' SEC filings and in financial statements and other documents that were in the possession of or available to Bremen Bank, Marshall & Ilsley, and Southwest Bank.

228.73.      Allegiant Bank knew that Lincoln's and Memorial's revenues were derived primarily from premiums on insurance policies generated by NPS.

228.74.      Upon information and belief, Bremen Bank, Marshall & Ilsley, and Southwest Bank knew that Lincoln's and Memorial's revenues were derived primarily from premiums on insurance policies generated by NPS.  This information was disclosed in Defendant

Forever Enterprises' SEC filings and in financial statements and other documents that were in the possession of or available to Bremen Bank, Marshall & Ilsley, and Southwest Bank.

228.75.      The Missouri Trustee Banks allowed the vast majority of NPS pre-need trust assets to be used to purchase life insurance policies issued by Lincoln.

228.76.      The Missouri Trustee Banks knew that Lincoln policies were a risky and imprudent use of NPS pre-need trust funds.

228.77.      The Missouri Trustee Banks knew that Defendant NHE was a closely held company that shared common ultimate ownership and control with NPS.

228.78.      The Missouri Trustee Banks knew that Defendant Forever Enterprises was a closely held company that shared common ultimate ownership and control with NPS.

228.79.      The Missouri Trustee Banks knew that Defendant LMS was a closely held company that shared common ultimate ownership and control with NPS.

228.80.      The Missouri Trustee Banks knew that Defendant Forever Network was a closely held company that shared common ultimate ownership and control with NPS.

228.81.      Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank knew that Defendant Forever Illinois was a closely held company that shared common ultimate ownership and control with NPS.

228.82.      Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank knew that Defendant Hollywood Forever was a closely held company that shared common ultimate ownership and control with NPS.

228.83.      The Missouri Trustee Banks knew that Defendant NPS Agency was a closely held company that shared common ultimate ownership and control with NPS.

228.84.     The Missouri Trustee Banks improperly transferred trust principal from the NPS pre-need trusts to NPS and NPS affiliates without receiving promissory notes or other collateral in return.

228.85.     On January 8, 2004, Allegiant Bank transferred $2 million in NPS Pre-Need Trust IV funds to LMS without receiving any value in return.

228.86.     On January 15, 2004, Allegiant Bank transferred $2.6 million in NPS Pre-Need Trust IV funds to LMS without receiving any value in return.

228.87.     On August 3, 2006, Bremen Bank transferred $1.7 million in NPS Pre-Need Trust IV funds to Texas Forever Enterprises without receiving any value in return.

228.88.     The Missouri Trustee Banks did not require NPS and NPS affiliates to pay interest or repay principal on loans and transfers of funds from the NPS pre-need trusts and did not track the amount of interest due to the trusts.

228.89.     The Missouri Trustee Banks did not require repayment of promissory notes and debentures from NPS or NPS affiliates that were assets of the NPS pre-need trusts.

228.90.     When the NPS pre-need trusts received interest payments on promissory notes from NPS affiliates that were assets of the NPS pre-need trusts, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank would remit those payments to NPS as income distributions without calculating or ensuring that such distributions were permissible.

228.91.     Mark Twain Bank, Mercantile Trust Company, and Allegiant Bank converted NPS pre-need trust assets—such as publicly traded stocks, bonds, and cash—into other trust assets with little or no value.

101

228.92.     Allegiant Bank used a total of more than $2.5 million in NPS pre-need trust assets to purchase stock in Defendant Forever Enterprises.

228.93.     The transfer of trust assets in return for Forever Enterprises stock was an imprudent use of trust assets.

228.94.     The NPS pre-need trusts lost money on the Forever Enterprises stock.

228.95.     Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, and Bremen Bank allowed NPS pre-need trust assets to be transferred to NPS in return for NPS debentures.

228.96.     The transfer of trust assets in return for NPS debentures was an imprudent use of trust assets.

228.97.     Allegiant Bank and Bremen Bank permitted NPS pre-need trust funds to be invested in the Caymus Fund.

228.98.     Allegiant Bank and Bremen Bank knew that the Caymus Fund was managed and operated by Veritas Holdings and knew that Defendants David Wulf and Tony Lumpkin were principals of Veritas Holdings.

228.99.     The investing of trust assets in the Caymus Fund was an imprudent use of trust assets.

### c. The Iowa Trustee Banks Breached Their Duties by Improperly Allowing Pre-Need Trust Funds to be Used to Purchase Insurance Policies

228.100.     At the direction of NPS employees, the Iowa Trustee Banks allowed pre-need funds from the NPS Iowa Pre-Need Trust to be used to purchase life insurance policies.

228.101.     The Iowa Trustee Banks allowed life insurance policies to make up the majority of trust assets in the NPS Iowa Pre-Need Trust.

228.102.     The Iowa Trustee Banks did not obtain the written consent of pre-need contract purchasers before converting trust-funded benefits to insurance-funded benefits in the NPS Iowa Pre-Need Trust, in violation of the Iowa statute.

228.103.     The Iowa Trustee Banks did not ensure that the life insurance policies that were assets of the NPS Iowa Pre-Need Trust had an increasing death benefit or similar feature, in violation of the Iowa statute.

> d.  *The Iowa Trustee Banks Breached Their Duties by Allowing Improper Investments in an NPS-Affiliated Insurance Company*

228.104.     The Iowa Trustee Banks knew that Lincoln, Memorial, and NPS shared common ownership and control.

228.105.     Upon information and belief, the Iowa Trustee Banks knew that NPS and Forever Enterprises had signed an Exclusivity Agreement dated April 1, 1998, under which NPS bound itself to purchase insurance policies exclusively from Lincoln and Memorial to fund its pre-need contracts.  The Exclusivity Agreement was disclosed in publicly available documents filed by Defendant Forever Enterprises with the SEC beginning in 1998.

228.106.     Upon information and belief, the Iowa Trustee Banks knew that substantially all of the insurance policies sold by Lincoln and Memorial were issued to fund NPS pre-need contracts and that Lincoln's and Memorial's revenues were derived primarily from premiums on insurance policies generated by NPS.  This information was disclosed in Defendant

Forever Enterprises' SEC filings and in financial statements and other documents that were available to the Iowa Trustee Banks.

228.107.     Bank of America, Comerica Bank, Marshall & Ilsley, and Southwest Bank knew that Lincoln and Memorial paid commissions to NPS for insurance policies generated by NPS.

228.108.     Upon information and belief, American Stock Transfer and Bremen Bank knew that Lincoln and Memorial paid commissions to NPS for insurance policies generated by NPS.  This information was disclosed in Defendant Forever Enterprises' SEC filings and in financial statements and other documents that were available to the Iowa Trustee Banks.

228.109.     By purchasing Lincoln life insurance policies with pre-need trust funds, the Iowa Trustee Banks indirectly invested in NPS's business operations, in violation of the Iowa statute.

228.110.     Upon information and belief, the Iowa Trustee Banks knew that Lincoln and Memorial were poorly rated insurance companies.

228.111.     The Iowa Trustee Banks knew that Lincoln policies were a risky and imprudent use of NPS Iowa Pre-Need Trust funds.

*e.   Allegiant Bank Breached Its Duties by Using Funds*
*From NPS Pre-Need Trusts to Purchase Assets From*
*Forever Enterprises at Inflated Prices*

228.112.     At Defendants Sutton and Brent Cassity's direction, Allegiant Bank used funds from NPS pre-need trusts to purchase various assets from Forever Enterprises that:

a.   were speculative and not reasonably prudent investments;

    b.  were purchased at prices set by Sutton and Brent Cassity, without Allegiant Bank ensuring that those prices were appropriate, reasonable, or reflective of the assets' market value;

    c.  were purchased at prices that were substantially above market value;

    d.  were purchased at prices that were intended to transfer losses from the RICO Defendants to the NPS pre-need trusts; and

    e.  caused the NPS pre-need trusts to lose money.

228.113.     Beginning in November 1999, Allegiant Bank was custodian of a Custody Account owned by Defendant Forever Enterprises, Account No. 194000139 (the "Forever Custody Account").

228.114.     In November and December 1999, Forever Enterprises used funds in the Forever Custody Account to purchase various securities on the open market that were then deposited into the account, including:

    a.  20,000 shares of Arch Communications Group stock, purchased for $140,300 ($7.00 per share plus $300 commission);

    b.  10,000 shares of Conseco stock, purchased for $200,300 ($20.00 per share plus $300 commission);

    c.  5,000 shares of Dell Computer Corporation stock, purchased for $249,675 ($49.875 per share plus $300 commission); and

    d.  10,000 shares of E-Trade Group stock, purchased for $270,625 ($27.0125 per share plus $500 commission).

228.115.    Although some of these stocks initially increased in value while held in the Forever Custody Account, all of them eventually lost significant value.  As described below, the RICO Defendants shifted these losses from Forever Enterprises to NPS Pre-Need Trust IV by directing Allegiant Bank to use Trust IV funds to purchase the stock from the Forever Custody Account at the price Forever Enterprises had paid for them, rather than at their market price. Allegiant Bank breached its fiduciary, statutory, and common law duties by complying with those directions.

228.116.    *Arch Communications Group ("Arch") stock*:

a.   On or about February 8, 2000, Allegiant Bank (as custodian of the Forever Custody Account) sold 10,000 shares of the Arch stock to a third party for $100,000 ($10 per share), at a profit for Forever Enterprises of about $30,000.

b.   The price for shares of Arch stock subsequently dropped.

c.   Nine months later, on or about November 15, 2000, Defendants Sutton and Brent Cassity sent Allegiant Bank a letter directing that Trust IV (for which Allegiant Bank was trustee) purchase the remaining 10,000 shares of Arch stock from the Forever Custody Account (for which Allegiant Bank was custodian).

d.   Defendants Sutton and Brent Cassity directed that Allegiant Bank purchase the shares for the price of $70,150, which was what Forever Enterprises had originally paid for them and which was listed as the "investment cost basis" for the shares on the Forever Custody Account bank statement produced by Allegiant Bank.

e.  Even though shares of Arch on the NASDAQ closed at only $2.13 per share on November 15, 2000, Allegiant Bank purchased the 10,000 shares of Arch using $70,150 in Trust IV funds, thereby paying over $7 per share.

f.  After the purchase, the Trust IV bank statement produced by Allegiant Bank for November 2000 listed the Current Market Value of the 10,000 Arch shares at only $10,940 ($1.09 per share).

g.  The value of Arch stock continued to drop, until by July 2002 the Trust IV bank statement produced by Allegiant Bank noted that the 10,000 shares of Arch were "worthless" and had no value, resulting in a loss to Trust IV of $70,150.

228.117.  *Conseco stock:*

a.  On or about December 14, 2000, Defendants Sutton and Brent Cassity sent Allegiant Bank a letter directing that Trust IV (for which Allegiant Bank was trustee) purchase 5,000 shares of Conseco stock from the Forever Custody Account (for which Allegiant Bank was custodian).

b.  Defendants Sutton and Brent Cassity directed that Allegiant Bank purchase the shares for $100,150, which was what Forever Enterprises had originally paid for them and which was listed as the "investment cost basis" for the shares on the Forever Custody Account bank statement produced by Allegiant Bank.

c.  Even though shares of Conseco on the New York Stock Exchange traded at a high of only $9.19 per share on December 14, 2000, Allegiant Bank

purchased the 5,000 shares of Conseco using $100,150 in Trust IV funds, thereby paying over $20 per share.

d.  After the purchase, the Trust IV bank statement produced by Allegiant Bank and dated December 31, 2000 listed the Current Market Value of the 5,000 Conseco shares at $65,940 ($13.19 per share).

e.  Five days later, on or about January 5, 2001, Defendants Sutton and Brent Cassity sent Allegiant Bank another letter directing that Trust IV (for which Allegiant Bank was trustee) purchase the remaining 5,000 shares of Conseco from the Forever Custody Account (for which Allegiant Bank was custodian).

f.  Defendants Sutton and Brent Cassity directed that Allegiant Bank purchase the remaining 5,000 shares of Conseco for $100,150, which was the same price as Trust IV had paid for the earlier shares and which was listed as the "investment cost basis" for the Conseco shares on the Forever Custody Account bank statement produced by Allegiant Bank.

g.  Even though the December 31, 2000 Trust IV bank statement valued Conseco shares at $13.19 per share, and even though shares of Conseco on the New York Stock Exchange traded at a high of $13.75 on January 5, 2001, Allegiant Bank purchased the remaining 5,000 shares of Conseco using $100,150 in Trust IV funds, thereby paying over $20 per share.

h.  Trust IV continued to hold the 10,000 Conseco shares until January 2003— several weeks after Conseco declared bankruptcy—when Allegiant Bank sold

108

all 10,000 shares for a mere $389.98 ($0.04 per share), at a loss to Trust IV of nearly $200,000.

228.118.    *Dell Computer Corporation ("Dell") stock:*

a.   On or about April 20, 2000, Allegiant Bank (as custodian of the Forever Custody Account) sold 2,500 shares of Dell stock to a third party for $125,000 ($50 per share), making a small profit for Forever Enterprises.

b.   The price of Dell stock subsequently dropped.

c.   Seven months later, on or about December 1, 2000, Defendants Sutton and Brent Cassity sent Allegiant Bank a letter directing that Trust IV (for which Allegiant Bank was trustee) purchase the remaining 2,500 shares of Dell stock from the Forever Custody Account (for which Allegiant Bank was custodian).

d.   Defendants Sutton and Brent Cassity directed that Allegiant Bank purchase the Dell shares for $124,837.50, which was what Forever Enterprises had originally paid for them and which was listed as the "investment cost basis" for the shares on the Forever Custody Account bank statement produced by Allegiant Bank.

e.   Even though shares of Dell on the New York Stock Exchange traded at a high of only $20.31 per share on December 1, 2000, Allegiant Bank purchased the 2,500 shares of Dell using $124,837.50 in Trust IV funds, thereby paying nearly $50 per share.

f.   After the purchase, the Trust IV bank statement produced by Allegiant Bank for December 2000 listed the Current Market Value of the 2,500 Dell shares at only $43,595 ($17.44 per share).

g.   The value of Dell stock continued to drop, and Allegiant Bank sold the Dell shares in April 2002 for a loss to Trust IV of over $57,000.

228.119.   *E-Trade Group ("E-Trade") stock:*

a.   On or about December 20, 2000, Defendants Sutton and Brent Cassity sent Allegiant Bank a letter directing that Trust IV (for which Allegiant Bank was trustee) purchase 7,500 shares of E-Trade stock from the Forever Custody Account (for which Allegiant Bank was custodian).

b.   Defendants Sutton and Brent Cassity directed that Allegiant Bank purchase the shares for $202,968.75, which was what Forever Enterprises had originally paid for them and which was listed as the "investment cost basis" for the shares on the Forever Custody Account bank statement produced by Allegiant Bank.

c.   Even though shares of E-Trade on the New York Stock Exchange traded at a high of only $7.75 on December 20, 2000, Allegiant Bank purchased the 7,500 shares of E-Trade using $202,968.75 in Trust IV funds, thereby paying over $27 per share.

d.   On December 28, 2000, Defendants Sutton and Brent Cassity sent Allegiant Bank a letter directing that Trust IV purchase the remaining 2,500 shares of E-Trade for $67,656.25, which was what Forever Enterprises had originally paid

for them and which was listed as the "investment cost basis" for the shares on the Forever Custody Account bank statement produced by Allegiant Bank.

e.   Even though shares of E-Trade on the New York Stock Exchange traded at a high of only $7.94 on December 28, 2000, Allegiant Bank purchased the 2,500 shares of E-Trade using $67,656.25 in Trust IV funds, thereby paying over $27 per share.

f.   After these purchases, the Trust IV bank statement produced by Allegiant Bank for December 2000 listed the Current Market Value of the 10,000 E-Trade shares at $73,750 ($7.375 per share).

g.   The value of E-Trade stock continued to drop, and Allegiant Bank sold the E-Trade shares in April 2004 for a loss to Trust IV of over $138,000.

### f.   The Missouri Trustee Banks Failed to Safeguard the Insurance Policies that Were Assets of the Trusts

228.120.    The Missouri Trustee Banks reported the value of insurance policies in the NPS pre-need trusts as the expected death benefit or face value of the policies.

228.121.    The Missouri Trustee Banks never reported cash surrender value or cash surrender value less surrender charges as the value of insurance policies in the NPS pre-need trusts.

228.122.    The Missouri Trustee Banks knew of and permitted policy mismatching, as described in section V.B of this Complaint, and permitted funds from paid-in-full NPS pre-need contracts to be used to purchase Lincoln life insurance policies requiring installment payments over a period of years.

228.123.    The Missouri Trustee Banks allowed the RICO Defendants to take policy loans on insurance policies that were assets of the NPS pre-need trusts.

228.124.    Policy loans on the insurance policies diminished the value of the trust assets.

228.125.    Policy loans taken on insurance policies that were assets of the NPS pre-need trusts totaled more than $15 million during the period Mark Twain Bank and/or Mercantile Trust Company served as trustee.

228.126.    Policy loans taken on insurance policies that were assets of the NPS pre-need trusts totaled more than $30 million during the period Allegiant Bank served as trustee.

228.127.    Allegiant Bank knew that on a single day, September 28, 1999, bulk policy loans totaling over $3 million were taken on insurance policies that were assets of NPS Pre-Need Trust IV.

228.128.    Policy loans taken on insurance policies that were assets of the NPS pre-need trusts totaled more than $9.5 million during the period Bremen Bank served as trustee of the NPS pre-need trusts.

228.129.    Bremen Bank knew that on a single day, September 29, 2006, bulk policy loans totaling over $2 million were taken on insurance policies that were assets of NPS Pre-Need Trust IV.

228.130.    The Missouri Trustee Banks wired policy loan proceeds out of the NPS pre-need trusts to NPS or NPS affiliates without requiring promissory notes or other security in exchange.

228.131.     The Missouri Trustee Banks did not adjust the stated value of trust assets to account for policy loans on the insurance policies that were assets of the NPS pre-need trusts.

228.132.     The Missouri Trustee Banks knew that proceeds from policy loans on the insurance policies that were assets of the NPS pre-need trusts were used to pay renewal premiums on other insurance policies that were assets of the trusts.

228.133.     On or about December 24, 1997, Mercantile Trust Company received a transfer of almost $1.4 million from Lincoln that consisted of proceeds from policy loans taken on insurance policies in NPS Pre-Need Trust III.  Five days later, Mercantile Trust Company transferred roughly the same amount to Lincoln for renewal premiums on Lincoln insurance policies in the NPS pre-need trusts.

228.134.     Allegiant Bank knew that on or about April 1, 2004, over $3 million in policy loans were taken on insurance policies that were assets of NPS Pre-Need Trust IV.  On April 2, 2004, Allegiant Bank transferred nearly $2 million of those funds to Lincoln for renewal premiums on NPS Pre-Need Trust IV Lincoln insurance policies.

228.135.     On October 5, 2006, Bremen Bank transferred over $2 million that consisted of proceeds from policy loans taken on insurance policies that were assets of NPS Pre-Need Trust IV to Lincoln for renewal premiums on NPS Pre-Need Trust IV insurance policies.

228.136.     Bremen Bank, Marshall & Ilsley, and Southwest Bank failed to examine the life insurance policies that were assets of the NPS pre-need trusts to know whether they were whole life or term policies.

228.137.     Bremen Bank, Marshall & Ilsley, and Southwest Bank allowed nearly all of the whole life insurance policies that were assets of the NPS pre-need trusts to be lapsed, surrendered, or replaced with term life insurance policies with significantly lower value.

228.138.     Bremen Bank, Marshall & Ilsley, and Southwest Bank did not adjust the reported value of NPS pre-need trust assets to account for the change from whole life insurance to term life insurance.

228.139.     In September 2007, Bremen Bank received from NPS more than 2000 pages listing whole life policies that were assets of NPS Pre-Need Trust IV and indicating that those policies—with a total face value of over $60 million—had been surrendered.

228.140.     Bremen Bank also knew of the September 2007 surrender from wire transfer documents and other sources.

228.141.     Bremen Bank did not take any steps to investigate, question, or respond to this September 2007 surrender of the life insurance policies that were assets of the NPS pre-need trusts.

