# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| JO ANN HOWARD AND ASSOCIATES, P.C., SPECIAL DEPUTY RECEIVER OF LINCOLN MEMORIAL LIFE INSURANCE COMPANY, MEMORIAL SERVICE LIFE INSURANCE COMPANY, AND NATIONAL PREARRANGED SERVICES, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> J. DOUGLAS CASSITY; RANDALL K. SUTTON; BRENT D. CASSITY; J. TYLER CASSITY; RHONDA L. CASSITY; ET AL., <br><br> Defendants. | Case No. 09-CV-1252-ERW |

## PLAINTIFFS' OPPOSITION TO THE IOWA TRUSTEES' MOTIONS TO EXCLUDE TESTIMONY FROM DR. JONATHAN ARNOLD

### INTRODUCTION

Plaintiffs retained Dr. Jonathan Arnold, an economist with an M.B.A. and Ph.D. from the University of Chicago, to offer an opinion regarding the amount of Plaintiffs' damages caused by the Iowa Trustees. In reaching his opinions, Dr. Arnold considered and analyzed hundreds of documents and databases compiling the data from tens of thousands of preneed contracts and life insurance policies. After considering these voluminous records, Dr. Arnold submitted a detailed expert report containing numerous exhibits, submitted errata clarifying the bases for those opinions, and sat through a two-day deposition to answer all questions posed by counsel for the various defendants, including Bank of America and Comerica (the "Iowa Trustees").

Despite Dr. Arnold's detailed explanations of his methodologies in both his report and at his deposition, the Iowa Trustees seek to exclude his opinions on the ground that he failed to explain those methodologies. Unable to cite to a single question Dr. Arnold was unable to answer as to how he arrived at his opinions, the Iowa Trustees characterize Dr. Arnold's answers and supporting documents as conclusory. Notwithstanding this characterization, the Iowa Trustees have access to all the source materials Dr. Arnold used in developing his opinion, but chose not to produce experts providing alternative damages figures for Plaintiffs' economic losses.

After arguing that Dr. Arnold's opinions should be excluded because they are too complex for Bank of America to understand what he did, it then argues that Dr. Arnold's opinions should be excluded because they are so simple they will be of no use to the jury. Dr. Arnold explained in detail the algorithm he employed to generate the damages numbers he assessed against the Iowa Trustees, which involved inputs relating to all the preneed contracts sold in Iowa during the relevant trusteeship periods. Even if this were a simple calculation, which it is not, the compilation of all this data would be of great use to the jury and should not be excluded. The Iowa Trustees' arguments for exclusion are, at best, arguments about the weight the fact-finder should give to Dr. Arnold's testimony. His opinions regarding the Iowa Trustees are helpful to a jury and should be admitted.[1]

## BACKGROUND

### I. The Iowa Trustees

Bank of America and Comerica were among the six trustees of funds paid by Iowa consumers on NPS pre-need contracts. These funds were held in a trust account (the "NPS

---

[1] Plaintiffs' response addresses the Iowa Trustees' arguments found in two separate motions, one filed by BOA [ECF Nos. 1744-45], and the other filed by Comerica [ECF Nos. 1830-31].

Iowa Trust") that originated at BOA and then was passed from trustee to trustee, including to Comerica. [ECF No. 916 (Third Amended Complaint) ¶¶ 80, 82]. The Iowa Trustees breached their duties to the NPS Iowa Trust beneficiaries in multiple ways. In accepting the trust, they failed to properly conduct due diligence or even understand the governing law. They allowed substantially all of the funds in the trust to be invested in life insurance policies issued by Lincoln Memorial Life Insurance Company, an affiliate of NPS, in violation of the prohibition on investing "directly or indirectly, in a seller's business operations."[2] IOWA CODE § 523A.203(6)(c). They treated the NPS Iowa Trust as a simple custody account and allowed NPS employees to direct investment decisions and the disposition of trust assets. They also failed to keep "a detailed listing of the amount deposited in trust for each beneficiary" and "a separate accounting of each purchaser's principal, interest, and income," thus eliminating their ability to understand how NPS was using trust assets. *Id.* § 523A.203(3).

