JO ANN HOWARD             )
ASSOCIATES, P.C., *et al.*,      )
                               )
       Plaintiffs,          )
                               )
       vs.                 )      Case No. 4:09CV01252 ERW
                               )
J. DOUGLAS CASSITY, *et al.,*     )
                               )
       Defendants.       )

## MEMORANDUM AND ORDER

This matter comes before the Court upon "Defendants National City Bank, U.S. Bank, National Association, and BMO Harris Bank's Motion for Partial Summary Judgment"[1] [ECF No. 1761] and "Defendants National City Bank and U.S. Bank, National Association's Joinder in Part in BMO Harris Bank's Motion for Partial Summary Judgment" [ECF No. 1788].

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This litigation arises out of proceedings instituted by the Texas Department of Insurance in Travis County, Texas, in which National Prearranged Services, Inc. ("NPS"), Lincoln Memorial Life Insurance Company ("Lincoln"), and Memorial Service Life Insurance Company ("Memorial") were placed in receivership and are currently in the process of being liquidated. Plaintiffs, in this litigation, are Jo Ann Howard and Associates, P.C., acting on behalf of NPS, Lincoln, and Memorial, as Special Deputy Receiver ("SDR") in connection with the Texas receivership proceedings; the National Organization of Life and Health Guaranty Associations

---

[1] BMO Harris Bank is no longer a party to this case, as such its participation in this motion is mooted.

("NOLHGA")[1]; and the individual state life and health insurance guaranty associations of Arkansas, Illinois, Kansas, Kentucky, Missouri, Oklahoma, and Texas. These individual guaranty associations, as well as those represented by NOLHGA, are statutory entities created by state legislatures to provide protection for resident policyholders in the event that a member insurance company becomes insolvent. Plaintiffs represent that these state guaranty associations have been assigned or subrogated to the claims of funeral homes and consumers arising out of dealings with NPS through (1) each state guaranty association's enabling act; (2) the NPS / Lincoln / Memorial Liquidation Plan approved by the Texas Receivership Court on September 22, 2008; or (3) express assignments received from recipients of death benefits paid by a state guaranty association.

Prior to the institution of the Texas proceedings, NPS was in the business of selling pre-need funeral service contracts, which were sold to consumers through funeral homes. Lincoln and Memorial were issuers of life insurance policies. NPS represented to these consumers that the necessary funds would be available when the pre-need beneficiary died and the funeral home's claim became due. In accordance with state law, this process was accomplished in certain states by requiring the purchaser to simultaneously apply for a life insurance policy, in this case many policies were issued by Lincoln or Memorial in an amount corresponding to the amount of the pre-need contract. In other states, the pre-need trust itself purchased the life insurance policies.

---

[1] NOLHGA represents the interests of the state life and health insurance guaranty associations of Arizona, California, Colorado, the District of Columbia, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Washington, West Virginia, Wisconsin, and Wyoming.

On May 3, 20, 2012, Plaintiffs herein filed their Third Amended Complaint, asserting a wide variety of claims against various defendants, including, but not limited to, claims for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968, violations of the Lanham Act, 15 U.S.C. §§ 1051-1141n, state law claims concerning intentional and negligent fraudulent misrepresentations, negligence and gross negligence, breach of fiduciary duties, and violations of the Texas Receivership Act, Tex. Ins. Code §§ 443.202-443.205 [ECF No. 916]. The Third Amended Complaint alleges the fraudulent scheme's ultimate goal was to siphon funds away from NPS, Lincoln, and Memorial for the personal use of certain defendants, a scheme that ultimately left more than $600 million in liabilities to be satisfied by the SDR and the state life and health guaranty association Plaintiffs.

There were over forty defendants named in Plaintiffs' Third Amended Complaint, with varying degrees of alleged involvement in what Plaintiffs characterize as a scheme to defraud individual consumers and funeral homes in the sale of NPS's pre-need funeral contracts. Many of these defendants have since been dismissed. National City Bank and U.S. Bank, National Association ("the Missouri Trustees") are requesting summary judgment on several issues including: (1) the extent of damages for which the Trustees can be held responsible under the law; (2) who is a beneficiary of the trusts; (3) liability for the investment advisor's decision to invest trust assets in Lincoln life insurance policies; (4) liability for conduct preceding their trusteeships; (5) establishment of claimed damages; and (6) claims related to the Mount Washington and CSA Trusts. The undisputed facts are as follows.

For over twenty-nine years, NPS sold pre-need contracts in nineteen states.[2]  Mark Twain Bank/Mercantile Trust Company[3] served as trustee of various NPS Pre-Need trusts from February 1989 until March 1999 [ECF No. 1763].[4]  Mark Twain/Mercantile served as trustee of the Mason Securities Association d/b/a Funeral & Cremation Society of America ("CSA") Pre-Need Trust from January 1995 until February 1998.  Allegiant[5] served as trustee for various NPS Pre-Need Trusts from August 1998 until May 2004.[6]  Allegiant served as trustee of the CSA trust from February 1998 until May 2004 and as trustee for the Mount Washington Forever Pre-Need Trust from April 2000 until May 2004 [ECF No. 1763].

Before accepting the trusts, neither Mark Twain nor Allegiant reviewed the terms of the pre-need contracts.  Mark Twain did not investigate NPS or its founder to discover Doug Cassity was a convicted felon.  Allegiant failed to learn NPS was subject to a consent judgment with the Missouri Attorney General's Office.  Allegiant administered the trusts in the same manner Mercantile did and did not learn the premium terms of the life insurance policies, the relationship between NPS and Lincoln, the value of the life insurance assets, or the recordkeeping requirements of the trusts [ECF No. 1952].

