UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JO ANN HOWARD AND ASSOCIATES, P.C., *et al.*, | ) ) ) |
| Plaintiffs, | ) |
| v. | ) Cause No. 4:09-CV-01252-ERW |
| | ) |
| J. DOUGLAS CASSITY, *et al.*, | ) ) |
| Defendants. | ) |

## NATIONAL CITY BANK'S TRIAL BRIEF[1]

Notwithstanding the facial complexity of this case, the principal issues that should be submitted to the jury are straightforward. Did Allegiant Bank, National City's predecessor-in-interest, breach any duty it owed as a trustee that did not have investment authority or discretion over the trust assets?[2] Even if it did, is Allegiant relieved of liability for investment decisions made by the investment advisor on the ground that the investment advisor appointed by NPS was registered, qualified, and independent?[3] If Allegiant breached any duty of trust and is not relieved of liability, did the breach cause injury to the Missouri Trusts? And if so, what is the amount of harm to the Missouri Trusts caused by Allegiant's breach? National City is confident that the jury, after hearing all the evidence, will rule in its favor on each and every one of these questions, if necessary.

---

[1] The Court issued its ruling on National City Bank's Motion for Summary Judgment shortly before this brief was due to be filed (D.E. #2092). Accordingly, National City Bank has not revised this brief to incorporate the Court's ruling. National City Bank reserves the right to file an amended or supplemental brief upon review of the Court's ruling.

[2] All references to National City Bank ("National City") include PNC Bank, N.A.

[3] As discussed below, National City respectfully submits that the Court's ruling on Plaintiffs' Motion for Rulings as a Matter of Law erroneously eviscerates National City's right to relief from liability under Chapter 436. *See* pp. 9-11, *infra*.

**FACTUAL BACKGROUND**

We expect the evidence at trial to show the following:

**A.      The Missouri Trusts.**

Missouri was just one of nineteen states in which NPS did business. Missouri law required NPS to deposit into trust at least 80 percent of the proceeds it received from the sale of a pre-need contract in the state of Missouri. Mo. Rev. Stat. §§ 436.021, 436.027 (enacted 1982; repealed 2009). Over the years, NPS established a number of Missouri trusts (collectively, the "Missouri Trusts").[4] NPS established the first trust in 1983. Over the years, there were five separate trustees of the Missouri Trusts. Allegiant Bank, the predecessor-in-interest to National City Bank, was trustee from 1998 until May 31, 2004.

Ordinarily, one of a trustee's duties is to invest the trust assets prudently. However, as National City's pre-need trust expert, James Atwood, will explain at trial, it is common in the pre-need industry to transfer the duty to invest trust assets from a trustee to a separate investment advisor. Applicable Missouri trust law expressly permitted such an arrangement. Missouri's trust code provided that, when an investment advisor is appointed, the trustee has no "duty to inquire into or participate in the performance" of the investment advisor's duties unless the trustee has "actual knowledge" that the advisor is breaching its fiduciary duties. Mo. Rev. Stat. § 456.550 (enacted 1983; repealed 2005).

Missouri's pre-need statute ("Chapter 436") also permitted this division of responsibilities. Both Chapter 436 and the trust agreements provided that when trust assets reached a certain threshold total, NPS was permitted to appoint "a federally registered or

---

[4] Plaintiffs also purport to bring claims against National City related to two other trusts in Missouri, the CSA and Mt. Washington Trusts. Those trusts were not established by NPS, and the SDR lacks standing to pursue claims related to those trusts. *See* D.E. #1762, at 52-53. National City will focus on the trusts establish by NPS in Missouri in this brief.

2

Missouri-registered independent qualified investment advisor" to make investment decisions about trust assets in lieu of the trustee. Mo. Rev. Stat. § 436.031(2).  In the case of such an appointment, the trustee was required to "liquidate[]" trust assets "upon request of the advisor." *Id.*

In 1988, NPS retained Wulf Bates & Murphy ("WBM") as investment advisor for the assets in the Missouri Trusts.  WBM served continuously thereafter as the investment advisor for the Missouri Trusts until NPS's collapse in 2008.  WBM was an investment firm founded by David Wulf, Charles Bates, and John Murphy in 1985 or 1986.  At all relevant times, WBM was registered as an investment advisor with the U.S. Securities and Exchange Commission.  WBM hired its own employees, paid its own taxes, and leased its own office space.  Neither NPS nor the Cassitys had an ownership stake in NPS.  NPS was just one of WBM's many clients.

