**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| JO ANN HOWARD AND ASSOCIATES, P.C., ) | |
| SPECIAL DEPUTY RECEIVER OF LINCOLN ) | |
| MEMORIAL LIFE INSURANCE COMPANY, ) | |
| MEMORIAL SERVICE LIFE INSURANCE ) | |
| COMPANY, AND NATIONAL ) | |
| PREARRANGED SERVICES, INC., ET AL., ) | |
| ) | |
| Plaintiffs, ) | Case No. 09-CV-1252-ERW |
| v. ) | |
| ) | |
| J. DOUGLAS CASSITY; RANDALL K. ) | |
| SUTTON; BRENT D. CASSITY; J. TYLER ) | |
| CASSITY; RHONDA L. CASSITY; ET AL., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' TRIAL BRIEF**

In accordance with the Case Management Order [ECF No. 1188], Plaintiffs respectfully submit this trial brief.

**I.      Factual Issues**

This litigation centers on the failures of the Missouri Trustees—Mark Twain, Mercantile, and Allegiant—to protect Missouri families' money entrusted to the trustees to pay for the families' funeral services.  The Missouri Trustees owed fiduciary duties to these pre-need funeral consumers, funeral homes, and National Prearranged Services, Inc. ("NPS").  The Missouri legislature mandated that bank trustees safeguard consumers' funds for future funeral services regardless of the viability of the pre-need seller.  Here, the Missouri Trustees were negligent and breached their fiduciary duties by allowing and participating in the siphoning away of families' pre-need funds from the trusts.  Among other breaches, the Missouri Trustees failed

to take custody or control of the life insurance policies that were the predominant asset of the trusts, allowed the value of the trusts to be depleted through NPS taking policy loans on trust assets, and improperly distributed funds to NPS and its cohorts.  They also failed to take any steps to protect consumers and funeral homes—beneficiaries of the trusts—from further harm when they were replaced as trustees by warning the beneficiaries or successor trustees of the red flags in the trusts.  As a direct result of the Missouri Trustees' breaches of their duties, the Missouri Trustees enabled a nationwide Ponzi-like scheme that has cost Plaintiffs approximately half a billion dollars in damages.

### Current Defendants

Plaintiffs[1] currently intend to proceed to trial against the following Defendants:

Missouri Trustee Defendants

- National City Bank, as the successor to Allegiant Bank
- PNC Bank, N.A., as the successor to National City Bank and Allegiant Bank
- U.S. Bank, N.A., as the successor to Mercantile Bank, N.A., Mercantile Trust Company, N.A., and Mark Twain Bank
- Herbert Morisse

RICO Defendants

- Nekol Province
- Forever Enterprises, Inc. ("Forever Enterprises")

---

[1] Plaintiffs are:  Jo Ann Howard & Associates, P.C., Special Deputy Receiver of Lincoln Memorial Life Insurance Company ("Lincoln"), Memorial Service Life Insurance Company ("Memorial"), and National Prearranged Services, Inc.; the National Organization of Life & Health Insurance Guaranty Associations; the Missouri Life & Health Guaranty Association; the Texas Life & Health Guaranty Association; the Illinois Life & Health Guaranty Association; the Kansas Life & Health Guaranty Association; the Oklahoma Life & Health Guaranty Association; the Kentucky Life & Health Guaranty Association; and the Arkansas Life & Health Guaranty Association.

### The Cassitys

Doug and Brent Cassity through Randy Sutton and David Wulf (collectively, the "Cassitys") were the active inner circle of the pre-need fraud scheme.  All have now been convicted of felonies for their role in this multi-state Ponzi operation that used the funds from newly sold pre-need contracts to pay for existing obligations to pay for families' funerals.

The Missouri Trustees, in exchange for fees and with the Cassitys' agreement to bring their other banking business to the respective bank, joined the NPS operation as the bank trustee required by Missouri law for the pre-need funeral funds that NPS collected from thousands of families.  The Missouri Trustees took all of their directions from Sutton and/or Wulf and repeatedly, knowingly, and blindly transferred the pre-need funds out of the trusts back to the Cassitys for their personal use and to various Cassity-owned and –controlled entities where they could and did perpetuate the fraud.

The RICO Defendants were also involved in the fraudulent scheme.  Province held numerous leadership positions within the Cassity Consortium, including Office Manager of NPS, President of NPS, and Vice President of LMS.  Province instructed the NPS sales staff to say "We do not do policy loans in any state," despite overwhelming evidence to the contrary, and directed the use of company funds for the personal enrichment of the Cassitys by purchasing real estate, paying credit card bills and transferring NPS funds directly to Doug Cassity.  Forever Enterprises siphoned pre-need funds from NPS and made infrequent repayments, if any.

### The Crucial Role of the Missouri Trustees

The Missouri Trustees enabled the Cassitys to further the multi-state fraudulent scheme through their actions and failures to act.  Mark Twain helped the Cassitys start the scheme and along with the successor trustee banks ensured it could keep going.  The Missouri Trustees knew that the Cassitys could not sell pre-need contracts in Missouri without a bank agreeing to be their trustee, knew that the Cassitys were collecting millions of dollars of Missouri families' money using the banks' names as trustee, and knew that the Cassitys could not get any money out of the trusts without the trustees' authorization.  The Missouri Trustees allowed the Cassitys to direct almost all of the money in the trusts into policies issued by the life insurance companies the Cassitys owned and controlled.

As the trustee of these assets, the Missouri Trustees had the duty to know their value, especially when these assets made up over 90% of the total stated "market value" of the trusts. The Missouri Trustees failed to ask the Cassitys or Lincoln for this information and thus failed to ever value the life insurance policies to see if they had sufficient cash value to cover trust liabilities.  From the early 1990s forward, the trusts never had sufficient assets to pay for outstanding liabilities.

