UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JO ANN HOWARD & ASSOCIATES, P.C.,   )
et al.,                              )
                                     )
                Plaintiffs,          )
                                     )
     VS.                             )  No. 4:09-CV-01252(ERW)
                                     )
J. DOUGLAS CASSITY, et al.,          )
                                     )
                Defendants.          )
_____)


TRIAL PROCEEDINGS -- VOLUME 2-A
BEFORE THE HONORABLE E. RICHARD WEBBER
FEBRUARY 5, 2015
ST. LOUIS, MISSOURI

FOR THE PLAINTIFFS:

     DANIEL M. REILLY
     LARRY S. POZNER
     CLARE S. PENNINGTON
     WENDY B. FISHER
     DRU RUTH NIELSEN
     FARRELL A. CARFIELD
     LAUREN G. JAECKEL
     PATRICK WITHERS
     MICHAEL T. KOTLARCZYK
     MICHAEL P. ROBERTSON
     GLENN E. ROPER
     REILLY POZNER, LLP
     1900 Sixteenth Street, Suite 1700
     Denver, CO  80202
     (303) 893-6100

     MAURICE B. GRAHAM
     GRAY & RITTER, P.C.
     701 Market Street, Suite 800
     St. Louis, MO  63101-1826
     (314) 241-5620

FOR THE DEFENDANTS:

 (National City Bank; PNC Bank, N.A.)

J. ANDREW KEYES
STEPHEN D. RABER
SETH A. MEYER
MARY BETH HICKCOX-HOWARD
AMY M. SAHARIA
TEAGAN J. GREGORY
WILLIAMS & CONNOLLY, LLP
725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5584

MIKE W. BARTOLACCI
KIM BOUSQUET
THOMPSON COBURN, LLP
One US Bank Plaza
St. Louis, MO  63101
(314) 552-6126

Proceedings recorded by mechanical stenography;
transcript produced by computer.

_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
111 South Tenth Street, Third Floor
St. Louis, MO  63102
(314) 244-7449

**INDEX**

INITIAL JURY INSTRUCTIONS BY THE COURT  . . . . . . .   6

OPENING STATEMENT BY MR. REILLY . . . . . . . . . .  15

```
 1              (Proceedings commenced at 8:30 AM.)

 2              THE COURT:  Keep your seats.  For those who may be

 3   here for the first time, there are certain -- When we first

 4   start a case and we go through, "All rise," and then after

 5   that, I like to, first of all, sort of come and go at breaks.

 6   And -- And attorneys have a lot going on, and I don't like

 7   them to be interrupted with formalities.  I get enough respect

 8   from them from the way they conduct themselves, and some of

 9   those other things just take more time.  So that's what that's

10   all about.

11              Welcome to those of you who are in the gallery this

12   morning.  I understand that we may need a few more minutes to

13   set up before ---

14              MR. REILLY:  A few more, Your Honor.

15              THE COURT:  Pardon me?

16              MR. REILLY:  A few more, please.

17              THE COURT:  A few more, okay.  So we will be a few

18   minutes.

19              Are the jurors here?

20              THE CLERK:  They're all here.

21              THE COURT:  They're all here, very well.  Just let me

22   know when you're ready.

23              MR. REILLY:  Thank you.

24              (Court recessed from 8:30 AM until 8:36 AM.)

25              THE COURT:  Ready?  Okay.  Bring them in.
```

```
 1              MR. REILLY:  My apologies.

 2              THE COURT:  That's okay.

 3              I would -- I would request, when the jury comes in,

 4    for all to rise when they come through the door, please.

 5              (Pause)

 6              THE CLERK:  Judge, ready?

 7              THE COURT:  Yes, we are ready.

 8              (Jury seated by the Clerk.)

 9              THE COURT:  Good morning.  Please be seated.

10              Thank you for your prompt appearance this morning,

11    and it's good to see you all.  I'm from -- originally from

12    northeast Missouri.  I called up there this morning, and it's

13    11 below.  So if that's any comfort at all, so be it.

14              Would you now, please rise, raise your right hand to

15    take an oath?

16              This oath will require you to try the case according

17    to the law and the evidence as you hear it.  If for some

18    reason you can't take the oath, remain standing when the other

19    jurors are seated.  Okay.

20              THE CLERK:  Please raise your right hands.

21              You do -- You and each of you do solemnly swear or

22    affirm that you will well and truly try the issues on trial

23    before this Court and a true verdict returned according to the

24    law and evidence, so help you God?

25              THE JURY:  I do.
```

```
 1              THE COURT:  Please be seated.

 2          I will be reading some instructions.  You'll be told

 3   that all instructions given, whether in writing or otherwise,

 4   are equally binding upon you and must be followed.  These are

 5   called "oral instructions."  They will not be taken back to

 6   the Jury Room, but, again, all are important whenever given

 7   and whether in writing or orally given.

 8          Ladies and Gentlemen -- This is No. 1.

 9          Ladies and Gentlemen:  I will take a few minutes now

10   to give you some initial instructions about this case and

11   about your duties as jurors.  At the end of the trial I will

12   give you further instructions.  I may also give you

13   instructions during the trial.  Unless I specifically tell you

14   otherwise, all such instructions, both those I give you now

15   and those I give you later, are equally binding on you and

16   must be followed.

17          This is a civil case brought by Plaintiffs against

18   Defendants.  The Plaintiffs allege that -- make allegations,

19   and you'll be told more about that by counsel.

20          It will be your duty to decide from the evidence

21   whether the Plaintiffs are entitled to a verdict against

22   Defendants.  From the evidence, you will decide what the facts

23   are.  You are entitled to consider that evidence in the light

24   of your own observations and experiences in the affairs of

25   life.  You will then apply those facts to the law which I give
```

1    you in these and in my other instructions, and in that way

2    reach your verdict.  You are the sole judges of the facts, but

3    you must follow the law as stated in my instructions, whether

4    you agree with it or not.

5         In deciding what the facts are, you may have to

6    decide what testimony you believe and what testimony you do

7    not believe.  You may believe all of what a witness says or

8    only part of it or none of it.  In deciding what testimony to

9    believe, consider the witness' intelligence, their opportunity

10   to have seen or heard the things they testify about, their

11   memories, any motives they may have for testifying a certain

12   way, their manner while testifying, whether they said

13   something different at an earlier time, the general

14   reasonableness of their testimony, and the extent to which

15   their testimony is consistent with other evidence that you

16   believe.

17        Do not allow sympathy or prejudice to influence you.

18   The law demands of you a just verdict unaffected by anything

19   except the evidence, your common sense, and the law as I give

20   it to you.  You should not take anything I may say or do

21   during the trial as indicating what I think of the evidence or

22   what I think your verdict should be.

23        No. 2:  I have mentioned the word "evidence."

24   Evidence includes the testimony of witnesses, documents and

25   other things received as exhibits, any facts that have been

1   stipulated; that is, formally agreed to by the parties.

2          Certain things are not evidence.  I shall list those

3   things for you now.

4          (1)  Statements, arguments, questions and comments by

5   lawyers are not evidence.

6          (2)  Objections are not evidence.  Lawyers have a

7   right and a duty to object when they believe something is

8   improper.  You should not be influenced by objections.  If I

9   sustain an objection to a question, you must -- you must

10  ignore the question and must not try to guess what the answer

11  might have been.

12         (3)  Testimony I strike from the record or tell you

13  to disregard is not evidence and must not be considered.

14  Anything you see or hear about this case outside the courtroom

15  is not evidence unless I specifically tell you otherwise

16  during the trial.

17         Furthermore, a particular item of evidence is

18  sometimes received for a limited purpose only.  That is, it

19  can be used by you only for one particular purpose and not for

20  any other purpose.  I shall tell you when that occurs and

21  instruct you on the purposes for which the item can and cannot

22  be used.

23         Finally, some of you may have heard the terms "direct

24  evidence" and "circumstantial evidence."  You are instructed

25  that you should not be concerned with those terms since the

1    law makes no distinction between the weight to be given to

2    direct and circumstantial evidence.

3            No. 3:  During the trial, it may be necessary for me

4    to talk with the attorneys out of your hearing either by

5    having a bench conference here while you are present in the

6    courtroom or by calling a recess.  Please understand that

7    while you are waiting, we are working.  The purpose of these

8    conferences is to decide how certain evidence is to be treated

9    under the Rules of Evidence and to avoid confusion and error.

10   We will, of course, do what we can to keep the number and

11   length of these conferences to a minimum.

12           No. 4:  At the end of the trial you must make your

13   decision based on what you recall of the evidence.  You will

14   not have a written transcript to consult and it may not be

15   practical for the court reporter to read back lengthy

16   testimony.  You must pay close attention to the testimony as

17   it is —— as it is given.  If you wish, however, you may take

18   notes to help you remember what witnesses said.  If you do so,

19   please understand that you must keep them to yourself until

20   you and your fellow jurors go to the Jury Room to decide the

21   case.  And do not let notetaking distract you so that you do

22   not hear other answers by the witness.  When you leave at

23   night, your notes will be secured and no one will see them.

24   At the end of the trial they will be shredded.

25           No. 5:  Finally, to ensure fairness, you, as jurors,

1   must obey the following rules.  You must decide this case

2   solely on the evidence and your own observations, experiences,

3   reason, common sense, and the law in these and other

4   instructions.  You must also keep to yourself any information

5   that you learn in court until it is time to discuss the case

6   with your fellow jurors during deliberations.

7          First, do not talk among yourselves about this case

8   or about anyone involved with it until you go to the Jury Room

9   to decide on your verdict.  And let me add:  Sometimes it's

10  common, based upon our experiences, to say, "Did you hear what

11  that person said," or something.  That's all out of bounds.

12  You're not to talk to each other about anything in this case

13  until you deliberate.

14         Second, do not talk with anyone else about this case

15  or about anyone involved with it until the trial is over.

16         Third, when you are outside the courtroom, do not let

17  anyone tell you anything about this case, anyone involved with

18  it or any news story, rumor or gossip about it, or ask you

19  about your participation in it until the trial is over.  If

20  someone should try to talk to you about this case during the

21  trial, please report it to me immediately.

22         I anticipate there will be news coverage of this case

23  from time to time.  It's your obligation not to read any news

24  accounts of this case whatsoever.  It's also the charge that

25  if you're in a room and something comes up on the television,

 1   put your hands to your ears and leave the room.  That

 2   instruction means exactly what it says because you might hear

 3   evidence that has nothing whatsoever to do with this case, and

 4   -- and it would be inappropriate for you to consider anything

 5   outside the courtroom.

 6            Fourth, during the trial, you should not talk to any

 7   of the parties, lawyers or witnesses, even to pass the time of

 8   day.  It is important that you do -- It is important that you

 9   do justice and also maintain the appearance of doing justice.

10   If a person from one side of the case sees you talking to a

11   person from the other side, even to pass the time of day, a

12   suspicion about your fairness might arise.  If any lawyer,

13   party or witness does not speak to you, it is because he or

14   she is not supposed to talk to you either.

15            Fifth, it may be necessary for you to tell your

16   family, friends, teachers, co-workers or employer about your

17   participation in this trial so that you can explain when you

18   are required to be in court and warn them not to talk to you

19   about the case, tell you anything they know or think they know

20   about the case, or discuss this case in your presence.  You

21   must not communicate with anyone about the parties, witnesses,

22   participants, claims, evidence or anything else related to the

23   case or tell anyone anything about the jury's deliberations in

24   this case until after I accept your verdict or until I give

25   you specific permission to do so.

1           During the trial, while you are in the courthouse and

2    after you leave for the day, do not provide any information to

3    anyone by any means about this case.  Thus, for example, do

4    not talk face to face or use any electronic device or media,

5    such as the telephone or cell phone or Smartphone, Blackberry,

6    PDA, computer, the Internet, any Internet service, any text or

7    Instant Messaging service, any Internet chat room, blog or

8    website, such as Facebook, MySpace, YouTube or Twitter, to

9    communicate to anyone any information about the case until

10   after I accept your verdict.

11          Several years ago we had a policy that cell phones

12   were confiscated when you came into the courthouse, and it

13   caused all kinds of problems.  People claimed they did not

14   receive back -- receive their telephone, received someone

15   else's phone, it was damaged.  So we changed the policy and

16   rely upon your good judgment and honesty and integrity in the

17   way you use those devices.  What I just told you does not

18   prevent you from calling home, telling someone you're going to

19   be late.  Anything like that is permissible, but you cannot

20   talk to anyone whatsoever about this case.

21          Does anyone have any question about that at all?  I

22   just want to make sure that -- Okay, very well.

23          Do not do any research on the Internet or in

24   libraries, in the newspapers, or in any way or make any

25   investigation about this case on your own.

1          Do not visit or view any place discussed in this case

2     and do not use Internet maps or GoogleEarth or any other

3     program or device to search for or to view any place discussed

4     in the testimony.  Also, do not research any information about

5     this case, the law, the people involved, including the

6     parties, the witnesses, the lawyers or the Judge.

7          7:  Do not read news stories or articles in print, on

8     the Internet or any blog about the case or about anyone

9     involved with it or listen to any radio or television reports

10    about it or about anyone involved with it or let anyone tell

11    you anything about the case in any way.  If you want, you can

12    have your spouse or friend clip any stories and set them aside

13    to give you after the trial is over.  I assure you that you

14    will have heard -- when you've heard all the evidence, you

15    will know more about this case than anyone will learn through

16    the news media or any other source, and it will be more

17    accurate.

18         8:  Do not make up your mind during the trial about

19    what the verdict should be.  Keep an open mind until you have

20    heard -- until you've had a chance to discuss the evidence

21    during deliberations.

22         9:  If at any time during the trial you have a

23    problem that you want to bring to my attention or you feel ill

24    or need to go to the restroom, please send a note to the Court

25    Security Officer, to the Court Clerk who will give them to me.

 1    I want you to be comfortable, so please do not hesitate to

 2    tell me about any problem.

 3            Now during -- Your comfort is utmost.  So it doesn't

 4    matter when it is.  If someone needs a recess, you know, try

 5    to get my attention or someone here, and we will address it.

 6    Do not be uncomfortable.

 7            Generally, we will be taking a recess -- today may be

 8    a little bit different, but usually we start promptly at 8:30,

 9    and then about 10:15 or 10:30, in that range, we'll take a

10    recess; about 15, 20 minutes.  And in the afternoon we'll take

11    a recess a little after 2:00, 2:15, 2:30 and then a stand-up

12    ten-minute break at 4:00, and then we will conclude the case

13    at 5:00 unless there's a witness on the stand that needs to

14    catch an airplane or something of that nature or cannot be

15    here the next day at which time we might go a little later

16    than that.  There will be days when we will finish earlier

17    than that.

18            So that concludes my opening -- No.  I have one more;

19    sorry.

