UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JO ANN HOWARD             )
ASSOCIATES, P.C., *et al.*,      )
                             )
      Plaintiffs,           )
                             )
      vs.                )     Case No. 4:09CV01252 ERW
                             )
J. DOUGLAS CASSITY, *et al.*,    )
                             )
      Defendants.         )

## MEMORANDUM AND ORDER

     This matter comes before the Court on PNC Bank's Renewed Motion for Judgment as a

Matter of Law, or, in the Alternative, for New Trial [ECF No. 2382].

## I.    BACKGROUND

     This litigation arose out of proceedings instituted by the Texas Department of Insurance

in Travis County, Texas, in which National Prearranged Services, Inc. ("NPS"), Lincoln

Memorial Life Insurance Company ("Lincoln"), and Memorial Service Life Insurance Company

("Memorial") were placed in receivership and subsequently liquidated. Plaintiffs in this

litigation are Jo Ann Howard and Associates, P.C., acting on behalf of NPS, Lincoln, and

Memorial, as Special Deputy Receiver ("SDR") in connection with the Texas receivership

proceedings; the National Organization of Life and Health Guaranty Associations

("NOLHGA")[1]; and the individual state life and health insurance guaranty associations of

Arkansas, Illinois, Kansas, Kentucky, Missouri, Oklahoma, and Texas.

---

[1] NOLHGA represents the interests of the state life and health insurance guaranty associations of
Arizona, California, Colorado, the District of Columbia, Georgia, Idaho, Indiana, Iowa,
Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New

On May 3, 2012, Plaintiffs herein filed their Third Amended Complaint, asserting a wide variety of claims against various defendants, including, but not limited to, claims for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968, violations of the Lanham Act, 15 U.S.C. §§ 1051-1141n, state law claims concerning intentional and negligent fraudulent misrepresentations, negligence and gross negligence, breach of fiduciary duties, and violations of the Texas Receivership Act, Tex. Ins. Code §§ 443.202-443.205 [ECF No. 916].

There were over forty defendants named in Plaintiffs' Third Amended Complaint, with varying degrees of alleged involvement in what Plaintiffs characterized as a scheme to defraud individual consumers and funeral homes in the sale of NPS's pre-need funeral contracts. All but two of these defendants were dismissed prior to trial. After an approximately five-week jury trial, on March 9, 2015, the jury returned a verdict for Plaintiffs and against Defendant PNC Bank[2] and Forever Enterprises [ECF No. 2301]. The jury awarded Plaintiffs' $355,500,000 in compensatory damages and $35,550,000 in punitive damages against PNC Bank and $100,000,000 in compensatory damages against Forever Enterprises. PNC Bank now seeks judgment as a matter of law, or in the alternative, a new trial, on several different issues.

## II. STANDARD

### A. *Judgment as a Matter of Law Standard*

Under Federal Rule of Civil Procedure ("FRCP") 50, if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue, the court may . . . grant a motion for judgment as a matter of law against the party." Fed. R. Civ. P.

Mexico, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Washington, West Virginia, Wisconsin, and Wyoming.

[2] PNC Bank includes PNC Bank, N.A. and National City Bank.

50(a). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." *Howard v. Mo. Bone & Joint Ct., Inc.*, 615 F.3d 991, 995 (8th Cir. 2010). The Court must "view the evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility." *Douglas County Bank & Trust Co. v. United Fin. Inc.*, 207 F.3d 473, 477 (8th Cir. 2000) (internal quotations omitted).

### B.    New Trial Standard

Following a jury trial resulting in an adverse judgment, a party may move for a new trial under Federal Rule of Civil Procedure 59(a)(1)(A). Under this Rule, "[a] new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996). A miscarriage of justice does not result whenever there are inaccuracies or errors at trial; instead, the party seeking a new trial must demonstrate that there was prejudicial error. *See Buchholz v. Rockwell Int'l Corp.*, 120 F.3d 146, 148 (8th Cir. 1997). Errors in evidentiary rulings or in jury instructions are only prejudicial, and therefore only represent a miscarriage of justice that requires a new trial, where the error likely affected the jury's verdict. *See Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 720 (8th Cir. 2008); *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 833 (8th Cir. 2005).

## III.   DISCUSSION

At the close of Plaintiffs' case-in-chief, on March 2, 2015, PNC Bank moved for judgment as a matter of law under FRCP 50(a). PNC Bank argued judgment as a matter of law

should be granted as to three categories of damages,[3] and the damages should be limited to the amount of harm to the trusts. The Court denied the motion. At the close of all of the evidence, on March 5, 2015, PNC Bank renewed its notion for judgment as a matter of law under FRCP 50(a) and asserted two additional grounds. PNC Bank argued Plaintiff's negligence claim was actually a claim for breach of trust and Plaintiffs had not proven Allegiant owed any independent duty to establish the claim, and PNC Bank argued Plaintiffs had not proved Allegiant caused Plaintiffs' claimed losses. The Court denied the motion.

In its renewed post-verdict motion, PNC Bank asserts judgment as a matter of law, or in the alternative, a new trial, should be granted on four issues. First, PNC Bank argues Plaintiffs did not prove Allegiant Bank[4] ("Allegiant") caused Plaintiffs' damages. Next, PNC contends Plaintiffs did not establish Allegiant's conduct was so outrageous as to justify the punitive damages award. PNC Bank also argues Plaintiffs failed to prove facts sufficient to award certain categories of damages including growth payments owed by NPS to funeral homes, losses related to contracts and policies issued outside of Missouri, and losses related to contracts and policies issued after Allegiant's tenure. Lastly, PNC Bank asserts Plaintiffs' did not prove Allegiant owed an independent duty to the trust beneficiaries, distinct from its fiduciary duties, and thus, failed to prove their negligence claim. Each ground asserted by PNC Bank for judgment as a matter of law, or in the alternative, a new trial, is discussed as follows.

### A. Causation of Plaintiffs' Losses

PNC Bank contends Plaintiffs failed to prove Allegiant caused Plaintiffs' losses. First, PNC Bank argues Plaintiffs did not prove the amount of harm to the trusts, which, according to

---

[3] The categories of damages included (1) growth payments NPS promised to make to funeral homes, (2) payments made in connection with Memorial policies, and (3) punitive damages.
[4] Allegiant Bank is the predecessor of PNC Bank.

PNC Bank, is the appropriate measure of damages under Missouri law.  But even if Plaintiffs are permitted to recover a different measure of damages, according to PNC Bank, Plaintiffs did not prove Allegiant's conduct caused $355.5 million in losses because Plaintiffs did not establish actual or proximate causation.  The Court disagrees with PNC Bank's assertions and will deny judgment as a matter of law, or a new trial, on these bases.

## 1.    Breach of Trust v. Negligence and Breach of Fiduciary Duty

PNC Bank asserts Plaintiffs' claims cannot be properly brought under negligence or breach of fiduciary duty because they are claims for breach of trust.  Further, PNC Bank argues damages for a breach of trust are limited to harm to the trust assets.  This argument has been raised several times throughout this case and the Court, each time, has allowed Plaintiffs to proceed with their claims as pled.  The Court will not rehash this argument and its reasoning again when no new case law or argument has been brought to its attention to change the decision. Instead, the Court refers the parties to its decision on this issue at summary judgment [ECF No. 2092].  Plaintiffs are permitted to bring negligence claims and breach of fiduciary duty claims, and their damages are not limited simply because Allegiant was a trustee.

