UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JO ANN HOWARD & | ) | |
| ASSOCIATES, P.C., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV01252 ERW |
| | ) | |
| J. DOUGLAS CASSITY, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on PNC Bank's Motion for New Trial Based on

Legal and Evidentiary Errors [ECF No. 2385].

## I.    STANDARD[1]

Following a jury trial resulting in an adverse judgment, a party may move for a new trial

under Federal Rule of Civil Procedure 59(a)(1)(A).  Under this Rule, "[a] new trial is appropriate

when the first trial, through a verdict against the weight of the evidence, an excessive damage

award, or legal errors at trial, resulted in a miscarriage of justice."  *Gray v. Bicknell*, 86 F.3d

1472, 1480 (8th Cir. 1996).  A miscarriage of justice does not result whenever there are

inaccuracies or errors at trial; instead, the party seeking a new trial must demonstrate that there

was prejudicial error.  *See Buchholz v. Rockwell Int'l Corp.*, 120 F.3d 146, 148 (8th Cir. 1997).

Errors in evidentiary rulings or in jury instructions are only prejudicial, and therefore only

represent a miscarriage of justice that requires a new trial, when the error likely affected the

---

[1] The Court incorporates its background included in its Memorandum & Order on PNC Bank's Renewed Motion for
Judgment as a Matter of Law issued on the same day as this Memorandum & Order.

jury's verdict.  *See Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 720 (8th Cir. 2008); *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 833 (8th Cir. 2005).

## III.    DISCUSSION

PNC Bank[2] asserts, a multitude of legal and evidentiary errors, require a new trial.  PNC Bank argues the following fourteen legal or evidentiary errors occurred: (1) a jury verdict was permitted rather than a bench trial; (2) Plaintiffs' damages were not limited to the loss in value to trust assets; (3) the Court denied PNC Bank's authorization defense; (4) the Court denied PNC Bank's *in pari delicto* defense; (5) an incorrect jury instruction was given regarding Allegiant Bank's duties when an independent investment advisor is appointed; (6) the Court rejected PNC Bank's proposed instruction on the scope of a trustee's duty to inquire into or participate in the performance of an investment advisor's duties; (7) the Court incorrectly ruled consumers and funeral homes are trust beneficiaries; (8) the Guaranty Associations' were found to have standing to assert claims on behalf of consumers and funeral homes; (9) the Special Deputy Receiver's (SDR) was found to have standing to bring claims related to Mount Washington and CSA Trusts; (10) the Court denied a jury instruction on superseding cause defense; (11) the Court denied apportionment of fault with Forever Enterprises; (12) the Court gave an incorrect jury instruction on punitive damages; (13) the Court's ruling Plaintiffs could introduce evidence about the due diligence review performed by National City Bank prior to acquiring Allegiant; and (14) the Court's exclusion of evidence relation to the unissued Hannover arbitration award.  The Court will address each error PNC Bank asserts.

### A.    *Right to a Jury Trial and Breach of Trust*

---

[2] PNC Bank includes PNC Bank, N.A. and National City Bank.

Many times during the course of this case, a variation of this issue has been raised and argued. PNC Bank asserts this case should not have been tried to a jury because Plaintiffs' claims are based on alleged breaches of duties Allegiant owed as a trustee, which is an equitable claim without a Seventh Amendment right to a jury trial. PNC Bank also asserts the Court erred in submitting Plaintiffs' claims to the jury as claims for negligence and breach of fiduciary duty instead of as a breach of trust and in rejecting PNC Bank's proposed jury instructions on breach of trust.

The Court rests on the decisions it has previously made when it decided Plaintiffs had a right to a jury trial, when it reconsidered that decision, when it determined at summary judgement Plaintiffs' claims were properly brought as negligence and breach of fiduciary duty claims, when it rejected PNC Bank's proposed jury instructions on breach of trust, when it rejected this reasoning as a basis for judgment as a matter of law for PNC Bank pre- and post-verdict, and the numerous other times the Court was faced with this issue and determined Plaintiffs were entitled to bring negligence and breach of fiduciary duty claims. Simply repackaging this argument in different forms does not change the outcome. As no new arguments have been raised to change the decision, the Court adopts its reasoning in its prior orders, including its summary judgment rulings [ECF No. 2092] and will deny PNC Bank's motion for new trial on these issues.

### B. Authorization Defense

PNC Bank asserts the Court erred in rejecting its proposed jury instruction on PNC Bank's authorization defense. As previously argued at summary judgment, PNC Bank contends a trust beneficiary who consents to a breach of trust is barred from recovering from the trustee for the alleged breach. According to PNC Bank, this applies even when the beneficiary has been

replaced by a receiver. PNC Bank likens this defense to an estoppel defense and states the only showing required is that National Prearranged Services, Inc. ("NPS") authorized the conduct of Allegiant. PNC Bank asserts this ruling was prejudicial because it significantly reduces the damages award. Buried in a footnote in its argument on the authorization defense, PNC Bank also asserts the SDR does not have standing to assert claims on behalf of preneed consumers and funeral homes because the claims are personal to a specific creditor and recovery would not inure to the benefit of the estate.

As stated in the summary judgment ruling on this issue, it is important to differentiate between the various plaintiffs in this case. First, there is the SDR who is bringing claims on behalf of NPS, Lincoln Memorial Life Insurance Company ("Lincoln") and Memorial Service Life Insurance Company ("Memorial"). The SDR is attempting to recover on behalf of the consumers and funeral homes as creditors of NPS, Lincoln, and Memorial. Then there are the State Guaranty Associations, who are bringing claims on behalf of consumers and funeral homes who were trust beneficiaries. As determined at summary judgment, only those consumers and funeral homes whose money was put into the Missouri trusts are trust beneficiaries [ECF No. 2092]. As stated in the summary judgment ruling on this issue, the SDR has standing to assert claims on behalf of preneed consumers and funeral homes because the claims are not personal and will inure to the benefit of the estate. *See* ECF No. 2092.

