# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| JO ANN HOWARD AND ASSOCIATES, P.C., SPECIAL DEPUTY RECEIVER OF LINCOLN MEMORIAL LIFE INSURANCE COMPANY, MEMORIAL SERVICE LIFE INSURANCE COMPANY, AND NATIONAL PREARRANGED SERVICES, INC., ET AL., | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | Case No. 09-CV-1252-ERW |
| v. | ) ) | |
| J. DOUGLAS CASSITY; RANDALL K. SUTTON; BRENT D. CASSITY; J. TYLER CASSITY; RHONDA L. CASSITY; ET AL., | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING ALLEGIANT'S BREACHES OF TRUST**

2176738

# TABLE OF CONTENTS

[PROPOSED] Findings of Fact ....................................................................................................3

    A.    The Parties .............................................................................................................3

            i.        *The Special Deputy Receiver* ....................................................................3

            ii.      *NOLHGA and the State Guaranty Associations* ........................................3

            iii.     *PNC Bank, N.A.* .......................................................................................5

    B.    Plaintiffs' Standing ...............................................................................................6

    C.    NPS and Its Operation ...........................................................................................6

    D.    Lincoln Memorial Life Insurance Company ..........................................................7

    E.    Additional Cassity-Controlled Entities .................................................................7

    F.    Overview of Missouri Revised Statute Chapter 436 ..............................................8

    G.    Background on Allegiant Trust Company ..............................................................9

            i.        *Size and Inexperience of the Allegiant Trust Department* .......................10

            ii.      *Allegiant's Acceptance of the Trusts* .....................................................11

            iii.     *NPS Preneed Trust Assets at Beginning of Allegiant's Tenure* ...............11

    H.    Allegiant's Failure to Treat Missouri Funeral Homes and Consumers as Trust Beneficiaries ...............................................................................................13

    I.    The Investment Advisor Was Not Independent ...................................................14

    J.    Allegiant's Flawed Wire Transfer Procedures ....................................................16

    K.    Allegiant's Failure to Satisfy Its Recordkeeping Obligations .............................20

    L.    Allegiant's Failure to Ensure that the Trust Assets Were Prudently Invested ...............................................................................................................22

    M.    Lincoln Life Insurance Policies as Assets of the Trusts ......................................23

            i.        *Allegiant Uses Face Value Rather than Market Value* ...........................23

            ii.      *Allegiant Allows Mismatching* ...............................................................25

            iii.     *Allegiant Allows Policy Loans* ...............................................................28

   *iv.*  *Lincoln's Deteriorating Financial Condition* ..........................................30

 N. Wire Transfers from the Trusts With Nothing Received in Return.....................32

   *i.*  *Wires to NPS* ................................................................................32

   *ii.*  *Wires to Other Cassity Entities* ..................................................34

 O. Promissory Notes from the Cassity Entities .......................................................35

 P. Debentures .........................................................................................................39

 Q. World Service Life Group Term Policy ...............................................................41

 R. Stock Purchases from Forever Enterprises for Above-Market Prices .................43

 S. Condition of Trusts At the End of Allegiant's Tenure.........................................46

 T. The Cassity Ponzi-Like Scheme ........................................................................46

 U. National City Bank Acquisition and Due Diligence of Allegiant ........................47

   *i.*  *National City's Due Diligence on the Trusts' Assets* ...............................49

   *ii.*  *National City's Due Diligence into Allegiant's Administration of the Trusts*........................................................................................52

 V. Passing the Trusts to Bremen Bank ...................................................................53

 W. Allegiant's Conduct Also Systematically Violated Industry Custom and Practice................................................................................................................58

   *i.*  *Allegiant's Failure to Control, Protect, and Record Pursuant to Industry Standards* ..................................................................58

   *ii.*  *Allegiant's Failure to Identify the Trusts' Beneficiaries* ..........................61

   *iii.*  *Allegiant's Failure to Understand and Properly Value the Trusts' Assets* ......................................................................................62

   *iv.*  *Allegiant's Failure to Conduct the Market Value Test* ............................63

   *v.*  *Allegiant's Failure to Ensure the Trusts' Assets were Prudently Invested* ......................................................................................64

   *vi.*  *Allegiant's Failure to Maintain Adequate Books and Records* ...............65

[PROPOSED] Conclusions of Law ..............................................................................67

I.      Judgment upon the Existing Record ................................................................................67

II.     Allegiant's Duties as Trustee .........................................................................................70

III.    Allegiant's Investment Advisor Defense ......................................................................74

Plaintiffs Jo Ann Howard, Special Deputy Receiver of Lincoln Memorial Life Insurance Company, Memorial Service Life Insurance Company, and National Prearranged Services, Inc.; the National Organization of Life and Health Insurance Guaranty Associations; and the State Guaranty Associations respectfully submit *[Proposed] Findings of Fact and Conclusions of Law Regarding Allegiant's Breaches of Trust* as follows:

THIS MATTER came on for trial before a jury commencing February 2, 2015 and

continuing through March 6, 2015, with return of the jury verdict on March 9, 2015.  Final

judgment was entered March 9, 2015 (ECF No. 2306), and then amended following post-trial

motions practice (ECF No. 2507).  Defendant PNC Bank, N.A. ("Defendant" or "PNC")

appealed the amended final judgment on numerous grounds.  As relevant here, Defendant argued

that the Plaintiffs' claims should have been treated as equitable breach of trust claims with losses

determined under a trust law measure of damages, rather than under tort principles, and that trial

should have been to the Court rather than to a jury.  In these respects, the Eighth Circuit agreed,[1]

reversed the judgment, and remanded the case back to this Court for further proceedings.  In its

written opinion, the Eighth Circuit expressly stated that this Court was not required to retry the

case in its entirety.  Noting that this Court is familiar with the evidence, the Eighth Circuit stated

that the Court "may proceed based on the existing trial record as it sees fit, with receipt of

additional evidence as the court deems appropriate."  (Op. at 21 [ECF No. 2521]).

On January 9, 2018, shortly after the case returned to this Court's jurisdiction, Plaintiffs

filed a motion seeking judgment as to the breaches of trust committed by Allegiant Trust

Company ("Allegiant"), which served as trustee of the relevant trusts from August 1998-May

2004, as well as PNC's affirmative investment advisor defense.  After considering the briefs

submitted by the parties, oral argument, and the existing record, the Court holds that entry of

judgment on those issues is appropriate for the reasons set forth in the "Conclusions of Law"

portion of this opinion.

---

[1] The Eighth Circuit affirmed this Court's rulings regarding, *inter alia*, the beneficiaries of the
NPS Preneed Trusts and PNC's defenses of *in pari delicto*, authorization, and the investment
advisor.  These rulings, as set forth herein, are relevant to these proposed findings of fact.

Accordingly, pursuant to F.R.C.P. 52, the Court hereby enters its findings of fact and conclusions of law on Allegiant's breaches of trust and investment advisor defense and will enter judgment accordingly.  Determination of what losses resulted from the breaches herein found by the Court, the damages to be awarded, and the related issues of prejudgment interest, punitive damages, and attorney's fees are reserved for judgment until further evidentiary proceedings are held in accordance with the Scheduling Order to be issued separately by the Court.

**[PROPOSED] Findings of Fact**

**A.      The Parties**

> *i.       The Special Deputy Receiver*

1.      Jo Ann Howard and Associates, P.C. is the duly appointed and designated Special Deputy Receiver ("SDR") for National Prearranged Services ("NPS"), Lincoln Memorial Life Insurance Company ("Lincoln") and Memorial Services Life Insurance Company ("Memorial"), which were placed into receivership by the Texas Department of Insurance on May 14, 2008, and are currently in the process of being liquidated.  Third Am. Compl. ¶ 28 (ECF No. 916); Trial Tr. Vol. 17A at 93:3-95:8, 102:11-103:4 (Howard); Trial Tr. Vol. 17B at 22:9-11 (Howard).

2.      The SDR is authorized to deal with the property, business, and claims for or against NPS, Lincoln, and Memorial pursuant to the provisions of the *Insurer Receivership Act*, Texas Insurance Code Chapter 443.  TEX. INS. CODE § 443.154.

> *ii.      NOLHGA and the State Guaranty Associations*

3.      Plaintiffs Missouri Life and Health Insurance Guaranty Association, Texas Life and Health Insurance Guaranty Association, Illinois Life and Health Insurance Guaranty Association, Kansas Life and Health Insurance Guaranty Association, Oklahoma Life and Health Insurance Guaranty Association, Kentucky Life and Health Insurance Guaranty Association, and

3

the Arkansas Life and Health Insurance Guaranty Association are statutory entities created by their respective state legislatures to provide protection to their respective states' resident policyholders in the event of an insolvency of a member insurance company.   Third Am. Compl. ¶ 31 (ECF No. 916); Trial Tr. Vol. 9A at 39:25-42:10, 42:22-43:15 (Gallanis).

4.      Plaintiff the National Organization of Life and Health Insurance Guaranty Associations ("NOLHGA") is a Virginia nonstock corporation.  It is a voluntary association of its members, which are all of the life and health insurance guaranty associations of the states of the United States of America and the District of Columbia.  *See* Trial Tr. Vol. 9A at 57:1-13, 75:14-76:6 (Gallanis).  NOLHGA is a plaintiff in this action as the assignee of claims for collection purposes only from the following state life and health insurance guaranty associations: Arizona, California, Colorado, District of Columbia, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Washington, West Virginia, Wisconsin, and Wyoming.  Trial Tr. Vol. 9A at 71:11-72:25 (Gallanis); Ex. P-117 (Assignment Agreements).  Each state life and health insurance guaranty association is a statutory entity created by their respective state legislatures to provide protection to their respective states' resident policyholders in the event of an insolvency of a member insurance company.   Third. Am. Compl. ¶ 29 (ECF No. 916); Trial Tr. Vol. 9A at 39:25-42:10, 42:22-43:15 (Gallanis).

5.      Pursuant to the Liquidation Plan approved by the Texas Receivership Court, the Plaintiff state guaranty associations and those state guaranty associations represented by NOLHGA are paying the death benefits under the Lincoln life insurance policies that were held by the preneed trusts over which Allegiant Bank served as trustee.  Ex. P-1513; Trial Tr. Vol. 9A

4

at 19:22-25:12, 55:19-25 (Gallanis).  Having funded the death benefits, the guaranty associations became creditors of the NPS and Lincoln estates.  Trial Tr. Vol. 17A at 113:25-114:19 (Howard); Trial Tr. Vol. 9A at 58:21-61:3, 108:1-109:24 (Gallanis).

> ### iii.    PNC Bank, N.A.

6.      PNC is a nationally chartered bank with its headquarters in Pittsburgh, Pennsylvania.  Answer to Third Am. Compl. at ¶ 84.3 (ECF No. 1018).  PNC is the successor-in-interest to National City Bank, National City Bank of the Midwest, and Allegiant Bank as a result of various mergers.  *Id.* at ¶¶ 70-72, 84.3.

7.      Allegiant Trust Company, a division of Allegiant Bank, served as the trustee for NPS Pre-Need Trust I between August 24, 1998 and May 14, 2004 ("Trust I"); Pre-Need Trust II between August 14, 1998 and May 14, 2004 ("Trust II"); Pre-Need Trust III between August 28, 1998 and May 14, 2004 ("Trust III"); Pre-Need Trust IV between August 11, 1998 and May 14, 2004 ("Trust IV"); Pre-Need Trust V between March 25, 1999 and May 14, 2004 ("Trust V"); as the trustee of the Mt. Washington Forever Pre-Need Trust between April 13, 2000 and May 14, 2004 ("MTW Trust"); and as the trustee of the Mason Securities Association d/b/a/ Funeral and Cremation Society of America Pre-Need Trust between February 19, 1998 and May 14, 2004 ("CSA Trust") (collectively, the "NPS Preneed Trusts").  Answer to Third Am. Compl. at ¶ 70 (ECF No. 1018).

8.      Allegiant Bank was merged with and into National City Bank of the Midwest effective as of July 31, 2004.  Answer to Third Am. Compl. at ¶ 70 (ECF No. 1018).  National City Bank of the Midwest, in turn, was merged with and into National City Bank effective July 22, 2006.  *Id.* at ¶ 71.  Finally, National City Bank was merged with and into PNC effective in November 2009.  *Id.* at ¶ 84.3.

B.      **Plaintiffs' Standing**

9.      The SDR has standing to bring claims on behalf of NPS, Lincoln, Memorial, their creditors, members, policyholders, shareholders, and the public.  TEX. INS. CODE §§ 443.154(l)-(m); Trial Tr. Vol. 17A at 84:14-24, 86:24-88:2 (Howard).

10.     The various state life and health insurance guaranty associations (including those named as Plaintiffs and those bringing claims through NOLHGA) have been assigned and/or subrogated to the causes of action the funeral homes, consumers and their estates, policyholders, beneficiaries, and other payees have against PNC through: (1) each state guaranty association's enabling act; (2) the NPS/Lincoln/Memorial Liquidation Plan approved on September 22, 2008, by the Texas Receivership Court in Travis County, Texas; and/or (3) express assignments received from every recipient of a death benefit paid by a state guaranty association.   Third Am. Compl. ¶ 32 (ECF No. 916); Ex. P-1513, at 36 to 37, ¶¶ 9.1-9.2 (Liquidation Plan); Ex. P-1513, at 69 to 70; Trial Tr. Vol. 9A at 63:9-66:12 (Gallanis).

C.      **NPS and Its Operation**

11.     NPS started in 1979 and was owned and controlled by the Cassity family, whose members were Doug Cassity, Rhonda Cassity, Tyler Cassity, and Brent Cassity.  Trial Tr. Vol. 8A at 55:20-56:18 (B. Cassity).

12.     NPS sold preneed funeral contracts.  Under a preneed funeral contract, a consumer would arrange and pay for a funeral before the time of need.  There were advantages to prearranging a funeral, including relieving loved ones of having to make decisions at the time of death and freezing the price of the funeral to the price at the time of prearrangement.  Trial Tr. Vol. 8A at 57:4-22, 93:10-94:19 (B. Cassity); Trial Tr. Vol. 10A at 116:11-17 (Sargent).

13.     After an individual with a preneed contract passed away and the designated funeral home provided the funeral service, the funeral home would make a claim with NPS for

reimbursement of the amount of the preneed contract plus inflation.  Trial Tr. Vol. 10A at 119:15-120:15 (Sargent).

14.     NPS became the largest preneed seller in the state of Missouri.  Trial Tr. Vol. 8A at 89:1-9 (B. Cassity).  As part of its marketing to funeral homes to sell NPS preneed contracts, NPS would stress that the funds received would be held in trust.  *Id.* at 92:12-16.

15.     Doug Cassity and Randy Sutton controlled the finances of NPS and made decisions regarding when and where to spend money, including sending funds to other Cassity-controlled entities.  Trial Tr. Vol. 8A at 63:21-64:25, 65:14-66:15 (B. Cassity).

**D.      Lincoln Memorial Life Insurance Company**

16.     Lincoln was a life insurance company that was owned by the Cassity family.  The Cassity family purchased Lincoln so that it could own and control the insurance company used for issuing life insurance policies to fund the preneed funeral contracts sold by NPS.  Trial Tr. Vol. 8A at 69:1-7, 70:2-11, 70:20-71:22 (B. Cassity).

17.     Doug Cassity and Randy Sutton, in addition to controlling NPS's operations, also controlled the operations of Lincoln.  Trial Tr. Vol. 11A at 96:19-98:4 (Lumpkin).

18.     Practically all life insurance policies issued by Lincoln were issued to fund the preneed funeral contracts sold by NPS.  Trial Tr. Vol. 11A at 98:5-12 (Lumpkin).  Likewise, the vast majority of the NPS Preneed Trusts' assets during Allegiant's period as trustee were in the form of life insurance policies issued by Lincoln.  *Id.* at 98:20-24; Trial Tr. Vol. 3B at 34:23-35:13, 40:2-22 (Morisse).

**E.      Additional Cassity-Controlled Entities**

19.     NPS and Lincoln were part of a broader network of companies all owned and controlled by members of the Cassity family.  Those companies included Memorial, Lincoln Memorial Services, National Heritage Enterprises, Forever Enterprises, Forever Network, and

numerous subsidiary funeral homes and cemeteries such as Hollywood Forever.  Trial Tr. Vol. 8A at 56:10-57:3, 58:2-21, 59:8-60:9 (B. Cassity); Trial Tr. Vol. 17B at 42:23-44:20 (Howard).

20.     While serving as trustee of the NPS Preneed Trusts, Allegiant knew that NPS, Lincoln, Forever Enterprises, Hollywood Forever, and many of the other companies within the Cassity consortium were related entities that were owned and controlled by the Cassity family. Trial Tr. Vol. 3A at 21:24-23:10 (Hayes); Trial Tr. Vol. 4A at 110:19-111:5, 115:8-116:1 (Morisse); Trial Tr. Vol. 9B at 62:18-21, 64:4-14 (Markow).

### F.     Overview of Missouri Revised Statute Chapter 436

21.     While Allegiant served as trustee of the NPS Preneed Trusts, Missouri Revised Statute Chapter 436 ("Chapter 436") governed the sale of preneed funeral contracts in the state of Missouri.  Among other provisions, Chapter 436 required that a preneed seller place at least 80% of preneed contract funds into a trust with a state or nationally chartered financial institution. MO. REV. STAT. §§ 436.007, 436.027, 436.031 (2009); Trial Ex. P-1328.  Chapter 436 also set forth obligations of the preneed trustee.  *See generally id.* at § 436.031.

22.     Chapter 436 was passed, in part, to protect the consumers' money who had paid for funerals in the present to be paid out in the future.  ECF No. 2505, at 8.

