# EXHIBIT C

Nos. 15-3872(L), 15-3878

# In the United States Court of Appeals for the Eighth Circuit

_____

JO ANN HOWARD & ASSOCIATES, *ET AL.*,
APPELLEES/CROSS-APPELLANTS

*v.*

NATIONAL CITY BANK; PNC BANK, N.A.,
APPELLANTS/CROSS-APPELLEES

_____

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI (NO. 4:09-CV-01252)
(THE HONORABLE E. RICHARD WEBBER, J.)*

_____

**BRIEF OF APPELLANTS PNC BANK, N.A.
AND NATIONAL CITY BANK**

_____

STEPHEN D. RABER
J. ANDREW KEYES
AMY MASON SAHARIA
WILLIAMS & CONNOLLY LLP
 *725 Twelfth Street, N.W.
 Washington, DC 20005
 (202) 434-5000*

JAMES F. BENNETT
 *COUNSEL OF RECORD*
CAITLIN E. O'CONNELL
DOWD BENNETT LLP
 *7733 Forsyth Boulevard, Suite 1900
 St. Louis, MO 63105
 (314) 889-7300*

# SUMMARY OF THE CASE

This case involves a claim that a predecessor of Appellant PNC Bank breached duties it owed as trustee to a trust beneficiary that, unbeknownst to the trustee, was running a nationwide criminal fraud.  Under longstanding Missouri law, that claim is governed by trust law, which defines the scope of a trustee's duties and a beneficiary's damages.  As this Court has held, that claim is equitable, to be tried to the court.  Despite this established law, the district court held that Plaintiffs could pursue before a jury "tort" claims and tort-based damages simply because they labeled their claims as "torts," and not as breach-of-trust claims.

The court then allowed the jury to award tort damages based on speculation that this Missouri trustee somehow could have stopped its beneficiary's nationwide fraud on its first day as trustee.  Before trial, the court struck PNC's defenses related to the beneficiary's criminal conduct because it held that the receiver standing in the beneficiary's shoes was immune from these defenses.  The result was a $355.5 million damages award (plus $35.55 million in punitive damages) that held PNC responsible *to the trust beneficiary* for every fraudulent contract issued *by the trust beneficiary* around the country over a ten-year period.

The district court's judgment cannot stand.  This appeal, which arises from a five-week jury trial, presents multiple important issues.  PNC respectfully requests 30 minutes for oral argument.

(i)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Appellants PNC Bank, N.A. and National City Bank state as follows:

1.     Appellant PNC Bank, N.A. is a national bank and a wholly owned subsidiary of PNC Bancorp, Inc.  PNC Bancorp, Inc. is a wholly owned subsidiary of The PNC Financial Services Group, Inc., which is a publicly held corporation. No publicly held corporation owns 10 percent or more of the stock of The PNC Financial Services Group, Inc.

2.     Appellant National City Bank was merged into Appellant PNC Bank, N.A. in November 2009.  PNC Bank, N.A. has assumed the liabilities of National City Bank and is being sued in this action as the successor-in-interest to National City Bank.  As a defunct entity, National City Bank has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

ii

# TABLE OF CONTENTS

Page

SUMMARY OF THE CASE.................................................................i

CORPORATE DISCLOSURE STATEMENT ................................ ii

STATEMENT OF JURISDICTION.............................................1

STATEMENT OF THE ISSUES.................................................1

STATEMENT OF THE CASE.....................................................3

     A.    Factual Background.................................................3

     B.    Procedural Background ........................................12

          *1.*    *Plaintiffs' claims* ........................................12

          *2.*    *The court's summary-judgment rulings*....................14

          *3.*    *Trial*................................................16

          *4.*    *The court's post-trial rulings* .................18

SUMMARY OF ARGUMENT ...................................................20

STANDARD OF REVIEW .........................................................23

ARGUMENT ..............................................................................25

I.    The Court Erroneously Permitted Plaintiffs To Try Their Breach-of-Trust Claim as "Tort" Claims..........................................25

     A.    Trust Law Governs a Trustee's Duties and Liability to Trust Beneficiaries.............................................25

     B.    Plaintiffs' Claims Against PNC Are Governed by Trust Law...........30

     C.    The Court's Prejudicial Error Requires Reversal. ..............35

iii

Page

II.   The Court Erroneously Submitted Plaintiffs' Claims to a Jury. ...................36

      A.   Plaintiffs Are Not Entitled To Try Their Claims to a Jury. ...............37

      B.   The Court's Erroneous Grant of a Jury Trial Requires Reversal
           for a Bench Trial...............................................................................41

III.  The Court Improperly Eliminated PNC's Defenses Based on the
      Conduct of NPS and Forever Enterprises.......................................................42

      A.   The Court Erred in Denying PNC's Defenses Based on the
           Conduct of NPS..................................................................................43

           1.   *The court incorrectly rejected PNC's authorization
                defense.*...................................................................................43

           2.   *The court incorrectly rejected PNC's* in pari delicto
                *defense.*...................................................................................53

           3.   *Because NPS is the sole trust beneficiary, PNC's
                authorization and* in pari delicto *defenses dispose of all
                claims.* ....................................................................................57

      B.   Given That the Court Allowed the Case To Be Tried on a Tort
           Theory, It Erred in Denying PNC's Apportionment Defense
           Based on the Criminal Acts of Forever Enterprises. ...........................61

IV.   The Court Improperly Eliminated PNC's Statutory "Investment
      Advisor" Defense..........................................................................................65

V.    Plaintiffs Did Not Prove That Allegiant Caused Plaintiffs' Claimed
      Damages........................................................................................................68

      A.   Missouri Law Required Plaintiffs To Prove Both "But For" and
           Proximate Causation. .........................................................................69

      B.   Plaintiffs Did Not Prove "But For" Causation....................................70

      C.   Plaintiffs Did Not Prove Proximate Causation. ..................................74

iv

Page

D.   At a Minimum, PNC Is Entitled to Judgment as a Matter of
Law on Three Subcategories of Damages.............................................76

1.   *Allegiant did not cause NPS's inability to make growth
payments.*....................................................................................76

2.   *Allegiant did not cause losses outside Missouri.* ....................77

3.   *Allegiant did not cause Plaintiffs' losses arising after
Allegiant's tenure.* ...................................................................79

VI.   Plaintiffs Did Not Prove That Allegiant Engaged in Outrageous
Conduct Sufficient To Warrant an Award of Punitive Damages.................80

A.   An Award of Punitive Damages Requires Clear and Convincing
Evidence of a Willful, Wanton, or Malicious Culpable Mental
State. ...................................................................................................80

B.   Plaintiffs Did Not Prove by Clear and Convincing Evidence
That Allegiant Had a Willful, Wanton, or Malicious Culpable
Mental State........................................................................................84

1.   *Plaintiffs admitted that Allegiant did not have "evil
motive."* ....................................................................................84

2.   *Plaintiffs failed to prove intentional misconduct or self-
dealing.* .....................................................................................85

3.   *The* Alcorn *factors weigh against an award of punitive
damages.* ...................................................................................86

CONCLUSION ................................................................................................88

STATUTORY ADDENDUM ...........................................................................89

CERTIFICATE OF COMPLIANCE AND ANTI-VIRUS
CERTIFICATION .............................................................................................94

v

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Ashley v. R.D. Columbia Assocs., L.P.*, 54 F.3d 498 (8th Cir. 1995) ......................23

*Bank of Am., N.A. v. JB Hanna, LLC*, 766 F.3d 841 (8th Cir. 2014) ...............24, 75

*Blankenship v. USA Truck, Inc.*, 601 F.3d 852 (8th Cir. 2010) ..............................55

*Bold v. Simpson*, 802 F.2d 314 (8th Cir. 1986) ..................................................83, 85

*Brown v. United Mo. Bank, N.A.*, 78 F.3d 382 (8th Cir. 1996) .......................*passim*

*C.L. Maddox, Inc. v. Benham Grp., Inc.*, 88 F.3d 592 (8th Cir. 1996)...................76

*Chauffeurs, Local No. 391 v. Terry*, 494 U.S. 558 (1990) .....................................40

*Cigna Corp. v. Amara*, 563 U.S. 421 (2011)..............................................28, 32, 40

*CitiMortgage, Inc. v. Just Mortg., Inc.*, No. 4:09 CV 1909 DDN, 2013
   WL 6538680 (E.D. Mo. Dec. 13, 2013) ......................................................63, 64

*Dabney v. Chase Nat'l Bank of City of N.Y.*, 196 F.2d 668 (2d Cir.
   1952) ....................................................................................................................29

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962)...................................................37

*Deangelis v. Corzine (In re MF Glob. Holdings Ltd. Inv. Litig.)*, 998
   F. Supp. 2d 157 (S.D.N.Y. 2014) .................................................................54, 56

*Des Moines Terminal Co. v. Des Moines Union Ry. Co.*, 52 F.2d 616
   (8th Cir. 1931)....................................................................................................27

*Dudley v. Dittmer*, 795 F.2d 669 (8th Cir. 1986) ..................................................68

*Entergy Ark., Inc. v. Nebraska*, 358 F.3d 528 (8th Cir. 2004)................................37

*FDIC v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir. 1995) (per curiam) ................54

*Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998) ...............39, 40

vi

Page

*Foster v. Time Warner Entm't Co.*, 250 F.3d 1189 (8th Cir. 2001) .......................24

*Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494
(8th Cir. 2010)...............................................................................................25, 51

*Goodman v. FCC*, 182 F.3d 987 (D.C. Cir. 1999) ...................................................52

*Graham Constr. Servs., Inc. v. Hammer & Steel, Inc.*, 755 F.3d 611
(8th Cir. 2014)...................................................................................23, 25, 36

*Grassmueck v. Am. Shorthorn Ass'n.*, 402 F.3d 833 (8th Cir. 2005) ..........49, 50, 56

*Halladay v. Verschoor*, 381 F.2d 100 (8th Cir. 1967)............................................39

*Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d
1051 (8th Cir. 2014)......................................................................................81, 84

*Honsinger v. UMB Bank*, No. 06-0018-CV-W-ODS, 2007 WL
4287683 (W.D. Mo. Dec. 4, 2007) ....................................................................27

*Jarrett v. Kassel*, 972 F.2d 1415 (6th Cir. 1992) .....................................................51

*Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955 (5th Cir. 2012) (per
curiam) .................................................................................................................54

*Kinserlow v. CMI Corp.*, 217 F.3d 1021 (8th Cir. 2000) .......................................72

*Klein v. Shell Oil Co.*, 386 F.2d 659 (8th Cir. 1967) ..............................................37

*Knauer v. Jonathon Roberts Fin. Grp., Inc.*, 348 F.3d 230 (7th Cir.
2003) ..............................................................................................................54, 55

*Koester v. Am. Republic Invs., Inc.*, 11 F.3d 818 (8th Cir. 1993)............3, 82, 83, 85

*Martin ex rel. Martin v. United States*, 984 F.2d 1033 (9th Cir. 1993)...................64

*Mueller v. Hubbard Milling Co.*, 573 F.2d 1029 (8th Cir. 1978)............................68

*N.Y. Marine & Gen. Ins. v. Cont'l Cement Co.*, 761 F.3d 830 (8th Cir.
2014) .....................................................................................................................57

vii

Page

*Nobile v. Pension Comm. of Pension Plan for Emps. of New Rochelle Hosp.*, 611 F. Supp. 725 (S.D.N.Y. 1985) ...........................................................38

*Novoletsky v. Metro. Life Ins.*, 49 F. Supp. 3d 123 (D. Me. 2014) .........................27

*Owatonna Clinic–Mayo Health Sys. v. Med. Protective Co.*, 639 F.3d 806 (8th Cir. 2011) ...................................................................................56, 57

*Packard v. Provident Nat'l Bank*, 994 F.2d 1039 (3d Cir. 1993) ............................26

*Phillips v. Collings*, 256 F.3d 843 (8th Cir. 2001) ..................................................24

*Pinnacle Pizza Co. v. Little Caesar Enters., Inc.*, 598 F.3d 970 (8th Cir. 2010) .....................................................................................................24

*Raines v. Safeco Ins. Co. of Am.*, 637 F.3d 872 (8th Cir. 2011) ......................46, 53

*Reynolds v. E. Dyer Dev. Co.*, 882 F.2d 1249 (7th Cir. 1989) ................................62

*Ross v. Bernhard*, 396 U.S. 531 (1970) ..................................................................40

*Sarvis v. BMO Harris Bank*, No. 14 C 09143, 2015 WL 2415244 (N.D. Ill. May 19, 2015) ....................................................................................28

*Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731 (8th Cir. 2009) .......................................................................................................50

*Schaefer v. Spider Staging Corp.*, 275 F.3d 735 (8th Cir. 2002) ............................75

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) ..................................................55

*SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90 (2d Cir. 1978) ..................32

*St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016 (8th Cir. 2015) ...........................66

*Troy v. City of Hampton*, 756 F.2d 1000 (4th Cir. 1985) (en banc) .......................41

*Tull v. United States*, 481 U.S. 412 (1987) .............................................................37

*Wagner v. Jones*, 758 F.3d 1030 (8th Cir. 2014) ...................................................24

viii

Page

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
254 F.3d 706 (8th Cir. 2001) ........................................................36, 67

*Wuliger v. Mfrs. Life Ins.*, 567 F.3d 787 (6th Cir. 2009)....................................54, 55

## STATE CASES

*Alcorn v. Union Pac. R.R.*, 50 S.W.3d 226 (Mo. 2001) (en banc) ..................*passim*

*Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. 2013) (en banc).............3, 80

*Barnett v. Rogers*, 400 S.W.3d 38 (Mo. Ct. App. 2013) ........................1, 29, 31, 32

*Bartlett v. McCallister*, 289 S.W. 814 (Mo. 1926) .................................................50

*Benson v. Jim Maddox Nw. Imps., Inc.*, 728 S.W.2d 668 (Mo. Ct.
App. 1987) .......................................................................................63

*Bradshaw v. Deming*, 837 S.W.2d 592 (Mo. Ct. App. 1992).................................82

*Brown v. Kneibert Clinic*, 871 S.W.2d 2 (Mo. Ct. App. 1993) ..............................62

*Burnett v. Griffith*, 769 S.W.2d 780 (Mo. 1989) (en banc) ..............................81, 84

*Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852 (Mo. 1993)
(en banc).........................................................................69, 70, 74, 80

*Chi. Title & Tr. Co. v. Brady*, 65 S.W. 303 (Mo. 1901) ..........................................44

*Children's Wish Found., Inc. v. Mayer Hoffman McCann, P.C.*, 331
S.W.3d 648 (Mo. 2011) ....................................................................55

*Cole v. Lamb*, 461 S.W.2d 14 (Mo. Ct. App. 1970) (per curiam) ..........................33

*Commerce Bank, N.A. v. Blasdel*, 141 S.W.3d 434 (Mo. Ct. App.
2004) (en banc) ................................................................................58

*Coster v. Crookham*, 468 N.W.2d 802 (Iowa 1991)..........................................30, 33

*Cotten v. Republic Nat'l Bank*, 395 S.W.2d 930 (Tex. Civ. App. 1965)................51

*Covey v. Pierce*, 82 S.W.2d 592 (Mo. Ct. App. 1935) (per curiam) ......................26

ix

Page

*Dobbs v. Dobbs Tire & Auto Ctrs., Inc.*, 969 S.W.2d 894 (Mo. Ct. App. 1998) ...................................................................53

*Eiteljorg v. Eiteljorg*, 951 N.E.2d 565 (Ind. Ct. App. 2011) ............................30, 36

*Estate of Luyties v. Scudder*, 432 S.W.2d 210 (Mo. 1968) (per curiam).......1, 29, 31

*Finocchio v. Mahler*, 37 S.W.3d 300 (Mo. Ct. App. 2000)............................*passim*

*First Trust Co. of Lincoln v. Carlsen*, 268 N.W. 89 (Neb. 1936)...........................33

*Gibson v. Adams*, 946 S.W.2d 796 (Mo. Ct. App. 1997) .......................................82

*Grove v. Sutliffe*, 916 S.W.2d 825 (Mo. Ct. App. 1995) ................................*passim*

*Gustafson v. Benda*, 661 S.W.2d 11 (Mo. 1983) (en banc)....................................63

*Haarmann v. Davis*, 651 S.W.2d 134 (Mo. 1983) (en banc)..................................82

*John R. Boyce Family Trust v. Snyder*, 128 S.W.3d 630 (Mo. Ct. App. 2004) ...................................................................47

*Kaitz v. Dist. Ct.*, 650 P.2d 553 (Colo. 1982) (en banc) ..........................................38

*Kann v. Kann*, 690 A.2d 509 (Md. Ct. App. 1997) ..........................................27, 38

*Kirschner v. KPMG LLP*, 938 N.E.2d 941 (N.Y. 2010)........................................56

*Kohler v. Fletcher*, 442 N.W.2d 169 (Minn. Ct. App. 1989) ..................................28

*Lopez v. Three Rivers Elec. Coop., Inc.*, 26 S.W.3d 151 (Mo. 2000) (en banc)..............................................................80, 82

*McKeehan v. Wittels*, 508 S.W.2d 277 (Mo. Ct. App. 1974) ..................................83

*Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71 (Mo. 1990) (en banc)..............................................................81, 85

*Miller v. Ernst & Young*, 892 S.W.2d 387 (Mo. Ct. App. 1995).............................55

*Miller v. Ernst & Young*, 938 S.W.2d 313 (Mo. Ct. App. 1997).....................*passim*

x

Page

*Nail v. Husch Blackwell Sanders, LLP*, 436 S.W.3d 556 (Mo. 2014) (en banc)...........................................................................................2, 69

*Norber v. Marcotte*, 134 S.W.3d 651 (Mo. Ct. App. 2004) .....................................82

*O'Riley v. U.S. Bank, N.A.*, 412 S.W.3d 400 (Mo. Ct. App. 2013)........................26

*Oellien v. Galt*, 131 S.W. 158 (Mo. Ct. App. 1910)................................................44

*Oliver v. Ford Motor Credit Co.*, 437 S.W.3d 352 (Mo. Ct. App. 2014) ...........................................................................................................23

*Parker v. Pine*, 617 S.W.2d 536 (Mo. Ct. App. 1981) .....................................*passim*

*Pilgrim Evangelical Lutheran Church of Unaltered Augsburg Confession v. Lutheran Church–Mo. Synod Found.*, 661 S.W.2d 833 (Mo. Ct. App. 1983)............................................................................43

*Pollock v. Brown*, 569 S.W.2d 724 (Mo. 1978) (en banc) ......................................87

*Priedeman v. Jamison*, 202 S.W.2d 900 (Mo. 1947) (per curiam) ........................63

*Ramsey v. Boatmen's First Nat'l Bank of K.C., N.A.*, 914 S.W.2d 384 (Mo. Ct. App. 1996).................................................................................34, 47, 48

*Reynolds v. Third Nat'l Bank*, 225 S.W. 901 (Mo. 1920) (per curiam) ........2, 44, 46

*Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104 (Mo. 1996) (en banc)...............................................................................................................81

*Rustici v. Weidemeyer*, 673 S.W.2d 762 (Mo. 1984) (en banc) .............................87

*Senn v. Manchester Bank of St. Louis*, 583 S.W.2d 119 (Mo. 1979) (en banc) (per curiam)...............................................................................82

