IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JO ANN HOWARD AND ASSOCIATES, P.C., SPECIAL DEPUTY RECEIVER OF LINCOLN MEMORIAL LIFE INSURANCE COMPANY, MEMORIAL SERVICE LIFE INSURANCE COMPANY, AND NATIONAL PREARRANGED SERVICES, INC., ET AL., <br><br>         Plaintiffs, <br>v. <br><br>J. DOUGLAS CASSITY; RANDALL K. SUTTON; BRENT D. CASSITY; J. TYLER CASSITY; RHONDA L. CASSITY; ET AL., <br><br>         Defendants. | ) ) ) ) ) ) ) ) ) Case No. 09-CV-1252-ERW ) ) ) ) ) ) ) |

## JOINT STIPULATION OF UNDISPUTED FACTS

1. Jo Ann Howard and Associates, P.C. is the duly appointed and designated Special Deputy Receiver ("SDR") for National Prearranged Services ("NPS"), Lincoln Memorial Life Insurance Company ("Lincoln") and Memorial Services Life Insurance Company ("Memorial"), which were placed into receivership by the Texas Department of Insurance on May 14, 2008, and are currently in the process of being liquidated.  ECF No. 2560-1 at 1, ¶ 1.

2. The SDR is authorized to deal with the property, business, and claims for or against NPS, Lincoln, and Memorial pursuant to the provisions of the *Insurer Receivership Act*, Texas Insurance Code Chapter 443. TEX. INS. CODE § 443.154. ECF No. 2560-1 at 1, ¶ 2.

3. Plaintiffs Missouri Life and Health Insurance Guaranty Association, Texas Life and Health Insurance Guaranty Association, Illinois Life and Health Insurance Guaranty Association, Kansas Life and Health Insurance Guaranty Association, Oklahoma Life and Health Insurance Guaranty Association, Kentucky Life and Health Insurance Guaranty Association, and the Arkansas Life and Health Insurance Guaranty Association are statutory entities created by

1

their respective state legislatures to provide protection to their respective states' resident policyholders in the event of an insolvency of a member insurance company.  ECF No. 2560-1 at 1-2, ¶ 3.

4. Plaintiff the National Organization of Life and Health Insurance Guaranty Associations ("NOLHGA") is a Virginia nonstock corporation. It is a voluntary association of its members, which are all of the life and health insurance guaranty associations of the states of the United States of America and the District of Columbia.  NOLHGA is a plaintiff in this action as the assignee of claims for collection purposes only from the following state life and health insurance guaranty associations: Arizona, California, Colorado, District of Columbia, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Washington, West Virginia, Wisconsin, and Wyoming. Each state life and health insurance guaranty association is a statutory entity created by their respective state legislatures to provide protection to their respective states' resident policyholders in the event of an insolvency of a member insurance company.  ECF No. 2560-1 at 2, ¶ 4.

5. PNC is a nationally chartered bank with its headquarters in Pittsburgh, Pennsylvania and its designated main office in Delaware.  PNC is the successor-in-interest to National City Bank, National City Bank of the Midwest, and Allegiant Bank as a result of various mergers. ECF No. 2560-1 at 3, ¶ 6.

6. Allegiant Trust Company, a division of Allegiant Bank, served as the trustee for NPS Pre-Need Trust I between August 24, 1998 and May 14, 2004 ("Trust I"); Pre-Need Trust II between August 14, 1998 and May 14, 2004 ("Trust II"); Pre-Need Trust III between August 28, 1998 and May 14, 2004 ("Trust III"); Pre-Need Trust IV between August 11, 1998 and May 14,

2004 ("Trust IV"); Pre-Need Trust V between March 25, 1999 and May 14, 2004 ("Trust V"); as the trustee of the Mt. Washington Forever Pre-Need Trust between April 13, 2000 and May 14, 2004 ("MTW Trust"); and as the trustee of the Mason Securities Association d/b/a/ Funeral and Cremation Society of America Pre-Need Trust between February 19, 1998 and May 14, 2004 ("CSA Trust") (collectively, the "NPS Preneed Trusts"). ECF No. 2560-1 at 3-4, ¶ 7.

7. Allegiant Bank was merged with and into National City Bank of the Midwest effective as of July 31, 2004. National City Bank of the Midwest, in turn, was merged with and into National City Bank effective July 22, 2006. Finally, National City Bank was merged with and into PNC effective in November 2009. ECF No. 2560-1 at 4, ¶ 8.

