**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

JO ANN HOWARD & ASSOCIATES, )
P.C. et al., )
 )
  Plaintiff(s), )
 )  Case No. 4:09CR01252 ERW
  vs. )
 )
J. DOUGLAS CASSITY, et al., )
 )
  Defendant(s).

## MEMORANDUM AND ORDER

  This matter comes before the Court on Plaintiffs' Motion for Summary Judgment as to

PNC's Investment Advisor Defense [2663], Defendants PNC Bank, N.A. and National City

Bank's Motion for Partial Summary Judgment on Prejudgment Interest [2665], Plaintiffs'

Motion for Partial Summary Judgment on Recovery under Section 205(b) [2670], Defendants'

Motion for Partial Summary Judgment on Plaintiffs' Claim for Damages under Restatement

(Second) of Trusts § 205(b) [2672], and Defendants' Motion for Partial Summary Judgment on

Plaintiffs' Claim for Damages Beyond Actual Benefits Paid, or to be Paid, by the State Guaranty

Associations [2677].

## I. BACKGROUND

  This litigation began on August 6, 2009, when Plaintiffs[1] filed a complaint against more

than forty defendants, including National City Bank, N.A. and PNC Bank N.A ("Defendants").[2]

---

[1] Plaintiffs consist of the Special Deputy Receiver, Jo Ann Howard and Associates, P.C., for National Prearranged
Services, Inc., Lincoln Memorial Life Insurance Company, and Memorial Service Life Insurance Company, and the
National Organization of Life and Health Guaranty Associations, and the individual state life and health insurance
guaranty associations of Arkansas, Illinois, Kansas, Kentucky, Missouri, Oklahoma, and Texas.
[2] PNC Bank, N.A. is the successor-in-interest to National City Bank, N.A. and was not included in the first
complaint, but was added at a later date.

After a stay was imposed on July 11, 2011,[3] while a corresponding criminal case progressed, the litigation proceeded on August 22, 2013. A jury trial began on February 2, 2015, and concluded in a jury verdict for Plaintiffs for $355,500,000 in compensatory damages and $35,550,000 in punitive damages. Plaintiffs and Defendants appealed the Court's rulings to the Eighth Circuit Court of Appeals, which affirmed, in part, and remanded, in part, the Court's decisions.

A.      *Eighth Circuit Opinion*

The Eighth Circuit affirmed, in part, and reversed, in part, the Court's rulings in the first trial of this case. *Jo Ann Howard & Assoc., P.C. v. Cassity*, 868 F.3d 637 (8th Cir. 2017). The issues challenged before the Eighth Circuit relevant to the motions currently before the Court are Defendants' arguments: (1) the district court improperly concluded Plaintiffs' claims arise in tort rather than under the law of trusts; (2) Plaintiffs' claims should have been tried to the court rather than a jury; and (3) the district court improperly disallowed Defendants' defenses. *Id.* at 642.

As to the first two arguments, the Eighth Circuit held a claim is for breach of trust whether through negligence or fraud if the duty violated arises from trust law. *Id.* at 645. The Eighth Circuit explicitly stated: "to the extent PNC is liable to [Plaintiffs] for breach of Allegiant's duties under trust law, the appropriate measure of damages is set forth in § 205." *Id.* at 646. It further held Plaintiffs could recover damages for breaches caused by Allegiant from 1998 to 2004. *Id.* Damages beyond that are not recoverable from Defendants as Allegiant's successors. *Id.*

As to the third argument, the Eighth Circuit decided the Court correctly struck Defendants' investment advisor defense stating: "A trustee always has a duty to ensure that trust assets are invested prudently, whether the trustee is investing the assets himself or monitoring the

---

[3] All discovery for criminal defendants was stayed while trustee defendants and Plaintiffs were permitted to conduct limited fact discovery during the pendency of the stay.

investment decisions of an investment advisor." *Id*. at 647. It further held that the statute recognized this duty by "providing that 'in no case' where assets are invested imprudently – investment advisor or no – may the trustee be relieved of liability." *Id*. at 648. Finally, the Eighth Circuit conclude Defendants' are only relieved of liability if Allegiant ensured the investment advisor invested trust assets within the authority of a reasonably prudent trustee. *Id*.

The Eighth Circuit remanded the case back to this Court to be tried before the Court as a case in equity.[4]

B. *Undisputed Facts*

Allegiant Bank, served as the trustee for NPS Pre-Need Trust I between August 24, 1998 and May 14, 2004 ("Trust I"); Pre-Need Trust II between August 14, 1998 and May 14, 2004 ("Trust II"); Pre-Need Trust III between August 28, 1998 and May 14, 2004 ("Trust III"); Pre-Need Trust IV between August 11, 1998 and May 14, 2004 ("Trust IV"); Pre-Need Trust V between March 25, 1999 and May 14, 2004 ("Trust V"); as the trustee of the Mt. Washington Forever Pre-Need Trust between April 13, 2000 and May 14, 2004 ("MTW Trust"); and as the trustee of the Mason Securities Association d/b/a/ Funeral and Cremation Society of America Pre-Need Trust between February 19, 1998 and May 14, 2004 ("CSA Trust") (collectively, the "NPS Pre-need Trusts"). ECF No. 2683, ¶ 1. During Allegiant's tenure as trustee, over 21,000 paid-in-full Missouri pre-need contracts were backed with Lincoln life insurance policies that required premiums payable over a period of years and Allegiant received over 1,000 wire transfer requests during this period. ECF No. 2683, ¶ 37; ECF No. 2680, ¶ 3.

