# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

JO ANN HOWARD & ASSOCIATES,    )
P.C. et al.,    )
    )
      Plaintiff(s),    )
    )     Case No. 4:09CV01252 ERW
      vs.    )
    )
J. DOUGLAS CASSITY, et al.,    )
    )
      Defendant(s).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter comes before the Court following a four-week bench trial. The above-captioned cause of action was filed for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, violations of the Lanham Act, 15 U.S.C. §§ 1051-1141n, state law claims concerning intentional and negligent fraudulent misrepresentations, negligence and gross negligence, breach of fiduciary duties, and violations of the Texas Receivership Act, Tex. Ins. Code §§ 443.202-443.205. Plaintiffs'[1] claims against the remaining Defendants PNC Bank, N.A. ("PNC") and National City Bank, N.A. ("NCB") (collectively "Defendants"), the only remaining defendants, allege Defendants breached their duties of trust owed to the beneficiaries of various pre-need funeral trusts. In March 2015, this matter proceeded to a jury trial pursuant to negligence and breach of fiduciary duty theories and the jury determined Defendants were liable to Plaintiffs for $355.5 million in compensatory damages and $35,550,000 in punitive damages.

---

[1] Plaintiffs consist of the Special Deputy Receiver, Jo Ann Howard and Associates, P.C., for National Prearranged Services, Inc., Lincoln Memorial Life Insurance Company, and Memorial Service Life Insurance Company, and the National Organization of Life and Health Guaranty Associations, and the individual state life and health insurance guaranty associations of Arkansas, Illinois, Kansas, Kentucky, Missouri, Oklahoma, and Texas.

Both Plaintiffs and Defendants appealed the Court's decisions. The Eighth Circuit affirmed, in part, and reversed, in part, the Court's rulings. *Jo Ann Howard & Assoc., P.C. v. Cassity*, 868 F.3d 637 (8th Cir. 2017). The Eighth Circuit concluded Defendants' claims arise under trust law rather than tort law. *Id*. at 645. Consequently, the Eighth Circuit held the claim is properly tried to the Court. *Id*. at 649.

The Eighth Circuit affirmed the Court's determination the funeral homes and consumers, as well as NPS, were the beneficiaries of the Trusts. *Id*. at 646. It also affirmed the Court's striking of Defendants' authorization and *in pari delicto* defenses. *Id*. at 647. As to Defendants' investment advisor defense, the Eighth Circuit held "PNC is not relieved of liability unless Allegiant ensured that Wulf was investing trust assets within the authority of a reasonably prudent trustee." *Id*. at 648. The Eighth Circuit concluded:

> In summary, we affirm the judgment in part, reverse in part, and remand for further proceedings. We conclude that [Plaintiffs] brought a trust-law claim in equity that should have been tried to the court. The beneficiaries of the preneed trusts were NPS, Missouri consumers, and the funeral homes that were to provide services for the consumers. The measure of damages for the trust claim is defined by § 205 of the Restatement (Second) of Trusts. . . Although the case was tried to a jury on a tort-law theory, we do no dictate that the case be retried in its entirety. The district court is familiar with the evidence and may proceed based on the existing trial record as it sees fit, with receipt of additional evidence as the court deems appropriate.

*Id*. at 651-652.

Having considered the pleadings, trial and deposition testimony, and exhibits, the Court hereby makes and enters the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## II.    FINDINGS OF FACT

1. Jo Ann Howard and Associates, P.C. is the duly appointed and designated Special Deputy Receiver ("SDR") for National Prearranged Services ("NPS"), Lincoln Memorial Life

Insurance Company ("Lincoln") and Memorial Services Life Insurance Company ("Memorial"), which were placed into receivership by the Texas Department of Insurance on May 14, 2008, and are currently in the process of being liquidated. Joint Stipulation of Undisputed Facts ("JSF"), ECF No. 2745.

2. The SDR is authorized to deal with the property, business, and claims for or against NPS, Lincoln, and Memorial pursuant to the provisions of the *Insurer Receivership Act*, Texas Insurance Code Chapter 443. JSF.

3. Plaintiffs Missouri Life and Health Insurance Guaranty Association, Texas Life and Health Insurance Guaranty Association, Illinois Life and Health Insurance Guaranty Association, Kansas Life and Health Insurance Guaranty Association, Oklahoma Life and Health Insurance Guaranty Association, Kentucky Life and Health Insurance Guaranty Association, and the Arkansas Life and Health Insurance Guaranty Association are statutory entities created by their respective state legislatures to provide protection to their respective states' resident policyholders in the event of an insolvency of a member insurance company. JSF.

4. Plaintiff National Organization of Life and Health Insurance Guaranty Associations ("NOLHGA") is a Virginia nonstock corporation. It is a voluntary association of its members, which are all of the life and health insurance guaranty associations of the states of the United States of America and the District of Columbia. NOLHGA is a plaintiff in this action as the assignee of claims for collection purposes only from the following state life and health insurance guaranty associations: Arizona, California, Colorado, District of Columbia, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Washington, West Virginia, Wisconsin, and Wyoming. Each state life and health insurance

guaranty association is a statutory entity created by their respective state legislatures to provide protection to their respective states' resident policyholders in the event of an insolvency of a member insurance company. JSF.

5. PNC is a nationally chartered bank with its headquarters in Pittsburgh, Pennsylvania and its designated main office in Delaware. PNC is the successor-in-interest to NCB, National City Bank of the Midwest, and Allegiant Bank[2] as a result of various mergers. JSF.

6. Allegiant Trust Company, a division of Allegiant Bank, served as the trustee for NPS Pre-Need Trust I between August 24, 1998, and May 14, 2004 ("Trust I"); Pre-Need Trust II between August 14, 1998, and May 14, 2004 ("Trust II"); Pre-Need Trust III between August 28, 1998, and May 14, 2004 ("Trust III"); Pre-Need Trust IV between August 11, 1998, and May 14, 2004 ("Trust IV"); Pre-Need Trust V between March 25, 1999, and May 14, 2004 ("Trust V"); as trustee of the Mt. Washington Forever Pre-Need Trust between April 13, 2000, and May 14, 2004 ("MTW Trust"); and as the trustee of the Mason Securities Association d/b/a Funeral and Cremation Society of America Pre-Need Trust between February 19, 1998, and May 14, 2004 ("CSA Trust") (collectively "the Trusts"). JSF.

7. Allegiant Bank was merged with and into National City Bank of the Midwest, effective as of July 31, 2004. National City Bank of the Midwest, in turn, was merged with and into National City Bank, effective July 22, 2006. Finally, National City Bank was merged with and into PNC effective in November 2009. JSF.

8. NPS started in 1979 and was owned and controlled by the Cassity family, whose members were Doug, Rhonda, Tyler, and Brent Cassity. JSF.

---

[2] Throughout the findings of fact and conclusions of law, Allegiant Bank is referred to as Allegiant Bank, Allegiant, and the Bank.

9. NPS sold preneed funeral contracts. Under a preneed funeral contract, a consumer would arrange and pay for a funeral before the time of need. There were advantages to prearranging a funeral, including relieving loved ones of having to make decisions at the time of death and freezing the price of the funeral to the price at the time of prearrangement. JSF.

10. NPS became the largest preneed seller in Missouri. As part of its marketing to funeral homes to sell NPS preneed contracts, NPS would stress the funds received would be held in trust. JSF.

11. Doug Cassity and Randy Sutton controlled the finances of NPS. JSF. Randy Sutton was president and/or Chief Financial Officer of NPS. Mr. Sutton was also President of Lincoln. JSF. During Allegiant's tenure, Brent Cassity was the Chief Operating Officer and President of Marketing at NPS. JSF. Angie Hall was an employee of NPS who reported to Mr. Sutton. JSF.

12. The Cassity family purchased Lincoln to own and control the insurance company used for issuing life insurance policies to back the preneed funeral contracts sold by NPS. JSF. Doug Cassity and Randy Sutton, in addition to controlling NPS's operations, also controlled the operations of Lincoln. JSF.

13. Practically all life insurance policies issued by Lincoln were issued to fund the preneed funeral contracts sold by NPS. Likewise, the vast majority of the NPS Preneed Trusts' assets during Allegiant's period as trustee were in the form of life insurance policies issued by Lincoln. JSF.

14. NPS and Lincoln were part of a network of companies each owned and controlled by the Cassity family. These companies included Memorial, Lincoln Memorial Services, National Heritage Enterprises, Forever Enterprises, Forever Network, and numerous subsidiary funeral

homes and cemeteries such as Hollywood Forever. Ex. P-2372, 56:10-57:3, 58:2-25, 59:8-60:9;
BT Vol. VI, 54:5-17; Ex. P-12.

15. Lincoln Memorial Services was Doug Cassity's private investment company, and was
an entirely different entity than Lincoln Memorial Life Insurance Company. BT Vol. VI, 54:18-
55:3; Ex. P-2372, 60:1-9.

16. While serving as trustee of the NPS Preneed Trusts, Allegiant, through its personnel,
knew NPS, Lincoln, Forever Enterprises, Hollywood Forever, and the other companies within
the Cassity consortium were related entities owned and controlled by the Cassity family. Ex. P-
2381, 62:18-63:2, 64:4-14; Ex. P-12; Ex. P-2378, 21:24-23:10; BT Vol. II, 102:16-20.

A.      Background of Allegiant, Herbert Morisse, and the Trusts

17. Herbert Morisse is a resident of Oakland, Missouri. BT Vol. V, 3:18-19. He became
an Eagle Scout in the mid to late 1960s. BT Vol. V, 4:8-11. He graduated from Webster Groves
High School in 1971, graduated from Westminster College, Fulton, Missouri in 1975, and
graduated from Washington University Law School in 1978. BT Vol. V, 4:14-18. He is an active
member of the Missouri Bar. BT Vol. V, 4:23-24.

18. While at Washington University Law School, he served as a clerk for one semester
for Judge Theodore McMillian. BT Vol. V, 5:2-3. He was married in 1984. BT Vol. V, 3:23. He
began his legal career in downtown St. Louis with the firm, Luke & Cunliff in 1978, practicing
principally in the area of insurance defense, worker's compensation and defense work. BT Vol.
V, 5:9-18. He supported a principal in the firm who was engaged in general practice in estate
planning, probate, trust, closely-held business entities, real estate contracts, and other areas. *Id*.

19. At Luke & Cunliff, he was assigned some wills and trust work including probate of
estates, wills, and trusts. BT Vol. V, 6:10-13. There, he developed an understanding of the nature

of fiduciaries. BT Vol. V, 6:18-20. When drafting trust instruments and wills, he learned, and understood, the roles of different parties. BT Vol. V, 6:23-6:25. In connection with estates, he learned "pretty much" detail about probate administration. BT Vol. V, 6:23-7:1. In the probate division in the City of St. Louis, he was appointed to one case, in particular, as guardian ad litem, to review administration of a decedent's estate, where a charitable beneficiary objected, either to a settlement or to a final settlement "not coming down the pike." BT Vol. V, 7:3-14. There were objections about assets in the estate, and he performed those ad litem responsibilities, and reported back to the court. *Id*. In that work, he looked into how a trustee should be administering an estate like the one on which he was working. BT Vol. V, 7:15-18.

20. In his law practice, up until 1995, he gained an understanding of a trust instrument, and it was always his understanding a trust is an entity, an abstract entity, and to have a valid trust, there needs to be a grantor, a trustee, and beneficiaries. BT Vol. V, 7:22-8:3. He believed administrative provisions of trusts could provide for many things. *Id*. In the area of estate planning, Mr. Morisse learned how to inquire of clients with respect to their needs and purposes, for inclusion in drafting of trust instruments. BT Vol. V, 8:4-7. He knew, under Missouri law, there were statutory duties a trustee had power to exercise, and the trust instrument could utilize those, or expand or restrict powers. BT Vol. V, 8:8-18. He learned the trustee had fiduciary responsibilities in the performance of trust duties. BT Vol. V, 8:17-18. He learned the duty of care was to exercise the responsibilities and duties with which the trustee was charged accurately and with good care. BT Vol. V, 8:19-24.

21. Mr. Morisse knew a trust instrument could incorporate and include duties, responsibilities and discretions from Missouri statutes. BT Vol. V, 9:3-9. He believed the trust instrument could not incorporate all duties, responsibilities and discretions, "if that was desired,"

but could create or include broader discretions and powers, or more restrictive discretions and powers by accordingly drafting in the powers and discretions' portion of the trust instrument. *Id*. He believed the trust instrument would control over background rules, if the trust instrument narrowed the duties of the trustee. BT Vol. V, 9:10-14.

22. By 1995, Mr. Morisse's private practice was 60 to 70 percent probate, trust or fiduciary work. BT Vol. V, 9:15-19.

23. For enrollment in continuing legal education courses, Mr. Morisse elected to focus on estate planning and taxation as related to fiduciary matters. BT Vol. V, 9:23-10:2.

24. In some of his work, there would be some person serving in the role of investment management. BT Vol. V, 10:3-5. First, he believed the trustee's responsibilities typically included, or would include investment responsibilities and administration. BT Vol. V, 10:8-10. He believed, if there was a wish to have an investment advisor appointed to perform the investment management function of the trust, that could be accomplished by incorporating that provision in the trust instrument. BT Vol. V, 10:10-14. In that case, Mr. Morisse believed the trust instrument would be followed with respect to the formalities of appointing that investment advisor, and the investment manager would be responsible for the investment actions and decisions of the trust. BT Vol. V, 10:15-19. Mr. Morisse had no investment management experience. BT Vol. V, 10:20-21. In practice for seventeen years, he learned there are differences in trust administration and investment management. BT Vol. V, 10:22-11:14.

25. Mr. Morisse believed trust administration was attending to performance of the administrative responsibilities of the trust, such as making discretionary or nondiscretionary distributions, accounting, interacting with beneficiaries, and attending day-to-day business of the trust, other than investment management. BT Vol. V, 11:1-10. Mr. Morisse believed an

investment manager would be responsible for establishing the investment objective for the account and physically making investment actions and decisions in accordance with the investment objective. BT Vol. V, 11:11-14.

26. As a practicing lawyer, Mr. Morisse sat down with clients establishing trusts, helped draft trusts, helped interpret trusts and represented people who were appointed as fiduciaries to trusts. BT Vol. V, 11:15-24. He represented fiduciaries as executors and executrixes, trustees of trusts, and conservators of conservatorships. BT Vol. V, 12:2-5. He counseled trustees with respect to their responsibilities and any particular question they presented. BT Vol. V, 12:6-8. He regularly appeared in St. Louis County and St. Louis City probate courts. BT Vol. V, 12:9-11.

27. Mr. Morisse described a discretionary trust as "a trust where the trustee has discretion, and, frankly, is charged with the responsibility of exercising discretion with respect to investment management." BT Vol. V, 12:15-21.

28. A nondiscretionary trust, he believed, "would be the flip," in that the trustee would not have the authority to engage in investment management. BT Vol. V, 13:1-3. In his view, even if the trustee wanted to try to exercise investment management decisions, the trustee would not have the underlying authority to do so. BT Vol. V, 13:7-10. In his law practice, Mr. Morisse learned a directed trust would be a type of nondiscretionary trust. BT Vol. V, 13:16-19.

29. In private practice, Mr. Morisse engaged in activities related to the profession, including civic activities, and as a member of the Estate Planning Council of St. Louis, which was composed of professionals from various disciplines, lawyers, CPAs, insurance professionals, specifically focused on estate planning, trust and estate matters. BT Vol. V, 14:20-15:15. Over a period of time, as a member of the Bar Association of Metropolitan St. Louis, he served on various probate, trust and real estate committees. BT Vol. V, 15:18-20; Ex. P-276.

30. Mr. Morisse learned, in private practice, the duty of an investment manager regarding how assets should be handled, managed and invested, included their own specific fiduciary responsibility to manage the assets in accordance with the trust instrument. BT Vol. V, 15:24-16:9. He observed, there is the prudent man rule and in Missouri, there is the prudent investment rule, which is essentially a standard of investing to meet fiduciary obligations when making investment decisions for a trust estate. BT Vol. V, 16:14-18.

31. The Missouri Supreme Court appointed Mr. Morisse as a committee member, under the Office of Chief Disciplinary Counsel, where he, and four other lawyers and two laypersons, hear complaints referred for deliberation and action, alleging violation by attorneys of Missouri's Code of Responsibility for lawyers. BT Vol. V, 16:21-17:13. He was finishing his second four-year term at the time of trial. BT Vol. V, 17:18-20.

32. Mr. Morisse left the law practice in 1995 when he became employed at United Missouri Bank ("UMB"). BT Vol. V, 17:21-18:3. The law firm was going in a different direction, and his practice focused more on estate planning, trust/probate, and closely-held corporations. BT Vol. V, 18:4-9. He worked at UMB from February 1995, to October 1997. BT Vol. V, 18:13-14. He learned of the job at UMB from Richard Markow. BT Vol. V, 18:15-16.

33. Throughout his career, Mr. Morisse worked in the trust departments of five banks, including UMB, Allegiant, NCB, PNC, and Wells Fargo. BT Vol. V, 19:19-21. Mr. Morisse believed he had lived up to the industry custom and practice, as he understood it, at all times of his career. BT Vol. V, 19:25-20:4.

34. When he worked at UMB, his duties were to act as trust administrator of trust accounts. BT Vol. V, 21:16-21. Day-to-day administration included understanding and following UMB's trust department's policies and procedures when performing his responsibilities. BT Vol.

V, 21:22-22:2. Daily, he reviewed the cash balance report to determine if there were overdrafts in his assigned accounts. BT Vol. V, 22:3-9. Thereafter, he attended day-to-day requirements and duties related to the various and specific accounts to which he was assigned. *Id*. He interacted with lawyers of clients who were either grantors or beneficiaries of accounts for which he was responsible. BT Vol. V, 22:12-14. Mr. Morisse recognized Mr. Markow's chief responsibilities were marketing, but he had management responsibility for the trust department staff. BT Vol. V, 22:15-19. Administratively, Mr. Morisse reported to Don Edinger at UMB's home office in Kansas City. BT Vol. V, 22:20-21. Mr. Markow worked at UMB from 1993 until 1996. BT Vol. V, 22:22-23.

35. While at UMB, Mr. Morisse administered a variety of fiduciary accounts, including revocable and irrevocable trusts, as well as other types of accounts. BT Vol. V, 23:1-4. At UMB, there was a portfolio manager on premises who performed investment management for discretionary trust accounts. BT Vol. V, 23:9-12. No portfolio manager or investment manager was assigned to nondiscretionary accounts. BT Vol. V, 23:13-16.

36. At the time Mr. Morisse's book of business had increased beyond the capacity that was the model for a trust administrator. BT Vol. V, 23:21-25. When no additional administrative assistants were hired, contrary to representations made to him, Mr. Morisse elected to resign, for health reasons. BT Vol. V, 24:1-5. Mr. Morisse joined Allegiant Bank shortly after leaving UMB in November 1997. Ex. P-0276; BT Vol. V, 24:22-25:2.

37. Allegiant Bank was founded in St. Louis Missouri in the spring of 1989. In the beginning Allegiant Bank did not have a trust department. JSF.

38. Shaun Hayes, the President and CEO of Allegiant Bank, wanted Allegiant to have a trust department so it would be "perceived as a full service financial institution." Ex. P-2378,

11

11:23-12:3. Allegiant's trust department was created as a marketing technique to give a mere "perception" Allegiant had a trust department. *Id*. at 12:10-23. The trust department was never a core competency of Allegiant Bank, and was never intended to be. *Id*. at 18:4-16. The trust department was so small Mr. Hayes "paid no attention" to it, as it was not where the Bank made its money. *Id*. at 33:25-34:9.

39. On or about October 1, 1997, a date preceding Herbert Morisse's[3] affiliation with Allegiant Bank, Mr. Morisse learned, through Richard Markow, Allegiant Bank was going to open "a brand-new trust department." BT Vol. II, 33:23-34:1; BT Vol. V, 24:6-9. Mr. Morisse was going to be invited to be the first and only trust administrator in Allegiant's new trust department. BT Vol. II, 34:8-10. There were no trusts on the books at the time Mr. Morisse became employed at Allegiant Bank. BT Vol. II, 34:11-15. At that time, he had handled no preneed trusts and had not worked on preneed trust accounts, but, as an attorney, he had worked with many clients with respect to creation of trusts and how assets should and could be transferred to trusts. BT Vol. II, 35:3-17. Mr. Morisse became familiar with Allegiant Bank operations, prior to him joining the Bank. BT Vol. V, 24:15-21. The Bank offered traditional banking services from making loans, maintaining deposit accounts, issuing Certificates of Deposit and offering safety deposit boxes. *Id*.

40. Richard Markow was going to be designated as the person responsible for administering the activities of Allegiant Bank's trust department. Ex. P-2001, pg. 2; BT Vol. II, 40:4-8. Allegiant Bank employed Mr. Markow as president of its trust department. BT Vol. II, 41:21-23. Even though the minutes of a board of directors meeting on September 17, 1997, designated Mr. Markow as trust administrator, Mr. Markow was never the administrator. Ex. P-2001; BT Vol. II, 85:22-24. Mr. Markow had no training or experience in administering trusts,

---

[3] Herbert Morisse was the trust administrator for the Trusts during Allegiant's tenure as trustee.

and was, instead, hired by Allegiant for his marketing and sales abilities. Ex. P-2381, 47:15-48:11, 54:14-16.

41.     Mr. Morisse met Richard Markow through his affiliation with the Estate Planning Council of St. Louis. BT Vol. V, 20:5-9. Mr. Morisse knew he had a law degree from the University of Missouri, was a CPA, and worked as an associate in the tax department of Laventhol and Horwath. BT Vol. V, 21:2-12; Ex. P-276, pg. 7. Mr. Morisse knew Mr. Markow was previously involved in marketing at United Missouri Bank ("UMB") and knew Mr. Markow had never served "in the slightest capacity as actual hands-on administering any trusts." BT Vol. II, 40:12-19, 41:12-15. Mr. Morisse knew Mr. Markow had no prior experience with preneed trusts, and did not recall Mr. Markow as having any experience as a trust administrator, even though he was appointed head of its trust department. Ex. P-2001, pg.2; BT Vol. II, 42:11-18. Mr. Morisse recognized, from the first day, Mr. Markow was hired for marketing only. BT Vol. II, 57:17-58:1. Mr. Morisse believed Mr. Markow was a qualified trustee executive. BT Vol. V, 21:13-15.

42.     Mr. Morisse was the sole trust administrator at Allegiant Bank. Previously, he was trust administrator at UMB where he had no investment responsibility, received no training in investment management, and was never employed as trust counsel. BT Vol. II, 23:10-24:3, 25:6-12. He understood, at UMB, other people in the trust department were experienced in investment management. BT Vol. II, 25:13-17. This was Mr. Morisse's first time acting as trust administrator. Ex. P-276; BT Vol. V, 18:17-19.

43.     Allegiant's trust department was small, and thinly staffed on purpose. Ex. P-2378, 18:4-16; 18:21-19:6. It had only three employees – including Mr. Markow and Mr. Morisse – at the time Allegiant took over as trustee for the Trusts. JSF. Pam Buchanan was the third person in

Allegiant Bank's trust department behind Mr. Markow and Mr. Morisse. BT Vol. II, 46:3-6. She was hired to be back-office support for Mr. Morisse. BT Vol. II, 46:7-9. She had no experience as a trust administrator, was not hired to judge prudence of any investment in the Trusts, and Mr. Morisse would not have relied on her judgment as to prudence of investments in the Trusts. BT Vol. II, 46:10-22. Neither, would Mr. Morisse have relied on Mr. Markow to judge prudence of investments in the Trusts. BT Vol. II, 46:23-47:1. Mr. Morisse was not trained to look at the assets in the Trusts and judge whether they were prudent investments. BT Vol. II, 47:4. The Court concludes the Trust Department was severely underfunded for all of the six years of Allegiant's tenure, and understaffing contributed to cause Allegiant's failure to comply with keeping, protecting, and controlling trust assets as required by Chapter 436.

44. Mary Schmidt arrived in the trust department shortly thereafter. BT Vol. V, 25:24-26:3. Ms. Schmidt formerly worked at First Bank and then UMB for a number of years as a trust administrator, when Mr. Morisse worked at UMB. BT Vol. V, 26:5-9. A document from Allegiant describing the employees of the trust department, shortly after it was established, described Mr. Markow as having overall management of the trust company. Ex. P-276, pg. 5. He had thirteen years of experience at UMB. *Id*. Mr. Morisse believed the trust department at Allegiant Bank, at the time he arrived, was "up to the tasks that were then facing it." BT Vol. V, 27:10-12.

45. When he joined Allegiant Bank, it had recently had its trust powers reactivated by the Missouri Division of Finance. BT Vol. V, 25:3-7. This was memorialized in an October 10, 1997, letter from the Missouri Division of Finance authorizing Allegiant Bank to exercise fiduciary powers, about a month before Mr. Morisse arrived at Allegiant Bank. Ex. P-276, pg. 4; BT Vol. V, 25:19-23.

14

46. In 1997, during Mr. Morisse's employment at Allegiant Bank, the trust department administered $2,277,000.00 in trust assets, over which he performed no management responsibilities. Ex. P-0496; BT Vol. II, 39:8-40:3. Mr. Markow did not involve himself in the day-to-day administration of any of the accounts in the trust department at Allegiant Bank. BT Vol. II, 47:20-23.

47. There was no investment manager on staff at Allegiant Bank when Mr. Morisse arrived as an employee. BT Vol. V, 27:13-15. The Bank required certain back-office support as a trust accounting system, and contractually engaged a firm named Midwest Trust Company ("Midwest") from Overland Park, Kansas. BT Vol. V, 27:16-23. Mr. Morisse worked with individuals from that firm. BT Vol. V, 27:24-25.

48. Midwest was comprised of "professionals who knew how to run trust administration" and which provided support for newer trust departments. Ex. P-2381, 53:1-11. Allegiant's contract with Midwest "allowed the state [of Missouri] to be comfortable with activating" Allegiant's "charter, the trust powers." Ex. P-2383, 81:9-19, 85:10-18.

49. Midwest provided operations services, maintained the trust vault, maintained and ran the trust and accounting systems, and provided investment management services. BT Vol. V, 28:1-6. Midwest Trust Company worked with Allegiant for at least a year, maybe two years, until Allegiant Bank obtained its own trust accounting system and, in effect, an operations manager. BT Vol. V, 28:12-18. Shortly thereafter, Allegiant Bank merged with Southside Bank. BT Vol. V, 28:19-22. Mr. Morisse visited Midwest to develop an understanding of what they did.  BT Vol. V, 28:23-25.

50. Mr. Markow drove Mr. Morisse to Midwest in Kansas to meet with Midwest's managers and representatives, for approximately one to two days, to discuss areas the Bank was

15

contracting for fiduciary services, one of which was investment management. BT Vol. V, 29:39. Any specific investment decisions were made by Bill Courtney, a portfolio officer assigned to work with Allegiant. BT Vol. V, 29:14-18. The customers of Allegiant knew the Bank had contracted with Midwest to perform investment management services as well as backroom services. BT Vol. V, 29:22-30:5.

51. In meetings with customers of Allegiant, face-to-face or by phone, Mr. Courtney was identified as a portfolio manager with Midwest. BT Vol. V, 30:1-5. Midwest also assisted with policy procedures and provided the Bank with an initial policy and procedure handbook. BT Vol. V, 30:6-12. The first trusts that came into the Bank while Mr. Morisse was trust administrator were either revocable or irrevocable trusts affiliated with Mr. Markow's father-in law, Dr. Aronberg. BT Vol. V, 30:13-18.

52. Shortly after he arrived at Allegiant, Mr. Morisse started looking into the Trusts. BT Vol. V, 30:19-21. That started when Mr. Markow advised him, Shaun Hayes and Mr. Markow were planning a meeting to discuss and potentially pursue business with NPS; Mr. Hayes on the loan side and Mr. Markow on the trust side. BT Vol. V, 30:22-31:1. On December 9, 1997, a financing and trust services proposal for the benefit of Forever Enterprises, Inc.[4] was presented to Allegiant. Ex. P-290. It was a combined commercial loan proposal and a trust services proposal. Ex. P-290, pg. 2. Mr. Markow proposed an account of $1,650,000.00 in preneed funds and an endowed care account of $834,000.00 to land a $2.4 million combination of preneed accounts with the prospect other NPS preneed accounts would follow. Ex. P-290, pg. 9; BT Vol. II, 51:20-25.

---

[4] In an organizational chart of "Cassity entities," Forever Enterprises, Inc. appeared under Heritage Enterprises, which also owned NPS, Lincoln Memorial Services, and Lincoln. BT Vol. II, 60:8-14; Ex. P-12.

53. The Bank was going to try to land all of the Trusts, which would dwarf all of the other accounts at Allegiant's trust department. BT Vol. II, 52:1-12.

54. Mr. Morisse learned the trusts that could potentially move to Allegiant were preneed funeral trusts, governed by a specific Missouri statute. BT Vol. V, 31:12-19. Mr. Morisse made an effort to familiarize himself with that statute, before he even got copies of trust agreements or statements to review. *Id.*

55. Mr. Morisse's recollection was, at some time either before the first meeting, or shortly after, but before a follow-up meeting Mr. Markow and Mr. Hayes had with Cassity family members, Mr. Morisse hand-wrote a list of questions he thought would be relevant in obtaining information to understand what the trusts were and the operation of them. 31:23-32:4. His notes are dated November 25, 1997, within the month of his arrival at Allegiant Bank. Ex. P-283.

56. His purpose in creating these notes was to understand what the trusts were, what would be required in connection with their administration and, or, management and what would be expected of the Bank. BT Vol. V, 32:25-33:4. Mr. Morisse had previously participated in intake of new accounts. BT Vol. V, 33:5-7. Mr. Morisse tried to follow that general due diligence procedure with the Trusts. BT Vol. V, 33:8-10. His first hand-written note was "Is the current corporate fiduciary serving as trustee under," and then its blank. Ex. P-283. He did not know the name of the trustee and he wanted to understand who was serving in what capacity and who it might be. BT Vol. V, 33:16-19. His answers came from a number of sources. BT Vol. V, 33:20-25. He discovered the trustee at the time was Mercantile Bank. *Id.*

57. Additional information came from NPS's attorney, Jean Maylack. BT Vol. V, 34:1-3. When asked if he had formed an opinion as to her quality, capability, and honesty as an attorney,

he responded, "Yes, she was then practicing as an attorney with a firm that I recognized in St. Louis, County." BT Vol. V, 34:6-9.

58.   Mr. Morisse's second question, in his notes, was "what is the current value of assets in trust?" Ex. P-283. He wanted to know what the Bank's responsibility would be. BT Vol. V, 34:15-16. His next question was, "What is the asset allocation? Fixed, equity, cash, other and unique." Ex. P-283. He received answers to that question. BT Vol. V, 34:17-22.

59. Mr. Morisse defined fixed assets as "fixed income, which is essentially bonds, notes." BT Vol. V, 34:23-35:1. Equity, he defined, as stocks, and "cash [was] cash." BT Vol. V, 35:2-5. He wanted to dig into "unique assets," to find out if there were any, and if there were, what would be expected or required. BT Vol. V, 35:6-11. He discovered the accounts substantially contained life insurance which he considered a unique asset. BT Vol. V, 35:12-16.

60. Next, on his hand-written list, he wrote, "Are investments directed or discretionary?" Ex. P-283. He knew it would make a difference, in terms of the Bank's responsibility if it accepted appointment as successor trustee, if they were solely administrative or included performing investment management duties. BT Vol. V, 35:19-24.

61. According to Mr. Morisse, if investments in the Trusts were directed, the Bank would not have investment responsibility. BT Vol. V, 36:5-8. If investments were discretionary, that would mean the Bank would have investment management responsibility, and there would need to be discussion of Midwest's services in the area. BT Vol. V, 36:9-14. Mr. Morisse found out the accounts were directed. BT Vol. V, 36:15-16. Mr. Morisse "at all times, even up to today []  believed the NPS trusts were directed." BT Vol. V, 36:17-19. At no point in time from 1997 to the present, did any person ever tell Mr. Morisse these investments were discretionary, where Allegiant would have investment responsibility. BT Vol. V, 36:23-37:1.

18

62. Mr. Morisse's third question was, "What are the total number of preneed contracts?" Ex. P-283. He believed he needed an understanding as to the volume and with respect to what responsibilities or expectations there would be and the Bank's ability to provide what was expected. BT Vol. V, 37:4-8. His next question was, "How many contracts involve premium payments, monthly, quarterly, annually?" Ex. P-283. He knew a premium was the amount due on an insurance policy to keep it in force. BT Vol. V, 37:13-15.

63. Mr. Morisse asked Mercantile Bank[5] and NPS how many contracts involved premium payments to determine the requirements for the Bank to make monthly, quarterly and annual premium payments. BT Vol. V, 38:5-14.

64. Mr. Morisse was told the Bank would not need to make any premium payments; any premiums paid would be handled by the outside investment advisor. BT Vol. V, 39:9-15. He also understood Mercantile Bank was not making premium payments. *Id*. Mr. Morisse understood, with respect to the life insurance policies, they were ordinary or whole-life policies, paid-up. BT Vol. V, 39:16-19.

65. His sixth note, intended for NPS, was, "Please furnish a sample report provided by you to the trustee." Ex. P-283. He received a sample of a packet supplied monthly by NPS, which was one used by Mercantile Bank. BT Vol. V, 39:23-40:3. His use of "packets" as trustee, were identical to what he understood Mercantile had been using for some time. BT Vol. V, 40:8-11. His next question on number five was, "How often do you furnish the reports?" Ex. P-283. He wanted to understand the frequency with which activity would be required to understand the expectations matched against the capabilities of the Bank. BT Vol. V, 40:18-20. The last question was, "What term for trustee services at quoted fee?" Ex. P-283.

---

[5] Mercantile Bank was the trustee immediately prior to Allegiant taking over as trustee.

66. Mr. Morisse also had some questions for a person name Kathi, who he believed was with Mercantile Bank. BT Vol. V, 41:9-14. He took notes of the conversation about acceptance of the trust on November 25, 1997. Ex. P-283. He believed he received sufficient information about the trust[6] to deliberate on whether the accounts should be accepted. BT Vol. V, 41:21-24.

67. The first issue addressed in his conversation with Kathi was "Company reputation," to get a comfort level or understanding of the client in the community. Ex. P-283; BT Vol. V, 42:2-4. The next question was sufficiency and frequency of reports furnished by NPS to the trustee. Ex. P-283. Next, he asked for the number of contracts. *Id*. After that, the question was the number of contracts with premium payments monthly, quarterly, annually. *Id*. He also wrote, "Get copy of Missouri Statute for trustee responsibilities and reporting requirements to Missouri." *Id*. Someone had mentioned a statute governed preneed funeral contracts and he wanted to be sure he obtained and understood it. BT Vol. V, 43:13-17.

68. Mr. Morisse also participated in drafting a request for information to NPS in the1997 time period, asking questions to determine if Allegiant Bank was able to submit a proposal to serve as trustee for the NPS preneed trust. Ex. D-729; BT Vol. V, 43:21-25. Mr. Morisse asked if the current trustee was serving under the provisions of Section 436.005 through .071 RSMo. Ex. D-729. He next asked for the most recent preneed trust annual report as filed with the "Registration of the Missouri Department of Economic Development." *Id*. Next, Mr. Morisse asked, "What is the current value of assets in trust and what value of assets is allocated to equity, fixed income and cash?" *Id*. Question four was, "Are the trust investments directed or discretionary?" *Id*. He was told this was a directed trust. BT Vol. V, 46:19-21.

---

[6] At this time, Allegiant was accepting only one trust, Trust I. The other trusts would be accepted by Allegiant at a later date.

69. Skipping to question six, Mr. Morisse asked, "What is the current number of preneed contracts having monthly, semi-annual, and annual premium payments?" Ex. D-729. He was told Mercantile was not making premium payments. BT Vol. V, 47:1-6. The seventh question was, "Please furnish us with a sample copy of the report you provided your current trustee. How often do you furnish this report?" Ex. D-729. He learned the report was a packet received monthly. BT Vol. V, 47:13-16.

70. On November 25, 1997, the Bank sent a letter to Jean Maylack, attorney for NPS, signed by John Meek, loan officer of Allegiant. Ex. P-284. Mr. Morisse learned Allegiant Bank, in addition to having an interest in the trust business, was also interested in making a loan. BT Vol. V, 48:9-15. The letter stated, "Allegiant Bank would like to propose financing," for a loan to Forever Enterprises, Inc. in the aggregate amount of $2.2 to $2.4 million. Ex. P-284. At this time, Mr. Morisse believed the credit department of the Bank was supportive of having a business relationship with businesses associated with the Cassitys. BT Vol. V, 48:23-49:2.

71. Allegiant Bank requested further financial information related to the trust proposal being considered. Ex. P-284. Item eight in the letter asked, "What regulations and requirements govern preneed sales?" *Id*. Item nine asked, "Are preneed services adequately funded? How are the assets managed, and by whom?" *Id*. Based on due diligence calls and documents provided, Mr. Morisse concluded preneed services were adequately funded by life insurance. BT Vol. V, 50:10-16. He learned assets were managed by an outside investment manager, named Wulf, Bates & Murphy. BT Vol. V, 50:17-20. As to regulations and requirements governing preneed trusts, Mr. Morisse learned Chapter 436 applied to preneed trusts and another section dealt with the annual report with the state agency. BT Vol. V, 50:21-25.

21

72. Mr. Morisse hand-drafted a formal trust company proposal. Ex. D-728, pg. 2-3; BT Vol. V, 51:1-3. In the proposal, Mr. Morisse wrote, "Allegiant Bank is prepared to act as trustee for your firm's preneed trust account and endowed care fund trust account in accordance with Missouri Statutory provisions governing those types of accounts," with section numbers stated. Ex. D-728. He believed the appropriate staffing and backroom services were available and adequate to meet expectations. BT Vol. V, 52:7-15. He believed he was qualified to read Chapter 436 and understand its requirements. BT Vol. V, 52:20-22.

73. Mr. Morisse stated in the proposal, "Since you have designated a qualified investment advisor to provide investment management services as trustee for the preneed trust account . . ." Ex. D-728. Mr. Morisse, at all times from before he took in the Trusts until he resigned May 13, 2004, believed there was a qualified investment advisor that provided investment management services for the preneed trust accounts.  BT Vol. V, 53:17-21.

74. Mr. Morisse next described services Allegiant Bank would be willing to provide. First, he described "custody of the assets." Ex. D-728. Mr. Morisse believed he did that for the whole time he was trustee, "by maintaining—by keeping, maintaining, owning, and controlling assets that were deposited to and/or part of the trust estate." BT Vol. V, 54:9-14. Mr. Morisse believed he lived-up to this service listed in his handwritten proposal. BT Vol. V, 54:15-17. As to "Receipt of Deposits," Mr. Morisse believed the Bank would have the capability to receive deposits either by check or wire, deposit them to the account, and have it accounted for and booked. BT Vol. V, 54:21-23. He believed he lived-up to that the whole time he was trustee. BT Vol. V, 54:24-55:2. The Court concludes, by clear and convincing evidence, Mr. Morisse did not lawfully receive deposits, did not lawfully deposit them to the account, and did not lawfully have deposits accounted for and booked.

75. The next service mentioned was, "Transfers to and interaction with investment advisor." Ex. D-728. To learn more, Mr. Morisse went to the Wulf, Bates & Murphy office at the Heritage office building in Clayton, Missouri. BT Vol. V, 55:14-22.

76. The next service Mr. Morisse identified Allegiant Bank would be willing to provide was any required account review and calculations related to distribution of income. Ex. D-728. Mr. Morisse understood NPS, as grantor of the trust, was entitled to distribution of income. BT Vol. V, 56:9-12. He believed administrative reviews in a directed account were done in accordance with the Bank's policy and procedures throughout the period of Allegiant Bank's tenure. BT Vol. V, 56:13-19. The Court disagrees with Mr. Morisse.

77. The next title was, "Distribution of income in accordance with applicable statutory provisions." Ex. D-728. Mr. Morisse believed he understood when income should be distributed. BT Vol. V, 56:24-57:4. His view was, income could be distributed if the value of the trust assets equaled the total amount of deposits to the account and would not be reduced below the total deposits to the account by the income distribution. *Id*. He believed he distributed income by that standard at all times. BT Vol. V, 57:5-7. Clearly, Mr. Morisse did not follow the statute in either regard. The next title was, "Monthly statements showing account transactions and account value," and then, "year –end tax information" was the last item. Ex. D-728. Mr. Morisse provided monthly statements which were generated by a third-party provider to the Bank, "outside the state of Missouri and printed, assembled and mailed monthly." BT Vol. V, 57:17-22. The statements went to NPS, attention Randy Sutton, and to Wulf, Bates & Murphy. BT Vol. V, 57:23-25.

78. Allegiant Bank entered into a lending relationship with the Cassity-owned companies. BT Vol. V, 59:15-18. A memorandum was prepared by the Allegiant Bank lending group, dated

December 5, 1997, in which John Meek was involved, on the loan or credit side of the Bank. Ex. P-12. The promissory note was for $2.2 million, amortized over 20 years at 8.625%, and was secured by a first deed of trust, naming Bellerive Heritage Gardens cemetery, formerly Hiram. *Id*.

79. Allegiant Bank was also willing to extend to NPS a working capital line of credit of $100,000.00 for twelve months. Ex. P-12. Additionally, Allegiant Trust Company extended a commitment to provide custodial services for their perpetual care and preneed trust totaling $2 million. *Id*. Later, Allegiant Bank took on many more of the Trusts. BT Vol. V, 61:8-10. The current administrator was Mercantile Bank, and the registered financial advisor was Wulf, Bates & Murphy. Ex. P-12. After Wulf, Bates & Murphy took over at Allegiant Bank as investment advisor for the Trusts, Mr. Morisse always believed that firm was managing investments for the trust, and he believed this memorandum documented that belief of the Bank in 1997. BT Vol. V, 61:16-23. The memorandum referenced that "substantial other trust accounts exist" and they are interested in leaving Mercantile. Ex. P-12.

80. Mr. Morisse believed Lincoln Memorial Services was affiliated with Lincoln Memorial Life Insurance Company. BT Vol. V, 62:14-16. The Banking Relations Memorandum showed Forever Enterprises was wholly-owned by Heritage Enterprises, Inc. Ex. P-12. Heritage Enterprises was a Missouri holding company, which also owned National Prearranged Services, Inc., Lincoln Memorial Services, Lincoln Heritage Corporation, Lincoln Memorial Life Insurance Company and Memorial Life Insurance Company. *Id*. Brent Cassity, and his family, controlled majority ownership of all corporations. *Id*. "The holding company reports $55 million in annual revenue with net profits exceeding $2 million." *Id*. When the Trusts came in, Mr. Morisse believed there was financial wherewithal behind the companies. BT Vol. V, 62:21-23.

81. From the Banking Relations Memorandum, Mr. Morisse knew the Cassity family had been in the funeral business over forty years, and in 1996, in the section on "Financial Condition," he saw cemetery revenue was $774,000.00. Ex. P-12. Interim financial statements the Bank received for September 30, 1997, showed virtually all revenue generated was attributed to cemetery sales with the company reflecting gross profits of $850,000 in nine-month sales of $1,056,000.00. *Id*. The banking memorandum described the strengths and weaknesses related to the to the Forever Enterprises business. *Id*.

82. The memorandum noted "Excellent cash flow coverage of 1.56 times with no reliance on increased sales brought on by the new mausoleum; Conservative LTV of 62% on marketable property with no reliance on developed cemetery property; Consistent earnings stream coupled with good liquidity; Significant trust relationship totaling $2MM with additional trusts available." Ex. P-12, pg. 4. Mr. Meek listed no weaknesses identified by the Bank's lending department. Ex. P-12, pg. 4. When the Bank accepted the Trusts, Mr. Morisse believed NPS-affiliated entities were able to pay their bills as they came due. BT Vol. V, 66:2-5.

83. Mr. Morisse assisted in drafting a formal proposal letter for signature by Mr. Markow to Brent Cassity, presenting the proposal for trust services. BT Vol. V, 66:9-12; Ex. P-292. The letter was of the same substance as the previously discussed handwritten version. Ex. P-292.

84. Allegiant Bank submitted a financing and trust services proposal for the benefit of Forever Enterprises signed by Mr. Meek and Mr. Markow. Ex. P-290. Included was a letter committing the Bank to the commercial real estate loan and working capital line of credit for $2.25 million. Ex. P-290. The Bank was willing to extend a working capital line of credit for an amount not to exceed $100,000.00. *Id*. Mr. Morisse recognized a promissory note from borrower Forever Enterprises, dated January 5, 1998, for $2.25 million. Ex. P-304; BT Vol. V, 68:15-18.

85. Included in the proposal was the letter Mr. Morisse drafted for Mr. Meek and Mr. Markow to sign. Ex. P-290. The letter stated "Allegiant Trust Company can serve as trustee of [Mr. Cassity's] firm's preneed trust account and endowed care fund trust account governed by Missouri statutory provisions of Section 436.005 et seq. [] and Section 214.320 et. seq. [], respectively." *Id*. Further in the letter Mr. Morisse drafted, he wrote, "However, in light of the fact that Allegiant Trust Company will be relieved of investment responsibility (and we would appreciate the opportunity to review the agreement with your financial advisor) . . ." Mr. Morisse, then, described fees. Ex. P-0290, pg. 10.

86. Mr. Morisse believed being relieved of investment responsibility meant the Bank, through some provision of the Trust Agreement or otherwise, did not have investment responsibility because of the appointment of an investment advisor. BT Vol. V, 71:1-6. Mr. Morisse viewed the Trust Agreement as a significant document for the work he would be doing if he were selected as trust administrator. BT Vol. V, 71:13-16.

87. From the time Mr. Morisse started at Allegiant Bank in August, 1998,[7] and the time he left in May 2004, as trust administrator, he believed Allegiant, and himself, lived up to what he said he would do, and all of these services provided in the proposal. BT Vol. V, 59:10-14. The Court disagrees with Mr. Morisse.

88. The Allegiant trust department was successful in landing all of the NPS preneed accounts in 1998. BT Vol. II, 61:15-18. The trust department, which had three total accounts valued at $2,277,000.00, increased its accounts to a total of $137 million, the vast majority being NPS accounts. JSF; BT Vol. II, 61:19-62:1. Of the $52 million in trust assets in Trust IV, $50,231,407.30 (96.38%) were in the form of Lincoln life insurance policies. JSF. Over 97% of

---

[7] Mr. Morisse actually joined the Allegiant Bank in November 1996.

Trust I's assets were certificates of debentures from NPS totaling approximately $1.7 million. JSF. Mr. Morisse participated in the intake process of the Trusts. BT Vol. V, 31:7-9.

89. When the Trusts came to Allegiant Bank, the entire trust department was Mr. Markow, Mr. Morisse and Pam Buchanan. BT Vol. II, 48:23-49:2.

90. In the release of Allegiant Bank's 1998 annual report, Mr. Hayes and the Board of Directors talked about the growth of Allegiant Bank. Ex. P-371, pg. 6. The annual report was intended for investors and potential investors in Allegiant Bancorp. BT Vol. IV, 226:10-13. On page 9 of the 1998 annual report, it stated: "Trust company ends first year with $130 million under management." Ex. P-0371, pg. 9.

91. Of the $137 million in trust assets at Allegiant Bank, almost all were the Trusts, which were not under the management by the trust department. BT Vol. IV, 225:13-21. "Under management" had a specific meaning in trust terminology, and at Allegiant Bank, the statement "under management" meant the trust department was actually managing the investments. BT Vol. IV, 225:22-226:3. According to Allegiant's definition of "under management," this statement in the report about the amount of assets under management was not true. BT Vol. IV, 228:4-12. Mr. Morisse agreed this "wouldn't be my characterization," and the NPS numbers should have been deducted because they were not under management. BT Vol. IV, 228:12, 229:11-14.

92. When Allegiant took over the Trusts, the Trust Agreement referenced Mark Twain Bank, a predecessor of Mercantile Bank, but such references did not change the Trust Agreement. Ex. P-168; BT Vol. V, 72:3-8. Mr. Morisse carefully read the Trust Agreement, and considered every paragraph, including the definitions section.  BT Vol. V, 72:16-21.

27

93. In the definitions section of the Trust Agreement, Article I, 1.1 described "Owner shall mean each person who shall execute a funeral agreement with the Seller for the purposes of funeral expenses, articles and facilities agreed to be furnished thereunder and either the person designated as his successor in the funeral agreement or if there is no such designation his legal representative." Ex. P-168. In Section 1.2, "Trustee shall mean [Allegiant Bank][8]and successor to the fiduciary business of said corporation, or any successor Trustee named by Seller hereunder which is agreed in writing to accept the trust property and act as Trustee." *Id*. In this case, NPS was Seller. BT Vol. V, 73:24-25.

94. In Section 1.5, "Beneficiary, is the person designated in writing by the owner of a funeral agreement as the person who is to be subject of the disposition and is to receive the funeral and/or burial services therein described, or if no such person is designated then the Owner thereof." Ex. P-168. Until the litigation began, Mr. Morisse believed the beneficiaries were NPS and Allegiant. After depositions and at the bench trial, Mr. Morisse said his understanding was the beneficiary meant "consumer" or the "person" who is going to get the funeral. BT Vol. V, 74:11-14.

95. Section 2.1 described the obligations of "Seller:" "Seller shall deposit with the trustee any sums received by it from owners, which are required to be deposited in the trusts by the laws of the State of Missouri." Ex. P-168. Mr. Morisse understood his responsibility concerning the "sums" was to receive them and deposit them. BT Vol. V, 75:6-9. He believed he always did that. BT Vol. V, 75:10-11.

96. Mr. Morisse believed the trust instrument required the seller, NPS, to keep evidence of the amounts on deposit for a particular customer. BT Vol. V, 94:16-19. He was asked, "And

---

[8] In place of the Court's inserted "[Allegiant Bank], "Mark Twain Bank" appears in the document. "Mark Twain Bank" was a predecessor trustee to "Mercantile Bank" which was a predecessor to Allegiant Bank, and the form was continually used in its original format.

do you believe that your view that NPS is who is supposed to keep information about the amount held in trust for each particular consumer, do you believe that that is reflected in the trust instrument, itself?" Mr. Morisse answered "Yes." BT Vol. V, 94:20-24. This mistaken belief by Mr. Morisse was a breach of trust.

97. Section 2.2, provided, generally, for the trustee to have management responsibility for the assets of the trust, provided if the preneed trust exceeds $250,000.00, Seller may appoint an outside investment advisor - or may appoint an independent qualified investment advisor. Ex. P-168. Mr. Morisse believed the Trusts' values always exceeded $250,000.00.  BT Vol. V, 75:23-76:2. From the day Allegiant was named as trustee, and Mr. Morisse as trust administrator, there was a large negative value for Trust IV.

98. Mr. Morisse believed an independent investment advisor could be appointed by looking at the balance of the assets in the accounts. BT Vol. V, 76:3-4. He believed NPS appointed an independent, qualified investment advisor. BT Vol. V, 76:25-77:3.

99. Section 2.2 of the Trust Agreement described the requirement for the investment advisor to comply with Missouri law. Ex. P-168. The advisor must be registered with the federal government or the state. *Id*. The last clause stated, ". . . and the Trustee shall have no liability for any investment decision made by such investment advisor." *Id*. This was a term understood in the industry as an exoneration provision, according to Mr. Morisse. BT Vol. V, 77:14-18. "Exoneration would be having no liability." BT Vol. V, 77:21.

100. Mr. Morisse had experience, in his legal practice, where on appointment and acceptance of appointment by a successor trustee, the successor trustee would have no liability, or would be exonerated from the acts of the prior trustee. BT Vol. V, 77:22-78:13. In any number of trusts with which he was affiliated "there was similarly an outside investment advisor

appointed." *Id*. He saw cases where the trust protector was exonerated or excused from or relieved of liability "if the duties per - - are performed in - - under his best belief and efforts." *Id*. Mr. Morisse understood the investment advisor for the NPS trust had served during Mercantile's tenure. BT Vol. V, 78:14-20.

101. Section 2.3 stated, "[n]o owner[9] shall be deemed to have individual ownership of any asset in the Trust." Ex. P-168. This Section also provided the ownership of all assets comprising the trust shall be solely in the trustee. Ex. P-168. Mr. Morisse thought he met that requirement, by either holding and having on the trust company's books marketable securities, or securities that were able to be held and registered in that fashion. BT Vol. V, 78:24-79:7. In the case of the evidence of life insurance in the NPS preneed trust, Mr. Morisse thought he met the requirement by having verification and certification of ownership and control, and also being named as beneficiary. *Id*. Mr. Morisse was mistaken.

102. Section 2.4 stated, "With each deposit, Seller will provide a breakdown of how much of said deposit is to be created[10] to each owner, described by number and name of Owner." *Id*. "[Allegiant] accepted and relied upon the information NPS provided to the Bank in the monthly packet." BT Vol. V, 79:24-25. Mr. Morisse believed it was the obligation of NPS, the Seller, to provide this breakdown, under Section 2.4. BT Vol. V, 80:1-3. Neither the Trust Agreement or Chapter 436 recognized this as a substitute for "how much of said deposit is to be created to each 'Owner,' described by number and name of owner."

103. Article III, Section 3.1 of the Trust Agreement referenced "Dispositive Distributions:" "The trustee shall hold, protect, and conserve the trust corpus through the management, investment and reinvestment of the trust property, and shall apply and distribute

---

[9] Owner refers to the individual who will receive the services.
[10] The Court believes the reference in the text should be "credited" rather than "created" as appears in the text, however, review of the Trust Agreement confirms the word appearing there is "created."

the principal and cause to be applied and distributed the income as provided." Ex. P-168. Mr. Morisse understood this provision governed his behavior at all times he was trustee, and he believed he complied with it. BT Vol. V, 80:14-18. With regard to the life insurance companies, Mr. Morisse believed he complied by, "The trust company, once again, owned and controlled the policies that were part of the assets of the estate, and distributions were made in accordance with the provisions of the Trust Agreement which paralleled the statute." BT Vol. V, 80:19-23. There is no doubt Allegiant Bank never controlled the insurance policies. Mr. Morisse actually drafted a custody agreement whereby custody of the policies was turned over to NPS.

104. Mr. Morisse understood there would be obligations, under the Trust Agreement, upon the death of a beneficiary as defined in Section 3.2(a). BT Vol. V, 80:24-81:5. Section 3.2(b) covered what happened when NPS or the owner cancelled the contract. Ex. P-168. When someone passed away and received a funeral, "the Bank relied on information that was included in the monthly packet that related to an affidavit that was supplied by Randy Sutton on behalf of NPS as the seller. And the affidavit affirmed as to certain matters with respect to the death or cancellation." BT Vol. V, 81:14-18. Every month "in support of the affidavit, a copy of a death certificate - - well, a listing of the individuals who had died was included." BT Vol. V, 81:19-23. "The death certificates relating to those individuals on the list" were also included. BT Vol. V, 81:24-82:1.

105. Mr. Morisse received evidence funerals occurred from the monthly report showing copies of cancelled checks received from respective providers of funeral services. BT Vol. V, 82:2-7. During his term as trustee, he received evidence NPS paid for "thousands and thousands and thousands" of funerals, and he received many copies of cancelled checks and death certificates. BT Vol. V, 82:11-14. He never received notice, from 1998 to 2004, NPS was not

31

paying for provided services. BT Vol. V, 82:17-20. He was never contacted by a consumer, with respect to funeral services not being provided. BT Vol. V, 82:24-25. Mr. Morisse believed the documentation he received under section 3.2(a), (b) and (c), worked well. BT Vol. V, 83:1-4.

106. Section 3.2 of the Trust Agreement stated the net income of the trust belonged to NPS, as Seller, and NPS was entitled to distributions of principal for deaths and cancellations. Ex. P-168. NPS was income beneficiary and was also entitled to principal. Ex. P-168; BT Vol. V, 83:24-84:1.

107. Article IV of the Trust Agreement described the trustee's powers and duties. Ex. P-168. Section 4.1 provided "As receipt of payment, the trustee shall be accountable to the seller and owner, only for the funds paid over to it by the seller under such owner's funeral agreement." *Id*. Mr. Morisse's understanding of "only for funds paid over to it" meant "the 80 per cent of the contract that was - - that would have been deposited to the trust by NPS." BT Vol. V, 87:21-25.

108. Section 4.1's next provision provided the trustee shall have no duty to see payment received complies with provisions of the funeral agreement. Ex. P-168. Mr. Morisse believed "the trustee has no responsibility or authority with respect to the terms and conditions of the actual or underlying preneed contract." BT Vol. V, 88:6-8. The final section of 4.1 provided "The Trustee shall not be obliged to collect any payments from the Seller nor be obliged to see that any payments so made to it are deposited according to the provisions of the Funeral Agreement." Ex. P-168.

109. Section 4.2 outlined investment authority of the trustee or investment advisor. Ex. P-168. The last sentence of section 4.2 (a) referenced the investment advisor's authorization and empowerment regarding investment, stating the "investment advisor may invest any part or all of

the funds in the trust in any common or preferred stocks, open-end or closed-end mutual funds, corporate [bonds], debentures, convertible debentures, commercial paper life insurance on the life of any beneficiary as the term beneficiary is defined in paragraph 1.5, U.S. treasury bills, notes and other securities, real estate mortgages and deeds of trust."[11] Ex. P-168. He recognized the trust invested in notes, and accepted mortgages and deeds of trust as security for those notes. BT Vol. V, 92:21-93:1. Immediately below the language in Section 4.2(a), referenced above, for acceptable investments, the trustee "shall in its absolute discretion select without regard to any of the restrictions of the laws of any jurisdiction applicable to investments of fiduciaries except that the Trustee shall exercise such judgment and care which men of ordinary prudence exercise in the management of their own affairs with regard to the permanent disposition of their funds." Ex. P-168, pg. 7 (emphasis added). Mr. Morisse believed, by using an investment advisor and looking at the categories of investment permitted, he always complied with sections 4.2 and 4.2(a). BT Vol. V, 93:2-5.

110. Mr. Morisse believed he could rely on information supplied by NPS, because Section 4.2(1) of the Trust Agreement authorized the trustee to rely upon any affidavit, statement, certificate, notice, or other written or oral communication believed by the trustee to be genuine and upon any other evidence deemed by it sufficient. BT Vol. V, 93:7-13. Mr. Morisse received affidavits from Randy Sutton at NPS, and he received statements, certificates and notices, as well, about the insurance policies. BT Vol. V, 93:21-94:1. He believed at the time he received those affidavits, certificates, and statements, the Trust Agreement specifically authorized him to rely on them.  BT Vol. V, 94:2-6.

---

[11] The definition of beneficiary in Section 1.5 was: "the person designated in writing by the owner of a Funeral Agreement as the person who is to be the subject of the disposition and is to receive the funeral and/or burial services therein described, or if no such person is designated then he owner thereof." Ex. P-168.

111. Section 4.3 of the Trust Agreement stated: "Trustee shall at all times maintain accurate books and records reflecting all transactions in any way pertaining to the trust."[12] Ex. P-168. Mr. Morisse believed he maintained accurate books and records reflecting the transactions pertinent to the trust. BT Vol. V, 95:8-11. He described his process in that "receipts and disbursements were reflected in transactions descriptions, booked to the trust accounting system, and reported in the statements." BT Vol. V, 95:13-15. He did not say the Bank made records of assets kept by the Bank. Mr. Morisse believed relying on material in the monthly packets satisfied the requirements of the Trust Agreement. Section 4.3 specifically referred to accurate books and records reflecting transactions. Ex. P-168. Mr. Morisse provided Seller (NPS) an annual statement of account, showing all investments, receipts, disbursements, and other transactions effected by the trustee during the year covered by the statement, as required by the Trust Agreement. Ex. P-101D, pg. 1602; BT Vol. V, 96:13-20.

112. Article VII of the Trust Agreement listed the governing law for the agreement, which included Missouri Statute Chapter 436. Ex. P-168. When Allegiant Bank was considering whether to accept appointment as successor trustee of the preneed accounts, in his process of conducting due diligence, Mr. Morisse made a copy of Chapter 436 and made notes on it. Ex. D-5; BT Vol. V, 103:21-104:1; BT Vol. II, 121:9-11. He read Chapter 436 closely, at the time having spent 17 years as a trust lawyer. BT Vol. V, 104:12-16. He read the definitions section. BT Vol. V, 104:17-19. Mr. Morisse kept a copy of this statute in his files at Allegiant the whole time he was administrator of the Trusts.  BT Vol. V, 104:23-105:1.

---

[12] Section 4.3 of the Trust Agreement read: "Trustee shall at all times maintain accurate books and records reflecting all transactions in any way pertinent to the trust and shall provide the seller an annual statement of account showing the conditions of the trust and all investments, receipts, disbursements and other transactions effected by the trustee during the year covered by the agreement , the trustee shall furnish any owner, upon written request from the owner, with information regarding the amount of his account held in trust. This information, shall be first provided to trustee by Seller." Ex. P-168, pg. 10.

34

113. At times, Mr. Morisse referred to the document and sent a copy to Jean Maylock, NPS's attorney. BT Vol. V, 105:2-4. At all times when Mr. Morisse was trustee, he believed he was complying with Chapter 436. BT Vol. V, 105:5-7. He understood Section 436.031 dealt with legal requirements for a financial institution to qualify as trustee, and the powers and duties of the trustee. BT Vol. V, 105:8-12. His intention in taking notes was to identify what he understood to be duties of the trustee per the statute. BT Vol. V, 105:15-20. Mr. Morisse made an effort to cross-reference the statute with the Trust Agreement. *Id*. Mr. Morisse believed Allegiant Bank met the institutional requirements of paragraph one of Chapter 436.031. BT Vol. V, 105:23-106:5.

114. The second duty of the trustee was "to administer the trust per the statute." BT Vol. V, 106:6-9. Next to the last sentence of 436.031.1, which concerned a trustee maintaining adequate records of all payments received, Mr. Morisse made a notation, which he described as "Trustee - - oh, 'duty to maintain records,' so the note there is that trust system entries and statements would satisfy perfor - - would exemplify or embody that duty." BT Vol. V, 107:5-8. Mr. Morisse defined "trust system entries," as "each trust department or trust company maintains its records on a trust accounting system, which is a computer software particularly designed for use by trust companies and trust organizations. And so entries are made into this trust accounting system that encompass the entirety of administrative activities as well as investment management activities. When those entries are entered into the trust accounting system, it remains as a constant in that trust accounting system. In other words, it can't be changed, unless there's an adjusting entry which reflects in the data for that trust accounting system. So that whether we see a transaction on the computer screen that I described, which is pulled up from data from that screen, that's going to match word-for-word and dollar-for-dollar information printed on the

35

statements that's mailed to the appropriate parties. BT Vol. V, 107:9-108:3. Mr. Morisse's belief was "we were meeting that obligation [in] that transactions and activities posted to the trust accounting system would be appropriately maintained and be able to be accounted for as needed." BT Vol. V, 108:4-7. Mr. Morisse thought the trust accounting system met the adequate records described under the statute. BT Vol. V, 108:8-10.

115. The top paragraph of 436.031.1 stated "Payments regarding two or more contracts may be deposited into and comingled in the same preneed trust so long as the trust's grantor is the seller of all such preneed contracts and the trustee maintains adequate record of all payments received." Ex. D-5. One of Mr. Morisse's handwritten notes acknowledged this trustee duty. BT Vol. II, 122:7-9. He testified maintaining adequate records of all payments received was an obligation of Allegiant Bank's trust department, regardless of whether an investment advisor was appointed. BT Vol. II, 122:10-14. Mr. Morisse knew he was required to maintain adequate books of account of all transactions through the trust and pertaining to the trust. BT Vol. II,122:22-123:1. Mr. Morisse never maintained account specific records for each consumer. He never knew how much money was on deposit at Allegiant for each consumer.

116. Section 436.031.2 was about investment of trust assets. Ex. D-5. To the left, where his handwritten notes appeared, Mr. Morisse wrote "investment management by trustee." *Id*. He recognized that section would be applicable if the trustee had investment management responsibility and authority. BT Vol. V, 108:18-20.

117. Mr. Morisse recognized any qualified investment advisor must be "by a federally registered or Missouri-registered independent, qualified investment advisor designated by the seller who established the trust." BT Vol. V, 109:15-20. Mr. Morisse determined Mr. Wulf was a federally-registered investment advisor. BT Vol. V, 109:21-24. Mr. Morisse believed Mr. Wulf

36

met the requirement on independence, because Mr. Wulf was independent from the Bank; he was not an agent, employee or representative of the Bank. BT Vol. V, 109:25-110:5. Mr. Morisse made a hand-written note, "Corporate resolution authorizing officer designate investment advisor, corporate officer's designation of investment advisor, investment advisor's directions to trustee." Ex. D-5. Mr. Morisse testified, "that was the current procedure, you know, dealing with insurance policies." BT Vol. V, 110:13-17. Mr. Morisse attempted to comply with his notes on how to do investment management by an investment advisor. BT Vol. V, 110:18-21. Mr. Morisse never claimed independence from NPS was required.

118. To the left, Mr. Morisse also wrote "Insurance in trustee's name, monthly verification to trustee of insurance in force." Ex. D-5. He was referring to the certification affidavit of Lincoln with respect to the policies included in the evidence of insurance listing. BT Vol. V, 111:3-7. There is nothing in the statute about "evidence of insurance." It appears he already had resolved to go with the monthly packet and evidence of insurance, rather than holding the policies. While Mr. Morisse was trust administrator, he believed this procedure complied with the statute. BT Vol. V, 111:8-11. He was mistaken.

119. Chapter 436.031.3 stated, "The seller of a preneed contract shall be entitled to all income, including without limitation, interest, dividends, and capital gains and losses generated by the investment of preneed trust property regarding such contract, and the trustee of the trust may distribute all income, net of losses, to the seller at least annually." Ex. D-5. However, the statute did provide limits on distribution: ". . . but no such income distribution shall be made to the seller, if and to the extent that the distribution would reduce the aggregate market value on the distribution date of all property held in the preneed trust, including principal and undistributed income, below the sum of all deposits made to such trust pursuant to subsection 1

37

of this section for all preneed contracts then administered." Ex. D-5. Mr. Morisse believed he

complied with that provision of Chapter 436 while he was trustee. BT Vol. V, 112:3-5.

Determining market value of the Trusts, Mr. Morisse believed, included the "evidence of

insurance" at face value and the value of other assets held in the Trusts. BT Vol. V, 112:6-9.

When Mr. Morisse became trust administrator, Trust IV had a negative value. The only way NPS

would have been entitled to an income distribution was because he valued the policies at face

value. Mr. Morisse did not conduct the market value test, and erroneously sent many millions of

dollars out of the Trusts in violation of Chapter 436.

120. Chapter 436 referenced maintaining books and records. Ex. D-5. The first sentence

of Section 436.031.5 read, "The Trustee of a preneed trust shall maintain adequate books of

accounts of all transactions administered through the trust and pertaining to the trust generally."

*Id*. Mr. Morisse erroneously claims he kept track of every transaction administered through the

trust "through the entries into the trust accounting system." BT Vol. V, 112:20-24. As to

maintaining other adequate records pertaining to the trust generally, Mr. Morisse used "the

monthly packets and information or data, including information provided by NPS, affidavits,

exhibits, death certificates, cancelled checks, et cetera." BT Vol. V, 112:25-113:5. The Bank also

maintained the wire transfer request forms. BT Vol. V, 113:6-8. All of the records maintained at

the Bank were in "computer form" including the monthly trust statements. BT Vol. V, 113:9-12.

121. Mr. Morisse said he was not aware of an obligation requiring Allegiant Bank to

maintain specific records by customer of specific amounts on deposit.[13] BT Vol. V, 113:23-

114:1. Section 436.031.5 stated, "The Seller shall furnish to each contract purchaser, within

---

[13] In addition to cited provisions of the Statute, Section 4.3 of the Trust Agreement specifically provides ". . . the Trustee shall furnish any owner, upon written request of the owner, with information regarding the amount of his account held in trust. This information shall first be provided to Trustee by Seller." This was the source of information so Allegiant could take that information and use it to maintain adequate records.

fifteen days after receipt of the purchaser's written request, a written statement of all deposits made to such trust regarding such purchaser's contract." Ex. D-5. Mr. Morisse believed he was not required to keep specific customer account information. BT Vol. V, 113:23-114:1. Mr. Morisse was mistaken.

122. Mr. Morisse did not maintain a written statement of deposits made to the Trusts regarding each purchaser's contract because he did not believe it was required by the statute. BT Vol. V, 114:22-115:1. It was his view the statute required NPS, as Seller, to keep those records, and he believed his interpretation of the statute was the same as his interpretation of Section 4.3 of the Trust Agreement. BT Vol. V, 115:2-9. Even though the Trust Agreement was more restrictive than the statute, he still believed both the Trust Agreement and the Statute supported his record-keeping approach regarding deposits of individual consumers. BT Vol. V, 115:8-13. The language cited from the Statute by Mr. Morisse pertained to collection and administration of payments made under a preneed contract. This did not abrogate the trustee's duty to maintain records of deposits to the trust after getting the information from Seller, as provided under the Trust Agreement for the trustee to furnish information to the contract purchaser.

123. Mr. Morisse did maintain records related to the transition from Mercantile.  BT Vol. V, 113:13-15.

124. Mr. Morisse explained NPS was the remainderman from his interpretation of Chapter 436.031.7, which referenced any trust property remaining at the termination of the trust shall be paid over to Seller. Ex. D-5, pg. 10; BT Vol. V, 116:6-14.

125. Mr. Morisse made the notation, "Trustee duty, distribute to Seller amount deposits for purchaser though defaults on payments when seller cancels contract upon delivery of purchaser's receipt, grantor affidavit." Ex. D-5, pg. 12. He believed the reference to "grantor

affidavit" would be the affidavit from Randy Sutton of NPS included in the monthly packet. BT Vol. V, 116:25-117:2. The procedure for handling cancellations, "was the packet included a copy of a preneed contract owner's actual request for cancellation of the contract." BT Vol. V, 117:3-9. Mr. Morisse recognized, Chapter 436.045, stated, upon notice of provision of funeral services, the trustee, in his words, has a "duty to distribute to seller the amount - - the amount of deposits for a preneed paid contract paid out due to death upon delivery of provider's receipt." BT Vol. V, 117:10-16. The actual words of the statute stated, "Upon delivery to the trustee of the provider's receipt for such payment, the trustee shall distribute to the seller from the trust an amount equal to all deposits made into the trust for the contract." Ex. D-5. Undisputed evidence in this case shows Allegiant Bank did not keep independent records on money paid by consumers into the Trusts, but relied on NPS to have that information. Money went out of the Trusts, upon request of NPS by wire transfer, before Allegiant Bank ever received information if providers had been paid, for whom money was being paid, or if the amount being paid tied to any contract. That information came to Allegiant Bank later in the monthly packets, but when it came to Allegiant, no specific account entries were made for each consumer.

126. By statute, consumers "had a right to contact the trustee and request confirmation of what was on deposit for them in the trust." BT Vol. V, 87:1-5. Mr. Morisse understood, as trust administrator he had to administer the trust in the way that protected the rights of the consumers and he believed he did so in the way he described.  BT Vol. V, 87:6-9.

127. Allegiant Bank retained outside counsel to aid in understanding the Bank's responsibilities under Missouri law 436. BT Vol. II pg. 58:11-16. Mr. Morisse did not use them to determine the identity of beneficiaries of the preneed accounts, prior to the Bank becoming trustee of the accounts. BT Vol. II, 58:24-59:3. He never inquired of outside counsel to

determine if it was permissible, under the law, to ask NPS to keep the records. BT Vol. II, 59:4-8. He never went to outside counsel seeking any advice concerning the preneed accounts Allegiant Bank was about to inherit, and he did not explain to outside counsel neither he, nor Richard Markow, had any experience with preneed trusts. BT Vol. II, 59:9-14. No evidence of payment of fees to outside counsel was presented.

128. Mr. Morisse did not believe he needed the advice of outside counsel in understanding Missouri Statute 436, based on what he reviewed, and his collaboration with fellow trust officer, Richard Markow. BT Vol. II, 64:16-25, 65:9-15. He had no discussion with Mr. Markow as to the identity of beneficiaries under Chapter 436 or whether NPS could maintain all the records pursuant to Chapter 436. BT Vol. II, 66:3-14. At all times, it was Mr. Morisse's responsibility to understand Chapter 436. BT Vol. II, 91:14-18, 22-24. He did due diligence with respect to asking questions related to how a trustee's administrative duties were affected by Chapter 436 and as it related to the Trust Agreement. BT Vol. II, 92:20-22. However, Mr. Morisse did not follow through with following Chapter 436.

129. To effectuate transfer of the Trusts, Mr. Morisse worked with Mercantile Bank to take receipt of the trust assets. BT Vol. V, 118:5-7. On August 7, 1998, Mr. Morisse sent a letter to Christina Whitmer at Mercantile Bank with delivery instructions. Ex. D-726.

130. From Mercantile, Allegiant acquired two types of unique assets: Lincoln life insurance policies, National Life Insurance policies, and certificates of debenture. BT Vol. V, 119:11-14. The only unique assets in Trust I were three certificates of debenture. BT Vol. V, 119:15-18.

131. Mr. Morisse believed activity in Trust I would be minimal, essentially holding the certificates of debenture. BT Vol. V, 120:5-9. Jean Maylock, NPS attorney, advised him Trust I would eventually go out of existence after all deaths were paid for. BT Vol. V, 120:12-15.

132. Mr. Morisse was identified as Trust Administrator in the first Allegiant Bank account statement for Trust I, dated August 31, 1998. Ex. P-101A. The statement identified transactions for that month in the account with dates. *Id*. The transactions in this statement involved certificates of debenture issued by NPS, with expiration dates. *Id*.

133. Mr. Morisse created a deposit form or used an asset deposit form associated with his work at Allegiant Bank. BT Vol. V, 121:6-9. He relied on an asset deposit form for Trust II, as an example of an internal document in Allegiant's operations area. BT Vol. V, 121:10-16; Ex. P-343. It was a single page, this one dated August 27, 1998. Ex. P-343. Under "shares/par" is the digit "1." *Id*. Under "description" it read, "Lincoln Memorial Life Ins. Company Evidence of Policies at Face Value." *Id*. Under "Tax Date" was written "10/2192." *Id*. Under "Tax Cost" was written "$14,776,022.65." *Id*. The account no. was recorded as 33-0008-19. *Id*. The account name was "NPS Pre-Need Trust II." *Id*. Other than "H. Morisse," nothing else appeared on this form. *Id*.

134. The representation to the Court was Mr. Morisse created an internal Allegiant Bank record to record assets deposited in NPS Trust II. Court examination of the exhibit does not show a list of policies, but "evidence of insurance." Allegiant never took physical control of any insurance policy, but relied on NPS to provide a form with some policy information. No form from NPS ever represented the Lincoln policies to be whole-life, paid-up policies. Mr. Morisse used the term "face value" for valuation of the policies; his stated reason being the policies were

so valued both by Mercantile during its administration "and as confirmed and advised by NPS and Jean Maylack, NPS's attorney." BT Vol. V, 122:11-19.

135. In a fax cover sheet, Mr. Morisse asked Carrie at Midwest to book unique assets "identified in the attached Asset Deposit Forms." Ex. P-343, pg. 2. Mr. Morisse referred to the evidence of insurance previously described and the certificates of debenture. BT Vol. V, 123:16-19. Mr. Morisse was not referencing actual insurance policies, just the initial "evidence of insurance" which he received in a packet from Mercantile. BT Vol. V, 123:22-24. He advised Carrie, Allegiant Bank would maintain subsequent statements of "evidence of insurance" on its premises. Ex. P-343. As to debentures, he told her the Bank was in possession of the original certificates of debenture, had requested they be retitled or renamed from Mercantile's name, and they would be forwarded to Midwest when they were received. *Id*.

136. A packet received from Mercantile included another internal asset deposit form together with copies of certificates of debenture and related information. Ex. D-11. It included the same type of "Asset Deposit Form" single page sheet previously referenced. *Id*. This document, representing Allegiant Bank's record of deposit of assets for Trust III, fills less than half a page. *Id*. Description of assets listed on the Asset Deposit Form included "Lincoln Memorial Life Ins. Company Evidence of Policies At Face Value, Tax Date 8/12/91, Tax Cost $26,393,938.79." Ex. D-11, pg. 3. The only other asset listed on the Asset Deposit Form is "Certificate of Debenture issued by NPS, Inc.; obligation Expires 1/1/06, Tax Date 1/1/96, Tax Cost $14,285,193.00." Included in the packet was a copy of the referenced Certificate of Debenture. A review of "related information" showed a document with NPS letterhead to Mercantile, dated January 1, 1996, called Exhibit "A." It stated, "All trust accounts listed in account #44316160." Ex. D-11, pg. 7. It was followed by four pages of material, bearing the

43

Mercantile Trust logo, concluding, as of April 30, 1998, Cash Equivalents were $182.00, and Certificates of Debenture were valued at $41,412,016.00. Finally, there was an Allegiant form for Securities Delivery Instructions. Ex. D-11, pg. 19-20.

137. Mr. Morisse was continuing a practice done by trustees before. BT Vol. V, 131:23-132:2. A reconciliation form, as described by Mr. Morisse from Mercantile, dated November 25, 1997, was a reconciliation or an accounting of the life insurance in the trust account. Ex. D-11, pg. 10. It started with the beginning balance at the end of the prior month, in this case, September 30, 1997, in the amount of $28,444,627.04. From this amount, payments for death claims and cancellations were subtracted, a total of $197,253.35. The final book balance of life insurance in force as of October 31, 1967, was $28,247.69. The practice of sending these "reconciliation" documents continued after Mr. Morisse took over. BT Vol. V, 133:7-10. He confirmed the $28 million "book balance of life insurance in force" was at face value. BT Vol. V, 133:13-17.

138. The information on Allegiant's Initial Asset Deposit Forms, referenced above, was the same as reported on Mercantile's statement. The primary assets listed in "Miscellaneous," were a certificate of debenture valued at $14,285,193.00 and Lincoln policies with a market value of $26,572,257.33. Ex. D-11, pg. 13.

139. The information Mr. Morisse received for Trust III was the same information he received for the other trusts. BT Vol. V, 139:3-7. He understood Wulf, Bates & Murphy managed investments for the Trusts at Mercantile Bank. BT Vol. V, 139:23-25.

140. Trust IV was always the largest of the Trusts. BT Vol. II, 157:22-24. Unique assets for Trust IV were Lincoln life insurance policies. BT Vol. V, 120:19-21. He booked them in the same way Mercantile Bank booked them. BT Vol. V, 120:22-121:1. Mr. Morisse agreed all of the assets Allegiant Bank supposedly received in August 1998 for Trust IV were in the form of

44

cash equivalents bonds and evidence of insurance in Lincoln. BT Vol. II, 160:6-9. At that time, there were no loans to Cassity entities in Trust IV, no investments in the Caymus Fund, Mr. Wulf's hedge fund, nor any investments in Forever Enterprises stock. BT Vol. II, 160:10-20; Ex. P-101D, pg. 1537. In August 1998, over ninety percent of assets in Trust IV were evidence of Lincoln life insurance policies at face value. BT Vol. II, 160:21-25. Mr. Morisse recognized Lincoln as the Cassitys' life insurance company. BT Vol. II, 161:1-2.

141. Mr. Morisse was told Mercantile Bank's listing of insurance policies in the monthly packet was the back-up for the life insurance listed in the account. BT Vol. V, 129:21-24. He was also informed Mercantile Bank did not keep account-specific deposit information per customer. BT Vol. V, 130:24-131:1. He did not maintain the back-up by microfiche, like Mercantile, but kept every packet received from NPS. BT Vol. V, 131:2-5. According to Mr. Morisse, the NPS reconciliation form received by Mercantile was the same format as what he subsequently received when he took over trust administration for evidence of insurance in force. Ex. D-11, pg. 10[14]; BT Vol. V, 131:14-22.

142. The CSA Trust was another NPS Trust, sometimes referred to as the Mason Securities Trust, because Forever Enterprises was doing business as Mason Securities

---

[14] The described "reconciliation form" is a one-page piece of paper, unfamiliar to a printing company. Writing covers a little more than half a page. At the top of the page is written, NATIONAL PREARRANGED SERVICES, INC., below appears MERCANTILE BANK & TRUST ACCT. # 443161160, below appears EVIDENCE OF INSURANCE IN FORCE. Then, there is below, BEGINNING BALANCE 9/30/1997, and to the right side of the page appears $28,44,627.04. Below, it states LESS: DEATHS 10/31/1997. Below that appears Statesman National Life (109,259.68). Below that, Lincoln Memorial Life ($73,730.92). Then, the language, LESS CANCELLATIONS 10/31/1997. Below is Statesman National Life ($400.00) and Lincoln Memorial Life ($13,862.75). Several blank spaces below is NET INCREASE (DECREASE), and to the right appears ($97,253.35). Below, back on the left side of the page is written BOOK BALANCE INSURANCE IN FORCE 10/31/1997, and across to the right $28,247,373.69. The following language appears at the middle of the page: Based on the information contained in this reconciliation statement, the deposits and distributions pursuant to Chapter 436 Revised Statutes of Missouri are hereby evidenced and accepted this date. Below on a line appears 11/25/1997 and on a line to the right an unreadable signature. There are no references to deposits and distributions on this "reconciliation form," nor an explanation why the beginning balance can be $28,444,627.04, deductions of $197.253.35 and show a Book Balance insurance in force of $28,247,373.69.

Organization. Ex. P-101F, pg. 2; BT Vol. II, 187:5-23. The only asset in the CSA Trust was $1.6 million in Lincoln life insurance. BT Vol. II, 187:24-188:3. The CSA, or Mason Securities Trust, was managed in the same way by Allegiant Bank as all the other NPS trusts. BT Vol. II, 188:15-19.

143. The April 2004 CSA/Mason Securities Trust Statement listed evidence of insurance policies at face value as 99.7 percent of the trust assets. BT Vol. II, 189:6-8; Ex. P-101F, pg. 445. The value of insurance doubled from $1.6 million to $3.6 million over Allegiant's tenure. BT Vol. II, 189:9-11. There was no certification of cash value or documentary certification the policies were paid-in-full or had premium payments due. Ex. P-0101F, pg. 445; BT Vol. II, 189:21-25. There was also no information on whether policy loans had been taken on the policies. BT Vol. II, 190:1-3. Mr. Morisse understood the premiums were being paid by Wulf, Bates & Murphy, but he believed the policies in the CSA, or Mason Securities Trust, were whole-life, paid-in-full policies. BT Vol. II, 190:4-17.

144. The Mt. Washington NPS preneed trust was operated under the same procedures by Allegiant Bank as the other NPS trusts. BT Vol. II, 191:5-8. At all times, Mr. Morisse knew Mt. Washington Forever was a Cassity-owned company. Ex. P-0101G; BT Vol. II, 191:14-192:1.

145. When Allegiant Bank assumed this trust in 2000, trust assets were all invested in cash and cash equivalents. BT Vol. II, 194:22-195:2.

146. Mr. Morisse received a report of holdings from Mercantile Bank, from their records, which was a copy of a selected holdings report Mercantile Bank printed-off of its trust accounting system and delivered to him in connection with the transfer of assets in the NPS account. Ex. D-11, pg. 13; BT Vol. V, 134:4-6. Mercantile Bank had no investment discretion, which meant, to Mr. Morisse, it had no investment management authority or responsibility. BT

Vol. V, 134:10-21. He concluded Mercantile Bank's account, like Allegiant's NPS accounts, was a nondiscretionary account for investments. BT Vol. V, 134:22-24. When Allegiant Bank took over as trustee from Mercantile Bank, Wulf, Bates & Murphy was listed as the investment advisor. BT Vol. II, 98:2-4.

147. Mr. Morisse believed he received sufficient information from Mercantile Bank to run the accounts. BT Vol. V, 136:3-17. It was explained, assets in the accounts with respect to life insurance and the protocol regarding receiving the monthly packets and what was included in the packets. *Id*. With respect to wire transfers into the account, it was explained, there would be wire receipts received from the insurance company. *Id*. Wulf, Bates & Murphy was the investment advisor and they wire funds out. *Id*. On a Mercantile Bank form, Mr. Wulf is written in as Portfolio manager. Ex. D-11.

148. Mr. Morisse described standard securities delivery instructions Allegiant Bank used when it was acquiring assets being transferred from another institution. Ex. D-11. A change Mr. Morisse made to how assets or transactions would be described, in comparison to how Mercantile described assets, was in the reconciliation statement, where he added life insurance was valued at face value. BT Vol. V, 141:15-25. He made this statement change after talking to Ms. Witmer at NPS and NPS's lawyer, Jean Maylack. *Id*. Although Allegiant Bank had a reputable law firm acting as outside counsel, Mr. Morisse preferred to confer with an NPS, Cassity-entity lawyer.

149. He also said he added the words "Evidence of Insurance," but the Mercantile Bank form, described in its entirety in the above footnote, plainly included the language, "Evidence of Insurance." Actually, he added "EVIDENCE OF POLICIES." He said the description of certificates of debenture on Allegiant Bank's statement was changed to show they were issued by

NPS. BT Vol. V, 142:17-21. Mr. Morisse, as noted, also added insurance was to be valued at "face value." BT Vol. V, 142:9-11.

150. As already noted, at that time in 1998, and for the rest of Allegiant's tenure, he always, mistakenly, believed the Lincoln policies were whole-life paid-up policies, when most of them were policies with premium obligations running as long as ten years, and a few at twenty years. For all of his term, he was authorizing renewal premiums in millions of dollars on policies; it is undisputed, he received requests money be wired out of the Trusts to pay renewal premiums on policies. While he should have demanded to keep the policies, he did not once ask for a sample of any insurance policy from NPS or Lincoln, both Cassity-owned entities, to confirm policies were paid-in-full whole-life policies with cash surrender values.

151. Mr. Morisse decided to describe transactions "per investment advisor," rather than just indicating a wire transfer with respect to disbursements made pursuant to the fax sheet the Bank received. BT Vol. V, 142:22-143:4. Obviously, his motivation in entering the language "per investment advisor," was to form a sound liability shield for Allegiant Bank. At that time, he did not recognize consumers as beneficiaries, and his mindset was not consideration of protection of consumers' money.

152. At UMB, Mr. Morisse understood an account was to be administered in accordance with the law and the trust document. BT Vol. II, 24:11-16. He understood, when there is a conflict between the Trust Agreement and Missouri law, in this case under the preneed trust statute, Missouri law must be applied. BT Vol. II, 24:24-25:5.

153. Although Mr. Morisse knew trusts he would be administering at Allegiant Bank were full of unique assets, he received no training, either at UMB or at Allegiant Bank, on valuing unique assets. BT Vol. II, 27:10-18.

48

154. Mr. Morisse did not know what an NPS certificate of debenture meant when the Trusts were first accepted at Allegiant. BT Vol. II, 30:13-25. He did know a certificate of debenture was an unsecured promise to pay. *Id*. Mr. Morisse received no training at either UMB or Allegiant Bank to evaluate the quality of debentures. BT Vol. II, 31:21-32:2. He was not experienced in valuing debentures. BT Vol. II, 32:7.

155. Mr. Morisse received no training regarding the Trusts. BT Vol. II, 52:18-22. "There was no authority or responsibility for judging investments, so no one at Allegiant, you know, reviewed or opined with respect to specific investments." Mr. Morisse was not experienced in the prudence of investing, and there was no one in the Allegiant trust department who was tasked with looking at the investments in the Trusts to ensure they were prudent for the period of Allegiant's tenure. BT Vol. II, 51-52;55-57. Mr. Morisse testified he was not in charge of judging prudence of trust investments of any of the accounts in the trust department. BT Vol. II, 62:11-13.

156. According to Mr. Morisse, "The Bank didn't have investment management authority." BT Vol. II, 49:5-6. "There was no one person or entity hired specifically for the NPS trust accounts." BT Vol. II, 49:19-23. Mr. Morisse had administrative duties, and none of the investment duties. BT Vol. II, 50:7-14.

157. Upon taking over as trustee, industry custom and practice required Allegiant to perform a comprehensive review of the trust assets within 60 days after receiving the Trusts. BT Vol. XIII, 28:22-30:10. The purpose of the 60-day review requirement is so the trustee can ensure it understands the nature of the trust assets and can identify any problems that exist relating to the assets. *Id*. Allegiant's internal policy manual governing the trust department

mandated a review of all new trust accounts be performed within 60 days. Ex. 2-0126, pg. 2. This did not occur.

158. Allegiant's own trust statements in the first 60 days noted Allegiant was transferring significant amounts of money out of Trust IV to Lincoln for monthly renewal premiums. Ex. P-101D, pgs. 5, 14. Allegiant failed to review these transactions or evaluate the premium terms of the Trusts' Lincoln policies. *See infra*. When Allegiant took over as trustee, the Trusts were significantly underfunded. BT Vol. XXII, 60:19-61:8. Even Defendants' actuarial expert opined Trust IV was in the hole by over $33 million in August 1998. BT XVII, 88:25-89:9.

159. Allegiant Bank had a Fiduciary Services Manual. Ex. 2-0126. Under Section 1.01 of the manual, Allegiant Bank was to have a trust committee at all times. *Id*. The section provided: "The Trust Committee shall be the board's representative in the operation of the trust department. Though the Board has delegated the trust department duties, the responsibility of the trust department remains with the Board." *Id*.

160. There was a trust committee at Allegiant Bank, which was in charge of overseeing how Allegiant Bank's Trust Department was handling trust accounts, to assure the Trust Department was staying inside the law at all times. BT Vol. II, 76:2-14. NCB's trust committee was comprised of bank employees with years of trust experience, unlike Allegiant's trust committee. BT Vol. II, 76:15-18. Allegiant's trust committee members were investors in Allegiant. BT Vol. II, 83:8-16; Ex. 2-100, pg. 23.

161. The Trust Committee, when Mr. Morisse joined Allegiant Bank, consisted of John Pyzk, John Weiss, Sid Gueller, and Richard Markow. BT Vol. XX, 5:3-10. Later, it consisted of John Pyzyk, chairperson, a real estate developer; William Gisson, a dentist; John Weiss, an auto dealer, and Kevin Farrell, a manufacturer. BT Vol. II, 78:13-80:13.; Ex. P-2001. None of these

individuals had any experience with trust administration. *Id.* Both Mr. Farrell and Mr. Weiss were investors in the Bank. BT Vol. II, 83:8-16. None of these members, like Mr. Morisse, received any training or guidance with respect to serving on a trust committee.

162. After the Bank acquired Southside Bank, the Committee was transformed. BT Vol. XX, 5:12-15. Mr. Morisse thought the business ability of the members was quite reputable, respected and diverse. BT Vol. XX, 5:16-20. Mr. Morisse was secretary of the meetings, initially, then later joined the Committee as a member. BT Vol. XX, 5:21-23. Minutes of the meetings were kept. BT Vol. XX, 5:24-25.

163. The manual also provided the Trust Committee was not only to review all fiduciary accounts for the appropriateness of investments and administrative action, it was to direct the taking of appropriate remedial action as may be required. Ex. 2-0126. The Trust Committee never asked the World Services group term policy be removed from the books, and the Committee was not aware of the six stock transactions, where the Trust paid more for the stocks than fair market value reported on the stock exchanges. BT Vol. IV, 194:16-23. Mr. Morisse could not remember if he showed the Committee the Letter of Direction he drafted where any employee of NPS could direct money be sent out of the Trusts. BT Vol. IV, 194:24-195:6. Section f.1 stated "The Trust Committee shall review each fiduciary account within 60 days of the establishment of the account," and no less often than every twelve months. Ex. 2-0126.

164. The Statement of Principles of Trust Department Management also required Allegiant Bank's Trust Department maintain records in sufficient detail to properly reflect all trust department activities, and to have a trust committee to oversee the Trust Department. BT Vol. IV, 185:15-21. It also required the Trust Committee to provide for review of each trust department account. Ex. 2-90.

165. There was to be a review of the NPS trust accounts addressing account administration, at least annually. BT Vol. IV, 187:10-14. Mr. Morisse did not tell the Trust Committee, as part of his account administration, he adopted a procedure to not review wire transfer request forms. BT Vol. IV, 188:11-17. He did not discuss with the Trust Committee his review of the actual monthly account statements, believing they were familiar with that he reviewed only "as needed of account data and information." BT Vol. IV, 188:18-24. The Committee was not familiar with the protocol of the faxes going straight to the operations department and then operations booking the transaction. BT Vol. IV, 188:25-189:6.

166. There was never an occasion, in all the years when Mr. Morisse administered the Trusts, that he went to the Trust Committee and said he saw a troubling transaction in any account of the Trusts. BT Vol. IV, 196:7-16.

167. Mr. Morisse believed, through the administrative review process and interaction with the Trust Committee, the Committee understood how the trust operated, and in general, what distributions were to be made. BT Vol. IV, 204:17-22. He did not tell the Trust Committee he was making distributions without doing the calculations himself. BT Vol. IV, 204:23-25.

168. When he joined Allegiant Bank, Mr. Morisse knew Allegiant adopted a written set of policies and procedures for the Trust Department. BT Vol. IV, 181:5-11. The protocol was for employees to familiarize themselves with the entire set of policies in the policies and procedure manual. BT Vol. IV, 181:12-14. The bank examiners were aware of this. *Id*. The policy and procedures manual applied, according to Mr. Morisse, to trust company personnel in the administration and management of all fiduciary accounts. BT Vol. IV, 181:22-24.

169. The Statement of Principles of Trust Department Management, revised in 1999, was adopted by Allegiant's trust committee. Ex. 2-0090. The code of conduct adopted by Allegiant's

52

Board of Directors, the Statement of Principles of Trust Department Management, and the Trust Manual were all applicable to Mr. Morisse, as well as any other trust department employee. BT Vol. IV, 185:10-14.

170. Mr. Morisse advised he and other members of the Trust Department were involved in making revisions, and he was responsible for completing the project for the 1999 revision to procedural policies. Ex. 2-0126; BT Vol. V, 242:10-22.

171. The policies addressed investment management. BT Vol. V, 242:23-25. The policy for "Conflicts of Interest," provided the "Bank may not realize gain from administration of fiduciary accounts except for fees charged in accordance with the Trust Department's Bank fee schedules." Ex. 2-0126, pg. 11. The Bank received no compensation from the Trusts other than for fees charged. BT Vol. V, 244:5-7. As to investment directions, it was the policy of the Bank to "receive written investment instructions from legally authorized parties on all custodial and self-directed accounts, co-fiduciaries or outside investment authority have investment authority with respect to the account or when the customer requires approval." Ex. 2-0126, pg. 56. Mr. Morisse said this policy applied to NPS trust accounts. BT Vol. V, 244:22-23.

172. Mr. Morisse did not recall if he asked the internal audit department of Allegiant to come in and review any aspect of his administration of the NPS preneed trust accounts. BT Vol. IV, 192:2-7.

173. Allegiant Bank's Policy manual referenced information related to Allegiant Bank's merger with Southside Bank when the two banks' accounts merged into the same trust accounting system. Ex. D-689, pg. 41. After the merger, Allegiant Bank's back-room operations was more extensively staffed. BT Vol. XX, 23:12-21. Investment managers and portfolio managers were also employed, which added members with additional past banking experience to

the Trust Committee. *Id*. A former FDIC examiner joined the trust committee. *Id*. The merger resulted in the resignation of Richard Markow as president of Allegiant Bank. BT Vol. XX, 23:22-24.

174. This occurred in the 2001 time period. BT Vol. XX, 24:2-3. Art Weiss was placed in charge of wealth management. BT Vol. XX, 24:7-9. After the merger, Mr. Morisse reported to David Scobee for certain matters and directly to Mr. Weiss for other matters. BT Vol. XX, 24:18-22.

175. After the Allegiant Bank – Southside merger, Mr. Morisse reported as part of the Trust Committee and continued to administer the NPS accounts. BT Vol. XX, 24:23-25:1. The reporting protocol activities were the same with respect to administrative reviews and discussions related to exams or audits, with an additional layer of different persons to report. BT Vol. XX, 25:6-13.

176. From January-April 2004, the proposed acquisition of Allegiant Bank by NCB was pending. BT Vol. II, 164:23-165:6.

177. On December 11, 2003, of the top ten trust accounts at Allegiant Bank, NPS accounts were more than two and one-half times the amount of the next nine accounts, combined. Ex. P-0073; BT Vol. II, 63:2-7.

178. The face value of Lincoln polices Allegiant Bank received in August 1998, by virtue of the phrase "evidence of life insurance" was $50,231,407.30. BT Vol. II, 161:5-8; Ex. P-101D. There was less than $2 million in cash or other assets. BT Vol. II, 161:9-11. Allegiant Bank's Trust IV statement for April 2004, a date a few weeks before Allegiant resigned as trustee and transferred the assets to Bremen Bank, stated the assets were composed of $114,852.00 in cash, $1.3 million in cash equivalents, $42,000.78 in bonds, and $2,860 in another bond. BT Vol. II,

162:2-10; Ex. P-101D, pgs. 1537, 1539. All assets not associated with the Cassitys totaled approximately $1,500,000.00. BT Vol. II, 162:11-14.

B.      *Wire Transfer Activity in the Trusts*

179. While Mr. Morisse would not agree the central purpose of Chapter 436 was to protect the consumers' monies, he testified, "The protection of assets was a part of the responsibilities with respect to the administration of the NPS trusts." BT Vol. II, 96:1-5.

180. There were thousands upon thousands of consumers whose deposits Mr. Morisse was to control and protect as identified in Ex. P-2287.

181. Allegiant knew it could only distribute trust funds to NPS under the specific circumstances authorized by Chapter 436 and the Trust Agreements. JSF.

182. Section 3.2 of the Trust Agreement described the limited purposes for which money could come out of the trust. Ex. P-168. It was Allegiant Bank's responsibility to determine whether a disbursement should be made. BT Vol. III, 109:14-23. NPS was entitled to receive trust principal when a preneed consumer died or if a preneed contract was cancelled because the consumer was entitled to claim the amount initially paid. BT Vol. III, 109:24-110:12. NPS could only be paid for a death claim if it supplied appropriate death claim paperwork. BT Vol. III, 110:13-16.

183. During Allegiant's period as trustee, money could not leave the Trusts without Allegiant's participation. NPS could only access the Trusts' preneed funds if Allegiant agreed to transfer the trust funds to NPS. JSF.

184. Mr. Morisse denied Allegiant Bank administered the Trusts with the belief NPS could deposit the consumers' money into the Trusts and draw the money out for any purpose. BT Vol. III, 110:17-21. Mr. Morisse believed the systems in place, expected a trustee to perform the

responsibilities, as a trustee under Chapter 436, as an investment for which money could go out at the "direction by the investment manager for exercising its investment management responsibilities." BT Vol. III, 111:16-112:9. Money was distributed from the Trusts in whatever amount to whatever party was on the wire request form. BT Vol. III, 112:10-16.

185. Allegiant disregarded Chapter 436's requirements governing distributions of trust principal to NPS, and instead, routinely transferred trust funds to NPS without any explanation or justification for the transfers. Ex. P-101D, pgs. 52, 559, 1494. In some cases, Allegiant transferred preneed funds out of the Trusts directly to NPS's checking account held at Allegiant Bank without any form of explanation. Ex. P-104, pgs. 299, 914. Allegiant repeatedly violated its fiduciary responsibilities to consumer and funeral home beneficiaries by the manner in which it violated Chapter 436 in its transfer of money out of the Trusts.

186. In order to get money out of the trust accounts at Allegiant Bank, the Bank executed wire transfers, utilized by the former trustee. BT Vol. II, 146:5-14. Mr. Morisse does not recall a wire transfer request not performed. BT Vol. III, 188:18-20.

187. Money was transferred from the Trusts to NPS and various other entities through wire transfers which were requested by NPS sending Allegiant a wire transfer request form. BT Vol. II, 148:6-11. Allegiant Bank's protocol provided for the wire transfer request to be routed directly to operations, known as the "back office." BT Vol. II, 148:12-22. If the wire transfer request was in the form as anticipated, expected and understood to be from Wulf, Bates & Murphy, the operations department had a standing instruction to send the money out of the Trusts, without additional approval or oversight from Mr. Morisse. BT Vol. II, 148:23-149:7. For the six years it was trustee, Allegiant Bank never scrutinized why money was being sent out of the Trusts through thousands of wire transfers. BT Vol. II, 149:8-12. Allegiant Bank personnel

only confirmed each transfer was at the direction of the investment advisor. *Id.* No one in the operations department was told to check the wire transfer requests against Chapter 436, nor was anyone in the operations department schooled on the requirements of Chapter 436. BT Vol. II, 149:13-18. The expectation, from Randy Sutton and NPS, was the requests would be processed immediately. BT Vol. II, 153:3-8.

188. Mr. Morisse dealt primarily with Angie Hall, Randy Sutton's assistant. BT Vol. III, 71:10-18. Even though the wire transfer request forms came from "Randy Sutton/Angie Hall" and only cc'd Wulf, Bates & Murphy, Mr. Morisse believed it was Wulf, Bates & Murphy directing the money be transferred. BT Vol. III, 72:4-9.

189. The Trust Committee was never informed this wire transfer protocol was adopted where any request for money out of any of the Trusts bypassed the trust administrator and was executed by the back office. BT Vol. II, 150:3-9.

190. Allegiant routinely wired funds out of Trust IV to various other entities owned and controlled by the Cassitys, with no explanation. Ex. P-104, pgs. 117, 435, 453, 458, 503, 638, 725, 927, 1057, 1148. These entities included Lincoln Memorial Services, Doug Cassity's personal investment company, and Memorial Service Life Insurance Company, which only issued policies for Texas consumers. Ex. P-104, pgs. 117, 1087.

191. If the wire transfer form said to send money to Hollywood Forever, Tyler Cassity's cemetery, the wire request would have been processed, whether any asset was received in return. BT Vol. II, 150:24-151:4. If a wire transfer form said send money to Doug Cassity to buy a house, it would have been processed. BT Vol. II, 151:10. If the wire transfer form came from Wulf, Bates & Murphy, the money would be sent. BT Vol. II, 151:11-15. However, the requests

actually came from Randy Sutton or Angie Hall, faxed from NPS offices, with a "cc" to Wulf, Bates & Murphy. BT Vol. II, 151:16-18.

192. There were more than one thousand wire transfer requests out of the Trusts during the time Allegiant was trustee. BT Vol. II, 151:23-25. The protocol was executed and Mr. Morisse, as trust administrator, did not question a single request. BT Vol. II, 152:1-14.

193. Every time a wire transfer form was executed, assets would leave the trust. BT Vol. II, 155:25-156:2. All of the wire request transfer forms for Trust IV, processed without Mr. Morisse's review or involvement, are contained in Ex. P-104. BT Vol. II, 156:13-17. Each form was received from NPS with a "cc Wulf" listed. Ex. P-104.

194. The wire transfer request forms were maintained in Allegiant Bank's trust department in a file cabinet or a box archived someplace that could be accessed by Mr. Morisse. BT Vol. II, 157:10-21.

195. On the April 2000 Trust IV statement, on April 4, 2000, one wire received from Lincoln was for $1 million and a second was for $69,263.00. Ex. P-101D, pg. 243. The transaction description was based on the wire transfer form received for the deposit. BT Vol. III, 150:19-22. All Allegiant Bank knew was money was received from Lincoln in a specific amount on a specific date. Ex. P-101D, pg. 243; BT Vol. III, 151:3-5. Mr. Morisse did not state any asset was booked on Allegiant Bank's books and offered no explanation for what purpose trust money was expended. On April 4, 2000, the exact amount, on the same day as the money was received, was amalgamated and wired out of Trust IV to Jefferson Bank, per the direction of the investment advisor. Ex. P-101D, pg. 247. The money did not come from NPS originally, it came from Lincoln as a deposit to Trust IV. P-101D, pg. 247; BT Vol. III, 152:9-12.

196. The money could not be an investment because it came from Lincoln, and under the Trust Agreement and the law, money from Lincoln could only be transferred for death claims and cancellations. BT Vol. III, 152:20-23. Mr. Morisse believed the transfer out was ordered by Wulf, Bates & Murphy but did not know why. BT Vol. III, 153:5-8. Mr. Morisse knew the investment advisor could only invest Trust IV funds. BT Vol. III, 153:9-14.

197. Mr. Morisse did not recall reading this trust statement showing a million dollars came in and went out. BT Vol. III, 154:15-18. Mr. Morisse believed there was no need to ask why Lincoln would send a million dollars to Trust IV, then, Allegiant would send it out for an investment the same day; he believed the only responsibility of the trust department was to accept deposits and make distributions per the investment advisor. BT Vol. III, 154:20-155:1.

198. A request for money to be transferred out of Trust IV for $248,000.00 was approved in March 2001 for transfer to NPS for no stated reason. Ex. P-104, pg. 281; BT Vol. III, 113:5-7. Mr. Morisse cannot explain what purpose was intended for this cash transfer, other than it was at the direction of Mr. Wulf, although the form says Randy Sutton and Angie Hall with a "cc" to Wulf, Bates & Murphy. BT Vol. III, 113:10-20. Allegiant Bank did not know the purpose of this investment. BT Vol. III, 113:21-23.

199. On May 15, 2001, a $50,716.00 deposit of consumer money was made by NPS into Trust IV. Ex. P-101D, pg. 451_05.

200. On May 18, 2001, Allegiant Bank sent $8,945.77 to Lincoln, with no explanation in Allegiant's records as to why it sent the money besides "per direction of investment advisor." Ex. P-101D, pg. 451_11; BT Vol. III, 8:25-9:10. Allegiant Bank did not know how many insurance policies for consumers the $8,945.77 was buying, or whether the money was even going to buy insurance policies. BT Vol. III, 9:11-17. The wire transfer request form for this

amount of money most likely went straight to the operations department for execution without going through Mr. Morisse; no steps were taken to identify what was being purchased with the $8,945.77 before sending the money out of Trust IV. P-104, pg. 313; BT Vol. III, 11:7-11. The batch number listed on this form is N8105171. Ex. P-104, pg. 313. Mr. Morisse did not know what this number referenced and never asked NPS to explain it. BT Vol. III, 12:2-11.

201. On May 22, 2001, there was a $341,879.46 wire transfer out of Trust IV to New Life. Ex. P-101D, pg. 451_11. New Life "could well have been" a name used by Lincoln.[15] BT Vol. III, 18:17-18, 19:13-22. There was no description on the trust statement as to how many policies would be purchased or if any were purchased. BT Vol. III, 19:23-20:2. Allegiant Bank's protocol was to ask no questions. BT Vol. III, 21:24-22:4. The wire transfer request form, asking $341,879.46 be transferred from Trust IV, went to the operations department. BT Vol. III, 22:5-10. All the information the trust department had for this transfer of money was contained on the wire transfer request form. BT Vol. III, 22:11-14. This included a box, titled "Monthly renewals," checked, and a batch number. Ex. P-104, pg. 315.

202. Mr. Morisse did not know, if he would have been alerted he was buying multi-pay policies with premiums due, when he saw "monthly premiums" checked. BT Vol. III, 24:15-20.

203. On May 24, 2001, Allegiant wired an additional $9,609.18 out of Trust IV "per direction of investment advisor." Ex. P-101D, pg. 451-11. Mr. Morisse believed "Allegiant was not authorized to disregard the direction of the investment advisor." BT Vol. III, 28:16-19. Even if trust money was disbursed to NPS directly, not to Lincoln, Mr. Morisse would have still followed the direction of Mr. Wulf, even though Chapter 436 says there are limited reasons why money can come out of the trust. BT Vol. III, 30:22-31:8. He had no idea why the $9,609.18 was

---

[15] The Court has no additional information on New Life.

leaving Trust IV, "[o]ther than it was at the direction of the investment advisor." BT Vol. III, 31:17-20.

204. The amount of money that can be distributed from an NPS trust by Allegiant Bank is "an amount equal to all deposits made into the trust for the contract." BT Vol. II, 208:7-11. Mr. Morisse recognized it was Allegiant Bank's responsibility to know how much it could lawfully distribute under Chapter 436, irrespective of whether there was an outside investor. BT Vol. II, 208:12-17. Allegiant relied on NPS to determine whether the amount of "withdrawals from the trust" was proper under Chapter 436 and never verified the accuracy of the information provided by NPS. BT Vol. IX, 210:4-211:4; Ex. D-132, pg. 7.

205. The wire transfer request form asked for the $9,609.18 to be sent to an account at Allegiant Bank owned by NPS. Ex. P-104, pg. 316. This was Allegiant Bank's own records showing the money was being sent directly to an NPS account. BT Vol. III, 31:25-32:17. Mr. Morisse's only concern was whether it was at the direction of the investment advisor.

206. In December 2001, there was a wire transfer of money from Trust IV for $694,299.52. Ex. P-104, pg. 451. Mr. Morisse did not know why his initials were by Pat Buchanan's signature on the wire transfer form. BT Vol. III, 132:15-18. The wire transfer form was checked "monthly renewals." Ex. P-0104, pg. 451.

207. This was at the same time Allegiant learned Lincoln lost $8 million the previous year. An internal e-mail discussed a loan application to Allegiant Bank from another Cassity entity.[16] Ex. P-573. Allegiant employees discussed how "money flows from a private entity to a public entity through an insurance company," and "none are profitable on a consistent basis." *Id*. The e-mail chain continued: "I'm told their insurance company lost $8 million last year." *Id*. Mr.

---

[16] Later, in this hearing, it was represented, the Bank might have considered making the loan if it had other information it received, later.

Morisse knew the insurance company was considered the strength behind the Cassity companies and the insurance company was losing millions. BT Vol. III, 121:6-9. The e-mail chain also revealed information about the officers of Allegiant Bank. Ex. P-573. Art Weiss, who had never been a trust administer or worked in a trust department, was head of Wealth Management of Allegiant Bank. BT Vol. III, 121:10-25. Within a few days, Mr. Morisse replied in the e-mail chain, stating, "The NPS Forever Enterprises relationship began I believe with Sean's[17] background and Mr. Cassity, the owner of NPS, principal owner. Forever Enterprises was initially also privately held, but went public a year or more ago." Ex. P-573. With this information Mr. Morisse did nothing to change the procedures of how the trust department would view requests for money to go to any Cassity entity. BT Vol. III, 124:17-24.

208. On January 7, 2002, there was a request for a wire transfer for $112,000 out of Trust IV to Forever Enterprises' corporate account. Ex. P-104, pg. 458. There was no description listed for the wire transfer, other than the fax was received as a direction by Wulf, Bates & Murphy. Ex. P-0104, pg. 458; BT Vol. III, 127:13-16. This wire transfer was sent a day after Mr. Morisse learned none of the Cassity companies were profitable and Lincoln was losing money on a consistent basis. BT Vol. III, 128:23-129:3. Mr. Morisse "followed the direction of Wulf, Bates & Murphy." BT Vol. III, 129:3. Mr. Morisse did nothing to change the procedure to send money, in any amount requested, to a Cassity-owned company if Wulf, Bates & Murphy was copied on the form from NPS saying "please send money." BT Vol. III, 129:4-14. Allegiant "accepted direction from Wulf, Bates & Murphy as set out in the letter of direction that existed with Wulf, Bates & Murphy." *Id*.

---

[17] This is a reference to Shaun Hayes.

209. Allegiant Bank was wiring money from the Trusts to Lincoln multiple times each month. BT Vol. III, 43:19-21. On June 6, 2002, Allegiant wired $5,326.34 from Trust IV to Lincoln. Ex. P-101D, pg. 1071.

210. A wire transfer request form asked $6,258.36 be sent from Trust IV to Lincoln with a request "deliver immediately to Allegiant trust/Herbert Morisse." Ex. P-104, pg. 1073. It was delivered to the back office for immediate processing. BT Vol. III, 44:15-21. On the bottom of the form, under "office use only," it stated this was for monthly rentals or policy loans. Ex. P-104, pg. 1073. Mr. Morisse did not see or read the form. BT Vol. III, 45:25-46:5.

211. On January 2, 2004, Allegiant wired $1.1 million to Lincoln. Ex. P-101D, pg. 1494. No description was included besides "per direction of investment advisor." *Id*.; BT Vol. III, 58:15-16. A wire transfer request form dated January 2, 2004, was in the amount of $1.1 million. Ex. P-0104, pg. 1062. There was an "X" on the form next to "monthly renewals." *Id*. It also listed "(BAL DUE: $731,953.28." *Id*. Mr. Morisse testified he did not know to what the "X" and "BAL DUE" referred. BT Vol. III, 60:12-23.

212. Mr. Morisse was first asked if he was forbidden from reading the form which said "for office use only." BT Vol. XX, 209:1-10. He said he did not recall having seen the exhibit and did not know if that was a part and parcel of what a bank is supposed to do with respect to the amount to be wired to the name of the bank, the routing number and the account number. *Id*. He was then asked if he needed to know what he was doing as a bank, when a wire transfer for $1.1 million was entered to go out of Trust IV. BT Vol. XX, 209:11-210:1. He said he believed he knew what he we were doing, which was following the direction of the investment advisor. *Id*.

213. Mr. Morisse believed the $1.1 million transaction was for the purchase of new life insurance policies, but there was no language in the statement stating it was to purchase new policies. BT Vol. III, 62:3-9. Mr. Morisse believed "the Bank didn't have the obligation to track transactions related to the direction of the investment advisor." BT Vol. III, 63:16-19. The $1.1 million sent to Lincoln to buy new policies should have been in Allegiant's records. BT Vol. III, 64:5-9. The wire transfer activity report for this amount was signed by Char Dupent, an operations manager. Ex. P-104, pg. 1066. She was not trained in trust department obligations under Chapter 436. BT Vol. III, 64:15-17. She, or one of her employees, would write in the amount requested to be wired on this form. BT Vol. III, 64:18-21. Mr. Morisse believed, since this was an internal operations form, it did not need to be routed through him. BT Vol. III, 65:1-3.

214. When asked if it could not have been done for the purpose of purchasing life insurance policies, Mr. Morisse stuck with an indefensible position, saying "It was for the purchase of life insurance policies." BT Vol. XX, 211:11-17. The form was clearly checked with an "X," by "MONTHLY RENEWALS." Ex. P-104, pg. 1067. Whether he even saw this document, originally, when he clearly had an opportunity to do so, when presented with this adverse evidence, under oath, he refused to acknowledge reality, continuing to diminish his credibility. When asked if it was for the purchase of $1.1 million in new insurance, he could have gone to the netting form to see if NPS just sold $1.1 million in life insurance policies. BT Vol. XX, 211:18-23. Mr. Morisse said, "I'm going to answer, I've said before, I don't recall this document." BT Vol. XX, 211:22-23. He then testified he did not recall seeing any of the 173 wire requests listed in Ex. P-2301. BT Vol. XX, 211:24-25. Those 173 wire entries on Ex. P-2301 were all for monthly renewal premiums.

215. On January 6, 2004, Allegiant wired $1,230,000.00 to NPS. Ex. P-101D, pg. 1494. There was no description for the transfer besides "per direction of investment advisor." *Id.*

216. The third wire transfer out of Trust IV was for $731,953.28 to Lincoln. Ex. P-101D, pg. 1494. On the wire transfer request form, there was an "X" next to "Monthly renewals." Ex. P-104, pg. 1071. Mr. Morisse did not know if the money was being wired out for a purpose other than new policies. BT Vol. III, 65:17-22. Mr. Morisse signed the Wire Transfer Activity Report for this wire transfer request. Ex. P-104, pg. 1070. Mr. Morisse refused to admit the form indicated the money would not be for new policies. BT Vol. III, 66:5-8. Someone else wrote $731,953.00 on the form; it was not he. BT Vol. III, 66:19-22.

217. By looking at the Statement of Transactions, Mr. Morisse should have been able to find out where the $10 million of new policies was being purchased, but he refused to agree or disagree with this proposition. BT Vol. III, 67:24-68:9.

218. Irrespective of the absence of any description identifying an investment, if a direction came from Wulf, Bates & Murphy, Mr. Morisse, and consequently, Allegiant Bank presumed it was an investment, as in the case of a wire transfer request form in the amount of $1,230,000.00 to Jefferson Bank and Trust to an account owned by NPS. BT Vol. III, 114:18-25; Ex. P-104, pg. 1069. Even though Mr. Morisse did not know what specific investment there was for $1,230,000, he believed "the transaction [was] permissible under the law because it's the direction of the outside investment advisor." BT Vol. III, 115:3-4. If a fax came in from NPS, Allegiant Bank accepted the fax as the direction of Wulf, Bates & Murphy to transfer funds. BT Vol. III, 116:14-18.

219. There were no protocols adopted at Allegiant Bank requiring Mr. Morisse to know about wires $100,000.00 and above, $1,000,000.00 and above, or $2,000,000.00 and above. BT

Vol. XX, 161:19-162:1. Mr. Morisse actually wrote the Delegation Letter where any employee of NPS could give Allegiant Bank direction and the direction will be accepted, on behalf of the outside investment advisor. BT Vol. XX, 162:6-15. He knew all of the faxed wire transfers came from NPS offices. BT Vol. XX, 162:16-18.

220. Individuals in the Operations Department were made aware, by him, the wire transfer request faxes were to be immediately processed. BT Vol. XX, 163:6-9. While Mr. Morisse cannot recall a single instance where the Operations Department halted a wire transfer or said, we have to do some verification before we send out this money, he believed there may have been occasions when they had to contact Mr. Wulf or NPS. BT Vol. XX, 163:24-164:4.

221. Allegiant's system of automatically processing all of NPS's wire transfer requests during its tenure as trustee without performing any form of scrutiny or review was a deviation from the industry standard of care. BT Vol. XIII, 42:1-25.

C.      *Policy Mismatching and Premiums Payments*

222. Policy "mismatching" was a term supported in the record, describing the practice of funding paid-in-full consumer preneed contracts with insurance policies requiring ongoing premium payments. BT Vol. VI, 82:12-20. Mismatching was prevalent through Allegiant's period as trustee. BT Vol. VI, 81:21-24. The vast majority of the Lincoln policies purchased by the Trusts were multi-pay policies which required monthly premiums to be paid for a period of years. BT Vol. VI, 59:25-60:24.

223. "Monthly renewals" were renewal premiums owed monthly on life insurance policies that are multi-pay policies rather than paid-in-full policies. BT Vol. VI, 94:10-20. During its tenure as trustee, Allegiant wired tens of millions of dollars out of the Trusts to Lincoln for monthly renewal premiums. Ex. P-2301.

224. The Trusts owed monthly renewal premiums on the policies, primarily because of the mismatching policy. BT Vol. VI, 94:21-23.

225. Premiums were being paid to Lincoln. BT Vol. II, 141:13. There is a difference between a premium to purchase a policy and a renewal premium. BT Vol. II, 141:19-21. A renewal premium should not exist for a paid-in-full policy. BT Vol. II, 141:22-24. Mr. Morisse claimed he did not see any evidence of renewal premiums being paid out of the Trusts until this litigation. BT Vol. II, 142:9-15. Mr. Morisse would have inquired with respect to what renewal premiums were if he had seen evidence of them in the monthly packets. BT Vol. II, 144:3-7. Mr. Morisse had no experience with paid-in-full policies that had renewal premiums. BT Vol. II, 145:5-11. In these packets, NPS never certified premiums were not owed on the policies. BT Vol. II, 145:21-23. Nor did Lincoln ever certify these policies were paid-in-full. BT Vol. II, 145:12-14.

226. Mr. Morisse believed the policies being purchased were all paid-in-full policies. BT Vol. III, 17:4-6. He admitted Allegiant Bank had no idea how many policies were being purchased with premium terms of five or ten years. BT Vol. III, 17:12-17.

227. This mismatching practice allowed the Trusts to pay a small amount of initial premiums to Lincoln to purchase a large face amount of coverage. BT Vol. VI, 66:7-22, 72:8-19. However, the mismatched policies required premium payments over the life of the policy that greatly exceeded the amount of funds deposited into the Trusts from the consumer. *Id*. at 87:13-20. As a result, new money coming into the Trusts was being used to pay premiums on existing Lincoln policies for other consumers. BT Vol. XXII, 61:21-25; Ex. P-2398, 502:19-23. The mismatching practice freed up funds in the Trusts because the Trusts only had to pay a small initial premium to purchase the mismatched policies. BT Vol. VIII, 108:12-109:23.

228. During Allegiant's trusteeship, roughly 21,000 Missouri consumers paid-in-full for their preneed contracts, and 81 percent of these contracts were backed with multi-pay policies which required premiums to be paid over a period of years. Ex. P-2321; BT Vol. VI, 83:22-86:1; JSF.

229. In September 1998, the statement for Trust IV listed $51,536,545.74 in evidence of insurance. Ex. P-101D, pg. 9. Mr. Morisse believed these to be paid-in-full policies. BT Vol. III, 94:17-19. He believed Allegiant Bank had the obligation to keep adequate records of the insurance assets. BT Vol. III, 94:23-25. According to Allegiant Bank's records, on September 25, 1998, it wired $393,396.12 out of Trust IV to Lincoln with the description "per investment advisor, monthly renewals." Ex. P-101D, pg. 14.

230. Allegiant Bank had the obligation to accurately record transactions. BT Vol. III, 95:6-13, 97:7-12. If Mr. Morisse had looked at a policy he should have been keeping under Chapter 436, at the very beginning of Allegiant's tenure, he could have seen the policies were not paid-in-full policies, because Allegiant was paying monthly premiums. BT Vol. III, 96:17-23. Mr. Morisse stated this would have suggested further inquiry by him. BT Vol. III, 98:2-10. He may have called Wulf, Bates & Murphy. BT Vol. III, 98:14-17. He would have made an effort to reconcile the transaction description with records that the Bank had received with respect to the monthly packets. BT Vol. III, 98:22-25.

231. The monthly packets never claimed the policies were paid-in-full and never showed premiums were not owed. BT Vol. III, 99:1-6.

232. Allegiant Bank listed $54.6 million in evidence of Lincoln policies in October 1998. Ex. P-101D, pg. 19. On October 30, 1998, there was a wire transfer to Lincoln, transferring

money out of Trust IV "per investment advisor – monthly renewals." *Id.* at pg. 24. Mr. Morisse did not routinely look at the monthly trust statements he signed. BT Vol. III, 101:9-13.

233. The November 1998 statement was an Allegiant Bank record. BT Vol. III, 101:14-18. There was a wire transfer of $444,658.22 cash to Lincoln "per investment advisor - monthly renewals." Ex. P-101D, pg. 32. If Mr. Morisse had ever seen these "monthly renewal" notes on Allegiant's own records, he may have inquired into it. BT Vol. III, 103:1-5.

234. A wire transfer form from January 1999 showed the monthly renewals were increasing to $494,000.00. Ex. P-104, pg. 1189. The Trust IV statement for March 1999 transferred $511,000.00 in cash to Lincoln, again marked "monthly renewals." Ex. P-101D, pg. 63. In five months, $2 million was transferred from Trust IV to Lincoln for monthly renewals. BT Vol. III, 107:4-7.

235. In early 2004, NCB performed a sample of 60 life insurance policies assisted by Mr. Morisse. BT Vol. III, 80:13-15. It was at this time Mr. Morisse first learned there were not actual paper policies supporting each insurance policy. BT Vol. III, 81:7-19.

236. The sampling of 60 insurance policies included an application for life insurance from Lincoln for consumer Dorothy Littleton. Ex. P-685. According to the prearranged funeral agreement, included in the application, Ms. Littleton paid, in full, $9,427.00, with $7,540.00 (80%) going into the trust. Ex. P-685. There was a check mark by the words "paid in full." *Id.* The data page, included in every application, summarized the policy of insurance purchased for the consumer; here, Ms. Littleton. BT Vol. III, 85:17-86:1. Mr. Morisse first discovered there were data pages, either at the time of the NCB due diligence, or during the course of this litigation. *Id.* Ms. Littleton's whole-life insurance policy contract should have shown annual

premiums of zero, but instead, it showed annual premiums of $1,592.00 for ten years. Ex. P-685; BT Vol. III, 86:19-23.

237. An Allegiant record summarized insurance purchased from Lincoln for Ms. Littleton and showed premiums payable over ten years. Ex. P-669, pg. 4. This information was available to Mr. Morisse if it had been requested. BT Vol. XX, 231:22-25.

238. Even though Mr. Morisse did not believe Ms. Littleton was a beneficiary in the trust, he knew Allegiant Bank was to protect the assets of the trust for the benefit of anyone with a legal interest in the trust, including preneed contract owners and purchasers. BT Vol. III, 87:6-16.

239. According to the data page, the trust owed premiums to keep this whole-life policy in force. BT Vol. III, 91:16-19. If a premium was not paid, the policy could become worthless. BT Vol. III, 92:1-4. Even though the trust would be required to continue making premium payments, no further payments would be due by the preneed contract owner to NPS. BT Vol. III, 92:7-18. Mr. Morisse understood this. *Id*.

240. Because the money would not come from Ms. Littleton, it would have to come from the trust estate in some fashion, at the direction of Wulf, Bates & Murphy. BT Vol. III, 93:3-10. Mr. Morisse believed "any records with respect to investment management would be with Wulf, Bates & Murphy, not the Bank." BT Vol. III, 93:11-18. He did not believe Allegiant would have records showing money being transferred to Lincoln to pay for renewal premiums. BT Vol. III, 93:19-24.

241. On January 6, 2004, there was a wire transfer of funds to Lincoln for $6,258.36, and on January 7, 2004, there was a transfer in the amount of $2,091.49 to Lincoln. Ex. P-101D, pg. 1494. Mr. Morisse stated "It doesn't seem likely, but I would not have any way of knowing,"

when asked if common sense would have told him a combined sum of a little more than $8,000.00 was not being used to purchase approximately $10 million in paid-in-full policies. BT Vol. III, 69:2-7. The next wire transfer, dated January 8, 2004, is for $25,000.00 to Hollywood Forever, a California Cassity-owned cemetery. Ex. P-101D, pg. 1494. This amount was obviously not to purchase new life insurance policies. BT Vol. III, 69:21-23. Mr. Morisse believed there were times when the trust department loaned money to the Hollywood Forever cemetery. BT Vol. III, 69:18-20.

242. On January 8, 2004, Allegiant wired $854,589.72 to Lincoln. Ex. P-101D, pg. 1494. The wire transfer request form, kept by Allegiant, listed "Policy Loans" at the bottom. Ex. No. P-104, pg.1081. Mr. Morisse testified he was unaware of any policy loans. BT Vol. III, 70:24-71:9. He believed he would have expected it to be an investment advisor decision. *Id*. Mr. Morisse admitted if he had received this form, he could have read it and seen all the information on the form. BT Vol. III, 71:19-24.

243. The January 2004 trust statement listed $2 million wired to Lincoln on January 8, 2004. P-101D, pg. 1494. However, the wire transfer request form for that date stated the amount was wired to Lincoln Memorial Services, Inc., not Lincoln, the life insurance company. Ex. P-104, pg. 1079. Mr. Morisse confirmed the amount went to Lincoln Memorial, not Lincoln; thus, it could not be used to purchase new life insurance policies. BT Vol. III, 74:14-16. The trust loaned money to Lincoln Memorial Services, Inc., but a bank examiner, looking at Allegiant's records, would not understand the $2 million was not going to buy new policies. BT Vol. III, 75:3-6.

244. According to the January 2004 trust statement, on January 15, 2004, $2.6 million was disbursed to Lincoln. P-101D, pg. 1495. The wire transfer request form, again, stated the

money was disbursed to Lincoln Memorial Services, Inc., not Lincoln for new life insurance policies. Ex. P-0104, pg. 1087; BT Vol. III, 76:11-22.

245. The transactions to NPS and Hollywood Forever did not fit with buying $10 million of paid-up whole life policies from Lincoln. BT Vol. III, 76:23-77:11. The pattern displayed with this example, a monthly packet saying we are buying millions of policies, with wire transfer request forms indicating new policies were not purchased with the money, was followed every month throughout Allegiant's tenure. BT Vol. III, 77:25-78:6. Transactions were not tracked and, at no time, was there a reconciliation by Allegiant to see if the moneys leaving the trust were actually being used to purchase new paid-in-full whole-life policies. BT Vol. III, 78:7-12. Allegiant only kept track of distributions for promissory notes and mortgages. BT Vol. III, 79:8-13.

246. On May 17, 2004, near the end of Allegiant Bank's tenure, there was a wire transfer request from the investment advisor for $200,000.00. Ex. P-104, pg. 1189. Not only was "monthly renewals" checked, the form stated there was a "balance due of $454,000.00." *Id*. This was just before Trust IV was to be transferred to Bremen. BT Vol. III, 107:23-25.

247. The Trusts became unable to meet their monthly renewal premium obligations in a timely manner and were often many months behind on paying the premiums owed. BT Vol. VI, 95:10-96:12, 99:21-100:4; Ex. P-2301, pgs. 12-20. Many of the wire request forms sent to Allegiant showed "balances due" on the monthly renewal premium batches. Ex. P-104, pgs. 710, 716, 736, 742, 773, 775, 777, 783, 803, 806, 821, 823, 827, 831, 833, 838, 840, 857, 876, 894, 899, 903, 909, 941, 942, 962, 967, 975, 996, 1025, 1029, 1035, 1039, 1067, 1105, 1111, 1115, 1117, 1131, 1142, 1149, 1157, 1159, 1166, 1182, 1183, 1186, 1189. The balances due reflected

on the wire transfer forms showed the Trusts were only able to make partial payments in installments of the total balance of renewal premiums due. BT Vol. VI, 96:13-97:14.

248. The delinquent premiums owed by the Trusts resulted in Lincoln commonly paying less than the policies' face values to the Trusts at the time of the consumers' deaths. BT Vol. VI, 117:22-118:19.

249. Mr. Morisse did not look at several more million-dollar transfers during the period January through May 2004; he did not recall tracking, once again, each wire transfer wire transaction. BT Vol. XX, 213:25-214:4. He admitted, 173 times wire transfer forms said money was for monthly renewals but did not recall seeing the forms. BT Vol. XX, 214:12-14. Mr. Morisse was unaware and had no understanding insurance policies were coming due and needed to be renewed. BT Vol. XX, 201:12-17.

250. The description on Allegiant's records showed renewal premiums were being paid. BT Vol. XX, 202:1-4. Mr. Morisse did not routinely receive monthly statements. BT Vol. XX, 204:13-18. He explained he did review information, data, and transaction descriptions included in information that could be pulled up on a computer screen at his desk, and he did not recall seeing those transactions. *Id*. He did not use his computer to look at the statements in electronic form and see renewal premiums were being paid from Trust IV to Lincoln for policy renewals. BT Vol. XX, 204:19-24.

251. Mr. Morisse understood, as trust administrator, it was Allegiant's job to accurately value the assets in the Trusts, whether or not there was an outside investor. This included the Lincoln life insurance policies. BT Vol. XX, 220:9-12.

252. When Mr. Morisse inherited Trust IV from the former trustee, he did not inquire of the former trustee the identity of the existing consumers for whom money was held. BT Vol.

XX, 221:17-20. While he did not ask NPS that specific question, he was in possession of the monthly packets, which included the listing of policies for preneed contract purchasers and owners. BT Vol. XX, 221:21-222:1. Mr. Morisse admitted, at this time, he did not recognize these people as traditional trust beneficiaries. BT Vol. XX, 222:2-4.

253. A binder of all Trust IV contracts was presented to Mr. Morisse. Ex. P-2287A. The first person on the list was Joseph Bailey. *Id*. When Allegiant Bank took over the Trusts from Mercantile Bank, Allegiant did not specifically request information about what was on deposit for Mr. Bailey. BT Vol. XX, 223:2-12.

254. NPS made no representation, in writing, it was taking money deposited by each consumer and buying a paid-in-full policy. BT Vol. XX, 243:20-24. Nowhere in the monthly packets did Lincoln state the value of the policies or that no premiums were owed on these policies. *See* Ex. D-36; BT Vol. XX, 243:25-244:4.

255. The only information Lincoln provided in the list of policies in force in the monthly packets was client number, policy number, name, face amount of policy, and date, regarding new policies. Ex. D-36, pg. 6. There was no information regarding premiums or anything related to a cash value. BT Vol. XX, 245:22-25.

256. There was no specific information about how much Trust IV paid for the policies listed in the monthly packet. BT Vol. XX, 246:1-3. Attached to the monthly packet was 747 pages of life insurance policies, in force. Ex. D-36. There was no information supplied by NPS identifying how much cash was deposited into Trust IV for each consumer, other than face value of the policy. BT Vol. XX, 246:13-16. There was no information identifying the premium terms of the life insurance policies Trust IV was buying, or how much money the Trust paid for any of the policies listed in the monthly packet. BT Vol. XX, 246:17-23.

257. At no time did Allegiant, as trustee, ever ask for even a sample of the Lincoln policies, so it could say we have picked some from this list to show us the terms of the policy and what premiums are due. BT Vol. XX, 246:24-247:5. Mr. Morisse believed payment of premiums was outside the scope of the authority and responsibility of the Bank. *Id.*

258. If Mr. Morisse had kept copies, without repeatedly relying on representations from NPS, he could have easily determined almost all of the Lincoln life insurance policies were not whole-life policies, but were burdened with premiums payable for many years.

259. Policy mismatching was imprudent and presented "considerable financial risk" to the Trusts. BT Vol. X, 25:13-27:25. Lincoln's Chief Operating Officer expressed concerns at the time, between 1998 and 2004, about the "huge scale" of the mismatching practice taking place. BT Vol. VI, 87:9-88:1. Mr. Lumpkin understood the imprudent nature of the mismatching practice at the time, as it was apparent "the trust would not have the resources to continue to make their premium payments," because the premiums owed on the mismatching policies would exceed the amounts deposited in trust for the consumers. *Id.* at 87:13-20.

260. Defendants' actuarial expert confirmed the mismatching practice was "creating long-term problems for the trusts." BT Vol. XVIII, 112:24-113:2, 149:7-150:5, 158:2-5. A third party hired by NCB also agreed the insurance policies, whose premium terms far exceed the policies' face values, were imprudent and "ridiculous" investments. Ex. P-2354, 52:20-53:22. Even David Wulf testified the imprudent nature of the mismatching policies put the Trusts "behind the 8-ball." Ex. P-2398, 512:15-513:2.

D.    *Failure to Track Investment Activity in the Trusts*

261. Although, "[t]he Bank had ownership and control of the assets" there was no system to check and see if an investment was coming back for money going out; each wire transfer

request was not tracked. BT Vol. II, 155:1-20. Allegiant relied on the actions of Wulf, Bates & Murphy as the investment advisor. BT Vol. II, 155:15-17. Whether there is an independent investment advisor, Allegiant Bank understood its responsibilities under Chapter 436 were to protect the assets of the Trusts. BT Vol. II, 155:21-24.

262. Irrespective of Mr. Morisse's equivocal testimony, there was no tracking system at Allegiant Bank to see if money going out of trust was for an investment, Mr. Morisse believed reasonable safeguards were put in place so NPS could not inappropriately take money from Trust IV. BT Vol. XX, 194:4-10. He previously testified he believed reasonable safeguards were in place, and none of the safeguards included, when money goes out, we need to find out what investment the Trusts received in return. BT Vol. XX, 195:3-9. Mr. Morisse never wanted to track the wires out and see what Allegiant got as an asset back for the trust. BT Vol. XX, 195:20-24. Neither did he assign anyone to do that, and no one was trained to do that. BT Vol. XX, 195:25-196:3.

263. Mr. Morisse did not recall millions of dollars going out of the Trusts and no asset coming back. BT Vol. II, 185:1-5. He did not believe it was his job to look, when millions of dollars went out, to see if an asset came back. BT Vol. II, 185:6-9. He said, that would have been the job of the investment manager. *Id*. Reliance was placed on the investment manager. BT Vol. II, 185:10. There was no experience that he recalled with respect to a default or an issue with the investments. BT Vol. II, 185:10-12.

264. When asked if he just presumed if money went out, someday, something would come back, Mr. Morisse said the Bank was relying on the responsibilities of the investment manager. BT Vol. II, 154:11-15. Mr. Morisse believed the investment manager also had an obligation to the Trusts. BT Vol. II, 154:13-15.

265. Allegiant Bank was depending on Wulf, Bates & Murphy to inform the Bank of any investments it was purchasing. BT Vol. III, 38:15-17. If Wulf, Bates & Murphy did not send anything to the Bank, the Bank could not book anything on the trust statement, because the Bank did not chart investments. BT Vol. III, 38:18-21.

266. Mr. Morisse did not compare each wire transfer out during the course of a month, line by line, with information received in a monthly packet for an accounting period that would have matched that summary of wire transfers, but he acknowledged the information was there. BT Vol. XX, 213:17-21.

267. When asked if he could have attempted to reconcile the batch amounts listed in the monthly packet with wire transfers listed on Allegiant's trust statement for that month, Mr. Morisse stated "there could have been a tracking or matching. I think I said before I did not track wire transfers out." *See* D-36, pg. 4; BT Vol. XX, 242:1-5. When asked if he reviewed at the end of every month, on his computer, to make sure every time money went out an investment came back, he could only repeat what he said previously, he did not track every wire transfer in and out. BT Vol. XX, 160:16-19.

268. When asked if a prudent trust administrator overseeing NPS-specific trusts, governed by Missouri law, did not need to be assured when money is wired out as a supposed investment, the trust gets anything in return, Mr. Morisse replied "I think I've said I did no track wire out and wire in." BT Vol. XX, 161:2-6.

269. Mr. Morisse disagreed, as a prudent trust administrator, it was Allegiant's job to track whether an asset came back in return for the wires to the Cassity-owned entities. BT Vol. XX, 177:24-178:3. He, instead, testified the Bank relied on the investment advisor for that. *Id.*

He was not aware of a system capability for the Operations Department to check when money was wired out, if the Trust Department got anything back. BT Vol. XX, 178:7-15.

270. As to whether Allegiant had the capability to track money going out of the Trusts, Mr. Morisse testified he did not know exactly what the capacities and capabilities of the trust accounting system were beyond any understanding of the ticklers for interest payments. BT Vol. XX, 178:16-21. Mr. Morisse did not know how it could be done for the trust department to track if an asset was received in return for money wired out of the trust. BT Vol. XX, 178:22-25. Mr. Morisse spent a lot of time drafting documents for NPS which allowed NPS to raid the Trusts, but he could not opine an accounting method to assure the Trusts he administered were getting assets in return for money spent. This lack of fiduciary care, for the benefit and protection of the beneficiaries, demonstrates a striking lack of knowledge and reckless conduct in administering these Trusts.

271. Mr. Morisse, at all times, worked on the assumption whatever needed to be deposited had been fully deposited by NPS, and that 100 percent of what had been deposited was used to buy a life insurance policy on the individual and each policy was a paid-in-full policy. BT Vol. XX, 153:25-154:9. The assumption all policies being purchased were paid-in-full policies was not correct. Mr. Morisse actually created a document saying any employee at NPS could direct an investment on behalf of Wulf, Bates & Murphy, and every direction from NPS, as to what to do with money, must be obeyed by Allegiant Bank. BT Vol. XX, 154:10-16.

272. It was understood a direction from Mr. Wulf automatically made the transfer request an investment. BT Vol. XX, 154:17-24. Mr. Morisse would take any direction from NPS that said "carbon copy David Wulf," as if it was an investment direction. *Id*. When asked if Mr. Morisse ever believed there was a reason, as fiduciary at Allegiant, to check to see if money

going out as an alleged investment really brought an asset back to the Trusts, he answered, he never encountered a circumstance where he believed that. BT Vol. XX, 154:25-155:12. As to each specific wire transmission, Mr. Morisse believed there was no duty on the part of the fiduciary to check to see when money was wired out, and did an investment come back. BT Vol. XX, 155:13-16. He did not believe, as trust administrator, he needed to see the wire transfer forms for scrutiny. BT Vol. XX, 155:21-25. In reality, the wire transfer forms coming in requesting money be paid from Trusts were sometimes approved by a bank teller at Allegiant Bank.

273. David Wulf, as principal in Wulf, Bates & Murphy, was the investment advisor who made investments in primarily insurance policies in Trust IV. BT Vol. XX, 63:9-15. Mr. Morisse believed it was appropriate to wire money from Trust IV back to Lincoln to purchase insurance at Mr. Wulf's direction. BT Vol. XX, 64:6-12. When Mr. Morisse wired money out to Lincoln, he stated he would receive back, and book into the trust, assets in exchange for that money. BT Vol. XX, 64:13-16. Mr. Morisse never touched or saw one Lincoln policy in all of his six years as Allegiant Bank trust administrator. Mr. Morisse testified he received evidence of life insurance in exchange for the wire transfers to Lincoln. BT Vol. XX, 64:20-22. Once again, Mr. Morisse tried to lead the Court away from his acknowledged responsibility to keep the policies in Allegiant Bank, not possession of a substituted piece of paper, indicating the policies exist somewhere in the custody of some other entity, in clear violation or Chapter 436.031.2. Although Mr. Morisse did not say he saw any insurance policy, he believed he was getting assets back for the wire transfers to Lincoln. BT Vol. XX, 64:23-65:2. Mr. Morisse's explanation for booking assets was to go through the adjusting entry transaction description he prepared, and the operations department entered into the trust accounting system, so the face value of life

insurance as of the end of each monthly accounting period was adjusted accordingly. BT Vol. XX, 65:21-25. This was Mr. Morisse's definition of booking assets, not that he actually received the assets and not that entries were made for each consumer with the amount attributable to that consumer.

274. As an example of him "booking" an asset received in exchange for a wire transfer, Mr. Morisse identified a form which accounts for changes in the face value of life insurance policies in the monthly packet, due to new policies being purchased. Ex. P-101D, pg. 700; BT Vol. XX, 66:7-13. Obviously, when he referenced booking, he was not saying he received possession of a physical asset. He admitted he was not aware "of this whole multipay issue" at the time he was trustee. BT Vol. XX, 66:18-20. In fact, Mr. Morisse believed the policies he was purchasing, which he never saw or examined, were whole-life paid-up policies. The majority of policies he was buying actually required monthly premium payments and he approved hundreds of wire transfer forms sending money out of Trust IV to pay those monthly renewal premiums. This information was readily reviewable if he had examined the forms. He testified he never gave consent to purchase anything other than fully paid-up policies. BT Vol. XX, 66:21-23.

275. There was a separate summary of assets from a portfolio review, at the end of each accounting period, which listed all of the investments held in in the account. BT Vol. XX, 67:16-21. Life insurance policies were valued at face value. BT Vol. XX, 67:22-24. An annual statement of transactions showed receipts of wire transfers. Ex. P-101D, pg. 606. He believed there was nothing wrong with money going out of Trust IV to Lincoln. BT Vol. XX, 68:21-25.

276. Mr. Morisse believed, for the hundreds of wire transfers going out to Lincoln, he was getting assets back. BT Vol. XX, 68:1-6. If he had been keeping the insurance policies in the Bank, as required by Chapter 436.031.2, he could have seen whether he was getting policies

back. If he looked at the policies, he could have seen he was actually buying, contrary to his belief, not whole-life paid-up policies, but instead, multi-pay policies, for which there was no accumulation of cash surrender value and which required Trust IV to pay monthly renewal premiums for up to ten years, and a few for up to twenty years. His continual obvious substitution of lack of knowledge, compounded with knowingly violating Chapter 436.031.2 tears away Mr. Morisse's credibility.

277. Mr. Morisse believed when money went out of Trust IV, assets were coming back, but there is no dispute, the largest valued assets of the Trusts were insurance policies, which Mr. Morisse never saw, irrespective of his sworn testimony he "booked" the assets. This is false and intentionally misleading testimony. What he actually did was book what he called "evidence of insurance" of multi-pay policies held by someone other than Allegiant Bank. He, nor anyone at Allegiant Bank, ever touched one of the life insurance policies. The misleading testimony continued, when he confirmed the "assets came back," resulting in cash to the Trusts. BT Vol. XX, 69:6-8. He testified he believed from 1998 until 2004, the system with Lincoln worked. BT Vol. XX, 69:9-11. He does not acknowledge the "system," which he orchestrated, resulted in many millions of dollars of losses to the Trusts.

278. NCB's auditors concluded, in early 2004, Allegiant had "no tracking system unless [Allegiant went] to NPS." Ex. P-43, pg. 1; Ex. P-2358, 90:21-91:6. Allegiant's failure to maintain a tracking system of its own for the trust activity was a violation of the industry standard of care. BT Vol. VIII, 70:12-15.

279. Mr. Coster, Plaintiff's expert, testified Allegiant, as a trustee, was "not required to track each transaction, but they were responsible for assuring themselves that the assets were appropriate to the trust." BT Vol. XIII, 214:15-24.

E.      *Receipt of Netting Forms from NPS*

280. Chapter 436 and the Trust Agreement both prescribed upon death or cancellation, Allegiant was only permitted to distribute funds to NPS in an amount equal to what had been previously deposited into trust for that individual consumer's contract. Mo. Rev. Stat. § 436.045; Ex. P-168, pgs. 4-5; JSF.

281. All of the death claim distributions made by Allegiant during its trusteeship were done through the "netting form" transactions. BT Vol. VIII, 165:6-9, 170:1-12; Ex. P-105. Through these netting form transactions, Allegiant permitted NPS to offset the amounts NPS claimed it was owed for death claims from the 80% new business deposits NPS was required to make into the Trusts. BT Vol. VIII, 170:25-171:12, 172:18-173:12.

282. Netting forms[18] were documents NPS sent, monthly, to Allegiant Bank that reported new consumer deposits into the Trusts. These forms were sometimes referred to as reconciliation forms. BT Vol. II, 209:11-13. The netting form would be accompanied by a copy of the original check. Ex. P-105; BT Vol. II, 210:13-19.

283. The last sentence of Chapter 436.045 stated, "Upon delivery to the trustee of the provider's [funeral home] receipt for such payment, the trustee shall distribute to the seller from the trust an amount equal to all deposits made into the trust for the contract." Ex. D-5; BT Vol. II, 206:25-207:4. Paying too much money out to any funeral home beyond the amount on deposit was forbidden by the statute. Ex. D-5, pg. 12; BT Vol. II, 207:16-18; JSF.

284. Every netting form Mr. Morisse signed, although he did not sign every form, stated "Based on the information contained in this reconciliation statement, this deposit and distribution

---

[18] Forms, referenced by Plaintiffs' counsel, shown to Mr. Morisse, are interpreted by him to be receipts. Reconciliation forms, mentioned, he believes, are forms included in the monthly packets.

pursuant to Chapter 436 Revised Statutes of Missouri is hereby evidenced and accepted this date and time." Ex. P-105, pg. 15; BT Vol. II, 216:10-20.

285. Allegiant never understood what the netting forms meant and never performed any reconciliation or inquiry into the forms, but nonetheless signed the forms certifying they were prepared pursuant to Chapter 436. JSF.

286. The netting forms Allegiant received showed only a gross deposit amount for a group of preneed consumers without providing any detail regarding how many consumers were covered by the deposit being made into trust or how much money was being deposited by NPS for each consumer. BT Vol. VIII, 170:1-172:16.

287. A netting form for October 29, 1998, listed $97,366.09 and $132,307.83 to total $229,673.92. Ex. P-105, pg. 15. Mr. Morisse had no idea what the subsidiary numbers of $97,366.09 and $132,307.83 were, and he never asked anyone at NPS for an explanation of the numbers. BT Vol. II, 217:5-19.

288. According to Mr. Morisse, only the bottom portion of the netting form, which stated the net check amount, was kept by Allegiant Bank. BT Vol. II, 215:3-216:6. The top portion, which was signed by an Allegiant Bank employee certifying the deposit was accepted, was not kept, even though the form came to Allegiant Bank as a single page. *Id*. There were no backup documents submitted to Allegiant supporting the single page form. BT Vol. II. 216:7-9.

289. No information was included on the forms, nor on any other form, that told Allegiant Bank which customers were covered by this deposit or how much was being deposited for each consumer. BT Vol. II, 217:23-25. There was no reference on these forms, or any other forms, to allow Allegiant Bank to determine whether the preneed contracts were paid in full or payable over time. BT Vol. II, 218:6-9.

83

290. The netting form for October 29, 1998, also included a line titled "Less Death Cancel Contributions" with the number, $97,418.46. Ex. P-105, pg. 15. Mr. Morisse did not know what amount of that figure was for death claims and what amount was for policy cancellations. BT Vol. II, 218:12-17. The numbers on the forms were placed there by NPS. *Id*.

291. Allegiant allowed a series of low-level employees with no experience or training in Chapter 436 to sign the netting forms. For example, Pam Buchanan, an administrative assistant within the Allegiant trust department, routinely signed the netting forms on Allegiant's behalf. Her responsibilities at Allegiant included answering phones, typing letters, and taking care of the mail. Ms. Buchanan had no knowledge or training concerning preneed trusts or Chapter 436. Ex. P-2371, 17:3-14, 48:25-49:16, 57:2-58:20. Although Ms. Buchanan signed these netting forms confirming the death claim distributions were being made "pursuant to Chapter 436," Ms. Buchanan had no familiarity with the statute. *Id*.

292. In addition to low-level trust department employees, Allegiant routinely allowed bank tellers, who were not employees of the Trust Department, to execute and process the netting form transactions, through which millions of dollars in death claim distributions were made to NPS. Ex. P-105, pgs. 35, 77, 100, 133, 302.

293. On May 15, 2001, a deposit was made into Trust IV, from NPS, for $50,716.15. Ex. P-101D, pg. 451-5. The netting form, signed by Pam Rice, contained the Chapter 436 reconciliation language. Ex. P-105, pg. 151. The statement, after being signed, was sent back to NPS. BT Vol. III, 39:12-20. Mr. Morisse did not ever review this reconciliation statement or any of the others. BT Vol. III, 41:5-9. The form stated the total deposit of new consumer money was $362,447.83. Ex. P-105, pg. 151. Subtracted from this was $311,731.68. *Id*. However, Mr. Morisse never had an understanding as to what the form and numbers meant. BT Vol. III, 41:15-

23. Allegiant Bank would receive from NPS receipt forms with the checks and check stubs. BT Vol. III pg. 42:4-12. When Allegiant Bank was signing the form, authorizing $311,731.38 in death claims, the Bank did not have any of the death certificates or information of any kind to account for the amount. BT Vol. III, 43:7-18.

294. Allegiant's process of paying death claims through the netting forms, without obtaining supporting records or understanding the numbers depicted on the forms, was a violation of the industry standard of care for professional trustees. BT Vol. XIII, 21:1-18, 22:2-23:12, 110:9-111:4.

295. Allegiant violated its duties of prudence to control, protect, and keep proper records relating to the trust transactions by accepting the netting forms without requesting the consumer-level information for the deposits or death claim distributions referenced on the forms. BT Vol. XIII, 115:4-118:6.

296. Allegiant's conduct in distributing death claims to NPS through the netting form transactions without ensuring the distribution amounts complied with Chapter 436 and without obtaining the necessary backup detail improperly ceded control to NPS. BT Vol. 118:15-119:23.

F.    *Receipt of Reconciliation Statements from NPS*

297. Each reconciliation statement[19] of evidence of insurance policies required a signature from Allegiant which would be returned to NPS. Ex. P-107, pg.4; BT Vol. III, 53:9-17. The statement stated, "Based on the information contained in this reconciliation statement, the deposits and distributions pursuant to Chapter 436 Revised Statutes of Missouri are hereby evidenced and accepted this date and time." Ex. P-107, pg. 4. The reconciliation statement for September 1998, listed distributions of $252,355.97 for death claims and $26,903.22 for

---

[19] Although similar, the netting forms and the reconciliation statements were different documents provided to Allegiant on a regular basis.

cancellations of policies. Ex. P-107, pg. 4. Mr. Morisse, nor anyone else at Allegiant Bank, knew how much money Trust IV paid to purchase the policies in September 1998. BT Vol. III, 56:9-12.

298. During its entire tenure, Allegiant Bank adopted the process: death claims would be paid out during the month, followed a month later by a reconciliation form, with copies of death certificates or proof of funerals. BT Vol. IV, 163:23-164:5. At no time did Allegiant Bank consider what it disbursed for death claims to NPS to see if the number of death claims balanced with the check written by Allegiant Bank. BT Vol. IV, 164:6-10. Instead, Allegiant relied on the affidavit from NPS. *Id*. Allegiant Bank allowed NPS to take as much money out for death claims as NPS claimed it was entitled to receive. BT Vol. IV, 164:11-13.

299. The monthly packet for October 3, 2003, for Trust IV included a reconciliation statement showing eight batches of evidence of insurance being received. Ex. P-106, beginning on pg. 575. Mr. Morisse depended on the reconciliation statement for information on insurance. BT Vol. III, 51:25-52:2. The total face value of these new policies was $2.4 million. Ex. P-106, pg. 574; BT Vol. III, 52:23-25. No other information on the policies, such as cash surrender value or premium terms, was included. BT Vol. III, 53:1-5.

300. The January 2004 reconciliation statement for Trust IV would have been received in February 2004, as part of the monthly packet. Ex. P-107, pg. 67; BT Vol. III, 56:18-25. In this month, Trust IV purchased over $10 million in insurance policies from Lincoln. Ex. P-107, pg. 67. The January 2004 Trust IV statement of transactions listed the outgoing transfers from Trust IV to Lincoln to purchase the $10 million in new policies referenced on the reconciliation form. Ex. P-101D, pg. 1494; BT Vol. III, 58:7-11.

301. Reconciliation was not done with the monthly packets, because Allegiant Bank's records showed money moving in and out of the trust account was grossly in excess of deaths and cancellations. BT Vol. III, 144:10-15. On December 29, 1998, according to a Trust IV statement, Allegiant Bank received a $580,280.55 wire transfer into Trust IV. Ex. P-101D, pg. 39. The only reason Trust IV should have been receiving money from Lincoln was to pay death claims or cancellations, and if it was for death claims or cancellations, the money should have then been sent to NPS to be paid to funeral homes. BT Vol. III, 144:25-145:5. There is no explanation why Lincoln was sending $580,000 into Trust IV. BT Vol. III, 145:6-8. On December 30, 1998, $580,000.00 left the Trust. Ex. P-101D, pg. 35. The money was sent to Nations Bank. *Id*. This was not for death claims or cancellations, so the $580,000.00 should not have been sent out. BT Vol. III, 145:16-18. This was a confusing transaction to Mr. Morisse. *Id*. Death claim funds should have gone to NPS. BT Vol. III, 146:1.

302. Allegiant violated the industry standard of care by not maintaining consumer-level deposit records, because, as here, where there are multiple beneficiaries of a trust, the trustee must keep records of the individual deposits made for each consumer. BT Vol. XIII, 76:2-9, 77:3-8; BT Vol. VIII, 47:2-48:2.

303. In early 2004, NCB's auditors performed due diligence into Allegiant's administration of the Trusts and concluded "[t]here was no reconciliation performed by Allegiant to the support provided by NPS." Ex. P-42, pg. 2. The auditors also concluded "NPS provides Allegiant with monthly directions to make adjustments to the trust accounts. This information only includes the net increase/decrease adjustments to make to the trust account. There was no specific information included at the policy level for Allegiant to review." *Id*.

304. Allegiant's failure to reconcile the information received from NPS "to verify the activity that was going on in the trusts" and acceptance of direction from NPS to adjust the trust accounts, while only receiving limited information, violated the industry standard of care. BT Vol. VIII, 66:19-68:5.

305. Allegiant also violated the industry standard of care by failing to perform a reconciliation of the monthly trust activity showing the purposes for the wire transfers and the amounts paid for each Lincoln policy during that month. BT Vol. VIII, 48:14-22.

G.      *The World Service Group Term Policy*

306. In early 2000, Allegiant began wiring money out of Trust IV to pay premiums on a group term life insurance policy issued by World Service Life Insurance Company. BT Vol. VIII, 212:12-213:3; Ex. P-104, pgs. 157, 162. World Service Life Insurance Company was a Cassity-owned company and an affiliate of Lincoln. BT Vol. VI, 124:16-21.

307. On April 27, 2000, Allegiant Bank booked, on the Trust IV trust statement, the group policy as an asset in Trust IV for a purported cost basis of $13,522,337.35. Ex. P-101D, pg. 249. Cost basis meant what was paid for the asset. BT Vol. IV, 24:23-25:1. The World Service group term policy was issued to cover an existing $13.5 million trust liability relating to policy loans previously taken. BT Vol. VIII, 212:23-214:4; BT Vol. VI, 122:16-21. It was the result of a consent judgment between NPS and the state of Missouri and the subsequent monitoring of the Trusts by court-appointed monitor, Robert Lock. BT Vol. IX, 72:22-73:24, 174:8-12; Exs. D-19, pg. 1, D-20, pg. 2.

308. In April 2004, evidence of insurance in Cassity-owned insurance companies was 94 percent of the entire trust. BT Vol. II,175:15-18. The World Service Policy was more than eight

percent of the total value of Trust IV; not a single other investment was as large as the World Service policy, other than the Lincoln life insurance policies. BT Vol. II, 175:19-176:3.

309. Allegiant valued the World Service group term policy at its face value, which was $13,522,337.35. Allegiant never updated or changed the value of the group term policy, and instead carried the policy on its books as an asset of Trust IV with a purported value of $13.5 million through May 2004, when the asset was transferred to Bremen. Ex. P-101D, pg. 1598.

310. Allegiant would accept a whole-life policy with payments due over ten years as if it were a whole-life policy paid-in-full. BT Vol. IV, 35:2-5. Whatever the face of the term policy was, Allegiant added it to its books as if it were the same as a whole life policy paid-in-full. BT Vol. IV, 35:14-18. Allegiant never considered the quality of the asset. BT Vol. IV, 35:23-25.

311. Allegiant Bank never investigated to determine if $13.5 million was ever actually paid by Trust IV for the policy. BT Vol. IV, 26:6-8. Mr. Morisse knew enough about insurance to know a term policy has no cash accumulation value. BT Vol. IV, 26:23-25. Mr. Morisse knew a term policy became worthless when premiums were not paid beyond the grace period. BT Vol. IV, 27:1-3. However, he took no steps to ask for the policy to know when it could become worthless. BT Vol. IV, 27:6-10. Because it was booked as a trust asset, there should have been evidence of the policy to support the deposit to the account. *Id*. Mr. Morisse did not believe Allegiant's trust department needed to acquire a copy of the policy, because "evidence of the policy" satisfied the trust's requirements. BT Vol. IV, 27:21-28:17. He did not remember if evidence of the policy was used by Allegiant's trust department in place of actually looking at the policy. *Id*.

312. The policy represented a high percent of Trust IV when it was booked into Trust IV in 2000. BT Vol. IV, 28:18-22. Mr. Morisse would not admit this was a material amount of the

trust, stating material is a relative and subjective term. BT Vol. IV, 28:22-29:1. "The Bank was not determining the prudence of any specific investment action or deposit" no matter the size of the asset. BT Vol. IV, 29:9-14. Allegiant did not track to see if payments were being made on the $13.5 million policy. BT Vol. IV, 30:4-7. Mr. Morisse's conclusion Allegiant was not determining the prudence of any specific investment is alarming and suggests abdication of responsibility of fiduciary duty to consumer and funeral home beneficiaries.

313. Mr. Morisse did not remember asking why a $13.5 million policy was booked to Trust IV in 2000. BT Vol. IV, 37:11-16. He did not remember seeing the form that should have alerted him consumers' money was flowing out of Trust IV to pay renewal premiums for this policy that was going to lapse. BT Vol. IV, 37:17-21. He had a general understanding of insurance and that premiums must be paid to maintain a term policy in force. BT Vol. IV, 37:22-38:5. When it was placed in the trust, Mr. Morisse did not know the policy was created to cover policy loans made in other trusts. BT Vol. IV, 38:6-9. He did not ask why Allegiant suddenly received an insurance policy like no other policy seen in any other trust. BT Vol. IV, 38:22-25. He could have asked, but did not. BT Vol. IV, 39:1-2. If Mr. Morisse had learned the policy was created to cover policy loans made in other NPS trusts, he believed he would have inquired of Wulf, Bates & Murphy. BT Vol. IV, 39:19-40:2.

314. Mr. Morisse did not know of the World Service Insurance Company. BT Vol. IV, 36:3-5. Allegiant's wire transfer request form showed money was to be paid to Lincoln for a renewal premium. Ex. P-104, pg. 162. The policy required a monthly premium to be paid by the trust in order to keep the policy in force. BT Vol. VI, 124:1-11, 254:9-19; Ex. D-19, pg. 7. If Trust IV failed to pay the monthly premium on the group term policy, the policy would cease to exist. BT Vol. VI, 124:12-15.

315. Shortly after Allegiant booked the group term policy as an asset of Trust IV, the policy lapsed and ceased to exist. BT Vol. VI, 125:12-16; BT Vol. IX, 185:25-186:6; BT Vol. XII, 242:5-8.

316. Allegiant Bank's records indicated loans were being taken out covered by the group term policy. Ex. P-104, pg. 162. The wire transfer request form on February 2, 2000, stated "Group Term (Loan Coverage) Monthly Premium." P-104, pg. 162. He did not recall seeing this form, and did not know to what it referred. BT Vol. IV, 41:8-10. "It was the protocol that these faxes went to the operations area for execution." BT Vol. IV, 41:11-14. There was no inquiry by Allegiant into what loan coverage meant. BT Vol. IV, 42:15-19.

317. Mr. Morisse was familiar with the World Service issue, at the time of his testimony. Evidence was previously presented concerning a Boone County, Missouri proceeding, and a letter dated May 4, 2000, to Judge Gene Hamilton. Ex. D-165. Mr. Morisse never received copies of the Boone County proceeding, and no one from the State of Missouri Attorney General's Office or the Department of Insurance talked to him about the proceeding. BT Vol. XX, 26:4-12. Mr. Wittner said nothing to him about this. BT Vol. XX, 26:13-14. At no time during Allegiant's tenure, did he recall seeing any document relating to the proceeding, prior to litigation in this case. BT Vol. XX, 26:15-19.

318. Included in the letter to Judge Hamilton was the comment, "People don't buy automobile liability policies for their cash surrender value, and people don't buy funeral policies for their cash surrender value. The death benefit is the value of the bargain." Ex. D-165. This is a curious stray reference consistent with the approach Mr. Morisse took while he administered the Trusts. Mr. Morisse always believed, throughout his tenure, the policies were whole-life policies

with cash surrender values. He never understood he was authorizing purchases of life insurance policies accumulating no cash value, with premiums due over many years.

319. At some point, Mr. Morisse believed he was given evidence of the existence of a term insurance policy, known as the World Service policy, because he believed he would have relied on evidence of that policy for the purpose of booking it to the account. BT Vol. XX, 27:17-22. Mr. Morisse recalled there was a policy and no one reported to him the policy had been cancelled. BT Vol. XX, 28:7-13.

320. On April 19, 2000, NPS sent a letter to Robert Lock enclosing a copy of the policy. Ex. D-19. It was booked into Trust IV at face value. Ex. D-166; BT Vol. XX, 29:25-30:2. A letter was sent from Howard A. Wittner to Hon. Judge Gene Hamilton of the Circuit Court of Boone County, Missouri, reciting he was depositing a group term policy in the amount of $13,522,337.35, alleviating any deficit under a consent judgment. Ex. D-166.

321. This letter included a copy of Allegiant Bank's trust statement dated April 30, 2000, showing the insurance policy was booked. Ex. D-166, pg. 3. Mr. Morisse testified his memory was consistent for having booked the World Service group term policy for the initial base amount of $13,522,337,35 in Trust IV. BT Vol. XX, 29:2-6. He said no one ever approached him as to how this policy should be changed. BT Vol. XX, 29:20-24.

322. In March 2004, through Mr. Jurmanovich, NCB asked about the World Service group policy.[20] Ex. P-45; BT Vol. IV, 48:13-15. Mr. Morisse was embarrassed, when he was interviewed by NCB's auditors, Mr. Jurmanovich and Mr. Kipskind, and was asked about the World Service policy and evidence of the policy. BT Vol. IV, 51:12-16. When Mr. Jurmanovich

---

[20] During this time, NCB was performing a due diligence examination with a view of merging Allegiant Bank with NCB.

inquired of Mr. Morisse, in early 2004, about the World Service policy, Mr. Morisse may have looked into whether the policy still existed. BT Vol. IV, 54:1-7.

323. In the prior trial, Mr. Morisse testified, in early 2004, Mr. Jurmanovich inquired, causing Mr. Morisse to look into whether the World Service group term policy existed, "And when [he] looked into it, [he] could not find not just a piece of paper, [he] couldn't find that there existed any such asset at all." BT Vol. IV, 59:2-10. Mr. Morisse agreed he tried to follow-up to find such a policy, and it is more likely than not, he called Great American Insurance Company learning it had no record of the policy. BT Vol. IV, 59:11-60:7.

324. Mr. Morisse recalled generally making an inquiry of Lincoln, asking if it had back-up records for the World Service group term policy. BT Vol. IV, 60:8-11. He recalled generally, but not specifically, making an inquiry and could not find a listing for the World Service Company. BT Vol. IV, 60:15-22. His recollection was, as a result of his inquiries, nobody could provide him with any evidence of the $13.5 million World Service group term policy. BT Vol. IV, 60:23-61:1. Mr. Morisse confirmed he knew it was a requirement there be support for an asset booked into a trust. BT Vol. IV, 61:9-11. He confirmed he knew it was his job to correctly control, protect and record the assets, and he did that when it was booked in. BT Vol. IV, 61:12-14.

325. Mr. Morisse did not remember if he told Mr. Hipskind and Mr. Jurmanovich the valuation of the World Service policy never changed. BT Vol. IV, 52:21-53:1. He also did not remember telling Mr. Jurmanovich he did not know what backed the policy, whether it was insurance or something else. BT Vol. IV, 53:5-9. He did not believe he told NCB he looked into the World Service term policy and could not find there existed any such asset. BT Vol. IV, 53:15-24.

326. There was a vault count record, considered a serious document in trust administration, which was supposed to show assets being put in and taken out of the vault. BT Vol. IV, 25:9-18. Mr. Morisse believed it was presented to operations in the booking and deposit process, but did not remember if a record of the World Service term policy was ever deposited into Allegiant Bank's vault, and he did not recall ever seeing such record. BT Vol. IV, 25:19-26:5.

327. Mr. Morisse testified he did not recall if there was an item in or out shown on the log of the Bank's vault for the World Service policy, but said he was working with the operations manager, who had charge of the vault, who was assisting in the search. BT Vol. IV, 61:20-62:6. He admitted he continued to book the World Service group term policy month after month after these inquiries were made finding no support. BT Vol. IV, 62:7-14. As of April 30, 2004, Allegiant was still carrying the World Service group term policy on its portfolio investment books with a value of $13,522,337.35. Ex. No. P-101D, pg. 1541.

328. Mr. Morisse agreed, anyone reading the trust statement would logically conclude it was a true asset worth $13.5 million. BT Vol. IV, 70:12-15. He confirmed, in March 2004, when he could not provide paperwork showing the continued existence for the asset, the problem was escalated to senior trust department officers. BT Vol. IV, 70:18-23. The senior trust department officers and the back office were aware of and discussed this matter as a result of Mr. Jurmanovich's audit, and it was a concern of the back office to the administrative branch, because they were in charge of the vault count. BT Vol. IV, 70:21-71:2. The operations area vault manager was not able to locate evidence of insurance that was relied upon to book the asset. BT Vol. IV, 71:5-7. While Mr. Morisse would not agree it was alarming no support could

be found to show the continued existence of the asset, he agreed it was an issue that was proper to be brought to the attention of the persons he mentioned. BT Vol. IV, 71:8-13.

329. Mr. Morisse said he talked to the operations manager, Char Dupent, who managed the vault, and believed he talked to other members of the senior trust management committee about not finding support for the policy. BT Vol. IV, 68:8-18.

330. When asked if he let Shaun Hayes know no support could be found for the policy, Mr. Morisse said, "I don't know if Shaun Hayes knew." BT Vol. IV,72:5-7. He believed Mr. Jurmanovich was in communication with Mr. Franke, regarding his audit of the NPS account and his observation and findings regarding the World Service policy. BT Vol. IV, 72:8-14.

331. Mr. Morisse testified he knew the policy was a term policy and once premiums were not paid, the policy terminated. BT Vol. IV, 55:10-15. He admitted, to control, protect, and properly record the assets of Allegiant, it was important to know whether a $13.5 million asset ceased to have any value. BT Vol. IV, 55:19-23. He admitted, Allegiant did not affirmatively track the asset after it was booked. BT Vol. IV, 56:2-6. He admitted, if he was aware of information indicating it no longer existed, he would have acted to remove it from the books with an adjusting entry. *Id*. Mr. Morisse admits he made no effort over the years to determine if the policy had lapsed. BT Vol. IV, 56:15-19.

332. Thereafter, Mr. Morisse never changed the booking of the World Service policy. BT Vol. XX, 30:3-5 As of April 30, 2004, evidence of Lincoln insurance policies and the World Service group term life insurance policy were held as assets in Trust IV. Ex. P-101D, pg. 1541. In 2004, the World Services policy was booked, essentially, at the same value as it was in 2000. BT Vol. XX, 30:16-19. At the time Mr. Morisse booked this policy as an asset in Trust IV, in April 2004, near the end of his term as trustee of Trust IV, Mr. Morisse admitted he did not know

the policy "didn't exist." BT Vol. XX, 30:20-23. Mr. Morisse further embraced his belief the World Service policy still existed as an asset, because he said he had not received any information it had ceased to exist and should be removed from the account. BT Vol. XX, 31:5-10. Mr. Morisse was then asked if this was in April after his March conversation with Mr. Jurmanovich, where he asked him for backup. BT Vol. XX, 31:11-13. He first said, "That's correct," then disavowed recollection of that conversation relating to the World Service policy, saying he recalled no conversations relating to the World Service policy, until depositions for this litigation, when he was presented with a memo or notes from Mr. Jurmanovich relating to this policy that refreshed his recollection there was a conversation about the policy. BT Vol. XX, 31:16-23.

333. The Court believes, and finds, Mr. Morisse knew about this worthless policy while he was trustee of Allegiant Bank and finds he willingly and intentionally passed the policy to Bremen Bank as having a value as an asset in Trust IV of more than thirteen million dollars, when he knew it had no value. Furthermore, the Court recognizes he did not hold the policy in the Bank, as required by Chapter 436, so he never saw or examined the policy, a major asset in Trust IV, upon which consumers had a legal right to rely for payment of funerals. Mr. Morisse agreed, it was the custom and practice of the industry, if a trust department represented the market value of the asset, that was the true value of the asset. BT Vol. IV, 63:6-13.

334. Mr. Morisse testified, where there was an outside investment manager, custom and practice in the trust profession was, no inquiries would be made concerning an item. BT Vol. IV, 65:13-25. He said "No," when he was asked if the very existence of an outside investment manager allowed him, at Allegiant, to continue to list the policy after he made inquiries and found no support for the policy. BT Vol. IV, 66:7-11.

335. Daniel Fitzpatrick, Defendants's trust expert, opined, once the group term policy was accepted into the trust, it became an asset that was the responsibility of the investment advisor, Mr. Wulf. He also stated, while it was a breach of the standard of care for Mr. Morisse not to have removed the policy from Allegiant's trust statements as a trust asset once it expired, this did not cause any harm to the trust. BT Vol. XXI, 133:5-9, 138:7-139:22.

336. It was Allegiant's responsibility to accurately value the group term policy. BT Vol. XIII, 155:19-23. NCB's own fiduciary risk manager testified it was improper for Allegiant to value this group term policy at its face value. Simply put, "you don't make the face amount of your policy the market value." Ex. P-2357, 103:14-104:23. Allegiant violated the standard of care for professional trustees by valuing the group term policy at its face value. BT Vol. XIII, 155:8-156:7.

337. Allegiant violated the industry standard of care by failing to obtain an explanation regarding what obligations were being covered by the group term policy or why the asset was being placed into the trust account. BT Vol. XIII, 154:9-155:18.

338. Allegiant had an obligation to ensure the premium payments were made on the group term policy. Allegiant's conduct fell below the industry standard by not monitoring or tracking the premiums owed on the policy. BT Vol. XIII, 157:7-158:1.

*H.     Promissory Notes Held by the Trusts*

339. Promissory notes and loans from the Trusts were made to Cassity family members, and no promissory notes were made unrelated to the Cassitys. BT Vol. III, 117:5-11.

340. On June 5, 2001, Forever Enterprises, Inc., by its Chief Executive Officer, Brent Cassity, executed a promissory note in the amount of $1,653,988.00 to Allegiant Bank, Trustee under Trust for National Prearranged Services, Inc. Pre-Need Plans dated 7/24/89 – Trust IV,

("Lender"). Ex. P-534. The nominal annual interest rate was 7.5%, and payments were to be made in 120 equal payments. Ex. P-534. Mr. Morisse's handwritten note in the upper right-hand corner stated, "Forever Enterprises Note Due 6/5/11 A/C 22040135327." *Id*. Mr. Morisse described this as an "asset." BT Vol. XX, 77:10-11. He acknowledged Forever Enterprises, Inc. was a Cassity-related entity. BT Vol. XX, 77:15-16.

341. A "Master Security File" from Allegiant, dated July 13, 2001, listed a summary report of information relative to this note booked to the account as an investment. Ex. D-201, pg. 1. A unique CUSIP[21] was assigned to the note. BT Vol. XX, 79:19-80:2. Also included, with other information, was the 7.5% interest rate, the next payment date, and the "map release code," called "paydate." Ex. D-201, pg. 1. Mr. Morisse filled out a booking form for the note and gave it to "Operations." Ex. D-201, pg. 2; BT Vol. XX, 80:15-17. It included the amount of the asset, $1,653,988. Ex. D-201, pg. 2.

342. On the Statement of Transaction for July 1 through July 31, 2001, an entry on July 12th showed "Forever Enterprises Prom Note 7.5 % due 6/5/2011 to place on record in exchange for wire transfer of funds on 6/4/2001 FBO FORVER ENTERPRISES- $1,653,988.00." Ex. P-101D, pg. 485. Mr. Morisse testified all promissory notes and mortgages were paid-in-full through Allegiant's tenure as trustee. BT Vol. XX, 82:8-10. He did not view this as a bad investment by Mr. Wulf. BT Vol. XX, 82:21-22.

343. Mr. Morisse received a letter from Jean Maylack, dated October 24, 2002, transmitting the original note and a copy of a deed of trust as security for a $1,668,524.04 note. Ex. P-626.

---

[21] A CUSIP is a unique identification number assigned to all stocks and registered bonds in the United States and Canada.

344. An internal form recorded a wire transfer out of Trust IV, dated July 24, 2001, for $700,000.00 to Truman Bank. Ex. P-104, pg. 348. Another wire transfer was recorded for June 22, 2001, for $900,000.00 from Trust IV to Truman Bank. Ex. P-104, pg. 334. These totaled $1,600,000.00. Mr. Morisse said this corresponded with one of the wire transfer forms. BT Vol. XX, 84:25-85:2.

345. An internal form to the Operations Department booked a promissory note for $1,600,000.00 at 7.5% to Trust IV, due June 22, 2001, listing borrower as Lincoln Memorial Services, Inc. Ex. P-540, pg. 1. The note was signed by Nekol Province, Vice- President of Lincoln Memorial Services, Inc. Ex. P-540, pg. 4. The promissory note was secured by a deed of trust on property in Nantucket, Massachusetts. BT Vol. XX, 87:12-15. A handwritten note by Mr. Morisse showed he conferred with Randy Sutton about this investment. Ex. P-540, pg. 6. A Statement of Transactions form showed receipt of $1,600,000.00 from Lincoln Memorial Services, Inc. to Trust IV, dated July 25, 2001. The form showed two wires went out totaling $1,600,000.00. Ex. P-101D, pg. 694.

346. Mr. Morisse testified he received payments on the promissory note. BT Vol. XX, 89:10-11. A Statement of Transactions form with a line date of July 26, 2001, showed an interest payment of $5,625.00 on the $1,600,000.00 note. Ex. P-101D, pg. 649. Mr. Morisse confirmed he received 26 payments of $14,807.00 from August 21, 2001, to October 2003, on the note. Ex. D-642.

347. Jean Maylack sent a letter to Allegiant transmitting a declaration of trust of NPS in connection with the mortgage of the Nantucket property. Ex. D-251. Mr. Morisse received an asset back into Trust IV for the money going out of Trust IV. BT Vol. XX, 90:19-21.

348. When wire transfer forms came into the Allegiant Bank Trust Department requesting transfer of money from the Trusts, the Bank had its form to approve the request. BT Vol. XX, 91:10-15. $577,864.10 was transferred out of Trust IV to Central Trust Bank, Jefferson City, Missouri. Ex. P-104, pgs. 438-439.

349. The asset Mr. Morisse received in exchange for the money wired from Trust IV was a promissory note in the amount of $577,864.10, dated December 21, 2001, bearing an interest rate of 7.5%, and a default rate of 10%, due December 21, 2006, from Forever Network. Inc., a Cassity affiliate. Ex. P-562 pg. 1. The promissory note had an amortization payment schedule. Ex. P-562, pgs. 5-6. It was signed by Brent Cassity, President of Forever Network, Inc. *Id*. at pg. 4.

350. The notes were always drawn-up by Jean Maylack, attorney for NPS. BT Vol. III, 133:16-18. "The Bank was not involved in the construction of the loan terms, that was done by Wulf, Bates & Murphy and the entity." BT Vol. III, 134:14-16. After examining the paperwork including the promissory note for $577,000.00, Mr. Morisse testified "It does not appear that there's any security; that the note is not secured." BT Vol. III, 134:21-135:22. Mr. Morisse believed neither the Bank nor the trust company could require any security for the note; they did not have the authority. BT Vol. III, 136:6-10. It did not make any difference how much the Bank was going to loan to a Cassity-owned company; the terms were always dictated by the Cassity-owned companies' lawyer, Ms. Maylack and Wulf, Bates & Murphy. BT Vol. III, 136:11-16.

351. The Statement of Transactions showed an asset was booked into Trust IV on February 28, 2002, from Forever Network. Inc., "prom. nt." for $577,884.10. Ex. P-101D, pg. 747. From this note, between February 2001, and October 2003, Trust IV received payments totaling $70,527.59. Ex. D-644. Jean Maylack followed with a February 15, 2002, letter

conveying an original recorded deed of trust securing the loan and a Loan Policy of Title Insurance. Ex. D-222.

352. There was title insurance covering the $577,864.10 transaction. BT Vol. XX, 95:2-15; Ex. D-22, pg. 4. Five days after the loan was made, the money went out to a Cassity-owned entity, and an asset came back, with interest payments made, all during Allegiant Bank's tenure. BT Vol. XX, 95:12-23.

353. Trust IV statements for March 2002 showed the note and payment process and listed principal repayments on March 28, 2002, totaling $43,327. Ex. P-101D, pgs. 763, 765, 766, 768. On the next day, Allegiant wired $100,000.00, in trust principal, back out to NPS, with no explanation, except per direction of investment advisor. Ex. P-101D, pgs. 763, 765, 766, 768. Mr. Morisse was not aware of a system involving Cassitys taking note payments out of the trust. BT Vol. IV, 113:10-14.

354. On January 4, 2002, a request came in from Randy Sutton and Angie Hall of NPS with a "cc" to David Wulf directing Allegiant Bank to wire $70,000.00 of Trust IV money to Hollywood Forever, Inc., a Cassity-owned cemetery. Ex. P-104, pg. 453. Mr. Morisse did not know if it was a loan or what the direction from Wulf, Bates & Murphy was. BT Vol. III, 130:8-11. Mr. Morisse did not know the specific purpose of sending $70,000.00 to Hollywood Forever. BT Vol. III, 130:12-18. Because he did not know the specific purpose of the transfer, Mr. Morisse could not compare it to authorized investments. BT Vol. III, 130:19-21.

355. A disbursement was made, by wire transfer, from Trust IV for $455,780.00 on June 3, 2002, to Old Title and Escrow Service, in return for a five-year promissory note of Forever Illinois, Inc., bearing 7.5% interest, dated June 3, 2002, signed by Brent D. Cassity, President of

Forever Illinois, Inc. Ex. P-101D, pg. 856. Mr. Morisse personally noted money went out of Trust IV, and an asset returned. Ex. P-596, pg. 2; BT Vol. XX, 97:25-98:2.

356. On a Statement of Transactions form, on June 28, 2002, the Forever Illinois, Inc. promissory note for $455,780.00 was placed on record in exchange for transferred wired funds. Ex. P-101D, pg. 859. Mr. Morisse reported all payments on this note were current as of May 31, 2004, when he stepped down as trust administrator. Ex. D-646; BT Vol. XX, 100:3-5.

357. In an October 30, 2002 e-mail Mr. Morisse wrote, "I have just learned that Southwest Bank has committed to loan Forever Network 2 and a half million dollars to build a new mausoleum on the Oak Hill Cemetery grounds in Kirkwood at Big Bend and I-44." Ex. P-627. He then stated five years was the term, with a ten-year amortization with interest at prime plus one and a half payable in the first eighteen months, then principal and interest per amortization schedule; one half point with full guarantees by Mr. and Mr. Simon Cassity, Brent Cassity and Tyler Cassity. Ex. P-627.

358. Mr. Morisse believed at the time a reputable bank was willing to make the $2,500,000 loan. BT Vol. XX, 104:1-3. It appeared Allegiant Bank was willing to make the loan on different terms. BT Vol. XX, 104:20-23.

359. While Allegiant Bank was trustee of Trust IV, Trust IV began making loans to various Cassity entities, and in late 2003, two promissory notes from Lincoln Memorial Services, Inc. were consolidated. Ex. P-101D, pg. 1471; BT Vol. IV, 108:3-10. Mr. Morisse did not know or did not remember Lincoln Memorial Services was David Cassity's investment company. BT Vol. IV, 108:18-20. According to Allegiant, no approval by the Bank was required for consolidation of these loans, because the investment action was directed by the investment advisor. BT Vol. IV, 109:4-7. The prudence of these loan was not investigated by the Bank. BT

Vol. IV, 109:11-13. Mr. Morisse did not recall, if through these consolidations, the terms of these loans were going to be extended. BT Vol. IV, 109:18-21.

360. The 2003 year-end trust statement for Trust IV showed securities distributed from the trust and consolidation of Trust IV loans. Ex. P-101D, pg. 1470; BT Vol. IV, 108:8-10.

361. The terms of the novation, or consolidation, were not evaluated or investigated by the Bank, even though Lincoln Memorial Services borrowed millions of dollars from Trust IV. BT Vol. IV, 110:2-3. Instead of repaying the loans, they were consolidated and the terms of the loans were changed. The Court agrees, no harm is shown to the trust by these transactions.

362. The promissory note to Lincoln Memorial Services, Inc. was listed as a trust asset valued at $4,129,000.00. BT Vol. II, 164:1-3. At the end of Allegiant Bank's tenure, the sum of all non-Cassity assets in Trust IV were less than half of the one promissory note to a Cassity-owned entity. BT Vol. II, 164:7-10.

363. There was a second promissory note from Lincoln Memorial Services for $1,981,757.16. BT Vol. II, 165:7-9; Ex. P-101D, pg. 1540. There was no investigation by Allegiant Bank to determine why millions of dollars were being loaned to Lincoln Memorial Services; the loan was never questioned. BT Vol. II, 165:12-19. The two promissory notes from Lincoln Memorial Services Inc. totaled $6 million, or four percent of Trust IV assets, an amount far greater than the amount of cash and non-Cassity assets. Ex. P-101D, pg. 1540; BT Vol. II, 165:23-166:13.

364. The promissory notes held by the Trusts had commercially reasonable interest rates, generally 7.5%. BT Vol. XX, 78:2-3; Ex. P-534, pg. 1; Ex. P-540, pgs. 1-2. Payments were made on these notes regularly and all payments were current as of the end of Allegiant's tenure as trustee. BT Vol. XX, 82:6-10, 102:13-21; Exs. D-641, D-642, D-643, D-644, D-645, D-646; BT

Vol. VI, 9:18-10:11. Many of the notes were secured. BT Vol. XX, 82:23-84:4; Ex. P-626, pg. 2; Ex. P-540, pg. 2.

365. In January 2004, there was a $2,000,000 transfer to Truman Bank from Trust IV. Ex. P-104, pg. 1079. When Mr. Morisse wired money to NPS affiliates or its principals, he said he expected the trust to get "things back." BT Vol. XX, 101:25-102:7. He did not recall if at the time of this transaction, a note came back. BT Vol. XX, 102:8-11.

I.      *The Custody Agreement*

366. Mr. Morisse drafted the Letter of Direction from Wulf, Bates & Murphy, dated November 1, 1999, titled "Custody agreement for life insurance policies held under National Prearranged Services, Inc. preneed plan trusts." Ex. P-421; Ex. P-414[22]; BT Vol. IV, 165:6-7.

367. Mr. Morisse stated he drafted it, on the recommendation of bank examiners after the Bank's first examination by the Missouri Division of Finance, to memorialize and document the practice. BT Vol. IV, 165:9-15. Mr. Morisse intended for NPS to serve as Allegiant Bank's agent for purposes of keeping all the life insurance policies and records required under Chapter 436. BT Vol. IV, 166:3-6. The Court does not believe the bank examiners recommended this procedure, and Mr. Morisse is being untruthful in so stating.

368. The Custody Agreement identified the number of insurance policies held as investments in the Trusts. Ex. P-414. It stated, "Custodian, in its capacity as grantor of the Trusts, keeps and maintains records, accountings, and other information relating to the policies held in the Trusts, as well as all of the records, accountings and other information required to be kept and maintained by the Grantor of the Trusts under Chapter 436." Ex. P-414, pg. 10. Through this agreement, Mr. Morisse abdicated essential duties as trust administrator.

---

[22] Exhibit P-421 is the executed copy of the Custody Agreement; Exhibit P-414 is the draft version.

369. In the Custody Agreement Mr. Morisse drafted, he created a new entity, "custodian," and empowered it to designate agents, and explained it could receive directions:

2. CUSTODIAN'S DESIGNATED AGENTS

The Custodian designates the following named employees of the Custodian and its agents to be responsible for the performance of the Custodian's duties hereunder and to receive Directions pursuant to this Custody Agreement, to-wit: Angie Hall, Lisa Kaleps, Nekol Province and Randall K. Sutton. The Custodian shall give written notification of any change to this designation of authorized agents to the Trustee and to the Investment Advisor.

3. DIRECTIONS

Whenever the terms "Direction(s)" or "Direct" are used in this Custody Agreement, they shall mean written Directions (including, without limitation, Directions received by the Custodian via facsimile) and verbal Directions (including, without limitation, Directions received by the Custodian via telecommunications devices) which the Custodian receives and reasonably believes to be from an authorized employee, agent, or representative of the Trustee or from an authorized employee, agent or representative of the Investment Advisor.

Ex. P-414, pgs. 10-11. Mr. Morisse granted all these powers to this fashioned surrogate within NPS, when he knew NPS was a Cassity-owned entity, Lincoln was a Cassity-owned entity, and Wulf, Bates & Murphy occupied offices in the same building as the Cassitys and their entities. Then, in the following paragraph, in violation of Chapter 436 and the Trust Agreement, he

105

authorized a fictitious entity full right to hold custody and control of the life insurance policies, as follows:

> 4. SAFEKEEPING, RECEIPT AND DELIVERY OF POLICIES
>
> The Custodian agrees to hold and keep safely all life insurance policies owned by the Trustee as investments in the Trusts. The Custodian shall receive any life insurance policies purchased by the Investment Advisor and shall deliver any life insurance policies sold by the Investment Advisor in accordance with the directions of the Investment Advisor.

Ex. P-414, pg. 11. The following paragraphs of the Custody Agreement provided for liquidation of the policies and cancellation of the preneed contracts, and other powers of the custodian. Mr. Morisse outlined the custodian's liability, stating this imagined custodian, shall be responsible to the trustee for any claim, loss or damage resulting from any failure by the Custodian to perform its duties hereunder. This so-called Custodian, authorized to receive no compensation, is an empty shell, with no ability to be financially responsible to anyone. Mr. Morisse knowingly gave the Cassitys the keys to the trust assets. A draftsman for the Cassitys could not have been more efficacious in abdicating fiduciary responsibilities of Allegiant Bank, in violation of Chapter 436, than its own trust administrator.

370. The Court notes the Custody Agreement stated the insurance policies were held as investments "in the trusts." Ex. P-414, pg. 1. Mr. Morisse did not draft the Custody Agreement to say the insurance policies are held in trust by the trustee. He wrote the phrase "Custodian, in its capacity as Grantor of the Trusts, keeps and maintains records, accountings and other information relating to the policies held in the Trusts, as well as all of the records, accountings and other information required to be kept and maintained by the Grantor of the Trusts under

Chapter 436 R.S.Mo." Ex. P-414. These words described a "Custodian" as to be keeping records. There was no reference to a custodian in Chapter 436 definitions. The Court interprets Mr. Morisse's Custody Agreement to provide for the Grantor, NPS, to be custodian to hold the trust assets. This is in direct violation of Section 436.032.2 of Missouri statutes.

371. Mr. Morisse testified he was referring to records kept and maintained by the grantor of the Chapter 436 trusts. BT Vol. V, 227:5-7. Between the trustee and the grantor, he believed the trust instrument and Chapter 436 called upon the grantor to keep deposit specific customer information. BT Vol. V, 227:8-11. He believed the Custody Agreement gave him an enforceable contract. BT Vol. V, 227:12-14.

372. Mr. Morisse was asked "did you believe part of this contract called for a requirement on NPS to maintain custody and control of adequate records?" BT Vol. V, 227:15-18. He answered, yes. BT Vol. V, 227:18. Mr. Morisse said it was his understanding this agreement would respond to the bank examiners' concerns. BT Vol. V, 227:19-21. The Court concludes Mr. Morisse was being untruthful in his statement the bank examiners recommended he draft the Custody Agreement.

373. The Custody Agreement itself did not say the Custodian is defined as NPS, but clearly the intent was for the imagined custodian to function under control of NPS. Ex. P-414. Mr. Morisse always believed NPS was the only beneficiary of the Trusts, except he made reference to Allegiant also being a beneficiary. In any event, he believed the Custodian was functioning as NPS, so NPS, by this agreement, had custody and control of the trust assets, while being beneficiary of the Trusts. Mr. Morisse testified he believed paragraph four of his drafted Custody Agreement gave him a contractual right, on behalf of the trust, to require the custodian to hold and keep these policies. BT Vol. V, 228:21-229:2. Mr. Morisse violated the statute by

granting this authority to the seller and he breached his fiduciary duty to the consumer and funeral home beneficaries.

374. While this chasm is too expansive for the Court to bridge, Mr. Morisse believed subsequent bank examiners embraced his drafting skills. There is no support for this statement.

375. The executed copy of the three-page Custody Agreement with NPS was dated November 1, 1999. Ex. P-421. The Custody Agreement referred to more than 46,200 life insurance policies held by the Trusts at the time the agreement was signed. Ex. P-421, pg. 1. Allegiant, Wulf, Bates & Murphy and NPS all signed the agreement. *Id.* at pg. 3. It contained the safekeeping, receipt and delivery, and title provisions reviewed in the draft. Ex. P-421; BT Vol. V, 233:22-25.

376. Mr. Morisse memorialized this system, although he knew Chapter 436 required Allegiant Bank to maintain control over the trust assets. BT Vol. IV, 166:7-10. Mr. Morisse understood Allegiant Bank's responsibilities included owning, controlling, and administering the assets as required by the statute and Trust Agreement. BT Vol. IV, 167:5-9. When he drafted the Custody Agreement giving NPS the agency to keep the records, Mr. Morisse knew Chapter 436 mandated preneed trust funds be held in a financially chartered institution. BT Vol. IV, 167:13-15. No steps were taken to see if NPS was taking moneys to which it was not entitled. BT Vol. IV, 167:23-168:1.

377. Mr. Morisse also drafted a document, on letterhead of Wulf, Bates & Murphy, for Mr. Wulf's signature, dated November 5, 1999, containing language of delegation allowing certain transfers of funds to be made by certain people. Ex. P-432; BT Vol. IV, 169:3-5. This was not drafted by NPS lawyers. BT Vol. IV, 169:8-12. In drafting this document, Mr. Morisse intended it to be an instruction from Wulf, Bates & Murphy to Allegiant Bank's trust department

to distribute any cash, securities or other assets from any of the referenced trust accounts in accordance with any directions received by Allegiant Bank, by fax, telephone or in person from a principal, officer, employee, agent, or representative of Wulf, Bates & Murphy, Inc. or NPS. BT Vol. IV, 169:13-15; Ex. P-432. Mr. Morisse drafted this document so Allegiant Bank could distribute any cash, anything of value, securities, other assets, whatever was described there, from direction given by a principal, officer, employee, agent or representative of NPS. BT Vol. IV, 171:3-10.

378. Per the letter of direction, a principal, an officer, an employee, an agent or a representative of NPS could take money out of the trust accounts. Ex. P-432; BT Vol. IV, 172:24-173:2. Mr. Morisse knew this letter meant Allegiant's operations department had a standing instruction to wire money out of NPS preneed trust accounts, anytime a wire transfer request form was received, from anyone within the description of the person from NPS. BT Vol. IV, 173:19-174:9. Mr. Morisse gave every indication he was abdicating his fiduciary responsibilities. This action was a breach of trust.

> J.     *Policy Loans in the Trusts*

379. For the six years of Allegiant's tenure, there was a pattern, when NPS deposited money, it was by check. BT Vol. III, 137:22-24. Transaction descriptions for receipts were on a Trust IV statement. Ex. P-101D, pg. 367. When Lincoln sent money to a trust, it was by wire. BT Vol. III, 137:25-138:2.

380. A wire form transferring $760,124.07 into Trust IV from Lincoln, dated February 28, 2000, was processed as soon as it was delivered. Ex. P-28. The procedure Allegiant had to track if assets came into Trust IV after money, like $760,124.07, went out, was to look at the monthly packet from NPS the following month that was supposed to reconcile receipts and

deposits and purchases of new insurance and existing insurance as of that accounting period. BT Vol. IV, 132:13-19. No one from Allegiant discovered, after looking into the reconciliation packet, there was no support for $760,000.00 in death claims, because no such reconciliation was ever performed by Allegiant. BT Vol. IV, 133:2-13. The Bank relied solely on the reconciliation provided by NPS. BT Vol. IV, 133:16. No one at Allegiant tracked each wire deposit in or a wire transfer out. BT Vol. IV, 133:20-21.

381. A wire transfer form from Allegiant Bank's files showed money going into Trust IV with "policy loans" written on the form. Ex. P-28. Mr. Morisse did not know the identification of initials on the form. BT Vol. IV, 134:11-12. Mr. Morisse did not remember seeing the form and he could not guess as to what the meaning was, who wrote it, or when it was written. BT Vol. IV, 135:5-7. Mr. Morisse did not recall a particular industry standard or custom regarding whether a bank or trust company should pay attention to wire transfer forms showing money coming into a trust, other than to report the deposit as an amount to the account, from where the funds came, and the date. BT Vol. IV, 135:13-20.

382. The Trust IV account statement for October 1, 2000, through the end of December 31, 2000, showed a deposit on December 28th of $760,124.07. Ex. P-101D, pg. 372. The description simply stated: "Received wire transfer of funds from Lincoln Memorial Life Insurance Company." *Id*. The trust statement included no description as to why Trust IV should be receiving $760,000.00 from Lincoln. *Id*.

383. Even though Allegiant's own records stated "policy loans," on them, Allegiant's trust department did not include that description for the transaction on the trust statement. BT Vol. IV, 136:9-19. Mr. Morisse said his understanding of the industry custom and practice was to

report receipts, as was done on this statement. BT Vol. IV, 137:1-2. Allegiant Bank did not investigate receipt of these funds. BT Vol. IV, 137:20-24.

384. Money came into Trust IV November 8 through November 16, 2000, through wire transfers from Lincoln. Ex. P-101D, pg. 367. Mr. Morisse's expectation was Lincoln ought to be sending money for death claims or cancellations, and for no other purpose. BT Vol. III, 138:13-139:6. Mr. Morisse believed paperwork on received death claims or cancellations, explaining each deposit would have been reconciled in the monthly packets. BT Vol. III, 139:7-13. However, he recognized information received was not concurrent with the received fax forms and Allegiant Bank did not know which consumers were covered by these deposits with respect to each fax form and deposit transaction. BT Vol. III, 139:14-20. Other than as reported in the transaction description, the protocol at Allegiant Bank, throughout its tenure over the Trusts, was no one in the trust department would review the incoming deposits to evaluate specifically what the deposit represented. BT Vol. III, 139:21-140:1.

385. If Allegiant Bank had discovered information there may be policy loans, Mr. Morisse would have inquired. BT Vol. III, 140:2-5. Mr. Morisse believed if policy loans were made while Allegiant Bank was trustee, Allegiant would have needed to have been a party to the application process, because Allegiant Bank was both an owner and beneficiary of the insurance policies. BT Vol. III, 140:7-9. Even if Mr. Wulf could take policy loans against the Lincoln policies as an investment decision, Mr. Morisse believed the Bank would still need to be involved if a decision was made to take a policy loan. BT Vol. III, 140:10-18. He believed the Bank would need to give contractual authorization, that is, it should have signed whatever would be required by the policy or the insurance company to take out the loan. BT Vol. III, 140:16-23. Mr. Morisse was not aware of documentation concerning policy loans. BT Vol. III, 142:19.

386. On a wire transfer request form dated December 10, 2000, from Lincoln to Trust IV in the amount of $1,800,000.00, the only description on the form was an account number, LML-Tr4. Ex. P-647. Mr. Morisse did not recall seeing this at the time it occurred. BT Vol. III, 159:5-9. Mr. Morisse did not review the wire transfer request forms. BT Vol. III, 156:8-13.

387. Mr. Morisse was familiar, through this litigation, with "this" concept of policy loans. BT Vol. XX, 52:23-25.  He acknowledged Allegiant Bank was owner of the insurance policies. BT Vol. XX, 53:1-2. He was never asked to agree to a policy loan, nor was he ever provided with a form called a policy owner service request or asked to check a box and sign he wanted a policy loan. BT Vol. XX, 53:3-13. He did not know policy loans were being taken out on policies held in trust at Allegiant Bank. BT Vol. XX, 53:14-16. On a "Policy Owner Service Request" form for Lincoln, dated June 15, 2002, a policy loan was sought on policy no. 490169856, on insured Donald Hoehne for $367.06. Ex. P-1417. On the signature line for Insured (Owner if not listed), Randy Sutton's signature was stamped. Ex. P-1417. Mr. Morisse did not believe Mr. Sutton owned the policy. BT Vol. XX, 54:16-17.

388. In the December 2002 Trust IV monthly statement, on December 11th, Allegiant Bank booked $1,800,000.00 from Lincoln into Trust IV. Ex. P-101D, pg. 1015. The same day, there was a transfer out of Trust IV for the same amount, $1,000,800.00, to Memorial Services Life. *Id*. Mr. Morisse could not recall if Allegiant Bank ever purchased insurance policies from Memorial Services Life. BT Vol. III, 158:21-23. At the bottom of the statement, under the recap for insurance every month, there was "evidence of Insurance, Lincoln Memorial." Ex. P-101D, pg. 1015. Lincoln sent $1,800,000.00 into Trust IV, without explanation, and Allegiant disbursed it out of Trust IV the same day to an insurance company owned by the Cassitys. *Id*.; BT Vol. III, 159:17-24. Mr. Morisse disagreed this did not fit within an investment directive David Wulf was

112

qualified to give to purchase life insurance. BT Vol. III, 160:11-18. Mr. Morisse believed this was a distribution of funds going to Memorial Services Life per Wulf, Bates & Murphy. BT Vol. III, 161:23-25. Mr. Morisse understood it to be an investment. BT Vol. III, 162:4. Mr. Morisse gave every impression of being an intelligent man and at the same time gave answers in opposition to base common sense reality.

389. Mr. Morisse did not remember any policy loans being taken against the life insurance policies, which would have caused the cash values of the policies to be depleted. BT Vol. IV, 128:3-8. He did not look into the cash values of any policies held in any account. *Id.* Mr. Morisse knew if a policy loan was taken against a policy, the face value would remain the same and the policy would remain in force. BT Vol. IV, 128:25-129:5.

390. The only safeguard Allegiant had in place to guard against policy loans taken against insurance policies was to sign or not sign documents related to a policy loan, if, or as directed by the investment advisor. BT Vol. IV, 130:23-25, 131:7-9. There is no evidence Mr. Morisse, or anyone at Allegiant Bank, ever reviewed a single request for a policy loan or any request for distribution of trust assets.

391. A wire transfer form from Lincoln, dated January 5, 2004, showed Lincoln sending Trust IV $2,816,543.00. Ex. P-39. This record, kept by Allegiant, included "Policy Loan" as the description for the transfer. Ex. P-39. Because the file was kept with the Bank, Mr. Morisse could have referred to the form and the information on it. BT Vol. IV, 139:20-140:2.

392. On April 1, 2004, Lincoln sent a wire transfer to Allegiant for slightly more than three million dollars. Ex. P-50. If the wire transfer was for death claims, there should have been an enormous stack of death claim forms, and Allegiant Bank could have looked at the reconciliation packet to see if death claims totaled $3 million. BT Vol. IV, 141:19-142:1. Near

the end of the wire transfer form, the purpose for the transfer stated, "Pol loan." Ex. P-50. This form was part of Allegiant Bank's records. BT Vol. IV, 142:14-16. Police loans were being taken out, reducing asset values of the Trusts for six years and Mr. Morisse claims no knowledge of policy loans against trust assets he was to protect.

393. Mr. Morisse said it is "now" his understanding if a policy loan was taken out, money went into the Trusts. BT Vol. XX, 55:21-24. These wire transfer forms came to the Bank by fax. BT Vol. XX, 56:6-10. This particular fax did not have listed "policy loan," but did state, "POL. LOAN." Ex. P-50. While Mr. Morisse did not believe he saw this form, the Court concludes that is not unusual, considering his practice of not reviewing wire transfers. In any event, Mr. Morisse did not believe this fax coming into Allegiant Bank trust department should have put him on notice there was an issue with policy loans requiring his attention. BT Vol. XX, 56:17-22.

394. The Trust IV April 2004 statement recorded the receipt of the $3 million from Lincoln with no description listed. Ex. P-101D, pg. 1543. Mr. Morisse recognized $3 million was a large number, but would not say it was unusual. BT Vol. IV, 143:4-13. The protocol was for the operations department to book the receipts in by wire; there was no protocol in place to bring Mr. Morisse's attention to anything that struck the operations department as an unusual transaction in the Trusts. BT Vol. IV, 143:14-21.

395. Nearly $26 million in policy loans were taken against Lincoln policies owned by the Trusts during Allegiant's period as trustee. BT Vol. VIII, 164:1-4. It is undisputed these policy loans served to deplete the value of the policies. BT Vol. X, 24:20-25:5; BT Vol. XVIII, 113:3-7.

396. As seen *supra*, for every policy loan taken, Lincoln deposited the policy loan proceeds into the Trusts with Allegiant. BT Vol. VI, 103:22-25. Allegiant then immediately

transferred the funds back out to a Cassity-owned entity. BT Vol. VIII, 162:12-20, 163:17-22; BT Vol. IX, 195:22-196:1. Allegiant received "clear notice" of policy loans being taken against the Trusts' Lincoln policies. Ex. P-2391, 246:5-248:23. Lincoln did not conceal the existence of policy loans from Allegiant and always assumed Allegiant knew of the policy loans based on the documents Allegiant received showing policy loans. BT Vol. VI, 104:1-13.

397. Allegiant should have recognized these policy loan documents and transactions as "red flags" that were significant. Ex. P-2391, 247:8-248:16, Ex. P-2381, 97:7-10. The policy loan transactions typically involved large amounts of money being deposited into trust by Lincoln and then those funds being immediately transferred back out of the trust by Allegiant in the same or substantially similar dollar amounts. BT Vol. VIII, 153:1-13, 156:3-6. Allegiant was required to understand the purposes for which money was moving into and out of the Trusts and to properly account for all funds moving into and out of the Trusts, including the policy loan funds. BT Vol. XIII, 132:7-15.

398. David Wulf of Wulf, Bates & Murphy was indicted in the United States Court of the Eastern District of Missouri for executing a scheme to defraud Allegiant Bank by obtaining policy loans from Lincoln on life insurance policies without the knowledge or consent of Allegiant Bank. Ex. D-39. Allegiant was adjudicated to be a victim of NPS's fraud as to policy loans. The Court has never, in any conclusion, assumed Mr. Morisse, or anyone at Allegiant, was are of Cassity entity fraudulent behavior during Allegiant's tenure, but trust law is designed, as one feature, to detect unlawful activity in a trust. Neither Mr. Morisse, or anyone at Allegiant, did anything, despite volumes of information available, to ever inquire or become enlightened as to what was happening in the trusts being administered.

399. Mr. Morisse was asked by the United States Attorney's Office to testify in Mr. Wulf's criminal trial. BT Vol. XX, 59:20-25. Mr. Morisse said he had no knowledge of, and did not consent to the policy loans. BT Vol. XX, 61:9-11.

400. The United States Attorney's Office relied on Mr. Morisse to prove the loans happened without the consent of Allegiant Bank. BT Vol. XX, 61:12-18. Mr. Wulf was convicted, by a jury, in the Eastern District of Missouri, partially on the testimony of Mr. Morisse. BT Vol. XX, 61:19-24. Mr. Lumpkin was forced to admit, repeatedly, he defrauded Allegiant regarding these loans and so testified, under oath, in the criminal case. BT Vol. VI, 133:11-18, 134:10-135:12.

401. Randy Sutton plead guilty to Counts VII, XXIV, XLIII and IILXLII, of the same indictment under which Mr. Wulf was convicted. Ex. D-41. Douglas Cassity also plead guilty to Counts VII, XVII, XXI, XXIV, XXXVI and XLIIX. Ex. D-39. Douglas Cassity was sentenced to 115 months imprisonment for bank fraud, wire fraud, mail fraud, money laundering and misappropriation of insurance funds, and jeopardizing soundness of insurer. Ex. D-40.

402. Mr. Morisse did not believe he breached his duties related to the policy loans because he was not aware of them and did not consent to them or authorize them. BT Vol. XX, 63:2-8. The Court believes a reasonable trust administrator would, and should, have been aware of the policy loans, Mr. Morisse fashioned a system, by his pen, that allowed the taking of policy loans, to the detriment of the beneficiaries.

403. His understanding was the Bank would have been required to have been a party to policy loans, since the Bank was owner and beneficiary of the policies. BT Vol. XX, 214:15-20. However, it was also his testimony the independent financial advisor could take loans against policies held in Trust IV without obtaining authorization from the Bank. BT Vol. XX, 214:21-24.

This confirms how misguided Mr. Morisse was in his reliance on his flawed judgment of the power of the independent financial advisor when administering fiduciary trusts.

404. Mr. Morisse saw the indictment naming David Wulf for multiple felony fraud counts. Ex. D-39. The indictment stated, "on or about November 1, 1999, Wulf, Bates & Murphy, Inc., [NPS] and Allegiant Bank, the trustee at the time of prearranged funeral trusts established by [NPS], entered into a written agreement to transfer custody of all life insurance policies obtained with money provided by persons who purchased prearranged funeral contracts." Ex. D-39, pg. 29. Mr. Morisse recognized this was the language of the Custody Agreement he drafted. BT Vol. XX, 215:21-216:6. The indictment continued, "the agreement further provided that defendant Randall K. Sutton, and defendant Sharon Nekol Province, were among the employees of [NPS] who were its authorized agents to take custody of the life insurance policies which were being held as investments in the prearranged funeral trusts which NPS established." Ex. D-39. Mr. Morisse admitted, through the document he drafted, he authorized Randal Sutton and Sharon Nekol Province to take custody of the policies. BT Vol. XX, 216:18-21.

405. The indictment continued, "this agreement violated the requirements of Missouri law that all property in preneed trusts shall be held, administered and invested by the trustee, and circumvented the laws governing prearranged funeral contracts by permitting the seller of prearranged funeral contracts to acquire possession of the funds provided by purchasers of such contracts." Ex. D-39, pg. 29.

406. It stated, "on or about November 5, 1999, defendant David R. Wulf sent a letter to the President of Allegiant Trust Company, which provided that Allegiant Bank take direction from representatives of either Wulf, Bates & Murphy, Inc., or [NPS], with regard to depositing

and distribution of assets, and settlement of trades." Ex. D-39, pg. 30. Mr. Morisse was the drafter of this delegation letter. BT Vol. XX, 218:15-16. The indictment also stated this letter violated Missouri law, because it permitted [NPS], a seller of prearranged funeral contracts, to control and manage the property obtained from purchasers in prearranged funeral trusts, which it established. Ex. D-39, pg. 30.

> ### K.  The Prudence of Investments Held by the Trusts

407. As to his duty to look at prudence of any of the investments in the Trusts, Mr. Morisse "did not believe there was a responsibility to determine the prudence of any specific investment." BT Vol. II, 75:11-22. Furthermore, he believed no one else in Allegiant's trust department was supposed to check the prudence of any of the NPS specific trust investments. BT Vol. II, 75:23-76:1.

408. The Bank was aware, at all times, its own trust department was not going to look at the prudence of specific investments. BT Vol. II, 87:15-18. The Trust Committee was not informed there was no one in the Trust Department looking to ensure the prudence of the NPS trust portfolios. BT Vol. II, 90:6-13. The Trust Committee was also never informed the Trust Department was not checking to see if premiums were owed on the insurance policies in the Trusts. BT Vol. II, 90:25-91:13.

409. Allegiant Bank did not engage in determining the prudence of insurance investments BT Vol. III, 45:5-8. Without Mr. Morisse's signature, or another authorized person's signature, money could not leave the trust account. BT Vol. III, 49:5-8. Mr. Morisse could have said the money would not leave the account until the trust department has the name of the consumer for each life insurance policy and the amount the consumer deposited, but he did not.

410. Mr. Morisse operated the Trusts believing, under Chapter 436, the Bank was not to make any specific investment decisions for the Trusts. BT Vol. II, 106:16-23. He admitted Allegiant Bank never applied a prudent investment standard test to the Trusts. BT Vol. II, 107:3-10. "The Bank did not second guess Wulf, Bates & Murphy's specific decisions or actions." *Id*. The Bank did not review each and every specific investment transaction. BT Vol. II, 107:14-15. The Bank believed it need not and should not look at each individual investment decision in the trust. BT Vol. II, 107:16-21.

411. Mr. Morisse reviewed Chapter 436 in 1998, and determined Allegiant Bank's responsibilities under that law. BT Vol. II, 108:23-109:1. He did not put in place any testing, by the Bank, of trust investments. BT Vol. II, 109:2-18. Even knowing the Trusts were concentrated in Cassity-owned companies, the Bank did not monitor or oversee "investment decisions, investment action." BT Vol. II, 109:21-24, 110:2-6. The Bank's reasoning for any of the wire transfers was "following the direction of the investment advisor." BT Vol. II, 110:7-15. Mr. Morisse did not apply common sense as to whether the transactions were prudent or imprudent and did not "question the investment decisions." BT Vol. II, 111:14-17. He did not believe it was his place to question investment direction of Wulf, Bates & Murphy. BT Vol. II, 113:20-23.

412. Allegiant Bank did nothing to monitor Wulf, Bates & Murphy, including investments Wulf, Bates & Murphy was making with trust money. BT Vol. II, 113:24-114:18. If money went out of a trust to purchase an asset, Mr. Morisse did not monitor it to see if an investment came back into the trust. BT Vol. II, 115:20-116:9. Even if he saw investments he believed, based on his experience, were so far off the spectrum that they were not prudent at all, he still proceeded with the wire requests without second-guessing the direction. BT Vol. II, 117:9-118:1. Allegiant Bank did not act, even if Mr. Morisse decided the money flowing out of

119

the Trusts was imprudent, because "it was not [their] place and we were not equipped to be judging investment actions of the investment advisor." BT Vol. II, 120:20-121:4.

413. Mr. Morisse never called David Wulf to ask "Is this an investment or something else," for the wire transfer request forms Allegiant received. BT Vol. II, 205:15-19. Mr. Morisse never specifically asked Mr. Wulf if he was actually receiving copies of the wire request forms, or to ask for an explanation about a wire request. BT Vol. II, 205:20-206:1.

414. Even though people at Allegiant Bank were capable of studying the prudence of these investments, they were not asked to do so. BT Vol. II, 183:12-15. In 2001 or 2002, Allegiant Bank had on staff a professional who could look at the prudence of investments in trusts. BT Vol. II, 169:1-4. Matt Finn and Paul Steube had specific talent and training to judge the prudence of investments in trust assets. BT Vol. II, 169:5-11. However, Mr. Morisse, as trust administrator, never asked them to look at trust investments in the Trusts to determine if they were prudent investments. BT Vol. II, 169:12-16.

415. Mr. Morisse never asked Allegiant Bank's internal bank auditing department to review any of the assets in the Trusts, believing the audit department performed its responsibilities in accordance with their own procedure, and he did not have any occasion to ask an internal auditor to do anything with respect to the NPS accounts. BT Vol. II. 201:25-202:6.

416. Mr. Morisse believed "to obtain protection of the exoneration from the investment management of the accounts by Wulf, Bates & Murphy, [he] needed to reasonably believe and know the investments in the trust account were of a type permitted to be invested in by a reasonable – or by a prudent investment manager." BT Vol. II, 196:5-10.

417. On the Trust IV statement for the period January 1 through January 31, 1999, there was an entry showing Allegiant Bank received more than $1 million from Lincoln on January 28,

1999. Ex. P-101D, pg. 47. There was no mention of death claims or any notation in Allegiant's

records as to why it received this money. Ex. P-101D, pg. 47; BT Vol. III, 146:22-25. On the

Trust IV statement for February 1999, there was an entry showing $1,027,000.00 going out of

the Trust IV account. Ex. P-101D, pg. 52. Within a couple days, the exact amount came in and

went out of Trust IV. Ex. P-101D, pgs. 47, 52; BT Vol. III, 147:8-10. This amount went to

Jefferson Bank and Trust. Ex. P-101D, pg. 52; BT Vol. III, 147:11-14. Mr. Morisse did not know

why Allegiant Bank had no documentation for why $1 million would come into Trust IV from

Lincoln and back out within a day or two in the exact same amount. BT Vol. III, 147:18-21.

There was no investigation or determination by Allegiant Bank as to the specific prudence of that

wire transfer. BT Vol. III, 147:22-25.

    418. Mr. Morisse believed this was an investment decision but there was no investigation

to determine if it was an investment. BT Vol. III, 148:1-4. If it was an investment, paperwork

should have been returned or an asset should have been booked. BT Vol. III, 148:5-7. Mr.

Morisse stated it would be in the purview of Wulf, Bates & Murphy as to what the investment

was for this $1 million. BT Vol. III, 148:11-18. Here, there was no such evidence of paperwork

for an investment. Mr. Morisse's only explanation for the absence of any documentation for this

$1 million transfer out of Trust IV was, "it was an investment at the direction of the investment

advisor." BT Vol. III, 149:11-12. This was Mr. Morisse's common response when he could not

assign a logical reason for wire transfers out of the Trusts.

    419. It was always Allegiant Bank's job to book the investment, but only when the asset

was presented to book. BT Vol. III, 149:20-22. Allegiant's responsibility was to follow the

"usual fashion," but for Allegiant, there was no system in place to track whether an asset was

booked in return. BT Vol. III, 150:1-10. This transaction was not tracked. BT Vol. III, 150:10.

Clearly, no asset was booked on Allegiant Bank's records.

420. Because there was an outside investment advisor with investment authority for the

Trusts, Mr. Morisse thought there was a need to have written investment instructions recorded.

BT Vol. V, 244:14-245:5. Mr. Morisse explained, investments required adequate documentation

to prove consent of the outside party to avoid risk of being a guarantor of the investment, and

without proper documentation on an account subject to shared or outside investment authority,

the Bank would become liable for consequences of the investment. BT Vol. V, 245:6-19. He

believed this policy was consistent with the industry practice. BT Vol. V, 245:23-246:1.

421. Allegiant's Statement of Principles policy 2.10 (a) provided, "In addition to the

initial review, regulations require a review of the assets of each account for which the Bank has

investment responsibility. Regulators prescribe as a minimum that such reviews be made no less

frequently than once during each calendar year following the initial review." Ex. 2-94. Mr.

Morisse said annual reviews were performed. BT Vol. XX, 16:8-15. On an administrative review

sheet for preneed Trust IV, performed September 12, 2000, there was a notation "N/A" under

investment officer, because an investment officer was not assigned due to the account being

nondiscretionary. Ex. 2-94; BT Vol. XX, 17:1-3. Mr. Morisse noted investment review as not

applicable. BT Vol. XX, 17:15-21. He said this type of form was available to bank examiners.

BT Vol. XX, 17:22-24.

422. At the bottom of the form, he circled the word "direction," meaning it was a directed

account, nondiscretionary, directed by a party other than the Bank. Ex. 2-94, pg. 2; BT Vol. XX,

18:3-6. By it he wrote "NPS 11/1/99, custody agreement 11/1/99 Wulf, Bates & Murphy

11/5/99," referring to documents he drafted. BT Vol. XX, 18:7-13; Ex. 2-94, pg. 2.

423. On the portfolio investment review for Trust IV, Mr. Morisse noted "none" next to "investment powers," because the Bank was not authorized to exercise investment powers. BT Vol. XX, 19:16-19; Ex. 2-94, pg. 3. He designated "other," for investment objective because if the Bank had investment powers, there would be a code defining investment objective for the account; where there was no investment authority, the code for investment objective was "other." Ex. 2-94; BT Vol. XX, 19:20-25.

424. Mr. Morisse, from the beginning of his tenure as trustee, understood the role of written investment directions, which he described as something memorialized in a writing or a document from a party authorized to give direction to take action with respect to an account, whether it be investment action or some other action. BT Vol. XX, 35:7-11. He was familiar with the concept of risk management, which he described as basically involving administering and taking action that is within the authority of your powers and observing applicable procedures and laws in pursuance of minimizing or alleviating risk to the Bank in doing so. BT Vol. XX, 35:12-18. He was familiar with trusts without investment discretion, where assuming investment discretion could result in guarantor liability. BT Vol. XX, 35:19-24. Mr. Morisse said this impacted how he handled this account. BT Vol. XX, 35:25-36:1. Mr. Morisse acknowledged Allegiant Bank had policies about written investment directions. Ex. D-86; BT Vol. XX, 36:2-4.

425. Policy 2.14 referred to written investment directions. Ex. D-86, pg. 56. Mr. Morisse explained it applied to the Trusts, in that Wulf, Bates & Murphy had been designated as outside investment manager, and so the Bank would be looking to directions from Wulf, Bates & Murphy with respect to executing investment directions. BT Vol. XX, 36:18-22. The stated purpose of Policy 2.14 was, "when an account is subject to shared or outside investment authority, investment transactions require adequate documentation to prove the consent of the

123

outside party. Without proper documentation, the Bank runs the risk of being guarantor of the investment." Ex. D-86, pg. 56. Mr. Morisse thought this meant, because the Bank did not have investment authority or discretion, if it would take or make an investment action without evidence of the direction of the party who had sent that authority, then with respect to that investment, the Bank could be considered a guarantor. BT Vol. XX, 37:11-17. So, if something went wrong, arguably, the beneficiary of the trust could come against the Bank as a guarantor. *Id*. As already repeatedly noted, all the time Mr. Morisse was trustee for Allegiant Bank, up to the NCB due diligence or the litigation in this case, he believed the only beneficiaries of the Trusts were NPS and Allegiant Bank.

426. Mr. Morisse knew the Bank had a policy, where even if the Bank itself would not do something if it had investment discretion, it still executed the direction if there was an outside investment advisor. Ex. D-86, pg. 57; BT Vol. XX, 38:11-14.

427. The Bank's policy was to dispose of unsuitable assets in the best interest of the account, unless it received written investment instructions from all accounts that were custodial, self-directed, or in the case of NPS, had outside investment advisors, or where the customer required approval. Ex. D-86, pg. 57.

428. Mr. Morisse believed the purpose of this policy was to memorialize retention of assets the Bank may not have a policy of purchasing or retaining if it were exercising investment discretion. BT Vol. XX, 39:1-4. Policy 2.15 stated the Bank may retain assets if appropriately directed in the governing instrument, or by written instruction by a person holding appropriate power over the account to so direct. Ex. D-86, pg. 57. To Mr. Morisse, that meant, in the case of NPS accounts, if the outside investment advisor directed the purchase or retention of assets the assets would be retained per that direction, because the Bank did not have investment

124

responsibility or authority. BT Vol. XX, 39:13-17. Mr. Morisse periodically drafted letters of direction for specific investments he understood the investment advisor wanted the Trusts to make. BT Vol. XX, 39:18-21. When he drafted these letters of direction, Mr. Morisse did not believe he was doing anything wrong. BT Vol. XX, 40:9-12.

429. When a wire transfer request came to the Trust Department at the direction of Wulf, Bates & Murphy for an investment in a mortgage or a promissory note, Mr. Morisse would be advised by Wulf, Bates & Murphy, or more often by Jean Maylack who prepared the promissory note or mortgage. BT Vol. XX, 73:11-15. If a wire transfer to an entity resulted in a promissory note being owned by the trust, the direction for the wire transfer came from Wulf, Bates & Murphy, and sometime later a promissory note would be received and booked to the account. BT Vol. XX, 73:25-74:4. Mr. Morisse viewed that as appropriate investment activity. BT Vol. XX, 74:5-6. The Court recognizes no defaults occurred on the promissory notes booked as assets.

430. Whenever money was going out of a trust on approval of a wire transfer form that says "per investment advisor," 100 percent of the time, Mr. Morisse believed it was for an investment being made with trust moneys. BT Vol. XX, 157:23-158:4. The truth is, Mr. Morisse did not know the identity of all investments coming back into the Trusts, he did not know the type of investments coming into the Trusts, and millions of dollars were paid out of the Trusts, on request by Randy Sutton at NPS, for which no assets came back to the Trusts. He could only say, it was his belief, every time money went out under a wire "per direction of investment advisor," he would find a return investment booked by Allegiant. BT Vol. XX, 158:18-22. His belief is inconsistent with the overwhelming weight of evidence. Mr. Morisse personally, with others untrained, approved wire transfers and sent money out of the Trusts for reasons unrelated to asset acquisitions.

431. Mr. Morisse believed Allegiant Bank operated at all times on the assumption, if money is requested per direction of Wulf, Bates & Murphy, it was for an investment. BT Vol. XX, 165:22-25. Mr. Morisse agreed, as he sat in the witness stand, that more than 1,000 times, wire requests came in for money and on every single instance, money requested went out. BT Vol. XX, 166:16-20.

432. As already noted, Mr. Morisse reviewed a copy of Chapter 436 during the time Allegiant Bank was considering accepting the Trusts from Mercantile Bank, and he made hand written notes on his copy of the statute. Ex. D-5. He was familiar with the language of the statute which stated, "nor shall said assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in." BT Vol. XX, 167:1-5. He admitted he believed that did not direct Allegiant Bank, as trustee, to judge the prudence of any particular investment; Mr. Morisse believed the direction of the investment advisor should be followed. BT Vol. XX, 167:6-16. Mr. Morisse had a responsibility under Chapter 436 to judge the prudence of investments under the Trusts and he violated Missouri law by never taking actions to judge the prudence of the Trusts' assets.

433. Mr. Morisse was asked to review a request for a wire transfer of $112,000.00 from Trust IV to Forever Enterprises, Inc. and an authorization signed by him. Ex. P-104, pg. 458; BT Vol. XX, 179:6-16. When asked if he did anything to assure it was prudent use of trust funds, he replied, "we were relying on the financial advisor." BT Vol. XX, 179:17-19. He acknowledged there was nothing on the form he signed describing why $112,000.00 was being wired to Forever Enterprises. BT Vol. XX, 179:20-24.

434. Mr. Morisse could not tell the reason $112,000.00 was leaving the trust, other than from or on behalf of the investment advisor. BT Vol. XX, 179:25-180:3. He did not track

126

individual wires out. BT Vol. XX, 180:7-10. He said "I did not track wires out," and "I did have occasion to routinely review assets and investments held in the account." *Id*. That necessarily would not have included the insurance policies, because they, or "evidence of the insurance policies" were in the custody of NPS, in violation of Chapter 436.031.2.

435. At the top of a wire transfer request form for $266,673.37 on February 2, 2000, was the description "group term loan coverage monthly premium." Ex. P-104, pg. 162. There was only one group term policy booked as an asset. BT Vol. IV, 34:4-6. Mr. Morisse did not recall seeing this form. BT Vol. IV, 34:9. At no time did Allegiant take steps to ensure the World Service group policy was a prudent investment of the trust, because the Bank did not question prudence of specific investment actions by the outside investment advisor. BT Vol. IV, 34:12-16.

436. Another request, dated September 16, 2002, for money from Trust IV was a wire transfer form from Randy Sutton/Angie Hall with a CC: to Dave Wulf/Trip Bates – Wulf, Bates & Murphy. Ex. P-104, pg. 661. $40,000.00 was requested to be sent to National Prearranged Services, Inc., Iowa Funds. *Id*. There was nothing on the form suggesting why or for what purpose the money was to be used. *Id*. When asked for the identification for the permissible investment, Mr. Morisse's response was that would have been within the authority of the investment advisor. BT Vol. XX, 180:18-21. He said he relied on the investment advisor to make investments on behalf of the trust account pursuant to the Trust Agreement. BT Vol. XX, 180:22-181:1.

437. There was a wire request for $582,592.00 from Trust IV, dated March 23, 2004, to Forever Marin, a Cassity-owned Cemetery. Ex. P-104, pg. 1148. Mr. Morisse had no recollection of having seen this document previously. BT Vol. XX, 181:11-12.

438. Another wire transfer request, dated December 11, 2002, resulted in $1,800,000.00 going out of Trust IV to a Memorial Service Life account at JP Morgan Chase. Ex. P-104, pg. 744. Mr. Morisse did not recall what Trust IV received from sending $1,800,000 to Memorial Services Life, a Cassity-owned company. BT Vol. XX, 184:19-22. He said if there was an asset booked, it would be in the records of Allegiant. BT Vol. XX, 184:25-185:1. Mr. Morisse would not concede he was aware many times no asset came back when money was wired to a Cassity-owned entity. BT Vol. XX, 185:2-5. Mr. Morisse agreed there should be an asset located in return for $1,800,000.00 going out of Trust IV. BT Vol. XX, 185:6-8. After a review of Allegiant documents, the conclusion was no asset came back to Trust IV. BT Vol. XX, 188:2-12. Mr. Morisse testified he saw nothing for a specific $1,800,000.00 entry as a line item. *Id.*

439. On December 17, 2002, a wire form requested $250,720.75 be taken from Trust IV payable to Texas Forever Enterprises, d/b/a Lincoln Heritage Corporation. Ex. P-104, pg. 756. Mr. Morisse did not recall seeing this document. BT Vol. XX, 190:22-25. Mr. Morisse could not say the money went out for an asset, he did not know if it was for an investment, but stated his understanding and belief was if it was directed by Wulf, Bates & Murphy, it was for an investment. *Id.*

440. If it was for an investment something should come back to Trust IV. BT Vol. XX, 192:8-11. Mr. Morisse believed anything NPS sent with a carbon copy to Wulf, Bates & Murphy, was an investment directive. BT Vol. XX, 192:16-19. When asked, if NPS could take hundreds of thousands, millions of dollars from Trust IV over six years through a series of transactions, that were not for investments, Mr. Morisse said he did not experience that and he did not believe that was the case. BT Vol. XX, 192:23-193:2. He agreed funds were wired per documentation received, and he assumed any wire request was an investment, and Allegiant was

128

ordered to honor the requests. BT Vol. XX, 193:10-17. There is no doubt, $250,720.75 was wired out of Trust IV on wire requests and no assets came back to the trust.

441. As of April 2004, investment in non-Cassity companies was roughly one percent of Trust IV's investments. BT Vol. II, 176:4-7.

442. Allegiant's failure to monitor the trust investments and failure to ensure the assets of the Trusts were prudent was a violation of the industry standard of care for professional trustees in the Allegiant era. BT Vol. XIII, 131:15-19; BT Vol. XXII, 106:12-107:24.

*L.    Investment in the Caymus Fund*

443. The January 31, 2004, Trust IV statement referenced Evidence of Class B interest in Caymus Fund LP at a cost of $575,000.00, an investment in David Wulf's hedge fund. Ex. P-101D, pg. 1482. Allegiant received a private placement memorandum for the Caymus Fund which stated, "These securities are speculative and involve a high degree of risk. They have not been approved by any regulatory authority. They are subject to restriction on transferability and resale . . ." Ex. P-586. Even though Trust IV money going to the Caymus Fund involved a high degree of risk to beneficiaries of the trust, Allegiant Bank did not investigate the specific investment action by the outside investment advisor. BT Vol. IV, 104:12-25. Allegiant did not evaluate the investment risk to consumers or funeral homes. BT Vol. IV, 105:21-25.

444. From the memorandum, Allegiant learned the general partner of the Caymus Fund was Veritas Holdings, at 10 South Brentwood, Suite 315, the same address as NPS and of Wulf, Bates & Murphy. Ex. P-586; BT Vol. IV, 106:1-12. Furthermore, Allegiant Bank knew the principals of the general partnership of Caymus Fund were David Wulf, Charles Bates and Tony Lumpkin, with Wulf, Bates & Murphy as investment advisor of the Caymus Fund. BT Vol. IV,

106:13-19. There is no suggestion in the evidence this caused Mr. Morisse to question the independence of Wulf, Bates & Murphy as investment advisor for the Trusts.

445. The memorandum stated the Caymus Fund would pay the general partner a quarterly management fee. Ex. P-586, pg. 7. David Wulf was a principal of the general partner; thus, he stood to personally profit off management fees paid by Trust IV. BT Vol. IV, 107:13-17. There was no consideration of Mr. Wulf's relationship with NPS. BT Vol. IV, 107:18-22.

446. The April 2004 trust statement also listed an investment in Caymus Funds. Ex. P-101D, pg. 1540. Allegiant Bank did not interfere with Wulf, Bates & Murphy's direction to buy it. BT Vol. II, 171:3-15. If Wulf, Bates & Murphy wanted to invest $50 million in a hedge fund and gave directions to do so, the Bank would have executed those directions. BT Vol. II, 171:16-172:2. The high-risk nature of the Caymus Fund was not hidden from Allegiant. BT Vol. II, 172:10-13.

447. In another Letter of Direction Mr. Morisse prepared and drafted, dated April 8, 2002, Allegiant was directed by Mr. Wulf to purchase $100,000.00 Class B interest in Caymus Fund, L.P. for NPS Trust IV. Ex. D-234. Instead of the investment advisor approaching Mr. Morisse with an asset purchase document prepared by NPS, Mr. Morisse prepared the forms for NPS. Mr. Morisse's profile projects him as working more for NPS than for the Trusts' beneficiaries, the consumer and funeral homes.

448. Mr. Morisse believed he did nothing wrong in receiving the Letter of Direction and investing in Caymus. BT Vol. XX, 43:4-8. There was no suggestion the "class B" designation was of concern to him. He always believed, even if the Investment Advisor invested in a bad investment, he would take no action, because, his involvement might cause the Bank to be liable.

M.    *Debentures Held by Trust I*

130

449. When Allegiant Bank began its tenure, Trust I was supported by certificates of debenture. Ex. P-101A; BT Vol. II, 176:24-177:3. The debentures were from NPS. BT Vol. III, 117:12-13. Mr. Morisse believed a debenture was an unsecured promise to pay. BT Vol. XX, 196:16-21.

450. Mr. Morisse understood Trust I was a "spend-down trust," where there was no intention of conducting current or new business activity. BT Vol. XX, 111:19-112:1. It was essentially holding debentures, and adjusting evaluation or reconstruction of debentures as Allegiant Bank was presented with information. *Id.* It involved pre-1982 preneed contracts, which were covered by the prior version of Chapter 436. BT Vol. XIII, 219:6-220:19.

451. On August 28, 1998, Allegiant Bank accepted three certificates of debenture into Trust I from Mercantile Bank. Ex. P-101A, pg. 3. The certificates of debenture were booked in Trust I at the values formerly assigned by Mercantile with no verification of their true values. BT Vol. IV, 3:24-4:3. Even though Allegiant Bank would have control of these assets with the job of accurately valuing them for the next six years, when the certificates of debenture came to Allegiant Bank, Mr. Morisse did not have an understanding as to what certificates of debenture were, beyond an unsecured promise to pay and that they were issued by NPS. BT Vol. IV, 4:4-19.

452. There was an asset deposit of three debentures issued by NPS to Trust I on August 27, 1998, from Mercantile. Ex. P-345. The trust sent out no cash for the debentures. Ex. P-345. The Certificate of Debenture #1001 listed the amount as $496,744.58 issued to Mercantile Bank, dated April 24, 1997. Ex. P-556, pg. 5. An asset summary page as of August 31, 1998, for Trust I showed the three separate certificates of debenture as assets of the trust. Ex. P-101A, pg. 2.

453. The purported value of the NPS debentures was $1,689,000 or 97.5 per cent of the value of Trust I. BT Vol. II, 177:4-9. Consumers, whose funerals were prepaid and their money was to be in Trust I, were dependent on those unfunded debentures. BT Vol. II, 178:23-179:2. When Mr. Morisse assumed the role as trust administrator from the predecessor trustee, he did not request a list of consumers whose monies the debentures represented. BT Vol. XX, 199:11-15.

454. The Trust Agreement authorized the Trusts to hold debentures. Ex. P-168.

455. On January 31, 2003, Allegiant Bank accepted four new debentures numbers 1004, 1005, 1006, and 1007. Ex. P-101A, pg. 307. There was a novation, consolidation or reorganization to replace the old debentures. BT Vol. IV, 14:10-11. The new debentures were simply IOUs of NPS. BT Vol. IV, 14:20-22.

456. Debenture 1004 was a ten-year debenture for $1,006,000.00. Ex. P-340. Although it was dated August 14, 1998, it was really a new debenture in January 2003. BT Vol. IV, 19:11-15. Similarly, Debenture 1005 was a $1,805,572.51 certificate of debenture issued by NPS to Trust I, dated August 14, 1998. Ex. P-339. Allegiant Bank took no steps to ensure this certificate of debenture was a prudent trust investment, because that was the domain of Wulf, Bates & Murphy. BT Vol. IV, 15:24-16:14.

457. Between January 2003, when this certificate of debenture was booked, and May 2004, when Allegiant Bank resigned, it had responsibility to control this asset. BT Vol. IV, 17:9-12. In response to whether he accepted the responsibility to protect the consumers' moneys held in Trust I, Mr. Morisse stated, "The Bank accepted responsibility to perform its obligations under the statutes and the Trust Agreement." BT Vol. IV, 17:18-22. He believed Allegiant Bank always had the responsibility to "report" the value of "this" asset, which meant, to him, Allegiant Bank

had the responsibility to correctly "record" the market value of this asset "in accordance with its standards and understanding." BT Vol. IV, 18:5-9.

458. The debentures were to be updated monthly to accurately reflect the "obligations thereunder." BT Vol. IV, 20:9-12. The balance of the debenture should have changed every month, based on how many Trust I consumer beneficiaries died during that month, but the listed value of debenture 1004 on Allegiant's records was always a face value of $1,006,462.00. BT Vol. IV, 20:16-20:12. Mr. Morisse understood the debenture was an investment in the trust estate and NPS was obligated to provide the funeral services and update the value of the debenture. *Id*.

459. Mr. Morisse sent a "Memorandum" to the operations department, dated March 26, 2004, concerning reconciliation of the debenture. Ex. P-845 pg. 2. An adjusting entry was made as a result of information provided by NPS. BT Vol. IV, 22:9-10. Allegiant Bank was to complete this reconciliation every month for Trust I debentures, when it reviewed the reconciliations. BT Vol. IV, 22:17-19. NPS responded with a statement, accepted by Pam Buchanan at Allegiant, asking for the debenture amount paid to trust to increase by $94.76. Ex. P-845. This amount was not actually paid into the trust by NPS, but it was added to the debenture. BT Vol. IV, 23:1-4. No money was paid to the trust. Mr. Morisse did not know to what this $94.76 amount related, if it related to a payment by a preneed contract owner or for some other reason. BT Vol. IV, 23:18-20. He did not know if Allegiant Bank's records would tell him the answer. BT Vol. IV, 23:21-22. He believed the line on NPS's statement, "Less debentures: death and cancelation," represented the preneed consumers who had died. BT Vol. IV, 23:23-25; Ex. P-845.

460. When these consumers died, their money was not paid out of the trust to NPS. BT Vol. IV, 24:1-3. Instead, NPS paid for the funeral services and simply decreased the amount of

133

the debenture by the amount of payments it had made to consumers. BT Vol. IV, 24:8-10. This was the practice from the first day to the last in Trust I. BT Vol. IV, 24:11-13.

461. Mr. Morisse assumed NPS would only deduct from the debentures the amount to which it was entitled, so principal diminished each time NPS said it was paying a death claim. BT Vol. XX, 200:9-15. Mr. Morisse did not specifically know if there were life insurance policies for each of those people, or if it was simply a debenture representing cash value they had deposited. BT Vol. XX, 201:2-6. Mr. Morisse could not recall if, in 2004, when NCB questioned him about the debentures, the debentures were backed-up by insurance. BT Vol. XX, 201:7-11.

462. A portfolio investment review for Trust I, dated January 31, 2004, showed Trust I held $47,969.00 in cash equivalent assets, and NPS certificates of debenture, purportedly worth a little more than $3 million. Ex. P-101A, pg. 385.

463. During his term with Allegiant Bank, from 1998 to 2004, no payments became due on the debentures; thus, none were missed by NPS.  BT Vol. V, 125:4-7; Ex. D-11. Mr. Morisse was unaware of NPS ever missing a payment on a debenture while he was trustee. BT Vol. XX, 108:15-17.

464. When Allegiant transferred the assets to Bremen Bank, the debentures had grown to $2.7 million. Ex. P-101A, pg. 406; BT Vol. II, 182:2-7. Since consumers' moneys were backed by debentures, it was critical to know the prudence of the debentures. BT Vol. II, 182:8-19. However, Allegiant believed that was only important for the investment manager to determine. *Id*.

465. The final dollar amount of the four debentures valued by Allegiant Bank as of May 31, 2004, when they were transferred to Bremen, was $2,789,573.05. Ex. P-101A, pg. 412. Mr. Morisse described securities distributed from the account, including delivery of NPS certificates

of debenture no. 1004 in the amount of $571,959 "and change," and delivery of debentures 1005, 1006, 1007 in the total amount of $2,177,863 "and some change." BT Vol. XX, 111:2-8. He did not know if "Calmos" is Cayman" or a total return fund, but it was listed at $39,750.00. Ex. P-101A, pg. 416; BT Vol. XX, 111:2-8.

466. Allegiant had a responsibility to exercise control over the Trust I debentures during its period as trustee, as well as to accurately value the debentures. BT Vol. XIII, 143:18-144:5. Furthermore, Allegiant had an obligation to ensure the debentures were prudent and permissible assets under Chapter 436. BT Vol. XIII, 144:17-23. It failed to do so.

*N.    Stock Purchases with Trust Assets*

467. There were six stock trades where Trust IV purchased publicly traded stocks at greater than market value, and Mr. Morisse never looked at the records for stock prices. BT Vol. XX, 175:12-16. Mr. Morisse testified, it was not within the Bank's authority or responsibility to know if Trust IV was buying stocks at greater than market value. BT Vol. XX, 175:17-21.

468. Forever Enterprises had a November 1999 account statement showing transactions in the account from November 22nd through November 26th. Ex. P-436, pg. 8. The first transaction was the purchase of 20,000 shares of Arch Communications at $7.00 a share with a commission of $300.00. Ex. P-436. The letter of direction for the purchase of shares was dated November 15, 2000, and related to Forever Enterprises and Trust IV. Ex. P-17. Mr. Morisse prepared every one of the Letters of Direction in respect to every one of the stock trades. BT Vol. III, 180:1-7.

469. When Mr. Morisse prepared the Letter of Direction, he did not specifically think about protecting the Bank, other than memorializing a transaction that involved two accounts over which the Bank had responsibility and to further memorialize the direction and/or approval

or acknowledgment of parties to the custody account where direction needed to be memorialized. BT Vol. III, 180:8-19. His primary concern was to document and memorialize the transaction; a secondary consequence was protection of the Bank by making a record. BT Vol. III, 180:16-19. His intention was not to specifically attempt to protect the Bank or the beneficiaries or owner of either of the accounts, but to memorialize the transaction. BT Vol. III, 180:23-181:2.

470. Mr. Morisse did not believe the Letter of Direction would take away any of the benefits parties with a legal interest in Trust IV had. He believed the Letter of Direction would protect anyone with a legal interest in Trust IV. BT Vol. III, 181:3-17.

471. The Letter of Direction was prepared based on David Wulf's specific direction to effect the sale that is described in the letter. BT Vol. III, 190:19-22. Forever Enterprises was directed to transfer to Trust IV 10,000 shares of Arch Communications stock in exchange for $70,150.00 cash from the Trust IV account. Ex. P-17. This amount, $70,150.00, represented a transfer of 10,000.00 shares of stock at a price of $7.00 per share plus one-half of commissions, or $150.00. BT Vol. III, 191:1-10. The record is undisputed, on November 15, 1999, the date of the purchase of 10,000 shares of Arch Communications stock by Trust IV, the stock traded in a range of $2.03 to $2.25 per share. ECF No. 2244. Mr. Morisse viewed this as Trust IV buying 10,000 shares of Arch at $7.00 a share at the direction of Wulf, Bates & Murphy. BT Vol. III, 191:16-19. At the highest price range, the stock had a market value of $22,500.00, Mr. Morisse overpaid by $47,650.00.

472. Mr. Morisse has purchased stock in his life and knew stocks trade at a market rate on exchanges. BT Vol. III, 192:12-19. He did not know the rationale of Wulf, Bates & Murphy, and would not, in terms of his personal experience, have bought the stock at that price. BT Vol. III, 192:24-193:1. However, he was unwilling to admit it made no sense for Trust IV to purchase

shares at $7.00 that were trading at a price no higher than $2.25. BT Vol. III, 193:2-7. He would

not speculate, because he did not make the decision to give the direction. BT Vol. III, 193:8-11.

473. On November 15, 2000, there was a cash transfer to Forever Enterprises for

$70,150.00 out of Trust IV. Ex. P-101D, p. 349; Ex. P-17. The value of the 10,000 shares in

Trust IV on Allegiant Bank's books at the end of November 1999 was $10,940.00. Ex. P-101D,

pg. 340. Mr. Morisse executed the direction from Wulf, Bates & Murphy, even though the

direction was to buy publicly traded shares at a price greatly exceeding the market, because he

believed Allegiant had to execute the direction. BT Vol. III, 194:18-195:1.

474. The December 1999 monthly statement for the custody account of Forever

Enterprises at Allegiant showed a purchase of 5,000 shares of Dell Computer by Forever

Enterprises on December 28, 1999, at a per share price of $49 7/8, plus commission of $300.00

Ex. P-446 pg. 7. A two-page document cover sheet and statement containing notes from Wulf,

Bates & Murphy to Mr. Morisse, dated December 22, 1999, detailing various stock purchases by

the Forever Enterprises custody account, made clear Forever Enterprises' custody account was

paying for the stock. Ex. P-449.

475. Mr. Morisse drafted a Letter of Direction, writing, "From RANDALL K. SUTTON,

CFO FOREVER ENTERPRISES, BRENT CASSITY, CHAIRMAN of the BOARD, LINCOLN

MEMORIAL LIFE INSURANCE COMPANY AND RANDALL K. SUTTON, C.F.O.

NATIONAL PREARRANGED SERVICES, INC. TO: ALLEGIANT BANK, CUSTODIAN

FOR FOREVER ENTERPRISES, INC and ALLEGIANT BANK, TRUSTEE UNDER THE

TRUST AGREEMENT FOR NATIONAL PREARRANGED SERVICES, INC PRE-NEED

PLANS DATED 7/24/1989." Ex. P-18. This was dated December 1, 2000, and stated it pertained

to Trust IV. *Id*. It actually directed transfer of 2,500 shares of Dell Computer, Inc. from Forever

Enterprises, Inc. to Trust IV in exchange for the transfer of $124,837.50 from Trust IV to the Forever Enterprises custody account. *Id*. It was signed by Randall K. Sutton, CFO of Forever Enterprises, Brent D. Cassity, chairman of the Board of Lincoln, Randall K. Sutton for NPS, and by an unreadable name on the signature line for Wulf, Bates & Murphy. Ex. P-18. Mr. Morisse kept a copy to serve as documentation to memorialize the directions. BT Vol. XX, 40:17-22. Mr. Morisse was instructed to write in, on the Letter of Direction, the amount of the withdrawal to pay for the Dell stock. BT Vol. III, 197:6-22.

476. Pursuant to a stipulation, on December 1, 2000, Dell was trading at a low of $18.67 per share and a high of $20.30 per share on the NASDAQ exchange. ECF No. 2244. Based on this information, Trust IV was buying publicly traded shares at more than twice their market value. BT Vol. III, 201:1-8. Mr. Morisse believed it was the Bank's responsibility to follow the direction of all the parties in this transaction. BT Vol. III, 201:12-13. Mr. Morisse paid, with trust money, over $80,000 above market value for the stock.

477. The December 31, 2000, Portfolio Investment Review, revealed Trust IV assets included Dell Computer Corp. stock at a cost of $124,000.00, the amount paid for the investment. Ex. P-101D, pg. 357. To the right on the form, the Current Market Value was disclosed at $43,595.00. *Id*. Mr. Morisse said he was not trying to hide anything. BT Vol. XX, 44:2-3. He said he did not know, at the time, Mr. Wulf was buying this stock at a higher price than it was quoted on the New York Stock Exchange, NASDAQ, or wherever it was traded. BT Vol. XX, 44:4-7.

478. To be clear, Mr. Morisse drafted a letter authorizing $124,837.50 from a trust, over which he was trustee, to buy shares of stock for Dell Computer, without inquiring of anyone who was a party to this transaction, or looking at the morning newspaper, to get a price per share

quote, knowing it did not matter to him, because he believed it was on direction of the investment advisor, it would be a nondiscretionary transaction and he only had administrative supervision over Trust IV, with no responsibility if it was a faulty investment. The door to the chicken coop was again, opened widely.[23]

479. As to the Dell stock trade, Mr. Morisse said it did not matter if the direction was for Trust IV to buy publicly traded stocks at greater than market value, Allegiant would memorialize and execute the direction. BT Vol. XX, 169:5-17. The Trusts clearly bought stocks at greater than market value, per direction of the investment advisor. Forever Enterprises had a custody account at Allegiant Bank. BT Vol. XX, 169:21-25. Mr. Morisse was administrator of that account, and, like other accounts, he could look at his computer screen and see the assets held in the account, and the value of those assets. BT Vol. XX, 170:20-23.

480. On November 16, 1999, Forever Enterprises purchased 10,000 shares of Conseco shares at $20.00 per share, plus $20.00 commission. Ex. P-436. On December 14, 2000, Mr. Morisse was directed to purchase 5,000 shares of Conseco stock for Trust IV, at the same $20.00 price paid, from the Forever Enterprises' custody account. Ex. P-19. On the date of this trade, December 14, 2000, Conseco common stock was traded on the New York Stock Exchange at a high of $9.10 and a low of $8.69 per share. ECF No. 2244; BT Vol. III, 203:9-25.

481. Mr. Morisse received verbal notice from Mr. Wulf to prepare the letter of direction and get it executed. BT Vol. III, 204:10-12. Forever Enterprises directed transfer of 5,000 shares of Conseco stock on January 5, 2001, to Trust IV at $20.00 per share plus $150.00 commission, with a transfer of cash from Trust IV back to Forever Enterprises. Ex. P-0024. The back office at Allegiant Bank executed the Letter of Direction. BT Vol. III, 205:3-8. On January 5, 2001,

---

[23] He acknowledged David Wulf was criminally prosecuted for a crime related to this transaction in the United States District Court for the Eastern District of Missouri. BT Vol. XX, 41:6-15. Of course, Mr. Morisse did not know at the time millions were being stolen. However, his actions and decisions invited this behavior to occur.

Conseco common stock traded on the New York Stock Exchange at a high of $13.75 and a low of $12.56. BT Vol. III, 205:14-22.

482. The Allegiant Bank Portfolio Investment Review form for Forever Enterprises' custody account showed the value of assets every month. BT Vol. XX, 172:25-176:3; Ex. P-503, pg. 2. Mr. Morisse had access to this form. BT Vol. XX, 173:14-16. On Allegiant Bank's records, Conseco, on December 31, 2000, for 5,000 shares, had a market value of $65,940. Ex. P-503. Allegiant Bank's own records showed stock transactions where stocks were being purchased by Trust IV at amounts greater than market value. The Court can see, Trust IV paid $100,150.00 for publicly traded Conseco stock while the market value, on the same line, was $65,940.00. Ex. P-503. Mr. Morisse paid $35,210.00 too much from funds he was lawfully supposed to protect.

483. On January 1, 2000, Forever Enterprises purchased from its custody account 10,000 shares of E-Trade at $27 and 1/8 per share with a commission of $500.00, for a total sum of $270,625.00. Ex. P-454, pg. 7. A Letter of Direction, dated December 20, 2000, directed Trust IV to purchase 7,500 shares of E-Trade stock at $27 1/8 for $202,968.00. Ex. P-21. On December 20, 2000, E-Trade stock traded at a low of $7.25 and a high of $7.75. Trust IV paid $27 1/8 to Forever Enterprises for the shares. BT Vol. III, 208:1-13. Mr. Morisse drafted the Letter of Direction for the purchase of the 7,500 shares. BT Vol. III, 209:13-18. Mr. Morisse paid from trust funds, owed to beneficiaries, about $150,000 too much.

484. A Letter of Direction, dated December 28, 2000, directed Trust IV to buy 2,500 shares of E-Trade stock, at the same price paid by Forever Enterprises to purchase it, at $27 1/8 for $67,656.25, including commission. Ex. P-22. On December 28, 2000, common stock shares of E-Trade traded on the NASDAQ at a high of $7.94 and a low of 7.06. BT Vol. III, 212:22-

214:1. Mr. Morisse paid about $20,000.00 too much for this stock from a Cassity-owned entity, again taking money away from beneficiaries he was supposed to be protecting.

485. Mr. Morisse claimed he was unaware of the direction to transfer stock from a custody account to Trust IV, in exchange for a sum of money greatly exceeding the market value of the asset. BT Vol. IV, 207:16-22. He would not agree the benefit was to Forever Enterprises and not the consumers. BT Vol. IV, 207:23-208:4. He believed the action taken by the Bank with respect to those transactions was administrative, the Bank had no discretion, and was only taking direction from the investment advisor, which was the party or person with the discretion in that regard. *Id.*

486. Mr. Morisse did not agree these trades did not make economic sense; he could not speculate as to Wulf, Bates & Murphy's rationale or decision. BT Vol. III, 214:2-9. He also refused to speculate, when asked, if after all his years as a lawyer, thirty months at UMB and now a trust administrator, if Trust IV buying publicly traded shares at prices greatly higher than market struck him as an imprudent transaction. BT Vol. III, 214:10-15.

487. The April 2004 trust statement listed, as an asset, common stock of Forever Enterprises valued at $1,383,024.95, cost basis and $721,431.90, market value. BT Vol. II, 166:14-21; Ex. P-101D, pg. 1540. Mr. Morisse knew Forever Enterprises was a publicly-traded company for a period of time. BT Vol. II, 166:22-167:1.

488. Mr. Morisse could have searched on the internet for Forever Enterprises and gotten Security and Exchange Commission reports. BT Vol. II, 167:8-168:1. Neither Mr. Morisse, nor anyone at Allegiant Bank, performed investment management research on Forever Enterprises' stock. BT Vol. II, 168:7-15. He did not know why he would have looked up Forever's SEC

filings. BT Vol. XX, 247:18-20. He knew David Wulf had purchased some Forever stock as one of the trust investments. BT Vol. XX, 247:21-24.

> O.    *The Prudence of Investing in Lincoln Insurance Policies*

489. During Allegiant's period as trustee, the vast majority of the assets in Trust IV, the CSA Trust, and the MTW Trust were in the form of Lincoln policies. Ex. P-101D, pg. 1541; Ex. P-101F, pg. 445-46; Ex. P-101G, pg. 178-79. When Allegiant took over as trustee, over 21,000 individual Lincoln policies were assets of the Trusts. During Allegiant's time as trustee, Trust IV purchased an additional 45,561 policies from Lincoln. Allegiant transferred tens of millions of dollars out of the Trusts to Lincoln to pay for new business and renewal premiums on the Trusts' life insurance policies. Ex. P-2301, pg. 20.

490. While it took Mr. Morisse awhile to realize Lincoln was related to the Cassity family, others at Allegiant Bank were aware of the relationship from the "first day," by loaning money to the Cassitys and soliciting trust accounts. BT Vol. III, 117:17-118:2.

491. Despite knowing NPS and Lincoln were affiliated, Allegiant never investigated Lincoln or reviewed even a single Lincoln life insurance policy. Ex. P-2381, 62:16-64:14; BT Vol. II, 74:21-75:10; 123:10-12.

492. Had Allegiant performed an investigation into Lincoln, it could have easily learned Lincoln was not rated by the major insurance rating services. Lincoln received a "D+" rating from one rating service that did rate the company, meaning Lincoln "was a weak company." Ex. P-46, pg. 3; Ex. P-2354, 15:9-16:3, 18:5-19:6, 20:8-10, 27:20-28:6.

493. Mr. Morisse believed the rating of Lincoln was beyond the scope of the Bank's responsibility or authority, whether the rating was an A or a D. BT Vol. II, 197:21-24. Mr. Morisse believed there was no responsibility to go to professionals in his own trust department to

142

ask them to look at the prudence of investing in Lincoln because there was no investment management responsibility over the Trusts for Allegiant. BT Vol. II, 200:13-201:12.

494. NCB evaluated Lincoln's financial condition in early 2004 and identified it as troubling and a red flag. Ex. P-2354, 15:16-16:3, 25:9-17. NCB confirmed Lincoln was a "financially ailing" and "weak" company whose financial status was "deteriorating." Ex. P-2354, 15:9-17, 20:8-10, 24:8-23, 30:4-21; Ex. P-46, pg. 3.

495. On May 15, 2001, Mr. Morisse directed a memorandum to the Board of Directors of Allegiant Bank concerning a Missouri Division of Finance examination report of February 20, 2001. Ex. P-531, pg. 2; BT Vol. IV, 215:16-18. Mr. Morisse wrote, as to the NPS accounts, "Although the vast majority of the trusts which hold life insurance policies and under which Allegiant serves as trustee specifically relieve and exonerate Allegiant from responsibility and liability for the financial condition of the company issuing the insurance policy . . ." Ex. P-531.

496. The trust department was never going to request a review of the quality of Lincoln policies because they were held in nondiscretionary accounts. BT Vol. IV, 223:7-10. Mr. Morisse would not ask any rating agency for its rating on Lincoln, because he believed he was not the person to do that. BT Vol. IV, 223:11-16. Instead, he believed it was the responsibility of an investment officer, and there was no investment officer assigned to the NPS accounts where the independent investment advisor was serving. *Id.*

497. Mr. Morisse believed Mr. Wulf selected Lincoln, from all insurance companies in America, from which policies would be purchased by the Trusts. BT Vol. XX, 164:14-19. Mr. Morisse was not aware Lincoln signed an exclusivity agreement where the only policies that would be bought by the Trusts were from Lincoln. BT Vol. XX, 247:12-17.

498. Lincoln's employees expressed concerns about the excessive premium rates being paid by the Trusts to purchase Lincoln policies. BT Vol. VI, 245:8-14. Lincoln recognized increased profits based on the premium rates being charged to the Trusts. BT Vol. VI, 245:2-7.

499. Plaintiffs' actuarial expert Andrew Dalton opined, after conducting a standard actuarial analysis, during the Allegiant period the Trusts were in fact "paying more in premium for the Lincoln Memorial policies than [they] would have to pay on equivalent policies from a non-related insurance entity. . ." BT Vol. X, 99:13-25, 132:6-17.

500. According to the March 2003 Trust IV statement, over 93 percent of the assets in Trust IV were in the form of evidence of Lincoln life insurance policies and the World Service group term policy. Ex. P-101D, pg. 1143. Originally, Mr. Morisse stated, Allegiant operated and relied on the understanding the total face value of the life insurance policies and the World Service group term insurance policy equaled the aggregate amount of the Trusts' assets. BT Vol. IV, 127:12-17. Then, he modified his answer to say Allegiant excluded the World Services policy and assumed all of the dollars in the Trusts for all of the consumers were evidenced by the Lincoln policies at face value. BT Vol. IV, 127:18-128:2.

> P.    *Wulf, Bates & Murphy*

501. NPS appointed David Wulf of Wulf, Bates & Murphy as the investment advisor for the Trusts in approximately 1987. JSF. Wulf, Bates & Murphy's appointment, as investment advisor, was confirmed in a letter from NPS dated November 1, 1999, constituting actual confirmation of the appointment by NPS. Ex. D-137. Mr. Morisse drafted the document. BT Vol. V, 231:16-18.

502. According to Mr. Morisse, David Wulf of Wulf, Bates & Murphy sent a Letter of Direction to Richard Markow, president of Allegiant Bank, which was intended to provide

documentation for the manner in which Wulf, Bates & Murphy would give direction for investment and take investment action for the listed accounts for which Wulf, Bates & Murphy had been appointed as independent investment advisor. Ex. D-17; BT Vol. V, 234:21-25.

503. The Letter of Direction stated Allegiant Bank was directed by the investment advisor to distribute cash, securities, or other assets in accordance with directions received by fax from any employee of Wulf, Bates & Murphy or NPS. Ex. D-17. Mr. Morisse testified he drafted the letter this way "at the recommendation of the bank examiners," but there is no record of such directions from the bank examiners. BT Vol. V, 235:8-10. Based on all of the information described below, concerning the bank examination, the bank examiners' Report and all correspondence following, the Court disbelieves this sworn statement of Mr. Morisse.

504. The Letter also directed Allegiant Bank to settle any trades in any of the listed trusts in accordance with any form of trade confirmation received by Allegiant Bank, or any of its agents, nominees or custodians, so long as such trade confirmation identified the account as Allegiant Trust F/A National Prearranged Services. Ex. D-17. If a trade confirmation did not identify in which of the above referenced trust accounts the trade was to be settled, Allegiant Bank was directed and authorized to rely on direction by telephone, fax or in person from a principal, officer, employee, agent, or representative of Wulf, Bates & Murphy, Inc. or NPS as to the trust account in which to settle the trade. Ex. D-17.

505. In all his drafting of agreements, it appears Mr. Morisse was doing everything possible to make his job as trust administrator easier, to shift his responsibility to Cassity-owned entities. Each agreement required less of him and his staff to protect trust assets, and it was as if he was acting on behalf of NPS, not consumers of the Trusts, to whom he unquestionably owed fiduciary responsibilities. The Trust Agreement in Article III, Section 3.1 stated "Trustee shall

hold, protect and conserve the Trust corpus through the management, investment and reinvestment of the trust property . . ." Ex. P-168, pg. 4. Article IV Section 4.2(f) provided the trustee had the duty "to perform any and all other acts in its judgment as a fiduciary necessary or appropriate for the property advantageous management, investment and distribution of the Trust." Ex. P-168, pg. 8. Missouri law provided, in Chapter 436.031.2, "All property held in a preneed trust, including principal and undistributed income, shall be invested and reinvested by the trustee thereof. The trustee shall exercise such judgment and care under circumstances then prevailing which men of ordinary prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income therefrom as well as the probable safety of their capital."

506. In drafting this Letter of Direction, Mr. Morisse made it easy for the investment advisor or NPS to pull money from any of the Trusts. He did not require the investment advisor to exercise such judgment and care under circumstances then prevailing which men of ordinary prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income therefrom, as well as, the probable safety of their capital. This was Mr. Morisse's opportunity to caution the investment advisor not to make speculative investments; perhaps the investment in stocks at twice their market value could have been avoided. Mr. Morisse was already warned in the bank examiners' report, "The trust account contains some investments that appear to be speculative or could have investment quality concern. Examples include a common stock investment in CAI Wireless Systems, Inc. and a convertible bond investment in Boston Chicken, Inc. Section 436.031.2 RSMo. states in part, 'in no case shall said

assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in.'" If Wulf, Bates & Murphy did not like Mr. Morisse's draft, they could have come back with amendments, but Mr. Morisse put up a "come on in, the door is wide open" sign at the chicken house gate. Priority in expressing and exercising fiduciary care of beneficiary funds was lacking in Mr. Morisse's role as trust administrator.

507. Mr. Morisse believed Wulf, Bates & Murphy should be independent from the Bank and no one else. BT Vol. III, 137:8-14. It did not make any difference to Mr. Morisse whether Wulf, Bates & Murphy was independent of NPS. BT Vol. II, 98:5-23. He made no inquiry to determine if it was. BT Vol. II, 98:24-99:1. Mr. Morisse administered the Trusts for six years on the belief it did not matter if Wulf, Bates & Murphy was controlled by NPS. BT Vol. II, 99:2-5.

508. NPS and the Cassity companies were practically Wulf's only clients. BT Vol. VI, 90:14-17, 91:1-3. David Wulf personally profited from the Trusts' purchases of Lincoln life insurance policies through his role as manager of Lincoln's portfolio. BT Vol. VI, 93:20-24. In addition to the Lincoln policies, Allegiant's records showed Mr. Wulf was personally profiting off other trust investments as well. BT Vol. IV, 107:15-22. During Allegiant's period as trustee, Mr. Wulf used an "nps.com" e-mail address and shared office space with NPS. BT Vol. VI, 128:12-19, 129:8-13.

509. Allegiant's determination Wulf only needed to be independent of the Bank and not NPS was a deviation from the industry standard of care for professional trustees. BT Vol. XIII, 51:20-53:7.

### Q.    Allegiant's Failure to Maintain Adequate Records

510. Allegiant had an obligation to maintain accurate books and records reflecting all transactions in any way pertinent to the Trusts. Allegiant understood it had this recordkeeping

responsibility. JSF. Under custom and practice in the industry, Allegiant was required to maintain adequate books of account of all transactions in the Trusts. *Id.*

511. Allegiant Bank was going to charge NPS $17,900.00 for all bookkeeping services and responsibilities of the Bank required under Chapter 436 with respect to Trusts I, II, III and IV. Ex. P-346; BT Vol. II, 70:20-24. This fee was grossly inadequate to comply with Chapter 436 and the Trust Agreement. The trust department at Allegiant Bank was severely understaffed. The Court concludes, receipt of this small fee explains, in part, why Mr. Morisse would not hold the trust assets at the Bank. Many of the documents Mr. Morisse drafted took statutory responsibility from Allegiant, and bestowed it on Cassity-owned entities, especially NPS. The Court concludes, in part, Mr. Morisse took action to shift trustee responsibility to NPS, to keep from employing sufficient staff to execute those responsibilities. Mr. Morisse was supervising a trust department in a bank that created a trust department to demonstrate it was a full-service bank. From the beginning, Mr. Morisse ignored fiduciary responsibilities.

512. Mr. Morisse testified, "Trust IV likely had deposits relating to 20,000 or plus preneed contract purchasers." BT Vol. II, 71:2-5. When asked if Allegiant Bank could not economically keep the records of what was on deposit for more than 20,000 consumers, Mr. Morisse said "I am having difficulty answering the question because I believe the records were kept." BT Vol. II, 71:12-16. When questioned if the records were kept by NPS, Mr. Morisse stated, "The records were kept by NPS and relied upon by Allegiant." BT Vol. II, 71:17-19. Mr. Morisse, by this answer, admitted Allegiant Bank was not keeping adequate records as required by Chapter 436.

513. When questioned again if Allegiant could keep the records of individual deposits for more than 20,000 consumers for a total of $17,900 a year, Mr. Morisse answered, "I have

difficulty in opinion – I forget what word you used, profitability or economic charge for performing its duties under these trusts, but I believe the Bank was capable of and did maintain the records." BT Vol. II, 71:20-72:2. Mr. Morisse testified, by going to the monthly packets, Allegiant Bank could identify how much money was on deposit in Allegiant Bank for each of the consumers. BT Vol. II, 72:6-20. Mr. Morisse is mistaken. For all of Allegiant's tenure, Mr. Morisse never knew how much was on deposit in Allegiant Bank for each consumer.

514. Mr. Morisse did not discuss with Mr. Markow his conclusion the Bank had no responsibility to know, under Chapter 436, how much each consumer has on deposit in the Bank's trust department. BT Vol. II, 66:25-67:5. He admitted he did not go to any superior and state we are not going to keep any records with respect to deposits in the Trusts. BT Vol. II, 68:7-14.

515. Chapter 436 only permitted funds from multiple preneed contracts to be comingled in a single trust account if the trustee maintained "adequate records of all payments received." Mo. Rev. Stat. § 436.031.1. Chapter 436 further specified the trustee "shall maintain adequate books of account of all transactions administered through the trust and pertaining to the trust generally." Mo. Rev. Stat. § 436.031.5. Allegiant, however, made the conscious decision it did not need to know how much money was being deposited into trust for each individual consumer. Ex. P-2391, 200:22-201:10.

516. Allegiant Bank received a monthly packet from NPS from which it could determine a list of consumers and how much money each should have in the Trusts. BT Vol. IV, 5:9-13. Mr. Morisse believed evidence of insurance at face value represented the 80 percent of the preneed contract required to be deposited into the Trusts. BT Vol. IV, 5:21-24. The only records at Allegiant Bank of the amount on deposit for an individual in any of the Trusts, was the

monthly packets stating the face value of the insurance on each individual. BT Vol. IV, 5:25-6:13. Other than inquiring of NPS, the monthly packets were Allegiant Bank's only method of tracking how much should be on deposit in any trust for any individual. BT Vol. IV, 6:11-13. Allegiant Bank had no trust records showing what was on deposit for the individual consumer. BT Vol. IV, 6:14-19.

517. Allegiant relied on numbers sent to it by NPS; the Bank did not put in place a system of checks and balances to verify the accuracy of those numbers. BT Vol. II, 124:17-20. Allegiant did not keep any records of how many consumers paid in full for their contracts and how many were paying over time. BT Vol. II, 124:21-23.

518. Section 2.4 of the Trust Agreement for the Trusts provided, with each deposit, Seller shall provide a breakdown of how much of said deposit is to be credited to each owner, described by number and name of owner. Ex. P-168, pg. 4. Mr. Morisse did not understand it was the obligation of Allegiant Bank's trust department to conform its bookkeeping to Section 2.4 of the Trust Agreement, but instead, it was his understanding he was to receive the information provided by NPS. BT Vol. III, 4:6-11. Mr. Morisse thought NPS provided the name of each owner whose funds NPS was depositing and the amount being deposited, but it did not do so with each deposit. BT Vol. III, 4:8-18. He believed the monthly statement provided that information, which he admitted, showed only the face amount of a policy. BT Vol. III, 4:19-24. Allegiant Bank received the deposit checks with reconciliation statements. Ex. P-105, pg. 2; BT Vol. III, 4:25-5:11. Mr. Morisse believed the Bank made the effort to keep those records it was required to keep. BT Vol. II, 69:5-10.

519. Mr. Morisse could not recall the location of the list of consumers whose funerals were to be paid from Trust I. BT Vol. II, 179:13-16.

520. Even though auditors look at how trust departments are keeping the books and records in trusts, Allegiant Bank relied on information in the packets furnished by NPS. BT Vol. II, 202:7-23. Allegiant Bank's trust department did not create separate subaccounts for preneed contract owners or purchasers. BT Vol. II, 202:20-23. "The Bank believed that accurately accounting for receipts of disbursements as called for by the statute and the Trust Agreement and the maintenance of the records that were received monthly from NPS met its obligation." BT Vol. II, 203:17-20. Mr. Morisse was mistaken in his belief.

521. The trust department's method of having NPS keep the records of what was to be on deposit was not examined by Allegiant's internal auditing committee, because "It was pretty obvious that the accounting records of receipts and disbursements was in accordance with and similar to those transactions in trust company accounts across the board, so there was no need to engage audit with regard to how records of receipts and disbursements were being kept." BT Vol. II, 204:12-18. An audit by the internal audit department was never requested. BT Vol. II, 204:19-21. The internal auditing department was never asked to inspect the wire transfer request forms and pair them up with trust statements to see if assets were coming back in when money flowed out. BT Vol. II, 204:22-25.

522. When NPS sold preneed contracts, under Chapter 436, it was allowed to keep 20 percent of the consumer's money, but could keep less than 20 percent. BT Vol. III, 5:16-20. Allegiant Bank received multiple checks from NPS each month for deposits of consumers' money. BT Vol. III, 6:3-16. For example, a Trust IV statement for May 31, 2001, listed Allegiant Bank received $50,716.15 from NPS. Ex. P-101D, pg. 451_5. As soon as the funds were deposited, Allegiant Bank had a responsibility to protect, record and control the asset. BT Vol. III, 7:5-11. When that $50,716.50 was deposited, Allegiant Bank did not know which consumers

were covered by that deposit. BT Vol. III, 7:18-21. Once the money was deposited into the trust, Allegiant Bank took no steps to confirm when the money left the trust or to whom it went. BT Vol. III, 7:25-8:9. Additionally, there was no system in place to determine if this consumer money was used to pay renewal premiums. BT Vol. III, 27:17-21.

523. When money came into a trust, Allegiant Bank did not get a statement, e.g, Mr. Simon Jones now has on deposit $5,000.00. BT Vol. IV, 124:10-13. NPS kept this record. *Id.* Reconciliation forms, which Allegiant did receive, showed life insurance at face value, which equaled the amount deposited with respect to that person's preneed contract, at least the amount Allegiant was told and understood to be on deposit. BT Vol. IV, 124:14-21.

524. The reconciliation statement in the monthly packet Allegiant received from NPS did not give any guidance as to "the human beings and how much is in deposit for each of them." Ex. P-105, pg. 2. Allegiant Bank did not physically have the records, it relied on NPS. BT Vol. IV, 125:19-20. Mr. Morisse did not "recall that [he] kept or had the receipt form." BT Vol. IV, 126:10. He did not recall having occasion to process or interpret the data at the top of that form." BT Vol. IV, 126:17-22. Allegiant did not have the records that accompanied the check, but Mr. Morisse believed the Bank had access to that information through NPS. BT Vol. IV, 126:23-127:2.

525. Allegiant Bank had its own written description of a protocol, in the operations section, on how to process incoming money. BT Vol. IV, 146:1-3. In the outgoing money section, the protocol stated "NPS sends outgoing wires," but it did not include any protocol for including the "purpose" of the outgoing wire. Ex. P-1261.

526. Even though Allegiant was responsible for proper administration of the Trusts, and was responsible to make sure money left the Trusts only in accordance with the requirements of

Chapter 436, Mr. Morisse did not know if there was a method for the operations department to judge whether money was being taken from the trust in violation of Chapter 436. BT Vol. IV, 153:18-21.

527. The 80/20 report of Trust I listed Hinton Funeral Home as a beneficiary of Trust I. Ex. P-106, pg. 103. Mr. Morisse did not recall knowing Allegiant Bank had records showing who the consumers were or to whom it owed money upon the death of a consumer. BT Vol. IV, 10:18-24. The 80/20 report also listed other consumer beneficiaries in Trust I, including consumers who purchased contracts through Jay B. Smith Funeral Home. Ex. P-106, pg. 104. Allegiant Bank did not provide any accounting services to any of the consumers of Jay B. Smith Funeral Home. BT Vol. IV, 11:11-16. Allegiant also did not disclose to any these consumers, or any other funeral homes and consumers, the money they were supposed to have in trust was backed by only an IOU from NPS.  BT Vol. IV, 11:17-22. Allegiant Bank let NPS do all of the bookkeeping for these consumers. BT Vol. IV, 13:2-5.

528. Mr. Morisse understood, at the time of trial, the term "owner" in the Trust Agreement was the consumer who bought the contract. BT Vol. V, 97:1-6. He knew the owner could get information about the amount in their account held in trust. BT Vol. V, 97:7-10. Mr. Morisse, without any doubt, believed and confirmed NPS, as Seller, was supposed to maintain the records about the amount of each consumer's account held in trust. BT Vol. V, 97:11-14. He based his answer on Section 4.3 of the Trust Agreement which stated, in the last sentence, "this information shall first be provided to the trustee by the seller." BT Vol. V, 97:15-18. According to Mr. Morisse, "That means that the trustee needs to get the information from the seller." BT Vol. V, 97:19-21. In the ordinary course of business, contract owners paid money to NPS under

their contracts. NPS then was required to inform Allegiant Bank so Allegiant could maintain records about the amount of each consumer's account held in trust.

529. Upon receipt of requests for information from consumers, Mr. Morisse called NPS and advised "them that we had received a request and for confirmation of the amount on deposit." BT Vol. V, 99:2-3. Mr. Morisse did not believe the trust instrument required him to keep account-specific information by consumer about what was on deposit. BT Vol. V, 99:4-7.

530. This process was followed when an attorney contacted Mr. Morisse on behalf of Betty Davis, a preneed consumer beneficiary, regarding the amount of Ms. Davis's contract money on deposit. BT Vol. XIX, 113:10-114:4; Ex. P-36; Ex. P-714; Ex. P-720. Ms. Davis had paid $6,392 for her preneed contract. BT Vol. XIX, 114:7-16, Ex. P-714, pg. 2. In response, Mr. Morisse contacted Angie Hall, at NPS, and requested information on the amount in trust. BT Vol. XIX, 114:20-115:1; Ex. P-36. Ms. Hall responded the amount in Trust IV for Ms. Davis was $5,112, which is 80 percent of the $6,392 contract price paid by Ms. Davis. BT Vol. XIX, 115:11-18, Ex. P-36.

531. Ms. Hall's email was inaccurate. Rather than purchasing a paid-in-full policy, a multi-pay policy was purchased with an initial premium amount due of $100, with the remaining contract money paid by Ms. Davis used, by NPS, for other purposes such as paying renewal premiums on other life insurance policies. BT Vol. IX, 97:21-98:23, 101:10-13, 102:12-17.

532. Mr. Coster also testified, when deposits were made, Allegiant did not have to go to NPS and say, I want backup and proof that you've actually given me 80% of the deposit. BT Vol. XIII, 216:10-13. Allegiant was accountable "only for the funds paid over to it" by NPS and had "no duty to see that the payment received complies with the provisions of the Funeral Agreement." Ex. P-168. The Trust Agreement stated Allegiant "shall not be obligated to collect

any payments from the Seller, nor obligated to see that any payments so made to it are deposited according to the provisions of the Funeral Agreement." *Id*. BT Vol. XIII, 216:24-217:3.

533. Mr. Coster, Plaintiff's expert, testified the trustee "did not have a duty to inquire as to the calculation, wh[ether] the money they received [from NPS] was 80 percent or not, no obligation to do that." BT Vol. XIII, 216:1-13.

534. The February 2000 Trust IV statement showed a wire transfer occurred on February 2, 2000. Ex. P-101D, pg. 216. Under "Cash Disbursements," $266,673.37 was listed as sent out of Trust IV to Lincoln on February 2, 2000, with no stated purpose, except per direction of investment advisor. *Id*. The fax came from NPS showing a "cc" to Wulf, Bates & Murphy, and per the direction of Wulf, Bates & Murphy. Ex. P-101D, pg. 216. Mr. Morisse confirmed, no one looking at this statement would have any idea the purpose of this quarter of a million-dollar wire request from NPS to Lincoln. BT Vol. IV, 31:10-19. The format for this wire transfer was consistent over Allegiant's tenure. Ex. P-104, pg. 162; BT Vol. IV, 33:24-25.

535. Rather than believing it was the responsibility of Allegiant Bank to know for what purposes the money was leaving, Mr. Morisse believed it was Allegiant Bank's responsibility to follow the directions and execute the directions on the wire transfer request form. BT Vol. IV, 32:24-33:3. Allegiant Bank did not put in place anything to see if this quarter of a million dollars, or other similar transactions, were indeed investments. BT Vol. IV, 33:6-11. Allegiant relied on Mr. Wulf's performance of his responsibilities and his fiduciary obligations to the account and the parties. *Id*. Rather than accept the fiduciary obligation not to release any money unless it was an investment, Allegiant instead ignored its responsibility, and followed the direction of the investment advisor. BT Vol. IV, 33:12-16.

536. Mr. Morisse confirmed Allegiant Bank never maintained the life insurance applications, it never sought data pages summarizing insurance purchased, and it never requested any of the preneed funeral contracts. BT Vol. XX, 230:18-231:5. When asked if Allegiant ever requested a single data page to compare it to see if the insurance policy being purchased by the trust was mismatched with the amount of money the consumer had deposited, Mr. Morisse said he is lost with the mismatch, but did not request to have the documents to which counsel was referring. BT Vol. XX, 231:6-11.

537. The April 2004 trust statement for Trust IV showed a group of transactions with money leaving Trust IV, with no description of the purpose other than to say they were performed per the direction of the investment advisor. Ex. P-101D, pg. 1550. The stock language copied on all of Allegiant Bank's trust statements, "per direction of investment advisor" was used when distributions were made upon receipt of direction by Wulf, Bates & Murphy, because that was the protocol adopted by the Bank. BT Vol. IV, 144:25-145:10.

538. The first trust statement for Trust IV was for the period August 1, 1998, through August 31, 1998, the month Trust IV was brought into the Bank. Ex. P-101D, pg. 2. Under the "Miscellaneous" section of the statement, "LINCOLN MEMORIAL LIFE INS. CO. EVIDENCE OF POLICIES AT FACE VALUE" appeared. *Id.*

R.    *Monthly Packets Received from NPS*

539. Each month Allegiant Bank received a "monthly packet" from NPS. The information contained in these packets was accurate. ECF No. 2824. The packet for October 2003 is a sample of one month for all of the Trusts. Ex. P-106, pg. 574. The packet included a list of policy adjustments, i.e., when the reconciliation form showed a total amount of

156

$79,952.26, the Bank could see all of the transactions that lead to that number. BT Vol. IV, 156:22-157:1.

540. The monthly packet Allegiant received from NPS included certifications from Lincoln. BT Vol. II, 129:15-19. In the packet received in October 2003, the certification stated, "Our evidence of insurance is hereby attached, confirming that Lincoln [] issued the attached policies in October 2003 and that the trust account listed above is shown as the owner and beneficiary of said attached policies." Ex. P-106, pg. 578. Lincoln Memorial Life Insurance Company never certified the *value* of the policies. BT Vol. II, 131:2-4 (emphasis added). The only information Allegiant Bank received was a contract number related to a policy number, the consumer's name, the face value of the policy, and the issue date of the policy. BT Vol. II, 131:5-9; Ex. P-106, pgs. 579-600. The monthly packet did not contain information showing how much should be on deposit, except face value. BT Vol. II, 131:14-21. Allegiant was told the face value of the policy equaled the amount the consumer had paid to NPS. BT Vol. II, 131:22-24. The face value of the policies did not always match the actual value of the policies.

541. The packet also included an affidavit from NPS, death certificates and cancelled checks. *Id.*; BT Vol. IV, 158:17-18. Mr. Morisse required a copy of a cancelled check in the monthly packet with a death certificate.  BT Vol. V, 117:17-21. The death certificates covered money being sent out of the Trusts. BT Vol. IV, 158:22-25. The affidavit related to the certificates, as well as cancelled policies. *Id*. That was the information related to Trust IV contained in the packet. Ex. P-106.

542. There was no representation in the packet the face values represent whole-life paid-up policies, and there was no representation policy loans were not taken and the value of the policies did not decrease as a result. BT Vol. IV, 159:12-17. Allegiant knew the monthly packets

157

would only show the face amount of the policy and the only way for the Bank to handle more than 20,000 individual customers with monies on deposit was to have someone else do the bookkeeping. BT Vol. II, 74:5-9.

543. NPS never certified the face amount of the policies equals the amount on deposit for each individual. BT Vol. II, 134:22-135:4. The cash surrender value of the policies was never included in the monthly packets. BT Vol. II, 135:5-8. The monthly packets do not delineate which of the policies were paid in full and which had premiums due; there was no information showing if payments were due, what were the payment terms (three-year, five-year, or ten-year). BT Vol. II, 135:13-16; Ex. P-106, pg. 601 (listing (744 pages) of all Lincoln insurance policies associated with Trust IV).

544. This portion of the October 2003 packet began by stating this was the CSA trust's portion of the monthly packet. Ex. P-106, pg. 1. It included an affidavit from Randy Sutton stating death claims were paid during the previous month, and some policies were cancelled. Ex. P-106, pg. 2. Allegiant Bank did not have a process in place to check if Mr. Sutton was speaking truthfully. BT Vol. IV, 160:11-13. The Bank relied on Mr. Sutton when he stated, "The withdrawals from Trust are true and correct as of the date of deaths or cancellations and as reflected by said attached summary of withdrawal." Ex. P-106, pg. 2. It was Allegiant Bank's job to control and protect these assets, even if NPS was keeping the records. BT Vol. IV, 160:14-16.

545. The Bank relied on NPS's records, regarding whether distributions for death claims were in the proper amount. BT Vol. IV, 161:5-9. It was the job of Allegiant Bank to ensure the amount being paid for death claims was no greater than allowed by Chapter 436. BT Vol. IV, 161:10-14.

158

546. Going through the packet to determine if Allegiant Bank was complying with the requirements of Chapter 436, Mr. Morisse agreed, the death certificate was one factor telling someone died. The cancelled check was a receipt for payment to a funeral home or to a provider of services and NPS would want, from the trust, the face amount of the insurance in place for that decedent. NPS would be entitled to the amount related to the deposit to the trust for that decedent. Mr. Morisse agreed, if the face amount of the policy did not match the amount on deposit for that individual, NPS was not be entitled to take that much from the trust. He also admitted Allegiant Bank was going to accept NPS's word every time, 10,000 times or more, relying on the affidavit provided with the document. He agreed death certificates provided no proof to Allegiant Bank how much should be on deposit for that individual. BT Vol. IV, 162:4-163:22.

547. Mr. Morisse did not print out a monthly statement himself, nor keep a copy "there." BT Vol. V, 58:1-3. He had access to the exact same information that was on the monthly statements. BT Vol. V, 58:4-6. The trust accounting system could be accessed by trust officers, and others with authority, to pull up information related to transactions, account balance, tax information and other data related to the account, the same system from which the monthly statements were also generated, printed, and mailed. BT Vol. V, 58:11-18. There was a section of the statement, as well as the data that he had access to, that provided account value on the asset summary or balance page. BT Vol. V, 58:24-59:2. At the end of the calendar year, a tax report would be generated and delivered to the tax preparer; NPS designated the tax preparer to prepare tax returns for the trust accounts. BT Vol. V, 59:3-9.

548. The November 2003 monthly packet, in principal, was in the same form as all the monthly packets. BT Vol. XX, 237:23-238:1. It included an affidavit Allegiant received from

Randy Sutton. BT Vol. XX, 238:12-14. It was always Allegiant Bank's responsibility, as fiduciary, to ensure Allegiant was only distributing the proper amount of money under Chapter 436. BT Vol. XX, 239:8-11. Mr. Morisse believed the affidavit, included in the packet, was a document the Bank, as trustee, could rely on in performing its responsibilities, but it was not an exoneration from its responsibilities. BT Vol. XX, 239:16-21. Allegiant never engaged in math to determine whether consumers were getting paid more money than had been deposited for them. BT Vol. XX, 239:22-25.

549. The November 2003 packet reconciliation statement showed evidence of insurance purchased for Trust IV during November 2003. Ex. D-36, pgs. 5-767. Mr. Morisse said he did not track, or follow, or was not aware of the money the trust sent to Lincoln by wire to buy life insurance, but he could see week by week how much NPS was saying it was spending to buy insurance policies. BT Vol. XX, 240:12-22. Allegiant was not reconciling or keeping track of how much money the trust was paying to Lincoln to purchase these batches of policies. BT Vol. XX, 241:5-8. Mr. Morisse, once again, stated he always believed policies he was buying were paid-in-full policies. BT Vol. XX, 241:9-11. The Court agrees with Mr. Stephen Browne, one of Plaintiffs' expert witnesses, Allegiant's failure to reconcile or verify the information contained in the monthly packets violated the industry standard of care. BT Vol. VIII, 77:16-79:3.

S.      *Use of Face Value for Lincoln Insurance Policies*

550. Chapter 436 required Allegiant to value the assets of the Trusts at their "market" value. Ex. P-2391, 179:10-18, 180:9-16; Mo. Rev. Stat. § 436.031.3. Allegiant ignored this requirement and instead, valued the Trusts' Lincoln policies at their face values. Ex. P-2391, 189:2-16; Ex. P-101D, pgs. 9, 1541. It was Allegiant's responsibility under industry custom and practice to value the Lincoln policies. BT Vol. XIII, 23:16-20; JSF.

160

551. Mr. Morisse understood, "the face value of the insurance for each preneed contract owner [] equaled the amount of the deposit that NPS made to the trust." BT Vol. II, 73:18-20. This was a mistaken conclusion. Mr. Morisse, and consequently Allegiant Bank, believed the insurance policies were paid-in-full policies, when multi-pay policies were being purchased from Lincoln requiring payment of monthly renewals. NPS would take the money deposited and use it for monthly renewal payments or other non-approved use of trust funds.

552. Mr. Morisse never kept records showing what individual A had on deposit or how much individual B had on deposit. BT Vol. II, 132:12-17. He understood the amount on deposit for each consumer was the face amount of the insurance policy. *Id*. Mr. Morisse believed if an insurance policy had a $5,000 face value, that meant it represented 100 percent of the 80 percent that should have been on deposit.[24] BT Vol. II, 133:12-25.

553. If an owner would have requested how much money he or she has on deposit, the only way Allegiant Bank could have answered was to call NPS and obtain verification of the information. BT Vol. IV, 168:8-11. Allegiant Bank did not have any money specifically on deposit for a preneed owner, it only had evidence of insurance at face value.[25] BT Vol. IV, 168:12-15.

554. "There was nothing in the [monthly forms] so indicating" NPS was misrepresenting to Mr. Morisse the face value of the policies equaled what had been paid into the Trusts. BT Vol. II, 140:6-10. Mr. Morisse repeatedly stated he received assurances every single policy was paid-in-full, and he depended on those assurances as the trust administrator for six years. BT Vol. II,

---

[24] The consumer or funeral home customer paid NPS an amount a funeral home agreed to apply when it supplied a funeral service to an individual at some time in the future. NPS by Missouri Statute 436 was entitled to keep 20% of the contract amount and was required to pay the remaining 80% into trust.

[25] It turns out, neither did NPS have insurance policies, only a piece of paper representing an insurance policy.

140:14-19. If Mr. Morisse had followed Missouri law and had control of the policies, he could have seen the policies were multi-pay policies.

555. The Trusts' Lincoln policies were worth far less than their face values due to the mismatching and policy loan practices prevalent during Allegiant's trusteeship. BT Vol. VI, 113:18-114:17. Defendants' actuarial expert agreed the Trusts' Lincoln policies were not worth anything close to their face values, and instead, carried a "negative" value. BT Vol. XVIII, 74:18-21, 78:10-16.

### T.    The Merger between Allegiant and NCB

556. Shortly after the 2003 Division of Finance examination, in November 2003, Mr. Morisse learned NCB was coming to look at Allegiant Bank. BT Vol. XX, 115:2-5. NCB announced its plan to acquire Allegiant in November 2003. Ex. P-2395, 15:17-20. The merger agreement required Allegiant to pay NCB a $25 million break-up fee in the event the merger was not completed, which represented more than one year's worth of earnings for Allegiant. Ex. P-2378, 72:22-73:3; Ex. 2-100, pg. 15.

557. Albert Kantra oversaw NCB's due diligence review of Allegiant's trust department. BT Vol. XI, 130:12-23. He reported in a December 2003 memorandum, Allegiant's "largest trust account is a $195,000,000 preneed funeral arrangement trust that generates only ~$60,000 in annual fees. They are losing big money on this account and the potential fiduciary liability is huge. In years past, we have had large losses related to these types of accounts in MI and other states. We will likely look to exit this relationship." Ex. D-303, pg. 2. Kantra determined early the "risk" was "extremely high." Exs. P-38, pg. 2, P-41.

558. NCB, through the due diligence performed on Allegiant's trust department in early 2004, sought to understand how Allegiant had been administering the Trusts. Ex. P-2395, 40:3-

21, 42:4-12. The NCB integration team worked with Mr. Morisse in obtaining information regarding Allegiant's administration of the Trusts and the trust assets. Ex. P-2391, 388:13-23; Ex. P-2359, 20:13-21:5.

559. Mr. Morisse answered questions from Alan Davidson, NCB's senior fiduciary officer, and drafted a letter to him dated February 24, 2004. BT Vol. XX, 121:2-5. Mr. Morisse provided information to NCB he viewed as helpful to their understanding, such as the Trust Agreement. BT Vol. XX, 121:21-122:2.

560. Mr. Morisse also provided NCB with copies of asset review reports, documentation of designation of the investment advisor, the letter of direction from the investment advisor, the Custody Agreement and a copy of Chapter 436. BT Vol. XX, 122:3-11. In the letter to Alan Davidson, Mr. Morisse communicated Allegiant's intention to resign to the chief operating officer of grantor/seller (NPS). Ex. D-324, pg. 1.

561. According to the Trust Agreement, the trustee may resign at any time upon 30-day notice to Seller, which is NPS, who will appoint a successor. Ex. P-168, pg. 10. Each successor trustee succeeds to the title to the trust vested in its predecessor by accepting in writing its appointment as successor trustee. Ex. P-168, pgs. 10-11.

562. Mr. Morisse learned from Alan Davidson, NCB did not have an appetite for preneed business because of prior unfavorable experience. BT Vol. XX, 125:15-22. NCB headquarters were in Cleveland, Ohio, and they were not interested in administering a non-local preneed trust from a distance. BT Vol. XX, 126:7-14. At no point did Mr. Morisse believe the way he administered the Trusts meant there was some huge liability out there. BT Vol. XX, 126:15-18. When he learned of the Bank's decision to resign, Mr. Morisse communicated that decision to NPS. BT Vol. XX, 126:19-21.

163

563. Within a day, or the next day, Mr. Morisse called Randy Sutton and advised him of the Bank's decision. BT Vol. XX, 126:22-127:1. Mr. Sutton told Mr. Morisse to call Jean Maylack. BT Vol. XX, 128:4-9.

564. Mr. Morisse also had a discussion with Janice Sackley from NCB about insurance records. BT Vol. XX, 115:10-20. He faxed her samples of death certificates and lists of insured on March 2, 2004. Ex. D-328; BT Vol. XX, 115:24-25.

565. In an email Ms. Sackley sent, on March 4, 2004, two days after Mr. Morisse sent her the material, she stated initial steps were agreed upon and verification of samples of death certificates and insureds were complete and checked out as legitimate. Ex. P-821. After his conversations with Ms. Sackley, Mr. Morisse believed he had answered all of her questions. BT Vol. XX, 117:16-19. He believed he had peace of mind regarding how he had been operating the Trusts for four years. BT Vol. XX, 117:20-23.

566. Through its due diligence, NCB reviewed and became familiar with the Trusts' assets. Ex. P-2395, 42:4-17. NCB learned in 2004 that NPS and Lincoln were affiliated companies which presented "red flags" due to obvious "conflicts" that necessitated further investigation. Ex. P-2355, 78:25-80:6.

567. NCB also identified the Trusts were saturated with assets in the form of NPS debentures, loans to Cassity-owned entities, and life insurance policies issued by a Cassity-owned company. NCB acknowledged these were not arm's length assets because they were all associated with companies under the Cassity family's ownership and control, and identified the trust assets as having "questionable" value. Ex. P-2374, 141:1-142:22.

568. When reviewing the Trusts' Lincoln life insurance policy assets, NCB's auditors quickly uncovered evidence of the "mismatching" scheme simply by requesting a small sample

of NPS preneed contracts and the associated Lincoln life insurance policies. Ex. P-2359, 102:11-104:17, 116:22-117:18. NCB performed a comparison of the Missouri consumers' preneed contracts with the associated Lincoln life insurance applications. Ex. P-2359, 33:4-11. The random examples selected by NCB auditors readily demonstrated paid-in-full Missouri preneed contracts were routinely funded with Lincoln life insurance policies requiring premiums payable over many years. Ex. P-2353, 131:24-138:17; Ex. P-559.

569. Shortly after reviewing the assets of the Trusts, NCB considered it "critical" to investigate the quality and "soundness" of Lincoln as a company. Ex. P-2357, 48:20-49:19, 56:4-15. NCB retained an insurance specialist to review Lincoln's rating and financial condition. Ex. P-2354, 11:13-12:6. Through minimal effort and review of publicly-available information, NCB learned Lincoln appeared to be "financially ailing." *Id*. at 15:9-16:3. NCB was informed Lincoln "is not rated by any service, is 745th in asset rank, and its financials have been deteriorating. Its surplus has been reduced by half in the last 2 years." Ex. P-46, pg. 3.

570. The results of NCB's 2004 investigation into Lincoln, which revealed Lincoln seemed to be financially ailing, were admittedly "troubling" and a "huge red flag" to NCB and "especially concerning" because Lincoln policies represented the vast majority of the Trusts' assets. Ex. P-2357, 64:4-65:3, 72:20-73:14.

571. NCB also reviewed the Trusts' certificates of debenture. Initially, when NCB's auditors asked Mr. Morisse what assets backed these debentures, Mr. Morisse incorrectly believed the debentures were backed by life insurance policies. Ex. P-2359, 87:18-88:2. After further discussion, Allegiant and NCB confirmed there were no insurance policies backing the debentures. *Id*. at 88:3-8, 89:4-9, 90:24-91:3; Ex. P-42, pg. 2. NCB identified Allegiant's

165

valuation of the debentures, as well as Mr. Morisse's lack of knowledge concerning the purported assets, as red flags. Ex. P-2359, 88:9-17, 89:4-16, 90:5-23.

572. NCB's due diligence on the Trusts raised overall concerns for NCB that the Trusts' assets were not worth the values being reported by Allegiant. Ex. P-2374, 144:12-145:3. As part of the review, Mr. Morisse met with Thomas Jurmanovich. BT Vol. XX, 118:2-5. A memo from Mr. Jurmanovich discussed a Pfitzinger asset and a booking error overstating the asset market value by $509,000.00. Ex. P-42, pg. 2. Mr. Morisse believed Pfitzinger Funeral Home was a preneed trust at Allegiant Bank, related to the NPS system. BT Vol. XX, 118:17-24. When shown Allegiant Bank's Statement of Account for October 31, 2003, he remembered it as Pfitzinger Funeral Home PreNeed Trust. *Id.*

573. On the Statement of Account, there was an entry, "Set up on record, Evidence of Great American Life Ins. @ Face Valu, Received from Former Trustee." Ex. D-283, pg. 6. The investment cost basis was listed as $459,342.77. Ex. D-283, pg. 6. Mr. Morisse recalled getting two units of Great American Life Insurance in October 2003. BT Vol. XX, 120:4-6. These were listed in the Statement of Account, Portfolio Investment Review with a cost value of $516,299.77. Ex. D-283, pg. 3. Mr. Morisse believed Mr. Jurmanovich's characterization of an overstated $509,000.00 amount was not accurate. BT Vol. XX, 120:19-23.

574. Through its pre-merger due diligence, NCB discovered a complete lack of documentation within Allegiant's trust department to support the $13.5 million group term life insurance policy asset of Trust IV. Ex. P-2359, 60:23-61:3, 62:19-63:16. In a memorandum, Mr. Jumanovich stated: "No support could be provided for Asset #Ip1900709 – World Service Group Insurance Company. The 2/25/2004 market value for this asset was $13,522,337. The Trust Officer indicated the balance of this asset has never changed and he has never received

underlying support for this asset." Ex. P-42. He also observed, "NPS provides Allegiant with monthly directions to make adjustments to the trust accounts. This information only includes the net increase/decrease adjustment to make to the trust account. There was no specific information included at the policy level for Allegiant to review." Ex. P-42. In the following bullet point he stated, "There was no reconciliation performed by Allegiant to the support provided by NPS." Ex. P-42, pg. 2. NCB's auditors described the lack of activity concerning the group term life insurance policy during Allegiant's trusteeship, as well as Allegiant's lack of support for the asset, as "disturbing" and a "red flag." Ex. P-45; Ex. P-2359, 62:19-63:24.

575. When NCB performed its due diligence in March 2004, it performed a random sample of sixty Lincoln policies. BT Vol. XX, 232:15-18. NCB officials "had to go through" Mr. Morisse and Mr. Franke, an internal auditor to get that information. BT Vol. XX, 232:19-22. Mr. Morisse was not familiar with data pages until this litigation. BT Vol. XX, 233:15-18.

576. Mr. Morisse recognized his handwritten notes referencing a conference call on March 19, 2004, with Rob H[26] and team NCB audit regarding NPS. BT Vol. XX, 248:14-18. He recalled this was when Janice Sackley and others were asking detailed questions about how he was administering the NPS preneed accounts. BT Vol. XX, 248:19-24.

577. In his meetings with NCB's auditors regarding Allegiant's administration of the Trusts, Mr. Morisse confirmed Allegiant had "no tracking system" for the Missouri consumer payments and had no "underlying support for funds received versus wires sent out." Ex. P-43, pg. 1. Mr. Morisse also told NCB Allegiant did not "know who the deceased is" when wiring money out of the Trusts. Ex. P-45; Ex. P-2359, 71:18-72:4. NCB identified Allegiant's failure to maintain policy level detail for the consumer and funeral home beneficiaries of the Trusts as a "red flag" regarding Allegiant's trust administration. *Id*. at 97:25-99:7.

---

[26] Rob H refers to Robert Hipskind.

578. NCB's due diligence team acknowledged it was a "red flag," by Allegiant not performing reconciliations and instead relying solely upon the information provided by NPS. Ex. P-2357, 141:24-142:19, 143:1-15; Ex. P-2359, 99:8-100:1. Allegiant's procedure of taking orders from NPS on how to value the Trusts' assets was another "red flag," and would not have been allowed had NCB been the trustee. *Id*. at 96:12-97:13.

579. The information NCB obtained regarding Allegiant's mismanagement of the Trusts came directly from Mr. Morisse. Ex. P-2359, 100:2-101:7.

580. Thomas Plant, NCB's in-house counsel, learned NPS had previously been sued for operating a "Ponzi scheme." Ex. P-47; Ex. P-2374, 23:18-24:12. Plant also learned NPS had previously been accused of not "fully funding" the Trusts, and that NPS was comprised of "a group of 'Sleez [sic] balls.'" Ex. P-2374, 31:19-32:2, 34:1-11; Ex. P-47. Plant wrote in his notes Allegiant Bank acted "more of a custodian than a trustee." Ex. P-48.

581. NCB determined it did not wish to become trustee of the Trusts due to "excessive potential fiduciary risk." Ex. 2-07, pg. 12.

582. In sum, the Court finds the facts relating to NCB's due diligence and review of Allegiant's trust department and the Trusts explained major problems in the Trusts, evident in information Allegiant had available to it. It also provided evidence of Allegiant's trust administration and what information Allegiant could have easily learned which would have raised serious concerns regarding the Cassitys. NCB's examination revealed Mr. Morisse's serious mismanagement of the Trusts.

*U.     Transfer of the Trusts to Bremen Bank*

583. Within 30 days after NCB began its due diligence of Allegiant's trust department, NCB instructed Allegiant to withdraw as trustee of the Trusts. Ex. P-771; Ex. P-2391, 400:25-

401:5. Specifically, Mr. Kantra wrote in an email to Arthur Weiss at Allegiant on January 15, 2004:

> Pursuant to our recent telephone conversation, please accept this email as formal notification to begin proceedings to facilitate a complete exit of all preneed funeral trust arrangements. Communications to impacted clients should begin immediately and all relationships must be closed out prior to the legal closing date of the acquisition, March 31, 2004. . . [E]mail me to confirm your receipt of this notification and the initiation of the closing/transfer process.

Ex. P-771.

584. Mr. Kantra testified Allegiant "got a clear message through our discussions around our appetite for preneed funeral trusts that they should resign and effect a transition if possible." Ex. P-2394, 176:13-24; BT Vol. VII, 29:17-19.

585. Art Weiss, head of Allegiant's wealth management department, informed Mr. Morisse NCB instructed Allegiant to "move [the Trusts] out of the Bank" and Mr. Weiss "made it clear that [Allegiant was] going to need to comply with" NCB's wishes. BT Vol. VII, 29:17-30:3. After receiving the instruction, there "was no further discussion about whether or not [Allegiant was] going to move these assets out of the Bank." *Id*. at 30:7-13. Mr. Weiss then "handed this assignment off to Mr. Morisse[.]" *Id*. at 30:19-21.

586. On February 5, 2004, John Beer, the Chief Financial Officer for NCB's wealth management group, emailed Armando Ramirez, NCB's head of mergers, among others, a business plan regarding the Allegiant merger. Ex. 2-06. The attached document, dated January 30, 2004, noted, "Due to excessive potential fiduciary risk, preneed funeral trusts are expected to be exited prior to or shortly after 3/31/04." Ex. 2-07, pg. 12.

587. NCB informed Mr. Morisse to keep them informed in finding a successor of the Trusts as well as NCB's concerns about fiduciary risk within the Trusts. Ex. P-2394, 186:9-22, 192:13-20, 193:5-9; BT Vol. XI, 201:6-13.

588. On February 24, 2004, Mr. Morisse sent a letter to Alan Davidson, NCB's chief fiduciary officer who was overseeing the integration of the two trust departments, stating he had "communicated Allegiant's intention to resign to the chief operating officer of the grantor/seller under the various NPS related trusts. We intend to serve formal notice of resignation shortly. A copy of the draft proposed resignation I have prepared with respect to the [NPS] trust is enclosed." Ex. P-805.

589. On March 29, 2004, Mr. Morisse signed a "Notice of Resignation of Allegiant Bank" under which Allegiant informed NPS it was resigning as trustee of the Trusts "effective April 30, 2004." Ex. P-846.

590. On April 1, Christine Verleye (who worked with Mr. Kantra) prepared a note stating "Funeral Trusts: Preliminary acceptance to take preneed trusts from another fiduciary. Enhanced comfort level to get off our books before 5/30. Will not need to conver these accounts. Al Kantra will contact [Tom] Plant and Rob Hipskind." Ex. P-49, pg. 2; Ex. P-2394, 133:17-134:8.

591. Allegiant's decision to implement NCB's directive to exit the Trusts and find a successor trustee ended NCB's inquiry into the Trusts – Mr. Kantra testified once Allegiant had located a successor trustee, NCB's need to continue due diligence was "negated." BT Vol. XI, 193:24-194:7.

592. In April 2004, NCB updated its issue log related to the Allegiant merger to note "Decision to find successor trustee. Preliminary acceptance to take preneed trusts by another Fiduciary before 5/31." Ex. P-2080.

593. NCB acknowledged it had "concerns" regarding the Trusts. When the Trusts "walked out the door" that was "fine with [NCB]." Ex. P-2374, 193:25-194:12.

594. Mr. Morisse began to consider potential successor trustees. BT Vol. XX, 128:19-22. He knew Richard Markow was at Bremen Bank. BT Vol. XX, 129:17-19. He contacted Mr. Markow and asked him to follow-up with Jean Maylack. *Id*; Ex. P-2381, 104:18-25.

595. Mr. Morisse explained to Mr. Markow, NCB had no appetite for preneed trusts and was not interested in administering a non-local trust account. BT Vol. XX, 130:2-9. He believed Bremen Bank fit the requirements of the statute to be successor and Mr. Markow had experience with NPS. BT Vol. XX, 130:10-15. Allegiant Bank formally resigned as trustee of NPS Trusts I, III, IV and V on March 29, 2004, effective April 30, 2004. Ex. P-846.

596. Once notice of intention to resign was accomplished, Mr. Morisse met with officials at Bremen Bank, including Mr. Markow and two of his administrative staff. BT Vol. XX, 131:11-18. He remembered the name, Sylvia Stuart. BT Vol. XX, 131:19-21. He took copies of each of the NPS trust accounts and may have taken copies of the trust instruments then or at a later time. BT Vol. XX, 131:22-132:3. He answered questions and believed he took a copy of the most current packet for Trust IV. BT Vol. XX, 132:4-8. His purpose in being there was to deliver copies of documents for their review so they could determine if they would accept appointment as successor trustee. BT Vol. XX, 132:11-14. Mr. Markow expressed concern about the ability to deal with the volume of wire transfers. BT Vol. XX, 132:20-23. Mr. Morisse testified he said nothing untrue at the meeting. BT Vol. XX, 132:24-133:1.

597. At the time of these meetings between Mr. Morisse and Bremen personnel, Allegiant still owed fiduciary duties to the beneficiaries of the Trusts, which included the Missouri preneed consumer and funeral home beneficiaries. JSF.

598. When Mr. Morisse had the meeting with Bremen Bank officials, he did not believe he was handing off trusts with large fiduciary liabilities. BT Vol. XX, 133:2-5. Mr. Morisse sent a letter to Mr. Markow, dated May 4, 2004. Ex. P-2103. The letter included copies of account synoptic reports for each of the trust accounts and a synoptic report including basic information for each trust account. *Id*. Also included were copies of the Trusts' governing trust instruments and copies of prior year's income tax returns. *Id*. In all, there were 91 pages of material. *Id*.

599. In the Account Synoptic Report for Trust I, the trust was described as having no investment discretion, what Mr. Morisse described as a nondiscretionary account. Ex. P-2103, pg. 9; BT Vol. XX, 134:20-23. At Allegiant Bank, since Trust I was a nondiscretionary account, no investment officer was assigned to the account. BT Vol. XX, 134:10-15. Wulf, Bates & Murphy was responsible for investment management of this account. BT Vol. XX, 135:16-18.

600. The material supplied to Bremen Bank included a November 5, 1999, letter directing and authorizing Wulf, Bates & Murphy as investment advisor for Hiram Cemetery Endowed Care trust, Mason Securities Pre-Need plans trust, and NPS Trusts I, III, IV and V. Ex. P-2103, pgs. 10-11. It also included a copy of NPS's designation and appointment of Wulf, Bates & Murphy as investment advisor of the NPS Trust accounts I, III, IV and V. Ex. P-2103, pg. 12. Mr. Morisse also provided a November 1, 1999, corporate resolution authorizing Randy Sutton to appoint Wulf, Bates & Murphy as investment advisor of the Trusts and his personally drafted Custody Agreement, which the Court concludes perpetuated an obvious violation of Chapter 436.031.2. Ex. P-2103, pgs. 13-16.

601. Mr. Morisse also provided Bremen Bank personnel with a copy of the Trust Agreement for the Trusts. Ex. P-2103, pg. 17.

602. He provided similar information for Trust IV which he provided for Trust I in the above-mentioned exhibits. Ex. P-2013, pg. 58. He highlighted there was no investment authority for Trust IV. Ex. P-2103, pg. 59. Mr. Morisse procured permission from Jean Maylack to give this information to Bremen Bank officials. BT Vol. XX, 140:13-16.

603. The paperwork Mr. Morisse gave to Bremen did not include the wire transfer request forms or "all of the forms that show monthly renewals. One of the wire transfer forms not given to Bremen Bank on May 17, 2004, shows a balance due for monthly renewals of $454,000." BT Vol. III, 108:1-6. There was no information given to the Court as to why the forms were not given to Bremen Bank. This suggests to the Court Mr. Morisse's testimony about being honest in what he said to Bremen Bank personnel, and what he did in transferring worthless paper to Bremen Bank was not truthful. Internal bank forms were not given to Bremen Bank. *Id*. He gave Bremen Bank the April 2004 trust account statements and something called account "synoptics statements." BT Vol. III, 108:7-15. Trust IV statements, from the beginning of Trust IV, showing monthly renewal payments made out of Trust IV to Lincoln, were not given to Bremen Bank. BT Vol. III, 108:16-21.

604. During Mr. Morisse's meetings with Bremen, he provided instructions to Bremen personnel regarding how the Trusts were to be administered. He instructed Bremen, for instance, to duplicate the information and format of Allegiant's trust statements. Ex. P-2388, 64:9-65:10. Mr. Morisse also told Bremen to execute wire transfers "immediately" because "NPS liked to have things done as soon as possible." *Id*. at 65:11-20, 70:18-21. Mr. Morisse further explained Bremen should report insurance values as provided by NPS without any independent reconciliation or verification by Bremen, and Bremen should simply distribute "the income out

that was on the books" rather than performing the calculation in accordance with Chapter 436. *Id*. at 68:5-70:3, 77:11-78:5.

605. When Trust IV was transferred to Bremen Bank, just before the acquisition of Allegiant Bank by NCB, evidence of insurance in April 2004 for Lincoln policies listed the face value of the policies at $131 million. Ex. P-101D, pg. 1541; BT Vol. II, 174:14-17. Allegiant Bank assigned all its interests in Trust IV life insurance policies to Bremen Bank on May 20, 2004. Ex. P-2118, pg. 31. On April 30, 2004, Allegiant Bank transferred assets in Trust I to Bremen Bank. BT Vol. II, 179:20-25.

606. Allegiant had a right to resign as trustee, under the terms of the Trust Agreement, at any time, on thirty days' written notice to Seller, who had the right to appoint a successor. Ex. P-168. Mr. Morisse understood, each successor trustee, under Section 4.5 of the Trust Agreement, shall succeed to the title to trust vested in its predecessor by accepting, in writing, its appointment as successor trustee and filing acceptance with Seller. BT Vol. V, 100:4-7. He believes he complied with this provision when Allegiant Bank resigned. BT Vol. V, 100:8-10. When Mr. Morisse transitioned the Trusts to Bremen Bank, there was a single document of resignation, appointment of successor and acceptance of successor. BT Vol. V, 100:19-23. Mr. Morisse prepared the document. BT Vol. V, 101:15-17.

607. The resignation of Allegiant Bank as trustee became effective May 14, 2004. BT Vol. XX, 140:17-19. The notice of resignation was signed by Herbert W. Morisse, Vice President and Trust Officer on that date. Ex. D-355, pg. 1. On the same date, Randy Sutton acknowledged receipt of the notice and Richard Markow, for Bremen Bank, accepted appointment as successor trustee. Ex. D-355, pgs. 3-4.

608. Allegiant failed to inform Bremen of the known problems that existed with the Trusts and their assets, as evidenced by its failure to remove the World Service group term policy asset from its books. Ex. P-101D, pg. 1598, Ex. P-2353, 118:12-121:18; *see infra*. Bremen relied on Mr. Morisse's misrepresentations with regard to this asset. Ex. P-2388, 79:23-80:13.

609. Mr. Morisse believed how he transitioned the Trusts complied with his duties as a fiduciary and under the Trust Agreement. BT Vol. XX, 142:14-17.

610. Mr. Morisse drafted a document memorializing the assets to be transferred in the Trusts, knowing the document would go to Bremen Bank, prospective successor trustee. BT Vol. IV, 101:17-25. Bremen was to accept and receive his draft, together with trust records and physical assets. Ex. P-2118, pg. 31; BT Vol. IV, 102:16-19.

611. The document was dated May 18, 2004, after Allegiant Bank resigned as trustee. BT Vol. V, 101:18-22. When he provided the assignment to Bremen Bank, Mr. Morisse thought he was doing the right thing. BT Vol. V, 102:14-17. His goal was to comply with the Trust Agreement and provide "what we've described here to Bremen as successor." BT Vol. V, 102:18-22. Mr. Morisse testified, at the time he did the assignment, he did not know the World Service policy had no value. BT Vol. V, 102:23-25. Mr. Morisse testified he believed it was still in existence when it was transferred to Bremen Bank. BT Vol. XX, 143:18-20. Considering all of the evidence adduced, in this case, about that worthless insurance policy, the Court does not believe Mr. Morisse was being truthful when he said he believed it still existed or that he believed it was still in force.

612. On May 20, 2004, Allegiant transferred assets to Bremen Bank. Ex. P-101D, pg. 1598. The World Service group term policy was transferred to Bremen Bank on May 20, 2004, with a notation "delivered" to Bremen. *Id*. Mr. Morisse agreed, as of May 20, 2004, Allegiant

still represented on its trust statements the World Service group term policy existed and had a market value of $13.5 million. BT Vol. IV, 77:2-5.

613. When NCB began to ask, in March 2004, for verification of the existence of the policy, Mr. Morisse attempted to locate the policy document after he was advised evidence of the insurance could not be found in the asset vault. BT Vol. XX, 251:24-252:6. Based on the memo from Mr. Jurmanovich, Mr. Morisse believed he called to sources he thought might be able to furnish a copy of the policy, and based on the phone calls, he was not successful. BT Vol. XX, 252:17-25.

614. Lincoln had no record of the policy, and there was no "World Service" Mr. Morisse could find as a company. BT Vol. XX, 253:1-5. When he went to another company, American Growth, and a separate insurance company, they had nothing. BT Vol. XX, 253:6-9. He believed he tried to contact Lincoln-related insurance companies. *Id*. After he could find absolutely nothing verifying it, he left the World Service term policy on the statements at a $13.5 million value. BT Vol. XX, 253:10-13.

615. Thereafter, Mr. Morisse met with Richard Markow at Bremen Bank and showed him statements for all of the trust accounts, including the $13.5 million term policy in Trust IV. BT Vol. XX, 253:14-22. Mr. Morisse prepared, and received back in return from Bremen Bank, what he compared to be a quit claim deed. BT Vol. XX, 254:3-9. Mr. Morisse was asked, "you are talking to Mr. Markow who is a friend, right?" Mr. Morisse testified, "he was my friend." BT Vol. XX, 254:22-24.

616. When asked, knowing he could find no evidence to support the existence of the $13.5 million policy, he not only did not take it off the records, he then prepared a document that said all rights to this policy, we are now giving to you, Bremen Bank, he answered, "I prepared

176

an assignment which included the policy. At the time, we were meeting and transferring documents, which involved a number of trusts and dozens of assets. I don't recall having a specific recollection or concern with regard to the World Life policy." BT Vol. XX, 256:6-15.

617. Allegiant Bank's security listing for Trust IV dated May 19, 2004, showed what was being transferred to Bremen Bank as successor trustee. Ex. P-2118, pg. 30. The World Service group term policy was listed. *Id*. Mr. Morisse agreed Allegiant was not going to take this asset off the books of Trust IV even though, after his inquiry, no paperwork could be found to show its continued existence. BT Vol. IV, 79:3-6. He also admitted, it was the custom and practice in the industry for a trustee to give a successor trustee accurate records of what assets are being handed over; here Allegiant, the original trustee, to Bremen Bank, the successor trustee. BT Vol. IV, 79:10-14. Allegiant's assignment of right, title and interest in the Trust IV life insurance policies was signed by Mr. Morisse, transferring them to Bremen. Ex. P-2118, pg. 31. The form included Allegiant's transfer to Bremen Bank of the World Service group term policy. *Id*.

618. Mr. Morisse agreed, common sense tells, a person reading the assignment would believe there is such a thing as a World Service life insurance policy. BT Vol. IV, 81:22-25.

619. Mr. Morisse said he realized, even when having conversations with Bremen Bank concerning the transfer of the Trusts, he had fiduciary duties every day until the assets left the Trusts. BT Vol. IV, 101:12-16. He drafted the assignment of right, title and interest understanding the document would go to Bremen. BT Vol. IV, 101:17-19. He said he did it to memorialize what was being transferred and did not think about how it might be relied upon. BT Vol. IV, 101:24-25.

620. The Court agrees it was Mr. Morisse's intention to prepare an assignment to Bremen Bank of any interest Allegiant had in any of these unique assets, including the World Service

policy. The Court believes he knew the value of the World Services policy to Allegiant Bank was zero, and accordingly, to Bremen Bank, it was worth zero. This was confirmed when he testified as to the legal significance of a quit-claim deed: "a conveyance of a titular owner's right, title and interest to the property being transferred." BT Vol. XX, 34:7-11. When asked if he believed the concept of a quit claim deed had any relevance to what he was attempting to do when he assigned rights he had in the policy, Mr. Morisse testified, "That was the full intention of the assignment, to act as a transfer of any right, title or interest in the property described, the World Services life insurance policy was included with the evidence of Lincoln [] insurance, the debentures and any other unique assets held in the accounts." The Court believes, beyond any doubt, he knew the World Service policy was worthless, and in conveying Allegiant Bank's interest in that policy, he was transferring an asset of no value representing to Bremen Bank it had a value exceeding thirteen million dollars.

621. Allegiant took no steps to remedy the known problems associated with the Trusts or to warn the consumer or funeral home beneficiaries or its successor trustee of the known problems with the Trusts. Ex. P-2381, 112:8-115:12; Ex. P-2388, 79:23-80:19; Ex. P-2391, 405:20-406:2, 407:17-408:9, 409:6-412:19.

622. Allegiant maintained fiduciary responsibilities to the beneficiaries of the Trusts throughout the transition period in 2004 when it was moving to Bremen. Custom and practice required Allegiant to maintain accurate and adequate records until Bremen took over as successor trustee. Custom and practice also required Mr. Morisse and Allegiant to protect the interests of the Trusts' beneficiaries – over the interests of Allegiant – until the time when the transfer of the Trusts to Bremen was completed. JSF.

623. Janice Sackley, NCB's fiduciary risk manager and a key member of NCB's due diligence team, testified it was improper to pass off inaccurate trust statements to a potential successor trustee without disclosing the known problems with the Trusts' assets. Ex. P-2357, 139:21-140:11.

624. Allegiant's failure to address and notify Bremen of known problems in the Trusts violated the applicable standard of care. BT Vol. XIII, 163:25-164:14; BT Vol. XXI, 137:20-138:15.

### V.      Allegiant's Duty of Loyalty to Beneficiaries

625. Allegiant Bank, as trustee, relied on Wulf, Bates & Murphy's fiduciary responsibility for investments to be in the best interests of the Trusts, even though Wulf, Bates & Murphy was investment advisor for a Cassity-owned company, Forever Enterprises, at the same time it was investment advisor for the Trusts. BT Vol. III, 175:6-15.

626. Mr. Morisse clearly believed Wulf, Bates & Murphy could serve both Allegiant Bank trust beneficiaries and Cassity-owned companies, at the same time, and observe fiduciary obligations to each. He knew the Bank was relying on Wulf, Bates & Murphy's meeting its obligations to the respective accounts, even though Wulf, Bates & Murphy had an obligation to both the Trusts and the Forever Enterprises custody account. BT Vol. III, 177:18-24.

627. On December 10, 1999, Allegiant Bank and Forever Enterprises entered into an agreement with Forever Enterprises to establish a custody account in the Trust Department. Ex. P-435. The custody account was a document requiring someone in the trust department at Allegiant Bank to oversee the account. Ex. P-435; BT Vol. III, 166:19-23. The delegated fiduciary overseeing the custody account for Forever Enterprises was Mr. Morisse. BT Vol. III, 166:24-167:2. The form allowed Forever Enterprises to designate an investment advisor. BT

Vol. III, 167:9-12; Ex. P-435. Mr. Morisse approved the form. BT Vol. III, 167:13-14. Mr.

Morisse knew, in November 1999, Wulf, Bates & Murphy was the investment advisor for

Forever Enterprises for their custody account. BT Vol. III, 167:18-21.

628. In Paragraph 11F, the Custodian, Allegiant Bank Trust Department, was to exercise

all reasonable efforts to execute reasonable directions received from owner or owner's

investment advisor, and owner shall indemnify and hold custodian harmless in executing any

such functions. Custodian shall not be required to execute such directions of owner or owner's

investment advisor which, in custodian's sole judgment, subject custodian to liability or

unreasonable expense, or to prosecute or defend any action, unless indemnified by owner in a

manner and amount satisfactory to custodian. Ex. P-435, pgs. 3-4. If Mr. Morisse was to exercise

his sole judgment on any proposed transaction, he would have needed to understand the

transaction. BT Vol. III, 170:2-12. Mr. Markow signed the agreement for Allegiant Bank and

Randy Sutton, CFO, signed for Forever Enterprises. Ex. P-435, pg. 4. Mr. Morisse knew Randy

Sutton was CFO or some sort of an officer of NPS, and he was a senior officer at Lincoln at the

same time. BT Vol. III, 170:23-171:7.

629. Mr. Morisse was required to obey Allegiant Bank's Fiduciary Services Policy

Manual. BT Vol. III, 171:17-18. He knew it provided, "All fiduciary accounts shall be

administered for the exclusive benefit of the account beneficiaries. The best interest of the

account shall always be the primary objective." BT Vol. III, 171:25-172:5; Ex. P-1761. Mr.

Morisse was aware the Trusts were fiduciary accounts.  BT Vol. III, 171:6-7. If it was in the best

interest of the account to turn down the transaction because it would not inure to the benefit of

the beneficiaries, Mr. Morisse stated he would have inquired into the transaction to determine the

180

effect of proceeding and escalate it, if necessary, or take appropriate action, depending on what was concluded. BT Vol. III, 172:25-173:7.

630. Mr. Morisse did not administer the Trusts looking for "red flags," even though the Bank's records showed an interrelationship between Wulf, Bates & Murphy and Cassity-owned companies. BT Vol. II, 102:1-15. Mr. Morisse did know, from a banking relations memo, the Cassity-controlled companies included NPS and Lincoln. BT Vol II, 102:16-20.

631. Neither Mr. Morisse, nor anyone at the Bank, objected to Wulf, Bates & Murphy's activities, including the massive consolidation of trust assets in Cassity-owned companies. BT Vol. II, 195:8-11.

632. Mr. Morisse was involved in an e-mail exchange concerning whether the Bank would loan money to some Cassity-owned entities. Ex. P-573. Art Weiss copied Mr. Morisse, to inquire of bank exposure if a loan was made to Cassity interests. *Id*. It became very apparent Mr. Morisse was well-versed in the Cassity entity complex. *Id*. He believed the Forever Enterprises relationship began with Shaun Hayes' background with Mr. Cassity, principal owner of NPS. *Id*. Forever Enterprises was a privately-owned company that went public. *Id*. "Another relationship in the loop [was] Dave Wulf, of Wulf, Bates & Murphy, the investment advisor for NPS and Forever." *Id*.

633. More condemning was the language, "At the outset of the NPS business coming to Allegiant, Dave was in the loop with Shaun and others. . . Last week, Dave was feeling 'out of the loop' as a result of Rich's departure and he was very hot about the Bank messing up an intra-account transfer of $20,000.00 . . . Mr. Cassity and Randy Sutton, CFO of NPS, rely on Dave's advice and recommendations." Ex. P-573. From at least this time to the end of his term as trust administrator, Mr. Morisse was armed with knowledge that would have alerted a reasonable

trustee to carefully examine Wulf, Bates & Murphy's money requests to protect the interests of beneficiaries for which he had responsibility.

634. When asked if he knew Forever was the dominant corporation owning NPS and Lincoln, he stated he knew they were interrelated, but forgot which might or might not have been dominant. BT Vol. XX, 247:25-248:3.

635. In six years, Mr. Morisse never looked to see, using a data page or contract, whether money on deposit by the consumer was used to buy a paid-in-full contract. BT Vol. XX, 234:25-235:3. At that time, he had 50,000 individual consumers for whom he was trust administrator. BT Vol. XX, 235:4-7. As to his duty of impartiality to all beneficiaries, Mr. Morisse believed the Bank owed a duty to perform its obligations under the Trust Agreement. BT Vol. XX, 235:8-16.

636. Mr. Morisse added, "when you inject impartiality, in his recollection and understanding at the time, that would have been involved in a discretionary account, not a nondiscretionary account; so, the performance of the trustee's responsibilities would, you know, not be determining whether it was being impartial or not impartial to one party or another." BT Vol. XX, 235:23-236:4. This admission shows Mr. Morisse was not observing duties of loyalty and impartiality owed to the Trusts' beneficiaries.

637. Mr. Morisse admitted he recognized at all times, Chapter 436 trumped the Trust Agreement, and if there was a conflict, he had to obey Chapter 436. BT Vol. XX, 237:14-18.

638. On November 19, 2003, Allegiant entered in an "Agreement and Plan of Merger" with NCB. Ex. P-726. In entering into the Merger Agreement, Allegiant's officers were "represent[ing Allegiant's] shareholders and shareholders' best interests." Ex. P-726, pg. 10, Ex. 2-100, pg. 8.

639. Under the terms of the Merger Agreement, NCB would pay a "premium" for the outstanding shares of Allegiant "compared to the market price before the announcement of the" Merger Agreement. Ex. 2-100, pg. 8. Shaun Hayes, the President of Allegiant, testified the merger would be "a happy day" for Allegiant's shareholders who were going to "cash in if the merger goes through." Ex. P-2378, 71:3-15. These shareholders included the members of Allegiant's trust committee who were investors in Allegiant. *See supra.*

640. As of February 13, 2004, Allegiant's directors and officers held 3.8 million shares of Allegiant which represented 21.8% of the outstanding shares of Allegiant. Ex. P-2-100, pg. 10; BT Vol. XIV, 152:7-20. With the merger, Allegiant's directors and officers received $27.032 million. Ex. 2-100, pg. 10.

641. In addition, Allegiant's directors and officers held almost 473,950 stock options in Allegiant. Ex. P-2-100, pg. 23. Shaun Hayes held 109,798 stock options. *Id.* Art Weiss held 22,500 stock options. *Id.* These stock options would convert to NCB stock options and become more valuable as a result of the merger. BT Vol. VII, 32:18-23.

642. Mr. Morisse claims he did nothing improper in the transition, because of economic motives. BT Vol. XX, 145:1-4. No one at Allegiant Bank told him to lie to Bremen Bank. BT Vol. XX, 145:7-9.

643. Mr. Morisse signed a Salaried Employee Review Form on February 10, 2004, after he learned about NCB's interest in acquiring Allegiant. Ex. D-323. Mr. Morisse wrote, "My immediate interest is for the retention by National City as a member of the post-merger St. Louis area wealth management team. If retained, my goal is to become proficient, as soon as possible, in learning, understanding and applying new fiduciary administration policies and practices and National City's trust operating system and to contribute to the retention of historic Allegiant

fiduciary accounts and the development of new fiduciary accounts." *Id*. In Mr. Morisse's mind, when he was transitioning to Bremen, he was doing nothing improper with the goal of keeping his job. BT Vol. XX, 146:21-24.

644. Mr. Morisse wrote, his participation with members of Allegiant's senior staff and administration of Allegiant's fiduciary accounts had been personally satisfying, and the team approach developed and implemented by the trust company's officers over the past couple of years had been productive for the Bank. Ex. D-323. He wrote while needs and opportunities continued to exist, the quality and commitment of trust company staff had improved from two years ago, and less staff currently serviced approximately the same number of fiduciary accounts in a more professional manner than two years ago. *Id*. He appreciated and enjoyed the respect displayed by key trust officers to each other and he enjoyed the camaraderie of the current trust company staff. *Id*.

645. Mr. Scobee wrote of Mr. Morisse, "he continues to reflect a superior skill set in this area, reflected by a strong result in the state trust exam and good internal audit. He has improved his decision-making timeliness by more instinctively utilizing his knowledge and experience verses exhaustive research. This has improved department turnaround and morale. He worked through several long-term client issues/problems with satisfactory results for all parties." Ex. D-323, pg. 2. Mr. Morisse agreed with this statement. BT Vol. XX, 148:8-9. Mr. Scobee wrote Mr. Morisse's work ethic quality was unparalleled. Ex. D-323, pg. 3. His manager ranking was 4+, for which, he said, he worked hard. BT Vol. XX, 148:14-17.

646. Mr. Morisse said he was not making a lot of money at Allegiant Bank. BT Vol. XX, 144:10-11. He explained options to purchase Allegiant stock were awarded in 2000 or 2001. BT Vol. XX, 144:12-15. After the merger with NCB, he received around $30,000.00. BT Vol. XX,

144:16-20. Before the NCB acquisition, his salary was $50,000.00 to $55,000.00. BT Vol. XX, 144:21-25.

647. Under the Merger Agreement, NCB could terminate the merger if, *inter alia* (i) there was a material change in Allegiant's financial condition; or (ii) Allegiant's representation its business, including the trust department, as being conducted in accordance with applicable laws, ordinances, or regulations, was false. Ex. P-726 §§ 4.11, 4.13, 7.3, 8.1(e).

648. If NCB terminated the merger, Allegiant was required to reimburse NCB "for reasonable expenses incurred in connection with [the Merger Agreement] and the transaction contemplated" in the Merger Agreement. Ex. P-726 § 8.10(b). Those expenses are referred to as "National City Out of Pocket Expenses." *Id.*

649. Defendants identified the NCB out of pocket expenses as: (i) Retention and Severance - $2,891,983; (ii) Other Employee Related - $1,888,316; (iii) Contract Labor & Consultants - $7,296,004; (iv) Contract Buyouts - $1,062,793; (v) Conversion, Travel & Other - $7,324,854; (vi) Investment Banker Fees and Legal - $3,476,424. Ex. P-2380, 97:21-98:14; Ex. P-5000. These categories equal approximately $20,443,950.00 in expenses. Ex. P-5000.

650. The Merger Agreement also included various "no shop" provisions that make it more difficult for Allegiant to sell its business to a party other than NCB. Ex. 2-100, pg. 18. These "no shop" provisions included a "Breakup fee" that required Allegiant to pay up to $25 million to NCB if Allegiant merged with another bank within two years of the termination of the Merger Agreement. Ex. P-726 § 8.10(b).

651. NCB's SEC filings explained these "no shop" provisions "might discourage a third party that might have an interest in acquiring all or a significant part of Allegiant from considering or proposing that acquisition even if it were prepared to pay consideration with a

higher per share market price than the current proposed merger consideration, and the termination fee might result in a potential competing acquirer proposing to pay a lower share price to acquire Allegiant than it might otherwise have proposed to pay." Ex. 2-100, pg. 19.

652. As described *supra*, prior to its merger with NCB and the transfer of the Trusts to Bremen, Allegiant knew of significant material problems in the Trusts including: (1) the lack of support for the $13.5 million World Service life insurance policy; (2) Trust IV's renewal obligations which it had no ability to meet; (3) policy loans being taken against the Trusts' Lincoln policies; and (4) NCB had identified the Trusts as an "extremely high" fiduciary risk. Allegiant did nothing to address these problems or inform Bremen of the problems.

653. In 2003, Allegiant's annual net income was $22.8 million and at the time of the merger, its capitalization was just under $200 million. BT Vol. XI, 94:20-21; BT Vol. XIV, 170:19-24. Given those financials, the testimony from NCB's head of wealth management stated an undisclosed liability as low as $10 million "would be major." Ex. P-2375, 72:7-73:14. Further, a material undisclosed liability would cause NCB to evaluate whether to adjust the offered price or walk away from the deal. *Id.* at 77:3-20; BT Vol. XI, 86:4-13. This is, obviously, less than the $13.5 million World Service group term policy not disclosed to Bremen.

    *W.    Bank Audits and Examinations*

654. After a time administering the Trusts, there was a bank examination of Allegiant in January 1999. BT Vol. V, 146:24-147:3. It was Mr. Morisse's first personal experience with a bank examination. BT Vol. V, 147:4-6. The examination was conducted by the Missouri Department of Finance. BT Vol. V, 147:9-22. Prior to the two-week in-bank examination, the Bank received a questionnaire, which members of the trust department were required to complete. *Id*. A computer printout, with a vast amount of information, was prepared which

included all the fiduciary accounts on the Bank's books. *Id*. Upon arrival, examiners met with bank staff to outline their plans for the examination. *Id*. The examiners asked questions and covered general information, then identified specific accounts to be audited. *Id*.

655. The examination resulted in a report dated February 11, 1999. Ex. D-15, pg. 1. Mr. Morisse received a copy of the report upon its arrival at the Bank. BT Vol. V, 157:24-158:1. Mr. Morisse read it carefully and Mr. Markow asked him to prepare a response to the examination. BT Vol. V, 158:2-4, 19-21.

656. The Report stated the examination began January 4, 1999, and ended January 22, 1999. Ex. D-15, pgs. 1, 17. The report indicated the examiners spent a total of 192 hours inside the Bank and 54 hours outside the Bank, for a total time of about 240 hours. Ex. D-15, pg. 17.

657. Mr. Morisse, Mr. Markow, Mary Schmidt, another vice-president, and Pam Buchanan, another administrator, attended the exit meeting on January, 22, 1999. Ex. D-15, pg. 4. For the Division of Finance, Mr. Rialti and Mr. Francis attended. Ex. D-15, pg. 4. Examiners reported "management agreed with the aforementioned recommendations and indicated corrective actions would be taken." Ex. D-15, pg. 4.

658. Mr. Morisse believed the Division of Finance did a full-scope examination of the trust department. BT Vol. V, 161:9-10. This included a review of the board of directors and trust committee minutes, department policies and procedures, operations and internal controls, audits, individual account reviews, and Y2K readiness. Ex. D-15, pgs. 22, 23.

659. The report discussed Allegiant's fiduciary services policy. Ex. D-15, pg. 3. The report stated policies and procedures were discussed with examiners. Ex. D-15, pg. 4. One of Mr. Morisse's tasks, after the report, was to review policies and procedures and implement the examiner's recommendations. BT Vol. V, 162:16-18. The accounting firm selected for external

audits of Allegiant Bank was Cummings Oberkfell, and audits of the trust company did occur. BT Vol. V, 163:5-14. However, the report also stated, "Trust department policy requires that an external audit shall occur at least once each year and must be concluded not more than fifteen months after the conclusion of the prior audit. Ex. D-15, pg. 3. As of the examination, no audit has been performed. Ex. D-15, pg. 3.

660. Even though policies required the board of the Bank establish a trust committee, Mr. Morisse confirmed that had not been established at the time of the examination. BT Vol. V, 163:17-25. He said it did not make sense to have a separate trust audit committee, so it was placed with the Bank's audit committee. BT Vol. V, 164:1-6. The report stated an individual account review was done on a sample basis. BT Vol. V, 164:7-9; Ex. D-15, pg. 3. The report stated the review of Trust IV "revealed several administrative exceptions, including an apparent violation of Section 436.031.2 RSMo and Section 436.045 RSMo. Management should perform a complete review of the preneed trust accounts to determine proper compliance with all state laws and the governing instruments, and to ensure adequate supporting documentation for investment and account administration is obtained." Ex. D-15, pg. 4 (emphasis added). Mr. Morisse testified he did as suggested by the report. BT Vol. V, 164:23-24. Clearly, that is false.

661. The statements also described transactions "per direction of the investment advisor." BT Vol. V, 150:24-151:1. On January 22, 1999, about five months after Mr. Morisse began administering Trust IV, the examiners met with the trust staff to be interviewed and to review the results of the examination. Ex. P-378; BT Vol. V, 151:10-12, 21-24. The first agenda item was the Tentative Examination Rating. Ex. P-378. On a scale of five, the Bank received a two, one being the highest rating. The composite rating was reported with favorable comments. Ex. D-15; BT Vol. V, 152:6-10.

662. The Uniform Interagency Trust Rating System described a score of two as: "Administration of fiduciary activities is fundamentally sound. Generally, no component rating should be more severe than a 3, only moderate weaknesses are present and are well within management's capabilities and willingness to correct. Fiduciary activities are conducted in substantial compliance with laws and regulations. Overall risk management practices are satisfactory relative to the institution size, complexity, and risk profile. There are no material supervisory concerns and, as a result, the supervisory response is informal and limited." Ex. D-13, pgs. 2, 3.

663. Mr. Morisse was pleased with the "2" rating. BT Vol. V, 153:6-7. The next item from the exit interview was to consider policies and procedures. Ex. P-378. This included: "Revised FDIC statement of Principles of Trust Department Management," "Review and update the fiduciary policies and procedures," "Missouri Prudent Investor Act," and "Other policy manual requirements." Ex. P-378. Mr. Morisse was put in charge of addressing the examiners' recommendations. BT Vol. V, 154:6-11. There was a discussion of the NPS accounts. BT Vol. V, 154:20-21.

664. Mr. Morisse testified, any issues raised by the examiners, concerning the trust audit, dealt primarily with documentation related to memorialization of certain matters and certain items in connection with the administration of accounts. BT Vol. V, 155:5-8. According to Mr. Morisse, the examiners, in particular, understood and believed Wulf, Bates & Murphy had been appointed investment advisor, but the corporate resolution and actual designation had not been passed along to Allegiant, and it was not in their files. BT Vol. V, 155:10-15. In the report, the examiners observed the receipts for payment of funeral services were not routinely included in the monthly packets the Bank had been receiving. BT Vol. V, 155:16-21. The examiners wished

189

to see memorialization, in written form, of how direction was being received from Wulf, Bates & Murphy. *Id*. Mr. Morisse testified, "after going through, in detail, the procedure with respect to the administration of, I believe it was NPS Trust IV, they were concerned that the Bank didn't hold physical policies, but received verification of the insurance in Allegiant's name and as beneficiary might create some question about whether the Bank was maintaining control of the policies." BT Vol. V, 155:23-156:4 (emphasis added).

665. That is not an accurate statement of what appears in writing in the examiners' report. Actually, the report said, "Section 436.031.2 RSMo. States, in part, that title to all investment assets shall remain in the trustee and be kept by the trustee to be liquidated upon request of the advisor of the seller." Ex. D-15, pg. 5. "In no case shall control of said assets be divested from the trustee." *Id*. "Approximately $56,935M in Lincoln Memorial Life Insurance Company policies, which are assets of the NPS Pre-Need Trust IV, are held by National Prearranged Services, Inc. This appears in violation of the aforementioned Section, as the insurance policies must be kept by and in control of the trustee." *Id*. (emphasis added). Mr. Morisse believed this "referred to the procedure that I described previously with regard to the holding of the life insurance, and control and ownership of the life insurance since individual policies were not held on premises at the Bank. And, there was frankly, a fair amount of discussion back and forth with the examiners understanding that reliance was placed on the verification, certification by the insurance company that the policies were owned by the Bank as trustee was listed as beneficiary in any event." BT Vol. V, 165:23-166:10.

666. After the examination Mr. Morisse was asked by Mr. Markow to prepare a memorandum, which would go to him and Sandy Friedman, financial officer at the Bank. The purpose of the memorandum was to provide a response to each item in the report calling for a

response from the Bank officials, after he, Mr. Markow and Ms. Schmidt met, in conjunction with the review of the examiners' report. Ex. D-124, pg. 1; BT Vol. V, 181:2-17. The three met and discussed issues the examiners identified. Section T-1A of the examiners' report pertains specifically to Chapter 436.031.2. In his memorandum, Mr. Morisse set forth the provisions of the statute in Article II Section 2.2 and 2.3. BT Vol. V, 187:18-189:18. He explained a "solution" to the examiners' report would be entry into a custody agreement between the Bank and NPS. He testified he described to examiners what he described in his March 5, 1999 memorandum. BT Vol. V, 190:6-20. He testified he included the following language in his memo, "The Missouri Division of Finance auditor believes that the absence of physical possession of each individual policy by Allegiant violates the statutory provisions that 'title to all investment assets shall remain with the trustee and be kept by the trustee,' and that in no case shall control of said assets be diverted from the trustee." BT Vol. V, 191:22-192:3.

667. Mr. Morisse testified he read the examiners' report, he understood it, and he agreed with the examiners' conclusions and recommendations. If these representations are true, the Court concludes, having studied the actual exhibits, and compared the language of the report to Mr. Morisse's testimony, Mr. Morisse's following statement about getting advice from an auditor or bank examiner is not logical or believable. The obvious conclusion would be the auditor would not have approached Mr. Morisse with a plan to violate trust rules by giving the grantor control of trust assets when bank examiners just concluded, in writing, Allegiant was violating Missouri law by allowing NPS to have custody and control of trust assets.

668. The bank examiners just reported Allegiant Bank violated Missouri law. Mr. Morisse said he talked to a bank examiner, then an auditor, who recommended the entry of a custody agreement with NPS, to be custodian of the individual policies, whereby the custodian

would be a non-paid agent of Allegiant Trust Company to "keep" and control the individual policies in compliance with the auditor's interpretation of the statutory provisions. BT Vol. V, 192:4-25. On his oath, Mr. Morisse swears he had interaction with bank examiners or an auditor who recommended he draft a custody agreement with NPS where the insurance policies would be held and controlled by NPS. He is claiming, after the bank examination by the Missouri Division of Finance, which had already issued its report specifically finding the Bank violated Missouri Law by not keeping and controlling the policies, bank examiners said, it was permissible for NPS to keep the policies, a procedure that would continue to divest Allegiant from holding and controlling customer assets. which were already in NPS's possession. The Court disbelieves Mr. Morisse.

669. After receiving the Bank examination report, Mr. Morisse, on March 5, 1999, wrote a memorandum to fellow senior bank officials outlining the issues presented by the bank examination for resolution. Notwithstanding, in this March 5, 1999 memorandum, he specifically recognized the above statutory language, and the examiners' conclusion the Bank was in apparent violation thereof, he wrote to fellow bank officials stating examiners made a suggestion in direct opposition of their official findings. In his memorandum, Mr. Morisse included a discussion of the investment advisor and then of control of assets. Ex. D-124, pg. 3. Mr. Morisse wrote: "If the auditor's interpretation of the relevant statutory provisions is accepted, we concur with his recommendation to consider entering into an agency agreement with NPS' custodian of the individual policies whereby the custodian would be a non-paid agent of Allegiant Trust Company to 'keep' and 'control' the individual policies in compliance with the auditor's interpretation of the statutory provisions." Ex. D-124, pg. 3. This part of the memorandum, on which he intended bank executives would rely, was not included in his drafted letter to the Chief

192

Examiner of the Missouri Department of Economic Development, Division of Finance. Ex. D-124. Instead, his drafted letter to the Chief Examiner said, "The Trust Company will take necessary action as trustee of the account, to maintain control of the insurance policy assets." Ex. D-126, pg. 2 (emphasis added). That is all he said about Allegiant Bank having any other plan related to control of assets. Ex. D-126, pgs. 1-3.

670. In the memorandum to bank officials, Mr. Morisse wrote, "All NPS and Forever Enterprises funeral preneed trust accounts have been reviewed and it has been determined that the accounts have been administered in compliance with the governing instruments (and as the accounts were administered by Mark Twain Bank and Mercantile Bank, the former trustees for the trust accounts) but that the provisions of the governing instruments differ in some respects from the statutory provisions cited at page T-1-a of the report." Ex. D-124, pg. 2. There was no suggestion the report was attached to his letter. "T-1-a" of the Report cited two violations of Missouri state laws in the administration of these accounts. Ex. D-124, pg. 2; BT Vol. V pg. 187:8-12.

671. While he did not cite all of 436.031.2 in his memorandum, Mr. Morisse cited the portion relevant to his representations under paragraph 6(a) of his letter. BT Vol. V, 187:22-188:9. Mr. Morisse is a skilled drafter and an accomplished attorney. He circled some provisions on his printed copy of Chapter 436 when Allegiant Bank was considering whether to succeed Mercantile Bank as trustee. Language circled included the following: "Investment decisions regarding the principal and undistributed income may be made by a federally registered or Missouri registered independent qualified investment advisor designated by the seller who established the trust; provided that title to all investment assets shall remain with the trustee and be kept by the trustee to be liquidated upon request of the advisor of the seller. In no case shall

control of said assets be divested from the trustee, nor shall such assets be placed in any investment, which would be beyond the authority of a reasonably prudent trustee to invest in. The trustee shall be relieved of all liability regarding investment decisions made by such qualified investment advisor." Ex. D-5, pg. 9. Part of the language circled by Mr. Morisse, he underlined in his March 4, 1999 memorandum to Sandy Friedman, "provided that title to all investment assets shall remain with the trustee and be kept by the trustee to be liquidated upon request of the advisor of the seller. In no case shall control of said assets be divested from the trustee, nor shall said assets be placed in any investment which would be beyond the authority of a reasonably prudent trustee to invest in." Ex. D-124, pg. 2-3.

672. Mr. Morisse cited language from the Trust Agreement, in his letter to Ms. Friedman. Ex. D-124, pg. 3. The governing Trust Agreement provided here, in part, in pertinent provisions: "Article II, Section 2.2: The Trustee shall have the exclusive management and control of the Trust and its funds . . ." *Id.*

673. As noted above, the State of Missouri Division of Finance bank examiners could not have been clearer in their conclusions. Allegiant Bank was in violation of the law by not having trust investments under its control. There is no question Mr. Morisse knew the Bank had a lawful obligation to keep the insurance policies. Mr. Morisse wrote the memorandum to Ms. Friedman, a senior financial officer at the Bank, to provide to her an analysis of Chapter 436 with the expectation she would talk to "Senior management and the Bank board, itself" about the issues raised in the memorandum. BT Vol. V, 188:10-21. He believed, through this memorandum, he discussed Chapter 436, its application, and its meaning with appropriate senior people within the Bank. BT Vol. V, 188:22-25. He did not inform those people the trust administration had

violated two Missouri statutes, according to the bank examiners, even though he knew a response to a bank examination report was a big deal. BT Vol. V, 189:19-20.

674. When he wrote the Friedman memorandum, he expected her to communicate the contents of the memo to other senior financial officers including, Shaun Hayes, the president of the Bank. BT Vol. V, 189:23-190:1. On March 17, 1999, Mr. Morisse drafted a letter in response to the Missouri Division of Finance for signature of Shaun Hayes. Ex. P-2249; BT Vol. V, 195:24-25**.** Twelve days after his memorandum to senior bank officials, in his letter to Mr. Lawrence Clos, Chief Examiner, Missouri Division of Finance, Mr. Morisse stated: "NPS Pre-Need Financial Accounts. The review of this account disclosed apparent violations of Sections 436.031.2 and 436.045 of the Missouri Revised Statures. Section 436.031.2 provides that when an investment advisor has been designated to perform investment management of trust assets as in the case of the trust in question, title to all investment assets shall remain with the trustee and be kept by the trustee. In no case shall control of said assets be divested from the trustee. Certain assets of the trust in question, life insurance policies approximately $56.9 million are physically held by the Grantor. The Trust Company will take necessary action so that as trustee of the account it will maintain "control" of the insurance policy assets in question. . ." Ex. D-124 (emphasis added).

675. Mr. Morisse said nothing in this letter to the Chief Bank Examiner about an auditor's recommendation to allow NPS, grantor, to "keep" and "control" trust assets. Ex. P-2249. Only Mr. Morisse knows why, from the beginning of his service as trust administrator, he had an aversion to Allegiant holding and keeping trust assets, the insurance policies. At the March 15, 1999 meeting, the Trust Committee discussed the trust company's response to the Division of Finance examiner's report. Ex. D-689, pg. 4. Mr. Morisse provided copies of the

responses to the Bank's examination to the Committee. Ex. D-689, pg. 4; BT Vol. XX, 9:24-10:1. Mr. Morisse got approval for his responses to the bank examiners from the Committee, and Mr. Hayes signed off on his response. BT Vol. XX, 10:2-6.

676. Mr. Morisse participated in a formal response to the bank examiners report, and a rough copy was prepared before the final draft. Ex. P-2249; BT Vol. V, 194:23-25. He drafted the final letter signed by Shaun Hayes. BT Vol. V, 196:8-10. The letter explained the Bank would make changes to the policy manual, which they did do several months later. Ex. D-126, pg. 1; BT Vol. V, 197:5-13. The letter confirmed there were plans for internal audits, not "External Audits" called for in the examiners' report. Ex. D-126, pg. 2.

677. Mr. Morisse's solution was the policy manual would be amended to reflect external trust audits would be the responsibility of the Bank's audit committee. BT Vol. V, 197:24-198:1; Ex. D-126, pg. 2. As to the issue of FDIC changes, Mr. Morisse testified the Bank adopted the principals at the February 18, 1999 board meeting. BT Vol. V, 198:2-6; Ex. D-126, pg. 2.

678. To address the issue of getting receipts before paying for funerals, Mr. Morisse stated, in his drafted letter, in the future the trust company would obtain receipts for payments made for funerals. Ex. D-124, pg. 2. He also said documentation would be improved for direction from the investment advisor and for income distributions. *Id*.

679. Mr. Morisse knew when he drafted a letter to be sent to Chief Examiner Clos, contrary to his representations to the examiner, he had no intention of taking control of the policies, but to the contrary, he already had taken action to arrange for NPS to keep and control the policies, violating basic rules of separation of trust law responsibilities.

680. What is clear, beyond any doubt, is, at this time, Mr. Morisse knew the trust department was in violation of state law, and at this early time in the administration of the

preneed trusts, he had been provided a road map, with clear instructions on actions he could easily have taken. He chose to refuse to take control of the life insurance policies. If he had asked Lincoln or NPS to examine just one policy, he would have discovered there were no customary folded policies, only pieces of paper representing the policies. He would have seen, if he had consecutive samples of policies, most of the policies were not whole-life fully paid-up policies, but were multi-pay policies requiring premium payments up to twenty years. Whether at the direction of others or because of his determination to avoid taking custody of the insurance policies, he forged ahead with his plans to allow NPS to keep the policies, contrary to his representations to the Chief Bank Examiner for the Missouri Division of Finance.

681. The second violation of Missouri law the bank examiners found was to Chapter 436.045 which pertained to payment distributions to seller. Ex. D-124, pgs. 3-4. The bank examiners found in their report, "The apparent violation exists in that payments are being rendered to the seller without obtaining the required provider's receipt." Ex. D-15, pg. 5. Mr. Morisse's solution was to get a copy of provider's receipt with the affidavit furnished to Allegiant. BT Vol. V, 194:10-13. Under the section titled "PAYMENT DISTRIBUTION TO SELLER," the report stated: "Section 436.045 RSMo states, within thirty days after a provider and a witness shall certify in writing to the seller that the provider has provided the final disposition of the dead body, and funeral services, facilities, and merchandise described in the contract, or has provided alternative funeral benefits for the beneficiary pursuant to special arrangements made with the purchaser, the seller shall pay to the provider a net amount equal to all payments required to be made pursuant to the written agreement between the seller and the provider or all payments made under the contract. Upon delivery to the trustee of the provider's receipt for such payment, the trustee shall distribute to seller form the trust an amount equal to all

deposits made into the trust for the contract." Ex. D-15, pg. 5. An apparent violation existed in that payments were being rendered to the seller without obtaining the required provider's receipts.

682. "Management indicated the exceptions were an oversight and agreed to take appropriate corrective actions." Ex. D-15, pg. 5. For this apparent violation of the statute, Mr. Morisse took corrective action by requiring NPS to provide cancelled checks for all funeral services provided. BT Vol. V, 167:8-16.

683. Mr. Morisse testified examiners identified no liabilities the Bank might have, associated with Trust IV. BT Vol. V, 168:3-7. He said their comments were for informational purposes. *Id*.

684. Bank examiners valued the assets in Trust IV, on the date Allegiant Bank became trustee, at over $58 million, based on the face value of the life insurance. Ex. D-15, pg. 9. Bank examiners concluded, "Since September 23, 1998, approximately $47M has been distributed from income cash to the Seller." Ex. D-15, pg. 9. According to Mr. Morisse, wire transfer forms were available to examiners, they discussed the distributions to Seller; the entirety of the process was reviewed including funds to be wired out at the direction of Wulf, Bates & Murphy, the receipt of funds and the faxes related to deposits in the account, reliance on the monthly packet, the insurance verification, the list of insurance policies valued at face value, the affidavit for Mr. Sutton, with respect to deaths and cancellations, as well as death certificates, and that net income distributions were being paid monthly to NPS. BT Vol. V, 169:24-170:24.

685. The examiners specifically discussed with Mr. Morisse, and reported on the Trust Agreement provision regarding the independent investment advisor. BT Vol. V, 171:2-6; Ex. D-15, pg. 10. The trust provision the examiners quoted related to the appointment of an outside

investment advisor if trust assets exceed $250,000.00, so long as the requirements of Missouri law were met. Ex. D-15, pg. 10. Mr. Morisse stated the examiners never suggested principal and interest in Trust IV did not exceed $250,000.00. BT Vol. V, 172:5-8. The examiners reported Wulf, Bates & Murphy was appointed by Seller as investment advisor; however, no written documentation had been obtained by Allegiant to evidence such appointment. Ex. D-15, pg. 10. Conversely, acceptance by the advisor, as proved by a written investment advisor agreement or contract with seller, had also not been obtained. Ex. D-15, pg. 10. The examiners identified no issues with the actual underlying transfers. Ex. D-15, pg. 10; BT Vol. V, 173:2-6.

686. The next issue raised by examiners pertained to investment directions being received and taken from Wulf, Bates & Murphy. Ex. D-15, pg. 10. Investment directions were being obtained, but the concern was the retention of information that proved or corroborated who could authorize or make the investment decisions on the account. Ex. D-15, pg. 10. They looked at the investments and Mr. Morisse believed they had some concern but nothing was expressed regarding unique assets, the evidence of life insurance, or the debentures. BT Vol. V, 173:19-174:3. After receiving the report stating examiners had concern about retention of assets and information as to whom could authorize or make investment decisions on the account, Mr. Morisse, in his drafting of a custody agreement to allow NPS to keep the policies, also made it easier for money to be taken from the Trusts, with no verification money taken was for an investment.

687. The examiners looked at some investments that appeared to be speculative, including CAI Wireless and a Boston Chicken company convertible bond. Ex. D-15, pg. 10. The examiners continued to put Mr. Morisse and Allegiant Bank on notice of the requirements of Chapter 436, quoting from Section 436.031.2, "In no case shall said assets be placed in any

investment which would be beyond the authority of a reasonably prudent trustee to invest in."
Ex. D-15, pg. 10. Mr. Morisse said no examiner reported to him life insurance policies were
speculative or could have investment quality concerns. Ex. D-15, pg. 10; BT Vol. V, 174:15-19.
This was strong evidence Mr. Morisse should have been alerted when the investment advisor
later bought common stock at higher than market price.

688. The examiners noted in their report, "Allegiant Bank as trustee has full investment
discretion under the Trust Agreement." Ex. D-15, pg. 10. As to another trust account, the
"Nadine Allen Testamentary Trust FBO Jane Eassler, Trustee UW 12-14-72, MV $3.689M," the
examiners stated "[t]he original investment review was scheduled for June, 15, 1998, but the
review form in the account files is stamped 'reschedule.' As of examination date, an initial
formal investment review had not been performed as required." Ex. D-15, pg. 10. A similar note
appeared in the report on page 11 concerning an investment review of a $1.069 million trust for
Marion D. Brunk. Ex. D-15, pg. 11. Mr. Morisse, over and over, said he had no investment
responsibility for the Trusts, but clearly, when he had investment discretion on other trusts, he
demonstrated a lack of responsibility for interests of beneficiaries, other than NPS.

689. In the report, under a section titled "Summary of Trust Activities," the examiners
listed distribution of assets as of January 4, 1999. Ex. D-15, pg. 12. Miscellaneous assets were
valued at $114,959,000.00. Ex. D-15, pg. 12. Mr. Morisse explained, this amount referenced
assets primarily composed of insurance policies and NPS debentures held in preneed funeral
trusts and cemetery endowed care funds. BT Vol. V, 176:20-23. Miscellaneous assets were listed
with an asterisk, which reference identified NPS as issuing the debentures. Ex. D-15, pg. 12.
These were not categorized as speculative. BT Vol. V, 177:9-11.

690. The next issue was, "Requirement of an External Audit." Ex. D-124, pg. 2. Mr. Morisse determined it did not make sense for separate audit and trust committees to be established, but that it could all be handled by the Bank's audit committee. BT Vol. V, 182:23-183:2. Next on the list was, "Establish a Trust Audit Committee." Ex. D-124, pg. 2. The examiners had found a trust audit committee had not formally been appointed. BT Vol. V, 183:11-12. The fifth issue was, "Adoption of updated FDIC Statement of Principles of Trust Department Management." Ex. D-124, pg. 2. Mr. Morisse testified the memo was intended to provide both context and background to Ms. Friedman, as well as specific discussion of the examiners' comments. BT Vol. V, 183:15-20. The September 1997 Statement of Principles had been updated and the examiners were requesting the board adopt the updated statement. BT Vol. V, 183:21-25.

691. The Bank adopted the updated statement. BT Vol. V, 184:6-11. The FDIC required, in paragraph 2(c) of the Statement of Principles, the trust committee should provide for a comprehensive review of all new accounts for which the Bank has investment responsibility. Ex. 2-90, pg. 1. Mr. Morisse believed this was in respect to discretionary accounts where the Bank has investment management responsibility. BT Vol. V, 184:16-185:4.

692. In paragraph (d) of the FDIC Statement of Principles, it stated the trust committee should provide for a review of each trust department account at least once during each calendar year. Ex. 2-90, pg. 2. For nondiscretionary accounts, annual administrative review was required; for the Bank's discretionary accounts, investment review and administrative review applied. BT Vol. V, 186:7-14.

693. Mr. Morisse stated the examiners did not report any criticism of his trust department staff, or that they were too inexperienced. BT Vol. V, 178:3-5. Trust officers, at that time, were

Mr. Pyzyk, Mr. Weiss, Mr. Gibson, Mr. Farrell, Mr. Guller, Mr. Markow and Mr. Morisse. Ex. D-15, pg. 18. While the bank examiners recorded no criticism for experience, evidence is persuasive some were on the trust committee for marketing priorities, and while the trust committee met monthly, evidence does not show any officers probed issues related to compliance with Chapter 436 or the Trust Agreement. Except for Mr. Morisse, Mr. Pyzyk, chairman of the committee, was a "pretty famous businessperson, very well-known in real estate investment and the apartment industry," "a big-time guy." BT Vol. V, 178:14-25. The report identified John Weiss as director/president of Brentwood Volvo; Dr. William Gibson as Director of St. Louis County Dental Health Services; Kevin Ferrell as director/president of St. Louis Steel Products, Inc.; and Sidney Guller as director/president of Essex Industries, Inc. Ex. D-15, pg. 19. Among this list of prominent men, there is nothing to suggest any one of them brought skills in trust management to the trust committee. Mr. Morisse opined they participated in trust committee meetings, asked questions, reviewed what they were asked to review, took the initiative to make comments and recommendations in various areas, and in his view, were active. BT Vol. V, 179:4-10.

694. Mr. Morisse viewed the bank examiner's "2" rating, and the conclusion the administration of fiduciary activities was fundamentally sound, as strong. BT Vol. V, 179:17-25. Mr. Morisse failed to recognize, on the Trust Report Checklist, the examiners concluded "no" to the line, "Are the accounting records of the department adequate?" and "not applicable" to the question, "Does the department subject adequate protection for all real and personal property under its care?" Ex. D-15, pg. 23.

695. Mr. Morisse drafted a letter, dated March 4, 1999, called Allegiant Trust Company memorandum responding to the 1999 bank examination for Mr. Markow's signature. Ex. D-124; BT Vol. V, 181:5-8.

696. The purpose in writing the document was to provide a response after Mr. Morisse, Mr. Markow and Ms. Schmidt met to review the examiner's report and attempt to specifically respond to each item requiring a response within the report. BT Vol. V, 181:12-17. In the second paragraph of the response to the report, titled "Review of the Fiduciary Services Policy manual," Mr. Morisse was tasked with the responsibility to "perform a complete review of all trust policies in the manual and to make appropriate recommendations to the Trust Committee for specific policy revisions and elimination." Ex. D-124, pgs. 1-2. Mr. Morisse said he did what he was told to do. BT Vol. V, 181:23-182:5.

697. Mr. Morisse served as secretary at the June 20, 1999, Trust Committee meeting. Ex. D-168, pg. 1. In minutes supplied to the Division of Finance, Trust V was discussed. Ex. D-168, pg. 8. As a nondiscretionary trust, it came up for administrative review only, according to statement of principles of the trust department. Ex. D-168, pg. 8; Ex. 2-90.

698. At the trust committee meeting on September 18, 2000, Mr. Morisse told the Committee only administrative review of Trusts I, II, and IV was required, because Allegiant, as trustee for NPS, was relieved of investment responsibility, requiring no changes or recommendations. Ex. D-689, pgs. 31-32. Examiners requested the minutes as specific documentary items they reviewed during the exam. BT Vol. XX, 12:17-22.

699. Mr. Morisse said he discussed audits with the Trust Committee. BT Vol. XX, 20:24-21:2. There was a firm that did outside independent audits for the trust department "depending on the - - you know, on the date or time during the tenure of the Bank's services as trustee." BT

Vol. XX, 21:3-7. The trust committee meeting minutes for September 13, 2001, stated Cummings, Oberkfell & Ristau, an outside auditing firm, had conducted an audit of the trust company's business and accounts. Ex. D-689, pg. 41. Mr. Morisse's testimony the audit included asset verification and review of compliance controls is not correct. BT Vol. XX, 21:17-21.

700. Cummings, Oberkfell & Ristau produced a report dated June 30, 2002. Ex. D-243, pg. 1. It was a limited scope audit. *Id.* According to the September 30, 2002, letter, accompanying the report, the firm performed the procedures agreed by the Audit Committee of the Board of Directors and management of Allegiant Bancorp, Inc. solely to assist the Company with respect to determining the accountability of the selected elements, accounts, or items of the financial statements enumerated in the attached pages of the Allegiant Trust Company. Ex. D-243, pg. 2. The letter explained the firm was "not engaged to, and did not, perform an examination, the objective of which would be the expression of an opinion on the specified elements, accounts or items of the Trust Company's financial statements." Ex. D-243, pg. 2. Mr. Morisse's role in this audit was to answer questions posed by the auditors, provide information and access to files, and otherwise cooperate with their efforts. BT Vol. XX, 22:7-10.

701. The Court presumes the exercise in presenting this testimony was to lead the Court to believe another audit was performed and the report was favorable to Allegiant Bank. Once again, Mr. Morisse leads the Court away from the truth. This was an audit of 31 selected items for audit review, and the Trusts were not included among those items. The only time insurance policies were mentioned was on one line, "Insurance policies $169,108," under assets. There was no audit of any of the Trusts. Ex. D-243. There was no verification regarding insurance policies.

702. Mr. Morisse drafted an August 9, 1999, memorandum to Jean Maylack, NPS attorney, to memorialize the Bank's procedure in administering preneed trust accounts. Ex. D-

132. Mr. Morisse described the document as an accurate description of how he was administering the insurance in 1999 and thereafter. BT Vol. V, 200:25-201:3.

703. Seven months after he wrote to the Chief Examiner at the Missouri Department of Finance, stating the Bank would take action to maintain control of the insurance policy assets, rather than telling Ms. Maylack delivery of the policies to the Bank would be required, he instead stated, in the memorandum, "2) Certification of Evidence of Insurance. The insurance company issuing the insurance policies which are the subject to the respective preneed trust accounts certifies that <u>Allegiant Bank</u> is the owner <u>and beneficiary</u> of the insurance policies listed in the attachment to the certification letter. A copy of the Certification for NPS preneed Trust IV dated July 1, 1999 is attached as Exhibit B." Ex. D-132, pg. 4 (emphasis added). As of the date of this memorandum, Mr. Morisse continued to allow the Bank to be in violation of Chapter 436, and of his representation to the Chief Financial Examiner.

704. In his memo, he addressed the issue of receipts the examiners raised. Ex. D-132, pg. 1. He mentioned distribution from the account for deaths and cancellations of contracts. *Id*. Throughout his testimony, Mr. Morisse referred to how former trustees administered the trust, as if that made any difference as to whether he was administering the Trusts lawfully. In this memorandum he stated, "It is our understanding that this procedure has been utilized since the time Mark Twain Bank began serving as trustee of the trust accounts (or even before, perhaps), with the exception that the furnishing of copies of cancelled checks by NPS with the monthly reports and documents commenced since and as a result of the examination of Allegiant's administration of the NPS preneed trust accounts in January of this year." *Id*. It is obvious Mr. Morisse recognized changes needed to be made after the bank examination, and he directed Ms. Maylack to make some changes.

705. In addition to Randy Sutton's affidavit and a copy of a death certificate, cancelled checks were added into, and sent in the monthly packet when death claims were paid. Payment out of the trust for cancellation of contracts based on letters or notes from customers were also supported by Mr. Sutton's affidavit. BT Vol. V, 204:3-10. In the packet, Mr. Morisse continued to receive a certificate of evidence of insurance, and he continued to accept that, irrespective of being in violation of Chapter 436, instead of keeping the trust assets. BT Vol. V, 204:22-24.

706. In addition to the monthly packet with the certification came a computer printout of insurance policies subject to the Trusts. BT Vol. V, 204:25-205:3. The memorandum listed the policy for NPS to deliver to Allegiant a Reconciliation Statement and Receipt. Ex. D-132, pg. 1. This would include information summarizing deposits and distributions for each applicable preneed trust account for the immediately preceding month. BT Vol. V, 205:8-13. He attached a copy of the form to the memorandum to Ms. Maylack. BT Vol. V, 205:14-17. The one attached to the letter, as Exhibit A, was signed by Pat Buchanan. Ex. D-132, pg. 3.

707. The memo also listed the policy for certification of evidence of insurance. Ex. D-132, pg. 4. Each month, in the packet, was a certification from the insurance company that Allegiant Bank, as trustee of Trust IV, in this instance, was owner and beneficiary of all life insurance policies for which evidence was included in the packet. BT Vol. V, 206:6-10. An example, Exhibit B, was attached which was a letter dated July 1, 1999, from Lincoln, signed by Gloria Robles. Ex. D-132, pg. 4. Mr. Morisse believed section 4.2 of the Trust Agreement authorized him to rely on this certification. BT Vol. V, 206:19-21. He did not say which paragraph of the Trust Agreement would allow him to substitute a statement, once removed from the company submitting paper documents representing typed entries of insurance policies, with actual possession of the insurance policies, which the statute required him to physically keep

206

under Chapter 436.031.2. He did not say he believed this complied with this section of the statute, which trumps the Trust Agreement. What he called a computer print-out or computer run, contained information including the account number, policy number, insured names, and face amount of the policy. BT Vol. V, 206:25-207:4. This was included in the memorandum as Exhibits C-1 and C-2. Ex. D-132, pg. 5-6. The computer print-out Mr. Morisse received included a list of the names of all the beneficiaries of new insurance for that month, as well as a list of names for existing policies in force as of that date. BT Vol. V, 207:10-14. He received these listings every month. BT Vol. V, 207:15-18. The Bank maintained these documents after receipt from NPS. BT Vol. V, 207:19-21. The Bank did not have the policies, and totally relied on NPS to inform it of what assets it owned.

708. Exhibit D to the memorandum was the sworn affidavit of Randy Sutton, which also appeared in the monthly packet. Ex. D-132, pg. 7. In the affidavit, Mr. Sutton swore, the funeral agreements listed and attached had matured, as a result of the death of the beneficiary or cancellation by the owner. *Id*. Mr. Morisse stated the word "beneficiary," in this instance, related back to the definitions in the Trust Agreement. BT Vol. V, 211:6-9. The word "beneficiary," in paragraph 1.5 of Article I of the Trust Agreement "is the person designated in writing by the owner of a funeral agreement as the person who is to be the subject of the disposition and is to receive the funeral and/or burial services therein described, or if no such person is designated then the owner thereof." Ex. P-168. Either until the NCB due diligence to determine if Allegiant would merge with NCB, or when this litigation began, Mr. Morisse believed NPS was the beneficiary, although he also stated several times, Allegiant Bank was beneficiary. Mr. Morisse should have known before he took over as administrator, having said he read the Trust Agreement and Chapter 436, the person getting the funeral or the owner of the contract, was one

of the beneficiaries, to which he owed a higher duty than he owed to the Bank. Not until his testimony, in court, or possibly in his deposition, did he declare in writing, "the beneficiary is the person who is the owner of the preneed contract, the person entitled to the funeral services." This clearly demonstrates, all during his term as trust administrator, Mr. Morisse's loyalty as a fiduciary was not to submit to NPS, but to protect the other beneficiaries' assets, which he clearly did not do.

709. In the third paragraph of the monthly affidavit, Randy Sutton swore, "Attached hereto are copies of the death certificates of the said beneficiaries or cancellation notice." Ex. D-132, pg. 7. Mr. Sutton further swore, "affiant states that the withdrawals from trust are true and correct as of the date of deaths or cancellation and as reflected by said attached summary of withdrawal." *Id.*

710. Included in the memorandum was Exhibit E-1, which identified a list of "Lincoln Deceased Policies." Ex. D-132, pg. 8. BT Vol. V, 212:19-24. On Exhibit E-1, Ruth Bere was listed as having died with a policy amount of $6,275.00. Ex. D-132, pg. 7. It also listed a date the check was sent and a check number. *Id.* This list also included the decedent's name, a policy number, a client number and a funeral home number. *Id.* For Ms. Bere, the date NPS sent the check was in July 1999. *Id.* Mr. Morisse said he would get such a record every month for every person who died. BT Vol. V, 214:5-8. He had a sworn affidavit stating information on Exhibit E-1 was truthful. BT Vol. V, 214:9-12. For Ms. Bere, he also got a death certificate, which was included as Exhibit E-2. Ex. D-132, pg. 9.

711. Mr. Morisse testified he kept records of death certificates, and accumulated hundreds of them over the years. BT Vol. V, 215:2-7. The back-up for Mr. Sutton's affidavit was the cancelled checks. BT Vol. V, 215:8-10. He confirmed the beneficiary here was Ruth Bere.

BT Vol. V, 215:13-15. The name of the funeral home was Betzer. BT Vol. V, 215:18-19. He also received back-up for contract cancellations. BT Vol. V, 215:20-23.

712. The memorandum also included an example list of cancelled contracts as Exhibit F-1. Ex. D-132, pg. 11. Mr. Morisse circled cancelled policies as of June 30, 1999, but review shows only one entry circled, and no date is discernable. *Id*. The name he referenced, Minnie Lee Fletcher is circled. Ex. D-132, pg. 11. Policy number, client number, funeral home name, policy amount, and Status (cancelled), are all listed on Exhibit F-1. *Id*. Exhibit F-2 to the memorandum was a handwritten letter requesting cancellation for Minnie Fletcher. Ex. D-132, pg. 12.

713. The final attachment to the Maylack memorandum was a partial reference to Chapter 436, sections 436.035, 436.041 and 436.045, relating to distributions from preneed trusts for death of the owner of a preneed contract, cancellation of a preneed contract by consumer, and cancellation of a preneed contract by seller. Ex. D-132, pgs. 13-15.

714. Mr. Morisse believed this was a good way to keep adequate records for the Trusts, believed it was appropriate treatment under the statute, and in 1999, believed he was very careful memorializing exactly what he was doing. BT Vol. V, 218:10-20. This memo post-dated the Division of Finance bank examination, but he thinks this accurately reflected what he described to them. *Id*. He did not say in the memorandum he took action to correct the two law violations the examiners discovered, nor did he inform Ms. Maylack he had written the Chief Examiner assuring the Bank would take corrective action. Notwithstanding the paper trail of law violations, Mr. Morisse continued his non-credible testimony when he was asked, "Did it ever enter your head that you weren't keeping the right records?" and he testified, "No, I – I just - - I really never thought that we were not receiving and maintaining the records as contemplated by the statute and the Trust Agreement and as expected." BT Vol. V, 218:21-25.

715. His memorandum to Jean Maylack, dated October 22, 1999, memorialized appointment of investment advisor, Wulf, Bates & Murphy, which was contemplated by the bank examination. BT Vol. V, 221:1-13; Ex. P-414. The proposed Custody Agreement addressing, in Mr. Morisse's words, the issue related custody and control of the life insurance policies, is troubling to the Court. Mr. Morisse testified he was sending the attached documents because, "Well, they were in response to the bank exam." BT Vol. V, 221:14-16. This is inconsistent with what he told the Chief Bank Examiner he would do to control trust assets.

716. The second page of the memorandum to Jean Maylack was a draft of a corporate resolution, for execution by NPS, with respect to appointment of Wulf, Bates & Murphy. BT Vol. V, 221:25-222:8. The draft recognized Wulf, Bates & Murphy was investment advisor for the predecessor trustee, had been acting as investment advisor for Allegiant Bank, and would continue to be investment advisor for Allegiant Bank. Ex. P-414, pg. 2; BT Vol. V, 222:4-15.

717. The third page of the memorandum was a letter from Randy Sutton confirming appointment of Wulf, Bates & Murphy as investment advisor for Trusts I, III, IV, and V under Section 2.2 of the Trust Agreement. Ex. P-414, pg. 3. By writing these documents, Mr. Morisse stated he was not trying to do something he viewed as bad. BT Vol. V, 223:16-19.

718. Mr. Morisse testified, in drafting the Custody Agreement and corporation resolutions for NPS, to address concerns over control of life insurance policies, he believed he was acting consistent with his fiduciary duties, and these documents provided further clarification and documentation of the procedure the Bank was utilizing and relying upon with respect to the life insurance policies. BT Vol. V, 224:11-22. The Court believes Mr. Morisse never understood his fiduciary duties as trust administrator for the entire term he was trust administrator, particularly to the consumers and funeral home beneficiaries. Clearly, Mr. Morisse

knew, when he drafted the Custody Agreement, he was acting contrary to the bank examiners'

report, which concluded Allegiant Bank was in violation of Chapter 436.031.2. He was acting

contrary to the response he wrote to the Chief Examiner of the Division of Finance, as to the

Trusts. As noted, Mr. Morisse wrote, in his letter to the Division of Finance, "Your review of this

account disclosed apparent violations of Sections 436.031.2 and 436.045 of the Missouri Revised

Statutes. Section 436.031.2 provides that when an investment advisor has been designated to

perform investment management of thrust assets, as in the case of the trust in question, title to all

investment assets shall remain with the trustee and be kept by the trustee. In no case shall control

of said assets be divested from the trustee. Certain assets of trust in question life insurance

policies approximating $56.9 million, are physically held by Grantor. The trust company will

take necessary action so trustee of the account will maintain 'control' of the insurance policy

assets in question." Ex. D-126, pg. 2. To take an oath to tell the truth, then testify he drafted this

Custody Agreement consistent with his fiduciary duties, which provided control of the life

insurance policies would remain in custody of NPS, "to address the concerns over control of the

life insurance," is, in this Court's opinion, intentional false testimony designed to mislead the

Court. *See* BT Vol. V, 224:7-24. Mr. Morisse is not a credible witness.

719. Bank examiners who returned to the Bank for future examinations started from the

1999 examination. BT Vol. V, 229:22-230:2. Mr. Morisse testified there was no criticism of the

Custody Agreement. BT Vol. V, 230:9-12. His conclusion was, it satisfied the concern of the

Missouri banking examiners who reviewed this issue of life insurance custody. BT Vol. V,

230:13-16.

720. Mr. Morisse said he went through the fax-in wire-transfer forms with the bank

examiners. BT Vol. V, 235:15-21.

721. He said statements of the bank examiners influenced his drafting of the second paragraph of the letter of direction which addressed distribution of assets. BT Vol. V, 236:10-24. There is no evidence this was true, except for his testimony, which the Court does not believe.

722. Mr. Morisse believed he drafted the letter of direction, Ex. D-17, regarding settlement of trades in trust accounts and it was responsive to the written text of the bank examiners' report and was consistent with his fiduciary duties. BT Vol. V, 240:10-23. The Court concludes Mr. Morisse, in this regard, acted in direct violation of his fiduciary responsibilities to protect beneficiary funds of consumers and funeral providers. The letter of direction, dated November 5, 1999, allowed for all of the Trusts to distribute cash, securities, or other assets from any of the seven NPS trusts "in accordance with any directions received by Allegiant Bank by fax, telephone or in person from a principal, officer, employee, agent, or representative of Wulf, Bates & Murphy, Inc. or National Prearranged Services, Inc." It further authorized Wulf, Bates & Murphy to settle any trades in any of the Trusts and Allegiant Bank was directed and authorized to rely on direction by telephone, fax, or in person from a principal, officer, employee, agent or representative of Wulf, Bates & Murphy or NPS as to the trust account in which to settle the trade. Ex. D-17, pgs. 1-2.

723. He believed he was creating these documents in furtherance of what he thought was improving and documenting the administration of the Trusts. BT Vol. V, 242:3-6. He was making it easy for the Trusts he was to protect to be raided.

724. Mr. Morisse discussed with the Trust Committee the fiduciary policy at Allegiant Bank. BT Vol. XX, 10:10-15. The meeting minutes for the trust committee on November 16, 1999, stated every item in the state exam was brought-up and discussed, and Mr. Markow reported FDIC examiners would be at the Bank in two weeks. Ex. D-689, pg. 17. Mr. Morisse

believed he kept the Committee informed of his activities in administering the Trusts, and the Committee was involved in account reviews. BT Vol. XX, 10:25-11:3. He said if the Bank was acting in a capacity including both administrative responsibilities and investment management, there would have been investment review in addition to administrative review. BT Vol. XX, 11:4-12:13. The Trust Committee minutes for September 2000, showed three accounts for which the Bank had both administrative and investment responsibilities had investment reviews. Ex. D-689, pg. 30.

725. In November 1999, an FDIC examination was conducted at Allegiant Bank resulting in the filing of a report, which Mr. Morisse received and reviewed. Ex. D-139; BT Vol. V, 250:25-251:4. There was a meeting with management about the FDIC examination attended by Mr. Morisse. Ex. D-139, pg. 6.

726. A letter, signed by Ronald Leonard on behalf of Lawrence E. Morgan, Jr., the Regional Director of the FDIC, and included in the FDIC report, stated FDIC Examiner Moore, "notes your trust department is operated in a satisfactory manner. However, your attention is invited to her recommendations which begin on page three and in her other comments throughout the report." Ex. D-139, pg. 3. The FDIC report begins with a history of Allegiant Bank's ratings and its current exam ratings. *Id*, at pgs. 7-8. The FDIC gave Allegiant a rating of two on a scale of one to five, with one being the best. Mr. Morisse explained the "2" rating was for satisfactory management practices, suggesting moderate weaknesses in management "[a]re present and well within management's ability to correct. Risk exposure is commensurate with management's abilities and the size and complexity of the assets managed. Supervisory response is limited." Ex. D-139, pg. 5. Mr. Morisse described the exercise as a "full-scope trust examination." BT Vol. V, 254:5-7. Examiners looked at trust committee minutes, trust policies,

practices and procedures, internal and external audits, and controls. Matters criticized at the last exam were reviewed, there was a sampling of selected trust accounts in each category the department serves and adherence to fiduciary laws and regulations was reviewed. Ex. D-139.

727. The examiners looked at the discretionary accounts and the nondiscretionary accounts differently. BT Vol. V, 255:1-5. The nondiscretionary Trusts had accumulated value of $118 million. Ex. D-139, pg. 7. FDIC examiners reported on compliance with Statement of Principles of Trust Management, "Overall, the department is in compliance with the Statement of Principles of Trust Management." Ex. D-139, pg. 5.

728. The Statement of Principles of Trust Management, by the FDIC, was the document stating asset reviews of nondiscretionary accounts did not need to include a stability review. BT Vol. V, 256:10-14.

729. The FDIC examiners concluded the staff of the department was knowledgeable with an aggregate thirty-one years of experience in this area, and each of the three department officers was previously employed in a similar position at UMB Bank of St. Louis. Ex. D-139, pg. 9. The three FDIC examiners were in the Bank a total of 178 hours. Ex. D-139, pg. 18. Mr. Morisse stated he did not meet with the FDIC examiners as much as with the Missouri Division of Finance review, but he did frequently meet with them. BT Vol. V, 257:12-15.

730. As to "Asset Management," the FDIC report stated, "approved investment policies and retention practices are adequate." Ex. D-139, pg. 12. It continued to state, "Risk management for fiduciary accounts appears prudent, and accounts do not contain derivatives or other complex investment products. Investment reviews are conducted annually and are adequately documented." Ex. D-139, pg. 12.

731. Mr. Morisse stated the FDIC examiners reviewed investment quality of items held in the Trusts, and said he was doing nothing wrong regarding Lincoln insurance and valuing policies at face value. BT Vol. V, 259:1-9. He noted the examiners mentioned Trust IV continued to hold a sub-investment quality security in Boston Chicken. BT Vol. V, 259:10-12. He told them he was not the person making investment decisions. BT Vol. V, 259:13-16. The FDIC Report gave Allegiant a "2" rating for "Compliance" and concluded the Bank was in general compliance with governing account instruments, applicable federal and state laws, regulations and regulatory policies and statements, accepted standard of fiduciary conduct, and applicable bank and/or holding company policies and procedures. Mr. Morisse testified he believed this was true. BT Vol. V, 260:18-19.

732. At the conclusion of the FDIC examination, Mr. Morisse was tasked with the responsibility of reporting to the board of directors. BT Vol. V, 261:24-262:2. Again, as with the former bank examination, he drafted the February 2000 letter for Richard Markow's signature. Ex. D-730; BT Vol. V, 262:7-13.

733. He explained it was similar to the response to the Missouri Division of Finance report. BT Vol. V, 263:7-10. He said he carefully reviewed the FDIC report. BT Vol. V, 263:11-13. He discussed the next external audit will include a review of the trust department. BT Vol. V, 263:16-19.

734. Mr. Morisse confirmed, when he read the FDIC report of the Trusts and the trust department generally, he felt "[t]hat it was a good mark. It was a good rating." BT Vol. V, 264:6-9. He "felt comfortable that the accounts were being administered appropriately." BT Vol. V, 264:10-15.

735. Since Mr. Morisse had been trust administrator, a little over a year, he had two full-scope examinations of his department that looked at investments in the Trusts with approximately 380 hours of examiners being in the Bank, and of that, 350 hours in the trust department. BT Vol. V, 265:14-266:11. At the end of 1999, he felt the trust department operated correctly and was staffed adequately to perform its responsibilities and meet the needs and expectations of all of the customers. BT Vol. V, 266:12-19.

736. Mr. Morisse testified he had resolved all issues with his management raised by the bank examiners from Missouri. BT Vol. V, 266:24-267:4. He felt he was doing what was required to the satisfaction and expectations of persons related to the accounts, and did not have any concerns or issues with the administration of the accounts. BT Vol. V, 267:5-12.

737. In 2001, Allegiant Bank had its second bank examination by the Missouri Division of Finance, which issued a report. Ex. D-27; BT Vol. XX, 44:9-14. It was a full-scope, on-site examination commencing February 20, 2001, using trust records as of January 31, 2001. Ex. D-27, pg. 3. Board of Directors and trust committee minutes were reviewed, as well as fiduciary policies and procedures, operations, internal routines and controls, audits, asset management practices and documentation, account administration and documentation, conflicts of interest, earnings, and individual account reviews. Ex. D-27. Mr. Morisse said he participated in the examination and the exit meeting. BT Vol. XX, 44:24-45:8.

738. At the March 2001 exit meeting, Mr. Morisse, Mr. Markow, Mary Schmidt, Lisa Hrabko, operations manager, and Mr. Rialti were present and signed the report. Ex. D-27, pg. 4. Gina Avella appeared on behalf of the Division of Finance. *Id*. The report noted, of the exit meeting, "Management agreed with the aforementioned recommendations and indicated corrective measures would be taken." Ex. D-27, pg. 4. The examiners looked into asset

216

management in the discretionary trusts. BT Vol. XX, 45:17-46:5. In the report, the examiners criticized the asset review process for insurance policies held in discretionary trusts, suggesting a review of the insurance company should be performed. Ex. D-27, pg. 3. Mr. Morisse stated the Trusts were nondiscretionary accounts, or directed accounts. BT Vol. XX, 46:24-25.

739. There was no portfolio review for the nondiscretionary accounts. BT Vol. XX, 47:10-13. The report stated review of the insurance company for any policies held by trust should be performed and documented. Ex. D-27, pg. 5. Assets in the Trusts were, for the most part, life insurance policies. BT Vol. XX, 47:18-20. Mr. Morisse did not believe this review of the insurance company being performed and documented in discretionary trusts meant he was to get ratings for Lincoln, because he believed it was unnecessary for nondiscretionary accounts. BT Vol. XX, 47:21-48:8.

740. The report included a summary of trust activity. Ex. D-27, pgs. 13-14. For the prior examination, insurance policies were categorized under "Miscellaneous." *Id*. In the 2001 examination, Lincoln insurance policies went to "Other Assets," but were not specifically listed under "Other Assets," instead "Other Assets" was followed by an asterisk which read, "Primarily composed of insurance policies held in the NPS preneed funeral trusts." Ex. D-27, pgs. 13-14. At the end of the Summary of Trust Activity, there was a remark about market value, and a reference to 57 nondiscretionary accounts valued at $178 million. Ex. D-27, pg. 13. Mr. Morisse said this bank examination categorized the Trusts as nondiscretionary. BT Vol. XX, 49:16-18.

741. For the bank examination, Mr. Morisse completed an Officer's Questionnaire for the trust department prior to the exam, which was included in the report. Ex. D-27, pgs. 18-20; BT Vol. XX, 49:21-25.

742. Mr. Morisse was in charge of implementing any suggestions that came out of the 2001 examination. BT Vol. XX, 50:16-19. He prepared a May 15, 2001 memo to the Board of Directors, after the 2001 State of Missouri Division of Finance bank examination was completed. Ex. P-531. In his memo, Mr. Morisse discussed annual reviews of insurance companies. Ex. P-531, pg. 2. He stated, "Allegiant will review the rating of all companies issuing life insurance policies and endeavor to obtain and review financial analysis of such insurance companies annually and retain a file of the information obtained and reviewed." *Id*. Notwithstanding this conclusion, Mr. Morisse did not believe that applied to Lincoln policies in the Trusts, because the comment was reserved for policies of companies in discretionary accounts. BT Vol. XX, 51:7-9.

743. Seemingly, as an excuse for remaining in violation of Chapter 436.031.2, Mr. Morisse testified, during his career as a trust administrator, fewer and fewer trust assets were actually physically held in trust departments. BT Vol. XX, 51:13-16.

744. From the first day Mr. Morisse became trust administrator at Allegiant Bank, he knew, beyond any doubt, Chapter 436.031.2 clearly stated, "title to all investment assets shall remain with the trustee and be kept by the trustee . . .[and] [i]n no case shall control of said assets be divested from the trustee . . ." In the first Department of Finance Bank examination, the examiners found Missouri State law violations for failure to hold the NPS insurance policies. As already noted, Mr. Morisse drafted a response to the Department of Finance after the first examination, responding to the call for corrective action, "The Trust Company will take necessary action so that as trustee of account, it will maintain control of the insurance policy assets." The insurance policies were, at the time, in the custody of NPS. Contrary to his

218

representations to the Division of Finance, when he said Allegiant Bank would take control of the policies, they remained with NPS.

745. The examiners of the second Division of Finance examination asked for description of the policies and procedures of investment and retention process, discussed policies and practices regarding administration of accounts, and commented on adequacy of account documentation. Ex. D-27. The Trust Company was asked to supply supplemental information concerning transfers within NPS accounts, transfers per direction of investment advisor Dave Wulf and receipt of direction/authorization from the investment advisor. *Id*, at pg. 20. On asset management, the examiners' report stated the Trust Department received a "3" rating. *Id*. The Division of Finance concluded the Bank did not have adequate documentation (including evidence of review) to support the purchase and/or retention of investments. *Id*. (emphasis added).

746. The next, and last bank examination during Allegiant Bank's tenure as trustee of the Trusts, was conducted by the State of Missouri Division of Finance. Ex. D-30, pg. 5. It began September 8, 2003, and concluded September 25, 2003. Ex. D-30, pg. 39. The final report to the Board of Directors of Allegiant Bank was dated October 17, 2003. Ex. D-30, pg. 2.

747. This was described as a full-scope examination resulting in a composite rating of "2." Ex. D-30, pg. 5. The rating for Asset Management in prior exams on March 18, 2002, and February, 20, 2002, was a "3". *Id*. Allegiant received a "3" rating for this exam as well, dated August 31, 2003. Ex. D-30, pg. 5. Examiner-in-Charge, Don Ketchum, concluded, "Asset management needs to be improved." Ex. D-30, pg. 5. He stated, "No formal risk management policy specifically designed to identify risks particular to the trust department has been developed. Management agreed to develop such a policy." Ex. D-30, pg. 6. More specifically, he

noted, "Several topics (enumerated under No.1. Management, on the Fiduciary Activities in General page of this report) have not been sufficiently addressed in the policies and procedures manual." Ex. D-30, pg. 6.

748. While the examination reported supervision by the Board of Directors and the Trust Committee was generally effective, two deficiencies were noted: no direct participation by the Trust Committee in the account portfolio review process, and no formalized trust department risk management program had been established. Ex. D-30, pg. 9. Since the Trust Committee did not actually perform account portfolio reviews (as required by internal trust Policy No. 1.01), the committee minutes did not adequately reflect the proper participation of senior management in this process. Ex. D-30 pg. 9.

749. The Examiner-in-Charge became more specific in his criticism, stating asset management was less than satisfactory. Ex. D-30, pg. 11. Notwithstanding satisfactory general overall policies and procedures addressing asset management, the problem was policies and procedures were not being effectively followed in practice. *Id*. He wrote, "Policy No. 1.01 is a well-written, comprehensive outline of the duties and responsibilities of the Trust Committee. This policy clearly places the responsibility for annual, in-depth account portfolio reviews on this committee." Ex. D-30, pg. 11. While complementary of the makeup of the committee, he concluded the Trust Committee had delegated the entire review process to an informal sub-committee of administrators and investment officers. *Id*. In effect, he noted, these officers were approving their own work. *Id*. The minutes of the Trust Committee did not even record a review of the account portfolios themselves. *Id*. This circumvention of the vital requirements of Policy No. 1.01 resulted in inadequate documentation of the asset management process. Ex. D-30, pg. 11.

750. This Examination treated the largest listed asset in the trust portfolio, valued at $198,266.000.00, as "miscellaneous." Ex. D-30, pg. 15. "Miscellaneous" was defined under "Comments," as "insurance policies, annuities, personal property, sundry assets miscellaneous liabilities and partnerships." Ex. D-30, pg. 15.

751. Under conclusions and recommendations, the Examiner-in-Charge concluded a "3" rating "would have been warranted in the asset management component due to the total lack of senior management participation in the annual account portfolio review process." Ex. D-30, pg. 40. The most profound observations about this final bank examination during Allegiant Bank's tenure, was preneed trusts were mentioned only one time in the report. *Id*. This was under "Comments," and explained "other assets" previously included insurance policies held in preneed funeral trusts. Ex. D-30, pg. 15.

752. NPS was mentioned one time in the examiner's report. Ex. D-30. Question two in the Report on page 21 asked, "Since the previous examination have any assets been sold, transferred or assigned from any fiduciary account to any other account within the department?" *Id*. That question was answered, "Transfers between NPS accounts per direction of outside investment advisor." *Id*. There was lack of attention given to the Trusts in this 2003 bank examination. *Id*. In the 2003 Report was this statement: "Verification of assets not performed due to annual 100% verification performed by outside auditors." Ex. D-30, pg. 45. As stated, the outside auditor did not do asset verification.

753. Mr. Morisse personally participated in the 2003 bank examination by interacting with examiners and providing information. BT Vol. XX, 112:11-16. The composite "2" rating is the second highest rating receivable. BT Vol. XX, 113:6-8.

754. Mr. Morisse's takeaway from four bank examinations during his tenure was "we" were happy with ratings received; each examination was time consuming, can be exhausting and involved a fair amount of time with the examiners. BT Vol. XX, 113:25-114:10. He believed items needing attention were addressed and other trust department managers were satisfied with results of the exams. *Id*. He felt satisfied and happy about the job he had done. BT Vol. XX, 114:22-24.

755. Mr. Morisse knew the existence of regulators did not change the fiduciary duties owed to consumers and funeral homes by Allegiant. BT Vol. IV, 175:25-176:3. He did not recall specifically mentioning to regulators the six stock transactions where stocks were acquired by Trust IV at prices greatly exceeding market value and he did not recall if the regulators reviewed these transactions. BT Vol. IV, 176:13-25.

756. Mr. Morisse did not alert regulators all the trust investments were in Cassity-owned companies, because he believed the regulators could see this. BT Vol. IV, 177:23-178:1. He did not recall telling regulators he knew, as of 2001, not one of the Cassity-owned companies was profitable on a consistent basis. BT Vol. IV, 178:7-11.

757. Mr. Morisse did not discuss, or review, with bank examiners Allegiant's practice of distributing death claim money to NPS without performing any review to see if the amount on the netting form was the amount on deposit for the individuals. BT Vol. IV, 179:1-8. Mr. Morisse said bank examiners were familiar with Allegiant's operations department having standard instructions to wire money out of the Trusts anytime, based on any wire request form received. BT Vol. IV, 179:9-13. He said they were very familiar with the process, but there was no discussion with bank examiners about reviewing or analyzing the requests. BT Vol. IV,

179:14-25. Mr. Morisse did not tell regulators, as sole trust administrator, he did not review monthly trust statements. BT Vol. IV, 180:23-181:2.

X.      *Conduct Related to NPS's Authorization and Ratification of Breaches of Trust*

758. The key NPS officers and employees, including Randy Sutton, Brent Cassity, and Doug Cassity, as well as Mr. Wulf, were adjudicated to be engaged in fraud on behalf of NPS. Exs. D-39, D-40, D-41, D-42.

759. Plaintiffs admit NPS "loot[ed] the NPS preneed trusts." ECF No. 916, ¶ 34. Plaintiffs admit NPS's officers defrauded funeral homes and consumers in order to continue operating and growing NPS's business. *Id*. ¶ 96. Further, NPS was the "alter ego" of the Cassitys and Mr. Sutton. *Id*. ¶¶ 223-228.

760. NPS appointed Mr. Wulf as investment advisor to the Trusts. BT Vol. XII, 128:22; BT Vol. XIII A, 27:7-9. NPS was aware of and authorized the wire transfers. Ex. P-104; Ex. P-2376, 98:17-99:15, 106:16-107:14, 129:6-18; Ex. P-2387, 79:3-7.

761. NPS advised Allegiant the amount deposited in trust would be determined based on the face value of the insurance in force. BT Vol. IV, 115:8-13. NPS approved and ratified Allegiant's reliance on the monthly packets. Those packets were prepared by NPS. Ex. P-2376, 128:2-9.

762. NPS and its agents directed, authorized, ratified, and/or consented to all the conduct Plaintiffs now claim was a breach of trust. Randy Sutton and Doug Cassity authorized and directed the purchase of "mismatched" policies. BT Vol. VI, 58:24-59:5, 88:2-10, 94:21-95:2, 135:13-17; Ex. P-2387, 68:21-24; ECF No. 916 ¶¶ 103, 120. Ms. Hall directed Allegiant to send money to Lincoln to pay these premiums. Ex. P-2376, 104:6-25. NPS, acting through Randy Sutton, authorized and directed the invalid policy loans. BT Vol. VI, 102:10-22, 106:7-15,

111:6-22; Ex. P-2376, 132:16-22; ECF No. 916 ¶ 122. Mr. Lumpkin admitted Allegiant was not provided notice of the invalid policy loans. BT Vol. VI, 163:14-16, 164:1-7. Mr. Sutton signed the forms purporting to authorize the loans. Ex. P-1417, pg. 21; BT Vol. VI, 156:2-18, 157:8-15. Randy Sutton also authorized the debentures, signing each one. Ex. P-2376, 107:23-108:18, 112:12-15; Exs. P-339, P-340, P-453.

763. NPS purchased the World Service term life insurance policy in 2000 and subsequently deposited it into Trust IV. BT Vol. VI, 122:12-21; Ex. D-19, pg. 1; Ex. D-20, pg. 2. The stock purchases were directed by Randy Sutton and Brent Cassity. Exs. P-17, P-18, P-19, P-21, P-24; ECF No. 916 ¶¶ 228.112-228.119.

Y.    *Allegiant's Failure to Understand Its Duties Owed to Beneficiaries*

764. The Trusts were fiduciary accounts. Allegiant's responsibilities pursuant to custom and practice in the trust industry between 1998 and 2004 (which included controlling trust assets, protecting the trust assets, and maintaining accurate records) applied to the Trusts for which Allegiant served as trustee. JSF.

765. During its entire trusteeship, Allegiant had a continuing obligation to identify: the trust beneficiaries, the assets in the Trusts, the value of the assets, the location of the assets, when the beneficiaries would be entitled to trust benefits, why the Trusts were established, and how the Trusts should be administered. JSF.

766. Allegiant had a "fundamental duty" to administer the Trusts in a prudent manner, to act with loyalty and to be impartial when dealing with all of the beneficiaries. BT Vol. XIII, 11:10-23. Allegiant's obligations to control the trust assets, protect the trust assets, and maintain accurate records relating to the trust assets and transactions are obligations under the duty of prudence. BT Vol. XIII, 12:17-13:14.

767. Allegiant relied on Mr. Morisse to determine what Allegiant's responsibilities were under Chapter 436. Ex. P-2381, 67:19-25. Allegiant chose never to request assistance from its outside counsel in reviewing and interpreting Chapter 436. Ex. P-2381, 68:1-9.

768. At the outset of its trusteeship, Allegiant decided the Missouri consumers and funeral homes were not beneficiaries of the Trusts. Ex. P-2391, 43:3-49:22. When Mr. Morisse made his review of Chapter 436, he made the decision the Missouri consumers and funeral homes, whose money had been placed in the Trusts, were not beneficiaries of the Trusts. BT Vol. II, 103:1-6. Mr. Morisse administered the Trusts, for six years, with the belief one of the only responsibilities he had to the consumers and funeral homes was to distribute their money to them in the event NPS failed to pay their cancellation or death claims. BT Vol. II, 104:18-23. Mr. Morisse believed, if problems were found in the accounts, there was not a reporting or accounting responsibility to the preneed contract owners or funeral homes. BT Vol. II, 104:24-105:21.

769. Allegiant's decision, it would treat only NPS as a beneficiary, was contrary to law, fact and industry custom. During Allegiant's entire period as trustee, the beneficiaries of the Trusts were NPS, the Missouri funeral homes providing the services, and the Missouri consumers purchasing the preneed funeral contracts. JSF.

770. Mr. Morisse believed fiduciary duties were owed by Allegiant Bank to NPS as grantor of the Trusts, as income beneficiary, and as remainderman. BT Vol. II, 158:3-8. He expressed no similar responsibility to consumers or funeral homes. As noted repeatedly, Mr. Morisse did not believe funeral homes and consumers were beneficiaries of the Trusts. BT Vol. XX, 152:25-153:9.

225

771. The first numbered sentence of the first section of Chapter 436, Section 436.005 clearly defined "Beneficiary" as "the individual who is to be the subject of the disposition and who will receive funeral services, facilities or merchandise described in a preneed contract." Mr. Morisse testified, repeatedly, he read Chapter 436, and he made handwritten notes on his copy of the statute, in evidence as Ex. D-5. The word "Beneficiary" on his copy was circled with the same font as all other handwritten notes on this exhibit. For six years, Mr. Morisse believed NPS was the only beneficiary.[27] This glaring mistake forms the basis for one of the breaches of his fiduciary duties.

772. An annual administrative review for Trust IV, dated September 12, 2002, which covered the time period since the last review in September 2001, had Mr. Morisse's initials at the top as trust administrator. Ex. 2-94; BT Vol. IV, 209:22-25. The date of the last review was omitted without explanation. BT Vol. IV, 211:2-6. Mr. Morisse placed a checkmark next to "Status of beneficiaries is being met." Ex. 2-94, pg. 2. For the purpose of performing this review, Mr. Morisse did not consider the consumers and funeral homes to be beneficiaries, but they would have been included in his "understanding of needs being met by [his] interaction with Angie Hall." BT Vol. IV, 211:23-212:5.

773. Allegiant Bank always had a conflicts of interest policy, of which Mr. Morisse was aware. Ex. 2-126, pg. 11. The policy stated, "All fiduciary accounts shall be administered for the exclusive benefit of the account beneficiaries." *Id*. Mr. Morisse believed he always held himself up to that, but when asked if he viewed NPS as the only beneficiary, he answered, in the traditional sense, NPS was the income beneficiary and remainderman. BT Vol. IV, 206:1-5.

774. Mr. Morisse interpreted the Trust Agreement, concluding Seller, NPS, was entitled to income. BT Vol. V, 85:3-9. Mr. Morisse concluded, as trust administrator, since NPS was

---

[27] Although he also made reference to Allegiant as a beneficiary.

226

entitled to income, principal and remainder principal, these were indicators of identity of the beneficiary of the trust instrument. BT Vol. V, 85:16-20. While working as trustee, Mr. Morisse concluded NPS was the trust beneficiary, although the Trust Agreement's definition of beneficiary appeared to describe the consumer's rights. BT Vol. V, 85:20-86:11.

775. Mr. Morisse did not ever review a single preneed funeral contract during the time Allegiant was trustee of the Trusts. BT Vol. II, 123:6-9. Mr. Morisse, not one time, ever received an actual insurance policy. BT Vol. II, 123:10-12. The insurance data pages[28] were never requested until NCB did so in March 2004.[29] BT Vol. II, 123:13-21. Mr. Morisse stated, "I don't recall having seen a data page." BT Vol. II, 123:21. Allegiant "relied on the information provided monthly to us." BT Vol. II, 123:15. While doing due diligence before accepting the Trusts, Allegiant asked about premium payments; however, once it was trustee, the Bank never inquired about premium payments. BT Vol. II, 123:24-124:2.

776. Mr. Morisse never read an NPS-related insurance contract. BT Vol. II, 74:18-23. Furthermore, he never ran a business credit report on NPS or any of the Forever companies. BT Vol. II, 74:24-75:2. He cannot recall ever reading an insurance company rating report on Lincoln. BT Vol. II, 75:3-7. He also never asked to see any financial statement of any of the Cassity-owned companies. BT Vol. II, 75: 8-10.

777. Mr. Morisse knew he was governed both by the trust instrument and Chapter 436. BT Vol. III, 33:10-12. He knew Chapter 436 stated if there was an investment advisor, all he or she could do was direct investments. BT Vol. III, 33:13-16. When the request for money was not for an investment, the Bank should not have honored the request. The system Mr. Morisse put in

---

[28] A "data page" is not the insurance policy, but a document which lays out some key information about the policy, including identity of the insured, identity of the owner, the policy number, the issuance date of the policy, and the gender and age of the policy holder. BT Vol. XV, 41:20-42:6.

[29] This was the period when NCB was performing due diligence efforts to determine whether it would be accepting the preneed trusts in the merger.

place was to follow the direction of Wulf, Bates & Murphy. There was no system in place to see what asset, if any, Allegiant got for an alleged investment, except for relying on the investment advisor. BT Vol. III, 37:6-10. There was no system to look behind the instruction of the investment advisor. BT Vol. III, 37:11-14.

778. Employees from Allegiant Bank only saw the netting forms for about two seconds before signing for acceptance. BT Vol. II, 223:1-3. The Bank did not require anyone signing the reconciliation statement pursuant to Chapter 436 to understand any of the numbers on the forms. BT Vol. II, 224:17-20. Individuals permitted to sign off on the reconciliation forms included Pat Buchanan, Lisa Parks, Bethany Thomson, and Pamela Rice, none of whom had training on the meaning of Chapter 436. Ex. P-105, pg. 9, 35, 77, 133; BT Vol. II, 230:3-232:16. Michelle Kyle was a bank teller with authority to sign the reconciliation statements. BT Vol. II, 232:2-7. She had no training on the meaning of 436. Ex. P-105, pg. 100; BT Vol. II, 232:8-9. No one in the operations department at Allegiant Bank, was given any training in Chapter 436, and they were not in a position to opine with regard to the provisions of Chapter 436. BT Vol. III, 26:6-20.

779. Mr. Morisse believed signing the receipt was simply certifying the packet was received. BT Vol. III, 54:22-55:7. Thus, any bank employee could acknowledge receipt of the packet. BT Vol. III, 55:21-24. Before signing the monthly receipt, Mr. Morisse did not consult outside counsel in regards to what he was signing. BT Vol. III, 55:8-18.

780. Mr. Morisse recognized it was his responsibility to acquaint the trust committee with any issues in administering a trust account. BT Vol. II, 83:25-24:3. The trust committee never voiced an understanding of what the requirements of the Bank were under Chapter 436. BT Vol. II, 83:21-24.

228

781. Chapter 436 provided no income distribution could be made from a trust to the seller if, and to the extent that, the distribution would reduce the aggregate market value on the distribution date of all property held in the preneed trust, below the sum of all deposits made to such trust. JSF; Mo. Rev. Stat. § 436.031.3. To conduct the market value test under Chapter 436 to determine if an income distribution could be made, Allegiant needed to know the aggregate market value of all property held in the Trusts on the distribution date, as well as the sum of all deposits made into the Trusts. JSF. Mr. Morisse did not know what was meant by the "market value test." BT Vol. IV, 123:12-13. Even though Chapter 436 required the trust assets be valued at their market values, Allegiant substituted face value for this requirement. Ex. P-2391, 180:9-16, 189:2-16.

782. Discretionary distributions were routinely discussed at Trust Committee meetings. BT Vol. XX, 7:8-10. On April 13, 1999, the meeting minutes stated, "Morisse reported . . . a distribution will be made tomorrow from NPS preneed Trust IV to National Prearranged Services, Inc. in the amount of $500,000.00, for partial distribution of capital gains from sale of investments in Trust IV." Ex. D-689, pg. 7. The minutes cited Mr. Morisse's review of Chapter 436.031.3 and the Trust Agreement. Ex. D-689, pgs. 7-8. Mr. Morisse claimed, at all times, he was aware of the following statutory provision: " . . . but no such income distribution shall be made to the seller if, and to the extent that, the distribution would reduce the aggregate market value  on the distribution date of all property held in the preneed trust, including principal and undistributed interest, below the sum of all deposits made to such trust pursuant to subsection 1 of this section." BT Vol. XX, 8:8-18. It was Mr. Morisse's understanding face value of all insurance policies held in Trust IV was equal to the amount of deposit – the aggregate amount of deposits to the trust. BT Vol. XX, 8:19-24.

229

783. It was always incumbent on Allegiant Bank to do the calculation before an income distribution, and if there was not enough money in the trust equaling all deposits, NPS could not get an income distribution. BT Vol. IV, 115:1-7. With respect to a specific consumer's preneed contract, if there was a $5,000.00 face amount policy from a person who paid-in-full, but the amount paid for the insurance policy was, for example, $500.00, with payments due over several years, Allegiant still calculated the face amount as equaling the amount on deposit for the consumer. BT Vol. IV, 115:14-19.

784. Allegiant distributed income out of the Trusts to NPS on a routine basis when Allegiant served as trustee. BT Vol. VIII, 189:24-190:2. It distributed approximately $2,571,731.00 as income to NPS during its tenure. BT Vol. VIII, 198:12-25.

785. When Allegiant Bank took over Trust IV from Mercantile Bank in August 1998, Allegiant valued Trust IV's Lincoln policies at over $50 million, at face value. BT Vol. XX, 225:16-21. Mr. Morisse believed the starting point, to see if a distribution of income to NPS was allowed, was the $50 million figure. BT Vol. XX, 226:15-17. Allegiant never requested an actuary or a life insurance professional confirm the value of the policies. BT Vol. XX, 226:21-24.

786. Net income was distributed, for example, if the Cassitys took a loan of $50,000.00 out of a trust and they repaid the $50,000.00 and interest, the minute the money was back in the trust, it was distributed again to NPS, without any further calculation; Allegiant assumed the insurance policies equaled all the money necessary to be in the trust. BT Vol. IV, 116:7-15. During the entirety of Allegiant's tenure as trustee, "The distributions were made predicated on the face value of the insurance policies equaling the total deposits." BT Vol. IV, 117:17-21.

787. As to Section 4.2(k) of the Trust Agreement, where it read: "For any purpose pertinent hereunder, to determine the value of any trust asset or of the trust as a whole in the basis of such quotations, data and information deemed pertinent and reliable by the Trustee," Mr. Morisse, in valuing the trust, believed income distributions were always authorized under the market value test, because the aggregate value of all insurance policies supporting the preneed contracts was equal to the aggregate value of deposits to the trust. BT Vol. XX, 9:10-15. Mr. Morisse believed the trust statement from Mercantile Bank at the beginning of his tenure did the market value test the same way. BT Vol. XX, 9:16-20. Mr. Morisse did not understand the market value test. His recklessness in administering the Trusts caused millions of dollars in losses to the Trusts. He was authorizing distributions from the Trusts to NPS when the aggregate market value of all property held in the Trusts was reduced below the sum of all deposits made to the Trusts.

788. Under Mr. Morisse's belief, NPS was entitled to distributions of income and realized capital gain from the Trusts at Allegiant Bank, as shown on a monthly distribution of income form dated April 12, 2001. BT Vol. XX, 72:1-8; Ex. P-101D, pg. 677. Mr. Morisse believed these transfers out of Trust IV were appropriate. BT Vol. XX, 72:9-11. NPS received an income distribution every month if there was net income in the income column of the accounting statement. BT Vol. XX, 72:23-73:1.

789. On March 29, 2002, a distribution of principal for $100,000.00 was made to NPS. Ex. P-101D, pg. 768. It was at the direction of the investment advisor. *Id*. There was never a calculation, in this trust, which was in the hole, to determine if it had less assets than all the deposits for all consumers. BT Vol. IV, 120:9-13.

790. Chapter 436's requirement the aggregate market value of the trust assets must exceed the sum of all deposits made into the trust before income distributions are allowed was never met during Allegiant's period as trustee. PNC's actuarial expert, Terry Long, calculated the Trust IV Lincoln policies as having a "negative" value every day of Allegiant's trusteeship. BT Vol. XVIII, 75:18-22, 78:10-16. Mr. Long testified because the trust's Lincoln policies were worthless, they should have been treated as a liability of the trust rather than an asset carrying a market value. BT Vol. XVIII, 75:23-76:5, 78:17-22.

791. Allegiant Bank's Code of Conduct policy was revised in March 2001. Ex. P-523. It stated: "You should learn and understand the various laws that are applicable to you in performing your duties on behalf of Allegiant." Ex. P-523, pg. 3. Mr. Morisse agreed this statement included Chapter 436. BT Vol. IV, 230:16-21. Section 2 of the Code of Conduct stated: "Allegiant's Ethics Policy specifically forbids the following conduct: Theft, fraud, embezzlement, misappropriation . . ." Ex. P-523, pg. 6.

792. Mr. Morisse believed he had to observe the Code of Conduct. BT Vol. IV, 234:8-25. The Code of Conduct also addressed when conflicts of interest could occur. Ex. P-523, pg. 7. Concerning handling of fiduciary responsibilities, Mr. Morisse did not believe or understand a $13.5 million life insurance policy was kept on the books years after it expired. BT Vol. IV, 235:23-236:7. It should have been disclosed to Bremen the asset did not exist, but Mr. Morisse claimed, "At that time, I didn't understand or believe that it didn't exist." BT Vol. IV, 236:8-13. This is untruthful testimony by Mr. Morisse.

793. In concluding his direct examination, Mr. Morisse testified he took very seriously his efforts to understand the accounts received from Mercantile and to administer them as he understood was appropriate under the provisions of Chapter 436, the Trust Agreement, and

within the guidelines of the Bank's policies and procedures, and to collaborate and cooperate with his fellow employees and bank staff in connection with the various requirements in administering the accounts and in doing so truthfully and honestly. BT Vol. XX, 149:17-25. In fact, Mr. Morisse was not prepared as a trust administrator when Allegiant accepted the trusts from Mercantile Bank, he never attempted to learn the responsibilities he had as trust administrator, and he never sought counsel with a reputable law firm available to him at all times.

794. Mr. Morisse acknowledged PNC agreed to provide him a defense, but PNC is not paying him. BT Vol. XX, 150:3-6. He said, as of that day of trial, he had been deposed or gave testimony for 102 hours. BT Vol. XX, 150:7-9.

795. The Trust Department of Allegiant Bank was clearly established as a marketing enterprise. The Examiner-in-Charge observed profitability has been a major problem for this trust department. For the five-year period of 1998-2002, 2001 was the only year in which the department showed a profit. He noted it would appear the corner had been turned, and profitability was expected to improve. Ex. D-30, pg. 10.

796. One issue that stands out to the Court is Mr. Morisse always believed the investment advisor relieved the Bank of investment liability, which explained his behavior in ignoring all of the red flags which should have motivated him to investigate the investment activity in the nondiscretionary trusts.

797. Mr. Morisse testified the law did not require the fiduciary, Allegiant Bank, to keep individual consumer-level records of what was on deposit for each consumer. BT Vol. XX, 153:15-19. His belief the trustee was not required to keep individual, consumer-level records on what was on deposit for each consumer was in violation of Missouri law. Chapter 436.031.1

required, "The Trustee shall accept all deposits made to it by seller of a preneed contract and shall hold, administer, and distribute such deposits, in trust, as trust principal, pursuant to the provisions of Section 436.005 to 436.071. Section 436.031.2 provided, ". . . title to all investment assets shall remain with the trustee and be kept by the trustee to be liquidated upon request of the advisor of the seller. In no case shall control of said assets be divested from the trustee . . ." Chapter 436.031.5 provided, "The Trustee of a preneed trust shall maintain adequate books of account of all transactions administered through the trust, generally. . ." Mr. Morisse, as trust administrator, refused to take custody of the Lincoln insurance policies, in clear violation of Chapter 436 and warnings from the Division of Finance bank examiners, Allegiant Bank was in violation of Missouri law for not having control of trust assets. Allegiant Bank breached its fiduciary duties by not keeping individual consumer level records of what was on deposit for each consumer.

798. The terms of the Trust Agreement provided for creation of "a trust for the deposit and administration of such portion of the sums received on the terms and conditions hereinafter set forth." Ex. P-168. Article 2.3 provided, "The ownership of all the assets comprising the trust shall be solely in the trustee . . ." Article IV, Trustee Powers and Duties, Section 4.2 (e) provided the trustee was "to hold any securities or other property in the name of the trustee or its nominee, or in another form as it may deem best, with or without disclosing the trust relationship." Finally, Section 4.3 provided, "Trustee shall at all times maintain accurate books and records reflecting all transactions in any way pertinent to the trust and shall provide the Seller an annual statement of account showing the conditions of the trust and all investments, receipts, disbursements and other transactions effected by the trustee during the year  covered by the statement . . ." Allegiant Bank violated its fiduciary duties set by the Trust Agreement, and Chapter 436, by not keeping

individual consumer-level records of what was on deposit for each consumer. If Mr. Morisse had the insurance policies, and intentionally or accidentally looked at one of the multi-pay policies, he would have learned all that was on deposit for the consumer, 81% of the time, was a policy with premiums due up to twenty years in the future, the policy had no cash surrender value, and all the consumer had was a policy at face value. Mr. Morisse would also have been alerted to inquire how premiums on the policy would be paid in the future, and to examine records received from NPS showing policy loans were being made and he was supplying trust funds to pay those policy loans.

799. There was no cross-training to perform his job as trust administrator over the Trusts. BT Vol. XX, 156:1-3. No other trust administrator looked at the wire transfer forms. BT Vol. XX, 156:4-8. Mr. Morisse believed the only limit on acquiring an investment was if it was of a type authorized in the Trust Agreement. BT Vol. XX, 156:9-11. When asked if he needed to look to see what investment was coming back, if it was of a type mentioned, Mr. Morisse was untruthful when he said he did that. BT Vol. XX, 156:12-15. Mr. Morisse could only say he looked at investments on a routine basis, saw them as assets and investments in the accounts, and understood and believed them to be as authorized by the trust instrument. BT Vol. XX, 156:18-20. When asked, if, as a reasonably prudent trust administrator, he first needed to look at what investment came back, and is it of the type covered by the law in the Trust Agreement, Mr. Morisse replied he did not agree. BT Vol. XX, 157:10-17. The evidence in this case clearly shows Mr. Morisse did not look at what investments came back to the Trusts.

Z.    *Evidence Related to Damages*

800. At trial, Plaintiffs presented the testimony of two loss experts: (i) Steve Browne, a forensic accountant and economist who performed a detailed forensic analysis of all trust

transactions and quantified losses to the Trusts at a transactional level, and (ii) Andy Dalton, an actuary who calculated losses to the Trusts through an actuarial diminution in value analysis and a calculation of trust losses from premium overpayments.

801. Mr. Browne did not quantify trust losses based on deposits into the Trusts. Instead, the mismatching losses were those amounts not used to purchase a policy for the individual consumer and instead, freed up to "either satisfy a liability via a renewal premium or going straight to NPS or a Cassity-related entity." BT Vol. VIII, 111:16-21; BT Vol. XXII, 18:17-21.

802. Mr. Browne identified all policy loan transactions where policy loans were taken against the Lincoln policies during Allegiant's trusteeship and where the policy loan proceeds were distributed from the Trusts under Allegiant. Mr. Browne identified $25,695,895.09 in policy loan losses relating only to transactions where policy loans were transferred out of the Trusts. BT Vol. VIII, 31:11-21, 151:22-25, 159:24-160:3.

803. Other than as noted, the Court will not be relying on Mr. Browne's analysis to calculate damages.

804. Andrew Dalton, Plaintiffs' actuarial expert, quantified two categories of losses to the Trusts during the Allegiant era using standard actuarial methodologies. BT Vol. X, 34:19-35:18, 99:13-25. First, Mr. Dalton calculated an actuarial loss due to the decrease in the funded status of the Trusts during Allegiant's trusteeship of $47,408,222. Second, Mr. Dalton calculated a loss due to overpayment of premium in the amount of $41,266,474. BT Vol. X, 34:24-35:18.

805. Funded status is defined as trust asset value minus the present value of trust obligations. BT Vol. X, 37:16-20. Mr. Dalton measured the difference in the funded status of the Trust IV, CSA, and MTW trusts at the end of Allegiant's tenure compared to the beginning of Allegiant's tenure. BT Vol. X, 36:6-18, 43:2-10. In performing this analysis, Mr. Dalton used the

Standard Nonforfeiture Law's proscribed formula for calculating the net cash surrender value of the life insurance policies. BT Vol. X, 44:14-45:6.

806. According to Mr. Dalton, the funded status of the Trusts deteriorated during Allegiant's trusteeship. As of May 2004, when Allegiant resigned as trustee, the Trusts were underfunded by over $85 million. Ex. 2-61, pg. 32. Between 1998 and May 2004, the funded status of the Trusts worsened by $47,408,222. This $47,408,222, according to Mr. Dalton, was the loss to the Trusts that occurred during Allegiant's tenure due to the decrease in funded status. BT Vol. X, 96:19-97:6.

807. Mr. Dalton's data sources included CTS, a database containing information on the preneed contracts. The second primary source was the Insware database, part of Lincoln, which provided information on the policies he was assessing BT Vol. X, 34:3-12.

808. The second component of Mr. Dalton's analysis was loss due to premium overpayment of premiums to Lincoln in the amount of $41,266,474. His next calculation was the loss due to Trust I debentures of $2,749,820.00. He then calculated the loss associated with the World Service group term policy in the amount of $13,522,337.00. These last two losses he identified as non-actuarial losses. Mr. Dalton calculates total trust losses during Allegiant's tenure at $104,946,853.00, with the actuarial component being roughly $88 million. BT Vol. X, 35:1- 37:9.

809. Mr. Dalton calculated funded status for the CSA Trust and the MTW Trust. *See* Ex. 2-61, pgs. 25-27 (CSA), pg. 28 (MTW); BT Vol. X, 40:24-42:14. Mr. Dalton prepared a table showing funded status as it changed during Allegiant's tenure for the three trusts. *See* Ex. 2-61, pgs. 30-32; BT Vol. X, 42:10-23.

810. Mr. Dalton made three actuarial assumptions to calculate trust obligations: interest rates, contract termination rates and mortality. Interest rates are used to calculate present value of future trust disbursements, to allow Mr. Dalton to account for the time value of money in the calculation of a trust obligation. He used the U.S. Treasury rate at the particular time he was doing the valuation of the trust obligation. The discount rate or interest rate used to discount cash flows should be consistent with the risk and uncertainty of the cash flow being discounted. He believes the U.S. Treasury rate gives the closest thing to a risk-free rate. BT Vol. X, 71:1-72:24. He rejected using corporate bond rates, as used by Mr. Long, because they necessarily reflect a risk spread in those corporate bond yields. Risk spread simply means these corporate bond discount rates reflect risk or uncertainty of a risk-bearing entity, such as a corporation. BT Vol. X, 73:3-10.

811. The second actuarial assumption of Mr. Dalton relates to contract termination for purposes of calculating the trust obligation. Consumers of NPS preneed contracts had the option of surrendering or cancelling their contract prior to their death, obligating the trust to return the 80 percent of their preneed contract amount that had been contributed to the trust. He believes this allows him to project the timing of those contract surrenders and the associated cash flows into the future. Mr. Dalton used a 5.5 percent rate which reflects his observed actual contract termination data rates during Allegiant's tenure. BT Vol. X, 74:11–75:12.

812. Mr. Dalton's third actuarial assumption for his trust obligation was the mortality factor, which relates to death rates or probability any particular individual will die within a particular year or at a particular age. The trust would always need to pay out or return 80 percent of the contract amount upon the preneed consumer's death. He needed the mortality rates to project the timing of those disbursements related to consumer deaths from the trust. Mr. Dalton's

mortality assumption is based on an actual actuarial study, an experienced analysis, of mortality or death rates of the Lincoln policies.[30] BT Vol. X, 75:13-76:7.

813. Mr. Dalton created a table showing the results of the trust obligation at various points from which during Allegiant's tenure, actually every month-end during Allegiant's tenure, including the beginning of its tenure and the end of its tenure, separately summarizing obligations of Trust IV, the CSA Trust and the MTW Trust. *See* Ex. 2-61, pgs. 18-20; BT Vol. X, 80:10-22. August 8, 1998 is the point he was doing the actuarial calculation of the trust obligation. The obligation on August 11, 1998, for Trust IV was $40,354,563.00. For the CSA Trust, the trust obligation was $1,768,534.00, and the trust obligation for the MTW Trust on August 11, 1998, was zero; there were no contracts in force in this trust at this time. BT Vol. X, 81:10-25.

814. The total trust obligation for Trust IV, the CSA Trust, and the MTW Trust as of August 11, 1998, was $42,123,097. May 14, 2004, marks the end of Allegiant's tenure as trustee, the final date for which Mr. Dalton calculated asset value, obligations and funded status. BT Vol. X, 82:1-25.

815. On May 14, 2004 the trust obligation for Trust IV was $85,326,334.00, for the CSA Trust, the trust obligation was $2,588,877, and for the MTW Trust, the trust obligation was $3,554,592. The total trust obligation for the three trusts was $91,469,803.00. Mr. Dalton testified he noticed a trend over Allegiant's tenure, a very persistent pattern of the trust obligation increasing month after month. BT Vol. X, 83:4-84:3.

---

[30] With mortality, generally the beginning step starts with a standard industry table with mortality rates that may vary by things like age and gender. Then mortality scalers are applied, with fit factors applied to that basic table; he starts to achieve that fit he discussed earlier. The mortality rates he developed, the assumption he developed will reproduce closely the actual experience observed in this case. BT Vol. X, 76:22-77:9. Mr. Dalton believes 1,082 observed deaths are needed in the aggregate so the data is credible, or reliable, for the purpose of developing an actuarial assumption. He had in excess of 93,000 observed deaths. BT Vol. X, 78:5-21.

816. The total asset value of the insurance policies in Trust IV, the CSA Trust, and the MTW Trust Mr. Dalton calculated on August 11, 1998, was $4,389,998.00. That value calculated May 14, 2004, was $6,167,245.00. Ex. 2-61, pgs.14-16; BT Vol. X, 86:23-87:25. Asset values in the three trusts increased slightly by $2 million. The trust obligation increased "in the magnitude" of $50 million. BT Vol. X, 88:5-17. This revealed assets intended to fund the Trusts were not keeping pace with the growth of obligation of the Trusts. BT Vol. X, 95:2-13.

817. Mr. Dalton's analysis shows funded status deteriorated materially over the period of Allegiant's tenure by approximately $47 million in loss of trust value in the three trusts. Funded status of Trust IV at the beginning of Allegiant's tenure was negative $36,111,075.00, and at the end of Allegiant's tenure, the change in funded status of Trust IV was negative $80,388.062.00, or an increase in negative value of $44,276,987.00. BT Vol. X, 89:1-25.

818. Mr. Dalton's calculated diminution of value over Allegiant's tenure for Trust IV was negative $44,276,987. The total loss to Trust IV, the CSA Trust, and the MTW Trust over Allegiant's tenure was $47,408,222.00. BT Vol. X, 96:3-25.

819. The second category of loss to Trust IV, the CSA Trust, and the MTW Trust was caused by overpayment of insurance premiums. He asseverates, to the extent a policy owner pays more for a policy actuarially required or actually sound, that money is a loss to the trust in this case; he calculated the loss at $41,266,474.00. Mr. Long agrees the $72,287,615.00 decrease in trust value he calculated captures any premium overpayment if, there was any premium overpayment. BT Vol. XVIII, 120:25-121:7. He agrees Mr. Dalton did a two-step calculation in finding trust losses. First, he calculated a decrease in funded status of the Trusts at $47.4 million using the Standard Nonforfeiture Law for the asset value. Mr. Long agrees it is true the prescribed methodology under the Standard Nonforfeiture Law for calculating the cash surrender

240

value is based on premium amounts actuarially required to mature the policy benefits, under prescribed conditions. He also agrees that calculation is not based on the rate schedules for the policies actually being purchased, and it is not based on the Standard Nonforfeiture Law on premiums a policy-holder would have to pay to keep a policy in force. Mr. Long said he understood, because of that, Mr. Dalton did a separate analysis of the premium rates the Trusts were paying to determine whether there was any overpayment of premiums. Mr. Long understands Mr. Dalton calculated premium overpayment by the Trusts to be approximately $41 million. Mr. Dalton, between his two steps, concluded the funded status calculation and the premium overpayment calculation to the Trusts to be approximately $88.6 million. BT Vol. XVIII, 121:8-122:24.

820. In Mr. Long's one-step calculation, trust value decreased $72.2 million. He opines for single-premium Lincoln policies held by the Trusts, the rate schedule premiums Mr. Dalton used were double counted, resulting in an excessive overstatement of trust losses of $14,394,684. Mr. Long agrees, if the Court rejects the $14.4 million sum for double counting, Mr. Dalton's actuarial number for trust losses would be $74,227,216.00. BT Vol. XVIII, 123:5-124:17. As previously noted, before deductions, Mr. Long's calculation for trust losses, which provides for premium overpayments, if any exist, is $72,287.615.00. Because the Court will be adopting part of Mr. Long's expert testimony and part of his conclusions, which incorporates premium overpayments, the Court will not include in these findings of fact the details of Mr. Dalton's premium overpayment opinions, except to compare his calculations to other experts.

821. The Court embraces Mr. Dalton's conclusion, there are no growth benefits in the Lincoln policies, and rejects Mr. Long's expert testimony the diminution on trust value should be reduced because of his finding a growth benefit should reduce trust losses.

822. Mr. Dalton's expert testimony provides, no adjustment in diminution in trust value in the Trusts needs to be made to account for a growth factor. Mr. Dalton explains growth benefit would mean the face value amount of the policy increases over time, e.g. a certain percentage of the face amount every year. Actuarial pricing considers carefully defined benefits that could change over time; that is embodied in the pricing analysis. Mr. Dalton did not price a growth benefit into reasonable actuarial rates for Lincoln policies. Mr. Dalton testified the Lincoln policies do not have any form of growth benefit. He explains in the policy forms and related actuarial materials filed with the State of Missouri, as part of the product review process, "It states very clearly in those policy forms and in the associated memoranda that these are level benefit policies." He confirmed there was no growth benefit in the policies through the Insware data, in the policy forms, and in the actuarial data. BT Vol. X, 114:7-115:19.

823. Terry M. Long is Senior Vice President and an owner of the firm, Lewis and Ellis, where he heads the actuarial practice. BT Vol. XV, 19:19-25. Mr. Long principally works in the life insurance operation. BT Vol. XV, 25:20-23.

824. Actuarial science is described by Mr. Long as a discipline using mathematics and statistical tools to assess risks that may include projecting or involving the assessment of a risk in the future and determining what the value is today. BT Vol. XV, 20:1-6.

825. Mr. Long was asked to perform a diminution of value calculation for the Trusts, to review the report of Mr. Dalton and his calculations of the diminution of value and premium overpayments. The third matter involved a review and response to expert reports of some of Plaintiffs' expert witnesses, Mr. Dalton, Steve Browne, Edgar Coster, and Max Schanzenbach. Mr. Long believes the diminution of value of the Trusts during Allegiant's tenure, after making reductions from his total diminution in trusts of $72,257,615.00, is $40,548,597.00. Mr. Long

242

disagrees with Plaintiffs' expert witness, Mr. Dalton, believing he undervalues the Trusts. BT Vol. XV, 29:13-30:22.

826. The first issue concerning Mr. Long's testimony relates to his conclusion the Lincoln policies provided for a growth factor, i.e. the NPS preneed contracts provided for inflation, form the time the contracts were signed until the death benefits under the contract were paid. He believed there was a mechanism in the insurance policies to pay for that inflationary component. The Court concludes, for reasons hereafter assigned, any losses he assigned to the Trusts cannot be reduced by any concept of growth factor benefit in the insurance policies.

827.  Mr. Long believes the form of the policies has a provision for a "participating" factor, and through the declaring and paying of a dividend, this is a mechanism to show the policies have a growth benefit.

828. Mr. Long wanted to reflect the Lincoln policies, or Lincoln itself, was funding NPS's growth benefit. His opinion is Lincoln was selling policies to the Trusts that included a growth benefit. BT Vol. XV, 32:4-20. The Court disagrees and concludes Lincoln was not selling policies that included a growth benefit.

829. Mr. Long was shown the terms of the agreement between the funeral home and the consumer. Ex. P-404, pg. 19; BT Vol. XV, 35:20-36:25. The agreement provided the full amount of the funeral was required to be paid with NPS providing funeral service benefits equal to the value of all payments made upon the above price. This is the language embraced by Mr. Long in a preneed contract to demonstrate the preneed contract he was reviewing provided for a growth payment. Mr. Long was not reviewing an insurance policy. BT Vol. XV, 37:9-38:17 (emphasis added).

830. Mr. Long explained the term "policy data page." *See* Ex. P-404, pg. 20. It is not the policy itself, but it lays out some key information regarding the policy, the identity of the insured, the identity of the owner, the Trust IV policy number, the issuance date of the policy, the gender and age of the insured and some of the terms. BT Vol. XV, 41:13-42:6.

831. Mr. Long identified Exhibit 2-0125 as correspondence from the State of Missouri Director of Insurance, involving submission by Lincoln of a whole-life policy, a single-premium policy, a flexible premium annuity and a rider. He explained before a company may sell a product it needs approval from the state insurance department. Hereafter, Mr. Long references pages from this exhibit. BT Vol. XV, 42:23-44:2.

832. Mr. Long relied on the testimony of Roxanne Sargent, an employee of NPS, to conclude Lincoln policies provided a growth benefit. He mentions "PAR" which he says stands for "Participating," which Mr. Long interprets as an insurance policy approved necessarily has a dividend payment provision designed to provide additional insurance, "It is - - it is a discretionary payment. It is not guaranteed." BT Vol. XV, 44:3-45:15.

833. Mr. Long also relied on the testimony of Brent Cassity in concluding there was a growth factor in Allegiant policies, saying he was testifying as to his interpretation and understanding of what Brent Cassity was saying. BT Vol. XV, 47:21-48:7.

834. Mr. Long describes information from a sample whole-life policy with premiums payable for the period shown on the schedule. *See* Ex. 2-125, pg. 12. There is a designation at the bottom, "LP.PAR 8/ 1998 Mo." This was part of an exhibit of correspondence with the Missouri Department of Insurance and NPS in connection with their getting their sample policies approved, dated February 21, 2001. BT Vol. XV, 51. The correspondence included a paragraph labeled "Participation," stating "at the end of the first policy year, the company will determine

and apportion the share of the divisible surplus of the company, and they can be credited as a dividend to the policy." Ex. 2-125. Mr. Long says this is relevant because this supplies the mechanism by which the insurance policy could provide a growth benefit to cover the growth benefit obligation of NPS. Mr. Long earlier testified, the dividends are not guaranteed, but believes there is another provision that says they can be used to buy additional insurance. BT Vol. XV, 49:2-50:5.

835. Mr. Long explained "LP," above referenced, means "Limited Pay;" it shows annual premiums payable for ten years. Option "B," of "Dividend Options" was used to purchase participating additional paid-up life insurance. Ex. 2-125, pg. 15; BT Vol. XV, 51:22-52:20.

836. Mr. Long explains companies can use the dividend to buy a very small paid-up policy that grows over time or they can use it to buy one-year term insurance policy. Mr. Long testified the dividend could be used to buy an amount equal to the growth benefit, so if the insured died during that time, the face amount plus the additional benefit would be paid. BT Vol. XV, 52:24-53:7.

837. Mr. Long also produced information for a sample multi-pay policy and information for a single premium participating life policy with the same referenced participation language as the multi-pay policy. Ex. 2-125, pg. 29; BT Vol. XV, 53:8-54:12.

838. Mr. Long was then referred to a letter dated June 2003 for the year ended December 2002 from Rosenthal, Packman & Company, certified public accountants to the board of directors of NPS regarding a balanced sheet and financial statements. Ex. D-265. Mr. Long focused on funeral home deferred liability where there is a statement, "The face amounts of the majority of prearranged funeral contracts sold are fully funded by insurance." *Id*. at pg. 7. It then stated NPS pays inflation amounts to funeral home providers in addition to the contract face

amount. The letter stated the company pays the inflation amount, in order to compensate the funeral homes for rising costs between the time the prearranged contract was executed and the time of the death. The letter continued, the insurance policies used to fund the prearranged funeral contracts make provision for increasing the face amount of the insurance policies, specifically for the purpose of funding this growth amount. The method in the policies used for this purpose is to declare policyholder dividends used to purchase paid-up additions in the increased face amount. The insurance subsidiaries have in the past declared such dividends, but such dividends are not guaranteed. Therefore, while the company [NPS] recognizes the liability that they have, they do not get to take an offset from the insurance policies.

839. Mr. Long admits, what he relied on was the statement the insurance companies had been paying those amounts. Mr. Long admitted the Lincoln policy did not reference growth amount specifically, just participation in the dividend options. It was his understanding that provision was a mechanism for funding the growth benefit. BT Vol. XV, 58:3-60:19. The undisputed evidence is Lincoln did not fund money to buy additional insurance. The provision in the Lincoln policy was discretionary and not guaranteed. Since there was no funding, there was no growth benefit and Mr. Long is mistaken when he says there should be any reduction in trust losses because of a growth benefit.

840. Mr. Long testified, after looking at these documents, and reviewing this information, he had no doubt as to whether the Lincoln policies NPS was purchasing during Allegiant's tenure included a growth benefit. BT Vol. XV, 67:21-68:3.

841. Exhibit D-305 is another letter dated May 13, 2004, pertaining to the year ended December 31, 2003, covering the balance sheet of NPS and related statements of income and stockholders' equity. Mr. Long notes, while it might not be audited, it is a report provided to the

NPS board of directors. The section on page eight is similar to the language in Exhibit D-265. This letter stated, "However, the company also pays inflation amounts to funeral home providers in addition to the contract face amount." BT Vol. XV, 68:3-70:22. This language must not be confused with the language above referenced related to any obligation the Lincoln policies had to fund this inflation rate. Mr. Long was presented with information showing there was a mechanism to provide for a growth benefit, but when all the evidence is examined, it is obvious, no dividends were available to support his conclusion the policies actually provided a growth benefit. He recognizes Mr. Dalton's report showing no dividends were paid in 1998, and the small amount of dividends paid in 1999 were reversed in 2000. It is clear, there is no evidence in this case, from any witness, dividends were paid beyond 2000. Ex. D-142; Ex. D-236; BT Vol. XVIII, 27:20-30:25. No dividends were paid in 2001 or 2002. BT Vol. XVIII, 31:1-25. No dividends were paid in 2003 or 2004. Ex. 2-211, Ex. D-372, BT Vol. XVIII, 32:1-25.

842. Mr. Long's opinion Lincoln must have paid growth benefits was based on NPS's unaudited financial statements and statements by some NPS employees. BT Vol. XVIII, 9:16-19, 11:5-7, 16:6-11. Mr. Long then calculated what the actuarially reasonable rate for the Lincoln policies should have been including a growth component. *Id*. at 17:10-18. However, under the actuarial standard of practice, Mr. Long should have looked to Lincoln's "capacity and intent" to pay dividends when determining reasonable premiums. *Id*. at 18:24-21:15. According to Lincoln's own policy data, Lincoln did not pay a growth benefit. *Id*. at 22:18-22. Mr. Long did not review Lincoln's financial ability to make the dividend payments he claims they made. *Id*. at 24:7-25:3. Mr. Long made no attempt to pull Lincoln's historical financial statements to see if it paid policyholder dividends. *Id*. at 26:8-12. In fact, as noted, according to Lincoln's audited historical financial statements, no dividends were paid in 1998. *Id*. at 27:14-22. According to

these financials, a small amount of dividends, $108,822, were paid in 1999, but these were reversed (in fact more than reversed) in 2000. *Id*. at 24:23-28:1. And after 2000, no dividends were paid during Allegiant's tenure. *Id*. at 28:2-4; *see also* Ex. D-142, pg. 4, D-236, pg. 6. Similarly, Forever Enterprises' SEC Form 10-K in 2001 stated "Our insurance subsidiaries paid no dividends in the past three years on their direct business." Ex. P-569, pg. 8. Further, Mr. Lumpkin testified Lincoln did not pay growth benefits or policyholder dividends between 1998 and 2004. BT Vol. VI, 129:21-130:12.

843. In his rebuttal report, Exhibit P-2263, page 13, Mr. Dalton criticizes only Mr. Long's inclusion of the growth and inflation benefits on the policies, not the contracts. When Mr. Long reran his calculations for his supplemental report, he removed the growth component from both the contracts and the policies. Mr. Long agrees, if he had rerun his calculations and only removed the growth benefit from the insurance policies, the trust assets, the trust values he calculated in his supplementary report would have been significantly lower. BT Vol. XVIII, 173:14-174:21.

844. In his supplementary report, Mr. Long did not redo his premium overpayment opinion to remove his growth payment assumption on the policies. His, and Mr. Dalton's, primary disagreement on the premium overpayment is whether a growth benefit should be included. Mr. Long calculated the trust values at the beginning and end of Allegiant's tenure, assuming no growth benefits on either the insurance policy or preneed contract liabilities. BT Vol. XVIII, 175:1-21.

845. Looking at the impact of removing growth from both sides of the equation on trust values, the change in trust value for the CSA Trust during Allegiant's tenure, according to Mr. Long, is a negative $1,598,490.00. Concerning the MTW Trust, Mr. Long's calculation for

change in trust value during Allegiant's tenure is $4,003,364.00, meaning both trusts decreased in value over Allegiant's tenure. As to Trust IV, the change in trust value Mr. Long calculated during Allegiant's tenure was negative $65,301,028.00. Removing growth from both sides of the equation, Mr. Long calculated the value of Trust IV decrease amount is $65.3 million during Allegiant's tenure. BT Vol. XVIII, 175:22-176:24. This figure includes is $11.2 million reduction because he believes all seven trusts, if included, would reduce the diminution in trusts' value.

846. In Exhibit P-2367, as already noted, he calculated trust losses during Allegiant's tenure in the CSA Trust, the MTW Trust, and Trust IV at $72,287,615.00. In his supplemental report, Ex. D-740C (Exhibit 3), Mr. Long's total decrease in trust value during Allegiant's tenure for the CSA Trust, the MTW Trust, and Trust IV is $70,902,882.00, meaning those three trusts lost $70.9 million when he removed the growth factor. In Exhibit P-2367, his trust value calculation in his original report, he included a growth benefit on both sides of the equation. By removing growth from both sides of the equation, for purposes of calculating the trust values, there was an approximate $1.3 million difference in the change of trust value amounts. BT Vol. XVIII, 176:25-177:25.

847. Turning to the effect removing growth on Mr. Long's reductions, in his original report, the amount of reduction for the initial impact of new business was approximately $17.9 million, but in his supplemental report, that reduction went up to $24.1 million. This was a function of growth being removed from the assets side of the equation, assets being insurance policies. By redoing his calculation and removing growth on the insurance policies, he subtracted an additional $6 million from the loss calculation. This is the primary area where his supplemental report was impacted by the change in his growth benefit assumption. BT Vol. XVIII, 178:14-179:22.

848. Other than removing the growth benefit from both policies and liabilities, Mr. Long's methodology remained the same. In his supplemental report, as with his original report, he aggregated across all seven trusts in reaching his final opinion. BT Vol. XVIII, 179:23-180:24.

849. Mr. Dalton concludes, it is plainly clear there is no intention to pay dividends as part of a policy value or part of the policy benefit. He observes, across the industry the participating feature of policies is purely a discretionary feature. BT Vol. X, 115:20-116:25.

850. Mr. Dalton's research discovered, one year, early in Allegiant's tenure, a hundred thousand dollars or so of dividends appear to have been paid, based on a financial statement, but the dividends were more than reversed the next year. The dividends paid by Lincoln were absolutely "zero." BT Vol. X, 117:11-118:1.

851. It is clear, dividends were not paid under the Lincoln policies, so the Trusts never funded the commitment NPS made to funeral home and other providers. The growth factor only exists if a dividend was declared and paid, and additional insurance was purchased to cover the inflation/growth factor. Mr. Long relied on the above referenced statement, increased insurance could be paid if dividends were paid to buy the increased insurance. With no dividends paid, there was no funding source to purchase additional insurance, and there is no evidence any additional insurance was purchased to provide for inflation/growth.

852. It is clear from all of the above discussion, Mr. Long failed in his analysis to prove any growth factor exists in the Lincoln policies, or in any other attempt to show a growth benefit factor exists to reduce Mr. Long's opinion, the loss in trust value during Allegiant's tenure was $72,287,615.00.

853. The primary disagreements between Mr. Long and Mr. Dalton are: (i) whether the Lincoln policies purchased by Trust IV paid a growth benefit and whether the premiums were too high; (ii) what data field should be used when calculating any premium overpayments; and (iii) whether the reductions taken by Mr. Long are appropriate.

854. Mr. Long adopts a "going concern model." In presenting his testimony, Mr. Long believes it is a "good fit," because the insurance policies are going to stay in force, the contractual liabilities were staying in force, and NPS and its obligations were continuing; the Trusts would continue to accept deposits from NPS, the Trusts would continue to pay obligations, NPS had to continue to buy policies from Lincoln, pay premiums, and receive the benefits. He says he believed the going concern analysis was more appropriate than an analysis that looked at something like net cash surrender value. BT Vol. XV, 88:6-22.

855. Mr. Long believes the cash surrender value is not appropriate for a diminution in value calculation, because it is a liquidation, i.e., stop the policies and take the cash. He thinks his diminution in value calculation would be valid if his $20 million adjustments were included, otherwise it would be a change in value calculation, not a diminution in value calculation. He says the first step is to develop a model using actuarial software, to develop the in-force policies and a listing of the contractual liabilities that could be put into the model. Using the Insware database, he determined face amounts of the policies, premiums to be paid, age and gender of the insured, and when they were issued. He did the same thing for the contracts using the CTS database. BT Vol. XV, 88:23-90:20.

856. The second step is to start determining assumptions to use in the model, the key assumption being mortality and lapse rates (terminations other than deaths). Mr. Long relied on experience studies to determine lapse rates and mortality rates. Mortality rate, he explained, is a

251

measure of rate of death to use in projections, expressed as the "number of deaths per thousands of lives insured or per thousand of death face amount." Lapse rate would cover termination other than death or policy maturity. BT Vol. XV, 90:24-92:6.

857. Mr. Long agrees judgment is required in the actuarial calculation and actuaries disagree. BT Vol. XV, 94:1-9.

858. At step three, Mr. Long assumed both the policies and the contracts provided for a growth benefit. Mr. Long explained at this stage, he had to use interest rates for projection purposes and discounting purposes on how to discount future cash flows. He went to the Federal Reserve and gathered information on high-quality corporate bonds. BT Vol. XV, 94:11-23. Mr. Long settled on a 7.75 beginning interest rate and a 6.75 ending period interest rate. BT Vol. XV, 94:24-95:5.

859. At step four, Mr. Long made projections of future policy cash flows into and out of the Trusts. BT Vol. XV, 95:25-96:3.

860. Mr. Long then explained the flow of funds from the Trusts to buy policies from Lincoln and from Lincoln to the Trusts when a benefit is paid. He explained how he calculated the value of policy assets by projecting cash flows the company would be expected to pay, using his mortality assumptions, lapse assumptions, premium information received from Insware, all the information he had. Then, he projected the premiums they would pay. He would also project death benefits to be paid, so he could get a series of cash flows in the future. He said this was done at the beginning of Allegiant's tenure. He projected cash flows between the Trusts and Lincoln, and he calculated future contract liabilities using a similar process. He projected deposits NPS would be paying to the Trusts on those policies – or on those contracts. He also

projected contract benefits that would be paid to NPS when a death occurred. BT Vol. XV, 96:14-98:7.

861. At step five, he discounted future cash flows. This involves the time value of money. Some cash flows in the future may be very short, others years from now. Those amounts are discounted back to determine what those values would be worth today. BT Vol. XV, 98:8-20.

862. At step six, Mr. Long calculated net policy asset value and contract liability. He determined present value of future policy benefits and did the same thing for present value of future premium payments by the Trusts to Lincoln. He discounted cash flows and got present value of future policy premium payments. He deducted present value of future policy premiums from the present value of future policy benefits. He explained, since there were policy loans, they had an impact when a benefit was made. He said, if a policy loan is in existence, the death benefit or surrender value is reduced by the amount of the outstanding loan. So, he said, we calculated the impact of those policy loans on future policy benefits. He had the present value of future policy benefits, the present value of future policy premiums, and the present value of the impact of the policy loans. He calculated the net policy asset value by subtracting the present value of future premiums plus the present value of the policy loans from the present value of the policy benefits. BT Vol. XV, 99:2-100:23.

863. Mr. Long used a similar process to calculate contract liabilities. He already had the cash flows projected. He discounted those using the same interest rates used for the policies. He had the stream of future contract benefits to be paid by the Trusts to NPS. He discounted those back to today, or to the beginning of Allegiant's tenure to give us the present value of the future contract benefits. He did the same thing for any obligations the Trusts would have or that NPS would have to the Trusts. Those would arise if it was a multi-pay contract, not a single pay

contract. Then, as those payments were made, the Trusts would forward the appropriate amount to NPS. BT Vol. XV, 102:12-103:6.

864. At step seven, Mr. Long calculated the Trusts' value for the beginning of the period, August 11, 1998. He took the net asset policy asset value, subtracted the contract liability and added in other assets, non-actuarial assets. Mr. Long calculated the trust value of all trusts at the beginning of Allegiant's tenure at negative $61,337,060.00. BT Vol. XV, 103:9-104:13.

865. At step eight, Mr. Long testified he repeated steps one through seven for the end of Allegiant's tenure. At step eight, his calculations produced a negative $122 million number at the end of Allegiant's tenure. Steps one through seven produced the $61 million negative number for the beginning calculation. He calculated the diminution of the Trusts' value after adjusting for new policy timing and economic factors discussed earlier. BT Vol. XV, 104:22-106:24.

866. Mr. Long believed it was also necessary to isolate and put a number on the impact policy loans had on the Trusts' value. When Allegiant Bank became trustee, the negative impact of policy loans was $15,734,443.00. At the end of Allegiant's tenure, the negative impact of policy loans was $29,374,218; the difference being $13,639,775. Adjustment for policy loans is included in Mr. Long's final diminution of trust value of negative $40,548,597 (including growth factor). The "recap" of how he got to his diminution of trust value number (including growth) is End Trust Value – May 14, 2004 minus Beginning Trust Value – August 11, 1998 plus New Policy Timing plus Economic Factors equals Mr. Long's Diminution of Value Calculation (including growth) of $40,548,597.00. Exhibit 1A (which includes D-Demo 30, slides 22-27); BT Vol. XV, 107:7-108:23.

254

867. Mr. Long understands Mr. Dalton's opinion is policy loans, premium mismatching and reduced paid-up (RPU)[31] conversions are the three primary reasons, in his calculations, the funded status deteriorated in the Trusts over Allegiant's tenure. BT Vol. XVIII, 112:11-23.

868. Mr. Long agrees the $66.5 Million decrease in Trust IV, the value he calculated, was caused, in part, by mismatching of policies. Mr. Long also agrees his $66.5 Million decrease in the value of Trust IV was caused, in part, by policy loans. For purposes of his calculations, Mr. Long, like Mr. Dalton, concluded the RPU conversions contributed to the decrease trust value. BT Vol. XVIII, 112:24-113:11.

869. In order to follow more clearly Mr. Long's analysis from this point, the Court notes Mr. Long believes all seven NPS trusts should be included in the calculation of diminution of trust values for the Trusts. Plaintiffs filed a complaint asking for relief in the seven trusts, but have pursued damages in this litigation for only the CSA Trust, the MTW Trust, and Trust IV. Mr. Long agrees, there is no actuarial reason to include all seven trusts in the damages calculation, and gains cannot be moved from one trust to the other. He is not opining either gains or losses can be moved between trusts. Nevertheless, he opines by doing the aggregation across all seven trusts, he decreases the losses by approximately $11.3 million. Mr. Long testified he is not offering any legal opinion that as a matter of law supposed gains in one trust can be moved to offset losses in another trust. BT Vol. XVIII, 117:4-118:18. The Court rejects Mr. Long's $11,344,793.00 reduction in trust losses due to aggregation of the Trusts. If all seven trusts are aggregated, the first reduction Mr. Long would make from his $72,287,615.00 figure would be $11,344,796.00, resulting in his $60.9 million figure.

---

[31] RPU means the death benefit on the policy gets reduced to a lower amount than the original death benefit, but the policy is considered fully paid, and after a reduced paid-up conversion, no more premiums are owed, but the death benefit received upon death or maturity of the policy is less.

870. The Court will make conclusions for calculation of trust losses only for the CSA Trust, the MTW Trust, and Trust IV. Mr. Long agrees, to know the diminution in trust value for only the CSA Trust, the MTW Trust, and Trust IV during Allegiant's tenure, he would add together the negative $1,666,629.00 (CSA), with the negative $4,114,934.00 (MTW), and the negative $66,506,052 (Trust IV), for a total loss of $72,287,615.00. BT Vol. XVIII, 98:20-99:2.

871. Mr. Long reduced his $60.9 million diminution in trust value during Allegiant's tenure for several reasons. BT Vol. XV, 76:17-24. Mr. Long's first reduction is for a timing factor of $17,909,866.00 for the "impact of new business." Near the end of Allegiant's tenure, there was a large growth in the number of NPS contracts. Mr. Long explains, when an insurance policy is developed, the issuing company is expecting to make a profit over expenses, so the charged premiums must be more than the amount needed to cover death benefits, contingencies, taxes, and profit the company expects to receive. BT Vol. XV, 77:7-25.

872. Mr. Long opines, immediately before issue, a policy would be in a negative position, the company would be paying more than the value of benefits they are going to receive. With a single-premium policy, upon payment of the premium, no further obligations would be due, and the benefits will be greater and the asset will be a positive asset. However, with a multi-pay policy, it will take more additional premium payments before the policy is in a positive benefit for the purchaser, and because the Trusts were growing concerns, these values would be recognized in the future. Mr. Long recognizes a preneed multi-pay policy has little or no value when purchased. He explains, the present value of future premiums to be paid will still be greater than the present value of the death and surrender benefits, because the premium still includes the load for expenses, profit, commissions, and taxes. BT Vol. XV, 81:23-82:4.

873. Mr. Long observes NPS was growing rapidly in the last two or three years of Allegiant's tenure; more contracts were being sold and the Trusts held more new policies mostly multi-pay policies. He stated his adjustment included all new business including single-premium policies. BT Vol. XV, 82:5-19.

874. Mr. Long believes $17.9 million for the impact of new business should be a reduction from his loss in value to Trusts CSA, MTW and Trust IV. *See* D-DEMO 30, pg. 10; BT Vol. XVIII, 140:1-6. In Exhibit D-616D of his October 22, 2018 report, the $17.9 million reduction he took for the impact of new business is the result of his exclusion from the calculation all policies written by Lincoln and held by the Trusts between 2001 and 2004. BT Vol. XVIII, 140:7-10. Mr. Long states for Trusts CSA, MTW and Trust IV, the gross policy value for policies issued in years 1998-2004, the "total line" is just for these three trusts. The entire $17.9 million reduction he took from the losses in those trusts came from new business in those trusts. BT Vol. XVIII, 140:1-5. For 1998 through 2000, the amounts in the "Total" field are positive, meaning, in the aggregate, the policies issued in those years and held by the Trusts at the end of Allegiant's tenure had a positive gross policy asset value, while for years 2001-2004, there are negative numbers, i.e., at the end of Allegiant's tenure their policy asset value was negative. BT Vol. XVIII, 142:9-143:7.

875. Mr. Long admits he simply excluded all of those four years in which there were negative values for the gross policy asset values in the aggregate. He kept in his calculations the years where the gross policy asset values in the aggregate were positive, saying "that wasn't the reasons I selected them, but that's the result." BT Vol. XVIII, 143:8-13.

876. For 2001, the total gross policy asset value was negative $575,609.00. For 2002, the gross policy asset value in the aggregate was negative $4,124,230.00. For 2003, the gross policy

asset value for the CSA Trust, the MTW Trust, and Trust IV was negative $8,007,628.00 at the end of Allegiant's tenure. For 2004, the total gross policy asset value of the policies in those three trusts was negative $5,202,399.00. BT Vol. XVIII, 144:6-25.

877. Adding the four negative values for those four years, the total negative value is $17,909,866. Exhibit P-2287D, page 388 listed the policy issue dates switch from being issued in the year 2000 to the year 2001. The first 387 pages of the Exhibit are policies purchased before 2001. From page 388 through page 1036, policies purchased by Missouri consumers for Trust IV are listed for 2001 through 2004. BT Vol. XVIII, 145:9-146:24.

878. Mr. Long removed all policies from his calculation for 2001-2004 in force on the last day of Allegiant's tenure. His $17.9 million reduction in NPS trust losses for initial impact of the new business is inherent in purchasing a whole-life policy with premium payments over time. Mr. Long stated his reason for excluding $17.9 million from his loss calculation was because, it is his opinion, the negative asset value associated with those policies will reverse over time, calling it "a timing issue." However, Mr. Long admits initial negative value of the new insurance policies would not exist for single-premium life insurance policies, once the premium has been paid. He admits single-premium policies would have a positive value as soon as the premium was paid. BT Vol. XVIII, 147:3-148:23.

879. Mr. Long acknowledges during the period 1998-2004, it was most common in the preneed industry to only sell single-premium policies to back preneed obligations. During the period 2001-2004 for Trust IV, multi-pay policies were purchased to back preneed contracts that had been paid in full by the consumers from the beginning; "there were multi-pay policies purchased for single-pay contracts." This is one form of "premium mismatching." Another form of mismatching is where there is a multi-pay contract, but the payment terms were for different

258

lengths of time, if the contract pay period and the premium paying period are not the same. BT Vol. XVIII, 148:24-150:1.

880. Mr. Long acknowledges both types of premium mismatching contributed to the decrease in trust value. He also admits if the Trusts had purchased single-premium policies for those consumers who had paid in full for their preneed contracts at the beginning, the new business impact would have been smaller. He admits if the trusts had purchased single-premium policies for consumers who had paid in full, for their preneed contracts at the beginning, those policies would immediately have had a positive asset value and that positive asset value would have made smaller the $17.9 million impact of new business he calculated. BT Vol. XVIII, 150:2-151:5.

881. While Mr. Long said he did not know, during Allegiant's era, in trust IV, 81 percent of paid-in-full preneed contracts were insured with multi-pay policies, he knew there were "some" mismatches at the beginning. It is undisputed, 20,869 preneed contracts were purchased by Missouri consumers, who paid in full for the contracts during Allegiant's era. Ex. P-2321, BT Vol. XVIII, 151:6-23. Eighty-one percent of 20,869 paid-in-full purchased contracts, or 16,882 times, Allegiant Bank purchased multi-pay policies, requiring premiums payments over time, to back those paid in full contracts. BT Vol. XVIII, 152:12-153:1, 153:16-20.

882. For the contracts that were paid in full by Missouri consumers, during Allegiant's era, no more money would be paid on the preneed contract from the consumer for the contract, and no more money would come into Trust IV for that consumer related to that contract. BT Vol. XVIII, 152:5-13.

883. The most common multi-pay policy was with ten-year premium payments. Trust IV also bought policies requiring premium payments for five and twenty years. BT Vol. XVIII,

155:6-23. In all 16,882 instances where a multi-pay policy was bought to back a paid-in-full preneed contract, it would have contributed to the new business impact he observed when they were still in force at the end of Allegiant's tenure, and in all those cases if Allegiant had purchased single-premium-policies, there would have been no new business impact. BT Vol. XVIII, 155:24-156:8.

884. Allegiant purchased some single premium policies, about three thousand, during its term as trustee between 2001 and 2004, but Mr. Long excluded those policies from his calculation, which would have improved the $17.9 million reduction by approximately $3 million. He agrees because multi-pay policies were being issued to back single-pay funeral contracts, it was creating long-term problems for the Trusts and, had that practice not been happening, the $17.9 million reduction would have been materially different, if necessary at all. BT Vol. XVIII, 156:11-158:9.

885. Mr. Long's reasoning for reduction of his loss calculation by $17.9 million is the negative asset value of these multi-pay insurance policies will reverse over time, meaning the asset value of multi-pay policies issued between 2001 and 2004 will eventually become positive, but only if the premiums are paid. He admits, even if premiums are eventually paid, positive policy asset value would happen only after Allegiant's tenure would have ended. In reality, Mr. Long admits, because of timing, by making this reduction to the trust loss calculation, he would be giving Allegiant Bank credit for gains in the policy asset values, and if they ever occurred, it would only occur after Allegiant's tenure ended. BT Vol. XVIII, 158:10-159:24 (emphasis added). Once again, Mr. Long says this calculation, which gives Defendants a $17.9 million benefit, could only happen after Allegiant's tenure ended, but "that was not the reason I made that change . . ."

886. The reduction would only happen if Trust IV, going forward, was able to pay the premiums. He does not dispute at the end of Allegiant's tenure, Trust IV's value was negative $99.5 million with a million dollars in non-insurance policy assets, as he reported in his Appendix G. BT Vol. XVIII, 159:25-160:9.

887. At the start of Allegiant's tenure, he calculated the Trust IV value at negative $33 million. BT Vol. XVIII, 161:22-25. He made no adjustment to that beginning value of the trust to account for policies Allegiant inherited from the prior trustee. When looking at the asset values for 2001-2004, in the aggregate, it had a negative policy asset value Mr. Long removed from the calculation. He said he did not remove it for that reason. Mr. Long removed it from the trust loss because he said it was a business and economic factor not within Allegiant's control, but he did not go to the beginning of Allegiant's tenure and do a similar analysis. If he had done such an analysis at the beginning of Allegiant's tenure and removed from the asset value any policies issued under the prior trustee's tenure that came in to Allegiant, in the aggregate in the years 1995-1998, and brought in only those years that were negative, and adjusted those, it would have improved the asset values of the trust policies at the beginning of Allegiant's tenure. BT Vol. XVIII, 162:1-164:24.

888. By improving the asset value, that would have improved the trust value of Trust IV at the beginning of Allegiant's tenure. Exhibit P-2367 presents a hypothetical situation. If trust value is improved to a negative $20 million, instead of a negative $33 million, that would have been an improvement in the trust value at the beginning of Allegiant's tenure. He agrees by improving the trust value in the beginning of Allegiant's tenure, with the value at the end of the tenure remaining the same, the difference, because they are negative numbers between the beginning and end of Allegiant's tenure in Trust IV, would be greater. He said he did not make

that analysis, but did some review of that, and he made no adjustment. BT Vol. XVIII, 164:25-165:25. This further demonstrates the unreliability of Mr. Long's new business reduction.

889. To add to the Court's conclusion rejecting the $17.9 million reduction in Mr. Long's calculation of trust losses, Exhibit P-2367 shows Mr. Long's $72,287,615.00 decrease in trust value for the CSA Trust, the MTW Trust, and Trust IV at the end of Allegiant's tenure only included the initial impact of new business adjustment at the end of Allegiant's tenure; Mr. Long did not make any similar corresponding adjustments at the beginning of Allegiant's tenure. BT Vol. XVIII, 160:19-161:5. The $17.9 million reduction will not be allowed.

890. The second category of reductions Mr. Long fashioned to his $72,287,615.00 calculation of loss to the Trusts during Allegiant's tenure is the application of an interest rate for discounting, alternatively to Mr. Dalton's applied interest rate. D-DEMO 30 page 10 is his summary of reductions due to business and economic factors. The interest rate reduction is $1.99 million, attributable by him to a decrease of one percent in interest rates during Allegiant's tenure. Mr. Long uses 7.75% discount rate at the beginning of Allegiant's tenure and 6.75% at the end of such tenure. In making this selection, he chose to use the corporate bond interest rate, while Mr. Dalton used the U.S. Treasury Bond rate. Mr. Long acknowledges the corporate bond interest rate includes a risk credit spread and the U.S. Treasury Bond interest rates have a much smaller, or no risk credit spread. BT Vol. XVIII, 166:3-167:23.

891. Mr. Long did not do the calculation used by Mr. Dalton and does not know if he had used the U.S. Treasury Bond interest rates for his discounting whether the nearly $2 million impact from the change in interest rates would have been considerably smaller. BT Vol. XVIII, 167:24-168:8. Mr. Dalton made a different actuarial choice with respect to interest rates, and this is the type of actuarial judgment as to which reasonable actuaries can disagree. BT Vol. XVIII,

169:17-22. Mr. Long is not persuasive in convincing the Court his $1.9 million reduction in trust loss should be made. His $1.9 million reduction is rejected.

892. Mr. Long's third reduction from his initial $60,942,898.00 calculation of diminution in value of the Trusts during Allegiant's tenure, is what he calls an adjustment by a decrease in the interest rate level by one percent in determining present value of future policy assets, or the value of policy assets and the value of contract liabilities to discount future cash flows. He used a 7.75 percent interest rate at the beginning of Allegiant's tenure and a 6.75 interest rate at the end of the tenure. BT Vol. XV, 82:20-83:7.

893. This third reduction, of $493,712.00 from his $72,287,615.00 trust losses during Allegiant's tenure, was for a decrease in values in non-insurance assets during Allegiant's tenure. *See* Ex D-613, Exhibit G, pg. 178. This reduction represents the difference between the total of other assets in these trusts at the beginning of Allegiant's tenure and the total of other assets at the end of such tenure, taken from the trust statements. In the beginning of the tenure the asset value of all seven trusts was $1,821,124.00. BT Vol. XVIII, 169:23-170:24. At the end of Allegiant's tenure non-insurance assets had decreased to $1,327,412.00. The difference is the decrease in value of assets from the beginning to the end of Allegiant's tenure, or approximately $493,712.00. BT Vol. XVIII, 171:21-172:3.

894. Mr. Long said he did this to avoid pulling in losses from outside Allegiant's tenure and the decrease in value of the non-insurance assets was a business or economic factor outside of Allegiant's control. He says the assets were in the Trusts at the beginning of Allegiant's tenure and while some of the assets were not in the Trusts at the end of the tenure, fewer of them were in the Trusts to the tune of $493,712.00. The assets he includes in his numbers are cash, CDs or

bonds that could be liquidated, and if cash left, it had to be distributed. BT Vol. XVIII, 172:4-173:9.

895. Mr. Long accesses Exhibit G of his report showing cash, treasury notes, U.S. Government agency bonds, Federal National Mortgage bonds, and certificates of deposit in the Trusts at the beginning of Allegiant's tenure, totaling $493,000.00. At the end of the tenure there was cash, Calamos Strategic Total Return, some certificates of deposit, evidence of Class B interest in Caymus Funds, some U.S. government agency bonds, and a Wentzville, Missouri School District municipal bond. BT Vol. XV, 85:8-86:23. Mr. Long's conclusions are not persuasive. The assets were in the Trusts at the beginning of Allegiant's tenure and absent at the end of Allegiant's tenure, fewer by $493,000.00. BT Vol. XVIII, 172:13-20. This reduction is not allowed.

896. To summarize, Mr. Long made calculations resulting in reductions from his $72,287,615.00 determination for trust losses to the CSA Trust, the MTW Trust, and Trust IV. He calculated in his report change in trust values between the start and end of Allegiant's tenure to be a negative $60.9 million for all seven NPS trusts. BT Vol. XVIII, 132:1-133:15. The Court rejected the $11.3 million reduction.

897. Mr. Long made a further reduction of $20,394,301.00 from the $60.9 million from his prior number for all NPS trust losses to get to $40.5 million. This $20.4 million figure comprises three separate categories. The first is valued at $17.9 million, for "new business issued in 2002 through 2004." BT Vol. XVIII, 133:16-134:21. This reduction has been rejected.

898. The second reduction category Mr. Long made to his loss calculation is related to a decrease in interest rate levels that happened during Allegiant's tenure resulting in a $2 million reduction. BT Vol. XVIII, 134:22-135:3. This reduction has been rejected.

899. The third category for reduction is for a decrease in the value of non-insurance assets of the Trusts between the start of Allegiant's tenure to the end of that tenure. The amount of this reduction is $435,712.00. Mr. Long states the reason for these three categories for reductions in claimed losses to the Trusts is they represent business and economic factors over which Allegiant had no control. BT Vol. XVIII, 135:4-13. This reduction is rejected.

900. In calculating the $72.2 million decrease in trust value for Trusts IV, the MTW Trust, and the CSA Trust during Allegiant's tenure, Mr. Long applied a recognized standard in the actuarial industry. BT Vol. XVIII, 101:2-8. Mr. Long testified he could have performed this calculation in 2004. *Id.* at 100:7-15.

901. Similarly, for comparison, if the World Service, Trust I debentures and single-pay premium overpayment amounts were removed from each expert's totals, Mr. Long's calculation was $72.2 million, Mr. Dalton's was $74.2 million, and Mr. Browne's was $77.1 million. BT Vol. XVIII, 130:11-131:10. Each made different assumptions and calculations; all were impressive individuals.

## III.   CONCLUSIONS OF LAW

The Court finds Allegiant breached the fiduciary duties it owed to the beneficiaries, Defendants are not relieved from liability due to the authorization, *in pari delicto*, or investment advisor defenses, and Defendants owe Plaintiffs' $72,287,615.00 in damages, $15,000,000.00 in punitive damages, and $14,847,678.07 in prejudgment interest for a total of $102,135,293.07.

### A.   *Breaches of Trust*

"A trustee is a fiduciary of the highest order, who is required meticulously to observe the fiduciary relationship and to perform the obligations of a trustee to the cestui que trust, and [it] is held to a high standard of conduct with respect to administration of the trust." *Bakewell v.*

*Mercantile Trust Co.*, 319 S.W.2d 600, 606 (Mo. banc 1958). A trustee is "to exercise utmost good faith in handling the funds in [its] hands, and in all respects to exercise a high standard of conduct and fidelity in respect to administration of his trust." *Morrison v. Asher*, 361 S.W.2d 844, 850 (Mo. Ct. App. 1962). A trustee must "strictly comply with the law in all respects touching the handling of such funds." *White v. Hughes*, 88 S.W.2d 268, 272 (Mo. Ct. App. 1935). "It is the duty of a trustee to exercise . . . his powers in good faith, and with the care skill and prudence which a man ordinarily uses in his own transactions and in handling his own property under like circumstances." *Redmond v. Commerce Trust Co.*, 144 F.2d 140, 154 (8th Cir. 1944).

"Trustees are obliged to act with loyalty, fidelity and integrity, and are held accountable to the faithful performance of their trust. *Bilton v. Lindell Tower Apartments*, 213 S.W.2d 952, 958 (Mo. 1948). "Even though given the widest discretion by the instrument, he is not authorized to dispense with the requirements of care, skill and diversification, but is under the duty to exercise the care, skill and diligence which a prudent man would exercise in the management of the funds of others. *Morrison*, 361 S.W.2d at 850. "The trustee, in his administration of the trust, is under the duty of acting exclusively and solely in the interest of the trust estate or the beneficiaries within the terms of the trust – he must act for and not against the trust estate or the beneficiaries." *Sternberg v. St. Louis Union Trust Co.*, 66 F. Supp. 23, 27 (E.D. Mo. 1946). "The acts of a trustee must be judged by the facts and circumstances affecting his action." *Redmond*, 144 F.2d at 154.

In general, the presumption is a trustee administers the trust in good faith. *Brown v. Brown*, 530 S.W.3d 35, 41 (Mo. Ct. App. 2017). The burden of proving to the contrary is on the party questioning the trustee's actions. *Id*. To prove a claim of breach of fiduciary duty by a

trustee, a plaintiff must show: "(1) the existence of a fiduciary duty; (2) a breach of that fiduciary duty; (3) causation; and (4) harm." *Id*. If a trustee commits a breach of trust, he is liable for "(a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust." *Estate of Luyties v. Scudder*, 432 S.W.2d 210, 216 (Mo. 1968). Missouri law is clear:

> A trustee commits a breach of trust not only where he violates a duty in bad fair, or intentionally although in good faith, or negligently, but also where he violates a duty because of a mistake as to the extent of his duties and powers. This is true, not only where the mistake is in regard to a rule of law, whether a statutory or common-law rule, but also where he interprets the trust instruments as authorizing him to do acts which the court determines he is not authorized by the trust instrument to do. In such a case, he is not protected from liability merely because he acts in good faith, nor is he protected merely because he relies upon the advice of counsel.

*Witmer v. Blair*, 588 S.W.2d 222, 224 (Mo. Ct. App. 1979). The evidence in this matter clearly establishes Allegiant breached its fiduciary duties to the beneficiaries of the Trusts.

Chapter 436, which governed pre-need contracts and pre-need trusts during Allegiant's tenure, and the Trust Agreement established the fiduciary duties Allegiant owed the beneficiaries. The Court previously determined the beneficiaries included NPS, the consumers, and the funeral homes who purchased preneed contracts. This decision was confirmed by the Eighth Circuit Court of Appeals. *Cassity*, 868 F.3d at 646. Those duties included: to keep adequate records of all payments received,[32] to maintain adequate books of account of all transactions administered through the trust and pertaining to the trust generally, to ensure it was

---

[32] There is a difference between the amount deposited for each consumer and the insurance policy asset purchased by the trust. The latter is the investment made with the trust funds – not the deposit made by the consumer. Chapter 436 permitted deposits paid by consumers to be commingled by NPS. However, NPS was then required to inform Allegiant of the specific amount deposited by each consumer. The monthly insurance packets which NPS sent to Allegiant, only listed face value of the insurance policies; they did not list the specific amount deposited by each consumer. Thus, Allegiant never knew how much was deposited for each consumer and consequently, failed to maintain adequate records.

not distributing more for death claims or cancellations than had been deposited into the Trusts for each individual consumer, to only make income distributions if the market value test was met, to ensure control of trust assets, in no case, was divested from the trustee, and to ensure title to all investment assets remained with the trustee and kept by the trustee. *See* Mo. Rev. Stat. 436.031.3, 436.035.1, 436.045, Ex. P-168.

These specific duties are encompassed by the more general duties of impartiality, loyalty, to protect and control trust assets, and to keep adequate records of trust activity. *See Cassity*, 868 F.3d at 645; *John R. Boyce Family Trust v. Snyder*, 128 S.W.3d 630, 636 (Mo. Ct. App. 2004) ("the most fundamental is the duty of loyalty."); *Engelsmann v. Holekamp*, 402 S.W.2d 382, 389 (Mo. 1966); FIND CITATION FOR IMPARTIALITY. From the day it accepted the Trusts and became trustee, to the day it resigned and transferred the Trusts to Bremen, Allegiant had to act in good faith and in the best interest of all the beneficiaries.

Allegiant repeatedly violated its duties by systematically failing to maintain control over the trust assets, protect the trust assets, and maintain the records required of preneed trustees under Chapter 436, the Trust Agreement, and the industry standard of care. Allegiant began its trusteeship by failing to properly interpret its responsibilities under Chapter 436 and the Trust Agreement. Then, at the outset of its trusteeship, Allegiant implemented a series of procedures and protocols at the outset of its trusteeship that were in place throughout the entire period Allegiant served as trustee. The protocol Allegiant implemented for its administration of the Trusts made it impossible for Allegiant to control and protect the trust assets. Allegiant knowingly provided NPS and the Cassitys unfettered access to the trust funds. Allegiant's failure to administer the Trusts in accordance with its duties as trustee resulted in a direct and foreseeable consequence – the Trusts were looted and the trust assets were depleted.

From its first day as trustee, Allegiant failed to understand its duties. Allegiant did not correctly identify the beneficiaries of the Trusts, did not understand the role of the investment advisor, did not understand its duties to monitor investments made by the investment advisor with trust assets, and did not understand the types of investments being held by the Trusts. Mr. Morisse could have easily asked for assistance from competent outside counsel designated as corporate counsel, but chose not to do so despite his, and Allegiant's, lack of experience or training in preneed trusts. Allegiant's determination Mr. Wulf only needed to be independent from Allegiant and not NPS was incorrect, as was its decision it had no liability for investments if an investment advisor was appointed. These decisions immediately set Allegiant on the wrong path and permitted NPS and the Cassitys access to trust funds.

Allegiant's handling of wire transfers breached its fiduciary duties. Allegiant established a system to automatically execute any wire transfer request received from NPS for money from the Trusts, on the basis David Wulf[33] was cc'd on the wire form. Without any inquiry into the purpose or propriety of the wires, Allegiant sent millions of dollars out of the Trusts. No one from Allegiant asked why this money was being disbursed and if it was disbursed for an investment or for some other permissible Chapter 436 purpose. Mr. Morisse believed it was not necessary for him to review the wire transfer requests, nor did anyone else at Allegiant. The standing rule provided the wire transfer request forms were to be signed and returned by trust department staff, or in some cases by a bank teller. Allegiant never had control over the trust assets and failed to protect the assets by implementing a policy to automatically execute wire transfer requests.

---

[33] David Wulf was a partner in the firm Wulf, Bates & Murphy, and was appointed investment advisor of the Trusts by NPS pursuant to Chapter 436.

Nearly $26 million in policy loans was taken against Lincoln policies during Allegiant's tenure as trustee, and these loans depleted the value of the policies held by the Trusts. Without Allegiant's authorization, money could not leave the Trusts. Allegiant authorized any disbursements from the trust assets based on the direction of *any* NPS employee through the November 5, 1999 delegation letter, drafted by Mr. Morisse. *See* Ex. D-17. Mr. Sutton's signature on the policy loan requests[34] falls within the scope of the delegation Allegiant authored, sanctioned, and under which it operated. Allegiant had notice of the policy loans in its own records. A company is charged with knowledge of what is in its records. *Helton v. AT&T Inc.*, 709 F.3d 343, 356 (4th Cir. 2013). Mr. Morisse testified he did not know policy loans were being taken. Even if Allegiant did not examine the records to see the notes of policy loans, it should have been alerted something was amiss when large amounts of money were being deposited into the trust by Lincoln and then immediately transferred back out in same or substantially similar dollar amounts. Because Allegiant did not investigate these transactions, they never discovered policy loans were taken out on Lincoln life insurance policies held as trust assets.

Allegiant's actions in failing to investigate or understand the nature and purpose of the transactions moving through the Trusts, and failing to properly account for the transfers of policy loan proceeds into and out of the Trusts, allowed the policy loans to occur and Allegiant's failure to control and protect the assets was a breach of trust. This was a breach of Allegiant's duty to control and protect trust assets. A loss to the Trusts occurred when Allegiant, after receiving policy loan proceeds in the Trusts, wired the funds right back out of the Trusts for the use of NPS to spend, sometimes for unauthorized purposes.

---

[34] Rather than a representative of Allegiant signing the policy loan forms as owner of the life insurance policies, Mr. Sutton, from NPS, signed as owner of the life insurance policies.

There is no question Allegiant breached its fiduciary duty to control and protect trust assets when Mr. Morisse drafted a custody agreement allowing NPS to retain custody of the Lincoln life insurance policies. The drafting and execution of this custody agreement ceded Allegiant's authority to NPS, which allowed NPS and the Cassitys to loot the Trusts and steal millions of dollars. This was a complete dereliction of duty Allegiant owed to the beneficiaries.

Allegiant had an obligation to maintain accurate books and records reflecting all transactions pertinent to the Trusts, and it utterly failed to do so. It had no record of trust deposits for each consumer, it did not maintain adequate records of the Lincoln insurance policies, and it failed to reconcile the trust transactions with the little information it did receive in the monthly packets from NPS.

Allegiant made the decision it did not need to know how much money was deposited into the trust for each individual consumer because the Trust Agreement required NPS, not Allegiant, to keep a breakdown of how each deposit should be credited to each consumer.[35]Allegiant did not consider the entire provision of Article II, Section 2.4 of the Trust Agreement. Allegiant did need to know how much was on deposit for each consumer to properly administer its other duties. Most significantly, if Allegiant did not know how much was on deposit for a specific consumer, it did not know what the appropriate amount to be disbursed to NPS when the consumer died. Without accurate records, NPS could ask for more money than the 80% on deposit for the consumer. It also needed the information to make correct distributions of income.

NPS sent a monthly "netting form" to Allegiant. It showed a gross amount of deposits for a group of preneed consumers but did not list any specific details related to consumers. Allegiant

---

[35] The Trust Agreement provided "With each deposit, Seller will provide a breakdown of how much of said deposit is to be created to each "Owner" described by number and name of Owner."

never received any supporting detail for these numbers, and did not ask for any details. This failure to maintain consumer-level deposit records was a breach of duty.

When a consumer died or cancelled his or her policy, Allegiant was to distribute funds to NPS in an amount equal to what had been previously deposited into the trust for that individual consumer. Mo. Rev. Stat. § 436.045; Ex. P-168. During its tenure, Allegiant distributed money for death and cancellations claims through "netting forms" where NPS offset the amounts it was owed for death claims with the amount of deposits it was required to make into the Trusts. Allegiant never received any information to show which consumers were covered by the transactions. Thus, it never knew if the correct amount of money was distributed for each consumer. Allegiant allowed NPS to take as much money out of the Trusts for death and cancellations to which NPS claimed it was entitled. Through this system, Allegiant improperly ceded control to NPS and committed a breach of trust.

Allegiant never maintained, controlled, kept, or reviewed a single Lincoln insurance policy during its tenure as trustee. The monthly packets Allegiant received contained only the face value of a policy; they did not include a cash surrender value, which policies were paid-in-full, which required ongoing premium payments, how much money was owed in premiums, or how many years of premiums were owed on the policies. Allegiant's failure to maintain adequate records of Lincoln policies allowed the "mismatching" practice to occur.

The practice of "mismatching" the funds received into the trust and the terms of the insurance policies purchased (for example, allowing a fully paid-up contract to be backed by a policy with ongoing premium obligations) freed up the money Allegiant then allowed to be improperly diverted from the Trusts. Lincoln's Chief Financial Officer testified, and both parties' actuarial experts opined, the practice of policy mismatching created problems for the Trusts.

Defendants' own trust expert testified the payment of renewal premiums should have prompted inquiry from Allegiant because it was contrary to Allegiant's belief all of the insurance policies were paid in full. As Mr. FitzPatrick testified, Allegiant had a duty to understand the liquidity needs of the Trusts, yet there is no evidence in the record Allegiant ever calculated or monitored those needs. Had Allegiant been doing so, it would have been apparent the Trusts were paying millions of dollars every year to keep the policies in force, Allegiant's understanding of the insurance policy assets was fundamentally flawed, and eventually, there would be no funds to pay for funerals.

Allegiant facilitated and enabled the mismatching practice to occur in the Trusts by, among other things, failing to monitor or track the Lincoln policies' premium terms, failing to take any steps to ensure the premium terms of the Lincoln policies were prudent, failing to investigate the nature or purpose of the wire transfers to Lincoln processed under Allegiant's protocol, and by valuing the Lincoln policies at their face values when the policies were not worth their face values due to the mismatching practice. This was a breach of trust.

Allegiant never reconciled any of the trust transactions or wire transfers with the information contained in the monthly packets. It never took any steps to verify the accuracy of the numbers provided by NPS. This was a violation of Allegiant's recordkeeping duties. A most egregious example of Allegiant's failure to keep adequate records is the World Services policy. Allegiant initially booked the policy with a value of $13.5 million and then never changed it during its entire tenure as trustee. It continued to keep this policy on the books despite its nonexistence at the end of Allegiant's tenure. Allegiant did not know how much, if anything, the trust paid to purchase the policy, it did not know if any premiums were due on the policy, and it did nothing to track the group term policy after initially booking it as an asset. In early 2004,

Allegiant became aware there as no support to demonstrate the policy still existed. Yet, it chose to keep the policy on its books. Allegiant's conduct regarding the World Services policy was a breach of its duty to keep proper records.

It was Allegiant's responsibility to value the Lincoln policies. It chose to value them using their face value. This was incorrect because the policies were worth far less than their face values due to mismatching and policy loan practices. Cash surrender value, rather than face value, should have been used. Allegiant had ample evidence the Trusts owed renewal premiums on the policies; thus, Allegiant was well aware face value was not the accurate value of the policies and was misleading to regulators, beneficiaries, and Bremen Bank, the successor trustee, as to the value of the assets in the Trusts. Allegiant's failure to accurately value the Trusts' Lincoln life insurance policies was a breach of trust.

Allegiant breached its duties in failing to keep "adequate records of all payments received" into the preneed Trusts and to "maintain adequate books of account of all transactions administered through the trust and pertaining to the trust generally," as required by Chapter 436. Allegiant never attempted to confirm distributions were for the proper amount, and could not have done so, even had it tried, because of its lack of record-keeping. Allegiant kept no records regarding the amount deposited for each individual consumer, engaged in no reconciliation of records, did not identify whether the insurance policies were fully paid-up or had ongoing premium obligations, did not accurately report the market value assets, did not have an understanding as to why funds were being wired out of the Trusts, and did not ensure the statutorily-required test for income distributions was satisfied before distributing funds to NPS. Allegiant kept no records that would allow it to comply with Chapter 436's provisions governing distributions.

Chapter 436 provided no income distribution could be made from a trust to a seller if the distribution would reduce the aggregate market value of all property held in the preneed trust below the sum of all deposits made to the trust. Mo. Rev. Stat. § 436.031.3. To conduct this test, Allegiant needed to know the aggregate market value of all property held in the Trusts, as well as the sum of all deposits made into the Trusts. JSF. Allegiant never performed a calculation to determine whether the trust was underfunded by having fewer assets than the total amount of consumer deposits. Allegiant did not maintain records sufficient to determine the market value of the trust assets or the sum of deposits made into the Trusts. It could not calculate the market value test, even if it had wanted to do so. If Allegiant had calculated the market value test, it would have discovered the Trusts were significantly underfunded when Allegiant took over as trustee, and continued to decrease in value over Allegiant's tenure. There was never a time when income distribution could be made. Yet, Allegiant regularly distributed income to NPS. Allegiant breached its duties by failing to properly satisfy Chapter 436's market value test when distributing income to NPS.

Allegiant also breached its duties by allowing imprudent investments to be made with trust assets. The record establishes investment in Lincoln policies was not prudent because Lincoln was a Cassity-owned entity, a financially ailing company, the Trusts overpaid for the insurance coverage received, and the Trusts purchased policies with ongoing premium liability but retained no assets to pay for those premiums. Allegiant never performed any investigation into Lincoln, despite knowing it was affiliated with NPS. As noted, Allegiant never even reviewed a single Lincoln life insurance policy to consider if the terms of the policies were fair, and if the policies were fully-paid or multi-pay policies requiring ongoing premium payments. Allegiant's failure to perform even minimal investigation into Lincoln, despite knowing it was a

275

Cassity-owned company and that practically all trust investments were in the form of Lincoln policies, was a breach of trust.

In addition to its failure to investigate Lincoln as an insurance company, Allegiant never, during its six-year period as trustee, took any steps to ensure the Lincoln policies being purchased by the Trusts, or their premium terms, were prudent. Allegiant did not even know what the premium terms were, or that there were ongoing renewal premiums owed on most policies. Allegiant's failure to ensure the Trusts' investments in Lincoln policies, including the premium terms, were prudent was a breach of trust. Allegiant's failure to investigate or inquire into the monthly renewal premiums owed by the Trusts on the Lincoln policies was also a breach of trust.

Allegiant also allowed a series of stock transfers to occur which breached its fiduciary duty to the beneficiaries. The Trusts purchased a series of stock from Forever Enterprises, a Cassity-owned entity, at above market prices, causing the Trusts to lose money. Allegiant did not investigate the stock purchases and did not question Mr. Wulf about them. While Allegiant was not required to monitor every investment decision, its failure to track any investments and to determine whether any investment decision was prudent led to the Cassitys and Mr. Wulf believing everything was acceptable, causing immense harm to the Trusts.

Allegiant inherited a series of debentures in Trust I from Mercantile and in January 2003, and booked a series of new debentures in Trust I. Allegiant took no steps to ensure these were prudent investments and allowed NPS to update the balances of the debentures rather than deposit new consumer funds into the trust as required by Chapter 436. Allegiant had a responsibility to exercise control over the debentures and to ensure they were prudent and

permissible assets. This is another example of Allegiant's failure to investigate if the investments made by the Trusts were prudent.[36]

The record establishes Allegiant did nothing to ensure the so-called investments made by David Wulf were prudent – or even investments, and in many cases Allegiant never knew if the Trusts were receiving any assets in return for funds wired out of the Trusts. Allegiant had an obligation to ensure the trust assets were not invested imprudently, even with the appointment of an investment advisor. The applicability of the investment advisor defense and Defendants' liability is discussed below.

Allegiant also committed a breach of the duty of loyalty during its resignation as trustee in the manner in which it transferred the Trusts to Bremen Bank as successor trustee. The evidence establishes Allegiant resigned because NCB instructed it to do so, and Allegiant understood and accepted it had to resign to ensure the merger with NCB closed. Allegiant failed to inform any trust beneficiary, a court, or Bremen Bank of any of the known problems in the Trusts, including the Trusts were underfunded, assets appeared on trust statements that Allegiant knew to be non-existent, and the Trusts had massive ongoing premium obligations with no assets to pay the premiums. Allegiant failed to take steps to correct any of these issues. While such disclosure or correction would plainly have been in the best interests of the beneficiaries, it was plainly not in Allegiant's best interest because of the potential threat to the success of the merger or, at the least, the risk NCB would demand to reduce the premium it had agreed to pay Allegiant in order to acquire it. Nor, was any disclosure or corrections in the best interests of Herb Morisse personally, as the record establishes he wanted a job with NCB, which he received. He was also motivated to conceal the issues with the Trusts to further his own reputation in the industry and continue his career.

---

[36] The Court does not find this was a breach of trust because the debentures did not cause harm to Trust I.

Not only did Allegiant fail to correct issues or disclose the material adverse facts to anyone, it went even further by affirmatively misrepresenting the state of the Trusts to Bremen Bank and encouraging Bremen Bank to administer the Trusts such that the Ponzi-like scheme would continue. Mr. Morisse misrepresented to Bremen Bank the World Services life insurance policy was an asset of the trust with a value of $13.5 million, even though Mr. Morisse knew no support for the asset existed. Bremen Bank's witnesses testified they would not have accepted the Trusts had they known the truth. Mr. Morisse also specifically told Bremen Bank's trust officer to execute wire transfers from NPS immediately, to disburse income on the books without performing calculations required by Chapter 436, and to report insurance values at face value as provided by NPS. This perpetuated and encouraged losses to consumers and funeral homes. Allegiant had a conflict of interest with respect to its resignation and transfer of the Trusts to Bremen Bank. By protecting its own interests to the detriment of the beneficiaries, Allegiant breached the duty of loyalty.[37]

Ultimately, Allegiant failed to understand the duties it owed to beneficiaries, and failed to fulfill the duties it undertook as trustee. Allegiant's response to the facts in this case has been repeatedly, "we did not know this was occurring". But they should have known; it was their duty to know. Failure to look does not excuse failure to act.

B.     *Defenses*

Defendants raise three defenses to liability: the authorization defense, the *in pari delicto* defense, and the investment advisor defense.

1.     Authorization and *In Pari Delicto* Defenses

---

[37] The Court is not persuaded the $30,000 Mr. Morisse received on the successful completion of the merger was a motivating factor in his failure to make true statements to Bremen Bank.

Defendants initially raised the authorization and *in pari delicto* defenses in their Motion for Partial Summary Judgment [ECF No. 1761] prior to the jury trial. In its ruling on the Motion for Partial Summary Judgment, the Court held the authorization defense and the *in pari delicto* defense could not be asserted against the SDR because the public policy behind appointing a receiver for a fraudulent, failed company, would be eviscerated if these defenses were permitted.

The Eighth Circuit briefly discussed these defenses in its opinion remanding the case:

> Identifying the trust beneficiaries is important, because PNC raises defenses based on an assumption that NPS was the sole beneficiary. PNC contends that the district court erroneously struck its authorization and *in pari delicto* defenses before trial. The authorization defense applies when a beneficiary concurs in or assents to a breach of trust; such a beneficiary is said to have authorized the breach and cannot complain about it in a lawsuit. *Walker v. James*, 337 Mo. 750, 85 S.W.2d 876, 885 (1935). The *in pari delicto* defense provides that "a person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party." *Dobbs v. Dobbs Tire & Auto Ctrs., Inc.*, 969 S.W.2d 894, 897 (Mo. Ct. App. 1998). These defenses do not apply to innocent Missouri consumers who were to receive funeral services under a preneed contract, or to funeral homes who were to provide those services. Because the consumers and funeral homes were beneficiaries of the preneed trusts, the district court did not err in striking the defenses.

*Cassity*, 868 F.3d at 647.

Plaintiffs assert the Court should reject application of this defense because the law of the case doctrine prevents relitigation of a settled issue in a case. Plaintiffs argue the Eighth Circuit's mandate encompasses Defendants' defenses because they included them in their appeal briefs. Defendants insist there are two new circumstances that did not exist at the time of the Court's prior rulings on these defenses: first, this case is a trust case, not a tort case, and second, Plaintiffs are seeking to recover new categories of damages.

The law of the case doctrine states, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent states in the same case." *Little Earth of the United Tribes, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 807 F.2d 1433, 1441 (8th

279

Cir. 1986). It applies to appellate decisions, as well as to final decisions by the district court. *First Union Nat. Bank v. Pictet Overseas Trust Corp., Ltd.*, 477 F.3d 616, 620 (8th Cir. 2007). The doctrine ensures uniformity of decisions, protects the expectations of the parties, and promotes judicial economy. *Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 784 (8th Cir. 1996). However, a court has the power to revisit its own prior decisions, "although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson v. Colt. Indus. Operating Corp.*, 486 U.S. 800, 817 (1988).

The Eighth Circuit did not explicitly determine whether the authorization and *in pari delicto* defenses barred recovery by the SDR standing in the shoes of NPS, even though it was raised on appeal by Defendants. As quoted above, it held the defenses did not apply against consumers and funeral homes. An appellate court's mandate encompasses everything decided, "either expressly or by necessary implication." *In re MidAmerican Energy Co.*, 286 F.3d 483, 487 (8th Cir. 2002). An argument is rejected by necessary implication when the holding stated or result reached is inconsistent with the argument. *United States v. Jordan*, 429 F.3d 1032, 1035 (11th Cir. 2005).

The Eighth Circuit determined, by necessary implication, the authorization and *in pari delicto* defenses, as applied against the SDR, were properly stricken by this Court. It would have only remanded the case as to the SGAs, not as to all Plaintiffs, if it had believed the defenses were applicable.

In *Knotts v. United States*, the United States asserted as a defense to a tort claim, it was immune from tort liability under state law. 893 F.2d 758, 759 (5th Cir. 1990). On appeal, the district court's judgment was vacated and remanded for reapportionment of fault and

determination of damages. *Id*. at 760. The United States had raised its immunity claim in the first appeal. When it attempted to do so again in the second appeal, the Fifth Circuit concluded it had rejected the claim in the first appeal. *Id*. at 761. The Fifth Circuit stated, "By remanding the case with instructions that the district court apportion fault between Mr. Knotts and the United States, we indicated, albeit tacitly, our rejection of the United States' claim of immunity. *Id*.

> In remanding this case, the Eighth Circuit stated:

> In summary, we affirm the judgment in part, reverse in part, and remand for further proceedings. We conclude that Appellees brought a trust-law claim in equity that should have been tried to the court. The beneficiaries of the preneed trusts were NPS, Missouri consumers, and the funeral homes that were to provide services for the consumers. The measure of damages for the trust claim is defined by § 205 of the Restatement (Second) of Trusts. . . Although the case was tried to a jury on a tort-law theory, we do not dictate that the case be retried in its entirety. The district court is familiar with the evidence and may proceed based on the existing trial record as it sees fit, with receipt of additional evidence as the court deems appropriate.

*Cassity*, 868 F.3d at 651-652. The remand was for damages to be applied pursuant to trust law, rather than tort law, and for this Court to receive any additional evidence it deems appropriate. This necessarily implies the defenses are not to be applied and the Eighth Circuit rejected Defendants' appeal on this issue. Thus, the law of the case doctrine applies.

A court may reconsider a previously decided issue if "substantially different evidence is subsequently introduced," the decision is "clearly erroneous and works manifest injustice," or "changed circumstances" provide a basis for departing from the law of the case. *Little Earth*, 807 F.2d at 1441. Defendants have not presented substantially different evidence on this issue, nor have they shown the prior decision was clearly erroneous and created manifest injustice. The cases cited in support of their defenses are the same cases reviewed by this Court previously and argued before the Eighth Circuit. While the circumstances of the case have changed, it is being decided pursuant to trust law rather than tort law, this change in no way affects the Court's prior

decision on the issue because it was not specific to or dependent on tort law. The Court will not

reconsider whether the authorization and *in pari delicto* defenses apply to the SDR standing in

the shoes of NPS.

2.      Investment Advisor Defense

Defendants also asserted a defense to liability pursuant to appointment of an investment

advisor for the Trusts. Missouri Revised Statute § 436.031.2 allowed for the appointment of an

investment advisor to manage all investments in a preneed trust if certain conditions were met.

The principal and interest in the trust must have exceeded $250,000, the appointed investment

advisor must have been a federal-registered or Missouri-registered advisor, and he or she must

have been independent and qualified. Mo. Rev. Stat. § 436.031.2. The statute further provided:

> In no case shall control of said assets be divested from the trustee nor shall said
> assets be placed in any investment which would be beyond the authority of a
> reasonably prudent trustee to invest in. The trustee shall be relieved of all liability
> regarding investment decisions made by such qualified investment advisor.

*Id*. Before the first trial, in the prior summary judgment motions, Defendants argued they had no

liability for any investment decisions made by the investment advisor. This Court rejected this

argument and stated:

> The statute relieves the trustee of all liability regarding investment decisions made
> by the investment advisor if the investment advisor is federally registered or
> Missouri-registered, qualified, independent, [and] control of the assets remains
> with the trustee and [] are not placed in any investment which would be beyond
> the authority of a reasonably prudent trustee to invest in.

ECF No. 2084, pg. 13. Defendants appealed the Court's ruling and the Eighth Circuit affirmed,

holding:

> A trustee always has a duty to ensure that trust assets are invested prudently,
> whether the trustee is investing the assets himself or monitoring the investment
> decisions of an investment advisor. The statute recognized this ongoing duty by
> providing that "in no case" where assets are invested imprudently – investment
> advisor or no – may the trustee be relieved of liability. PNC is not relieved of

282

liability unless Allegiant ensured that Wulf was investing trust assets within the authority of a reasonably prudent trustee.

*Cassity*, 868 F.3d at 647-48 (internal citations omitted). Defendants raised the investment advisor defense again in their Motion for Summary Judgment as to PNC's Investment Advisor Defense ECF No. 2664, arguing Allegiant only had to ensure the investments being made were the *type* of investments permitted by the trust agreement. This Court rejected this interpretation of the Eighth Circuit's holding and determined the trustee was not required to review every single investment made by the investment advisor but certainly was required to do more than just check if the *type* of investment was permitted in the trust agreement.

Defendants now assert they have met all of the requirements for application of the investment advisor defense and they should be relieved of liability for any investment decisions in the Trusts. The Court wholeheartedly disagrees. Defendants have not met the requirements for application of the investment advisor defense.

### i.  *Minimum Principal and Interest Amount*

Missouri Revised Statute § 436.031.2 provided an investment advisor may be appointed when the principal and interest of the trust exceeded $250,000. Principal and interest are not defined in the statute. The trust agreement defined "trust principal" as:

> All funds deposited by the Seller with the Trustee under this Trust and held by it pursuant to existing and outstanding Funeral Agreement, but it shall not include any earnings and realized capital gains from the investment and reinvestment of Trust Principal which earnings and all other gains shall accrue to Seller and may be distributed to Seller as hereinafter provided.

Ex. P-168, Article I, 1.7. Interest is not defined in the trust agreement. Plaintiffs assert the value of the assets in Trust IV at the start of Allegiant's tenure, according to Terry Long, Defendants' expert, was negative $2,722,234. Defendants' argue Plaintiffs' are using the actuarial value of

the assets, not the principal value, which included cash in the amount of $305,769.88, cash equivalents of $167,994.14, and bonds equal to $1,416,683.57.

The Court does not believe the statute intended a trustee to determine the actuarial value of trust principal and interest prior to appointing an investment advisor. Thus, the Court will use the amount of principal listed on the first trust statement during Allegiant's tenure as trustee, August 1998. These are the amounts listed by Defendants, above. Trust IV had at least $250,000 in principal when Allegiant became trustee to qualify for the appoint of an investment advisor.

### ii. *Independence of David Wulf*

There is no question David Wulf was a registered investment advisor. The question remains whether he was independent of Allegiant and NPS. The statute does not state from whom the investment advisor must be independent. Considering the purposes of the statute, to protect money paid by consumers and funeral homes for preneed contracts, the Court holds the investment advisor must be independent of the Seller. David Wulf was not independent of NPS and this should have been clear to Allegiant. Mr. Wulf used an NPS e-mail address, and shared office space with NPS, dissolving any independence he once had. More importantly though, the actions of NPS and Mr. Wulf showed he was clearly not independent of NPS.

### iii. *Failure to Monitor Investments*

Finally, Defendants cannot take advantage of the investment advisor defense, because Allegiant failed to monitor the investments of Mr. Wulf and Wulf, Bates & Murphy in any way, shape, or form. Mr. Morisse repeatedly testified there was no system in place to track investments. He did not check to see if an investment returned when money was sent out. He never once questioned an investment decision; instead, he implemented a policy to automatically execute any wire transfers received. It is impossible for Allegiant to have monitored investments

when it did not even know what types of investments were held by the Trusts; Allegiant thought all insurance policies were whole-life single premium, paid-in-full policies when, in fact, millions of dollars of renewal premiums were paid and owed. There is no evidence account reviews of the Trusts were completed and investments were ever reviewed. Allegiant completely failed to monitor Mr. Wulf and the investments he was making with trust assets, which included stock purchases for amounts above market price and investments in the Caymus fund, Mr. Wulf's own hedge fund. Defendants are not protected from liability by the investment advisor defense, because of Allegiant's failure to monitor investment decisions and lack of independence of Wulf, Bates & Murphy.

       C.    *Standing of SDR*

Defendants again raise the issue of whether the SDR has standing to pursue claims on behalf of consumers or funeral homes. The Court previously determined this issue on January 12, 2015, and again addressed it on November 20, 2018. On January 12, 2015, the Court determined the SDR could bring claims on behalf of consumers and funeral homes because the claims were not personal and the claims would inure to the benefit of the estate. *See* ECF No. 2092, pg. 20. On November 20, 2018, the Court refused to address the issue again under the law of the case doctrine, holding Defendants had not presented substantially different evidence to change the Court's decision, they had not shown the decision was clearly erroneous and created manifest injustice, and although the circumstances of the case have changed, it did not impact the Court's decision on the issue of standing. *See* ECF No. 2789, pg. 22. For these same reasons, the Court will not readdress the issue. The SDR has standing to bring claims on behalf of the consumers and funeral homes.

       D.    *SGAs' Right to Recovery of Damages*

Defendants assert the SGAs' recovery is limited to the actual benefits paid or to be paid under the Texas Receivership Statute. On November 20, 2018, in deciding Defendants' Motion for Partial Summary Judgment, the Court held it was not appropriate for it to determine if the SGAs' recovery was limited, how the money is disbursed from the Trusts or to whom it is disbursed. That is a matter to be dealt with by the receivership court. This Court is tasked with determining whether Allegiant breached its duties to the beneficiaries, and what amount, if any, should be restored to the trust. As a beneficiary, the SGAs may sue for all damages owed to the Trusts even if the amount of damages they receive is ultimately limited. *See* ECF No. 2789, pg. 22-24. The Court will not revisit this decision.

### E.    *Damages*

Restatement (Second) of Trusts § 205 states as follows:

> If a trustee commits a breach of trust, he is chargeable with: (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust.

On the parties' motions for summary judgment, the Court held the types of remedies available under § 205(a), (b), and (c) are mutually exclusive, but two separate breaches of trust can result in two separate remedies. The Court concludes Plaintiffs' will be awarded damages pursuant to § 205(a) using a diminution in value analysis. No damages will be awarded under § 205(b).

### 1.    Damages under 205(a)

A trustee "is chargeable with (a) any loss or deprecation in value of the trust estate resulting from the breach of trust . . ." *Estate of Luyties v. Scudder*, 432 S.W.2d 210, 216 (Mo. 1968). Under Missouri law, "resulting from" has been interpreted to require a causal connection that is "reasonably apparent," such that the "loss must be a natural and reasonable incident or

286

consequence" of the conduct. *Poage v. State Farm Fire & Cas. Co.*, 203 S.W.3d 781, 787 (Mo. Ct. App. 2006); *Eichholz v. Secura Supreme Ins. Co.*, 735 F.3d 822, 827 (8th Cir. 2013).

Allegiant's conduct resulted in losses to the NPS preneed trusts. As detailed *supra*, Allegiant failed to act prudently to control, protect or adequately record the trust assets. Through the wire transfer protocol, the custody agreement, and the delegation letter, Allegiant effectively allowed the Cassitys to use the trust funds as they desired. Allegiant did nothing to monitor the investments, ensure their prudence, determine if the Trusts were receiving assets in return for money going out, track the liquidity needs of the trust, ensure income distributions were statutorily allowed, or check death claim and cancellation distributions were for the proper amount. Mr. Morisse's drafting of documents resulted in complete abdication of Allegiant's duties permitting the Trusts to be looted. Defendants, as Allegiant's successors, are liable to restore all losses the Trusts suffered during Allegiant's tenure as trustee.

Multiple expert witnesses were presented at trial to establish the losses to the Trusts during Allegiant's tenure. Plaintiffs presented Steve Browne, who determined damages using forensic accounting, and Andrew Dalton, who determined damages using actuarial science. Defendants presented Robert Rock, who opined on the usefulness of using forensic accounting in this matter, and Terry Long, who determined damages using actuarial science. Both of the actuarial experts offered diminution in value theories for calculating damages.

Steve Browne, Plaintiffs' forensic accountant, engaged in a transaction-by-transaction analysis of the activity in the Trusts. He categorized and quantified the losses in seven different categories: policy mismatching, policy loans, overpayment of death claims, improper income distributions, premium overpayments on single premium life insurance policies, debentures, and

the World Service group term life insurance policy. Mr. Browne opinioned the total trust losses to Trust IV, CSA, MTW, and the Trust I debentures, was $108,217,829.

Mr. Rock critiqued Mr. Browne's analysis, asserting it was not reliable because the fungibility of money rendered it impossible to know where the trust funds went or to categorize the losses. The Court does not embrace Mr. Browne's methodology and opinions; some of his calculations are reliable, while others are not. A major concern of the Court's is the possibility some losses have been counted twice.

Plaintiffs' actuarial expert, Andrew Dalton, testified the diminution in trust value to Trusts IV, CSA, and MTW, as measured by the decrease in funded status of those Trusts, was $47,408,222. In calculating this amount, Mr. Dalton used the Standard Nonforfeiture Law's proscribed formula for calculating the net cash surrender value of the life insurance policies. The premiums necessary to keep the policies in force under the particular terms of the Lincoln policies were not part of Mr. Dalton's equation. Therefore, Mr. Dalton also determined whether the Trusts paid an actuarially fair premium for the insurance coverage being issued. Mr. Dalton concluded Allegiant overpaid for the Lincoln life insurance policies by $41,266,474. Thus, according to Mr. Dalton, there was a total actuarial loss to the Trusts in the amount of $88,674,696.

Defendants' expert, Terry Long, calculated the diminution in trust value for the Trusts to be $72,287,615. Mr. Long opined Allegiant is accountable for only $40.5 million of the decrease in value. Mr. Long reduced the $72 million by $11.3 million by aggregating the reduction in value of the three trusts for which Plaintiffs seek losses, with four other NPS pre-need trusts with positive values for which Plaintiffs are not seeking losses. The Court disagrees with this reduction. Each of the seven NPS pre-need trusts were separate trusts, with separate

288

beneficiaries. Gains in one should not be used to offset losses in another. *See* Rest. (Second) of Trusts § 213 (a trustee cannot reduce the amount of his liability for one breach of trust with the amount of gain from a different breach of trust).

Mr. Long also reduced his trust loss calculation by $20,394,301: (1) a reduction of approximately $17.9 million for the "initial impact of new business" between 2001 and 2004; (2) a reduction of approximately $2 million for a decrease in interest rate levels; and (3) a reduction of approximately $500,000 for a decrease in value of the Trusts' non-insurance assets. The Court does not embrace these reductions. The $17.9 million reduction for the "initial impact of new business" ignores the factual and economic realities of the case, as Mr. Dalton and Plaintiffs' economic expert, Jonathan Arnold, testified. Reducing Defendants' liability by this amount would improperly credit Allegiant for allowing the policy mismatching that occurred, and for allowing the Trusts to operate through a Ponzi-like scheme. The Court does not believe Mr. Long's other reductions are reliable, for the reasons set forth in the Findings of Fact, *supra*.

Mr. Long and Mr. Dalton disagree as to whether there was any premium overpayment by the Trusts. Mr. Long opined there was not, but at the same time conceded any premium overpayment was captured in his calculation that the Trusts lost $72.3 million in value over the Allegiant tenure. Mr. Long conceded, on cross-examination, the single biggest reason he believed there was no premium overpayment was because he assumed the Lincoln life insurance policies held by the Trusts paid a growth benefit to either the Trusts or NPS, directly. Mr. Dalton opined there is no factual or evidentiary basis to believe the insurance polices paid for growth. All of the documentary and testimonial evidence indicates the policies did not pay any growth. Therefore, the Court finds Mr. Dalton's testimony to be more persuasive and concludes no reduction in calculated Trusts' losses should be awarded because of a growth benefit factor.

289

The primary area of dispute between Mr. Dalton and Mr. Long is whether the proper data field for the actuarial calculations was the accounting data used by Mr. Long, or the premium rate data used by Mr. Dalton. Mr. Long testified, by using the premium rate data, Mr. Dalton's premium overpayment calculation was overstated by $14.3 million because for single premium policies there was a double count of the premiums.

Both Mr. Dalton and Mr. Long testified their actuarial calculations did not include the Trust I debentures, or the World Service group term life insurance policy. To the extent the Court decides these were losses to the Trusts, those losses have not been included in the actuarial loss calculations. The Court will not include the Trust I debentures and World Services policy losses in the damages. Mr. Long's diminution in value analysis necessarily captures the diminution of value of any asset that had value at the start of Allegiant's tenure. Neither the World Services policy or the Trust I debentures had any value, thus, there were no losses associated with them. The record establishes trust funds were not used to purchase the World Services policy. Plaintiffs' experts testified the value of the policy was "essentially zero" when it was booked and at the end of Allegiant's tenure. Therefore, there were no trust losses associated with it.

Considering Mr. Long's exclusion of premium overpayments, the three experts' damages calculations are remarkably close to each other. Before adding in losses on the Trust I debentures, World Services Life policy, and single-premium overpayments: Mr. Long's loss calculation is $72,287,615; Mr. Dalton's loss calculation is $74,227,215; and Mr. Browne's calculation is approximately $77.1 million.

The Court has considered all of the testimony offered by Plaintiffs' and Defendants' expert witnesses on trust losses. Considering all of the evidence, the Court finds Allegiant's breaches of trust resulted in losses to the Trusts in the amount of $72,287,615.00, based on an

actuarial calculation of diminution of the Trusts' value. Defendants, as successors-in-interest, are liable for this amount.

    2.    Damages under 205(b)

Plaintiffs seek between $19.66 million for merger expenses Allegiant allegedly "would have had to indemnify National City for in the event of a termination of the merger," and/or a $25 million break-up fee in the event the merger was terminated and Allegiant was acquired by another bank within two years. Plaintiffs also ask the Court to award damages for profits made, through stock and stock options, by Allegiant's directors, officers, and employees, including Mr. Hayes, Mr. Weiss, and Mr. Morisse, that they would have lost if the merger had terminated. Plaintiffs seek these damages under Restatement (Second) of Trusts § 205(b).

The Court holds Plaintiffs are not entitled to damages for merger expenses because there is no evidence the claimed expenses were for pre-merger costs rather than for post-closing integration costs. Mr. Ramirez, who was in charge of NCB's M&A department, testified Plaintiffs' claimed expenses contained a mix of pre-merger and post-closing costs, and in some instances "the bulk of them would be post merger." Post-closing expenses are not recoverable and Plaintiffs cannot ascertain which portion is properly attributable to pre-merger expenses. Plaintiffs' merger finance expert, Anjan Thakor, conceded he cannot say to a reasonable degree of professional certainty how much of the expense damages were pre-closing expenses. These damages are speculative and will not be imposed.

Plaintiffs' damages sought for a potential $25 million break-up fee and the profits made by Allegiant's employees, are also speculative and cannot be imposed by this Court. Payment of this fee by Allegiant to NCB would have required the merger to be terminated, and Allegiant to have been acquired by another entity within a two-year period. There was no analysis presented

291

by Plaintiffs as to the likelihood of these events occurring. Many steps would have had to occur for Allegiant to have incurred the $25 million break-up fee: (1) NCB determines there are liabilities from Allegiant's administration of the Trusts; (2) NCB declares those liabilities material; (3) NCB provides notice and opportunity to cure; (4) Allegiant does no cure; (5) NCB terminates the publicly-announced merger; (6) the termination is announced to the public; (7) another bank steps in and buy's Allegiant's stock. All of these steps are hypothetical, and it is entirely speculative as to whether they would have occurred. For these reasons, the Court will not impose damages for a break-up fee or for profits made by Allegiant's employees because there is no evidence to support the merger would not have concluded. No damages will be awarded under § 205(b).

F.     Punitive Damages

In a diversity action, the propriety of an award for punitive damages and the factors to consider in granting such an award are questions of state law. *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989). In Missouri, punitive damages may be awarded when a defendant's conduct is outrageous, because of the defendant's evil motive or reckless indifference to the rights of others. *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d 1051, 1060 (8th Cir. 2014). "When someone intentionally commits a wrong and knew that it was wrong at the time, an evil motive and wanton behavior is exhibited. An evil intent may also be inferred where a person recklessly disregards the rights and interests of another person." *Id*. Punitive damages are awarded in cases alleging a breach of fiduciary duty "where the wrongful acts were perpetrated in a willful, wanton, or malicious manner." *Koester v. Am. Republican Inv., Inc.*, 11 F.3d 818, 823 (8th Cir. 1993). Every breach of fiduciary duty does not warrant an award of punitive damages. *Id*. "The remedy of punitive damages is so

292

extraordinary or harsh that it should be applied only sparingly." *Alcorn v. Union Pacific R.R. Co.*, 50 S.W.3d 226, 248 (Mo. 2011) (reversed on other grounds).

The record in this case supports an award of punitive damages. Based on all of the evidence presented at trial, the Court finds Allegiant circumvented protections created to prevent pre-need trusts from losing their assets and was a trustee in name only. The following conduct by Allegiant showed its reckless disregard for the beneficiaries: the protocol Allegiant intentionally put into place at the beginning of its trusteeship, under which it would not review any wire transfer requests before processing them; Allegiant's practice of accepting NPS's statement of death claim distribution amounts without ever understanding them or attempting to reconcile them to the amounts on deposit as required by Chapter 436, the custody agreement, and the delegation letter authored by Allegiant under which NPS could freely dictate distributions of assets.

As set forth at length above when resigning as trustee and transferring the assets to Bremen, Allegiant was in a conflict of interest with respect to its resignation as trustee and the record clearly establishes Allegiant put its interests ahead of the beneficiaries. Mr. Morisse acted dishonestly in misrepresenting the state of the trust assets to Bremen, and acted with reckless indifference to the rights of the beneficiaries by instructing Bremen on how to administer the Trusts, such that the Cassity scheme would continue.

Throughout his long testimonial experience in this case, Mr. Morisse was repeatedly asked, when making specific decisions and taking particular action, if he believed he was doing anything wrong. He always answered "No." It is the responsibility of this Court to carefully examine all of the evidence in this case, to look at actions taken by Allegiant Bank personnel, and others associated with issues presented in the case, and decide, from the weight of the

evidence, if Allegiant Bank should be assessed punitive damages. The issue is not whether Herbert Morisse is a bad person. The issue is not, looking back over more than twenty years, if some kind of isolated error was made resulting in harm. The task at hand is for the Court to decide whether conduct for which Defendants are responsible, was outrageous, because of evil motive or reckless indifference to the rights of others or where wrongful acts were perpetuated in a willful, wanton, or malicious manner.

As a relatively newly chartered bank, Allegiant's President and senior officials decided the Bank should have a trust department to demonstrate Allegiant was a full-service banking institution. None had any experience or knowledge in administering pre-need funeral trusts, and only Mr. Morisse had a little experience as a trust administrator.

This is not about the vilification of Herbert Morisse; it is about senior Allegiant Bank officials, who conducted the business of the Bank, focusing on producing money for themselves and shareholders, lacking knowledge of the operation of a trust department and the responsibilities the Bank had to individual consumer depositors and funeral home providers, accepting the NPS pre-need trusts into the Bank's trust department for a token fee to administer the trusts with an insufficient number of untrained employees, including Mr. Morisse, in the Trust department, and directing him to function in a money-losing trust department, to fulfill responsibilities neither they nor he understood. The knowingly, willful transfer of the worthless World Services Group Policy to Bremen, representing it was worth $13,522,377.35, knowing it had no value was particularly egregious.

A special Missouri statute was adopted, pertaining to pre-need funeral trusts. Chapter 436 of the Revised Statutes covered duties and responsibilities of a trustee administering pre-need trusts, among other things. Senior Bank officials were acquainted with Douglas and Brent

294

Cassity, of the Cassity family, which operated many corporations. One of these corporations was NPS, which was recognized by Allegiant Bank officials as a possible source for fund deposits into its newly fashioned trust department to satisfy the need to project the Bank as a full-service Bank for marketing purposes. The Bank was able to convince NPS officials it was able and willing to receive funds into the Bank, which would act as trustee. Initially a small amount of funds were received into trust, then all of the NPS trusts were received by the Bank.

A pernicious pattern developed, whereby Mr. Morisse was given more and more authority to administer all the trusts and to draft documents and correspondence related to the trust department as an untrained fiduciary. Mr. Morisse was always a skilled draftsman who performed legal services for the Trust Department and the Bank. He was asked by the Bank president to draft documents for the Trusts' operations, to prepare drafts of memorandums and letters for interdepartmental offices in the Bank, with Cassity-owned entities and bank examiners. It is not known precisely how much pressure was put on Mr. Morisse by senior bank officials in his drafting of documents and his activities on behalf of the Bank, but it is clear there was no intercession by any Allegiant Bank official to control Mr. Morisse's actions or redirect his reckless course. His functioning on behalf of the Bank caused, and directly contributed to cause, massive financial losses to the Trusts in this case.

When it became his responsibility to serve as trust administrator for Allegiant Bank, Mr. Morisse obtained a copy of Chapter 436. He made marks on that copy and was interrogated, at trial, extensively about his understanding of the statute. It is undisputed the Bank had contracted with a reputable St. Louis law firm which was available to Mr. Morisse for advice. He did not consult the firm to seek advice on understanding the provisions of the statute. He believed he

was qualified to serve as trust administrator for Allegiant Bank that would serve as trustee for all of the NPS trusts.

The first section of Chapter 436 was the definitions section. The number (1) definition concerned "Beneficiary," defined as "the individual who is to be the subject of the dispositions and who will receive funeral services, facilities or merchandise described in a preneed contract." For almost six years Mr. Morisse believed the only beneficiary of the NPS trusts was NPS, and he also said he thought Allegiant Bank was beneficiary. For that period, he did not consider funeral service recipients, or as they are frequently referenced, consumers or contract owners, as entitled to his care as trust administrator.

More troubling is his actions related to controlling trust assets. He testified he understood a valid trust required a grantor (NPS), a trustee (Allegiant Bank) and a beneficiary. Nevertheless, he never took control of Lincoln life insurance policies, the major assets of the trusts, but permitted the policies, or what represented the policies, to remain with NPS. After a bank examination by the Missouri Division of Insurance concluding Allegiant was in violation of Chapter 436.031 2. for not holding and controlling the policies, he drafted a "custody agreement" which allowed NPS to hold the policies and made it easier for NPS to withdraw money from the trusts. While Mr. Morisse said he knew a valid trust required a grantor, trustee and beneficiary, he took Allegiant Bank out of that equation, demonstrating his lack of understanding of the integrity of trust requirements. With the drafting of that agreement, particularly since he did not review requests for disbursements from the trusts, Allegiant Bank became a bank account for NPS, which raided the Trusts. He did not keep track to see if investments came into the Trusts, for money going out of the Trusts, and approved every single request for wire transfers out of the

Trusts, erroneously believing he could not interfere with the requests of Wulf, Bates & Murphy, investment advisor.

Mr. Morisse was confident he was not required to keep records in the Bank for amounts of money on deposit for each consumer. He never knew the amount of money any consumer paid into the Trusts he was administering. He erroneously believed every insurance policy he was buying from Lincoln was a paid-in-full policy with no future premiums required. In fact, eighty-one percent of the time, he was buying multi-pay policies requiring future premium payments, mostly for ten years, with a few for twenty years. He thought face value meant the policy was a paid up, paid-in-full policy. If he had kept records, as required by Chapter 436, he could have looked at the policies and seen he was not getting for what he was paying, he could have seen NPS was taking out policy loans on the insurance policies to pay premiums on other individuals' policies and was spending money for other than investment purposes. Chapter 436.031 5. stated: "The trustee of a preneed trust shall maintain adequate books of account of all transactions administered through the trust and pertaining to the trust generally." Under this provision, and under industry custom and practice, Mr. Morisse violated his fiduciary duties by failing to control trust assets.

If Allegiant Bank did not conclude the merger with NCB, it was to suffer penalties and senior bank officials and shareholders were going to lose many millions of dollars. During the due diligence investigation by NCB, it discovered potential "huge losses" if it accepted the NPS preneed trusts. The Bank was put on notice to divest itself of the Trusts before the merger would be completed. Mr. Morisse was tasked with the responsibility of finding a successor trustee that would assume the trust assets and trust liabilities before the merger. He knew and consulted with Mr. Markow, who was at that time with Bremen Bank, to discuss transfer of the Trusts to

297

Bremen. Mr. Morisse met with Mr. Markow and two members of his administrative staff. Mr. Morisse took copies of the NPS trust accounts and "may have taken copies of the trust instruments then or at a later time." He believes he took a copy of the most current packet for Trust IV. Mr. Markow expressed concern about the ability to deal with the volume of wire transfers. On May 4, 2004, Mr. Morisse sent a letter to Mr. Markow which included copies of account synoptic reports for each of the trust accounts and a synoptic report including basic information for each trust account. He also provided copies of the Trusts' governing trust instruments and copies of prior years' income tax returns. In all, 91 pages were produced by Mr. Morisse.

Paperwork supplied to Bremen Bank did not include the wire request transfer forms. Wire forms showing policy renewals did not go to Bremen Bank. Other information not supplied to Bremen Bank included internal bank forms, Trust IV statements showing monthly renewals of payments out of Trust IV to Lincoln, and the $454,000.00 amount due for premiums on life insurance policies. He told Bremen personnel, Bremen should report insurance values as provided by NPS without any independent reconciliation or verification by Bremen, and Bremen should simply distribute "the income out that was on the books" rather than performing the calculation in accordance with Chapter 436. This is intentional conduct known by Mr. Morisse to be in violation of Chapter 436, willfully leading Bremen away from learning the legal obligations it would be accepting.

When Trust IV was transferred to Bremen Bank, evidence of insurance in April 2004 was listed at face value of $131 million. Allegiant assigned its interest in Lincoln policies to Bremen Bank on May 20, 2004.

The Court will not repeat all that has been recorded in this opinion about the World Service Group term policy. It was transferred to Bremen as an asset having a market value of $13.5 million. Mr. Morisse drafted the document listing the assets being transferred to Bremen Bank. Bremen Bank relied on the representations made by Mr. Morisse. In fact, the World Service Group policy was worthless, not worth one cent.     Mr. Morrise did not believe Allegiant Trust Department needed to acquire a copy of the policy because "evidence of the policy" satisfied the trust's requirement. This is consistent with his mistaken belief Allegiant had no responsibility to hold and control trust assets, such belief is in violation of Chapter 436.

The World Service Group term policy represented more than eight percent of the entire value of Trust IV. Mr. Morisse would not admit this was a material amount of the Trust, stating, material is a relative and subjective term. He surprisingly said, "The Bank was not determining the prudence of any specific investment action or deposit," no matter the size of the asset. Mr. Morisse said Allegiant did not track to see if payments were being made on the $13.5 million policy. Shortly after Allegiant booked the World Service Group term policy as an asset of Trust IV, the policy lapsed and ceased to exist.

On March 24, 2004 Mr. Jurmanovich, for NCB, asked about the World Service Group policy. Mr. Morisse was embarrassed when he was interviewed by NCB's auditors, Mr. Jurmanovich and Mr. Hipskind, about the policy and the evidence of the policy. When asked by Mr. Jurmanovich about the policy, Mr. Morisse said he may have looked into whether the policy still existed.

In the prior trial, Mr. Morisse testified, in early 2004, Mr. Jurmanovich inquired, causing Mr. Morrise to look into whether the World Service term policy existed, "And when [he] looked

into it, [he] could not find not just a piece of paper. [He] couldn't find that there existed any such asset at all."

The Bank had a vault count record, considered a serious document in trust administration which was supposed to show assets being put in and taken out of the vault. Mr. Morrise believed it was presented to the Operations Department in the booking and deposit process, but did not remember if the record of the World Service Group policy was ever deposited into Allegiant's Bank vault, and he did not recall ever seeing such a record.

Mr. Morisse confirmed, in March 2004, when he could not provide paperwork, showing the continued existence of the asset, he escalated up the problem. The senior trust department officers and the back office were aware of and discussed the matter as a result of Mr. Jurmanovich's audit, and it was a concern of the back office, because they were in charge of the vault count. Mr. Morisse admitted he talked to operations manager Char DuPont who managed the vault, and believed he talked to other members of the senior trust management committee about not finding support for the policy.

From the time the asset was booked as an asset of Allegiant Bank, with a market value of over $13.5 million, the value on Allegiant's books never changed. Mr. Morisse knew a term policy became worthless if premiums were not paid. He never investigated to see if premiums were being paid. Mr. Morisse admitted he continued to book the World Services Group term policy after these inquiries were made finding no support. He reported Lincoln had no record of the policy and there was no World Service company he could find. When he went to another company, American Growth, and a separate insurance company, "they had nothing." He believes he tried to contact Lincoln-related insurance companies.

After he could find absolutely nothing verifying the policy, he put the World Service policy on the statement, representing to Bremen Bank it had a market value of $13.5 million. Mr. Morisse met with Mr. Markow and showed him the statements recommending the World Service policy had a value of $13,522,337.35. Not only could he not find existence of the policy, he drafted a document representing the value was $13,522,337.35. He agreed common sense would tell, a person reading the assignment would believe there was such a thing as the World Service policy. He said he did not think of how it might be relied upon.

Mr. Morisse was being untruthful when he testified under oath he believed the policy was in existence when he transferred what was a worthless asset. Mr. Morisse's conduct was outrageous because he had an evil motive and acted with reckless indifference by transferring a worthless asset to Bremen Bank, which he represented to Bremen Bank had a market value of $13.5 million, when he knew it was worthless and the policy did not exist.

Mr. Morisse has given untruthful testimony throughout this bench trial, as indicated above. Mr. Morisse was again untruthful when he testified under oath he believed the policy was in existence when he knowingly, willfully and intentionally transferred a worthless asset to Bremen Bank, knowing Bremen Bank believed it was receiving an asset valued by Allegiant at $13,522,337.35. Mr. Morisse's conduct was willful, wanton and malicious; he was acting with an evil motive and acting with reckless indifference, through the combination of knowingly giving false testimony throughout this bench trial and by transferring a worthless asset to Bremen Bank.

The Court has examined transcripts and exhibits for hundreds of hours, painstakingly reviewing and re-reviewing all of the evidence, knowing the high burden of Plaintiffs in

301

receiving an award of punitive damages. Without hesitation, the Court believes Plaintiffs are lawfully entitled to an award of punitive damages, in the amount of $15,000,000.

G.    *Prejudgment Interest*

Plaintiffs are seeking prejudgment interest from May 14, 2004, the last day of Allegiant's tenure as trustee, to November 28, 2018, the first day of trial, in the amount of either $116,124,981 (simple interest) or $222,053,662 (compound interest). Defendants assert prejudgment interest is not appropriate because Plaintiffs' damages are not liquidated or readily ascertainable. The Court holds prejudgment interest is appropriate in this matter, beginning on August 17, 2017, the date of the Eighth Circuit's remand to this Court, and November 28, 2018, the first day of the bench trial.

In their Motion for Partial Summary Judgment on Prejudgment Interest, Defendants asserted Plaintiffs could not recover prejudgment interest. Because the determination of whether prejudgment interest is appropriate is guided by the equitable principles of fairness and justice, *see infra*, the Court declined to rule on the issue on summary judgment because it had not heard all of the evidence. *See* ECF No. 2789. However, the Court did determine an award of prejudgment interest is not limited to situations where a trustee has used trust assets for its own purposes or retained benefit from those assets or where a trustee was required to hold trust assets in interest-bearing investments and did not do so. *Id*. The Court did hold prejudgment interest may only be awarded, even in equitable actions, when damages are liquidated and readily ascertainable. *Id*.

The question of prejudgment interest is controlled by state law. *Catron v. Columbia Mut. Ins. Co.*, 723 S.W.2d 5, 7 (Mo. 1987). An award of prejudgment interest serves two purposes: to compensate a party for the "true costs of money damages incurred" and to promote settlement

302

and deter attempts to benefit from the delays of litigation. *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir. 1986). In equitable actions, the Court is guided by the principles of fairness and justice when determining whether to award prejudgment interest. *Health Care Found. of Greater Kan. City v. HM Acquisition, LLC*, 507 S.W.3d 646, 668 (Mo. Ct. App. 2017).

Damages are liquidated when "the amount becomes due and is fixed and determined or readily ascertainable by computation or a recognized standard." *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo. Ct. App. 2008). A party's denial of liability or defense against a claim, or a dispute as to the amount of damages, does not preclude an award of prejudgment interest. *Id*. Prejudgment interest may be awarded even in cases where a damage calculation is dependent on expert testimony. *Unlimited Equip. Lines, Inc. v. Graphic Arts Ctr., Inc.*, 889 S.W.2d 926, 942 (Mo. Ct. App. 1994).

In this case, damages did not become readily ascertainable until the Eighth Circuit's holding the case must be decided pursuant to trust law. Initially, Plaintiffs' pursued a damages theory under tort law, which the Eighth Circuit rejected. Plaintiff's theories and claims for categories of damages vacillated over the course of this litigation, making damages initially unascertainable. *Macheca Transport Co. v. Phila. Indem. Ins. Co.*, 737 F.3d 1188, 1197 (8th Cir. 2013). Not only were Plaintiffs' damages unascertainable, applying the principles of fairness and justice as is appropriate in equitable actions, the Court does not find it would be fair to charge Defendants with prejudgment interest for a time period in which they successfully defended their legal claims. However, once the Eighth Circuit determined the case should be decided pursuant to trust law, the damages became readily ascertainable. Therefore, the Court finds Plaintiffs' are entitled to prejudgment interest to compensate them for the "true cost" of the loss of trust assets.

When a court awards prejudgment interest in an equitable action, the rate of interest is set by Missouri Revised Statute § 408.020, which states interest is set at nine per cent per annum. *Health Care Found. of Greater Kan. City*, 507 S.W.3d at 668-69; Mo. Rev. Stat. § 408.020. The statute does not specify whether simple or compound interest should be applied. *Id*. Courts may assess compound interest when "justice requires it to serve the cause of equity" or if the parties have consented to it in the contract or agreement at issue. *Health Care Found. of Greater Kan. City*, 507 S.W.3d at 669. Compound interest has been upheld in cases where there has been a breach of fiduciary duty such as self-dealing or commingling of funds. *Id*. The Restatement (Second) of Trusts § 207 states a trustee is chargeable with compound interest only when (a) he has received compound interest, (b) he received a profit at least equal to compound interest, or (c) it was his duty to accumulate the income. Because there was no self-dealing or commingling of funds in this case, and the three situations outlined in Restatement (Second) of Trusts § 207 do not apply, the Court will award simple interest, not compound interest.

Therefore, the Court will award simple interest from August 17, 2017, to November 28, 2018, at a rate of nine percent per annum, for a total amount of $14,847,678.07 in prejudgment interest.

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that judgment shall be issued on behalf of Plaintiffs, against Defendants National City Bank, N.A. and PNC Bank, N.A., in the amount of $72,287,615.00 in damages to the Trusts, $14,847,678.07 in prejudgment interest, and $15,000,000.00 in punitive damages, for a total of $102,135,293.07.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Judgment Against PNC Bank on Allegiant's Breaches of Trust and PNC's Investment Advisor Defense [2526] is **DENIED**, as moot.

**IT IS FURTHER ORDERED** that Defendants' Motion for Judgment on Partial Findings Under Federal Rule of Civil Procedure 52(c) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Rule 52(c) Judgment Against PNC Bank on PNC's Affirmative Defenses is **DENIED**.

An appropriate judgment will accompany these Findings of Fact and Conclusions of Law.

So Ordered this 3rd day of July, 2019.

_____
**E. RICHARD WEBBER**
**SENIOR UNITED STATES DISTRICT JUDGE**

305