228.142.     In October 2007, term life insurance policies with a total face value of approximately $73 million were issued to replace the whole life policies that were surrendered. Bremen Bank knew of this issuance of term life insurance policies.

### 5.  The Trustee Defendants Failed to Maintain Adequate Trust Records

228.143.     The Trustee Defendants did not maintain accurate books and records for the NPS pre-need trusts.

228.144.     The Trustee Defendants did not account for all transactions administered through the NPS pre-need trusts.

228.145.     The Trustee Defendants did not accurately report trust income and principal for the NPS pre-need trusts.

228.146.     The Missouri Trustee Banks did not track the following for NPS pre-need contracts for which funds were placed in NPS pre-need trusts:

    a.   the identity of the NPS pre-need contract holder;

    b.   payments made on the NPS pre-need contract;

    c.   percentage of NPS pre-need contract payments retained by the seller;

    d.   sum of deposits made into NPS pre-need trust;

    e.   outstanding balance on the NPS pre-need contract;

    f.   whether the NPS pre-need contract was cancelled; and

    g.   whether the NPS pre-need contract was satisfied.

228.147.     The Missouri Trustee Banks did not keep copies of completed NPS pre-need contracts.

228.148.     The Missouri Trustee Banks did not provide NPS an annual statement of account showing the condition of the trusts and all investments, receipts, disbursements, and other transactions during the relevant year.

228.149.     The Missouri Trustee Banks did not obtain the necessary information to enable them to assist NPS in the preparation of annual reports relating to the trusts.

228.150.     The Missouri Trustee Banks did not assist NPS in the preparation of annual reports relating to the trusts.

228.151.    Bremen Bank received monthly CD-ROMs from NPS that purported to list the life insurance policies that were assets of each NPS pre-need trust, the market value of the assets, and changes in account status.

228.152.    Bremen Bank did not verify or review the information contained on the CD-ROMs it received from NPS.

228.153.    Upon information and belief, Allegiant Bank, Marshall & Ilsley, and Southwest Bank received monthly CD-ROMs or monthly statements from NPS that purported to list the life insurance policies that were assets of each NPS pre-need trust, the market value of the assets, and changes in account status but did not verify the information contained on the CD-ROMs or statements.

228.154.    Bremen Bank's Statement of Principles of Trust Department Management required that Bremen's trust department complete an administrative review for the NPS pre-need trust accounts annually.

228.155.    Bremen Bank did not conduct yearly administrative reviews for the NPS pre-need trust accounts while it served as trustee of those trust accounts.

228.156.    The Iowa Trustee Banks did not maintain a separate accounting of each pre-need purchaser's principal, interest, and income.

228.157.    The Iowa Trustee Banks relied on NPS to supply the value of life insurance policies constituting the vast majority of the NPS Iowa Pre-Need Trust assets.

228.158.    The Iowa Trustee Banks reported the value of insurance policies in the NPS Iowa Pre-Need Trust as the expected death benefit or face value of the policies.

116

228.159.     The Iowa Trustee Banks never reported cash surrender value or cash surrender value less surrender charges as the value of insurance policies in NPS Iowa Pre-Need Trust.

228.160.     American Stock Transfer and Comerica Bank allowed NPS to prepare and file annual reports for the NPS Iowa Pre-Need Trust that the Iowa statute required to be filed by the financial institution.

228.161.     Upon information and belief, Bank of America, Marshall & Ilsley, Southwest Bank, and Bremen Bank allowed NPS to prepare and file annual reports for the NPS Iowa Pre-Need Trust that the Iowa statute required to be filed by the financial institution.

### 6.  *The Missouri Trustee Banks Improperly Distributed Funds to NPS*

228.162.     The Missouri Trustee Banks made income distributions to NPS without regard to whether those distributions were allowable under applicable law or the trust agreements.

228.163.     The Missouri Trustee Banks did not calculate the aggregate market value of property held in the NPS pre-need trusts before making income distributions to NPS.

228.164.     The Missouri Trustee Banks each made income distributions to NPS even though the aggregate market value of all property held in each NPS pre-need trust was below the sum of all deposits made for the pre-need contracts administered through that trust.

228.165.     The Missouri Trustee Banks allowed disbursement of trust principal as directed by NPS employees, without verifying:

    a.  that NPS had paid for funeral services under an NPS pre-need contract;

    b.  the amount due to NPS; and

      c.  that the disbursement was in an amount equal to all deposits made into the NPS pre-need trust for the relevant NPS pre-need contract.

### 7. The Missouri Trustee Banks Breached Their Duties With Respect to Roll-Overs

228.166.    While serving as trustee of the NPS pre-need trusts, Mercantile Bank agreed to also serve as successor trustee for roll-over pre-need funds that were transferred to NPS from other funeral homes or pre-need sellers.  Mercantile Bank accepted transfers of cash and assets from those accounts and immediately liquidated the assets, then wired significant amounts of cash out of the accounts to NPS or NPS affiliates.

228.167.    While serving as trustee of the NPS pre-need trusts, Allegiant Bank agreed to also serve as successor trustee for millions of dollars in roll-over accounts.  As to each roll-over, Allegiant Bank accepted transfers of cash and assets from those accounts and immediately liquidated the assets, often at a substantial loss or incurring a penalty.  Allegiant Bank then wired significant amounts of cash out of the accounts to NPS or NPS affiliates.

228.168.    While serving as trustee of the NPS pre-need trusts, Bremen Bank also agreed to serve as successor trustee for millions of dollars in roll-over accounts.  As to each roll-over, Bremen Bank accepted transfers of cash and assets from those accounts and immediately liquidated the assets, often at a substantial loss or incurring a penalty.

228.169.    Bremen Bank knew that NPS employees sent false and inflated account statements to one or more funeral homes showing account values in excess of the actual funds in the accounts.

228.170.    Bremen Bank knew that NPS employees sent Muehlebach Funeral Home, which had transferred its pre-need business to NPS, multiple account statements showing that the

Muehlebach Custody account held by Bremen Bank contained over $1 million more than the account actually contained.

8.    *Allegiant Bank's, Marshall & Ilsley's, and Southwest Bank's Other Banking Relationships Created Conflicts of Interest*

228.171.    While serving as trustees of the NPS pre-need trust accounts, Allegiant Bank, Marshall & Ilsley, and Southwest Bank engaged in personal and commercial banking relationships with NPS, members of the Cassity family, and other Cassity-related entities.

228.172.    As to Allegiant Bank, this included but was not limited to:  a $2,250,000 loan to Defendant Forever Enterprises, a loan of over $1 million to Defendants Doug and Rhonda Cassity, a loan of nearly $2 million to Defendant Forever Network, a loan of over $20,000 to Defendant Wulf Bates, and numerous payroll, checking, and other accounts of Defendants NPS Agency, NHE, and Forever Enterprises.

228.173.    As to Southwest Bank and Marshall & Ilsley, this included but was not limited to:  a $5.3 million loan to Defendant Forever Network, a $3 million line of credit to Defendant Forever Network, and a $3.5 million term loan agreement with Defendant Forever Enterprises.

228.174.    Southwest Bank and Marshall & Ilsley accepted and acted as trustee of the NPS pre-need trust accounts as a means to further Southwest Bank's and Marshall & Ilsley's banking relationship with members of the Cassity family and their related entities.

228.175.    Allegiant Bank, Marshall & Ilsley, and Southwest Bank allowed the above-described personal and commercial banking relationships with NPS, members of the Cassity family, and other Cassity-related entities to detrimentally affect the performance of their

trustee duties with respect to the NPS pre-need trusts.  This constituted a conflict of interest in violation of Allegiant Bank's, Marshall & Ilsley's, and Southwest Bank's fiduciary duties.

228.176.    Through their personal and commercial banking relationships with NPS, members of the Cassity family, and other Cassity-related entities, Allegiant Bank, Marshall & Ilsley, and Southwest Bank knew that NPS and NPS affiliates were in a weak financial condition, were late in repaying loans, and needed a large influx of cash to continue business operations.

228.177.    In approximately December 2001, while Allegiant Bank was trustee of the NPS pre-need trusts, Defendant Forever Enterprises sought $1.5 million in financing from Allegiant Bank.  Allegiant Bank employees noted internally that Allegiant Bank's "substantial" pre-need trust business with NPS could be at risk if they denied the loan request from an NPS affiliate:  "NPS has over $100 million in assets in Trust and about $35-40k in annual fees. . . .  If the answer is 'no' on the loan side we will definitely need [Allegiant Bank President Shaun Hayes's] involvement to keep our end of the relationship."

228.178.    Allegiant Bank denied Forever Enterprises' loan request because of significant concerns about the financial soundness of the Cassity-related companies.  One Allegiant Bank employee stated that he was not "comfortable with the cash flow of the whole organization" because "[n]one [of the Cassity-related companies] are profitable on a consistent basis" and that he would not "recommend a loan . . . without a strong source of cash flow to repay."  Another Allegiant Bank employee noted:  "I'm told their insurance co. lost [$8 million] last year.  That was always the strength behind the [Cassity-related companies]."

228.179.     Despite Allegiant Bank's concerns about the financial condition of NPS and NPS affiliates and Allegiant Bank's unwillingness to directly grant a loan to an NPS affiliate, Allegiant Bank allowed millions of dollars in loans and transfers from the NPS pre-need trusts to go directly to NPS and NPS affiliates.  This constituted a conflict of interest in violation of Allegiant Bank's fiduciary duties.

*9.   The Iowa Trustee Banks Violated Iowa Statute*

228.180.     All the Iowa Trustee Banks agreed to and adopted a Trust Agreement dated September 5, 2002, which conflicted with Iowa laws governing pre-need trusts.

228.181.     American Stock Transfer served as trustee of the NPS Iowa Pre-Need Trust without being authorized to do business as a trust company within the state of Iowa.

228.182.     On February 26, 2004, Michael O'Brien, Vice-President of American Stock Transfer, wrote a letter to Defendant Scannell stating that his company "is a state (New York) charted trust company and does not currently meet . . . the  requirements of Iowa laws as they relate to Prearranged Funeral Agreements.  AST has determined that the costs associated with the qualification, registration and ongoing compliance would prove to be burdensome and therefore does not warrant continuing to act as trustee."

*10. The Trustee Defendants Failed to Warn of Their Concerns and*
*of Problems With the Trusts*

228.183.     When Marshall & Ilsley and Southwest Bank began serving as trustees of the NPS pre-need trusts, they became concerned that the NPS pre-need trusts were being operated in such a way that it could expose them to potential liability.

228.184.     Upon information and belief, Marshall & Ilsley and Southwest Bank decided to stop serving as trustees after only a few months because of their concern over potential liability as trustees of the NPS pre-need trusts.

228.185.     Despite their concerns, Marshall & Ilsley and Southwest Bank continued serving as trustees of the Mt. Washington Forever Pre-Need Trust, the Mason Securities Association d/b/a Funeral & Cremation Society of America Pre-Need Trust, and the Pfitzinger Funeral Home Pre-Need Trust until the date of receivership.

228.186.     Upon information and belief, when Allegiant Bank merged into National City Bank of the Midwest in 2004, National City Bank of the Midwest and/or National City Bank became concerned that the NPS pre-need trusts were being operated in such a way that it could expose them to potential liability.

228.187.     Upon information and belief, National City Bank of the Midwest and/or National City Bank required that Allegiant Bank be divested of the NPS pre-need trusts as a condition of the merger because of the potential liability arising from the NPS pre-need trusts.

228.188.     In connection with the transfer of NPS pre-need trust assets from Allegiant Bank to Bremen Bank, representatives from Allegiant Bank met with Bremen Bank's trust administrators and instructed and trained Bremen Bank to administer the NPS pre-need trust accounts in the same way that Allegiant Bank had administered them.

228.189.     Allegiant Bank continued to provide instructions, direction, and training to Bremen Bank after Bremen Bank had taken custody of the pre-need trust assets.

228.190.     In December 2002, while Bank of America was serving as trustee of the NPS Iowa Pre-Need Trust, NPS and Forever executives approached Bank of America

representatives about Bank of America serving as trustee for other NPS and Forever funeral and cemetery trusts.

228.191.    Bank of America rejected the other NPS and Forever trust business.

228.192.    In a January 28, 2003 internal email, a Bank of America employee wrote that the decision to reject the other NPS and Forever trust business was "based on the assets of the trust – life insurance policies issued by NPS' captive 'too-small-to-rate' life insurance company – and an inability to get comfortable with the administrative duties of the trust."

228.193.    Six days later, on February 3, 2003, Bank of America sent a letter to NPS stating that it "must . . . resign as trustee for the NPS Iowa prearranged funeral trust."  The resignation letter stated that Bank of America "will work with you on moving the trust to another trustee of your choice."

228.194.    The Trustee Defendants, including specifically Marshall & Ilsley, Southwest Bank, and Bank of America, failed to take any steps to notify or warn regulators, NPS, successor trustees, funeral homes, and consumers of the violations of law and fiduciary breaches that occurred with respect to the NPS pre-need trusts, thus allowing those violations and breaches to continue and contributing to and facilitating the successor trustees' breaches of duty.

228.195.    The Trustee Defendants' actions, or failures to act, were in reckless disregard of the consequences of their actions or failures to act.

123

## 11. National City Bank Improperly Cancelled a Mortgage After Receivership

228.196.     In June 2002, Allegiant Bank wired over $450,000 from Trust IV to Defendant Forever Illinois, in return for a promissory note and a mortgage on property in Madison County, Illinois as security for the note.

228.197.     On September 9, 2009—nearly a year after the Liquidation Order was entered by the Texas Receivership Court—upon information and belief, Defendant National City Bank caused a "Satisfaction of Mortgage" to be filed in Madison County, Illinois.

228.198.     The Satisfaction of Mortgage listed "NATIONAL CITY BANK SUCCESSOR BY MERGER WITH ALLEGIANT BANK trustee for National Prearranged Services Inc, Pre Need Plan dtd 7/24/1989-Trust IV" as the mortgage grantee.

228.199.     The Satisfaction of Mortgage stated that National City Bank "has received full payment and satisfaction" of the mortgage on the Madison County, Illinois property and purported to cancel and discharge the mortgage.

228.200.     Upon information and belief, at the time National City Bank caused the Satisfaction of Mortgage to be recorded, there was an outstanding balance on the promissory note from Defendant Forever Illinois.

228.201.     By improperly cancelling the mortgage that served as security for the promissory note, Defendant National City Bank breached its fiduciary duties as trustee of the NPS pre-need trusts.

228.202.     By improperly cancelling the mortgage that served as security for the promissory note, Defendant National City Bank violated the Permanent Injunction and the Automatic Stay that are part of the Liquidation Order.

*P.   Defendants Markow and Morisse Were Negligent and*
*Participated in Various Fiduciary Breaches by Allegiant Bank and*
*Bremen Bank*

228.203.      Defendant Markow joined Allegiant Bank in 1997 as President of Allegiant Trust Company and served in that position until 2001.  He was responsible for bringing the NPS pre-need trusts to Allegiant Bank during 1998 and 1999.

228.204.      Defendant Morisse was a Vice President and Trust Officer for Allegiant Bank or it successors from 1997 to approximately 2009, during which time he was responsible for the administration of Allegiant Bank's trust accounts including the NPS pre-need trusts.

228.205.      Morisse and Markow knew of the requirements of the relevant laws governing pre-need contracts, including Missouri statutes requiring and governing the establishment of pre-need trusts.

228.206.      Morisse and Markow knew that the NPS pre-need trusts were intended to preserve and protect the funds paid by thousands of consumers and funeral homes under pre-need funeral contracts so that there would be sufficient funds to pay for the contracted-for funeral goods and services when needed.

228.207.      Morisse and Markow knew that while they were at Allegiant Bank, and while Markow was at Bremen Bank, they were performing fiduciary obligations with respect to the NPS pre-need trusts.

228.208.      Morisse and Markow knew that Missouri state examiners cited Allegiant Bank in 1999 for violations of Missouri statutes with respect to the NPS pre-need trust accounts.

228.209.      Markow and Morisse did not notify the beneficiaries of the NPS pre-need trusts about the violations cited by Missouri state examiners in 1999.

228.210.        Morisse and Markow did not resolve the violations cited by Missouri state examiners in 1999.

228.211.        Morisse allowed funds that were supposed to be deposited into the NPS pre-need trusts to be offset by death benefits owed on other pre-need contracts.   Morisse personally signed some of the "netting" forms.

228.212.        Morisse and Markow knew that Allegiant Bank failed to take custody of the life insurance policies that made up the vast majority of the NPS pre-need trust assets.

228.213.        Morisse and Markow knew that Allegiant Bank failed to take and retain ownership and control of the NPS pre-need trust assets, including life insurance policies that made up the vast majority of the NPS pre-need trust assets.

228.214.        Morisse and Markow improperly treated the NPS pre-need trust accounts as custody accounts rather than trusts.

228.215.        Markow signed the Custody Agreements described in paragraphs 228.24-228.38.

228.216.        Morisse participated in the drafting of the Custody Agreements described in paragraphs 228.24-228.38 and knew of their terms.

228.217.        Markow and Morisse did not ensure that assets in the NPS pre-need trusts were invested in reasonably prudent investments.

228.218.        Markow and Morisse did not ensure that assets in the NPS pre-need trusts were properly diversified.

228.219.        Markow and Morisse did not ensure that the NPS pre-need trusts retained sufficient liquidity.

228.220.    Morisse and Markow knew that Missouri law and the trust agreements required that any trust investment advisor designated by NPS must be "independent."

228.221.    During their respective tenures at Allegiant Bank and/or Bremen Bank, Morisse and Markow knew that Wulf and Wulf Bates, the NPS-designated investment advisors for the NPS pre-need trusts, were not independent.

228.222.    During their respective tenures at Allegiant Bank and/or Bremen Bank, Morisse and Markow did not review Wulf and Wulf Bates' qualifications.

228.223.    During their respective tenures at Allegiant Bank and/or Bremen Bank, Morisse and Markow did not establish the scope of Wulf and Wulf Bates' authority.

228.224.    During their respective tenures at Allegiant Bank and/or Bremen Bank, Morisse and Markow did not monitor Wulf and Wulf Bates' actions or performance.

228.225.    Morisse took direction from NPS employees regarding investment decisions and disposition of trust assets.

228.226.    The November 5, 1999 and the April 13, 2000 Wulf letters described in paragraphs 228.55-228.62 above were addressed to Markow, who had knowledge of their content.  Morisse participated in the drafting of the Wulf letters and was familiar with their content.

228.227.    Morisse approved income distributions to NPS.

228.228.    Morisse approved income distributions to NPS without regard to whether those distributions were allowable under applicable law or the trust agreements.

228.229.    Morisse did not calculate the aggregate market value of property held in the NPS pre-need trusts before approving income distributions to NPS.

228.230.     Morisse knew that Allegiant Bank made income distributions to NPS even though the aggregate market value of all property held in each NPS pre-need trust was below the sum of all deposits made for the pre-need contracts administered through that trust.

228.231.     Markow and Morisse knew that Lincoln and NPS shared common ownership and control.

228.232.      Markow and Morisse knew that Defendant Sutton was President and CEO of both NPS and Lincoln.

228.233.     Upon information and belief, Markow and Morisse knew that Lincoln was a poorly rated insurance company and that Lincoln policies were a risky and imprudent use of NPS pre-need funds.

228.234.     Markow and Morisse allowed the vast majority of NPS pre-need trust assets at Allegiant Bank and Bremen Bank to be used to purchase life insurance policies issued by Lincoln.

228.235.     Morisse knew that Allegiant Bank reported the value of insurance policies in the NPS pre-need trusts as the expected death benefit or face value of the policies.  Upon information and belief, Morisse authorized this practice by Allegiant Bank, which resulted in the overstatement of the trusts' asset value.

228.236.     Morisse knew that Allegiant Bank never reported the cash surrender value or cash surrender value less surrender charges as the value of insurance policies in the NPS pre-need trusts.

228.237.     Morisse was directly involved in the calculations of evidence of insurance values and personally signed many of the insurance in force forms.