While BOA was trustee of the NPS Iowa Trust, NPS approached it about also becoming trustee of its Missouri trusts. At that point BOA finally conducted a rating analysis of Lincoln and its parent Memorial, concluding that "[n]either one of the companies are rated by Moodys, Best[,] or Standard and Poors because of their smaller size." Ex. E at 1. BOA decided to both reject the NPS Missouri business and resign from the NPS Iowa Trust, due to "the assets of the trust - life insurance policies issued by NPS' captive 'too-small-too-rate' [sic] life insurance company - and a [sic] inability to get comfortable with the administrative duties of the trust." Ex. F at 1. In resigning, BOA failed to warn anyone of its concerns or problems with the NPS Iowa Trust that led to its resignation.

---

[2] Lincoln and Memorial were owned by NPS's sister company Forever Enterprises. Forever Enterprises and NPS were owned by National Heritage Enterprises. [ECF No. 916 ¶¶ 56-57].

Comerica, which was trustee of the NPS Iowa Trust from 2004 to 2006, [ECF No. 916 ¶ 82], likewise breached its duties with respect to that trust. Although Comerica recognized that Lincoln was an affiliate of NPS and dependent on NPS for "[m]ost of [its] premiums," Ex. G, it never investigated further into Lincoln's financial health or the propriety of investing substantially all trust assets in Lincoln life insurance policies. Comerica also allowed Randy Sutton—President of *both* NPS and Lincoln—to direct trust transactions and investments in the NPS Iowa Trust.

With the Iowa Trustees turning a blind eye, the RICO Defendants were able to perpetrate a fraud that has cost Plaintiffs—the life insurance guaranty associations of numerous states and the Special Deputy Receiver for NPS, Lincoln, and Memorial—hundreds of millions of dollars.

## II.   Dr. Arnold's Damage Calculations

Dr. Arnold calculated and described how all of Plaintiffs' losses related to NPS pre-need contracts issued in Iowa should be allocated to the various periods for which the Iowa Trustees acted as trustee of the NPS Iowa Trust. As to pre-need contracts for which funds were placed in the NPS Iowa Trust, Dr. Arnold stated in his report:

- "The damages during Bank of America's trustee period was $469,343." Ex. A (Expert Report of Jonathan Arnold) ¶ 130.

- "The economic loss during Comerica Bank's trustee period was $3,350,826." *Id.* ¶ 131.

- "[T]he losses that occurred subsequent to each trustee's trusteeship period (which would have not occurred in the absence of . . . each bank trustee's improper actions (or absence of proper actions)) are $9,806,661 [as to Bank of America] . . . [and] $8,934,502 [as to Comerica]." *Id.* ¶ 132.

In an errata to his report, Dr. Arnold further described how losses related to all Iowa pre-need contracts, including those for which funds were not placed in the NPS Iowa Trust, should

4

be allocated to each of the different trustee periods, including the periods for which BOA and Comerica were trustees:

> I understand that the plaintiffs will establish that the trustees of the Iowa Trust are responsible for all the losses on Iowa-originated contracts. The losses sustained on Iowa-originated contracts (including contracts whose proceeds were not placed into the Iowa Trust) total $21,373,960. $1,785,000 of the losses derives from Bank of America's trustee period; $1,235,650 occurred during STC's trustee period; $955,551 occurred during the American Stock Transfer trustee period; $5,874,552 occurred during Comerica's trustee period; $2,127,715 occurred during the Marshall & Ilsley trustee period; and $9,395,491 occurred during Bremen Bank's trustee period.

Ex. B (Errata Sheet for Expert Report of Jonathan Arnold) at 2.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-92 (1993). "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and "the rule clearly is one of admissibility rather than exclusion." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (quotations omitted). Expert testimony is admissible under Rule 702 if it meets three prerequisites: (1) "evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact"; (2) "the proposed witness must be qualified to assist the finder of fact"; and (3) "the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.* (citations and quotations omitted); *see also Kinergy Corp. v. Conveyor Dynamics Corp.*, No. 4:01CV00211 ERW, 2003 WL 26110512, at *7 (E.D. Mo. Oct. 14, 2003) (Webber, J.) ("[*Lauzon*] is an excellent reference for cases reviewed under *Daubert*."). Because Rule 702 favors admissibility, "[o]nly if the expert's

5

opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Doe v. City of St. Louis*, No. 4:10-CV-2158-JAR, 2012 WL 1134032, at *1 (E.D. Mo. Apr. 4, 2012) (quoting *United States v. Coutentos*, 651 F.3d 809, 820 (8th Cir. 2011)).