David Wulf's firm, Wulf Bates & Murphy, was selected as the investment advisor for the NPS trusts in 1988 and continued as the trusts' investment advisor until 2008 [ECF No. 1763].  Wulf Bates & Murphy was founded by David Wulf, Charles Bates, and John Murphy in 1985 or 1986.  Throughout the time period Wulf Bates & Murphy was investment advisor for the trusts,

---

[2] NPS did not sell in all nineteen states for the 29-year period.  At the height of the company, it was selling in nineteen states.
[3] U.S. Bank is the successor to Mark Twain Bank and Mercantile Trust Company.
[4] Mark Twain/Mercantile was trustee of Trust I from December 1996-August 1998, Trust II from February 1989-August 1998, Trust III from July 1989-August 1998, Trust IV from February 1994-August 1998, and Trust V from July 1996-March 1999.
[5] National City and PNS Bank, N.A. are the successors to Allegiant Bank.
[6] Allegiant served as trustee of Trust I-IV from August 1998-May 2004 and Trust V from March 1999-May 2004.

they were registered as an investment advisor with the U.S. Securities and Exchange Commission and David Wulf as registered with the Financial Industry Regulatory Authority. NPS was not Wulf Bates & Murphy's only client. No Cassity family member or any Missouri Trustee had an ownership stake in Wulf Bates & Murphy. The firm hired its own attorneys, paid its own taxes and leased its own office space. However, Wulf Bates & Murphy did rent office space from NPS beginning in 1999 and joined NPS' health insurance plan but paid for the insurance itself.

In 1999, Wulf Bates & Murphy signed a letter purportedly authorizing NPS to send investment directions to the Trustees. The Trustees were sent wire transfer requests from NPS employees and approved by Randall Sutton, the president of NPS. NPS also sent copies of the requests to David Wulf. These wire requests were never denied by Mark Twain or Mercantile and were automatically processed by Allegiant [ECF No. 1952].

NPS approved the purchase of Lincoln life insurance policies for the trust assets [ECF No. 1763]. Mr. Sutton signed, on behalf of NPS, a Custody Agreement, permitting NPS to keep physical custody of the life insurance policies held by the trusts.[7] Lincoln sent a monthly certification to the trustee of the Missouri trusts stating the trust was the owner and beneficiary of the insurance policies held in the trusts and listing the policies held by the trusts.[8] Mr. Sutton directed policy loans be taken on the insurance policies held by the Missouri trusts.[9] Allegiant was informed of these requests on the wire transfer documents describing the transaction as "POL LOAN" [ECF No. 1952].

---

[7] Plaintiffs dispute the effect of this agreement and whether it was enforceable or valid.
[8] Plaintiffs dispute this occurred every month and dispute the policies were held by the trusts.
[9] The Missouri Trustees allege Mr. Wulf participated in this but Plaintiffs assert he did not play any role.

Distributions of trust principal to NPS affiliates were also authorized by NPS [ECF No. 1763]. Mr. Sutton signed letters instructing the trustees to distribute the net income in the trust accounts and to report the face value of the policies held in the trusts. Mr. Sutton directed Allegiant to purchase shares of stock on behalf of a trust from a Forever Enterprises Custody account and dictated the price to be paid. These letters were also signed by Brent Cassity and David Wulf.

David Wulf testified he never issued directions relating to insurance premiums or took steps to manage the individual life insurance policies held by the trusts. He also testified he did not direct wire transfers from the trusts related to premium payments, transfers to NPS or NPS's affiliated companies; these were all directed by Randy Sutton [ECF No. 1952].

Assets from the Missouri trusts were transferred to Memorial to reimburse Memorial for administrative costs Memorial incurred on NPS's behalf and to pay premiums on Memorial life insurance policies. Assets were also transferred to pay premiums on non-Missouri life insurance policies. Approximately $2.5 million was also transferred out of the trusts to Hollywood Forever. Approximately $4.6 million was transferred out of the trusts to Lincoln Memorial Services, a company owned by the Cassity family. Numerous other transactions occurred which transferred money from the Missouri trusts to companies outside of Missouri. Brent Cassity, the Chief Operating Officer of NPS testified in an affidavit, NPS's operations in Missouri were "critical" to the company's continued existence. Allegiant also accepted deposits into the trusts from Lincoln and Memorial from policy loan proceeds taken on life insurance policies from other states than Missouri. These funds were used to pay premiums on Missouri life insurance policies [ECF No. 1952].

The grantor of the CSA trust is Mason Securities Association [ECF No. 1763]. The grantor of the Mt. Washington Forever trust is Mt. Washington Forever, LLC. The SDR is not the receiver for Mason Securities Association or for Mt. Washington Forever, LLC.

Between 1979 and 2008, $1.383 billion in pre-need contracts were sold by NPS nationwide. Approximately $533 million of these sales occurred in Missouri. Until 2008, when the companies went into receivership, all claims for funeral services were paid. Plaintiffs' expert on damages quantified damages assuming the banks could have stopped the entire scheme, thus, he allocated all of the economic loss damages to each trustee. These damages include amounts for all payments on all insurance policies issued by Lincoln and Memorial that have been or are expected to be covered by the SGAs and other associations. These damages include policies issued outside Missouri and for policies never held by the Missouri trusts. Included in the damages calculation are also the following: $94.5 million for a payment Texas Life and Health Guarantee Association made to a third party to assume the remaining obligations of Memorial, $81 million in growth or inflation payments on NPS contracts with consumers, $5.55 million for contracts without an associated life insurance policy, $3.4 million for Lincoln life insurance policies issued to purchasers residing in California, $22.5 million in administrative expenses of the SGAs, and $16 million in administrative expenses for the SDR [ECF No. 1763].[10]

## II.     SUMMARY JUDGMENT STANDARD

A court shall grant a motion for summary judgment only if the moving party shows "there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). By definition, material facts "might affect the outcome of the suit under the governing

---

[10] All of these amounts are approximate figures.

law," and a genuine dispute of material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The moving party bears the initial burden of proof in establishing "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). The moving party must show that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party must then set forth affirmative evidence and specific facts that demonstrate a genuine dispute on that issue. *Anderson*, 477 U.S. at 250. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing that a genuine dispute of material fact exists. Fed. R. Civ. P. 56(c)(1); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden and survive summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must demonstrate sufficient favorable evidence that could enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

In ruling on a motion for summary judgment, the Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.* The Court must view the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009).