David Wulf, a co-founder of WBM, is currently in federal prison after a jury convicted him of, among other things, defrauding Allegiant.  David Wulf advised NPS to take out policy loans against the life insurance policies owned by the Missouri Trusts.  Allegiant did not authorize or even know about any such loans.  Five other individuals associated with the Cassitys and NPS were sent to federal prison after having looted and bankrupted NPS, Lincoln, and Memorial.

**B.    Allegiant's Trusteeship.**

During Allegiant's trusteeship, WBM invested the vast majority of the Missouri Trusts' funds in life insurance policies issued by Lincoln, an affiliate of NPS.  As National City's preneed trust expert has opined, life insurance is commonly used in the pre-need industry to finance funerals.  Indeed, Plaintiffs' own actuarial expert agrees that purchasing whole life insurance

3

policies is an appropriate strategy for funding pre-need contract obligations. The trust agreements expressly permitted such investments in life insurance policies.

The face value of the life insurance policy was equal to the amount that NPS deposited into the trusts associated with the pre-need consumer's contract. The Missouri Trusts were the owners and beneficiaries of the life insurance policies. The insured life under the policy was that of the pre-need consumer. When the pre-need consumer died, Lincoln paid the death benefit to the Missouri Trust that owned the policy. Pursuant to the trust agreements and Missouri law, Allegiant returned the amount of the initial deposit to NPS upon the consumer's death. NPS was responsible for paying the funeral home that provided the funeral to the consumer.

Allegiant received a statement each month from Lincoln listing all of the policies and confirming (1) that the trusts owned the policies, (2) that the policies were in force, and (3) the face value of the policies.[5] The statements did *not* identify the loans that Lincoln was issuing to NPS, purportedly on the Missouri Trusts' policies. During Allegiant's tenure and for several years thereafter, Lincoln paid death benefits to the Missouri Trusts (without any deduction for the amount loaned to NPS) each and every time an insured pre-need consumer died.

During Allegiant's trusteeship, all of the policies in the Missouri Trusts were whole life policies. *After* Allegiant's trusteeship, WBM began surrendering the Trusts' whole life policies in mass and replacing them with cheaper term life policies. There were no mass surrenders of policies, or replacement of whole life policies with term policies, during Allegiant's trusteeship.

Allegiant's trust department was repeatedly examined by state and federal regulators during the period it served as trustee. Allegiant received a "2" rating, the second highest possible

---

[5] It is common in the pre-need industry to value life insurance policies at their face value. As National City's experts will explain, because the purpose of the policy is to provide funds to be used upon a person's death, the value of the policy to the trust is its face value.

4

rating, from both the FDIC and the Missouri Division of Finance on five separate occasions between 1998 and 2004.  Notably, in a 1999 exam, the Division of Finance specifically selected NPS Trust IV, the largest of the Missouri Trusts, for an in-depth review.  As a result of this review, the Division of Finance requested that Allegiant document the longstanding practices that Allegiant had continued when it accepted the Missouri Trusts as successor trustee.  It also questioned certain recordkeeping practices, which Allegiant promptly corrected.  The Division of Finance did not otherwise suggest that Allegiant's administration of the trust violated the standard of care.

With respect to the documentation concerns, the examiners requested that Allegiant document that, although NPS had physical custody of the life insurance policies held in the trust, Allegiant maintained title to and control of the life insurance policies.[6]  In response to this request, Herb Morisse drafted the Custody Agreement in 1999.  Mr. Morisse will testify that the idea of the Custody Agreement originated with the examiners, and that he reviewed the draft agreement with the Division of Finance examiners.  The Custody Agreement provided that "[n]othing herein shall constitute or be construed to constitute any waiver or relinquishment by the Trustee of the Trustee's title to and control of the life insurance policies held by the Custodian pursuant to this Custody Agreement."  Moreover, it stated that Allegiant was to receive "certification by the respective life insurance companies issuing the policies that the Trustee is the owner and beneficiary of the policies."  In fact, as discussed above, Allegiant received these certifications from Lincoln every single month.

---

[6] As National City's pre-need expert will testify, pre-need trustees do not maintain physical custody of thousands of individual life insurance policies.  It is a generally accepted practice for the insurance company to share with the policy owner a record of ownership, as occurred here.