The Missouri Trustees argue the trusts had sufficient assets and paid for funerals as they came due.  In reality, the trusts paid for consumers' funerals not with the consumers' own money, which had been stolen long ago, but by taking money from new consumers.  With the assistance of the Missouri Trustees, the Cassitys were able to continue to sell millions of dollars of pre-need contracts in multiple states and to conceal that the new consumer money was being used to pay the claims for earlier consumers' funerals whose money, intended to pay for their

4

own family's funerals, had been looted years before.  The Missouri Trustees made the scheme possible, they made it easy, and they caused it to expand.

## Missouri Chapter 436

The Missouri legislature inserted bank trustees into the pre-need industry through Chapter 436 because there had been a history of problems with pre-need sellers.  Under Chapter 436, the bank acting as trustee is required to maintain control of the assets, preserve the assets, and keep records of all activities of the trust.  The Cassitys needed a bank to agree to serve as trustee in name only to satisfy Chapter 436, while at the same time ensuring that the bank would not actually or actively enforce the protections of Chapter 436.  Only with a bank willing to accept the badge of trustee and fiduciary without honoring the responsibilities attached to that role could the Cassitys keep control of the money that would be generated by the sales of pre-need contracts.  The Missouri Trustees here fit the bill year after year.

## The NPS Ponzi-Like Scheme

A Ponzi scheme uses new victims' money to pay the currently due obligations to victims who were duped earlier and whose own money has long been squandered.  Plaintiffs' expert Jonathan Arnold will testify that a Ponzi scheme involves three elements:  (1) a time lapse between when promises are made and obligations come due; (2) the constant need for large amounts of new money regularly coming in to pay past promises that are coming due; and (3) complete control of and access to all of the money and cash flows so that the schemers can collect the new cash to continue the scheme and avoid detection by paying past promises as they come due while siphoning off large amounts of money for themselves.  Pre-need funeral trusts, supervised by a complicit trustee, were perfect for this type of scheme.

5

In the Cassitys' version of the Ponzi-like scheme, they looted the trusts by mismatching pre-need contracts to life insurance policies, taking insurance policy loans, manipulating whole life policies, exchanging trust assets for worthless debentures (promises to pay or IOUs), purchasing stock at inflated prices, and wrongfully distributing trust funds to NPS and other Cassity-controlled entities while the trusts were underfunded.  The Cassitys used their own insurance company to issue the policies, a company which Bank of America (a one-time trustee of the NPS Iowa Trust) termed "captive" and which received a "D+" or "weak" rating from the Weiss insurer rating agency.  The Missouri Trustees themselves never, in over 15 years, checked Lincoln's ratings or financial condition.

The Missouri Trustees played a central role in this scheme.  The Cassitys promoted their sales to funeral homes and consumers by claiming that 80% of the funds would be kept securely in a bank trust.  NPS made this claim in every pre-need contract they issued in Missouri.  With the cooperation of the Missouri Trustees, NPS and Forever were able to drain tens of millions of dollars from the trusts to use for the Cassitys' personal benefit and to perpetuate the Ponzi-like scheme by paying out policies and death claims for previous victims' funerals with funds from new pre-need consumers. All of these funds went through the trusts that were the responsibility of the Missouri Trustees.  The Missouri Trustees allowed the scheme to continue when they could have stopped it at any point.  They did not.

The Missouri Trustees also could have put a stop to the scheme by simply refusing to accept the trusts in light of the numerous indications of fraud.  For example, United Missouri Bank ("UMB"), which held the NPS trust accounts before Mark Twain, notified NPS that it could not distribute any more income to NPS until it was satisfied that the trust was adequately

funded.  However, Mark Twain never investigated why NPS was searching for a new trustee, including simply calling anyone at UMB.  If it had, it would have learned of the problems identified by UMB.  Mark Twain also never reviewed the UMB trust agreement, which contained greater fiduciary protections for trust assets than the agreement Mark Twain signed, including greater recordkeeping responsibilities.  Mark Twain also did not conduct any due diligence concerning NPS or its management and so did not learn that NPS's founder, Doug Cassity, had been convicted of fraud.

Allegiant similarly accepted the NPS trusts without an adequate understanding of the nature of the trusts and the assets.  The Allegiant Trust Committee voted to accept the trust accounts without knowing: that NPS and Lincoln were affiliates; the terms of the pre-need contracts; the premium terms and future premium requirements of the life insurance policies; the cash values of the policies; whether the policies were whole life or term; how many policies were held by the trusts; the recordkeeping requirements for the trusts; and whether Allegiant would have physical possession of the life insurance policies.

The Missouri Trustees' agreements with the Cassitys enabled the scheme to begin, to flourish, and to continue from trustee to trustee. There was an express agreement between the Missouri Trustees and the Cassitys providing that the Missouri Trustees would get the Cassitys' nationwide banking business if they agreed with how the Cassitys wanted the trusts to be handled.  The Missouri Trustees agreed not to maintain control of the assets by not demanding or obtaining (as legally required) control of the policies.  As a result, the Missouri Trustees did nothing to preserve the assets, which Plaintiffs' trust experts will testify was one of their primary jobs as trustees of a pre-need trust account.  The Missouri Trustees agreed not to track the value

of the trust assets to see if their value was increasing or decreasing.  They never tracked or inquired into trust liabilities.  They never questioned the flow of cash in and out of the trusts. They agreed not to keep records sufficient to know what was going on with the trust accounts as required by Missouri Law in Chapter 436 of the Missouri Revised Statutes, but instead agreed simply to rely on the Cassitys' word.  The Missouri Trustees did not investigate whether the supposed hundreds of millions in trust assets were being invested as claimed, and did not question that those assets were nearly all used to purchase life insurance policies issued by a poorly-rated insurance company owned and controlled by the Cassitys.