20            The trial will proceed in the following manner.

21    First, the Plaintiffs' attorney may make an opening statement.

22    Next, the Defendants' attorney may make an opening statement.

23    An opening statement is not evidence but is simply a summary

24    of what the attorney expects the evidence to be.

25            The Plaintiff will then present evidence and counsel

1    for Defendant may cross-examine.  Following the Plaintiffs'

2    case, the Defendant may present evidence and Plaintiffs'

3    counsel may cross-examine.

4           After presentation of evidence is completed, the

5    Court will instruct you further on the law.  The attorneys

6    will make their closing arguments to summarize and interpret

7    the evidence for you.  As with opening statements, closing

8    arguments are not evidence.  After that, you will retire to

9    deliberate on your verdict.

10          Because opening statements are not evidence, you will

11   not get your notebooks until after the opening statements.

12          Plaintiff ready?

13          MR. REILLY:  Plaintiffs are ready, Your Honor.

14          THE COURT:  All right.  You may proceed.

15          MR. REILLY:  Thank you, Your Honor.

16          Counsel, colleagues and clients, may it please the

17   Court, --

18          THE COURT:  Yes, Mr. Reilly.

19          MR. REILLY:  -- Members of the Jury.  I'm Dan Reilly,

20   and I represent Jo Ann Howard, Chuck Renn and a number of

21   other folks that I'll introduce here in a minute.

22          We're honored to be here.  We started working on this

23   case almost six years ago.  We have people on our team and

24   clients who have devoted most of their time and much of their

25   lives to this moment so that we could have a jury hear the

1    claims that are being brought, and you are that jury.

2         Everything that we do between now and the end of this

3    trial will be to convince you that our claims are proper.

4    Every witness that we call on the stand -- And that's where

5    the evidence is going to come through.  The witness will sit

6    right there.  You'll be close to them.  You'll be able to see

7    them.  You'll be able to hear them.

8         We'll have the exhibits shown on this screen.  You'll

9    be able to see the papers, and you'll be able to hear the

10   evidence through the witnesses we present.

11        Every question we ask is intended to convince you

12   that my clients in this room are correct that this bank didn't

13   do its job.

14        THE COURT:  Mr. Reilly, could you pull that

15   microphone over --

16        MR. REILLY:  Yes.  I'm sorry, Your Honor.

17        THE COURT:  -- in front of where you are?  Thank you.

18   That's good.  Thank you, sir.

19        MR. REILLY:  My apologies.

20        THE COURT:  No; that's all right.  The court reporter

21   was struggling a little.  Go ahead.

22        MR. REILLY:  You don't want me to start over, do you?

23        THE COURT:  No, no; no.

24        MR. REILLY:  When a party files a lawsuit, they get

25   certain power.  They get the right to serve a subpoena on

1    witnesses.  They get the right to ask questions in writing to

2    the other side.  They get the right to demand internal

3    documents from the other side, and we have been very

4    aggressive in doing that.

5         And we now have the internal documents of what went

6    on inside this bank in the six years that Allegiant Bank

7    served as the trustee over the consumer funds of thousands of

8    families here in Missouri.  And we now have the testimony when

9    we called people in to take what's called a "deposition."  You

10   have heard that term.  You'll hear it again here.  Almost

11   every witness that we call to the stand we've already had

12   under oath with the documents; able to ask them the questions

13   we want answered, and we've gotten those questions answered.

14   And now for you, we're going to bring those people in here and

15   put them on the witness stand.

16        You don't have to listen to my words about whether

17   this bank failed in its duties.  Those words will come out of

18   the mouths of their witnesses.  You don't have to listen to my

19   words about what the paper is going to say, what the internal

20   documents are going to show because it's their paper that we

21   now have, and it's their paper that we're going to show you.

22   The evidence will show in this case that we will prove our

23   case using their people and their paper.

24        Some witnesses, if you're out of state, can't be

25   subpoenaed here for trial, but we videotaped that testimony of

1   people who are out of state.  We got their internal documents,

2   after we knew they played a role in what went on behind the

3   scenes at Allegiant Bank in the six years that they were

4   supposed to be protecting consumers' money so that it was

5   still there when the funerals were needed.  And we will show

6   you -- For those witnesses that we can't bring here to court,

7   we will show you videotape of the testimony that we took.  And

8   the Court will instruct you:  You treat that just as if

9   they're sitting in that witness box.  They're under oath;

10  they're the admissions that they made.

11         Many of those are questions being asked by my

12  partner, Larry Pozner.  You will hear his voice.  He's got a

13  good voice.

14         And through those depositions and this witness chair,

15  we'll lay out for you the case.  My job now is to try and tell

16  you what's coming.  I want to make sure that when I sit down,

17  you have an understanding of our case and our response to

18  their case.  But as you can imagine, working on it for six

19  years, I have a lot to say.  And I promise you that I've

20  dropped a lot of things that I want to say so that I can keep

21  this clear.  But if it's not clear at any point, feel comfort

22  that when we put the witnesses on and ask them the questions

23  and we present the evidence to you, that we'll make it clear.

24         I can't tell you everything that's going to happen.

25  I can't describe every question that's going to be asked.  I

1    can't talk about every document that's going to be offered.  I

2    can't talk about everything that the Defendants might say, but

3    I can summarize for you what we've learned.

4          You're going to sit here in judgment on what a bank

5    trust department did.  I've never been a bank trust department

6    officer.  You've never been a bank trust department officer,

7    but we're going to help you understand what their legal

8    obligations are under Missouri law which has a law that talks

9    about preneed funeral contracts.  It lays out how it's

10   supposed to work.  It lays out what -- the duties of a trustee

11   holding consumer money for people who have paid for a preneed

12   funeral contract.

13         But more importantly, when you're having to make that

14   decision about whether they did their job, we have people from

15   their side admitting that what they did was disturbing.  Not

16   my words; their words.

17         There really are three banks represented at this

18   table here.  They're all one now because Allegiant merged into

19   a bank called "National City Bank" which merged into a bank

20   called "PNC."  And PNC is responsible under the law for

21   whatever Allegiant did.  That's undisputed.  In America, if a

22   bank takes over a bank, you can't say, "Well, we don't want

23   the problems that existed in that bank."  And so PNC is the

24   Defendant in this case, liable for what went on between 1998

25   and 2008.

1          I represent Jo Ann Howard who is the Special Deputy

2   Receiver for the Texas Department of Insurance.  She was

3   appointed by the Commissioner of the Texas Department of

4   Insurance to oversee the liquidation of three companies.  One

5   of those companies is called "National Prearranged Services",

6   "NPS", and that was a St. Louis company, headquartered in

7   Clayton, and it's the company that sold thousands of preneed

8   contracts in 19 different states.  And it went belly-up seven

9   years ago.

10          As the Special Deputy Receiver, Jo Ann's job is to go

11  in and look at these companies, take them over, look at the

12  computer bases, look at the databases, lock them down.  It's a

13  takeover team.  They come in; they shut everything down.  They

14  tell people, "Get your hands off the computers."  They change

15  the passwords because something was going wrong.  They have to

16  find out who they can trust and who they can't trust.

17          But the companies still have to keep running because

18  when these companies were taken over in 2008, there were more

19  than 150,000 families who had signed contracts for their loved

20  ones to have a funeral paid for in multiple different states.

21  150,000 families.

22          I was thinking about it.  If you took the Cardinal

23  stadium and filled it, if you took the Blues stadium and

24  filled in, if you took the RAMS Stadium and filled it, you

25  still have more people.  You have 20,000 people in the parking

1    lot.

2         And every one of those contracts represents a family

3    who put money in to NPS.  And in 2008 when the Special Deputy

4    Receiver went in to those companies, there wasn't any money

5    there.  At that point the amount that was owed to those

6    families was 500 million dollars, roughly.  It's hard to

7    figure out exactly until you get in and see the contracts.

8    That's a half a billion dollars.

9         One of the jobs of the Special Deputy Receiver then

10   is to start figuring out if there's a way to pay claims

11   because a claim happens when one of those next of kin, whether

12   it's here in Missouri or it's in Illinois or it's in Texas,

13   Ohio, Arkansas, California, when one of those folks dies,

14   there's a claim.  This was a gigantic mess in 2008.

15        The second job of the Special Deputy Receiver is to

16   start processing claims as a family member dies.  And you can

17   imagine folks who have put money in and believe that their

18   funeral of their mom or their brother or their father is taken

19   care of, and they find out the money's gone, and they don't

20   know who to talk to.  They call a funeral home because a lot

21   of these policies -- I'm sorry -- these contracts were bought

22   through funeral homes all over the country.

23        Colin, can you show Slide 52?

24        Funeral homes are part of this process in many ways.

25   Some people bought on their own from NPS.  Some people bought

1    through a funeral home in their hometown.  And in 2008 we'll

2    see that there were funeral homes -- Sorry.  Is that 52?  I'll

3    get it here in just a second.  That's my fault; 50.

4            This is Colin Pitet.  He has the job of running the

5    computer system; anticipating my mistakes; covering them, if

6    he can.

7            Each red dot is a funeral home.  It's a building.

8    It's a place where people in that town go when their loved

9    ones die.  It's a place that should be getting money because

10   they promised to pay for funerals in the future.  And we will

11   have funeral home directors out of Missouri here come in and

12   tell you how they ended up in this process.

13           Thanks.  You can shut that down.

14           Another job of the Special Deputy Receiver is to try

15   and find a way to get these claims paid.  The contracts in

16   many states were supposed to be backed by a life insurance

17   policy, but that life insurance policy was owned by this

18   trust, by the Allegiant Trust Bank.  They were supposed to be

19   the owners of the policies, but it turned out that that

20   company was part of a scam because it was owned by the same

21   people that owned NPS.  It was run by the same people that

22   owned NPS called "Lincoln Memorial Life."

23           And there was another life insurance company in Texas

24   called "Memorial," and that was owned by the same people that

25   owned NPS, the Cassitys.  The Cassitys are a St. Louis family,

1   but they're a St. Louis family with a father in federal prison

2   for the second time and a son in federal prison because of

3   this conduct.

4           When a life insurance company goes under in any

5   state, there's a system set up so the consumers get protected

6   so that consumers are not without their life insurance

7   benefits.  And that system is called the "State Guaranty

8   Association," and every single state has one of those.  So

9   that if a life insurance company goes under, the State

10   Guaranty Associations step in and they pay the claims.

11           Chuck Renn, Jefferson City, Executive Director of the

12   Missouri Guaranty Association.

13           Those 150,000 families around the country who's had

14   people die between 2008 and today are getting their claims

15   paid because of the Missouri Guaranty Association for those

16   folks in Missouri.  And 28 other Guaranty Associations are

17   paying those claims, and they pay more than 200 million

18   dollars.  Every time a family member passes away in Missouri,

19   the Missouri Guaranty Association takes care of it.

20           Every time a family member passes away in Texas,

21   Bart Boles, would you please stand?

22           Bart Boles is the Executive Director of the Texas

23   Life and Health Guaranty Association, and his Guaranty

24   Association makes sure they get paid.

25           Every time a family member dies in Oklahoma -- Tad?

1          Tad Rhodes, the Executive Director of the Oklahoma

2    Life Guaranty Association makes sure that family gets paid.

3          Every time a family member or next of kin dies in

4    Kansas, Linda Becker, Executive Director of Kansas Life

5    Insurance Guaranty Association makes sure they get paid.

6          Is Janis here?

7          Every time a family member dies in Illinois,

8    Janis Potter, Executive Director of the Illinois Guaranty

9    Association makes sure they get paid.

10         In Iowa -- Tom?

11         Every time a family member dies in Iowa,

12   Tom Sullivan, Executive Director of the Guaranty Association

13   of Iowa makes sure it gets paid.

14         There are 28 other states where that goes on, and the

15   Guaranty Associations of those states are represented here

16   today by Bill O'Sullivan.  Bill's the Senior Vice-President

17   and General Counsel of the National Organization of Guaranty

18   Associations.

19         And, Bill, do you mind standing?

20         And Paul Peterson.  Paul's the Vice-President of

21   Accounting and Finance for the National Association, and

22   they're overseeing the payment of claims on the following

23   states if somebody dies in those states:  Arizona, California,

24   Colorado, District of Columbia, Georgia, Ohio, Iowa, Idaho,

25   Indiana, Louisiana, Maryland, Michigan, Minnesota,

 1   Mississippi, Montana, Nebraska, Nevada, New Mexico

 2   North Dakota, Ohio, Oregon, Rhode Island, South Dakota,

 3   Tennessee, Utah, Washington, West Virginia, Wisconsin and

 4   Wyoming.

 5            Bill, Paul, thank you.

 6            My clients today also involve Chris Fuller.  Chris

 7   represents -- is counsel to the Special Deputy Receiver,

 8   Jo Ann Howard's lawyer.

 9            Marisol Saenz, Marisol is a staff attorney with the

10   Texas Department of Insurance and an attorney to the

11   Commissioner of Insurance in this role as a receiver for

12   National Prearranged Services, Lincoln Memorial and Memorial

13   Service Life Insurance Company.

14            Thanks, Marisol.

15            I think I've gotten everyone.

16            It was a huge mess in 2008.  The computer system was

17   gigantic.  The data was enormous.  The number of contracts was

18   gigantic, but the Special Deputy Receiver went in and grabbed

19   it all.

20            Another job of the Special Deputy Receiver is to try

21   and figure out what caused this mess, to investigate, because

22   Jo Ann's job is to collect as much money into that estate,

23   that liquidation estate.  And that's what happens; these three

24   companies become an estate.  And she has to look and say:

25   What do they owe?  And we talked about what they owe.  Well,

1    what do they have?  We talked about what they had; nothing.

2    Can I collect anything from anyone?

3           And jointly, Jo Ann Howard and the Guaranty

4    Associations created a plan about how these claims could be

5    paid, but they also hired lawyers to figure out if someone was

6    responsible for this because when Jo Ann Howard is appointed

7    as the Special Deputy Receiver in Texas, she has a right to

8    file lawsuits against those companies that caused the problem,

9    those companies that breached their duties that resulted in

10   these losses.

11          And when the Guaranty Associations pay these claims,

12   they have a right to step into the shoes of whoever had those

13   losses.  There's no free lunch here.  The Special Deputy

14   Receiver didn't have any money and didn't cause these claims.

15   The Guaranty Associations had to collect money to pay these

16   claims.  They didn't cause these claims.  They're doing their

17   job.  The Guaranty Associations are doing their job.  This

18   case is about the bank that didn't do its job.

19          Our focus in this case is about Allegiant Bank and

20   the six years that they were supposed to protect this money.