The Court would like to address a quote cited by PNC Bank from Learned Hand:  "The law ought not to make trusteeship so hazardous that responsible individuals and corporations will shy away from it."  PNC Bank uses this quote to support its position the damages against a trustee are limited to the damage to the trust and a trustee cannot be liable for negligence or breach of fiduciary duty.  While this quote may have application to the facts of the case examined by Learned Hand, it is not persuasive when analyzing this case.

The actions of Allegiant in this case are particularly egregious and the Court will summarize a few of the harmful actions taken by Allegiant.  Allegiant's trust department was

created for marketing purposes, to represent to bank customers Allegiant was a full service bank, not to provide consumers qualified, reputable trust services. Regrettably for the consumers who relied on Allegiant to protect their money, Allegiant's accumulated failures to function under the rules and laws regulating trustees, opened its vault to the massive fraud committed by the Cassitys.[5] Allegiant circumvented every protection created to prevent trusts, especially pre-need trusts, from losing their assets. Throughout its tenure, Allegiant wired millions of dollars to NPS through a system created to automatically execute wire transfer requests from David Wulf, the investment advisor of the trusts. Tr. Vol. 12, 42:11-14; Vol. 4A, 66:8-67:5, 67:24-68:19, 85:19-86:21, 90:9-20; Vol. 5A, 106:10-17, 108:24-109:3, 114:17-115:1, 116:5-16, 121:10-122:4. Allegiant did not deny a single wire request. Tr. Vol. 5A, 121:3-6. This allowed NPS unfettered access to the money being held in the trusts, making the trusts into a checking account for NPS. Rather than conducting routine independent reconciliations of consumer deposits as required by Chapter 436, Allegiant signed off on monthly reconciliation forms provided by NPS and certified the forms were prepared pursuant to Chapter 436. Tr. Vol. 4B, 52:16-53:24, 55:7-18; Vol. 6A, 81:16-82:3, 82:13-83:3. This, along with other noted failures of Allegiant, as noted below, allowed the Cassitys to manipulate transactions and continue their fraudulent conduct.

---

[5] When the Court refers to "the Cassitys," it includes members of the Cassity family, entities owed by the Cassitys and employees who worked for the Cassitys and were involved in the criminal scheme. Randall Sutton pled guilty to bank fraud, mail fraud, money laundering, and insurance fraud which jeopardizes the soundness of an insurer. Sharon Nikol Province pled guilty to two counts of fraud by wire affecting a financial institution, mail fraud, mail fraud affecting a financial institution, and insurance fraud which jeopardizes the soundness of an insurer. James Douglas Cassity pled guilty to bank fraud, two counts of fraud by wire, two counts of mail fraud, money laundering, and insurance fraud which jeopardizes the soundness of an insurer. Brent Douglas Cassity pled guilty to fraud by wire, mail fraud, money laundering, and insurance fraud. Howard A. Wittner pled guilty to insurance fraud which jeopardizes the soundness of an insurer and insurance fraud. David Wulf was found guilty by a jury of conspiracy to commit mail fraud, wire fraud, and bank fraud affecting a financial institution, three counts of bank fraud, three counts of fraud by wire affecting a financial institution, and three counts of fraud by wire. *See USA v. Sutton,* No. 4:09-CR-509-JCH.

During Allegiant's tenure as trustee, Allegiant purchased thousands of Lincoln[6] life insurance policies under the auspices they were investments.  Rather than valuing the trusts' Lincoln life insurance policies at market value, Allegiant valued them at face value.  Tr. Vol. 5B, 31:13-20; Vol. 12, 40:18-19.  Astoundingly, at trial, Herbert Morisse, trust administrator, testified he still does not know what market value means, which is the appropriate standard by which to value a life insurance policy.  Tr. Vol. 6B, 10:25-11:4.  It is common for an insurance policy's face value to have no accumulated value, and have no value, in the absence of being submitted to pay a death claim.  Regarding insurance policies issued by other companies, Allegiant's trust statements properly reflected market value, rather than face value.

While the banking division at Allegiant found the Cassitys unworthy as borrowers,[7] the trusts loaned money to the Cassitys on a regular basis.  Tr. Ex. P-573; Tr. Vol. 4A, 99:13-23. Because of the numerous failures of Allegiant's trust department in approving improper transactions, Cassity entities had access to funeral home and consumer money from the trusts which they needed to fund their expansion operations in many states.  Never, did Mr. Morisse, during the entire Allegiant tenure, question the many millions of dollars in loans from pre-need money to Cassity entities.  Tr. Vol. 4A, 120:5-22; Vol. 4B, 35:16-37:3.  Nor, did anyone at Allegiant ever examine the terms of corresponding promissory notes or monthly trust statements to determine if promissory notes were collateralized.  Tr. Vol. 6A, 19:9-20:2, 23:7-18, 24:1-10, 33:12-21.  Additionally, Allegiant accepted millions in debentures which were unsecured by specific assets.  Tr. Vol. 6A, 47:2-5, 48:8-13.  Instead of depositing pre-need funds into the trusts, as required by the statute, NPS increased the balances of the debentures held by the trusts,

---

[6] Lincoln was an entity owned by the Cassitys.
[7] Mr. Morisse knew the reason the loan department of Allegiant denied a bank loan to Cassity entities was because the entities were losing money and their cash flows were inadequate.

without Allegiant investigating the terms of the debentures.  Tr. Vol. 3B, 37:25-38:12, Vol. 6A, 57:20-58:11.  Thus, the trusts appeared to have assets equaling or greater than the amount of deposits from consumers' contracts, which they did not in fact have.  Allegiant was aware the debentures were simply IOUs from NPS, yet ignored their suitability as sound trust assets.  Tr. Vol. 6A, 47:6-15, 48:2-16; Vol. 3B, 46:11-24.  Mr. Morisse did nothing to review trust documents or alter the handling of the trusts in any manner, allowing $25 million in policy loans to be taken against life insurance policies owned by the trusts.  Tr. Vol. 4B, 80:5-21; Vol. 6B, 29:1-11;  Vol. 11A, 137:16-138:5.  PNC Bank's corporate representative testified Allegiant should have recognized these transactions related to policy loans as significant.  But, Allegiant ignored these red flags, along with many others, as noted.  Tr. Vol. 12 at 43:4-8.