The authorization defense states a beneficiary who acquiesces to a breach of a trustee's duty cannot later maintain a suit for the breach of duty. *See Coates v. Coates*, 304 S.W.2d 874, 877-78 (Mo. 1957); *Walker v. James*, 85 S.W.2d 876, 885 (Mo. 1935). The consent of one beneficiary does not preclude other beneficiaries from bringing suit. Rest. (Second) of Trusts § 216, cmt. g (1959). Thus, the claims brought by the SGAs are not subject to the authorization

defense because the consumers and funeral homes who are trust beneficiaries did not consent to the breaches of duties committed by Allegiant.

However, the vast majority of damages are awarded to the SDR on behalf of the NPS estate. The Cassitys fraudulent scheme was implemented through NPS. But, this does not bar an action against Allegiant. In *Walker v. James*, the Missouri Supreme Court held:

> "A beneficiary, who, subsequently to a breach of trust, acquiesces in it, cannot maintain a suit for relief against those who would otherwise have been liable. The acquiescence, in order to produce this effect, must take place with full information by the beneficiary of all the facts, and with full knowledge of his legal rights arising from those facts; in short, it must have all the requisites of an acquiescence heretofore described, to defeat the liability of a defaulting trustee."

85 S.W.2d 876, 885 (Mo. 1935). As noted, for acquiescence, it must take place with full information by the beneficiary of all of the facts, and with full knowledge of legal rights arising from those facts. There is no evidence Allegiant took any steps to inform NPS of all of the facts or of the legal rights which arise from those facts. The vast majority of the evidence suggests Allegiant had no idea what was occurring in the trusts so was unable to inform NPS of all of the facts or of the legal rights which arose from the facts. Additionally, there is no evidence suggesting anyone consented to Allegiant's failure to maintain records. There is no evidence suggesting Allegiant checked with NPS when wire transfer requests came in to ensure they were proper or NPS consented to the transfers; Allegiant just assumed they were. Allegiant was taking direction from NPS, and made no effort to confirm the reliability of NPS's actions. Not once did Allegiant inform NPS these actions would be considered a breach of duty and it needed confirmation from NPS to go forward. Taking direction from a beneficiary without any knowledge of what is happening, or any attempts to inform the beneficiary of its rights, does not create authorization of a breach. NPS was a vassal of the Cassity crime family. It acted, reacted,

and had its being at the direction of the Cassitys and its representatives, including the later convicted investment advisor. Unlike the customary beneficiary, who is capable of making intentional decisions thereby being able to decide whether to consent to suggestions, actions, or activities, NPS was a corporation controlled by officers and directors who perpetrated fraud through NPS. In this case, common sense and interests of public policy cannot support the defense of authorization.

An analysis of the cases cited by PNC Bank supports this Court's reasoning in denying application of the authorization defense. In *Coates v. Coates*, the decedent created a trust in his will. 304 S.W. 2d 874, 875 (Mo.1957). The decedent's wife was a lifetime income beneficiary of the trust, as well as a trustee. *Id*. She and her co-trustee, decedent's son, filed a declaratory action against decedent's brothers and other sons by a former marriage. *Id*. The dispute concerned whether certain accretions, capital gains from four investment companies, should be credited to income and paid to the wife or credited to principal of the trust, to be eventually divided among the remaindermen, the three sons. *Id*. Two of the decedent's sons appealed a favorable ruling for the decedent's wife. *Id*.

The trustees were permitted to make certain investments except for investing in common stock which required the consent of the defendants. *Id*. Throughout the administration of the trust, defendants consented to investment in four open end investment trusts. *Id*. In the first three years of the trust, the co-trustee paid decedent's wife all cash dividends and capital gains received from the four companies as income. *Id*. When one of the defendants objected to capital gains being considered income, the co-trustee stopped paying the capital gains to decedent's wife. *Id.*, at 875-76. On appeal, defendants protested by claiming the "court erred in finding they had 'unqualifiedly consented' to the investment . . ." *Id*. The appellate court held, "[t]he

two contesting remaindermen, with full knowledge of the nature of the investments as well as the returns, the life beneficiary having only such knowledge as their broker imparted to her, voluntarily and knowingly gave up to the life beneficiary the items in question  and accordingly are bound." *Id.*, at 877-878.  It is logical that the trust beneficiaries, having voluntarily and knowingly consented to the action of the trustees, should not be lawfully permitted to gain an advantage by challenging the action to which they consented.

This behavior of the defendants stands in sharp contrast to the facts and circumstances of the present case where the Cassitys and their representatives, now convicted and imprisoned or deceased, owning and manipulating an artificial entity, NPS, by their connivances, treachery and thievery, stole millions of dollars from other trust beneficiaries.  PNC asks this Court to conclude the felonious actions of these individuals should clothe NPS with authority to consent to breaches of these trusts.  But that is not the intent of the authorization defense as described in *Coates*.

PNC next cites *Pilgrim Evangelical Lutheran Church of the Unaltered Augsburg Confession of St. Louis, Missouri v. The Lutheran Church Missouri Synod Foundation,* 661 S.W. 2d 833 (Mo. 1983).  Plaintiff sought to revoke an irrevocable charitable trust, claiming as settlor and sole valid beneficiary, it could revoke the trust.  *Id.*, at 838.  The trust at issue originally began as an endowment fund and was converted into an irrevocable trust, with the same purposes and restrictions as the endowment fund, by the plaintiff.  *Id.*, at 836-37, 839.  Plaintiff argued the transfer of funds from the endowment fund to the irrevocable trust was a breach of trust because the trust agreement itself is a violation of the terms of the gifts given to the endowment fund.  *Id.*, at 839.  The court ruled the creation of the trust was consistent with the history of the endowment fund and plaintiff "could not complain of breach of trust when, with full knowledge of the facts

and legal rights, it has consented to or confirmed and ratified the action." *Id.* (citing *Scullin v. Clark*, 242 S.W.2d 542, 548 (Mo. 1951)).