23.     Allegiant knew from the beginning of its trusteeship that Chapter 436 governed its administration and operation of the NPS Preneed Trusts, and that the statute's provisions were requirements that Allegiant had to follow.  Trial Tr. Vol. 5A at 60:22-61:8 (Morisse).  Allegiant knew that of the funds paid to NPS by the Missouri consumers, 80% had to be deposited into the preneed trusts.  *Id.* at 61:9-17.

24.     Allegiant was aware that Chapter 436 required it to maintain adequate records of all payments received and of all transactions affecting the NPS Preneed Trusts.  Trial Tr. Vol. 5A at 70:12-17 (Morisse).

25. Allegiant further understood that funds could leave the NPS Preneed Trusts only for limited purposes, such as death claims and cancellations, and in those instances only the amount that had been deposited into trust on behalf of the particular consumer could to be released from the trust.  Trial Tr. Vol. 5A at 62:6-63:7 (Morisse).  Similarly, income distributions could only be made to the extent the aggregate market value of all property held in the preneed trust exceeded the sum of all deposits made into the trust for the preneed contracts then administered through the trust.  Trial Tr. Vol. 6B at 32:8-23 (Morisse); MO. REV. STAT. § 436.031.3.

26. Allegiant also understood during its trusteeship that it was required to protect and control the NPS Preneed Trusts' assets.  Trial Tr. Vol. 5B at 17:16-18:20 (Morisse).

27. As described extensively in the findings below, however, "Allegiant did nothing required of it under Chapter 436" to account for, control, and protect the trust funds.  ECF No. 2504, at 13, 16.  Allegiant shirked all obligations imposed on preneed trustees under Chapter 436 and instead acted as "a trustee in name only."  *Id.* at 17.  "Allegiant took no action to fulfill the duties of a trustee during its tenure[.]"  *Id.* at 11.  In sum, "Allegiant's breaches of these trusts were regular and continuous from the beginning of its trusteeship."  ECF No. 2505, at 8.

G. **Background on Allegiant Trust Company**

28. Allegiant Bank was founded in St. Louis, Missouri in the spring of 1989.  Trial Tr. Vol. 3A at 10:14-21 (Hayes).  In the beginning, Allegiant Bank did not have a trust department.  *Id.* at 11:18-22.

29. Shaun Hayes, the President and CEO of Allegiant Bank, wanted Allegiant to have a trust department so it would be "perceived as a full service financial institution."  Trial Tr. Vol. 3A at 11:23-12:3 (Hayes).  Allegiant's trust department was created as a marketing technique to give a mere "perception" that Allegiant had a trust department.  *Id.* at 12:10-23.  The trust

9

department was never a core competency of Allegiant Bank, and was never intended to be.  *Id.* at 18:4-16.  The trust department was so small that Mr. Hayes "paid no attention" to it, as it was not where the bank made its money.  *Id.* at 33:25-34:9.  Allegiant's trust department was created for marketing purposes, and "not to provide consumers qualified, reputable trust services."  ECF No. 2504, at 5-6.

      *i.  Size and Inexperience of the Allegiant Trust Department*

  30.  Richard Markow ("Markow") was hired to run Allegiant's trust department.  Trial Tr. Vol. 3A at 14:3-7 (Hayes).  Markow had no training or experience administering trusts, and was instead hired by Allegiant for his marketing and sales abilities.  Trial Tr. Vol. 9B at 47:15-48:11, 54:2-16 (Markow); Trial Tr. Vol. 3A at 14:14-15:1, 20:6-10 (Hayes); Trial Tr. Vol. 4A at 31:25-32:2 (Morisse).

  31.  Herbert Morisse ("Morisse") was Allegiant's sole trust administrator with regard to the NPS Preneed Trusts.  Morisse had no prior experience or training relating to preneed trust accounts.  Trial Tr. Vol. 3B at 19:7-13, 19:23-20:5 (Morisse).

  32.  Allegiant's trust department was very small, and was thinly staffed on purpose because Allegiant never intended to be an expert in trusts.  Trial Tr. Vol. 3A at 18:4-16, 18:21-19:6 (Hayes).

  33.  The NPS Preneed Trusts moved to Allegiant in 1998.  Allegiant's trust department had only three employees—including Markow and Morisse—at the time Allegiant took over as trustee of the NPS Preneed Trusts.  Trial Tr. Vol. 9B at 54:2-10 (Markow).

  34.  The Allegiant Trust Committee, which oversaw the trust department, did not have any members with a trust background.  The Allegiant Trust Committee was instead comprised of an owner of a car dealership, an owner of some Arby's fast-food restaurants, and a dentist.  Trial

Tr. Vol. 3A at 44:18-45:9 (Hayes); Trial Tr. Vol. 4A at 32:15-33:1, 33:7-24, 35:10-36:3 (Morisse).

### ii.     Allegiant's Acceptance of the Trusts

35.     Allegiant first became trustee of an NPS Preneed Trust in 1998.  In the one year between December 1997 and December 1998, Allegiant's trust assets under management jumped from approximately $2.2 million to approximately $137.8 million—with the NPS Preneed Trusts being the vast majority of the assets.  Ex. P-496; *see also* Trial Tr. Vol. 9B at 56:2-25 (Markow).

36.     Allegiant used the size of the NPS Preneed Trusts for marketing purposes, claiming in annual reports that its trust department had over one hundred million dollars in assets under trust management.  Trial Tr. Vol. 3A at 32:23-33:17 (Hayes).  This marketing was important to Allegiant because it would give "others a perception that you're larger [and] people like to go where others are."  *Id.* at 33:9-13.  The marketing allowed Allegiant to "create a perception that its Trust Department had . . . large assets," even though in reality Allegiant's trust department was "insignificant."  *Id.* at 33:14-20.

### iii.     NPS Preneed Trust Assets at Beginning of Allegiant's Tenure

37.     In August 1998, when Allegiant became trustee over Trust IV, $50,231,407.30 of the reported $52 million in trust assets was in the form of Lincoln life insurance policies.  Trial Tr. Vol. 3B at 34:11-18 (Morisse).  Lincoln policies thus represented 96.38% of the Trust IV assets when Allegiant took over as trustee.  *Id.* at 34:19-35:1; Ex. P-0101D at 2.

38.     When Allegiant took over as trustee of Trust I in August 1998, over 97% of Trust I's assets consisted of certificates of debenture issued from NPS.  The reported value of these debentures totaled approximately $1.7 million.  Trial Tr. Vol. 3B at 35:18-36:6 (Morisse); Ex. P-101A at 2.

11

39.    At the beginning of Allegiant's tenure as trustee over Trust II in August 1998, 98% of Trust II's approximately $15 million in assets were Lincoln life insurance policies.  Trial Tr. Vol. 3B at 40:2-12 (Morisse); Ex. P-101B at 2.

40.    Similarly, Trust III was comprised of approximately $40,679,131 in assets when Allegiant became trustee in August 1998.  Trial Tr. Vol. 3B at 45:14-21 (Morisse); Ex. P-101C at 3.  Of that amount, 64.88% consisted of Lincoln life insurance policies and the remaining 35.12% consisted of a certificate of debenture from NPS with a reported value of $14,285,193.  Trial Tr. Vol. 3B at 46:5-16 (Morisse); Ex. P-101C at 3.

41.    The Court finds that the NPS Preneed Trusts' assets on the first day of Allegiant's tenure were not properly diversified, but were instead comprised almost exclusively of Lincoln life insurance policies and certificates of debenture issued by NPS, the preneed seller.

42.    Allegiant's failure to ensure that the assets of the NPS Preneed Trusts were properly diversified at the outset of Allegiant's tenure as trustee was a breach of trust.

43.    Allegiant's conduct in accepting appointment as trustee of the NPS Preneed Trusts when Allegiant knew that its trust department had been created simply for marketing purposes, and when Allegiant knew or should have known that its trust department was not adequately staffed or qualified to administer the NPS Preneed Trusts, was a breach of trust on Allegiant's first day of trusteeship.

44.    Allegiant's conduct in accepting appointment as trustee of the NPS Preneed Trusts when Allegiant knew that its trust department had been created simply for marketing purposes, and when Allegiant knew or should have known that its trust department was not adequately staffed or qualified to administer the NPS Preneed Trusts, was recklessly indifferent to the rights of the trusts' beneficiaries.

45.     Allegiant's failure to ensure that the assets of the NPS Preneed Trusts were properly diversified at the outset of Allegiant's tenure as trustee resulted in losses to the trusts in an amount to be later determined and quantified.

**H.     Allegiant's Failure to Treat Missouri Funeral Homes and Consumers as Trust Beneficiaries**

46.     The beneficiaries of the NPS Preneed Trusts were NPS, the Missouri funeral homes providing the services, and the Missouri consumers purchasing the preneed contracts. ECF No. 2084, at 11; ECF No. 2092, at 29; ECF No. 2521, at 11-13 (affirming beneficiary ruling).

47.     For the entire six-year period Allegiant served as trustee, Allegiant mistakenly believed and operated with the understanding that the only beneficiary of the NPS Preneed Trusts was NPS.  Trial Tr. Vol. 4A at 40:13-41:8 (Morisse).  Consequently, Allegiant did not view Missouri consumers or funeral homes as beneficiaries of the trusts to whom fiduciary duties were owed.  *Id.*  Specifically, Allegiant never informed the preneed consumers or funeral homes of the activity in the NPS Preneed Trusts because Allegiant did not believe it had any duties of accounting or notice toward the funeral homes and consumers.  *Id.*; *see also id.* at 44:7-25.

48.     PNC's Rule 30(b)(6) corporate representative likewise testified that Allegiant determined at the beginning of its trusteeship that the Missouri consumers and funeral homes were not trust beneficiaries.  Accordingly, Allegiant behaved during the entirety of its tenure as trustee as though it owed no fiduciary duties to the Missouri consumers and funeral homes.  Trial Tr. Vol. 12 at 38:11-14, 16-17 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 43:3-21, 48:8-10, 12-18, 21-22; 49:16-20, 22).

49.     Allegiant's failure to identify and treat the Missouri consumers and funeral homes as trust beneficiaries was a breach of trust.

13

50.     Allegiant's conduct in failing to identify and treat the Missouri consumers and funeral homes as trust beneficiaries was recklessly indifferent to the rights of these beneficiaries.

51.     Allegiant's failure to identify and treat the Missouri consumers and funeral homes as trust beneficiaries resulted in losses to the trusts in an amount to be later determined and quantified.

### I.     The Investment Advisor Was Not Independent

52.     NPS appointed David Wulf of Wulf, Bates & Murphy as the investment advisor for the NPS Preneed Trusts in approximately 1987.  Trial Tr. Vol. 12 at 128:22 (Wulf 4/29/2014 Dep. Tr. at 10:10-17).

53.     Chapter 436 requires that any investment advisor appointed for a preneed trust be independent from both the trustee *and* the preneed seller.  Trial Ex. P-1328 at 10; *see also* ECF No. 2084, at 12-14.  During Allegiant's period as trustee of the NPS Preneed Trusts, Chapter 436 required that David Wulf and Wulf, Bates & Murphy be independent from both Allegiant and NPS.

54.     Allegiant never inquired into whether David Wulf and Wulf, Bates & Murphy (collectively, "Wulf") were independent from NPS.  Instead, Morisse believed that it made no difference whether Wulf was controlled by NPS or the Cassity family so long as Wulf was independent from Allegiant.  Trial Tr. Vol. 4A at 48:4-18, 49:3-17 (Morisse).

55.     The President of Allegiant Trust Company conceded that it would have been prudent for Allegiant to investigate whether Wulf was independent from NPS even though he acknowledged that no such investigation was performed.  Trial Tr. Vol. 9B at 70:22-71:4 (Markow).

56.     Allegiant neglected its responsibility to investigate whether Wulf was independent from NPS even though Allegiant's own records demonstrated that Wulf continually

acted in the best interests of the Cassitys and against the best interests of the NPS Preneed Trusts. Trial Tr. Vol. 5B at 83:4-21 (Morisse).

57.     David Wulf did not believe he had the ability to say no to the Cassitys and Randy Sutton even when they were directing transactions that Wulf knew would result in the NPS Preneed Trusts losing money.  Trial Tr. Vol. 13A at 26:7-8 (Wulf 5/1/2014 Dep. Tr. at 579:7-10, 12-25).

58.     David Wulf personally profited from the NPS Preneed Trusts' purchases of Lincoln life insurance policies through his role as manager of Lincoln's portfolio.  Trial Tr. Vol. 11B at 25:8-26:6 (Lumpkin).

59.     NPS and the other Cassity companies were essentially Wulf's only clients.  Trial Tr. Vol. 11B at 26:20-25 (Lumpkin); *see also* Trial Tr. Vol. 11A at 120:20-121:10, 145:19-146:12 (Lumpkin).  David Wulf utilized an NPS e-mail address, was on NPS's employee health insurance plan, and shared office space with NPS.  Trial Tr. Vol. 11B at 27:21-28:5 (Lumpkin).

60.     The Court finds, based on the aforementioned facts, that Wulf was not independent from NPS as required under Chapter 436.

61.     Allegiant's failure to evaluate or confirm whether Wulf was independent from NPS was a breach of trust.

62.     Allegiant's conduct in failing to evaluate or confirm whether Wulf was independent from NPS was recklessly indifferent to the rights of the trust beneficiaries.

63.     Allegiant's failure to evaluate or confirm whether Wulf was independent from NPS resulted in losses to the NPS Preneed Trusts in an amount to be later determined and quantified.

J.        **Allegiant's Flawed Wire Transfer Procedures**

64.       Allegiant understood that no funds could be distributed out of the NPS Preneed Trusts for any purpose other than those authorized by Chapter 436.  Trial Tr. Vol. 5A at 70:18-23 (Morisse).  On day one of Allegiant's tenure as trustee, however, Allegiant created a system whereby it automatically executed all wire transfers requested by NPS without performing any scrutiny or review regarding the purposes of the transfers.  Trial Tr. Vol. 12 at 42:11-14 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 232:16-20, 22-25, 233:2-6, 8); Trial Tr. Vol. 4A at 66:8-67:5, 67:24-68:19, 85:19-86:21, 90:9-20 (Morisse); Trial Tr. Vol. 4B at 55:7-9 (Morisse); Trial Tr. Vol. 5A at 106:10-17, 108:24-109:3, 114:17-115:1, 116:5-16, 121:10-122:4 (Morisse).

65.       Allegiant received over 1,000 wire transfer requests during its period as trustee. In every instance, Allegiant wired out the funds as requested without confirming the wires were permissible under Chapter 436.  Trial Tr. Vol. 4A at 56:7-21, 63:24-64:23, 71:18-72:5, 85:25-86:5 (Morisse); Trial Tr. Vol. 5A at 106:23-107:11, 121:3-6, 122:15-123:2 (Morisse).

66.       Morisse established a "protocol" at Allegiant under which he never reviewed Allegiant's own trust statements or the wire transfer forms Allegiant received from NPS.  This protocol made it impossible for Allegiant to evaluate the propriety of the wire transfer requests. Trial Tr. Vol. 3B at 66:15-67:11, 68:7-14 (Morisse); Trial Tr. Vol. 4A at 61:17-23, 88:16-24 (Morisse); Trial Tr. Vol. 4B at 40:9-41:2, 80:5-17 (Morisse); Trial Tr. Vol. 5B at 42:23-43:20, 48:16-18, 48:25-49:19 (Morisse); Trial Tr. Vol. 6A at 52:3-53:3 (Morisse).

67.       Morisse chose not to review the trust statements and wire transfer forms associated with the NPS Preneed Trusts despite knowing Allegiant had responsibilities to protect the trust assets, to stop any improper transactions, and to identify any red flags.  Trial Tr. Vol. 4A at 93:5-8 (Morisse); Trial Tr. Vol. 5A at 95:12-15 (Morisse); Trial Tr. Vol. 6A at 53:1-3 (Morisse).  Morisse's superiors, however, testified that Morisse should have reviewed the trust

16

statements so that he could identify any red flags occurring within the NPS Preneed Trusts.  *See, e.g.*, Trial Tr. Vol. 9B at 71:5-8, 74:22-25, 86:2-12 (Markow).

68.     Allegiant automatically processed all wire transfer requests it received, even though the wire transfer forms plainly stated that they were from Randy Sutton and Angie Hall at NPS, with the investment advisor Wulf only cc'd on the form.  *See, e.g.*, Ex. P-104 at 1069; Trial Tr. Vol. 4A at 70:3-72:5, 106:18-107:8 (Morisse).  Allegiant's trust statements inaccurately stated that all wire transfers from the NPS Preneed Trusts were executed "per direction of investment advisor," when in fact Wulf did not direct the wire transactions.  *See, e.g.*, Trial Tr. Vol. 12 at 130:25, 131:6-7, 17-18, 20-21 (Wulf 5/1/2014 Dep. Tr. at 459:20-460:2, 464:24-465:5, 465:7-9, 474:22-475:4, 475:6-13, 477:14-25).

69.     Allegiant knowingly allowed NPS to direct wire transfers out of the NPS Preneed Trusts.  *See, e.g.*, Trial Tr. Vol. 10A at 73:18-21 (Markow); Trial Tr. Vol. 12 at 42:10-12 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 231:17-232:10, 16-20, 22).  Allegiant inexplicably behaved as if it had a duty to execute all of the wire transfer requests it received from the Cassitys.  Trial Tr. Vol. 12 at 42:15 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 234:14-16).