*Shriners Hosps. for Crippled Children v. Gardiner*, 733 P.2d 1110 (Ariz. 1987) (en banc).........................................................................29

*Slack v. Farmers Ins. Exch.*, 5 P.3d 280 (Colo. 2000) (en banc) ...........................64

*Walker v. James*, 85 S.W.2d 876 (Mo. 1935) (per curiam)....................................43

Page

*Werremeyer v. K.C. Auto Salvage Co.*, 134 S.W.3d 633 (Mo. 2004) (en banc)......................................................................................64

*Willers v. Wettestad*, 510 N.W.2d 676 (S.D. 1994)..................................30

*Williams v. Van Biber*, 886 S.W.2d 10 (Mo. Ct. App. 1994) ..................70

*Witmer v. Blair*, 588 S.W.2d 222 (Mo. Ct. App. 1979)...........1, 26, 27, 30

## CONSTITUTIONAL PROVISION, STATUTES, AND RULES

U.S. Const. amend. VII .........................................................................37

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1367 .....................................................................................1

Fed. R. Civ. P. 50 ..............................................................................56, 57

Fed. R. Civ. P. 50(a)(1) .....................................................................23, 35

Fed. R. Civ. P. 50(b) ..............................................................................35

Fed. R. Civ. P. 52 ..............................................................................21, 41

Fed. R. Civ. P. 59 ...................................................................................24

Ala. Code § 27-17A-31(g)-(h) (West 2016) ...........................................59

Fla. Stat. § 497.458(g), (j) (2015) ..........................................................59

Mo. Rev. Stat. § 436.005 (2008) (repealed 2009) ..................................60

Mo. Rev. Stat. § 436.021(1)(2) (2008) (repealed 2009)............................4

Mo. Rev. Stat. § 436.027 (2008) (repealed 2009) .................................4, 5

Mo. Rev. Stat. § 436.031(2) (2008) (repealed 2009)........................*passim*

Mo. Rev. Stat. § 436.031(3) (2008) (repealed 2009).................................5

xii

Page

Mo. Rev. Stat. § 436.035(1) (2008) (repealed 2009)..................................5

Mo. Rev. Stat. § 436.038 (2008) (repealed 2009) ....................................5

Mo. Rev. Stat. § 436.041 (2008) (repealed 2009) ....................................5

Mo. Rev. Stat. § 436.045 (2008) (repealed 2009) .................................4, 5

Mo. Rev. Stat. § 436.048 (2008) (repealed 2009) ..................................59

Mo. Rev. Stat. § 456.10-1001(1) (2015)..................................27

Mo. Rev. Stat. § 456.10-1001(2)(3) (2015) ..................................28

Mo. Rev. Stat. § 456.10-1002 (2015) ..................................29, 33

Mo. Rev. Stat. § 537.067 (2015)..................................21, 62, 63, 64

Mo. Rev. Stat. § 537.067(1) (2015) ..................................2, 62

Mo. Rev. Stat. § 537.067(2) (2015) ..................................64

Mo. Rev. Stat. § 537.068 (2015) ..................................75

Mo. Rev. Stat § 538.305 (2015) ..................................63

L.1987, H.B. 700 § 41..................................62

L.2005, H.B. No. 393..................................62

Tex. Ins. Code Ann. § 443.154(m) (West 2015) ..................................51

## MISCELLANEOUS

76 Am. Jur. 2d *Trusts* § 598 (2015)..................................28, 38

76 Am. Jur. 2d *Trusts* § 671 (2015) ..................................30

*Black's Law Dictionary* 934 (10th ed. 2014)..................................58

George Gleason Bogert, et al., *Bogert Trusts and Trustees*, § 1 (3d ed. 2006) ..................................58

Page

George Gleason Bogert, et al., *Bogert Trusts and Trustees*, § 942 (3d ed. 2006) ...............................................................................46

1 Dan B. Dobbs, *Law of Remedies:  Damages–Equity–Restitution* § 2.6(3) (2d ed. 1993) .................................................................38

David M. English, *The Uniform Trust Code (2000):  Significant Provisions and Policy Issues*, 67 Mo. L. Rev. 143 (2002) .................................27, 28

Restatement (Second) of Trusts § 198(1) (1959)................................38, 39

Restatement (Second) of Trusts § 198(1) cmt. e (1959)........................38

Restatement (Second) of Trusts § 201 (1959) .......................................26

Restatement (Second) of Trusts § 205 (1959) ............................29, 30, 33

Restatement (Third) of Agency § 5.04 cmt. c (2006)............................49

Restatement (Third) of Trusts § 2 (2003) ........................................26, 33

Restatement (Third) of Trusts § 47 cmt. a (2003) .................................59

Restatement (Third) of Trusts § 48 (2003) ........................................2, 58

Restatement (Third) of Trusts § 48 cmt. a (2003. ................................58

Restatement (Third) of Trusts § 56 (2003) .............................................59

Restatement (Third) of Trusts § 70 (2007) .............................................26

Restatement (Third) of Trusts § 76 (2007) .............................................26

Restatement (Third) of Trusts § 77 (2007) .............................................26

Restatement (Third) of Trusts § 95 cmt. b (2012) ...........................28, 32

Restatement (Third) of Trusts § 97 (2012) .............................................44

Restatement (Third) of Trusts § 97 cmt. b (2012) .................................48

Page

Restatement (Third) of Trusts § 97 cmt. c (2012) ...................................................48

Restatement (Third) of Trusts § 100 (2012) ............................................................28

Restatement (Third) of Trusts § 100 cmt. a(2) (2012)............................................32

Rev. Rul. 73-140, 1973-1 C.B. 323 .........................................................................59

4 Austin Wakeman Scott et al., *Scott & Ascher on Trusts* § 24.1.1 (5th
     ed. 2007) ............................................................................................................27

4 Austin Wakeman Scott et al., *Scott & Ascher on Trusts* § 24.9 (5th
     ed. 2007) ............................................................................................................30

Uniform Trust Code § 1002 (2000) ........................................................................29

## STATEMENT OF JURISDICTION

The district court entered judgment on March 9, 2015.  Addendum ("Adden.") 58.  On April 6, 2015, PNC Bank filed a renewed motion for judgment as a matter of law, a motion for new trial, and a motion to amend the judgment.  On November 20, 2015, the court entered rulings denying PNC's renewed motion for judgment as a matter of law and motion for new trial, and granting PNC's motion to amend the judgment.  Adden. 59; Adden. 91; Docket Entry ("Dkt.") 2507.  PNC filed a timely notice of appeal on December 2, 2015.  Appendix ("A.") 1124.

The district court had jurisdiction over Plaintiffs' claims against Forever Enterprises under 28 U.S.C. § 1331 and Plaintiffs' claims against PNC under 28 U.S.C. § 1367.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the court erred in holding that Plaintiffs could pursue "tort" claims against PNC and thereby avoid the trust-law measure of damages.

*Estate of Luyties v. Scudder*, 432 S.W.2d 210 (Mo. 1968) (per curiam);

*Barnett v. Rogers*, 400 S.W.3d 38 (Mo. Ct. App. 2013);

*Parker v. Pine*, 617 S.W.2d 536 (Mo. Ct. App. 1981);

*Witmer v. Blair*, 588 S.W.2d 222 (Mo. Ct. App. 1979).

2.     Whether the court erred in submitting Plaintiffs' claims to a jury.

*Brown v. United Mo. Bank, N.A.*, 78 F.3d 382 (8th Cir. 1996).

(1)

3.    a.    Whether the court erred in disallowing PNC's defenses of (i) authorization, (ii) *in pari delicto*, and (iii) apportionment of fault based on the conduct of NPS and Forever Enterprises.

*Reynolds v. Third Nat'l Bank*, 225 S.W. 901 (Mo. 1920) (per curiam);

*Miller v. Ernst & Young*, 938 S.W.2d 313 (Mo. Ct. App. 1997);

*Grove v. Sutliffe*, 916 S.W.2d 825 (Mo. Ct. App. 1995);

Mo. Rev. Stat. § 537.067(1) (2015).

b.    Whether the court erred in holding that Missouri consumers and funeral homes were beneficiaries of the Missouri trusts.

Restatement (Third) of Trusts § 48 (2003).

4.    Whether the court erred in instructing the jury that the defense established by Mo. Rev. Stat. § 436.031(2)—which "relieve[s] [the trustee] of all liability regarding investment decisions made by [an] investment advisor" appointed by the pre-need seller—applies only if the investment advisor's decisions were reasonably prudent.

Mo. Rev. Stat. § 436.031(2) (2008) (repealed 2009).

5.    Whether the court erred in holding that Plaintiffs proved that PNC's predecessor-in-interest, Allegiant Bank, caused Plaintiffs' claimed damages.

*Nail v. Husch Blackwell Sanders, LLP*, 436 S.W.3d 556 (Mo. 2014) (en banc);

*Finocchio v. Mahler*, 37 S.W.3d 300 (Mo. Ct. App. 2000).

2

6.      Whether the court erred in holding that Plaintiffs proved by clear and convincing evidence that Allegiant engaged in outrageous conduct sufficient to warrant an award of punitive damages.

*Koester v. Am. Republic Invs., Inc.*, 11 F.3d 818 (8th Cir. 1993);

*Alcorn v. Union Pac. R.R.*, 50 S.W.3d 226 (Mo. 2001) (en banc), *overruled in part on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29, 40 (Mo. 2013) (en banc).

## STATEMENT OF THE CASE

### A.      Factual Background

1.      This case arises from a nationwide criminal scheme orchestrated by a St. Louis-based company called National Prearranged Services ("NPS"), which was owned and operated by the Cassity family.  A.417-418.  The Cassitys also owned a number of related companies, including Forever Enterprises, which operated funeral homes and cemeteries, and two Texas-based life insurance companies, Lincoln Memorial Life Insurance Company ("Lincoln") and Memorial Services Life Insurance Company ("Memorial").  A.418-421.

NPS began operations in 1979.  A.417.  It sold pre-need funeral contracts, which permit an individual to buy funeral services in advance at a locked-in price.  A.462.  There were three parties to these contracts:  a consumer, a funeral home, and NPS, the pre-need seller.  A.463.  Upon the consumer's death, the funeral

3

home provided the funeral services, and NPS paid the funeral home the face amount of the contract (*i.e.*, the amount paid by the consumer) plus an additional "growth" amount governed by a separate agreement between NPS and the funeral home.  A.463-465.  Promises to pay "growth"—such as a guaranteed annual return of 5 percent (and potentially as high as 12 percent) on all contracts—were one of the ways that NPS induced funeral homes to do business with NPS.  A.415-416, 422-423, 479-480.

2.     Missouri was one of nineteen states in which NPS operated, A.425, and was one of six "foundation" states from which NPS expanded over time, A.471.  NPS's business model in Missouri differed from its model in other states. Missouri pre-need funeral contracts were governed by Chapter 436 of the Missouri Revised Statutes.  Chapter 436 permitted the pre-need seller to "retain as his own money" up to 20 percent of the amount agreed to be paid by the consumer.  Mo. Rev. Stat. § 436.027 (2008) (repealed 2009).  It required the seller to deposit into a trust the remaining 80 percent.  *Id.* §§ 436.021(1)(2), 436.027.  It also required the seller to appoint as trustee a chartered bank authorized to exercise trust powers in Missouri.  *Id.* § 436.031(2).

Upon the consumer's death, the funeral home was required to certify to the pre-need seller that it had provided the agreed-upon funeral services.  *Id.* § 436.045.  The pre-need seller would then pay the funeral home the amount due

4

under the contract.  *Id.*  After this payment, the trustee would "distribute to the seller from the trust an amount equal to all deposits made into the trust for the contract."  *Id.*  Because the seller was permitted to "retain as his own money" up to 20 percent of the amount agreed to be paid by the consumer, *id.* § 436.027, the trustee's distribution to the seller of funds deposited into the trust for the contract would not necessarily cover the entire amount the seller had received from the consumer or paid the funeral home.  The trustee distributed trust principal only to the pre-need seller, *not* to funeral homes or pre-need consumers.  *See id.* § 436.045; *see also id.* §§ 436.035(1), 436.038, 436.041; A.373.  Only the seller had the right to trust income.  Mo. Rev. Stat. § 436.031(3).

Chapter 436 provided that trust property, including principal and undistributed income, "shall be invested and reinvested by the trustee."  *Id.* § 436.031(2).  Once the trust reached a certain size, however, the statute authorized the pre-need seller to appoint "a federally registered or Missouri-registered independent qualified investment advisor" to make "investment decisions regarding the principal and undistributed income."  *Id.*  In that case, the trustee was required to keep "title to all investment assets . . . to be liquidated upon request of the advisor of the seller."  *Id.*  The statute gave the trustee an important protection in that situation:  "[t]he trustee shall be relieved of all liability regarding investment decisions made by such qualified investment advisor."  *Id.*

5

Outside Missouri, NPS typically was not required to deposit pre-need funds into trust.[1]  In those states, when a consumer purchased a pre-need contract, the consumer also purchased a life insurance policy from Lincoln or Memorial to pay for funeral services upon the consumer's death.  A.472-473.  Lincoln issued policies in multiple states; Memorial did so only in Texas.  A.650-651.

3.     NPS and its affiliates were subject to extensive regulatory oversight. NPS was regulated and examined by the Missouri Division of Professional Regulation and Board of Embalmers and the Texas Department of Banking.  *See* A.565, 691, 694-695, 992, 1414-1421.  Between 1994 and 2000, a court-appointed monitor audited NPS's funding of its Missouri trusts pursuant to a sealed consent judgment between NPS and the Missouri Attorney General's office.  *See* A.564, 569-571.  Lincoln and Memorial were regularly examined by the Texas and Missouri Departments of Insurance.  *See, e.g.*, A.692-695, 887, 890, 990-992.

4.     PNC is the successor-in-interest to National City Bank, which was the successor-in-interest to a Missouri bank called Allegiant Bank.  Allegiant became trustee of NPS's Missouri trusts in August 1998.  A.572.  Allegiant served for approximately six years, resigning in May 2004.  A.588.  Herbert Morisse, a licensed attorney, was Allegiant's administrator for the trusts.  A.346, 366.

---

[1] NPS also had an Iowa trust to hold proceeds from sales of pre-need contracts in that state.  A.174.  Allegiant was not trustee of NPS's Iowa trust.

6

When Allegiant accepted the trusts from the previous trustee, Morisse reviewed and annotated Chapter 436, comparing it with the trust agreement.[2]  A.367-371, 1402.  The trust agreement closely mirrored Chapter 436:  it required the trustee to make distributions of principal and income to NPS, A.1130-1132; authorized NPS to appoint an investment advisor, A.1129-1130; and vested "full discretion and authority with respect to the investment of the funds" in the trustee "or" the investment advisor, A.1133.

Before Allegiant accepted the trusts, NPS already had appointed an investment management firm, Wulf Bates & Murphy ("WBM"), as investment advisor to the Missouri trusts.  *See* A.374-375, 1141.  WBM was founded in the mid-1980s and was registered with the U.S. Securities and Exchange Commission.  A.520-526, 531-542, 1061-1062.  Neither the Cassitys nor any Cassity-affiliated company had any ownership stake in WBM.  A.1063.  WBM hired its own employees, paid its own taxes, and leased its own office space.[3]  A.1062.  David Wulf of WBM had primary responsibility for the trusts.  A.384.

WBM served as investment advisor throughout Allegiant's tenure.  A.1014. Consistent with the prior trustee's practice, Allegiant transferred trust funds upon

---

[2] There were multiple trust agreements that governed the various trusts administered by Allegiant.  The trust agreements are identical in all material respects.

[3] At some point in time, WBM began leasing office space from NPS, as did other businesses.  A.687, 976, 1063.  WBM paid rent to NPS.  A.1063-1064.

7

written instructions received from NPS, copied to WBM, which Allegiant understood to reflect the direction of WBM.  A.353-354, 389-390.  Wulf confirmed to Allegiant in writing that NPS was authorized to relay WBM's investment decisions to Allegiant.  A.1179.  He represented that "all investment transactions reflected [in Allegiant's trust statements to date] were executed upon the direction and authorization of [WBM] as Investment Advisor."  A.1180.  Following Wulf's direction, Allegiant continued to transfer funds upon written instruction from NPS.  A.353.  NPS copied those instructions to WBM, A.377-378, 518; *see, e.g.*, A.1436, and Allegiant reported the transactions on the trust statements (which were sent to WBM) as made at WBM's direction, A.379-381; *see, e.g.*, A.1181-1197.

During Allegiant's trusteeship, most trust assets were invested in Lincoln life insurance policies.  A.362.  Wulf viewed life insurance policies as a "close to perfect" investment for the pre-need trusts in part because such policies are guaranteed by Guaranty Associations.  A.1021.  The trusts were the owner and beneficiary of those policies, which insured the lives of NPS's pre-need consumers in Missouri.  A.347.  Each month, Lincoln sent Allegiant a list of policies in force, identifying the insured lives and face values of the policies, as well as a certification that the trusts were the owner and beneficiary of newly issued policies.  A.347; *see, e.g.*, A.1276-1296.

8

5.     Allegiant resigned as trustee in May 2004.  A.588.  At that time, approximately $122.9 million was still deposited into the Missouri trusts.  A.696-697.  The trusts held approximately $159.8 million in Lincoln life insurance policies, A.697, all of which were then in force, A.555.

A merger between Allegiant and National City precipitated Allegiant's resignation.  The planned merger was announced in 2003.  As a general matter, National City did not like the pre-need trust business based on past experience with it.  A.338-342, 857, 862.  National City quickly decided that it did not want to assume Allegiant's role as trustee for the Missouri pre-need trusts.  A.852-853.  National City conveyed its views to Allegiant so that Allegiant could look for a successor.  A.865, 870.  In the meantime, because the trusts would transition to National City if a successor trustee were not found, it commenced a review of the trusts.  A.868.

National City's auditors reviewed documents and spoke to Morisse.  The auditors wrote internally that NPS did not provide Allegiant with policy-level information regarding adjustments to the trust accounts.  A-1422.  And they discovered that Allegiant could not locate any support for a $13.5 million group term life insurance policy, about which Morisse was "embarrassed."  A.1434-1435.  This latter issue was the only problem that the auditors disclosed to Morisse.

Shortly before the merger, Allegiant transferred the Missouri trusts to Bremen Bank.  There was no evidence that National City or Allegiant believed that

NPS was operating a fraud.  Nothing National City learned during its review of the trusts caused it to call off its acquisition of Allegiant (which included Allegiant's liabilities).

6.    NPS, it turns out, had been deceiving its regulators, trustees, and customers for years.  In late 2007 (years after Allegiant's tenure), insurance regulators discovered that NPS had been borrowing against the Lincoln policies owned by the Missouri trusts and ordered Lincoln to reverse all such policy loans.  *See* A.605. At the direction of NPS's founder, Doug Cassity, and CFO, Randy Sutton, Lincoln had routinely issued policy loans against these policies without obtaining authorization or consent from the trustees, notwithstanding that the trusts owned the policies.  A.481, 490-497; *see also* A.1516 (Lincoln instructions to employees to conceal existence of policy loans).  Regulators also discovered that, outside Missouri, NPS had been using "white-out" to change the payment information on insurance applications; this scam allowed NPS to pocket insurance premiums paid by preneed consumers, rather than submitting the premiums to the life insurance company.  A.598-601, 607-608.