8. NPS started in 1979 and was owned and controlled by the Cassity family, whose members were Doug Cassity, Rhonda Cassity, Tyler Cassity, and Brent Cassity. ECF No. 2560-1 at 6, ¶ 11.

9. NPS sold preneed funeral contracts. Under a preneed funeral contract, a consumer would arrange and pay for a funeral before the time of need. There were advantages to prearranging a funeral, including relieving loved ones of having to make decisions at the time of death and freezing the price of the funeral to the price at the time of prearrangement. ECF No. 2560-1 at 6, ¶ 12.

10. NPS became the largest preneed seller in the state of Missouri. As part of its marketing to funeral homes to sell NPS preneed contracts, NPS would stress that the funds received would be held in trust. ECF No. 2560-1 at 7, ¶ 14.

11. Doug Cassity and Randy Sutton controlled the finances of NPS and made decisions regarding when and where to spend money, including sending funds to other Cassity-controlled entities. ECF No. 2560-1 at 7, ¶ 15.

12. During Allegiant's tenure as trustee, Randy Sutton was President and/or Chief Financial Officer of NPS. Mr. Sutton was the head of NPS and ran NPS. Mr. Sutton was also President of Lincoln.

13. During Allegiant's tenure as trustee, Brent Cassity was the Chief Operating Officer and President of Marketing at NPS.

14. During Allegiant's tenure as trustee, Sharon Nekol Province was Vice President and Assistant Secretary of NPS.

15. During Allegiant's tenure as trustee, Angela Hall was an employee of NPS and was Randy Sutton's assistant.

16. During Allegiant's tenure as trustee, Sandy Wallis was an employee in the accounting department of NPS. Ms. Wallis reported to and took direction from Randy Sutton.

17. Lincoln was a life insurance company that was owned by the Cassity family. The Cassity family purchased Lincoln so that it could own and control the insurance company used for issuing life insurance policies to fund the preneed funeral contracts sold by NPS. ECF No. 2560-1 at 12, ¶ 16.

18. Doug Cassity and Randy Sutton, in addition to controlling NPS's operations, also controlled the operations of Lincoln. ECF No. 2560-1 at 12, ¶ 17.

19. Practically all life insurance policies issued by Lincoln were issued to fund the preneed funeral contracts sold by NPS. Likewise, the vast majority of the NPS Preneed Trusts' assets during Allegiant's period as trustee were in the form of life insurance policies issued by Lincoln. ECF No. 2560-1 at 12, ¶ 18.

20. Allegiant was aware that Chapter 436 required it to maintain adequate records of all payments received and of all transactions affecting the NPS Preneed Trusts. ECF No. 2560-1 at 16, ¶ 24.

21. Allegiant further understood that funds could leave the NPS Preneed Trusts only for limited purposes, such as death claims and cancellations, and in those instances only the amount that had been deposited into trust on behalf of the particular consumer could to be released from the trust. Similarly, income distributions could only be made to the extent the aggregate market value of all property held in the preneed trust exceeded the sum of all deposits made into the trust for the preneed contracts then administered through the trust. ECF No. 2560-1 at 16, ¶ 25.

22. Allegiant also understood during its trusteeship that it was required to protect and control the NPS Preneed Trusts' assets.  ECF No. 2560-1 at 16, ¶ 26.

23. Allegiant Bank was founded in St. Louis, Missouri in the spring of 1989.  In the beginning, Allegiant Bank did not have a trust department. ECF No. 2560-1 at 20, ¶ 28.

24. The NPS Preneed Trusts moved to Allegiant in 1998.  Allegiant's trust department had only three employees—including Markow and Morisse—at the time Allegiant took over as trustee of the NPS Preneed Trusts. ECF No. 2560-1 at 24, ¶ 33.

25. Allegiant first became trustee of an NPS Preneed Trust in 1998. In the one year between December 1997 and December 1998, Allegiant's trust assets under management jumped from approximately $2.2 million to approximately $137.8 million—with the NPS Preneed Trusts being the vast majority of the assets. ECF No. 2560-1 at 26, ¶ 35.

26.  In August 1998, when Allegiant became trustee over Trust IV, $50,231,407.30 of the reported $52 million in trust assets was in the form of Lincoln life insurance policies. Lincoln

policies thus represented 96.38% of the Trust IV assets when Allegiant took over as trustee. ECF No. 2560-1 at 28, ¶ 37.

27. When Allegiant took over as trustee of Trust I in August 1998, over 97% of Trust I's assets consisted of certificates of debenture issued from NPS. The reported value of these debentures totaled approximately $1.7 million. ECF No. 2560-1 at 28, ¶ 38.