While serving as trustee of the NPS Pre-need Trusts, Allegiant accepted and booked a series of "certificates of debenture" from NPS as trust assets. ECF No. 2683, ¶ 51. Allegiant

---

[4] The Eighth Circuit made additional decisions in its opinion regarding the proper beneficiaries, Defendants' *in pari delicto* and authorization defenses, and Plaintiffs' aiding and abetting claims, among others; but these decisions are not relevant to the motions for summary judgment so the Court has not included them in this summary.

understood that NPS Pre-need Trusts' debentures were "IOUs" issued to the trusts by NPS acknowledging NPS owed the trusts money. ECF No. 2683, ¶ 52. Allegiant assigned the debentures a total "market value" of nearly $17 million. ECF No. 2683, ¶ 53.

NPS appointed David Wulf of Wulf, Bates & Murphy as the investment advisor for the NPS Pre-need Trusts in approximately 1987. ECF No. 2680, ¶ 11. PNC testified Allegiant "relied on the investment advisor" "to ensure the NPS trust assets were being prudently invested." ECF No. 2680, ¶ 9. Robert Lock, who monitored the administration of Trust II and Trust III, concluded, based on his own review, "Mr. Wulf was acting in a capacity of basically just carrying out" the "wishes" of NPS and he "was acting at the direction of NPS. He was not independent." ECF No. 2680, ¶ 16. National City acknowledged it had "concerns" regarding the NPS Pre-need Trusts. When the trusts "walked out the door" that was "fine with [National City]." ECF No. 2683, ¶ 68.

In April 2000, Allegiant booked a group term life insurance policy as an asset of NPS Pre-need Trust IV. ECF No. 2683, ¶ 29. Allegiant assigned this group term policy a value of $13,522,337.35, and this purported value never changed during Allegiant's period as trustee. ECF No. 2683, ¶ 29.[5] PNC's disclosed expert, Mr. Terry Long, calculated, at the beginning of Allegiant's tenure, the net value of Trust IV was $33,044,987 and the net value of Trust IV decreased over Allegiant's tenure by $64,275,466. ECF No. 2680, ¶¶ 20, 21.

On November 19, 2003, Allegiant entered into an "Agreement and Plan of Merger" with National City (the "Merger Agreement"). ECF No. 2683, ¶ 2. In entering into the Merger Agreement, Allegiant's officers were "represent[ing Allegiant's] shareholders and shareholders' best interests[.]"ECF No. 2683, ¶ 3. Under the terms of the Merger Agreement, National City

---

[5] The parties disagree s to whether the policy, at the end of Allegiant's tenure, was worthless and whether the policy lapsed or was terminated.

would pay a "premium" for the outstanding shares of Allegiant "compared to the market price [of Allegiant's outstanding shares] before the announcement of the" Merger Agreement. ECF No. 2683, ¶ 4. In the Merger Agreement, Allegiant made several representations and warranties. These included:

a. "[T]here has not been any change in the financial condition, results of operations or business of Allegiant or any Allegiant Subsidiary which would or in the future will have a Material Adverse Effect." Ex. A § 4.11 (P-0726-0035).

b. "Except as disclosed in the Allegiant Reports filed by Allegiant with the Commission… there is no suit, action or proceeding pending or, to the knowledge of Allegiant, threatened or affecting Allegiant or any Allegiant Subsidiary which, if determined adversely to Allegiant, would be reasonably expected to have a Material Adverse Effect[6]…." Ex. A § 4.12 (P-0726-0035).

c. "[T]he businesses of Allegiant and each Allegiant Subsidiary are not being conducted in violation of any law, ordinance, regulation, judgment, order, decree, license or permit of any Governmental Entity (including, without limitation, in the case of an Allegiant Subsidiary that is a bank, all statutes, rules and regulations pertaining to the conduct of the banking business and the exercise of trust powers), except for violations which individually or in the aggregate do not…have a Material Adverse Effect…" ECF No. 2683, ¶ 14.

---

[6] The term "Material Adverse Effect … means an event, change, or occurrence which has a material negative impact on the financial condition, businesses or results of operations of Allegiant and its subsidiaries, taken as a whole…. or the ability of Allegiant or National City, as the case may be, to consummate the transaction contemplated hereby provided, however, a Material Adverse Effect does not include a material adverse change in general economic, political or financial conditions…." ECF No. 2683, ¶ 15.

The Allegiant-National City merger could not have closed without the approval of the holders of at least two-thirds of the outstanding shares of Allegiant's common stock. ECF No. 2675, ¶ 13. In its filings with the SEC, National City identified that it was paying a 24.98% premium based on the then-current trading price of National City stock and the price of Allegiant's stock 30 days before the announcement of the merger. ECF No. 2683, ¶ 5. In total, National City and Allegiant represented to Allegiant's shareholders the total consideration for the Merger was $489.6 million valued in both cash and stocks. ECF No. 2683, ¶ 6. The stocks held by Allegiant's directors and officers could either be exchanged for cash or for National City stock at the merger premium if the merger were accomplished. ECF No. 2683, ¶ 9. These stock options would convert to National City Stock options as a result of the merger. ECF No. 2683, ¶ 11.