228.238.    Markow and Morisse, during their respective tenures at Allegiant Bank and/or Bremen Bank, allowed policy loans to be taken on the insurance policies in the NPS pre-need trusts, which diminished the value of the trust assets.

228.239.    Morisse did not adjust the stated value of trust assets to account for these loans, which diminished the value of the policies—and therefore the trust assets.

228.240.    Morisse knew of and permitted Allegiant Bank's practice of wiring policy loan proceeds out of the trusts without requiring promissory notes or other security in exchange.

228.241.    Morisse was involved in the booking, or failure to book, promissory notes while Allegiant Bank was trustee.

228.242.    Morisse knew that when the NPS pre-need trusts received interest payments on promissory notes held in the trusts, Allegiant Bank would remit those payments to NPS as income distribution.

228.243.    Morisse carried out requests to convert NPS pre-need trust assets—such as publicly traded stocks, bonds, and cash—into other assets with little or no value.

228.244.    Morisse carried out requests to use over $2.5 million in NPS pre-need trust assets to purchase stock in Forever Enterprises, which Morisse knew was an NPS affiliate.

228.245.    Morisse carried out requests to use NPS pre-need trust assets to purchase various assets from Forever Enterprises that were speculative and/or not reasonably prudent investments, at prices substantially inflated over market value, thus diminishing the trust assets and shifting losses from Forever Enterprises to the trusts.

228.246.    In connection with the transfer of NPS pre-need trust assets from Allegiant Bank to Bremen Bank, Morisse met with Markow and other Bremen Bank employees to instruct

and train Bremen Bank on administering the NPS pre-need trust accounts in the same way that Allegiant Bank had administered them.

228.247.     Morisse continued to provide instructions, direction, and training to Bremen Bank after Bremen Bank had taken custody of the pre-need trust assets.

228.248.     After leaving Allegiant Bank, Markow joined Bremen Bank in 2002 or 2003.  He was the head of Bremen Bank's trust department and a Senior Vice President/Trust Officer for Bremen Bank until 2008.

228.249.     In April 2004, Markow presented the NPS trust business to the Bremen Bank board of directors and recommended that Bremen Bank accept the NPS trust business. Bremen Bank became trustee of the NPS pre-need trusts.

228.250.     In approximately February 2006, Marshall & Illsley and/or Southwest Bank became the trustees of the NPS pre-need trusts.

228.251.     Approximately three months later, NPS Pre-Need Trusts I through V returned to Bremen Bank.  In an April 2006 board of directors meeting, Markow reintroduced the NPS trust accounts to Bremen Bank and recommended that Bremen Bank accept the business again.  In June 2006, Markow also recommended to the board of directors that Bremen Bank become the trustee for the NPS Iowa Trust.

228.252.     Markow used grossly inadequate pre-acceptance account review procedures when recommending that Bremen Bank accept the NPS business in 2004 and then again in 2006.  Markow's account acceptance reviews did not convey the bank's legal capacity, its actual responsibilities under law or the governing document, or the risks presented by the type of assets held and where they were held.

228.253.     Markow failed to exercise due care in his oversight of the Bremen Bank trust department's management of the NPS pre-need trusts.

228.254.     Markow failed to ensure that Bremen Bank's trust department staff was familiar with the governing documents and applicable laws, rules, and regulations related to the NPS pre-need trusts.

228.255.     Markow failed to ensure that Bremen Bank's trust department staff was aware of the sum of deposits in each trust.

228.256.     Markow knew that Bremen Bank was the trustee for the NPS pre-need trust accounts.

228.257.     Markow instructed the Bremen Bank trust department to treat the NPS accounts as custodial accounts.

228.258.     Markow knew that Bremen Bank failed to take custody of the life insurance policies that formed the vast majority of the trust assets.

228.259.     Markow directed the Bremen Bank trust department to make distributions from the NPS trusts solely at the direction of NPS.

228.260.     Markow allowed Wulf and Wulf Bates to continue to serve as investment advisors for the NPS accounts at Bremen Bank despite knowing that Wulf and Wulf Bates were not independent.

228.261.     While at Bremen Bank, Markow took no steps to investigate suspicious account activity on the NPS accounts.  When Bremen Bank trust department employees reported to Markow regarding large or unusual wire transfers out of the NPS pre-need trusts, Markow approved the wire transfers without taking any steps to assess whether the wire transfers should

131

be authorized.  Markow also approved promissory notes that were backdated without taking any steps to determine whether the promissory notes should be booked.

228.262.     While at Bremen Bank, Markow failed to establish a recordkeeping system that would properly monitor principal and income cash flows, calculate the sum of account deposits, and report the accurate market values of account assets.

228.263.     Markow's actions and failures to act caused the Bremen Bank trust department to be in material non-compliance with Missouri and Iowa state statutes.

228.264.     The 2008 FDIC Report reached the following conclusions regarding Markow's actions and omissions that furthered Bremen Bank's failure to meet its duties as trustee of the NPS accounts:

- "Pre-acceptance account reviews are generally performed on all new accounts; however, the reviews and procedures appear inadequate.  The majority of the reviews we looked at during the examination were completed by former Senior Vice President and Marketing Officer Richard Markow.   The reviews consisted of Mr. Markow's summary of what he felt were the pertinent issues surrounding each account.    The reviews frequently did not appropriately convey the legal capacity of the bank, its actual responsibilities under law and the governing document, or risks presented by the type of assets held and where held."  (2008 FDIC Report at 2).

- "When questioned by examiners, [trust] department staff indicated that they were unaware of the sum of deposits for each trust, were unfamiliar with the requirements of the governing document and applicable rules, and were operating under the assumption that Bremen Bank and Trust was the custodian for the trust accounts and not trustee as former Senior Vice President Richard Markow specified.   Vice President Stuart also noted that she made distributions solely at the direction of NPS and that she was specifically following Mr. Markow's directions as to how these trusts should be handled."  (*Id.* at 15-16).

- "From the trustee standpoint, former Senior Vice President Richard Markow basically used the 'we don't have investment discretion' claim when examiners inquired as to why the department did not raise questions when the assets started to shift to illiquid and affiliate-related assets." (*Id.* at 26).

228.265.    The FDIC concluded in its 2008 Report that the Bremen Bank trust department's "material deterioration is attributed to former dep[artment] head, SVP & Marketing Officer Richard Markow." (*Id.* at 29).

228.266.    The following additional examples demonstrate Markow's knowing and active participation in Bremen Bank's failure to meet its duties as trustee of the NPS pre-need accounts:

a.   In February 2008, Bremen Bank received an "Investigative Demand" from the Missouri Attorney General's office regarding an investigation into whether NPS was engaging in unlawful practices.  In bold letters on the first page, the demand stated:  "**Except for the disclosure to employees or counsel as necessary to facilitate your compliance with this investigative demand, you are not to disclose the existence of this directive.  Any such disclosure could impede the investigation being conducted and thereby interfere with the enforcement of the law.**"  On February 15, 2008, Markow faxed the demand to Angie Hall, an employee of NPS, with a note on the cover sheet of the fax that stated: "Angie – Attached is the subpoena I called you about yesterday afternoon."

b.   In a March 6, 2008 email to Carl Freund, President of Bremen Bank, Markow wrote:

"Carl – As you know, Bremen is Trustee of various National Prearranged Services (NPS) pre-need funeral Trusts.  Our role is that of Trustee in name, but our main function is that of a Custodian.  In accordance with the documents and relevant MO statutes, we do not manage the funds in the Trust.  A large portion of the assets are in life insurance policies.  A funeral owner by the name of Scott Lindley (Lindley Funeral Home, Chilicothe, MO), has dealings with NPS.  He is concerned that his customers have given money to NPS, and NPS has purchased life insurance policies whereby they have tapped the cash value of the policies.  Lindley dropped by this morning, unannounced, with a number of questions.  I told him that all policies are in force, and that NPS has paid claims (i.e. when a holder passes away)/business has preceeded [sic] as usual.  The bottom line is that he left a signed letter with me, demanding that we transfer the life insurance policies into hard assets.  We have to look into this matter, but, in the meantime, he mentioned that he will be dropping in on you, to give you the same letter.  If you meet with him, you have no info to share with him, and we are reviewing his letter."

228.267.     Markow was terminated by Bremen Bank during the 2008 FDIC examination.  Upon information and belief, Markow was terminated because he contributed to Bremen Bank's failure to meet its duties as trustee of the NPS accounts.

<u>FIRST CLAIM FOR RELIEF</u>

**Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)**

(Against the RICO Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers)

229.     Plaintiffs incorporate by reference all allegations contained in this Complaint.

230.     Each of the Plaintiffs is a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

231.     Each of the RICO Defendants is a "person" under 18 U.S.C. §§ 1961(3) and 1962(c).

134

232.     NPS, Lincoln, and Memorial were a group of persons associated in fact for the common purposes of selling and insuring pre-need funeral contracts and of conducting the fraudulent scheme described in this Complaint:  namely, fraudulently inducing the funeral homes to sell, and consumers to buy, NPS pre-need contracts and to transfer funeral homes' existing pre-need funds to NPS, and then siphoning away the pre-need funds that were supposed to be, and were represented to be, safeguarded and prudently managed.  As a result, NPS, Lincoln, and Memorial constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "NPS Enterprise").  During all relevant times, the NPS Enterprise was engaged in and its activities affected interstate and foreign commerce.

233.     The RBT Trust II, NHE, Forever Enterprises, LMS, NPS, Lincoln and Memorial were also a group of persons associated in fact for the common purposes of selling and insuring pre-need funeral contracts and of conducting the fraudulent scheme described in this Complaint. As a result, the RBT Trust II, NHE, Forever Enterprises, LMS, NPS, Lincoln, and Memorial constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "RBT Enterprise").  During all relevant times, the RBT Enterprise was engaged in and its activities affected interstate and foreign commerce.

234.     The RICO Defendants were each employed by and/or associated with the NPS and RBT Enterprises as detailed in this Complaint.

235.     The RICO Defendants each conducted and/or participated in the conduct of the NPS and RBT Enterprises' affairs, as described in this Complaint, through a pattern of racketeering activity, as that phrase is defined in 18 U.S.C. §§ 1961(1), (5).

236.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341, 1343.   Specifically, the RICO Defendants engaged in an intentional scheme to defraud the funeral homes and consumers and to obtain money or property from funeral homes and consumers through false or fraudulent pretenses, representations, and promises.   It was reasonably foreseeable to each RICO Defendant that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme to defraud.

237.    For the purpose of furthering and executing the scheme to defraud, the RICO Defendants regularly transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds (the "wirings"), and also regularly caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier (the "mailings").   The details of the wirings and mailings are set forth above.

238.    The RICO Defendants used the wires and/or mails on a daily basis for the above stated purposes to further and execute the scheme to defraud the funeral homes and consumers. For example, every time that NPS mailed or wired a paid-in-full certificate to a funeral home or consumer, or paid a funeral home on a death claim, the RICO Defendants furthered the false impression that NPS was a viable company that had prudently managed the pre-need funds.

239.    The wire transfers detailed in this Complaint each constitute a predicate act of wire fraud because each wire transfer furthered and executed the scheme to defraud the funeral homes and customers.

240.    The RICO Defendants each participated in the scheme to defraud knowingly, willfully, and with a specific intent to defraud funeral homes into selling, and consumers into buying, NPS pre-need funeral contracts and then siphoning off the pre-need funds.

241.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  The predicate acts were not isolated events but related acts aimed at the common purpose and goal of convincing funeral homes to sell, and consumers to buy, NPS pre-need funeral contracts and then siphoning away as much of the pre-need funds as possible.  The RICO Defendants were the common participants in the predicate acts and the funeral homes and consumers were the common victims.

242.    The RICO Defendants' scheme to defraud the funeral homes and consumers and siphon away the pre-need funds extended over at least a 13-year period, from 1995 to May 14, 2008.  The predicate acts were the NPS and RBT Enterprises' manner of conducting their pre-need funeral business and posed the threat of continuing racketeering activity but for the Texas Department of Insurance placing NPS, Lincoln, and Memorial into receivership.

243.    The scheme to defraud detailed in this Complaint left NPS, Lincoln, and Memorial unable to pay the pre-need funeral contracts and/or life insurance policies both now and in the future.  As a direct and proximate result of the RICO Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

244.    As a result of their misconduct, the RICO Defendants are liable to Plaintiffs for their losses, in an amount to be determined at trial.

245.    In addition, pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages plus costs and attorney fees from the RICO Defendants.

SECOND CLAIM FOR RELIEF

**Conspiracy to Violate RICO under 18 U.S.C. § 1962(d)**

(Against the RICO Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers)

246.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

247.    Each of the RICO Defendants conspired to violate 18 U.S.C. § 1962(c) by agreeing to conduct and participate, directly and indirectly, in the conduct of the affairs of the RBT Enterprise and/or the NPS Enterprise through a pattern of racketeering activity.  This agreement was in violation of 18 U.S.C. § 1962(d).

248.    Each of the RICO Defendants also conspired to violate 18 U.S.C. § 1962(a) by agreeing to use or invest income received, directly or indirectly, from a pattern of racketeering activity in the acquisition of any interest in, or the establishment or operation of, Defendant Forever Enterprises.  This agreement was in violation of 18 U.S.C. § 1962(d).

249.    The RICO Defendants committed and caused to be committed a series of overt predicate acts of racketeering in furtherance of the conspiracy, including but not limited to the acts described in this Complaint.

250.    As a direct and proximate result of the overt predicate acts of racketeering and of the RICO Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

138

251.    As a result of their conspiracy in violation of 18 U.S.C. § 1962(d), the RICO Defendants are liable to Plaintiffs for their losses, in an amount to be determined at trial.

252.    In addition, pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages plus costs and attorney fees from the RICO Defendants.

THIRD CLAIM FOR RELIEF

**Violation of RICO 18 U.S.C. § 1962(a)**

(Against Defendants Brent Cassity, Tyler Cassity, and Forever Enterprises, Inc.)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers)

253.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

254.    Each of the Plaintiffs is a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

255.    Each of the Defendants Brent Cassity, Tyler Cassity, and Forever Enterprises is a "person" under 18 U.S.C. §§ 1961(3) and 1962(a).

256.    At all relevant times, Defendant Forever Enterprises constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4) and 1962(a) which is engaged in, and the activities of which affect, interstate or foreign commerce.

257.    Defendants Brent Cassity and Tyler Cassity were at all relevant times Officers and/or Directors of Defendant Forever Enterprises.

258.    Defendants Forever Enterprises, Brent Cassity, and Tyler Cassity received income derived, directly or indirectly, from the pattern of racketeering activity described in this Complaint.   Specifically, Defendants Forever Enterprises, Brent Cassity, and Tyler Cassity

received income derived, directly or indirectly, from the scheme to defraud the funeral homes into selling, and consumers into buying, NPS pre-need funeral contracts.

259.    Defendants Forever Enterprises, Brent Cassity, and Tyler Cassity participated as principals within the meaning of 18 U.S.C. § 2 in the pattern of racketeering activity described in this Compliant.

260.    Upon information and belief, Defendants Forever Enterprises, Brent Cassity, and Tyler Cassity used or invested, directly or indirectly, a part of such income, or the proceeds of such income, in the acquisition of an interest in, or the establishment or operation of, Forever Enterprises and its subsidiaries, including but not limited to Defendant Hollywood Forever and Forever Marin, in violation of 18 U.S.C. § 1962(a).

261.    Specifically, Defendants Forever Enterprises, Brent Cassity, and Tyler Cassity used or invested, directly or indirectly, the funds derived from the pattern of racketeering activity described in this Complaint to acquire property ultimately owned by Defendant Forever Enterprises, including but not limited to cemeteries, and to undertake construction projects on property ultimately owned by Defendant Forever Enterprises, including but not limited to building mausoleums.

262.    As a direct and proximate result of Defendants Forever Enterprises', Brent Cassity's, and Tyler Cassity's violation of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

263.    Specifically, Plaintiffs' injury was directly and proximately caused by the investment of the racketeering funds into illiquid assets such as cemeteries and mausoleums,

because such investment made the racketeering funds permanently inaccessible to NPS to pay the funeral homes under the NPS pre-need contracts.

264.    As a result of their misconduct, Defendants Forever Enterprises, Brent Cassity, and Tyler Cassity are liable to Plaintiffs for their losses in an amount to be determined at trial.

265.    In addition, pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages plus costs and attorney fees from Defendants Forever Enterprises, Brent Cassity, and Tyler Cassity.

<u>FOURTH CLAIM FOR RELIEF</u>

**Lanham Act (Violation of 15 U.S.C. § 1125(a))**

(Against the RICO Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from
Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas;
and the SDR on behalf of funeral homes)

266.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

267.    The RICO Defendants' misconduct as set forth above constitutes false and misleading descriptions and representations, which caused confusion, mistake or deception and misrepresented the nature, characteristics and qualities of services and goods in violation of 15 U.S.C. § 1125(a).

268.    The RICO Defendants' misrepresentations were made in commercial advertising or promotion concerning goods, services, and commercial activities.

269.    The RICO Defendants' misrepresentations deceived the recipient funeral homes and influenced the funeral homes' purchasing decisions.

270.    The funeral homes competed with the RICO Defendants in the market for the sales of pre-need funeral contracts, including the financing and servicing of such contracts.  The RICO Defendants' misrepresentations and omissions resulted in the funeral homes entrusting their pre-need business and funds to the RICO Defendants and corresponding loss of their pre-need business and funds.

271.    The RICO Defendants' misrepresentations injured the Plaintiffs.

272.    The RICO Defendants' misrepresentations were intentional and with knowledge of their falsity.

273.    Plaintiffs seek compensatory damages for the injuries sustained from the misrepresentations, and such damages should be trebled because of the RICO Defendants' willful misconduct and intentional misrepresentations.

274.    The RICO Defendants also are required to account to Plaintiffs for any and all gains, profits and advantages derived by them from the conduct in violation of 15 U.S.C. § 1125(a) and all of Plaintiffs' litigation expenses, including reasonable attorney fees and the costs of this action.

<u>FIFTH CLAIM FOR RELIEF</u>

**Fraudulent Omissions/Nondisclosure**

(Against the RICO Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from
Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas;
and the SDR on behalf of funeral homes and consumers)

275.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

276.    The RICO Defendants failed to disclose to and concealed from the funeral homes and consumers, and engaged in a fraudulent scheme to keep the funeral homes and consumers ignorant of, pertinent and material information regarding how NPS, Lincoln, and Memorial intended to operate and did operate and the manner in which NPS intended to handle and did handle the pre-need funds.  Specifically, the RICO Defendants failed to disclose and concealed from the funeral homes and consumers pertinent and material information that includes but is not limited to the following:

a)  Defendant Doug Cassity is a disbarred Missouri lawyer who served time in federal prison as a result of a felony fraud conviction, and, as a result of that conviction, was and is permanently banned from having any involvement in the insurance industry;

b)  Defendant Doug Cassity effectively ran all entities within the Cassity Consortium, including but not limited to NPS, Lincoln, and Memorial;

c)  NPS, Lincoln, and Memorial shared common ownership and control;

d)  Defendant Sutton was the President of both NPS and Lincoln;

e)  Defendants pillaged the pre-need trust funds, withdrawing cash and replacing the cash with promissory notes and/or debentures;

f)  NPS' "independent investment advisor" for NPS' pre-need trusts was not independent, as evidenced by the fact that Defendants Wulf and Wulf Bates: (1) officed in the same building as NPS, and Defendants NHE, Forever Enterprises, LMS, Forever Network, Forever Illinois, Texas Forever, NPS Agency, Legacy International, and Brentwood Heritage; (2) appointed Defendant

143

Sutton as its "agent," thereby allowing Defendant Sutton to directly manipulate NPS pre-need trust assets; (3) allowed Defendants Scannell and Doug Cassity to write Defendant Wulf's letters professing to provide investment advice; (4) owned stock in Defendant Forever Enterprises; (5) directed the investment of some NPS pre-need trust funds in stock of Defendant Forever Enterprises; (6) directed the investment of millions of dollars of NPS pre-need trust funds into Defendant Wulf's personal investment partnerships; (7) invested the remainder of the NPS pre-need trust funds almost exclusively in life insurance policies issued by Lincoln; and (8) Defendant Wulf received health benefits through the Cassity Consortium;

g)   The RICO Defendants purchased life insurance policies that did not match how the corresponding pre-need contract was financed or how the corresponding "original" unaltered insurance policy application was signed, in order to allow NPS and the RICO Defendants to retain the bulk of the money received from the consumer;

h)   The RICO Defendants routinely "whited-out" and altered the life insurance policy applications filled out by the consumers from single premium, paid-in-full policies to monthly premium policies to allow NPS and the RICO Defendants to retain the bulk of the money received from the consumer;

i)   The RICO Defendants systematically depleted the value of the whole life insurance policies by taking out sizeable policy loans against the cash value of the policies;

j)   The RICO Defendants did not repay the policy loans;

k)   The RICO Defendants routinely surrendered large blocks of whole life insurance policies and directed that Lincoln pay the cash surrender value of the policies to NPS;

l)   The RICO Defendants often replaced the whole life policies with term policies that required NPS pay Lincoln significantly less premium (allowing NPS to keep more of the money) and had no cash value;

m)  In some cases, the RICO Defendants failed to pay premiums on the whole life and/or term life insurance policies issued by Lincoln and Memorial, causing the policies to be converted to RPU status and/or potentially lapse; and

n)   The RICO Defendants siphoned the ill-gotten funds from NPS to other entities within the Cassity Consortium and used the ill-gotten funds to personally enrich the individual Defendants.