## ARGUMENT

I. **Dr. Arnold Adequately Explained His Methodology in His Report and at His Deposition**

"An expert must have a reasonable factual basis for his testimony and his conclusions must be based on reliable methods." *Burroughs v. Mackie Moving Sys. Corp.*, No. 4:07CV1944MLM, 2010 WL 1254630, at *6 (E.D. Mo. Mar. 24, 2010) (citing Fed. R. Evid. 702, 703). Expert testimony is therefore reliable under Rule 702 when the expert reviews items germane to the case, such as pleadings, depositions, business records, and other relevant data, and provides opinions based on experience and specialized knowledge. *See Kinergy*, 2003 WL 26110512, at *10 (expert that reviewed the relevant documents and data "had sufficient basis to come to his conclusions" and any shortcomings went "to the weight of his conclusion[s]," not their admissibility); *Certain Underwriters at Lloyd's v. SSDD, LLC*, No. 4:13-CV-193, 2014 WL 3097284, at *7 (E.D. Mo. July 7, 2014); *see also Burroughs*, 2010 WL 1254630, at *7.

In his report and at his deposition, Dr. Arnold thoroughly explained his methodology and the sources he used in evaluating damages caused by the Iowa Trustees. He used NPS's massive electronic pre-need contract database, together with Plaintiffs' loss records, to identify and calculate the losses related to NPS pre-need contracts issued in Iowa. Although the Iowa Trustees are each responsible for all of those losses, Dr. Arnold alternatively allocated these losses to each of the Iowa Trustees' periods as trustee. Ex. A ¶¶ 130-32; Ex. B at 2. In addition to describing this methodology, Dr. Arnold also produced the underlying spreadsheets and other

6

data showing the sources of his calculations. *See* Ex. C at 1-3. This is sufficient explanation to satisfy the requirements of Rule 702 and Dr. Arnold should be allowed to present his damages analysis to the jury.

Dr. Arnold's report explained his basic methodology in the context of an alternative analysis of damages caused by the Missouri trustees. Specifically, he used an NPS computer database (the "Contract Tracking System")[3] to identify pre-need contracts that originated during each bank's tenure as trustee and measured the amount of Plaintiffs' losses—both those that have been paid and those that will be paid in the future—emerging from each trustee period:

> My examination of the Contract Tracking System shows that many millions of dollars of contracts originated during the trusteeship of each separate Missouri trustee. I examined the contracts from each trustee period and measured the amount of loss (paid and unpaid) that emerged from each trustee period. I then prorated all other forms of economic loss (as well as offsets) to each trustee period based on the relative magnitude of the contract losses.

Ex. A at 39, n.78.

At his deposition, Dr. Arnold made clear that he applied this same methodology with respect to damages caused by the Iowa Trustees. Dr. Arnold testified that he identified the NPS contracts for which funds were placed in the NPS Iowa Trust, then determined the amount of Plaintiffs' losses attributable to those contracts:

> Q: Okay. I want to figure out how you came to that number [the economic loss during Comerica's trustee period]. So can you explain to me how you arrived at that specific number?

---

[3] The Contract Tracking System ("CTS") is a complex database containing voluminous information regarding each of the NPS pre-need contracts. A complete electronic copy of the CTS database was made available to the Iowa Trustees in connection with the production of Dr. Arnold's report.

> A: Yes. . . . So the loss that I attribute to Comerica is computed by identi -- this measure of loss attributed to Comerica is measured by taking the Iowa-based contracts that are related to the Iowa trust that originated during the period of Comerica's trusteeship of the Iowa bank.
>
> There are actual losses that have emerged from that set of contracts. Then there are also contracts that are still open and the actual -- actuarial value has been taken of -- of those still open contacts.
>
> In addition, I then take the portion of other -- other costs and contracts that are attributable or that are part of the overall damages scheme and allocate the rateable portion of them to Iowa and then in particular to Comerica's trustee period.