## III. DISCUSSION

"A federal court adjudicating supplemental state law claims that are pendant to a federal claim must apply the choice of law rules of the forum state." *East Maine Baptist Church v. Union Planters Bank, N.A.*, 244 F.R.D. 538, 545 (E.D.Mo. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Missouri's choice of law rules govern Plaintiffs' state law claims. Missouri applies the "most significant relationship test" in tort actions. *Id.* at 545 (citing *Kennedy v. Dixon*, 439 S.W.2d 173, 184 (Mo. banc 1969). Application of Missouri law is clear in this suit. The governing trusts are Missouri trusts, the trust agreements list Missouri law as the governing law, and a significant number of the consumers who purchased pre-need services from NPS resided in Missouri. The Court will apply Missouri law to the claims unless a more specific choice of law analysis is required for an individual argument raised by the parties.

### A. *Limitation of Liability*

The Trustees assert Missouri law limits the liability of a trustee for breaches of trust to the loss in value of the trust property attributable to the breach, the profit inuring to the trustee

from the breach, or the loss of profit to the trust which would otherwise have accrued but for the breach [ECF No. 1762].  The Trustees contend any breach of a duty owed by the trustee because of its position as a trustee qualifies as a breach of trust, without regard to how the claim is styled.  Plaintiffs argue the Trustees are liable for all damages proximately caused by their conduct and there is no limitation on damages caused by negligence or breach of fiduciary duties.

Both Plaintiffs and the Trustees are correct in certain aspects.  In an ordinary breach of fiduciary duty or negligence claim, a plaintiff is allowed to collect all damages proximately caused by the breach.  *See Lockwood v. Schreimann*, 933 S.W.2d 856, 863 (Mo. Ct. App. 1996); *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 383 (Mo. Ct. App. 2000).  In a breach of trust, the beneficiary is entitled to recover the loss or depreciation to the value of the trust assets, the profit made from the breach, or any profit which would have accrued if not for the breach.  *Estate of Luyties v. Scudder*, 432 S.W.2d 210, 216 (Mo. 1968).     The Missouri Supreme Court has stated:  "It is well settled that every violation by a trustee of a duty that equity lays upon him, whether wrongful and fraudulent or done through negligence or arising through mere oversight and forgetfulness, is a breach of trust.  The term includes every omission and commission which violates in any manner any of the three following obligations:  (1) That of carrying out the trust according to its terms; (2) that of care and diligence in protecting and investing the trust property; (3) that of using perfect good faith."  If this case were brought in equity, the damages would be limited because as the Missouri Supreme Court has stated, every violation of duty equity lays upon a trustee is a breach of trust and a breach of trust has limited remedies.  However, this is a suit at law and Plaintiffs are alleging duties legal in nature.  As this Court has previously decided, Plaintiffs have a right to a jury trial because the underlying conduct is actionable in a direct suit at common law [ECF No. 1171].  When a suit is actionable at law, the

parties have all of the legal remedies available and are not limited to equitable remedies. If Plaintiffs brought suit to replenish the trust assets solely, the suit would be equitable but where the plaintiffs are seeking recovery personally, the action is legal in nature.

If this Court were to follow the Trustees reasoning, a trustee could never be held responsible for certain damages caused by its negligence or breach. It would mean a fiduciary, which has a higher duty than an ordinary person, would be liable for a much smaller amount. When the underlying conduct is fraudulent, a trustee is not allowed to skirt the consequences of its actions by asserting its conduct was a breach of trust with limited remedies. This would create a grave injustice in the law. If Plaintiffs are able to prove breaches of fiduciary duties and negligence, the damages will not be limited to loss of the trust assets or profit made from the breach. The Trustees are liable for all damages proximately caused by their breaches for those of which they owed duties.

The Trustees raise seven categories of damages claimed by Plaintiffs for which the Trustees claim they are not liable, because they are outside the trusts. Although this Court has decided the Trustees are liable for all damages proximately caused by the breaches, the Plaintiffs still have to establish the Trustees owed a duty to be liable for damages.

The Plaintiffs allegations against the Trustees assert the Trustees owed duties to NPS, consumers, and funeral homes because they were trustees of the pre-need trusts [ECF No. 916]. The Trustees only owe duties to the beneficiaries of the trusts as trustee. Without the relationship of trustee and beneficiary, Plaintiffs have not alleged the Trustees owe any other duty to the consumers or funeral homes. The injury incurred by the consumers and funeral homes is the funeral services going unpaid. Keeping this in mind, the Court will analyze each category of damages Trustees raise.

## 1.    Amounts owed by SGAs on Lincoln and Memorial Insurance Policies

The Trustees assert they are not liable for payments made by the SGAs for policies never held as trust assets or were residents of Missouri. Plaintiffs argue the scheme would not have been able to expand to other states without the Cassitys having unfettered access to the Missouri trust assets, thus, the damages were proximately caused by the Trustees' actions. The issue is not whether the damages were proximately caused; it is whether the Trustees owed a duty to those policyholders. If the policies were never placed in the trusts or the payments for the pre-need contract was never put into the trust, then the Trustees did not owe a duty to the consumer or funeral home. The beneficiaries of the trust cannot collect damages for injuries to consumers and funeral homes who were not beneficiaries, whether those injuries were caused by the Trustees' breaches or not. The SGAs cannot collect damages for consumers and funeral homes to whom the Trustees did not owe a duty. The distinction between who is a beneficiary and who is not cannot be made simply by drawing a line between those who live in Missouri and those who do not. The record indicates funds from other states may have been put in the Missouri trusts. If a consumer or funeral home's funds or life insurance policy were held in the Missouri trusts, a duty is owed to them as beneficiaries and the SGAs have the possibility of collecting those damages, if the Plaintiffs are able to establish the other elements of the claims.[11]

## 2.    The Amount Paid to Another to Assume Memorial's Obligations

Approximately $94 million was paid by the Texas Life and Health Insurance Guaranty Association to a third party for the third party to assume Memorial's remaining obligations. The Trustees assert the undisputed evidence shows Memorial's policies were never held by Missouri

---

[11] The SGAs have brought suit on behalf of consumers and funeral homes and the analysis of duty pertains solely to the SGAs claims, not to claims brought by the SDR on behalf of NPS, Lincoln or Memorial.

trusts.  Plaintiffs dispute the Trustees characterization of the evidence.  If the policies were held by the Missouri trusts, a duty was owed and the Trustees may be liable for the damages. However, it is a genuine dispute of material fact as to whether the policies were held by the Missouri trusts.  This must be decided by the jury.