5

The examiners also suggested that Allegiant document the practice whereby WBM, the investment advisor, authorized NPS to communicate investment directives to Allegiant on WBM's behalf.  Mr. Morisse drafted a November 5, 1999 letter from WBM to Allegiant authorizing this longstanding practice.  Mr. Morisse will testify that he also showed this draft letter to the Division of Finance examiners.  In that letter, David Wulf of WBM represented that "all investment transactions reflected" in Allegiant trust statements to date "were executed upon the direction and authorization of Wulf, Bates, & Murphy."  Consistent with this letter, Mr. Morisse understood that the wire transfer requests that he received from NPS—which in every case were copied to WBM—were communicating the investment directives of WBM.  Allegiant carefully documented transactions processed in this manner as being "per the direction of the investment advisor" on the trust statements.  Wulf, who received and reviewed the trust statements from Allegiant each month, never challenged this characterization.

The value of the Missouri Trust assets increased during Allegiant's tenure.  When Allegiant resigned as trustee in May 2004, the Missouri Trusts had sufficient whole life insurance in force to cover all deposits into the Trusts.  As of May 31, 2004, the amount of Lincoln life insurance in force in the Missouri Trusts was $159 million, compared to a total of $123 million in deposits into the trusts.  Plaintiffs have adduced no evidence that those policies could not be honored at the end of Allegiant's trusteeship.

To be sure, WBM, acting for NPS, had purported to take policy loans against the loans behind Allegiant's back.  But, as the former Director of the Missouri Department of Insurance will testify at trial, those so-called policy loans could not be enforced against the Missouri Trusts because Allegiant, the owner of the policies, never authorized them.

6

Lincoln's insolvency four years after Allegiant resigned as trustee—an event beyond Allegiant's control—is the only reason the Missouri Trusts stopped receiving death benefits on these policies. The policies were never lost. The trust "vault" was not empty. The Missouri Trusts owned the policies as of May 31, 2004. If Lincoln had remained able to pay on the policies it had issued to the Missouri Trusts, none of us would be here today. And, if the State Guaranty Associations had paid death benefits to the Missouri Trusts, as required under the policies that the Missouri Trusts purchased, National City would not be here defending claims that the Trusts were depleted of assets in 2008, long after its tenure. The Missouri Trusts lack funds to reimburse NPS for deposits made into the trusts only because the State Guaranty Associations agreed to pay funeral homes directly, circumventing the Trusts, in an attempt to manufacture a claim against National City and the other trustees.[7]

## PLAINTIFFS' CLAIMS AND NATIONAL CITY'S DEFENSES

### I. Plaintiffs' Claims.

Plaintiffs asserted claims against PNC Bank and the other Missouri Trustees for breach of fiduciary duty and negligence. Both rest on duties the Missouri Trustees owed as trustees. As National City Bank has demonstrated elsewhere, Plaintiffs' claims are claims for breach of trust. *See, e.g.*, D.E. #1995, at 4-6. The claims are governed by trust law.

Plaintiffs allege that Allegiant breached its duties as trustee in a number of ways. National City is prepared to show at trial that Allegiant did not breach the standard of care required of pre-need trustees. National City's proof will comprise both fact testimony, including

---

[7] As set forth in the Missouri Trustees' summary judgment motion, the State Guaranty Associations do not have valid claims against National City, notwithstanding the Court's ruling that consumers whose pre-need contracts are governed by Chapter 436 and their associated funeral homes—*i.e.*, consumers and funeral homes in Missouri—are trust beneficiaries. *See* D.E. #1762, at 23-31.

7

the testimony of Mr. Morisse, as well as the testimony of National City's pre-need trust expert, James Atwood. Unlike Plaintiffs' trust experts, who have *never* worked in the pre-need industry, Mr. Atwood has nearly twenty-five years of professional experience with pre-need trusts.

National City focuses the Court's attention on several legal issues regarding Allegiant's duties as trustee.

**A. The Role of the Investment Advisor.**

The appointment of WBM as investment advisor is a critical fact in this case. As discussed above, under then-applicable Missouri law, when a trust grantor (in this case, NPS) appoints someone other than the trustee to perform certain fiduciary duties, the trustee is "not under a duty to inquire into or participate in the performance of any such duties" by the other person. Mo. Rev. Stat. § 456.550. The only exception to this rule is where the trustee has "actual knowledge" that the other person is "contemplating, committing or concealing a breach of trust." *Id.* Constructive or inquiry knowledge does not suffice; the statute expressly requires actual knowledge. As will be established at trial, this kind of division of fiduciary duties is common in the trust industry, including in pre-need trusts. The investment advisor makes decisions regarding investments. The trustee then executes those decisions and administers the trust.