The Missouri Trustees' agreement with the Cassitys caused them to ignore all of the red flags on the trust accounts and the Cassitys' other bank accounts.  The Missouri Trustees agreed to NPS's choice of Wulf to act as the "independent" investment adviser under the statute, without analyzing whether he satisfied Chapter 436's legal requirements of independence or whether he was actually making the investment decisions.  Moreover, even if Wulf had been an independent investment adviser (which he was not), the Missouri Trustees still had continuing, ongoing fiduciary obligations as trustee to keep safe the trust funds.  They knowingly breached these duties.  They remained silent in the face of repeated suspicious and criminal activities.

## II.   Legal Issues

### A.   The Missouri Trustees' Negligence and Breaches of Fiduciary Duty

Plaintiffs have asserted negligence and breach of fiduciary duty claims against the Missouri Trustees.  The two causes of action contain similar elements.  "An adequately pleaded claim for breach of fiduciary duty consists of the following elements: l) the existence of a fiduciary relationship between the parties, 2) a breach of that fiduciary duty, 3) causation, and 4) harm."

8

*Gannon Int'l, Ltd. v. Blocker*, No. 4:10CV0835 JCH, 2011 WL 111885, at *9 (E.D. Mo. Jan. 13, 2011) (quoting *Robert T. McLean Irrevocable Trust U/A/D v. Patrick Davis, P.C.*, 283 S.W.3d 786, 792–793 (Mo. Ct. App. 2009)).   Similarly, "[t]o make an adequate claim for common law negligence, a plaintiff must establish that the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused injury to the plaintiff." *Sill v. Burlington N. R.R.*, 87 S.W.3d 386, 391 (Mo. Ct. App. 2002) (citing *Lopez v. Three Rivers Elec. Co–op., Inc.*, 26 S.W.3d 151, 155 (Mo. 2000)).

Plaintiffs stand in the shoes of NPS, consumers, and funeral homes and have brought the negligence and breach of fiduciary duty claims on their behalf.   On January 9, 2015, the Court held that NPS, "recipients of funeral services and providers of funeral services are beneficiaries of the preneed trusts."   [ECF No. 2084 at 11].   Accordingly, the Missouri Trustees owed fiduciary duties to Plaintiffs.

### (1)   Duty and Breach

"A trustee is a fiduciary of the highest order and is required to exercise a high standard of conduct and loyalty in administration of the trust." *Saigh v. Saigh*, 218 S.W.3d 556, 561 (Mo. Ct. App. 2007) (quoting *Ramsey v. Boatmen's First Nat'l Bank of K.C.*, 914 S.W.2d 384, 387 (Mo. Ct. App. 1996)).   The bar is even higher for professional trustees like the Missouri Trustees.   "To an increasing extent statutes and court decisions require a higher standard of care for professional fiduciaries."   George Gleason Bogert et al., Bogert's Trusts & Trustees § 541.   The Missouri Court of Appeals recognized that banks are held to a higher standard of care, stating, "[a]s a corporate trustee, a bank is generally chosen for objectivity and expertise. *A bank cannot take a passive role in the administration of the trust* for which it accepted a fiduciary responsibility as a

9

trustee." *Ramsey*, 914 S.W.2d at 388 (emphasis added); *see also Moeller v. Superior Ct.*, 947 P.2d 279, 285 (Cal. 1997) ("[P]rofessional trustees . . . are held to a higher standard of care in discharging their legal duties than are others."); Mo. Rev. Stat. § 456.8-806 ("A trustee who has special skills or expertise, or is named trustee in reliance upon the trustee's representation that the trustee has special skills or expertise, shall use those special skills or expertise.").

The Missouri Trustees also owed Plaintiffs a duty to use that degree of skill and learning ordinarily used under the same circumstances by commercial trustees. "When negligence . . . is asserted in the performance of professional conduct, 'the specific duty is defined by the profession.'" *Luscombe v. Mo. State Bd. of Nursing*, --- S.W.3d ---, 2013 WL 68899, at *7 (Mo. Ct. App. 2013) (quoting *Ostrander v. O'Banion*, 152 S.W.3d 333, 338 (Mo. Ct. App. 2004)); *see also Business Men's Assurance Co. of Am. v. Graham*, 891 S.W.2d 438, 453 (Mo. Ct. App. 1994) ("When a person possesses knowledge or skill superior to that of an ordinary person, the law requires of that person conduct consistent with such knowledge or skill."). "This 'professional standard' is commonly referred to as a standard of care." *Luscombe*, 2013 WL 68899, at *7.

The Missouri Trustees breached their duties to Plaintiffs during the administration of the trusts and by allowing NPS to transfer the trusts to their successors without taking any steps to advise the beneficiaries or successors as to problems with the trusts.

The Court held on December 1, 2014, that Plaintiffs' trust experts Edgar Coster and Donald Fitzgerald are qualified under Rule 702 to give expert opinions concerning the conduct of the Missouri Trustees.  [ECF No. 1972].  Coster and Fitzgerald's testimony will include their opinions concerning "the responsibilities of trustees" and "[w]hether [the] trustees complied or did not comply with the standard of care."  *Id.* at 8.  Coster and Fitzgerald have identified

numerous instances in which the Missouri Trustees failed to comply with the standard of care in administering and passing on the NPS trusts.