21   And in that timeframe, it's going to be undisputed that they

22   had duties under Missouri law because they agreed to be a

23   trustee.  They agreed to let their Bank Trust Department be

24   the place where Missouri consumer funds were going to be put;

25   to be the accounts where the funds were supposed to be kept

1    safely so that when the funerals happened in the future, the

2    money was still there.  And for six years, this bank allowed a

3    massive multi-state consumer fraud scheme run right through

4    their Trust Department.

5         And when you have to decide whether they breached

6    their duties by doing that, you don't have to listen to me.

7    You don't have to -- You do have to listen to me, but you

8    don't have to be convinced by me because we're going to put

9    evidence on by the bank that took them over, National City

10   Bank, who came in when they were taking them over and looked

11   at what that Allegiant Bank Trust Department had been doing

12   for six years and said, "This is disturbing."

13        Another bank has already done that evaluation.  This

14   case is about the liability of Allegiant Bank.  And when

15   National City Bank was taking it over, they were looking into

16   and evaluating the liability of Allegiant to see if it did its

17   job while it was supposed to be protecting this money.

18        There is only one company, Allegiant Bank and Trust

19   Company, that had the responsibility to protect that money as

20   a trustee in those years.  There's only one company that had

21   to do what we call "CPR;" not the standard CPR you know.

22   Their responsibility was to control the money in the trusts.

23   Their responsibility was to protect the money in the trusts.

24   Their responsibility was to record the activities in the

25   trusts.  Control, protect, record.  They were supposed to know

1    what was the money coming in and what the money was that was

2    coming out.  And the system was set up so that anybody who

3    might want to try and steal the money or keep the money

4    couldn't get it.  The trustee was supposed to be protecting

5    that money, controlling that money, keeping records.

6            This Trust Department isn't like someone -- If -- If

7    I ask my brother to keep an eye on money for our mom, he's not

8    a professional trustee.  We talked in jury selection the other

9    day.  Some folks have been a trustee, but they weren't paid

10   for it.  They were just asked to do it.  This is a

11   professional Trust Department.  They were paid to do this.

12   They held themselves out as expert -- experts in doing it.

13   They're supposed to know how to do it.

14           How they did it wasn't a mistake.  It was a choice.

15   They made a decision that they were not going to keep control

16   of the money; that they were not going to protect the money,

17   and they were not going to keep records.  And the people that

18   they gave the control of money to and the people who they let

19   protect the money and the people who they let keep the records

20   were crooks.  They let them steal the money.  They never

21   looked at the requests by those folks to take money out of the

22   bank.

23           One -- More than a -- More than a thousand times,

24   more than a thousand times in that six years the people stole

25   the money; sent a wire transfer to this bank; said, "Give us

1    the money; we need some money out of the trusts."  Sometimes

2    it was a thousand dollars.  Sometimes it was a hundred

3    thousand dollars.  Sometimes it was five hundred thousand

4    dollars.  Sometimes it was a million dollars.  Sometimes it

5    was more than a million dollars.  And this Trust Department,

6    more than a thousand times, instead of saying, "What do you

7    need this money for, where are you sending this money, who's

8    getting this money," never asked those questions; never knew

9    where the money was going.  And more than a thousand times, in

10   fact, it's every single time while they were the trustee, when

11   those crooks asked for the money, they gave it to them.

12         I'll show you the list of the thousand plus requests

13   for money out of this trust and the thousand times this Bank

14   Trust Department said, "Sure," and the thousand times they

15   will admit, "We never asked what it was for; we never asked

16   who it was going to."

17         Before they sent a dollar out of these trusts, they

18   had a responsibility under the law.  They had a responsibility

19   under the trust agreement because when they agreed to be a

20   trustee, they signed a contract, and that contract says

21   they're going to follow the law.  They're going to follow

22   Chapter 436.  You'll see that number here.  It's in here but

23   it's small.

24         You'll hear about Chapter 436.  That's the Missouri

25   law.  And the contract they signed when they said, "We'll be

1   the trustee; we agree we'll maintain control of the money; we

2   agree we'll protect the money; we agree we'll keep records; we

3   agree we'll follow the law," and we'll see that contract.

4        So they got responsibilities under the law, under the

5   contract, and then there's a third area they have

6   responsibilities under which is just the industry practice.

7   They're in the business of trust industry practice.  We will

8   bring experts in who say there are certain do's and don'ts.

9   There are ABCs.  It's like anything else out there.  There's a

10  certain way to build a car.  There's a certain way you're

11  going to shoot a gun.  There's a certain way that you take

12  care of somebody who's elderly and needs help.  There's a

13  certain way you process things.  There are checklists of those

14  things, and everybody understands them, the ABCs of being a

15  trustee.  And there are schools, national schools, two or

16  three of them that our experts -- one of our experts teaches

17  at that bank -- young bank officers, senior bank trust

18  officers go to those schools; one up at Northwestern

19  University.  And they're trained.  They're trained in CPR.

20  They're trained in how to control money in the trusts.

21  They're trained on how to protect money in the trusts.

22  They're trained in how to keep records.

23       Allegiant Bank Trust Department knew how to do this,

24  but they didn't.  We don't have to prove that they are the

25  worst Trust Department ever.  We only have to prove they

1    didn't do their job, and that's what we're going to prove.

2          When you get to the end of this case, the Judge will

3    give you or read to you a set of instructions, and that's the

4    law and that's Judge Webber's job, and he'll tell you what the

5    law is.  I won't tell you what the law is, but I will tell you

6    what I think Judge Webber will say.

7          And then you'll get a verdict form.  And when you go

8    in there, whoever you pick as your foreperson, you'll start

9    deliberating.  And you'll take the law and the facts that came

10   through this witness stand and the exhibits that you saw on

11   this screen, and you'll put them together to make a decision.

12         And the first decision you make is three questions

13   you have to ask.  Did this bank do its job?  If it didn't, did

14   it cause losses?  And if it did cause losses, what's the

15   amount of the losses?

16         Those are the three questions you'll have in front of

17   you.  And the lawyers call that:  Did they breach their duty?

18   Was their breach a cause of damages?  What's the amount of

19   damages?

20         Our claim in this case are two claims; one, that they

21   were negligent.  They failed to use ordinary care, the kind of

22   care that you would expect someone to use if they were looking

23   out for someone else's money.  You decide that.

24         I suspect that when you walked out of here the other

25   day and realized you were going to be on this jury and when

1   you took the oath this morning, you felt the power and the

2   authority that you have, and you have it.

3          One claim is that they failed to use ordinary care.

4          The second claim is they breached their fiduciary

5   duty, and the Court will tell you what a "fiduciary" is.

6   That's a term some people have heard; some know, some don't;

7   but a fiduciary is a position of trust.  I have a fiduciary

8   duty to my clients.  They -- They have to trust me.  I have to

9   do what's best for them.  I can't put my interests before

10  them.  Their interests come first.  I'm up here now doing what

11  my clients have paid me to do.  And our claim is that we're

12  here now because Allegiant didn't do what it was paid to do.

13         That fiduciary duty is a special duty.  It's the

14  highest duty in law.  It's a duty where they have a duty of

15  loyalty to their beneficiaries.  You've heard that term.  And

16  the beneficiaries in this case were the consumers in Missouri,

17  the funeral homes in Missouri, and NPS, the company selling

18  the preneed contracts.  They had to put their interests behind

19  theirs.

20         Our claim is they didn't do their job because they

21  didn't do CPR.  And I'm going to give you more details about

22  that as we walk through the five years that they served as

23  trustee.  It's more than five years.  It's almost six years,

24  but there's five full years, 1999, 2000, 2001, 2002, 2003,

25  those full five years they served as trustee.  And I'll show

1   you –– I'm not going to go through every thousand times that

2   there was a request, but I'll give you some highlights to give

3   you a sense of what that paperwork flow was, what they could

4   have done.

5       This bank was the only bank with the opportunity in

6   that timeframe to say "no" to this scheme.  All they had to do

7   was control the assets, and the crooks would have been

8   stopped.  All they had to do was protect the assets, and the

9   crooks would have been stopped.  All they had to do was keep

10  records, and the crooks would have been stopped.  One of the

11  records they're supposed to keep is before they send money out

12  of the trusts, they're supposed to do a calculation to see:

13  Do we have enough money in the trusts now to pay the future

14  funerals?  And I'm not a bookkeeper, but I can see that's

15  complicated.  How many funerals do we have?  Fifty thousand

16  people are expecting funerals?  How much have they paid for?

17      Because when the consumers buy funerals or preneed

18  funerals, they make a decision.  How much can I afford?  And

19  they get a menu:  What type of funeral do you want?  What

20  services, burial, do you want?  Some of you probably have done

21  this if you've had a loved one pass away.  You're doing it at

22  a very difficult time.  But you can pay back in these days

23  maybe $3000 up to 10 or 15,000 dollars.  You can pay way more

24  than that, but none of these were that big.  And they make

25  that decision.  So the Trust Department is supposed to know

1   for each individual how much did they -- do we -- are we going

2   to owe them and how much did we pay?

3          They didn't have any records in their Trust

4   Department for the individual consumers to know how much they

5   had paid or know how much they were owed.  And when we put

6   their trust officer on the stand, the one who's responsible,

7   the only trust officer responsible throughout this entire

8   six-year period, he'll say, "You know what?  We didn't have to

9   worry about the individual consumers.  We didn't treat them

10  like they were our beneficiaries.  We didn't need to know how

11  much they paid in or how much they paid out."  And that turns

12  out from the evidence in this case to be wrong.

13         We'll present evidence that shows that they were

14  required, under industry practice as a trustee, to know for

15  each individual consumer how much money went in, how much

16  money was going to be due, so if that person called up and

17  canceled their policy, they'd know how much to give them back.

18         Or if that person called up and said, "My mom just

19  died; how much is my contract -- is her contract for?  Because

20  I wasn't there when she bought it."  They don't have any

21  records like that -- they're the trustee -- because they gave

22  all of those recordkeeping rights to the crooks.

23         The second question is -- So this is duty and breach.

24  What other duties did they breach?

25         The next one is causation.  Did their breach cause an

```
 1    injury?

 2            Because this bank didn't do its job, there were

 3    losses.  The Cassitys' Ponzi scheme, I'll talk about the

 4    Cassitys in a minute when we go over the board and walk

 5    through the scheme.  The Cassity Ponzi scheme was allowed to

 6    continue and expand into many other states.

 7            Can we get the expansion slide, Michael?

 8    Michael Robertson, why don't you stand up for a second.

 9            Michael Robertson is an associate with our law firm.

10    He has devoted his entire life to this for the last five

11    years.  And you will see at times that when I can't remember a

12    fact, I can't remember something, I'm 61 years old.  All

13    right?  I'm just happy I remembered to be here on time, but

14    Michael is a computer database for us.  He doesn't look like a

15    computer, but he has engrossed himself in this.

16            So what we'll see here is that money -- Is this the

17    state expansion?

18            Your Honor, can I move around here for just a second

19    and see if that's ---

20            THE COURT:  Yes.

21            MR. REILLY:  Okay.  So this started in three states

22    in 1998.  While they were the trustee, this Ponzi scheme --

23    And this is our symbol for the Ponzi scheme.  You'll get to

24    see that close-up in a minute.  I'll show you what it is.

25            It expanded to Illinois.  I'm not going to guess all
```

1    these states.  It kept going; it kept going.  It's like fifth

2    grade geography now, but that's Nevada.  I know that's

3    California.  All right, Ohio, Florida.

4          They expanded in those states while they were the

5    trustee.  And what -- And what "expanded in those states"

6    means this:  It means that another family bought a contract

7    and another family was owed money.  And what we're going to

8    see is that that Ponzi scheme was such that the minute that

9    family put the money into the trust, instead -- into Missouri,

10   instead of staying in the trusts, it went out of the trusts.

11   And as a result, that individual's money was gone.  It was

12   used to pay someone else's funeral.

13         That's what's -- That's what a Ponzi scheme is.  A

14   Ponzi scheme is when you promise people money in the future.

15   You take their money when you get it.  And when you have to

16   pay them, you need new money coming in to give them the money.

17   And that's how this scheme worked, and I'll show you that in a

18   little more detail, too.  Consumer money comes in.  Somebody

19   else dies.  They take their money and give it to them.  That

20   person's money is gone.  And the only way it can work is that

21   they got to keep getting more money in the door; more money in

22   the door.  And that's why they have to expand because they

23   can't -- They can only get so much money out of Missouri.

24         That Ponzi scheme was run through the Allegiant Bank

25   Trust Department for more than five years.  And if they had

1    done their job, this scheme would have not been allowed to

2    expand or continue.

3         Because the bank didn't do its job, thousands of

4    families were victimized.  A hundred and fifty thousand plus

5    families in 2008 had signed NPS contracts, and there was no

6    money because the Ponzi scheme run by the Cassity family had

7    drained it through the Allegiant Bank Trust Department.

8         Millions of consumer dollars were drained out of the

9    trusts for improper purposes.  And we'll -- we'll put on the

10   witness stand a witness named "Travis Ardrey," and he has

11   spent the last five years going through the paperwork, and

12   he'll show how the money came into St. Louis or into the

13   Clayton office and out to pay other people's funerals, to pay

14   other people's claims, to pay insurance premiums on contracts

15   -- on insurance policies that were backing some of these

16   contracts in other states.  The Cassitys who were running this

17   scheme were keeping the records, and that let them keep the

18   money.

19        The third question that you'll have to answer is:  If

20   you find that the bank didn't do its job and if you find

21   because the bank didn't do its job there were losses, you have

22   to decide the amount of the losses.  That question for you is

23   for you to decide what's fair and what's reasonable under the

24   circumstances.  But when you answer that question, you're not

25   going to have to guess how much money's gone.  You're not

1   going to have to guess what the dollar amount is.  We're not

2   going to just dump on you a big pile of claim forms and say,

3   you know, "See if you can total them up."  It's not fair to

4   you.  Because the Special Deputy Receiver had access to all of

5   those documents, all the contracts, because the claims are

6   being processed by the Guaranty Associations, by Paul Peterson

7   and his crew over the last five years, and because all the

8   claims that are going to be processed in the future are going

9   to get paid, every person of those 150,000 who has a funeral

10  due under NPS with a contract insurance policy behind it is

11  going to get their funeral paid until the last person passes

12  away.

13          And so we've calculated the dollars that are lost.

14  We calculated what the Special Deputy Receiver's losses are.

15  And, in fact, the Special Deputy Receiver technically owes

16  money to the Guaranty Associations because they're the ones

17  who are paying these claims, and they have a claim against the

18  Special Deputy Receiver.  It's friendly, you know.  They

19  understand each other.  They're working together.  That's how

20  the system works, but they're not supposed to clean up the

21  mess for nothing.  Somebody else made the mess.  They can

22  pursue them, and that's why we're here.