Further, Allegiant authorized the trusts to purchase securities owned by the Cassitys at grossly inflated prices with no attempt to determine if the purchases were for fair market value.[8] Mr. Morisse testified the stock transactions should have been recognized as "red flags" and they were improper.  Tr. Vol. 9B, 84:15-85:4.  He acknowledged pre-need funds were routinely transferred to NPS checking accounts at Allegiant without explanation, beyond it being at the direction of investment advisor, David Wulf.  Tr. Vol. 5B, 39:9-24, 43:21-44:20.  Allegiant allowed these transfers, knowing it could only distribute trust principal under certain conditions pursuant to Chapter 436 and the NPS trust agreements.  Tr. Vol. 5B, 26:19-27:2, 28:3-7.  One such purpose would be for investments, but Mr. Morisse never confirmed the transfers were for investment purposes, only that the request stated it was from David Wulf, investment advisor,

---

[8] Examples of securities purchased far above publicly-traded values include:  (1) Trust IV transferred $70,150 to Forever Enterprises in exchange for 10,000 shares of Arch Communications for $7.00 per share which was trading at a high of $2.25 per share that day; (2) Trust IV purchased 2,500 shares of Dell from Forever Enterprises at $50.00 per share, which was trading that day at a high of $20.31; and (3) Trust IV purchased 5,000 shares of Conseco common stock from Forever Enterprises at $20.00 per share, which was trading that day at a high of $9.19.

who acknowledged wires to NPS approved by Allegiant were not an investment.  Tr. Vol. 5B, 43:2-44:7; Tr. Vol. 12, 131:6-7.

There was substantial testimony at trial regarding a concept of "mismatching," the practice permitted where over 21,000 paid-in-full pre-need contracts from Missouri consumers were backed with life insurance policies requiring premiums to be paid over a period of years, rather a fully paid policy.  For example, if a consumer paid $10,000 in cash on a pre-need contract, the Cassitys, through NPS, rather than ordering a fully-paid life insurance policy be purchased with the full amount of $10,000, would instead order a policy to be purchased with a face value of $10,000 with a small upfront payment of $500, allowing the Cassitys to pocket almost all of the $10,000.[9]  By allowing the trusts to pay a small amount of initial premiums, large sums of money were siphoned off by the Cassitys.  The trusts were required to pay premiums over the life of the policy in amounts greatly exceeding the amount deposited from the consumer.  The example of the $10,000 policy could actually require the trust to pay twice that amount in monthly premiums if the insured on the policy lived a long life.  This was a key component of the Cassitys' "Ponzi like" scheme.  Eventually, the trusts would not have money to make the premium payments.  Tr. Vol. 11A, 111:4-21, 115:11-20.  Once again, adding to the list of trust management misconduct by Allegiant, instead of implementing a system to track premium obligations, or seeking policy information from Lincoln, Allegiant simply assumed this was within the purview of David Wulf, as investment advisor, and not Allegiant's responsibility. Tr. Vol. 3B, 54:1-3, 54:10-20, 55:12-56:1; Tr. Vol. 6A, 73:18-74:6; Tr. Vol. 11A, 104:3-105:5. Mr. Morisse did nothing to correct this, notwithstanding receiving documents demonstrating the

---

[9] The amounts in this example do not reflect actual amounts presented at trial but are only used for the purpose of explaining the concept of mismatching.

trusts owed millions of dollars in monthly renewal premiums. Tr. Vol. 6B, 23:16-27:8. As a result of Allegiant's failure to address mismatching, approximately 17,000 Missouri policies lapsed in 2004 due to the trusts' inability to meet their premium obligations. Trial Ex. P-1628, Tr. Vol. 11A, 125:15-25, 146:19-147:12, 148:22-149:21.

From its founding in 1979, NPS relied on revenue from Missouri sales to fund its operations. Tr. Vol. 8A, 107:18-108:4. During Allegiant's tenure, NPS expanded into thirteen states which required significant front-end expenses including training and advertising. Tr. Vol. 10A, 125:10-15, 126:9-16, 127:6-24; Vol. 10B, 4:23-6:2; Vol. 8A, 105:24-106:11, 106:21-107:17. Allegiant transferred funds from trusts to NPS to pay these expenses, knowing NPS was operating outside Missouri. Tr. Vol. 17A, 43:1-44:20, 47:22-48:1, 49:18-50:14; Vol. 5B, 32:2-5; Trial Ex. P-0104 at 661, 758. In addition, Allegiant financed NPS's expansion and operations outside Missouri by using trust funds to pay renewal payments on Lincoln policies purchased for non-Missouri consumers. Tr. Vol. 17A, 53:14-54:11, 54:22-55:11. Allegiant also allowed the Cassitys to use money from Missouri trusts to finance expansion of their cemetery and funeral home operations. Tr. Vol. 5B, 9:18-10:2; Vol. 6A, 35:1-19, 36:4-11; This assisted NPS in establishing new sales in other states. Tr. Vol. 8A, 83:4-16, 112:1-113:15.

In November 2003, Allegiant and National City Bank entered into a merger agreement, which, by its terms, required Allegiant to pay National City Bank a $25 million break-up fee if the transaction should not be completed; an approximate one year loss of earnings by Allegiant if the merger was unsuccessful. Tr. Vol. 3A, 72:22-73:3. A due diligence audit by National City Bank followed briefly after the execution of the agreement. During this audit, many "red flags" were found related to Allegiant's mismanagement of the trusts, including suspicious transactions and poor financial conditions of Cassity entities. Among those findings were:

- Lack of documentation or support for a $13.5 million group term life insurance policy reported as a trust asset.[10] Tr. Ex. P-0045; Tr. Vol. 3B, 5:3-5.

- Lack of a tracking system for consumer payments and there was no support for funds received into the trusts versus funds sent out of the trusts.  Tr. Ex. P-0043; Tr. Vol. 6B, 106:6-25.

- Lack of documentation review for Trust I debentures.  Tr. Ex. P-0042.

- A lawsuit was filed against NPS alleging NPS was engaged in a "Ponzi scheme" and not fully funding the pre-need trusts.  Tr. Ex. P-0047.

- Lincoln was financially failing, not rated by any service, 745th in asset rank, and its surplus had been reduced by half in the previous two years.  Tr. Ex. P-0046.

Just thirty days after Albert Kantra's[11] first visit, National City Bank instructed Allegiant to withdraw as trustee of the NPS trusts.  Tr. Ex. P-0771; Vol. 6B, 129:13-130:3; Vol. 12, 46:4-5; Vol. 2B, 65:8.  Faced with the risk of being required to pay National City Bank the $25 million break-up fee, Allegiant did nothing to correct potential liability or advise its successor trustee, Bremen Bank, of the potential liability posed by the pre-need trusts, thereby perpetuating the fraudulent scheme.  Tr. Vol. 6B, 120:13-20, 122:23-123:4, 123:16-124:10, 131:10-14; Vol. 9B, 112:8-113:11, 113:22-115:12; Vol. 10B, 79:8-80:19; Vol. 12, 46:6-7, 46:9, 46:11-18. Allegiant took no action to fulfill the duties of a trustee, during its tenure, with clear ability to do so, and knowing all of the dangers of allowing NPS to continue to function, and potential harm to past and future consumers and funeral homes, Allegiant, by its deceit, encouraged NPS to continue on its doomsday path, saving itself $25 million.  With his job intact at National City

---

[10] Evidence at trial found this police had no value.
[11] Albert Kantra was National City Bank's integration leader for the merger.