While the court observed different rules apply to charitable trusts, this Court distinguishes the ruling in that case from the present case on grounds described below. Additionally, NPS's approval of Allegiant's actions cannot be viewed in the traditional sense. Allegiant blindly approved all financial transactions directed by NPS without performing its legally mandated duties under Chapter 436 RSMo. The Cassitys' representatives drove NPS to make fraudulent transactions gaining approval of all transactions without review by Allegiant. To say because NPS approved the fraudulent transactions ordered by the Cassitys, when Allegiant did nothing to fulfill its trustee duties, as a basis for relief under the authorization defense, is a misapplication of that defense. This Court previously correctly rejected PNC's reliance on that defense.

The facts of this case are extremely different than the cases cited by PNC Bank. These trusts were established pursuant to statute, Chapter 436, which was passed for a multitude of reasons, one of which being to protect consumer's money who paid for funerals in the present to be paid out in the future. Allegiant's breaches of these trusts were regular and continuous from the beginning of its trusteeship. During the course of Allegiant's tenure, the man responsible for the administration of these trusts was Herbert Morisee. Mr. Morisse never investigated or questioned any request for distribution of funds from NPS trusts, but blindly approved all requested wire transfers from now convicted David Wulf, the "Independent" Investment Advisor, resulting in millions of dollars of losses to the trusts. Allegiant purchased, with trust funds, thousands of life insurance policies from Lincoln and Memorial life insurance companies,

both owned by the Cassitys. Allegiant then over-valued these policies making it appear as if the trusts held millions more in assets when, in fact, the money was gone.

Allegiant also loaned millions of dollars to Cassity entities, which its own loan department refused to do because of the unworthiness of these entities as borrowers. Many of these loans were unsecured by any collateral. Mr. Morisse approved the purchase of the thousands of dollars of securities from Cassity entities at grossly inflated prices, making no attempt to determine the fair market value of the securities. Allegiant also allowed mismatching of insurance policies to occur during its tenure – the Cassity practice where pre-need contracts were backed with life insurance policies requiring premiums to be paid over a period of years rather than a fully paid policy allowing the Cassitys to siphon millions of dollars from the trusts. Instead of depositing preneed funds into the trusts, as required by statute, NPS increased the balances of debentures (IOUs) held by the trusts, without Allegiant investigating the terms of the debentures. All of these actions, and many others, were breaches of Allegiant's duties as trustee. The facts of the cases cited by PNC Bank, where the authorization defense was allowed, pale in comparison to the facts of this case. This conduct of Allegiant, not only permitted, but encouraged the Cassitys, through the Cassity controlled entities, including NPS, to steal millions of dollars of other beneficiaries' funds by the now known, but not surprising, criminal manipulation of NPS. Cited authority by PNC in support of application of the Authorization Defense in this case is not persuasive. The Court will deny PNC Bank's motion for a new trial on this basis.

### C. *In Pari Delicto Defense*

PNC Bank also asserts the Court erred in rejecting application of the *in pari delicto* defense. PNC Bank contends a person who engages in fraud forfeits all rights to protection and

this is applicable to the receiver appointed for an insolvent corporation. According to PNC Bank, the Court's reasoning at the summary judgment stage that it could not assert this defense because Plaintiffs are acting on behalf of innocent creditors is wrong and has been rejected by Missouri courts. In support, PNC Bank states Doug Cassity, Randy Sutton (CFO of NPS) and David Wulf (investment advisor) were convicted of defrauding Allegiant Bank, making this the exact situation where *in pari delicto* should apply.

At summary judgment, this Court decided *in pari delicto* did not apply in this case because the corrupt officers had been removed from NPS and the recovery was for the benefit of innocent creditors, not parties who had previously benefitted from the fraud, such as stockholders. The Court reasoned the basis of *in pari delicto* was to prevent a wrongdoer from benefitting from their unlawful actions, which is not the situation here. The reasoning of the Court's decision at summary judgment remains true. *See* ECF No. 2092, pgs. 21-23. PNC Bank has not raised any new arguments to persuade the Court a new trial is warranted on this basis. The doctrine should be applied when "it promotes right and justice by considering all of the facts and circumstances of a particular case." *Pony Express Cmty Bank v. Campbell*, 206 S.W.3d 399, 402 (Mo. Ct. App. 2006). Application of *in pari delicto* will not promote right and justice under the circumstances of this case.

NPS is one of several of Cassity-owned entities. Doug Cassity (its founder), Randy Sutton (its CFO), and David Wulf (its investment advisor) were convicted of various fraud offenses and received substantial prison sentences. Brent Cassity, also involved in the Cassity enterprises, was also convicted, and like the three mentioned, received a lengthy prison sentence. Allegiant accepted requests for wire transfers of funds from trusts held by Allegiant from David Wulf and paid many millions of dollars of beneficiary funds based on those requests, without

abiding by the duties imposed by Chapter 436 of the Missouri Revised Statutes to preserve and protect those funds. The money was fraudulently procured and wrongfully used to promote the Cassity enterprise which would not have occurred but for Allegiant's failure to fulfill its duties as a trustee.