70.     Wulf, in reality, did not direct or even track the wire transfers out of the NPS Preneed Trusts during Allegiant's tenure as trustee.  Trial Tr. Vol. 12 at 130:2-3, 8-10, 22-23, 131:8-10, 17-18  (Wulf 5/1/2014 Dep. Tr. at 433:7-21, 433:23-434:20, 441:22-442:2, 442:4-15, 443:13-23, 456:3-14, 456:16-17, 466:15-18, 466:20-467:9, 474:22-475:4, 475:6-13); Trial Tr. Vol. 11B at 105:7-20, 106:16-107:18 (Hall); Trial Tr. Vol. 17A at 67:12-68:13, 79:3-10 (Wallis).

71.     Allegiant and Morisse would wire funds out of the NPS Preneed Trusts without knowing whether any asset was being received in return, even where the outgoing wire was purportedly for investment purposes.  Trial Tr. Vol. 4A at 86:22-88:24, 89:15-90:20 (Morisse); Trial Tr. Vol. 5B at 7:19-8:4 (Morisse).  Morisse never checked the monthly statements to see if any asset was received in return for outgoing wires.  Trial Tr. Vol. 4A at 88:16-24 (Morisse); Trial Tr. Vol. 5B at 42:12-43:20 (Morisse).  Nor did Morisse set up any kind of "tickler" or reminder system to follow-up and ensure that an asset was received in return for monies wired out of the NPS Preneed Trusts.  Trial Tr. Vol. 4B at 79:9-15 (Morisse); *see also* Trial Tr. Vol. 5A at 116:10-117:3 (Morisse).

72.     Not once did Morisse ever review the wire transactions to determine whether they were prudent or imprudent, because he "did not believe it was [his] place to question investment direction from Wulf, Bates & Murphy."  Trial Tr. Vol. 5A at 120:2-10 (Morisse).  Allegiant admittedly had no system in place to look for or stop the theft of trust assets.  *Id.* at 124:1-20.

73.     It "did not matter" to Morisse whether the wire transfers being made supposedly for investment purposes were prudent or imprudent.  Trial Tr. Vol. 5B at 24:3-10 (Morisse).

74.     Morisse conceded that he was unaware of the purposes for why money was being transferred out of the NPS Preneed Trusts.  *See, e.g.*, Trial Tr. Vol. 4A at 86:8-21, 90:9-20 (Morisse); Trial Tr. Vol. 5A at 106:10-17, 108:24-109:3, 114:17-115:10, 116:10-19, 121:23-122:4 (Morisse).  Even National City Bank's 30(b)(6) corporate representative testified, however, that Morisse and Allegiant should have known why money was moving in and out of the NPS Preneed Trusts and should have been reviewing the wire transfer activity for potentially suspicious transactions.  Trial Tr. Vol. 12 at 39:25-40:1, 40:21-22, 42:19-20, 44:7 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 145:25-146:3, 5, 196:7-15, 17, 239:1-4, 6, 274:14-23).

18

75.     Allegiant's flawed wire transfer protocol allowed NPS unfettered access to the money being held in the trusts and resulted in Allegiant treating the NPS Preneed Trusts as if they were checking accounts rather than trust accounts.  Trial Tr. Vol. 17A at 77:17-78:3 (Wallis); *see also* ECF No. 2504, at 6.

76.     The NPS Preneed Trusts' assets would not have been depleted had Allegiant not allowed the trust assets to be so easily removed from the trusts.  ECF No. 2504, at 16.  The beneficiaries of the NPS Preneed Trusts were harmed when Allegiant allowed the trust funds to be removed from the trusts with no oversight.  *Id.*  The NPS Preneed Trust beneficiaries would not have been harmed had Allegiant done its job.  *Id.* at 17.

77.     Allegiant's blind acceptance and execution of the wire transfer requests it received resulted in Allegiant "pay[ing] many millions of dollars of beneficiary funds based on those requests, without abiding by the duties imposed by Chapter 436 of the Missouri Revised Statutes to preserve and protect those funds."  ECF No. 2505, at 10-11.

78.     Allegiant's flawed wire transfer procedures and systematic failure to review or scrutinize NPS's wire transfer requests was a breach of trust.

79.     Allegiant's conduct in failing to control the NPS Preneed Trusts, protect the trusts, and keep proper records of the trusts, thus permitting NPS "unfettered access to the money being held in the trusts" and "making the trusts into a checking account for NPS," was recklessly indifferent to the rights of the trusts' beneficiaries.  ECF No. 2504, at 6, 21.

80.     Allegiant's flawed wire transfer procedures and systematic failure to review or scrutinize NPS's wire transfer requests resulted in losses to the NPS Preneed Trusts in an amount to be later determined and quantified.

### K.     Allegiant's Failure to Satisfy Its Recordkeeping Obligations

81.     Allegiant had an obligation to maintain accurate books and records reflecting all transactions in any way pertinent to the NPS Preneed Trusts.  Allegiant understood that it had this recordkeeping responsibility.  Trial Tr. Vol. 4A at 93:18-21 (Morisse).

82.     Allegiant, however, failed to keep independent records and instead relied solely on the records and accountings of trust assets provided to it by NPS.  Allegiant did nothing to check or verify the accuracy of the records.  Trial Tr. Vol. 3B at 72:20-24 (Morisse); Trial Tr. Vol. 5A at 63:25-64:16, 66:14-21 (Morisse).

83.     Allegiant made a conscious decision not to maintain records regarding how much money was supposed to be on deposit in the NPS Preneed Trusts for each individual consumer. Trial Tr. Vol. 12 at 40:24-25 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 200:22-201:7, 201:10); Trial Tr. Vol. 5A at 66:14-67:3, 69:20-70:11 (Morisse); Trial Tr. Vol. 6B at 54:11-18 (Morisse).

84.     Allegiant never verified or reconciled the trust deposits received from NPS with any funds used by the NPS Preneed Trusts to purchase life insurance policies from Lincoln. Instead, each month Allegiant received an "Evidence of Insurance" packet from NPS listing the changes to the insurance policies that Allegiant would report on its trust statements.  Allegiant signed for receipt of the packets each time, certifying that the reconciliation contained in the packets was prepared in compliance with Chapter 436.  In reality, Allegiant did nothing to reconcile or inquire about the information received.  Trial Tr. Vol. 4B at 51:2-55:18 (Morisse); Ex. P-107; *see also* ECF No. 2504, at 6.

85.     Similarly, Allegiant regularly received forms from NPS netting out new business deposits with death claims and cancellations.  *See, e.g.*, Ex. P-105.  Allegiant never understood what the forms meant and never performed any reconciliation or inquiry into the forms, but

nonetheless signed the forms certifying that they were prepared pursuant to Chapter 436.  Trial Tr. Vol. 6A at 75:19-78:8, 80:5-83:3 (Morisse).

86.    Allegiant knew that its name appeared on the preneed funeral contracts NPS sold to Missouri consumers.  Trial Tr. Vol. 6B at 89:4-17 (Morisse); *see also* Exs. P-1345 & P-1418. Allegiant also knew that the NPS Preneed Trusts were supposed to be holding Lincoln life insurance policies worth millions of dollars.  *E.g.*, Trial Tr. Vol. 3B at 34:11-35:3 (Morisse). Allegiant nonetheless failed to maintain or review even a single example of a preneed contract or Lincoln life insurance policy during its tenure as trustee.  Trial Tr. Vol. 3B at 30:21-25, 41:20-25 (Morisse).

87.    "Allegiant did nothing required of it under Chapter 436 to account for the [consumers' and funeral homes'] money.  It kept no reconciliation of records, did not identify pre-need contracts with fully paid up life insurance policies, and incredibly, did not know NPS was paying small premiums on life insurance policies, allowing the Cassitys to withdraw the difference between the fully paid-up pre-need contract and the small premium, which would go on until the death of the consumer, requiring more new consumer money in the future."  ECF No. 2504, at 13.

88.    In short, the Court finds that Allegiant breached its recordkeeping obligations. Allegiant's failure to maintain adequate records and accountings relating to trust transactions and assets was a breach of trust.

89.    Allegiant's conduct in failing to perform the statutorily-required recordkeeping and reconciliations was recklessly indifferent to the rights of the trusts' beneficiaries.

21

90.     Allegiant's failure to maintain adequate records and accountings relating to trust transactions and assets resulted in losses to the NPS Preneed Trusts in an amount to be later determined and quantified.

**L.      Allegiant's Failure to Ensure that the Trust Assets Were Prudently Invested**

91.     Allegiant understood that no funds could be distributed from the NPS Preneed Trusts for investment purposes unless those investments were within the "authority of a reasonably prudent trustee to invest it."  Trial Tr. Vol. 4A at 57:17-58:7 (Morisse).

92.     Allegiant, however, took no steps to monitor the NPS Preneed Trusts' assets or ensure that the trusts' assets were prudently invested.  Trial Tr. Vol. 4A at 40:7-9, 79:11-80:3, 118:4-17, 120:19-22 (Morisse); Trial Tr. Vol. 5A at 120:2-10 (Morisse); Trial Tr. Vol. 5B at 24:7-25:5 (Morisse).

93.     Even though Morisse's superiors at Allegiant expected him to understand the quality of the assets in the NPS Preneed Trusts, *see, e.g.*, Trial Tr. Vol. 3A at 16:7-15 (Hayes), Morisse testified that it made no difference to him whether the investment decisions for the trusts were prudent or imprudent.  Trial Tr. Vol. 5B at 24:3-10 (Morisse).

94.     Allegiant failed to take even remedial measures to evaluate whether the NPS Preneed Trusts' assets were being prudently invested, including Allegiant's failure to review Lincoln's ratings or evaluate NPS's ability to repay the "IOUs" that Allegiant booked as assets of the trusts.  Trial Tr. Vol. 3B at 37:2-38:5 (Morisse); Trial Tr. Vol. 5B at 24:11-25:5 (Morisse); Trial Tr. Vol. 7B at 56:16-20 (Morisse).

95.     Allegiant's failure to ensure that the NPS Preneed Trusts' assets were prudently invested was a breach of trust.

22

96.     Allegiant's conduct in failing to ensure that the NPS Preneed Trusts' assets were prudently invested was recklessly indifferent to the rights of the trusts' beneficiaries.

97.     Allegiant's failure to ensure that the NPS Preneed Trusts' assets were prudently invested resulted in losses to the trusts in an amount to be later determined and quantified.

**M.     Lincoln Life Insurance Policies as Assets of the Trusts**

98.     During the course of Allegiant's tenure as trustee, "Allegiant purchased thousands of Lincoln life insurance policies under the auspices they were investments."  ECF No. 2504, at 7; *see also* Ex. P-106 at 300-366 (Trust II 2003 year-end policy listing), 371-503 (Trust III 2003 year-end policy listing), 601-1344 (Trust IV 2003 year-end policy listing), 1348-1359 (Trust V 2003 year-end policy listing).

99.     Between August 1998 (when Allegiant took over as trustee) and May 2004 (when Allegiant resigned as trustee), the reported value of Trust IV's Lincoln life insurance policies alone grew from roughly $50 million to $131 million.  Ex. P-0101D at 2, 1598.

100.     Allegiant never requested or received any of the Lincoln policies.  Instead, Allegiant agreed to accept merely "evidence" of insurance from NPS.  Trial Tr. Vol. 3B at 40:23-41:1, 41:20-25 (Morisse); Trial Tr. Vol. 4B at 51:21-52:7, 59:1-10 (Morisse).

*i.     Allegiant Uses Face Value Rather than Market Value*

101.     Chapter 436 required Allegiant to value the assets of the NPS Preneed Trusts at their "market" value.  Trial Tr. Vol. 12 at 40:15-16 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 179:10-18, 180:9-16); Ex. P-1328 at 10.   Allegiant ignored this requirement, and instead valued the trusts' Lincoln life insurance policies at their "face" values.  Trial Tr. Vol. 12 at 40:17-19 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 189:2-6, 9-13, 16); Trial Tr. Vol. 5B at 31:13-20 (Morisse).

102.     Astoundingly, Morisse testified that he never knew or understood what market value meant.  Trial Tr. Vol. 6B at 10:25-11:4 (Morisse); *see also* ECF No. 2504, at 7.

23

103.    During Allegiant's period as trustee of the NPS Preneed Trusts, the trusts' Lincoln life insurance policies were worth less than their face values.  Trial Tr. Vol. 11B at 7:2-18, 8:14-22 (Lumpkin).  As a result, Lincoln typically paid less than the policies' face values when the Missouri consumers died.  Trial Tr. Vol. 11A at 128:19-129:24 (Lumpkin).  Lincoln's Chief Operating Officer testified that it "doesn't make any sense" to value the trusts' Lincoln policies at their face value because it would be analogous to an individual buying a million-dollar policy, making one premium payment, and then calling himself a millionaire.  Trial Tr. Vol. 11B at 8:14-22 (Lumpkin).

104.    Neither NPS nor Lincoln ever represented to Allegiant that the trusts' Lincoln policies were worth their face values.  Trial Tr. Vol. 6B at 33:9-14 (Morisse); Trial Tr. Vol. 11B at 8:2-13 (Lumpkin).

105.    Allegiant had the ability to value life insurance policies at market value. Allegiant's trust statements properly reflected market value, rather than face value, for life insurance policies issued by companies other than Lincoln.  Trial Tr. Vol. 7B at 52:4-53:18 (Morisse); *see also* ECF No. 2504, at 7.

106.    The Court finds that Allegiant "over-valued" the trusts' life insurance policies, "making it appear as if the trusts held millions more in assets when, in fact, the money was gone."  ECF No. 2505, at 9.

107.    Allegiant's conduct in valuing the NPS Preneed Trusts' Lincoln life insurance policies at face value was a breach of trust.

108.    Allegiant's conduct in agreeing to value the NPS Preneed Trusts' Lincoln policies at their face values, and in not acquiring an understanding of what market value meant under Chapter 436, was recklessly indifferent to the rights of the trusts' beneficiaries.

24

109.    Allegiant's conduct in valuing the NPS Preneed Trusts' Lincoln life insurance policies at face value resulted in losses to the trusts in an amount to be later determined and quantified.

### ii.    Allegiant Allows Mismatching

110.    During Allegiant's tenure as trustee, over 21,000 paid-in-full Missouri preneed contracts were backed with Lincoln life insurance policies that required premiums payable over a period of years.  Ex. P-1641; Trial Tr. Vol. 11A at 107:5-16, 114:22-115:7, 118:24-119:5 (Lumpkin).

111.    This "mismatching" practice allowed the NPS Pre-Need Trusts to pay a small amount of initial premiums to Lincoln in order to purchase a large "face amount" of coverage. Trial Tr. Vol. 11A at 105:20-106:2 (Lumpkin).  However, the mismatched policies required premium payments over the life of the policy that greatly exceeded the amount of funds deposited into the NPS Pre-Need Trusts from the consumer.  *Id.* at 110:15-111:17; *see also* Trial Tr. Vol. 6B at 19:5-11, 20:25-21:16 (Morisse); ECF No. 2504, at 9.  As a result, new money coming into the trusts was being used to pay premiums on existing life insurance policies for other consumers.  Trial Tr. Vol. 12 at 132:16 (Wulf 5/1/2014 Dep. Tr. at 502:19-23).

112.    Allegiant "allowed mismatching of insurance policies to occur during its tenure," and this practice "allow[ed] the Cassitys to siphon millions of dollars from the trusts."  ECF No. 2505, at 9.

113.    National City Bank's own witnesses conceded that insurance policies whose premium terms far exceed the policies' face values are imprudent and "ridiculous" investments. Trial Tr. Vol. 17A at 81:16-21 (Koch 1/15/2015 Dep. Tr. at 52:20-24, 53:1-4, 6-10, 12-13, 15-19, 21-22).  Even Wulf, the purported investment advisor to the trusts, testified that the

imprudent nature of the mismatched policies put the trusts "behind the 8-ball."  Trial Tr. Vol. 12 at 132:21-22 (Wulf 5/1/2014 Dep. Tr. at 512:4-6, 512:8-513:2).

114.    The mismatching practice presented clear "concern" that the NPS Preneed Trusts "would eventually not have the money to make the[] premium payments."  Trial Tr. Vol. 11A at 110:15-111:17 (Lumpkin).  The mismatched policies that were purchased by the trusts during Allegiant's period as trustee presented significant risk to the Missouri consumers who were beneficiaries of the trusts.  *Id.* at 112:18-113:9.

115.    The NPS Preneed Trusts were paying excessively high premiums to Lincoln during Allegiant's tenure as trustee.  The trusts could have purchased "the same coverage under a similar plan for a cheaper amount from a different life insurance company" that was not owned by the Cassitys.  Trial Tr. Vol. 11A at 116:12-24 (Lumpkin).

116.    Doug Cassity and Randy Sutton—rather than Wulf—directed the NPS Preneed Trusts' purchases of mismatched Lincoln policies.  Trial Tr. Vol. 11A at 99:15-100:13, 107:9-16 (Lumpkin).  Wulf testified that he never directed the mismatching of the NPS Preneed Trusts' Lincoln policies because premium payments were "too complex" for him.  Trial Tr. Vol. 12 at 132:11-14, 21-23; Trial Tr. Vol. 13A at 36:24-25 (Wulf 5/1/2014 Dep. Tr. at 494:24-495:2, 495:7-12, 495:14-496:10, 496:12-19, 512:4-6, 8-14, 513:3-14, 16-18).  Wulf did not consider the NPS Preneed Trusts' life insurance policy assets to be under his management.  Trial Tr. Vol. 12 at 133:13-21 (Wulf 5/1/2014 Dep. Tr. at 548:13-21).

117.    Allegiant failed to implement any form of system to track the premiums owed by the NPS Preneed Trusts on the trusts' Lincoln policies.  Allegiant instead simply assumed that every insurance policy was fully paid-up and required no premiums.  Trial Tr. Vol. 3B at 54:1-3, 54:10-20, 55:7-56:1 (Morisse); ECF No. 2504, at 9.