In 2008 a Texas court placed NPS, Lincoln, and Memorial into receivership. A.435-436, 1298-1299.  The Plaintiff Special Deputy Receiver ("SDR") was appointed.  A.593-594.  Because Lincoln and Memorial were life insurance companies, their liquidation triggered coverage by the Plaintiff Guaranty Associations.

10

A.437-438.  State statutes created the Guaranty Associations and require them to honor the policy obligations of insolvent member companies.  A.437-439.  Each Guaranty Association funds such payments by assessing its member companies.  A.440.  Membership in a state's Guaranty Association is mandatory for any insurance company doing business within that state.  A.440-441.  As their enabling statutes require, the Guaranty Associations are making payments on policies issued by Lincoln and Memorial, thereby protecting funeral homes and NPS's customers.  A.442-443, 446.

The Guaranty Associations and the SDR agreed to a Liquidation Plan for NPS, Lincoln, and Memorial.  A.1297.  As discussed above, in Missouri, the trusts were the owners and beneficiaries of the policies issued by Lincoln.  Death benefits under those policies were payable to the trustee.  A.1307.  In the Liquidation Plan, however, the Guaranty Associations and the SDR agreed to bypass the trusts.  Rather than paying death benefits to the trusts, the Guaranty Associations would pay death benefits "directly to the funeral home that is responsible for providing . . . the funeral/burial services."  A.1307.  In return, the funeral homes receiving benefits and the consumers whose lives were insured by the policies would assign to the paying Guaranty Association any rights under and causes of action relating to the policies.  A.1309-1310.

11

7.    The federal government convicted six individuals for their role in the NPS fraud:  Doug Cassity; Brent Cassity, an officer of NPS and Forever Enterprises; David Wulf, the investment advisor; Randy Sutton, NPS's CFO; Howard Wittner, NPS's outside lawyer; and Sharon Nekol Province, an NPS officer.  A.427, 1349-1401.  Doug Cassity, Sutton, and Wulf were convicted of "knowingly execut[ing] and attempt[ing] to execute a scheme and artifice to defraud Allegiant," A.685-686, by taking policy loans without its knowledge, A.549.

## B.    Procedural Background

### 1.    *Plaintiffs' claims*

a.    The SDR and Guaranty Associations filed this lawsuit on August 6, 2009.  The SDR purports to sue PNC on behalf of the NPS estate, funeral homes, and consumers.  A.126.  The Guaranty Associations purport to sue PNC as assignees of funeral homes and consumers receiving payments under the Liquidation Plan.  A.122-123.

In the Third Amended Complaint, Plaintiffs brought claims against more than forty defendants, most of whom were individuals and entities associated with NPS, including Forever Enterprises.  Plaintiffs sued those defendants under RICO, claiming that they operated a fraudulent scheme that "used new dollars received through NPS pre-need contract sales to pay claims on prior contracts sold by NPS and to pay life insurance premiums."  A.151-174.

12

Plaintiffs also sued all the trustees of NPS's trusts in Missouri and Iowa (or their successors-in-interest).  Plaintiffs asserted claims against PNC and the other trustee defendants for breach of fiduciary duty, negligence, and aiding and abetting fraud and breach of fiduciary duty.  The court granted PNC's motion to dismiss the aiding-and-abetting claims.  Dkt. 1123.

The two claims that proceeded to trial—breach of fiduciary duty and negligence—were virtually identical.  Plaintiffs alleged that, "[a]s trustees of one or more NPS pre-need trusts, the Trustee Defendants . . . were responsible for prudently administering the NPS pre-need trusts in good faith and in accordance with the purposes of the trusts and the interest of the beneficiaries."  A.284, 287-288.  Plaintiffs alleged that the trustees' "duties as trustees included controlling and protecting the [NPS pre-need] trust funds, monitoring and accounting for the funds in the trusts, and maintaining adequate records concerning all trust transactions."  A.285, 288.  As a result of the trustees' breaches of these duties, Plaintiffs alleged, other defendants "were able to manipulate trust assets and siphon millions of dollars from the NPS pre-need trusts, such that the trusts lacked sufficient assets to provide consumers their pre-paid funeral services."  A.286, 288.

b.    PNC moved to strike Plaintiffs' jury demand, arguing that Plaintiffs' claims are, in reality, a single, equitable claim for "breach of trust."  The court denied PNC's motion, Adden. 1, and its motion for reconsideration, Adden. 4.

13

## 2.    *The court's summary-judgment rulings*

a.    PNC moved for summary judgment.  PNC argued that trust law defines Plaintiffs' monetary remedy as the amount of harm to the trust assets.  PNC further contended that the SDR's claims are barred by the *in pari delicto* doctrine and that the SDR cannot recover for actions authorized by NPS, the trust beneficiary.  PNC also sought a ruling that NPS was the sole beneficiary of the trusts.

Plaintiffs moved for partial summary judgment, arguing that consumers and funeral homes were trust beneficiaries and that Chapter 436 provides a trustee relief from liability for investment decisions made by an investment advisor only if the decisions are reasonably prudent.

b.    The court held that Plaintiffs' claims were not subject to the trust-law measure of damages because "this is a suit at law and Plaintiffs are alleging duties legal in nature."  Adden. 33-34.  The court seemingly held, however, that PNC could not be liable for damages relating to life insurance policies that were not assets of the Missouri trusts because Allegiant owed no duties related to such policies.  Discussing one category of policies—those issued by Memorial—the court found that it was disputed whether those policies were held in the Missouri trusts.  Adden. 35-36.  Turning to PNC's *in pari delicto* and authorization defenses, the court held that it would "not allow [those defenses] to be asserted against the SDR" even though NPS itself was subject to the defenses.  Adden. 46.

14

Granting partial summary judgment to Plaintiffs, the court held that consumers and funeral homes were trust beneficiaries.  Adden. 20.  It further held that Chapter 436 relieves a trustee of liability for an investment advisor's investment decisions only if "the assets are not placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in."  Adden. 22-23.

c.     PNC moved for limited reconsideration, pointing out that it was undisputed that the Missouri trusts did *not* hold Memorial life insurance policies.  Therefore, under the court's reasoning, PNC could not be liable for losses associated with those policies.  The court denied PNC's motion.  Adden. 54.  It held that the Guaranty Associations (as assignees of funeral homes and consumers) could not claim those losses because Allegiant did not owe duties to consumers or funeral homes associated with those Memorial policies.  Adden. 56.  The court held, however, that the *SDR* could nonetheless recover those amounts on behalf of NPS because the Guaranty Associations had filed a claim against the NPS estate.  Adden. 57.  The court thus permitted the SDR to claim as damages the amounts the Guaranty Associations are paying on policies issued by Memorial and those issued by Lincoln in states outside Missouri—none of which were ever assets of the Missouri trusts.  It was this back-door damages theory that proceeded to trial.  *See* Adden. 83.

15

### 3.   *Trial*

a.   The case was tried to a jury from February 2 to March 9, 2015.  By then, only two defendants remained:  PNC and Forever Enterprises, NPS's sister company.  Forever Enterprises did not participate in the trial.  Plaintiffs told the jury in closing that it could award whatever sum it wanted against that defendant. A.723.

b.   Plaintiffs claimed $355.5 million in compensatory damages from PNC. A.612.  This amount was not tied to losses in the Missouri trusts.  Plaintiffs' damages expert, Dr. Jonathan Arnold, testified that he did not calculate the value of the trust assets, A.642-643; did not examine "whether any particular investment by the trusts made money," A.641; and "did not calculate losses from the particular transfer of any money out of the Missouri trusts," A.638-640.

Instead, Dr. Arnold simply summed up three categories of obligations of the NPS estate.  First, he totaled NPS's obligations to the Guaranty Associations for contracts with associated life insurance policies.  A.618-619.  This amount, which includes obligations related to both Lincoln and Memorial policies, totaled approximately $307.7 million.  A.624-625.  Dr. Arnold divided this amount into four sub-categories:

- Losses on policies issued in Missouri during Allegiant's trusteeship: approximately $53.2 million.  A.631.

16

- Losses on policies issued outside Missouri during Allegiant's trustee-ship:  approximately $63.4 million.  A.631-632.

- Losses on policies issued in Missouri after Allegiant's trusteeship: approximately $40 million.  A.635.

- Losses on policies issued outside Missouri after Allegiant's trustee-ship:  approximately $151.1 million.  A.635-636.

Next, Dr. Arnold added $44 million in NPS's "growth" obligations to funer-al homes around the country.  A.620-621, 627-628.  He divided this figure into the same four subcategories; $12.5 million of the $44 million stemmed from growth obligations related to contracts NPS sold in Missouri during Allegiant's trustee-ship.  A.631.  Finally, Dr. Arnold added approximately $3.8 million in so-called "orphan" contract obligations, obligations on pre-need contracts which did not have associated life insurance policies and thus are not covered by the Guaranty Associations.  A.622-623, 629-630.  After subtracting other funds available to the SDR to pay claims (such as recoveries from Lincoln's reinsurers), A.626-627, he arrived at $355.5 million in total damages.

Dr. Arnold's damages figure thus included NPS's obligations on every con-tract it sold around the country over a ten-year period, starting the very first day Allegiant became trustee and continuing for years after Allegiant had resigned—as Plaintiffs' counsel put it in closing statement, "[f]rom Day One until the Cassity Ponzi scheme crashed."  A.716.  To arrive at this figure, Dr. Arnold "assum[ed]

17

that Allegiant . . . could have stopped the . . . ongoing Cassity scheme" on "Day One when Allegiant took over as trustee."  A.615-617.

      c.    At the close of Plaintiffs' case in chief and following the close of evidence, PNC moved for judgment as a matter of law.  *See* Dkt. 2285; A.657-684, 701-706.  PNC argued that Plaintiffs had not proven the trust-law measure of damages or that Allegiant caused their claimed damages.  In the alternative, PNC argued that Plaintiffs had not proven that Allegiant caused two subcategories of damages:  "growth" payments and the losses incurred outside Missouri on Memorial policies.  PNC also argued that there was no basis for submitting punitive damages to the jury.

      The court denied PNC's motion.  A.684.  It observed, however, that it had "some significant concerns" about categories of Plaintiffs' claimed damages and "some concern about proceeding or allowing a punitive damage instruction." A.684.

      d.    The jury awarded Plaintiffs $355.5 million in compensatory damages and $35.55 in punitive damages against PNC.  A.724-725.  The jury awarded Plaintiffs $100 million on their RICO claim against Forever Enterprises.  A.726.

### 4.    *The court's post-trial rulings*

On April 6, 2015, PNC filed a renewed motion for judgment as a matter of law or, in the alternative, new trial or remittitur; a motion for a new trial based on

18

legal and evidentiary errors; and a motion to amend the judgment to account for settlement amounts paid by other defendants.

The court denied PNC's renewed motion for judgment as a matter of law. Adden. 59.  It also denied PNC's motion for a new trial.  Adden. 91.  The court re-iterated its holdings that (a) Plaintiffs were entitled to try tort claims to a jury, (b) Chapter 436 protects a trustee from liability only for reasonably prudent invest-ments, and (c) Missouri consumers and funeral homes are trust beneficiaries.  Ad-den. 92-93, 104-107, 108-109.  The court reaffirmed its rejection of PNC's author-ization and *in pari delicto* defenses, although it *sua sponte* advanced new argu-ments to justify that result.  Adden. 93-104.  Finally, the court held that it had cor-rectly denied PNC a jury instruction on apportionment of liability with Forever En-terprises.  Adden. 112-113.

In a sealed ruling, the court granted PNC's motion to amend the judgment. Dkt. 2507.  The court reduced the compensatory damages award.  This produced a total amended judgment of $289,437,000.17 (which includes the $35.55 million punitive damages award).  A.101.  The court denied Plaintiffs' motion for pre-judgment interest, Dkt. 2508, and granted Plaintiffs $499,723.20 in costs, Dkt. 2509.

19

## SUMMARY OF ARGUMENT

The district court committed a series of prejudicial legal errors.  The jury's astonishing damages award is the direct product of those errors.  This Court should reverse the judgment with instructions to enter judgment in PNC's favor, or in the alternative, to grant a new bench trial.

I.     Trust law defines a trustee's duties and a beneficiary's remedy upon breach of those duties.  Because Plaintiffs claim that Allegiant breached duties it owed as trustee to beneficiaries, their claims are necessarily governed by trust law.  Under Missouri law, a beneficiary's damages remedy for breach of a trustee's duties is the loss in value of the trust assets.  The court held, however, that Plaintiffs' claims were governed by tort law, not trust law, because Plaintiffs called their claims "tort" claims and sought money damages.  As a result, it permitted the jury to award damages based on a theory that bore no relation to Allegiant's duties or the trust-law measure of damages.  This unprecedented and prejudicial error requires reversal.

II.     As this Court has held, a beneficiary's claim for money damages for a trustee's breach of duties is an equitable claim.  The district court incorrectly held that Plaintiffs' claims were at law because they pleaded "negligence" and sought money damages.  The court's erroneous grant of a jury trial was the foundation for the court's later ruling on the measure of damages and deprived this Court of the

20

findings of fact required by Rule 52. If this Court does not reverse with instructions to enter judgment for PNC, it should remand for a new bench trial in the alternative.

III.    A.    The court erroneously struck PNC's defenses based on the conduct of NPS. Plaintiffs' theory is that Allegiant improperly took direction from NPS, allowing NPS to steal money from the trusts. A beneficiary that authorizes a trustee's actions, however, cannot later claim that those actions constitute a breach of duty. And, under the *in pari delicto* doctrine, a wrongdoer's fraudulent conduct bars a claim that the defendant should have prevented the fraud. The court's holding that public policy precludes these defenses against NPS's receiver, the SDR, contravenes Missouri cases that apply these or similar defenses in analogous circumstances. That holding eviscerated defenses to the SDR's claims. Moreover, although the court permitted the Guaranty Associations to pursue a subset of Plaintiffs' claimed damages as assignees of consumers and funeral homes, the court's holding that consumers and funeral homes were trust beneficiaries also was in error.

B.    The court further erred in denying apportionment of liability with Forever Enterprises, a named defendant who was on the verdict form at trial. Because the court permitted Plaintiffs to pursue "tort" claims against PNC and Forever Enterprises, PNC was entitled to have the jury apportion liability under Mo. Rev. Stat.

21

§ 537.067.  The court's contrary holding contradicts the plain text of the statute, rests on inapposite cases involving different defenses, and necessitates a new trial.

IV.    Under Chapter 436, when a pre-need seller appoints an investment advisor, as here, the trustee is "relieved of all liability regarding investment decisions" made by the investment advisor.  The court instructed the jury that this defense applied only if the investment advisor's decisions could have been made by a reasonably prudent trustee.  That interpretation rendered PNC's statutory defense a dead letter, because any reasonably prudent decision could not give rise to liability in the first place.  The court's interpretation thus rendered meaningless important statutory text.  A new trial is required to remedy this error, which bolstered one of Plaintiffs' principal theories of liability.

V.    PNC is entitled to judgment as a matter of law or, in the alternative, new trial because Plaintiffs did not prove that Allegiant caused their claimed damages.  Plaintiffs sought to hold PNC liable for every pre-need contract issued by NPS nationwide during a ten-year period, on the theory that Allegiant could have prevented NPS from issuing additional contracts anywhere and at any time from the first day of its trusteeship.  No evidence supports that implausible proposition. Moreover, Plaintiffs' claimed damages—the vast majority of which arose outside Missouri and after Allegiant resigned as trustee—are far too attenuated from Alle-

22

giant's conduct to establish proximate causation.  At a minimum, PNC is entitled to judgment as a matter of law on three subcategories of damages.

VI.    Finally, Plaintiffs did not prove by clear and convincing evidence that Allegiant engaged in outrageous conduct tantamount to intentional wrongdoing, as is required to obtain punitive damages.  Courts applying Missouri law have not permitted an award of punitive damages against a fiduciary absent intentional misconduct or self-dealing.  There is no evidence of such conduct here; to the contrary, each of the factors weighing against punitive damages is present on this record.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for judgment as a matter of law de novo.  *Graham Constr. Servs., Inc. v. Hammer & Steel, Inc.*, 755 F.3d 611, 616 (8th Cir. 2014).  Judgment should be granted where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [opposing] party on [an] issue."  Fed. R. Civ. P. 50(a)(1).  When reviewing the sufficiency of the evidence on a state-law claim, courts apply "the sufficiency standard of the state in which it sits."  *Ashley v. R.D. Columbia Assocs., L.P.*, 54 F.3d 498, 501 (8th Cir. 1995).  Under Missouri law, "each and every fact essential to liability" must be supported by evidence that, "if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case."  *Oliver v. Ford Motor Credit Co.*, 437 S.W.3d 352, 357-58 (Mo. Ct. App. 2014) (internal quotation marks omitted).

23

This Court reviews de novo the question "[w]hether a party is entitled to a jury trial," *Brown v. United Mo. Bank, N.A.*, 78 F.3d 382, 387 (8th Cir. 1996), and a court's decision to grant or deny summary judgment, *Pinnacle Pizza Co. v. Little Caesar Enters., Inc.*, 598 F.3d 970, 974 (8th Cir. 2010).

The denial of a motion for new trial is reviewed for clear abuse of discretion, "with the key question being whether a new trial is necessary to prevent a miscarriage of justice." *Wagner v. Jones*, 758 F.3d 1030, 1033-34 (8th Cir. 2014) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 1529 (2015); *see also Bank of Am., N.A. v. JB Hanna, LLC*, 766 F.3d 841, 851 (8th Cir. 2014).  This Court "may reverse a district court's denial of a Rule 59 motion where its judgment rests on an erroneous legal standard." *Wagner*, 758 F.3d at 1033-34 (internal quotation marks omitted).  This Court will reverse a district court's denial of remittitur "upon a manifest abuse of discretion or [when] the verdict is so grossly excessive as to shock the conscience." *Foster v. Time Warner Entm't Co.*, 250 F.3d 1189, 1194 (8th Cir. 2001) (internal quotation marks omitted).

When a motion for new trial is based on challenged jury instructions, this Court asks "whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Phillips v. Collings*, 256 F.3d 843, 851 (8th Cir. 2001) (internal quotation marks omitted).  An erroneous instruction warrants a new trial if the error

24

"misled the jury or had a probable effect on the verdict." *Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 499 (8th Cir. 2010) (internal quotation marks omitted).  A court abuses its discretion when it refuses to give a requested jury instruction that "is legally correct and supported by the evidence." *Graham Constr. Servs.*, 755 F.3d at 618 (internal quotation marks omitted).

## ARGUMENT

### I.   The Court Erroneously Permitted Plaintiffs To Try Their Breach-of-Trust Claim as "Tort" Claims.

A fundamental legal error permeated this case and culminated in an unprecedented damages award.  Under Missouri law, which mirrors the law around the country, a trust beneficiary's claim that a trustee has breached its duties is governed by trust law.  Trust law defines the trustee's duties and the corresponding measure of a trustee's monetary liability to the beneficiary.  The district court held, however, that trust law did not apply because Plaintiffs sought recovery in "tort" for money damages.  This ruling finds no support in Missouri law.  It produced a $355.5 million "tort" verdict against PNC that bears no relation to Allegiant's duties or the trust-law measure of its liability.  This fundamental error requires reversal.