28. At the beginning of Allegiant's tenure as trustee over Trust II in August 1998, 98% of Trust II's approximately $15 million in assets were Lincoln life insurance policies. ECF No. 2560-1 at 28, ¶ 39.

29. Similarly, Trust III was comprised of approximately $40,679,131 in assets when Allegiant became trustee in August 1998. Of that amount, 64.88% consisted of Lincoln life insurance policies and the remaining 35.12% consisted of a certificate of debenture from NPS with a reported value of $14,285,193. ECF No. 2560-1 at 28, ¶ 40.

30. The Court and the Eighth Circuit have found that the beneficiaries of the NPS Preneed Trusts were NPS, the Missouri funeral homes providing the services, and the Missouri consumers purchasing the preneed contracts. ECF No. 2560-1 at 35, ¶ 46.

31. NPS appointed David Wulf of Wulf, Bates & Murphy as the investment advisor for the NPS Preneed Trusts in approximately 1987. ECF No. 2560-1 at 40, ¶ 52.

32. Allegiant had an obligation to maintain accurate books and records reflecting all transactions in any way pertinent to the NPS Preneed Trusts. Allegiant understood that it had this recordkeeping responsibility. ECF No. 2560-1 at 78, ¶ 81.

33. Allegiant regularly received forms from NPS netting out new business deposits with death claims and cancellations. *See, e.g.*, Ex. P-105. Allegiant never understood what the forms meant and never performed any reconciliation or inquiry into the forms, but nonetheless

6

signed the forms certifying that they were prepared pursuant to Chapter 436.  ECF No. 2560-1 at 80, ¶ 85.

34. Allegiant understood that no funds could be distributed from the NPS Preneed Trusts for investment purposes unless those investments were within the "authority of a reasonably prudent trustee to invest it."  ECF No. 2560-1 at 88, ¶ 91.

35. During Allegiant's tenure as trustee, over 21,000 paid-in-full Missouri preneed contracts were backed with Lincoln life insurance policies that required premiums payable over a period of years. ECF No. 2560-1 at 111, ¶ 110.

36. Allegiant knew that it was only permitted to distribute trust funds to NPS under the specific circumstances authorized by Chapter 436 and the trust agreements.  ECF No. 2560-1 at 150, ¶ 155.

37. Indeed, during Allegiant's period as trustee, money could not leave the NPS Preneed Trusts without Allegiant's participation.  NPS could only access the trusts' preneed funds if Allegiant agreed to transfer the trust funds to NPS. ECF No. 2560-1 at 150, ¶ 156.

38. In November 1999, Allegiant's trust department opened a custody account for Cassity entity Forever Enterprises. Herb Morisse simultaneously served as Allegiant's account administrator for the NPS Preneed Trusts and the Forever Enterprises custody account.  ECF No. 2560-1 at 217-218, ¶ 230.

39. During Allegiant's period as trustee, the reported value of Trust IV assets grew from approximately $52.1 million in 1998 to $154 million in 2004. ECF No. 2560-1 at 237, ¶ 243.

40. Expert testimony established that by its nature a Ponzi scheme is a scheme under which a person or entity develops a strategy to convince people to pay money upfront in return

7

2189995

for the promise of outsized returns at a later date. In the process, the schemer diverts the money for an improper purpose, and then uses new money obtained from different people at a later date to satisfy the prior obligations until the scheme inevitably collapses. ECF No. 2560-1 at 238, ¶ 244.

41. At the time of the meetings between Morisse and Bremen in 2004, Allegiant still owed fiduciary duties to the beneficiaries of the NPS Preneed Trusts, which included the Missouri preneed consumer and funeral home beneficiaries. ECF No. 2560-1 at 278, ¶ 280.

42. Pursuant to custom and practice in the trust industry, a trustee has the core responsibilities to control the trust assets, to protect the assets, and to maintain accurate records of the assets. The sources of these responsibilities include the trust agreements and state laws that govern the activities of trustees. A trustee has a fundamental responsibility to understand the job it takes on when it accepts the role as trustee. ECF No. 2560-1 at 299, ¶ 301.

43. The NPS Preneed Trusts were fiduciary accounts. Allegiant's core responsibilities pursuant to custom and practice in the trust industry between 1998 and 2004, which included controlling the trust assets, protecting the trust assets, and maintaining accurate records, applied to the NPS Preneed Trusts for which Allegiant served as trustee. ECF No. 2560-1 at 299-300, ¶ 303.