If National City Bank had withdrawn under one of the specified circumstances, and Allegiant had entered into a subsequent agreement to be acquired by another bank "within twenty four (24) months following the effective date of termination," Allegiant would have owed National City Bank a $25 million termination or "break-up" fee. ECF No. 2667, ¶ 12. If National City terminated the merger because of the inaccuracy of Allegiant's representations, Allegiant was required to "indemnify National City from and against all costs or expenses (including without limitation reasonable attorneys' and advisor fees), losses and damages actually suffered or incurred by National City … arising from or in connection with the termination of" the Merger Agreement. ECF No. 2683, ¶ 24.

National City's SEC filings explain that these "no shop" provisions "might discourage a third party that might have an interest in acquiring all or a significant part of Allegiant from considering or proposing that acquisition even if it were prepared to pay consideration with a

higher per share market price than the current proposed merger consideration, and the termination fee might result in a potential competing acquirer proposing to pay a lower per share price to acquire Allegiant than it might otherwise have proposed to pay." ECF No. 2683, ¶ 28.

Armando Ramirez, the head of National City's mergers group during National City's merger with Allegiant, testified "if National City had determined that Allegiant's representation that it was in material compliance with its legal obligations was inaccurate, National City could have terminated the merger." ECF No. 2683, ¶ 16. Mr. Ramirez testified if National City discovered Allegiant had not disclosed "litigation which if it were brought and decided against Allegiant [it] would have a material adverse effect" on the merger and that National City was unaware of any potential liability relating to NPS trusts during the acquisition of Allegiant. ECF No. 2683, ¶ 17. A violation of section 4.11 of the Merger Agreement would also allow National City to withdraw. ECF No. 2683, ¶ 17. Mr. Ramirez testified "it would have made no sense for National City to continue with the merger transaction if it had discovered that Allegiant had mismanaged the NPS pre-need trusts." ECF No. 2683, ¶ 18; ECF No. 2715, ¶ 18.

On February 5, 2004, John Beer, the Chief Financial Officer for National City's wealth management group, emailed Armando Ramirez, NCB's head of mergers, among others, a business plan regarding the Allegiant merger. The document, which is dated January 30, 2004, notes "Due to excessive potential fiduciary risk, pre-need funeral trusts are expected to be existed prior to or shortly after 3/31/04." ECF No. 2683, ¶ 64. In early February, 2004, Herbert Morisse underwent a performance review. ECF No. 2683, ¶ 13. In an attachment to that review, Mr. Morisse wrote his "immediate aspiration is for retention by National City as a member of the post-merger St. Louis area Wealth Management team." ECF No. 2683, ¶ 13. Mr. Morisse, like Mr. Hayes and Mr. Weiss, held Allegiant stock options, which would become more valuable

after the merger. ECF No. 2683, ¶ 13. NCB states Allegiant "got a clear message through our discussion around our appetite for pre-need funeral trusts that they should resign and effect a transition if possible." ECF No. 2683, ¶ 61. As Mr. Kantra testified, from his "standpoint" once National City was "assured that Allegiant had located a successor trustee, there was no further need to look into Allegiant's handling of the NPS trusts." ECF No. 2683, ¶ 72. Mr. Weiss, who was then Head of Wealth Management at Allegiant, testified "NCB made it clear [to Allegiant] that NCB did not want the pre-need trusts to remain at Allegiant[.]"ECF No. 2683, ¶ 62. Mr. Weiss testified he would have "literally told [Mr. Morisse] that we have been instructed to – to get these accounts out of the bank and there's not much more I can say. I mean, the guy who runs the company that now owns us told me to do it and, you know, it's not – not a discussion or a debate here." ECF No. 2683, ¶ 62. National City's February 17, 2004 SEC S-4 filing explicitly disclosed "OFFICERS AND DIRECTORS OF ALLEGIANT HAVE POTENTIAL CONFLICTS OF INTEREST IN THE MERGER." ECF No. 2683, ¶ 12. On March 29, 2004, Mr. Morisse signed a "Notice of Resignation of Allegiant Bank" under which Allegiant informed NPS it was resigning as trustee of the NPS Pre-Need Trusts "effective April 30, 2004." ECF No. 2683, ¶ 66.

On April 1, 2004 Christine Verleye, who worked with Mr. Kantra recording information and assembling agendas, prepared a note that states "Funeral Trusts: Preliminary acceptance to take pre-need trusts from another fiduciary. Enhanced comfort level to get off our books before 5/30. Will not need to convert these accounts. Al Kantra will contact Tom Plant and Rob Hipskind." ECF No. 2683, ¶ 67. On April 5, 2004, NCB's integration Workbook was updated to state there was a "decision to find Successor Trustee. Preliminary acceptance to take Pre-need

trusts by another Fiduciary before 5/31." The status of the Pre-Need Trusts issue in the workbook was updated to "Completed." ECF No. 2683, ¶ 69.