277.   The RICO Defendants had superior knowledge and information about how NPS, Lincoln, and Memorial intended to operate and did operate and the manner in which NPS intended to handle and did handle the pre-need funds, which knowledge and information was not reasonably available to the funeral homes and consumers and could not have been discovered through ordinary diligence.  The RICO Defendants therefore had a duty to speak and to inform the funeral homes and consumers of the truth about the nondisclosed, omitted, and concealed facts.

278.   By failing to disclose to, omitting, and concealing from the funeral homes and consumers the true facts regarding how NPS, Lincoln, and Memorial intended to operate and did

operate and the manner in which NPS intended to handle and did handle the pre-need funds, the RICO Defendants intended to create a false impression of the actual facts in the minds of the funeral homes and consumers.

279.    The RICO Defendants ensured that the funeral homes and consumers would not discover the truth by keeping NPS' own sales agents, the primary contact persons for the funeral homes, ignorant of how NPS, Lincoln, and Memorial intended to operate and did operate and the manner in which NPS intended to handle and did handle the pre-need funds.

280.    The RICO Defendants' nondisclosures, omissions, and concealments were material because, had the funeral homes and consumers known the truth, the funeral homes would not have agreed to sell NPS pre-need contracts and would not have entrusted pre-need funds to NPS, and consumers would not have purchased the NPS pre-need services.

281.    The RICO Defendants knew that:  (1) this information would have been highly material to the funeral homes' decision of whether to sell NPS pre-need contracts and whether to roll-over funds from previous pre-need sales to NPS, and the consumers' decision of whether to purchase NPS pre-need services; (2) the funeral homes and consumers were ignorant of this material information; and (3) the funeral homes and consumers were not in a position to discover the truth about NPS', Lincoln's, and Memorial's operations.

282.    The funeral homes and consumers relied on the RICO Defendants' fraudulent nondisclosures, omissions, and concealments by selling and purchasing NPS pre-need contracts, respectively, when the funeral homes and consumers would not have done so had they been aware of the true facts regarding how NPS, Lincoln, and Memorial intended to operate and did operate and how NPS intended to handle and did handle the pre-need funds entrusted to it.

283.   The funeral homes' and the consumers' reliance was reasonable and justified under the circumstances, and the funeral homes and consumers had a right to rely on the facts as they believed them to be absent knowing the fraudulent nondisclosures, omissions, and concealments.

284.   As a direct and proximate result of the RICO Defendants' fraudulent nondisclosures, omissions, and concealments, and the funeral homes' and the consumers' reliance on the assumption that the concealed and undisclosed facts did not exist or were different from what the facts actually were, Plaintiffs suffered injuries, damages, or losses in an amount to be determined at trial.

285.   Plaintiffs are entitled to punitive damages because the RICO Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

SIXTH CLAIM FOR RELIEF

**Fraudulent Misrepresentations**

(Against the RICO Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from
Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas;
and the SDR on behalf of funeral homes and consumers)

286.   Plaintiffs incorporate by reference all allegations contained in this Complaint.

287.   The RICO Defendants made numerous false representations, both orally and in writing, to the funeral homes and consumers regarding NPS, Lincoln, and Memorial operations and how NPS handled the pre-need funds entrusted to it.  These false representations include:

147

a) The statement on each non-Missouri pre-need contract that (or to the effect of) "THIS PREPAID FUNERAL CONTRACT IS FUNDED BY INSURANCE";

b) The statement on each Missouri pre-need contract that "National Prearranged Services, Inc. shall deposit all payments required to be placed in trust to secure the performance of the Prearranged Funeral Agreement with [bank name]";

c) That the investment advisor hired for the NPS pre-need trusts was "independent";

d) Sending paid-in-full certificates to the funeral homes;

e) The statement in the NPS "Advantage" marketing materials that consumers who paid in full were "100% protected";

f) The statement in the Lincoln life insurance application that the consumer "continue[s] to pay premiums and retain ownership" of the policy;

g) The statement that proceeds from roll-overs "will go to trust, and subsequently be placed in life insurance within thirty (30) days"; and

h) The statement that there is "a double-layer of protection [for proceeds from roll-overs] using trusted insurance[.]"

288.    At the time they were made, the funeral homes and consumers did not know that these representations were false and fraudulent.

289.    These false representations were material to the funeral homes' decision to sell, and the consumers' decision to buy, NPS pre-need funeral services and/or merchandise.  Had the funeral homes and customers known that these representations were not true, the funeral homes would not have sold, and the consumers would not have purchased, NPS pre-need funeral services and/or merchandise.

290.    The RICO Defendants made the false representations knowing them to be false or being aware that they did not know whether the representations were true or false.  The RICO Defendants knew that the NPS pre-need funeral contracts were not actually "funded by life insurance," that the NPS pre-need funds were not properly held in trust, that the NPS pre-need trusts' investment advisor was not independent, and that consumers who paid-in-full were not "100% protected," because the RICO Defendants knew that the pre-need funds would be and were being siphoned away from the insurance companies, the insurance policies, and the pre-need trusts.

291.    The RICO Defendants willfully and consciously disregarded the truth of these false representations.

292.    The RICO Defendants made the false representations with the intent that funeral homes and consumers would rely on the false representations.  In order to ensure that funeral homes and consumers would rely on the false representations, the RICO Defendants kept NPS' own sales agents ignorant of how NPS, Lincoln, and Memorial operated and the manner in which NPS handled the pre-need funds entrusted to it.

293.    The funeral homes and consumers relied on the RICO Defendants' false representations by selling and buying NPS pre-need funeral services and/or merchandise, respectively, and the funeral homes entrusted to NPS the money generated from those sales or previous pre-need sales rolled-over to NPS when they would not have done so had they known the truth about how NPS, Lincoln, and Memorial operated and the manner in which NPS handled the pre-need funds entrusted to it.

294.    The funeral homes' and consumers' reliance was reasonable and justified, and the funeral homes and consumers had a right to rely on the false representations.

295.    As a direct and proximate result of the RICO Defendants' false representations, and the funeral homes' and consumers' reliance on those false representations, Plaintiffs suffered injuries, damages, or losses in an amount to be determined at trial.

296.    Plaintiffs are entitled to punitive damages because the RICO Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

<u>SEVENTH CLAIM FOR RELIEF</u>

**Conspiracy to Commit Fraud**

(Against the RICO Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of funeral homes and consumers)

297.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

298.    The RICO Defendants each knowingly and willfully conspired and agreed to engage in the scheme to defraud described in this Complaint.

299.    The RICO Defendants committed and caused to be committed one or more overt and unlawful acts in furtherance of the conspiracy, including but not limited to the acts described in this Complaint.

300.    As a direct and proximate result of the RICO Defendants' conspiracy to commit fraud, Plaintiffs suffered injuries, damages, or losses in an amount to be determined at trial.

301.    Plaintiffs are entitled to punitive damages because the RICO Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

EIGHTH CLAIM FOR RELIEF

**Aiding and Abetting Fraud**

(Against the RICO Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from
Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas;
and the SDR on behalf of funeral homes and consumers)

302.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

303.    Each of the RICO Defendants knew about the schemes used to defraud the funeral homes and consumers that are described in this Complaint.

304.    Each RICO Defendant actively participated in the schemes to defraud by knowingly providing encouragement and substantial assistance in perpetration of the fraud, as described in this Complaint.

305.    As a direct and proximate result of the RICO Defendants' encouragement and substantial assistance in perpetration of the fraud, Plaintiffs suffered injuries, damages, or losses in an amount to be determined at trial.

306.    Plaintiffs are entitled to punitive damages because the RICO Defendants conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

<u>NINTH CLAIM FOR RELIEF</u>

**Negligent Misrepresentations and Omissions**

(Against the RICO Defendants)

(Bought by Plaintiffs NOLHGA; the individual state guaranty associations from
Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas;
and the SDR on behalf of funeral homes and consumers)

307.    Plaintiff incorporates by reference all allegations contained in this Complaint.

308.    In the course of their business, the RICO Defendants supplied marketing, financial, and other information to the funeral homes and consumers that was relevant and material to the consumers' determination whether to enter into a contract with NPS, and to the funeral homes' determination of whether to sell NPS pre-need contracts and whether to roll-over funds from previous pre-need sales to NPS.

309.    The RICO Defendants owed a duty to disclose to the funeral homes and consumers all pertinent and material information relevant to the decision of whether to sell and buy NPS pre-need funeral contracts, including but not limited to all pertinent and material information regarding the manner in which NPS invested the pre-need funds that the funeral homes entrusted to NPS.

310.    Due to the RICO Defendants' failure to exercise reasonable care, the RICO Defendants:  (1) provided false information to the funeral homes and consumers; and (2) failed to disclose to the funeral homes and consumers pertinent and material information regarding how NPS operated and handled the pre-need funds.  This failure to disclose material information was tantamount to supplying false information.

311.    The RICO Defendants negligently made misrepresentations and failed to disclose material information to the funeral homes and consumers with the intent that the funeral homes and consumers would rely on the misrepresentations and omissions and agree to sell and buy NPS pre-need funeral contracts.

312.    At the time they were made, the funeral homes and consumers did not know that the representations were false and did not know the information that the RICO Defendants negligently failed to disclose.

313.    In deciding to enter into contracts with NPS and in selling and buying NPS pre-need funeral contracts, the funeral homes and consumers reasonably and justifiably relied on the information, including the negligent misrepresentations, provided by the RICO Defendants.

314.    Had the funeral homes and consumers known that these misrepresentations were not true or known the material information that the RICO Defendants had a duty to disclose and failed to disclose, the funeral homes would neither have agreed to sell nor have sold NPS pre-need funeral contracts and the consumers would not have entered into NPS pre-need contracts.

315.    The funeral homes and consumers in fact relied upon the RICO Defendants' omissions and nondisclosures by selling and buying, respectively, NPS pre-need contracts when the funeral homes and consumers would not have done so had they been aware of the true facts regarding how NPS operated and handled the pre-need funds entrusted to it.

316.    As a direct and proximate result of the RICO Defendants' negligent misrepresentations, omissions, and nondisclosures, and the funeral homes' and consumers' reliance on those misrepresentations and the assumption that the concealed and undisclosed facts

153

did not exist or were different from what the facts actually were, Plaintiffs suffered injuries, damages, or losses in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF

**Breach of Promissory Notes**

(Against the Promissory Note Defendants)

(Brought by Plaintiff SDR on behalf of NPS, Lincoln, and Memorial)

317.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

318.    As detailed in the chart below, the Promissory Note Defendants took substantial sums of money from NPS, NPS pre-need trusts, Lincoln, and Memorial, and in exchange executed a series of promissory notes setting forth repayment obligations.

319.    As the Receiver of NPS, Lincoln, and Memorial, the SDR is the holder of each such note.

320.    The Promissory Note Defendants have failed to timely pay principal and interest due and/or have failed to comply with the other terms of the promissory notes placing them in default.

321.    The promissory notes expressly waive demand, presentment, notice of intent to demand or accelerate payment, diligence in collecting, and notice and protest of every kind and nature in reference to the promissory notes.

322.    The promissory notes authorize the holder to accelerate payment in the event of a default, such that all principal and interest due on the notes become immediately due and payable.

323.    Plaintiff SDR elects to accelerate payment on each and every promissory note in default that is held by NPS, an NPS pre-need trust, Lincoln, and Memorial such that all principal and interest is immediately due and payable.

324.    The promissory notes on which the Promissory Note Defendants are in default include, but are not limited to:

| Date | Amount Received (in $) | Maker/Borrower | Holder/Lender |
|---|---|---|---|
| 1/1/1993 | 1,500,000.00 | NPS Agency | NPS |
| 12/30/1998 | 50,000.00 | Lincoln Heritage Corp. (now known as Forever Enterprises) | NPS |
| 11/9/1999 | 4,000,000.00 | Forever Enterprises (Guarantor: Lincoln Heritage Corp.) | Lincoln |
| 12/18/2000 | 228,176.90 | Wise, Mitchell & Associates (Guarantor: North American Holdings, Ltd.) | Memorial |
| 1/1/2001 | 8,508,360.51 | Forever Enterprises | Memorial |
| 1/1/2001 | 8,652,419.81 | Forever Enterprises | Memorial |
| 6/22/2001 | 1,600,000.00 | LMS | Allegiant Bank, Trustee for NPS Pre-Need Trust IV |
| 10/21/2002 | 559,912.79 | Forever Network | Allegiant Bank, Trustee for NPS Pre-Need Trust IV |
| 11/1/2002 | 4,550,219.04 | LMS | Allegiant Bank, Trustee for NPS Pre-Need Trust IV |
| 11/26/2002 | 150,000.00 | Texas Forever | NPS Pre-Need Trust IV |
| 9/17/2003 | 2,061,551.43 | LMS | Allegiant Bank, Trustee for NPS Pre-Need Trust IV |
| 10/1/2003 | 4,508,754.85[6] | LMS | Allegiant Bank, Trustee for NPS Pre-Need Trust IV |
| 2/1/2004 | 4,600,000.00 | LMS | Bremen Bank, Trustee for NPS Pre-Need Trust IV |
| 6/10/2004 | 40,000.00 | Hollywood Forever | NPS Custody Account (Bremen Bank) |

---

[6] This note is a novation of the note dated 11/1/2002, in the original amount of $4,550,219.04, made by LMS to Allegiant Bank.

| 7/28/2004 | 75,000.00 | Hollywood Forever | NPS Custody Account (Bremen Bank) |
|---|---|---|---|
| 8/18/2004 | 12,000.00 | Hollywood Forever | NPS Custody Account (Bremen Bank) |
| 9/9/2004 | 100,000.00 | Hollywood Forever | NPS Custody Account (Bremen Bank) |
| 10/15/2004 | 100,000.00 | Hollywood Forever | NPS Custody Account (Bremen Bank) |
| 11/22/2004 | 100,000.00 | Hollywood Forever | NPS Custody Account (Bremen Bank) |
| 12/13/2004 | 32,000.00 | Hollywood Forever | NPS Custody Account (Bremen Bank) |
| 7/18/2006 | 378,000.00 | Forever Enterprises | NPS Pre-Need Trust IV |
| 7/18/2006 | 378,000.00 | Forever Enterprises | NPS Pre-Need Trust IV |
| 7/18/2006 | 1,700,000.00 | Forever Enterprises | NPS |
| 8/11/2006 | 280,000.00 | Forever Enterprises | NPS |
| 8/11/2006 | 1,700,000.00 | Forever Enterprises | NPS Pre-Need Trust IV |
| 8/11/2006 | 1,700,000.00 | Forever Enterprises | NPS Pre-Need Trust IV |
| 1/31/2007 | 90,000.00 | Forever Enterprises | NPS Pre-Need Trust IV |
| 1/31/2007 | 193,109.22 | Legacy International Imports | NPS |
| 4/23/2007 | 50,000.00 | Brentwood Heritage | NPS |
| 5/10/2007 | 558,524.30 | Forever Enterprises | NPS Pre-Need Trust IV |
| 10/30/2007 | 704,409.93 | LMS | Bremen Bank, Trustee for NPS Pre-Need Plans Trust IV |
| 10/30/2007 | 336,955.64[7] | Hollywood Forever[8] | Bremen Bank, Trustee for NPS Pre-Need Plans Trust IV |
| 1/30/2008 | 227,424.45[9] | Forever Network | Bremen Bank, Trustee for NPS Pre-Need Plans Trust IV |
| 3/10/2008 | 254,383.37[10] | Forever Network | Bremen Bank, Trustee for NPS Pre-Need Plans Trust IV |

[7] This note is a novation of a note dated 10/1/2003, in the original amount of $4,508,754.85, made by Forever Enterprises to LMS.

[8] Forever Network assumed this note from Hollywood Forever on 1/30/2008.

[9] This note is a novation of the note dated 10/1/2003, in the original amount of $336,955.64, made by Hollywood Forever to Bremen Bank.

[10] This note is a novation of the note dated 1/30/2008, in the original amount of $227,424.45, made by Forever Network to Bremen Bank.

325.    As set forth in the promissory notes, the SDR is further entitled to recover from the Promissory Note Defendants the costs of collection, including attorney fees, expenses, court costs, and other litigation expenses related to the promissory notes.

## ELEVENTH CLAIM FOR RELIEF

### Consumer Protection Act Violations

(Against the RICO Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from
Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas;
and the SDR on behalf of funeral homes and consumers)

326.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

327.    The RICO Defendants knowingly and intentionally engaged in the unfair, unlawful, deceptive, and unconscionable trade practices set forth above that violate numerous state consumer protection acts.  Plaintiffs assert claims under all state consumer protection acts where the conduct underlying the violations, or the injuries, occurred.[11]

328.    The RICO Defendants' unfair, unlawful, and deceptive trade practices occurred in the course of the RICO Defendants' business; significantly impacted the funeral homes and their customers as consumers; and the challenged practices proximately caused actual damages and injury to Plaintiffs.

---

[11] The consumer protections acts are as follows:  Ark. Code Ann. §§ 4-88-101, *et. seq.*; Ariz. Rev. Stat. Ann. §§ 44-1521, *et. seq.*; Cal. Civ. Code §§ 1750 *et seq.*; Ga. Code Ann. §§ 10-1-390, *et. seq.*; 815 ILCS 505/1 *et. seq.* (Illinois); Ind. Code Ann. §§ 24-5-0.5-0.5, *et. seq.*; Kan. Stat. Ann. §§ 50-623, *et. seq.*; Ky. Rev. Stat. §§ 367.110, *et. seq.*; La. Rev. Stat. Ann. §§ 51:1401, *et. seq.*; Mo. Ann. Stat. § 407.020 & .025; Neb. Rev. Stat. §§ 59-1601, *et. seq.*; Ohio Rev. Code Ann. §§ 1345.01, *et. seq.*; Okla. Stat. Ann. tit. 15 §§ 751, *et seq.*; Pa. Stat. Ann. tit. 73 §§ 201-1, *et. seq.*; S.C. Code Ann. §§ 39-5-10, *et. seq.*; S.D. Codified Laws §§ 37-24-1, *et seq.*; Tenn. Code Ann. §§ 47-18-101, *et. seq.*; and Tex. Bus. & Com. Code Ann. §§ 17.41, *et. seq.*

329.     The RICO Defendants intended that the funeral homes and their customers rely on their deceptions which occurred in and affected the course of conduct involving trade or commerce.

330.     The RICO Defendants made a misrepresentation or omission of a material fact in connection with the sale of merchandise and the misrepresentation or omission proximately caused injury to the funeral homes and their customers.

331.     Plaintiffs relied on the RICO Defendants' misrepresentations and deceptive acts, which acts are uncured or incurable.