Ex. D at 506:12-507:6; *see also id.* 513:16-22 ("I'm looking at contracts that were issued during [each Iowa trustee's tenure] in asking how many dollars of paid losses have emerged from those -- that set of contracts, [and] how many dollars of actuarial value is associated with contracts that are still open associated with that period."). Dr. Arnold further testified that he applied the same methodology as to NPS pre-need contracts issued in Iowa for which funds were not placed in the NPS Iowa Trust. *Id.* at 594:15-596:1. Finally, Dr. Arnold explained the basis for his allocation to the different trustee periods of a portion of Plaintiffs' losses related to other costs:

> Q: All right. And I think you've talked about this some earlier, but with respect to page two of Exhibit 8, the category "Others" under Comerica Bank in column two, what does that indicate?
>
> A: That reflects the other sources of economic loss that total $18,481,094 across the entirety of the economic losses that I described in Exhibit 7 as amended. Iowa is seven percent of the action here, so if you take seven percent of that 18 million roughly, you'll get 1.3 million roughly.
>
> That $1.3 million of other losses is then allocated to the pre-trustee period, trustee period, and post trustee period for each of the banks in this table.

8

> Q: You said Iowa is seven percent of the action. I know you talked about that a little bit yesterday, but I didn't quite understand. How did you come up with the seven percent?
>
> A: Iowa's -- the losses on contract -- on policy-backed contracts relating to Iowa are seven percent of the losses on policy-backed contracts.

*Id.* at 526:25-527:21. Although the above discussion took place under questioning by counsel for Comerica, Dr. Arnold testified that he used the same methodology with respect to BOA that he applied to Comerica. *Id.* at 514:1-6 ("It's the same process all the way through."). BOA's claim that Dr. Arnold "fails to provide any methods for calculating damages against BOA or the other Iowa Trustees," [ECF No. 1745 at 4], simply ignores Dr. Arnold's description of his methods.

Using the above-described methodology, Dr. Arnold was able to determine numerical values which were the factual basis for his ultimate damages analysis. Dr. Arnold then testified that he used the Statistical Analysis Software ("SAS") program, a common tool among economists, to calculate the damages attributable to the Iowa Trustees' periods as trustee. Ex. D at 511:18-512:1; 512:12-17. This explanation was a sufficiently detailed description of his methodology to allow the Iowa Trustees to "examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quotation omitted).

In addition to explaining his methodology, Dr. Arnold provided the Iowa Trustees with supporting documents showing the time periods he used for each Iowa trustee, Ex. A at Ex. 5, and the underlying calculation spreadsheets supporting his conclusions, Ex. C. BOA's claim that this latter spreadsheet is "nothing more than the 'output'" of Dr. Arnold's analysis [ECF No. 1745 at 6] is contradicted by the document itself as well as Dr. Arnold's testimony. The spreadsheet lists the number of policies associated with each Iowa trustee, the losses attributable

to those policies, and the amount of economic loss created before, during and after each trustee period. Ex. C. Dr. Arnold further explained the spreadsheet at his deposition:

> Q: What is entailed in doing the work to prepare this Exhibit Number 8 [the calculation spreadsheet] over this five to ten hours up to a day and a half?
>
> A: Taking the original data set, identifying Iowa contracts, distinguishing between the ones that went into a trust, those that did not go into a trust, obviously double-checking those numbers to make sure that they're correct, and doing internal consistency checks to make sure that you're pulling the data from the entire data set.
>
> Then next would be calculating the other costs, the percent that's attributable to Iowa, preparing the spreadsheet on page two of Arnold 8, and doing the allocation in the pre, during, and post trustee period for each Iowa trustee bank.
>
> Then aggregating those data into the first page of Arnold 8 and then having somebody do an audit and review who's independent of the process to make sure that there's no mistake, and then writing it up and inserting it into the report.

Ex. D at 519:25-520:23.

BOA's claim that Dr. Arnold's spreadsheet "fails to show from where these underlying numbers were attained or calculated," [ECF No. 1745, at 6], similarly fails upon a simple review of the document. The spreadsheet specifically lists its sources as (1) the CTS Data, (2) a file identifying the dates of each Iowa Trustee's tenure, and (3) "GA Policy Listing 3.31.14.xlsx," which is a listing of Lincoln and Memorial policies for which the guaranty associations are providing coverage. Ex. C at 2. Each of these underlying data sources were provided or made available to the Iowa Trustees in connection with Dr. Arnold's report. Despite having access to this data and an explanation of Dr. Arnold's methodology, the Iowa Trustees have chosen not to designate experts to provide a competing calculation that would undermine Dr. Arnold's loss

figures, and are instead inappropriately seeking to prevent Dr. Arnold from being able to express his opinions to a jury.