### 3.      Amounts Owed by NPS to Funeral Homes for Growth Payments

Plaintiffs are seeking to recover payments owed by NPS to funeral homes for growth or inflation under the pre-need contracts.  The Trustees did owe a duty to NPS because NPS was a beneficiary of the trusts.  It is possible NPS's inability to pay growth or inflation payments is a proximate cause of the alleged breaches of the Trustees.  It is the jury's providence to decide if the Trustees breached their duties and if the damages claimed were proximately caused by those breaches.

### 4.      Amounts owed by NPS on Orphan Contracts

Orphan contracts are pre-need contracts without an associated life insurance policy.  NPS has an obligation to pay these contracts.  For the same reasoning as the growth payments, the Trustees may be liable for these damages as they owed duties to NPS and these could be proximately caused by alleged breaches of the Trustees.

### 5.      Amounts Owed by NPS to California Pre-Need Purchasers

Approximately $3 million in damages is claimed by the Plaintiffs for amounts owed on Lincoln policies issued to consumers in California.  As with the other damages claimed for consumers outside of Missouri, if the funds from the contract or the insurance policy were in the Missouri trusts, the Trustees may be liable for the damages because a duty was owed to those consumers.  If the funds or the insurance policy were not placed in the trust, the Trustees did not owe a duty to those consumers and cannot be liable for their damages.

### 6. The SGA's Administrative Expenses

The Court's analysis of whether the SGA can collect administrative expenses is detailed *infra*.

### 7. The SDR's Administrative Expenses

The Trustees assert the SDR's administrative expenses do not qualify as losses to the trust; therefore the Trustees are not liable for them. Plaintiffs assert the administrative expenses reasonably and necessarily flow from the harm. The SDR is bringing claims on behalf of Memorial, Lincoln, and NPS. The Trustees only owed duties to NPS. Plaintiffs have not established SDR's administrative expenses are the proximate cause of the Trustees' actions. The Court finds nothing in the record suggesting the SDR's administrative expenses result from the Trustees' conduct as to create a genuine dispute of material fact precluding summary judgment.

### B. *Claims Brought by State Guaranty Associations*

The SGAs are asserting claims as assignees or subrogees of consumers and funeral homes under the liquidation plan. The Trustees put forth four arguments for why the SGAs cannot recover from the Trustees. First, the Trustees claim NPS is the sole beneficiary and consumers and funeral homes have no causes of action against Missouri trustees because they are not beneficiaries. Second, they argue many of the consumers and funeral homes have no connection to the Missouri trusts and the Trustees did not owe any duties to them. Third, the Trustees contend the trusts were the sole owners and beneficiaries of the life insurance policies and the consumers and funeral homes had no legal rights to the policies; therefore, they have no causes of action relating to the policies to assign to the SGAs. Lastly, according to the Trustees, the SGAs have no claim for administrative expenses because they are bringing claims solely as assignees or subrogees of consumers and funeral homes. Plaintiffs argue the consumers and

funeral homes are beneficiaries of the trusts and as beneficiaries, they hold the beneficial interest in the life insurance policies and any other trust assets. Additionally, Plaintiffs claim the consumers are the insured under the policies and the administrative expenses are proximately caused by the Trustees' breaches and negligence. The court will address each argument as follows.

### 1. Pre-Need Purchasers and Funeral Homes' Claims

The Court has previously addressed the parties' arguments regarding who are the beneficiaries of the pre-need trusts. As the Court found in its Memorandum and Order on Plaintiffs' Motion for Rulings as a Matter of Law [ECF No. 2084], the consumers and funeral homes are beneficiaries of the pre-need trusts. Therefore, the Trustees' request for summary judgment of the SGAs' claims on the basis the consumers and funeral homes are not trust beneficiaries and do not have claims to assign is denied.

### 2. Insurance Policies Not Held by the Missouri Trusts

As stated *supra*, the Trustees only owe duties as trustees to those consumers and funeral homes who are beneficiaries of the trusts. If the money or policies did not flow through the trusts, the Trustees cannot be liable for the damages incurred by those entities.

### 3. Insurance Policies Issued to the Missouri Trusts

The Trustees next argue the consumers and funeral homes have no legal rights under the insurance policies and no causes of action relating to the policies to assign to the SGAs. The Trustees' argument is summarized as follows. The trusts are the owners and beneficiaries of the covered policies. The beneficiaries are entitled to the death benefits. The consumers and funeral homes do not have legal entitlement to the payments, as they are not beneficiaries to the policies. The payment recipient can transfer his/her rights under and any cause of action relating to the

15

policy to the SGAs. The consumers and funeral homes are not parties to the policy and have no rights arising under the policies. Although consumers and funeral homes may have causes of action relating to the policies, they must first have rights under the policies. Allowing consumers and funeral homes to assert claims against the Trustees violates principles of insurance law because an insurer can assert claims via subrogation against third parties but may not assert claims against the insured. Thus, according to the Trustees, the consumers and funeral homes have no causes of action relating to the policies.

Plaintiffs argue the trusts, not the Trustees, are the owners and beneficiaries of the policies and as the beneficiaries of the trust, the consumers have a beneficial interest in the policies and the trust assets and can assign their claims to Plaintiffs. Additionally, Plaintiffs state the consumers are parties to the contract because they are defined in the policies as the insured. Plaintiffs contend the Trustees' subrogation argument fails because the insurer is not suing the insured; the consumers are the insured and the Trustees are the third party.