Chapter 436 provides even greater protection to a pre-need trustee where a pre-need seller designates "a federally registered or Missouri-registered independent qualified investment advisor." Mo. Rev. Stat. § 436.031(2). Upon such an appointment, the trustee *must* "liquidate[]" trust assets "upon request of the advisor." *Id.* In return, "[t]he trustee shall be relieved of all liability regarding investment decisions made by such qualified investment advisor." *Id.*

This is not to say that a trustee is relieved of *all* liability when a registered, independent, qualified investment advisor is appointed under Chapter 436. National City Bank has never

advanced such an argument. Even when an investment advisor has been appointed, the trustee retains recordkeeping duties. *Id.* § 436.031(5). The trustee owes duties to make trust distributions as provided under Chapter 436. *Id.* § 436.031(6). The trustee must keep "title" to and "control of" the trust assets. *Id.* § 436.031(2). The trustee's duty to "control" the trust assets, however, does not give the trustee final say over the investment advisor's decisions. The statute expressly requires the opposite: the trustee must "liquidate[]" the assets upon direction of the investment advisor. *Id.*

The Court has ruled that, under Chapter 436, a trustee is "relieved of all liability regarding investment decisions made by such qualified investment advisor" only if the "assets are not placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in." D.E. #2084, at 13. National City respectfully submits that this interpretation of § 436.031(2) improperly renders the final sentence of that section superfluous. *Cf. Hyde Park Hous. P'ship v. Dir. of Revenue*, 850 S.W.2d 82, 84 (Mo. 1993) ("[I]t will be presumed that the legislature did not insert idle verbiage or superfluous language in a statute."). If an investment made by an investment advisor is not "beyond the authority of a reasonably prudent trustee to invest in"—that is to say, if the investment satisfies the reasonable prudence standard—there is no basis for holding the trustee or investment advisor liable in the first place. The Court's reading leaves no role for the final sentence. Under the Court's interpretation, there could never be a situation in which the final sentence would be applied to "relieve[]" a trustee of liability that would otherwise attach for an investment decision.

The Court suggested that its reading of § 436.031(2) is necessary to give meaning to the sentence that reads, "In no case . . . shall said assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in." National City respectfully

9

disagrees. That sentence provides that, when the pre-need seller appoints an investment advisor, the investment advisor is held to the same standard of prudence as a trustee. Thus, even though the trustee is "relieved of all liability" for imprudent investment decisions made by an investment advisor, the investment advisor is still liable. National City's interpretation of the statute harmonizes both provisions and accords with the plain text of the final sentence, which does not condition relief from liability on the prudence of the investment made by the investment advisor.

The Court has ruled that the statute requires WBM to be independent of both NPS and the trustee and that the question of WBM's independence is a factual question for the jury. Without waiving its argument that the investment advisor must only be independent of the trustee and that the only measure of independence is the lack of common ownership, National City highlights the following considerations that would guide any factual determination of WBM's independence.

First, the relevant inquiry would be whether WBM was independent of NPS, not whether it was acting independently with respect to any particular transaction. If the "independence" of the investment advisor could vary from transaction to transaction, the trustee would have to understand the decision-making process behind every investment decision—which would eviscerate the division of fiduciary duties. Second, the measure of "independence" could not possibly be that the pre-need seller cannot have any influence over investment decisions, as Plaintiffs have asserted. Investment advisors do not operate in vacuums, without any input from their clients. And Chapter 436 gives the pre-need seller authority to select and discharge the investment advisor for the trust. In addition, independence would be measured at the time the advisor was appointed or when a trustee first becomes trustee. A trustee cannot reasonably be expected to monitor the independence of the investment advisor continuously on a going-forward

10

basis. Again, such monitoring would break down the division of duties contemplated by Chapter 436 and otherwise authorized by Missouri law.

Finally, National City stresses that, if the heightened protection of Chapter 436 does not apply, the jury would have to determine whether Allegiant breached any duty it owed under the background principles of Missouri trust law. The relevant question would be whether Allegiant had "actual knowledge" that WBM was breaching its fiduciary duties. Mo. Rev. Stat. § 456.550. Allegiant did not have actual knowledge of this fact. David Wulf was defrauding Allegiant. Indeed, he was convicted of that very crime.