### Breaches During the Administration of the Trusts

*Mark Twain/Mercantile.*  During Mark Twain's and its successor-in-interest Mercantile's time as trustee from 1989 to 1998, they turned a blind eye to numerous red flags.  The trusts were underfunded and the two banks did nothing about it.  Instead, Mark Twain and Mercantile allowed the Cassitys to direct millions of dollars in trust funds to a non-rated and then poorly-rated insurance company controlled by NPS.  The trust accounts went from 0% in insurance policies to roughly 80% of stated trust market value in two years.  Mark Twain made no inquiries into these companies nor questioned the dramatic shift in assets, thus allowing the Cassitys to perpetrate their fraudulent scheme.  Mark Twain and Mercantile allowed policy loans to be taken on life insurance policies despite suspicious transactions related to these loans.

During Mark Twain's trusteeship, NPS was audited by Bob Lock to "determine compliance with Chapter 436."  Bob Lock had extensive experience auditing pre-need sellers and was intimately familiar with Chapter 436 compliance.  The Court has held that in addition to his factual testimony, Lock is qualified as an expert to provide expert testimony "on whether the trustees acted in compliance with the statutory requirements of Chapter 436 and if David Wulf acted as an independent investment advisor."  [ECF No. 1972 at 5].  Lock's audit determined that the Cassity pre-need trusts were underfunded by approximately $13.5 million.  Lock also made extensive findings regarding the "Trustee Responsibilities":

> Our analysis of the trust balance demonstrate[s] that the trust is funded at a substantially lower amount than required by Chapter 436 and as specified in the annual report. This deficiency is principally the result of shortages of deposits as described in Finding 1.  However, distributions were made for loan payouts by the

trustee even though the trust is funded at a level below the sum of deposits that is required to be held in trust.

. . .

The trustee is not meeting their fiduciary responsibility in holding, administering and distributing such deposits in trust as established by Chapter 436 RSMo.

. . .

[T]he examiner detected a lack of control procedures of the seller's records which we assume extend to the trustee level.

Lock recommended that "records be maintained" that would "ensure[] the trustee that compliance with Chapter 436 is being provided for each deposit and distribution."

As part of the monitoring process, Lock interviewed John Zieser, a Mark Twain trust administrator, regarding the trusts.  Following his interview of Zieser, Lock noted the many failings of Mark Twain in administering the trusts:

- Zieser had not reviewed the consent decree NPS had entered into with the Missouri Attorney General, asking "should we have [a copy of] it?";

- The trustee did "not perform th[e] function" of "ensur[ing] funds are deposited by NPS to pay insurance premiums sufficient to fund insurance benefits equal to 100% of the face value of the pre-need contract";

- When a contract was cancelled, the trustee merely accepted NPS's determination of how much was owed on the contract;

- The trustee was "[n]ot really sure" of the purpose of some of the wire transfers out of the trusts; and

- "NPS dictate[d]" all withdrawals from pre-need trusts II-IV.

Even though it had knowledge of this Consent Judgment, Mark Twain failed to monitor trust transactions and continued to do nothing except what the Cassitys told it to do, all while continuing to collect its trustee fees and conduct the Cassitys' other banking business.  For example:

- Mark Twain knew of negative publicity surrounding the underfunding of the NPS pre-need trusts and related litigation in 1993 and 1994 and almost withdrew as trustee but ultimately took no steps to oversee trust transactions.

- Mark Twain did not ask any questions and simply followed instructions regarding the initial purchase of Lincoln life insurance policies.

- Mark Twain continued to serve as trustee of the NPS pre-need trusts and processed disbursements without oversight, despite a Senior Vice President at Mark Twain suspecting NPS and various Cassity Consortium entities of check kiting.

- Mark Twain failed to perform income calculations as required by Missouri law.

- Mark Twain would disburse trust funds as NPS said because NPS told the bank they "could listen to" them.

*Allegiant.*  While serving as trustee from 1998 to 2004, Allegiant played a critical role in the Cassitys' plot by agreeing to a role in which it was paid to process all wire transfer requests received from NPS/Forever and Wulf without any form of screening or review.  No money left the trust accounts without an Allegiant employee actively sending it out of the trust.  Allegiant thus was not a mere passive observer to the looting of the trusts.  It was an active participant each and every time family money was stolen from the trusts, and had it said "no" at any time, the pre-need funds could not have been siphoned away.

There are numerous examples of Allegiant's willful mishandling of the trusts:

- Herbert Morisse, an Allegiant employee, *authored* the Custody Agreements, which enabled NPS and Forever to maintain both custody of trust assets and the records and accountings associated with such assets.

- Herbert Morisse also *drafted* the Wulf Letters, which purported to authorize Allegiant to take direction from NPS and Forever representatives to distribute cash and settle trades.   Relying on this letter Allegiant actively wired out tens of millions of dollars from the trust any time NPS or Forever requested that they do so, no questions asked, no matter how facially inappropriate the request appeared.

13

- Herbert Morisse admitted in a 2010 interview with government investigators that Allegiant treated the NPS and Forever pre-need trusts as custody accounts.  This fact explained why Allegiant disregarded its knowledge of the misconduct and why they did nothing to protect the pre-need consumers.

- National City admitted that "[n]o money could leave the NPS trusts between 1998 and 2004 without Allegiant's participation" "[b]ecause NPS can't wire the money out of the trust itself [so] [i]t has to have Allegiant's participation."

- National City admitted that Wulf did "not have the authority to direct transfers out of the NPS trusts that [we]re unrelated to investment decisions."

- National City admitted that Allegiant "did not have to follow requests to wire money out of the NPS trust that were not related to investment decisions," that it had "a responsibility to know whether the money it was sending out of the trusts were in fact related to investment decisions," and that it was "a responsibility of the Allegiant operations department to review the wire activity within the NPS trusts for potentially suspicious transactions."