23          And we've calculated the losses caused by Allegiant.

24  Each new contract that was written and still active from

25  Allegiant's Day One, from the first day they said, "Yes, we

1    will be the trustee for the Cassitys' companies," that's

2    August of 1998, that first contract, all the way until the

3    Ponzi scheme crashed in 2008.  And that number is 363 million

4    dollars.  And there isn't any dispute that that number is a

5    loss.  And you have to decide:  Is it because they didn't do

6    their job that those losses were caused?

7           Let's talk about the Defendants for a minute here.

8    On the bottom left here you'll see the symbol for Allegiant

9    Bank.  I'll give you a bigger picture of them as we walk

10   through the process.  They were the trustee from 1998 to 2004.

11   And right at the end of their trustee era, National City Bank,

12   NCB, headquartered out of Cleveland came in and took them

13   over.  And they signed what's called a "Merger Agreement"

14   because National City was going to merge -- I'm sorry --

15   Allegiant Bank was going to merge into National City.

16          These sizes are just approximates, but National City

17   was much larger and, frankly, much more sophisticated than

18   Allegiant.  Allegiant's Trust Department was small and new.

19   And when it said "yes" to being these preneed trustee -- be

20   the preneed trustee, they had no experience ever doing preneed

21   trusts before.  Nobody in their department had ever done them

22   before.

23          National City Bank, when they signed a Merger

24   Agreement, and these are -- you know, these are complicated

25   legal agreements, they announce in December of 2003 -- sign a

1   big thick legal document with all kinds of attachments -- "We

2   are going to merge these two banks."

3           And like when you buy a house, there's going to be a

4   closing.  So the closing happens six months or so afterwards.

5   Right around Christmas of 2003, May-ish or so of 2004 it

6   finally closes.  In that six months National City Bank has

7   every department that they are going to absorb go to St. Louis

8   and see what the department they're absorbing has been doing.

9   So there's a Trust Department in National City, and they fly

10  down to St. Louis to meet with the people at Allegiant because

11  they're supposed to take that business over.

12          The Allegiant Bank Trust Department, when they were

13  going to be taken over by National City Bank, only had one big

14  customer:  NPS.  They had only had one big account; the

15  preneed funeral accounts.  Ninety percent of their business

16  was in those accounts.

17          And National City Bank knew something about preneed

18  contracts.  National City Bank had had preneed contracts

19  before.  So they knew the questions that should have been

20  asked by Allegiant on Day One when they took these accounts

21  over, and they started asking questions.  National City Bank

22  is a Defendant in this case.  Again, in their role as the

23  successors, as the company that took over Allegiant, when they

24  took them over, they had to take on the liabilities.  If

25  Allegiant's liable in this case, National City Bank is liable.

1              What you see here is that National City Bank -- see

2      what we wrote right next to it -- they quickly saw many red

3      flags in the Allegiant trusteeship.  In one lunch, a man named

4      Albert Kantra, K-A-N-T-R-A, came down to St. Louis and met

5      with the trust people at Allegiant, and he immediately

6      realized that the potential liability, and it's actually a

7      potential fiduciary liability of Allegiant, was huge.  Not my

8      words; his words.

9              Let's look at his memo.  And Mr. Kantra, we'll show

10     his video.  As soon as defense counsel are finished with their

11     opening statement, we're going to put him on through

12     videotape.

13             This is a memo he wrote December 21st, 2003, from

14     Al Kantra to Tim Lathe.  That's his boss in Cleveland.  He's

15     talking about the Allegiant integration visit notes and

16     current issues.  He's just been in St. Louis to meet with a

17     fellow named "Herb Morisse," M-O-R-I-S-S-E.  You will hear

18     that name a lot.  He was the Allegiant Trust Department person

19     responsible for these trusts.

20             "The largest trust account is a 195 million dollar

21     preneed funeral arrangement trust that generates only about

22     $60,000 in annual fees.  They are losing big money on this

23     account, and the potential fiduciary liability is huge.  In

24     years past, we have had large losses related to these types of

25     accounts in Michigan and other states.  We will likely look to

1   exit this relationship."

2          The future -- The potential fiduciary liability he's

3   talking about is the liability in this case.  You bet it's

4   huge.  It's huge because this bank let it get huge.

5          And when we got this document, we went and served a

6   subpoena on Mr. Kantra; went to Cleveland where he was.  You

7   can subpoena somebody to appear in their home state through

8   the federal court system.  You can't drag them to another

9   state, but we were going to go to Cleveland after we saw this

10  document.  This is exactly what our case was about.  We wanted

11  to hear Mr. Kantra admit that this is what he wrote.

12         And after the defense counsel have done their opening

13  statement, we'll call our first witness.  And this is unusual

14  for Mr. Pozner and me.  We've tried a lot of cases together

15  over the years.  We normally put a live witness on the stand,

16  but we're going to show you video right out of the box.  But

17  we're showing you what we think is most important right out of

18  the box, and Mr. Kantra will be the first video that you'll

19  see maybe this afternoon.

20         Mr. Kantra made internal notes on an Excel

21  spreadsheet that we also got.  And along the top here he's

22  indicated various tasks, and this particular task is the one

23  regarding the Allegiant accounts.  The description of his task

24  is that he "must decide whether or not to retain preneed

25  funeral trusts totaling 195 million dollars in assets and

1    generating 58,000 in annual fees."

2         Mr. Kantra saw the problems with these trusts the way

3    Allegiant was handling them after one day in St. Louis.  They

4    will say they didn't see it for six years.  That was a choice.

5         Mr. Kantra then indicated what the priority was of

6    this task; meaning, "What are we going to do?  Are we going to

7    take these accounts on or are we going to get rid of them?"

8    And what the risk assessment was.  The priority was "urgent"

9    and the risk assessment was "extremely high."  Not our words;

10   the words of a Defendant Bank.

11        He then discussed what information they obtained and

12   the action and steps they were going to do.  "Most information

13   to date indicates we should exit this business as soon as

14   possible.  Exit language in documents to be reviewed by

15   Davidson and Sackley."

16        Davidson and Sackley are what are called "Fiduciary

17   Risk Officers" in National City Bank; Fiduciary Risk Officers,

18   evaluating the risks.

19        When they say, "We should exit this business as soon

20   as possible," the evidence is going to show what that means

21   is:  The thousands of Missouri families who have signed

22   contracts to get their future funerals paid for themselves or

23   their next of kin, who put money into these trust accounts who

24   this Trust Department, Allegiant, was supposed to be watching,

25   are going to get shipped somewhere else to another bank.  It's

VOLUME 24A                                                                44

1    not National City Bank they're talking about, right?

2         They're saying, "We need to get somebody else to take

3    these trusts over because we don't want them because the

4    future fiduciary liability is huge."

5         I'm going to walk through this process a little bit,

6    but let me tell you that at the end of this process, National

7    City Bank didn't take these trusts.  They got rid of them to

8    another bank in St. Louis.  And when they got rid of them,

9    Allegiant Bank didn't tell that bank about the problems.  And

10   when they got rid of them, the people whose money was supposed

11   to be in those trust accounts were never told their money was

12   moved to another bank; were never told there was a new trustee

13   different than the one whose name was on their contract when

14   they signed up.  The only people that knew that the trusts had

15   been moved were the Allegiant Bank Trust Department and the

16   National City Bank Trust Department and the new bank called

17   "Bremen Bank" here in St. Louis that took the trusts on.

18        And when they took the trusts on, Allegiant met with

19   them and told them how to run the trusts, and they ran the

20   trusts just like Allegiant did.  They didn't know there were

21   problems.  They didn't do CPR either.  And the number of

22   people signing up kept growing and growing and growing, and

23   the Ponzi scheme kept going and going and going, and the

24   losses kept building and building and building.

25        The people in Cleveland, that's -- that's National

1    City Bank people, Al Kantra, they sent an e-mail to St. Louis

2    and said, "You know what?  We're not taking these trusts on.

3    You guys need to find another bank to do it."

4            And we've got that e-mail now.  Let's show that.

5            This is an e-mail from Mr. Kantra on January 15th,

6    2004.  Before Christmas, he was in St. Louis.  It's after the

7    new year now.  He's sending an e-mail to Art Weiss.  Art Weiss

8    at this time was the head of what's called the Wealth

9    Management Group in Allegiant.  We're going to call Art Weiss

10   to the witness stand.  It may be tomorrow.  At the latest, it

11   will probably be Monday.  And we're subpoenaing him to come in

12   here.

13           The subject on the top bullet here is "The Preneed

14   Funeral Trusts Action Requested."  So Cleveland, the bank

15   that's taking over the St. Louis bank, is requesting action.

16           "Art, pursuant to our recent telephone

17   conversation" -- so they've had a phone call about this

18   already -- "please accept this e-mail as formal notification

19   to begin proceedings to facilitate a complete exit of all

20   preneed funeral trust arrangements.  Get going on getting rid

21   of these trusts."

22           And when National City Bank says to Art Weiss, "Get

23   going," they're going to be the new boss.  All right?

24           Headquarters is now moving from St. Louis to

25   Cleveland.  And headquarters in Cleveland is saying, "When we

1    take you over, get rid of those."

2          And just think about -- You'll see here the evidence

3    in this.  Think about the people at Allegiant Bank.  They're

4    all -- in the Trust Department.  They're all hoping they get

5    to stay on, you know.  They're hoping they get a job after the

6    merger.  They know that National City is evaluating every one

7    of them.  They're going to send some of their own people down.

8    They're going to look each person in the eye and say, "What

9    have you been doing?  Have you been doing a good job here?  I

10   want to know what you've been doing."

11         They don't say it that bluntly, but that's what's

12   going on.  Nobody at Allegiant wants to thumb their nose at

13   National City Bank.  Art Weiss doesn't want to.  He'd like to

14   know if he's going to have a job.  Herb Morisse, who is the --

15   running the department, he'd like to know.  He'd like to know

16   if he has a job, and he ended up staying with National City.

17         "Communications to impacted clients should begin

18   immediately, and all relationships must be closed out prior to

19   the legal closing date of the acquisition, March 31st, 2004."

20         That's a nice way of saying, "Get rid of these things

21   before we close."

22         "Based on our conversations, it's my understanding

23   you have apprised Shaun Hayes of the likelihood of this

24   decision, and he indicated the commercial relationship with

25   the impacted clients has already left the bank."  What does

1    that mean?

2         Well, Shaun Hayes was a co-founder of Allegiant Bank.

3    He was the owner of Allegiant Bank.  He was the CEO of

4    Allegiant Bank.  He was the decision maker that they were

5    going to sell Allegiant Bank to National City.  And we've

6    subpoenaed Shaun Hayes to come in and testify on the witness

7    stand.  And it may be tomorrow, it may be Monday.

8         You will hear that Shaun Hayes, while he was at

9    Allegiant, was relentless in pushing everybody to sell, sell,

10   sell; "get more accounts, get more customers," because the

11   bank fundamentally is a business.  And Allegiant Bank in that

12   way isn't different.  They make money loaning money to people.

13   They make money opening accounts for people.  They make money

14   charging people for overcharges.  They make money in their

15   Trust Department by supposedly watching other people's money.

16   And every week Shaun Hayes told people, "We need more

17   accounts.  Get out there and get more accounts."  And that

18   included the Allegiant Trust Department.

19        THE COURT:  We're going to take a -- take a break.

20        MR. REILLY:  You bet.

21        THE COURT:  Throughout the course of this trial, I'm

22   going to be giving you an instruction.  And probably by the

23   end of it, you'll be able to -- you'll hear it in your dreams

24   because it's the same thing over and over and over, but it's

25   the instruction I'm required to give you.  So please bear with

 1     me as I do it.

 2          Until this case is given to you to decide, you must

 3     not discuss the case among yourselves, with others or remain

 4     in the presence of anyone discussing it.  If anyone should try

 5     to talk to you about the case, advise me immediately or as

 6     soon thereafter as you possibly can.  Do not read, listen or

 7     watch any television, radio or news reports of the trial.  And

 8     the most important thing:  Keep an open mind until all of the

 9     evidence has been received and you've heard the views of your

10     fellow jurors.

11          This will be a 15-minute recess, and Ms. Berg will

12     accompany you back to the Jury Room at this time.

13          Court's in recess for 15 minutes.

14          (Jury escorted to the Jury Room by the Clerk.)

15          MR. REILLY:  Thank you, Your Honor.

16          THE COURT:  To those in the gallery, thank you, you

17     know, for your -- being very quiet and not whispering,

18     talking.  With lawyers in the well, even the slightest sound

19     is distracting and annoying, and I've noticed that that hasn't

20     happened, and I appreciate it very much.  So thank you.

21     Court's in recess.

22          (Court recessed from 10:00 AM until 10:15 AM.)

23          (Jury seated by the Clerk.)

24          THE COURT:  Plaintiff ready?

25          MR. REILLY:  Yes, sir.

 1          THE COURT:  Defendant ready?

 2          MR. RABER:  Yes.

 3          THE COURT:  Please be seated.  You may continue,

 4  Mr. Reilly.

 5          MR. REILLY:  Thank you, Your Honor.

 6          I'm just going to finish up this e-mail here again

 7  from the first NCB person that came to St. Louis to look at

 8  the Allegiant trust era.

 9          And Mr. Kantra testifies, and you'll see it on video

10  probably this afternoon, "You know, I was directed by my

11  supervisor to withdraw that e-mail, to unsend it."  You'll see

12  his description of that, but it's a little vague as to why.

13  He then says he's not sure -- Even though he admits he pushed

14  the "send" button, he's not sure it got to anybody.

15          One of the things you have the right to do and the

16  power to do is decide who you believe and who you don't

17  believe.  The Court will instruct you on how to do that, but,

18  fundamentally, you can use your common sense.

19          Let's go blank for a second.

20          Once Mr. Kantra started telling people at National

21  City Bank that there were problems with the trusts -- And

22  actually Glenn Roper, my partner, pointed out on the break:

23  Remember when I showed you the green and red colors that

24  showed "urgent" and -- and immediate?  We didn't add those

25  colors.  All right?

1          Those were the colors that Mr. Kantra's Excel

2    spreadsheet had gotten put on by him.  So we're not adjusting

3    evidence in any way.

4          Once Mr. Kantra gave the National City Bank people in

5    Cleveland a heads-up, "We better be careful with these

6    trusts," they got their Legal Department involved.  And a

7    lawyer named "Plant" started getting engaged in the process,

8    and he hired a law firm to do some looking into NPS, the

9    people at NPS, because they may -- National City might have to

10   keep these trusts if they couldn't find somebody else to take

11   them.  And we have his notes because, again, we get to ask for

12   that information.  And these are notes that he had of a phone

13   call with the lawyer that he hired to go out and see if he

14   could find out anything about this company called "NPS."