Bank, Mr. Morisse actually went to Bremen Bank's offices and instructed its employees to administer the trusts in the same manner as Allegiant had done. Tr. Vol. 4A, 24:9-18; Vol. 10B, 63:6-66:19, 67:21-69:22, 70:4-73:23, 77:15-78:21. He told them, specifically, to execute wires from NPS immediately because that is what they expected, to disburse income on the books without performing calculations required by Chapter 436, and to report insurance values as provided by NPS without verification or reconciliation of values, effectively perpetuating and encouraging gigantic losses to consumers and funeral homes. Tr. Vol. 10B, 65:11-20, 68:5-70:3, 70:18-21, 77:11-14. In no way did Allegiant warn Bremen Bank of known serious "red flags" in the trusts; even the worthless $13.5 million group term policy. Tr. Vol. 6B, 120:13-20, 122:23-123:4, 123:16-124:10, 131:10-14; Vol. 9B, 112:8-113:11, 113:22-115:12; Vol. 10B, 79:8-80:19; Vol. 12, 46:6-7, 46:9, 46:11-19). Sylvia Stuart, trust officer at Bremen Bank, testified Bremen would never have accepted the trusts, or the group term insurance policy as an asset, if Allegiant had sounded a warning. Vol. 10B, 79:8-80:13. Failure of these disclosures and instructions by Allegiant perpetuated the multi-state scheme beyond 2004.

Trustees, as a group, receive rigorous training and have substantial experience in recognizing the importance and risks in managing other peoples' money. The word "trustee" has special caretaker meaning to individuals making decisions to separate themselves from their assets by putting those assets in trusts. Common expectations are that trustees will, at some time in the future, return their assets with, perhaps, some growth. The egregious facts of the current case distinguish it from the normal client-trustee relationship. Individuals desiring to make arrangements for a funeral for themselves, or others, were directly solicited as customers by NPS agents, or learned of NPS as a seller of pre-need funeral contracts from funeral homes. Many funeral homes, with their individually operated pre-need contracts, stopped their independent

pre-need funeral business and solicited customers on behalf of NPS. The pre-need contracts included language stating the consumer was a "full participant in the Permanent Trust Fund established pursuant to the terms of the governing indenture and in conformance with the laws of the Missouri State Statute Section 436," and included the name and address of Allegiant Bank Trust Department, as an inducement to convince people to execute pre-need funeral contracts with NPS. Representation the money would be held in trust gave the appearance the money would be available upon death of a named individual.

The individual consumers and funeral homes of Allegiant's trust department did not know, and were not told, the money being paid into the trusts was not being safely preserved, according to represented expectations. Instead, Allegiant did nothing required of it under Chapter 436[12] to account for the money. It kept no reconciliation of records, did not identify pre-need contracts with fully paid up life insurance policies, and incredibly, did not know NPS was paying small premiums on life insurance policies, allowing the Cassitys to withdraw the difference between the fully paid-up pre-need contract and the small premium, which would go on until the death of the consumer, requiring more new consumer money in the future. The premiums, over the years, requiring new money from other customers to keep the Ponzi-like scheme running, far exceeded the amounts paid-in for pre-need contracts.

The consumers and funeral homes were unaware Allegiant had no in-house record system to verify the legality of NPS requests for disbursements from the trusts. They did not know Allegiant always paid, without exception, wire transfers requested by NPS, without verifying the

---

[12] Chapter 436 of the Missouri Revised Statutes required trustees to maintain adequate records of all payments received, invest trust funds prudently, distribute income to the seller if the aggregate market value of the assets in the trusts is above the sum of all deposits made to the trusts for all preneed contracts, maintain books of all transactions administered through the trusts, and distribute trust principal upon cancellation or default of a contract or death of a beneficiary.

13

transfers were for legitimate purposes, when many hundreds were not. Consumers and funeral homes did not know the banking side of Allegiant would not approve loans to NPS because the applications were too risky. But, because Allegiant's trust department kept no independent records and approved all requested wire transfers of NPS without questioning their purpose, the Cassitys borrowed vast sums of money, in most cases without collateral from the trusts. In unusual cases, when the Cassitys offered collateral, it was inadequate for the loan. Additionally, consumers and funeral homes were unaware the trusts were purchasing securities for prices far exceeding fair market value without Allegiant investigating, checking or verifying values. Consumers and funeral homes were never told Allegiant, with full knowledge of the risk of losing $25 million dollars if its merger with National City Bank was not consummated, ridded itself of the NPS trusts, then, allowed the fraud to continue by not warning Bremen Bank, and affirmatively training Bremen employees in a manner assuring the fraud would continue.

Defendants reliance on the eloquence of renowned Learned Hand in their argument is misplaced. The famous jurist did not have before him for analysis the facts of this case. Justice Hand was wise in asseverating trust departments should have protection in controlling their damages in administering trusts to encourage banks to take on that responsibility. A drafter, far less capable in analysis, and seeking in no way to suggest equivalent sparring rights with that brilliant mind, is so brave to suggest it would be a great travesty to allow PNC Bank a safe harbor from all of the damage it has caused or contributed to cause, by limiting its damages to the value of trust assets managed. Paving such a path would encourage others, clothed in the time-honored appellation of trustee, to include themselves in the company of a few, who would allow and encourage thievery of what they are by law ordered to protect.

    2.  **Actual Causation**

PNC Bank's arguments regarding actual causation focus on two alleged weaknesses in Plaintiffs' case. First, PNC Bank asserts Plaintiffs have not established actual causation because the majority of Plaintiffs' losses are amounts the Guaranty Associations are required to pay on Lincoln and Memorial policies which backed NPS pre-need contracts. PNC Bank claims numerous witnesses testified the insolvencies of Lincoln and Memorial are the reasons why those losses were incurred, not Allegiant's conduct. According to PNC Bank, no witness testified as to why the insolvencies occurred, nor did any witness testify that Allegiant's conduct caused the insolvencies. PNC Bank, secondly, argues there is no actual causation as Plaintiffs presented no evidence Allegiant could have shut down the Cassitys' criminal scheme on the first day Allegiant became trustee, which is the basis of Plaintiffs' causation theory. PNC Bank claims it is pure speculation to assume NPS would have stopped all of its operations had Allegiant administered the trusts differently.