The nature of the *in pari delicto* defense is soundly reasoned in *Dobbs v. Dobbs Tire & Auto Centers, Incorporated,* 969 S.W. 2d 894, 897-98 (Mo. Ct. App. 1998), cited by PNC. Under the doctrine of *in pari delicto,* the legal counterpart of the equitable doctrine of unclean hands, "a person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party." *Id.*, at 897. A party may not maintain a claim for damages, where the cause of action is based on an unlawful act or transaction in which both plaintiff and defendant participated. *Id.* The *Dobbs* court observed "the doctrine of *in pari delicto* holds anyone who engages in a fraudulent scheme forfeits all rights to protection, either in law or equity." *Id.* (quoting *Kansas City Operating Corp. v. Dunwood*, 278 F.2d 354, 357 (8th Cir. 1960)). If the parties to a fraud are *in pari delicto,* the law will leave them where it finds them. *Id.*, at 897-98.

In *Dobbs*, the plaintiff alleged in his complaint the defendants used corporate funds for personal expenses. *Id.*, at 898. However, Plaintiff admitted he also used corporate funds from a slush fund, a means of acquiring compensation without payment of taxes, to pay his personal expenses. *Id.* He did not report these amounts on his income tax returns. *Id.* The court ruled "[b]y engaging in a scheme to defraud taxing authorities, appellant forfeited his right to court protection." *Id.* This case does not mention or analyze the exception to the *in pari delicto* doctrine which is pertinent to unfavorable resolution of PNC's argument for its application, discussed *supra*.

PNC cites *Miller v. Ernst & Young,* where the former chief executive officer, former chief financial officer and former president and general manager of the Loughman Division of Bank Building and Equipment Corporation ("BBC") were sued on allegations the former president and manager committed fraud by manipulating Loughman's accounting system so it appeared projects, not completed, were completed, thereby giving the appearance of greater profitability of that Division to gain better lines of credit. 938 S.W.2d 313, 314 (Mo. Ct. App. 1997). As a result, costs were shifted from one job to another resulting in obtaining unprofitable job contracts. *Id.* Allegations of negligence were lodged against the chief executive officer, chief financial officer and Ernst & Young, the independent auditor of BBC. *Id.* Plaintiffs are representatives of BBC's bankruptcy estate. *Id.*

Ernst & Young contended the contributory negligence of BBC, arising from negligence of the chief executive officer and chief financial officer, was an absolute defense when economic damages are involved. *Id.*, at 315. The court rejected that proposition, holding instead "plaintiffs [] stand in the shoes of BBC and are subject to the same defenses that would be available to the defendant if BBC had brought the action." *Id.* The court explained the primary costs of fraud on the corporation are borne not by shareholders but by outsiders to the corporation. *Id.* Ergo, the stockholders should not be allowed to escape all responsibility for such a fraud. *Id.* However, *Miller* holds "there is an exception to that rule where the agent is acting adversely to the principal's interest." *Id.*, at 315-16.

While PNC cites *Grove v. Sutliffe,* 916 S.W. 2d 825 (Mo. Ct. App. 1996), it fails to expose the exception to the rule mentioned in *Miller*. *Grove* makes it clear, "[t]he 'adverse interest exception' applies where an agent is acting adversely to his principal's interest." *Id.*, at 830. There is a distinction between a case of management stealing or looting from the company

and a case where management is stealing from outsiders. *Id.* Here, the corrupt officers, who looted from the company *and* stole from people outside of NPS, such as innocent consumers and funeral homes, have been removed from NPS. The people who SDR represents in this lawsuit did not benefit from the fraud while it was ongoing and they will have to bear the consequences of the fraud if the SDR were not allowed to bring suit. Therefore, for reasons herein stated and in other conclusions of the Court's, the *in para delicto* defense does not apply in this case.

The Eighth Circuit recently decided a case which references the *in pari delicto* defense. *Zayed v. Associated Bank, N.A.*, 779 F.3d 727 (8th Cir. 2015). In this case, over approximately three years, "five schemers bilked unsuspecting investors of an estimated $190 million in a Minnesota Ponzi scheme." *Id.*, at 729. The schemers took over $79 million of investors' money with the help of defendant Associated Bank. *Id.* A receiver was appointed to take custody of funds owned by the schemers' estates and organizations under their control. *Id.* The receiver brought an action alleging Associated Bank aided and abetted the scheme. *Id.* The District Court's order granting Associated Bank's motion to dismiss for failure to state a claim was reversed. *Id.* The opinion focuses on the knowledge of Associated Bank primarily through one of its employees, concluding "the facts alleged in the complaint give the receiver's claims facial plausibility – the receiver has pled factual content that allows the court [and a jury] to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, at 735. (internal citation omitted).

Defendant Associated Bank also argued for dismissal pursuant to *in pari delicto*. *Id.*, at 736. The court concluded *in pari delicto,* as an equitable defense, is discretionary. *Id.*, at 737. It observed "[a] paramount public interest . . . may call for judicial intervention in favor of one wrongdoer against the other in order to effectuate the enforcement of a public policy which

overrides considerations of a benefit inuring to a wrongdoer." *Id.* (citing *State by Head v. AAMCO Automatic Transmissions, Inc.*, 199 N.W.2d 444, 448 (Minn. 1972)). In referencing related cases, the Eighth Circuit noted, "because this case involves a Ponzi scheme, the Receivership Entities are considered victims of the fraud and thus creditors of the Ponzi scheme." *Id.* (citation omitted).[3] Then, citing from *Scholes v. Lehmann,* 56 F. 3d 750,754 (7th Cir. 1995), the Court quoted "[f]reed from [the schemers'] spell [the receiver entities] became entitled to the return of the moneys – for the benefit not of [the schemers] but of innocent investors – that [the schemers] had made the [receiver entities] divert to unauthorized purposes." *Id.* Although the Eighth Circuit declined to rule on the applicability of *in pari delicto* to the case before it, this language suggests this Court's ruling on the applicability of the doctrine is proper. The Court will decline to apply the *in pari delicto* defense and will deny PNC Bank's Motion for New Trial on this basis.