118.    Lincoln never represented to Allegiant that the NPS Preneed Trusts' life insurance policies were fully paid-up.  Trial Tr. Vol. 11A at 104:17-105:2 (Lumpkin).

119.    Allegiant inexplicably believed that all of the NPS Preneed Trusts' Lincoln policies were fully paid-up despite routinely receiving documents that showed the trusts owed millions of dollars in monthly renewal premium payments.  Trial Tr. Vol. 6B at 23:16-27:18 (Morisse).

120.    During Allegiant's period as trustee, the NPS Preneed Trusts became unable to meet the premium obligations that resulted from the mismatching scheme.  Trial Tr. Vol. 11A at 123:22-125:18 (Lumpkin).

121.    It was foreseeable and inevitable that many of the NPS Pre-Need Trusts' Lincoln policies would lapse due to the mismatching that occurred under Allegiant's watch as trustee. Trial Tr. Vol. 11A at 146:19-147:12 (Lumpkin).

122.    As a result of Allegiant's failure to address mismatching, approximately 17,000 Lincoln life insurance policies lapsed due to the NPS Preneed Trusts' inability to meet their premium obligations.  Trial Ex. P-1628, Trial Tr. Vol. 11A at 125:15-25, 148:22-149:21 (Lumpkin); *see also* ECF No. 2504, at 10.

123.    In addition, the "insolvency of Lincoln, Memorial, and NPS was inevitable due to the mismatching scheme which occurred on Allegiant's watch."  ECF No. 2505, at 22.

124.    The Court finds that Allegiant facilitated and enabled the mismatching scheme by, among other things, failing to maintain records relating to the premium terms of the trusts' Lincoln policies and by ignoring the key documents in its possession which revealed the trusts' significant and unfunded premium obligations.  *See, e.g.*, Trial Tr. Vol. 3B at 54:1-3, 54:10-20, 55:7-56:1 (Morisse); Trial Tr. Vol. 6B at 23:16-27:18 (Morisse).

125.    The Court finds that the "mismatched" Lincoln policies were imprudent investments for the trusts.

126.    The Court also finds that the trusts' purchases of Lincoln policies during Allegiant's period as trustee were imprudent because the trusts could have purchased the same amount of coverage from a different life insurance company that was not owned by the Cassitys for less money.  Trial Tr. Vol. 11A at 116:12-24 (Lumpkin).

127.    Allegiant's failure to maintain records or a system to track the trusts' premium obligations was a breach of trust.

128.    Allegiant's failure to understand that it was routinely wiring out of the NPS Preneed Trusts to pay renewal premiums on the trusts' Lincoln policies was a breach of trust.

129.    Allegiant's conduct in failing to maintain records relating to the trusts' premium obligations, and routinely wiring "renewal premiums" out of the trusts to Lincoln without reviewing the wire transfer documents in its possession,  enabled the mismatching scheme and was recklessly indifferent to the rights of the trusts' beneficiaries.

130.     Allegiant's breaches of trust, which enabled the mismatching scheme, resulted in losses to the NPS Preneed Trusts in an amount to be later determined and quantified.

### iii.    Allegiant Allows Policy Loans

131.    More than $25 million in policy loans were taken against the NPS Preneed Trusts' Lincoln policies during Allegiant's tenure as trustee.  Trial Tr. Vol. 11A at 137:16-23 (Lumpkin); Ex. P-1622.

132.    All of the policy loans taken against the NPS Preneed Trusts' Lincoln policies during Allegiant's period as trustee were taken at the direction of Randy Sutton or Doug Cassity.  Trial Tr. Vol. 11A at 138:20-24, 145:11-23 (Lumpkin).

133.    Allegiant knew that policy loans would serve to deplete the value of the trusts' Lincoln policies, yet Allegiant chose not to implement any system to prevent policy loans.  Trial Tr. Vol. 4B at 82:18-23, 83:5-22 (Morisse); Trial Tr. Vol. 12 at 43:11-12 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 249:11-13, 15).

134.    While serving as trustee, Allegiant received "clear notice" of policy loans being taken against the NPS Preneed Trusts' Lincoln policies.  Trial Tr. Vol. 12 at 43:6-10 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 247:22-248:9, 11-14, 16-21, 23).  NPS and Lincoln made no efforts to conceal the policy loans from Allegiant.   Trial Tr. Vol. 11A at 133:17-23 (Lumpkin); Trial Tr. Vol. 9B at 96:15-20 (Markow).

135.    Allegiant routinely received documents showing that millions of dollars in policy loan proceeds were being transferred through the NPS Pre-Need Trusts.  Trial Tr. Vol. 4B at 114:16-115:3 (Morisse); Trial Tr. Vol. 11A at 134:22-135:5 (Lumpkin); *see also*, *e.g.*, Exs. P-0028, P-0039 & P-0050.

136.    Allegiant should have recognized the policy loan transactions and associated wire transfer forms in its possession as significant "red flags" that were related to policy loans.  Trial Tr. Vol. 12 at 43:4-8 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 247:8-10, 12, 22-248:9, 11-14, 16); Trial Tr. Vol. 9B at 97:1-16 (Markow).

137.    Under Allegiant's watch as trustee, policy loan proceeds were often used to pay the premiums on the NPS Preneed Trusts' Lincoln policies that were owed as a result of the mismatching scheme.  Trial Tr. Vol. 11A at 141:3-22 (Lumpkin).  This practice of taking policy loans to pay premiums presented additional risk to the Missouri consumers who were beneficiaries of the NPS Preneed Trusts.  *Id.* at 142:7-21.

138.    The Court finds that Allegiant facilitated and enabled the Cassitys' practice of taking policy loans against the NPS Preneed Trusts' Lincoln policies by, among other things, failing to control the trust assets, failing to record the trust transactions, failing to review or scrutinize the trusts' wire transfer activity, and by ignoring the policy loan documents in its possession.

139.    Allegiant's failure to implement control and recordkeeping systems sufficient to identify and prevent policy loans was a breach of trust.

140.    Allegiant's failure to recognize or stop the policy loan transactions that occurred under Allegiant's watch as trustee was a breach of trust.

141.    Allegiant's act of ignoring the documents in its possession which provided clear notice of the policy loan activity was a breach of trust.

142.    Allegiant's conduct in failing to review or evaluate the documents in its possession which provided "clear notice" of the policy loans being taken against the trusts' assets was recklessly indifferent to the rights of the trusts' beneficiaries.

143.    Allegiant's breaches of trust, which enabled the policy loans to be taken against the NPS Preneed Trusts' Lincoln policies, resulted in losses to the trusts in an amount to be later determined and quantified.

<em>iv.     Lincoln's Deteriorating Financial Condition</em>

144.    During Allegiant's period as trustee of the NPS Preneed Trusts, Lincoln was not rated by the major insurance ratings services.  Lincoln received a "D+" rating from one rating service that did rate the company, meaning that Lincoln "was a weak company."  Ex. P-0046 at 3; Trial Tr. Vol. 17A at 80:8-10, 13-14, 81:3-5 (Koch 1/15/2015 Dep. Tr. at 15:9-15, 15:19-16:1, 3, 18:5-19:6, 20:8-10, 27:10-28:4, 6).

145.    While Allegiant served as trustee, National City Bank identified Lincoln's financial condition as troubling and a red flag.  Trial Tr. Vol. 17A at 80:8-10, 23-24 (Koch Dep. Tr. at 15:16-17, 15:19-16:1, 3, 25:9-12, 16-17).  National City confirmed during Allegiant's period as trustee that Lincoln was a "financially ailing" and "weak" company whose financial status was "deteriorating."  *Id.* at 80:8, 14, 20-22, 81:6-7 (Koch Dep. Tr. at 15:9-17, 20:8-10, 24:8-14, 16-21, 23, 30:4-19, 21); Ex. P-0046 at 3.

146.    Allegiant knew while serving as trustee that Lincoln was losing significant amounts of money and was not financially sound.  Trial Tr. Vol. 4A at 99:13-23, 101:3-22 (Morisse); Ex. P-573.

147.    In light of Lincoln's deteriorating financial condition during Allegiant's period as trustee, the Court finds that the trusts' investments in Lincoln policies were imprudent.

148.    Allegiant's failure to investigate Lincoln's financial condition at the beginning of its trusteeship was a breach of trust, especially in light of Allegiant's knowledge that practically all of the trusts' assets were in the form of Lincoln policies.

149.    Allegiant's failure to recognize the red flags associated with NPS and Lincoln being affiliated entities was a breach of trust.

150.    Allegiant's failure to take any action to protect the trust beneficiaries upon learning that Lincoln was not a financially-sound company was a breach of trust.  *See* Trial Tr. Vol. 4A at 99:13-23, 101:3-22 (Morisse); Ex. P-573.

151.    Allegiant's act of allowing the NPS Preneed Trusts to continue investing almost exclusively in Lincoln policies after learning that Lincoln was not financially sound was a breach of trust.

152.    Allegiant's conduct in failing to investigate Lincoln's financial condition at the outset of its tenure of trustee was recklessly indifferent to the rights of the trusts' beneficiaries.

153.    Allegiant's conduct in allowing the NPS Preneed Trusts to continue investing almost exclusively in Lincoln policies after learning that Lincoln was not financially sound was recklessly indifferent to the rights of the trusts' beneficiaries.

154.    Allegiant's breaches of trust relating to its failure to investigate Lincoln's financial condition at the outset of its trusteeship, and its conduct in permitting the trusts to continue investing in Lincoln policies upon learning that Lincoln was not a financially-sound company, resulted in losses to the NPS Preneed Trusts in an amount to be later determined and quantified.

N.    **Wire Transfers from the Trusts With Nothing Received in Return**

i.    *Wires to NPS*

155.    Allegiant knew that it was only permitted to distribute trust funds to NPS under the specific circumstances authorized by Chapter 436 and the trust agreements. *See, e.g.*, Trial Tr. Vol. 5B at 26:19-27:2, 28:3-17 (Morisse).

156.    Indeed, during Allegiant's period as trustee, money could not leave the NPS Preneed Trusts without Allegiant's participation.  NPS could only access the trusts' preneed funds if Allegiant agreed to transfer the trust funds to NPS.  Trial Tr. Vol. 9B at 71:9-72:4 (Markow).

157.    Allegiant disregarded the Chapter 436 requirements governing distributions of trust principal to NPS.  Instead, Allegiant routinely transferred trust funds to NPS without any explanation or justification for the transfers. *See, e.g.*, Ex. P-0101D at 52 ($1,027,463.22 wire to NPS without explanation), 559 ($200,000 wire to NPS without explanation), & 1494

32

($1,230,000 wire to NPS without explanation); *see also* Trial Tr. Vol. 5B at 39:9-24, 43:21-44:20 (Morisse).

158.    In many cases, Allegiant willingly transferred preneed funds out of the NPS Preneed Trusts to NPS's checking account held at Allegiant Bank without any form of explanation.  Trial Tr. Vol. 5B at 32:6-33:11, 38:9-24 (Morisse); *see also, e.g.*, Ex. P-104 at 299 ($812,995.58 wire to NPS's Allegiant Bank checking account without explanation), & 914 ($344,000 wire to NPS's Allegiant Bank checking account without explanation).

159.    Allegiant never took any steps to confirm whether the NPS Preneed Trusts received anything in return for the wire transfers to NPS.  Trial Tr. Vol. 5B at 43:2-44:7 (Morisse).

160.    Wulf did not direct the wire transfers to NPS, and instead conceded that these wires were "clearly not an investment."  Trial Tr. Vol. 12 at 131:6-7 (Wulf 5/1/2014 Dep. Tr. at 464:12-465:5, 7-9).

161.    The Court finds that Allegiant's wire transfers of trust principal to NPS were not prudent.

162.    The Court finds that Allegiant failed to protect the interests of the consumer and funeral home beneficiaries by wiring trust principal to NPS without first confirming that the wires were permissible under Chapter 436.

163.    Allegiant's failure to confirm that the wire transfers to NPS were permissible under Chapter 436 was a breach of trust.

164.    Allegiant's failure to confirm or investigate whether the NPS Preneed Trusts received anything in return for the wire transfers to NPS was a breach of trust.

165.     Allegiant's conduct in failing to confirm whether the wire transfers of trust principal to NPS were permissible under Chapter 436, and failing to investigate whether the trusts received any form of asset or repayment from NPS in exchange for the wire transfers, was recklessly indifferent to the rights of the trusts' beneficiaries.

166.     Allegiant's failure to confirm whether the wire transfers of trust principal to NPS were permissible under Chapter 436 and failure to investigate whether the trusts received any form of asset or repayment from NPS in exchange for the wire transfers resulted in losses to the trusts in an amount to be later determined and quantified.

### ii.     *Wires to Other Cassity Entities*

167.     Besides NPS and Lincoln, Allegiant also knew that the Cassity family owned and controlled a series of other companies.  These additional Cassity-owned entities included Forever Enterprises, Forever Network, and Hollywood Forever.  Trial Tr. Vol. 4A at 108:1-6, 113:18-114:14, 115:8-116:8 (Morisse).

168.     During its tenure as trustee of the NPS Preneed Trusts, Allegiant routinely transferred trust funds to Forever Enterprises, Hollywood Forever, and other entities owned and controlled by the Cassitys without any explanation or justification for the transfers.  *See, e.g.*, Trial Tr. Vol. 4B at 119:9-12 (Morisse); Trial Tr. Vol. 5B at 9:18-10:8, 10:24-11:5, 19:12-20:2 (Morisse); *see also* Ex. P-104 at 458, 1008, 1093, & 1079 (examples of wire transfers to Cassity entities with no explanation).

169.     Despite routinely transferring trust funds to the Cassity entities, Allegiant established a system under which it never reviewed its own records to confirm whether the NPS Preneed Trusts received any form of asset or repayment in return for the wire transfers.  Trial Tr.

Vol. 5A at 116:10-117:3 (Morisse); Trial Tr. Vol. 5B at 7:19-8:8, 17:10-12, 41:5-8, 42:23-43:20 (Morisse).

170.    The NPS Preneed Trusts, in fact, never received any form of assets or repayment in return for many of the wire transfers to the Cassity entities that were executed by Allegiant. *See, e.g.*, Trial Tr. Vol. 5A at 122:19-123:2, 124:1-11, 124:18-20 (Morisse); Trial Tr. Vol. 5B at 12:17-13:5 (Morisse).

171.    Wulf "had no involvement in directing" any of the wire transfers to the Cassity companies from the NPS Preneed Trusts.  Trial Tr. Vol. 12 at 130:21-24, 131:17-18 (Wulf 5/1/2014 Dep. Tr. at 455:16-21, 456:3-14, 456:16-22, 456:25-457:1, 474:22-475:4, 475:6-13).

172.    Allegiant's conduct in wiring money out of the NPS Preneed Trusts to the various Cassity entities without any form of scrutiny or review was a breach of trust.

173.    Allegiant's failure to investigate whether the trusts received any form of repayment or assets in return for the transfers to the Cassity entities was a breach of trust.

174.    Allegiant's conduct in wiring preneed funds from the NPS Preneed Trusts to the various Cassity entities without performing any scrutiny or review of the wire requests, and without confirming whether the trusts received anything in return for the wire transfers, was recklessly indifferent to the rights of the trusts' beneficiaries.

175.    Allegiant's conduct in wiring preneed funds from the NPS Preneed Trusts to the various Cassity entities without performing any scrutiny or review of the wire requests, and without confirming whether the trusts received anything in return for the wire transfers, resulted in losses to the trust in an amount to be later determined and quantified.

### O.    Promissory Notes from the Cassity Entities

176.    In addition to the millions of dollars in preneed funds that Allegiant transferred to the Cassity entities without requesting any form of asset or repayment in return, Allegiant also

"loaned" millions of dollars from the NPS Preneed Trusts to the Cassity entities in exchange for promissory notes.  *See, e.g.*, Exs. P-562 & P-534; *see also* Ex. P-0101D at 1100-01.

177.    Allegiant never questioned the millions of dollars in preneed funds being loaned to the Cassity entities from the NPS Preneed Trusts during its trusteeship.  Trial Tr. Vol. 4A at 120:5-22 (Morisse); Trial Tr. Vol. 4B at 35:16-37:3 (Morisse).

178.    Although Allegiant received promissory notes in exchange for some of the wire transfers to the Cassity entities, Allegiant never reviewed the repayment terms of the notes or evaluated whether the notes contained sufficient collateral.  Trial Tr. Vol. 6A at 19:9-20:2, 20:19-21:8, 23:7-18, 24:1-10, 33:15-21 (Morisse).

179.    The promissory notes that Allegiant booked as assets of the NPS Preneed Trusts often contained little or no security, and included repayment terms that were designed to benefit the Cassitys at the detriment of the trusts.  Trial Tr. Vol. 9B at 86:20-87:7 (Markow); Trial Tr. Vol. 12 at 118:5-6 (Hollywood Forever 30(b)(6) Dep. Tr. (T. Cassity) at 108:12-19, 21).

180.    Wulf did not direct or participate in the NPS Preneed Trusts' promissory note transactions.  Trial Tr. Vol. 12 at 134:8-10 (Wulf 5/1/2014 Dep. Tr. at 556:9-10, 556:12-557:11, 13-22).

181.    Had Allegiant reviewed the promissory note documents that were in its possession, Allegiant would have discovered that trust funds were even being used to purchase residential properties from Doug and Rhonda Cassity.  Trial Tr. Vol. 12 at 45:21 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 358:4-17); Trial Tr. Vol. 6A at 28:5-11 (Morisse).

182.    Morisse's superiors at Allegiant acknowledged that the NPS Preneed Trusts' loans and promissory notes were "highly unusual" and "troubling" transactions that Morisse

should have recognized as red flags.  Trial Tr. Vol. 3A at 42:9-44:11 (Hayes); Trial Tr. Vol. 9B at 87:24-88:13 (Markow).