#### A.   Trust Law Governs a Trustee's Duties and Liability to Trust Beneficiaries.

1.   The relationship between trustee and beneficiary is unique.  A trust is "a fiduciary relationship *with respect to property* . . . subjecting the person who

25

holds title to the property to duties to deal with it . . . for one or more persons." Restatement (Third) of Trusts § 2 (2003) (emphasis added).[4]  A trustee's duties are governed by trust law and the trust agreement, *see* Restatement (Third) of Trusts §§ 70, 76 (2007)—not by tort law, s*ee Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1047 (3d Cir. 1993) ("[T]he law of trusts is different from the law of torts."). In administering the trust, the trustee ordinarily must exercise "reasonable care" in "collecting and protecting the trust property," "managing the trust estate to provide returns or other benefits from trust property," and "applying or distributing trust income and principal during the administration of the trust."  Restatement (Third) of Trusts §§ 76, 77; *see also, e.g.*, *Parker v. Pine*, 617 S.W.2d 536, 539-40 (Mo. Ct. App. 1981).

2.     A "'violation by the trustee of any duty which as trustee he owes to the beneficiary'" is a "'breach of trust.'" *Witmer v. Blair*, 588 S.W.2d 222, 224 (Mo. Ct. App. 1979) (quoting Restatement (Second) of Trusts § 201 (1959)). "[E]very violation by a trustee of a duty that equity lays upon him, whether wrongful and fraudulent or done through negligence or arising through mere oversight and forgetfulness, is a breach of trust."  *Covey v. Pierce*, 82 S.W.2d 592, 598 (Mo.

---

[4] Missouri courts typically look to the Restatements of Trusts for guidance.  *See, e.g.*, *O'Riley v. U.S. Bank, N.A.*, 412 S.W.3d 400, 406 (Mo. Ct. App. 2013).  As relevant here, the Restatement (Third) of Trusts does not materially deviate from the Restatement (Second) of Trusts.

Ct. App. 1935) (per curiam); *see also Des Moines Terminal Co. v. Des Moines Union Ry. Co.*, 52 F.2d 616, 627 (8th Cir. 1931).  The Missouri Legislature codified this principle when it adopted the Missouri Uniform Trust Code ("MUTC") in 2004.[5]  *See* Mo. Rev. Stat. § 456.10-1001(1).

A trustee's breach of duties is still a "breach of trust," even if it occurs "negligently."  *Witmer*, 588 S.W.2d at 224 (internal quotation marks omitted).  "[C]ourts generally refuse[] to permit a trust beneficiary to maintain an action at law in tort against the trustee for breach of trust."  4 Austin Wakeman Scott et al., *Scott & Ascher on Trusts* § 24.1.1 (5th ed. 2007); *see, e.g.*, *Honsinger v. UMB Bank*, No. 06-0018-CV-W-ODS, 2007 WL 4287683, at *3 n.7 (W.D. Mo. Dec. 4, 2007) (trust-law statute of limitations applied to all of plaintiffs' claims because they were all "suits by beneficiaries against trustees for actions arising from the trust relationship"); *Novoletsky v. Metro. Life Ins.*, 49 F. Supp. 3d 123, 150-51 (D. Me. 2014) (dismissing negligence claim against trustee because "whatever duties [the trustee] had . . . arose out of her fiduciary relation to [the trust], not a more general tort duty of reasonable care"); *see also, e.g.*, *Kann v. Kann*, 690 A.2d 509,

---

[5] The MUTC took effect in 2005, after Allegiant's tenure.  In all relevant respects, the Uniform Trust Code (on which the MUTC is based) "codifies the common law."  David M. English, *The Uniform Trust Code (2000): Significant Provisions and Policy Issues*, 67 Mo. L. Rev. 143, 144 (2002).

27

517-20 (Md. Ct. App. 1997); *Kohler v. Fletcher*, 442 N.W.2d 169, 172 (Minn. Ct. App. 1989).

This principle makes eminent sense.  A trustee owes duties to a beneficiary by virtue of the trust relationship, and trust law defines those duties, as discussed above.  A beneficiary cannot evade application of trust law simply by "dress[ing] up" a trust claim "in the guise of a tort claim."  *Sarvis v. BMO Harris Bank*, No. 14 C 09143, 2015 WL 2415244, at *6 n.4 (N.D. Ill. May 19, 2015), *aff'd*, 619 F. App'x 520 (7th Cir. 2015); *see also, e.g.*, 76 Am. Jur. 2d *Trusts* § 598 (2015) ("The fact that beneficiaries predicate their breach of trust claim upon the trustee's alleged negligent performance of its duties does not convert an action in equity into one cognizable in law.").

3.     Trust law also governs a beneficiary's remedies against a trustee. Those remedies include "monetary 'compensation' for a loss resulting from a trustee's breach of duty."  *Cigna Corp. v. Amara*, 563 U.S. 421, 441-42 (2011); *see also* Mo. Rev. Stat. § 456.10-1001(2)(3) (to "redress a breach of trust," a court may order a trustee to "pay[] money"); Restatement (Third) of Trusts §§ 95 cmt. b, 100. Under the common law, as codified in the Uniform Trust Code, "[t]he measure of damages for breach of trust is designed to restore the trust property and distributions to what they would have been had the breach not occurred."  David M. Eng-

28

lish, *The Uniform Trust Code (2000): Significant Provisions and Policy Issues*, 67 Mo. L. Rev. 143, 203 (2002).

Missouri law has long defined the measure of a trustee's monetary liability consistent with this restorative purpose. In 1968, the Missouri Supreme Court adopted the measure of liability in section 205 of the Restatement (Second) of Trusts:

> [I]f the trustee commits a breach of trust, he is chargeable with (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust.

*Estate of Luyties v. Scudder*, 432 S.W.2d 210, 216 (Mo. 1968) (per curiam) (internal quotation marks omitted). The Court of Appeals has reaffirmed this measure of liability, *see Barnett v. Rogers*, 400 S.W.3d 38, 49-50 (Mo. Ct. App. 2013); *Parker*, 617 S.W.2d at 540, and the Legislature codified it in the MUTC, *see* Mo. Rev. Stat. § 456.10-1002. Both the Court of Appeals and the drafters of the Uniform Trust Code have described it as a beneficiary's "damages" remedy. *See Parker*, 617 S.W.2d at 540; Uniform Trust Code § 1002 (2000).

The damages remedy set forth in section 205—which Judge Learned Hand described as "hornbook law," *Dabney v. Chase Nat'l Bank of City of N.Y.*, 196 F.2d 668, 673 (2d Cir. 1952)—finds universal acceptance among courts and commentators. *See, e.g.*, *Shriners Hosps. for Crippled Children v. Gardiner*, 733 P.2d

29

1110, 1111 (Ariz. 1987) (en banc); *Willers v. Wettestad*, 510 N.W.2d 676, 680-81 (S.D. 1994); 4 Scott et al., *supra*, § 24.9; 76 Am. Jur. 2d *Trusts* § 671.  Courts have overturned damages awards against trustees that exceeded the losses to the trust.  *See Eiteljorg v. Eiteljorg*, 951 N.E.2d 565, 572 (Ind. Ct. App. 2011) (reversing beneficiary's damages award that was based on the *beneficiary's* lost profits because section 205 permits an award of damages only based on "profits lost to the trust corpus"); *Coster v. Crookham*, 468 N.W.2d 802, 808 (Iowa 1991) (reversing beneficiary's damages award that exceeded the "out-of-pocket loss to the trust").

### B.    Plaintiffs' Claims Against PNC Are Governed by Trust Law.

1.    Although Plaintiffs captioned their claims against PNC "negligence" and "breach of fiduciary duty," both claims are quintessential claims for breach of trust.  Plaintiffs allege that Allegiant breached duties that it owed to the beneficiary *as trustee*.  *See supra* p.13.  In its summary-judgment ruling, the district court acknowledged this point.  *See* Adden. 34 ("The Trustees only owe duties to the beneficiaries of the trusts as trustee."); Adden. 48 (holding that Plaintiffs had not proved that "the Trustees owed a duty outside of their duties as trustees").  Because Plaintiffs' claim is that Allegiant violated duties that "as trustee [it] owe[d] to the beneficiary," Plaintiffs' claim is for breach of trust.  *Witmer*, 588 S.W.2d at 224 (internal quotation marks omitted).

30

The measure of Allegiant's monetary liability to the beneficiary therefore must be the amount of "(a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by [Allegiant] through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust." *Estate of Luyties*, 432 S.W.2d at 216 (internal quotation marks omitted); *accord Barnett*, 400 S.W.3d at 49-50; *Parker*, 617 S.W.2d at 540.  The trust agreement incorporates this measure of liability.  *See* A.1132 ("The Trustee shall be accountable . . . only for the funds paid over to it by the Seller . . . .").

2.    The district court declined to apply Missouri trust law.  In one paragraph of analysis in its summary-judgment ruling, the court held that Plaintiffs' claims were "tort" claims and therefore the trust-law measure of a trustee's liability was inapplicable.  *See* Adden. 33-34.  The court principally reasoned that Plaintiffs' claims were not governed by trust law because the court had previously held that Plaintiffs' claims are at law.  Adden. 33.  According to the court, "[i]f Plaintiffs brought suit to replenish the trust assets solely, the suits would be equitable but where the plaintiffs are seeking recovery personally, the action is legal in nature."  Adden. 34.  This conclusion, made without citation to authority, is wrong in two respects.

31

*First*, a beneficiary's damages remedy against a trustee *is* an equitable remedy. *See Cigna*, 563 U.S. at 441-42 (characterizing a beneficiary's monetary remedy for "a loss resulting from a trustee's breach of duty" as "exclusively equitable" (internal quotation marks omitted)).  That equitable remedy "extend[s] to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary."  *Id.* at 442.  That this relief "takes the form of a money payment does not remove it from the category of traditionally equitable relief."  *Id.* at 441; *see also Brown*, 78 F.3d at 388 ("An action for damages for a breach of trust . . . remains an equitable action."); *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 95 (2d Cir. 1978); Restatement (Third) of Trusts § 95 cmt. b.

An equitable breach-of-trust claim is not transformed into a "tort" claim simply because a beneficiary seeks to recover damages directly.  *See* Restatement (Third) of Trusts § 100 cmt. a(2) (observing that the court may distribute a trustee's monetary payment to the trust *or* to beneficiaries).  The Missouri Court of Appeals has characterized the trust-law damages remedy as payable to the beneficiary.  *See Parker*, 617 S.W.2d at 540 ("[T]he beneficiary is entitled to recover . . . ."); *see also Barnett*, 400 S.W.3d at 40, 51.  The MUTC confirms this point:  a trustee that commits a breach of trust "is liable *to the beneficiaries*" in "the amount required to restore the value of the trust property *and trust distributions* to what

32

they would have been had the breach not occurred."  Mo. Rev. Stat. § 456.10-1002 (emphases added).

*Second*, even if Plaintiffs' claims were properly tried at law to a jury, that fact would not alter the measure of Allegiant's liability.  The measure of a trustee's liability derives from the scope of its duties.  A trustee does not assume a duty to protect a beneficiary from any and all harm or to prevent the beneficiary from harming others.  Rather, a trustee's duty is to protect the *trust property* on behalf of the beneficiary.  *See Cole v. Lamb*, 461 S.W.2d 14, 15 (Mo. Ct. App. 1970) (per curiam); see *also* Restatement (Third) of Trusts § 2.  The district court acknowledged this principle in its jury instructions, *see* Adden. 118-121, but disregarded it with respect to damages.  If the trustee breaches that duty, it must pay damages that reflect the harm done to the assets under the trustee's control—whether such damages are deemed legal or equitable.  A plaintiff cannot alter that fundamental principle merely by asking for more.

Courts have applied the measure of damages set forth in section 205 in cases where the trustee did not oppose a jury trial.  Notably, although *Parker* was tried to a jury, 617 S.W.2d at 538, the Missouri Court of Appeals recognized that section 205 provided the applicable measure of damages, *id.* at 540; *see also, e.g.*, *Coster*, 468 N.W.2d 804, 806-07; *First Trust Co. of Lincoln v. Carlsen*, 268 N.W. 89, 91

33

(Neb. 1936).  In short, the fact that Plaintiffs sought to recover money damages directly has no bearing on the measure of those damages.

The district court also reasoned that it would be unfair to permit "a fiduciary, which has a higher duty than an ordinary person," to "be liable for a much smaller amount" than a person subject to tort-law duties.  Adden. 34; *see also* Adden. 72 (finding that it would be unfair to grant PNC "safe harbor" by "limiting its damages to the value of trust assets managed").  Liability for damages to the trust assets managed by a trustee is hardly a safe harbor.  In any case, the court was not free to apply the aspects of Missouri trust law it deemed fair (here, the degree of care and loyalty imposed on trustees) and disregard the rest.  The court's reasoning confuses the *degree* of a trustee's duty of care and loyalty with the substantive *scope* of those duties and liability therefor.  Although trust law holds trustees to high standards of care and loyalty, it does so in connection with the trustee's "administration of the trust."  *Ramsey v. Boatmen's First Nat'l Bank of K.C., N.A.*, 914 S.W.2d 384, 387 (Mo. Ct. App. 1996).  There is nothing unfair about a rule that ties the measure of a trustee's liability to the scope of its duties—duties that are governed by trust law, not tort law.

If allowed to stand, the district court's ruling—which allows a plaintiff to avoid the measure of a trustee's liability merely by pleading a "tort" claim—would circumvent principles that have been well settled since the origins of trust law.

34

### C.   The Court's Prejudicial Error Requires Reversal.

1.     The jury's damages award of $355.5 million bears no relation to Allegiant's duties as trustee or the trust-law measure of its liability.  The vast majority of the jury's award stemmed from obligations that NPS incurred *outside* Missouri and *after* Allegiant's tenure—none of which involved trust assets under Allegiant's control.  *See supra* pp.16-17.  The court's acceptance of Plaintiffs' legally flawed damages theory prejudiced PNC.

2.     Because there is no "legally sufficient evidentiary basis" in the record to find that Plaintiffs proved the amount of harm to the trust assets, PNC is entitled to judgment as a matter of law.  Fed. R. Civ. P. 50(a)(1).  In response to PNC's Rule 50(b) motion, Plaintiffs did not dispute that they failed to prove the trust-law measure of damages.  *See* Dkt. 2412, at 17-21.  They cannot dispute this point, which their damages expert, Dr. Arnold, conceded at trial.  *See supra* p.16.  Dr. Arnold measured the wrong thing when he simply totaled various liabilities of the NPS estate.  *See supra* pp.16-17.

3.     At a minimum, this Court should reverse and remand for a new trial to correct the district court's error.  PNC proffered a jury instruction that accurately set forth the measure of a trustee's monetary liability to a beneficiary for breach of trust.  *See* Adden. 126 ("If you find in favor of the Plaintiff Special Deputy Receiver on its claim for breach of trust against National City Bank, . . . then you

35

must award a sum equal to the loss in value of the trust property attributable to the breach."). The court rejected that instruction. It instead submitted to the jury claims for "negligence" and "breach of fiduciary duty," Adden. 118-121, and instructed the jury to award as damages "such sum as you believe will fairly and justly compensate Plaintiffs for any damages you believe *Plaintiffs* sustained and are reasonably certain to sustain in the future that the conduct of Allegiant Bank directly caused or directly contributed to cause," Adden. 122 (emphasis added). The court's instruction incorrectly permitted the jury to award tort damages based on losses sustained *by NPS*. *See Eiteljorg*, 951 N.E.2d at 572.

Had the court given PNC's "legally correct" jury instruction, *Graham Constr. Servs.*, 755 F.3d at 618 (internal quotation marks omitted), the jury could not have awarded $355.5 million in damages, or anything approaching it. By instructing the jury on the wrong legal theory, the court abused its discretion and committed "harmful, prejudicial, and reversible" error. *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 712-14 (8th Cir. 2001).

## II.    The Court Erroneously Submitted Plaintiffs' Claims to a Jury.

This Court has held that a beneficiary's claim for money damages based on a trustee's alleged mismanagement of a trust is an equitable claim that must be tried to the court. *See Brown*, 78 F.3d at 388. The district court erroneously declined to follow this authority.

36

### A.    Plaintiffs Are Not Entitled To Try Their Claims to a Jury.

1.    Federal law governs the question whether the Seventh Amendment guarantees a jury trial of state-law claims.  *Klein v. Shell Oil Co.*, 386 F.2d 659, 662 (8th Cir. 1967).  "[T]he Seventh Amendment . . . guarantees trial by jury only in those actions which would have been triable before a jury under the common law at the time the Seventh Amendment was adopted" in 1791, *id.*, as well as in cases that are "analogous" to such actions, *Entergy Ark., Inc. v. Nebraska*, 358 F.3d 528, 541 (8th Cir. 2004) (internal quotation marks omitted).  "[A]ctions that are analogous to 18th-century cases tried in courts of equity . . . do not require a jury trial."  *Tull v. United States*, 481 U.S. 412, 417 (1987).

The "choice of words used in the pleadings" is not dispositive.  *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477-78 (1962); *see also Klein*, 386 F.2d at 663. Although Plaintiffs captioned their claims "negligence" and "breach of fiduciary duty," their claims are in fact for breach of trust.  *See supra* p.30.  The relevant question, then, is whether a beneficiary's claim for money damages for breach of trust was tried at law at the time of our country's founding and, if not, whether it is analogous to claims that were.

This Court has answered that very question.  In *Brown*, beneficiaries brought an action for damages alleging that a trustee had breached its fiduciary duties by imprudently managing trust assets.  78 F.3d at 386-87.  This Court observed that

37

"[c]ourts of equity generally have exclusive jurisdiction over actions against a trustee for breach of trust, as they are equitable actions." *Id.* at 387.  The Court noted that section 198(1) of the Restatement (Second) of Trusts carves out a limited exception for actions that claim "indebtedness arising out of a breach of trust."  *Id.* at 388.  As the Restatement explains, "If the trustee is under a duty to pay money immediately and unconditionally to the beneficiary, the beneficiary can maintain an action at law against the trustee to enforce payment."  Restatement (Second) of Trusts § 198(1) (1959).  By contrast, "[a]n action at law cannot be maintained against a trustee for *damages* for a breach of trust as distinguished from an indebtedness arising out of a breach of trust."  *Id.* cmt. e (emphasis added); *see also* 1 Dan B. Dobbs, *Law of Remedies:  Damages–Equity–Restitution* § 2.6(3), at 163 (2d ed. 1993).  In *Brown*, the Court held that the beneficiaries' claims that the trustee had "mishandl[ed]" trust assets were not triable at law because "those claims [were] for damages, rather than for an indebtedness arising out of a breach of trust."  78 F.3d at 388.[6]

_____

[6] As *Brown* is binding precedent, this Court need not look further, but PNC notes that *Brown* is consistent with the great weight of authority.  *See* 76 Am. Jur. 2d Trusts § 598 ("An action by beneficiaries for a breach of trust is an equitable proceeding, even if money damages are the only remedy sought."); *see also, e.g.*, *Nobile v. Pension Comm. of Pension Plan for Emps. of New Rochelle Hosp.*, 611 F. Supp. 725, 728-29 (S.D.N.Y. 1985); *Kaitz v. Dist. Ct.*, 650 P.2d 553, 555 (Colo. 1982) (en banc); *Kann*, 690 A.2d at 516-17.