44. During its entire trusteeship, Allegiant maintained a responsibility to identify: the trust beneficiaries, what assets were in the trusts, what value did the assets have, where were the assets located, when the beneficiaries would be entitled to trust benefits, why the trusts were established, and how the trusts should be administered. ECF No. 2560-1 at 300, ¶ 304.

45. A trustee has the responsibility to hold the trust property for the benefit of the beneficiaries, and to put the interests of the beneficiaries before its own interests. ECF No. 2560-1 at 310, ¶ 313.

46. Chapter 436 provides that no income distribution can be made from a trust to the seller if, and to the extent that, the distribution would reduce the aggregate market value on the distribution date of all property held in the preneed trusts, below the sum of all deposits made to such trust. ECF No. 2560-1 at 318, ¶ 322.

47. In order to conduct the market value test under Chapter 436 to determine if an income distribution could be made, Allegiant needed to know the aggregate market value of all property held in the NPS trusts on the distribution date, as well as the sum of all deposits made into the trusts. ECF No. 2560-1 at 318, ¶ 323.

48. Under custom and practice in the trust industry, Allegiant was required to maintain adequate books of account of all transactions in the trusts. ECF No. 2560-1 at 331, ¶ 334.

49. Pursuant to industry custom and practice, Allegiant maintained fiduciary responsibilities to the beneficiaries of the NPS Preneed Trusts during the transition period in 2004 when the trusts were moving from Allegiant to Bremen. Custom and practice required Allegiant to maintain accurate and adequate records until Bremen took over as successor trustee. Custom and practice also required Morisse and Allegiant to protect the interests of the trusts' beneficiaries—over the interests of Allegiant—until the time when the transfer of the trusts to Bremen was completed. ECF No. 2560-1 at 334, ¶ 339.

Dated this 9th day of November, 2018.

                Respectfully submitted,

                *s/ John M. McHugh*
Daniel M. Reilly (Admitted *Pro Hac Vice*)
Larry S. Pozner, E.D. Missouri Bar No. 2792CO
Clare S. Pennington (Admitted *Pro Hac Vice)*
Robert J. Kelly (Admitted *Pro Hac Vice*)
Michael P. Robertson (Admitted *Pro Hac Vice*)
Farrell A. Carfield (Admitted *Pro Hac Vice*)
John M. McHugh  (Admitted *Pro Hac Vice*)

Reilly Pozner LLP
1700 Lincoln Street, Suite 3400
Denver, CO 80203
(303) 893-6100

and

Maurice B. Graham, Bar No. 3257
Gray, Ritter & Graham, P.C.
701 Market Street, Suite 800
St. Louis, MO 63101
(314) 241-5620

Attorneys for Plaintiffs Jo Ann Howard and Associates, P.C., in its capacity as Special Deputy Receiver of Lincoln Memorial Life Insurance Company, Memorial Service Life Insurance Company, and National Prearranged Services, Inc.; the National Organization of Life and Health Insurance Guaranty Associations; the Missouri Life & Health Insurance Guaranty Association; the Texas Life & Health Insurance Guaranty Association; the Illinois Life & Health Insurance Guaranty Association; the Kansas Life & Health Insurance Guaranty Association; Oklahoma Life & Health Insurance Guaranty Association; the Kentucky Life & Health Insurance Guaranty Association; and the Arkansas Life & Health Insurance Guaranty Association

By: /s/ *Edward L. Dowd*
Edward L. Dowd, Mo. Bar No. 28785
James F. Bennett, Mo. Bar No. 46826
James G. Martin, Mo. Bar No. 33586
Gabriel E. Gore, Mo. Bar No. 45416
Elizabeth C. Carver, Mo. Bar No. 34328
Megan S. Heinsz, Mo. Bar No. 56377
Caitlin E. O'Connell, Mo. Bar No. 67577
Jeffrey R. Hoops, Mo. Bar No. 69813
DOWD BENNETT LLP
7733 Forsyth Boulevard, Suite 1900
St. Louis, MO 63105
(314) 889-7300 (telephone)
(314) 863-2111 (facsimile)
jbennett@dowdbennett.com

*Attorneys for Defendants PNC Bank, N.A. and National City Bank, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2018, the foregoing was filed electronically with the Clerk of Court and served by operation of the Court's electronic filing system upon all counsel of record in this case participating in Electronic Case Filing.

*s/ John M. McHugh*
John M. McHugh
(Admitted *Pro Hac Vice)*
Attorney for Plaintiffs