On April 12, 2004, three days after the merger closed, Mr. Kantra emailed Mr. Morisse (at his new Allegiant email account) an Issue and Action chart with an entry stating, "Preliminary acceptance to take pre-need trusts by another Fiduciary before 5/3" is an "Urgent Priority" and that the risk assessment was "extremely high." Kantra again emailed Morisse a week later with an updated chart stating there had been "preliminary verbal acceptance" to take the pre-need trusts and "going to board for formal acceptance." ECF No. 2683, ¶ 70.

On August 7, 2008, the SDR, certain insurance companies, NPS, and the Guaranty Associations entered into a liquidation plan (the "Liquidation Plan"). ECF No. 2679, ¶ 1. The Liquidation Plan defines the scope of the Guaranty Associations' obligations. ECF No. 2679, ¶ 2. Plaintiffs' experts have proffered the following opinions on the total damages, not including any interest: Alleged Trust Losses $104,946,853; Alleged Total Merger Gain/Benefit $236,500,000; Foregone Investment Gains $6,806,861. ECF No. 2675, ¶ 51.

## II.    STANDARD

A court shall grant a motion for summary judgment only if the moving party shows "there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). By definition, material facts "might affect the outcome of the suit under the governing law," and a genuine dispute of material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a

complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The moving party bears the initial burden of proof in establishing "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). If the moving party meets this initial burden, the non-moving party must then set forth affirmative evidence and specific facts demonstrating a genuine dispute on the specific issue. *Anderson*, 477 U.S. at 250. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing a genuine dispute of material fact exists. Fed. R. Civ. P. 56(c)(1); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). The non-moving party must demonstrate sufficient favorable evidence that could enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

In ruling on a motion for summary judgment, the Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.* The Court must view the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009).

## III. DISCUSSION

A.      *Investment Advisor Defense*

In their Motion for Summary Judgment as to PNC's Investment Advisor Defense [2664], Plaintiffs argue Defendants cannot establish their investment advisor defense for three reasons: (1) the Eighth Circuit has held the defense cannot shield Allegiant from a failure to protect trust assets from unreasonable investments; (2) David Wulf, the investment advisor, was not independent from NPS; and (3) the trusts did not have the required $250,000 in principal in income for investment decisions to be made by an investment advisor as required by Chapter 436. Defendants' assert they are shielded from liability if Allegiant ensured David Wulf was investing in the type of investments within the authority of a reasonably prudent trustee. According to Defendants, if the type of investment was permitted by the trust agreement, then Allegiant should be shielded from liability for any damages resulting from the investment.

Before the first trial, in the prior summary judgment motions, Defendants argued they had no liability for any investments decisions made by the investment advisor. This Court rejected this defense and stated:

> The statute relieves the trustee of all liability regarding investment decisions made by the investment advisor if the investment advisor is federally registered or Missouri-registered, qualified, independent, [and] control of the assets remains with the trustee and [] are not placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in.

ECF No. 2084, pg. 13. Defendants appealed the Court's ruling and the Eighth Circuit affirmed, holding:

> A trustee always has a duty to ensure that trust assets are invested prudently, whether the trustee is investing the assets himself or monitoring the investment decisions of an investment advisor. The statute recognized this ongoing duty by providing that "in no case" where assets are invested imprudently – investment advisor or no – may the trustee be relieved of liability. PNC is not relieved of liability unless Allegiant ensured that Wulf was investing trust assets within the authority of a reasonably prudent trustee.

*Cassity*, 868 F.3d at 647-48 (internal citations omitted).

Defendants' interpretation of the Eighth Circuit's holding is too broad, does not make logical sense, and completely eviscerates the trustee's duties to ensure reasonably prudent investments are made. Under Defendants' interpretation, if the trust agreement permitted loans as investments, then the trustee would not have any liability for a loan made with trust assets, no matter to whom the loan was made or what the risk factors were for the loan. This would not comport with the Eighth Circuit's statement that "in no case where assets are invested imprudently – investment advisor or no – may the trustee be relieved of liability." Simply ensuring the types of investment are within the authority granted by the trust agreement is not enough to relieve the trustee of liability. This does not mean the trustee was required to check every single investment made by the investment advisor.

The Court will not determine, at this time, whether David Wulf was independent or the trusts held $250,000 because there are material facts in dispute on these issues. Therefore, this motion for summary judgment will be granted in part, and denied, in part.

B.    *Prejudgment Interest*

In their Motion for Partial Summary Judgment on Prejudgment Interest [2666], Defendants assert Plaintiffs are not entitled to recover prejudgment interest. First, Defendants claim Plaintiffs cannot recover as a matter of law because they do not allege Allegiant was contractually required to invest trust assets in interest-bearing investments, or Allegiant received, and used for its own purposes, interest or profits received from the trust funds. Second, Defendants argue Plaintiffs are not entitled to prejudgment interest because their damages are neither liquidated nor readily ascertainable.