332.     The RICO Defendants used or employed a deception, a fraud, a false pretense, a false promise, a misrepresentation, an unfair practice, or a concealment, suppression or omission of a material fact; the unlawful act occurred in connection with the sale or advertisement of merchandise in trade or commerce to the funeral homes and their customers; Plaintiffs suffered an ascertainable loss of money as a result of the unlawful act; and the loss arose from the funeral homes' or consumers' purchase of merchandise or services primarily for personal use.

333.     Plaintiffs are entitled to treble damages, punitive damages, attorney fees and costs as provided by the state consumer protection acts specified above.

<u>TWELFTH CLAIM FOR RELIEF</u>

**Texas Receivership Act Violations (Tex. Ins. Code §§ 443.202 to 205)**

(Against the RICO Defendants and the Fraudulent Transfer Defendants)

(Brought by Plaintiff SDR on behalf of NPS, Lincoln, and Memorial)

334.     Plaintiffs incorporate by reference all allegations contained in this Complaint.

335.    Under her authority as set forth in the September 22, 2008, Liquidation Order entered by the Receivership Court, the SDR brings statutory claims under TEX. INS. CODE §§ 443.202 to 205.

336.    Under § 443.202 of the Texas Insurance Code, the SDR has the right to recover from any affiliate of NPS, Lincoln, and Memorial any property of the insurer transferred to or for the benefit of the affiliate, or the property's value, if the transfer was made within the two years preceding the initial petition for receivership.

337.    The RICO Defendants and the Fraudulent Transfer Defendants were affiliates of NPS, Lincoln, or Memorial as contemplated by TEX. INS. CODE § 443.202 and § 443.832.

338.    Within two years of the initial petition for receivership, NPS, Lincoln, or Memorial transferred property for the benefit of the RICO Defendants and the Fraudulent Transfer Defendants as described in this Complaint.

339.    NPS, Lincoln, and Memorial were insolvent at the time of the transfers, the transfers were unlawful, and NPS, Lincoln, and Memorial and the RICO Defendants and the Fraudulent Transfer Defendant affiliates knew, or should have known, that the transfers placed NPS, Lincoln, and Memorial in violation of applicable capital or surplus requirements; below the applicable minimum risk-based capital level; in violation of applicable writing ratios; and caused NPS', Lincoln's, and Memorial's filed financial statements to not present fairly their capital and surplus.

340.    In violation of TEX. INS. CODE § 443.203, NPS, Lincoln, and/or Memorial transferred an interest in property or an obligation after the petition for receivership was filed on

May 13, 2008, without authorization of the SDR, the Receivership Court, or Chapter 443. The SDR invokes its right to revoke all such transfers.

341.    Under TEX. INS. CODE § 443.204, the SDR has the right to recover "preference" transfers NPS, Lincoln, and Memorial made to the RICO Defendants and the Fraudulent Transfer Defendants within two years preceding the filing of the petition for receivership that enabled those Defendants to receive more than they would have received under Chapter 443.

342.    NPS, Lincoln, and Memorial were insolvent at the time the preference transfers were made; some or all of the preference transfers were made within 120 days before the filing of the petition for receivership; the RICO Defendants and the Fraudulent Transfer Defendants knew or should have known at the time of the preference transfers that NPS, Lincoln, and Memorial were (or were about to become) insolvent.

343.    The Defendants receiving the preference transfers were:  (1) officers or directors of NPS, Lincoln, or Memorial; (2) employees, attorneys, or other persons who were in a position to effect a level of control or influence over NPS, Lincoln, or Memorial comparable to an officer or director; or (3) an affiliate.

344.    Under TEX. INS. CODE § 443.205, the SDR has the right to recover any transfer of an interest of the insurer in property, any reinsurance transaction, or any obligation incurred by an insurer that was made or incurred on or within two years of the initial petition for receivership.

345.    NPS, Lincoln, and Memorial transferred property or incurred an obligation with actual intent to hinder, delay, or defraud those persons and entities to which they were indebted; and received less than a reasonably equivalent value in exchange for the transfer or obligation.

346.     The foregoing transfers caused damage to the receivership estates.

347.     Under TEX. INS. CODE § 443.207, the RICO Defendants and the Fraudulent Transfer Defendants must return the property transferred, or the value of the property, to the SDR for the receivership estates.  These Defendants also must pay rental for the use of tangible property; actual interest or income earned by intangible property or interest at the Texas statutory rate for judgments; plus all costs and other expenses, including investigative costs and other expenses necessary to the recovery of the property or funds, and reasonable attorney fees.

<u>THIRTEENTH CLAIM FOR RELIEF</u>

**Violation of Texas Insurance Code § 463.302**
**(“Distributions to Shareholders and Affiliates”)**

(Against the RICO Defendants and Rhonda L. Cassity)

(Brought by Plaintiff SDR on behalf of NPS, Lincoln, and Memorial)

348.     Plaintiffs incorporate by reference all allegations contained in this Complaint.

349.     TEX. INS. CODE § 463.302 authorizes the SDR to recover distributions to affiliates of the insolvent insurer, other than a stock dividend the insurer paid on the insurer’s capital stock, made during the five years preceding the date of the petition for liquidation or rehabilitation.

350.     The RICO Defendants are liable for the amount of all distributions received directly, or indirectly, from NPS, Lincoln, and Memorial.  The RICO Defendants that controlled NPS, Lincoln, or Memorial when the distribution was declared are liable for the amount of the distribution the affiliate would have received if the distribution had been paid immediately.  Two or more Defendants liable for the same distribution are jointly and severally liable.  If a Defendant liable under this subsection is insolvent, all of the affiliates that controlled the

insolvent Defendant when the distribution was paid are jointly and severally liable for any resulting deficiency in the amount recovered from the insolvent Defendant.

351.    The RICO Defendants are "affiliates" as that term is used in the Texas Insurance Code.  As described above, each of the RICO Defendants received distributions directly, or indirectly, from NPS, Lincoln, or Memorial, other than stock dividends, in the five years before the receivership.

352.    The transfers caused damage to the receivership estate and the SDR seeks an award against each of the RICO Defendants in an amount equal to the transfers under Section 14 of TEX. INS. CODE Art. 21.28-D.

## FOURTEENTH CLAIM FOR RELIEF

### Fraudulent Transfer Act Violations

(Against the Fraudulent Transfer Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, consumers, and general creditors of the estates of NPS, Lincoln, and Memorial)

353.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

354.    Plaintiffs are creditors of the Fraudulent Transfer Defendants because Plaintiffs have a right to payment for services and merchandise provided and due under NPS' pre-need contracts.  Plaintiffs assert claims under all state fraudulent transfer acts where the creditors' injuries have occurred.[12]

---

[12]   The fraudulent transfer acts are as follows:  Mo. Rev. Stat. §§ 428.005-.110; Tex. Bus. & Com. Code Ann. §§ 24.001-.013; 740 Ill. Comp. Stat. 160/1-160/12; Cal. Civ. Code §§ 3439.01-.12; Ala. Code §§ 8-9A-1 to -12; Alaska Stat. §§ 34.40.010-.130; Ariz. Rev. Stat. §§ 44-1001 to -1010; Ark. Code Ann. §§ 4-59-201 to -213; Colo. Rev. Stat. §§ 38-8-101 to -112; Conn. Gen. Stat. §§ 52-552a to -552l; Del. Code. Ann. tit. 6, §§ 1301-1311; D.C. Code Ann. §§ 28-3101 to -3111; Fla. Stat. ch. 726.101-.112; Ga. Code Ann. §§ 18-2-70 to -80; Haw. Rev. Stat.

355.    The Fraudulent Transfer Defendants include debtors that are liable for Plaintiffs' claims; insiders of debtors, including officers, directors, persons in control, and relatives of such officers, directors, and persons in control of debtors; affiliates of debtors; and transferees of assets.

356.    The Fraudulent Transfer Defendants made and received numerous transfers of funds between the related entities within the Cassity Consortium.  Some of the transfers of funds were supposedly backed by promissory notes, and included direct payments to or on behalf of the Fraudulent Transfer Defendants.

357.    The Fraudulent Transfer Defendants made and received the transfers with the intent to hinder, delay, and defraud the funeral homes and consumers, so that funds would not be available for the funeral homes to receive compensation for services and merchandise they are required to provide under the NPS pre-need funeral contracts to their customers.

358.    The Fraudulent Transfer Defendants made and received transfers without receiving or providing a reasonably equivalent value in exchange for the transfer and while the Fraudulent Transfer Defendants were engaged in a business where the remaining assets were unreasonably small in relation to their business, and while they intended to incur debts beyond their ability to pay.

---

§§ 651C-1 to -10; Idaho Code §§ 55-910 to -921; Ind. Code §§ 32-18-2-1 to -21; Iowa Code §§ 684.1-.12; Kan. Stat. Ann. §§ 33-201 to -212; Ky. Rev. Stat. Ann. §§ 378.010-.100; Me. Rev. Stat. Ann. tit. 14, §§ 3571-3582; Md. Code Ann., Com. Law I §§ 15-201 to -214; Mich. Comp. Laws §§ 566.31-.43; Minn. Stat. §§ 513.41-.51; Miss. Code Ann. §§ 15-3-101 to -121; Mont. Code. Ann. §§ 31-2-326 to -342; Neb. Rev. Stat. §§ 36-701 to -712; Nev. Rev. Stat. 112.140-.250; N.M. Stat. Ann. §§ 56-10-14 to -25; N.C. Gen. Stat. §§ 39-23.1 to -23.12; N.D. Cent. Code §§ 13-02.1-01 to -10; Ohio Rev. Code Ann. §§ 1336.01 to .12; Okla. Stat. tit. 24, §§ 112-123; Or. Rev. Stat. §§ 95.200-.310; 12 Pa. Cons. Stat. §§ 5101-5110; R.I. Gen. Laws §§ 6-16-1 to -12; S.C. Code Ann. §§ 27-23-10; S.D. Codified Laws §§ 54-8A-1 to -12; Tenn. Code. Ann. §§ 66-3-301 to -313; Utah Code Ann. §§ 25-6-1 to -14; Vt. Stat. Ann. tit. 9, §§ 2285-2295; Va. Code Ann. §§ 55-80; Wash. Rev. Code §§ 19.40.011-.903; W. Va. Code §§ 40-1A-1 to -12; Wis. Stat. §§ 242.01-.11; Wyo. Stat. Ann. §§ 34-14-201 to -212.

359.    The transferees accepted the transfers with knowledge that they were giving no or inadequate consideration for the payments or promissory notes with no intention or fact of repayment.

360.    Among other indicators of the Fraudulent Transfer Defendants' actual intent to defraud the funeral homes and consumers, the Fraudulent Transfer Defendants made transfers to insiders, including Defendants Doug Cassity, Tyler Cassity, Brent Cassity, Crawford, Wise, and Lumpkin, all of whom were officers, directors, and/or persons in control of debtors.

361.    The Fraudulent Transfer Defendants made the transfers with no consideration or actual repayment of the transfers, notes or loans, and with the effect of transferring substantially all of NPS', Lincoln's, and Memorial's assets, thus causing those entities' insolvencies.

362.    The Fraudulent Transfer Defendants were indebted to the funeral homes and consumers at the time of making the transfers, as numerous pre-need contracts had been sold and funeral homes were obligated to provide services and merchandise in exchange for payment by NPS.

363.    While making the transfers, the Fraudulent Transfer Defendants continued and intended to incur more debts to the funeral homes and consumers by selling additional NPS pre-need funeral contracts and inducing the funeral homes to provide services and merchandise under the NPS pre-need contracts.

364.    As a result of the Fraudulent Transfer Defendants' conduct, Plaintiffs are entitled to an avoidance of the transfers to the extent of the satisfaction of the Plaintiffs' claims, an attachment against the Fraudulent Transfer Defendants' property, attorney fees, and costs as provided by the fraudulent transfer acts specified above.

## FIFTEENTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty by Officers and Directors

(Against the D&O Defendants)

(Brought by Plaintiff SDR on behalf of NPS, Lincoln, and Memorial)

365.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

366.    At various times relevant to the events detailed in this Complaint, Defendants Sutton, Crawford, Brent Cassity, Nekol Province, Schnieders, and Wittner (individually) were officers and/or directors of NPS.

367.    At various times relevant to the allegations of this Complaint, Defendants Sutton, Lumpkin, Cappleman, Brent Cassity, Tyler Cassity, Nicki Province, Wise, Singer, Hale, Wittner (individually), Jones, and Chrun were officers and/or directors of NPS, Lincoln, and/or Memorial.

368.    As officers and/or directors of NPS, Lincoln, and Memorial, the D&O Defendants (Defendants Sutton, Crawford, Brent Cassity, Tyler Cassity, Nicki Province, Schnieders, Wittner (individually) Lumpkin, Cappleman, Wise, Singer, Hale, Jones, and Chrun) were fiduciaries of NPS, Lincoln, and Memorial, and had duties of care and loyalty to NPS, Lincoln, and Memorial.

369.    The D&O Defendants breached their fiduciary duties of care and loyalty to NPS, Lincoln, and Memorial by, including but not limited to, engaging in the following conduct:

  a)  actively participating in the activity described in the allegations of this Complaint;

  b)  engaging in self-dealing;

c)  failing to ensure that Defendants Wulf and Wulf Bates were "independent" investment advisors of the NPS pre-need trusts, as required by statute;

d)  engaging and continuing to use Defendants Wulf and Wulf Bates as investment advisors of the NPS pre-need trusts despite the apparent and material conflicts of interest of Defendants Wulf and Wulf Bates;

e)  dictating and controlling investment decisions for the NPS pre-need trust funds;

f)  as to Defendant Sutton, acting as an "agent" for Defendants Wulf and Wulf Bates for the NPS pre-need trusts despite Defendant Sutton's significant and material conflicts of interest;

g)  withdrawing and/or allowing the withdrawal of funds from the NPS pre-need trusts without appropriate documentation, without committing or ensuring the commitment to pay back the funds, without paying or ensuring the payment of a reasonable interest rate for the use of trust assets, and without actually repaying or ensuring the actual repayment of the loans from the NPS pre-need trusts;

h)  taking or allowing the taking of millions of dollars in unreasonable and imprudent policy loans on the life insurance policies that had been purchased with NPS pre-need trust funds;

i)  replacing or causing the replacement of the whole life policies issued by Lincoln with term life policies of significantly lower value;

j)  failing to pay or ensuring the payment of premiums on the life insurance policies issued by Lincoln and Memorial;

k) wasting the assets of NPS and the NPS pre-need trusts by causing thousands of life insurance policies to be surrendered and/or lapsed;

l) allowing the fraudulent activity to continue and deplete the assets of NPS, Lincoln, and Memorial to the point of insolvency; and

m) failing to detect the illegal and fraudulent activity described in this Complaint.

370.    The D&O Defendants' breaches of their fiduciary duties left NPS, Lincoln, and Memorial insolvent and unable to honor their commitments to the consumers and to pay the funeral homes for performing funeral services and providing funeral merchandise pursuant to the NPS pre-need funeral contracts.

371.    As a direct and proximate result of the D&O Defendants' breaches of their fiduciary duties of care and loyalty, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

<u>SIXTEENTH CLAIM FOR RELIEF</u>

**Gross Negligence by Officers and Directors**

(Against the D&O Defendants)

(Brought by Plaintiff SDR on behalf of NPS, Lincoln, and Memorial)

372.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

373.    At various times relevant to the events detailed in this Complaint, Defendants Sutton, Crawford, Brent Cassity, Nicki Province, Schnieders, and Wittner (individually) were officers and/or directors of NPS.

374.    At various times relevant to the allegations of this Complaint, Defendants Sutton, Lumpkin, Cappleman, Brent Cassity, Tyler Cassity, Nicki Province, Wise, Singer, Hale, Wittner (individually), Jones, and Chrun were officers and/or directors of NPS, Lincoln, and/or Memorial.

375.    As officers and/or directors of NPS, Lincoln, and Memorial, the D&O Defendants (Defendants Sutton, Crawford, Brent Cassity, Tyler Cassity, Nicki Province, Schnieders, Wittner (individually) Lumpkin, Cappleman, Wise, Singer, Hale, Jones, and Chrun) had duties of care and loyalty to NPS, Lincoln, and Memorial.

376.    The D&O Defendants were grossly negligent by, including but not limited to, engaging in or permitting the following conduct:

a)  failing to ensure that Defendants Wulf and Wulf Bates were "independent" investment advisors of the NPS pre-need trusts, as required by statute;

b)  engaging and continuing to use Defendants Wulf and Wulf Bates as investment advisors of the NPS pre-need trusts despite the apparent and material conflicts of interest of Defendants Wulf and Wulf Bates;

c)  permitting the withdrawal of funds from the NPS pre-need trusts without appropriate documentation, without ensuring a commitment to pay back the funds, without ensuring payment of a reasonable interest rate for the use of trust assets, and without ensuring repayment of the loans from the NPS pre-need trusts;

d)  permitting millions of dollars in unreasonable and imprudent policy loans on the life insurance policies that had been purchased with NPS pre-need trust funds;

e)  permitting the surrenders of whole life policies issued by Lincoln and the subsequent replacement with term life policies of significantly lower value;

f)  failing to pay premiums on the life insurance policies issued by Lincoln and Memorial;

g)  wasting the assets of NPS and the NPS pre-need trusts by causing thousands of life insurance policies to be surrendered and/or lapsed;

h)  allowing the fraudulent activity to continue and deplete the assets of NPS, Lincoln, and Memorial to the point of insolvency; and

i)  failing to detect the illegal and fraudulent activity described in this Complaint.

377.   The D&O Defendants' gross negligence left NPS, Lincoln, and Memorial insolvent and unable to honor their commitments to the consumers and to pay the funeral homes for performing funeral services and providing funeral merchandise pursuant to the NPS pre-need contracts.

378.   As a direct and proximate result of the D&O Defendants' gross negligence, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

<u>SEVENTEENTH CLAIM FOR RELIEF</u>

**Breach of Fiduciary Duty by Investment Advisors**

(Against the Investment Advisor Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

379.   Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

380.    As investment advisors for the NPS pre-need trusts, Defendants Wulf and Wulf Bates were fiduciaries who were responsible for assuring that the NPS pre-need trust funds were preserved, protected, and prudently invested.

381.    Defendants Wulf and Wulf Bates owed fiduciary duties to NPS, as the entity that settled and funded the NPS pre-need trust accounts.

382.    Defendants Wulf and Wulf Bates owed fiduciary duties to the funeral homes and consumers, as the direct or intended third-party beneficiaries of the NPS pre-need trusts.

383.    Defendants Wulf and Wulf Bates breached their fiduciary duties to NPS and to the funeral homes and consumers, including by:

a)  actively participating in the activity described in the allegations of this Complaint;

b)  engaging in self-dealing in violation of the duty of loyalty including using more than $1,000,000 of NPS pre-need trust assets to purchase interests in partnerships owned by Defendant Wulf and in Defendant Forever Enterprises, in which Defendant Wulf owned stock;

c)  failing to prudently invest the NPS pre-need trust funds including the purchase of illiquid assets, stock in companies within the Cassity Consortium, and insurance policies from a single company, Lincoln, that was within the Cassity Consortium and controlled by NPS, Defendant Sutton, and the Cassity family;

d)  designating Defendant Sutton, who had significant and material conflicts of interest that were known to Defendants Wulf and Wulf Bates, as an investment "agent";

e) replacing the whole life policies issued by Lincoln with term life policies of significantly lower value;

f) failing to pay premiums on the life insurance policies issued by Lincoln and Memorial;

g) wasting the assets of NPS and the NPS pre-need trusts by causing thousands of life insurance policies to be surrendered and/or lapsed;

h) allowing Defendants to indiscriminately withdraw funds from the NPS pre-need trusts without appropriate documentation, commitments from the Defendants to repay the funds, or requiring a reasonable interest rate on Defendants' use of the trust funds;

i) abdicating their responsibilities for the NPS pre-need trust funds and allowing the other RICO Defendants to dictate and control investment decisions;

j) failing to maintain adequate independence from NPS as required by the relevant Missouri pre-need statute, and

k) accepting the appointment and continuing to act as investment advisors for the NPS pre-need trusts despite having material conflicts of interest.