BOA mistakenly argues that Dr. Arnold should only be allowed to express a damages opinion based on BOA's "trustee records." [ECF No. 1745 at 5 ("Having not reviewed any of BOA's trustee records, Dr. Arnold should not be allowed to opine on supposed damages that resulted from BOA's trusteeship.")]. By "trustee records," BOA apparently means the trust statements that it prepared and issued while it was trustee. *See id.* (quoting Ex. D at 535:25-536:21). Unsurprisingly, BOA cites no authority in support of this position; nor does it cite to any evidence that its trust statements are a reliable, let alone mandatory, source for information an expert could use to evaluate the damages caused by BOA's breaches. One of Plaintiffs' contentions is that the Iowa Trustees' statements failed to properly reflect the true value of trust assets; Plaintiffs' expert can hardly then be expected to base his opinions on those same statements. [*See* ECF No. 916 ¶¶ 228.157-228.159]. Dr. Arnold detailed in his report the sources of his data and calculations. To the extent that BOA's trustee records have any relevance to Dr. Arnold's opinions as to the damages caused by BOA's breaches of duty, the documents he did or did not review are proper topics for cross-examination. *Bonner*, 259 F.3d at 929-30.

II.  **Dr. Arnold's Opinions Are Helpful for the Jury to Understand the Damages Caused by the Iowa Trustees' Failure to Meet Their Duties With Respect to Thousands of Preneed Contracts and Insurance Policies**

Expert testimony is useful and relevant when it helps juries understand complex issues presented to them for disposition. *Kinergy*, 2003 WL 26110512, at *9; *Lemmon v. Wyeth, Inc.*, No. 4:04CV01302 ERW, 2012 WL 2848671, at *5 (E.D. Mo. July 11, 2012) (Webber, J.) (expert testimony regarding defendant's net worth was helpful in "advanc[ing] the jury's

11
1912939

understanding" of pertinent factual issues in the case, such as whether to award punitive damages). Expert testimony is admissible where it addresses evidence that is "sufficiently technical and complex to be outside the common knowledge or experience of a jury." *Bryant v. Laiko Int'l Co.*, No. 1:05CV00161 ERW, 2006 WL 2788520, at *9 (E.D. Mo. Sept. 26, 2006) (quoting *Eppler v. Ciba-Geigy Corp.*, 860 F. Supp. 1391, 1394-95 (W.D. Mo. 1994)). To make that determination, courts "engage in a case-by-case, common-sense determination of whether the untrained layman would be qualified to determine intelligently the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Anderson v. Bristol, Inc.*, 936 F. Supp. 2d 1039, 1066 (S.D. Iowa 2013) (internal quotation marks, alterations, and citation omitted).

Federal courts have also recognized that experts can be used to "help[] . . . the trier of fact in understanding evidence that is simply difficult, [though] not beyond ordinary understanding." *United States v. Downing*, 753 F.2d 1224, 1229 (3d Cir. 1985) (quotation omitted). Thus, even if individual pieces of the underlying evidence would be within a layperson's comprehension, an expert may be used to distill and aggregate evidence. *See, e.g.*, *Total Control Inc., v. Danaher Corp.*, 338 F. Supp. 2d 566, 569 (E.D. Pa. 2004) ("[W]hile any individual calculation performed by [the expert] may appear simple and straightforward, . . . his ability to present a vast quantity of calculations derived from disparate sources in an understandable format will assist the jury."); *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 4008822, at *5–6 (W.D. Wash. Aug. 5, 2013) (admitting expert accountant's conclusions based on his review and summary of legal billing invoices); *Quad/Graphics, Inc. v. One2One Commc'ns, LLC,* 09–CV–99–JPS, 2011 WL 4478440, at *3 (E.D. Wis. Sept. 23, 2011)

1912939

(admitting testimony of expert accountant who "reviewed underlying documents for mathematical accuracy, traced information to other documents including cost-sharing spreadsheets and invoices, and went over the materials with [client] officials"). Rule 702 contains no requirement that a proffered expert "make *complicated* mathematical calculations," *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011).