Both parties reference the Liquidation Plan for determining what rights the SGAs have. The Liquidation Plan states " . . . every current or future recipient of a benefit under this Liquidation Plan . . . is considered to have assigned to the respective Participating Association the rights under, and any cause of action relating to the Policy to the extent of the benefit . . ." [ECF No. 1763-10, p.13]. The listed owner and beneficiary on an insurance policy is the associated pre-need trust account [ECF No. 1770-5, Ex. 81]. The insured lists a pre-need consumer. Under the policy, the beneficiary will receive the proceeds on the death of the insured.

The Trustees do not have rights under the insurance policies. They are not owners of the policies or beneficiaries. The trusts are the owners and beneficiaries of the policies. This

distinction is important in analyzing the relationship between the parties for the purposes of subrogation. An insurer cannot seek subrogation from its insured; it can only seek subrogation against third parties because subrogation arises from the rights of the insured. *Benton House, LLC v. Cook & Younts Ins. Inc.*, 249 S.W.3d 878, 882 (Mo. Ct. App. 2008). This is not a situation where an insurer has brought suit against an insured, as the Trustees are not the insured, the owners, or the beneficiaries of the policies. Any rights under the policies are held by the trusts. If the Plaintiffs were suing the trust and the Trustees were defending the trust, the situation would be different and the insurer would be suing the insured. However, this distinction between the trust and the Trustees is not dispositive because aspects of the Plaintiffs' argument fail as well; the beneficiaries of the trusts do not have a right to enforce the claims of the trust because a beneficiary of a trust cannot enforce the claims of the trust against a third party. *Int'l Ass'n of Fire Fighters, Local 2665 v. City of Clayton*, 320 F.3d 849, 851 (8th Cir. 2003) (citing Restatement (Second) of Trusts § 281).

The Liquidation Plan does provide rights for the consumers and funeral homes under the life insurance policies. Section 5.4.8 of the Liquidation Plan provides:

> "Death benefits that would otherwise be due or payable to a Trustee will be paid by the Participating Association directly to the funeral home that is responsible for providing and actually provides the funeral/burial services and/or merchandise for the benefit of the Insured. For purposes of the Liquidation Plan, the Insured under such Policy shall be considered the owner of the Policy . . ."

Section 8.3 provides similar language: "Where NPS or a Trust was previously identified as an owner of a Policy and to the extent an owner needs to be identified or ownership rights may be exercised, then the Insured shall be treated as the owner instead of NPS or the Trust solely for purposes of this Liquidation Plan." The Liquidation Plan transposes the owner of the life insurance policy from the trust to the insured. The rights of ownership, which the Trustees are

now asserting belonged solely to the trusts, were given to the Insured. If the Trustees objected to this, they should have raised it before the Receivership Court as provided in Section 8.5 of the Liquidation Plan which states:

> "Any owner, beneficiary, payee, assignee or other interested person that receives (or whose representative receives) notice of this Liquidation Plan and the petition seeking approval thereof, is hereby prohibited from exercising any rights in any way inconsistent with this Liquidation Plan unless such person: (i) has appeared in the Receivership Court; (ii) has filed an opposition to the approval of the Liquidation Plan; and (iii) such opposition has been granted by and such asserted rights have been specifically confirmed by the Receivership Court and any appeals related thereto have been favorably resolved in favor of such person."

The Trustees cannot have given up the rights of ownership on behalf of the trusts in one court and then claim in another those rights solely belong to them.

Public policy dictates this outcome. If the rights under the policies were not assigned to the SGAs, the SGAs would bear the entire burden of this scheme without any burden being shared by the alleged wrongdoers. If the insured, in this instance, did not have any rights under the life insurance policies, this scheme could flourish again as another trustee invests trust assets in questionable life insurance policies. The Court finds the consumers and funeral homes do have rights under the life insurance policies.

### 4.    Administrative Expenses

The Trustees claim Plaintiffs cannot recover the SGAs' administrative expenses because the SGAs are bringing claims assigned to them from the consumers and funeral homes and administrative expenses could not be considered their damages. Plaintiffs contend the SGAs' administrative expenses are damages proximately caused by the Trustees' conduct. The SGAs may not recover their administrative expenses from the Trustees. The SGAs are bringing claims assigned to them from payees, policy or contract owners, beneficiaries, and the insured of the life

insurance policies. The administrative expenses are not damages of these parties listed and the SGAs only have the rights of those assigned. *See* Section 9.2 of the Liquidation Plan [ECF No. 1763-10]. Although the Texas Insurance Code contemplates the expenses of the guaranty association, they are in relation to the insolvency of Lincoln or Memorial. *See* Tex. Ins. Code § 443.301(a)(2). If the SGAs were enforcing claims of Lincoln or Memorial, the administrative expenses may be recoverable but the SGAs are enforcing the claims of those with rights under the life insurance policies and their administrative expenses are not damages collectible by those individuals or entities. The Court finds the Trustees are not liable for the SGAs' administrative expenses.

### C.    *Liability for Actions Authorized by NPS and In Pari Delicto*

The Trustees assert they are not liable for actions authorized by NPS because a beneficiary cannot recover for a breach it authorized. The Trustees also argue Plaintiff SDR does not have standing to bring claims on behalf of the consumers and funeral homes because the claims are personal to the consumers and funeral homes. Plaintiffs contend the Trustees are still liable because NPS is not the sole beneficiary of the trusts and the other beneficiaries did not consent and because the insurer receivership acts in Missouri and Texas disallow defenses based on the actions of the liquidated company.

An important distinction in this analysis is the difference between the various Plaintiffs. The SDR is bringing claims in its power as receiver of NPS, Lincoln and Memorial on behalf of these companies' creditors, members, policyholders, shareholders, and the public. Tex. Ins. Code § 443.154(m). The SDR can bring claims on behalf of the consumers and funeral homes in their position as creditors of NPS. The SGAs are bringing claims on behalf of consumers, funeral homes, policy holders, and beneficiaries whose claims have been assigned to them. The

authorization defense is being asserted by the Trustees only against the claims brought by the SDR.