### B. Liability for Acts of Predecessor and Successor Trustees.

As National City has already argued, National City is not liable for the actions of Allegiant's predecessor trustees. *See* D.E. #1995, at 33-35. The trust agreements expressly provide that "[n]o successor Trustee shall be liable for any act or failure to act of any predecessor Trustee." *E.g.*, A D-1, ¶ 4.5. Moreover, even if the Court were to hold that this provision does not apply, under Missouri law, Allegiant was "under no duty to inquire into the acts or doings of a predecessor trustee," and could be held "liable only for an act or failure to act of a predecessor trustee of which the successor trustee had actual knowledge and which the successor trustee fails to reveal to a majority in interest of the [income] beneficiaries." Mo. Rev. Stat. § 456.187 (enacted 1994; repealed 2005). Plaintiffs cannot prove liability under this provision because NPS, the only income beneficiary, had equal knowledge about the actions of Allegiant's predecessors.

Moreover, as a matter of common sense, Allegiant cannot be liable for the actions of its successor trustees because Allegiant no longer owed any duties to trust beneficiaries after it resigned. Likewise, Allegiant cannot be held liable for funds put into the Missouri Trusts after its tenure. The Trust Agreements expressly provide that the trustee is "accountable . . . only for

11

the funds paid over to it by the Seller." *E.g.*, A D-1, ¶ 4.1. This provision precludes liability for funds paid into the Missouri Trusts after Allegiant's trusteeship.

## II. National City's Affirmative Defenses.

Two affirmative defenses are the subject of National City's pending summary judgment motion. Both prevent the SDR from recovering any damages in this case.

First, under Missouri law, a trust beneficiary who authorizes an alleged breach of trust or receives a benefit from the alleged breach is barred from recovering from the trustee for the alleged breach. *See* D.E. #1762, at 31-32. The evidence will show that NPS, acting through its officers and employees, authorized all of the actions that Plaintiffs now claim breached Allegiant's fiduciary duties and that NPS benefitted from the alleged breaches. Therefore, NPS could not recover from Allegiant on a breach-of-trust claim. Under Missouri law, NPS's authorization of these alleged breaches of duty is attributed to its receiver, the SDR. *See Reynolds v. Third Nat'l Bank of St. Louis*, 225 S.W. 901, 903-04 (Mo. 1920) (per curiam) (estoppel defense). The SDR's claims against National City are barred.

Second, the SDR's claims against Allegiant are barred by the *in pari delicto* doctrine. The essence of Plaintiffs' claim is that Allegiant should have discovered and stopped the Cassitys' fraud. This is precisely the type of claim that Missouri courts have held is barred by the defense of *in pari delicto*, including in actions brought by the representative of a company in liquidation. *See Miller v. Ernst & Young*, 938 S.W.2d 313, 316 (Mo. Ct. App. 1997); *Grove v. Sutliffe*, 916 S.W.2d 825, 830 (Mo. Ct. App. 1995); *see also* D.E. #1995, at 25-27.

## III. Damages.

Eager to tap into National City's perceived deep pockets, Plaintiffs have developed a damages theory that bears no relation to their breach-of-trust claim. In their complaint, Plaintiffs claimed that Allegiant's alleged breaches of fiduciary duties allowed the Cassitys to "manipulate

12

trust assets and siphon millions of dollars from the NPS pre-need trusts, such that the trusts lack sufficient assets to provide consumers their pre-paid funeral services." TAC ¶ 399.  However, in expert discovery, Plaintiffs did not claim as damages particular losses that they allege resulted from the Cassitys' siphoning of trust assets or the amount by which the Missouri Trusts were purportedly underfunded.

Instead, Plaintiffs claim as damages against National City *all* of the losses—all over the United States—that resulted from the insolvencies of NPS, Lincoln, and Memorial, regardless of whether the losses had anything to do with trust assets.  This ambitious damages theory is so unprecedented that neither party was able to find any remotely similar claim in any reported case involving a trustee anywhere in the entire United States.  Plaintiffs claim that these losses total $516 million.  To recap, this amount principally comprises the following categories of damages, less certain offsets:

- *Amounts paid or owed by the SGAs on Lincoln and Memorial insurance policies*. The SGAs seek to recover from National City every dollar they have paid or will pay on all Lincoln and Memorial life insurance policies—regardless of whether the policy was ever held in the Missouri Trusts.  This category of damages amounts to $492 million.