- Nevertheless, "Allegiant never denied NPS's request to wire money out of the trust for any reason."  In fact, Allegiant never denied a single request out of the hundreds from NPS/Forever to wire money out of the trust accounts despite "by its own documents Allegiant can see that trust four money is being used to purchase two residential properties from Doug Cassity and Rhonda Cassity." National City admitted that this transfer approval process "was a system that Allegiant knowingly and consciously created, whereby it would *automatically* execute all wire transfers requested by NPS" and that it "felt it had a duty to process all wire requests received from NPS."

Allegiant also did not prevent the trusts' life insurance policies from being depleted despite receiving clear notice of policy loans being taken against these policies.

### Failure to Take Proper Steps to Warn Potential Successor Trustees of Problems with the Trusts

*Mark Twain/Mercantile.*  When Mercantile ended its role as trustee in 1998, it could and should have warned the incoming trustee, Allegiant, about the Consent Judgment.  It did not. Mercantile failed to inform the successor trustee of the pre-need trusts of the Consent Judgment

14

and the court-ordered monitoring.  Markow testified that Allegiant "would never have taken the [NPS and Forever] accounts" had Allegiant known of the Consent Judgment.  This was another chance for the Ponzi-like scheme to be stopped, but it did not occur because of the Missouri Trustees' complicit actions.

*Allegiant.* National City agreed to purchase Allegiant in November 2003.  National City had Albert Kantra act as the integration leader between the two companies' trust departments. Following his first site visit to Allegiant's trust department, Kantra wrote a memorandum to his supervisor in which he identified the potentially "huge" fiduciary liability posed by the NPS/Forever pre-need trusts:

> Their largest trust account is a $195,000,000 pre-need funeral arrangement trust that generates only ~$60,000 in annual fees.  They are losing big money on this account and the potential fiduciary liability is huge.  In years past, we have had large losses related to these types of accounts in MI and other states.  We will likely look to exit this relationship.

In the integration team's task log, Kantra designated the decision on whether to retain the NPS/Forever trust accounts as the most "urgent" task for the integration team.  Kantra also listed the "risk assessment" for the NPS/Forever trusts as "extremely high."

National City executives held conference calls with Allegiant executives and conducted due diligence which uncovered numerous red flags about the mismanagement of the trusts and the suspicious transactions and ownership arrangements of the related entities, including:

- National City auditors uncovered evidence of the RICO Defendants' "policy mismatching" scheme and saw multiple examples of paid-in-full pre-need funeral contracts being funded with Lincoln life insurance policies requiring premiums payable over many years.

- National City auditors discovered a complete lack of documentation or support for the supposed $13.5 million group term life insurance policy reported as an asset on Allegiant Bank's trust statements.  Despite this knowledge, National City

> allowed Allegiant Bank to issue a trust statement including the fictional $13.5 million group term life insurance policy as an asset of one of the NPS pre-need trusts, which successor trustees relied on in continuing to list the group term policy as a trust asset.

Allegiant and National City knew there were illegal and financially disastrous activities occurring in these trust accounts. When Allegiant withdrew as trustee in 2004 at National City's direction, Allegiant could have taken steps to remedy the situation or warn trust beneficiaries. It did not. It could have warned the incoming trustee Bremen Bank. It did not. The multi-state scheme could have been stopped once again but Allegiant and National City were complicit and did nothing to stop it but allowed it to continue.

### (2)    Causation

"[T]he test 'of proximate cause is whether the negligence is an efficient cause which sets in motion the chain of circumstances leading to the plaintiff's injuries or damages.'" *Lafarge N. Am., Inc. v. Discovery Grp. L.L.C.*, 574 F.3d 973, 985 (8th Cir. 2009) (quoting *English v. Empire Dist. Elec. Co.*, 220 S.W.3d 849, 856 (Mo. Ct. App. 2007)). It is irrelevant whether the Missouri Trustees reasonably foresaw all of Plaintiffs' particular injuries. "The test is not whether a reasonably prudent person would have foreseen the particular injury," but "whether, after the occurrences, the injury appears to be the reasonable and probable consequence of the act or omission." *Schaffer v. Bess*, 822 S.W.2d 871, 876 (Mo. Ct. App. 1991); *see also Robinson v. Mo. State Highway & Transp. Comm'n*, 24 S.W.3d 67, 78 (Mo. Ct. App. 2000) ("It is only necessary that the party charged knew or should have known there was an appreciable chance *some* injury would result.") (emphasis added, quotation omitted).

For a defendant to have proximately caused the plaintiff's injury, the "defendant's negligence need not be the sole cause of the injury. It is sufficient that it be one of the efficient

causes thereof, without which the injury would not have occurred." *Shervin v. Huntleigh Sec. Corp.*, 85 S.W.3d 737, 743 (Mo. Ct. App. 2002).

The Missouri Trustees' breaches set in motion the chain of circumstances leading to Plaintiffs' losses. The Cassitys' scheme, including its operations in other states, could not have occurred without the pervasive negligence and breaches of fiduciary duty committed by the Missouri Trustees. Under Chapter 436, NPS needed a bank trustee in order to operate in Missouri. Missouri families' money that was deposited into the Missouri trusts was essential to the Ponzi-like scheme perpetrated by the Cassitys. The Missouri Trustees allowed the Cassitys to take out policy loans, without the knowledge and consent of the insureds, thus depleting the value of the assets held in the trusts. The Missouri Trustees also allowed the Cassitys to withdraw funds from the trusts to pay for NPS's operations in other states. If the Missouri Trustees had complied with their duties by exercising control over the trust assets and/or by alerting the successor trustee to problems with the trusts, the Cassitys never could have operated in Missouri or other states, and Plaintiffs would not have suffered the losses attributable to NPS's nationwide operations. As the Court recognized in its January 12, 2015 order, "These actions allowed NPS to continue to expand and flourish." [ECF No. 2092 at 28].