15         And there's some words in here that we didn't write

16   but that were used, and so I want to make sure that you know

17   these are coming from his notes, not ours.

18         Let's show this now.

19         It says, "Missouri AG sued NPS in '92 or '93.  Suit

20   was involving a Ponzi scheme.  They" -- What does that say?

21   Anybody know?

22         THE JURY:  Weren't.

23         MR. REILLY:  Weren't.  "They weren't" -- Yeah.  "They

24   weren't fully funding the trusts at 80 percent of the contract

25   by statute requires -- by statute requires.  NPS keep more

1   than 20 percent."  I think that means NPS kept more than 20

2   percent.  I'll read the rest, and we'll talk about it.

3            "Said that NPS is a group of sleazeballs."  There's

4   more to this note.  You'll get to see the rest of it, but what

5   this is talking about is that the lawyer at National City Bank

6   found out that there had been a lawsuit by the Missouri

7   Attorney General against this company and that they hadn't

8   been putting 80 percent in.

9            Under Missouri law, when there's a preneed contract

10  written, the seller of that contract, and that's NPS, that's

11  the Cassity company, has to take 80 percent of that money and

12  put it into trust.  They can keep 20 percent.

13           That lawsuit was about -- They weren't even doing

14  that initially.  That's not what our claim is about, but

15  someone at National City Bank was told that NPS is a group of

16  sleazeballs.

17           Another note that Mr. Plant was given or information

18  was given and then he wrote a note -- And I want to make a

19  distinction here between a "trustee," which is the job they

20  took, and what in a bank is called a "custodian."  A custodian

21  just keeps the records.  If somebody asks for the money out,

22  they can take the money out.  It's still their money.  They're

23  just holding it.  You can treat it like a savings account,

24  checking account.  They're just a custodian of it.  Since it's

25  your money, you can take it out.

1          But a trust account only gets taken out if the

2     trustee approves it.  So that's what the trustee power is

3     here, to approve whether money goes out.  They can say "yes";

4     they can say "no."

5          As I said, you're going to see evidence that 1,026

6     times they were asked to send money out, and 1,026 times they

7     said, "Yes."

8          The lawyer for National City Bank is told that,

9     "Allegiant Bank, more a custodian than a trustee."  He's told

10    that they're really not acting like a trustee, and that's what

11    the evidence will show.  They were a trustee.  They had the

12    name.  They had the responsibility.  They had the duties, but

13    they didn't act that way.

14         All right.  Let's -- Let's move to Allegiant Bank.

15    I'm going to talk about Day One.  Allegiant Bank agreed to do

16    business with the Cassitys.  All right?

17         This is Allegiant Bank and Trust.  And you see a lot

18    of banks are bank and trust, bank and trust.  Some banks are

19    just two departments.  They have a Loan Department and a

20    bank -- and a Trust Department.  Some actually have a company

21    that's a trust company within it.  This is a bank and trust

22    company.

23         So we'll see next that they have a President, CEO,

24    Shaun Hayes.  All right?

25         This is 1998, the day that they took on the trusts.

1    And as I said, we're going to subpoena Shaun Hayes, and we're

2    going to bring him in.  And this is my expectation of what

3    he's going to say.

4           "President and CEO, Allegiant Bank.  The NPS, Forever

5    Enterprises relationship began, I believe, with Shawn's

6    relationship with Mr. Cassity, the principal owner of NPS, a

7    privately-owned company."

8           That's a memo from inside Allegiant Bank that this

9    relationship started because Shaun, the President, knew

10   Mr. Cassity.

11          Shaun Hayes denies, when we subpoenaed him under

12   oath, that he knew Doug Cassity was a convicted felon.

13   However, his close friend, I believe his college roommate and

14   the person that he hired later on to take over the Trust

15   Department, will testify that, "Shaun Hayes told me" --

16   Art Weiss will testify; senior member of the Allegiant Trust

17   Committee -- "that Doug Cassity was a convicted felon."  He's

18   going to say, "I didn't know it."  His friend is going to say,

19   "He told me he was."

20          He will admit, Shaun Hayes, that he was personally

21   notified that none of the Cassity entities were profitable and

22   that their insurance company was losing business.  What's that

23   have to do with it?

24          A couple of years after they start this trust

25   business, they were asked to lend more money to the Cassitys.

1    When it was this bank's money going out to the Cassitys,

2    that's when they said "no."  They wouldn't lend any more of

3    their own money to the Cassitys.  But they let the Ponzi

4    scheme and Missouri consumers continue to buy and buy and buy

5    and buy.  And you'll see throughout the case evidence that

6    supports when it's Allegiant Bank's money, when Allegiant

7    Bank's interest is on the line, they protect themselves.  And

8    the evidence will show time and time and time again when it's

9    other people's money on the line, like the Missouri consumers,

10   the Missouri funeral homes, they don't protect them at all.

11          Let's show the Loan Department.

12          So we have -- we have a Loan Department in this bank,

13   and then we have a Trust Department.  The Trust Department on

14   the first day that the Cassitys' business got taken and

15   accepted by the bank was run by a guy named "Richard Markow,"

16   President of Allegiant Trust Company.  Richard Markow was a

17   defendant in this case.  We sued him, and we resolved our

18   claim with him.  And when we resolved our claim with him, he

19   was required to cooperate with us.  We're going to call him as

20   a witness in this case, and he's going to testify about what

21   he knew.

22          We have three boards for Mr. Markow.  He was

23   President of Allegiant Trust Company from 1997 to 2001.  And

24   then later he was a Senior Vice-President at Bremen Bank and

25   Trust Company from 2003 to 2008, and I'll tell you why that's

 1   relevant.

 2          "At the beginning of Allegiant's trust period as a

 3   trustee from the first day Allegiant took over as trustee, the

 4   Allegiant Trust Company had detailed information

 5   regarding" ---

 6          THE COURT:  Can't hear you; can't hear you up here.

 7          MR. REILLY:  I'm sorry.

 8          THE COURT:  The court reporter can't hear you.

 9          MR. REILLY:  "From the beginning" -- "From the first

10   day Allegiant took over as trustee, Allegiant Trust Company

11   had detailed information regarding the relationships between

12   all of the Cassity companies."

13          And now that I've seen that, I should have written

14   "among all of the Cassity companies" because you have --

15   "Between" is two, and if you have three, it's "among."  That's

16   my -- my mistake.  My wife would catch that.  She's a lawyer,

17   too.

18          So what's -- What was meant?

19          What this matters is that the bank knew all about the

20   Cassity interrelated companies.  What you're going to see in

21   this case is the Cassitys didn't just own NPS.  Then owned

22   these two life insurance companies, and they owned about 20

23   other companies.  Most of them are just sham companies.

24   They're just set up so they can move money in and out of the

25   various companies so that somebody can't figure out who's

1    stealing it.  That's what they got indicted for in the

2    criminal case.  That's what they got convicted of, and that's

3    why they're in prison, but all those companies were known to

4    this bank from Day One.

5         "From the first day Allegiant took over as trustee,

6    Allegiant Trust Company was aware that Doug Cassity served as

7    a Chairman of the companies."

8         Doug Cassity is a convicted felon before they take

9    his business to the bank.

10        And if this bank takes the position, "How could we

11   know that there were going to be crooks in this business, that

12   there were going to be somebody stealing money," they started

13   Day One with knowledge that there was a crook running the

14   business.

15        And the evidence will come in through testimony from

16   somebody named "Tony Lumpkin" who was within NPS.  And he's

17   going to say, "You know, all this business that we did,

18   Doug Cassity was running it."

19        And we have a business card for when they met and

20   took on this business.  Doug Cassity's business card is in

21   their file.  They're going to try and say, "We didn't know,"

22   or they're going to try and say, "We didn't have any

23   involvement with him," but the evidence is going to contradict

24   that.

25        Let's go to the next individual.  It's small.  I

1    apologize.  We'll have a big board of it when we're done.

2    We're building this, and then we'll have a bigger board of it.

3         But the head of the Trust Department is Herb Morisse.

4    That's M-O-R-I-S-S-E.  And that's where CPR is supposed to

5    take place.  He's the one who's supposed to control the

6    assets, protect the assets and keep records of the activity.

7         In every Trust Department there actually is a vault.

8    They're kind of cool.  Lots of Trust Departments have gigantic

9    vaults, vaults bigger than this room, and that's where the

10   assets of a trust are supposed to be kept.

11        In this case, the assets in these trusts, when they

12   took them over, were thousands of life insurance policies.  In

13   Missouri, every single contract that a family signs for a

14   preneed contract gets backed up by a life insurance policy.

15   The problem here is the Cassity contract is backed up by the

16   Cassity life insurance company.

17        It is standard procedure that those contracts are

18   kept in the vault of a Trust Department.  There should have

19   been stacks of life insurance policies in the vault.  And what

20   you're going to hear is that this bank never got a single life

21   insurance policy.  If you went through that door and said,

22   "Let's find -- During the six years they were the trustee,

23   let's find the Lincoln Life Insurance policies that are

24   supposedly backing it up, these contracts," none because they

25   let the crooks keep them.

1          And it turns out actually there aren't any life

2     insurance policies.  Had they asked for them, they would have

3     been told, "We don't have any.  We just have a sheet of paper

4     that says there are."  And the bank accepted a sheet of paper

5     each month saying that there were life insurance policies.

6          And the evidence will be from our trust experts that

7     it would be like you bought a car and all you got was the

8     title.  You never got the car.  That's not appropriate.  Those

9     policies should have been in the vault.

10         And the evidence will show that the owner of those

11    policies is the trustees.  The bank is the one who's supposed

12    to be the owner of those policies.  And instead, they accepted

13    a piece of paper each month that was called "Evidence of

14    Insurance."  Never checked to see if they really existed.

15         They're supposed to know, like anybody who owned a

16    life insurance policy, how much is owed on that policy because

17    there's premiums that have to be paid.  They're supposed to be

18    paying premiums on it.  They have no idea what the premiums

19    are due on any individual policy.  And I know that sounds a

20    little vague because there's thousands of policies, but just

21    envision a single consumer and a single policy, if that's all

22    they took the trusteeship on.

23         And they say, well, you know, "Okay; you just sent us

24    Evidence of Insurance.  Okay.  Where's the policy?"

25         "You're not -- You can't get it."

1          What do we owe on the policy?  Because the trust is

2    supposed to pay the premiums.  They don't know if they've been

3    paid in full.  They don't know if they're paying ten dollars a

4    month.  They don't have any records of that.  And that was the

5    way that the crooks wanted it set up from the beginning, and

6    that's the way it operated for six years so that the crooks

7    could keep moving the money around within their life insurance

8    company, within NPS, within all these other sham companies.

9          And we'll show you some examples of how the consumer

10   money that's supposed to be here, either in cash or in a life

11   insurance policy, is just flying all over the country among

12   the Cassity Ponzi scheme entities.

13         Let's look at the Cassity scheme.  This is the

14   Cassitys, their companies, their cohorts.  Doug Cassity,

15   National Heritage Enterprises.  He's the Chairman of that

16   company.  That's a company that's oversees NPS, the two life

17   insurance companies.

18         Underneath that you see Memorial Service Life

19   Insurance Company.  That's the Texas company.  Under that, you

20   see NPS in Clayton.

21         Randy Sutton, Randy Sutton was convicted in this

22   related criminal case and passed away in prison recently.

23         Brent Cassity, the son of Doug, convicted for his

24   involvement in this process.  We're actually subpoenaing

25   through the Court's order Brent Cassity to trial.  He's going

1    to be on that witness stand probably sometime next week, and

2    he's going to admit that all the money that ran through -- the

3    Missouri consumer money that ran through Allegiant Bank was

4    used to allow them to expand into the other states.

5           Lincoln, that's the insurance company.  The

6    President's Randy Sutton.  See his face appears twice there.

7    He's the President of NPS and he's the President of Lincoln.

8    So they can work the money through the life insurance company

9    any way they want.

10          The bank also accepts David Wulf as part of this

11   scheme.  David Wulf is supposedly an investment advisor, but

12   he's part of the scheme.  He's in on the scheme.  And he's

13   doing time in Terre Haute, Indiana federal penitentiary

14   because of his role here because all he was was a puppet.  He

15   did whatever Randy Sutton told him to do, and Randy Sutton did

16   whatever Doug Cassity told him to do.

17          David Wulf worked with a company called "Wulf, Bates

18   & Murphy," and they were supposedly the Independent Investment

19   Advisor here, but the evidence will show that they weren't

20   independent of NPS.  They were dependent on NPS.

21          Almost all their business came from NPS.  And Wulf

22   not only was an investment advisor for NPS, he was the

23   investment advisor for Lincoln, also.

24          When from Day One Allegiant Bank agreed to be trustee

25   for the Missouri trusts -- Let's go to the next slide.

1          There were -- It was related to a loan or it was

2    connected with a loan from another company called "Forever

3    Enterprises."  And the Loan Department loaned Forever

4    Enterprises 2.25 million dollars.  That was the first Cassity

5    loan in January of 1998.  There were a number of other loans

6    to the Cassitys, but, in essence, Allegiant Bank let this

7    Ponzi scheme into their bank in 1998.

8          On the trust side, the Missouri families and funeral

9    homes were moved into the Trust Department when they said

10   "yes."  So the money that they had -- Let's go to the next.

11         Missouri funeral homes went through NPS into the

12   Trust Department through Herb Morisse who's got responsibility

13   to oversee the trust accounts.  And those are the five -- I'm

14   sorry -- the seven trust accounts that came in.  And those

15   trust accounts, you'll see, are filled with Cassity-related

16   companies.  Instead of the consumers' cash being there, it's

17   Lincoln Memorial Life Insurance policies.  It's something

18   called a "debenture."

19         In -- In Trust No. 1, you'll see that one has got

20   black in it.  Almost all of that money in that trust is -- is

21   Cassity family debentures.

22         A debenture is just an IOU.  It's not a very secure

23   loan.  And when the money came in like that, our experts will

24   testify you have to ask when you accept that money in the

25   trust:  Who's paying on the debenture?  Where are -- What's

1    the payment plan?  What are -- Have there been any payments?

2    Because that's supposedly an asset of the Trust Department.

3            This Trust Department never asked anything about that

4    particular debenture.  And it's all money basically that the

5    Cassitys have taken and written an IOU and said, "We'll pay

6    you back."  And there's boatloads of handwritten notes and

7    debentures, promissory notes that the Cassitys are supposedly

8    going to pay money back, and they never paid money back.  Or

9    if they paid money back, they made it look like they paid

10   money back, and they take it from somewhere else.