Both negligence and breach of fiduciary duty require a party prove causation. *Heffernan v. Reinhold*, 73 S.W.3d 659, 664 (Mo. Ct. App. 2002) (Negligence has four elements, one of which is causation); *Robert T. McClean Irrevocable Trust v. Patrick Davis, P.C.*, 283 S.W.3d 786, 793 (Mo. Ct. App. 2009) (Stating breach of fiduciary duty consists of a fiduciary relationship between the parties, a breach of the fiduciary duty, causation, and harm.). Causation includes "but for" causation and proximate causation. *Nail v. Husch Blackwell Sanders, LLP*, 436 S.W.3d 556, 562 (Mo. 2014). "But for" causation is merely causation in fact. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862 (Mo. 1993). Absolute certainty is not required to prove causation. *Basta v. Kansas City Power & Light Co.*, 456 S.W.3d 447, 454 (Mo. Ct. App. 2014). The jury can infer causation from the circumstances. *Id*. "If the logical conclusion from

the evidence is that if certain things had been done certain results would not have occurred, and such results did occur, the evidence of causation is sufficient." *Id.*

The record is replete with evidence of Allegiant's harmful conduct in regards to the administration of the trusts. Plaintiffs provided testimony trustees have responsibility to control trust assets, protect those assets, and maintain accurate records, none of which Allegiant did. Simply put, Allegiant had no clue what trust assets were coming into or going out of the trusts, nor did they have any idea of why the assets were leaving the trusts. Additionally, Allegiant did not keep independent records of the activity of the trusts; instead, it relied solely on the records kept by NPS, which was solely controlled by the Cassitys. Allegiant did not review the pre-need funeral contracts or life insurance policies during its tenure which allowed for policy mismatching by NPS. Furthermore, Allegiant allowed various companies owned by the Cassity family to borrow money from the trusts without reviewing the terms of the promissory notes, collateral, or repayment terms. These examples, along with many more in the record, and detailed *supra*, highlight the failures of Allegiant to protect the trust assets. It was easy for the jury to infer the assets from the trusts would not have disappeared had Allegiant done its duties.

As Plaintiffs correctly state, the focus of causation is what caused the trust beneficiaries to sustain their losses, not what caused Lincoln and Memorial to become insolvent. The trust beneficiaries would not have sustained damages had Allegiant fulfilled its duties as trustee, irrespective of whether Lincoln and Memorial became insolvent. It's clear, the trusts' assets would not have been depleted had Allegiant not allowed the trust assets to be so easily removed from the trusts. The harm did not occur when Lincoln and Memorial became insolvent, the harm occurred when Allegiant allowed the money be removed from the trusts with no oversight.

PNC Bank's argument it could not possibly have stopped the criminal scheme on day one of its trusteeship similarly fails. Allegiant was not required to stop the criminal scheme on day one, but it was required to protect and control the trust assets and maintain records from day one, which it did not do. Had Allegiant performed as required by law, the criminal scheme, as it was conducted, could not have functioned. The Cassitys may have engineered other ways to steal, but these trust beneficiaries would not have been harmed had Allegiant done its job. If there is any doubt whether Allegiant could have stopped the Cassity criminal scheme, there is no doubt it could have stopped the harm by simply maintaining records, keeping control of trust assets, and protecting the trust assets.

PNC Bank cites *Finocchio v. Mahler*, for the proposition "liability should not be lightly assessed when the injury would not have happened but for the criminal conduct." 37 S.W.3d 300, 303 (Mo. Ct. App. 2000). The Court does not "lightly assess" liability in this case. Instead, the Court agrees with the jury's assessment of liability because it finds the conduct of Allegiant to be particularly egregious. Allegiant was a trustee in name only. Further, *Finnocchio* states a defendant is not excused from liability just because the "chain of causation" includes criminal acts. *Id.* The facts of this case demonstrate exactly the situation in which the criminal acts of another do not excuse the actions of the defendant.

PNC Bank attempts to argue Allegiant had no duty to prevent the Cassitys from inflicting harm because the Restatement of Torts does not requires a person to prevent a third party from causing harm, absent a special relationship. *See Zelaya v. United States*, 781 F.3d 1315, 1325-26 (11th Cir. 2015). The flaw in this argument is Allegiant did have a special relationship with Plaintiffs, that of trustee, which imposed upon Allegiant an affirmative duty to protect trust assets. Allegiant treated these trusts as if they were checking accounts rather than trusts and

must now account for its conduct.  The Court finds Plaintiffs sufficiently established actual causation.

### 3.     Proximate Causation

Next, PNC Bank argues Plaintiffs did not establish proximate causation.  PNC Bank asserts Plaintiffs' theory on proximate causation is simply an extension of "but for" causation.  PNC Bank claims the connection between Allegiant's conduct and Plaintiffs' losses is too far removed for liability.  Plaintiffs argue proximate cause is easily shown in this case because the injury is a reasonable and probable consequence of Allegiant's conduct.

Proximate causation is established if the injury was a reasonable and probable consequence of the defendant's negligence.  *Nail*, 436 S.W.3d at 562.  It is a limitation on liability.  *Heffernan* 73 S.W.3d at 664 (Mo. Ct. App. 2002).  The test in Missouri is, generally, a "look back" test with a "sprinkling of foreseeability."  *Williams v. Van Biber*, 886 S.W.2d 10, 14 (Mo. Ct. App. 1994).  The test is not whether a reasonably prudent person would have foreseen the injury, but rather, whether after the injury, the injury is a reasonable and probable consequence of the act or omission.  *Shaffer v. Bess*, 822 S.W.2d 871, 876 (Mo. Ct. App. 1991).  A defendant need not be the sole cause of the injury.  *Id*.

Allegiant's conduct was the proximate cause of the losses Plaintiffs endured.[13]  It is the reasonable and probable consequence that assets will be taken from trusts for ill-gotten purposes when a trustee takes no action to protect the assets.  PNC Bank continues to argue the losses in this case would not have occurred had Lincoln and Memorial not become insolvent.  But the actions of Allegiant contributed to the harm caused by the insolvencies.  This is not a case where a trustee complied with its duties but was hoodwinked by criminals.  Allegiant did not fulfill its

---

[13] This refers to the losses as a whole.  The Court will address the objections to specific categories of damages *infra*.

duties and a natural and probable consequence of failing to fulfill its duties, is the trust assets were depleted. Plaintiffs sufficiently established proximate causation.

### 4. New Trial

In the alternative, PNC Bank asserts a new trial should be granted because the verdict is against the weight of the evidence. The Court does not agree. As stated above, Plaintiffs presented ample evidence to support the jury's findings and there was no miscarriage of justice.

### B. *Punitive Damages*

PNC Bank contends Plaintiffs did not prove Allegiant engaged in outrageous conduct justifying an award of punitive damages. According to PNC Bank, Plaintiffs presented no evidence of intentional wrongdoing. PNC Bank argues punitive damages require more than negligent conduct, and in cases of a breach of fiduciary duty, intentional misconduct or self-dealing is required. Lastly, PNC Bank asserts Plaintiffs' arguments justifying punitive damages lack merit.