>   D.      *Investment Advisor Defense*

Next, PNC Bank argues the Court's jury instructions no. 12 and 13 on the investment advisor defense were erroneous. First, PNC Bank contends an investment advisor need only be independent of the trustee, not also independent of the seller. Second, PNC Bank states, when an investment advisor is appointed, a trustee is relieved from liability for any decisions made by the investment advisor, without exception. Third, PNC Bank argues the Court erroneously did not link the investment advisor defense to subparagraph (d) of the verdict-directing instruction. According to PNC Bank, these errors eviscerated its investment advisor defense.

---

[3] Although the Eighth Circuit cites to and references Minnesota State Court cases on *in pari delicto*, the doctrine in substantially similar to that applied in Missouri.

At summary judgment, the Court decided Chapter 436 relieves a trustee of all liability for investment decisions made by an investment advisor if the advisor is federally or Missouri registered, qualified, independent, control of the assets remains with the trustee, and the assets are not placed in any investment which would be beyond the authority in which a reasonably prudent trustee would invest. The Court's decision was a matter of statutory interpretation and was made from the plain language of the statute. Missouri Revised Statute § 436.031 states:

> "A preneed trust agreement may provide that when the principal and interest in a preneed trust exceeds two hundred fifty thousand dollars, investment decisions regarding the principal and undistributed income may be made by a federally registered or Missouri-registered independent qualified investment advisor designated by the seller who established the trust; provided, that title to all investment assets shall remain with the trustee and be kept by the trustee to be liquidated upon request of the advisor of the seller. In no case shall control of said assets be divested from the trustee nor shall said assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in. The trustee shall be relieved of all liability regarding investment decisions made by such qualified investment advisor."

At first glance, the final two sentences appear to be contradictory, which is where the dispute between the parties arises. But once the sentences are read together, with the rest of the paragraph, it becomes clear. A trustee must not allow the assets to be placed in an investment beyond the authority of a reasonably prudent trustee, no matter if an investment advisor has been appointed. Contrary to PNC Bank's assertion, this does not make the last sentence superfluous. It reinforces the role of the trustee in protecting trust assets and does not allow a trustee to shirk all duty by appointing an investment advisor. A trustee has a duty to maintain and control the trust assets as well as ensure trust assets are prudently invested. Therefore, the instruction as written, is a correct statement of the law.

The verdict directors for negligence and breach of fiduciary duty, Instructions No. 12 and 13,[4] correctly linked the investment advisor defense to subparagraph (b) of the instructions and not subparagraph (d).[5]  Subparagraph (b) directly refers to investment of trust assets whereas subparagraph (d) refers to the much more general disposition of assets.  The investment advisor defense applies to investment decisions only, not the general disposition of assets.  Linking this defense to both subparagraphs would have created confusion.  This instruction correctly states the applicable law and any failure to link the defense to subparagraph (d) did not seriously impair

[4] Instructions No. 12 and 13 are substantially similar with the only difference being Instruction No. 12 addresses negligence and Instruction No. 13 addresses breach of fiduciary duty.

[5] Instructions No. 12 stated:  On Plaintiffs' claim of negligence against Allegiant Bank, your verdict must be for Plaintiffs if you believe:

> First, either:
>> a. Allegiant Bank failed to maintain title and control of all trust assets, or
>> b. Allegiant Bank failed to ensure that the trust assets were held in reasonably prudent investments, or
>> c. Allegiant Bank failed to maintain adequate records of all transactions administered through the trusts and pertaining to the trusts, generally, or
>> d. Allegiant Bank failed to exercise the judgment and care in the permanent disposition of trust assets that a person of ordinary prudence, discretion, and intelligence would use in the management of his or her own affairs, or
>> e. Allegiant Bank distributed trust income when the aggregate market value of trust assets at the time of the distribution was not greater than the total amount deposited under all the pre-need contracts administered through the trust at the time of the distribution, or
>> f. Allegiant Bank distributed trust principal deposited under a pre-need contract without obtaining proof that the promised funeral services had been provided, that NPS had paid the amount promised under a pre-need contract, or that the contract was cancelled by the consumer or seller, and
>
> Second, Defendant, in any one or more of the respects submitted in paragraph First, thereby was negligent, and
>
> Third, such negligence, directly caused or directly contributed to cause Plaintiffs' damages.
>
> Except you shall not impose liability against Allegiant Bank under subparagraph b. of Paragraph First for investment decisions made by Wulf, Bates and Murphy, if you believe that:
>> (i) Wulf, Bates and Murphy was a federally or Missouri-registered investment advisor; and
>> (ii) Wulf, Bates and Murphy was independent of National Prearranged Services and Allegiant Bank; and
>> (iii) Wulf, Bates and Murphy made the investment decisions; and
>> (iv) title of all investment assets remained with the trustee and were kept to be liquidated upon request of the investment advisor of the seller (National Prearranged Services); and
>> (v) control of the assets was never divested from the trustee; and
>> (vi) the assets were not placed in any investment which would be beyond the authority of a reasonably prudent trustee in which to invest.

PNC Bank's ability to present their defense. *Cox v. Dubuque Bank & Trust Co.*, 163 F. 492, 496 (8th Cir. 1998).

Lastly, the investment advisor must be independent from both the seller and the trustee. The statute does not give guidance on this issue; thus, at summary judgment, the Court looked to the legislative intent and purpose of enacting the law to determine this issue. It is clear, a main purpose of the statute was to protect a preneed consumer's funds so they are available at an unidentified date in the future for funeral services. Finding the investment advisor must be independent of both the trustee and preneed seller fits with this purpose. *See also* ECF No. 2084]. The Court will deny PNC Bank's motion for a new trial on this basis.