183.    Even when the Cassity companies made payments to the NPS Preneed Trusts on the promissory notes, Allegiant allowed the Cassitys to re-take these and other proceeds back out of the trusts.  Trial Tr. Vol. 20 at 127:12-24 (Rock); Trial Tr. Vol. 7B at 77:4-18 (Morisse).

184.    Allegiant permitted the Cassity entities to take "loans" out of the NPS Preneed Trusts despite knowing that these entities were not financially sound and that Allegiant Bank refused to loan the bank's money to the Cassity companies.  For instance, on December 14, 2001, Morisse learned that Allegiant Bank denied a loan request from the Cassity companies because the companies were losing money and the bank could "not get comfortable with the cash flow of the whole organization."  Trial Tr. Vol. 4A at 99:13-23, 101:3-22 (Morisse); Ex. P-573.

185.    Although Allegiant Bank was unwilling to lend the bank's money to the Cassity entities, Morisse and Allegiant allowed these same companies to take the money out of NPS Pre-Need Trust IV less than a week later.  Trial Tr. Vol. 4A at 107:17-108:10, 109:10-23 (Morisse); Ex. P-562.

186.    Allegiant continued to loan preneed funds out of the trusts to the Cassity companies throughout its tenure as trustee without ever considering whether the transactions were prudent.  Trial Tr. Vol. 4A at 120:5-22 (Morisse); Trial Tr. Vol. 4B at 35:16-37:3 (Morisse).

187.    "[B]ecause Allegiant's trust department kept no independent records and approved all requested wire transfers of NPS without questioning their purpose, the Cassitys borrowed vast sums of money, in most cases without collateral from the trusts.  In unusual cases, when the Cassitys offered collateral, it was inadequate for the loan."  ECF No. 2504, at 14.

188.    The Cassity entities were not financially sound, and the NPS Preneed Trusts' loans to these entities were imprudent investments.

189.    Allegiant's conduct in permitting the Cassity companies to take "loans" from the NPS Preneed Trusts was a breach of trust, especially in light of Allegiant's knowledge that these entities were not financially sound.

190.    Allegiant's failure to review or evaluate the promissory notes' repayment terms or collateral was a breach of trust.

191.    Allegiant's failure to investigate whether the Cassity entities were repaying the loans to the trusts was a breach of trust.

192.    Allegiant's conduct in wiring funds out of the NPS Preneed Trusts to purchase residential property from Doug and Rhonda Cassity was a breach of trust.  Trial Tr. Vol. 12 at 45:21 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 358:4-17); Trial Tr. Vol. 6A at 28:5-11 (Morisse).

193.    Allegiant's conduct in permitting the trusts to loan money to Cassity entities which Allegiant knew were not financially sound, failing to review the repayment and security terms of the promissory notes, failing to confirm whether the Cassity entities were issuing repayments to the trusts, and agreeing to transfer preneed funds out of the trusts for improper purposes such as purchasing property from Doug and Rhonda Cassity, was recklessly indifferent to the rights of the trusts' beneficiaries.

194.    Allegiant's breaches in permitting the trusts to loan money to the Cassity entities, failing to review the repayment and security terms of the promissory notes, failing to confirm whether the Cassity entities were issuing repayments to the trusts, and agreeing to transfer preneed funds out of the trusts for improper purposes such as purchasing property from Doug

and Rhonda Cassity, resulted in losses to the trusts in an amount to be later determined and quantified.

### P.   Debentures

195.   While serving as trustee of the NPS Preneed Trusts, Allegiant accepted and booked a series of "certificates of debenture" from NPS as trust assets.  Trial Tr. Vol. 6A at 47:2-5, 48:8-13 (Morisse); Ex. P-0101A at 307; Ex. P-0101C at 11; *see also* Exs. P-340 & P-453.

196.   Allegiant understood that NPS Preneed Trusts' debentures were merely "IOUs" issued to the trusts by NPS that represented nothing more than pieces of paper acknowledging that NPS owed the trusts money.  Trial Tr. Vol. 3B at 36:7-37:5 (Morisse); Trial Tr. Vol. 6A at 47:12-15, 48:8-16 (Morisse).

197.   Despite this understanding, Allegiant assigned the debentures a total "market value" of nearly $17 million.  Ex. P-0101C at 11; Ex. P-0101A at 307.

198.   Allegiant took no steps during its period as trustee to determine whether the debentures were prudent investments or suitable assets for the NPS Preneed Trusts.  Trial Tr. Vol. 6A at 47:6-15, 47:23-48:7 (Morisse).

199.   Wulf did not direct or participate in the NPS Preneed Trusts' investments in certificates of debenture from NPS.  Trial Tr. Vol. 13A at 26:2 (Wulf 5/1/2014 Dep. Tr. at 568:4-16).

200.   Allegiant knew that NPS was simply increasing the balances of the debentures rather than depositing the requisite amount of preneed funds into the trusts.  Despite this knowledge, Allegiant never investigated the terms of the debentures or confirmed that any repayments on the debentures were ever received by the trusts.  Trial Tr. Vol. 3B at 37:25-38:12 (Morisse); Trial Tr. Vol. 6A at 57:20-58:11 (Morisse); Trial Tr. Vol. 11B at 110:25-111:6 (Hall); *see also* ECF No. 2505, at 9.

39

201.     Allegiant routinely performed "reconciliations" of the NPS Preneed Trusts' certificates of debenture which often increased the amounts of the "IOUs" owed to the trusts by NPS.  Allegiant inexplicably signed these reconciliation forms as having been performed in compliance with Chapter 436.  *See, e.g.*, Ex. P-845 at 2; Trial Tr. Vol. 6A at 56:10-13, 57:4-58:16 (Morisse).

202.     The reported values of the NPS Preneed Trusts' debentures increased by millions of dollars during Allegiant's tenure as trustee.  Ex. P-0101A at 3, 416; Trial Tr. Vol. 7B at 113:11-114:12, 115:10-22 (Morisse).

203.     The NPS Preneed Trusts never received any payments on the debentures while Allegiant served as trustee.  *See, e.g.*, Trial Tr. Vol. 11B at 114:3-8 (Hall).

204.     The NPS Preneed Trusts' certificates of debenture were not prudent investments.

205.     Allegiant's conduct in agreeing to accept and book debentures or "IOUs" from NPS as trust assets was a breach of trust.

206.     Allegiant's failure to review the repayment terms of the debentures was a breach of trust.

207.     Allegiant's failure to ensure that the trusts' "investments" in the debentures were prudent uses of trust funds was a breach of trust.

208.     Allegiant's conduct in assigning a total value of nearly $17 million to the trusts' debentures despite knowing these purported assets were merely "IOUs" from NPS was a breach of trust.

209.     Allegiant's conduct in reconciling the debentures and representing that the debenture reconciliations were in compliance with Chapter 436 was a breach of trust.

210.     Allegiant's conduct in agreeing to increase the balances of the debentures rather than NPS having to deposit preneed funds into the NPS Preneed Trusts was a breach of trust.

211.     Allegiant's failure to notify the consumer and funeral home beneficiaries that NPS had withheld deposits from the trusts and instead increased the balance of an IOU to the trust was a breach of trust.

212.     Allegiant's conduct in agreeing to accept and book "IOUs" from NPS as trust assets, failing to review the repayment terms of the debentures, failing to ensure that the debentures were prudent investments, failing to properly value the debentures at their market values, representing that the debenture reconciliations were being performed in compliance with Chapter 436, and agreeing to increase the debenture balances rather than having NPS deposit preneed funds into the trusts was recklessly indifferent to the rights of the trusts' beneficiaries.

213.     All of Allegiant's breaches of trust associated with the trusts' certificates of debenture resulted in losses to the trusts in an amount to be later determined and quantified.

**Q.    World Service Life Group Term Policy**

214.     In April 2000, Allegiant booked a group term life insurance policy as an asset of NPS Preneed Trust IV.  Trial Tr. Vol. 3B at 62:17-25, 65:11-20 (Morisse); Ex. P-0101D at 249. Allegiant assigned this group term policy a value of $13,522,337.35, and this purported value never changed during Allegiant's period as trustee.  *Id.*

215.     Allegiant was aware that this group term policy was "term" life insurance, meaning that the policy carried no cash value and would become worthless if one premium payment was missed.  Trial Tr. Vol. 3B at 64:10-20 (Morisse); *see also* Trial Tr. Vol. 11B at 21:15-24 (Lumpkin).

41

216.    The group term life insurance policy that was issued to Trust IV in April 2000 was issued by World Service Life Insurance Company, a Cassity-owned company that had been previously acquired by Lincoln.  Trial Tr. Vol. 11B at 23:5-13 (Lumpkin).

217.    Allegiant never made any form of inquiry into this purported $13.5 million group term life insurance policy asset.  Trial Tr. Vol. 3B at 66:10-14 (Morisse); Trial Tr. Vol. 11B at 23:22-24:8 (Lumpkin).

218.    Wulf did not direct or participate in Trust IV's investment in the group term life insurance policy.  Trial Tr. Vol. 12 at 134:4-7 (Wulf 5/1/2014 Dep. Tr. at 554:3-4, 6-9, 11-22, 554:24-555:13).

219.    Shortly after the group term policy was issued to NPS Pre-Need Trust IV in April 2000, the monthly premium was not paid and the policy ceased to exist.  Trial Tr. Vol. 11B at 21:15-22:23 (Lumpkin).

220.    In early 2004, Allegiant learned through National City Bank's due diligence of Allegiant's trust department that nobody, including Lincoln, could provide support or documentation showing that the group term policy existed.  Trial Tr. Vol. 3B at 59:2-11 (Morisse); Trial Tr. Vol. 8B at 12:22 (Jurmanovich 1/8/2015 Dep. Tr. at 56:8-57:1).

221.    Morisse conceded in 2004 that he "didn't have a clue" about this purported $13.5 million asset of Trust IV.  Trial Tr. Vol. 3B at 59:12-16 (Morisse).  Morisse was "embarrassed" that Allegiant had been carrying a $13.5 million asset on the books of Trust IV when in fact the asset did not exist.  *Id*. at 59:17-25.

222.    Allegiant's conduct relating to its administration of the group term policy asset of Trust IV was admittedly "not acceptable" and warranted a "failing grade" from the president of Allegiant Bank.  Trial Tr. Vol. 3B at 60:1-3 (Morisse); Trial Tr. Vol. 3A at 93:6-94:17 (Hayes).

42

223.    The group term policy, given its nature as "term" life insurance, was not a prudent investment.

224.    Allegiant's conduct in valuing the group term policy at its face value, and never adjusting the reported value of this asset, was a breach of trust.

225.    Allegiant's conduct in administering the group term policy, including Allegiant's failure to maintain documentation or support for the policy, was a breach of trust.

226.    Allegiant's failure to track the premium payments and premium obligations relating to the group term policy was a breach of trust.

227.    The Court finds, in sum, that Allegiant failed to control, protect, or maintain proper records relating to the group term policy.  All of these failures represent breaches of trust by Allegiant.

228.    Allegiant's conduct in valuing the group term policy at its face value, never adjusting the value of the policy, failing to maintain records or support for the policy, and failing to monitor the premium obligations or payments on the policy was recklessly indifferent to the rights of the trusts' beneficiaries.

229.    All of Allegiant's breaches associated with the group term policy asset of Trust IV resulted in losses to the trust in an amount to be later determined and quantified.

**R.    Stock Purchases from Forever Enterprises for Above-Market Prices**

230.    In November 1999, Allegiant's trust department opened a custody account for Cassity entity Forever Enterprises.  Herb Morisse simultaneously served as Allegiant's account administrator for the NPS Preneed Trusts and the Forever Enterprises custody account.  Trial Tr. Vol. 4B at 122:5-23 (Morisse).

231.    Forever Enterprises purchased a series of publicly-traded securities in the custody account shortly after the account was opened.  Trial Tr. Vol. 4B at 123:7-9 (Morisse).  The

market value of these publicly-traded securities plummeted shortly after they were purchased by

Forever. *See, e.g.*, Ex. P-454 at 3-4 (January 2000 custody account statement showing difference

between the current market value and cost basis of the account's investments). Allegiant then

allowed NPS Preneed Trust IV to purchase these securities from Forever Enterprises at prices

greatly exceeding market value. *See, e.g.*, Trial Tr. Vol. 5B at 63:9-16 (Morisse).

232.    For instance, on November 15, 2000, Allegiant transferred $70,150 from Trust IV

to Forever Enterprises in exchange for 10,000 shares of Arch Communications common stock.

Trial Tr. Vol. 5B at 61:13-62:4 (Morisse). Trust IV paid $7 per share for the stock even though

Arch stock traded that day on the NASDAQ exchange at a high of $2.25 and a low of $2.03 per

share. *Id.* at 62:7-19. Allegiant's own records showed that Trust IV drastically overpaid for

these securities, and Morisse could not provide any logical explanation for this transaction other

than fraud. *Id.* at 64:23-65:17, 66:20-67:4.

233.    Another example occurred on December 1, 2000, when Allegiant allowed Trust

IV to purchase 2,500 shares of Dell common stock from Forever Enterprises at $50 per share.

Trial Tr. Vol. 5B at 77:5-14 (Morisse). Dell stock traded that day on the NASDAQ exchange at

a high of $20.31 and a low of $18.06 per share. *Id.* at 77:17-24. When asked whether these

transactions were prudent, Morisse testified that he would not personally have paid twice the

market value for these shares. *Id.* at 74:8-11, 77:25-78:11.

234.    On December 14, 2000, Allegiant transferred $100,000 in preneed funds from

Trust IV to Forever Enterprises to purchase 5,000 shares of Conseco common stock from

Forever at $20 per share. Trial Tr. Vol. 5B at 70:8-19 (Morisse). Conseco stock traded that day

on the New York Stock Exchange at a high of $9.19 and a low of $8.69 per share. *Id.* at 71:5-12.

Allegiant's own records demonstrated that Trust IV overpaid for these securities, and Morisse

acknowledged that no sensible person would pay above market value for publicly-traded stock. *Id*. at 72:7-15, 74:8-20.  Shortly after Trust IV overpaid for these securities, the value of Conseco stock plummeted to 41 cents per share.  *Id*. at 75:1-12.

235.    The aforementioned examples are representative of other similar transactions where Allegiant permitted NPS Preneed Trust IV to purchase publicly-traded securities from Forever Enterprises at prices greatly exceeding market value.  *See, e.g.*, Ex. P-0101D at 383-84, 402 (showing various securities being transferred from Forever Enterprises to Trust IV).

236.    These stock transactions were improper and should have been recognized as red flags by Allegiant.  Trial Tr. Vol. 9B at 84:15-85:4 (Markow).  Had Morisse notified his superiors at Allegiant of these improper stock transactions, it would have generated further investigation by Allegiant and likely would have resulted in the transactions being stopped.  *Id*. at 83:1-12, 85:14-22.

237.    The NPS Preneed Trusts' purchases of publicly-traded securities from Forever Enterprises at prices greater than market value were imprudent.

238.    Allegiant's conduct in facilitating and allowing the NPS Preneed Trusts to purchase securities from Forever Enterprises at inflated prices was a breach of trust.

239.    Allegiant's conduct in facilitating and allowing the NPS Preneed Trusts' purchases of securities from Forever Enterprises at inflated prices was recklessly indifferent to the rights of the trusts' beneficiaries.

240.    Allegiant's conduct in facilitating and allowing the NPS Preneed Trusts' purchases of securities from Forever Enterprises at inflated prices resulted in losses to the trusts in an amount to be later determined and quantified.

### S.     Condition of Trusts At the End of Allegiant's Tenure

241.    At the end of Allegiant's tenure as trustee, there were 64,129 Lincoln life insurance policies held by the NPS Preneed Trusts, which backed 48,037 unique NPS preneed contracts.  Ex. P-1907; Trial Tr. Vol. 14A at 108:4-109:2 (Barnard).

242.    At the end of Allegiant's tenure, the approximately 64,000 policies in the NPS Preneed Trusts carried a monthly premium obligation of approximately $2.6 million dollars. Trial Tr. Vol. 14A at 115:3-116:18 (Barnard).

243.    During Allegiant's period as trustee, the reported value of Trust IV assets grew from approximately $52.1 million in 1998 to $154 million in 2004.  P-0101D at 2, 1538-41.

### T.     The Cassity Ponzi-Like Scheme

244.    Expert testimony established that by its nature a Ponzi scheme is a scheme under which a person or entity develops a strategy to convince people to pay money upfront in return for the promise of outsized returns at a later date.  In the process, the schemer diverts the money for an improper purpose, and then uses new money obtained from different people at a later date to satisfy the prior obligations until the scheme inevitably collapses.  Trial Tr. Vol. 18A at 48:2-51:20 (Arnold).

245.    Expert testimony established that the Cassitys orchestrated a "Ponzi-like" scheme in the NPS Preneed Trusts in Missouri and in other states in which NPS conducted business. Trial Tr. Vol. 18A at 52:15-55:7 (Arnold).  The Cassitys' Ponzi-like scheme manifested itself under Allegiant's trusteeship when the Cassitys were able to use consumer money from new Missouri preneed contract sales to pay off old obligations on old contracts.  *Id.* at 54:10-56:5.

246.    By failing to control and protect the NPS Preneed Trust assets, Allegiant enabled the Cassitys' Ponzi-like scheme to continue and flourish.  Trial Tr. Vol. 18A at 55:8-56:5 (Arnold).  Had the Cassitys been unable to access funds in the NPS Preneed Trusts for one group

of Missouri consumers to pay death claims for other unrelated consumers, the Ponzi-like scheme would have collapsed. *Id.* at 56:6-57:7. In short, Allegiant acted as "a vassal of the Cassity crime family," which made the Cassitys' Ponzi-like scheme possible. ECF No. 2505, at 5.