38

As in *Brown*, Plaintiffs seek money "damages" for Allegiant's alleged "mishandling" of trust assets. *Id.*; *see* A.285, 288. Plaintiffs do not claim, nor could they, that Allegiant is "indebted[]" to Plaintiffs such that their claims would fall in the exception in section 198(1) of the Restatement (Second). *Brown*, 78 F.3d at 388. Thus, Plaintiffs' claims are equitable, and the court was required to strike Plaintiffs' jury demand.

2.      In reaching its contrary conclusion, the district court was led astray by two arguments advanced by Plaintiffs. *First*, it incorrectly concluded that *Halladay v. Verschoor*, 381 F.2d 100 (8th Cir. 1967), is the applicable precedent. *See* Adden. 3. In *Halladay*, the plaintiff was a trustee who alleged that the defendant had conspired with the previous trustee to enrich himself at the expense of the trust. 381 F.2d at 102-03. This Court, which held that the case had properly been tried to a jury, emphasized that the case did *not* involve a claim by a trust beneficiary or a fiduciary relationship, finding "an obvious distinction between the case at hand and one brought by a beneficiary of a trust." *Id.* at 106, 109.

*Second*, the court also erred in applying the two-part test the Supreme Court has developed to decide whether a modern-day cause of action "is more analogous to cases tried in courts of law than to suits tried in courts of equity or admiralty." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348 (1998). *See* Adden. 2-3; Adden. 6-7. That test first compares "the statutory action to 18th-century

39

actions brought in the courts of England prior to the merger of the courts of law and equity." *Chauffeurs, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990) (internal quotation marks omitted).  It next examines "the remedy sought" to "determine whether it is legal or equitable in nature." *Id.* (internal quotation marks omitted). Of these two factors, the second is more important. *Id.*

The court concluded that it was required to apply this two-part test, and it held that because Plaintiffs are seeking money damages, the case is triable to a jury.  Adden. 2-3.  That reasoning is inconsistent with *Brown*, which postdates the Supreme Court's development of this test yet did not apply the test.  The Supreme Court's test aims to determine whether a modern-day cause of action is "analogous" to one tried at law or equity in 1791.  *Feltner*, 523 U.S. at 348; *see e.g., id.* at 342 (Copyright Act); *Terry*, 494 U.S. at 563 (National Labor Relations Act); *Ross v. Bernhard*, 396 U.S. 531, 531 (1970) (shareholder derivative suit).  Here, there is no need to determine whether Plaintiffs' breach-of-trust claim is *analogous* to one that was tried at law or in equity in 1791.  Breach-of-trust claims always have been tried in equity—then and now.  *See Cigna*, 563 U.S. at 441-42.  Moreover, even if the test applies, in the context of breach-of-trust claims and with the narrow exception discussed above that is not pertinent here, monetary relief is an *equitable*, not legal, remedy.  *See Cigna*, 563 U.S. at 441-42; *Brown*, 78 F.3d at 388.

40

### B.     The Court's Erroneous Grant of a Jury Trial Requires Reversal for a Bench Trial.

The district court's erroneous grant of a jury trial was the foundation for its later ruling on the measure of damages.  The court's summary-judgment order leaves no doubt that it would have applied a different measure of damages had it believed that Plaintiffs' claims were equitable.  *See* Adden. 33 ("If this case were brought in equity, the damages would be limited because as the Missouri Supreme Court has stated, every violation of duty equity lays upon a trustee is a breach of trust and a breach of trust has limited remedies.").  Thus, the court itself acknowledged that, had it been compelled to hold a bench trial in equity, it would have applied the trust-law measure of damages. *See supra* Part I.

The district court's error also deprived this Court of the findings of fact and conclusions of law required by Rule 52.  "In close cases the losing parties' right to appellate review can be prejudiced where there is a general jury verdict and the appellant was entitled to the benefit of the separate findings and conclusions provided by Rule 52."  *Troy v. City of Hampton*, 756 F.2d 1000, 1003 (4th Cir. 1985) (en banc).  Such is the case here.  Plaintiffs' "tort" causation theory required the jury to find that Allegiant could have stopped NPS's nationwide fraud on the first day of its trusteeship.  Had the court been required to articulate findings of fact establishing causation, that exercise would have made starkly clear to the court the implau-

41

sibility, if not outright impossibility, of causally linking the tort damages sought by Plaintiffs to the breaches they claimed.

Although PNC is entitled to judgment in its favor for the multiple reasons set forth herein, at a minimum this Court should reverse the judgment in light of the district court's erroneous grant of a jury trial and remand for a new bench trial. And, if the Court remands for a new trial for any other reason, it should instruct the district court to conduct a bench trial on remand.

## III. The Court Improperly Eliminated PNC's Defenses Based on the Conduct of NPS and Forever Enterprises.

The conduct of NPS and Forever Enterprises is at the core of this case.  The SDR, stepping into NPS's shoes, claims that Allegiant improperly took direction from NPS and permitted NPS's fraudulent scheme to continue.  That theory provides PNC with two defenses to the SDR's claims:  the SDR cannot recover for actions authorized by NPS, the beneficiary, and the SDR's claims are barred by *in pari delicto*.  Additionally, because Plaintiffs pursued "tort" claims, Missouri law permitted PNC to apportion liability with NPS's partner-in-crime, Forever Enterprises.  The court erroneously struck PNC's authorization and *in pari delicto* defenses before trial and refused PNC an apportionment defense at trial.  The district court thus allowed NPS to sue for its own misconduct and then prevented PNC from pointing this out to the jury.

42

### A.    The Court Erred in Denying PNC's Defenses Based on the Conduct of NPS.

#### 1.    *The court incorrectly rejected PNC's authorization defense.*

Plaintiffs' theory from beginning to end was that Allegiant breached its duties by taking "direction from NPS employees regarding investment decisions and disposition of NPS pre-need trust assets."  A.207, 713-715.  That theory runs head-first into the principle that a beneficiary that authorizes or retains the benefits of a trustee's action cannot claim that the action was a breach of trust.  The court erroneously struck PNC's authorization defense before trial.[7]  This Court should remand for a new trial.

#### a.    PNC was entitled to present its authorization defense.

Under Missouri law, a beneficiary who induces, consents to, ratifies, or retains the benefits of an alleged breach of trust is barred from recovering from the trustee.  *See, e.g.*, *Walker v. James*, 85 S.W.2d 876, 885 (Mo. 1935) (per curiam) ("If a [beneficiary] is a party to, or concurs in, or even assents to, a breach of trust by the trustee, he debars himself thereby of all claim for [r]elief." (internal quotation marks omitted)); *see also, e.g.*, *Pilgrim Evangelical Lutheran Church of Unaltered Augsburg Confession v. Lutheran Church–Mo. Synod Found.*, 661 S.W.2d

---

[7] Although the court had already struck PNC's defense before trial, PNC proffered a jury instruction in an abundance of caution.  *See* Adden. 123, 125.  The court rejected that instruction.

833, 839 (Mo. Ct. App. 1983); *Oellien v. Galt*, 131 S.W. 158, 159 (Mo. Ct. App. 1910); Restatement (Third) of Trusts § 97 (2012).

The SDR asserts claims as receiver for NPS.  Under Missouri law, when receivers pursue claims for insolvent companies, they "occupy substantially the same relation which was occupied by the original parties against whom or over whose estate they were appointed."  *Chi. Title & Tr. Co. v. Brady*, 65 S.W. 303, 307 (Mo. 1901).  Accordingly, "[a]ny defense . . . which [a] defendant might have made to an action brought by the original party in interest is equally available, and may be made with like effect, when the action is instituted by [the] receiver."  *Id.* (internal quotation marks omitted).

In *Reynolds v. Third National Bank*, 225 S.W. 901 (Mo. 1920) (per curiam), an insurance company's receiver brought suit claiming that the defendant bank had improperly diverted the company's funds to a company agent.  *See id.* at 902.  The evidence established that the company's officers "had actual knowledge of all the facts" because they had audited a passbook issued by the bank that disclosed the transactions at issue.  *Id.* at 903.  Because the company was required to examine the passbook promptly and complain about improper transactions, the Missouri Supreme Court held that the company and its receiver were estopped from maintaining the action.  *Id.* at 903-04.

44

This authority entitled PNC to present an authorization defense.  At the summary-judgment stage, PNC offered evidence that NPS authorized distributions of trust principal and income, instructed Allegiant how to value the life insurance policies, approved specific investments challenged by Plaintiffs, and directed the issuance of policy loans, among other things.  *See* Dkt. 1762, at 34-38.  In opposition, Plaintiffs did not dispute that NPS directed these actions.

Plaintiffs' trial witnesses confirmed PNC's summary-judgment evidence.  The jury heard that Sutton, NPS's CFO, instructed his assistant to send wire transfer requests to Allegiant directing transfers of trust funds, A.498-499, 501; authorized the creation of debentures that were held as trust assets, A.500; and managed the policy loans that NPS took against trust policies, A.504.  The court itself found that Allegiant "was taking direction from NPS," performed all wire transactions requested by NPS, and routinely transferred trust funds to NPS.  Adden. 95, 98.  The evidence supported PNC's authorization defense.

### b.  The court's shifting rationales for denying PNC an authorization defense do not withstand scrutiny.

The district court provided a series of reasons for rejecting PNC's authorization defense.  None withstands analysis.

In its summary-judgment ruling, the court lumped together PNC's authorization defense with its *in pari delicto* defense and held that, because the corrupt

45

agents had been removed from NPS, the SDR is not subject to these defenses.[8] Adden. 45-46.   The court erred in holding that public policy considerations it deemed relevant to the *in pari delicto* doctrine bar application of an authorization defense against a receiver.   Unlike the *in pari delicto* doctrine, the authorization defense does not require a showing of wrongdoing.   The defense is akin to estoppel, which the Missouri Supreme Court held in *Reynolds* was applicable against an insurance company's receiver, consistent with the general rule that a defense that is available against the original party in interest is equally available against the party's receiver.   *See* 225 S.W. at 903-04; *see also, e.g.*, George Gleason Bogert, et al., *Bogert Trusts and Trustees*, § 942 (3d ed. 2006) (courts sometimes use the term "estoppel" to refer to the trust-law ratification defense).   Deciding this state-law question, the district court was required to predict how the Missouri Supreme Court "would decide if it were to address the issue." *Raines v. Safeco Ins. Co. of Am.*, 637 F.3d 872, 875 (8th Cir. 2011).   The Supreme Court's "analogous decision[]" in *Reynolds* strongly suggests that it would apply an authorization defense here, *id.* (internal quotation marks omitted), where NPS directed investment decisions and the disposition of trust assets and benefitted from those actions.

---

[8] The court's conclusion that Missouri courts would not recognize an *in pari delicto* defense in these circumstances is incorrect.   *See infra* Part III.A.2.

46

After trial, the district court seemingly recognized its error in holding that receivers are not subject to an authorization defense, as the court did not reaffirm that holding (as it did with *in pari delicto*).  *See* Adden. 93-99.  Plaintiffs, however, had not offered any other reason for striking the defense.  To deny PNC's motion for new trial, the court relied upon rationales never asserted by Plaintiffs.

*First*, the court reasoned, based on the trial evidence, that NPS's consent was not fully informed.  *See* Adden. 95.  Setting aside for now the court's resolution of a factual question, that overlooks the procedural history of the case.  The court struck PNC's authorization defense at the summary-judgment stage, *before trial*. *See* Adden. 46.  If the trial record does not support the defense, that is because the court's pre-trial error striking the defense as a matter of law prevented PNC from proving it at trial.

In any event, sufficient evidence supported the defense, which is why Plaintiffs never advanced this argument before.  This case is nothing like the cases in which Missouri courts have held that beneficiaries' consent was not informed.  In *John R. Boyce Family Trust v. Snyder*, 128 S.W.3d 630 (Mo. Ct. App. 2004), the trustee "misrepresented" facts and "withheld information" from the beneficiaries about the value of a grocery store that he sold to the trust in a self-dealing transaction.  *Id.* at 636-37.  In *Ramsey*, 914 S.W.2d 384, the defendant's co-trustee advised his 92-year-old mother, the beneficiary, to invest in ventures in which he had

47

a personal interest, and the defendant trustee failed to explain the conflict of inter-

est or ensure that the beneficiary understood the risks.  *Id.* at 387-88.

The court's conclusion that NPS's consent was uninformed strains credulity.

Unlike the cases just discussed, Allegiant did not hoodwink NPS by withholding

information.  (Just the opposite:  NPS's founder, CFO, and investment advisor

were convicted of defrauding Allegiant.  *See supra* p.12.)  NPS was intimately fa-

miliar with Allegiant's management of the trust.  Sutton's assistant testified that

she reviewed Allegiant's monthly trust statements and painstakingly reconciled

them to NPS's own records.  A.502-504, 519.[9]

*Second*, the court concluded that "common sense and interests of public pol-

icy" require rejecting PNC's authorization defense because Allegiant's actions

permitted "NPS[] to steal millions of dollars of *other* beneficiaries' funds."  Ad-

den. 96-99 (emphasis added).  The court did not cite any authority supporting this

"public policy" exception.  In creating the exception, the court misapprehended the

authorization defense, which applies only to claims by NPS—*not* to claims by oth-

er beneficiaries.  *See* Restatement (Third) of Trusts § 97 cmt. c.  If consumers and

funeral homes in Missouri are trust beneficiaries (they are not, *see infra* Part

---

[9] The court also suggested that the defense was inapplicable because Allegiant did not tell NPS that it was committing a breach of trust.  Adden. 95.  Such notifica-tion—which undoubtedly would have been futile—is not required.  *See* Restate-ment (Third) of Trusts § 97 cmt. b.

48

III.A.3), they potentially could sue Allegiant if it permitted NPS to steal from the trusts.  But it is incorrect to say that NPS, through its receiver, can sue Allegiant for permitting *NPS* to steal money from the trusts.  That is exactly what the authorization defense precludes.

*Third*, the court seemingly held that NPS is not bound by the actions of its agents.  *See* Adden. 97, 102-03.  "Generally the actions of the agent bind the principal."  *Miller v. Ernst & Young*, 938 S.W.2d 313, 315 (Mo. Ct. App. 1997).  Under the "adverse-interest exception" to this rule, an agent's actions are not imputed to his principal where he "is acting adversely to his principal's interest," *id.* (citing *Grove v. Sutliffe*, 916 S.W.2d 825, 830 (Mo. Ct. App. 1995)), but this exception applies only if the agent defrauds his principal.  Where the agent defrauds others "for the benefit of the company," his actions are imputed to the company.  *Id.* at 315-16; *see also Grove*, 916 S.W.2d at 830.

"The adverse-interest exception is inapplicable when all of an organization's relevant decisionmakers are involved in the wrongful conduct at issue."  Restatement (Third) of Agency § 5.04 cmt. c (2006).  When corporate insiders dominate and control the company, their knowledge and conduct are *always* imputed to the company.  *See Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 838-41 (8th Cir. 2005) (holding that "where the principal and agent are one and the same, the agent's knowledge is imputed to the principal" (internal quotation marks omitted));

49

*Bartlett v. McCallister*, 289 S.W. 814, 818 (Mo. 1926).  This principle, sometimes called the sole-actor doctrine, recognizes that, as is the case here, "[w]here the principal and agent are alter egos, there is no reason to apply an adverse interest exception to the normal rules imputing the agent's knowledge to the principal" because the principal and agent are the same.  *Grassmueck*, 402 F.3d at 838.

PNC argued in its summary-judgment motion that NPS is bound by its agents' conduct because they engaged in a scheme to defraud others for NPS's benefit and because NPS's decision-makers were alter egos of NPS, triggering the sole-actor doctrine.  *See* Dkt. 1762, at 33-34; *see also* Dkt. 1778, at 36-39.  Plaintiffs did not dispute these points in their opposition or thereafter, thus waiving any challenge to this point.  *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009).  The district court, moreover, *agreed* with PNC at the summary-judgment stage.  It ruled that the actions of NPS's agents are imputed to NPS, Adden. 45, but struck the authorization and *in pari delicto* defenses because the SDR had stepped into NPS's shoes, Adden. 46.

It would be manifestly unfair to excuse the court's pre-trial error in striking PNC's authorization defense on the ground that PNC did not prove at trial that the actions of NPS's agents are imputed to NPS—particularly where the court previously held the opposite and Plaintiffs waived any such argument.  In any event, the court's post-trial ruling confirms that the adverse-interest exception cannot apply

50

because NPS and its corrupt agents were alter egos.  *See* Adden. 95-96 (finding that "NPS was a vassal of the Cassity crime family," that NPS "had its being at the direction of the Cassitys and its representatives," and that "NPS was a corporation controlled by officers and directors who perpetrated fraud").  PNC's authorization defense was legally correct and was "supported by sufficient evidence to create a triable issue."  *Friedman & Friedman*, 606 F.3d at 501.

### c. The court's rejection of PNC's defense prejudiced the outcome of this case.

The court's errors in striking this defense at the summary-judgment stage and denying PNC's proposed instruction materially affected the verdict.

The authorization defense bars the SDR's claims in their entirety because the SDR has standing only to pursue claims belonging to NPS.  The court erred in holding that the SDR also has standing to pursue claims belonging to individual consumers and funeral homes whom the court held to be beneficiaries.  Adden. 94.  Although the SDR may pursue claims "on behalf of . . . creditors" generally, she cannot pursue a "claim [that] is personal to a specific creditor [where] recovery on such claim would not inure to the benefit of the estate."  Tex. Ins. Code Ann. § 443.154(m) (West 2015).  This statutory provision reflects the common-law rule that receivers lack standing to pursue claims that are "by their nature personal" to creditors.  *Cotten v. Republic Nat'l Bank*, 395 S.W.2d 930, 941 (Tex. Civ. App. 1965); *see also Jarrett v. Kassel*, 972 F.2d 1415, 1426 (6th Cir. 1992) (although

51

the receiver was "charged" with protecting the interests of customer creditors, he had "no authority to bring a cause of action on behalf of . . . individual customers").  If Missouri consumers and funeral homes are trust beneficiaries, their claims for breach of trust are "personal" to them because those claims are based on duties that Allegiant owed *to them*.  *See Goodman v. FCC*, 182 F.3d 987, 991-92 (D.C. Cir. 1999) (receiver cannot bring claim based on alleged mistreatment of the receivership entity's creditors).  The SDR thus lacked standing to pursue individual beneficiaries' claims.

Regardless whether the SDR has standing to pursue claims for individual consumers or funeral homes, "the vast majority of damages [were] awarded to the SDR on behalf of the NPS estate."  Adden. 95.  Of the $355.5 million compensatory damages award, only $93.1 million could be attributable to Missouri consumers and funeral homes whom the court held were trust beneficiaries.[10]  *See* A.637.  The remaining $262.4 million could be collected only by the SDR on behalf of NPS. At a minimum, the court's ruling deprived PNC of a critical defense to $262.4 million in damages.  This Court should remand for a new trial.

---

[10] This amount is the sum of the losses on policy-based contracts issued in Missouri during and after Allegiant's trusteeship.  *See supra* pp.16-17.

## 2.   *The court incorrectly rejected PNC's* in pari delicto *defense.*

The court also erred in striking PNC's *in pari delicto* defense to the SDR's claims.  This Court should reverse with instructions to grant judgment to PNC on the SDR's claims or, in the alternative, to grant a new trial.[11]

### a.   **PNC is entitled to an *in pari delicto* defense.**

"Under the *in pari delicto* doctrine, a person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party."  *Dobbs v. Dobbs Tire & Auto Ctrs., Inc.*, 969 S.W.2d 894, 897 (Mo. Ct. App. 1998) (internal quotation marks omitted).