Missouri Revised Statute § 408.020 governs when prejudgment interest may be awarded in contract and tort cases.[7] In equitable actions, the determination of whether to award prejudgment interest is left to the discretion of the Court. *Health Care Found. of Greater Kan. City v. HM Acquisition, LLC*, 507 S.W.3d 646, 668 (Mo. Ct. App. 2017). The Court is guided by the equitable principles of fairness and justice. *Id.* Therefore, to determine whether prejudgment interest is appropriate, the Court must first hear all of the evidence at trial. *Axis Specialty Ins. Co. v. N.H. Ins. Co.*, No. 15-0809-CV-W-ODS, 2016 WL 4257369 at *6 (W.D. Mo. Aug. 11, 2016) ("Without hearing all of the evidence, the Court cannot determine, at this juncture, whether prejudgment interest is appropriate.").

Defendants' assertions the trustee must have used trust assets for its own purposes or retained any benefit from those assets or have been required to hold trust assets in interest-bearing investments and did not do so, awarding prejudgment interest is not supported in case law. In *Kane v. Kane's Adm'r*, cited by Defendants, the Missouri Supreme Court held interest is charged when "the trustee has failed to make [interest] when the terms of the trust required him to do so" and compound interest is charged when "the trustee has speculated with the trust funds, and no other method can be adopted to ascertain the profit he has made." 48 S.W. 446, 447 (Mo. 1898). In *Bobb v. Bobb*, also cited by Defendants, the Missouri Supreme Court held "where the administrator has used the moneys, not for the interest of the estate, but for his own purposes, he might be charged with the highest rate of interest." 4 S.W. 511, 515 (Mo. 1887). In both of these cases, the Missouri Supreme Court allowed interest to be charged but did not state these are the only circumstances in which it can be charged. Furthermore, more recent case law does not put any limitations on the Court's discretion in awarding prejudgment interest in equitable cases. *See*

---

[7] In a diversity case, the question of prejudgment interest is substantive and controlled by state law. *Emmenegger v. Bull Moose Tube Co.*, 324 F.3d 616, 624 (8th Cir. 2003).

*Springfield Land & Dev. Co. v. Bass*, 48 S.W.3d 620, 634 (Mo. Ct. App. 2001) (stating simply "in equitable actions, the determination of the whether to award prejudgment interest is left to the discretion of the trial court."); *Carpenter v. Countrywide Home Loans, Inc.*, 250 S.W.3d 697, 704 (Mo. 2008) (same).

Defendants also argue the award of damages must be clear and the amount due must be liquidated and readily ascertainable for Plaintiffs to be entitled to prejudgment interest. Defendants state the damages in this case are not readily ascertainable which is demonstrated by the shifts in Plaintiffs' theories of damages, their endorsement of seven experts on damages, and at least one error in their experts' damages calculations. In *Health Care Foundation of Greater Kansas City v. HM Acquisition, LLC*, the appellate court stated:

> In equitable actions, the determination of whether to award prejudgment interest is left to the discretion of the trial court. When a claimant seeks an equitable remedy, the trial court may be guided by the equitable principles of fairness and justice when determining whether to award prejudgment interest. If the trial court, in its discretion, awards prejudgment interest in an equitable action, the rate of interest should be that in section 408.020. Prejudgment interest under section 408.00 may be awarded when the measure of damages is clear and when the amount due is liquidated or readily ascertainable.

507 S.W.3d at 668 (internal citations and quotations omitted). This makes clear that even in equitable actions, damages must be liquidated and readily ascertainable for prejudgment interest to be awarded.

Damages may still be ascertainable even if there is a dispute over the amount or if the parties' experts calculate different estimates of the damages. *Macheca Transport Co. v. Phila. Indem. Ins. Co.*, 737 F.3d 1188, 1196 (8th Cir. 2013). In the same case, some damages may be ascertainable while others are not; therefore, prejudgment interest may be awarded for a certain category of loss and not for another. *Id.* at 1197. However, the Court cannot make a determinative ruling on summary judgment as to whether the damages were readily ascertainable

and liquidated because the evidence for damages is very much in dispute. The Court cannot determine whether it is appropriate to award prejudgment interest until all of the evidence has been presented. Thus, summary judgment will be denied.

C.    *Recovery under Section 205(b)*

Both Plaintiffs and Defendants filed motions for summary judgment regarding Restatement (Second) of Trusts § 205(b). In Plaintiffs' Motion [ECF No. 2670], they ask the Court to find Allegiant breached its duty of loyalty when it transferred the trusts to Bremen Bank and Plaintiffs can seek Allegiant's profits from the breach as damages. They do not ask the Court to determine the amount of profits. In Defendants' Motion, they ask the Court to find Plaintiffs must choose to recover damages under § 205(a) or § 205(b) because they are mutually exclusive, and to recover damages under § 205(b), Plaintiffs must show the breach involved the use or disposition of trust assets, which they cannot do. Defendants also ask the Court to find Allegiant did not earn profits within the meaning of § 205(b) from the alleged breaches.

1.    Availability of Remedies under § 205

Restatement (Second) of Trusts § 205 states as follows:

If a trustee commits a breach of trust, he is chargeable with: (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust.

It is clear from the plain reading of § 205, the types of remedies available are mutually exclusive. A party may be awarded (a), (b), *or* (c) but cannot collect all three for the same breach of trust. *See United States v. Allegheny*, 366 F.3d 164, 181 n.10 (3d Cir. 2004) ("The Restatement (Second) of Trusts § 205 provides (in the disjunctive) . . . ); *Estate of Luyties v. Scudder*, 432 S.W.2d 210, 216 (Mo. 1968) ("These are alternative remedies" when referring to § 205). However, the language also makes it clear that the remedy chosen applies to *a* breach of trust.