384.  As a direct and proximate result of these failures and breaches of their duties, the other RICO Defendants were able to manipulate NPS pre-need trust assets and siphon millions of dollars in value from the trusts, such that the trusts lacked sufficient funds to pay funeral homes for the funeral services and merchandise they were required to provide to their customers.

385.     As a direct and proximate result of Defendants Wulf and Wulf Bates' breaches of their fiduciary duties of care and loyalty, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

386.     Plaintiffs are entitled to punitive damages because Defendants Wulf and Wulf Bates' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

## EIGHTEENTH CLAIM FOR RELIEF

### Gross Negligence by Investment Advisors

(Against the Investment Advisor Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from
Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the
SDR on behalf of NPS, funeral homes, and consumers)

387.     Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

388.     As investment advisors for the NPS pre-need trusts, Defendants Wulf and Wulf Bates were responsible for assuring that the NPS pre-need trust funds were preserved, protected, and prudently invested.

389.     Defendants Wulf and Wulf Bates owed duties of loyalty and care to NPS, as the entity that settled and funded the NPS pre-need trust accounts.

390.     Defendants Wulf and Wulf Bates owed duties of loyalty and care to the funeral homes and consumers, as the direct or intended third-party beneficiaries of the NPS pre-need trusts.

391.    Defendants Wulf and Wulf Bates breached their duties to NPS and to the funeral homes and consumers through their gross negligence in engaging in or permitting the conduct set forth in the immediately preceding claim.

392.    As a direct and proximate result of their gross negligence and breaches of their duties, the other RICO Defendants were able to manipulate NPS pre-need trust assets and siphon millions of dollars in value from the trusts, such that the trusts lacked sufficient funds to pay funeral homes for the funeral services and merchandise they were required to provide to their customers.

393.    As a direct and proximate result of Defendants Wulf and Wulf Bates' gross negligence and breaches of their duties of care and loyalty, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

<u>NINETEENTH CLAIM FOR RELIEF</u>

**Breach of Fiduciary Duty by Trustee Banks**

(Against the Trustee Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

394.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

395.    As trustees of one or more NPS pre-need trusts, the Trustee Defendants or their respective predecessors in interest, were fiduciaries to NPS and were responsible for prudently administering the NPS pre-need trusts in good faith and in accordance with the purposes of the trusts and the interest of the beneficiaries.

396.     The funeral homes that were listed as funeral providers on NPS pre-need contracts and the consumers who provided the funds to be placed in trust were the direct or intended third-party beneficiaries of one or more NPS pre-need trusts at all times material to this claim and thus were owed fiduciary duties by each Trustee Defendant during the time it served as trustee or its respective predecessor in interest served as trustee.

397.     The Trustee Defendants' duties as trustees included controlling and protecting the trust funds, monitoring and accounting for the funds in the trusts, and maintaining adequate records concerning all trust transactions.

398.     The Trustee Defendants breached their fiduciary duties to NPS, the funeral homes, and consumers by, *inter alia:*

a)  permitting the looting of the NPS pre-need trusts through promissory notes and debentures to affiliated entities within the Cassity Consortium and the other schemes set forth in this Complaint;

b)  failing to ensure that the promissory notes were adequately secured by assets, that security interests were properly recorded, and failing to ensure payment of interest due under the promissory notes;

c)  failing to adequately account for the funds in the NPS pre-need trusts;

d)  failing to keep and review adequate records of trust transactions;

e)  "rubber-stamping" the accounting of trust funds presented to them by Defendants Wulf, Wulf Bates, and other RICO Defendants;

f)  failing to independently verify the trust account records;

g)   allowing the RICO Defendants, the Promissory Note Defendants, and/or the Fraudulent Transfer Defendants to indiscriminately withdraw funds from the NPS pre-need trusts without appropriate documentation, commitments from those Defendants to repay the funds, or requiring a reasonable interest rate on those Defendants' use of the trust funds;

h)   failing to ensure that Defendants Wulf and Wulf Bates were "independent";

i)   using or allowing NPS pre-need trust funds to be used primarily to purchase life insurance policies from Lincoln, a company which the Trustee Defendants knew or should have known was closely affiliated with NPS and which was controlled by the same Defendants who controlled NPS;

j)   allowing the RICO Defendants to manipulate the Lincoln policies through policy loans, surrenders, and other means;

k)   failing to ensure the payment of premiums on the life insurance policies held by the NPS pre-need trusts, thus allowing those policies to be surrendered or lapsed; and

l)   violating the "know your customer" rules as set forth in 15 U.S.C. § 78, and 31 U.S.C. § 5318.

399.   As a direct and proximate result of these failures and breaches of their duties, the RICO Defendants, including Defendants Wulf and Wulf Bates, were able to manipulate trust assets and siphon millions of dollars from the NPS pre-need trusts, such that the trusts lacked sufficient assets to provide consumers their pre-paid funeral services.  The Trustee Defendants'

breaches were also a direct and proximate cause of the insolvency of NPS, Lincoln, and Memorial.

400.    If the Trustee Defendants had complied with their duties as trustees, the other Defendants would not have been able to manipulate and improperly withdraw trust assets, and the fraudulent and illegal activities described in this Complaint would have been prevented.

401.    As a direct and proximate result of the Trustee Defendants' breaches of their fiduciary duties of care and loyalty, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

401.1.  Plaintiffs are entitled to punitive damages because the Trustee Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to, or reckless disregard for the rights of others.

401.2.  The Trustee Defendants are jointly and severally liable for the damages caused to Plaintiffs.

TWENTIETH CLAIM FOR RELIEF

**Negligence and Gross Negligence by Trustee Banks**

(Against the Trustee Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

402.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

403.    As trustees of one or more NPS pre-need trusts, the Trustee Defendants or their respective predecessors in interest, were responsible for prudently administering the NPS pre-

need trusts in good faith and in accordance with the purposes of the trusts and the interest of the beneficiaries.

404.    The funeral homes who were listed as funeral providers on NPS pre-need contracts and the consumers who provided the funds to be placed in trust were the direct or intended third-party beneficiaries of one or more NPS pre-need trusts at all times material to this claim and thus were owed duties of care and loyalty by each Trustee Defendants during the time it served as trustee or its predecessor in interest served as trustee.

405.    The Trustee Defendants' duties included controlling and protecting the NPS pre-need trust funds, monitoring and accounting for the funds in the trusts, and maintaining adequate records concerning all trust transactions.

406.    The Trustee Defendants breached their duties to NPS, the funeral homes and consumers through their negligent and grossly negligent conduct as set forth in the immediately preceding claim.

407.    As a direct and proximate result of their negligent and grossly negligent conduct, the RICO Defendants, including Defendants Wulf and Wulf Bates, were able to manipulate trust assets and siphon millions of dollars from the NPS pre-need trusts, such that the trusts lacked sufficient assets to provide consumers their pre-paid funeral services and/or merchandise.  The Trustee Defendants' negligent and grossly negligent conduct was also a direct and proximate cause of the insolvency of NPS, Lincoln, and Memorial.

408.    If the Trustee Defendants had complied with their duties as trustees, the RICO Defendants would not have been able to manipulate and improperly withdraw trust assets, and the fraudulent and illegal activities described in this Complaint would have been prevented.

409.    As a direct and proximate result of the Trustee Defendants' negligence and gross negligence, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

409.1.  The Trustee Defendants are jointly and severally liable for the damages caused to Plaintiffs.

<u>TWENTY-FIRST CLAIM FOR RELIEF</u>

<strong>Aiding and Abetting Breach of Fiduciary Duty by Investment Advisors</strong>

(Against all RICO Defendants except Defendants Wulf and Wulf Bates<br>and the D&O Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from<br>Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the<br>SDR on behalf of NPS, funeral homes, and consumers)

410.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

411.    As set forth in the preceding Breach of Fiduciary Claim against the Investment Advisors, Defendants Wulf and Wulf Bates owed fiduciary duties to NPS and to the funeral homes and consumers, were responsible for ensuring that the Trust assets were prudently invested, protected, and maintained, breached their fiduciary duties to NPS and to the funeral homes and consumers, and caused injury to the Plaintiffs.

412.    The other RICO Defendants and the D&O Defendants knew of Defendants Wulf and Wulf Bates' actions and conduct and knew that it constituted a breach of Defendants Wulf's and Wulf Bates' fiduciary duties.

413.    The other RICO Defendants and the D&O Defendants substantially assisted and encouraged Defendants Wulf and Wulf Bates in the conduct that constituted a breach of their fiduciary duties to the funeral homes, consumers, and NPS, as evidenced by the following:

a)   selecting Defendants Wulf and Wulf Bates to serve as investment advisors even though they knew Wulf and Wulf Bates were not "independent" as required by statute;

b)   selecting and retaining Defendants Wulf and Wulf Bates to serve as investment advisors despite serious conflicts of interest as demonstrated by their investments in Defendant Forever Enterprises (despite Defendant Wulf's ownership), and in partnerships owned by Defendant Wulf;

c)   various Defendants, including Doug Cassity and Sutton, dictated and directed the investment decisions for the NPS pre-need trusts, including the decision to purchase term life policies;

d)   Defendants Wittner, Scannell, Lumpkin, and Doug Cassity drafted letters purporting to be from Defendant Wulf describing and justifying investment decisions; and

e)   Defendant Sutton accepted an appointment as an investment "agent" for Defendants Wulf and Wulf Bates, even though Defendant Sutton was at that same time President of both NPS and Lincoln and therefore conflicted.

414.   As a direct and proximate result of the breach of fiduciary duties and the other RICO Defendants' participation in the breach, Plaintiffs suffered injuries, damages or losses in an amount to be determined at trial.

<u>TWENTY-SECOND CLAIM FOR RELIEF</u>

**Aiding and Abetting Breach of Fiduciary Duty by Trustee Banks**

(Against the RICO Defendants and the D&O Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

415.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

416.    As set forth in the preceding Breach of Fiduciary Claim against the Trustee Defendants, the Trustee Defendants (or their respective predecessors in interest) each served as trustee for the NPS pre-need trusts at various times, owed fiduciary duties to NPS and to the funeral homes and consumers, breached their fiduciary duties to NPS and to the funeral homes and consumers, and caused injury to the Plaintiffs.

417.    The RICO Defendants knew of the Trustee Defendants' actions and conduct and knew that it constituted a breach of the Trustee Defendants' fiduciary duties.

418.    The RICO Defendants substantially assisted and encouraged the Trustee Defendants in the conduct that constituted a breach of their fiduciary duties to the funeral homes, consumers and NPS.

419.    As a direct and proximate result of the breach of fiduciary duties and the RICO Defendants' participation in the breach, Plaintiffs suffered injuries, damages or losses in an amount to be determined at trial.

TWENTY-THIRD CLAIM FOR RELIEF

**Legal Malpractice**

(Against the Attorney Defendants)

(Brought by Plaintiff SDR on behalf of NPS, Lincoln, and Memorial)

420.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

421.    Defendant Wittner acted as general counsel for various entities within the Cassity Consortium—including NPS, Lincoln, and Memorial—beginning at times relevant to the allegations in this Complaint through approximately October 2002.  He continued to act as an outside attorney for various entities within the Cassity Consortium at the law firm of Wittner, Spewak & Maylack, P.C. even after he ceased to be general counsel for the Cassity Consortium entities.

422.    Wittner, individually, and as a member of Wittner, Spewak & Maylack, P.C., had an attorney-client relationship with NPS, Lincoln, and Memorial at all times relevant to the allegations in this claim.

423.    Defendant Scannell was employed by Defendant NHE as the in-house general counsel for most or all entities within the Cassity Consortium—including NPS, Lincoln, and Memorial—from approximately October 2002 until April 2009.

424.    Defendant Scannell had an attorney-client relationship with NPS, Lincoln, and Memorial from approximately October 2002 through April 2009.

425.    The Attorney Defendants provided legal advice authorizing and assisting in the development and implementation of the scheme, as described in this Complaint, including

without limitation taking out policy loans on life insurance policies and surrendering and lapsing life insurance policies.

426.   The Attorney Defendants were negligent and careless and failed to exercise ordinary legal skill in their provision of legal advice to NPS, Lincoln, and Memorial, including by:

a)   failing to advise NPS, Lincoln, and Memorial as to the ramifications of the actions planned and carried out as described in the allegations of this Complaint;

b)   failing to properly research and evaluate the ramifications of those actions;

c)   providing faulty legal advice related to those actions; and

d)   failing to inform NPS, Lincoln, and Memorial of better alternative courses of action.

427.   Because of the negligence and carelessness of the Attorney Defendants and their failure to exercise ordinary legal skill and diligence, the funds of NPS, Lincoln, and Memorial were depleted to the point of insolvency and NPS, Lincoln, and Memorial were placed into a Texas receivership.

428.   If the Attorney Defendants had not been negligent and careless in their work as attorneys for NPS, Lincoln, and Memorial, NPS, Lincoln, and Memorial would have not been left insolvent.

429.   As a direct and proximate result of the Attorney Defendants' negligent and deficient representation and malpractice, Plaintiff SDR suffered injuries, damages or losses in an amount to be determined at trial.

## TWENTY-FOURTH CLAIM FOR RELIEF

**Breach of Fiduciary Duty by Attorneys**

(Against the Attorney Defendants)

(Brought by Plaintiff SDR on behalf of NPS, Lincoln, and Memorial)

430.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

431.    As attorneys for NPS, Lincoln, and Memorial, the Attorney Defendants were fiduciaries who owed duties to those companies, including the duty of loyalty and scrupulous fidelity to the best interests of NPS, Lincoln, and Memorial.  The Attorney Defendants failed to disclose their conflicts of interest and failed to obtain knowing waivers of their conflicts from NPS, Lincoln, and Memorial while representing other parties in the Cassity Consortium.

432.    The Attorney Defendants breached their fiduciary duties to NPS, Lincoln, and Memorial by consenting to, encouraging, and participating in the actions set forth in this Complaint, as evidenced by the following examples of conduct:

a)  Defendants Wittner and Scannell helped drafted letters purporting to be from Defendant Wulf describing and justifying investment decisions, in an attempt to hide the fact that Defendants Wulf and Wulf Bates were not "independent" and that the RICO Defendants were actually directing the investment of pre-need trust funds;

b)  Defendant Scannell participated in the decision to instruct NPS sales agents to inform funeral homes that NPS did not take out policy loans in Ohio or any other state; and

c)   Defendant Scannell approved sending a letter to an Ohio funeral home stating that "NPS has no ownership in the [insurance] policy.  The purchaser is, at all times, the owner of the policy." even though she knew or should have known that NPS systematically took out policy loans under the purported justification of policy ownership.

433.   The Attorney Defendants breached their fiduciary duties to NPS, Lincoln, and Memorial for their own personal gain and advantage, including financial gain.  In doing so, they took undue advantage of their position as attorneys and fiduciaries at the expense of NPS, Lincoln, and Memorial.

434.   Because of the Attorney Defendants' breaches of fiduciary duties, NPS, Lincoln, and Memorial became insolvent and were placed into receivership.

435.   As a direct and proximate result of the Attorney Defendants' breaches of fiduciary duties, Plaintiffs suffered injuries, damages or losses in an amount to be determined at trial.

436.   Plaintiffs are entitled to punitive damages because the Attorney Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

<u>TWENTY-FIFTH CLAIM FOR RELIEF</u>

**Professional Negligence Against Auditors**

(Against Defendant Brown Smith Wallace, L.L.C.)

(Brought by Plaintiff SDR on behalf of Lincoln and Memorial)

437.   Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

438.    Defendant Brown Smith Wallace had an accountant-client relationship with Lincoln and Memorial.  Brown Smith Wallace also owed a duty of care to third parties for whose benefit and guidance it was providing the audit reports and to third parties it knew would receive information from the audit.

439.    As an independent certified public accountant firm, Defendant Brown Smith Wallace was required to exercise a reasonable degree of care and competence in the performance of its services of conducting independent audits.   Brown Smith Wallace certified that it conformed with the standards of the accounting profession as contained in the Code of Professional Conduct and pronouncements of the American Institute of Certified Public Accountants, and the Rules of Professional Conduct of the Missouri Board of Public Accountancy.

440.    Defendant Brown Smith Wallace was negligent and careless and failed to adhere to the requisite standard of care in conducting audits of the financial statements of Lincoln and Memorial.  Brown Smith Wallace's negligence is evidenced by:

   a)  Failing to fully and fairly disclose all relevant facts related to the financial condition of the companies, particularly with respect to the fact and effect of related party transactions;

   b)  Failing to provide an accurate portrayal of the financial condition of the companies, which, if made, would have revealed that Lincoln and Memorial had been rendered insolvent by the RICO, Fraudulent Transfer, and Promissory Note Defendants looting their assets;

    c)  Failing to properly perform the audits in accordance with generally accepted auditing standards;

    d)  Failing to identify or report numerous transactions that depleted the cash value of the policies;

    e)  Failing to confirm changes to policies with independent parties; and

    f)  Failing to review the financial condition of NPS as the premium payor of the insurance policies.

441.    As a result of the negligence of Defendant Brown Smith Wallace, the funds of NPS, Lincoln, and Memorial were depleted to the point of insolvency and NPS, Lincoln, and Memorial were placed into a Texas receivership.

442.    As a direct and proximate result of Brown Smith Wallace's negligence, Plaintiffs suffered injuries, damages or losses in an amount to be determined at trial.

<u>TWENTY-SIXTH CLAIM FOR RELIEF</u>

**Interference with Business Relationships (Tortious Interference with Contract**)

(Against the RICO Defendants)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

443.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

444.    When NPS obtained cash directly from the sale of NPS pre-need funeral contracts, the funeral homes and consumers entered into valid, enforceable contracts with NPS ("NPS Contracts") whereby the funeral homes agreed to provide funeral services and/or

merchandise as described in NPS pre-need contracts in return for payment for those services and/or merchandise from NPS.

445.     When NPS rolled-over funeral homes' pre-need trusts funds, the trust funds were proceeds of funeral homes' valid, enforceable contracts directly with their customers to provide funeral services to them in the future (the "Roll-over Contracts").

446.     The RICO Defendants knew of the existence of the NPS Contracts and Roll-over Contracts at all times material to this claim.

447.     The RICO Defendants' fraudulent, illegal, and tortious conduct described in this Complaint, including the RICO Defendants' siphoning money from NPS, caused NPS to breach its contracts with the funeral homes and the consumers, and the funeral homes to breach their contracts with their customers.

448.     The RICO Defendants' interference was without justification or excuse, and was done through unlawful and improper means, including intentional misrepresentations of fact, fraud, and misappropriation of funds.

449.     Any RICO Defendants employed by or associated with NPS were acting ultra vires and outside the scope of their corporate status when causing NPS to breach its pre-need contracts with the funeral homes.

450.     The acts and conduct of the RICO Defendants directly and proximately caused damage to the funeral homes as a result of the loss of the benefit of the NPS Contract and Roll-over Contracts, together with incidental fees and expenses incurred.

451.     The acts and conduct of the RICO Defendants caused financial damage to the funeral homes, in that the funeral homes are required by law to provide funeral services and

merchandise to beneficiaries of pre-need funeral contracts even though NPS—because of the RICO Defendants' actions—is unable to compensate the funeral homes for those services.

452.    As a direct and proximate result of the RICO Defendants' intentional interference with contract, Plaintiffs suffered injuries, damages or losses in an amount to be determined at trial.

453.    Plaintiffs are entitled to punitive damages because the RICO Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive or reckless indifference to the rights of others.

<u>TWENTY-SEVENTH CLAIM FOR RELIEF</u>

**Conversion**

(Against the RICO Defendants)

(Brought by Plaintiff SDR on behalf of NPS, Lincoln, and Memorial)

454.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

455.    In the Plaintiff SDR's role as representative of the estates of NPS, Lincoln, and Memorial, Plaintiff SDR has a right of ownership and entitlement to the immediate possession of funds paid to NPS under the pre-need funeral contracts.