As explained above, Dr. Arnold analyzed and extracted information from various sources to generate his damages calculations as to the Iowa Trustees. This entailed reviewing and processing data from CTS and the guaranty associations' policy listings to determine (1) which contracts were issued in Iowa, (2) which contracts had proceeds deposited into the NPS Iowa Trust, (3) whether Plaintiffs have suffered paid losses under each contract or whether an actuarial value for the contract should be used to determine economic loss on that contract, (4) which bank trustee period each contract is attributable to, and (5) the portion of Plaintiffs' other losses, as well as offsets, that should be attributed to the Iowa contracts and the Iowa Trustees' time periods. This process goes well beyond "simple arithmetic," as claimed by BOA [ECF No. 1745 at 7]. Rather, it required Dr. Arnold to make numerous decisions relating to these inputs that require explanation that only he, as the expert, can give. These analyses are beyond the common ability of laypersons, and Dr. Arnold's testimony will be of great help to the jury.

Although Dr. Arnold's final damages calculation necessarily involves addition and subtraction, his determination of which numbers to add or subtract—and the derivation of those numbers—is a clear application of expertise that will assist the jury in coming to its conclusions. BOA is entitled to cross-examine Dr. Arnold as to the wisdom of the decisions he made, but his opinions are not excludable just because BOA believes they were too simple. Although an expert

1912939

need not "make *complicated* mathematical calculations," *WWP, Inc.*, 628 F.3d at 1040, Dr. Arnold's analysis is sufficiently complex that it is needed to assist the jury in reaching its damages decision.

BOA cites *Triad Capital Mgmt., LLC v. Private Equity Capital Corp.*, No. 07 C 3641, 2010 WL 10076450, at *3 (N.D. Ill. Nov. 22, 2010), for the proposition that expert testimony is inadmissible when only simple arithmetic is involved because a "jury can do simple math and read." In *Triad*, however, the expert had "merely read a sentence" from a stock purchase agreement that contained the values about which the expert testified. *Id.* In contrast, Dr. Arnold's analysis entailed precisely the sort of determinations that are admissible because they are helpful to the jury.

BOA's reliance on *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, No. 3:09cv1546 (MRK), 2010 WL 2978289 (D. Conn. Apr. 9, 2010), is similarly misplaced. In *Master-Halco*, an expert calculated damages by adding two numbers he was provided and multiplying them by an interest rate. *Id.* at *3. The court excluded the expert's opinion because "[t]here is absolutely no reason why the jury cannot do this for itself; in fact, juries do these types of calculations all the time." *Id.* In contrast, Dr. Arnold selected values to include in the damages calculation by analyzing a massive, complex database and a large spreadsheet, then writing SAS program code to extract the relevant data. Where the jury in *Master-Halco* could add numbers together and multiply the total by an interest rate, the jury in this case could not, without the help of Dr. Arnold's testimony, review data related to thousands of preneed contracts and insurance policies and arrive at a damages calculation for BOA. Dr. Arnold's damages testimony will be useful to the jury in this case and is admissible under *Lauzon* and Rule 702.

**III. Comerica's Motion to Exclude Dr. Arnold Fails for the Same Reasons BOA's Motion Should Be Denied**

On October 31, Comerica filed its own motion to exclude Dr. Arnold. [ECF No. 1830]. The memorandum in support of the motion contains only one and a half pages of argument with no citation to legal authority. [*See* ECF No. 1831, at 6-7]. Comerica does not appear to make any argument that is distinct from arguments made by BOA or the Missouri Trustees, whose arguments will be addressed in a separate response brief filed today. Comerica's argument that Dr. Arnold did not adequately identify the bases of his calculations, *id.* at 6 ("It appears Dr. Arnold has done nothing more than add up the amounts provided to him by plaintiffs regarding what plaintiffs have paid or will have to pay on pre-need contracts and then arbitrarily assign a portion to Comerica"), has been addressed above. Comerica's argument that other opinions of Dr. Arnold's are based on incorrect legal assumptions, *id.* at 7 ("Comerica has no liability for amounts that were not paid over or received by it"; "Comerica bears no responsibility for contracts that were not only never provided to it but never placed in the Iowa Trust"), will be addressed in Plaintiffs' response to the Missouri Trustees' motions to bar Dr. Arnold's testimony.