Before analyzing the authorization defense, the Court will address an argument raised by the Trustees in their Reply in relation to this defense. The Trustees assert the SDR does not have standing to recover on behalf of the consumers or funeral homes in their capacities as creditors of NPS because the claims are personal to the consumers and funeral homes. The SDR cannot bring claims which are personal to a specific creditor and will not inure to the benefit of the estate. Tex. Ins. Code § 443.154(m). The claims brought by the SDR on behalf of consumers and funeral homes are not personal. Although the amount sought for each individual is different, the facts for each are identical, thus the claims are not personal. *See Craig v. Stacy*, 50 S.W.2d 104, 107 (Mo. 1932) (finding when the wrong is common to all of the creditors, the suit must be brought by the receiver of the corporation). The statute requires two conditions be satisfied for the Court to bar the SDR's claims: the claims must be personal *and* the claims will not inure to the benefit of the estate. It is clear the Plaintiffs' claims will inure to the benefit of the estate. Thus, the SDR has standing to bring claims on behalf of the funeral homes and consumers. However, this does not resolve the issue of whether the SDR's claims are subject to the authorization defense asserted by the Trustees.

A beneficiary who consents to a breach by the trustee cannot later bring suit for the consequences of the breach. *See Coates v. Coates*, 304 S.W.2d 874, 877-78 (Mo. 1957). It is undisputed by the parties NPS authorized and directed many of the alleged breaches of the Trustees. However, as the Court found in its Memorandum and Order on Plaintiffs' Motion for Rulings as a Matter of Law [ECF No. 2084], NPS is not the sole beneficiary of the trusts. The consent of one beneficiary does not preclude the other beneficiaries from bringing suit.

Restatement (Second) of Trusts § 216, cmt. g. (1959). The claims asserted by the SGAs who brought suit on behalf of the consumers and funeral homes in their position as beneficiaries, are not subject to the authorization defense. However, the SDR is bringing claims on behalf of NPS who did consent to the breaches.

The Trustees authorization defense closely aligns with the Trustees' *in pari delicto* defense. *In pari delicto* bars claims brought by a person who must rely on an unlawful act to establish the cause of action. *Dobbs v. Dobbs Tire & Auto Centers, Inc.*, 969 S.W.2d 894, 897 (Mo. Ct. App. 1998). The Trustees argue NPS was the entity which created the fraudulent scheme and SDR is bringing claims on behalf of NPS, thus the claims are barred by *in pari delicto*. Plaintiffs claim a receiver is in a different position than a typical plaintiff and public policy weigh in favor of bringing their claims.

Generally, the actions of an agent bind the principal. *Miller v. Ernst & Young*, 938 S.W.2d 313, 315 (Mo. Ct. App. 1997). The exception is when the agent acts adversely to the principal's interest. *Id*. The Seventh Circuit faced a similar situation in *Cenco Inc. v. Seidman & Seidman*. 686 F.2d 449 (7th Cir. 1982). The plaintiffs, stockholders of a corporation, brought suit against the corporation's auditors for failing to detect the fraud by the corporation's own employees. *Id*. The Seventh Circuit made a distinction between fraud on behalf of a corporation and fraud against it. *Id.* at 456. Fraud against the corporation hurts only the corporation and the stockholders are the only victims. *Id*. Fraud for the benefit of the corporation hurts those outside of the corporation and the stockholders at the beneficiaries of the fraud when it is ongoing. *Id*. The stockholders should not be allowed to escape responsibility for the fraud because they did not bear the costs of the fraud. *Id*.

Missouri adopted the reasoning of the Seventh Circuit in *Grove v. Sutliffe*. 916 S.W.2d 825 (Mo. Ct. App. 1995). In *Grove*, the plaintiffs, trustees of a liquidating trust of a bankrupt corporation, brought suit against accounting firms who provided services to the corporation. *Id*. at 826. The individual in control of the corporation was running a Ponzi scheme. *Id*. at 827. Plaintiffs alleged, had defendants not issued a clean audit, the scheme would not have been able to continue. *Id*. at 828. The Court found there is a distinction between stealing or looting from the company and stealing from outsiders. *Id*. at 830. When management uses the corporation to commit fraud against others, the adverse interest exception does not apply. *Id*. Applying this reasoning alone, Plaintiffs cannot bring claims against the trustees on behalf of NPS because the management of NPS used the corporation to commit fraud against outsiders similar to the facts in *Cenco Inc*. and *Grove*, but the Court does not find these cases to be dispositive here.[12] When the Court analyzes the reasoning behind these prior courts' decisions, a different conclusion becomes apparent.

The Court's reasoning for not allowing the authorization defense or *in pari delicto* to be asserted against the SDR is the same, thus the Court discusses both as one. A receiver is in a different position than the stockholders or the trustee in the prior cited cases. The receiver is acting on behalf of the corporation, its creditors, and the public. The reasoning for the Court's holding in *Cenco Inc.*, was because the Court did not want the stockholders to benefit twice for the company's actions. 686 F.2d at 455. Stockholders benefitted from the fraud in increasing stock prices throughout, the stockholders elected the managers who committed the fraud, and

---

[12] The Trustees also cite to *In re Bernard L. Madoff Inv. Sec., LLC*, 721 F.3d 54 (2nd Cir. 2013). The trustee of Bernard L. Madoff Investment Securities, LLC attempted to collect from several banks alleging breaches of fiduciary duties among other claims for participation in Bernie Madoff's Ponzi scheme. *Id*. The Second Circuit held *in pari delicto* bars the trustee's claims. The trustee was only bringing claims on behalf of the company. Here, the receiver has the power to bring the claims on behalf of NPS and its creditors, not solely NPS. As such, the reasoning of the Second Circuit is not applicable here.

many of the corrupt officers still hold stock in the company. *Id.* This is not the situation here. The corrupt officers have been removed from NPS and will not benefit from any recovery by SDR and the creditors of NPS, the consumers and funeral homes, did not benefit from the fraud while it was ongoing like the stockholders did. Additionally, the SDR is bringing claims on behalf of the public, who are entirely innocent from the scheme and will have to bear the consequences if the SDR is not allowed to bring its claims. "[W]hen a party is denied a defense under such circumstances, the opposing party enjoys a windfall. This is justifiable as against the wrongdoer himself, not against the wrongdoer's innocent creditors." *FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995); *see also Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995) and *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 (5th Cir. 2012).