- *The amount paid by the Texas Life and Health Guaranty Association ("TLHGA") to another insurer to assume Memorial's obligations*.  As a subset of the first category of damages, Plaintiffs seek to recover approximately $94 million that the TLHGA paid an insurer in 2011 to assume the remaining obligations of Memorial.  Memorial did not issue any policies to the Missouri Trusts or anywhere outside Texas.

- *Growth payments*.  The SDR seeks approximately $81 million that it claims NPS owes funeral homes across the country to compensate them for the increased costs of providing funeral services due to inflation.

- *"Orphan contracts."*  The SDR claims approximately $5.5 million in payments that NPS owes on pre-need contracts that did not have associated life insurance policies.  This figure includes contracts outside Missouri.

- *California co-insurance*. The SDR seeks approximately $3 million in payments NPS owes to California pre-need consumers, regardless of whether the consumer ever lived in Missouri or whether their policies were held by the Missouri Trusts.

- *The SGAs' administrative expenses*. The SGAs claim approximately $22 million in their own administrative expenses.

- *The SDR's administrative expenses*. The SDR claims approximately $16 million in its own administrative expenses.

There is no basis in the law or the factual record for Plaintiffs to recover these damages against National City.

First, as National City has already argued, the damages remedy for a trust beneficiary is the amount of "(a) loss in value of the trust property attributable to the breach, (b) profit inuring to the trustee from the breach, or (c) loss of profit to the trust which would otherwise have accrued but for the breach." *Barnett v. Rogers*, 400 S.W.3d 38, 49-50 (Mo. Ct. App. 2013) (quotation marks omitted). This measure of damages stems from the special nature of a trust relationship. A trust is "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person." Restatement (Second) of Trusts § 2 (1959). Because a trustee's duties relate to trust "property," the scope of the trustee's liability is tied to that "property." Plaintiffs' claimed damages bear no relation to the losses, if any, suffered in the Missouri Trusts.

Second, Plaintiffs' claimed damages remedy is inconsistent with the governing trust agreements. Each agreement provides that the trustee is "accountable . . . only for the funds paid over to it by the Seller [*i.e.*, NPS]." *E.g.*, A D-1, ¶ 4.1. National City highlighted this provision in its summary judgment motion. *See* D.E. #1762, at 11. To this date, Plaintiffs have not even attempted to explain how their claimed damages can be reconciled with this provision.

Third, Plaintiffs cannot prove that Allegiant Bank's conduct caused Plaintiffs' claimed injuries.  Plaintiffs appear to claim that Allegiant should have somehow put a stop to the Cassitys' scheme at some unspecified time during its trusteeship.  But before, during, and after Allegiant's trusteeship, NPS, Lincoln and Memorial were subject to extensive scrutiny by multiple regulators in Texas and Missouri.  And, during the first part of Allegiant's trusteeship, NPS was being monitored by Plaintiffs' own expert, Bob Lock, as a condition of a consent decree between NPS and the Missouri Attorney General.  These regulators, many of whom had unfettered access to NPS's and Lincoln's books and records, already knew everything that Allegiant could have discovered—and much, much more.  But the Cassitys were running a complex fraud and managed to fool sophisticated regulators until 2008.  The idea that Allegiant, with its limited role in NPS's nationwide operation, somehow could have ended the Cassitys' scheme is fanciful.

Fourth, Plaintiffs' causation theory is inherently at odds with itself.  Plaintiffs' damages expert opines—without any actual analysis—that NPS was running a Ponzi-like scheme for decades.  As a result, he claims, if Allegiant had refused to distribute money to NPS from the Missouri Trusts,  NPS would have been strapped for cash, could not have paid its bills, and would have collapsed then and there.  But, if NPS was already bankrupt when Plaintiffs claim that Allegiant should have taken certain action, then Allegiant could not have caused all of the losses that Plaintiffs now try to pin on Allegiant.

Fifth, the evidence will show that it was other actors that caused the demise of NPS, Lincoln, and Memorial after Allegiant's trusteeship.  The Cassity family and their cohorts drained NPS, Lincoln, and Memorial of cash to fuel their lavish lifestyles and to prop up flailing business ventures around the country.  After Allegiant's trusteeship, the Cassitys resorted to

15

increasingly brazen measures to pull cash from Lincoln. Notably, NPS began surrendering in mass large blocks of Lincoln policies, replacing them with cheaper term life insurance policies.