Plaintiffs expect that the Missouri Trustees may seek to argue that they did not proximately cause Plaintiffs' injuries because the fraud committed by the Cassitys and their cohorts was an intervening and superseding cause. Such an argument is improper in this case in light of Missouri law and the Court's prior rulings. "An intervening cause is a new and independent force that so interrupts the chain of events that it becomes the responsible, direct, proximate, and immediate cause of the injury . . . ." *Shervin*, 85 S.W.3d at 743. An act "which is

itself a *foreseeable and natural result* of the original negligence" does not constitute an intervening act. *Schaffer*, 822 S.W.2d at 877 (emphasis added).  In denying Comerica's motion for summary judgment, the Court held that under nearly identical Iowa law, the RICO Defendants' actions were not a superseding cause:

> The intervening actions of the RICO Defendants were reasonably foreseeable to Comerica.  As previously discussed, the purpose of pre-need trusts is to prevent exactly the type of harm which occurred in the present case.  That an individual would use fraudulent actions to gain access to assets in any trusts is entirely foreseeable.

[ECF No. 2068 at 9].  Accordingly, the Missouri Trustees are not entitled to jury instructions or to advance any arguments concerning intervening cause.

### (3)    Damages

Plaintiffs seek both compensatory and punitive damages against the Missouri Trustees.

### Compensatory Damages

On January 12, 2015, the Court held that "[i]f Plaintiffs are able to prove breaches of fiduciary duties and negligence, the damages will not be limited to loss of the trust assets or profit made from the breach."  [ECF No. 2092 at 11].  Plaintiffs' expert, Jonathan Arnold, will testify at trial that Plaintiffs' current and projected future losses total approximately half a billion dollars. Plaintiffs seek the full amount of these damages from each of the Missouri Trustees.  Mark Twain was trustee when the Cassitys instituted their fraudulent scheme and began taking policy loans against policies held in the trusts.  By permitting the Cassitys' misconduct and by failing to take any steps to alert a potential successor trustee to problems in the trusts, Mark Twain/Mercantile are liable for all damages.  Allegiant is similarly liable for the full amount of damages.  Allegiant never should have allowed the Cassitys to loot the trusts or passed on the

18

trusts to Bremen Bank without advising it of any of the problems it or National City had uncovered during Allegiant's trusteeship.  In addition, Allegiant is liable "for its own failure to remedy the breaches" committed by Mark Twain/Mercantile.  [ECF No. 2068 at 11].

Plaintiffs intend to prove at trial that the Missouri Trustees are also jointly and severally liable for Plaintiffs' injuries.[2]

> According to the great weight of authority, where the concurrent or successive negligent acts or omissions of two or more persons, although acting independently of each other, are, in combination, the direct and proximate cause of a single injury to a third person, and it is impossible to determine in what proportion each contributed to the injury, either is responsible for the whole injury, even though his act alone might not have caused the entire injury, or the same damage might have resulted from the act of the other tortfeasor, and the injured person may at his option or election institute suit for the resulting damages against any one or more of such tortfeasors separately, or against any number or all of them jointly.

*Glick v. Ballentine Produce Inc.*, 396 S.W.2d 609, 613 (Mo. 1965) (quotation omitted), *overruled on other grounds by Bennett v. Owens-Corning Fiberglas Corp.*, 896 S.W.2d 464, 466 (Mo. 1995).  "An indivisible injury results when two or more causes combine to produce a single injury incapable of division on any reasonable basis and each is a substantial factor in bringing about the harm." *McDowell v. Kawasaki Motors Corp. USA*, 799 S.W.2d 854, 861-62 (Mo. Ct. App. 1990) (citing Restatement (Second) of Torts § 433A(2) cmt. i).

The breaches committed by Mark Twain/Mercantile and Allegiant combined to cause Plaintiffs' losses.  The Cassitys' Ponzi-like scheme resulted in shifting liabilities between trustee periods, so that a pre-need contract and associated life insurance policy issued during Mark Twain or Mercantile's tenure would be paid off with funds taken in from new consumers during

---

[2] The Court found in its January 12, 2015 order that "at this time, Plaintiffs have not proven the impossibility of apportioning the damages as is required for joint and several liability."  [ECF No. 2092 at 28].

Allegiant's trusteeship.  The prior trustee breached its duties by failing to exercise control over the life insurance policy and allowing the Cassitys to drain its value, and Allegiant breached its duties by allowing new consumers' money to be used to pay those older promised benefits (leaving no money for the new consumers' contracts).   In other words, both Mark Twain/Mercantile's and Allegiant's breaches of duties combined to cause Plaintiffs' single, indivisible harm.

Whether Plaintiffs' injuries are indivisible is a question for the jury.  *See Richardson v. Volkswagenwerk, A.G.*, 552 F. Supp. 73, 80 (W.D. Mo. 1982) ("If reasonable minds could differ on whether the plaintiff's injuries are divisible, the trier of fact determines whether the injury can be reasonably apportioned among the defendants and the extent of each defendant's liability."); *see also Mo. Pub. Entity Risk Mgmt. Fund v. Am. Cas. Co. of Reading*, 399 S.W.3d 68, 81 (Mo. Ct. App. 2013) ("Issues surrounding damages, including apportionment thereof, are questions for a trier of fact . . . .").