11           I want to talk about Travis Ardrey because,

12   obviously, I'm not making those statements, and you don't have

13   to accept what I'm saying is true, and you don't have to

14   accept what any witness says is true either, but we will put

15   Mr. Ardrey on.  He's a Special Agent with the Internal Revenue

16   Service.

17           He'll testify that, "Allegiant transferred millions

18   of dollars out of the NPS trusts to NPS and the other Cassity

19   companies which was never repaid."

20           "Over 25 million dollars in policy loans were taken

21   against Missouri life insurance policies while Allegiant was

22   trustee.  These policy loans taken under Allegiant were

23   typically paid off using funds taken from non-Missouri

24   consumers."

25           So they are just using money from another state to

```
 1    pay a policy loan.  But when they take that money from another

 2    state, that's a person's money that was supposed to be there

 3    to pay for their funeral, and that money is gone.

 4           Mr. Ardrey will testify, "The Missouri consumer money

 5    that was transferred out of the trusts by Allegiant was

 6    commonly used to pay premiums on Lincoln policies purchased by

 7    non-Missouri consumers."

 8           Now they're taking Missouri money and paying life

 9    insurance premiums on somebody else.

10           "Allegiant transferred millions of dollars of

11    Missouri consumer money out of the trusts to pay NPS costs

12    associated with the national expansion."

13           When NPS wants to move it to another state, they've

14    got to send some salespeople out there.  They've got to find

15    people to hire.  They've got to set up shop there.  They've

16    got to generate new contract forms for that state.  The money

17    from Missouri was being used to fuel, to feed that.  It's the

18    economic engine for their expansion in all these other states.

19           "When Allegiant was" -- "When Allegiant transferred

20    the NPS trusts to Bremen in May of 2004, there was a

21    substantial unfunded premium liability."

22           What's that mean?

23           That means when they passed the trusts along after

24    National City Bank told them to get rid of them, the trust was

25    underfunded.  There wasn't enough money in the trust at that
```

1   point to pay for future funerals.

2          And the evidence will be that when they told that

3   next bank, Bremen, how to do it, it was foreseeable that the

4   Ponzi scheme would continue.  The Ponzi scheme was already

5   behind.  It was foreseeable that new contracts were going to

6   be generated.  It was foreseeable that the Cassitys would

7   continue to steal more money.

8          When they took over the Missouri business in 1998 --

9   let's go to the next slide -- there already were thousands of

10  Texas families who had bought preneed funerals from NPS.

11  That's the blue line.  The money went to NPS.  That money

12  generally didn't go into the Missouri trusts, but it stayed in

13  the NPS Ponzi circle.

14         There was money -- thousands of Illinois families

15  already in NPS; same thing.  That money wasn't legally

16  supposed to go into the Missouri trusts, but it was in the

17  Ponzi circle.

18         I'm going to move a little quickly now through the

19  Ponzi scheme.  Let me just show you how it works.  This is how

20  they did it.

21         This is a consumer.  The consumer buys a contract.

22  The money is supposed to go into Allegiant Bank, and it's

23  supposed to be -- Let's go to the next one.

24         When that person's funeral happens, the bank should

25  have the money to pay for the funeral.  Instead, that money

1   went back to the Cassitys and their companies.  So the

2   consumer's money is gone and not available to pay it.

3          Next?

4          That money comes out of the bank, goes back to NPS,

5   and the Cassitys get it.

6          Let's go to the next slide.

7          Because of this family's money is gone, their loved

8   one's funeral will have to be paid for by another Missouri

9   family's new money.  We went over this a little bit, but I

10  want to graphically show you how it happens.  And that new

11  money has to come in right away.  And that's this light blue.

12  It comes in NPS.  It goes in the bank.  There's a funeral.

13  It's paid by somebody else because the first consumer's money

14  is gone.  And then that happens again when the second

15  consumer's funeral has to happen because that consumer's money

16  is gone.  And so new money that just came in, instead of being

17  kept for that person, gets paid -- used to pay somebody else.

18         Let's look to Slide -- Let's go blank for a second.

19         I told you that there were 1,026 times that Allegiant

20  said "yes" to money coming out of the trusts.  Let me show you

21  Slide 34.  There was a process by which NPS would ask for

22  money.  They would send a wire transfer form.  This is a Wire

23  Transfer Activity Report.  This is January 6th of 2004.  The

24  amount:  1.2 million dollars.  The customer:  Allegiant Trust

25  Company.  The originator:  Allegiant Trust Company.  The wire

1    requested by:  That's Herb Morisse.  He's the trust officer.

2    Authorization verified:  Yes.

3              And when we put Mr. Morisse on the stand, we're going

4    to call him, too.  He's going to admit, "We said 'yes' every

5    time.  We said 'yes' without looking.  We said 'yes' without

6    asking."

7              The next slide.

8              We've assembled the data showing how many times in

9    1998 the crooks asked for money out of the bank.  And these

10   are account numbers and amounts and dates, and you can see

11   where the money was sent.  Thousands of times.

12             Let's go on to 2000.

13             Next slide.

14             2001, 2002, 2003 and 2004.  This period, this last

15   period here, the 2004 period, that's when National City Bank's

16   looking at them and telling them that maybe, you know -- "We

17   want you to get rid of these trusts."  And you'll see millions

18   of dollars in that timeframe before the merger is flowing out.

19   The activity gets even worse.  This is policy loans that the

20   bank is going to say and claim, "We don't know anything

21   about."  We have evidence they did know about them.

22             This is payment in other states of premiums like

23   Mr. Ardrey is going to testify.  This is money sent to NPS

24   that allowed Doug Cassity and his family to go on yachting

25   trips, to buy homes in Nantucket, to live a high life.

1          Let's talk about the law for a little bit.  I'm sure

2     you're all excited about this part, but it matters.  That's

3     why we're here.

4          Missouri Chapter 436 -- Let's go to 52.

5          There is a Missouri preneed law, and it is clear and

6     specific and detailed.  The Judge will tell you what it means.

7     We're allowed to put up what it says.  I'm not going to

8     interpret it for you.  The Judge will give you those

9     instructions.  But the statute says, "Trustee of preneed trust

10    to be a chartered financial institution; powers and duties,

11    cost of administration, termination of trust."  So this is the

12    section that -- 436.031, this is the section that lays out

13    duties and responsibilities.

14         Let's pull out the next section.

15         "The trustee shall accept all deposits made to it by

16    the seller."

17         Next.

18         "It shall hold, administer and distribute such

19    deposits in trust as trust principal.  The trustee maintains

20    adequate records of all payments received."

21         Next.

22         "The trustee shall exercise such judgment and care

23    under the circumstances which men of ordinary "-- and I think

24    it should say "men and women" -- "of ordinary prudence,

25    discretion and intelligence exercise."

1          Next.

2          "In no case shall control of said assets be divested

3    from the trustee."  We're -- This is our -- our fundamental

4    point.  They didn't keep control of the assets.

5          Next.

6          "Nor shall said assets be placed in any investment

7    which would be beyond the authority of a reasonably prudent

8    trustee."

9          What you're going to see is that the assets in these

10   trusts, 90 percent of them in those different trust accounts

11   were in Lincoln Insurance policies.  Ninety percent of the

12   Cassity preneed contracts were in Cassity life insurance --

13   were in a Cassity life insurance company.  And this bank,

14   Allegiant Trust, never asked a question about:  Who is Lincoln

15   Life Insurance Company?  How strong is that company?  Who owns

16   that company?  What direction is its financial condition

17   going?  That's the backing on these contracts; those policies.

18         "The seller of preneed contract" -- that's NPS --

19   "shall be entitled to income."  They get to keep income.

20   Eighty percent goes into the trust; twenty percent can be

21   kept.

22         "No such income distribution shall be made to the

23   seller if and to the extent that the distribution would reduce

24   the aggregate market value below the sum of all deposits."

25         And our experts call this the "market value test."

1   They cannot distribute money to NPS if they don't have enough

2   money to pay for the future funerals, and this bank didn't

3   have the data to even do that calculation.  The one thousand

4   plus times they sent money out, they didn't have enough money

5   in the trusts to pay for future funerals, and they sent the

6   money out, anyway.  And they never ran this test because they

7   didn't have the records to do it because they let the crooks

8   keep the records.

9         "The trustee of a preneed trust shall maintain

10  adequate books of accounts -- of account on all transactions."

11        Let's go to 74.

12        On Day One when they took over these accounts, they

13  knew that there were -- were four trusts.  You'll see that in

14  the papers that you get that it's Trust Roman Numeral I, Trust

15  Roman Numeral II, Roman Numeral III and Roman Numeral IV and

16  V.  I get confused with Roman numerals, so we've just changed

17  it for the demonstrative purposes here with the numbers.

18        But Trust No. 1, it was invested, almost 95 percent,

19  in Cassity affiliates.

20        Trust No. 2, 95 percent in Cassity affiliates.  The

21  blue is other investments.  The blue might be real stocks,

22  real bonds; prudent investments.  These were not prudent

23  investments.

24        Trust No. 3 had 15 million dollars in assets; a

25  hundred percent in Cassity companies.  And what that typically

 1   means is they -- they gave them the money, and they wrote a

 2   note back and said, "Well, we're good for it."

 3          Trust No. 4 the biggest trust, 52 million dollars;

 4   vast majority in Cassity affiliates; small sliver in real

 5   investments.  But what's in Trust No. 4 are Lincoln Life

 6   Insurance policies.  That's -- That's what they've got listed.

 7          When Allegiant started on Day One and accepted these

 8   trusts, they should have asked questions about the insurance

 9   that they now owned because they became the owner.  They

10   should have asked:  Who is Lincoln?  They should have asked:

11   How strong is Lincoln?  They should have asked:  Why are the

12   trusts invested solely in Lincoln?  And they should have asked

13   questions about the policy.  What is the value of the

14   policies?  What are the future premiums owed on the policies?

15   Are the policies encumbered, meaning are there loans taken on

16   the policies.

17          When National City Bank came in and was looking at

18   these trusts, they asked those questions.

19          Let's go to the next slide.

20          They looked at what Lincoln Memorial's strength was.

21   They found, "It seems to be financially ailing."  This is the

22   bank that's going to take them over, asking the questions they

23   never asked.

24          "It seems to be financially ailing.  Lincoln Memorial

25   is not rated by any service.  It is 745th in asset rank and

1    its financials have been deteriorating.  Its surplus has been

2    reduced by half in the last two years.  See the documents on

3    this one."

4           That information isn't hard to get.  When they took

5    it over, they could have contacted the rating services.  They

6    could have contacted Lincoln and said, "Send us your

7    information."  They didn't do any of that.  They didn't get

8    the trusts in the -- in the vault.  They didn't get the

9    policies in the vault.  They didn't evaluate the strength of

10   Lincoln.

11          Let's go to 78.

12          I want to talk about the value of a life insurance

13   policy.  This is maybe more than you want to hear, but it

14   matters.

15          If you buy a life insurance policy, and it's a whole

16   life policy, and that's what these -- these policies are

17   supposed to be, you have that policy for your whole life.  And

18   if you keep paying and keep paying and keep paying, the cash

19   value grows.  If you stop paying, you still have insurance,

20   but you only got what you've paid in so far.  But if you want,

21   you can borrow from that policy; take a loan.  But if you take

22   a loan, the value of the policy drops.

23          The trusts owned all these thousands of policies.

24   They needed to know what the actual value of them was.  Let's

25   just walk through this.

1          If someone pays a thousand dollars, the cash value

2     goes up.  If they pay another premium in the policy, the

3     premium goes up -- the value goes up.  Another premium, the

4     value goes up.  But if they take a loan of a thousand dollars,

5     the value goes down.

6          And what you're going to see in this case is that the

7     trusts never checked to see whether anybody was taking loans.

8     It's their policy.  They don't know what they owe.  They don't

9     know if anybody was taking loans.  The Ponzi scheme group was

10    taking loans.  They were keeping money and dropping the value

11    of these policies, and the trustee never checked, never knew.

12         I'm going to show you the size of the loans and the

13    number of the loans that were taken that this trustee never

14    knew on its own policies that it didn't have in the trust

15    vault.

16         86.

17         On January 27th, 1999, there was a policy loan batch,

18    and what the -- what the Cassitys would do is they'd take a

19    little bit of money from each of the policies.  This went

20    through the trusts.  $1,027,463.22, represents loans taken on

21    299 Missouri policies.  Trustee said, "Sure."  They got a wire

22    transfer; "want to take a million dollars out."  They said,

23    "Yes."  Never asked what policy -- whether it's policy loans

24    or not.

25         September 28th, 1999 -- we're going to move through

1   this chronologically -- another 3 million dollars.  It

2   represents loans taken on 3,517 Missouri policies.  The

3   consumers in Missouri who bought those 3,517 contracts and

4   have a life insurance policy backing it have no idea that

5   money is being taken out in loans on that policy.  They're

6   never told.

7        April 3rd, another one, 2000, another million dollars

8   plus; represents 255 Missouri policies.  The trustee says,

9   "Yes;" the consumers don't know.

10        September 29, 2000, another million dollars; 285

11   policies.  The trustee says, "Yes;" the consumers don't know.

12        December 10th, 2002, 5.1 million dollars taken

13   against 12,567 Missouri families' policies.  I'm not going to

14   say it every time.  The trustee says, "Yes;" the consumers

15   don't know.

16        March 25th, 2003, 2.8 million dollars; represents

17   loans taken on 19,890 Missouri policies, 1526 Kansas policies,

18   1113 Arizona policies.

19        November 17, 2003, policy loan batch:  3.3 million

20   dollars; represents 17,000 Missouri policies, 882 Illinois

21   policies.

22        January, 2004, now this is when NCB is in St. Louis,

23   right?  They've come down from Cleveland.  They're saying,

24   "We're going to take this stuff over; get rid of these

25   trusts."  And the trustee is still doing what it always did:

1    Nothing.

2            Another 2 million dollars; represent loans taken on

3    3,157 policies.

4            April, 2004, about a month before the merger between

5    National City Bank and Allegiant, 3 million dollars on 33,536

6    policies.

7            Next page.

8            In the slides -- I'm sorry.  In the wire transfers

9    that are sent through Allegiant Trust Department, we see a

10   note here, handwritten note that says "policy loans."  The

11   next wire transfer shows policy loans.  Another wire transfer

12   shows policy loans.  These are documents that came from the

13   Allegiant Trust Department, and Herb Morisse is going to

14   testify that he didn't know that policy loans were being

15   taken; they were.

16           They were going through his Trust Department, and

17   there is notes to that effect.  They should have known it.  It

18   was their responsibility to know it.  It was a failure to do

19   CPR because if they had controlled the assets, they'd know

20   that nobody -- they wouldn't let anybody take policy loans.

21   They'd protect it.  They'd record them.  If they had those

22   records, they'd know and they'd stop them.