In Missouri, punitive damages may be awarded for "conduct that is outrageous, because of the defendant's evil motive or reckless indifference to the rights of others." *Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo. 1989).[14] A party must show the conduct is outrageous because of evil motive or reckless indifference by clear and convincing evidence. *Romeo v. Jones*, 144 S.W.3d 324, 334 (Mo. Ct. App. 2004).[15] Clear and convincing evidence is if it "instantly tilts the scales in the affirmative when weighed against the evidence in opposition and

---

[14] For a state law claim, the issue of punitive damages is a question of state law. *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989). Federal law will control the proper review of a jury award by a district court. *Id.* at 279. The district court will determine if the jury's verdict is within the confines of state law. *Id.*

[15] A point of contention between the parties is whether the standard is evil motive *or* reckless indifference or evil motive *and* reckless indifference. Both parties cite cases supporting their position. The Court will apply evil motive *or* reckless indifference because the Missouri Supreme Court has used this standard. *See Burnett*, 769 S.W.2d at 789.

it causes the fact finder to have an abiding conviction that the evidence is true."[16]  *Id.*  The necessary mental state for punitive damages is "when a person intentionally does a wrongful act without just cause or excuse."  *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d 1051 (8th Cir. 2014).  When a person intentionally commits a wrong and knew it was wrong at the time, evil motive and wanton behavior is established.  *Id.*  Evil intent can also be found when a person recklessly disregards the rights and interests of another.  *Id.*

In cases of negligence, punitive damages may be awarded, but it is not appropriate in every case.  *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 74 (Mo. 1990).  More than just negligence must be established; scienter in some degree is needed for punitive damages.  *Id.*  A plaintiff must establish defendant knew, or should have known, the conduct at issue created a "high degree of probability of injury" showing "complete indifference or conscious disregard to the safety of others."  *Coon v. Am. Compressed Steel, Inc.*, 207 S.W.3d 629, 637 (Mo. Ct. App. 2006).  Complete Indifference or conscious disregard is "an act or omission . . . that manifests such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted."  *King v. Taylor, Inc.*, No. 4:13CV1217 TCM, 2013 WL 5567721 at *2 (E.D.Mo. Oct. 9, 2013) (quoting *Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc.*, 700 S.W.2d 426, 435 (Mo. 1985) (en banc)).  Actual or constructive knowledge that injury will occur if a defendant is negligent does not create the necessary mental state for punitive damages.  *Walters v. Kone, Inc.*, No. 4:09CV599-DJS, 2010 WL 3362975 at *3 (E.D.Mo. Aug. 25, 2010).

---

[16] The Court must determine if the evidence is sufficient to permit a reasonable juror to conclude Plaintiff established it was highly probable a defendant's conduct was outrageous because of evil motive or reckless indifference.  *Lopez-Vizcaino v. Action Bail Bonds, Inc.*, 3 S.W.3d 891, 893 (Mo. Ct. App. 1999).

Where there has been a breach of fiduciary duty, punitive damages are appropriate "where the wrongful acts were perpetrated in a willful, wanton, or malicious manner." *Koester v. Am. Republican Inv., Inc.*, 11 F.3d 818, 823 (8th Cir. 1993). Every breach of fiduciary duty does not warrant an award of punitive damages. *Id.* While it is more rare for punitive damages to be awarded in cases of breach of fiduciary duty, it is not limited to instances of intentional misconduct or self-dealing as PNC Bank suggests.

The facts of this case support a finding for punitive damages. There is no dispute; Allegiant is responsible for the acts of its officials. Mr. Morisse knew if Allegiant was unable to rid itself of the NPS trusts, Allegiant would be required to pay $25 million to National City Bank. His conduct alone in participating in passing the trusts to Bremen Bank without warning its officers, thereby permitting the Cassity fraudulent scheme to continue, satisfies the reckless indifference element, irrespective of other behavior heretofore outlined.

Further, Allegiant's conduct was egregious; there is evidence, detailed *supra*, suggesting Allegiant acted in a willful, wanton, or malicious manner. There was suggestion Allegiant knew what it was doing was wrong and certainly evidence showing Allegiant acted with reckless indifference to the beneficiaries' rights. The Court has already listed the evidence repeatedly in this Memorandum & Order supporting the finding punitive damages are appropriate. Thus, judgment as a matter of law will be denied on the issue of punitive damages. PNC Bank's request for a new trial will also be denied.

## C.        *Specific Categories of Damages*

PNC Bank asserts if the Court does not grant judgment as a matter of law on the lack of Plaintiffs' causation generally, it should grant judgment as a matter of law on three particular categories of damages. Those categories are growth payments, damages related to contracts and

policies issued outside of Missouri, and damages related to contracts issued after Allegiant's tenure.

### 1.    Waiver of PNC Bank's Argument

For two of the categories of damages, damages for contracts and policies outside of Missouri and for those issued after Allegiant's tenure, Plaintiffs assert PNC Bank waived any arguments because they did not raise them specifically in their pre-verdict motion for judgment as a matter of law.  According to Plaintiffs, PNC Bank's Rule 50(a) motion was limited to growth payments, damages related to Memorial life insurance policies, and punitive damages, and in its oral motion, PNC Bank referenced proximate causation generally, but not these specific categories of damages.  Plaintiffs assert PNC Bank created the impression it was not seeking JMOL on all non-Missouri damages, but instead, only as to specific damages related to Memorial policies and growth payments.

PNC Bank argues it did not waive its right to seek judgment as a matter of law on these specific categories of damages because they are encompassed by PNC Bank's request for judgment as a matter of law on all damages and have the same legal and factual basis of its request on the losses related to Memorial.  PNC Bank claims these grounds are inextricably intertwined with the grounds advanced in the pre-verdict motions.

A renewed motion for judgment as a matter of law pursuant to Rule 50(b) is limited to the issues asserted in the pre-verdict motion for judgment as a matter of law pursuant to Rule 50(a).  *Hyundai Motor Fin. Co. v. McKay Motors I, LLC*, 574 F.3d 637, 640 (8th Cir. 2009).  If a party fails to articulate the grounds for its pre-verdict motion with specificity, judgment as a matter of law cannot be granted unless to prevent manifest injustice.  *Id*.  Technical precision is not necessary, but the motion must be specific enough to notify the court and the opposing party

of the issue. *Id.* at 642. The purpose of requiring such articulation in the motion is to give the other party an opportunity to cure any defects. *Conseco Fin. Servicing Corp. v. N. Am. Mort. Co.*, 381 F.3d 811, 821 (8th Cir. 2004).

PNC Bank did not waive its arguments on granting judgment as a matter of law on damages outside of Missouri or after Allegiant's tenure. Its pre-verdict motion encompassed all damages and the grounds for seeking judgment as a matter of law on all of the damages are the same grounds asserted in this motion as to these specific categories of damages. Additionally, PNC Bank asserted similar arguments at summary judgment. *See Bank of Am., N.A. v. JB Hanna, LLC*, 766 F.3d 841, 850 (8th Cir. 2014) (stating the 8th Circuit has permitted an appeal where the movant filed an imprecise 50(a) motion but fleshed it out in summary judgment or in oral arguments before the district court). PNC Bank's argument regarding the tenuous nature of Plaintiffs' proximate cause theory relate most precisely to these two specific categories of damages, which are the damages most attenuated from Allegiant's conduct. Plaintiffs' assertion they were not on notice of PNC Bank's arguments and in fact were misled by PNC Bank's oral motion is difficult to understand as the Court itself expected these arguments to be raised again. PNC Bank's arguments regarding causation of specific categories of damages have not been waived.