### E. Scope of Trustee's Duty When There is an Investment Advisor

PNC Bank asserts the Court erroneously rejected its proposed instruction on Allegiant's duties under Missouri Revised Statute § 456.550. PNC Bank states this statute is to be read in accordance with Chapter 436 and sets forth the scope of a trustee's affirmative duties. PNC Bank argues the Court's failure to give this instruction, along with its failure to properly instruct the jury regarding Chapter 436, prejudiced PNC Bank.

Section 456.500 through 456.600 governs, generally, a trustee's powers, duties and responsibilities in Missouri.[6] Chapter 436 is a more specific statute governing pre-need funeral contracts and trusts established for money collected through those contracts. It is the more specific statute; thus, it governs over 456.550. *State ex rel. Taylor v. Russell*, 449 S.W.3d 380, 382 (Mo. 2014). Including a jury instruction on general trust law when a more specific statute

---

[6] Missouri Revised Statute § 456.550 states: "Unless the terms of the trust provide otherwise, when an instrument creating or amending the terms of a trust authorizes or directs one or more of several cotrustees or other persons to perform designated duties, other cotrustees are not under a duty to inquire into or participate in the performance of any such duties by the cotrustee or cotrustees or other persons authorized or directed to perform it alone in the absence of actual knowledge that the former is or are contemplating, committing or concealing a breach of trust."

applies would only mislead the jury. It was not error for the Court to refuse an instruction which would only serve to confuse the jury on which law applied. *Northwestern Mut. Life Ins. Co. v. Stevens*, 71 F. 258, 263 (8th Cir. 1895). The Court will deny PNC Bank's motion on this basis.

### F.    Beneficiaries

PNC Bank argues the Court's decision consumers and funeral homes are beneficiaries of the trusts "infused the trial with legal error that stacked the deck against PNC Bank." PNC Bank asserts the Court's ruling is based solely on its view of the purpose of the statute which is rests on a misunderstanding of the law and overlooks the possibility there were other reasons for the Missouri Legislature to enact this law. PNC Bank states this ruling affected the entire trial because it allowed reference to the consumers to be used throughout the trial, and most importantly, allowed the presence of the State Guaranty Associations in this case.

The Court's decision to include consumers and funeral homes as trust beneficiaries came after lengthy oral and written arguments by the parties and much discussion on the interaction of the trust agreement, general trust law, and Chapter 436. While the purpose of the statute certainly was a consideration in the Court's decision, it was not the sole reason it came to the stated conclusion.[7] The Court's reasoning is extensive and it's unnecessary to repeat it when it is detailed in the Court's Memorandum & Order on Plaintiffs' Motion for Rulings as a Matter of Law [ECF No. 2084]. The Court's decision remains the same as neither party has raised new arguments to change it. Additionally, even if the Court had ruled differently, testimony from consumers and funeral homes, as well as evidence regarding them, would have been allowed at trial because they are integral to describing what occurred and the consequences of Allegiant's

---

[7] PNC Bank's assertion the Court misunderstands the law is incorrect. Section 436.031(7) does not limit the instances in which a preneed trust can terminate. It states a preneed trust shall terminate when the trust principal no longer includes any payments made under a preneed contract. In making its decision, the Court reviewed the entirety of Chapter 436, not just those sections which support a certain position.

actions.  Excluding consumers and funeral homes would have been confusing and prejudicial to Plaintiffs.  As the Court's decision did not infect the trial with legal error, because there was no legal error, the Court will deny PNC Bank's motion on this basis.

### G. State Guaranty Association's Claims

PNC Bank argues the Court erred in rejecting its proposed jury instruction which states the SGAs lack standing to assert claims.  PNC Bank asserts the Court should not have ruled the Liquidation Plan transferred ownership of the life insurance policies from the trusts to the consumers and funeral homes, which gave the SGAs standing to bring claims against PNC Bank.  According to PNC Bank, without this erroneous ruling, the SGAs would not have been present at trial.

At summary judgment, the Court analyzed the provisions of the Liquidation Plan in determining if consumers and funeral homes had any rights under the life insurance policies.  The Court concluded the Liquidation Plan transposes the owner of the life insurance policy from the trust to the insured.  The rights of ownership were given to the consumers and funeral homes.  PNC Bank asserts this applies solely for the purposes of the Liquidation Plan.  But one of the purposes of the Liquidation Plan is for the SDR or SGAs to pursue causes of action related to the policies, otherwise there would be little need for the Liquidation Plan to include language on assignment and subrogation rights.  Applying PNC Bank's theory, the rights to pursue causes of action relating to the life insurance policies are assigned to the SGAs when the SGAs pay a claim, but then immediately the rights become useless because the SGAs cannot pursue those rights outside the Liquidation Plan.  The Court disagrees with this conclusion.  The SGAs have standing to bring their claims against PNC Bank; thus, it was not error to reject PNC Bank's jury instruction stating they did not have standing.

The presence of the SGAs at trial did not prejudice PNC Bank, because they would have been present no matter the outcome of the Court's decision on this point. The SGAs had an interest in the outcome of this case and their presence needed to be explained to understand the regulatory scheme enacted after the insolvency of Lincoln, Memorial and NPS. The jury could not understand the presence of the SDR without also being told of the SGAs. The Court will deny PNC Bank's motion on this basis.

### H.    *Mount Washington and CSA Trusts*

Next, PNC Bank asserts the Court erred in permitting the SDR to assert claims related to the Mt. Washington and CSA trusts. PNC Bank claims NPS is not a beneficiary of the trusts because the trust agreements list Mt. Washington Forever, LLC and the Mason Securities Association as beneficiaries; therefore, the SDR lacks standing to assert claims related to these trusts. Plaintiffs assert under Chapter 436, the seller of a pre-need contract is a trust beneficiary and NPS was a seller of pre-need contracts for these trusts.