247.    The Cassitys' ability to manipulate the values of the NPS Preneed Trusts' Lincoln policies through policy loans and the "mismatching" scheme under which unsustainable premiums were owed by the trusts was a "key component of the Cassitys' 'Ponzi like' scheme." ECF No. 2504, at 9; Trial Tr. Vol. 18A at 57:8-58:17 (Arnold). The premiums owed by the trusts through the mismatching scheme, "over the years, requiring new money from other customers to keep the Ponzi-like scheme running, far exceeded the amounts paid-in for pre-need contracts." ECF No. 2504, at 13.

248.    Allegiant's conduct "not only permitted, but encouraged the Cassitys, through the Cassity controlled entities, including NPS, to steal millions of dollars of other beneficiaries' funds by the now known, but not surprising, criminal manipulation of NPS." ECF No. 2505, at 9.

249.    Allegiant's conduct in enabling the Cassitys' Ponzi-like scheme involving the NPS Preneed Trusts was a breach of trust.

250.    Allegiant's conduct in enabling the Cassitys' Ponzi-like scheme involving the NPS Preneed Trusts resulted in losses to the trusts in an amount to be later determined and quantified.

### U.    National City Bank Acquisition and Due Diligence of Allegiant

251.    National City Bank announced its plan to acquire Allegiant in November 2003. Ex. P-726; Trial Tr. Vol. 2B at 69:7 (NCB 30(b)(6) Dep. Tr. (Kantra) at 15:17-20). The merger agreement required Allegiant to pay National City a $25 million break-up fee in the event the

merger was not completed, which represented approximately one year's worth of earnings for Allegiant.  Trial Tr. Vol. 3A at 72:22-73:3 (Hayes).

252.    National City knew that it would become liable for Allegiant's conduct following the merger.  Trial Tr. Vol. 12 at 54:21-23 (Plant 1/13/2015 Dep. Tr. at 61:12-17, 61:22-62:3, 62:7-8).

253.    Albert Kantra, National City's integration leader for the Allegiant merger, oversaw National City's due diligence review of Allegiant's trust department.  Trial Tr. Vol. 2B at 69:19 (Kantra 5/22/2014 Dep. Tr. at 56:15-18).  Kantra determined early in National City's due diligence process that "the potential fiduciary liability is huge" for the NPS Preneed Trusts. Ex. P-0038 at 2.  Kantra also identified the "risk" associated with the NPS Preneed Trusts as "extremely high."  Ex. P-0041; Trial Tr. Vol. 2B at 65:1 (Kantra 5/22/2014 Dep. Tr. at 149:10-150:13).

254.    National City, through the due diligence performed on Allegiant's trust department in early 2004, sought to understand how Allegiant had performed its duties in administering the NPS Preneed Trusts.  Trial Tr. Vol. 2B at 69:10-12 (NCB 30(b)(6) Dep. Tr. (Kantra) at 40:3-21, 42:4-12).  The National City integration team worked closely with Morisse in obtaining information regarding Allegiant's administration of the NPS Preneed Trusts and the trust assets.  Trial Tr. Vol. 12 at 46:2 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 388:13-23); Trial Tr. Vol. 7B at 129:18 (Jurmanovich 1/8/2015 Dep. Tr. at 20:13-21:5).

255.    During National City's "audit, many 'red flags' were found related to Allegiant's mismanagement of the trusts, including suspicious transactions and poor financial conditions of Cassity entities."  ECF No. 2504, at 10.

           i.        *National City's Due Diligence on the Trusts' Assets*

256.    National City, through its due diligence efforts, reviewed and became familiar with the NPS Preneed Trusts' assets.  *See, e.g.*, Trial Tr. Vol. 2B at 69:12 (NCB 30(b)(6) Dep. Tr. (Kantra) at 42:4-17).

257.    National City learned in 2004 that NPS and Lincoln were affiliated companies. Trial Tr. Vol. 8B at 20:5 (Sackley 2/7/2014 Dep. Tr. at 78:25-79:8).  This affiliation presented "red flags" due to the obvious "conflicts" that necessitated further investigation.  *Id.* (Sackley 2/7/2014 Dep. Tr. at 79:14-80:6).

258.    National City also identified during its due diligence that the NPS Preneed Trusts were saturated with assets in the form of NPS debentures, loans to the Cassity entities, and life insurance policies issued by a Cassity-owned company.  National City acknowledged that these were not arm's length assets because they were all associated with companies under the Cassity family's ownership and control, and identified the trust assets as having "questionable" value. Trial Tr. Vol. 12 at 57:13-16 (Plant 1/13/2015 Dep. Tr. at 141:1-142:1, 142:4-9, 142:13-16, 142:19-22).

259.    When reviewing the trusts' Lincoln life insurance policy assets, National City's auditors uncovered evidence of the "mismatching" scheme simply by requesting a small sample of NPS preneed contracts and the associated Lincoln life insurance policies.  National City worked through Allegiant to obtain the sample contracts and policies.  Trial Tr. Vol. 8B at 13:2, 14:21, 14:25-15:2 (Jurmanovich 1/8/2015 Dep. Tr. at 64:19-65:2, 102:11-104:17, 116:22-117:3, 117:6-15, 18).

260.    National City performed a comparison of the Missouri consumers' preneed contracts with the associated Lincoln life insurance policies.  Trial Tr. Vol. 7B at 130:3

(Jurmanovich 1/8/2015 Dep. Tr. at 33:4-11).  The random examples selected by National City auditors demonstrated that paid-in-full Missouri preneed contracts were routinely funded with Lincoln life insurance policies requiring premiums payable over many years.  Trial Tr. Vol. 3B at 5:8-19 (Hipskind 5/13/2014 Dep. Tr. at 131:24-132:6, 132:9-133:10, 133:13-16, 133:19-21, 133:24-134:6, 134:9-135:6, 135:9-12, 135:18-137:4, 137:7-9, 137:12, 137:16-138:14, 138:17); *see also, e.g.*, Ex. P-559.

261.    Allegiant too could have uncovered the mismatching scheme had it simply asked for a sample of pre-need funeral contracts and Lincoln policies.  *See, e.g*., Trial Tr. Vol. 6A at 86:14-21, 88:3-89:13 (Morisse); Trial Tr. Vol. 6B at 20:4-21:6 (Morisse).

262.    After reviewing the assets of the NPS Preneed Trusts, National City considered it "critical" to investigate the quality and "soundness" of Lincoln as a company.  Trial Tr. Vol. 8B at 22:2-3, 6 (Sackley 1/9/2015 Dep. Tr. at 48:20-24, 49:3-19, 56:4-15).

263.    National City retained an insurance specialist to review Lincoln's rating and financial condition.  Trial Tr. Vol. 17A at 80:6 (Koch 1/15/2015 Dep. Tr. at 11:13-12:6). Through minimal effort and review of publicly-available information, National City learned that Lincoln appeared to be "financially ailing."  *Id*. at 80:8-10 (Koch 1/15/2015 Dep. Tr. at 15:9-17, 15:19-16:1, 3).  National City was informed that Lincoln "is not rated by any service, is 745th in asset rank, and its financials have been deteriorating.  Its surplus has been reduced by half in the last 2 years."  Ex. P-0046 at 3.

264.    The results of National City's 2004 investigation into Lincoln, which revealed that Lincoln seemed to be financially ailing, were admittedly "troubling" and a "huge red flag" to National City.  Trial Tr. Vol. 8B at 22:12-13 (Sackley 1/9/2015 Dep. Tr. at 64:4-24, 65:2-3).

These results were "especially concerning" because Lincoln policies represented the vast majority of the trusts' assets.  *Id*. at 22:17 (Sackley 1/9/2015 Dep. Tr. at 72:20-73:14).

265.     Allegiant too could have obtained this information regarding Lincoln's troubling financial condition during its tenure as trustee through minimal investigation and effort.

266.     Through its pre-merger due diligence, National City also discovered a complete lack of documentation within Allegiant's trust department to support the $13.5 million group term life insurance policy asset of Trust IV.  *See, e.g.*, Trial Tr. Vol. 8B at 12:25-13:1 (Jurmanovich 1/8/2015 Dep. Tr. at 60:23-61:3, 62:19-63:16).  Morisse admitted to National City that he had "no clue" about this trust asset and was "embarrassed about not knowing anything." Ex. P-0045; Trial Tr. Vol. 3B at 58:13-59:19 (Morisse).  National City's auditors described the lack of activity concerning the group term life insurance policy during Allegiant's trusteeship, as well as Allegiant's lack of support for the asset, as "disturbing" and a "red flag."  Ex. P-0045; Trial Tr. Vol. 8B at 13:1 (Jurmanovich 1/8/2015 Dep. Tr. at 62:19-63:24).

267.     National City also reviewed the trusts' certificates of debenture.  Initially, when National City's auditors asked Morisse what assets backed these debentures, Morisse incorrectly believed that the debentures were backed by life insurance policies.  Trial Tr. Vol. 8B at 13:20 (Jurmanovich 1/8/2015 Dep. Tr. at 87:18-88:2).  After further discussion, however, Allegiant and National City confirmed that there were no insurance policies backing the debentures.  *Id*. at 13:20-21, 24 (Jurmanovich 1/8/2015 Dep. Tr. at 88:3-8, 89:4-9, 90:24-91:3); P-0042 at 2. National City identified Allegiant's valuation of the debentures, as well as Morisse's lack of knowledge concerning the purported assets as red flags.  *Id*. at 13:20-24 (Jurmanovich 1/8/2015 Dep. Tr. at 88:9-17, 89:4-11, 89:15-16, 90:5-15, 90:20-23).

268.     National City's due diligence on the NPS Preneed Trusts raised overall concerns for National City that the trusts' assets were not worth the values being reported by Allegiant. Trial Tr. Vol. 12 at 57:17-20 (Plant 1/13/2015 Dep. Tr. at 144:12-17, 144:19-24, 145:1-3).

269.     The information obtained by National City through Allegiant regarding Allegiant's administration of the NPS Preneed Trusts' assets further confirmed that the trusts' assets were imprudent and that Allegiant failed to control, protect, and keep adequate records concerning the trusts.

     *ii.*      *National City's Due Diligence into Allegiant's Administration of the Trusts*

270.     In his meetings with National City's auditors regarding Allegiant's administration of the NPS Preneed Trusts, Morisse confirmed that Allegiant had "no tracking system" for the Missouri consumer payments and had "no underlying support for funds received versus wires sent out." Ex. P-0043; Trial Tr. Vol. 6B at 106:6-25 (Morisse).  Morisse also told National City that Allegiant did not "know who the deceased is" when wiring money out of the NPS Preneed Trusts.  Ex. P-0045; Trial Tr. Vol. 8B at 13:9 (Jurmanovich 1/8/2015 Dep. Tr. at 71:18-72:4). Allegiant's failure to maintain policy level detail for the consumer and funeral home beneficiaries of the NPS Preneed Trusts was identified by National City as a "red flag" regarding Allegiant's administration of the trusts.  *Id*. at 14:9-14 (Jurmanovich 1/8/2015 Dep. Tr. at 97:25-98:2, 98:5-7, 98:10-17, 20, 98:23-99:4, 7).

271.     National City's due diligence team acknowledged that it was a "red flag" that Allegiant was not performing reconciliations and was instead relying solely upon the information provided by NPS.  Trial Tr. Vol. 8B at 25:5-8 (Sackley 1/9/2015 Dep. Tr. at 141:24-142:19, 143:1-3, 143:6-12, 15); *id*. at 14:14-17 (Jurmanovich 1/8/2015 Dep. Tr. at 99:8-13, 99:16-18, 99:21-23, 100:1).  Allegiant's procedure of taking orders from NPS on how to value the trusts'

assets was another "red flag" to National City, and this procedure would not have been allowed had National City been the trustee.  *Id.* at 14:5-8 (Jurmanovich 1/8/2015 Dep. Tr. at 96:12-23, 97:2-5, 97:8-10, 13).

272.   The information National City obtained regarding Allegiant's mismanagement of the NPS Preneed Trusts came directly from Morisse.  Trial Tr. Vol. 8B at 14:17-20 (Jurmanovich 1/8/2015 Dep. Tr. at 100:2-13, 100:21-23, 101:1-4, 7).

273.   Thomas Plant, National City's in-house counsel, also learned through minimal effort that NPS had previously been sued for operating a "Ponzi scheme."  Ex. P-0047; Trial Tr. Vol. 12 at 53:19-20 (Plant 1/13/2015 Dep. Tr. at 23:18-24:3, 24:7-12).  Plant also learned during National City's due diligence of Allegiant that NPS had previously been accused of not "fully funding" the trusts, and that NPS was comprised of "a group of 'Sleez [sic] balls.'"  Trial Tr. Vol. 12 at 53:23, 54:1 (Plant 1/13/2015 Dep. Tr. at 31:19-32:2, 34:1-11); Ex. P-0047.

274.   Plant wrote in his notes that Allegiant Bank acted "more of a custodian than a trustee."  Trial Tr. Vol. 12 at 54:4-6 (Plant 1/13/2015 Dep. Tr. at 47:9-15, 47:25-48:11, 48:25-49:2); Ex. P-0048.

275.   In sum, the Court finds that the facts relating to National City's due diligence and review of Allegiant's trust department and the NPS Preneed Trusts "explained major problems in the trusts evident in information Allegiant had available to it.  It also provided evidence of Allegiant's trust administration and what information Allegiant could have easily learned which would have raised serious concerns regarding the Cassitys. "  ECF No. 2505, at 25.

## V.   Passing the Trusts to Bremen Bank

276.   Within 30 days after National City began its due diligence of Allegiant's trust department, National City instructed Allegiant to withdraw as trustee of the NPS Preneed Trusts. Ex. P-771; Trial Tr. Vol. 6B at 129:13-130:3 (Morisse); Trial Tr. Vol. 12 at 46:4-5 (NCB

30(b)(6) Dep. Tr. (Quiroga) at 400:25-401:2, 401:5-22); Trial Tr. Vol. 2B at 65:8 (Kantra 5/22/2014 Dep. Tr. at 166:7-14).

277.    "Faced with the risk of being required to pay National City Bank the $25 million break-up fee, Allegiant did nothing to correct potential liability or advise its successor trustee, Bremen Bank, of the potential liability posed by the pre-need trusts, thereby perpetuating the fraudulent scheme."  ECF No. 2504, at 11.

278.    In accordance with National City's instruction that Allegiant was to find a successor trustee before the merger closed, Morisse contacted Markow about his interest in taking the NPS trust business at Bremen Bank.  Trial Tr. Vol. 9B at 104:18-25 (Markow).

279.    In 2004, while Allegiant was still acting as trustee of the NPS Preneed Trusts, Morisse participated in multiple meetings with Bremen's trust department regarding details concerning Bremen taking over as successor trustee.  Trial Tr. Vol. 9B at 107:2-18 (Markow); Trial Tr. Vol. 10B at 63:6-64:8 (Stuart).

280.    At the time of these meetings between Morisse and Bremen, Allegiant still owed fiduciary duties to the beneficiaries of the NPS Preneed Trusts, which included the Missouri preneed consumer and funeral home beneficiaries.

281.    During Morisse's meetings with Bremen, Morisse provided instructions to Bremen regarding how the NPS Preneed Trusts were to be administered.  Morisse instructed Bremen, for instance, to duplicate the information and format of Allegiant's trust statements. Trial Tr. Vol. 10B at 64:9-65:10 (Stuart).  Morisse also told Bremen to execute wire transfers "immediately" because "NPS liked to have things done as soon as possible."  *Id*. at 65:11-20, 70:18-21.  Morisse further explained during his meetings with Bremen that Bremen should report insurance values as provided by NPS without any independent reconciliation or verification by

54

Bremen, and that Bremen should simply distribute "the income out that was on the books" rather than performing the calculation in accordance with Chapter 436. *Id.* at 68:5-70:3, 77:11-78:5.

282.    The Court finds that Allegiant taught "the successor trustee to handle the trusts in the same way" Allegiant had. ECF No. 2505, at 22. "With his job intact at National City Bank, Mr. Morisse actually went to Bremen Bank's offices and instructed its employees to administer the trusts in the same manner as Allegiant had done." ECF No. 2504, at 11-12.

283.    Allegiant failed to inform Bremen, the successor trustee, of the known problems that existed with the NPS Preneed Trusts and their assets. For example, despite knowing that that there was no support for Trust IV's group term policy asset, Allegiant continued to carry this policy as a trust asset with a purported value of $13.5 million on its trust statements. Bremen Bank, the successor trustee, relied on Allegiant's misrepresentations with regard to this purported $13.5 million asset. Trial Tr. Vol. 3B at 5:3-5 (Hipskind 5/13/2014 Dep. Tr. at 118:12-15, 118:19-119:24, 120:1-121:18); Trial Tr. Vol. 3B at 69:15-21, 70:5-19 (Morisse); Trial Tr. Vol. 10B at 79:8-80:13 (Stuart); *see also* P-0101D at 1598.

284.    Allegiant similarly continued to misrepresent the value of the NPS Preneed Trusts' debentures on its trust statements despite knowing there were no underlying insurance policies or other assets in support of the debentures. *See, e.g.*, Exs. P-0101A at 416 & P-0101C at 360; *see also* Trial Tr. Vol. 9B at 113:5-11 (Markow).

285.    The Court finds that Allegiant's trust statements issued in 2004 after Allegiant learned of the problems associated with the NPS Preneed Trusts and the trusts' assets were intentionally false and issued to disguise the known problems from the successor trustee. *See, e.g.*, Trial Tr. Vol. 10B at 64:9-65:10, 65: 21-66:19, 67:21-69:22 (Stuart) (Allegiant instructed Bremen to "duplicate" the information on Allegiant's trust statements).