As already discussed, a receiver generally is subject to the same defenses as the company it represents.  *See supra* p.44.  Although the Missouri Supreme Court has not decided whether a company's receiver is subject to an *in pari delicto* defense, "[w]here an intermediate appellate state court rests its considered judgment upon the rule of law which it announces," a federal court may not disregard this analysis, "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  *Raines*, 637 F.3d at 875 (alteration in original) (internal quotation marks omitted).

---

[11] Although the court struck PNC's *in pari delicto* defense before trial, PNC proffered a jury instruction in an abundance of caution.  *See* Adden. 124-125.  The court rejected that instruction.

The Missouri Court of Appeals has twice applied an *in pari delicto* defense in circumstances similar to this case.  *See Miller*, 938 S.W.2d at 314-16 (holding that the company's fraud barred claims by the representatives of the company's bankruptcy estate against the company's former accountant for failing to discover the fraud); *Grove*, 916 S.W.2d at 826, 830 (holding that the fraud of a company that was operating a Ponzi scheme barred a claim by the "trustees of a liquidating trust of [the] defunct corporation" against the company's former accountants). *Grove* and *Miller* are consistent with decisions from other jurisdictions.  *See, e.g.*, *Knauer v. Jonathon Roberts Fin. Grp., Inc.*, 348 F.3d 230, 232, 238 (7th Cir. 2003) (rejecting argument that receiver appointed to collect assets "for the benefit of the investors" of a company that had operated a Ponzi scheme should not be subject to *in pari delicto* defense (internal quotation marks omitted)); *see also, e.g.*, *Wuliger v. Mfrs. Life Ins.*, 567 F.3d 787, 798 (6th Cir. 2009); *Deangelis v. Corzine (In re MF Glob. Holdings Ltd. Inv. Litig.)*, 998 F. Supp. 2d 157, 189 (S.D.N.Y. 2014), *aff'd*, 611 F. App'x 34 (2d Cir. 2015).

To be sure, some courts outside Missouri have rejected application of the *in pari delicto* defense against a company's receiver.  *See Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 (5th Cir. 2012) (per curiam); *FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995) (per curiam).  The district court cited these deci-

54

sions when it struck PNC's defense.[12]   The court erred in relying on out-of-jurisdiction cases rather than following the rule twice applied by the Missouri Court of Appeals.  *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856-59 (8th Cir. 2010).

The court attempted to distinguish the Missouri Court of Appeals' decisions in *Grove* and *Miller* on the ground that the SDR here is acting for the benefit of "innocent" creditors.  *See* Adden. 45-46; Adden. 100-103.  But that is what receivers always do; the SDR is not special in that regard.  *See, e.g.*, *Wuliger*, 567 F.3d at 798; *Knauer*, 348 F.3d at 232.  The plaintiffs in *Miller* were appointed by the estate's "creditors," *Miller v. Ernst & Young*, 892 S.W.2d 387, 387 (Mo. Ct. App. 1995), *abrogated on other grounds by Children's Wish Found., Inc. v. Mayer Hoffman McCann, P.C.*, 331 S.W.3d 648 (Mo. 2011), but that fact did not immunize them from the *in pari delicto* defense.

Other courts have rejected the district court's reasoning.  As those courts have explained, barring application of the *in pari delicto* defense against a receiver would unfairly create "'a double standard whereby the innocent stakeholders of the corporation's outside professionals are held responsible for the sins of their errant agents while the innocent stakeholders of the corporation itself are not charged

---

[12] The court also cited *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), but overlooked that the Seventh Circuit has cabined *Scholes* to fraudulent conveyance claims brought by a receiver.  *See Knauer*, 348 F.3d at 236.

55

with knowledge of their wrongdoing agents.'" *MF Global Holdings*, 998 F. Supp. 2d at 190 (quoting *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 958 (N.Y. 2010)). That observation is particularly weighty here.  PNC's stakeholders are triply inno-cent, as PNC is the successor-in-interest to the successor-in-interest to Allegiant. In contrast, the SDR's principal stakeholders are the Guaranty Associations, which exist for the very purpose of paying claims against insolvent insurance companies.

After trial, the court also distinguished *Grove* and *Miller* on the ground that NPS's agents both defrauded others for the benefit of NPS and "looted from the company," triggering (in the court's view) the adverse-interest exception.  Adden. 102-103.  That rationale fails for the reasons already discussed.  *See supra* pp.49-51; *see also Grassmueck*, 402 F.3d at 841 (applying the sole-actor doctrine to bar, under the *in pari delicto* doctrine, a bankruptcy trustee's claims).

### b. PNC is entitled to judgment on the SDR's claims or, in the alternative, a new trial.

*In pari delicto* is a complete defense to the SDR's claims.  The court's rejec-tion of this defense prejudiced PNC.  *See supra* pp.51-52.

PNC is entitled to judgment on the SDR's claims.  In denying PNC's sum-mary-judgment motion, the court expressly struck PNC's defense, Adden. 46, "ef-fectively grant[ing] partial summary judgment" to Plaintiffs.  *Owatonna Clinic–Mayo Health Sys. v. Med. Protective Co.*, 639 F.3d 806, 810 (8th Cir. 2011).  Thus, PNC "did not get a trial" on its defense and could not bring a Rule 50 motion.  *Id.*

56

Accordingly, this Court may review the court's summary-judgment order notwith-standing the absence of a Rule 50 motion raising this issue.  *See id.*[13]

At the summary-judgment stage, Plaintiffs did not dispute that the actions of NPS's agents are imputed to NPS or that the *in pari delicto* doctrine would bar a claim by NPS.  Plaintiffs' only argument was that *in pari delicto* does not apply because the SDR has stepped into the shoes of NPS.  As explained, that position is incorrect.  PNC was entitled to judgment on the SDR's claims.

At a minimum, this Court should remand for a new trial at which PNC can present and prove its *in pari delicto* defense.

### 3. *Because NPS is the sole trust beneficiary, PNC's authoriza-tion and* **in pari delicto** *defenses dispose of all claims.*

PNC's authorization and *in pari delicto* defenses dispose of the SDR's claims.  In granting partial summary judgment to Plaintiffs, however, the court held that pre-need consumers and funeral homes whose payments were deposited into the Missouri trusts *also* were trust beneficiaries.  *See* Adden. 14-20.  That er-roneous ruling gave the Guaranty Associations (as putative assignees of consumers and funeral homes) standing to pursue a subset of Plaintiffs' claimed damages and fundamentally altered the course of trial.  This Court should reverse and remand

---

[13] The court's summary-judgment ruling also is reviewable on appeal because the ruling was "preliminary to the merits," much like the issue of standing.  *N.Y. Ma-rine & Gen. Ins. v. Cont'l Cement Co.*, 761 F.3d 830, 839 (8th Cir. 2014).

57

with instructions to enter judgment as a matter of law dismissing the Guaranty Associations' claims.

a.    "A person is a beneficiary of a trust if the settlor manifests an intention to give the person a beneficial interest."  Restatement (Third) of Trusts § 48 (2003).  A "beneficial interest" is a "right or expectancy" in the trust.  *Black's Law Dictionary* 934 (10th ed. 2014).  As Professor Bogert explains:

> Advantages usually come to the beneficiary because the trustee invests trust property so that it produces income, and because the trust document directs the trustee to distribute income and principal to the beneficiary.  How the benefits come to the beneficiary is unimportant. The important trust concept is the beneficiary's *right* to obtain them.

Bogert et al., *supra*, § 1 (emphasis added).  A person who "benefits incidentally from the performance of the trust" is not a trust beneficiary, even if he has rights to trust assets "as [a] creditor[]."  Restatement (Third) of Trusts § 48 & cmt. a.

b.    The settlor's intent is ascertained from the trust agreement.  *See Commerce Bank, N.A. v. Blasdel*, 141 S.W.3d 434, 444 (Mo. Ct. App. 2004) (en banc).  The trust agreement does not give pre-need consumers or funeral homes rights to trust principal or income.  Consistent with Chapter 436, the agreement gives those rights only to NPS.  As discussed above, it requires the trustee to make all distributions of principal and income to NPS (the "Seller"), and NPS is not entitled to obtain trust principal until *after* it has disbursed funds to the funeral home or consumer.  *See supra* pp.4-5, 7; A.1130-1132.

58

Chapter 436 confirms that consumers and funeral homes are not trust beneficiaries.  Under section 436.048, if the pre-need seller defaults on an obligation, "in addition to other rights and remedies against such seller," the consumer or funeral home may "make demand upon the trustee . . . to distribute . . . as damages for [the seller's] breach, an amount equal to all deposits made into the trust for the contract."[14]  Mo. Rev. Stat. § 436.048 (2008) (repealed 2009).  This provision provides a "damages" remedy to consumers and funeral homes as creditors of the pre-need seller.  *Cf.* Restatement (Third) of Trusts § 56 (2003).  But having a right to access trust funds as creditor of a trust beneficiary does not make that creditor a beneficiary of the trust.  *See id.* § 47 cmt. a.

c.    The court's contrary holding was driven by its "common sense" view that "[m]aking the consumers and funeral homes beneficiaries of the trusts protects their payments," which the court deemed the purpose of Chapter 436.  Adden. 19-20.  But there are countervailing considerations—such as avoiding taxation of pre-need consumers as trust beneficiaries, *cf.* Rev. Rul. 73-140, 1973-1 C.B. 323—that might have led the Legislature to make a different policy choice, as other states have done, *see* Ala. Code § 27-17A-31(g)-(h) (West 2016); Fla. Stat. § 497.458(g), (j) (2015).  The best gauge of the Legislature's intent is the language of the statute.

---

[14] There was no evidence at trial that NPS defaulted on its obligation to Missouri consumers or funeral homes during Allegiant's tenure.  *See* A.613-614.

59

The court also observed that the trust agreement's definitions section defines "beneficiary" to mean "the person designated in writing by the Owner of a Funeral Agreement as the person who is to be the subject of the disposition and is to receive the funeral and/or burial services therein described."[15]  A.1128.  Because certain trust-related obligations are tied to the death of the *pre-need contract* beneficiary, the agreement coined the term "beneficiary" as shorthand to refer to that person.[16]  *See* A.1128-1131, 1133, 1138.  Under the trust agreement, "beneficiary" refers to the pre-need contract beneficiary.  The agreement does not give the pre-need contract beneficiary any rights to trust principal or income.

d.      Because consumers and funeral homes are not trust beneficiaries, they had no claims against PNC to assign to the Guaranty Associations, and the Guaranty Associations lack standing to pursue claims against PNC.  Even if this Court concludes that consumers and funeral homes in Missouri *are* trust beneficiaries, the Guaranty Associations' claims on remand would be limited to claims assigned

---

[15] As this definition makes clear, the "Owner" and "beneficiary" of a pre-need contract could be different persons; for example, a person ("Owner") might purchase a contract for his or her parent, who would be the contract "beneficiary."  *See* A.1128 (defining "Funeral Agreement").

[16] The trust agreement thus mirrors the definitions section of Chapter 436.  *See* Mo. Rev. Stat. § 436.005 (2008) (repealed 2009).  As the court itself recognized, Chapter 436 governs pre-need funeral contracts and is not necessarily referencing trusts when it defines the term "beneficiary."  Adden. 18.

60

by consumers or funeral homes in Missouri who were beneficiaries during Allegiant's trusteeship, as Allegiant did not owe fiduciary duties after its tenure.[17]

A remand is required for another reason: the court's incorrect ruling that pre-need consumers and funeral homes were beneficiaries tainted the entire trial. Repeatedly, the jury heard argument, questioning, and testimony about "consumers' money" in the trusts. *See, e.g.*, A.334, 348-349, 358, 717. Plaintiffs elicited testimony that neither Morisse nor PNC believed that consumers and funeral homes were beneficiaries. *See* A.335, 346, 452, 508-517, 902-903. And Plaintiffs' experts gave inflammatory testimony on this score. *See* A.546-548 ("Q. Have you ever heard, other than this case, of any trustee ever administering a trust and not know[ing] who the beneficiary was?  A.  Never."); *see also* A.581. Thus, even if this Court concludes that the SDR's claims are not barred by the authorization and *in pari delicto* defenses, a new trial is required to cure the prejudicial effect of the court's pre-trial legal error about who was a trust beneficiary.

### B.     Given That the Court Allowed the Case To Be Tried on a Tort Theory, It Erred in Denying PNC's Apportionment Defense Based on the Criminal Acts of Forever Enterprises.

1.     Missouri law provides tort defendants the right to apportion liability with joint tortfeasors:

---

[17] Of the $93.1 million in damages that Plaintiffs claimed for the Guaranty Associations, approximately $40 million stems from pre-need contracts issued after Allegiant resigned as trustee.  *See* A.635.

61

> In all tort actions for damages, if a defendant is found to bear fifty-one percent or more of fault, then such defendant shall be jointly and severally liable for the amount of the judgment rendered against the defendants.  If a defendant is found to bear less than fifty-one percent of fault, then the defendant shall only be responsible for the percentage of the judgment for which the defendant is determined to be responsible by the trier of fact . . . .

Mo. Rev. Stat. § 537.067(1) (2015).[18]  As (erroneously) submitted to the jury, this was a tort action.  Plaintiffs' RICO claim against Forever Enterprises is a statutory tort.  *See, e.g.*, *Reynolds v. E. Dyer Dev. Co.*, 882 F.2d 1249, 1253 (7th Cir. 1989).

A joint tortfeasor is one who has caused the same injury as another, regardless of whether he committed the same tort.  *See Brown v. Kneibert Clinic*, 871 S.W.2d 2, 3 (Mo. Ct. App. 1993).  Plaintiffs' damages expert testified that Allegiant and Forever Enterprises were responsible for all of Plaintiffs' damages because both Defendants purportedly could have stopped the issuance of pre-need contracts.  A.615-616, 652-653.  Under Plaintiffs' theory, Allegiant and Forever Enterprises were joint tortfeasors.

2.     The court rejected PNC's proposed jury instruction on apportionment and corresponding verdict form.  *See* Adden. 127-129.  It held that section 537.067 does not permit allocation of fault with an *intentional* tortfeasor, observing that

---

[18] Section 537.067 was enacted in its present form in 2005.  *See* L.2005, H.B. No. 393.  The 2005 statute replaced an earlier version of the statute, enacted in April 1987, which provided that, "[i]n all tort actions for damages" in which no fault was assessed against the plaintiff, liability among defendants was joint and several.  *See* L.1987, H.B. 700 § 41.

62

"[t]he current suggestion from Missouri case law is apportionment of fault does not apply to intentional torts."  Adden. 112-113.[19]  This holding was error.

*First*, the court's conclusion that Missouri law precludes apportionment of fault where one defendant has engaged in an intentional tort is contrary to the plain language of the statute.  The statute contains no language restricting its application only to some tort actions; rather, the word "all" indicates that the statute reaches broadly, *see Priedeman v. Jamison*, 202 S.W.2d 900, 902 (Mo. 1947) (per curiam).

*Second*, the two decisions upon which the court relied do not support its conclusion.  Each involved a defendant alleged to have committed an intentional tort seeking to assign fault to a plaintiff or third party, *not* a co-defendant.  *See CitiMortgage, Inc. v. Just Mortg., Inc.*, No. 4:09 CV 1909 DDN, 2013 WL 6538680, at *10 (E.D. Mo. Dec. 13, 2013); *Benson v. Jim Maddox Nw. Imps., Inc.*, 728 S.W.2d 668, 669 (Mo. Ct. App. 1987).  Neither court cited section 537.067 as a basis for rejecting the defendants' arguments, for good reason.  *Benson* was decided one month *before* the Legislature adopted section 537.067.  *See supra* note

---

[19] The court also mentioned the Missouri Supreme Court's adoption of the Uniform Comparative Fault Act ("UCFA") in *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. 1983) (en banc).  Adden. 113.  The *Gustafson* Court observed that, to the extent the UCFA conflicted with a Missouri statute, the statute prevailed.  661 S.W.2d at 15 n.10.  The Legislature adopted section 537.067 four years *after Gustafson* and then amended the statute in 2005 to provide defendants with the right to apportion fault in all cases filed after August 28, 2005.  *See supra* note 18; *see also* Mo. Rev. Stat § 538.305.

18.  Section 537.067, moreover, does not speak to comparative fault between a tortfeasor and the plaintiff or third parties.  The *CitiMortgage* court *permitted* the defendant to assert a separate affirmative defense under section 537.067(2) (seeking several liability for punitive damages) notwithstanding that the plaintiff alleged intentional conduct.  2013 WL 6538680, at *11.  The Missouri Supreme Court likewise has applied an earlier version of section 537.067—containing the critical "[i]n all tort actions" language—in a case involving intentional torts.  *See Werremeyer v. K.C. Auto Salvage Co.*, 134 S.W.3d 633, 636 (Mo. 2004) (en banc); *see also supra* note 18.

3.    The court's rejection of PNC's apportionment instruction was prejudicial.  The jury found that Forever Enterprises had engaged in criminal racketeering.  Any rational fact-finder would conclude that, as between the criminal, intentional wrongdoer "whose deviation from the standard of reasonable care is clearly greater" and the allegedly negligent trustee that failed to uncover the crime, the intentional wrongdoer is more at fault.  *Slack v. Farmers Ins. Exch.*, 5 P.3d 280, 286 (Colo. 2000) (en banc) (internal quotation marks omitted); *see also, e.g.*, *Martin ex rel. Martin v. United States*, 984 F.2d 1033, 1039 (9th Cir. 1993) (recognizing "the common sense notion that a more culpable party should bear the financial burden caused by its intentional act" (internal quotation marks omitted)).  If the court had permitted PNC to present this defense, the jury likely would have assigned more

64

than fifty percent of fault to Forever Enterprises.  In that case, the jury's $355.5 million compensatory damages award against PNC would have been cut in half, at a minimum.

If this Court affirms the district court's holding that Plaintiffs' claims were properly brought in tort, it should reverse and remand for a new trial on this alternative ground to permit PNC to assert an apportionment defense.

## IV.   The Court Improperly Eliminated PNC's Statutory "Investment Advisor" Defense.

Chapter 436 "relieved" a pre-need trustee "of all liability regarding investment decisions made by [an] investment advisor" appointed by the pre-need seller. Mo. Rev. Stat. § 436.031(2).  By instructing the jury that this defense applies only if the investment advisor's decisions were within the authority of a reasonably prudent trustee, the district court erroneously read this protection out of the statute.

A.   Chapter 436 authorized pre-need sellers to appoint an independent, qualified, and registered investment advisor to render decisions about the investment of trust assets.  *See* Mo. Rev. Stat. § 436.031(2).  Absent an investment advisor, the trustee was required to "exercise such judgment and care . . . which men of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs" in investing the trust assets.  *Id.*  Once an investment advisor was appointed, however, the trustee was "relieved of all liability regarding investment decisions made by such qualified investment advisor."  *Id.*  Instead, the investment advisor was held to the same standard as the trustee otherwise would have been—

65

after authorizing the appointment of an investment advisor, the statute provided that "[i]n no case . . . shall [the] assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in." *Id.*

B.     The court misinterpreted Chapter 436 to provide that the trustee is relieved of liability only if the investment advisor's decisions are reasonably prudent. Over PNC's objection, the court instructed the jury that PNC could prevail on its defense only if "the assets were not placed in any investment which would be beyond the authority of a reasonably prudent trustee in which to invest."  Adden. 119, 121; A.709.