Therefore, if there is more than one breach of trust, a party may be awarded the appropriate remedy for each breach, even if they are different remedies. Two separate breaches of trust results in two separate remedies.

Comment a to § 213 supports this reading of § 205. Section 213 states:

> A trustee liable for loss occasioned by one breach of trust cannot reduce the amount of his liability by deducting the amount of gain which has accrued through another and distinct breach of trust; but if the two breaches of trust are not distinct, the trustee is accountable only for the net gain or chargeable only with the net loss resulting therefrom.

Comment a states:

> *Distinct breaches of trust with respect to different parts of the trust property.* A trustee who is liable for a loss occasioned by a breach of trust with respect to one portion of the trust property cannot reduce the amount of his liability by deducting the amount of a gain which accrued with respect to another part of the trust property through another and distinct breach of trust.

> Thus, if the trustee improperly invests part of the trust funds in securities which he sells at a profit and improperly invests another part of the trust funds in other securities which he sells at a loss, the beneficiary can accept the transaction on which there was a profit and reject that on which there was a loss; he can compel the trustee to account for the profit on the former securities and charge the trustee with the loss on the latter securities.

> For these reasons, the Court finds distinct breaches of trust allows for distinct remedies.

A determination of what breaches of trust, if any occurred, and if there are separate breaches of trust allowing for recovery of more than one remedy under § 205 requires an evaluation of the evidence. The factors to consider in determining whether breaches of trust are distinct are: (1) whether the breaches relate to the same or different parts of trust property; (2) whether the breaches arise out of successive dealings with the same property; (3) the amount of time between the breaches; (4) whether there has been an accounting between the breaches; (5) how the trustee has dealt with the property between the breaches; (6) the trustee's intent; and (7) whether the breaches of trust are the result of a single policy on the part of the trustee. Rest. (Second) of

Trusts, § 213, comment e. In this case, the evidence regarding breaches of trust is in dispute; therefore, the Court cannot determine what exact remedies are available until it has heard the evidence.

### 2.    Requirements of § 205(b) for Recovery

The next issue regarding § 205 involves the recovery allowed under § 205(b). Defendants assert, to recover under § 205(b), the breach of trust must involve the use or disposition of trust assets. Comment h to § 205 supports Defendants' position: "The trustee is chargeable with any profit made by him through the improper disposition or use of trust property." However, § 206, comment l suggests improper disposition or use of trust property is not required to recover profits from a breach. Comment l states: *Competition with the beneficiary*. If the trustee in breach of his duty of loyalty to the beneficiary . . . enters into competition with the interest of the beneficiary . . . if he makes a profit thereby, he is accountable for the profit. Rest. (2nd) Trusts § 206, cmt. l. The illustration to comment l reinforces this:

> A transfers Blackacre and a sum of money to B in trust for C and directs him to develop oil well son Blackacre. B purchases adjoining land for himself and opens oil wells thereon which deplete the oil from the wells on Blackacre. B can be compelled to hold the adjoining land and any profit which he makes upon a constructive trust for C, on being reimbursed out of the trust estate for his expenditures.

In this illustration, B did not improperly dispose of or use trust property, but he can still be compelled to disgorge the profits he made from the breach of trust. This suggests Comment h to § 205 explains a trustee is chargeable for any profit made through improper disposition or use of trust property, but does not limit that to the only scenario in which profits may be recovered.

The Court finds a trustee may be required to disgorge profits under § 205(b) whether or not improper use or disposition of trust assets occurred in connection with the breach of trust requiring the disgorgement of profits.

3.     Recovery of Profits under § 205(b)

Defendants assert three arguments as to what qualifies as profits under § 205(b): (1) avoided loss is not a profit; (2) the alleged stock price premium paid by National City was not a profit made by Allegiant as trustee; and (3) Plaintiffs' merger-profit theory is too speculative to support a claim for damages.

Section 205(b) does not define profits, neither is it defined elsewhere in the Restatement. Black Law's Dictionary, Tenth Edition, defines "profit" as "the excess of revenues over expenditures in a business transaction." Missouri courts have stated "the word profits usually signifies gain realized form business or investments over and above expenditures" and "the word profit is equivalent to net profit." *Sidney Smith, Inc. v. Steinberg*, 316 S.W.2d 243, 255 (Mo. Ct. App. 1958); *Siteman v. Marine Petroleum Co.*, 511 S.W.2d 436, 439 (Mo. Ct. App. 1974). The commonly understood definition of profits is the amount earned less the costs.

Plaintiffs claim the term "profit" under § 205(b) includes avoided losses arguing if the merger had not gone through because Allegiant had disclosed the alleged problems in the trusts, then Allegiant would have had to pay a $25 million penalty to National City and this "avoided loss" now must be paid to the trusts. In support, Plaintiffs cite to *Estate of Luyties v. Scudder*, 432 S.W.2d 210 (Mo. 1968), contending the beneficiary was allowed to recover the avoided losses from the trustee for the trustee's breach of trust.