456.    The pre-need contract and trust funds were placed in the custody of the RICO Defendants for the specific purposes of purchasing insurance policies to fund pre-need contracts, investing funds in pre-need trust accounts for payments on pre-need contracts, and compensating funeral homes for providing services and/or merchandise pursuant to the terms of pre-need contracts.

457.   The RICO Defendants diverted and misappropriated the pre-need contract funds for the other and different purposes of using the funds for their own personal use and different business interests that were in conflict with and unrelated to the purpose of funding pre-need contracts.

458.   The RICO Defendants' misappropriation of the pre-need contract funds deprived Plaintiffs of their possessory rights to the pre-need contract funds.

459.   As a result of the RICO Defendants' conduct, Plaintiffs are entitled to recover the value of the converted funds, plus interest calculated from the time of conversion.

460.   Plaintiffs are entitled to punitive damages because the RICO Defendants' conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive or reckless indifference to the rights of others.

<u>TWENTY-EIGHTH CLAIM FOR RELIEF</u>

**Unjust Enrichment**

(Against the Fraudulent Transfer Defendants and the Trustee Defendants)

(As to the Fraudulent Transfer Defendants:  Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers)

(As to the Trustee Defendants:  Brought by Plaintiff SDR on behalf of NPS)

461.   Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

462.   The Fraudulent Transfer Defendants were enriched and benefited by appropriating payments that NPS received from funeral homes and/or pre-need customers, which funds were intended and legally required to be used to provide funeral services and/or merchandise under the pre-need contracts.   The Fraudulent Transfer Defendants received

benefits in various ways, including through direct payments, indirect payments of credit card bills and other expenses, and loans with below-market interest rates or an indefinitely extended repayment schedule.

463.   The Fraudulent Transfer Defendants were enriched and benefited by appropriating money out of NPS pre-need trusts for their personal use and to purchase assets including residences and funeral homes.

464.   The Fraudulent Transfer Defendants were enriched and benefited when funeral homes "rolled-over" their existing pre-need contract business to NPS.   After funeral homes transferred their pre-need funds to NPS to hold in trust, those funds were siphoned away as described in this Complaint and used to enrich and benefit the Fraudulent Transfer Defendants.

465.   The Fraudulent Transfer Defendants were enriched and benefited by the policy loans that were taken out on insurance policies that insured the lives of pre-need contract beneficiaries.   Money from the policies loans was used to enrich and benefit the Fraudulent Transfer Defendants.   These policy loans diminished the value of the insurance policies, which were intended to be used to pay for funeral services and/or merchandise for the pre-need contract beneficiaries.

466.   The Fraudulent Transfer Defendants recognized, accepted, and retained all these benefits at the funeral homes' and consumers' expense and did not provide equitable recompense to the funeral homes or their customers.

467.   The Trustee Defendants (or their respective predecessors in interest) served as trustees of the NPS pre-need trusts, and other trusts holding NPS pre-need funds, and received substantial fees paid out of the trust assets in exchange for providing trust services.

468.   Because of the Fraudulent Transfer Defendants and the Trustee Defendants' actions, NPS was and is unable to pay the costs for funeral services and merchandise for the funeral home customers.   Because of the Fraudulent Transfer Defendants and the Trustee Defendants' actions, NPS, Lincoln, and Memorial became insolvent and unable to pay benefits under the relevant life insurance policies.

469.   Given the circumstances described in this Complaint—including the fact that the Fraudulent Transfer Defendants and Trustee Defendants directed, encouraged, knew of, and/or facilitated fraudulent and illegal conduct—it would be inequitable and unjust for the Fraudulent Transfer Defendants and the Trustee Defendants to retain the benefits they received at the funeral homes' and consumers' expense.

470.   Plaintiffs are entitled to all lawful and equitable remedies attendant to the Fraudulent Transfer Defendants and the Trustee Defendants' unjust enrichment, including a restitution of all fees, monies, and assets unjustly retained, or converted for the Fraudulent Transfer Defendants' personal use, to the detriment of the funeral homes and their customers, and disgorgement of profits or gains on such fees, monies, and/or assets.

<u>TWENTY-NINTH CLAIM FOR RELIEF</u>

**Money Had and Received**

(Against the Fraudulent Transfer Defendants and the Trustee Defendants)

(As to the Fraudulent Transfer Defendants:  Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers)

(As to the Trustee Defendants:  Brought by Plaintiff SDR on behalf of NPS)

471.   Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

472.    NPS received pre-need contract payments from funeral homes and/or pre-need customers.

473.    NPS received money when funeral homes "rolled-over" their existing pre-need contract business to NPS and transferred their pre-need funds to NPS to hold in trust.  Those funds were to be used to compensate the funeral homes for providing funeral services and/or merchandise under the pre-need funeral contracts.

474.    As described in this Complaint, the money received by NPS was intentionally, fraudulently, and illegally converted and appropriated for the Fraudulent Transfer Defendants' use, including through direct payments, direct loans with below-market interest rates which were not paid back, and policy loans on life insurance policies.

475.    The Trustee Defendants (or their respective predecessors in interest) served as trustees of the NPS pre-need trusts, and other trusts holding NPS pre-need funds, and received substantial fees in exchange for providing trust services.

476.    The Fraudulent Transfer Defendants and the Trustee Defendants thereby received or obtained possession of money which in equity and good conscience belongs to the funeral homes and their customers.

477.    Because of the Fraudulent Transfer Defendants and the Trustee Defendants' actions, NPS was left insolvent and unable to pay the funeral homes for funeral services they provided to customers under pre-need contracts.

478.    Plaintiffs are entitled to all lawful and equitable remedies attendant to the Fraudulent Transfer Defendants and the Trustee Defendants' misconduct, including a restitution

of all such fees, monies, or assets purchased with the monies unlawfully had and received, and disgorgement of profits generated by the fees, monies or assets.

THIRTIETH CLAIM FOR RELIEF

**Constructive Trust**

(Against Defendants Doug Cassity, Rhonda Cassity, Brent Cassity, Tyler Cassity, Randall Sutton, Howard Wittner individually and as Trustee of RBT Trust II, Katherine Scannell, David Wulf, Wulf, Bates and Murphy, Inc., Forever Enterprises, Inc., National Heritage Enterprises, Inc., Lincoln Memorial Services, Inc., Rhonda L. Cassity, Inc. a/k/a Wellstream, Inc., Forever Network, Inc., Forever Illinois, Inc., Hollywood Forever, Inc., Texas Forever, Inc., National Prearranged Services Agency, Inc., Legacy International Imports, Inc., Wise, Mitchell & Associates, Ltd. )

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, Lincoln, Memorial, funeral homes, and consumers)

479.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

480.    The Defendants, through their fraudulent conduct, induced the consumers into paying money to NPS for future funeral services and/or merchandise and funeral homes into entering into agreements by which the funeral homes are obligated to provide services and merchandise under the NPS pre-need contracts without compensation from NPS.

481.    The Defendants wrongfully diverted monies from NPS, Lincoln, and Memorial in violation of their fiduciary, statutory, common law, and contractual obligations and used the proceeds for their personal use and to purchase assets, including residences and funeral homes.

482.    The Defendants have retained property which rightfully belongs to the Plaintiffs.

483.    Plaintiffs request the Court impose a constructive trust on the Defendants' property, including accounts and real and personal property of each individual Defendant, and accounts and property owned by each entity, and order an equitable accounting of such property.

193

THIRTY-FIRST CLAIM FOR RELIEF

**Aiding and Abetting Fraud**

(Against Defendants U.S. Bank, National City Bank, Bremen Bank, Marshall & Ilsley, Southwest Bank, PNC Bank, and BMO Harris Bank)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of funeral homes and consumers)

484.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

485.    As described in this Complaint, Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank:  (a) were aware of the role they played—as trustees of the pre-need trusts—in the schemes to defraud described in this Complaint;  (b) acted with severe recklessness, thus providing substantial assistance to the perpetrators of the fraud describe in this Complaint; and (c) knew of the schemes to defraud described in this Complaint.

486.    Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank actively participated in the schemes to defraud described in this Complaint by providing encouragement and substantial assistance in perpetration of those frauds.  Their participation and assistance included those actions and failures to act described or referred to in this Complaint, including in Counts 19, 20, 31, 32, 33, and 34, and in paragraphs 228.1-228.267.

487.    In addition, their participation and assistance included, but is not limited to, the following:

a) Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank failed to maintain control of all trust assets;

b) Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank failed to retain and keep title to all trust assets;

c) Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank failed to hold, protect, preserve, and conserve trust assets;

d) Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank failed to assure that distributions of trust assets made to NPS and NPS affiliates were permissible under applicable law and the trust agreements;

e) Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank failed to comply with applicable limitations on the distribution of trust income and principal; and

f) Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank failed to properly hold, administer, record, account for, and distribute deposits made into the pre-need trusts.

488.   The encouragement and substantial assistance from Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank enabled the RICO Defendants to develop, execute, and perpetuate the scheme to defraud described in this

Complaint and caused damages to Plaintiffs, which damages were a foreseeable consequence of the  Missouri Trustee Banks' encouragement and assistance.

489.    Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank, and their respective successors in interest, are jointly and severally liable for all damages caused by their misconduct as trustees, whenever arising, because such damages were a reasonably foreseeable consequence of the banks' misconduct.

490.    Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank, and their respective successors in interest, are jointly and severally liable for damages beyond the assets of the NPS pre-need trusts because their misconduct:  (1) aided the RICO Defendants' fraudulent conduct with respect to all the Cassity Consortium's pre-need funeral business; and (2) caused losses beyond the funds, property, and assets included in the pre-need trusts.

491.    As a direct and proximate result of the encouragement and substantial assistance from Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank in perpetration of the fraud, Plaintiffs suffered injuries, damages, or losses in an amount to be determined at trial.

492.    Plaintiffs are entitled to punitive damages because the conduct of Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to, or reckless disregard for the rights of others.

493.    Defendants U.S. Bank, National City Bank, PNC Bank, Bremen Bank, Marshall & Ilsley, Southwest Bank, and BMO Harris Bank are jointly and severally liable for the damages caused by their (or their respective predecessors in interest) aiding and abetting fraud.

494.    Defendants National City Bank and PNC Bank are jointly and severally liable for the damages caused by Defendants Markow and Morisse as officers of Allegiant Trust Company, and Defendant Bremen Bank is jointly and severally liable for the damages caused by Defendant Markow as an officer of Bremen Bank's trust department.

<u>THIRTY-SECOND CLAIM FOR RELIEF</u>

**Aiding and Abetting Breach of Fiduciary Duty by Investment Advisors**

(Against Defendants U.S. Bank, National City Bank, Bremen Bank, Marshall & Ilsley, Southwest Bank, PNC Bank, and BMO Harris Bank)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

495.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

496.    As set forth in Count 17 for Breach of Fiduciary Claim against the Investment Advisors, Defendants Wulf and Wulf Bates owed fiduciary duties to NPS and to the funeral homes and consumers; were responsible for ensuring that the Trust assets were prudently invested, protected, and maintained; breached their fiduciary duties to NPS and to the funeral homes and consumers; and caused injury to the Plaintiffs.

497.    Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank knew of Defendants Wulf and Wulf Bates' misconduct and knew that that misconduct constituted a breach of Defendants Wulf and Wulf Bates' fiduciary duties.

498.    Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank substantially assisted and encouraged Defendants Wulf and Wulf Bates in the conduct that constituted a breach of their fiduciary duties to the funeral homes, consumers, and NPS.  That assistance and encouragement included, but is not limited to:

a)  allowing Wulf and Wulf Bates to serve as investment advisors for the NPS pre-need trusts even though they knew Wulf and Wulf Bates were not "independent" as required by statute;

b)  allowing Wulf and Wulf Bates to serve as investment advisors for the NPS pre-need trusts despite serious conflicts of interest as demonstrated by the investment of pre-need trust assets in Forever Enterprises stock, stock purchased from Forever Enterprises, and partnerships owned by Wulf;

c)  allowing the use of trust assets in ways that were not investment decisions, such as the transfer of trust assets to NPS or NPS affiliates without consideration, paying inflated prices for stock or other assets, taking out policy loans on trust policies, using policy loan proceeds to pay renewal premiums, and transferring policy loan proceeds to NPS or NPS affiliates without consideration;

d)  allowing other Defendants, including Doug Cassity, Brent Cassity, and Sutton, to dictate and direct investment decisions for the NPS pre-need trusts;

e)  failing to inform or warn regulators, NPS, successor trustees, funeral homes, and consumers of the violations of law and fiduciary breaches that they knew of with respect to the trusts;

     f)   as to Allegiant Bank, signing Custody Agreements with Wulf expressly giving up custody and control of trust assets;

     g)   as to Allegiant Bank, helping draft letters signed by Wulf authorizing and directing Allegiant Bank to take direction from NPS and Mt. Washington Forever employees regarding use and disposition of trust assets; and

     h)   as to Bremen Bank, Marshall & Ilsley, and Southwest Bank, allowing other Defendants, including Doug Cassity and Sutton, to direct the surrender or lapse of whole life policies and the purchase of term life policies.

499.    As a direct and proximate result of the breach of fiduciary duties and the participation in the breach by Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank, Plaintiffs suffered injuries, damages or losses in an amount to be determined at trial.

500.    Plaintiffs are entitled to punitive damages because the conduct of Mark Twain Bank, Mercantile Trust Company, Allegiant Bank, Bremen Bank, Marshall & Ilsley, and Southwest Bank was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

501.    Defendants U.S. Bank, National City Bank, PNC Bank, Bremen Bank, Marshall & Ilsley, Southwest Bank, and BMO Harris Bank are jointly and severally liable for the damages caused by their (or their respective predecessors in interest) aiding and abetting the breach of fiduciary duty by investment advisors.

502.    Defendants National City Bank and PNC Bank are jointly and severally liable for the damages caused by Defendants Markow and Morisse as officers of Allegiant Trust Company,

and Defendant Bremen Bank is jointly and severally liable for the damages caused by Defendant Markow as an officer of Bremen Bank's trust department.

<u>THIRTY-THIRD CLAIM FOR RELIEF</u>

**Aiding and Abetting Breach of Fiduciary Duty by Bremen Bank**

(Against Defendants National City Bank and PNC Bank)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

503. Plaintiffs incorporate by reference all allegations contained in this Complaint.

504. As set forth in Count 19 for Breach of Fiduciary Claim by Trustee Banks, Bremen Bank served as trustee for the NPS pre-need trusts, owed fiduciary duties to NPS and to the funeral homes and consumers, breached its fiduciary duties to NPS and to the funeral homes and consumers, and caused injury to the Plaintiffs.

505. National City Bank and PNC Bank (as successors to Allegiant Bank and National City Bank of the Midwest) knew of Bremen Bank's actions and conduct and knew that they constituted a breach of Bremen Bank's fiduciary duties.

506. National City Bank and PNC Bank (as successors to Allegiant Bank and National City Bank of the Midwest) substantially assisted and encouraged Bremen Bank in the conduct that constituted a breach of its fiduciary duties to the funeral homes, consumers, and NPS. That assistance and encouragement included, but is not limited to:

   a) instructing and directing Bremen Bank to operate the trusts as Allegiant Bank had done, in a manner that violated the relevant law and trust agreements;

b)  failing to inform or warn Bremen Bank of the violations of law and fiduciary breaches that Allegiant Bank knew of with respect to the trusts; and

c)  failing to inform or warn NPS, regulators, or the trust beneficiaries of the violations of law and fiduciary breaches that Allegiant Bank knew of with respect to the trusts.

507.    As a direct and proximate result of Bremen Bank's breach of fiduciary duties and the participation in the breach by National City Bank and PNC Bank (as successors to Allegiant Bank and National City Bank of the Midwest), Plaintiffs suffered injuries, damages or losses in an amount to be determined at trial.

508.    Plaintiffs are entitled to punitive damages because the conduct of Allegiant Bank was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

509.    Defendants National City Bank and PNC Bank are jointly and severally liable for the damages caused by their (or Allegiant Bank's) aiding and abetting the breach of fiduciary duty by Bremen Bank.

510.    Defendants National City Bank and PNC Bank are jointly and severally liable for the damages caused by Defendants Markow and Morisse.

## THIRTY-FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Breach of Fiduciary Duty by Bremen Bank**

(Against Defendants Marshall & Ilsely, Southwest Bank, and BMO Harris Bank)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

511.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

512.    As set forth in Count 19 for Breach of Fiduciary Claim by Trustee Banks, Bremen Bank served as trustee for the NPS pre-need trusts, owed fiduciary duties to NPS and to the funeral homes and consumers, breached its fiduciary duties to NPS and to the funeral homes and consumers, and caused injury to the Plaintiffs.

513.    Marshall & Ilsley and Southwest Bank knew of Bremen Bank's actions and conduct and knew that they constituted a breach of Bremen Bank's fiduciary duties.

514.    Marshall & Ilsley and Southwest Bank substantially assisted and encouraged Bremen Bank in the conduct that constituted a breach of its fiduciary duties to the funeral homes, consumers, and NPS.  That assistance and encouragement included, but is not limited to:

   a)   failing to inform or warn Bremen of the violations of law and fiduciary breaches that Marshall & Ilsley and Southwest Bank knew of with respect to the trusts;

   b)   failing to inform or warn NPS, regulators, or the trust beneficiaries of the violations of law and fiduciary breaches that Marshall & Ilsley and Southwest Bank knew of with respect to the trusts;

   c)   accepting direction from the RICO Defendants to transfer some NPS pre-need trusts and trust assets back to Bremen Bank, even though Marshall & Ilsley and

Southwest Bank knew that Bremen had not met its obligations while previously serving as trustee; and

d) accepting direction from the RICO Defendants to transfer some NPS pre-need trusts and trust assets back to Bremen Bank, even though Marshall & Ilsley and Southwest Bank knew or should have known that Bremen would continue to operate the trusts in the same manner that it had operated them previously.

515.    As a direct and proximate result of Bremen Bank's breach of fiduciary duties and the participation in the breach by Marshall & Ilsley and Southwest Bank, Plaintiffs suffered injuries, damages or losses in an amount to be determined at trial.

516.    Plaintiffs are entitled to punitive damages because the conduct of Marshall & Ilsley and Southwest Bank was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

517.    Defendants Marshall & Ilsley, Southwest Bank, and BMO Harris Bank are jointly and severally liable for the damages caused by their aiding and abetting the breach of fiduciary duty by Bremen Bank.

<u>THIRTY-FIFTH CLAIM FOR RELIEF</u>

**Negligence**

(Against Defendant Richard Markow)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

518.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

519. During the period in which Allegiant Bank served as trustee for the NPS pre-need trusts, Markow was an officer of Allegiant Bank.

520. During the period in which Bremen Bank served as trustee for the NPS pre-need trusts, Markow was an officer of Bremen Bank.

521. As an officer of the trustee for the NPS pre-need trust accounts, Markow personally had duties of care to NPS and the funeral homes and consumers that were beneficiaries of the NPS pre-need trusts. Those duties included but were not limited to the use of reasonable care in the exercise of his powers and the performance of his duties as an officer and compliance with governing law, including Missouri and Iowa statutes.

522. While at Allegiant Bank and Bremen Bank, Markow breached those duties.

523. As set forth in Counts 19 and 20 and the general factual allegations of this Complaint, Allegiant Bank and Bremen Bank's conduct was also negligent and/or grossly negligent. Markow knowingly participated in the negligent and/or grossly negligent conduct of Allegiant Bank and Bremen Bank.

524. As a direct and proximate result of Markow's negligence and his knowing participation in Allegiant Bank and Bremen Bank's negligent and/or grossly negligent conduct, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

525. Markow is jointly and severally liable for the injuries, damages, or losses caused by Allegiant Bank and Bremen Bank.

## THIRTY-SIXTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

(Against Defendant Richard Markow)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

526.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

527.    As an officer of Allegiant Bank and Bremen Bank—trustees for the NPS pre-need trusts—Markow personally had fiduciary duties to NPS, the funeral homes, and consumers.

528.    Through his actions and omissions as an officer of Allegiant Bank and Bremen Bank, Markow breached his fiduciary duties to NPS, the funeral homes, and consumers.