Comerica's brief and unsupported argument section raises no new arguments and Comerica's motion to exclude should be denied for the reasons discussed above.

## CONCLUSION

For the reasons stated above, as well as for the reasons set forth in a related pleading filed today by Plaintiffs (Plaintiffs' Consolidated Response in Opposition to the Missouri Trustees' Motions to Strike or Exclude Portions of the Expert Testimony of Dr. Jonathan Arnold), the Iowa Trustees' motions should be denied.

15

1912939

Dated this 10th day of November, 2014.

Respectfully submitted,

    *s/ Wendy B. Fisher*
Daniel M. Reilly (Admitted *Pro Hac Vice*)
Larry S. Pozner, E.D. Missouri Bar No. 2792CO
Wendy B. Fisher (Admitted *Pro Hac Vice*)
Glenn E. Roper (Admitted *Pro Hac Vice*)
Clare S. Pennington (Admitted *Pro Hac Vice)*
Farrell A. Carfield (Admitted *Pro Hac Vice*)
Lauren G. Jaeckel (Admitted *Pro Hac Vice*)
Sean Connelly (Admitted *Pro Hac Vice*)
Michael P. Robertson (Admitted *Pro Hac Vice*)
Michael T. Kotlarczyk (Admitted *Pro Hac Vice*)
Dru R. Nielsen (Admitted *Pro Hac Vice*)
Ashley D. Morgan (Admitted *Pro Hac Vice*)

Reilly Pozner LLP
1900 16th Street, Suite 1700
Denver, CO 80202
(303) 893-6100


Maurice B. Graham, Bar No. 3257
Morry S. Cole, Bar No. 77854
Gray, Ritter & Graham, P.C.
701 Market Street, Suite 800
St. Louis, MO 63101
(314) 241-5620

Attorneys for Plaintiffs Jo Ann Howard and Associates, P.C., in its capacity as Special Deputy Receiver of Lincoln Memorial Life Insurance Company, Memorial Service Life Insurance Company, and National Prearranged Services, Inc.; the National Organization of Life and Health Insurance Guaranty Associations; the Missouri Life & Health Insurance Guaranty Association; the Texas Life & Health Insurance Guaranty Association; the Illinois Life & Health Insurance Guaranty Association; the Kansas Life & Health Insurance Guaranty Association; Oklahoma Life & Health Insurance Guaranty Association; the Kentucky Life & Health Insurance Guaranty Association; and the Arkansas Life & Health Insurance Guaranty Association

16

# CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2014, the foregoing **PLAINTIFFS' OPPOSITION TO THE IOWA TRUSTEES' MOTIONS TO EXCLUDE TESTIMONY FROM DR. JONATHAN ARNOLD** was filed electronically with the Clerk of Court and served by operation of the Court's electronic filing system upon all counsel of record in this case participating in Electronic Case Filing.

I hereby further certify that on November 10, 2014, the foregoing was sent by United States Postal Service or by electronic means, as indicated below, to the following non-participants in Electronic Case Filing:

| | |
|---|---|
| Tony B. Lumpkin, III<br>2806 Horseshoe Bend Cove<br>Austin, TX 78704<br>*Pro se* | David R. Wulf, *Pro se*<br>Register # 38227-044<br>FCI Terre Haute<br>Federal Correctional Institution<br>Satellite Camp<br>P.O. Box 33<br>Terre Haute, IN 47808 |
| Sharon Nekol Province, *Pro se*<br>Register # 36759-044<br>FMC Carswell<br>Federal Medical Center<br>P.O. Box 27137<br>Fort Worth, TX 76127 | Randall K. Sutton, *Pro Se*<br>Register Number 36549-044<br>Rochester Federal Medical Center<br>P.O. Box 4000<br>Rochester, MN 55903 |
| Brent Douglas Cassity, *Pro se*<br>Register # 38224-044<br>USP Leavenworth<br>U.S. Penitentiary Satellite Camp<br>P.O. Box 1000<br>Leavenworth, KS 66048 | James Douglas Cassity, *Pro se*<br>Register # 02005-045<br>USP Marion<br>U.S. Penitentiary<br>Satellite Camp<br>P.O. Box 1000<br>Marion, IL 62959 |

                *s/ Wendy B. Fisher*
                Wendy B. Fisher
                (Admitted *Pro Hac Vice*)
                Attorney for Plaintiffs