If the authorization defense and the *in pari delicto* defense were permitted against receivers of fraudulent companies, the receiver would never be able to bring suit against any parties because the opposing party would always have the defense of the company consented to the actions or took part in the actions. This would eviscerate the powers of the receiver to bring suits. The basis of these defenses is to prevent a wrongdoer from benefitting from the wrongdoer's unlawful actions. This is not the situation here. "Even when the parties have been found to be in pari delicto, relief has at times been awarded on the ground that in the particular case public policy has found to be best conserved by that course." *Smith v. Holdoway Constr. Co.*, 129 S.W.2d 894, 902 (Mo. 1939). Thus, the Court will not allow the authorization defense or *in pari delicto* to be asserted against the SDR.

### D. *Liability for Wulf Bates & Murphy's Investment Decisions*

The Court found in its Memorandum and Order on Plaintiffs' Motion for Rulings as a Matter of Law [ECF No. 2084], the statute relieves the trustee of all liability regarding

investment decisions made by the investment advisor if the investment advisor is federally registered or Missouri-registered, qualified, independent, control of the assets remains with the trustee, and the assets are not placed in any investment which would be beyond the authority in which a reasonably prudent trustee would invest.

In addition to their argument they cannot be held liable for the investment advisor's decisions, the Trustees also argue Wulf Bates & Murphy was independent of NPS and made all of the investment decisions. Plaintiffs assert Wulf Bates & Murphy was not independent and did not make all of the investment decisions.

These are two genuine disputes of material fact which must be determined by the jury. The Court has already determined the investment advisor must be independent from both NPS and the Trustees. But there are significant disputed facts as to whether the investment advisor was independent and who made the decisions. For example, the Trustees cite to facts Wulf Bates & Murphy was in existence before and after NPS and retained other clients. Plaintiffs cite facts asserting NPS was the vast majority of Wulf Bates & Murphy's business. It is the job of the jury to decide which facts are true and if Wulf Bates & Murphy was independent. There is also a dispute as to who made the decisions; the Trustees assert Wulf Bates & Murphy did, citing to David Wulf's deposition testimony. Plaintiffs cite to documents referencing Randy Sutton and other NPS employees as the individual who made investment decisions. A determination of who made the investment decisions is not appropriate on summary judgment.

### E.     *Liability for Acceptance of the Trusts or Predecessor Trustees' Actions*

The Trustees assert they cannot be held liable for alleged negligence in account acceptance or the acts of predecessor trustees because trustees do not owe a duty to a trust beneficiary unless and until the trustee accepts the trust account. Plaintiffs argue a trustee can be

liable for conduct prior to assuming his role as trustee if the trustee does eventually accept the trust and a trustee is liable for not redressing the breaches of predecessor trustees.

### 1. Pre-Acceptance Negligence

A trustee is under a duty to the beneficiaries to administer the trust solely in the interest of the beneficiaries "upon acceptance of the trusteeship." *Estate of Luyties*, 432 S.W.2d at 214 (citing Restatement (Second) of Trusts §§ 169, 170). A trustee is not under a duty unless it accepts the trust. Restatement (Second) of Trusts § 169 cmt. a. The Trustees cannot be liable for pre-acceptance negligence unless Plaintiffs can prove the Trustees owed a duty outside of their duties as trustees, which the Plaintiffs have not done.

Plaintiffs cite *John R. Boyce Family Trust v. Snyder*, for the proposition a trustee is liable for pre-acceptance conduct *once* he accepts the trust. 128 S.W.3d 630 (Mo. Ct. App. 2004). Plaintiffs arguments proposes, as long as a trustee eventually accepts, it will be liable for pre-acceptance conduct. But *John R. Boyce* does not stand for the Plaintiffs' proposition. In *John R. Boyce*, the defendant owned several grocery stores and was interested in selling one of the stores in Eureka, Missouri. *Id.* at 634. He convinced John Boyce, a beneficiary of the John R. Boyce Family Trust, that the trust should purchase the grocery store. *Id.* When the trustee resigned, the defendant became the successor trustee. *Id.* at 635. The defendant became the trustee the day before his grocery store was purchased by the trust. *Id.* The trust ended up losing hundreds of thousands of dollars as a result of this purchase. *Id.* at 636. The Court held the defendant was liable for breaching his duty of loyalty to the trust because at the time of the sale, when he was trustee, he should have disclosed all of the information known to him and should not have engaged in a transaction beneficial to his interests. *Id.* at 637. If the sale of the grocery store had taken place the day before the defendant became trustee, he would not have been held liable.

Contrary to Plaintiffs' assertion, the trustee in *John R. Boyce* was not held liable for his pre-acceptance conduct but for not disclosing the information he knew once he became trustee before the sale of his grocery store to the trusts.

Plaintiffs have alleged in their pleadings the basis of the Trustees' duties is their position as trustees. While Plaintiffs may be able to establish the Trustees were negligent in conducting due diligence before accepting the trusts, they have not established the Trustees owed a duty prior to accepting the trusts. *Graham v. Conner*, 412 S.W.2d 193, 201-202 (Mo. Ct. App. 1967). Therefore, the Trustees cannot be held liable for pre-acceptance conduct.

### 2. Liability for Predecessor Trustees' Actions

The Trustees contend they cannot be held liable for a predecessor trustee's breaches because they cannot be held liable for conduct before they owed a duty and the trust agreements relieves them of any liability for predecessors' actions. Plaintiffs argue the Trustees are liable for neglecting to redress breaches the trustees knew of or should have known were committed by predecessors.

As stated *supra*, a trustee cannot be liable for conduct before its duty to the beneficiaries arose. Plaintiffs cite to the Restatement (Second) of Trusts § 223 and several out-of-state cases stating a successor trustee is liable if he knows or should have known of a breach of trust by a predecessor and allows it to continue or does not redress it [ECF No. 1949, p. 54]. But as the Trustees point out, this section of the Restatement had not been adopted by Missouri at the time of the Trustees' tenures. At the time, Missouri statutes provided:

> "A successor trustee shall be under no duty to inquire into the acts or doings of a predecessor trustee, and is liable only for any act or failure to act of a predecessor trustee of which the successor trustee had actual knowledge and which the successor trustee fails to reveal to a majority in interest of the

beneficiaries entitled, at the time of succession, to receive or eligible to have the benefit of the income from the trust."