Allegiant's successor trustees, Bremen and Marshall & Ilsley ("M&I"), had clear notice that mass surrenders were occurring without their authorization. Bremen's and M&I's *own* trust statements, compiled by their trust departments, reveal precipitous drops in the amount of insurance in force reported by Lincoln. But Bremen and M&I apparently failed to appreciate what they were seeing.

Lincoln's and Memorial's auditor, Brown Smith Wallace, also knew of the mass surrenders and Lincoln's contemporaneous issuance of term policies. As part of its 2004 audit of Lincoln, Brown Smith Wallace also reviewed documents showing that NPS was manipulating pre-need consumers' life insurance applications outside Missouri—the very practice that eventually led to regulatory scrutiny of NPS in 2007. Yet Brown Smith Wallace failed to report this practice to the Texas Department of Insurance, as its own auditor testified it should have done. Plaintiffs have themselves admitted that Brown Smith Wallace should have detected NPS's nationwide fraud in 2005 and reported it to the Texas Department of Insurance.

In sum, even if Plaintiffs could establish liability, they cannot recover their claimed damages as a matter of law and they cannot prove that Allegiant caused their claimed damages as a matter of fact.

## CONCLUSION

Plaintiffs' claim against National City is a quintessential breach-of-trust claim, requiring proof of duty, breach, causation, and damage to the trust property. Because Plaintiffs cannot sustain their burden to prove a breach of duty based on the facts of Allegiant's conduct, and because Plaintiffs cannot possibly prove that Allegiant could have stopped the Cassitys when

16

numerous entities and individuals with far greater information about the fraud could not, National City suspects that Plaintiffs will try their hardest to make this trial about other things: National City's due diligence of Allegiant, as just one example.  National City will address this issue and other similar issues in its motions in limine and throughout trial.  National City appreciates in advance Your Honor's diligence in resolving these, and other evidentiary, issues before and during trial.

     Plaintiffs' theory of this case is an improper attempt to rewrite history with the benefit of hindsight.  Knowing what we now know about the Cassitys, it is far too easy to cast blame for not catching them sooner.  The contemporaneous evidence will show that Allegiant acted reasonably.  National City looks forward to showing the facts to the jury.

Dated:  January 12, 2015               Respectfully submitted,


                                By:  /s/ Amy Mason Saharia
                                     Stephen D. Raber (Admitted *pro hac vice*)
                                     J. Andrew Keyes (Admitted *pro hac vice*)
                                     Amy Mason Saharia (Admitted *pro hac vice)*
                                     Mary Beth Hickcox-Howard (Admitted *pro hac vice*)
                                     Teagan J. Gregory (Admitted *pro hac vice*)
                                     **WILLIAMS & CONNOLLY LLP**
                                     725 Twelfth Street, N.W.
                                     Washington, DC 20005
                                     (202) 434-5000 (telephone)
                                     (202) 434-5029 (facsimile)
                                     asaharia@wc.com

                                     Mike W. Bartolacci, Bar No. 29110
                                     **THOMPSON COBURN LLP**
                                     One U.S. Bank Plaza, Suite 2600
                                     St. Louis, MO 63101
                                     (314) 552-6000 (telephone)
                                     (314) 552-7000 (facsimile)
                                     mbartolacci@thompsoncoburn.com

                                     *Attorneys for Defendants National City Bank
                                     and PNC Bank, N.A.*

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 12, 2015, the foregoing TRIAL BRIEF was filed electronically with the Clerk of Court and served by operation of the Court's electronic filing system upon all counsel of record in this case participating in Electronic Case Filing.

      I hereby further certify that the foregoing was mailed by United States Postal Service to the following non-participants in Electronic Case Filing:

Wulf, Bates & Murphy, Inc.
c/o David R. Wulf
2714 Hillcroft Drive
Chesterfield, MO 63017

Sharon Nekol Province
Register Number 36759-044
FMC Carswell
Federal Medical Center
P.O. Box 27137
Fort Worth, TX 76127
*Pro se*

David R. Wulf
Register # 38227-044
FCI Terre Haute
Federal Correctional Institution
Satellite Camp
P.O. Box 33
Terre Haute, IN 47808
*Pro se*

      /s/ Amy Mason Saharia
      Amy Mason Saharia
      (Admitted *Pro Hac Vice*)

      *Attorney for Defendants National City Bank and PNC Bank, N.A.*