## Punitive Damages

Plaintiffs also seek punitive damages against the Missouri Trustees.  "Punitive damages may be awarded if the defendant showed complete indifference to or a conscious disregard for the [rights] of others."  *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. 1996) (internal quotations omitted); *see also Haynam v. Laclede Elec. Co-op., Inc.*, 889 S.W.2d 148, 155 (Mo. Ct. App. 1994) (holding that a punitive damage instruction may be modified from "safety of others" to "rights of others" when the case involves only pecuniary harm).  In addition, Plaintiffs can receive punitive damages based on negligence "if, at the time of the negligent act, the defendant 'knew or had reason to know that there was a high degree of probability that the action would result in

injury.'" *Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 338 (Mo. 1996) (quoting *Hoover's Dairy, Inc. v. Mid–Am. Dairymen, Inc.*, 700 S.W.2d 426, 436 (Mo. 1985)) (emphasis omitted). Punitive damages must be supported by "clear and convincing" evidence. *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. 1996).  There is no cap on a jury's award of punitive damages.  *See Lewellen v. Franklin*, 441 S.W.3d 136, 142-45 (Mo. 2014) (striking Missouri's statutory cap on punitive damages as unconstitutional as applied to causes of action that existed in 1820); *see also Watts v. Lester E. Cox Med. Ctrs.*, 376 S.W.3d 633, 638 (Mo. 2012) (recognizing that "civil actions for damages resulting from personal wrongs have been tried by juries since 1820").

The Missouri Trustees showed complete indifference to and a conscious disregard for the rights of funeral homes and consumers.  Both Mark Twain/Mercantile and Allegiant testified that they did not treat funeral homes and consumers as beneficiaries of the trusts and did not act as trustees to protect them.   During Mark Twain's tenure, Mark Twain allowed the overwhelming majority of trust assets to be shifted to a NPS/Cassity-controlled insurance company and allowed NPS to take policy loans against these trust assets.  Mark Twain also allowed NPS to "dictate" all withdrawals from the trusts.  Allegiant similarly admitted in its 30(b)(6) deposition that it "knowingly and consciously created" a system that "would automatically execute all wire transfers requested by NPS."  In addition, recent testimony from Thomas Jurmanovich, a former National City Bank employee, demonstrates that Allegiant was aware of numerous problems with the trusts while Allegiant still administered them, including the lack of any support for a $13.5 million insurance policy listed as a trust asset and that Allegiant did not reconcile the amounts NPS stated it had deposited in the trust accounts.

Despite its own awareness of these significant problems in the trusts, Allegiant failed to take any steps to alert the beneficiaries, a successor trustee or a court to protect the funeral homes or consumers before passing the trusts off to the next trustee.  The Missouri Trustees knew or should have known that there was a high degree of probability that this conduct would result in injury.

### (4)   Participation in Breach of Trust Claim Against Morisse

Plaintiffs have also asserted a claim against Morisse for participation in Allegiant's breach of trust. As this Court recognized in denying Morisse's motion for judgment on the pleadings, if the officer of a corporation "has actual or constructive knowledge of, and participated in, an actionable wrong, the officer may be held liable." [ECF No. 2060 at 5].  Morisse was the main administrator of the NPS trusts for the entire time they were at Allegiant, during which time he "allowed policy loans to be taken on trust assets without receiving promissory notes or other security; he allowed improper distributions of trust income; he participated in drafting documents which allowed NPS and the Cassity family to loot the trust assets of their value; and in taking these steps, he failed to protect the trust assets as he was required to do." *Id.* at 5-6. The jury will decide whether Morisse's knowledge and participation in these acts give rise to liability.

### B.   The RICO Defendants' Violations of RICO

Plaintiffs have asserted numerous claims against the RICO Defendants, but seek to go to trial against the RICO Defendants only as to Count 1: violation of 18 U.S.C. § 1962(c). Establishing a violation of § 1962(c) requires a showing that the defendant: (1) conducted (2) an enterprise (3) through a pattern of racketeering activity that causes injury to the plaintiff's business or property.  *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

### (1)      The "Enterprise"

An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  To establish the existence of an "enterprise," a plaintiff must demonstrate "(1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering." *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 769-70 (8th Cir. 1992).

Plaintiffs alleged two separate enterprises in the Third Amended Complaint: the NPS Enterprise (consisting of NPS, Lincoln and Memorial) and the RBT Enterprise (consisting of RBT Trust II, NHE, Forever Enterprises, Lincoln Memorial Services, Inc., NPS, Lincoln and Memorial).  The requirement for a "common or shared purpose" is satisfied so long as the "RICO defendant shared in the *general* purpose and to some extent facilitated its commission." *Handeen v. Lemaire*, 112 F.3d 1339, 1351 (8th Cir. 1997).  These enterprises shared the purpose of defrauding funeral homes and consumers by misappropriating funds required to be held for their benefit and diverting the funds to improper purposes, such as the personal enrichment of the Cassitys.  These enterprises also had continuity and an ascertainable structure, as they were run as entities within the Cassity consortium by the Cassitys themselves and their cohorts.

### (2)      The RICO Defendants' "Conduct"

For a defendant to be liable under RICO, it must have "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  "In order to participate, directly or indirectly, in the conduct of

[an] enterprise's affairs, one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (internal quotations omitted).

The RICO Defendants all played some part in directing the enterprises' affairs. Province held numerous leadership positions within the enterprises, including Office Manager of NPS, President of NPS, and Vice President of LMS. Province instructed the NPS sales staff to say "We do not do policy loans in any state," despite overwhelming evidence to the contrary, and directed the use of company funds for the personal enrichment of the Cassitys by purchasing real estate, paying credit card bills and transferring NPS funds directly to Doug Cassity. Forever Enterprises siphoned money from NPS and made infrequent repayments, if any.