23           Next slide.

24           While Allegiant was trustee, there were more than

25   100,000 policy loans.  They affected 53,000 policies.  That

1    affected 41,000 contracts.  Why that might be confusing, there

2    are some contracts, preneed contracts, that have more than one

3    policy; again, because the Ponzi scheme is manipulating

4    things, but it's not always a one-to-one ratio.  So there's

5    41,000 contracts affected.  The dollar amount of those policy

6    loans was more than 25 million dollars.

7         The preneed contract that's signed by a consumer when

8    they're signing up to pay for the future funeral is a

9    three-party contract.  The consumer signs, NPS signs, and the

10   funeral homes sign.  And on each preneed contract Allegiant

11   Bank and Trust's name was on it.  And it sets forth language

12   from 436 that says the money is going to be held in trust;

13   every single contract.  There were thousands of Missouri

14   consumer contracts.  Not only did they not get the policies,

15   they don't get the contracts either.  They never saw a

16   contract at any time in the six years they were serving as

17   trustee.

18        The policy loans continued after they transferred the

19   trusts, also.

20        Let's look at 101.

21        After they get rid of the trusts to Bremen, another

22   19 million dollars in policy loans to the next trustee because

23   they did it the same way.  And the evidence will be that they

24   were told how to do it.

25        We'll have this board available throughout the trial

1    to keep an eye -- to help you focus on who's who, Shaun Hayes,

2    Markow, Morisse.

3             THE COURT:  Would you stand on this side of the

4    board?

5             MR. REILLY:  Yes, I'm sorry.

6             And help you get oriented because I know this is a

7    lot of information, a lot of new stuff.  But each one of these

8    people are going to be called in to testify; Mr. Hayes,

9    Mr. Markow, Mr. Morisse.  And Doug Cassity, we're -- he's

10   going to stay in prison.  We're not -- We're not bringing him

11   here.

12            There were a number of suspicious transactions that

13   were run through the Allegiant Trust Department by NPS and

14   others.  I'm going to give you some samples.  When I showed

15   you those more than a thousand different ones, I'm just going

16   to pull a few out to show you what would have gone under the

17   nose of Mr. Morisse in that Trust Department that would have

18   been approved without question.

19            This is 1.8 million dollars coming into Trust IV on

20   December 10th, 2002.  And Trust IV is the biggest trust.  It's

21   where all the activity -- most of the activity is where most

22   of the money went through.

23            The next day there's a request to take the 1.8

24   million out of the trust.  Allegiant takes the money in one

25   day, sends it out another.  Never asks any questions why, and

1     it's 1.8 million dollars.  And if you ask Mr. Morisse what it

2     was for, he'll say, "I don't know."

3            Another example:  1. -- $1,069,263 comes into Trust

4     IV on April 4th, 2000.  On the same day they ask for a cash

5     disbursement out for the same amount; no questions asked.

6            Next one:  Allegiant allows investments in NPS

7     debentures.  This is an IOU.  That is, that's all you get.

8     All right?  You get this piece of paper.

9            When the bank was bringing in the Cassitys to decide

10    if they were going loan them money, they didn't get just a

11    debenture.  They got a first Deed of Trust on their property.

12    They got a promise that -- and a promissory note that if they

13    didn't pay it back, they would have to give it to them.  They

14    got the ability to foreclose on their property.  They locked

15    them up when their money was being lent out.  But when the

16    trust money was being lent out, they just signed a piece of

17    paper.

18           There was a point -- I'm going to go over quickly on

19    this one, but we'll -- we'll show you evidence that there was

20    a point where the Cassitys wanted to borrow more money from

21    the bank, and I mentioned this a little bit.  And the bank

22    side, the lending side, thought that all the Cassity companies

23    were losing money.  And they said, "We're not going to --

24    We're not going to lend that money out."  I think they -- they

25    wanted to build a mausoleum.  And the bank -- We have e-mails

1    back and forth.  We'll show them to you through the witness

2    stand that show that the bank was saying, "We're not lending

3    them any more money."

4          Then a couple days later, Cassitys sent a request to

5    the Trust Department to get the money out of the consumer

6    funds, and the Trust Department said, "Sure."  That's a

7    classic example of them protecting themselves and not the

8    consumers.

9          This next document -- Let's go to 109.

10          It shows that Allegiant -- Allegiant's own documents

11   show that money coming out of Trust IV was used to buy a house

12   for Doug Cassity.  We'll get into the detail of it, but that's

13   where consumer money was sent.

14          Another thing that you will see is that there's

15   something called "mismatching."  This is an example of a

16   consumer who paid in full.  This is from her preneed contract.

17   She paid in full.  You see the "PIF" on the right where it

18   says $8,272.72? All of her money went in to pay off the

19   contract.  It was checked paid in full in yellow there.  But

20   when the Cassitys bought the policy, they didn't buy a policy

21   in full because they wanted to keep the money and only pay a

22   little bit over time.  So they bought what we call a

23   "mismatched policy."  Instead of paying the whole premium for

24   the life insurance policy so it's all paid up, they only paid

25   -- they paid over a five-year period, and the annual premium

1    was $4000.  So not only did the crooks keep the money, but the

2    trust was paying far more for life insurance than they needed

3    to because if you take the number of years, five years, times

4    $4000, that's $20,000 in premiums.  Well, they only got 8000

5    from this consumer.

6         The trust never gets this document.  They don't --

7    They never ask about the insurance policy.  They never ask

8    about the contract, but it's the perfect evidence for them to

9    see that this thing is running out -- that it's running at a

10   deficit.  There's not enough money.  And when National City

11   Bank came in to look at the trusts of Allegiant, they got

12   these documents, and they lined them up and they said, "Oh my!

13   That's a red flag."

14        You'll see in the next couple of days as we put on

15   the witnesses for National City Bank that they admit that they

16   found red flag after red flag after red flag within the

17   Allegiant Trust Department.  This happened, this mismatching

18   where the consumer pays all the money in at the beginning but

19   a policy is bought that's just installment over time, it

20   happened thousands of times.

21        Let's look at 112.

22        During the Allegiant period, there were 24,000

23   individual families that paid in full on their Missouri

24   contracts.  All their money's in.  Twenty-one thousand of

25   those were not policies that were paid in full.  So millions

1   of dollars that were put in to pay for a policy were kept

2   back, and the policies were paid a hundred dollars over time,

3   a hundred dollars a month, a hundred dollars a month, a

4   hundred dollars a month.

5          Next slide.

6          That shows what the -- what happened in Missouri

7   only.  Twelve thousand consumers in Missouri paid in total

8   during the Allegiant period.  Eleven thousand of them, they

9   didn't take the money and buy an entire insurance policy.

10  They just bought it over time.

11         Oh, I'm sorry.  This is after Allegiant.  All right?

12  After Allegiant.  So -- Because one of the -- one of the

13  claims we made -- Thank you.

14         MR. POZNER:  She is the SDR.

15         MR. REILLY:  She is the SDR, that's right.

16         What our claim is:  That they're not only liable for

17  the losses, for contracts that were written in their era, but

18  they're liable for the contracts that were written after they

19  gave it up because they didn't warn anybody about the

20  problems, and it was foreseeable that the losses would

21  continue.  And that 363 million dollars that we're asking for

22  includes all the contracts written during the six years they

23  were the trustee and all the contracts that were written in

24  the three-and-a-half to four years afterwards before the

25  entire Ponzi scheme crashed.

1        And the law will tell -- The Judge will tell you that

2   the law is that if it is foreseeable that a party's conduct

3   caused the losses, then you can award damages for those

4   losses.

5        The Court's also going to give you an instruction, I

6   believe, at the end of the case that there can be more than

7   one cause of loss, but if the Defendant is one of those

8   causes, they're liable for the losses.

9        And in this case, there may have been other causes.

10  The Cassitys were part of it.  They caused some of the

11  problems, but that's not an excuse in a case if you decide

12  that this bank didn't do its job.  If it's a cause, they're

13  responsible for the losses under the law.  You have to decide

14  whether they were a cause, but they don't have to be the only

15  cause.

16        Let's go to 120.

17        This is another one of the wire transfers.  In this

18  one Allegiant wired trust funds to a Cassity company with no

19  explanation; $112,000 from Trust IV to Forever Enterprises.

20  It was never repaid.  It was never asked why.  And in this

21  case, we have as a defendant Forever Enterprises.  They're a

22  defunct company now.  They're not even represented here today.

23  But at the end of the case, we'd ask you that you award the

24  money that we ask from them.  It will be far less than the 363

25  million dollars.  They're not a major part of our claim, but

1    we'll ask you to do that for claims like this that they never

2    paid on.

3           Next, 121.

4           Here's another wire transfer to a Cassity company

5    with no explanation; 2.6 million dollars from Trust IV to LMS,

6    another Cassity-controlled company; never repaid.

7           Slide 122.

8           $52,530 to Hollywood Forever; never repaid.

9    Hollywood Forever was a funeral home company in California

10   that one of the other Cassity sons started with money from

11   Missouri consumers.

12          Next slide.

13          We'll show you that Allegiant allowed Trust IV to

14   overpay for stock.  They would use Missouri consumer money to

15   pay more on stock than was required.  They were forced here or

16   ordered here and agreed to buy Dell stock from Forever

17   Enterprises for $124,000.

18          Next slide.

19          But the stock that was trading on the open market at

20   that time was only $43,000; that they just bought it in the

21   stock exchange.  Morisse administered both accounts.

22   Allegiant's own accounts show the fraud here.  Why would a

23   Trust Department pay, what, three times more the price?

24   Because they're really not looking.  They're really not doing

25   their job, but, again, that was a choice.  It was a conscious

1   decision that they were going to disregard the rights and the

2   interests of the consumers and the funeral homes and NPS.

3            And I want to make that clear.  Ms. Howard here is

4   suing on behalf of NPS and Lincoln and Memorial, but when she

5   does that, she's not responsible for the bad acts that NPS did

6   because that would make no sense.  Then every company that

7   went under because of a fraud could never collect from anybody

8   because, "Well, we're not going to try and collect from you

9   because you had fraudsters in it.  You had scammers in it."

10  She's entitled to pursue these claims even though there were

11  bad people, criminals engaged in conduct at NPS.

12           126, please.

13           $40,000 from Trust IV to NPS Iowa you see on the

14  bottom there.  Why would Missouri consumer funds be sent to

15  Iowa?  That's a question that the evidence will show is never

16  asked by anybody at Allegiant Trust Department.

17           Next.

18           $600,000 from Trust IV to NPS Texas.  Why are

19  Missouri consumer funds being sent to Texas?  Never asked.

20           Next.

21           There were times where NPS would terminate Lincoln

22  policies; just shut them down.  Allegiant signed off here on a

23  1.2 million dollars' worth of what are called "surrenders."

24  That's what happens when a policy is surrendered.  You'll see

25  there's Evidence of Insurance here; 1,156,000.  Those are

1   replacement policies purchased by the trusts, but they don't

2   know they're purchasing it.  They don't even know what they're

3   doing here.

4          And you'll see below it that there were

5   cancellations; 1.1 million dollars of policies being canceled.

6   There are questions just from looking at this piece of paper.

7   Why are policies being canceled?  Why in that amount?  What's

8   happening to the money?  Never asked.

9          Next, 129.

10          One of the things that NPS did in terms of getting

11   money into the accounts was what were called "rollovers."

12   Some funeral homes around the country and in Missouri, before

13   they dealt with NPS, sold contracts to people in their town

14   and created their own trust fund.  So they would keep the

15   money in a bank in their own town.  And we have folks from

16   Palmyra, I think, coming in to explain that.  NPS would go out

17   to those people and say, "You want to transfer your funds to

18   us?  Allegiant Bank will hold the funds.  You don't have to

19   worry anymore about managing the funds, keeping them safe."

20          And there were a number of large dollar amounts

21   rolled over out of funeral home accounts into the trust

22   accounts.  And that might have meant dozens or hundreds of

23   different people had their accounts moved through their

24   funeral home into Allegiant.

25          In this action here, Allegiant allows rollover funds

1    to be removed from the trusts.  They don't change the process.

2    It doesn't matter where the money comes from.  If a funeral

3    home in Palmyra sent 2 million dollars in and NPS then said,

4    "We want it," it went out.  They got the funds in on Exhibit

5    129.  And then on 130, immediately they wired funds out of the

6    trust at the request of Randy Sutton, Angie Hall, and they

7    copied David Wulf and Tripp Bates.

8           I'm not sure what counsel for PNC is going to say,

9    but I know what the witnesses have said for Allegiant.

10   They're going to say, "We could" -- "We did this because

11   Dave Wulf told us to do it.  He was the investment advisor.

12   He was an Independent Investment Advisor.  He was making these

13   decisions.  And as long as he told us that this was okay, we

14   did it."

15          The evidence will show that a trustee is supposed to

16   be sure that investments being made in the trust are prudent.

17   He's supposed to be sure that money sent out of the trusts is

18   being sent for proper purposes.  And under Missouri law,

19   David Wulf and his company, Wulf, Bates & Murphy, had to be

20   independent of NPS to justify the trustee following their

21   directions.  And the evidence will show that David Wulf and

22   Wulf, Bates were connected with -- inner-connected with NPS.

23   They got their business from them.  They took their direction

24   from them.  And this carbon copy of his name on here is just

25   rubber stamping the Ponzi scheme.

1          The evidence will be that this trustee never looked

2     into who David Wulf was; never checked to see if he was

3     independent; never made sure that the person who they claimed

4     was telling them to buy Lincoln Life Insurance policies was

5     really being directed by Doug Cassity and Randy Sutton.

6          We went to Terre Haute, Indiana, federal penitentiary

7     to take the testimony of David Wulf.

8          THE COURT:  A little louder, please.

9          MR. REILLY:  We went to Terre Haute, Indiana to take

10    the testimony of David Wulf who was convicted of the crime for

11    his role in this, and I'm going to show you some summary of

12    his testimony.  But you can see we're talking about this

13    criminal case.  There were six criminal cases.  That's a

14    different case than this case.  We're not asking for anybody

15    to go to prison.  We're only asking for the bank to pay what

16    damages it caused.

17         But there's parts of that case that matter here

18    because in that case you'll see the indictments.  You'll see

19    the plea bargains that people entered in that case.  The

20    Federal Government wasn't looking at Allegiant Bank from a

21    criminal standpoint.  They didn't make any charges against

22    them.  We're not suggesting they should have.

23         This is a civil lawsuit.  The Court will tell you the

24    difference between those two lawsuits, but one of the main

25    differences is in this case, our burden of proof is for us to

1    convince you, to show you that the bank didn't do its job,

2    that it caused losses, and that the losses were substantial.

3    It is what's called the "weight of the evidence."  In a

4    criminal case, you have proof beyond a reasonable doubt.

5    Here, we just have to balance it in our favor.  That's the

6    main distinction.