## 2. Growth Payments

PNC Bank argues it cannot be liable for growth payments promised by NPS[17] because these payments were independent from the pre-need contract with the consumer and were not placed in the trusts. PNC Bank claims Allegiant owed no duty to NPS related to growth

---

[17] Growth payments are amounts NPS promised to pay funeral homes to compensate for the rising costs of funerals over the term of a pre-need contract.

payments and Allegiant did not cause NPS's inability to make growth payments. PNC Bank asserts Allegiant's conduct was not the "but for" cause of NPS's inability to make growth payments, nor was it the proximate cause. Plaintiffs argue proximate cause was established because NPS would have either been able to meet its obligations or would not have continued selling contracts with growth obligations had Allegiant fulfilled its duties. Plaintiffs also claim they were not obligated to prove Allegiant caused NPS's inability to make the growth payments, but instead, were only obligated to prove Allegiant contributed to cause NPS to incur these obligations for which the SDR is now liable. According to Plaintiffs, the only relevant question is whether the SDR losses, including growth obligations, were caused by Allegiant's breaches of duties.

At summary judgment, this Court held PNC Bank owed a duty to NPS because NPS was a beneficiary of the trusts. The Court also held it was possible NPS's inability to pay growth was a proximate cause of the alleged breaches of Allegiant, but it was the providence of the jury to decide if Allegiant breached its duties and if proximate cause existed. The jury reasonably concluded there was proximate cause. The Court cannot say there was "no reasonable inference sustaining the position" of Plaintiffs. *See Howard*, 615 F.3d 991, 995 (8th Cir. 2010). Allegiant's conduct contributed to cause this damage to occur, even though Allegiant was just one of multiple causes of it. The Court will not grant judgment as a matter of law or a new trial on this basis.

### 3. Damages Outside of Missouri

The next category of damages PNC Bank contests is damages awarded for contracts issued outside of Missouri. PNC Bank argues Plaintiffs did not prove Allegiant caused the losses on pre-need contracts and life insurance policies issued outside of Missouri. PNC Bank claims

Plaintiffs did not present evidence Allegiant could have stopped NPS's expansion into other state; therefore, Plaintiffs did not establish actual or proximate cause. Additionally, PNC Bank asserts Plaintiffs did not present any evidence NPS would have stopped doing business nationwide if it was forced to stop doing business in Missouri. Further, PNC Bank argues the losses suffered outside of Missouri are too far removed from Allegiant's conduct to impose liability. Lastly, PNC Bank contends NPS engaged in fraudulent, criminal conduct outside of Missouri, different from anything which happened in Missouri, and is not the probable consequence of Allegiant's conduct in Missouri.

Plaintiffs assert the jury properly found Allegiant's breaches directly contributed to cause the SDR's damages on contracts and policies outside of Missouri. Plaintiffs claim the Missouri trusts were central to NPS's expansion efforts and the profitability of Missouri allowed NPS to expand to other states. Further, Allegiant allowed money to flow out of the Missouri trusts to be used for expansion including to cover operations in Texas, California, Iowa, and Illinois, to pay for training of sales agents who sold contracts in other states, to pay for advertising and marketing expenses, and to pay premiums on life insurance policies purchased for non-Missouri consumers. Plaintiffs assert the SDR is authorized to sue for all of the losses that were caused by Allegiant's breaches.

At summary judgment, this Court held Plaintiffs could not collect damages for consumers and funeral homes who were not beneficiaries of the Missouri trusts because Allegiant owed no duty to those consumers and funeral homes. After this ruling, Plaintiffs pursued these damages through the SDR, rather than the State Guaranty Associations, because the SDR stands in the place of NPS who is a beneficiary of the Missouri trusts. The Court allowed Plaintiffs to pursue this theory at trial and Plaintiffs introduced evidence showing these damages were proximately

caused by Allegiant's conduct. Money was routinely taken out of the Missouri trusts to be used by NPS on its expansion efforts. There is no doubt NPS used the trusts as essentially a checking account. Allegiant's failure to safeguard the trust assets and to implement any procedures to verify the purpose of this money leaving the trusts allowed NPS to further its scheme. PNC Bank asserts Allegiant could not be expected to stop a massive criminal scheme on the first day it became trustee. But Allegiant could have asked where the money was going, checked to make sure it was being used for legitimate purposes, inquired of David Wulf, the allegedly independent investment advisor, asked him why wire transfers were handled in the fashion he encouraged, and maintained records of transactions in the trusts. Allegiant's actions facilitated NPS's criminal scheme in Missouri and other states.

PNC Bank asserts at a minimum, it cannot be liable for the amounts the SDR owes the Texas Life and Health Insurance Guaranty Association in connection with Memorial policies because the Memorial policies were not held in the Missouri trusts and a jury could not have reasonably concluded Allegiant could have stopped NPS's operations in Texas because NPS was established in Texas before Allegiant became a trustee. Allegiant was not trustee when NPS initially expanded into Texas. However, Allegiant's conduct allowed NPS to expand within Texas and to continue growing its business in Texas throughout Allegiant's tenure. Plaintiffs sufficiently established proximate cause over these damages as well. The Court will not grant judgment as a matter of law or a new trial for these damages.

### 4. Damages Incurred After Allegiant's Tenure

The final category of damages on which PNC Bank requests judgment as a matter of law is losses on contracts and policies issued after its tenure. PNC Bank asserts Allegiant had no control over the actions of NPS and Allegiant's successor trustees after Allegiant resigned; thus,

it cannot be liable for any additional damages. According to PNC Bank, Plaintiffs' causation theory for these damages is entirely speculative. PNC Bank argues Bremen Bank had an independent legal duty to properly administer the trusts and Bremen did not administer the trusts in the same way Allegiant did. Additionally, PNC Bank contends a number of intervening negligent and criminal acts occurred after its tenure, breaking the chain of causation.

Plaintiffs disagree. According to Plaintiffs, Allegiant transferred the trusts to Bremen Bank in a financial condition which made future events inevitable. Plaintiffs claim Allegiant transferred trusts that could not pay their obligations on life insurance policies at the time of transfer. Additionally, Plaintiffs assert Allegiant caused Plaintiffs' injuries because it trained Bremen to administer the trusts in the same way it handled them. Plaintiffs also argue Allegiant failed to warn Bremen of known problems in the trusts.

The Court finds Plaintiffs introduced sufficient evidence to establish causation. Allegiant's conduct in training Bremen Bank in how to handle the trusts, while Allegiant was still trustee and still owed duties to the beneficiaries, even if Bremen Bank went on to do further bad acts, was a contributing cause to the injuries Plaintiffs incurred after Allegiant's tenure. Allegiant failed to warn Bremen Bank of the problems in the trusts, and facilitated NPS's ability to continue the scheme past Allegiant's tenure. Allegiant does not owe a duty to Bremen Bank, but it did owe duties to the beneficiaries of the trusts to administer the trusts in the proper manner, which it failed to do at all times, including when the trusts were being transferred. Allegiant was facing a $25 million break-up fee for the merger with National City Bank if it did not transfer the trusts. It is clear Allegiant put its own interests above those of the beneficiaries and must now face the consequences of those actions. The Court will not grant judgment as a matter of law, or a new trial, on this category of damages.

### 5.    Remittitur

PNC Bank requests the Court enter an order of remittitur, if it does not enter judgment as a matter of law, or a new trial, on damages.  PNC Bank asserts the jury's damages award shocks the conscience and should be reduced.  According to PNC Bank, the majority of the damages will compensate Plaintiffs for life insurance policies issued to persons who were never trust beneficiaries during Allegiant's tenure.  PNC Bank also argues the verdict is arbitrary because co-Defendant Forever Enterprises, which was found to have participated in racketeering activity, was only found to be liable for $100 million in damages.  PNC Bank states the damages against a criminal wrongdoer were three times less than those against Allegiant, who was found to be negligent.