The Court correctly held at summary judgment that NPS was a beneficiary of the CSA and Mt. Washington trusts because NPS was the seller of pre-need contracts for the trusts. The Court is permitted to consider the facts and circumstances of the parties to determine the identity of the real parties and beneficiaries. The Court looked primarily to the language of the trust agreement and the statutes which required the trusts be established to determine the beneficiaries. Only after considering these sources did the Court look to the facts and circumstances surrounding the parties. *See Commerce Bank, N.A. v. Blasdel*, 141 S.W.3d 434, 443 (Mo. Ct. App. 2004). ("While it is not inappropriate to resort to outside evidence of surrounding circumstances to identify the beneficiaries . . .," the Court looks primarily to the language of the trust agreement). The Court did not look to outside evidence to determine the intent of the trust

settlor but to determine the real beneficiaries. *Id.*, at 444. (stating the intent of the maker is to be ascertained from the four corners of the instrument). The Court's decision to allow the SDR to pursue claims on behalf of NPS for the CSA and Mt. Washington trusts was not erroneous.

## I. *Superseding Cause Instruction*

PNC Bank argues the Court erred in rejecting its proposed jury instruction on its affirmative defense of superseding cause. PNC Bank asserts because it is an affirmative defense, it is properly included as a tail instruction. PNC Bank claims the denial of this instruction prevented PNC Bank from arguing there were unforeseeable superseding causes that broke the causal connection between Allegiant's conduct and Plaintiffs' injuries. Plaintiffs contend superseding cause is not a jury issue and in any event, PNC Bank argued at trial that others caused Plaintiffs' injuries, not Allegiant. Additionally, Plaintiffs assert the verdict director given encapsulates all aspects of causation.

A superseding cause exists when an intervening act, independent of the original negligence, severs the connection between the defendant's conduct and the plaintiff's injury, as a matter of law. *Mengwasser v. Anthony Kempker Trucking, Inc.*, 312 S.W.3d 368, 375-76 (Mo. Ct. App. 2010). The chain of causation will not be broken when it is "merely a natural progression of events set in motion by the original negligent act" or when it is foreseeable. *English v. Empire Dist. Elec. Co., Inc.*, 220 S.W.3d 849, 856-57 (Mo. Ct. App. 2007). A court may decide there is a superseding cause as a matter of law, but if there is a submissible case there was not a superseding cause, it belongs to the jury. *Buchholz v. Mosby-Year Book, Inc.*, 969 S.W.2d 860, 862 (Mo. Ct. App. 1998); *see also Cramer v. Maren Engineering Corp.*, No. 4:08CV840 DDN, 2009 WL 3434102 at *12 (E.D.Mo. Oct. 19, 2009) (citing *Gomez v. Clark Equip. Co.*, 743 S.W.2d 429, 433 (Mo. Ct. App. 1987)).

Although superseding cause may be an issue left to the jury, there is no Missouri case law stating an instruction on superseding cause must be given. A trial judge is given "broad discretion" in deciding how to instruct a jury. *Roth v. Black & Decker, U.S., Inc.*, 737 F.2d 779, 783-84 (8th Cir. 1984). The instructions, as a whole, must adequately and sufficiently state the applicable state law. *Id.* The Court did not instruct the jury on superseding cause because it was not appropriate under the facts of this case. The events which occurred after Allegiant's tenure were foreseeable; there was no superseding cause to cut off Allegiant's negligence. In fact, Allegiant put in place the system through which future criminal acts could occur. By establishing this system where no review of wire transfers was done, where trust administrators had no knowledge of what assets the trust had or any knowledge of loans taken on trust assets, and then teaching the successor trustee to handle the trusts in the same way, Allegiant enabled the future fraudulent acts. The insolvency of Lincoln, Memorial, and NPS was inevitable due to the mismatching scheme which occurred on Allegiant's watch. None of the events listed by PNC Bank qualify as a superseding cause because they were foreseeable; thus, a jury instruction on superseding cause was not appropriate.

### J.    *Apportionment of Fault*

At trial, PNC Bank proffered a jury instruction on apportionment of fault with Forever Enterprises, which the Court denied. PNC Bank asserts it was entitled to apportionment of fault with Forever Enterprises because both defendants were defending against tort claims. According to PNC Bank, whether one of the claims is an intentional tort does not change the application of apportionment. PNC Bank states if it had been allowed to apportion fault with Forever Enterprises, the jury would likely have apportioned more than fifty percent of the fault to Forever Enterprises, significantly reducing the amount of damages against PNC Bank. Plaintiffs contend

the verdict makes clear the jury believed Allegiant bore more responsibility because the damages assessed against Allegiant were much higher.

Missouri Revised Statute § 537.067 states "[i]n all tort actions for damages, if a defendant is found to bear fifty-one percent or more of fault, then such defendant shall be jointly and severally liable for the amount of the judgment rendered against the defendants." Missouri has adopted the doctrine of pure comparative fault in accordance with the Uniform Comparative Fault Act. *Gustafson v. Benda*, 661 S.W.2d 11, 15-16 (Mo. 1983). The Act does not include intentional torts, but does not preclude courts applying it to cases involving intentional torts. However, it seems the law in Missouri excludes application of comparative fault to intentional torts. In *Benson v. Jim Maddox Northwest Imports, Inc.*, the Missouri Court of Appeals for the Eastern District of Missouri refused to apply contributory negligence because the claim was for an intentional tort. 728 S.W.2d 668, 669 (Mo. Ct. App. 1987). Similarly, in *CitiMortgage, Inc. v. Just Mortgage, Inc.*, United States Magistrate Judge David Noce for the Eastern District of Missouri refused to apply the Uniform Comparative Fault Act because the case involved fraud, an intentional tort. No. 4:09CV1909 DDN, 2013 WL 6538680 at *11 (E.D. Mo. Dec. 13, 2013). The only case which applies § 537.067 to an intentional tort is *Werremeyer v. K.C. Auto Salvage Company*. 134 S.W.3d 633, 636 (Mo. 2004). However, in that opinion, the Missouri Supreme Court was discussing joint and several liability, not applicability of the statute to intentional torts, and were applying an earlier version of the statute. The current suggestion from Missouri case law is apportionment of fault does not apply to intentional torts. Therefore, the Court was not erroneous in refusing an apportionment of fault jury instruction.[8]