286.    Janice Sackley, National City's fiduciary risk manager and a key member of National City's due diligence team, testified that it was improper to pass off inaccurate trust statements to a potential successor trustee without disclosing the known problems with the trusts' assets. Trial Tr. Vol. 8B at 25:3-4 (Sackley 1/9/2015 Dep. Tr. at 139:21-140:8, 140:11).

287.    Shaun Hayes, the President of Allegiant Bank, provided additional testimony at trial acknowledging that the beneficiaries of the NPS Preneed Trusts should have been informed of the known problems and red flags associated with the trusts.  Trial Tr. Vol. 3A at 109:20-23 (Hayes).

288.    The Court finds that Allegiant deliberately took no steps to remedy the known problems associated with the NPS Preneed Trusts or to warn its successor trustee of the problems Allegiant and National City uncovered.  *See, e.g.*, Trial Tr. Vol. 6B at 120:13-20, 122:23-123:4, 123:16-124:10, 131:10-14 (Morisse); Trial Tr. Vol. 9B at 112:8-113:11, 113:22-115:12 (Markow); Trial Tr. Vol. 10B at 79:8-80:19 (Stuart); Trial Tr. Vol. 12 at 46:6-19 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 405:20-406:2, 407:17-23, 407:25-408:9, 409:6-10, 409:18-22, 409:25-410:4, 410:12-17, 410:20-25, 411:2, 5, 411:25-412:4, 412:7-10, 412:13-17, 412:19).  Allegiant "facilitated the continued misuse of trust assets without making any attempt to fix the problems in the trusts or notify Bremen of the problems which had arisen."  ECF No. 2505, at 25.

289.    The Court finds that Allegiant made intentional and material misrepresentations to Bremen regarding the status and quality of the NPS Preneed Trusts and the trusts' assets.

290.    The Court finds that Allegiant benefited from its decision to conceal the known problems associated with the NPS Preneed Trusts from Bremen.  For example, Allegiant's failure to warn Bremen facilitated the merger with National City and allowed Allegiant to avoid paying the $25 million break-up fee which would have otherwise been required.

291.    By failing to correct the known problems with the NPS Preneed Trusts or disclose these problems to the successor trustee, the Court finds that Allegiant put its own interests ahead of those of the trusts' beneficiaries.

292.    "Allegiant, by its deceit, encouraged NPS to continue on its doomsday path, saving itself $25 million."  ECF No. 2504, at 11.

293.    Morisse also personally benefited from concealing the known problems with the NPS Preneed Trusts from Bremen, which facilitated the merger and improved his chances of being retained by National City following the merger.  Trial Tr. Vol. 4A at 24:9-18 (Morisse).

294.    The Court adopts the reasonable and logical inference from the evidence that had Allegiant warned Bremen of the known problems in the NPS Preneed Trusts, Bremen would have either refused to accept the trusts or demanded that the problems be corrected.  *See, e.g.*, Trial Tr. Vol. 9B at 109:6-10, 115:9-116:6 (Markow); Trial Tr. Vol. 10B at 79:8-80:13 (Stuart).

295.    Allegiant's failure to correct the known problems with the NPS Preneed Trusts or disclose the problems to Bremen was a breach of trust.

296.    Allegiant's failure to disclose the known problems with the NPS Preneed Trusts to the trusts' beneficiaries—including the Missouri consumer and funeral home beneficiaries—was a breach of trust.

297.    Allegiant's conduct in passing the NPS Preneed Trusts to Bremen without warning its officers of the problems in the trusts known to Allegiant, thereby permitting the Cassitys' fraudulent scheme to continue, was recklessly indifferent to the rights of the beneficiaries of the trusts.  ECF No. 2504, at 21.

298.    Allegiant "acted in a willful, wanton, or malicious manner" by passing the NPS Preneed Trusts to Bremen without warning Bremen of the known problems with the trusts.  ECF No. 2504, at 21.

299.    Allegiant's conduct in passing the NPS Preneed Trusts to Bremen Bank without warning Bremen of the problems in the trusts, and in failing to control the trusts, protect the trusts, and keep proper records was "particularly egregious."  ECF No. 2504 at 5.

300.    Allegiant's conduct during the transition and "hand-off" to Bremen presented great risk to the trust beneficiaries, and resulted in losses to the trusts in an amount to be later determined and quantified.

**W.    Allegiant's Conduct Also Systematically Violated Industry Custom and Practice**

      *i.    Allegiant's Failure to Control, Protect, and Record Pursuant to Industry Standards*

301.    Pursuant to custom and practice in the trust industry, a trustee has the core responsibilities to control the trust assets, to protect the assets, and to maintain accurate records of the assets.  Trial Tr. Vol. 16A at 69:20-70:17, 71:8-13 (Coster); Trial Tr. Vol. 13B at 15:17-16:6, 28:10-17, 30:23-31:3, 34:9-13, 35:1-8 (Fitzgerald). The sources of these responsibilities include the trust agreements and state laws that govern the activities of trustees. Trial Tr. Vol. 16A at 80:20-81:3 (Coster). A trustee has a fundamental responsibility to understand the job it takes on when it accepts the role as trustee. Trial Tr. Vol. 16A at 80:16-19 (Coster).

302.    A trustee is not relieved of its responsibilities to control, protect and keep accurate records of assets in a trust when an outside investment advisor has been appointed. Trial Tr. Vol. 16B at 27:9-28:21 (Coster); Trial Tr. Vol. 13B at 35:9-17; 74:6-13 (Fitzgerald).

303.    The NPS Preneed Trusts were fiduciary accounts. Trial Tr. Vol. 16A at 80:2-6 (Coster).  Allegiant's core responsibilities pursuant to custom and practice in the trust industry

between 1998 and 2004, which included controlling the trust assets, protecting the trust assets, and maintaining accurate records, applied to the  NPS Preneed Trusts for which Allegiant served as trustee.  Trial Tr. Vol. 16A at 74:23-75:1 (Coster).

304.     During its entire trusteeship, Allegiant maintained a responsibility to identify: the trust beneficiaries, what assets were in the trusts, what value did the assets have, where were the assets located, when the beneficiaries would be entitled to trust benefits, why the trusts were established, and how the trusts should be administered.  Trial Tr. Vol. 16A at 82:7-84:20 (Coster); Trial Tr. Vol. 13B at 29:23-30:1, 31:11-22 (Fitzgerald).

305.     The trust agreement governing the NPS Preneed Trusts required Allegiant to comply with the laws of the State of Missouri, and specifically the preneed statutes in effect at the time.  Trial Tr. Vol. 16B at 24:9-15 (Coster); Ex. P-168 at 12.  Allegiant had the responsibility to comply with the trust agreement, with Chapter 436, and with the custom and practice that applied to trustees in similar situations.  Trial Tr. Vol. 16B at 24:16-21 (Coster); Trial Tr. Vol. 13B at 24:18-24; 25:6-8 (Fitzgerald); Trial Tr. Vol. 15A at 133:4-134:16 (Lock). Allegiant had the responsibility to read the Trust Agreement and understand each clause.  Trial Tr. Vol. 16B at 9:6-16 (Coster); Ex. P-168.

306.     With regard to the trusts' assets, Allegiant failed to meet its obligations under industry custom and practice to hold, protect, and keep adequate records.  For example, while serving as trustee, Allegiant wired millions of dollars to NPS through a system created to automatically execute all wire transfer requests.  This allowed NPS unfettered access to the money being held in the trusts, making the trusts into a checking account for NPS.  ECF No. 2504, at 6.

59

307.    The Custody Agreement For Life Insurance Policies Held Under National Prearranged Services, Inc. Pre-Need Plan Trusts dated 11/1/99, which was drafted by Morisse, did not comply with industry custom and practice requiring a trustee to maintain control of trust assets.  The Custody Agreement was wholly inconsistent with the standard of responsibility for a trustee.  Trial Tr. Vol. 16A at 94:8-96:3 (Coster); Trial Tr. Vol. 13B at 71:3-73:13 (Fitzgerald); Ex. P-421.

308.    The "delegation" letter from Wulf, Bates & Murphy to Richard Markow dated November 5, 1999, which was also drafted by Morisse, was not consistent with Allegiant's obligations to protect trust assets and was inconsistent with the standard of responsibility for a trustee.  Trial Tr. Vol. 16A at 94:8-96:3 (Coster); Trial Tr. Vol. 13B at 76:23-78:6 (Fitzgerald); Ex. P-432.

309.    In any trust, when a wire transfer is taking place, custom and practice requires the trust officer to know the purpose of the transfer.  Trial Tr. Vol. 13B at 65:5-11 (Fitzgerald). The procedure established by Allegiant under which Allegiant never reviewed NPS's wire transfer requests but instead automatically processed the requests violated industry custom and practice and was wholly unacceptable in a trust.  Trial Tr. Vol. 16A at 93:19-94:7 (Coster); Trial Tr. Vol. 13B at 69:8-13 (Fitzgerald); Trial Tr. Vol. 15B at 4:20-5:10, 15:14-17:7 (Lock).

310.    Allegiant's conduct in processing wire transfers without receiving any reason or explanation for the transfers violated industry custom and practice.   Allegiant should have asked questions such as: what is this? Whose money is it?  And why are we wiring it?  Trial Tr. Vol. 16B at 36:7-37:4 (Coster); Trial Tr. Vol. 13B at 63:10-65:11 (Fitzgerald).

311.    Under custom and practice, Allegiant had the ability to say no to wire transfer requests received from NPS.  Trial Tr. Vol. 16B at 27:4-24 (Coster); Trial Tr. Vol.13B at 64:14-21 (Fitzgerald).

312.    Allegiant's flawed wire transfer procedures represent a failure on the part of Allegiant to control, protect, and properly record the assets of the trusts.  Trial Tr. Vol. 16B at 41:1-11 (Coster).  Allegiant did not comply with the terms of the Trust Agreement that required Allegiant to "hold, protect and conserve the trust corpus."  Trial Tr. Vol. 13B at 48:7-14 (Fitzgerald).

<em>ii.      Allegiant's Failure to Identify the Trusts' Beneficiaries</em>

313.    A trustee has the responsibility to hold the trust property for the benefit of the beneficiaries, and to put the interests of the beneficiaries before its own interests.  Trial Tr. Vol. 13B at 27:13-28:13 (Fitzgerald).

314.    Allegiant's responsibility to control, protect and maintain adequate records of the trusts included the responsibility to know who the trusts' beneficiaries were. Trial Tr. Vol. 16A at 82:21-83:1 (Coster).  When Allegiant accepted the role as trustee of the NPS Preneed Trusts, Allegiant did not properly identify the beneficiaries of the trusts, who had claim on the assets, and what was the value of those claims.  Trial Tr. Vol. 16A at 85:10-87:5 (Coster).

315.    The beneficiaries of the trusts were NPS, the preneed consumers, and the funeral homes. Trial Tr. Vol. 16A at 87:17-88:14 (Coster); Trial Tr. Vol. 13B at 32:3-13 (Fitzgerald). Allegiant treated NPS as the sole beneficiary and administered the NPS Preneed Trusts with this understanding.  Allegiant violated custom and practice in the trust industry by failing to identify or treat the Missouri consumers and funeral homes as trust beneficiaries. Trial Tr. Vol. 16A at 91:4-12 (Coster); Trial Tr. Vol. 13B at 33:14-19 (Fitzgerald).

> iii.     *Allegiant's Failure to Understand and Properly Value the Trusts' Assets*

316.    Allegiant's responsibilities to control, protect and maintain adequate records of the trusts included the responsibility to know what assets were in the trusts.  Trial Tr. Vol. 16A at 83:2-8 (Coster); Trial Tr. Vol. 13B at 29:23-30:1 (Fitzgerald).  Allegiant did not fulfill its responsibility under custom and practice in the trust industry to determine what assets were in the trusts.

317.    National City Bank's due diligence and review of Allegiant's trust department in 2004 found no documentation for certain assets listed in Allegiant's trust statements, including a group term life insurance policy which National City concluded did not exist.  Allegiant's failure to identify or understand that the group term policy asset did not exist was inconsistent with Allegiant's responsibilities under industry custom and practice.  Trial Tr. Vol. 16A at 91:13-92:21 (Coster).

318.    Allegiant's responsibilities to control, protect and maintain adequate records of the trusts also included the responsibility to understand and record the value of the trust assets. Trial Tr. Vol. 13B at 13:1-6 (Fitzgerald). The nearest approximation to market value for an insurance policy is cash surrender value net of any reductions. Custom and practice in the trust industry requires a trustee to value whole life insurance policies at net cash surrender value. Trial Tr. Vol. 13B at 9:6-23 (Fitzgerald).

319.    A trustee would need to know the net cash surrender value in order to value each life insurance policy asset.  Trial Tr. Vol. 16B at 16:21-19:17 (Coster).  There was no evidence that Allegiant had any experience in how to value life insurance policies. Trial Tr. Vol. 13B at 14:2-6 (Fitzgerald).

320.     Any reasonable trustee would have been concerned about NPS's use of face value to value the trusts' life insurance policies.  Trial Tr. Vol. 16B at 39:10-40:21 (Coster).  Allegiant did not meet its obligations under industry custom and practice by valuing the NPS Preneed Trusts' Lincoln policies at their face value.  Trial Tr. Vol. 16A at 105:19-106:8 (Coster); Trial Tr. Vol.  13B at 14:7-16 (Fitzgerald).

321.     Allegiant further violated custom and practice by valuing Trust IV's group term life insurance policy asset at its $13.5 million face value because the policy was term insurance and thus carried no cash value.  Trial Tr. Vol. 13B at 43:3-44:13 (Fitzgerald); Trial Tr. Vol. 15B at 30:18-31:17 (Lock).

*iv.*      *Allegiant's Failure to Conduct the Market Value Test*

322.     Chapter 436 provides that no income distribution can be made from a trust to the seller if, and to the extent that, the distribution would reduce the aggregate market value on the distribution date of all property held in the preneed trusts, below the sum of all deposits made to such trust.  Ex. P-482 at 9.

323.     In order to conduct the market value test under Chapter 436 to determine if an income distribution could be made, Allegiant needed to know the aggregate market value of all property held in the NPS trusts on the distribution date, as well as the sum of all deposits made into the trusts.  Trial Tr. Vol. 16B at 15:24-18:4 (Coster); Trial Tr. Vol. 13B at 78:23-79:16 (Fitzgerald).

324.     Allegiant did not know the sum of all deposits made into the trusts.  Allegiant also did not know the aggregate market value of all property held in the trusts because it did not request or receive the information necessary to determine the net cash surrender value of the trusts' Lincoln policies.  Trial Tr. Vol. 16B at 16:13-19:17 (Coster).

325.    Allegiant never performed the market value test before making distributions from the trusts.  Trial Tr. Vol. 16B at 21:10-17, 31:25-32:8 (Coster); Trial Tr. Vol. 13B at 79:23-80:1 (Fitzgerald).  Wire transfers that were allowed by Allegiant without conducting the market value test were improper and contrary to Allegiant's responsibilities under industry custom and practice.  Trial Tr. Vol. 16B at 32:21-33:13 (Coster); Trial Tr. Vol. 13B at 80:2-6 (Fitzgerald).

*v.      Allegiant's Failure to Ensure the Trusts' Assets were Prudently Invested*

326.    Under industry custom and practice, Allegiant had the responsibility to make sure the trust assets were not invested in anything that was beyond the authority of a reasonably prudent trustee to invest in, whether or not an independent investment advisor had been appointed.  Trial Tr. Vol. 16B at 27:9-28:21, 145:7-10 (Coster); Trial Tr. Vol. 13B at 45:23-46:14 (Fitzgerald); P-482 at 9; *see also* ECF No. 2521, at 13-14.

327.    A trust's concentration in any asset type should be a concern for a trustee because overconcentration in any trust should be avoided given the inherent risks associated with overconcentration.  Trial Tr. Vol. 16B at 5:19-6:17; 7:19-8:12 (Coster); *see also* Trial Tr. Vol. 13B at 34:17-22 (Fitzgerald).

328.    Early in Allegiant's trusteeship, a reasonably prudent trustee would have been alarmed by the trusts' high concentration in one asset and the enormous concentration of assets in Cassity entities.  Trial tr. Vol. 16B at 6:18-7:18 (Coster).

329.    The dominance of Lincoln policies in the trusts should have been a concern to Allegiant under industry custom and practice.  Trial Tr. Vol. 16B at 38:23-39:9 (Coster).  Allegiant's failure to investigate the financial strength of Lincoln violated the custom and practice applicable to trust departments.  Trial Tr. Vol. 13B at 42:21-43:2 (Fitzgerald).

330.    Because the vast majority of the assets in the trusts were invested in Cassity entities, the mix of assets was not reasonably prudent.  Trial Tr. Vol. 16B at 8:13-9:3 (Coster); Trial Tr. Vol. 13B at 39:23-41:16 (Fitzgerald).

331.    Under industry custom and practice, Allegiant had the right to say no to Wulf or NPS if the investments were not prudent.  Trial Tr. Vol. 13B at 74:14-19 (Fitzgerald).

332.    Allegiant had the responsibility to determine whether Wulf was independent of NPS, and Allegiant's failure to ensure that Wulf was independent of NPS was a "red flag."  Trial Tr. Vol. 13B at 74:24-76:2 (Fitzgerald).  Wulf did not appear to be independent of NPS from a custom and practice standpoint.  Trial Tr. Vol. 16B at 29:3-6 (Coster); Trial Tr. Vol. 15B at 17:8-18:3, 19:22-20:1 (Lock).