By limiting the defense to investment decisions for which there could be no liability in the first place, the court's interpretation reads the defense out of the statute.  The statute declares that "[t]he trustee shall be relieved of *all* liability." Mo. Rev. Stat. § 436.031(2) (emphasis added).  It has no exceptions and does not condition the trustee's relief from liability on the reasonable prudence of the investment advisor's decisions.  Indeed, a reasonably prudent investment decision could *not* give rise to liability in the first place.  By confining the investment advisor defense to prudent investments, the court improperly rendered the statutory defense "superfluous."  *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1025 (8th Cir. 2015).

The court's jury instructions expose the problem inherent in this interpretation.  The court gave virtually identical instructions on Plaintiffs' two claims.  In

66

subparagraph (b), the court instructed the jury to find for Plaintiffs if it believed that Allegiant "failed to ensure that the trust assets were held in reasonably prudent investments."  Adden. 118, 120.  The court then instructed the jury *not* to impose liability under subparagraph (b) for investment decisions made by WBM, but only if "the assets were not placed in any investment which would be beyond the authority of a reasonably prudent trustee in which to invest."  Adden. 119, 121.  That instruction rendered PNC's defense a dead letter.  Once the jury concluded that the investments made by WBM were not reasonably prudent, PNC's defense could never be satisfied.

The court's construction also disregards the rest of the statute, which *requires* the trustee to "liquidate[]" trust assets "upon request of the advisor of the seller."  Mo. Rev. Stat. § 436.031(2).  The court's interpretation, by contrast, would require the trustee to second-guess and refuse to comply with the investment advisor's decisions to avoid liability.

C.     The court's erroneous interpretation of section 436.031(2) did not "fairly and adequately present the relevant state law."  *Wheeling*, 254 F.3d at 711. The court instructed the jury on six distinct theories of liability.  *See* Adden. 118, 120.  One theory was that Allegiant "failed to ensure that the trust assets were held in reasonably prudent investments."  Adden. 118, 120.  This theory featured prominently in Plaintiffs' case.  *See, e.g.*, A.718-719.

67

The court's instruction fatally tainted this theory of liability by allowing the jury to find against PNC on a ground directly contrary to section 436.031(2).  Because the jury returned a general verdict, it is impossible to say with confidence that the verdict rested on an untainted theory.[20]  A remand for a new trial is therefore necessary.  *See Dudley v. Dittmer*, 795 F.2d 669, 673 (8th Cir. 1986) ("The rule in this circuit is clear that when one of two theories has erroneously been submitted to the jury, a general verdict cannot stand."); *see also, e.g.*, *Mueller v. Hubbard Milling Co.*, 573 F.2d 1029, 1038-39 (8th Cir. 1978).

## V.   Plaintiffs Did Not Prove That Allegiant Caused Plaintiffs' Claimed Damages.

PNC moved for judgment as a matter of law or, in the alternative, new trial based on Plaintiffs' failure to prove that Allegiant caused Plaintiffs' damages.  The court's post-trial analysis of this argument reads as if Plaintiffs had tried an entirely different case.  The court repeatedly observed that Plaintiffs' evidence permitted the jury to find that Allegiant caused the loss of trust "assets."   Adden. 74-77.  Plaintiffs, however, did not claim as damages the amount of losses to the trust assets.  Rather, they sought to hold PNC liable for the obligations of the NPS estate

---

[20] As PNC argued below, the court also should have applied the defense to subparagraph (d), which instructed the jury to find for Plaintiffs if it believed that Allegiant "failed to exercise the judgment and care in the permanent disposition of trust assets that a person of ordinary prudence, discretion, and intelligence would use in the management of his or her own affairs."  Adden. 118, 120; *see* A.707-708.  The defense should have applied to that basis of liability because the disposition of trust assets relates to "investment decisions."

68

to creditors around the country incurred over a ten-year period, on the premise that Allegiant could have stopped NPS's fraudulent scheme.  Plaintiffs' decision to pursue such sprawling damages—as opposed to seeking the trust-law measure of damages—is the genesis of the fatal flaws in their causation case.

### A.   Missouri Law Required Plaintiffs To Prove Both "But For" and Proximate Causation.

Plaintiffs were required to prove both actual and proximate causation.  *See Nail v. Husch Blackwell Sanders, LLP*, 436 S.W.3d 556, 562 (Mo. 2014) (en banc); *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862 (Mo. 1993) (en banc).  Actual causation, or causation in fact, is established if a plaintiff shows that the injury would not have occurred "but for" the defendant's conduct.  *Nail*, 436 S.W.3d at 562.

Proximate causation "requires more than mere causation in fact because the 'but for' test serves only to exclude items that are not causal in fact; it will include items that are causal in fact but that would be unreasonable to base liability upon because they are too far removed from the ultimate injury or damage."  *Id.* at 563 (internal quotation marks omitted).  In determining whether a "but for" cause is sufficiently tied to the ultimate injury, Missouri courts ask whether an injury was "the natural and probable consequence" of the act.  *Id.* at 562.  "This is generally a 'look back' test but, to the extent it requires that the injury be 'natural and proba-

69

ble,' it probably includes a sprinkling of foreseeability." *Callahan*, 863 S.W.2d at 865.

Where "the facts involved an extended scenario involving multiple persons and events with potential intervening causes, then the requirement that the damages that result be the natural and probable consequence of defendant's conduct comes into play and may cut off liability." *Id.* *Finocchio v. Mahler*, 37 S.W.3d 300 (Mo. Ct. App. 2000), is instructive. There, the defendant left a handgun in his dresser, knowing that his daughter's friends had access to his bedroom. *Id.* at 301-02. A teenager stole the gun and used it to kill another teenager. *Id.* The court concluded that, although the defendant's negligence was a "but for" cause of the death, the harm was too far removed to hold the defendant liable. *Id.* at 303-04; *see also, e.g.*, *Williams v. Van Biber*, 886 S.W.2d 10, 14 (Mo. Ct. App. 1994) (physician not liable for birth defects that would not have occurred "but for" negligent vasectomy because the act was "too far removed from the ultimate damage").

### B. Plaintiffs Did Not Prove "But For" Causation.

1. Plaintiffs claimed as damages the obligations of the NPS estate in connection with every pre-need contract issued by NPS from the time Allegiant became trustee in 1998 until NPS's demise in 2008. *See supra* pp.16-18. Thus, if on the first day of Allegiant's trusteeship in 1998, NPS sold a pre-need contract in Texas, a transaction having nothing to do with the Missouri trusts, Plaintiffs

70

claimed that contract amount as damages.  And, if in 2007—three years after Allegiant resigned—NPS sold a pre-need contract in Georgia, again having nothing to do with the Missouri trusts, Plaintiffs claimed that contract amount as damages as well.

Plaintiffs' theory of "but for" causation was that Allegiant caused the losses associated with every pre-need contract that NPS issued after Allegiant became trustee because it could have stopped NPS from selling additional contracts.  That theory required the jury to find that Allegiant could have stopped NPS's criminal scheme in its tracks on "Day One" of Allegiant's trusteeship of the NPS trusts. A.615-617, 716.  That theory defies common sense and has no basis in the record. For Allegiant to have stopped NPS's fraud, Allegiant would have had to discover the fraud and alert NPS's regulators, and those regulators would have had to investigate and initiate action to stop NPS from issuing contracts.  The notion that this series of events could occur on the first day of Allegiant's trusteeship is fantastical. It is disproved by the long history of regulatory scrutiny of NPS and its affiliates. *See supra* p.6.

Plaintiffs argued that Allegiant could have ended the fraud by "stopp[ing] the flow of money from the Missouri trusts," thus forcing NPS to abandon its scheme.  Dkt. 2412, at 21-23.  But the evidence does not permit an inference that had Allegiant refused a transaction on the first day of its trusteeship, NPS would

71

have instantaneously abandoned its criminal scheme.  Brent Cassity—whom, at Plaintiffs' urging, the court hauled out of jail to testify, *see* Dkt. 2138—stated, "We would have had to have used a different technique.  I'm not saying that we couldn't have created a new technique, but we would have had to have done it differently."  A.426.  The court itself concluded after trial that "[t]he Cassitys may have engineered other ways to steal."  Adden. 75.  The record "contains no proof beyond speculation to support the verdict."  *Kinserlow v. CMI Corp.*, 217 F.3d 1021, 1026 (8th Cir. 2000) (internal quotation marks omitted).

In addressing this flaw, the court rewrote Plaintiffs' claims.  It observed that, although "[t]he Cassitys may have engineered other ways to steal," "these trust beneficiaries would not have been harmed had Allegiant done its job" and that Allegiant "could have stopped the harm by simply maintaining records, keeping control of trust assets, and protecting the trust assets."  Adden. 75.  But those assertions do not substantiate the jury's verdict.  That verdict held PNC liable for the harms caused by NPS's nationwide fraud—*not* for losses to the trust assets.  If, as the court found, the Cassitys would have found other ways to defraud customers, Allegiant's conduct with respect to the Missouri trusts cannot be a "but for" cause of the nationwide losses of those customers.

2.     The actual cause of Plaintiffs' claimed damages is obvious.  The vast majority of those damages are payments the Guaranty Associations are required to

72

make on Lincoln and Memorial policies.  *See* A.618.  Lincoln's and Memorial's insolvency is the reason the Guaranty Associations must make those payments.  *See* A.443-444, 585-586, 649.  Plaintiffs, however, did not attempt to prove what caused the insolvencies of Lincoln or Memorial or when they became insolvent.  Witness after witness disclaimed having determined what caused the insolvencies.  *See* A.550-551, 563, 586-587, 644-645.[21]

The court improperly dismissed the relevance of the life insurance companies' insolvencies, stating:

> The trust beneficiaries would not have sustained damages had Allegiant fulfilled its duties as trustee, irrespective of whether Lincoln and Memorial had become insolvent . . . .The harm did not occur when Lincoln and Memorial became insolvent, the harm occurred when Allegiant allowed the money [to] be removed from the trusts with no oversight.

Adden. 74.  But, once again, the harm Plaintiffs claimed as damages was not "the money . . . removed from the trusts," but rather NPS's obligations on pre-need contracts sold nationwide after 1998.  Those losses are the direct result of the insolvencies of Lincoln and Memorial, which sold the insurance policies that backed

---

[21] Any number of factors might have caused those insolvencies, including mass surrenders of life insurance policies by NPS in 2007 (three years after Allegiant resigned), NPS's withholding money from Lincoln by fraudulently manipulating policy applications outside Missouri, and a dispute between Lincoln and its primary reinsurer.  *See* A.431, 474, 485-486, 558-559, 1437 (manipulated applications).

nearly all of those contracts.  Lincoln's and Memorial's failure invariably would have caused Plaintiffs' claimed losses.

### C.    Plaintiffs Did Not Prove Proximate Causation.

Plaintiffs' case for proximate causation is even weaker.  Plaintiffs' multi-step causal theory is the epitome of "an extended scenario involving multiple persons and events with potential intervening causes" in which proximate causation cannot exist.  *Callahan*, 863 S.W.2d at 865.

The events that led to Plaintiffs' claimed losses began long before Allegiant became trustee and persisted long after Allegiant resigned.  Allegiant had no insight into, or control over, NPS's actions outside Missouri, where NPS was criminally altering insurance applications with white-out to withhold premiums.  *See, e.g.*, A.485-489; *see also* A.606-608 (testimony by the SDR that accounting firm Brown Smith Wallace caused Plaintiffs' losses by failing to detect the white-out scheme).  Allegiant also could not control NPS's actions, inside or outside Missouri, after its trusteeship—when Allegiant owed no fiduciary duties to NPS or any other beneficiary.  And Plaintiffs' own witnesses disclaimed having analyzed what caused the insolvencies of Lincoln and Memorial.

Given these intervening forces, Plaintiffs' claimed damages are too attenuated from Allegiant's conduct to sustain a finding of proximate cause.  *See Finocchio*, 37 S.W.3d at 303 ("[C]ourts show great reluctance to hold a defendant liable

74

if the chain of causation includes a series of events, subsequent to the initial act or omission, over which the defendant has absolutely no control.").  In one paragraph of analysis, the district court reasoned that Plaintiffs had established proximate causation because

> [i]t is the reasonable and probable consequence that *assets will be taken from the trusts* for ill-gotten purposes when a trustee takes no action to *protect the assets*. . . . Allegiant did not fulfill its duties and a natural and probable consequence of failing to fulfill its duties, is *the trust assets were depleted*.

Adden. 76-77 (emphases added).  This again highlights the stark contrast between the theory the jury was charged on (tort damages) and the district court's justifications for the verdict, which invoke the trust-law theory of damages.  The court did not even analyze whether NPS's inability to pay its nationwide obligations is the natural and probable result of Allegiant's conduct.  This oversight speaks volumes. The court did not identify evidence establishing a proximate causal link because no such evidence exists.  Plaintiffs' failure to prove causation entitled PNC to judgment as a matter of law.  At a minimum, this Court should grant PNC a new trial or remittitur because the jury's finding of causation is against the great weight of evidence, *see Bank of Am.*, 766 F.3d at 851, and its damages award exceeds "fair and reasonable compensation," Mo. Rev. Stat. § 537.068; *see, e.g.*, *Schaefer v. Spider Staging Corp.*, 275 F.3d 735, 737-38 (8th Cir. 2002).

**D.    At a Minimum, PNC Is Entitled to Judgment as a Matter of Law on Three Subcategories of Damages.**

In the alternative, PNC is entitled to judgment as a matter of law on three subcategories of damages. *Cf. C.L. Maddox, Inc. v. Benham Grp., Inc.*, 88 F.3d 592, 603 (8th Cir. 1996) (judgment as a matter of law may be granted as to subsets of damages). Excluding these subcategories of damages result in damages to Plaintiffs (*not* damages to the trusts, *see supra* Part I) of $53.6 million.[22]

### 1.    *Allegiant did not cause NPS's inability to make growth payments.*

Plaintiffs' claim for $44 million in "growth" payments illustrates the grasping nature of their causation theory. A.627-628. Growth payments were "money that was never put into the NPS trusts in Missouri." A.478; *see also* A.450-451, 480, 556-557, 603. They were essentially inflation payments that NPS promised to funeral homes, *see supra* p.4, and there was no evidence that Allegiant even knew about them. NPS's growth obligations are no more connected to Allegiant than any other obligation NPS incurred in the ordinary course of business. It would be absurd to conclude that Allegiant should be liable to NPS for NPS's unpaid electric bills simply because Allegiant failed to put NPS out of business. NPS's growth obligations are no different.

---

[22] This amount is the sum of the $53.2 million in losses on policy-based contracts issued in Missouri during Allegiant's tenure plus approximately $400,000 in losses on "orphan contracts" issued during that period. A.631; *see supra* pp.16-17.

76

Although the court summarily held that "[t]he jury reasonably concluded there was proximate cause" as to this category of damages, Adden. 82, it did not identify the evidence that would have permitted the jury to reach that conclusion. In fact, the SDR testified that no one had analyzed whether NPS would have remained able to make growth payments absent Allegiant's alleged breaches of the standard of care.  A.602-604.  That concession defeats Plaintiffs' claim to this category of damages.

### 2.   *Allegiant did not cause losses outside Missouri.*

Damages related to pre-need contracts and life insurance policies issued *outside* Missouri totaled $242 million.  *See* A.631-632, 635-636.  Allegiant served as trustee only in Missouri, however, and owed no duty to protect life insurance policies issued to non-Missouri consumers that were never trust assets.  *See* Adden. 83; *supra* p.33.

Plaintiffs claimed at trial that if Allegiant had stopped NPS's operations in Missouri, NPS would have been unable to expand into other states.  As Plaintiffs argued in closing:

> Missouri was the *economic engine* for how they moved [into] each of these additional states. And that's why they're liable for the losses in other states because had they stopped it, the expansion could not have occurred.

A.720 (emphasis added).  Plaintiffs' own witnesses refused to support this "economic engine" theory.  Plaintiffs obtained an order, premised on the materiality of

77

this theory, to deliver Brent Cassity from prison to testify live at trial, *see* Dkt. 2087, but when asked to confirm that Missouri was the "economic engine that drove NPS," Cassity refused, responding, "I don't know.  I mean, that's your words," A.424.  NPS's President of Corporate Development testified that Missouri was but one of *six* foundation states upon which NPS built its business.  A.471; *see also* A.470.  NPS *already* was operating in Texas, Illinois, and Florida before Allegiant became trustee in Missouri in 1998.  A.425, 466.

The court stated that "money leaving the trusts" was sufficient to establish causation because it "facilitated NPS's criminal scheme in Missouri and other states."  Adden. 83-84.  Notably, it did not conclude that Allegiant could have stopped NPS's criminal scheme outside Missouri on the first day of its trusteeship.  But even if it had, that would establish only "but for" causation.  *Cf. Finocchio*, 37 S.W.3d at 303-04.  NPS's fraud outside Missouri was not the natural and probable result of Allegiant's actions.[23]  Allegiant had no control or insight into how NPS did business in other states, where NPS was fraudulently manipulating life insurance applications.  A.474, 485-486, 607.  That fraud—which occurred solely outside Missouri—is too attenuated from Allegiant's role as trustee of Missouri trusts to permit an award of damages.

---

[23] The connection between Allegiant and $94.6 million in claimed damages related to policies issued by Memorial is weaker still, since Memorial did business only in Texas.  A.445, 624-625, 650-651.

78

### 3. Allegiant did not cause Plaintiffs' losses arising after Allegiant's tenure.

The jury held PNC liable for $209 million in connection with pre-need contracts issued by NPS in the four years following Allegiant's trusteeship. *See* A.636. Because Allegiant had "absolutely no control" over what happened after its resignation in 2004, it did not cause NPS to incur obligations during this period. *Finocchio*, 37 S.W.3d at 303.

In the years after Allegiant resigned, two other banks—Bremen and M&I—served as NPS's Missouri trustee. A.458-461. Bremen actually served twice—before and after M&I. A.458-461. The court held that Allegiant is liable for all the obligations that NPS incurred after Allegiant's tenure because it trained Bremen how to be trustee and failed to disclose to Bremen problems with the trusts. Adden. 85. But, as the record demonstrates, Allegiant had no control over Bremen's (let alone M&I's) conduct as trustee. Plaintiffs' expert Edgar Coster admitted that each new trustee had the duty to administer the trusts based on its own investigation and diligence. *See* A.576-580, 588-589. A Bremen witness testified that when Bremen become trustee, it was free to administer the trusts "the Bremen way." A.456-457. Moreover, the evidence does not show that Allegiant *knew* of problems in the trusts when it resigned, aside from a lack of documentation as to one asset. *See supra* pp.9-10. The lack of documentation for that asset was equally apparent to Bremen.

Allegiant likewise had no influence or control over NPS after it resigned as trustee.  Allegiant cannot be liable for the crimes committed by NPS after Allegiant's tenure.  *See Finocchio*, 37 S.W.3d at 303-04; *Callahan*, 863 S.W.2d at 865.  Those crimes are not the natural and probable result of Allegiant's alleged breaches.  At bottom, Plaintiffs' theory is that Allegiant is responsible for everything NPS did after Allegiant became trustee no matter how attenuated from Allegiant's conduct.  The proximate causation requirement exists precisely to cut off such claims.