In *Estate of Luyties*, the co-executor of the estate was also a beneficiary of the estate, which included shares of a pharmaceutical company. *Id*. at 211. The co-executor received the shares of the pharmaceutical company as beneficiary of the estate. *Id*. at 212. For purposes of the estate's federal estate tax return, the shares were valued at $6.00 per share. *Id.* at 212. When the co-executor liquidated the shares he received, he sold the shares for $24.71 a share, which would

result in a large capital gains tax for his personal income tax filing. *Id*. at 213. The co-executor

informed the Internal Revenue Service ("IRS") of the actual price for which the shares were sold

and the IRS reopened the estate's tax return assessing it an additional $28,031.64 in taxes. *Id*.

This resulted in the co-executor's personal income tax being reduced. *Id*. The trial court found

the co-executor benefited $27,817.25 from reopening the estate's tax return. *Id*. This was the

difference between the income tax proposed by the government and the amount he actually paid.

*Id*. The appellate court affirmed, stating "as a result [he] personally profited in the sum of

$27,817.25 and the court did not err in any respect in entering judgment against him for that

sum." *Id*. at 215.

It is unclear how the trial court determined $27,817.25 was the amount the co-executor

benefitted and it is unclear if this truly supports Plaintiffs' theory. Nevertheless, the Court will

consider Plaintiffs' evidence on its claim for avoided losses and will not make an affirmative

ruling on the definition of "profit" at this time.

Next, Defendants argue the alleged premium paid to Allegiant shareholders for their

stock in Allegiant is not a profit to Allegiant because there is a distinction between shareholders

and the corporation. Plaintiffs assert this is a "legal fiction."

The Supreme Court stated: "We must treat the corporation as a substantial entity from the

stockholder, not only because such is the practical fact but because it is only by recognizing such

separateness that any dividend – even one paid in money or property – can be regarded as

income of the stockholder." *Eisner v. Macomber*, 252 U.S. 189, 214 (1920). This concept bears

out in Missouri case law as well. "Generally, corporations are treated as distinct entities from

their stockholders and managing officers." *Scott v. Edwards Transp. Co. Inc.*, 807 S.W.2d 75, 81

(Mo. 1991). "The outstanding stock of a corporation is the individual property of the

shareholders. It is not the corporation's property and the corporation, as such, has no interest in it

or in dealings among shareholders with respect to their stock." *Gieselmann v. Stegeman*, 443

S.W.2d 127, 131 (Mo. 1969). A corporation is a separate and distinct entity from its shareholders

and as such, a profit to its shareholders is not the same as a profit to Allegiant. If Plaintiffs seek

to recover the stock price premium paid to the shareholders, then Plaintiffs will need to pierce

the corporate veil. *Mobius Mgmt Sys., Inc. v. West Physician Search, LLC*, 175 S.W.3d 186, 188

(Mo. Ct. App. 2005) (To hold owners of a corporation personally liable, a plaintiff must pierce

the corporate veil and show the corporation is the alter ego of the owners.). Plaintiffs have not

alleged the shareholders are personally liable for the breaches of trust and have not attempted to

pierce the corporate veil. Therefore, recovery of the stock price premium paid to the shareholders

is not recoverable in this action.

Finally, Defendants allege Plaintiffs' merger-profits theory is too speculative to recover

damages under § 205(b). The merger-profits theory is Plaintiffs' claim they are entitled to

profits, and avoided losses, to Allegiant in the course of its merger into National City Bank.

Whether or not the theory is too speculative is a battle of the experts in this case. The expert

reports of Plaintiffs and Defendants have differing views on whether the damages are

ascertainable. This is due to many factors, including the many disputed issues of material fact

remaining in this case. The Court will not determine if the theory is too speculative to recover

damages until it hears all of the evidence pertaining to Plaintiffs' theory.

### 4. Allegiant's Breach of the Duty of Loyalty

Plaintiffs allege Allegiant self-interested decision to transfer the trusts in 2004 was a

breach of its duty of loyalty and the Court should enter summary judgment in its favor on this

point because there are no disputed material facts. The Court will not do so. Defendants have

submitted, in response to Plaintiffs' Motion, several disputed facts questioning what Allegiant knew at the time of the merger. Thus, whether Allegiant breached its duty of loyalty is a question that cannot be resolved on summary judgment.

     *D.    Damages Beyond Actual Benefits Paid*

In their Motion for Partial Summary Judgment on Plaintiffs' Claim for Damages Beyond Actual Benefits Paid, or to be Paid, by the State Guaranty Associations [2677], Defendants raise two arguments. First, they assert the Special Deputy Receiver ("SDR") lacks standing to pursue claims on behalf of consumers or funeral homes, and second, they argue the State Guaranty Associations ("SGAs") are not entitled to recover damages exceeding actual benefits paid or to be paid. Therefore, Defendants claim the Court should grant partial summary judgment limiting the damages the SGAs may be awarded to the amount of benefits actually paid or to be paid to Missouri consumers or funeral homes.

     1.    SDR's Standing

On January 12, 2015, the Court decided this exact issue. *See* ECF No. 2092, pg. 20. In their reply brief to their Motion for Partial Summary Judgment [1761], Defendants argued the SDR did not have standing to recover on behalf of consumers or funeral homes because the claims were personal to the consumers and the funeral homes. The Court determined the SDR could not bring claims which were personal to a specific creditor and would not inure to the benefit of the estate, pursuant to Texas Insurance Code § 443.154(m). However, the Court found the claims brought by the SDR on behalf of consumers and funeral homes were not personal because facts for each claim were identical. Additionally, the Court found the claims would inure to the benefit of the estate. Therefore, the Court held the SDR had standing to bring claims on behalf of the funeral homes and consumers.