529.    As a direct and proximate result of the breach of Markow's duties, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

530.    Plaintiffs are entitled to punitive damages because the conduct of Defendant Markow was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

## THIRTY-SEVENTH CLAIM FOR RELIEF

### Participation in a Breach of Trust Duties and Aiding and Abetting Breach of Fiduciary Duties

(Against Defendant Richard Markow)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

531.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

532.    Allegiant Bank and Bremen Bank committed various breaches of trust duties, including but not limited to breaching their fiduciary, common law, and statutory duties to NPS, funeral homes, and consumers.

533.    Markow assisted, facilitated, aided, furthered, and participated in Allegiant Bank and Bremen Bank's breaches of trust duties.

534.    Markow knew he was assisting, facilitating, aiding, furthering, and participating in Allegiant Bank and Bremen Bank's breaches of trust duties.

535.    Markow provided substantial assistance in Allegiant Bank and Bremen Bank's breaches of trust duties.

536.    As a direct and proximate result of Markow's substantial assistance and participation in the breaches of trust duties, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

537.    Plaintiffs are entitled to punitive damages because the conduct of Defendant Markow was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

538.    Markow is jointly and severally liable for the injuries, damages, or losses caused by Allegiant Bank and Bremen Bank.

## THIRTY-EIGHTH CLAIM FOR RELIEF

**Aiding and Abetting Fraud**

(Against Defendant Richard Markow)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of funeral homes and consumers)

539.     Plaintiffs incorporate by reference all allegations contained in this Complaint.

540.     As described in this Complaint, Markow:  (a) was aware of the role he played—as an officer of Allegiant Trust Company and an officer of Defendant Bremen Bank—in the schemes to defraud described in this Complaint; (b) acted with severe recklessness, thus providing substantial assistance to the perpetrators of the fraud describe in this Complaint; and (c) knew of the schemes to defraud described in this Complaint.

541.     Markow actively participated in the schemes to defraud described in this Complaint by providing encouragement and substantial assistance in perpetration of those frauds. His participation and assistance included those actions and failures to act described or referred to in this Complaint, including in paragraphs 228.203-228.267.

542.     The encouragement and substantial assistance from Markow enabled the RICO Defendants to develop, execute, and perpetuate the scheme to defraud described in this Complaint and caused damages to Plaintiffs, which damages were a foreseeable consequence of Markow's encouragement and assistance.

543.     As a direct and proximate result of the encouragement and substantial assistance from Markow in perpetration of the fraud, Plaintiffs suffered injuries, damages, or losses in an amount to be determined at trial.

544.     Plaintiffs are entitled to punitive damages because Markow's conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to, or reckless disregard for the rights of others.

545.     Markow is jointly and severally liable for the injuries, damages, or losses caused by Allegiant Bank and Bremen Bank.

THIRTY-NINTH CLAIM FOR RELIEF

**Negligence**

(Against Defendant Herbert Morisse)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

546.     Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

547.     During the period in which Allegiant Bank served as trustee for the NPS pre-need trusts, Morisse was an officer of Allegiant Bank.

548.     As an officer of Allegiant Bank, the trustee for NPS pre-need trust accounts, Morisse personally had duties of care to NPS and the funeral homes and consumers that were beneficiaries of the NPS pre-need trusts. Those duties included but were not limited to the use of reasonable care in the exercise of his powers and the performance of his duties as an officer and compliance with governing law, including Missouri and Iowa statutes.

549.     While at Allegiant Bank, Morisse breached those duties.

550.    As set forth in Counts 19 and 20 and the general factual allegations of this Complaint, Allegiant Bank's conduct was also negligent and/or grossly negligent.  Morisse knowingly participated in the negligent and/or grossly negligent conduct of Allegiant Bank.

551.    As a direct and proximate result of Morisse's negligence and his knowing participation in Allegiant Bank's negligent and/or grossly negligent conduct, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

552.    Morisse is jointly and severally liable for the injuries, damages, or losses caused by Allegiant Bank.

<u>FORTIETH CLAIM FOR RELIEF</u>

**Breach of Fiduciary Duty**

(Against Defendant Herbert Morisse)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

553.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

554.    As an officer of Allegiant Bank—trustee for NPS pre-need trusts—Morisse personally had fiduciary duties to NPS, the funeral homes, and consumers.

555.    Through his actions and omissions as an officer of Allegiant Bank, Morisse breached his fiduciary duties to NPS, the funeral homes, and consumers.

556.    As a direct and proximate result of the breach of Morisse's duties, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

557.    Plaintiffs are entitled to punitive damages because the conduct of Defendant Morisse was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

FORTY-FIRST CLAIM FOR RELIEF

**Participation in a Breach of Trust Duties and
Aiding and Abetting Breach of Fiduciary Duties**

(Against Defendant Herbert Morisse)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas; and the SDR on behalf of NPS, funeral homes, and consumers)

558.    Plaintiffs incorporate by reference each and every allegation contained in this Complaint.

559.    Allegiant Bank committed various breaches of trust duties including but not limited to breaching its fiduciary, common law, and statutory duties to NPS, funeral homes, and consumers.

560.    Morisse assisted, facilitated, aided, furthered and participated in Allegiant Bank's breaches of trust duties.

561.    Morisse knew he was assisting, facilitating, aiding, furthering, and participating in Allegiant Bank's breaches of trust duties.

562.    Morisse provided substantial assistance in Allegiant Bank's breaches of trust duties.

563.    As a direct and proximate result of Morisse's substantial assistance and participation in the breaches of trust duties, Plaintiffs have suffered injuries, damages, or losses in an amount to be determined at trial.

210

564.    Plaintiffs are entitled to punitive damages because the conduct of Defendant Morisse was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to or reckless disregard for the rights of others.

565.    Morisse is jointly and severally liable for the injuries, damages, or losses caused by Allegiant Bank.

## FORTY-SECOND CLAIM FOR RELIEF

### Aiding and Abetting Fraud

(Against Defendant Herbert Morisse)

(Brought by Plaintiffs NOLHGA; the individual state guaranty associations from
Missouri, Texas, Illinois, Kansas, Oklahoma, Kentucky, and Arkansas;
and the SDR on behalf of funeral homes and consumers)

566.    Plaintiffs incorporate by reference all allegations contained in this Complaint.

567.    As described in this Complaint, Morisse:  (a) was aware of the role he played—as an officer of Allegiant Trust Company—in the schemes to defraud described in this Complaint; (b) acted with severe recklessness, thus providing substantial assistance to the perpetrators of the fraud describe in this Complaint; and (c) knew of the schemes to defraud described in this Complaint.

568.    Morisse actively participated in the schemes to defraud described in this Complaint by providing encouragement and substantial assistance in perpetration of those frauds. His participation and assistance included those actions and failures to act described or referred to in this Complaint, including in paragraphs 228.203-228.267.

569.    The encouragement and substantial assistance from Morisse enabled the RICO Defendants to develop, execute, and perpetuate the scheme to defraud described in this

Complaint and caused damages to Plaintiffs, which damages were a foreseeable consequence of Morisse's encouragement and assistance.

570.    As a direct and proximate result of the encouragement and substantial assistance from Morisse in perpetration of the fraud, Plaintiffs suffered injuries, damages, or losses in an amount to be determined at trial.

571.    Plaintiffs are entitled to punitive damages because Morisse's conduct was malicious, willful, wanton, intentional, and outrageous, evidencing evil motive, reckless indifference to, or reckless disregard for the rights of others.

572.    Morisse is jointly and severally liable for the injuries, damages, or losses caused by Allegiant Bank and Bremen Bank.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs seek the following remedies:

1) Damages in an amount to be proven at trial, including but not limited to compensatory and consequential damages;

2) Treble damages under RICO, 18 U.S.C. §§ 1961 *et seq.* and the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a);

3) Restitution;

4) The imposition of a constructive trust on all monies provided by the funeral homes and/or consumers to the Defendants and all assets acquired with such funds;

5) Equitable accounting, including accounting to Plaintiffs for any and all gains, profits, and advantages derived by Defendants from the conduct in violation of 15 U.S.C. § 1125(a) and all of Plaintiffs' litigation expenses, including reasonable attorney fees and the costs of this action;

6) An avoidance of the transfers to the extent of the satisfaction of the Plaintiffs' claims, an attachment against the Defendants' property, attorney fees, and costs as provided by the fraudulent transfer acts specified above;

7) Injunctive relief preventing the sale or disposition of Defendants' assets acquired through the diversion of funds from NPS, Lincoln, and Memorial;

8) A finding of alter ego status for the Cassity Consortium entities, including but not limited to, Defendants Howard Wittner as trustee for the RBT Trust II, National Heritage Enterprises, Inc., Forever Enterprises, Inc., Lincoln Memorial Services,

Inc., Doug Cassity, Rhonda Cassity, Brent Cassity, and Tyler Cassity, and joint and several liability imposed for the damages caused by their actions;

9) A finding of joint and several liability on any and all causes of action and against any Defendants where permitted by law;

10) Punitive damages on any and all causes of action permitting such damages;

11) Attorney fees and costs incurred in prosecuting this action;

12) Pre-judgment and post-judgment interest as provided by statute;

13) Additional and/or alternative relief as the Court may deem to be just, equitable and appropriate.

Dated this 30th day of April, 2012.

Respectfully submitted,


_____*s/ Wendy B. Fisher*_____
Daniel M. Reilly (Admitted *Pro Hac Vice*)
Larry S. Pozner, E.D. Missouri Bar No. 2792CO
Wendy B. Fisher (Admitted *Pro Hac Vice*)
Glenn E. Roper (Admitted *Pro Hac Vice*)
Clare S. Pennington (Admitted *Pro Hac Vice*)
Farrell A. Carfield (Admitted *Pro Hac Vice*)
Reilly Pozner LLP
1900 16th Street, Suite 1700
Denver, CO 80202
(303) 893-6100

Maurice B. Graham, Bar No. 3257
Morry S. Cole, Bar No. 77854
Gray, Ritter & Graham, P.C.
701 Market Street, Suite 800
St. Louis, MO 63101
(314) 241-5620

Attorneys for Plaintiffs Jo Ann Howard and
Assocs., P.C., Special Deputy Receiver of Lincoln
Memorial Life Insurance Company, Memorial
Service Life Insurance Company, and National
Prearranged Services, Inc.; the National
Organization of Life and Health Insurance Guaranty
Associations; the Missouri Life & Health Insurance
Guaranty Association; the Texas Life & Health
Insurance Guaranty Association; the Illinois Life &
Health Insurance Guaranty Association; the Kansas
Life & Health Insurance Guaranty Association;
Oklahoma Life & Health Insurance Guaranty
Association; the Kentucky Life & Health Insurance
Guaranty Association; and the Arkansas Life &
Health Insurance Guaranty Association.

## CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2012, the foregoing THIRD AMENDED COMPLAINT was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

Adam Goffstein
Email: adam@goffsteinlaw.com
Adam M. Goffstein, LLC
7777 Bonhomme Avenue, Suite 1910
St. Louis, MO 63105
*Attorney for Defendant Katherine Scannell*

Bogdan Rentea
Email: brentea@rentealaw.com
Rentea & Associates
1002 Rio Grande
Austin, TX 78701
*Attorney for Defendant
Lennie J. Cappleman*

Bruce A. Lipshy
Email: blipshy@lipshylaw.com
Law Offices of Bruce A. Lipshy
812 San Antonio St., Suite 105
Austin, TX 78701
*Attorney for Marianne Jones*

Brent D. Cassity
E-mail: bcassity@winghavencc.com
528 West Polo Drive
Clayton, MO 63105
*Defendant, pro se*

Danielle E. deBenedictis
Email: Ddeb95@aol.com
deBenedictis, Miller & Blum, P.A.
95 Commercial Wharf
Boston, MA 02110
*Attorney for Rhonda L. Cassity, Inc., a/k/a
Wellstream, Inc.*

Burton H. Shostak
Email: bshostak@shostaklawfirm.com
Shostak & Shostak, LLC
The Berkley Building
8015 Forsyth Boulevard
St. Louis, MO 63105
*Attorney for Defendant Randall K. Sutton*

Jeffrey T. Demerath
Email: jdemerath@armstrongteasdale.com
Christopher R. LaRose
Email: clarose@armstrongteasdale.com
Armstrong Teasdale LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, MO 63105-1847
*Attorneys for Defendants Southwest Bank and
Marshall & Ilsley Trust Company, N.A.*

Mike W. Bartolacci
Email: mbartolacci@thompsoncoburn.com
Kimberly M. Bousquet
Email: kbousquet@thompsoncoburn.com
Amanda J. Hettinger
Email: ahettinger@thompsoncoburn.com
Thompson Coburn, LLP
One US Bank Plaza, Suite 26
St. Louis, MO 63101
*Attorneys for Defendant National City Bank*

Sandra J. Wunderlich
Email: swunderlich@stinson.com
Stinson Morrison Hecker, LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105-1821
*Attorneys for Defendant U.S. Bank, N.A.*

Darren S. Enenstein
Email: dse@enensteinlaw.com
David Z. Ribakoff
Email: dribakoff@enensteinlaw.com
Robert A. Rabbat
Email: rrabbat@enensteinlaw.com
Enenstein & Ribakoff, APC
233 Wilshire Blvd., Suite 900
Santa Monica, CA 90401
*Attorneys for Defendants Tyler Cassity and Hollywood Forever, Inc.*

David B. Cosgrove
Email: dcosgrove@cosgrovelawllc.com
Kurt J. Schafers
Email: kschafers@cosgrovelawllc.com
Cosgrove Law, LLC
Magna Place
1401 S. Brentwood Blvd., #560
St. Louis, MO 63144
*Attorneys for Defendant Anne Chrun*

David H. Luce
Email: dhl@carmodymacdonald.com
Meghan M. Lamping
Email: mml@carmodymacdonald.com
Carmody MacDonald P.C.
120 S. Central Ave., Suite 1800
St. Louis, MO 63105
*Attorneys for Defendant Michael R. Butler*

Firmin A. Puricelli
Email: firminap@gmail.com
Law Offices of Firmin A. Puricelli
120 South Central Ave., Ste. 130
St. Louis, MO 63105-1705
*Attorney for Defendants Forever Enterprises, Inc., Forever Network, Inc., Forever Illinois, Inc., Texas Forever, Inc., Lincoln Memorial Services, Inc., National Heritage Enterprises, Inc., National Prearranged Services Agency, Inc., Legacy International Imports, Inc., and Brentwood Heritage Properties, L.L.C*

E. Calvin Matthews, IV
Email: ecm@gpslegal.com
Jim J. Shoemake
Email: jjs@gpslegal.com
Deborah J. Westling
Email: djw@gpslegal.com
Eric M. Walter
Email: emw@gpslegal.com
Guilfoil Petzall & Shoemake, L.L.C.
100 South Fourth Street, Suite 500
St. Louis, MO 63102-1821
*Attorneys for Defendant Randall K. Sutton*

Deirdre C. Gallagher
Email: dgallagher@foleymansfield.com
Foley & Mansfield PLLP
1001 Highlands Plaza Drive West, Suite 400
St. Louis, MO 63110
*Attorney for Defendant J. Tyler Cassity and Hollywood Forever, Inc.*

Gary E. Snodgrass
E-mail: snodgrass@pspclaw.com
Steven J. Hughes
E-mail: hughes@pspclaw.com
Jaime N. Ott
E-mail: ott@pspclaw.com
Pitzer Snodgrass, P.C.
100 South Fourth Street, Suite 400
St. Louis, Missouri 63102
*Attorneys for Defendant Brown Smith Wallace, L.L.C.*

Donald W. Holcomb
Email: dwh@khkclaw.com
Knolle and Holcomb
7600 N. Capital of Texas Highway
Building B, Suite 110
Austin, TX 78731
*Attorney for Wise, Mitchell and Associates*

James M. Golden
Email:  jgolden@dykema.com
Richard E. Gottlieb
Email: rgottlieb@dykema.com
Renee L. Zipprich, *pro hac vice*
Email: rzipprich@dykema.com
Jeffrey E. Jamison
Email: jjamison@dykema.com
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, IL  60606
*Attorneys for Defendant Comerica Bank & Trust, N.A.*

Joseph P. Whyte
Email: jwhyte@whytelawfirm.com
The Whyte Law Firm
P.O. Box 440236
2025 South Brentwood Blvd., Suite 102
St. Louis, MO  63144-0236
*Attorney for Defendant Comerica Bank & Trust, N.A*

Kerri K. Fields
Email: kerrikfields@1stcounsel.com
          kerrikfieldslaw@msn.com
P. O. Box 1089
Bastrop, TX  78602
*Attorney for George Wise, III*

Michael Jesse Carlson
 Email:  mcarlson@wc.com
Paul M. Wolff
Email:  pwolff@wc.com
Grace L. Hill
Email:  ghill@wc.com
J. Andrew Keyes
Email:  akeyes@wc.com
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
*Attorney for Defendant National City Bank*

Jay L. Kanzler Jr.
Email:  jaykanzler @wkllc.com
Witzel Kanzler Kenney Dimmitt & Kanzler LLC
2001 S. Big Bend Boulevard
St. Louis, MO  63117
*Attorney for Defendant American Stock Transfer and Trust Company*

Thomas Cummings
Email: tcummings@armstrongteasdale.com
Jonathan D. Valentino
Email: jvalentino@armstrongteasdale.com
Armstrong Teasdale LLP
One Metropolitan Square, Suite 2600
St. Louis, MO  63102-2740
*Attorneys for Defendant Bremen Bank and Trust Company*

Jonathan F. Andres
Email: andres@stlouislaw.com
Green Jacobson, P.C.
7733 Forsyth Boulevard, Suite 700
Clayton, MO  63105
*Attorneys for Defendants Wulf and Wulf, Bates & Murphy, Inc.*

Joseph L. Green
Email: joe@josephgreenlaw.com
The Law Firm of Joseph Green
#1 McBride and Sons Center Dr., Ste. 225A
Chesterfield, MO 63005
*Attorney for Defendant Nekol Province*

Perry Brandt
Email: perry.brandt@bryancave.com
Jeffrey A. Ziesman
Email: jeff.ziesman@bryancave.com
Timothy J. Davis
 Email:  tim.davis@bryancave.com
Bryan Cave, LLP
3500 One Kansas City Place, 1200 Main Street
Kansas City, MO  64105
*Attorney for Defendant Bank of America, N.A*

John Mark Hongs
Email:  jhongs@hinshawlaw.com
Hinshaw & Culbertson LLP
Gateway One
701 Market Street, Suite 1300
St. Louis, MO   63101-1843
*Attorney for Defendant Comerica Bank &*
*Trust, N.A.*

Steven M. Cohen
Email: scohen@bcbslaw.com
Berger, Cohen & Brandt, L.C.
8000 Maryland Ave., Suite 1550
Clayton, MO  63105
*Attorneys for Defendant Roxanne J.*
*Schnieders (Sargent)*

Steven A. Muchnick
Email: steven.muchnick@usdoj.gov
Office of U.S. Attorney
111 S. Tenth Street, 20th Floor
St. Louis, MO 63102

Paul Simon, Jr.
Email: pas@sauerwein.com
William L. Sauerwein
Email: wls@sauerwein.com
Sauerwein Simon, PC
147 N. Meramec
St. Louis, MO 63105
*Attorneys for Defendants*
*Howard A. Wittner, individually and as*
*Trustee of the RBT Trust II and*
*Wittner, Spewak & Maylack, PC*

I hereby certify that on April 30, 2012,  the foregoing was mailed by United States Postal Service
to the following non-participants in Electronic Case Filing:

Randall J. Singer
10833 Forest Circle Dr.
St. Louis, MO  63128
*Pro se*

James M. Crawford
418 Pine Bend Drive
Chesterfield, MO  63005
*Pro se*

J. Douglas Cassity
P.O. Box 16220
St. Louis, MO  63105
*Pro se*

Tony B. Lumpkin, III
6508 Cuesta Trail
Austin, TX  78730
*Pro se*

                  *s/ Wendy B. Fisher*
_____
Wendy B. Fisher
(Admitted *Pro Hac Vice*)

Attorney for Plaintiffs