Under the trust agreement and the statute, the consumers and funeral homes are not entitled to the income from the trust, only NPS is entitled to the income. Mo. Rev. Stat. § 436.031.3 (1985). Plaintiffs can only recover damages on behalf of NPS on their predecessor liability theory if they can prove (1) the Trustee had actual knowledge of the act or failure to act; (2) the Trustee failed to reveal this information to NPS; and (3) NPS did not participate in the action causing the breach.[13] If NPS knew of the predecessor's breach because of its own actions in participating in the breach or inducing the breach, the successor trustee cannot be held liable for failing to reveal the breach to NPS.

### F.     Proof of Damages

Next, the Trustees argue Plaintiffs cannot prove the Trustees are responsible for $516 million in damages because they cannot prove the Trustees caused the damages. Plaintiffs claim causation is a question for the jury and the Trustees are jointly and severally liable for Plaintiffs' damages because the injury is indivisible.

### 1.     Causation

Plaintiffs have submitted sufficient evidence on causation to preclude summary judgment. Absence of causation must be shown to prevent the question from proceeding to trial. *Howard v. Mo. Bone & Joint Ctr., Inc.*, 615 F.3d 991, 996 (8th Cir. 2010) (citing *Williams v. Daus*, 114 S.W.3d 351, 359 (Mo. Ct. App. 2003)). Plaintiffs have presented evidence suggesting the Trustees did not question disbursements of the trust principal, did not question the purchase

---

[13] Because Missouri law does not require a successor trustee to redress a predecessor's actions, the Court does not need to address the exculpation clause in the trust agreement. If Missouri law did follow the Restatement and require a successor to redress prior breaches, the Court would find the trust agreement only precludes liability for a predecessor's prior breaches, not a failure to redress breaches by the successor trustee.

of life insurance policies as a trust asset, and did not maintain control of the trust assets, among others. These actions allowed NPS to continue to expand and flourish. The Trustees have not shown an absence of causation as to allow the Court to decide this issue on summary judgment.

### 2. Joint and Several Liability

Joint and several liability means each defendant can be held liable for the entire amount of damages. *State ex rel. Nixon v. Dally*, 248 S.W.3d 615, 618 n.4 (Mo. 2008). Where there are successive, independent tortfeasors, joint and several liability is not appropriate. *Id*. If the torts are disparate in time and place, it is the burden of the Plaintiff to establish which damages were caused by each separate defendant. *State ex rel. Retherford v. Corcoran*, 643 S.W.2d 844, 846 (Mo. Ct. App. 1982). Difficulty of proof does not create joint liability. *Id*. The indivisibility rule applies when the torts "occur in such close proximity in time and place that it is impossible to identify with any definiteness the injury sustained in each [tort]." *Id*. The time separating the torts is not as important as the "impossibility of definitely attributing a specific injury to each [tort]." *Id*. "Whether or not harm to the plaintiff is capable of apportionment among two or more causes is a question of law." *Richardson v. Volkswagenwerk, A.G.*, 552 F.Supp. 73, 83-84 (W.D. Mo. 1982) (citing *Barlow v. Thornhill*, 537 S.W.2d 412, 419 (Mo. banc 1976)).

Plaintiffs' expert, Dr. Arnold, suggests an allocation between each trustee could be calculated [ECF No. 1995, Ex. 84]. Based on Plaintiffs' own expert, the Court finds it difficult to accept this is an indivisible injury. Joint and several liability is rare and the Trustees are independent, successive tortfeasors. While apportionment between the Trustees may be difficult, the evidence suggests it is not impossible. The Court finds, at this time, Plaintiffs have not proven the impossibility of apportioning the damages as is required for joint and several liability. Plaintiffs must prove which damages were caused by each defendant.

### G.  Mount Washington and CSA Trusts

The final argument asserted by the Trustees is the Trustees cannot be liable for claims related to the Mount Washington and CSA trusts because the SDR does not have standing to bring claims related to those trusts.  The Trustees claim NPS is not the settlor or beneficiary of these trusts and the SDR is asserting claims only on behalf of NPS, funeral homes, and consumers.  Plaintiffs argue NPS was the pre-need seller for theses trusts and as such is a beneficiary of the trusts.

The CSA trust agreement lists the Mason Securities Association, doing business as Funeral & Cremation Society of America, as the "Seller" [ECF No. 1763-3, Ex. 3].  "Seller" is defined as "Mason Securities Association," as the seller and any successor thereto who agrees to accept and discharge the obligations of the Seller under its outstanding Funeral Agreements." The Mount Washington trust agreement lists Mount Washington Forever, LLC, as the "Seller" and has a similar definition of "seller" [ECF No. 1763-4, Ex. 4].  While NPS is not listed as the seller of these trusts, Plaintiffs have cited to evidence showing NPS was the seller of the contracts in the account.[14]  While the language of the trust agreement is significant in determining who is a beneficiary of the trust, the actual practice of the parties related to the trust is persuasive.  NPS sold the contracts in the trust and was the actual seller.  As the seller, even though not named in the trust agreement, NPS is a beneficiary of the trusts in practice.  The SDR has standing to bring claims related to the Mount Washington and CSA pre-need trusts.

---

[14] The Trustees have not controverted these facts.

Accordingly,

**IT IS HEREBY ORDERED** that "Defendants National City Bank, U.S. Bank, National Association, and BMO Harris Bank's Motion for Partial Summary Judgment" [ECF No. 1761] and "Defendants National City Bank and U.S. Bank, National Association's Joinder in Part in BMO Harris Bank's Motion for Partial Summary Judgment" [ECF No. 1788] are **GRANTED in part, and DENIED in part**.

So Ordered this 12th Day of January, 2015.

_____
**E. RICHARD WEBBER**
**SENIOR UNITED STATES DISTRICT JUDGE**