### (3)     A Pattern of Racketeering Activity

A "pattern of racketeering activity" requires "at least two acts of racketeering." 18 U.S.C. § 1961(5). These acts "must be related and must amount to or pose a threat of continued criminal activity." *Wisdom v. First Midwest Bank of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir. 1999) (internal quotations omitted). The RICO Defendants' numerous acts of mail and wire fraud constitute a pattern of racketeering activity. To establish mail or wire fraud, a plaintiff must show: (1) the existence of a scheme or artifice to defraud; (2) the use of the mail or wires for purposes of executing the scheme; and (3) a specific intent to defraud. 18 U.S.C. §§ 1341, 1343; *United States v. Manzer*, 69 F.3d 222, 226 (8th Cir. 1995). These statutes do not require that the defendant used the mail or wires personally, only that she "causes" the use of the mails or wires. *See Jerome M. Sobel & Co. v. Fleck*, No. 03 Civ. 1041 RMB GWG, 2003 WL 22839799, at *6 (S.D.N.Y. Dec. 1, 2003).

All the RICO Defendants used the mail and the wires to siphon money from NPS that was owed to families to pay for their funerals to line the pockets of the Cassitys and their cohorts. As detailed above, Province caused wire transfers of NPS funds on behalf of Cassity family members to pay for their credit card expenses, cars, and other personal transactions. Forever Enterprises and its subsidiaries used wire transfers of funds from NPS and the NPS Trusts to cover operating expenses and the expansion of the Cassitys' business into new states. All of these transactions were done in furtherance of the enterprises' scheme to defraud funeral homes and pre-need funeral consumers of the money to which they were justly entitled.

### C.    Apportionment of Fault

The jury should not be permitted to apportion fault for Plaintiffs' injuries to any dismissed defendant or other non-party. "In Missouri, fault is only to be apportioned among those at trial." *Kan. City Power & Light Co. v. Bibb & Assocs., Inc.*, 197 S.W.3d 147, 159 (Mo. Ct. App. 2006) (citing *Jensen v. ARA Servs., Inc.*, 736 S.W.2d 374, 377 (Mo. 1987)). "Missouri law does not permit the comparison of fault of non-parties to the litigation." *Tucker v. Wal-Mart Stores, Inc.*, No. 1:06-CV-19 CAS, 2006 WL 1134712, at *3 (E.D. Mo. Apr. 26, 2006).

## III.   Anticipated Substantive or Procedural Problems

Plaintiffs are unaware of any anticipated substantive or procedural problems other than those related to the matters that will be set forth in Plaintiffs' motions *in limine*.

Dated this 12th day of January, 2015.

Respectfully submitted,

_____*s/ Wendy B. Fisher*_____
Daniel M. Reilly (Admitted *Pro Hac Vice*)
Larry S. Pozner, E.D. Missouri Bar No. 2792CO
Wendy B. Fisher (Admitted *Pro Hac Vice*)
Glenn E. Roper (Admitted *Pro Hac Vice*)
Clare S. Pennington (Admitted *Pro Hac Vice*)
Farrell A. Carfield (Admitted *Pro Hac Vice*)
Lauren G. Jaeckel (Admitted *Pro Hac Vice*)
Sean Connelly (Admitted *Pro Hac Vice*)
Michael P. Robertson (Admitted *Pro Hac Vice*)
Michael T. Kotlarczyk (Admitted *Pro Hac Vice*)
Dru R. Nielsen (Admitted *Pro Hac Vice*)
Ashley D. Morgan (Admitted *Pro Hac Vice*)

Reilly Pozner LLP
1900 16th Street, Suite 1700
Denver, CO 80202
(303) 893-6100

Maurice B. Graham, Bar No. 3257
Morry S. Cole, Bar No. 77854
Gray, Ritter & Graham, P.C.
701 Market Street, Suite 800
St. Louis, MO 63101
(314) 241-5620

Attorneys for Plaintiffs Jo Ann Howard and Associates,
P.C., in its capacity as Special Deputy Receiver of Lincoln
Memorial Life Insurance Company, Memorial Service Life
Insurance Company, and National Prearranged Services,
Inc.; the National Organization of Life and Health
Insurance Guaranty Associations; the Missouri Life &
Health Insurance Guaranty Association; the Texas Life &
Health Insurance Guaranty Association; the Illinois Life &
Health Insurance Guaranty Association; the Kansas Life &
Health Insurance Guaranty Association; Oklahoma Life &
Health Insurance Guaranty Association; the Kentucky Life
& Health Insurance Guaranty Association; and the as Life
& Health Insurance Guaranty Association

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2015, the foregoing PLAINTIFFS' TRIAL BRIEF was filed electronically with the Clerk of Court and served by operation of the Court's electronic filing system upon all counsel of record in this case participating in Electronic Case Filing.

I hereby further certify that on January 13, 2015, the foregoing was sent by United States Postal Service or by electronic means, as indicated below, to the following non-participants in Electronic Case Filing:

Tony B. Lumpkin, III
2806 Horseshoe Bend Cove
Austin, TX  78704
*Pro se*

Sharon Nekol Province, *Pro se*
Register # 36759-044
FMC Carswell
Federal Medical Center
P.O. Box 27137
Fort Worth,  TX 76127

David R. Wulf, *Pro se*
Register # 38227-044
FCI Terre Haute
Federal Correctional Institution
Satellite Camp
P.O. Box 33
Terre Haute, IN 47808


_____*s/ Wendy B. Fisher*_____
Wendy B. Fisher
(Admitted *Pro Hac Vice)*
Attorney for Plaintiffs