7            THE COURT:  A little louder.  Your -- Your voice is

8    fading away.

9            MR. REILLY:  Okay.  Thank you.  Maybe it's telling me

10   something.

11           THE COURT:  Well, the court reporter is telling me

12   something.

13           MR. REILLY:  May I have a moment, Your Honor?

14           THE COURT:  Yes.

15           (Pause)

16           MR. REILLY:  In the criminal case, in the indictment

17   and in the plea bargains, including Brent Cassity's plea

18   bargain, it says that the Federal Government found the people

19   learned or knew that David Wulf wasn't independent of NPS.  We

20   believe the evidence will show and confirm that in this case.

21   And if they're not -- If it's not independent, then they get

22   no protection for following his instructions.

23           David Wulf, I believe you will see, is not to be

24   believed.  He says multiple different things at multiple

25   different times about the same subject.  At times he says, "I

1    was not making investment decisions."  At times he says he was

2    making investment decisions.  He's handed affidavits before he

3    went to prison by the lawyers for NPS, lawyers who went to

4    prison; a lawyer went to prison.  He signs whatever is put in

5    front of him.  He does whatever he's told to do, and we don't

6    put any credence in what he says.  So we did not subpoena him

7    to come and not tell you the truth.

8            But we do have a videotape of his testimony.  Can you

9    see that?

10           Your Honor, I'm just going to move over and slide

11   this over a little.

12           THE COURT:  All right, sure.

13           MR. REILLY:  "Wulf, Bates & Murphy's Procedures for

14   the NPS Trusts."

15           "Randy Sutton directed all wire transfers out of the

16   NPS trusts during Allegiant's period as Trustee."

17           He's saying, "I wasn't doing that.  Randy Sutton was

18   doing that."

19           "David Wulf understood that Randy Sutton and

20   Allegiant reached an agreement whereby Wulf, Bates & Murphy

21   would have limited or no involvement in the NPS trusts."

22           That one seems to be true.  He's just acting at the

23   direction.  Randy Sutton and the Cassitys directed Wulf to

24   sign various letters of direction.

25           "David Wulf believed he lacked the authority to tell

1   Randy Sutton and the Cassitys 'no' when he directed Wulf to

2   sign these letters of direction."

3          "David Wulf believed he lacked the authority to tell

4   Randy Sutton and the Cassitys 'no' when they wanted money

5   wired out of the trusts."

6          The evidence will show that even though David Wulf

7   doesn't tell the truth in a lot of things, that's pretty much

8   the truth.

9          "The evidence will show that Wulf, Bates & Murphy

10  never managed a single life insurance policy asset of the NPS

11  trusts and never considered the individual Lincoln policies to

12  be under their management."

13         Again, why am I showing this?  Because the trustee,

14  Morisse, said, "I did this because Wulf told me."

15         "Wulf, Bates & Murphy never directed, recommended or

16  even knew about the individual policy premium terms because

17  the premiums were too complex for David Wulf."

18         He says, "I'm not a life insurance guy.  I don't

19  understand life insurance."

20         "Wulf, Bates & Murphy never directed or had any

21  involvement with the practice of mismatching of payment terms

22  between consumers' preneed funeral contracts and the Lincoln

23  Life Insurance policies."

24         He's not doing that process when they collect all the

25  money from the consumer but only pay part of it to buy the

1    life insurance policy.

2           "Wulf, Bates & Murphy received no information on the

3    individual life insurance policies associated with the NPS

4    trusts."

5           The other crooks kept David Wulf out of the life

6    insurance issues, just like they got the trust to agree they

7    weren't going to be any part of it either.

8           Your Honor, if I could just ask for a minute, I'm

9    going to -- I will finish before noon, but if I could have a

10   minute here, I may be able to cut through some things.

11          THE COURT:  All right.

12          (Pause)

13          THE COURT:  If anyone on the jury wants to stand and

14   stretch, feel free to do that.

15          MR. REILLY:  We're not using every one of these.

16          THE COURT:  Just one -- Just one second.

17          (Pause)

18          THE COURT:  Okay.

19          MR. REILLY:  It will be undisputed in this case that

20   Allegiant was the trustee.  The Cassitys were never trustees

21   in this case.  They were never state regulators, were not

22   trustees.  They didn't have responsibilities to protect the

23   money of the consumers.  The only party, the only defendant,

24   the only company that had fiduciary duties was this trustee

25   that we're suing.

1          The criminal indictment makes comments about

2    David Wulf.

3          Let's go to 137.

4          This is a section called "Use Of An Investment

5    Advisor Whose Independence Was Compromised."  This is the

6    Federal Government against Randall Sutton, Defendant Sharon

7    Nekol Province, James Douglas Cassity, Brent Cassity,

8    Howard Wittner who was the lawyer for the Cassitys, Defendant

9    David Wulf and other persons known and unknown to the

10   Grand Jury; "caused National Prearranged Services, Inc., to

11   make the materially false and fraudulent representation that

12   Wulf, Bates & Murphy, Inc., of which Defendant Wulf was Chief

13   Executive Officer, was an Independent Investment Advisor."

14         The Government found or alleged that he was not.

15         Let's go to the next slide.

16         In the paragraph following that, this says that those

17   defendants obtained access to the funds which were held in

18   trusts for purchasers of prearranged funeral services from

19   National Prearranged Services, Inc.  They're just confirming

20   that it got access to the funds out of the trusts.

21         Next.

22         Talking about a 1999 agreement; Wulf, Bates & Murphy,

23   National Prearranged Services and Allegiant.  So this is a

24   signed document between the Bank Trust Department that we're

25   suing, the crooks at National Prearranged Services, and Wulf,

1    Bates.  They're supposedly an Independent Investment Advisor.

2    They entered into a written agreement to transfer custody of

3    all life insurance policies obtained with money provided by

4    the persons who purchased prearranged funeral contracts.

5            They were already doing this in 1999.  They already

6    didn't have custody of the policies in the vault.

7    Herb Morisse, the trust officer, wrote this letter, and they

8    decided, "We're going to write it up so it says it's okay that

9    we don't have the policies."  And they're going to say, you

10   know, "We -- We believe that we were told to write that letter

11   up by regulators."  The evidence will be very slim that

12   supports anything like that.  You can hear the evidence and

13   judge it, whether you believe that.

14           But in the indictment, "This agreement violated the

15   requirements of Missouri law that all property in preneed

16   trusts shall be held, administered and invested by the trustee

17   and circumvented the laws governing prearranged funeral

18   contracts by permitting the seller of prearranged funeral

19   contracts to acquire possession of the funds provided by the

20   purchasers of such contracts."

21           Our expert witnesses will come in and testify they

22   agree with that.  This agreement of November 1st, 1999, which

23   we call the "Custody Agreement," violated the obligations of

24   the trustee to keep control of the assets.

25           Next slide.

1          This is the Custody Agreement that we're talking

2     about.  Herb Morisse will admit under oath that he drafted it.

3          Next slide.

4          There's another letter around that same time,

5     November 5th, 1999.  David Wulf, who's a criminal defendant in

6     this criminal case, sent a letter to the President of

7     Allegiant Trust Company which provided that Allegiant Bank

8     "take direction from representatives of either Wulf, Bates &

9     Murphy or NPS Services, Inc., with regard to depositing and

10    distribution of assets and settlement of trades."

11         Here's a setting where Wulf, Bates, who supposedly is

12    giving investment direction, is saying, "You know what?  I'm

13    going to sign an agreement that says that if the crooks tell

14    you send money out of the trusts, you can do it.  Okay?"

15         And they sign it; the bank signs it.  This letter

16    also violated Missouri law because it permitted National

17    Prearranged Services, a seller of prearranged funeral

18    contracts, to control and manage the property obtained from

19    purchasers in prearranged funeral trusts which it established.

20         Our experts will confirm that, in their view, this

21    letter signed by the bank violated the obligations, fiduciary

22    obligations, of Allegiant Bank by giving NPS the rights to

23    direct the assets in the trusts.  It gave them the control.

24    It violated the "C" of CPR.  It violated the "P" of CPR

25    because they ended up buying Lincoln policies.  And it

1     violated the "R" of CPR because it allowed the crooks to keep

2     the records.

3              Next slide.

4              This is the letter -- This is the Wulf letter that

5     allows them to -- "for NPS to distribute any cash securities

6     or other assets from any of the above-referenced trust

7     accounts in accordance with any directions received by

8     Allegiant Bank by fax, telephone, or in person from a

9     principal, officer, employee, agent or representative of Wulf,

10    Bates & Murphy or" -- and that's the key -- "or National

11    Prearranged Services, Inc."

12             NPS should not have had the ability to tell this

13    trustee to send money out of the trusts.

14             These are the two eras that we're asking you to award

15    damages on in this case.  This is the Allegiant trustee

16    period.  $146,809,281 of contracts that were sold around the

17    country during the Allegiant period.

18             After they transfer the trusts to Bremen, without

19    warning them about the problems, without telling them that

20    they had found all kinds of red flags, and instructing them to

21    do the business the same way, there were another 216 million

22    contracts sold.

23             Mr. Markow, who was the trust officer in Bremen Bank

24    when they accepted the trusts from Allegiant, will testify

25    that had he been told about the problems that National City

 1    Bank knew about, about the red flags that National City Bank

 2    had found, that the fact that the trust was being mishandled

 3    by Allegiant, they never would have taken the trusts on.  And

 4    as a consequence of that, everything could have been stopped

 5    and should have been stopped in 2004.  Instead, from 2004 till

 6    2008 when the Ponzi scheme collapsed, another 200 million

 7    dollars of consumer money was lost.  More contracts were

 8    written all over the country.  More policies were issued.

 9    More contracts were mismatched, and the losses piled up for a

10    total of 363 million dollars.

11          This case is about this amount of money and the

12    multiple times that this bank could have stopped those losses.

13          Let's go to No. 8.

14          National City Bank discovered and was told that what

15    the Cassitys were doing was a Ponzi scheme.  They found that

16    out in a matter of a couple of months.  They found out that

17    the people or that there were people at NPS who were

18    sleazeballs.  They found that out in a couple of weeks.  This

19    bank either knew it or should have known it in that same

20    timeframe.  They either knew it when they knew that

21    Doug Cassity, a convicted felon -- By the way, the ---

22          THE COURT:  You're really getting into argument.

23          MR. REILLY:  All right.

24          THE COURT:  Please wrap it up.

25          MR. REILLY:  Okay, sure.

1          The evidence will show that this information was

2     knowable to Allegiant Bank Department throughout the six years

3     that they were serving as trustee.

4          When you get to the end of the case, in addition to

5     those factors that you have to decide, whether they did their

6     duty, whether they caused injury and what the amounts are,

7     we're going to also ask you to consider that this -- and

8     determine whether you think that this conduct was a conscious

9     disregard of the rights of others; determine whether this was

10    not a mistake but a choice and that there were multiple

11    choices made every step of the way, and that for five years

12    there were opportunities for Allegiant Bank to not let money

13    flow out.  Thousands of opportunities to stop the Ponzi scheme

14    that they didn't take.  And at the end of the case, we'll ask

15    you to consider ---

16          Oops!  That's a slide, I guess.  What's the number?

17          We'll ask you to consider punitive damages against

18    this Bank Defendant.  And the Court will instruct you as to

19    what punitive damages are for, but they are generally to

20    punish this bank for its conduct and to keep -- we got two

21    "keeps" in there actually -- but to really keep others from

22    doing the same thing.  And we'll ask you for each year that

23    Allegiant Bank was the trustee and had an opportunity to stop

24    this Ponzi scheme and stop these losses, that you multiply

25    whatever the compensatory damage award is times five to send a

 1  message to this bank and others that this conduct is not

 2  acceptable.

 3          I thank you for listening to me for all morning.  As

 4  we said, everything we tell you is because we want to make

 5  sure you understand it, and the evidence will start this

 6  afternoon sometime after bank counsel has completed their

 7  statements.  I have -- I'm sure that I haven't covered

 8  everything.  I'm sure that they'll indicate that there's

 9  things that I didn't say, but be sure that anything they

10  address we'll bring up through that witness stand and through

11  the exhibits that we'll show you.

12          Thank you very much.

13          THE COURT:  We're going to be taking the lunch

14  recess.

15          Again, do not discuss the case among yourselves or

16  with others or remain in the presence of anyone discussing it.

17  If anyone should try to talk to you about the case, advise me

18  immediately.

19          Do not read, watch or listen to any radio, television

20  or news reports of the trial.  Keep an open mind until all of

21  the evidence has been received, and you've heard the views of

22  your fellow jurors.

23          Court's in recess for one hour.  We'll be back at

24  1:00; an hour and five minutes.

25          (Jury excused from the courtroom.)

1          THE COURT:  Court's in recess.  We're going -- The

2    personnel will be moving these tables.  Should that be --

3    Should we wait until after you've finished your argument?

4          MR. RABER:  Yes, Your Honor, because you may

5    remember, we're going to set up a timeline here.

6          THE COURT:  Yes, that's correct.  Okay.  We shall

7    wait until after that occurs.

8          Would you notify Betty upstairs, Melanie, and also

9    have her call John and Adam and tell them to hold up until

10   after ---

11         THE CLERK:  Already done; they're pushed back.

12         THE COURT:  Okay, good.  Thank you.

13         MR. RABER:  Your Honor?

14         THE COURT:  Yes, go ahead.

15         MR. RABER:  Just a quick question.

16         When I'm giving my opening, it's going to be quite

17   distracting to have three people between me and the jurors.

18         THE COURT:  Sure.

19         MR. RABER:  I'm wondering if there's a way that these

20   folks can be rearranged a little bit so that I don't stumble

21   going to the board and -- and have to speak over three people?

22         THE COURT:  Can you accommodate that?

23         MR. REILLY:  We'll accommodate.  I'd like to stay

24   here.  Can I stay here?

25         MR. RABER:  Sure.

1          MR. REILLY:  Okay.  We'll clean up.

2          MR. RABER:  Okay.  Thank you.

3          THE COURT:  All right.

4

5

6          (Court recessed for the lunch hour from 11:55 AM

7   until 1:00 PM.  Whereupon, Shannon White resumed the court

8   reporting duties for the afternoon session.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER


        I, Deborah A. Kriegshauser, Federal Official Realtime

Court Reporter, in and for the United States District Court

for the Eastern District of Missouri, do hereby certify that

pursuant to Section 753, Title 28, United States Code, that

the foregoing is a true and correct transcript of the

stenographically-reported proceedings held in the

above-entitled matter and that the transcript page format is

in conformance with the regulations of the Judicial Conference

of the United States.

        Dated this 5th day of February, 2015.


                    /s/ Deborah A. Kriegshauser
        _____
                    DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                    FEDERAL OFFICIAL COURT REPORTER