Plaintiffs assert the verdict is not conscience shocking and there was no bias or prejudice by the jury.  Plaintiffs state the verdict is not a windfall and is well supported by the evidence from Dr. Arnold.  Further, Plaintiffs claim there is no support for the argument a damages award is conscience shocking because it is more than the damages award against a different defendant.  Plaintiffs argue the difference in damages is appropriate because Forever Enterprises is a defunct corporation without any assets and was not a focus of Plaintiffs' case at trial.

Missouri Revised Statute § 537.068 states a court may enter a remittitur award when the court finds the jury's verdict is excessive because it exceeds "fair and reasonable compensation for plaintiff's injuries and damages."  District courts grant remittitur when the verdict is "so grossly excessive as to shock the court's conscience."  *Am. Bus. Interiors, Inc. v. Haworth, Inc.*,

798 F.2d 1135, 1146 (8th Cir. 1986).[18] "A verdict is considered grossly excessive when there is plain injustice or a monstrous or shocking result." *Hudson v. United Systems of Arkansas, Inc.*, 709 F.3d 700, 705 (8th Cir. 2013).

First, Plaintiffs' argument PNC Bank is required to prove bias and prejudice is incorrect. The law states a court has two options if a jury verdict is excessive: (1) if there is an indication of bias and prejudice by the jury then the court must grant a new trial, or (2) if no prejudice is apparent, remittitur may be ordered. *Collier v. City of Oak Grove*, 246 S.W.3d 923, 927 (Mo. 2008) (overruled on other grounds). Thus, bias and prejudice must be found to grant a new trial, but not to order remittitur.

However, even eliminating this requirement, the Court still does not believe the verdict was excessive as to shock the conscience of the Court. The damages awarded to Plaintiffs were substantiated by Plaintiffs' expert. These damages were also the proximate cause of Allegiant's conduct. While the damages award against Forever Enterprises is much lower than PNC Bank's, the amount of evidence introduced against Forever Enterprises was also much less. It was clear to the jury that Forever Enterprises was a defunct corporation when it was not even represented by any attorneys in court and did not participate in the trial. This alone could have been reason enough for the jury's lower damages against Forever Enterprises. The Court does not find a remittitur award is appropriate. The jury verdict was fair and reasonable compensation for Plaintiffs' injuries.

### D.     *Plaintiffs' Negligence and Breach of Fiduciary Duty Claims*

---

[18] Review of the size of jury verdicts is a matter of federal law. *Am. Bus. Interiors, Inc.*, 798 F.2d at 1146 (citing *Donovan v. Penn. Shipping Co., Inc.*, 429 U.S. 648, 649 (1977)). The law of the forum state is applied when weighing the excessiveness of the verdict. *Id.*

PNC Bank requests the Court grant judgment as a matter of law on Plaintiffs' negligence claim and a new trial on Plaintiffs' breach of fiduciary duty claim. According to PNC Bank, Plaintiffs did not prove their negligence claim because they did not establish the element of duty. PNC Bank asserts the only duty Allegiant owed was that of a trustee, so there was no basis for submitting a separate negligence claim to the jury. PNC Bank claims Plaintiffs stated the two claims were alternates and because the jury ruled in Plaintiffs' favor on the breach of fiduciary duty claim, judgment as a matter of law should be granted for PNC Bank on the negligence claim. Further, PNC Bank argues the erroneous submission of the negligence claim likely confused the jury on the breach of fiduciary duty claim, so a new trial should be granted on this claim. PNC Bank argues Allegiant's duty was to protect the trust assets, not to protect people. Thus, according to PNC Bank, when the jury considered the negligence claim involving a duty to protect people, the Court altered the jury's view of the scope of Allegiant's fiduciary duties.[19]

Plaintiffs assert they are entitled to judgment on both claims. Plaintiffs claim they are permitted to bring both a professional negligence claim (breach of fiduciary duty) and a general negligence claim. Additionally, Plaintiffs state they are permitted to submit multiple legal theories to the jury which arise from the same set of facts. Plaintiffs assert Allegiant's duty was not just to protect trust assets, but to protect the interests of all the beneficiaries. According to Plaintiffs, their negligence claim was proper and the jury was appropriately instructed on both claims.

First, the Court notes PNC Bank provides no support for its proposition Plaintiffs cannot submit both a negligence and breach of fiduciary duty claim. This is simply another attempt by

_____

[19] PNC Bank also again asserts Plaintiffs' claims are properly brought as a breach of trust claim in this section of their argument. Because the Court already addressed this *supra*, it will not address it again.

PNC Bank to argue a negligence claim cannot be brought against a trustee, only a breach of trust claim is allowed. The Court has repeatedly addressed this argument and will not do so again. Plaintiffs are allowed to submit multiple legal theories based on the same facts. *Resolution Trust Corp. v. Fiala*, 870 F.Supp. 962, 969 (E.D. Mo. 1994). As long as the proof needed for one theory does not disprove the other theory, the two theories may be submitted. *Whittom v. Alexander-Richardson P'ship*, 851 S.W.2d 504, 507 (Mo. 1993). Plaintiffs' claims of negligence and breach of fiduciary do not negate each other. It is also clear from the jury verdict, Plaintiffs were not given duplicate damages but were instead given one damages award for both claims. *See Trien v. Croasdale Const. Co., Inc.*, 874 S.W.2d 478, 481 (Mo. Ct. App. 1994) (holding a plaintiff may not recover duplicate damages when multiple theories are submitted for a single injury).

PNC Bank also provides no support for its argument the duties a trustee owes cannot fulfill the duty element for negligence. There is nothing to suggest the duty element of negligence is limited in this manner. In a negligence action, the plaintiff must establish "a legal duty on the part of the defendant to conform to a certain standard of conduct to protect others against unreasonable risks. . ." *Hoover's Dairy, Inc.*, 700 S.W.2d at 431. Plaintiffs introduced evidence of the standard of care in the industry and showed Allegiant owed duties to the beneficiaries. PNC Bank characterizes a trustee's duties as to solely protect trust assets, not to protect the beneficiaries. But this is too narrow a view of a trustee's duties. Trustees owe duties to the beneficiaries. A trustee's duty to protect the trust assets is for the benefit of the beneficiaries, to prevent the beneficiaries from losing their interest in the trust. PNC Bank's theory the duties are owed solely to trust assets is nonsensical. Plaintiffs' sufficiently established

duty for their negligence claim and are allowed to submit both negligence and breach of fiduciary duty claims to the jury.  The Court denies PNC Bank's motion on this point.

**IV.     CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that PNC Bank's Renewed Motion for Judgment as a Matter of Law, or, in the Alternative, for New Trial [ECF No. 2382] is **DENIED.**

So Ordered this 20th day of November, 2015.

_____
**E. RICHARD WEBBER**
**SENIOR UNITED STATES DISTRICT JUDGE**