---

[8] The Court notes it does not agree with Plaintiffs' suggestion the amount of damages awarded between the two defendants indicates how the jury would have apportioned fault. As Plaintiffs themselves argued in previous briefs

### K.     Punitive Damages Instruction

PNC Bank argues the Court's jury instruction on punitive damages was incorrect because it failed to define clear and convincing evidence and incorrectly stated the Missouri standard for imposing punitive damages.  PNC Bank claims the Court's denial of the instruction prejudiced the jury's verdict on punitive damages because jurors do not understand it is a more demanding burden of proof than the greater weight of the evidence standard which was defined in the instructions.[9]  Plaintiffs assert an instruction defining clear and convincing evidence is not necessary according to a recent Missouri Supreme Court opinion.

The Missouri Supreme Court opinion Plaintiffs cite is *In re Van Orden*, 271 S.W.3d 579 (Mo. 2008).  In this case, the Missouri Supreme Court held "'[c]lear and convincing evidence' requires no further defining.  The words are commonly used and readily understandable, and the phrase provides the jury with sufficient instruction on the applicable burden of proof." *Id.*, at 586.  This decision has since been applied by Missouri appellate courts. *See In re Pogue*, 315 S.W.3d 399, 403 (Mo. Ct. App. 2010).  The Missouri Supreme Court's opinion is conclusive on this matter; an instruction defining "clear and convincing evidence" is not required.  The Court will deny PNC Bank's motion on this basis.

### L.     Evidence of National City Bank's Due Diligence

PNC Bank argues the Court erred in allowing the introduction of evidence relating to National City Bank's due diligence review of Allegiant prior to National City Bank's merger with Allegiant.  PNC Bank claims this evidence invited the jury to impose liability based on the

---

before the Court, the lower amount of damages awarded against Forever Enterprises may be because the entity is insolvent and was not represented at trial or the focus of Plaintiffs' evidence at trial.
[9] PNC Bank also asserts an award of punitive damages requires evil motive and reckless indifference and can only be awarded against fiduciaries when there is intentional misconduct. The Court has already addressed this issue in its Memorandum & Opinion on PNC Bank's Renewed Motion for Judgment as a Matter of Law.

conduct and knowledge of National City Bank, rather than Allegiant Bank. Additionally, PNC Bank claims the evidence was confusing and suggested Allegiant should be held to the standard of care reflected in National City Bank's due diligence review.

PNC Bank filed a Motion in Limine to exclude this evidence prior to trial. The Court ruled this evidence may be admissible to prove causation and what Allegiant should have known during its time as trustee. The Court also ruled some of the evidence may not be relevant and it would take up any objections related to specific exhibits throughout the trial. PNC Bank objected to many exhibits, which were overruled. Federal Rule of Evidence 403 states evidence may be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The evidence submitted at trial was not unfairly prejudicial and did not confuse the issues, mislead the jury, cause undue delay, waste time, or needlessly present cumulative evidence. Instead, this evidence explained major problems in the trusts evident in information Allegiant had available to it. It also provided evidence of Allegiant's trust administration and what information Allegiant could have easily learned which would have raised serious concerns regarding the Cassitys. Additionally, this evidence highlighted the manner in which Allegiant transferred the trusts to Bremen Bank and facilitated the continued misuse of trust assets without making any attempt to fix the problems in the trusts or notify Bremen of the problems which had arisen. This evidence was not misunderstood at trial to establish the standard of care as Plaintiffs introduced testimony of standards in the industry through an expert, Ed Coster. While this evidence was certainly damaging against PNC Bank, it was not unduly prejudicial so as to be excluded. The Court will deny PNC Bank's motion on this basis.

### M. Hannover Arbitration Award

The last argument PNC Bank asserts in support of its Motion for New Trial is the Court erred in excluding evidence related to the unissued Hannover arbitration award. First, PNC Bank asserts the Court erred in preventing PNC Bank from discovering information related to this award.  Second, PNC Bank contends the Court compounded this error at trial by barring PNC Bank from introducing evidence about the award or the SDR's decision not to seek issuance of the award.  PNC Bank argues this evidence was necessary to dispute Plaintiffs' theory of causation.

Prior to trial, Plaintiffs sought a motion in limine excluding evidence of the Hannover arbitration award, which the Court denied.  In that decision, the Court stated evidence of the arbitration could be admitted but PNC Bank would not be allowed to suggest or argue the decisions of the Texas Receivership Court were incorrect.  PNC Bank's collateral attack on the Texas Receivership Court was also the basis for the Court's decision to quash PNC Bank's subpoena of the draft award and to strike PNC Bank's failure to mitigate defense.  PNC Bank was allowed to raise the issue of the award at trial including during its opening statement, in questioning of Brent Cassity and Plaintiffs' experts, in introducing deposition testimony of Lincoln's former counsel on the issue, and during questioning of Ms. Howard, the SDR.  It is difficult to understand PNC Bank's argument it was not allowed to introduce any evidence related to this award when it clearly was allowed to do so.  The Court will deny PNC Bank's motion on this basis.

Accordingly,

**IT IS HEREBY ORDERED** that PNC Bank's Motion for New Trial Based on Legal and Evidentiary Errors [ECF No. 2385] is **DENIED.**

So Ordered this 20th day of November, 2015.

_____
**E. RICHARD WEBBER**
**SENIOR UNITED STATES DISTRICT JUDGE**