333.    Based on industry custom and practice, the fact that wire transfer requests were sent to Allegiant by either Randy Sutton or Angie Hall with only a copy going to Wulf should have been a concern to Allegiant.  Trial Tr. Vol. 13B at 76:3-18 (Fitzgerald).

      *vi.*      *Allegiant's Failure to Maintain Adequate Books and Records*

334.    Under custom and practice in the trust industry, Allegiant was required to maintain adequate books of account of all transactions in the trusts.  Trial Tr. Vol. 13B at 47:2-16 (Fitzgerald).

335.    On day one of its trusteeship, Allegiant should have known it needed records sufficient to show each beneficiary's proportionate interest in the trust based on how much money had been deposited into trust for each individual.   Allegiant was also required to maintain its own independent records in order to verify NPS's requests for money to pay for funerals.  Trial Tr. Vol. 16A at 85:10-87:5 (Coster).

336.     A trustee must have its own records relating to the corpus of the trust and the responsibility for payments in the future.  Allegiant failed to maintain records of whose money was in the trusts, how much money had been paid by the consumer, how much the trust paid to buy a Lincoln policy for that consumer, and whether there were any premiums due on the policy. Trial Tr. Vol. 16A at 86:22-87:11, 99:15-100:3, 102:1-104:23  (Coster).

337.     Based on the industry custom and practice, Allegiant did not meet its responsibilities to maintain adequate books and records for the trusts.  Trial Tr. Vol. 13B at 35:1-8, 47:17-48:1, 78:7-12 (Fitzgerald); Trial Tr. Vol. 15A at 133:9-134:24 (Lock); Trial Tr. Vol. 15B at 4:5-5:10; 39:3-12 (Lock).

338.     Allegiant did not comply with the terms of the Trust Agreement that the trustee "at all times maintain accurate books and records reflecting all transactions in any way pertinent to the trust."  Trial Tr. Vol. 13B at 47:2-48:1 (Fitzgerald); *see also* Ex. P-168 at 10.

> vii.     *Allegiant's Failure to Advise Bremen of the Problems in the Trusts*

339.     Pursuant to industry custom and practice, Allegiant maintained fiduciary responsibilities to the beneficiaries of the NPS Preneed Trusts during the transition period in 2004 when the trusts were moving from Allegiant to Bremen.  Custom and practice required Allegiant to maintain accurate and adequate records until Bremen took over as successor trustee. Trial Tr. Vol. 16B at 68:24-70:1, 72:22-73:14 (Coster).  Custom and practice also required Morisse and Allegiant to protect the interests of the trusts' beneficiaries—over the interests of Allegiant—until the time when the transfer of the trusts to Bremen was completed.  Trial Tr. Vol. 13B at 85:18-86:6 (Fitzgerald).

340.     Based on the custom and practice that applied to Allegiant in February, March and April 2004, Allegiant had a responsibility to notify Bremen of the known problems in the

trusts.  Trial Tr. Vol. 16B at 72:2-73:14 (Coster); Trial Tr. Vol. 13B at 35:18-23 (Fitzgerald); Trial Tr. Vol. 14A at 28:7-21 (Fitzgerald).

341.    The risk to the funeral homes and consumers in 2004 based on how Allegiant had handled the NPS Preneed Trusts was extremely high.  Trial Tr. Vol 16B at 67:23-68:4 (Coster).

342.    Allegiant did not meet the custom and practice requirements to disclose the known problems in the NPS Preneed Trusts to Bremen.  Trial Tr. Vol. 16B at 73:15-19 (Coster).

343.    A reasonably prudent trustee would not have accepted the NPS Preneed Trusts had Allegiant advised the potential trustee of the known problems with the trusts and their assets. Trial Tr. Vol. 14A at 30:25-31:15 (Fitzgerald).

## [PROPOSED] Conclusions of Law

## I.    Judgment upon the Existing Record

The Eighth Circuit was clear:  "Although the case was tried to a jury on a tort-law theory, we do not dictate that the case be retried in its entirety.  The district court is familiar with the evidence and *may proceed based on the existing trial record* as it sees fit[.]" (ECF No. 2521, at 21 (emphasis added)).  In so ruling, the Eighth Circuit was plainly referring to the trial record developed in the previous jury trial.  It is clearly within the bounds of the Eighth Circuit's mandate for this Court to enter judgment on Allegiant's breaches of trust without receipt of additional evidence.

Consistent with the Court's mandate, both the Eighth Circuit judges and counsel for PNC discussed this Court's use of Rule 52 to make findings based on the existing record.

MR. BENNETT:  So even if you said we're going to do damages or we think that liability's established – and Judge Webber essentially made the Rule 52 findings –

…

THE COURT: But you're saying if Judge Webber made adequate liability findings that could be said to comply with Rule 52, then that might be a ground to affirm the liability?

MR. BENNETT: Well, the problem with doing that approach in any way, shape or form, though, is that the breaches that are findable aren't tied to any of the damages that were presented, and, therefore, you would still have to have a causation-related … trial as well.

THE COURT: Well – but – … he might already have the record that's necessary.

MR. BENNET: He – well, if you – … remanded for that purpose, I think we could talk to him about whether –

THE COURT: Yeah.

MR. BENNET: he thought that he had that or not.

Ex. B (Oral Arg. Tr. 9/20/16) at 13:2-14:20.  The Eighth Circuit further questioned PNC's counsel: "But setting [your defenses] aside, why would there need to be a new trial if the defenses are inapplicable. Since the judge heard all the evidence, **why couldn't he just make the necessary findings based on the existing record**?" *Id.* at 7:25-8:4 (emphasis added).  The two relevant issues are: (1) did Allegiant bank breach its duties as trustee; and (2) did Allegiant bank carry its burden to show that it ensured that Wulf was investing trust assets within the authority of a reasonably prudent trustee.

On both of these issues, Allegiant has been fully heard.  During the five-week jury trial, PNC was fully heard on the issue of breach of its duties.  PNC had every opportunity and incentive to fully defend against the breach of fiduciary duty and negligence claims.  The first two elements for both claims are, of course, duty and breach.  *See, e.g.*, *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 411 (Mo. Ct. App. 2000) (breach of fiduciary duty); *Lopez v. Three Rivers Elec. Coop., Inc.*, 26 S.W.3d 151, 155 (Mo. 2000) (negligence).  These are the same as the elements for breach of trust.  *See Honsinger v. UMB Bank, N.A.*, No. 06-0018-CV-W-ODS, 2007 WL 4287683, at *3 (W.D. Mo. Dec. 4, 2007).  Because the source of Allegiant's duty here

68

was its role as trustee, the evidence of breach that was presented and admitted in the jury trial is the same evidence relevant to the Court's consideration of whether Allegiant committed breaches of trust.

PNC maintained before both this Court and the Eighth Circuit that Plaintiffs' negligence and breach of fiduciary duty claims were, as a matter of law, a single claim for breach of trust, calling Plaintiffs' breach of fiduciary duty and negligence claims *"quintessential claims for breach of trust."* (PNC Opening Br. at 30 (emphasis added)). As PNC repeatedly and ultimately successfully argued, "[a] breach of trust is a violation by the trustee of *any duty* which as trustee he owes to the beneficiary." Restatement (Second) of Trusts § 201 (1959) (emphasis added); *see also* Restatement (Third) of Trusts § 93 cmt. b (2012) ("A breach of trust is a violation by a trustee of a fiduciary duty—that is, of any duty the trustee owes, *as trustee* . . . ." ) (emphasis in original); *Witmer v. Blair*, 588 S.W.2d 222, 224 (Mo. Ct. App. 1979); *Covey v. Pierce*, 82 S.W.2d 592, 598 (Mo. Ct. App. 1935) ("It is well settled that every violation by a trustee of a duty that equity lays upon him, whether wrongful and fraudulent or done through negligence or arising through mere oversight and forgetfulness, is a breach of trust."). PNC has argued expressly that "there is *no difference* between 'breach of trust claims' and 'breach of fiduciary duty and negligence claims' against a trustee." ECF No. 1940, at 5 (emphasis added).

The Eighth Circuit agreed with PNC, ruling that the duties breached by Allegiant were duties imposed by trust law, and that therefore PNC's liability is for breach of trust (with the corresponding trust-law measure of damages applying). ECF No. 2521, at 10-11. This is now, of course, the law of the case and binding under the mandate rule. *See, e.g.*, *Thomas v. C.I.R.*, 821 F.3d 1008, 1011 (8th Cir. 2016). Furthermore, judicial estoppel bars PNC from arguing that there is a difference between the breach of fiduciary duty and negligence claims and an equitable

breach of trust claim on the question of duty.  *Spencer v. Annett Holdings, Inc.*, 757 F.3d 790, 798 (8th Cir. 2014) ("[J]udicial estoppel applies when a party—having taken one litigating position and successfully persuaded a court to adopt that position—would derive an unfair advantage or impose an unfair detriment on the opposing party by taking a contrary position in new litigation."); *see also In re Contest of Primary Election Candidacy of Fletcher*, 337 S.W.3d 137, 140 (Mo. Ct. App. 2011) ("Judicial estoppel will lie to prevent litigants from taking a position, under oath, in one judicial proceeding, thereby obtaining benefits from that position in that instance and later, in a second proceeding, taking a contrary position in order to obtain benefits . . . at that time.") (internal quotations omitted).  "Missouri courts in particular have consistently refused to allow litigants to take contrary positions in separate proceedings to ensure the integrity of the judicial process."  *Id.* at 146.

Similarly, PNC was fully heard on its investment advisor defense.  PNC presented the defense to the jury and was given a full and fair opportunity, and had every incentive, to present evidence in support of this affirmative defense.  There is no difference between this affirmative defense as to the tort claims tried before the jury and the trust claims now to be tried before this Court.  *See* ECF No. 2505, at 14-18; ECF No. 2521, at 13-14.  Because PNC finished presenting its evidence on this affirmative defense, judgment is appropriate.

## II.    Allegiant's Duties as Trustee

Allegiant served as a fiduciary trustee to the NPS Preneed Trusts.  Trial Tr. Vol. 6B at 93:14-16 (Morisse); Trial Tr. Vol. 12 at 38:8 (NCB 30(b)(6) Dep. Tr. (Quiroga) at 19:2-4.  It is thus fundamental that Allegiant owed fiduciary duties to the beneficiaries.  "A trustee is a fiduciary of the highest order and is required to exercise a high standard of conduct and loyalty in administration of the trust."  *John R. Boyce Family Trust v. Snyder*, 128 S.W.3d 630, 636 (Mo. Ct. App. 2004).  "Although the trustee has many duties emanating from the fiduciary

relationship, the most fundamental is the duty of loyalty." *Id.* This duty requires that the trustee "administer the trust solely in the interest of the beneficiary" and "precludes self-dealing." *Id.*

It also goes without saying that a trustee has a duty to know the identity of the trust beneficiaries. Where there are two or more beneficiaries, the trustee must deal with them impartially. Restatement (Second) of Trusts § 183 (1959). The trustee must keep the trust beneficiaries reasonably informed of all material facts affecting the beneficiary's interest in the trust. Gleason Bogert et al., The Law of Trusts and Trustees § 962.

In addition to these fundamental duties, Plaintiffs have argued throughout this case that Allegiant had duties to control, protect, and keep accurate records of the NPS Preneed Trust assets. The trust agreements required as much. *E.g.*, Ex. P-168 at § 3.1 ("Trustee shall hold, protect and conserve the Trust corpus through the management, investment and reinvestment of the Trust property . . . ."). There is also ample common law and statutory authority establishing that Allegiant had such duties. During Allegiant's tenure as trustee of the NPS Preneed Trusts, Missouri Chapter 436 governed both the sale of preneed contracts in the state of Missouri and the obligations of preneed trustees. With respect to the duties to control and protect trust assets, Chapter 436 provided that "[i]n no case shall control of said assets be divested from the trustee nor shall said assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in." Mo. Rev. Stat. § 436.031.2; *see also id.* ("The trustee shall exercise such judgment and care under circumstances then prevailing which men of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs . . . ."). As the Eighth Circuit held, irrespective of whether an investment advisor was appointed to make investments for the NPS Preneed Trusts, Allegiant retained the duty and obligation to ensure that the assets were invested prudently. ECF No. 2521, at 14 (citing Restatement (Third)

of Trusts §§ 90, 91 (2007)).  The duties of a trustee to control, protect, and prudently invest trust assets are likewise well-established at common law.  *See, e.g.*, Restatement (Second) of Trusts §§ 175, 176, 181; BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 582; Restatement (Third) of Trusts § 76.

Allegiant's duty to protect the trust assets included doing so when it resigned as trustee and passed the trusts to the successor trustee, Bremen Bank.  The Restatement (Third) of Trusts explains with respect to the resignation of a trustee:

> [A] trustee may not … resign for the purpose of facilitating a breach of trust by the remaining co-trustee(s) or of escaping adverse consequences without disclosing the breach or circumstances to the beneficiaries, settlor, or court, as the case may be.  That all trustee powers are subject to a duty of good-faith exercise, see [other restatement sections].

Restatement (Third) of Trusts § 36 cmt. a (2003).  Allegiant could not resign for purposes of "escaping adverse consequences" and was, in any event, obligated to inform the trust beneficiaries of the "red flags" in the trusts.  Allegiant did not do so, instead moving forward with resigning without any notice to the funeral home and consumer beneficiaries.  *See* FOF ¶¶ 283-300.  Allegiant did so to ensure that its merger with National City Bank would close and it would avoid the $25 million break-up fee that would have been incurred had the merger fallen through.  *Id*. at ¶ 277.  In so doing, Allegiant acted in its own self-interest, to avoid the break-up fee and potential fiduciary liability that National City Bank's Al Kantra described as "huge."  *Id*. at ¶¶ 253, 277, 282-93.  Allegiant went even further in its dereliction of duty to protect the trust assets, by meeting with Bremen employees while Allegiant was still trustee and, as described at length in the above findings of fact, training Bremen to administer the trusts such that the Ponzi-like scheme would continue.  *Id*. at ¶¶ 278-83.

It is also beyond dispute that Allegiant had the obligation to keep accurate records of all activity in the NPS Preneed Trusts.  Chapter 436 mandated that "[t]he trustee of a preneed trust

shall maintain adequate books of account of all transactions administered through the trust and pertaining to the trust generally."  MO. REV. STAT. § 436.031.5; *see also* MO. REV. STAT. § 436.031.1 ("Payments regarding two or more preneed contracts may be deposited into and commingled in the same preneed trust, so long as . . . the trustee maintains adequate records of all payments received.").  This is a fundamental duty of any trustee.  *See, e.g.*, *Engelsmann v. Holekamp*, 402 S.W.2d 382, 389 (Mo. 1966) (trustee must "keep full, accurate, and orderly records of the status of the trust administration and of all acts thereunder," and if the trustee fails to do so then "the presumptions are all against him.") (quoting BOGERT, THE LAW OF TRUST AND TRUSTEES § 962); Restatement (Second) of Trusts § 172.

Here, the duty to maintain accurate records included the obligation to only disburse income to NPS where the aggregate market value of all property held in the trust exceeded the sum of all deposits made into the trust for the preneed contracts then administered.  MO. REV. STAT. § 436.031.3.  Similarly, Chapter 436 clearly defined the amount of principal that could be distributed in the event of a death claim or cancellation— "an amount equal to all deposits made into the trust" for the particular preneed contract.  MO. REV. STAT. §§ 436.035.1, 436.045; *see also* Ex. P-0168 at § 3.2.  Yet Allegiant made no attempt to review or quality control *any* distribution of funds to NPS (trust income or otherwise), kept no records regarding the amount deposited for any given individual, did nothing to accurately report the market value of the assets, and never ensured that the statutorily-required test for income distributions was satisfied before distributing funds to NPS.  *See, e.g.*, FOF ¶¶ 81-87, 101-06, 324-27.  In short, Allegiant kept no records that would allow it to comply with Chapter 436's provisions governing distributions.

III.    **Allegiant's Investment Advisor Defense**

During the five-week jury trial, PNC asserted an affirmative defense under MO. REV. STAT. § 436.031.2.  Chapter 436 provides that investment decisions may be made by an "independent qualified investment advisor[.]"  MO. REV. STAT. § 436.031.2.  Chapter 436 then states that the "trustee shall be relieved of all liability regarding investment decisions made by such qualified investment advisor."  *Id.*  However, Chapter 436 also states that in "no case … shall [trust] assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in."  *Id*.  As this Court previously explained:

> A trustee must not allow the assets to be placed in an investment beyond the authority of a reasonably prudent trustee, no matter if an investment advisor has been appointed.… [This duty] reinforces the role of the trustee in protecting trust assets and does not allow a trustee to shirk all duty by appointing an investment advisor.  A trustee has a duty to maintain and control the trust assets as well as ensure trust assets are prudently invested.

ECF No. 2505, at 15.  The Eighth Circuit affirmed, noting that PNC could only be relieved of liability under this affirmative defense if "Allegiant ensured that [the investment advisor] was investing trust assets within the authority of a reasonably prudent trustee."  ECF No. 2521, at 14.

As PNC's investor advisor defense is an affirmative defense, PNC carries the burden of proof.  *See PNC Bank, Nat'l Ass'n v. El Tovar, Inc.*, No. 4:13-CV-1073 CAS, 2014 WL 538810, at *8 (E.D. Mo. Feb. 11, 2014).  As discussed above concerning Allegiant's duty to protect trust assets and detailed in the above findings of fact, PNC utterly failed to ensure that Wulf was investing trust assets within the scope of a reasonably prudent trustee.  *See, e.g.*, FOF ¶¶ 91-94.  Thus, PNC failed to carry its burden on its affirmative investment advisor defense.