## VI. Plaintiffs Did Not Prove That Allegiant Engaged in Outrageous Conduct Sufficient To Warrant an Award of Punitive Damages.

### A. An Award of Punitive Damages Requires Clear and Convincing Evidence of a Willful, Wanton, or Malicious Culpable Mental State.

1. Under Missouri law, "[t]he remedy of punitive damages is so extraordinary or harsh that it should be applied only sparingly." *Alcorn v. Union Pac. R.R.*, 50 S.W.3d 226, 248 (Mo. 2001) (en banc) (internal quotation marks omitted), *overruled in part on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29, 40 (Mo. 2013) (en banc).  Punitive damages are available only when the defendant engages in outrageous conduct "so egregious" that it is "'tantamount to intentional wrongdoing.'" *Id.* (quoting *Lopez v. Three Rivers Elec. Coop., Inc.*, 26 S.W.3d 151, 160 (Mo. 2000) (en banc)).  Because jury instructions on punitive damages "are necessarily general," "careful judicial scrutiny is needed to determine whether the conduct" satisfies this standard.  *Id.* at 247-48.

80

To obtain punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant acted with "evil motive," which may "be inferred where a person recklessly disregards the rights and interests of another person." *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d 1051, 1060 (8th Cir. 2014) (internal quotation marks omitted) (applying Missouri law); *see also Burnett v. Griffith*, 769 S.W.2d 780, 787 (Mo. 1989) (en banc) ("[P]unitive damages require a showing of a culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act or reckless disregard (from which evil motive is inferred) for an act's consequences."). A plaintiff thus must prove that the defendant acted with "a wilful, wanton or malicious culpable mental state." *Burnett*, 769 S.W.2d at 789. Although punitive damages may be available on a negligence claim, "[f]acts in addition to those relied on in the negligence submission must be established in order to recover punitive damages." *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 74 (Mo. 1990) (en banc), *overruled on other grounds by Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110 (Mo. 1996) (en banc).

In *Alcorn*, the Missouri Supreme Court set forth "[f]actors that weigh against submission of punitive damages claims." 50 S.W.3d at 248. An award of punitive damages is inappropriate where

> prior similar occurrences known to the defendant have been infrequent; the injurious event was unlikely to have occurred absent negligence on the part of someone other than the defendant; and, the de-

81

> fendant did not knowingly violate a statute, regulation, or clear indus-
> try standard designed to prevent the type of injury that occurred.

*Id.* (quoting *Lopez*, 26 S.W.3d at 160). "[C]onformity with the regulatory process"

also weighs against punitive damages. *Id.* at 249.

2.     This Court and the Missouri courts have closely scrutinized claims for

punitive damages against fiduciaries. The principle that arises from these cases is

that, absent intentional misconduct or self-dealing, a breach of fiduciary duty is in-

sufficient to justify the "extraordinary" remedy of punitive damages. *Id.* at 248

(internal quotation marks omitted). In the cases cited by Plaintiffs below, the de-

fendant fiduciaries engaged in intentional misconduct or self-dealing. *See, e.g.*,

*Senn v. Manchester Bank of St. Louis*, 583 S.W.2d 119 (Mo. 1979) (en banc) (per

curiam) (vendor holding legal title to real property in trust intended to defraud the

plaintiffs), *disavowed on other grounds by Haarmann v. Davis*, 651 S.W.2d 134

(Mo. 1983) (en banc); *Norber v. Marcotte*, 134 S.W.3d 651, 658 (Mo. Ct. App.

2004) (fiduciary wrongfully transferred business's funds to a personal account);

*Gibson v. Adams*, 946 S.W.2d 796, 801, 804 (Mo. Ct. App. 1997) (fiduciary en-

gaged in self-dealing and usurped corporate opportunities); *Bradshaw v. Deming*,

837 S.W.2d 592, 593-94 (Mo. Ct. App. 1992) (fiduciary misappropriated assets).

By contrast, this Court has reversed a punitive damages award under Mis-

souri law against a fiduciary because there was no proof of intentional misconduct

or self-dealing. In *Koester v. Am. Republic Invs., Inc.*, 11 F.3d 818 (8th Cir. 1993),

82

"after representing that he would personally manage the partnership properties," a fiduciary sold property "without accounting for or distributing the sale proceeds to [the] plaintiffs," *id.* at 823.  Despite the fiduciary's misdeeds, this Court overturned the punitive damages award:

> [N]one of these actions is inherently reflective of bad motive or legal malice—they are not *malum in se*. Unlike the proof in *McKeehan*,[24] plaintiffs do not contend that [defendant] engaged in self dealing or misappropriated partnership funds in connection with the sale and foreclosure transactions in question. Plaintiffs' argument reduces to the proposition that any breach of fiduciary duty warrants an award of punitive damages. . . .  Missouri law is to the contrary.

*Id.* at 823.

Similarly, in *Bold v. Simpson*, 802 F.2d 314 (8th Cir. 1986), this Court reversed a punitive damages award against a corporate officer who breached his fiduciary duty by assigning a company lease to himself and mismanaging property. The jury found that the defendant committed fraud, conversion, and negligent mismanagement.  *Id.* at 321. Nonetheless, as in *Koester*, the Court reversed the award of punitive damages because there was no evidence of "malice."  *Id.*

---

[24] *McKeehan v. Wittels*, 508 S.W.2d 277, 281 (Mo. Ct. App. 1974), upheld an award of punitive damages where the defendants "deliberately ignored plaintiff's instructions so that their own financial positions would be enhanced."

83

**B.      Plaintiffs Did Not Prove by Clear and Convincing Evidence That Allegiant Had a Willful, Wanton, or Malicious Culpable Mental State.**

Plaintiffs did not establish by clear and convincing evidence that Allegiant's conduct was so outrageous as to be tantamount to intentional wrongdoing, *Alcorn*, 50 S.W.3d at 248, or was motivated by "a wilful, wanton or malicious culpable mental state," *Burnett*, 769 S.W.2d at 789.  In fact, the record affirmatively establishes the contrary.

### 1.      *Plaintiffs admitted that Allegiant did not have "evil motive."*

Plaintiffs' theory of this case is completely at odds with their claim for punitive damages.  As the court observed at trial, Plaintiffs' "theory all along [was] not only did they [*i.e.*, Allegiant] not have evil intent, they were benign and totally clueless to what was going on.  So evil intent is out." A.675-676.  During closing argument, Plaintiffs disclaimed any allegation that Allegiant acted with evil motive.  *See* A.722.

Even if Plaintiffs had presented evidence of reckless indifference (they did not), reckless indifference supports punitive damages only if it leads the jury to conclude, by inference, that the defendant had an evil motive.  *See Hallmark Cards*, 758 F.3d at 1060 (requiring evidence of evil motive, whether direct or "inferred where a person recklessly disregards the rights and interests of another person" (internal quotation marks omitted)).  As Plaintiffs conceded, the evidence did

84

not permit that inference here.  Plaintiffs repeatedly characterized their claims as resting on Morisse's negligent performance of his duties.  *See, e.g.*, A.719 ("Now Mr. Morisse might not have known about the policy loans but he should have known."); *see also, e.g.*, A.721.  But "[f]acts in addition to those relied on in the negligence submission must be established in order to recover punitive damages." *Menaugh*, 799 S.W.2d at 74.  Such additional facts are absent from this record.

### 2.    *Plaintiffs failed to prove intentional misconduct or self-dealing.*

Allegiant's conduct does not come close to the conduct that this Court found insufficient to justify punitive damages in *Koester* and *Bold*.  In attempting to defend the jury's punitive damages award, the district court put near-dispositive weight on Morisse's "conduct . . . in passing the trusts to Bremen Bank without warning [Bremen's] officers."  Adden. 79.  The court found that "Morisse knew if Allegiant was unable to rid itself of the NPS trusts, Allegiant would be required to pay $25 million to National City Bank," suggesting that this break-up fee motivated him to hide known problems from Bremen.  *Id.*

The court did not cite any record support (let alone clear and convincing evidence) for this finding.  There is no evidence that Morisse was even *aware* of the $25 million breakup fee, much less that it motivated him to conceal any problem with the trusts.  Further, Plaintiffs identified only one problem that Morisse discovered before Allegiant resigned:  he could not find documentary support for one

85

group term life insurance policy reported on the trust statements.  *See* A.1434. There was no evidence that this discovery revealed the Cassitys' fraud to Morisse or that he deliberately concealed this problem from Bremen—by, for example, fabricating support for the policy.  That sort of intentional wrongdoing is conspicuously absent.

### 3. The **Alcorn** *factors weigh against an award of punitive damages.*

The *Alcorn* factors—which the district court ignored—"weigh against submission of [the] punitive damages claim[]" here.  *Alcorn*, 50 S.W.3d at 248.  *First*, Plaintiffs offered no evidence of prior similar occurrences.  *Second*, absent the criminal conduct of the Cassitys and their cohorts, three of whom were convicted of defrauding Allegiant, Plaintiffs' claimed injuries could not have occurred.

*Third*, Allegiant did not "*knowingly* violate a statute, regulation, or clear industry standard."  *Id.* (emphasis added) (internal quotation marks omitted).  Rather, the evidence showed that Morisse carefully reviewed and annotated Chapter 436, read and attempted to understand the trust agreement, and inquired into how the trusts had been administered by the prior trustee.  *See* A.367-372, 1402.

Based on his review of the trust agreement and Chapter 436, Morisse believed that NPS was the sole beneficiary and that, because NPS had appointed WBM as investment advisor, Allegiant had no authority to second-guess WBM's investment decisions.  *See* A.346, 374-376, 381-383.  His management of the trusts

86

is largely explained by these two legal conclusions.  Although the district court reached the opposite legal conclusions a decade after Allegiant resigned as trustee, *see supra* Parts III.A.3 and IV, even if Morisse's conclusions were incorrect, a reasonable or good-faith mistake of law is insufficient to support punitive damages, *see Rustici v. Weidemeyer*, 673 S.W.2d 762, 772 (Mo. 1984) (en banc) (a "good faith mistake" of law "is sufficient to negate the legal malice required for the imposition of punitive damages" (citing *Pollock v. Brown*, 569 S.W.2d 724, 733 (Mo. 1978) (en banc))).  The court's disagreement with Morisse's legal conclusions negates any argument that Morisse or Allegiant *knowingly* violated any statute, regulation, or clear industry standard. [25]

*Fourth*, the evidence showed that the Missouri Division of Finance repeatedly examined Allegiant's trust department during its trusteeship and told Allegiant that its trust department was "fundamentally sound."  *See* A.1155 ("2" rating); A.1199 (same); A.1231-1234 (same); *see also* A.1145 (rating of "2" means that "[a]dministration of fiduciary activities is fundamentally sound").  In 1999, the Division of Finance performed an in-depth review of the largest NPS trust and awarded Allegiant a "fundamentally sound" rating.  *See* A.391-411, 1155.  This

---

[25] The district court stated that "[t]here was suggestion Allegiant knew what it was doing was wrong," Adden. 79, but did not identify what evidence suggested that conclusion.  A "suggestion," even if one could be identified, falls short of the clear and convincing evidence Plaintiffs were required to present.

87

fact further "negate[s]" the conclusion that Allegiant's conduct was tantamount to intentional wrongdoing.  *Alcorn*, 50 S.W.3d at 249.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court with instructions to enter judgment in favor of PNC or, in the alternative, to grant a new, bench trial.

Respectfully submitted,

/s/ James F. Bennett
JAMES F. BENNETT
  *COUNSEL OF RECORD*
CAITLIN E. O'CONNELL
DOWD BENNETT LLP
  *7733 Forsyth Boulevard,*
  *Suite 1900*
  *St. Louis, MO 63105*
  *(314) 889-7300*

STEPHEN D. RABER
J. ANDREW KEYES
AMY MASON SAHARIA
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*

MARCH 7, 2016

88

## STATUTORY ADDENDUM

**Mo. Rev. Stat. § 436.031(2) (2008) (repealed 2009)**

All property held in a preneed trust, including principal and undistributed income, shall be invested and reinvested by the trustee thereof. The trustee shall exercise such judgment and care under circumstances then prevailing which men of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income therefrom as well as the probable safety of their capital.  A preneed trust agreement may provide that when the principal and interest in a preneed trust exceeds two hundred fifty thousand dollars, investment decisions regarding the principal and undistributed income may be made by a federally registered or Missouri-registered independent qualified investment advisor designated by the seller who established the trust; provided, that title to all investment assets shall remain with the trustee and be kept by the trustee to be liquidated upon request of the advisor of the seller. In no case shall control of said assets be divested from the trustee nor shall said assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in.  The trustee shall be relieved of all liability regarding investment decisions made by such qualified investment advisor.

**Mo. Rev. Stat. § 436.031(3) (2008) (repealed 2009)**

The seller of a preneed contract shall be entitled to all income, including, without limitation, interest, dividends, and capital gains, and losses generated by the investment of preneed trust property regarding such contract, and the trustee of the trust may distribute all income, net of losses, to the seller at least annually; but no such income distribution shall be made to the seller if, and to the extent that, the distribution would reduce the aggregate market value on the distribution date of all property held in the preneed trust, including principal and undistributed income, below the sum of all deposits made to such trust pursuant to subsection 1 of this section for all preneed contracts then administered through such trust.

89

**Mo. Rev. Stat. § 436.035(1) (2008) (repealed 2009)**

> At any time before the final disposition of the dead body, or before funeral services, facilities, or merchandise described in a preneed contract are provided by the provider designated in the preneed contract, the purchaser may cancel the contract without cause by delivering written notice thereof to the seller and the provider.  Within fifteen days after its receipt of such notice, the seller shall pay to the purchaser a net amount equal to all payments made into trust under the contract.  Upon delivery of the purchaser's receipt for such payment to the trustee, the trustee shall distribute to the seller from the trust an amount equal to all deposits made into the trust for the contract.

**Mo. Rev. Stat. § 436.038 (2008) (repealed 2009)**

> If the death of the beneficiary occurs outside the general area served by the provider designated in a preneed contract, then the seller shall either provide for the furnishing of comparable funeral services and merchandise by a licensed mortuary selected by the next of kin of the purchaser or, at the seller's option, shall pay over to the purchaser in fulfillment of all obligations under the contract, an amount equal to all sums actually paid in cash by the purchaser under the preneed contract together with interest to be provided for in the contract.  Upon seller's full performance under the provisions of this section, the trustee of the preneed trust for the contract shall distribute to the seller from the trust an amount equal to all deposits made into the trust for the contract.

**Mo. Rev. Stat. § 436.041 (2008) (repealed 2009)**

> If the payments payable under a preneed contract shall be more than three months in arrears, the seller may cancel the contract by delivering written notice thereof to the purchaser and the provider, and by making payment to the purchaser of a net amount equal to all payments made into trust under the contract.  Upon delivery of the purchaser's receipt of such payment to the trustee, the trustee shall distribute to the seller from the trust an amount equal to all deposits made into the trust for the contract.

**Mo. Rev. Stat. § 436.045 (2008) (repealed 2009)**

Within thirty days after a provider and a witness shall certify in writing to the seller that the provider has provided the final disposition of the dead body, and funeral services, facilities, and merchandise described in the contract, or has provided alternative funeral benefits for the beneficiary pursuant to special arrangements made with the purchaser, the seller shall pay to the provider a net amount equal to all payments required to be made pursuant to the written agreement between the seller and the provider or all payments made under the contract.  Upon delivery to the trustee of the provider's receipt for such payment, the trustee shall distribute to the seller from the trust an amount equal to all deposits made into the trust for the contract.

**Mo. Rev. Stat. § 436.048 (2008) (repealed 2009)**

If a seller shall fail to make timely payment of an amount due a purchaser or a provider pursuant to the provisions of sections 436.005 to 436.071, the purchaser or provider, as appropriate, shall have the right, in addition to other rights and remedies against such seller, to make demand upon the trustee of the preneed trust for the contract to distribute to the purchaser or provider from the trust, as damages for its breach, an amount equal to all deposits made into the trust for the contract.

**Mo. Rev. Stat. § 456.10-1001 (2015)**

1. A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust.

2. To remedy a breach of trust that has occurred or may occur, the court may:

    (1)    compel the trustee to perform the trustee's duties;

    (2)    enjoin the trustee from committing a breach of trust;

    (3)    compel the trustee to redress a breach of trust by paying money, restoring property, or other means;

91

(4)     order a trustee to account;

(5)     appoint a special fiduciary to take possession of the trust property and administer the trust;

(6)     suspend the trustee;

(7)     remove the trustee as provided in section 456.7-706;

(8)     reduce or deny compensation to the trustee;

(9)     subject to section 456.10-1012, void an act of the trustee, impose a lien or a constructive trust on trust property, or trace trust property wrongfully disposed of and recover the property or its proceeds; or

(10)    order any other appropriate relief.

## Mo. Rev. Stat. § 456.10-1002 (2015)

1. A trustee who commits a breach of trust is liable to the beneficiaries affected for the greater of:

(1)     the amount required to restore the value of the trust property and trust distributions to what they would have been had the
breach not occurred; or

(2)     the profit the trustee made by reason of the breach.

2.  Except as otherwise provided in this subsection, if more than one trustee is liable to the beneficiaries for a breach of trust, a trustee is entitled to contribution from the other trustee or trustees that are also liable.  A trustee is not entitled to contribution if the trustee was substantially more at fault than another trustee or if the trustee committed the breach of trust in bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries.  A trustee who received a benefit from the breach of trust is not

92

entitled to contribution from another trustee to the extent of the benefit received.

## Mo. Rev. Stat. § 537.067 (2015)

1. In all tort actions for damages, if a defendant is found to bear fifty-one percent or more of fault, then such defendant shall be jointly and severally liable for the amount of the judgment rendered against the defendants.  If a defendant is found to bear less than fifty-one percent of fault, then the defendant shall only be responsible for the percentage of the judgment for which the defendant is determined to be responsible by the trier of fact; except that, a party is responsible for the fault of another defendant or for payment of the proportionate share of another defendant if any of the following applies:

    (1)    The other defendant was acting as an employee of the party;

    (2)    The party's liability for the fault of another person arises out of a duty created by the federal Employers' Liability Act, 45 U.S.C. Section 51.

2. The defendants shall only be severally liable for the percentage of punitive damages for which fault is attributed to such defendant by the trier of fact.

3. In all tort actions, no party may disclose to the trier of fact the impact of this section.

## Mo. Rev. Stat. § 537.068 (2015)

A court may enter a remittitur order if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages.  A court may increase the size of a jury's award if the court finds that the jury's verdict is inadequate because the amount of the verdict is less than fair and reasonable compensation for plaintiff's injuries and damages.

93

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS
## AND ANTI-VIRUS CERTIFICATION

I, James F. Bennett, counsel for appellants and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief of Appellants is proportionately spaced, has a typeface of 14 points or more, and contains 20,994 words.

I further certify, pursuant to Circuit Rule 28A(h)(2), that the attached Brief of Appellants and Addendum of Appellants have been scanned for viruses and are virus-free.

/s/ James F. Bennett
JAMES F. BENNETT

MARCH 7, 2016

94

## CERTIFICATE OF SERVICE

I, James F. Bennett, counsel for appellants, certify that, on March 7, 2016, a copy of the attached Brief of Appellants, was filed electronically through the appellate CM/ECF system with the Clerk of the Court.

/s/ James F. Bennett
JAMES F. BENNETT

MARCH 7, 2016