The law of the case doctrine prevents relitigation of this issue. *Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 784 (8th Cir. 1996). The doctrine states when a court decides an issue that decision continues to govern the same issues in subsequent stages of the same case. *Little Earth of the United Tribes, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 807 F.2d 1433, 1441 (8th Cir. 1986). "This principle applies to both appellate decisions and district court decisions that have not been appealed." *Alexander v. Jensen-Carter*, 711 F.3d 905, 909 (8th Cir. 2013). Reconsideration of a previously decided issue is only allowed if substantially different evidence is subsequently introduced, the decision is clearly erroneous and works manifest injustice, or there are "changed circumstances." *Id.*

In the present case, Defendants have not presented substantially different evidence to change the Court's decision, nor have they shown the decision was clearly erroneous and created manifest injustice. The circumstances of the case have certainly changed. The case is on remand from the Eighth Circuit and will be decided under trust law rather than tort law. However, these changes in no way affect the Court's decision about the SDR's standing to pursue claims on behalf of consumers and funeral homes. The Court's decision was not dependent on the case being tried under tort law. None of the Eighth Circuit's decisions in their opinion affect the Court's determination on this issue. Therefore, the Court will not relitigate this issue. The Court's prior ruling stands; the SDR has standing to pursue claims on behalf of consumers and funeral homes.

2.      SGA's Rights to Recovery of Damages

The Liquidation Plan, which governs NPS's receivership, establishes the rights of the SGAs to recovery of damages. The Liquidation Plan states as follows in regards to the rights of the SGAs:

9.1. Statutory Assignment and Subrogation. In accordance with Tex. Ins. Code §
463.261(a) and the Enabling Act for each respective Participating Association,
effective upon approval of the Liquidation Plan by the Receivership Court and the
commitment of each Participating Association to provide the benefits
contemplated in this Liquidation Plan, each and every current or future recipient
of a benefit under this Liquidation Plan from a Participating Association is
considered to have assigned to the respective Participating Association the rights
under, and any cause of action relating to, the Policy to the extent of the benefit
provided or to be provided, including but not limited to the benefit of continuing
coverage under a Policy, and any other rights provided for under the Enabling Act
of the Participating Association. In accordance with Tex. Ins. Code § 463.261(c)
and the Enabling Act for each respective Participating Association, each and
every Participating Association has all common law rights of subrogation and any
other equitable or legal remedy that would have been available to the Insolvent
Insurers, the contract holder and/or policy holder with respect to the Policy, and
any other rights provided for under the Enabling Act of the applicable
Participating Association.

ECF No. 2678-1, pg. 13-14.[8]

Defendants' argument is the language "to the extent of the benefit provided or to be
provided" limits the SGAs' recovery to the actual benefits paid or to be paid. That may be true. It
is not for this Court to determine how the money is disbursed from the trusts and to whom it is to
be disbursed. This Court is tasked with determining whether Allegiant breached its duties of trust
and what amount of money, if any, should be restored to the trust. Any beneficiary whose
interests were affected by the alleged breach of trust, may sue to compel the trustee to restore the
losses to the trust, or to seek disgorgement. *Graden v. Conexant Systems, Inc.*, 496 F.3d 291,
295-96 (3d Cir. 2007). Even a beneficiary who may never receive the trust assets may sue for a
breach of trust. *Scanlan v. Eisenberg*, 669 F.3d 838, 844 (7th Cir. 2012). Therefore, the SGAs
may sue for all damages owed to the trusts, even if the amount of damages they ultimately
receive are limited. The Court will deny Defendants' Motion for Partial Summary Judgment.

---

[8] The Liquidation Plan defines "Participating Association" as "each Affected Association that agrees to participate
in this Liquidation Plan." ECF No. 2678-1, pg. 6. "Affected Association" is defined as "each life and health
insurance guaranty association which, in accordance with its respective state governing laws and Enabling Acts, and
as a result of the Liquidation Order, has, or may have, Covered Obligations." ECF No. 2678-1, pg. 4.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment as to PNC's Investment Advisor Defense [2663] is **GRANTED, in part,** and **DENIED, in part.**

**IT IS FURTHER ORDERED** that Defendants PNC Bank, N.A. and National City Bank's Motion for Partial Summary Judgment on Prejudgment Interest [2665] is **GRANTED, in part,** and **DENIED, in part**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment on Recovery under Section 205(b) [2670] is **GRANTED, in part,** and **DENIED, in part.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiffs' Claim for Damages under Restatement (Second) of Trusts § 205(b) [2672] is **GRANTED, in part,** and **DENIED, in part**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiffs' Claim for Damages Beyond Actual Benefits Paid, or to be Paid, by the State Guaranty Associations [2677] is **DENIED**.

So Ordered this 20th day of November, 2018.

_____

**E. RICHARD WEBBER**
**SENIOR UNITED STATES DISTRICT JUDGE**